---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

BLAINE FRANKLIN SHAW, et al.,
*Plaintiffs-Appellees,*

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

———

MARK ERICH, et al.,
*Plaintiffs-Appellees,*

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

---

## APPELLANT'S APPENDIX VOLUME IV

---

Appeal from the United States District Court for the District of Kansas
Honorable Kathryn H. Vratil, Senior District Court Judge
District Court Case Nos. 19-CV-1343-KHV and 20-CV-1067-KHV-GEB

---

**OFFICE OF ATTORNEY GENERAL**
**KRIS W. KOBACH**

120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
(785) 296-2215
anthony.powell@ag.ks.gov
dwight.carswell@ag.ks.gov
kurtis.wiard@ag.ks.gov

Anthony J. Powell
*Solicitor General*
Dwight R. Carswell
*Deputy Solicitor General*
Kurtis K. Wiard
*Assistant Solicitor General*

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

Transcript of Motion Hearing
      (ECF No. 356) ...................................................................................... 1

UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

BLAINE SHAW, ET AL.,                )
                                    )    Case No. 19-1343-KHV
    Plaintiffs,                     )
                                    )
    v.                              )    Kansas City, Kansas
                                    )    Date:  1/3/2023
HERMAN JONES, ET AL.,               )
                                    )
    Defendants.                     )
..................................

TRANSCRIPT OF MOTION HEARING
PROCEEDINGS HELD IN CHAMBERS

BEFORE THE HONORABLE KATHRYN H. VRATIL
SENIOR UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiffs:

Brian M. Hauss                      Sharon Brett
American Civil Liberties            ACLU Foundation of Kansas
Union Foundation - NY               6701 W. 64th Street
125 Broad Street                    Suite 210
New York, NY 10004                  Overland Park, KS 66202

Madison A. Perry
Spencer Fane, LLP - KC
1000 Walnut Street
Suite 1400
Kansas City, MO 64106


For the Defendants:

Arthur S. Chalmers
Office of Attorney General - Kansas
120 SW 10th Avenue
Topeka, KS 66612-1597

Proceedings recorded by machine shorthand, transcript produced
by computer-aided transcription.

1                         I N D E X

2

3    Order to Show Cause                                30

4    Ruling on Fourth Amendment Summary Judgment       36

5    Ruling Testimony of Christi Asbe                   36

6    Ruling Moving Trial to Kansas City                 39

7    Ruling Motion in Limine Expert Aden                40

8    Ruling Motion in Limine Mummolo Expert             56

9    Discussion Samuel Shaw Settlement                  60

10   Discussion Settlement Offer Deadline               67

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (Court called to order.)

2           THE COURT:  And, I mean, I want to say, so this is --

3   this is the first time I have ever had a case which combines

4   regular 1983 claims against individual officers with an

5   *Ex parte Young* claim and no claim against, in this case,

6   Mr. Jones and in his personal capacity.  And I'm kind of

7   spinning trying to get my head around what you all seem to

8   think are the governing standards and what I think are the

9   governing standards.  I'm not sure I figured it out, so I want

10  to start by asking what -- why did you sue Jones only in his

11  official capacity and how -- how do you think that changed --

12  how do you think your decision changes what we would be doing

13  if it weren't in his personal capacity?

14          MS. BRETT:  So my understanding is that the

15  Eleventh Amendment requires the suit be against Jones in his

16  official capacity as the head of the agency.  And it's just a

17  suit for prospective for leave against Jones, which is sort of

18  a different posture than if we were suing, say, a police

19  department of, you know, the City of Kansas City, Kansas.  The

20  official capacity lawsuit is about, you know, his decisions as

21  the policy maker for the agency and his oversight of the agency

22  and the actions of the individual troopers within that agency.

23  So that's the proper vehicle to use as the *Ex parte Young*

24  lawsuit against Defendant Jones in his official capacity.

25          THE COURT:  So you're saying that you think you could

19-1343 Shaw et al v Jones et al  1.3.23                    4

```
 1    not have sued him in his personal capacity?

 2              MS. BRETT:  That's my understanding as well.

 3              THE COURT:  And do you agree with that, Mr. Chalmers?

 4              MR. CHALMERS:  I don't think there's evidence that

 5    would support a claim against him in his individual capacity.

 6    I think that would require --

 7              THE COURT:  Now, stop, I'm just talking about

 8    theoretically.

 9              MR. CHALMERS:  That's -- and I think that explains it.

10    I mean, he's like any other individual.  A person can be sued

11    in his individual -- in his individual capacity.  Just he

12    happens to be the head of the KHP doesn't change that.  But I

13    agree that if what you're doing is essentially suing KHP, then

14    he has to be sued in his official capacity.

15              THE COURT:  But, I mean, do you agree that they --

16    they could -- I'm not saying that it would be a meritorious

17    claim, but that in theory they could have brought a personal

18    capacity claim against him under 1983?

19              MR. CHALMERS:  Sure.

20              THE COURT:  I mean, that's the way I see these cases

21    teed up all the time.  So I've never seen one that's brought as

22    what you all are referring to as an *Ex parte Young* case.  And

23    it's very confusing to me, because I'm having a hard time

24    figuring out what the standards of liability would be if there

25    even is a standard of liability.  And I find myself kind of
```

19-1343 Shaw et al v Jones et al  1.3.23                    5

1   going and coming around because you're taking the language from

2   -- from the 1983 cases in *Monell* and acting like this is a case

3   against him in his personal capacity where you are trying to

4   establish that he has a pattern or practice of responsibility,

5   but you're specifically disavowing any reliance on that line of

6   cases, and I don't get that.  I don't understand what you're

7   trying to accomplish here.

8           MS. BRETT:  Sure, I'm happy to speak to that a little

9   bit if that would be helpful.

10          THE COURT:  Sure, please.

11          MS. BRETT:  So I think we intentionally in the

12  complaint stayed away from asserting a traditional *Monell* claim

13  for liability because a *Monell* claim is not an appropriate type

14  of claim against a state actor.  It's the type of claim that's

15  issued against municipalities, and the *Monell* decision

16  discusses as much, that it is a specific to claims against a

17  municipality, his holding municipality reliable -- or liable

18  for the actions of individual officers.

19          Here it is a claim that is about the practices of KHP.

20  It's about what they are doing in practice on a widespread

21  scale.  So I certainly understand that there's overlap in the

22  language used to discuss the claim, but what we're trying to

23  say in our papers is that a claim for *Monell* liability needs to

24  meet the standards that the Supreme Court and the Tenth Circuit

25  have held out for holding a municipality liable for the actions

1   of individual officers, and that's not what we are doing here.

2   What we are doing here is more akin to a traditional tort

3   lawsuit under *Ex parte Young* against Jones who is, we assert,

4   engaging in and endorsing and promulgating a widespread

5   practice of violating the constitutional rights of motorists by

6   detaining them without adequate reasonable suspicion.

7          So I certainly understand that there's some tension

8   there, and I think it's -- as a doctrinal matter, it is quite

9   interesting because it doesn't come up in your average case.

10  Most cases, under 1983 liability, are going to be against

11  municipalities or counties because that's where most law

12  enforcement authority lies rather than at the state level.  So

13  it's infrequent that the -- the head of a state police agency

14  would be sued, which is why you don't have a ton of authority

15  on the proper standard for an *Ex parte Young* lawsuit against

16  the head of a state police agency.  It's just there's only a

17  small number of them as compared to the number of law

18  enforcement agencies at the municipality level or at the county

19  level.

20         So I think that's why there's a little bit of a lack

21  of law sort of laying this out very clearly, but I do think

22  that there is law saying that the -- the heightened standards

23  that the Supreme Court has found must be met to hold a

24  municipality liable under a *Monell* theory don't have the same

25  application in an *Ex parte Young* lawsuit, and that's what we

1   are trying to tease out in our pleadings.

2           THE COURT:  So what do you think the standard is?

3           MS. BRETT:  I think it's whether -- I think we address

4   this most clearly in our reply brief in support of our

5   affirmative motion for summary judgment.  It's -- it's almost

6   one of tort liability.  It's the actions of Defendant Jones,

7   does he have the -- were his actions the ones that were

8   contributing to and allowing a pattern of unconstitutional

9   conduct to continue unabated.  And we are arguing that because

10  he is the principal policy maker, he is the one that is

11  endorsing this policy.  He is the one who is basically signing

12  off on it and saying this is what troopers should do under my

13  watch; that -- that he is responsible for these continued

14  constitutional violations in that way and he's the proper

15  vehicle for injunctive relief.

16          THE COURT:  So you both filed cross-motions for

17  summary judgment, and I've been really struggling with them

18  because obviously you all disagree about what the standard of

19  liability should be and you -- you refer to this *Ex parte Young*

20  claim, and I really do not know what that would be.  I don't

21  know what an *Ex parte Young* claim would be because, as I

22  understand *Ex parte Young*, it has to do with sovereign immunity

23  and, you know, the capacity in which Jones could be made a

24  defendant here in court, but it doesn't really speak to the

25  circumstances in which you would grant relief against him.  It

1   doesn't say what does plaintiff have to show other than ongoing

2   constitutional violations and some connection between Jones and

3   those violations.  I mean, is there more to it than that?

4          MS. PERRY:  No, I think that's exactly right, Your

5   Honor.  I think what plaintiffs need to show is that he is

6   responsible or connected to those alleged constitutional

7   violations, and so that here that's what we've alleged and

8   argued:  that he's maintaining that practice and he's doing

9   that through endorsing this policy of permitting impermissible

10  factors as a -- as part of a reasonable suspicion calculous.

11  He is endorsing the policy even in this litigation by saying

12  that troopers can continue to rely on those factors:  the

13  travel plans, the residency, destination, origin from drug

14  source areas.

15         But specifically back to your question on what the

16  standard is, I think you're right, Your Honor, what we need to

17  prove is he's connected to those alleged constitutional

18  violations, that causal nexus language.

19         THE COURT:  All right.  So we're on the same page so

20  far.  So -- and we'll come to Mr. Chalmers' argument that you

21  need also show pattern or practice, whatever, but for now let's

22  assume we're on the same page.  What are the ongoing

23  constitutional violations that you believe you will be able to

24  prove?

25         MS. PERRY:  Sure.  So those are Fourth Amendment

1   violations.  We have the examples of the three stops related to

2   our plaintiffs:  that's the Erich and Maloney stop with their

3   children, that is the Shaw stop, that is the Bosire stop.

4           Those would be three examples of the constitutional

5   violations.  We also have Mr. Mummolo's report this practice is

6   widespread, that troopers continue to rely on travel plans or

7   residency as part of detaining drivers for canine sniffs.

8           And we also have trooper testimony, which a number of

9   troopers have testified, and that goes from Jones' testimony at

10  the head of the agency, that general counsel's testimony, as

11  well as a number of troopers, including troopers who train

12  other troopers, that they are continuing to rely on these

13  impermissible factors.  And then Dr. Mummolo's report really

14  pulls that together that shows that this is happening.

15          MS. BRETT:  And will continue to happen into the

16  future.

17          MS. PERRY:  Yes.

18          THE COURT:  Okay.  So the three stops that you

19  mentioned, those were in 2017 and 2019; right?

20          MS. PERRY:  2017, 2018 and 2019.

21          THE COURT:  Okay.  So you don't have any evidence of

22  specific stops of specific people in the last three years?

23          MS. PERRY:  So in the summary judgment record, we

24  supported that with Dr. Mummolo's evidence.  But, generally

25  speaking, yes, at trial we would plan to call certain Rule 26

1    witnesses that we've disclosed, and there are other stops at

2    issue, yes.

3         THE COURT:  Okay.  And who -- how many are there and

4    when were they and that kind of thing?

5         MS. PERRY:  Sure.  And so the answer is there are

6    Rule 26 disclosures.  I believe we disclosed around 20 stops

7    with the benefit of Dr. Mummolo's testimony showing that it's

8    widespread.  We plan to call somewhere between three and five

9    Rule 26 witnesses, and they are spread out in the time frame of

10   that 2017 to 2019 period.  In addition, we have stops -- is it

11   '20 and 2021?

12        MS. BRETT:  We have one as recently as this August we

13   plan to call as a Rule 26 witness.

14        MS. PERRY:  And that specific one, Your Honor, was

15   part of a discovery dispute that we had earlier in this case.

16   We asked for additional discovery when we learned of his stop.

17   That discovery was denied, but we do still plan to call him as

18   a witness.

19        THE COURT:  Okay.  So we've got the three stops

20   involved in this case.  At trial you say there will be evidence

21   of three to five additional stops, the most recent one being

22   from August of 2022.

23        MS. BRETT:  That's correct.

24        THE COURT:  And as to -- how do you pronounce his

25   name?  Mummolo?  Mummolo?

1          MS. PERRY:  Mummolo.

2          THE COURT:  I've read his report.  I understand what

3    he says about the disproportionate number of stops and that

4    kind of thing, but we don't know anything about stops of these

5    hypothetical other people in terms of whether they consented to

6    the detention or anything about the circumstances there; right?

7          MS. PERRY:  Yes, Your Honor, but in part that's

8    because the Kansas Highway Patrol does not keep records --

9          THE COURT:  Doesn't matter.

10          MS. PERRY:  -- of stops.

11          THE COURT:  Doesn't matter.  I'm just talking about

12    what the evidence would be that the jury might hear.

13          So -- so we don't really know anything about whether

14    the drivers consented to a prolonged detention or whether they

15    had committed a traffic violation or anything like that?

16          MS. BRETT:  I actually do think we have some of that.

17          THE COURT:  Okay.  What is it?

18          MS. BRETT:  In the form of the canine sniff reports.

19    So for many of those which we reviewed -- in which Dr. Mummolo

20    reviewed as part of his analysis, there is an explanation

21    saying, "I asked for a consent and was denied," "I suspected,"

22    "I had reasonable suspicion to detain the person for a canine

23    sniff, and then I conducted a canine sniff."  So for a number

24    of those there is some sort of narrative write-up.  It is

25    certainly not the entire universe of canine sniffs where that

1    narrative write-up is included, but I think we included some of

2    those in the summary judgment record --

3              THE COURT:  Okay.

4              MS. BRETT:  -- as well as some complaints that were

5    filed with the Professional Standards Unit of KHP where people

6    complained of the exact same conduct we alleged happened to our

7    individual clients.

8              THE COURT:  Okay.  And if -- for the three stops at

9    issue here if we go to trial and plaintiffs lose, have you

10   thought about whether they would have standing to seek relief

11   injunctively on behalf of these three to five other people who

12   will be testifying?

13             MS. BRETT:  Yes.  And I think this came up at the

14   hearing that Your Honor held in August of 2021, the specific

15   question of:  Is the liability of Jones necessarily dependent

16   on a finding of liability against the individual named

17   troopers?  And we said that it was not, and Mr. Chalmers on the

18   record said that it was not as well, that the claims against

19   Superintendent Jones did not require a finding of liability on

20   behalf of the individual trooper officers in the damages

21   claims.

22             THE COURT:  Did you say that?

23             MR. CHALMERS:  Yeah, that's accurate.

24             THE COURT:  Okay.

25             MR. CHALMERS:  It's -- now you're talking about a

1    finding of liability.  I'm not necessarily talking about

2    standing, which is a little bit different issue, which I think

3    is what you had inquired about.  But the law has been that you

4    can have someone who may not be able to recover for a past

5    event who, if they can, in my view, satisfy the rigorous

6    requirements to have standing to the circuit claim for

7    injunctive relief prospectively, now you're looking at the

8    likelihood of them encountering the same experience that would

9    be a violation of those constitutional rights.  So, yeah,

10   conceivably you could have a policy that is ongoing approved

11   and that would be separate from.  You don't have to prove

12   liability for the -- from their prior experience.  It comes up

13   in qualified immunity situations quite a bit.

14          THE COURT:  Yeah, I'm thinking factually how that

15   would play out in this case.  Because I know, in your response

16   to the motion to sever, you say, well, the fact that plaintiffs

17   might lose their individual claims isn't dispositive because

18   you could have situations where there's nobody that is held

19   individually accountable but there's kind of a disbursed

20   responsibility, and you know, therefore, you could hold Jones

21   responsible even without -- or you could hold any state actor,

22   I guess, responsible even without proof that anybody was

23   personally liable for the constitutional violation.

24          I don't see factually how that would play out in this

25   case.  I mean, it seems to me that for these particular three

1    stops either plaintiffs' constitutional rights under the Fourth

2    Amendment were violated or they weren't.  And if they were,

3    they were violated by the officers who stopped them and not

4    some other people.  So who -- what's -- what am I missing here?

5           MS. BRETT:  Well, they have standing to bring the

6    claim against Superintendent Jones for prospective relief on

7    the basis that they will continue to travel through the state

8    of Kansas.  And if this is a widespread practice where

9    out-of-state motorists are targeted for traffic stops and for

10   prolonged detentions for the purposes of canine sniffs without

11   adequate reasonable suspicion, that there's a likelihood that

12   they could be subjected to that again.

13          And Ms. Perry can speak more to standing on the

14   injunctive relief claim generally, but that is the essence of

15   their -- of their prospective relief claim:  that they will be

16   engaging in this type of travel again in the future and that

17   the widespread practice that Superintendent Jones endorses

18   subjects them to the possibility that they will have their

19   constitutional rights violated again in the future.

20          THE COURT:  So, I mean, one of the issues I have with

21   your summary judgment briefing is you confuse and conflate the

22   issues of standing and the merits of your right to an

23   injunction.  So, yes, I agree they have standing because

24   they've alleged that they intend to travel on the highways in

25   Kansas in the future.  I think that does not mean that they --

1    just because they have standing doesn't mean they are entitled

2    to injunctive relief because you have to show more in the way

3    of a likelihood of future injury.  The likelihood of future

4    injury has to be non-speculative and, you know, that kind of

5    thing.

6         And so we've gotten kind of far away from where we

7    started here, but I don't see -- I don't see, especially if

8    they -- if they lose on their underlying claim -- Fourth

9    Amendment claims, I don't see the likelihood of them being able

10   to prevail on their injunctive claims.

11        MS. PERRY:  Well, I think too I'd just point to the

12   evidence that we already talked about too.  In addition to the

13   three stops, we've talked about standing for the injunctive

14   relief claim.  As far as the evidence, the evidence is more

15   than their three stops.  The evidence is also the widespread

16   practice, and that comes from other stops and other witnesses

17   that we'll bring in the other PSU complaints, other --

18   Dr. Mummolo's report about how widespread this is, and also

19   just trooper testimony too.

20        THE COURT:  So as you're saying some -- I'm thinking

21   about the issue of how we configure these trials.  So if we --

22   if we have a trial on the individual plaintiffs'

23   Fourth Amendment claims and they lose -- well, let's say they

24   win, okay.  So they win.  Let's say they have -- we have two

25   trials on the Fourth Amendment claims -- two or three?

1        MR. CHALMERS:  Two.

2        THE COURT:  That's what I thought.

3        MS. PERRY:  Two.  The third stop doesn't have any.

4        THE COURT:  Okay.  And you think we could do each of

5   those within three days?

6        MR. CHALMERS:  I think so.  I think we could do two

7   days, but maybe I'm being overly optimistic with lawyers who

8   like to hear such talk.

9        THE COURT:  I've never had a two-day jury trial.  By

10  the time you pick the jury and instruct the jury, there's two

11  days itself.  How long do you think it would take to try each

12  of the underlying claims?

13       MS. BRETT:  Well, so I think maybe we'll start from

14  the -- from the position that we don't think that the claims

15  should be severed.

16       THE COURT:  Right, I'm aware, yeah.

17       MS. BRETT:  But that said, I think we have evidence

18  that we want to put on for punitive damages.  We still have a

19  live claim for punitive damages for each of them, too.  So I

20  think it would take quite a few days to try each one

21  individually.

22       MS. PERRY:  Essentially we believe that the evidence

23  would be overlapping each of the trials, so we think we would

24  be closer to seven days at a minimum for each of the trials.

25       THE COURT:  So, I mean, I don't -- I'm not saying that

 1    this is my final ruling on the subject, but the way I see this

 2    right now, and I guess you need to talk me out of this because

 3    it could become my final ruling, is that what makes the most

 4    sense is to sever the claims of each set of defendants -- I

 5    mean, plaintiffs.  So we would have two -- two trials on the

 6    underlying Fourth Amendment claims and then we would kick down

 7    the road the claims against Jones.  If plaintiffs win on their

 8    underlying claims, then they would have whatever damages,

 9    actual and punitive and/or punitive, and they could seek

10    injunctive relief.  I don't know that we would need another

11    trial about that, but whatever, that would be a bench trial,

12    and that's not something we would need to build into this

13    schedule right up front.

14          If plaintiffs lose on those individual claims, then I

15    would think the case is basically over, because I don't see

16    that they would have standing to seek injunctive relief any

17    more than some random person on the street, we would have a

18    right to seek injunctive relief to -- of the kind that you're

19    asking for.

20          So tell me what's wrong with that.

21          MS. PERRY:  Go ahead.

22          MS. BRETT:  So a few things.  I think that severance

23    of these trials is supposed to be the exception rather than the

24    rule, and I think the arguments that we laid out for why it

25    doesn't meet that exception in our briefing are -- are valid

1   ones here:  that I think there's overlap among the claims and

2   amongst the evidence that would be presented, and having a

3   number of separate trials here is prejudicial to the plaintiffs

4   in how they want to present their case and not a good use of --

5   of everyone's resources in the sense that we're going to have

6   to call multiple witnesses multiple times and it would lead to,

7   I think, some very sticky logistical issues to work out in that

8   respect, including what we do with different jury verdicts,

9   right, or how we want to decide the ultimate question of

10  qualified immunity, which I am assuming the defendant troopers

11  are going to raise again.

12         It is possible that the jury finds a Fourth Amendment

13  violation and that Your Honor rules ultimately that qualified

14  immunity precludes relief.  In that case do the individual

15  plaintiffs prevail for the sake of having standing to go

16  forward on their claim against Jones?  I think that the case

17  law would say they do because, you know, the qualified immunity

18  analysis is what prevented them -- prevented them from getting

19  relief from the jury verdict.

20         But I think, you know, at bottom the plaintiffs

21  brought these cases -- these claims in a single case because

22  they are -- with the exception of the Erich and Maloney

23  plaintiffs who are joined into our case, because we --

24         THE COURT:  I thought we -- I thought they were

25  separately filed.

1          MS. BRETT:  No.

2          THE COURT:  We consolidated them for discovery.

3          MS. BRETT:  So -- so the Shaws filed their case pro se

4    originally and then we filed a First Amendment amended

5    complaint also adding Mr. Bosire's claims in, and then the

6    Erich and Maloney plaintiffs were a separate case that was then

7    consolidated for all purposes with ours later on.  But the

8    Shaws and Mr. Bosire were in one case with claims for

9    injunctive relief against -- against Jones in that case.

10         THE COURT:  So, I mean, if I could just jump in here,

11   I don't think they were properly joined, and so I -- it doesn't

12   give me any heartburn to split them apart at this point because

13   they -- I think the rules of joinder under -- I can't remember,

14   is it 17 or 16?

15         MR. CHALMERS:  Might be 20.

16         THE COURT:  I might have to actually look at the rule

17   book, but because they -- they don't -- there's no joint

18   liability or possibility -- there's no problem if there are

19   inconsistent verdicts here because they were independent

20   events, and the only real connection is that they have the same

21   theory and some of the same facts.

22         MS. PERRY:  I believe the injunctive relief ties them

23   as well, because both of the individual stops support the

24   injunctive relief claim, and so I think that's too where the

25   joinder comes in.

1          THE COURT:  Well, I mean, if we get to that point, we

2    could consolidate the trials for purposes of injunctive relief

3    and handle that as one proceeding.

4          MS. PERRY:  And I think too, just getting back to the

5    evidence, because I think some specifics are helpful when we're

6    considering these things, for example, I know Ms. Brett said

7    the punitive damages are still on the table.  One of the main

8    purposes of punitive damages is deterrence, and that's not only

9    against the individual troopers but other troopers.  And so

10   showing a jury that this a widespread practice is very

11   important to any claims in punitive damages.  So I just want to

12   raise that too.

13         And also the number -- the witnesses -- I know

14   Ms. Brett has talked about it, witness inconvenience and coming

15   to these trials, we do have a number of out-of-state witnesses

16   who would be traveling and do have that time blocked off on the

17   6th, the week.

18         THE COURT:  Okay.  Anyway, go ahead.  Is there

19   anything else you want to say about that scenario that I laid

20   out?

21         MS. BRETT:  No, Your Honor.  I think we continue to

22   believe that the way we should present the case is as one case

23   and that there are proper avenues through limiting instructions

24   and controlling the presentation of evidence that would

25   alleviate concerns of having a damages claims and a -- an

1    *Ex parte Young* claim tried jointly.

2           THE COURT:  Don't -- please don't say *Ex parte Young*

3    claim unless you're going to tell me what that is.  You still

4    haven't.

5           MS. BRETT:  A claim for injunctive relief, Your Honor.

6           THE COURT:  Usually those happen at the end of the

7    case, you know, after there's been an underlying violation

8    which is established.  And actually that's why I have a lot of

9    heartburn with both of your cross-motions for summary judgment,

10   because at this point we have no evidence of any constitutional

11   violations.  Zero.  I mean, not only do we not have any

12   verdicts, but, I mean, we have conflicting evidence of whether

13   there's a constitutional violation.  So really how could you be

14   entitled to summary judgment?

15          MS. PERRY:  I understand the issue, Your Honor, but I

16   think we would just, again, point to the fact there can be a

17   verdict from Dr. Mummolo's evidence, these other stops, the PSU

18   complaints, all of that evidence is what we would point to.

19          THE COURT:  And that's another -- that's another

20   stumbling block that I have with the way both sides have teed

21   this up, because you are arguing that it's a constitutional

22   violation for them to instruct the troopers to do A, B, C,

23   right, or to fail to prevent them from doing A, B, C, and it's

24   not.  I mean, it's not -- there's nothing inherently illegal in

25   what they teach the officers.

1          What's illegal is there's a violation is what happens

2     with the boots on the ground, the interaction between the

3     driver and the troopers, and that's the missing piece, you

4     know, in this whole summary judgment context and in Mummolo's

5     numbers too.  Because without knowing the length of the

6     detention, how long it was prolonged, what the driver said, all

7     of that, we don't know if it -- if it's illegal.  So neither --

8     you can't show that there's no constitutional violations

9     because in your cross-motion we have to give them the benefit

10    of every favorable inference, and you haven't shown any

11    constitutional violations let alone any ongoing violations.

12         So is there anything, as a practical matter, that I

13    can really do with these motions?  That's why we haven't ruled,

14    because it seems kind of like a fool's errand from our

15    standpoint to put a lot of time and energy into this.  It looks

16    to me like you have the cart before the horse.

17         Unless we have some established constitutional

18    violations, how can we address whether injunctive relief is

19    appropriate?  We don't know if the violations are ongoing,

20    whether they're stale, what.

21         MS. BRETT:  I think, Your Honor, maybe one alternative

22    framing or way of looking at it, is the claim that we have for

23    injunctive relief is that the way Jones is leading his

24    department is fostering the possibility of continued ongoing

25    constitutional violations.  We posit there will be enough

1    evidence that we produce at trial to show that these

2    constitutional violations are ongoing.  But the evidence that

3    we put forth in our summary judgment motion shows that he is

4    encouraging troopers to violate the law by ignoring *Vasquez*.

5         THE COURT:  Doesn't matter if they're not actually

6    violating it.  It's the flip side of the argument.  You know,

7    we're certified; therefore, you know, that means that we're

8    more likely to follow the law.  We teach good police

9    procedures; therefore, our officers aren't violating the law.

10   Well, you can teach them to violate the law, but that doesn't

11   mean they're going to violate it.  So there's like this gap

12   analytically between.  The teaching really, I think, is a red

13   herring.  Unless there's actual violations that are occurring,

14   it really doesn't matter what they're taught; right?

15        MS. BRETT:  And I think our position is that we show

16   both.  I understand that Your Honor doesn't see that as clearly

17   in the record as we may have liked, but I think our position is

18   that we show, both in the papers -- and we intend to show both

19   at trial, both that this is what Jones is encouraging troopers

20   to do and it is what, in fact, troopers are doing, and that we

21   can show that by the testimony the individual troopers that we

22   deposed gave where we said, "Do you consider this?" and they

23   said, "Yes, we consider these factors," which the Tenth Circuit

24   has said you're not supposed to consider.  "We give weight to

25   this under the totality of the circumstances," and the Tenth

1    Circuit has said you shouldn't give weight to that.  And

2    troopers testified that, in their practices today as they

3    currently police on Kansas highways, that they are doing that.

4         THE COURT:  What if I don't agree with your

5    interpretation of *Vasquez*?

6         MS. BRETT:  Well, then that's a different question.

7         THE COURT:  Yeah, also, the Texas two-step thing,

8    there's nothing in the abstract that is illegal about that.

9    And teaching officers that that's something they can do is not

10   a constitutional violation.  So it's all how it plays out on

11   the ground.

12        MS. BRETT:  That I certainly agree with, Your Honor,

13   there is nothing inherently unconstitutional about the

14   two-step.  We point to the two-step as a tactic that the KHP

15   engages in in its violation of motorists' constitutional rights

16   on an individual basis.  And I think we intend to present

17   evidence through our -- our named plaintiffs as well as Rule 26

18   witnesses the two-step is used to detain them without adequate

19   reasonable suspicion.

20        THE COURT:  So if -- if any of the plaintiffs get a

21   favorable verdict on the underlying Fourth Amendment claim,

22   then they would seek injunctive relief against Jones and --

23        MS. BRETT:  I don't want -- I don't want to cut Your

24   Honor off in your chain of thought.  I do want to just note too

25   the Erich and Maloney plaintiffs do not have a claim for

```
 1    damages.  They only have a claim for injunctive relief.  And I
 2    don't think it would be fair to foreclose their, you know,
 3    ability to seek injunctive relief against Defendant Jones on
 4    the basis of the Shaws and Mr. Bosire losing their claims at
 5    trial.
 6              THE COURT:  Okay.
 7              MS. BRETT:  I do think that's an important thing to
 8    talk about here.  They just joined for the injunctive relief
 9    claim.
10              THE COURT:  I guess then no matter what happens with
11    the liability trials, then we would take up the question of
12    injunctive relief.
13              MS. BRETT:  I think that's the case, Your Honor.  And
14    I think Your Honor, in ruling over a bench trial, would serve
15    as the fact finder on the -- the Erich and Maloney plaintiffs'
16    claims about their own constitutional violation.
17              THE COURT:  So in your cross-motions for summary
18    judgment, nobody really talks about what the standards would be
19    for the court to enter injunctive relief.  Just because -- so,
20    I mean, there's a -- there's a huge body of law about when it's
21    appropriate to enter injunctive relief and for what reasons.
22    None of you talk about that in the summary judgment --
23    cross-motions for summary judgment.  Nobody talks specifically
24    about the injunctive relief that you're asking for.
25              And, frankly, I think the injunctive relief that
```

```
 1   you're asking for is so intrusive and overreaching that,
 2   honestly, I can't imagine myself granting it.  And I -- I would
 3   almost invite you -- well, it's not part of the -- the
 4   cross-motions for summary judgment and I'm not going to make a
 5   ruling on that right now, but have you all looked at some of
 6   the Supreme Court cases and Tenth Circuit cases about when it's
 7   appropriate to enter injunctive relief?
 8          Basically I think what you would be asking me to do
 9   is, first of all, completely unworkable, because then I would
10   be basically in a role of monitoring and supervising every
11   traffic stop by the Kansas Highway Patrol to see if it complies
12   with the injunction that has been entered.  I think it raises
13   huge issues about federalism and comity with regard to state
14   law, law enforcement procedures.  It's -- we don't have the
15   resources to do that.
16          And I -- I think it's particularly of concern that the
17   Fourth Amendment is already one of the most vigorously
18   protected parts of the Constitution.  We've got various ways
19   that people can vindicate denial of rights under the Fourth
20   Amendment from motion to suppress, tort liability under state
21   law, federal constitutional liability.
22          I guess I just don't see a need for the kind of
23   injunctive relief that you're seeking.  So I would let you
24   brief this before I would make a ruling on it, but just as a
25   practical matter so -- so there's another part of the tail --
```

1    the --

2            COURTROOM DEPUTY:  Cart before the horse.

3            THE COURT:  Cart before the horse.  Thank you very

4    much.

5            So not only do we have no evidence at this point of

6    ongoing constitutional violations, but if the only reason that

7    we're doing all this litigation about Jones and the practices

8    and policies and procedures is to get to injunctive relief, I

9    don't think we're going to get to injunctive relief, and that's

10   a practical matter that I think we have to take to -- into

11   account as we're figuring out the trial strategy and whether

12   we're going to sever or bifurcate or whatever.

13           I mean, I feel like, just looking at the pretrial

14   order and seeing the kind of injunctive relief that you're

15   asking for, we could almost do a judgment on the pleadings and

16   save everybody the time and the expense of getting witnesses in

17   to testify about that, because, like I said, I just don't see

18   that happening.

19           MS. BRETT:  Well, I'll say, first of all, that, of

20   course, Your Honor has the discretion to craft injunctive

21   relief --

22           THE COURT:  Right.

23           MS. BRETT:  -- that you find to be appropriate --

24           THE COURT:  Right.

25           MS. BRETT:  -- that would be our offering to curb this

1   practice.  I think it's coming in large part due to the fact

2   that we have testimony in the record from KHP troopers and

3   Jones himself saying that *Vasquez* did not alter their practices

4   at all.  And I think there's a concern that we have that even

5   with a ruling like *Vasquez* that the KHP does not seem to be

6   taking that seriously.  And so I think we would leave it within

7   the discretion of the court to -- to craft the appropriate

8   remedy to ensure that the ongoing constitutional violation that

9   we were hoping to enjoin is, in fact, enjoined.

10        So it's a suit for injunctive and declaratory relief

11  about the KHP's practices.  And I think our job in the pretrial

12  order is to offer what we think is the appropriate form of an

13  injunction to make sure this practice is stopped once and for

14  all.  But, of course, it's within the court's sound discretion

15  to craft what the court would find to be appropriate as a

16  remedy here.

17        THE COURT:  Yeah, if anything.  I mean, so the problem

18  is -- so the first thing that plaintiffs would have to show is

19  actual success on the merits.  So they have to win their

20  underlying suit.  So let's -- let's say they meet that hurdle.

21  Then they would have to show that there's a possibility of

22  irreparable harm unless the injunction is issued.

23        Typically we would say in that context are there legal

24  remedies that are available or is an injunction necessary -- is

25  it necessary to enter equitable relief to prevent future

1   damages?  And I would say there is no irreparable harm because

2   if this same thing happens -- and it's not likely to -- but if

3   it does happen again, plaintiffs would still have the same

4   remedies they have now.  They can file a motion to suppress if

5   there's drugs or contraband found in the car, on the ground,

6   that the search was illegal.  They can file a civil lawsuit

7   just like they've done now.  They could file a tort lawsuit

8   under the Kansas Tort Claims Act.  So to me there are multiple

9   remedies at law which are available and they would not suffer

10  any irreparable harm if the court fails to enter an injunction.

11       I would also have to find that the threatened injury

12  outweighs the harm that the injunction would cause.  And, I

13  mean, my judgment is that the exact opposite would be true,

14  because to have me riding herd on the Kansas Highway Patrol and

15  basically being super adjudicator of the lawfulness of every

16  stop that they make, I think that's -- that is, I think, a

17  outrageous imposition on their operations and violates

18  everything I understand about principles of comity and

19  federalism and respect for other branches of government.  So to

20  me some the -- the harm that would result from an injunction is

21  far worse than any benefit that would be gained.

22       So, again, I'm happy to let you brief this, but I

23  think we also have to be practical.  Given that that's the

24  direction I see this going, that has a big bearing on how I

25  think the trial should be shaping up.

1          MS. BRETT:  I think we would take Your Honor up on the

2    opportunity to brief it.  I think there's a few different

3    things we would want to respond to in that.  I think there's a

4    way to craft an injunction here that would not put Your Honor

5    in the position of having to oversee the day-to-day operations

6    of the Kansas Highway Patrol, which I think is a valid concern.

7    And so if -- if we can have the opportunity to brief that

8    issue, I think that's something we'd want to do.

9          THE COURT:  I mean, like I said, I will let you do

10   that.  It's not my job to figure out an injunction that I would

11   feel comfortable with, because I'm comfortable with no

12   injunction.  And so -- and I want you to read a case called

13   *O'Shea versus Littleton*.  Are you familiar with that?

14         MS. BRETT:  Yes, Your Honor.

15         THE COURT:  I mean, to me a classic example of, you

16   know, all the reasons why we shouldn't have an injunction here,

17   because it would require the federal court to be continuously

18   involved in the operations of the Kansas Highway Patrol.  I

19   mean, that case kind of speaks for itself.  So let's -- I think

20   in the pretrial order you've laid out the injunction that you

21   want.  Let me see if -- it's on page 47.

22         So let's just say that I am verbally ordering you to

23   show cause in writing why the court should not deny your

24   request for injunctive relief.  This is tantamount to a motion

25   for judgment -- not a motion -- an order to show cause under

1   the same procedural posture as a motion for judgment on the

2   pleadings.

3           So when can you do that?  I really think the sooner

4   the better, because, like I said, this will affect how we --

5           MS. BRETT:  Sure, Your Honor.

6           THE COURT:  -- try the liability issues.

7           MS. PERRY:  Do you want to consider it on the 9th?

8           THE COURT:  That would be great if you can.  That

9   doesn't give defendant much time to respond, but I'm sure you

10  will rise to the occasion, right, work all next weekend?

11          MR. CHALMERS:  I'll do what I have to do.

12          THE COURT:  Okay.  So five o'clock on the 7th --

13          MS. PERRY:  Yes.

14          THE COURT:  -- you'll respond.  And then what time is

15  our hearing on the 9th?

16          MS. BRETT:  12:30 I believe.

17          THE COURT:  12:30.  How about can you respond -- is

18  the 7th a Sunday?

19          LAW CLERK:  7th is a Saturday.

20          THE COURT:  Five o'clock on the 8th, Mr. Chalmers,

21  give me the best response you can.  I think you know what the

22  issues are so you can already start looking.

23          MR. CHALMERS:  I can.  All right.

24          THE COURT:  So if -- if I resolve the injunction

25  issue, I mean, basically what I would be saying is it doesn't

 1    matter if there's an ongoing constitutional violation.  I have

 2    concerns whether you'll be able to prove that there is.  But

 3    even assuming that you do, I would not grant you the injunctive

 4    relief that you are seeking.  So, therefore, the claims against

 5    Mr. Jones, Superintendent Jones, would be out of the case and

 6    we would be looking at basically two garden variety trials of

 7    Fourth Amendment violations in roadside detention type of --

 8    when I say garden variety I don't mean that to be demeaning of

 9    the plaintiffs or their claims or anything.  I actually think

10    their claims are strong claims and I think that this would be a

11    really interesting trial in terms of shining a spotlight on

12    some of the law enforcement techniques that are used, you know,

13    by the highway patrol.  So...

14         MS. BRETT:  Can I ask a point of clarification?

15         In our response to your show cause order, I take it

16    from Your Honor's comments that the injunction that we have

17    proposed in the pretrial order is not one that you would find

18    acceptable?

19         THE COURT:  Not even close.

20         MS. BRETT:  If we are able to craft one that you would

21    find acceptable that is much more limited in nature that

22    doesn't have the same concerns, is that something that we

23    should propose in our show cause?

24         THE COURT:  Well, yeah, because I think it's your last

25    chance to be heard.

1          MS. BRETT:  I say that only because, in police

2    misconduct claims like this claims for injunctive relief, there

3    are times when a court would order something, you know, very

4    wide-ranging that's very intrusive, which we're being counseled

5    against, which I understand, and there's other times when the

6    injunctive relief states something very simple like you cannot

7    consider -- the Kansas Highway Patrol is enjoined from

8    considering "x" in their reasonable suspicion calculous or from

9    doing this one thing and that's it.  That's the sort of

10   contours of the -- of the injunction.  And so I -- if we

11   propose something that is much more limited like that, does it

12   have the same concerns of federalism?

13          THE COURT:  Uh-huh, and I can tell you why.

14          Number one, I don't agree with your interpretation of

15   *Vasquez* it is quite the bright line that you say it is.  I

16   think there's wiggle room in there that is very fact specific

17   and contingent on the boots on the ground situation.  So I

18   don't -- I don't think me issuing injunction saying you can't

19   ask this question, you can't consider that information, that

20   would be, number one, impossible to enforce, and it would just

21   drive underground, you know, all of the transparency that we're

22   trying to accomplish in having officers articulate why they do

23   what they do.  So I don't think that would be productive.

24          And I think it opens up the same issues about, in

25   every traffic stop, where, you know, people may have a criminal

1    case, they may have civil cases under state or federal law, and

2    they shouldn't be able to come to me and do an end-run and say,

3    well, you said they couldn't consider this and they say they

4    didn't but they really did.  And where does that leave the

5    federal court if we have a difference of opinion between

6    whether they violated the Constitution and, you know, what a

7    court in -- in the criminal case might say or the court --

8    different court in the civil liability case might say?

9           I mean, there's no upside for this that I can see in

10   terms of the -- the workability, comity, federalism and all of

11   that.  But, I mean, if you think you can make it work, yes, you

12   better put it in the --

13          MS. BRETT:  I want to think about it and do some

14   research, Your Honor, then we'll brief it for you.

15          THE COURT:  Okay.  I mean, typically -- so the things

16   that you have in here are maybe, like, best practices.  I don't

17   think that they are necessary to vindicate Fourth Amendment

18   rights.  And even if they were, it's based on law that already

19   exists.  Typically we wouldn't, for example, in an employment

20   discrimination case, if plaintiff wins, follow that up with an

21   injunction against the employer saying don't violate Title VII

22   anymore.  You know, Title VII speaks for itself.  There's

23   independent enforcement mechanisms that are available, and so

24   an equitable remedy is not necessary.  I think that's exactly

25   the situation we're in.

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that a copy of the foregoing APPELLANT'S APPENDIX, as submitted in digital form is an exact copy of the document filed with the Clerk.

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2024, the foregoing APPELLANT'S APPENDIX was electronically filed with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I also certify that within five business days of the issuance of notice that the electronic filing is compliant, one paper copy will be delivered by Federal Express to the Clerk's Office.


DATED: April 24, 2024                    /s/ Kurtis K. Wiard