# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

BLAINE FRANKLIN SHAW, et al.,
*Plaintiffs-Appellees*,

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

———

MARK ERICH, et al.,
*Plaintiffs-Appellees*,

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

## APPELLANT'S APPENDIX VOLUME V

Appeal from the United States District Court for the District of Kansas
Honorable Kathryn H. Vratil, Senior District Court Judge
District Court Case Nos. 19-CV-1343-KHV and 20-CV-1067-KHV-GEB

**OFFICE OF ATTORNEY GENERAL
KRIS W. KOBACH**

120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
(785) 296-2215
anthony.powell@ag.ks.gov
dwight.carswell@ag.ks.gov
kurtis.wiard@ag.ks.gov

Anthony J. Powell
  *Solicitor General*
Dwight R. Carswell
  *Deputy Solicitor General*
Kurtis K. Wiard
  *Assistant Solicitor General*

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

Transcript of Shaw Trial, Day 1
(ECF No. 597) ...................................................................... 1

1

2                  UNITED STATES DISTRICT COURT
                      DISTRICT OF KANSAS,
3
   BLAINE FRANKLIN SHAW,
4                                   Docket No. 19-1343-KHV

5     Plaintiff,                    Kansas City, Kansas
                                    Date: 2/6/2023
6       v.

7   DOUG SCHULTE,

8     Defendant.
   ...................
9
                        TRANSCRIPT OF
10             TESTIMONY FROM JURY TRIAL
            BEFORE THE HONORABLE KATHRYN H VRATIL,
11          UNITED STATES SENIOR DISTRICT JUDGE.

12  APPEARANCES:

13  For the Plaintiff :    Madison A Perry & Patrick A McInerney
                           Spencer Fane LLP -KC
14                         1000 Walnut Street, Suite 1400
                           Kansas City, MO  64106
15
                           Sharon Brett
16                         ACLU Foundation of Kansas
                           6701 W 64th Street, Suite 210
17                         Overland Park, KS  66202

18  For the Defendant:     Arthur S Chalmers
                           Office of Attorney General - Kansas
19                         120 SW 10th Avenue
                           Topeka, KS  66612
20
    Court Reporter:        Nancy Moroney Wiss, CSR, RMR, FCRR
21                         Official Court Reporter
                           558 US Courthouse
22                         500 State Avenue
                           Kansas City, KS  66101
23

24

25

1                    I N D E X

2
    Offer of Proof by Mr. Chalmers after Mr. Shaw's      106
3   testimony
    Response by Mr. McInerney RE:  Mr. Chalmers'         108
4   offer of proof following Mr. Shaw's testimony
    Response by Mr. Perry RE:  Mr. Chalmers' offer of    109
5   proof following Mr. Shaw's testimony
    Response by Mr. Chalmers to Defense Attorneys'       110
6   Response RE:  Offer of Proof Arguments following
    Mr. Shaw's testimony
7   Court's Ruling RE:  Mr. Chalmers' proffer            112
    following Mr. Shaw's testimony
8

9   Plaintiff's Witness:                                 Page

10  BLAINE SHAW
       DIRECT EXAMINATION BY MS. PERRY                   4
11     CROSS EXAMINATION BY MR. CHALMERS                 48
       RE-DIRECT EXAMINATION  BY MS. PERRY               97
12     RE-CROSS EXAMINATION BY MR. CHALMERS              102
       FURTHER RE-DIRECT EXAMINATION BY MS. PERRY        104
13

14

15

16                    E X H I B I T S

17  Plaintiff's
        Exhibits              Offered           Received
18

            1                    20                 21
19          3                    21                 21
            7                    37
20
    Defendant's
21      Exhibits              Offered           Received

22         809                   92

23

24

25

1    THE COURT:  So I'm going to give you a chance to tell

2    me what's on your mind, but I just told the jury that we were

3    going to make good use of their time, so we're not going to

4    come in when the jury is scheduled to come in and say, oh,

5    wait, we want to take up something with you that relates to

6    admission of exhibits, 'cause I'm not going to keep the jury

7    waiting while we do that.  If you want to do something outside

8    of the jury's presence, you need to tell me before I'm due to

9    come in to court, before the jury is due, and we'll take it up

10   on our time, not theirs, okay?  Tell me what it is you want to

11   talk about, and then we'll bring the jury in.

12       MS. PERRY:  Sure, Your Honor.  I have three exhibits

13   that I'm planning to use with Mr. Shaw.  Mr. Chalmers has

14   objected to each one.  None of the exhibits are going to be

15   based on testimony that he's going to be giving.  None of the

16   objections are based on that.  It's Plaintiff's Exhibits 1, 3,

17   and 7 A.

18       THE COURT:  Okay.  Let's bring in the jury.  What is

19   Exhibit 1?

20       MS. PERRY:  Exhibit 1 is the dash cam.  Exhibit 3 is

21   the cell phone video.  Mr. Chalmers' objections are that I cut

22   it.  What I did pursuant to the court's motion in limine

23   ruling, that I just thought that issue should be kept out, and

24   so I've cut it shortly after the dog and right after the

25   trooper opens the van.

1       (Jury entering courtroom.)

2       THE COURT:  All right.  Members of the jury, you've

3   heard the opening statements of the lawyers, and now we're

4   moving directly into the testimony of the witnesses.  As you

5   know, plaintiffs go first.  Plaintiff will call their first

6   witness.

7       MS. PERRY:  Your Honor, plaintiff calls plaintiff

8   Blaine Shaw.

9       THE COURT:  Mr. Shaw, will you please step here into

10  the witness box and raise your right hand so that you can be

11  sworn?

12      (Witness sworn.)

13      THE WITNESS:  Yes.

14      MS. HARPER:  Thank you.  And there's water, a cup

15  there if you need some.

16                          BLAINE SHAW,

17  Called as a witness on behalf of the plaintiff, having been

18  first duly sworn, testified as follows:

19                      DIRECT EXAMINATION

20  BY MS. PERRY:

21  Q.  Go ahead, Mr. Shaw.  Could you please state and spell your

22  name for the record please?

23  A.  My full name legal name is Elontah Blaine Franklin Shaw.

24  Q.  Okay.  And can you spell that for the record please?

25  A.  Elontah is spelled E L O N T A H.  Blaine is spelled B L A

1    I N E.  And Franklin and Shaw are a common spelling.

2    Q.   Mr. Shaw, where do you live?

3    A.   I live in Oklahoma City, Oklahoma.

4    Q.   And how long have you lived in Oklahoma?

5    A.   I've pretty much lived in Oklahoma all my life.

6    Q.   Okay.  I'd like to talk a little bit about your education.

7    Where did you go to high school?

8    A.   I went to a small high school in Tulsa called Cascia Hall.

9    Q.   And did you receive any education after high school?

10   A.   Yes, right out of high school, I went -- I attended the

11   University of Oklahoma in Norman, Oklahoma which is a suburb of

12   Oklahoma City.

13   Q.   Did you attend any other school after high school?

14   A.   I attended for three-semesters, didn't really know what I

15   wanted to study, moved back to Tulsa, and worked for a year or

16   so, and then I applied to Tulsa Community College, and I took

17   several classes there, still an undecided major just like I was

18   when I first started, and then I was just short of enough

19   classes to be qualified as a sophomore, and I stopped for four

20   or five years, and then returned to Tulsa Community College,

21   knowing what I wanted to major in, which was criminal justice,

22   and graduated with a two-year associate's degree in criminal

23   justice from Tulsa Community College.

24   Q.   Okay.  Did you do any schooling after that?

25   A.   Immediately after that, I transferred to the University --

1   back to the University of Oklahoma, took classes on line while

2   still living in Tulsa, and the ones that I was able to, and

3   then moved at the end of 2011 to Oklahoma City and began

4   attending University of Oklahoma, did a couple of full-time

5   semesters with difficulty.  I lived 30 miles away, I had a wife

6   and daughter, and so it took me a few more years by the time I

7   pulled it off of and graduated ultimately in 2016 with four

8   years bachelor's degree in sociology criminology.

9   Q.  So do I have it right that you have an associate's degree

10  from the community college, and then you received a bachelor's

11  degree from Oklahoma?

12  A.  Yes.

13  Q.  And when was that bachelor's degree?

14  A.  2016.

15  Q.  What type of courses did you take during your majors?

16  A.  I took intro to criminal justice and criminal evidence,

17  criminal procedures, couple of law classes, then criminology

18  class, and then several sociology/criminology-oriented

19  sociology type of classes.

20  Q.  Were any of those classes taught by attorneys?

21  A.  Most of them were.

22  Q.  Did any of your courses require -- either in your

23  associate's degree or your bachelor's degree require special

24  interaction with police?

25  A.  Yes, my criminal procedures class required a police

1  ride-along.

2  Q.  And did you do that ride-along?

3  A.  Yes.

4  Q.  Are you proud of your degree, Mr. Shaw?

5  A.  Very much so.  I worked hard for them.

6  Q.  After graduating, had your interest in criminal justice

7  continued?

8  A.  Yes.

9  Q.  How so?

10  A.  I have become very interested in the constitution.  I

11  follow attorneys on social media.  I'm very interested in our

12  rights.  The constitution is very important to me.  It is

13  basically what defines us as Americans, as a free country, and

14  I'm very interested in -- in that.

15  Q.  You mentioned you graduated a few years longer than a

16  four-year degree might take regularly.  Did you have any life

17  events during the span of after high school until you got your

18  degree?

19  A.  Yes.

20  Q.  What were those?

21  A.  In 2009, I was involved in a very serious car accident as a

22  passenger.  I was in the back seat with my wife, girlfriend at

23  the time, and we were T-boned.  We were almost at a stop and

24  intersection, and a car came through and slammed right into us

25  going full speed, and my wife and I were both seriously

injured.  I ended up having a broken clavicle collar bone, I
broke several ribs, I broke my back in several places, the --
near the neck, the C4, the C7, several thoracic towards the
middle, and then most seriously, I fractured my left hip and
acetabulum, and it required surgery, and they had to
permanently -- surgery, permanently implant hardware into my
left hip, and the first time they attempted the surgery, I -- I
quit breathing on the operating table, and they had to like
resuscitate me, respiratory arrest they called it.  My heart
didn't stop, but I quit breathing, was having breathing issues
when I went came into the hospital, I was on eight liters of
oxygen, and I also had to have four blood transfusions, so they
had to delay the surgery.  During that time, they put me in
traction.  What -- what traction is, is they drill a hole.
They drilled a hole in my femur above my knee, and put this
metal bar across it, and they attached a string to it with a
20, 25-pound weight at the end, and what it does is it pulls
the femur out of the hip, the upper part of that.  That's to
reduce strain.  They call it traction.  And so I did that for
maybe a week, and then I believe it was July 6th, they were
able to successfully do the surgery.  Following --
Q.  I was just going to ask you what your recovery process was
like after surgery?
A.  Yes.  So after that, my grandmother, she was a retired
nurse, she took me in during my convalescence, and she helped

1   me a lot, very much. She had a hospital bed at her house. I

2   was in a wheelchair for three months. Following that period, I

3   was -- went through physical therapy, 'cause I wasn't allowed

4   to put any weight on that hip while it healed for those three

5   months, and physical therapy, using a walker, graduated to a

6   cane, which I still use a cane from time to time, depending on

7   how I feel. I have good days and bad days. It depends on how

8   long I'm going to be on my feet. I keep a cane in my vehicle

9   at all times, and I'd say -- I'd say probably about 10 or

10   11 months after the accident, I was finally able to walk

11   without a limp, and could walk at times without the cane, and

12   so that was probably when I was recovered enough to, you know,

13   be fully recovered from the injuries itself, minus the lasting

14   effects of it.

15   Q. And you mentioned you fully recovered. And do you suffer

16   any lasting effects?

17   A. Yes, I suffer from chronic pain from that. My hip and

18   back, they've never been the same again. I have good days and

19   bad days, but they bother me, both of 'em do. If it's not one,

20   it's the other; I can't win.

21   Q. And you said that accident was in 2009; is that right?

22   A. Yes.

23   Q. So I'd like to fast forward now to 2017; okay? Were you

24   employed in 2017?

25   A. Yes. Early that year, I had begun working as an Uber

1  driver.

2  Q.  Why did you decide to drive for Uber?

3  A.  I -- I had a therapist, a counselor that I met with

4  regularly, and she was an Uber driver herself on the side, and

5  she suggested that to me.  She says, well, with your condition,

6  you could work for yourself on your good days, as much as

7  you -- as much as you feel comfortable doing, and she kind of

8  -- kind of pushed me into it, and I love doing it.  I like -- I

9  used to like to drive, and so I began doing that in that --

10  around April of 2017.

11  Q.  How long did you drive for Uber?

12  A.  I drove for Uber part-time as much as -- as much as I could

13  handle all the way through until the traffic stop that brings

14  us here today.

15  Q.  What about after the traffic stop?

16  A.  I didn't want to drive anymore.  I didn't feel like my

17  rights were protected and that.

18  Q.  And we'll get to this a little bit later on, but did you

19  drive for Uber at all after the traffic stop?

20  A.  Not for a long time, not for the entire year of 2018.

21  Q.  Let's talk about your involvement in your community.  Can

22  you tell us about that?

23  A.  Yes.  I'm a part Osage American Indian, native American

24  Indian.  My -- my first -- first name which I don't use, that's

25  why it's not listed in this lawsuit, is Elontah, and that means

1  first born son.  I never used it in school, so it's not really
2  a name I use.  I go by Blaine; Blaine Franklin Shaw, you know,
3  common three names, and so I'm very active in my Osage
4  community.  My family's been involved in a ceremonial cordons
5  dance that began in 1884.  Our -- our tribe has three villages.
6  Ours is Gray Horse.  The other two are Hominy and Patuska.
7  Ours is the smaller one, and there's going to be a movie about
8  -- that focuses on ours.  Martin Scorcese will be coming out
9  about that.  So just so you all know, it will be coming out
10 soon.  So that it's my village.  Those are my people.  So I was
11 brought up in that dance.  My dad brought me into that dance.
12 It's a ceremonial dance.  Now, when you think of dancing, most
13 people thinking of the fancy dancers with all the fancy moves
14 and everything.  Ours isn't quite like that, more of a walk
15 around the drum kind of a shuffle that you can dance hard, you
16 can dance easily.  So you know, people of all ages can
17 participate.  I can still participate despite my injuries.  I
18 have to go easy, but I've been involved in that my entire life.
19 It's a great thing to be a part of.  Now, my main involvement
20 is that the dance, it is organized and arranged by -- by a
21 family, and the position is called the drum keeper, and the
22 drum keeper is usually the young male who is usually a first
23 born son like I was, and they hold that position nominally, and
24 the family supports them, and they take care of arranging and
25 scheduling the dance.  They have the committee of other people

1  from the village that support them, and I was honored to be the

2  drum keeper from 1994 to 1998, and ever since, I've been on the

3  committee.

4  Q.  Mr. Shaw, let's turn now to your family.  Tell us who you

5  live with.

6  A.  I live with my wife Cindy and my daughter Amber.

7  Q.  How old's your daughter?

8  A.  She's 11.

9  Q.  What types of things do you like to do with them?

10  A.  We do typical family things.  We cook together, we play

11  board games, my wife loves Monopoly.  We do all sorts of other

12  board games, too.  We go to movies.  We go to the park.  My

13  daughter just started middle school this year, so she -- she

14  started playing volleyball, so she likes to practice that.

15  We've been involved with that.

16  Q.  Do you have any other family that lives nearby?

17  A.  Yes, my grandmother lived nearby me, the one that I

18  recovered with, but she passed away in 2021, unfortunately, but

19  she lived very close to me in Oklahoma City, but my mother and

20  brother still live close to me.

21  Q.  Tell us about your brother.

22  A.  My brother is about eight years younger than me, and he --

23  he had traumatic brain injury from football, and began to

24  manifest itself in around 2010.  He just did -- I don't know --

25  it started off more minor, and just progressively got worse.

1    Basically, typical symptoms of traumatic brain injury, just

2    moody, anxious, not sociable.  It's really hard to explain how

3    he is, but he's not the same person he originally was.

4    Q.   And I don't think I caught it.  I'm sorry if you did say;

5    what's your brother's name?

6    A.   My brother's name is Sam, Samuel Shaw.  Sam, he goes by

7    Sam.

8    Q.   And who does he live with?

9    A.   He lives with my mother, lives with our mother.  I said my

10   mother, our mother.

11   Q.   We've talked a little bit about your family in Oklahoma.

12   Do you have any friends or family in the Colorado area?

13   A.   Yes, I have extended family who are also Osage, and they

14   live in Colorado Springs.

15   Q.   Any other friends in the Colorado area?

16   A.   Yes, my brother has a good friend that he played youth

17   football with that lives in Denver.

18   Q.   Before 2017, how often did you go to Denver to visit them?

19   A.   We would go two or three times a year when we were able to

20   get away during -- usually during when my daughter was out of

21   school and I could get away.

22   Q.   How would you travel there?

23   A.   To get there, I travel north on I-35 from Oklahoma City,

24   straight north to Salina.  I-35 meets I-70, and then take I-70

25   west, and it's a straight shot to Denver.

1    Q.   Was it usually just you visiting them?

2    A.   Me and my brother.

3    Q.   What do you and your brother like to do when you're there?

4    A.   We like to car camp, which is kind of a common things these

5    days, but we started doing it before -- before it was a thing,

6    I guess.

7    Q.   You mentioned you car camp.  Do you also camp at camp

8    sites?

9    A.   Yes, car camp at camp sites.  There's one called Cherry

10   Creek State Park that I really like that's in the Denver area.

11   Q.   And what type of things do you pack when you go camping?

12   A.   I have luggage, and then other typical camping gear, such

13   as a camping -- camping chair that folds up.  I have a cot now.

14   My cot -- I have a 2010 Chrysler Town and Country, and the

15   model I had was called stow-in-go seats.  So those seats

16   actually fold into the floorboard.  So you've got a completely

17   flat back area back behind the two front seats, and

18   fortunately, I got a cot set up behind the driver's seat,

19   either side really.  I put it behind the driver's seat, and on

20   that cot, I put bedding on there.  There's a bed roll with

21   several blankets for padding, and then pillows and bedding like

22   that.  Another thing I would bring like during cold weather is

23   a portable heater, little -- little propane heater which is

24   good, it will heat a little camp pretty well, and a tent, I

25   also had a tent.

1  Q.  Do you usually pack the same things about each time?

2  A.  Yes.

3  Q.  Do you usually pack them the same each time?

4  A.  Yes, everything is in its place.

5  Q.  I'd like to turn now to December of 2017.  Did you and your

6  brother take a road trip in December of 2017?

7  A.  Yes.

8  Q.  When was that?

9  A.  December 20th is when we left.

10  Q.  December 20th, 2017?

11  A.  Yes.

12  Q.  Where were you going?

13  A.  We were heading to Denver.

14  Q.  Why?

15  A.  We were going to, prior to Christmas, just go get away for

16  a few days.  My brother wanted to go, it sounded good to me,

17  and we were going to visit, we were going to camp, we were

18  going to visit his friend that he likes to see, 'cause they

19  lived in Tulsa, and they moved to Denver, and so we'd see them

20  there, and then we'd see our family in Colorado Springs, and

21  then make our way -- make our way back home.

22  Q.  And you mentioned you left on December 17th about what time

23  of day?

24  A.  December 20th of 2017.

25  Q.  Yes, thank you.  What time of day?

1   A.   Oh, we left early in the morning, before day break.  It was

2   still dark.

3   Q.   How long were you planning for your drive?

4   A.   I -- I have to pace myself due to my pain.  If I drive long

5   enough, I start -- my C7 -- C4, C7 area starts getting this

6   nervy pinchy pain type of feeling, and so it takes me longer

7   than the straight -- the straight through drive would take.

8   Straight through, it's like nine and a half hours, nine hours

9   and 45 minutes, but it could take me up to 12 hours depending

10  on how long I stop.  That's why I have that cot all ready set

11  up so I can park and lay down, 'cause that's the way to escape

12  my back pain is if I lay down, it alleviates it.

13  Q.   Can you tell us about the car that you were driving on this

14  trip?

15  A.   It was a white 2010 Chrysler Town and Country minivan.

16  Q.   Whose car was it?

17  A.   It belonged to my dad.

18  Q.   And why were you driving it?

19  A.   My dad, when I started driving for Uber, he allowed me to

20  use his van while retaining ownership for Uber, as well as to

21  have as a family car.  My dad was a good man.  He was very

22  generous.  I lost him to brain cancer two years ago, lost my

23  grandma five weeks after that.  I've experienced a lot of loss,

24  but that was his van that I used and for the trip.

25  Q.   What state were the license plates on that van from?

1  A.   The van had tribal plates, indian tribal plates, so it was

2  registered Osage Nation of Oklahoma.

3  Q.   Can you tell us what was in the back of the car?

4  A.   I had my camping gear that I mentioned before, then my cot

5  set up.

6  Q.   What else besides your cot?

7  A.   My cot, luggage, my tent, and it's zip-up case, my camping

8  chair, and I think I forgot to mention I also had a cooler ice

9  chest, probably a bag with some snacks, like chips and stuff

10  like that, and then my -- since it was December, I had my

11  camping heater, like a little propane heater.  It screws on to

12  one of those little green canisters, and it will last about

13  12 hours, and it's good to have, especially if you're traveling

14  when it's cold.  If you break-down, then, you know, in a rural

15  area, and you don't have any heat, you can start that thing up

16  and at least not freeze, you know, so it's good to travel with.

17  Q.   You mentioned the heater a couple times.  What was the

18  weather like on December 20th while you were traveling?

19  A.   It was -- it was I'd say brisk is the best way.  It was --

20  it was chilly.  It wasn't below freezing or anything like that,

21  but it was still chilly, and it was windy, a little windy.

22  Q.   Did you get pulled over for a traffic stop on that trip?

23  A.   Yes.

24  Q.   Can you tell us where that happened?

25  A.   Just before Hayes, Kansas.

1   Q.   Let's talk about the drive just prior to being pulled over.

2   What do you remember about the few minutes before being pulled

3   over?

4   A.   Well, I had my cruise control set at the speed limit.  I

5   was in the outside lane cruising along, and there was a truck

6   ahead of me, a semi-truck, I think some call them tractor

7   trailers, and it was going slower than me, so I start getting

8   closer to it, I started hearing little pings and dings, you

9   know, like rocks and stuff, debris hitting it, and it got

10  louder, and I grew concerned that a rock may hit my windshield

11  and chip it or crack it, which I've had happen before, and so I

12  decided to pass the truck, so...

13  Q.   What happened once you passed the truck?

14  A.   So I proceeded to change lanes and pass the truck, and just

15  after I -- as I passed the truck, just as I was probably about

16  even with the truck, ahead of the truck a little ways down was

17  a white SUV, and police lights came on.

18  Q.   Did you end up passing that police car?

19  A.   Yes.  I saw the police lights.  I didn't know if it was for

20  me, because was ahead of me and in a different lane.  I don't

21  know how radars work.  They didn't talk about that in

22  criminology or criminal justice.  I've never really looked into

23  that.  I always pictured 'em from the side.  So I didn't know I

24  could be clocked from behind, so -- but maybe it was for me, so

25  I wanted to do the right thing.  I don't want to get pulled

1    over when somebody's turned their lights on ahead of you, and

2    pull over for somebody ahead of you.  So I went and passed the

3    vehicle while not speeding.  I'm sure I was speeding as I

4    passed the police car and safely got in front of the police

5    car.

6    Q.   Did you eventually realize that you were being pulled over?

7    A.   Yes.  There was an exit ramp not too far down, and if I was

8    going to be pulled over, I thought that would be the safest

9    place to be pulled over, instead of cars whizzing by at

10   75 miles an hour.  When there's a ramp off ahead, just pull off

11   the ramp.  So I exited the ramp, so when the police car

12   followed me, I knew for sure I was being pulled over, and so I

13   proceeded on the ramp, and it widened toward the end, and I

14   pulled over on the shoulder of the ramp where it was safe and

15   was pulled over.

16   Q.   Mr. Shaw, do you know if there's been any recordings of

17   your stop?

18   A.   Yes.

19   Q.   What are those recordings?

20   A.   There is a police dash cam video from the trooper that

21   pulled me over.

22   Q.   Anything else?

23   A.   I also recorded a cell phone video.

24   Q.   Why did you record this interaction?

25   A.   Due to my studies, criminal justice, criminology, taught by

1 lawyers, it's kind of a standard that following on social

2 media, always record all police encounters, just to protect

3 your rights, make sure your rights are protected.

4 Q.   Are you familiar what I've marked as Trial Exhibit 1 in

5 this case?

6 A.   Yes.

7 Q.   What is it?

8 A.   That is the police dash cam video.

9 Q.   And have you seen it?

10 A.   Yes.

11 Q.   Does it fairly and accurately represent the portions on the

12 video?

13 A.   Yes.

14 Q.   Fairly, accurately depicts what your stop was?

15 A.   Yes.

16        MS. PERRY:  Your Honor, I'd move to admit Exhibit 1.

17        THE COURT:  Any objection?

18        MR. CHALMERS:  Yeah, the video's not complete, Your

19 Honor.  It's a portion of it, and we've had the video marked.

20 We have made -- removed some sound because we want to abide by

21 other orders of the court.

22        MS. PERRY:  Your Honor, I'd ask to approach if we

23 could.

24        MR. CHALMERS:  I don't think it's appropriate to play

25 a partial video.

1          THE COURT:  Well, under the Federal Rules of Evidence,

2     you can introduce the rest.

3          MR. CHALMERS:  Okay.

4          THE COURT:  All right.  Exhibit 1 as tendered is

5     received.

6     BY MS. PERRY:

7     Q.   Mr. Shaw, do you know what I've marked as Trial Exhibit 3?

8     A.   Yes.

9     Q.   What is it?

10    A.   That is my cell phone video.

11    Q.   And have you viewed the whole thing?

12    A.   Yes.

13    Q.   Does it fairly and accurately depict your traffic stop on

14    that day?

15    A.   Yes.

16         MS. PERRY:  Your Honor, I'd move to admit exhibit 3.

17         MR. CHALMERS:  Well, it -- the testimony -- it's a

18    partial video.  I think your ruling is -- is the same, but I

19    have to object to the lack of foundation if he's saying it

20    shows the whole thing.

21         THE COURT:  I don't think he said it shows the whole

22    thing, but you can offer that in your own case-in-chief or on

23    cross-examination, and we will deal with that issue later.

24    Received.

25    BY MS. PERRY:

1  Q.  Mr. Shaw, are you aware that the video is both cut off at a

2  certain point before you were eventually released by Trooper

3  Schulte?

4  A.  Yes.

5  Q.  And are you claiming any damages for the portion of the

6  video after its cut off in Exhibits 1 and 3?

7  A.  No.

8       MS. PERRY:  Your Honor, permission to play Exhibit 1.

9       THE COURT:  Go ahead.

10  BY MS. PERRY:

11  Q.  Mr. Shaw, I'm going to start Exhibit 1, and I'm going to

12  start at about a minute 45 and go to 225, but have you -- since

13  you've seen this whole thing, can you tell us what happens from

14  the beginning until about 145?

15  A.  It shows the road ahead of the police car before I pass

16  him.

17  Q.  And is that the police car there on your screen?

18  A.  Yes.

19  Q.  I think you said this was Trooper Schulte's dash cam?

20  A.  Yes.

21  Q.  If we could play starting at 145 and go to do 225.  And

22  does the video show that you're behind Trooper Schulte when his

23  lights and sirens came on?

24       MR. CHALMERS:  Wait.  Wait a second.  Your Honor, I

25  have to object.  I don't think it's appropriate to have him

1  commentate on the video.  It speaks for itself, and the

2  question was leading.

3         THE COURT:  Overruled.

4  BY MS. PERRY:

5  Q.  You can answer.

6  A.  No, it only shows after I pass it.  It doesn't show --

7  there's no rear view.

8  Q.  Sure.  Do the sirens come on before we see your car in the

9  view here?

10 A.  Yes.

11 Q.  And you eventually, is that your white van there?

12 A.  Yes.

13 Q.  Does it eventually move into the right-hand lane once you

14 get in front of the trooper?

15 A.  Yes.

16 Q.  Did you use your blinker to do that?

17 A.  Yes.

18 Q.  Once you moved over to -- into the right-hand lane, do you

19 eventually slow down?

20 A.  Yes.

21 Q.  And where do you go from there?

22 A.  I saw that there were -- I could see ahead of me that there

23 was a ramp, and so I felt I had the right to pull over where I

24 felt it was safe, since it was a ramp that was nearby and

25 visible.

1  Q.  You're mentioning ramp, and I think we know what you

2  probably mean.

3  A.  Exit ramp, sorry.

4  Q.  Sure.  That's okay.  Just because the court reporter's

5  taking down.

6  A.  Sorry.

7  Q.  So you continued to the exit ramp?

8  A.  Yes.

9  Q.  And do you know the name of the trooper who was pulling you

10 over here?

11 A.  Yes, Doug Schulte.

12 Q.  Okay.  If we could play Exhibit 225 to 438.  Does it seem

13 right that your first interaction with Trooper Schulte was

14 about 45 seconds?

15 A.  Yes.

16 Q.  What happened next?

17 A.  After -- after the video cut off?

18 Q.  Yes.  After the -- after about 438.

19 A.  So he had given me a hard time about not pulling over fast

20 enough, even though he was ahead of me, and I explained that,

21 and then it proceeded on as a normal traffic stop, gave him my

22 documents -- required documents, and he -- he went back to his

23 vehicle to write me a ticket.

24 Q.  After he left your window, did he walk straight back to his

25 car?

1   A.   No.

2   Q.   What did he do?

3   A.   Seemed like he stopped and decided to peer into my window.

4   Q.   Once he was back in his car, what were you doing?

5   A.   Just waiting.

6   Q.   For about how long?

7   A.   Probably ten minutes, give or take.

8   Q.   You mentioned you also recorded this stop?

9   A.   Yes.

10  Q.   Does it show a different view than what we just saw here in

11  Trooper Schulte's dash cam?

12  A.   Yes.

13  Q.   Does it show your reaction to being pulled over?

14  A.   Yes.

15  Q.   Were you mad when you first got pulled over?

16  A.   At myself.

17       MS. PERRY:  Your Honor, I'd like to play permission to

18  play Exhibit 3.

19       THE COURT:  You may.

20  BY MS. PERRY:

21  Q.   Play through from the beginning and through seven minutes.

22  Mr. Shaw, you mentioned a couple times in that video that

23  you're going to -- going to see family in Denver.  Why?

24  A.   I was more or less just stating the obvious to put my

25  brother at ease.  He -- due too his mental condition, he --

1  gets restless, agitated, so I just wanted to put his mind at

2  ease, and make sure that he knew that, you know, this is --

3  it's a speeding ticket, that's all we're doing, we're

4  traveling.

5  Q.  It wasn't to get your story straight before Trooper Schulte

6  came back to your window?

7  A.  No, there is no story to keep straight.

8  Q.  At some point a little over ten minutes into the stop, does

9  Trooper Schulte walk buck to your window?

10  A.  Yes.

11  Q.  What was his demeanor at that time?

12  A.  He explained the ticket, he went through what seemed to me

13  like a spiel, like what he has to say to everyone he writes a

14  ticket to, standard practice, explained, you know, how to pay

15  it, things like that.

16  Q.  Did he walk back to his car after that interaction?

17  A.  Well, he said to drive -- to slow down and drive safe, and

18  then briefly turned around, and then like three seconds later,

19  before I -- before I could even do anything, he -- I guess he

20  decided he wasn't done with me yet, and decided to ask me some

21  questions.

22  Q.  When he came back to your window, what did he say?

23  A.  He said, can I ask -- ask you a question or ask you some

24  questions?

25  Q.  You think you could have just ignored him?

A.  No.

Q.  Could you have just driven off?

A.  Oh, no, he was right next to the car.  That wouldn't have been a good idea.

Q.  Did you feel like you were free to leave?

A.  No.

Q.  Why not?

A.  Because he was right there by the vehicle.  I -- I would not have been free to leave until he was back away from the vehicle, at least back to his car or no longer right next to my vehicle, because it's never a good idea to be driving when somebody's standing right next to a vehicle.  You run over their feet.  It's just -- I would never do that, anybody next to my vehicle, until I know it's safe and clear.

Q.  Did anyone else show up at this time?

A.  Yes.  Saw in my rearview mirror that another law enforcement officer had arrived.  He was dressed differently.

Q.  And you mentioned you've seen this whole video that we've been watching from your cell phone?

A.  Yes.

Q.  And we stopped it there at seven minutes.  We're going to fast forward now on Exhibit 3, and play from 1030 to 1210.  Did Trooper Schulte tell you at that point where we just stopped the video that you were being detained for a canine sniff?

A.  No.

1   Q.   He asked you during that last interaction if you had

2   anything illegal?

3   A.   Yes.

4   Q.   And what did you tell him?

5   A.   That I didn't have any of those things he listed.

6   Q.   Would you have voluntarily agreed to be questioned by

7   Trooper Schulte for further investigation?

8   A.   No.

9   Q.   Did he ask to search your car?

10  A.   Yes.

11  Q.   What did you say?

12  A.   I said that I don't consent to searches.

13  Q.   Why?

14  A.   And as a courtesy, I explained, you know, due to my

15  studies, I was a criminology major -- criminal justice major,

16  that that's -- lawyers teach those classes.  You don't consent

17  to searches.  You don't want strangers going through your

18  things, to begin with, not to mention that's advice given and

19  what I've learned in school.

20  Q.   What was going through your head at this point after

21  Trooper Schulte left your window?

22  A.   That like, the traffic stop was going to be extended than

23  what it should.  I should have been issued a citation and go on

24  my way.

25  Q.   I'd like to play Exhibit 3 taking off from 1210 to 1835.

1    Mr. Shaw, does Mr. Trooper (sic) eventually return to your

2    window?

3    A.   Yes.

4    Q.   Do you remember that to be about 20 minutes into the stop?

5    A.   Yes.

6    Q.   If we could play from 1835 to 1910.  What did he tell you

7    during that interaction?

8    A.   He told me that we were going to be waiting on a canine.

9    Q.   Did you consent to be detained for a dog sniff?

10   A.   No.  It was my understanding I had that right to not

11   consent to that.

12   Q.   After he leaves your window there, what happens next?

13   A.   Well, I tried to ask him what I'd done, you know, to

14   warrant that, and he just turned and walked away.

15   Q.   Do you then have to wait in your car for another period of

16   time?

17   A.   Yeah, like another 20, 25 minutes.

18   Q.   Does your camera that you have here stay in the same spot

19   the whole time?

20   A.   No.  I eventually take it down so I can contact attorneys.

21   Q.   If we could play Exhibit 3 from 1910 to 2530.  If we could

22   stop for just a second.  Mr. Shaw, your hand's on the screen

23   there.  Can you tell us why that is?

24   A.   Probably I sat the phone on my lap, and since it's got kind

25   of a smooth back to it on the case, it tends to slide.  So if

1    my phone is not in the mount, I put it in my lap.  I generally

2    set my hand on it to keep it from sliding off.  I don't really

3    remember.

4    Q.   If we could continue the video.  Mr. Shaw, you mentioned

5    you tried to contact an attorney.  Did you try to contact

6    anyone else during this stop?

7    A.   No.  I guess at that -- at that point, I had probably

8    texted my -- my mother, and maybe my wife, but I did place a

9    phone call shortly thereafter.

10   Q.   Did you say your mother and then your wife?

11   A.   Yes.

12   Q.   So at that point in the video, you're over 25 minutes into

13   your stop, can you tell the jury how you're feeling at that

14   point?

15   A.   I'm growing more and more frustrated at this point, because

16   this is going everything -- against everything I learned in

17   school, you know.  I learned about the Constitution and how

18   these traffic stops are supposed to go, and this is just

19   blatantly violating what I believe are our rights as American

20   citizens.

21          MR. CHALMERS:  Excuse me, Your Honor, I have to

22   object.  I think he's gone beyond the question how he's

23   feeling.  He's now trying to argue some sort of legal position

24   that is not appropriate from this witness.

25          THE COURT:  That is overruled.  If this is part of

1  what he's feeling at the time, he's allowed to testify about
2  that to the jury.  Go ahead.
3  BY MS. PERRY:
4  Q.  You can finish.
5  A.  Yeah, that's exactly how I felt.  I felt like I was being
6  violated, 'cause the Constitution is what defines the United
7  States of America as a free country, and if that's not
8  followed, it doesn't feel like a free country, and it was very
9  frustrating.  The longer I waited, the more frustrated I felt.
10  Q.  And I think you said on the video, he acted like you're
11  free to go, but then started asking questions again.  What did
12  you mean by that?
13  A.  Well, he said drive safe, and he never said you're free to
14  go.  He said slow down, drive safe, and then three seconds
15  later, before I could even get the ticket put away, and -- he
16  acted like he changed his mind, like he wasn't done with me
17  yet, like there was going to be more to it, and then he started
18  asking the questions.
19  Q.  Did Trooper Schulte eventually return to your window?
20  A.  After the point we cut off on the --
21  Q.  Yes.
22  A.  Yes, he came back once the canine officer had arrived.
23  Q.  Okay.  And we're going to skip a portion of the video just
24  so we all don't have to sit here and watch you have it and
25  waste time, but other than making a couple comments and phone

1   calls like you've all ready testified to, was anything else

2   going on?

3   A.   No, just -- just sitting there getting frustrated is all.

4   Q.   Let's fast forward from 2530 where we just left off up to

5   37 minutes, and we'll play from 37 minutes to 3725.  What

6   happens after the video cuts off here?

7   A.   I was allowed to grab my jacket, the one that was within

8   the nearest reach was kind of a light wind breaker, and I was

9   asked to get out of the car, and then I -- he did a pat-down on

10  me to check my pockets and stuff, and then asked my brother and

11  I to go stand ahead of the vehicle, but a little bit down in

12  the ditch on the side of the ramp.

13  Q.   And again, I think we -- most of us know what you mean by

14  pat-down, but can you explain it just in case?

15  A.   Where they just like feel around your pockets, and just

16  kind of go around your sides and --

17  Q.   How many troopers were there at that time when you got out

18  of the vehicle?

19  A.   Three, and a dog.

20  Q.   What were the conditions like outside?

21  A.   It was brisk out, it was chilly but not below freezing or

22  anything, but -- but there was a -- there was -- there was --

23  it was windy a little bit.  I could feel it.  It was cold, too,

24  cold wind.

25  Q.   What was going through your mind at the point of you were

1  told to get out of the car and then you started to get pat

2  down?

3  A.   Just that my rights were being violated and that this

4  situation was wrong.

5  Q.   If we could go back to Exhibit 1, the dash cam of Trooper

6  Schulte's dash cam, and play from time stamp 4025 to 4526.  Did

7  Trooper Schulte tell you that the dog was going to jump into

8  your van through your window?

9  A.   No.

10  Q.   That portion of the video that we just watched, what

11  happened?

12  A.   The dog did a lap or two around my vehicle, and then once

13  the dog got to the open window, it decided to jump into my

14  vehicle through the window.

15  Q.   Did someone eventually tell you that the dog alerted?

16  A.   Umm, in the -- in the end, yes.

17  Q.   And as you sit here today, are you aware of why Trooper

18  Schulte claims to have found you suspicious during this traffic

19  stop?

20  A.   At the time, I didn't know, until I learned throughout the

21  course of this lawsuit, there was a -- a document provided by

22  Trooper Schulte, I can't think of the name off it off-hand,

23  like a declaration, and he listed -- he said at the time he

24  made the declaration, said he couldn't remember for sure, but

25  he listed them, and three of 'em, I can think of right now.

1    First one is that I didn't pull over fast enough.

2           MR. CHALMERS:  Your Honor, I think he was asked

3    whether or not he was alerted by Trooper Schulte as to what his

4    suspicions were.  Now, he's I think commenting on somebody

5    else's testimony, and on hearsay in terms of an affidavit, and

6    it's not proper testimony from this person.

7           THE COURT:  I think the question was, did he learn the

8    reasons for the stop, he answered yes, and he was referring to

9    the affidavit that Trooper Schulte executed in this lawsuit.

10   Am I right so far?

11          THE WITNESS:  Yes.

12          THE COURT:  And so what is the problem?

13          MR. CHALMERS:  Well, I don't think -- isn't that

14   hearsay, and isn't he commenting on somebody else's testimony

15   which witnesses aren't supposed to do unless they're an expert?

16   He's not testifying to his facts, Your Honor.

17          THE COURT:  Last time I checked the rules of evidence,

18   a statement by a party opponent is an exception to the hearsay

19   rule.  Is there any other objection?

20          MR. CHALMERS:  No, Your Honor.  I -- again, it's -- it

21   is not proper for him to comment on his understanding of what

22   the trooper's justifications were, and that's why I object.

23          THE COURT:  I think he hit on something.  Is there --

24   why is -- I think your question went to whether at the time of

25   the stop, the trooper said anything about the reasons for

1  stopping; right?

2       MS. PERRY:  Your Honor, I was asking if he's aware

3  today of why Trooper Schulte found him suspicious so that he

4  can put context to his explanation of why those things were

5  not.

6       THE COURT:  Why -- in his opinion, why they were not

7  suspicious?

8       MS. PERRY:  Correct.

9       THE COURT:  Okay.  You can go ahead.

10  BY MS. PERRY:

11  Q.  And I think, Mr. Shaw, I'll just start again.  Do you

12  remember what any of those reasons were why Trooper Schulte

13  found you suspicious?

14  A.  Yes, the first one was that I didn't pull over fast enough,

15  which I explained earlier the circumstances for that.  Second

16  one was -- was my brother's behavior, which was him just

17  sitting there with his hands in his lap looking forward, not

18  involving himself in the stop or in talking.

19  Q.  Do you remember any other reasons?

20  A.  And then third one, they ran my name and saw a 2009 arrest.

21  Q.  Were you arrested in 2009?

22  A.  Yes.

23  Q.  What for?

24  A.  I was charged with possession of marijuana with intent.

25  Q.  Was that about eight and a half years before the stop?

1    A.   Yes.

2    Q.   What was the result of that arrest?

3    A.   I went through a -- like a diversion program, and I was

4    successful in that, and the charge against me was dismissed.

5    Q.   I think you also mentioned that he found your brother's

6    behavior suspicious; is that right?

7    A.   Yes.

8    Q.   How was Sam acting during the time when Trooper Schulte was

9    at your window?

10   A.   He sat quietly with his hands in his lap looking forward.

11   Q.   How does Sam typically act around new people or situations

12   that he's uncomfortable in?

13   A.   He's not outgoing, he's quiet.  He's not -- he's not going

14   to just talk to people he doesn't know.

15   Q.   Have you ever seen direction from the Kansas Highway Patrol

16   on how motorists should act when being pulled over?

17   A.   Yes.

18   Q.   Do you have the exhibit binder beside you there?

19            MS. PERRY:  Your Honor, permission to approach?

20            THE COURT:  Yeah, sure.

21   BY MS. PERRY:

22   Q.   I'm going to turn here to Exhibit 7.  I don't want you to

23   talk about it yet, but do you see Exhibit 7 A in front of you?

24   A.   Yes.

25   Q.   Do you recognize what it is?

1    A.   Yes, it is a part of the Kansas Highway Patrol web site.

2    Q.   Have you seen that before today?

3    A.   Yes.

4    Q.   Does it fairly and accurately depict what you've seen on

5    the web site?

6    A.   Yes.

7         MS. PERRY:  Your Honor, I'd move to admit Exhibit 7.

8         THE COURT:  Any objection?

9         MR. CHALMERS:  Yeah, it's -- it's not relevant, and I

10   don't think it's adequate foundation in that it has not shown

11   when it was placed on the web site or have anything to do with

12   Trooper Schulte's observations.

13        THE COURT:  So you do need to lay a better foundation

14   about when he looked at this, what's the date of the screen

15   shot and so forth.

16   BY MS. PERRY:

17   Q.   Sure.  Did you take this screen shot?

18   A.   No.

19   Q.   Did you come to learn of it in the course of this

20   litigation?

21   A.   Yes.

22        MS. PERRY:  And Your Honor, I would just respond to

23   the objection to say I don't think it matters the time that it

24   was posted.  We're not offering it for hearsay purposes.  The

25   purpose we're offering it for is the Kansas Highway Patrol,

1    Trooper Schulte's employer, has directed people how they should
2    act around police officers, and specifically, when they are
3    pulled over, and that goes to Trooper Schulte's state of mind
4    about whether or not he found Mr. Sam Shaw's behavior that was
5    acting just like the Kansas Highway Patrol has told them to,
6    whether or not it's fair for Trooper Schulte to think that
7    that's suspicious.
8              MR. CHALMERS:  I don't know when this was put on the
9    web page.  I don't know if Trooper Schulte has ever looked at
10   it.  I think he said hasn't, and I think what we're trying to
11   do is put together some sort of training material argument,
12   which wouldn't be proper, violation for training, and the way
13   the objection's flow, the jury's going to have to think somehow
14   this suggests some untoward behavior by Trooper Schulte.  I
15   don't think it says that either, but it's some sort of I guess
16   opinion as to how to act that wouldn't be relevant in this --
17   to this particular stop to this particular trooper, Your Honor.
18             THE COURT:  So I mean, I take it you're not offering
19   it for the truth of the matter asserted.  You're just trying to
20   show that there was notice to drivers on how to act?
21             MS. PERRY:  That's right, how police officers to each
22   motorist act, and whether or not when they act in conformity
23   with that, if it's suspicious.
24             THE COURT:  It doesn't show how officers are taught.
25             MS. PERRY:  No, it's not related to training.

1         THE COURT:  It's just a statement apparently on the

2  web site.

3         MR. CHALMERS:  It's a statement on the web site.  I

4  don't know when it was put there.

5         THE COURT:  I know you said that.

6         MR. CHALMERS:  To suggest that that was put -- oh, I'm

7  sorry, go ahead.

8         THE COURT:  Okay.  It was during the course of this

9  lawsuit.  That's what --

10         MR. CHALMERS:  They discovered it during the course of

11  the lawsuit.  I don't know that it was on the web site during

12  the course of the stop or anything that was pertinent in this

13  lawsuit.

14         THE COURT:  Okay.

15         MS. PERRY:  Your Honor, and Mr. McInerney, with the

16  exhibit, when he talks with Trooper Schulte later, can ask if

17  Trooper Schulte was aware of it or not.

18         THE COURT:  Well, if we don't know whether it was

19  posted as of the time of the stop, then I think that's a good

20  objection.

21         MS. PERRY:  Sure, Your Honor.  My only response to

22  that would be, we could ask Trooper Schulte if motorists'

23  behavior in 2017 should have been any different than it was

24  today.

25         THE COURT:  Okay.  Well, when he testifies, you can

1    maybe offer it through him.

2         MS. PERRY:  Sure.  We'll move on.

3    BY MS. PERRY:

4    Q.  Mr. Shaw, as a result of this traffic stop and then

5    detention and search, were you cited for anything other than

6    speeding?

7    A.  No.

8    Q.  Were you cited for possession of illegal drugs?

9    A.  No.

10   Q.  Cited for possession of illegal guns?

11   A.  No.

12   Q.  Or any guns?

13   A.  No.

14   Q.  I'm going to move past your stop now.  After you were

15   finally released by Trooper Schulte, were you able to continue

16   on to Colorado?

17   A.  Yes.

18   Q.  Did you make any stops after that?

19   A.  Yes, I proceeded onto the next town, I believe it was Ellis

20   if I remember right where a gas station was, a Love's, and just

21   briefly stopped to assess the damage to all my stuff.

22   Everything was disheveled and not how I had it.  I was really

23   upset, and think I got some gas and -- and then proceeded on.

24   Q.  After that stop that you just told us about, did you

25   eventually make it to Denver?

A.  Yes.

Q.  What did you do in Denver?

A.  As soon as I got there, I found a place to park and try and get all my stuff back in order.  I mean, my blankets and stuff were all wadded up, no longer on my cot, pillows were thrown to the side, zippers on my luggage were broken, everything was disheveled, my bag of chips was sitting open, and so I spent some time getting everything back to how I had it.

Q.  In Denver, generally, what did you and your brother do?

A.  Well, we proceeded on to -- to Cherry Creek and spent the night there.

Q.  Did you go camping for a few days?

A.  Yes.

Q.  Did you visit anybody while you were in Denver?

A.  Yes, the next day, we visited the Roth family, which is my -- my brother's friend and his parents.

Q.  When you left Denver -- when did you leave Denver?

A.  Let's see, it was two -- 22nd, I believe day or two later, proceeded south to Colorado Springs, visited my extended family there, the Bennings (ph), they live in Colorado Springs, briefly visited there.

Q.  What did you do after Colorado Springs?

A.  When I -- when we -- when we travel and do these camping trips, instead of back-tracking, I like to -- like as I explained before, go north and catch I-70, and go to Denver,

1    and then there's I-25, the I-25 corridor runs along the

2    mountains, it's real scenic.  I love that drive; proceeded on

3    down to Trinidad.  I don't know if any of you been to Trinidad,

4    but it's really scenic there.  I like it there.  We spent a

5    night there and camping, and then proceeded eastward to the

6    bottom corner of Colorado to a town called Springfield, and my

7    brother wanted to stay in a hotel finally, just after

8    everything that had happened.  We don't usually do that.  We

9    stayed at a little hotel called the Stage Stop.  I know it was

10   really nice, and rested up there.

11   Q.   You mentioned you took a different route home.  Would you

12   have felt comfortable driving back through Kansas?

13   A.   No, especially not after that.

14   Q.   Did you eventually return home to Oklahoma City?

15   A.   Yes.

16   Q.   Once you returned home, did you ever file a complaint about

17   Trooper Schulte?

18   A.   No.

19   Q.   Why not?

20   A.   I didn't feel like that would go anywhere.

21   Q.   Did you do anything instead?

22   A.   Rather than file a complaint that likely wouldn't go

23   anywhere, I figured the best thing to do was pursue legal

24   action for accountability.

25   Q.   Mr. Shaw, can you explain to the jury how you would

1 describe your injuries and your damage from being detained and
2 required to wait for that canine sniff?
3 A. Umm, as I originally said, the Constitution means a lot to
4 me, and I learned a lot about it in my studies, and being out
5 in public and especially driving, which I used to like to
6 drive, I felt that, you know, I -- I -- I was protected by --
7 by those rights, and you know, if I -- if I commit a moving
8 violation, then I -- the Constitution will be followed, I'll be
9 ticketed, and everything can be taken care of properly. That's
10 how I used to feel. But instead, now, I'm concerned -- I -- I
11 have a concern in that after my experience, that -- that police
12 may -- can potentially -- I didn't think it would happen to me
13 until it did, and when it did, I think that they can ignore the
14 Constitution when it suits them, and play by their own rules,
15 and so after that, anytime I'd see law enforcement, I'd get
16 just -- just a really uncomfortable feeling in my stomach, like
17 a knot in my stomach and my chest, and just be really, really
18 uncomfortable, and so I didn't want to Uber anymore. I
19 wouldn't drive unless I had to. I've got a family, you know,
20 my wife was injured from the wreck, too, so there were times I
21 had to drive, you know, for shopping, and to take my daughter
22 to and from school, things like that, but I didn't do Ubering
23 anymore, and just for quite awhile after that, it was pretty
24 intense, just anytime I'd see law enforcement, especially if
25 one was behind me.

1    Q.   Do you feel like the stop had a lasting impact on you?

2    A.   Yes.  It's -- I've never -- like I said, I used to feel

3    that I was protected by the Constitution, and that rules would

4    be followed, and now I've learned from my experience that

5    they're not.

6    Q.   And I think you described a knot in your stomach and things

7    when you now are driving and see police.  Do you think that

8    that anxiety is something that will go away?

9    A.   It will never completely go away.  Like anything, time

10   heals to an extent, but it will never fully heal.

11   Q.   You mentioned that you stopped driving for Uber; is that

12   right?

13   A.   Yes.

14   Q.   Are you claiming lost wages in this lawsuit?

15   A.   Yes.

16   Q.   How much?

17   A.   I came up with an exact figure.  That figure was $9,435.44.

18   Q.   How did you come up with that number?

19   A.   When I started working for Uber in April of 2017, I had a

20   monthly average.  I like math, so I did figures.  I -- I looked

21   at my monthly amount and average for those months, 'cause I

22   worked consistently all the way through until that traffic

23   stop.  I didn't Uber at all in 2018, so I multiplied that

24   average, and this is the average after expenses, gas and

25   what-not, and the percentage Uber takes, and I multiply that by

1    12 for the entire year of 2018 that I did not Uber.  For 2019,

2    you know, as I said, time heals to an extent, I tried to ease

3    back into it, but I did not Uber to the extent that I did in

4    2017.  So did the same multiplication, monthly average by 12,

5    but I subtracted what I made -- what I was able to actually

6    make, and those two sums from those two years got me at that --

7    that amount.

8    Q.  You mentioned you took your monthly average in 2017.  In

9    2017, were you working for Uber what you would call full-time?

10   A.  No.  I -- I was, you know, under 40 hours a week.  Of

11   course, I just worked what I was able to handle with my pain

12   and everything, good days and bad days.  So when I have a good

13   day, I'd work as hard as I could, but the flexibility allowed

14   me to not be on a schedule where I had to be somewhere when I'm

15   having a bad day.

16   Q.  Do you think you would have been able to work full-time in

17   2018?

18   A.  No.

19   Q.  What about 2019?

20   A.  No.

21   Q.  Why not?

22   A.  My -- my pain level, good days and bad days, any sustained

23   activity causes me pain, whether it's sitting for a period of

24   time, and my back.  If it's standing, then it's my hip and my

25   lower back, so anything sustained that would equate to

1   full-time causes too much pain to be able to handle the

2   full-time hours.

3   Q.   And so you're not seeking lost wages for what would be

4   full-time work in 2018 and 2019?

5   A.   No, just the flexible job that I had driving for Uber.

6   Q.   Did you stop Ubering in 2020?

7   A.   By that time, the pandemic hit, and so I didn't Uber for

8   that reason.  So I did not include 2020 in my -- in my damages.

9   Q.   How has this stop, and then being detained and held for a

10  dog sniff affected any travel you might do through Kansas?

11  A.   I don't like to be in the jurisdiction of Kansas.

12  Q.   Do you do it if you have to?

13  A.   Yes.

14  Q.   How has it impacted your feelings about law enforcement

15  generally?

16  A.   I -- I'm not anti-police.  I -- I feel police provide an

17  important service, you know.  They -- there's people that would

18  victimize others, and they take them off the streets so that

19  they can't victimize others.  That's important.  That's an

20  important service, so I respect that.  I believe police deserve

21  the benefit of the doubt.  But from my experience in the

22  traffic stop, I learned what they're capable of, what they can

23  do, and that they'll violate your rights.  I didn't think it

24  would happen to me until it did, and that impacted that view in

25  that -- in that capacity.

1    Q.   After your stop and detention, did you post on social media

2    about it?

3    A.   I never made any posts, but I did make comments on people I

4    follow.  If somebody had something that -- that that were a

5    response regarding a traffic stop, my experience would be

6    pertinent, then I would make comments, so comments, not posts.

7    Q.   Why?

8    A.   Just to say, hey, whatever -- based on whatever the post

9    was, hey, this is what happened to me, and I'd mention what

10   happened to me in -- in -- in a -- in conjunction with it being

11   related to whatever the post was about.

12   Q.   Mr. Shaw, can you tell the jury why you brought this

13   lawsuit?

14   A.   Look, as I said, the Constitution means a lot to me.  It

15   defines what the United States of America is as a free country.

16   It's important.  People fought and died for it, and I want

17   accountability.  That's why I filed this lawsuit.  I filed it

18   not just for myself, but for everyone that's had their rights

19   violated that had no recourse, they just who had to roll over

20   and take it, and that's why I'm here, for that reason, so that

21   there's accountability, and hopefully, it won't happen again to

22   others.  I have a daughter, maybe I'll have grandkids, and I

23   hope for a future where the Constitution is honored and

24   respected by law enforcement.

25        MS. PERRY:  Your Honor, I'll pass the witness.

1          THE COURT:  Cross-examination.

2          MR. CHALMERS:  Yes, Your Honor.

3                    CROSS EXAMINATION

4    BY MR. CHALMERS:

5    Q.  I'm going to want to show this, but do we need to turn a

6    switch on or anything?  Once I just -- or can I just plug in

7    the -- here, I'll test it real fast.  Oops.  That's not showing

8    my screen.

9          MS. HARPER:  You might have to do it from the table.

10   Maybe you don't have it in the right port.

11         MR. CHALMERS:  Well, with my little training, this is

12   what I was told I could use.  See if I can't do it from the

13   table.

14         MS. HARPER:  Oh, try one more time.  Sorry, Mr.

15   Chalmers.

16         MS. PERRY:  Mr. Chalmers, are you playing one of the

17   exhibits that was all ready admitted?

18         MR. CHALMERS:  Not necessarily.  This is showing

19   what's all ready been admitted.

20         MS. PERRY:  Is this an exhibit that was all ready

21   admitted?

22         MR. CHALMERS:  Okay.  Here we go.

23         THE COURT:  I'm sorry, what exhibit are you -- are you

24   trying to --

25         MR. CHALMERS:  Well, what I showed is the same as

1    Exhibit Number 1.  It's my Exhibit 803 that I'm going to offer
2    in a bit, but the part that -- just to make sure that the
3    screen works, and I've got my dog up there.
4            THE COURT:  Okay.  Well, why don't you take it down
5    for now, and if you're discussing Exhibit 1, why don't we just
6    stick with Exhibit 1.
7            MR. CHALMERS:  Well, I'm going to offer Exhibit 803,
8    because it shows things that Exhibit 1 does not show, Your
9    Honor, but I'll --
10           THE COURT:  Okay.
11           MR. CHALMERS:  I'll go get to that in a minute if
12   that's all right.  I just wanted to make sure mine is up.
13   BY MR. CHALMERS:
14   Q.   Mr. Shaw, just that -- I'm not sure we have it in the
15   record.  On the date of this particular stop, you were, what,
16   34 years old?
17   A.   Yes.
18   Q.   Your birthday is November 19th, 1983; is that correct?
19   A.   Yes, I had just turned 34 the month before.
20   Q.   Okay.  And you were living in Oklahoma City at your
21   grandmother's place; is that right?
22   A.   Yes, at a house that she owned, but I did not live with my
23   grandmother.
24   Q.   I understand.  And she was paying for the gas, the water,
25   the electric bills and so forth?

1      MS. PERRY:  Objection, Your Honor, relevance.

2      THE COURT:  Relevance?

3      MR. CHALMERS:  I think we're going to get into whether

4  or not he had a reason to necessarily need to or want to work,

5  Your Honor.

6      THE COURT:  So this goes to damages?

7      MR. CHALMERS:  Yes.

8      THE COURT:  Okay.  The objection is overruled.

9  BY MR. CHALMERS:

10  Q.  So I think the question I was asking you, you were living

11  in your grandmother's house, the house on Redmond Avenue in

12  Oklahoma City; is that right?

13  A.  Correct.

14  Q.  You were living there with your wife and your daughter; is

15  that correct?

16  A.  Correct.

17  Q.  And your grandmother's paying the water, the gas, electric

18  bills; is that right?

19  A.  Yes.

20  Q.  And you've been allowed to stay in that house starting in

21  2012, well, essentially rent free by your grandmother; is that

22  correct?

23  A.  Correct.

24  Q.  Now, you were in this accident in 2009, and between 2009

25  and 2012, I don't think you worked during that period; is that

1   right?

2   A.   Correct.

3   Q.   And in between 2012 and 2017, again, until you started the

4   Uber job, you had not been working; is that right?

5   A.   Correct.

6   Q.   Now, you have been a permanent resident of Oklahoma City

7   since 2011; is that correct?

8   A.   Correct.

9   Q.   And up until -- the longest period you'd spend in Colorado

10  was probably just a couple weeks, and that was up until the

11  time of the stop, and that was probably in 2014; is that right?

12  A.   Correct.

13  Q.   The stop itself took place, what, shortly before Christmas.

14  It was on the 20th of December.  Does that sound right?

15  A.   Yes.

16  Q.   And your wife and your daughter, they were back at home

17  during this stop; is that right?

18  A.   Yes.

19  Q.   Okay.  And you were headed to -- according to what you told

20  the officer on tape, to see family in Denver.  Isn't that --

21  isn't that what you told them on the --

22  A.   That is what I said, yes.

23  Q.   But in fact, you don't have any family in Denver, do you?

24  A.   Well, I was referring to family in Colorado Springs.  I

25  really -- what I should have said is friends and family in

1    Denver and Colorado Springs, so...

2    Q.   You don't have any family in Denver, do you?

3    A.   Blood family, no, but the Roth's are like family to us.

4    Q.   And you -- the family you had in Colorado Springs --

5    Colorado Springs is really about an hour's drive away from

6    Denver; isn't that right?

7    A.   Roughly, maybe a little less.

8    Q.   Now, you indicated to your brother to try to make you feel

9    better, look, on the tape, you volunteered, we're just

10   traveling to Denver to see family; isn't that right?

11   A.   Yes.

12   Q.   And you said that was to make him feel better?

13   A.   Correct.

14   Q.   Are you now saying that it was also because, well, you had

15   this kind of what you feel like extended family in Denver?

16   A.   Yes.

17   Q.   Okay.

18   A.   And Colorado Springs, both.  I just said Denver to shorten

19   it.

20   Q.   Okay.  And you remember being deposed in this case.  I had

21   the opportunity to talk to you.  It was during the peak of

22   masks and all that.  We did it by Zoom.  You remember that,

23   don't you?

24   A.   Yes.

25   Q.   And you were testifying under oath in that deposition;

1  isn't that right?

2  A.   Correct.

3         MR. CHALMERS:  Your Honor, if I may give him the

4  original deposition; is that all right?

5         THE COURT:  Sure.

6  BY MR. CHALMERS:

7  Q.   I'm going to approach you and hand that to you real fast.

8  Now, if you would turn to Page 63, please.

9         THE COURT:  If I could jump in here.  Members of the

10 jury, you may not know what a deposition is, and so let me just

11 explain that.  After a lawsuit is filed, there's a period of

12 time where both sides can participate in what we call

13 discovery.  Discovery is a period of time where each side has

14 various tools they can use to try and figure out what the other

15 side's evidence will be at trial, and also to preserve evidence

16 for use at trial.  So it's -- it's really very similar to a

17 trial, except that it usually takes place in a lawyer's office.

18 There's -- the witness is there, attorneys from both sides are

19 there, there's a court reporter, each side asks questions,

20 direct examination, cross-examination, exactly like what you're

21 seeing here except there's no judge who's present, nobody's

22 presiding.  After the questioning is done, the court reporter

23 types everything up in a booklet like what Mr. Shaw has in

24 front of him, and it's a transcript of all the questions and

25 answers.  The witness then has 30 days to go through that and

1   make any corrections or changes if it's not an accurate

2   transcript.  The witness then signs the deposition and attests

3   under oath that it's an accurate transcript.  So sometimes, we

4   use these transcripts really for two purposes.  If for some

5   reason, the witness isn't available to testify at trial,

6   sometimes we can -- the parties can use the transcript instead

7   of having a live witness, or if the witness comes to court and

8   says something different than what the witness said at the

9   deposition, then the attorneys can try to impeach the witness,

10  or question his credibility or her credibility by pointing out

11  the inconsistency in the testimony.  Go ahead.

12  BY MR. CHALMERS:

13  Q.   Thank you, Your Honor.  And I was going to ask you to turn

14  to Page 63, Mr. Shaw.  Are you there?

15  A.   Yes.

16  Q.   Okay.  Before we talk about the specifics of your

17  testimony, your deposition was taken on October 2nd, 2020.  You

18  see that on the first page?

19  A.   Yes.

20  Q.   And the judge explained the procedure.  I asked questions,

21  you answered them under oath, the same oath as you just took a

22  few moments ago?

23  A.   Yes.

24  Q.   Now, at the time of your deposition, the question was asked

25  starting at 18, if the video reflects that you did -- I'm

1    sorry, let's start at 14. Do you remember telling your brother

2    on the video that you two were traveling to see family in

3    Denver, and you said, I don't remember. And the question is,

4    if the video reflects you did, why would you have said to your

5    brother, we're traveling to Denver to see family or words to

6    that effect? Now, your answer was, I don't know, wasn't it?

7    A.   Didn't remember at the time of the deposition.

8    Q.   So now, you remember a little bit more than two years later

9    that it was to make your brother feel better, and because the

10    family you had in Denver was -- you felt like was extended

11    family. Is that your testimony?

12    A.   On further reflection and review, yes.

13    Q.   Now, my point, or my interest, however, is the conversation

14    you had with the trooper about this family, and that was during

15    -- and you saw the video, during your second conversation with

16    the trooper where you were asked where you were headed; isn't

17    that right?

18    A.   Yes.

19    Q.   And you asked him -- or he asked, and you said, I'm going

20    to go see family in Denver, and again, we've talked about this

21    is now you're thinking some sort of extended family, I guess.

22    Is that your testimony?

23    A.   Yes, I think what I should have said was friends and

24    family.

25    Q.   But what you didn't say is, I'm going there to go camping,

1  did you?

2  A.  No, I didn't think I needed to explain all of my plans.  I

3  just kept it simple.

4  Q.  And I appreciate your comments.  I -- I really do.  You

5  understand that it's important that the jury hears your

6  testimony, and you don't need to necessarily feel like you have

7  to defend yourself.  You understand that, don't you?

8  A.  I'm just trying to be thorough.

9  Q.  Now, let me talk to your about your damage claim for a

10  moment.

11  A.  Yes.

12  Q.  It's fair to say that you at some point made a claim for

13  generically what were called non-economic damages for -- as

14  your injuries in this lawsuit.  You remember that, don't you?

15  A.  Define the non-economic damages.

16  Q.  Well, I can show you your answers to interrogatories.

17  Would that help?

18  A.  Yes.  I just can't remember that phrase.

19          THE COURT:  I'm sorry, where are we going with this?

20  Because we don't -- we don't allow testimony about claims in

21  pleadings.

22          MR. CHALMERS:  Well, I can probably change it, but --

23  Your Honor, but I think what the evidence is going to be is

24  that now that all the injuries that he had claimed had been

25  related to the search and the subsequent activity, and not to

1   the detention.

2          THE COURT:  Okay.  Well, let's move on then.

3          MR. CHALMERS:  Okay.  Appreciate it.  In any event,

4   the damages that you have claimed in this case, let me just see

5   if I can't get this right, you've discussed -- we've discussed

6   them before, it's always been --

7          THE COURT:  Counsel, we're going to talk about damages

8   he claims now, okay?

9          MR. CHALMERS:  Okay.

10  BY MR. CHALMERS:

11  Q.  The damages, when you were asked what your damages were on

12  this lawsuit, all related to the injuries that you claim for

13  the search attending the delay, didn't they?

14  A.  Could you -- could you explain what you mean?

15  Q.  Well, let's put it this way.  Do you remember being asked

16  at your deposition, if this matter goes to trial, you will no

17  doubt give a description of what your injuries and damages are

18  as a result of the stop and detention, and this is my

19  opportunity to learn what your testimony would be, and then I

20  asked you to tell me what you're going to tell the jury.  You

21  remember that line of questioning, don't you?

22  A.  It sounds familiar, but I'd have to see it again to

23  remember specifics.

24  Q.  And you remember that then in describing what it was that

25  you were claiming, and you said you would claim to the jury as

1 injuries and damages as a result of the stop and detention were

2 that I was searched without my consent, and my property was

3 damaged, and that basically, my rights were violated.  You

4 remember saying that, don't you?

5 A.  Sounds right.

6 Q.  Yeah.  What you didn't say is that --

7       MS. PERRY:  Your Honor, this is improper without

8 stating the line and page number that we're on.  This is just

9 improper impeachment.

10       THE COURT:  I don't know where you're coming from.

11 Are you using the deposition?  Because the pretrial order

12 contains the damages claims, and if you're going to question

13 him about his damages, they're stated on Page 46 of the

14 pretrial order.

15       MR. CHALMERS:  Your Honor -- Your Honor, for counsel's

16 benefit, the examination starts at Page 88 at Line 21, and

17 until he testifies any differently, I didn't know that it was

18 necessary for me to point that out.  For your benefit, Your

19 Honor, what I was asking was, in this lawsuit, what he was

20 claiming for damages.

21       THE COURT:  Would you approach please?

22       MR. CHALMERS:  Sure.

23    (Proceedings held at the bench, outside the hearing of open

24 court.)

25       THE COURT:  I think everybody's aware that the damage

1    claims have changed, and everybody knows why, because of

2    rulings, and so I don't think it's fair for you to try and

3    impeach him by evidence that his claims have shifted in

4    response to one of the rulings that I've made.  That's

5    Number 1.  Number 2, it's -- it's -- you're -- as I think

6    everybody's aware, the lawyers are the ones that set -- tee

7    that -- tee up the damage claims, and unless you can show that

8    he personally made strategic decisions to put damage claims in

9    this bucket or that bucket, I don't think that that's fair

10   cross-examination.

11        MR. CHALMERS:  What I think I'm trying to get at is,

12   his testimony was, is tell me how you've been damaged, how

13   you've been hurt, then he gives that testimony.  Then I asked

14   him how does this impact you and why, and he hasn't quite got

15   there yet, but none of it has to do with the period of time

16   that he sat in the car.  It all had to do with the search, with

17   the dog getting in his vehicle, with the damage to his -- to

18   his property.  That's -- that's always been what he's claimed

19   causes his injury in this case.

20        MS. PERRY:  Your Honor, I would add that we have

21   interrogatory responses here.  He asked how he was damaged, and

22   he said, I have suffered emotional injuries as a result of my

23   unlawful detention, and I have also sustained financial injury.

24   We also talked about his injuries and damages in the pretrial

25   order.  He can ask Mr. Shaw if he feels damaged from that first

1   part of the detention or not, but what he's doing is improper,

2   and as you've discussed, claims have changed, certain claims

3   have gone, and he's not claiming damages for the part after the

4   search after the dog alert.

5           MR. CHALMERS:  I'd just like to put on his testimony

6   as to what he said what his damages or what his injuries are,

7   why it was that he was hurt, how he thought he had this

8   emotional distress.  He's saying something different now,

9   that's true.

10          THE COURT:  I guess I understand the distinction,

11  because you're saying originally, he was claiming damages for A

12  plus B.  Now he's only claiming damages for A.  That's not

13  really inconsistent.

14          MR. CHALMERS:  Never claimed damages for A, he only --

15          THE COURT:  It's right here in the pretrial order.

16  How can you say he didn't?

17          MR. CHALMERS:  In his testimony, he never described

18  the injuries in the delay.

19          THE COURT:  Did you ask him?  Did he say that you're

20  not claiming any damages for the period before the search?

21          MR. CHALMERS:  No.  What I asked was, in his

22  deposition, what injuries you had, what are you claiming, what

23  are you going to tell the jury are your damages in this case,

24  and he provided the answer.  That answer does not talk about

25  anything to do with the detention.

1        THE COURT:  Okay.  So maybe he gave an incomplete

2   answer.  You disagree with what she says he disclosed in the

3   interrogatory answers that there was a claim?

4        MS. PERRY:  And the interrogatory responses, for the

5   record, were signed July 15th of 2020, and it's Interrogatory

6   Number 11.

7        MR. CHALMERS:  I don't -- I was -- I don't know when

8   it's signed.  They say when it was signed.  Unlawful detention,

9   he signed a little bit differently.

10       THE COURT:  I'm sorry, I can't understand when you

11  mumble.  I know it matters to the court reporter and me, but

12  okay.

13       MR. CHALMERS:  As it concerns to the unlawful

14  detention, in the interrogatory answer, if she thinks that

15  that's talking about something different, she's free to try to

16  rehabilitate him.  In his deposition, bring the transcript.

17  That's not what he said.  I asked him, why is it that you are

18  hurt, what are your damages in this case?  He gives an

19  explanation.  Said, well, how has that impacted you?  He gives

20  that explanation, and it all has to do with the search and the

21  resulting activities after the search, and it's a causation

22  question, the damage he's claiming.

23       THE COURT:  I will let you have five more minutes on

24  this, and then we're going to move on, just because I mean, I

25  will give you free range to cross-examine him, but I expect

1  impeachment to be about material matters, not failing to

2  volunteer information that you didn't ask about, or information

3  that has been otherwise discovered.  So go in, give it your

4  best shot, and then they can deal with it on redirect.  Okay?

5      MS. PERRY:  Your Honor, I'd also ask if there's going

6  to be impeachment that there be page and line numbers so we can

7  track that as well.

8      THE COURT:  Right.

9  (Proceedings continued in open court.)

10  BY MR. CHALMERS:

11  Q.  Now, I think the question that I was trying to ask, and see

12  if I -- 'cause I lost sight of where we were.  I wanted a

13  description of your injuries and damages as a result of the

14  stop and detention, and the only response that you talked about

15  in the deposition was that I was searched without my consent,

16  and my property was damaged, and that basically, my rights were

17  violated.  Isn't that true?

18  A.  Yes, that was part of it.

19  Q.  Well, that was the answer you gave, wasn't it?

20  A.  Correct.

21  Q.  Then you were asked --

22      MS. PERRY:  Mr. Chalmers, can you please give us a

23  page number for impeachment?

24      MR. CHALMERS:  Page 88, starting at Line 21 is the

25  whole length of it, through 89 to Line 23.

1   BY MR. CHALMERS:

2   Q.  Then you were asked, tell me how this has, and I

3   paraphrase, how this has impacted you on some level, if you

4   can, and you said well, following the traffic stop, I didn't

5   like to drive, I felt like my rights weren't protected, and I

6   know the police were going to play by their own rules, and that

7   stuff, just fair game at the time.  Isn't that basically what

8   your testimony was?

9   A.  Yes.

10  Q.  And it was as a result of the previous question, because

11  you were searched without your consent?

12  A.  I was searched because I was detained, prior to that.

13  They're both reasons, equally.

14  Q.  Well, you -- okay.  I -- but you're now stepping back the

15  search.  You're saying it was the detaining that was the

16  problem and not the resulting search?

17  A.  I was searched because I was detained.  Both were

18  Constitutional concerns to me, and both resulted in those

19  damages, but there was physical damage in the search.

20  Q.  But is it at least fair to say that, sir, when you

21  testified in your deposition, rather than talking about the

22  injury, as you said, the part of it from the detention, you

23  talked only about injury from the lack of your consent?

24  A.  I should have mentioned both.

25       MS. PERRY:  Your Honor, objection.  Your Honor, asked

1    and answered.

2         THE COURT:  Sustained.

3    BY MR. CHALMERS:

4    Q.  And you were invited to make corrections to your deposition

5    if it was incomplete, weren't you?

6    A.  Yes.

7    Q.  In fact, there was an explanation that the outset to go

8    ahead and make those corrections, and at the very end of the

9    deposition, you were reminded to go ahead and make those

10   corrections if you like; isn't that correct?

11   A.  Correct.

12   Q.  And if you turn to -- when you -- when -- when we talked

13   about it, and we've talked a little bit at length, and I'll

14   move on, but you never mentioned any anxiety from while you

15   were waiting in the car, did you, in your deposition?

16   A.  I don't remember if I did or not about the waiting part.

17   Q.  When you were waiting in the car, did you see anybody that

18   you recognized that you knew?

19   A.  My brother was with me, but aside from that, no.

20   Q.  No.  Everybody else going by was probably pretty much a

21   stranger?

22   A.  Yeah.

23   Q.  And they were coming up to the stop light, stopping and

24   moving on; is that right?

25   A.  Yes.

1    Q.   So they wouldn't have known whether you were there for five

2    minutes, two minutes, or 20 minutes if they just came up to the

3    stop light and moved on; isn't that right?

4    A.   Right.

5    Q.   And then when you were outside waiting for the dog, that

6    was about -- about, what, five minutes, four minutes, that you

7    waited before the dog came back and they told you that it had

8    alerted?

9    A.   I don't remember.  It felt like a long time to me.

10   Q.   And you knew that Officer Schulte had not run the dog;

11   somebody else was running the dog, didn't you?

12   A.   Yes.

13   Q.   And you were asked about Officer Schulte and the dog going

14   through the passenger window that you left down.  Are you

15   implying that Officer Schulte in some fashion directed that the

16   dog go through the open window?

17   A.   I don't know.

18   Q.   You were asked about economic damages.  Those are the ones

19   that you say you lost from Uber, and you explained how you went

20   through that counting those.  The rate of an Uber driver's

21   salary on an hourly basis, Uber kind of publishes that and

22   tells you here what you can kind of expect, doesn't it?

23        MS. PERRY:  Objection, Your Honor.  Objection, Your

24   Honor, hearsay if he's about to talk about what Uber says.

25        THE COURT:  Sustained.

1   BY MR. CHALMERS:

2   Q.   Do you know what the -- about the approximate rate of an

3   Uber driver's salary is on an hourly basis?

4   A.   No.

5   Q.   When you were applying to become an Uber driver, did you

6   look into what your potential income was?

7   A.   No.

8   Q.   And did you try to sort out how much you were making on an

9   hourly basis?

10  A.   I didn't think of it as an hourly thing.  I thought of it

11  as per ride, and how long I could handle it for, and how much I

12  made.

13  Q.   Okay.  And so on the ride, you and Uber both share what you

14  recover on a given fare; is that right?

15  A.   Correct.

16  Q.   And how long would a typical fare take?

17  A.   It varied anywhere from a couple miles to 25 miles.

18  Q.   Okay.  Let's take a 25 mile drive.  You have to go pick up

19  the person, collect them, and deliver them.  That's part of the

20  Uber feature; is that correct?

21  A.   Correct.

22  Q.   And so for 25 mile ride, about how long does that take?

23  A.   Umm, it depends on the destination, and whether it's

24  highway; depends on the conditions, it's daytime, nighttime,

25  traffic, so time-wise, I couldn't tell you.

1   Q.  Okay.  Sure.  I'm not asking you to be precise.  I'm trying

2   to ask you what on average that might be.

3   A.  Well, probably -- probably a half -- for 25 mile ride,

4   probably a half hour, I guess, just give or take.  It's just a

5   guess.

6   Q.  So -- well, you had to get there, I guess.  So can we maybe

7   just to be fair say the time to get there, the time to make the

8   drive, hour?

9   A.  It varies.  Sometimes to pick up that 25 mile ride, they

10   may be a mile away, they could be a couple; every -- every

11   scenario's different.

12   Q.  Would be a lot shorter?

13       MS. PERRY:  Your Honor, I'll object to this line of

14   questioning as speculative.  He's just asking Mr. Shaw what it

15   might take.

16       THE COURT:  Sustained.

17   BY MR. CHALMERS:

18   Q.  And how much do you get in terms of your share for a 25

19   mile pick-up and delivery?

20       THE COURT:  If you know.

21       THE WITNESS:  It depends on if I get a tip or not, for

22   starters.  It depends on if it's an Excel ride, the rate's

23   different.  If you have a van and can seat more people, then

24   it's a higher rate.  I'd have to have a calculator to tell you

25   for sure.

1  BY MR. CHALMERS:

2  Q.  Well, let's say we've got one person in this ride, and you

3  go 25 miles, and let's say they don't give you a tip.

4       MS. PERRY:  Your Honor, I continue to object to the

5  speculation, and ask that we move on.

6       THE COURT:  You haven't shown a foundation that he has

7  the knowledge to answer these, so, so far he said he doesn't

8  know in response to every one of your questions.  So if you can

9  establish that there is some knowledge here, that's fine to ask

10  him.

11  BY MR. CHALMERS:

12  Q.  You are an Uber driver, or were, weren't you?

13  A.  Yes.

14  Q.  And you did charge people as part of the Ubering, didn't

15  you?

16  A.  Uber charged them, and it added up on the phone app.

17  Q.  And you kind of knew what they were charging you, because

18  you'd get a share of it, didn't you?

19  A.  To tell you, I'd have to look at the -- and calculate it to

20  tell you what it would be.

21  Q.  What, you didn't know that you were getting a share of what

22  the Uber ride was?

23  A.  Okay.  I can tell you the percent average.  I would get

24  75 percent of what was total collected.

25  Q.  And as an Uber driver, you have no sense as to any distance

1   as to what generally the Uber fare would be?

2        MS. PERRY:  Your Honor, I'm going to continue to

3   object.  If he wants to ask him about a specific ride that Mr.

4   Shaw's taken, we'll do it, but that's not what he's asking.

5   He's just asking him to speculate as to what some ride might

6   be.  He's all ready testified, depends on traffic, depends on

7   tips; just ask that he moves on.

8        THE COURT:  Rumor has it that Uber uses surge pricing,

9   so it wouldn't even be the same.  If you can lay a foundation,

10  I'd say this is a fair subject, but I don't know where you're

11  going with this.

12       MR. CHALMERS:  Okay.  Your Honor, I think I've taken

13  an indirect route in making things a little bit more difficult

14  than it can be, and I apologize.

15  BY MR. CHALMERS:

16  Q.  You've been an Uber driver.  It's not your testimony that

17  you're clueless about what an Uber ride would generate to you

18  an income; is that right?

19  A.  I didn't really look on it on a per ride basis.  I would do

20  ride after ride as long as I could and look at the bigger

21  picture, not broken down per ride.  I really --

22  Q.  Okay.  And what you're also saying is, I do ride after

23  ride, but I have no idea as to how many hours or how many days

24  I put into that; is that right?

25  A.  It varied, depended on my pain level.  I can't -- I

1    can't -- there's -- I don't know.

2    Q.   Okay.  So are you able to think of a ride that you gave

3    that, what, took about 20 minutes or so, what the rate was

4    charged to the -- to the individual for which you got

5    75 percent?

6    A.   Would depend on if it was an Excel ride.

7    Q.   I'm asking if you can think of one that you did.

8         THE COURT:  Think of a specific ride for 20 hours that

9    he gave somebody?

10        MR. CHALMERS:  No, for 20 miles.

11        THE COURT:  20 miles.  Okay.

12        THE WITNESS:  For 20 miles?  I haven't driven Uber in

13   a while.  You ask me to reach back to a few years.

14   BY MR. CHALMERS:

15   Q.   And -- okay.

16   A.   So can you ask the question again so I can try and give you

17   a number?

18   Q.   Well, I understand that you -- that this is going to be an

19   effort that's difficult for you to give me an answer, so what I

20   would prefer to do is get you to agree that you have no idea

21   what your hourly rate was on your Uber driving.

22   A.   I didn't look at it like that, and I didn't care.  Cared

23   about how much I could make, and I made a certain amount per

24   month on average, and that's what it was, and that's all.

25   Q.   You're not claiming you made a hundred dollars an hour, are

1   you?

2   A.  No.

3   Q.  Much less than?

4   A.  Yes.

5   Q.  Now, all your Ubering was in Oklahoma; isn't that right?

6   A.  Yes.

7   Q.  Not in Kansas?

8   A.  Correct.

9   Q.  There was no risk to Ubering in seeing Officer Schulte

10   again; isn't that right?

11   A.  Correct.

12   Q.  Or any other Kansas Highway Patrol; is that right?

13   A.  Correct.

14   Q.  You've indicated that you weren't suspicious of law

15   enforcement before, but that someone recommended that you video

16   any stop you had.  Was that what you're saying?

17        MS. PERRY:  Objection, Your Honor.  Mr. Shaw never

18   testified to that.

19        MR. CHALMERS:  Did you -- were you suspicious of law

20   enforcement before?

21        THE WITNESS:  Before -- before the 2017 traffic stop,

22   was I suspicious of law enforcement before that?

23   BY MR. CHALMERS:

24   Q.  Yeah.

25   A.  Sure.  There is a lot of -- lot of videos on YouTube over

1   the years prior to that, so to a certain degree, but much more

2   since then when it happened to me.

3   Q.  And the video you made in this instance was because it was

4   your view that police could be dishonest; isn't that right?

5   A.  Could you -- could you repeat the question?

6   Q.  The video that you took in this instance for this stop was

7   because of your concerns about your views that police could be

8   dishonest; isn't that right?

9   A.  No, not necessarily.  I would say I took the video to

10  ensure my rights were protected, and I did so because I know

11  police have their own recordings, but it is notoriously

12  difficult for a citizen to get a police video in certain

13  instances, so it's better to have my own.

14  Q.  You turned the video on when you first realized you were

15  about ready to be pulled over, didn't you?

16  A.  No, I believe I turned it on once I -- as soon as I was

17  stopped, not while I was driving.

18  Q.  Oh, I get that.  And there's an app on your vehicle that is

19  designed to allow you to readily start the video.  You had that

20  app in your phone -- in your car?

21  A.  On my phone, yes, there was an app, a background recording

22  app that just records in the background.

23  Q.  Now, you -- after this event in 2017, although you weren't

24  Ubering at that time, I guess you drove to Coffeyville to visit

25  family several times; isn't that right?

1   A.   Rarely, with my wife, when my wife insisted, 'cause she

2   needs to see her family, too, and so we would go on occasion.

3   Q.   And you would also, I think you indicated, be able to drive

4   your daughter around and wife, if needed, when you weren't

5   Ubering; isn't that right?

6   A.   Yes.

7   Q.   As of the date of the deposition, you'd been back to

8   Colorado two or three times.   The deposition was 2020; is that

9   right?

10  A.   Yes.

11  Q.   And you always took I-70 those time periods, didn't you?

12  A.   Yes.

13  Q.   You were pulled over for speeding, you were going 91 miles

14  per hour in the 75-mile per hour zone; isn't that right?

15  A.   Yes, that was the ticket I received.

16  Q.   And you were in your father's vehicle; is that correct?

17  A.   Yes.

18  Q.   And you didn't have any ownership interest in the vehicle

19  at the time, did you?

20  A.   No.

21  Q.   And you didn't stop right away; isn't that correct?

22  A.   Correct.

23  Q.   Now, do you have a memory of hearing a siren?

24  A.   Never.   I never heard a siren at all.

25  Q.   Okay.   So the video was on, and you remember hearing kind

1   of a shrill noise when your video came on?

2   A.  It was more low pitch.  It didn't sound like a normal

3   siren.  It was weird to me when I heard it in the video and --

4   Q.  And the question I guess is that low pitch, if that's the

5   radar, would that indicate when you were clocked at going 91,

6   to your knowledge?

7         MS. PERRY:  Objection, Your Honor, speculation.

8   BY MR. CHALMERS:

9   Q.  If he doesn't know --

10  A.  I don't know.

11        THE COURT:  Do you know?

12        THE WITNESS:  I don't know.

13  BY MR. CHALMERS:

14  Q.  Okay.  But I thought maybe you had indicated that the siren

15  came on when you were passing the trooper's vehicle.  That's

16  not accurate apparently?

17  A.  I never indicated that.  I've never indicated anything

18  about a siren.  I never heard a siren.  I only saw lights in

19  front of the truck a little ways down in the other lane from

20  me, and that's -- that was the only indication I received.

21  Q.  And when you saw the lights, you were -- this is after you

22  were passing a truck; is that right?

23  A.  Correct.

24  Q.  And the truck, this -- I-70 out there is a four lane

25  highway; right?

1    A.   Yes, two lanes each way.

2    Q.   Okay.  So you're westbound and the truck is in the lane

3    lane -- the curb lane.

4    A.   Yes.

5    Q.   And you'd be in the passing lane; is that right?

6    A.   Correct.

7    Q.   And you found it necessary to go 91, you felt, to get

8    around the truck?

9    A.   I was not aware I was going 91.  I certainly wasn't

10   deliberately trying to go 91.  I was focused on the road and

11   trying to safely pass the truck.  I don't know if the truck

12   sped.  I really don't know.

13   Q.   And just about the time you get past that truck, that's

14   when you saw something alerting you that the trooper, what, had

15   turned on his lights?

16   A.   As soon as I saw lights, my foot went off the gas first

17   thing.

18   Q.   Sure, and you probably looked down at your speedometer at

19   that point, didn't you?

20   A.   Possibly.  I don't remember.  I do know that I was not

21   speeding as I passed the trooper.

22   Q.   You --

23   A.   I remember that.

24   Q.   Okay.  So you immediately slowed down so that you wouldn't

25   be speeding when you passed the trooper; is that right?

1   A.  Well, I knew I needed to get in front of him in case he was

2   trying to pull me over, trying to do the right thing, and I

3   wasn't going to speed past him, and I know I wasn't, 'cause I

4   remember that for sure.

5   Q.  Okay.  So you are -- you're -- you sped up to pass the

6   truck, you may have looked at your speedometer, but you took

7   the foot off right away when you saw some lights, and then you

8   passed the trooper; is that right?

9   A.  Correct.

10   Q.  Okay.  And you didn't associate the fact that you'd been

11   speeding with the trooper's lights?

12   A.  I didn't know.  He was ahead of me.  I didn't know it was

13   possible to clock somebody from that vantage point.  I had no

14   idea.

15   Q.  And so you pulled around the trooper, you got into the

16   right lane; is that correct?

17   A.  Correct.

18   Q.  And then you hit the brakes a couple different times before

19   you stopped.  Was that to slow down further?

20   A.  I don't remember.  I just know I was trying to get in front

21   of him safely and at a proper distance, signaling and doing it

22   properly so that I could be in front of him, so that if he was

23   trying to pull me over, he could pull me over properly.

24   Q.  There are a lot of vehicles that were even further in

25   advance of you when you were pulled over to the -- going

1  westbound; is that right?

2  A.  I'm not sure what was directly ahead of me, but I know I --

3  there would be -- once I got in front of Trooper Schulte, was

4  vehicles ahead of me at that time.  I safely merged into the

5  other lane.  That's how I remember it.

6  Q.  And from the trooper's perspective, is it fair that he

7  would have seen a vehicle in front of him pull in front of his

8  vehicle with his lights on, to continue to travel basically a

9  mile down the road before it pulled over?

10  MS. PERRY:  Objection, Your Honor, speculation.

11  Trooper Schulte can testify to what he saw.

12  THE COURT:  Rephrase the question please.

13  BY MR. CHALMERS:

14  Q.  Sure.  Trooper was behind you when you pulled over?

15  A.  After I'd changed lanes and got in front of him.

16  Q.  So from his vantage point, the person in that vehicle as he

17  was following you would have seen another vehicle, your

18  vehicle, continuing to drive on approximately a mile before it

19  pulled over to the side of the road; isn't that right?

20  A.  Can you -- can you -- can you repeat that?  I don't know

21  what you mean.

22  Q.  You pulled -- drove approximately a mile down the road with

23  a trooper with his lights lit behind you before you pulled

24  over, didn't you?

25  A.  Got in front of him still not knowing if it was for me.  I

1 knew the ramp was ahead, and that was a safe place to pull

2 over, and I felt I had that right. It was a mile. That's like

3 a minute, less than a minute going the speed limit, and --

4 Q. I'm wondering if you can answer my question. You drove for

5 approximately a mile in the right lane before you pulled over

6 with a trooper behind you with his lights on?

7      MS. PERRY: Objection, Your Honor, asked and answered.

8 BY MR. CHALMERS:

9 Q. True?

10      THE COURT: Sustained; he has answered.

11 BY MR. CHALMERS:

12 Q. Well, when you got to the bottom of the ramp, the first

13 thing the trooper pointed out to you was, in fact, and we can

14 look at it again, what do you do when you have someone with

15 their lights on going -- asking you -- behind you?

16 A. Well, I was trying to explain to him that the lights came

17 on when he was ahead of me, and that I explained that to him;

18 it was confusing.

19 Q. He -- when he came up to you, the first thing that he said,

20 in fact, was what do you do when the lights are on behind you;

21 same rule in Oklahoma, that's what he told you, isn't it?

22      THE COURT: Did he say behind? Is this in the tape?

23      MR. CHALMERS: I'd have to look on the tape.

24      THE COURT: Don't mischaracterize the evidence. Let's

25 get it right.

1          MR. CHALMERS:  Let's see.  I'd be happy to do that,

2     Your Honor.

3          MS. BRETT:  Your Honor, is there any objection to me

4     leaving to use the restroom real quick?

5          THE COURT:  Okay.

6          MS. BRETT:  Thank you.

7     BY MR. CHALMERS:

8     Q.  So what I'm going to show you, Mr. Shaw, hopefully, there

9     we go.

10         MS. PERRY:  Mr. Chalmers, is this Plaintiff's

11    Exhibit 1 which is in evidence?

12         MR. CHALMERS:  Yeah, I'd like to be able to explain

13    that before you start asking, but this is Exhibit 1, and I'd

14    like to show you that, and we'll start at about second 45 on

15    the tape.  And wait a second.  We don't have sound, do we?

16    Yeah, there we do.  Okay.

17    BY MR. CHALMERS:

18    Q.  Okay.  So we heard that, and we're now on Exhibit 1 at

19    about 205.  Do you see that on the bottom left?  Okay.

20    A.  Yes.

21    Q.  And we heard that noise that we were talking about before,

22    that kind of rumbling noise?

23    A.  Yes.

24    Q.  And you don't know what that is, but you don't have any

25    recollection of any lights?

A.   I did not hear it while I was driving my vehicle at all.

Q.   That's passed you now.  We're at 207, and that's your van
that went by pretty much immediately after that rumbling noise;
isn't that right?

A.   Yes.

Q.   Okay.  Okay.  And we've pulled over at 218, and now you've
moved over from the passing lane to the curbside lane; isn't
that correct?

A.   Correct.

Q.   And the vehicles that were -- that had passed before you
were well ahead of you at that point when you pulled over;
isn't that right?

A.   I believe so.

Q.   And so -- you've pumped your brakes at one point at 231;
isn't that correct?

A.   Yes, because of the vehicle in front of me.

Q.   Okay.  You pump the brakes again at 244.  Again, that's
because of a vehicle in front; is that right?

A.   Yes, trying to follow at a safe distance.

Q.   Sure.  But on either occasion -- on neither occasion did
you pull over the side of the road?

A.   There were signs we were passing as you could see in the
vehicle, and it was clearly evident that that was a ramp, and I
felt that that was the safest place to pull over, and I felt I
had that right.  It was not that far.

1   Q.   You didn't pull over, did you?

2   A.   Pulled over at the ramp.  He followed me.  I confirmed

3   100 percent I pulled over.

4   Q.   It's pretty obvious you didn't pull over, and you didn't

5   pull over when the lights came on.  You didn't pull over.

6   A.   I didn't.

7        MS. PERRY:  Objection, Your Honor.

8        THE COURT:  Sustained.  Let's -- we're not just going

9   to argue with the witness.  He's answering your questions.  You

10  don't like your answers maybe, but let's not argue.  Just ask

11  your questions.

12       MR. CHALMERS:  Sorry, didn't mean to push that.  Okay.

13  BY MR. CHALMERS:

14  Q.   Okay.  So now you have pulled over at 321, a little bit

15  more than a minute of highway time after the lights came on

16  when he was behind you?

17  A.   Yes.

18  Q.   About a mile?

19  A.   I believe so.

20  Q.   The pause is at 343 for a second, this particular video, in

21  this.  Maybe it shows it, maybe it doesn't, but your rear

22  window was kind of tinted; isn't it?

23  A.   Yes.

24  Q.   And as you observe in this particular video at 343, really

25  can't see what the passenger and what the driver are doing if

1   you're sitting where the motorist is behind you, and in the --

2   the -- in the patrol vehicle; isn't that right?

3   A.  From here, I can't tell for sure.  I can see -- I can see

4   the rearview mirror and the outlines of the -- of me and my

5   brother's heads.

6   Q.  Yeah.  So you see images maybe that there are people in

7   there, but not much more?

8   A.  Not from this image, no.

9   Q.  Okay.  And you remember now that he asked you, what do you

10   do when you see red and blue lights?

11   A.  Yes.

12   Q.  And you said, you pull off to the side is what you do; is

13   that right?

14   A.  When you see red and blue lights come up behind you, then

15   you pull up to the side.  If the emergency lights are coming up

16   on you behind you, then you pull up to the side.  That's --

17   that's what state law says is what he was referring to.

18   Q.  You described the contents of your van in your questioning

19   here this afternoon?

20   A.  Yes.

21   Q.  You said you had a tent in the van?

22   A.  Yes.

23   Q.  What did that tent look like?

24   A.  It was a dome type tent.  It was in a long zip-up case,

25   folded up in it.  It was probably about that -- about that

1    dimension and about that long.

2    Q.  Looks like a tube?

3    A.  Yeah.

4    Q.  Okay.  And you've seen video of your -- of the stop.  Did

5    you see the dome tent in the video afterwards?

6    A.  I don't remember.

7    Q.  You didn't have any sleeping bags with you; is that right?

8    A.  Right.

9    Q.  You didn't have any cooking equipment with you, did you?

10   A.  No.

11   Q.  Did you have any lanterns?

12   A.  I don't think I brought a lantern with me that time.  I do

13   have a lantern.

14   Q.  Now, there are -- when you're camping, sometimes people

15   have fishing equipment or other hiking equipment.  You didn't

16   have any of that in the back of your van, did you?

17   A.  No, we don't fish or hike.

18   Q.  Yeah.  I don't remember seeing, were there sleeping bags in

19   the back?

20   A.  No.

21        MS. PERRY:  Objection, Your Honor.

22   BY MR. CHALMERS:

23   Q.  Now, you had referred to this as well -- I'm sorry?

24        THE COURT:  Okay.  So I'm confused about where we're

25   going with this, because did you say anything to Trooper

1  Schulte about going camping?

2          THE WITNESS:  No.

3          THE COURT:  So this couldn't have formed any part of

4  his suspicion or basis for the stop, so what are -- what are we

5  doing here?

6          MR. CHALMERS:  Well, I think the plaintiff's position

7  is that Trooper Schulte should have understood that's what he

8  was doing is camping.

9          THE COURT:  I don't think he testified that -- that

10  when he said he was going to Denver to see family, Trooper

11  Schulte should have inferred that he was going camping, and

12  thought it was suspicious because there was no camping gear in

13  the car.

14          MR. CHALMERS:  No, I agree.

15          THE COURT:  Okay.  So let's move on.

16          MR. CHALMERS:  Okay.  Well, Your Honor, I think what

17  he's saying is, is that Trooper Schulte should not have been

18  suspicious about the contents of the vehicle because they would

19  have appeared to him as just somebody ordinarily going to

20  Denver to camp, or that area.  That's been their position.

21          THE COURT:  Did the -- I'm confused because I don't

22  remember this subject of camping ever coming up in the stop.

23          MR. CHALMERS:  It didn't.  It came up in his direct,

24  and it came up in the arguments that had been advanced by the

25  plaintiff's attorneys.

1      THE COURT:  So your -- is it your theory that he

2  should have known you were going camping, and asked you about

3  where your camping gear was?

4      THE WITNESS:  No, I didn't volunteer that information

5  to him.

6      THE COURT:  Okay.  Okay.  Let's move on.

7      MR. CHALMERS:  Okay.  But if I can at least clarify

8  this, Your Honor.  He used the phrase in his direct, car

9  camping.  I don't know.

10     THE COURT:  Let's move on.

11     MR. CHALMERS:  The fact is, from the contents in the

12 back of your van, they would have looked like someone who is

13 not planning to stay for an extended period of time, but is on

14 the road and staying in their car; isn't that right?

15     THE WITNESS:  Seeing a cot back there, perhaps.

16 BY MR. CHALMERS:

17 Q.  In fact, it would have looked very much like you were

18 traveling to Colorado and planning a quick return without

19 staying at any place other than in your car; isn't that right?

20     MS. PERRY:  Objection, Your Honor, speculation.  What

21 it would have looked like from Trooper Schulte's view, he can

22 testify to.

23     THE COURT:  Sustained.

24     MR. CHALMERS:  Well, umm, then I'd like to talk about

25 what it looked like, and what was the contents, Your Honor.

1          THE COURT:  You can ask him about that.  I think he's

2     all ready testified to that, but go ahead.

3          MR. CHALMERS:  Appreciate it.  Okay.

4     BY MR. CHALMERS:

5     Q.   What it had was items in it that included some coolers?

6     A.   Yes.

7     Q.   And included the cot that you would lay down with

8     occasionally 'cause of your back issues?

9     A.   Yes.

10    Q.   And it included -- you don't know whether you saw in the

11    video a copy of -- or that it included a tent or not?

12    A.   Not in the video.  There was a tent.  I've seen subsequent

13    photographs, and the tent was included in those photographs.  I

14    know I had the tent with me, brought the tent with me.

15    Q.   You've seen subsequent photographs.  Where are those

16    photographs?

17    A.   I believe when I took some pictures of the damage to my

18    vehicle, there was -- there was a tent in one of 'em.

19    Q.   All right.

20    A.   And I don't -- I brought my tent.  I had a tent with me.

21    Q.   Okay.  You know, it's not a big deal.  I don't think those

22    have been produced, but the -- the -- the question I have, I

23    guess, boils down to if when Officer Schulte was looking into

24    your car or your van as he's walking by, what he's seeing by

25    way of contents are those things that one might have if they

1   were planning to travel quickly to Colorado and return in the

2   interim?

3           MS. PERRY:  Objection, Your Honor.

4           THE COURT:  Sustained.  Sustained.  This is -- you

5   just asked him the same question I just sustained an objection

6   to.

7   BY MR. CHALMERS:

8   Q.  When you had your second conversation with Trooper Schulte,

9   he came up to you, and this is on Exhibit 3, he talked to you

10  about the ticket, gave you the ticket, had some explanation,

11  and then he left; is that right?

12  A.  He didn't really leave.  He -- he -- he remained at my car,

13  and decided to ask questions.

14  Q.  He remained at your car?

15  A.  Yes.

16  Q.  And he acted like, however, you were free to go, didn't he?

17  A.  He said to slow down and drive safe, and before I could do

18  anything, can I ask you some questions.

19  Q.  Did he act like you were free to go?

20          MS. PERRY:  Objection, Your Honor, asked and answered.

21          THE COURT:  Sustained.

22  BY MR. CHALMERS:

23  Q.  Well, let me talk to you about Exhibit 3, and I'm going to

24  go to Exhibit 3 at about 2520 or 2505.  Start just a hair

25  before it.  25-- I'm sorry, 2505.  We'll back up, starting at

1   2455.  And you heard your statement that he acted like you were

2   free to go?

3   A.   When he said what he said --

4   Q.   Let me go back to the same exhibit at 1135.  Start at 11,

5   just to reference.  Okay.  So now it's at 1131 on the tape, and

6   Trooper Schulte has now returned your materials?

7   A.   Yes.

8   Q.   And then at 1135, you tell him, yeah, it's okay to answer

9   those questions; is that right?

10  A.   That's what I said.

11  Q.   Now, let's look back.  So safe trip, drive safely.  What do

12  you do?  You put it in gear, don't you?

13  A.   I don't remember.  It appears possible.  I don't know.

14  Q.   And when he asked you the questions, your position is that

15  he was -- whether he could -- whether he could ask you to visit

16  with you, your position is, he was standing right by you?

17  A.   He was right by the vehicle still.

18  Q.   And when you answered that question, sure, you'd been

19  looking kind of down towards some paper just before then; is

20  that right?

21  A.   Yes.

22  Q.   Really weren't aware where he was standing at that

23  particular point when you said yeah; you just turned and said

24  yeah?

25  A.   I wasn't -- yeah, it's like three seconds later, he was

1    still by the vehicle.  I mean, three seconds.

2    Q.   Okay.  So you assumed he was still by the vehicle?

3    A.   Yes.

4    Q.   Let's look at Exhibit 80-- I'm sorry, Exhibit 1.  Well,

5    that's not supposed to be going.  Okay.  So here we are in

6    Exhibit 1.  It's basically at -- basically broken.  I don't

7    know why the sound's not going, but see if we can't get this in

8    a second for a moment.  So in Exhibit 1 at 1425, you recognize

9    from viewing this video, this is when Trooper Schulte --

10    Defendant Schulte is back talking to you about the ticket that

11    he's just given you, don't you?

12    A.   My screen's blank.

13    BY MR. CHALMERS:

14    Q.   Oh.  Well, that explains that.  Okay.  Now it's stopping at

15    1508, and do you see the lights come on to your -- your van?

16    A.   Yes, my foot was on the brake.

17    Q.   And do you see the white on your -- underneath the brake

18    light, the light come on?

19    A.   It doesn't look illuminated to me, the white doesn't.

20    Q.   So trooper comes back, and see where he is positioned to

21    your window and to your -- to your car at 1510?

22    A.   Yes.

23    Q.   That's when you said yeah, isn't it?

24    A.   Appears so.

25    Q.   Okay.  So he wasn't really right up by you when you said

1   yeah, then?

2   A.  He was close enough that I could not pull away and it be a

3   good idea.  I wouldn't want to pull away until he's at least

4   not anywhere next to my vehicle.

5   Q.  Fair enough.  But he wasn't right up by your van, and you

6   knew as a criminal justice major that you could have said no, I

7   don't want to talk to you?

8        MS. PERRY:  Objection, Your Honor, misstates the

9   testimony.  I believe Mr. Shaw testified he didn't feel like he

10  was free to leave, and I believe he all ready testified that

11  when Trooper Schulte popped back up at his window, asked, hey,

12  can I ask you another question, he didn't feel like he was free

13  to go.

14       THE COURT:  I don't want the speaking objection, and

15  it's overruled.  You can answer the question, but counsel, you

16  should repeat it.

17  BY MR. CHALMERS:

18  Q.  I probably would.

19  A.  Yes.

20  Q.  Yeah, thank you.  What I'm getting at is that you knew as a

21  criminal justice major that when Trooper Schulte was there and

22  said, can I speak to you, asking you more questions, you could

23  have simply just said no?

24  A.  In hindsight, I should have.

25  Q.  And you knew you could have?

1  A.  At the moment, it happened too fast for me to -- I was

2  trying to be cooperative and continue the traffic stop.  It was

3  like he decided he wasn't done with me yet, so...

4  Q.  Is that a -- turn that off.  Is that a yes, I knew I could

5  have, but didn't?

6       MS. PERRY:  Objection, Your Honor, misstates the

7  testimony.

8       THE COURT:  Sustained.

9  BY MR. CHALMERS:

10  Q.  Well, then there was a wait after the second conversation,

11  and that would have started somewhere around -- on that screen

12  we're looking at, sometime around maybe 2505.  If you remember,

13  that's when you said -- no, let me get that straight.  That

14  would have started sometime around 1135 when you said, yeah,

15  I'll talk to you.  There was a wait between that time and the

16  time the dog arrived; is that correct?

17  A.  Yes.

18  Q.  Okay.  And that worked out to be about, what, 28 minutes?

19  A.  I believe so.

20  Q.  And when the dog arrived, you were asked to leave your van,

21  and you and your brother went back and stood kind of in an -- I

22  don't know if ditch is the proper term, but off the side of the

23  road where you could see what was happening; is that correct?

24  A.  That is where they told me to stand.

25  Q.  Yeah.  And Your Honor, there is a portion of the video that

1    Mr. Shaw took that is not contained in Exhibit -- in Exhibit 1,

2    but is in Exhibit 809.  No, I'm sorry, it is in Exhibit 803.

3    No, I apologize, it is 809.  Let me look to see.  That shows --

4        MS. PERRY:  Objection, Your Honor.  I think Mr.

5    Chalmers is laying the foundation of this.  If he needs Mr.

6    Shaw to lay the foundation for this video, he can ask him if he

7    can.

8        MR. CHALMERS:  I'm just not sure that I've gotten done

9    with my question first.

10       THE COURT:  Let's hear your question.

11       MR. CHALMERS:  What I was saying is that there is a

12   video that is the extension of the video which is Exhibit 3,

13   and what I'm pausing to do is to make sure I've got the right

14   number.  I think it's 809.  Yeah, it is 809 that -- that Mr.

15   Shaw has identified as knowing that he took the video and has

16   submitted with its contents, and I would move the admission of

17   809 to show the portion that hadn't been shown by plaintiff's

18   counsel.

19       THE COURT:  Okay.  You haven't said anything yet about

20   why it would be relevant.

21       MR. CHALMERS:  Well, actually, the conversation

22   that -- that they discussed in their direct exam, and the

23   observations that they discuss in their direct exam as he was

24   standing on the curbside, or the roadside, this shows those.

25   That's how it's relevant.

1    MS. PERRY:  Your Honor, may we approach?

2    THE COURT:  Uh-huh.

3    (Proceedings held at the bench, outside the hearing of open

4    court.)

5    MS. PERRY:  And I apologize, I'm not sure still if

6    we're talking about Exhibit 803 or 809.  Are we talking about

7    the cell phone or the dash cam?

8    MR. CHALMERS:  809.

9    MS. PERRY:  Your Honor, Exhibit 3 goes to time stamp

10   3725 which is the cell phone video.  Defendant's Exhibit 809

11   goes to time stamp 40.  What that shows beyond 3725 is that the

12   phone goes into Mr. Shaw's pocket, a portion of the audio is

13   then on, also on the dash cam which we all know you have, the

14   phone at 3906 comes out of Mr. Shaw's pocket, shows the dog

15   sniffing around, but then Mr. Shaw says, oh, God, in relation

16   to the dog jumping in the window, asks about whether or not

17   they keep the dog clean, and then --

18   THE COURT:  Asks what?

19   MS. PERRY:  Whether or not they keep their dogs clean,

20   because he was concerned with him rumbling around, and then at

21   3948 says -- one of the troopers, not Trooper Schulte, says

22   he's a lazy dog.  He don't jump in the window unless he notices

23   an odor of narcotics.

24   We've all ready filed the motion in limine in what was

25   found in the car should be excluded -- the search should be

1  excluded.  I believe everything the jury needs to see and is

2  fair to see related to Mr. Shaw's damages is clearly on Exhibit

3  3.  We alerted Mr. Chalmers to this at least by January 30th

4  that he could cut the video in some way, and he chose not to do

5  so.

6          THE COURT:  What are you trying to use this for?

7          MR. CHALMERS:  Well, I think I did edit the video in

8  terms of the stop point, and I'm not sure which part you're

9  talking about.

10         THE COURT:  Talking about the part that she just

11 identified.

12         MR. CHALMERS:  Well, what I'm trying to show with that

13 is what he testified all ready to, and which is to illustrate

14 his interest with the dog getting in the window, illustrate his

15 knowledge that the dog had alerted, and to explain the -- he's

16 where he was, and where he was standing on what took place.

17         THE COURT:  Did you not get my order saying we're not

18 going to get into the marijuana?

19         MR. CHALMERS:  It doesn't get into the marijuana.

20         THE COURT:  It's -- that's a drug -- it's a drug dog

21 who's alerting at his car.  That is part of what I'm excluding.

22         MR. CHALMERS:  Okay.

23         THE COURT:  Because it doesn't matter whether there's

24 drugs in the car.  It doesn't matter whether the dog alerted.

25         MR. CHALMERS:  But they have opened the door on

1    countless ways by talking about what wasn't found, charges

2    weren't brought, that --

3         THE COURT:  If you -- if you have contrary evidence

4    that charges were brought, or that they found marijuana,

5    then --

6         MR. CHALMERS:  They did find marijuana remnants.

7         THE COURT:  No, but not in the record that I've seen,

8    they did not.  They found a baggy that was empty, that smelled

9    funny or smelled, a bag or something, but they never tested.

10        MR. CHALMERS:  They found multiple bags.

11        THE COURT:  Okay.

12        MR. CHALMERS:  And -- and they have on the outside of

13    'em print saying smelly bag one does, because it's designed to

14    try to keep the marijuana odor in.  The others have on them a

15    little placard that say medical marijuana.

16        THE COURT:  Okay.  I told you.  I told you we are not

17    injecting the issue of marijuana, whether they had the odor or

18    not.  First of all, they didn't open the door, in my opinion,

19    and number two, if they did open the door, it's such a tiny

20    crack that it does not warrant getting into the matters you're

21    trying to inject under Rule 403.

22        MR. CHALMERS:  Understanding what I'm trying to inject

23    now under -- this is not the finding there's marijuana, it's

24    the alert by the dog, it's the dog climbing into the vehicle

25    that he gets all upset about, which is part of my theory that

1  that's what his damages are, not the waiting on the side of the

2  curb, and not waiting in the car.

3       THE COURT:  Okay.  I know that's your theory.  The

4  ruling is the same.

5       MR. CHALMERS:  Okay.

6       (Proceedings continued in open court.)

7       THE COURT:  Members of the jury, we're going to recess

8  at 4:30 tonight.  Can you go for ten more minutes, or do you

9  need a break?  Yes?  Okay.  Let's go.

10  BY MR. CHALMERS:

11  Q.  Okay.  Well, I think I can get done then.  Knock on wood.

12  You were told the dog had alerted, and that the troopers were

13  going to search your vehicle; is that right?

14  A.  I can't remember if they came up and actually said the dog

15  alerted on your vehicle, but I remember it was pretty evident

16  to me when the dog jumped in my window.

17  Q.  And they did search your van, and they emptied out pretty

18  much the contents in the back, didn't they?

19       MS. PERRY:  Objection, Your Honor.  Relevance.

20       THE COURT:  What's the relevance of this?

21       MR. CHALMERS:  Again, it goes to his damages.  He's

22  claimed damages from the injury arising from the search, and I

23  ought to be able to introduce what the search was, and the

24  duration of the search.

25       THE COURT:  He is not claiming damages for the search.

1    I think we covered that very clearly about two hours ago.

2         MR. CHALMERS:  Your Honor, I -- I don't want to waste

3    anybody else's time at this point with further

4    cross-examination.  I've got proffers of evidence to make.  I

5    don't know whether you want to do those this evening or at

6    whatever appropriate time, but I don't have any further

7    questions for him at this point, subject to the right to

8    proffer evidence.

9         THE COURT:  Okay.  Let's --

10        MS. PERRY:  Your Honor, could I have redirect?  Your

11   Honor, I'm not sure I can wrap this up in the ten minutes

12   before 4:30.  Is your preference to break now?

13        THE COURT:  Well, my preference is for you to go 'til

14   4:30.

15        MS. PERRY:  Okay.

16                    RE-DIRECT EXAMINATION

17   BY MS. PERRY:

18   Q.  Mr. Shaw, you were asked a lot about your response to

19   Trooper Schulte when he popped back up at your window, that you

20   were heading to visit family in Denver; right?

21   A.  Yes.

22   Q.  Have you watched the video a bit more since your

23   deposition?

24   A.  Yes.

25   Q.  To prepare for trial today?

1  A.  Yes.

2  Q.  And did you -- do you remember if Trooper Schulte asked you

3  what you were doing, or did he ask you where you were going?

4  A.  He asked where I was going.

5  Q.  So you didn't volunteer that you were camping?

6  A.  Not at all.

7  Q.  Was that relevant to his question?

8  A.  No.

9  Q.  Do you remember answering questions really early into this

10  lawsuit about what types of damages you were seeking?

11  A.  Yes.

12  Q.  You remember if -- if it was Trooper Schulte who was asking

13  you those questions, those written questions?

14  A.  In the deposition?

15  Q.  No, do you remember a process in this lawsuit where you

16  were asked to write out answers to written questions?

17  A.  The interrogatories?

18  Q.  Yes.

19  A.  Yes.

20  Q.  Does it seem like that was around July 15th, 2020?

21  A.  Yes.

22  Q.  Did you hear Mr. Chalmers ask you a lot of questions about

23  what you testified to, and what you were claiming as damages as

24  part of this lawsuit?

25  A.  Yes.

1   Q.   Have you changed what you were claiming in damages related

2   to your detention before the canine alert from the time this

3   case was filed 'til today?

4   A.   No.

5   Q.   Have you always claimed that you suffered emotional

6   injuries as a result of your unlawful detention?

7   A.   Yes.

8   Q.   Do you remember Mr. Chalmers asking you questions about if

9   you knew anyone who was passing you in those cars when you were

10   pulled over?

11   A.   Yes.

12   Q.   Have you ever been embarrassed in front of strangers that

13   you didn't know?

14   A.   Not -- not really.

15   Q.   Do you remember being asked about whether or not Trooper

16   Schulte is in Oklahoma?

17   A.   Yes.

18   Q.   Regardless of whether or not Trooper Schulte specifically

19   is in Oklahoma, do you still feel anxious around police in

20   Oklahoma when you're driving?

21   A.   Yes.

22   Q.   And specifically when they're behind you?

23   A.   Yes.

24   Q.   We talked a little bit about the recording app, and I think

25   you mentioned it maybe on direct, but I did just want to

1   clarify in case the record's not clear.  Why did you have an

2   app on your phone for recording?

3   A.   Just in case I ever had a police encounter, I'd be able to

4   have my own documentation.  As I said, it's notoriously

5   difficult for citizens to get a police copy, so I wanted my

6   own, any police encounter I was involved in.

7   Q.   Did you start thinking about that during your criminal

8   justice classes?

9   A.   Yes.

10  Q.   And did any of your professors suggest that you do that?

11  A.   Yes.

12  Q.   Do you remember being asked about whether or not you

13  traveled to Coffeyville, Kansas?

14  A.   Yes.

15  Q.   Where is Coffeyville, Kansas?

16  A.   It is due north of Tulsa, and it is right across the border

17  from Oklahoma.

18  Q.   And I'd like to clarify.  I know we've talked about the

19  stop, so I'll be brief, but when Trooper Schulte's lights came

20  on, were you in front of him or behind him?

21  A.   Behind him as well as in a different lane.

22  Q.   Did you eventually pass Trooper Schulte?

23  A.   Yes.

24  Q.   Once you got past him, did you eventually turn on your

25  blinker and get in front of him?

1   A.   Yes.

2   Q.   In the right-hand lane?

3   A.   Yes.

4   Q.   And at some point in that right-hand lane, you slowed?

5   A.   Yes.

6   Q.   Did Trooper Schulte immediately get closer to you once you

7   got in the right-hand lane?

8   A.   I can't remember.  I don't think so.

9   Q.   That's okay.  And you eventually pulled over at the exit.

10  At this bottom of the exit, you pulled over onto the shoulder?

11  A.   Yes.

12  Q.   Do you remember being asked about whether or not the back

13  window of your minivan was tinted?

14  A.   Yes.

15  Q.   Do you know why windows in minivans might be tinted?

16  A.   I know -- as far as I know, what that one, that it came

17  that way.  That's like a factory tint, to my understanding,

18  probably to reduce sun glare, I --

19  Q.   Okay.  And you were asked whether or not you had sleeping

20  bags?

21  A.   Yes.

22  Q.   And you didn't?

23  A.   I don't use sleeping bags.  I use other bedding, blankets

24  rather than a sleeping bag.

25  Q.   You had blankets with you?

1   A.   Yes.

2   Q.   Tent?

3   A.   Yes.

4   Q.   There was a portion when Mr. Chalmers asked you, and this

5   was about 25 minutes into your stop, a little bit over

6   25 minutes into the stop, you made a comment that you didn't

7   feel like you were free to go.  What did you mean by that?

8   A.   I wasn't free to go, because I didn't even have time to

9   like sit my ticket down.  I had no intention of pulling away

10  despite it being in drive until the trooper was a safe distance

11  away from the vehicle, and he never was a safe distance away

12  from the vehicle.

13  Q.   When Trooper Schulte popped back at your window, did you

14  feel like you could have just driven off?

15  A.   No.

16  Q.   And ignored his question?

17  A.   No.

18  Q.   Did you instinctively just answer yes?

19  A.   Yes.

20          MS. PERRY:  No further questions, Your Honor.

21          THE COURT:  Any redirect -- re-cross?

22          MR. CHALMERS:  Yeah, just a couple so that I

23  understand the testimony.

24                          RE-CROSS EXAMINATION

25  BY MR. CHALMERS:

1  Q.  Mr. Shaw -- counsel, I think maybe this is yours.  When

2  Trooper Schulte asked you where you were going, you said to

3  Denver to see family, didn't you?

4  A.  Yes.

5  Q.  He didn't ask you what you were doing, I guess is what

6  you're saying, but you offered, to see family, didn't you?

7  A.  Yes.

8  Q.  Didn't say camping?

9  A.  No.

10  Q.  Now, then maybe I mis-heard the question, and I quite

11  likely did.  You were asked about your -- what was said on the

12  tape at about 2505 where it reported -- you said he acted like

13  you were free to go.  Did you understand him to say that you

14  weren't free to go?

15  A.  When I say acted like I was free to go, free to go, it

16  seemed like he was in the process of concluding the traffic

17  stop, but he never went back to his car, so I never was free to

18  go.

19  Q.  That's your --

20  A.  And I say acted like; it was like he was wrapping it up,

21  but he decided he wasn't done with me, so I never was free to

22  go.

23  Q.  And that's what you thought until he came back and said can

24  you answer a question or questions?

25  A.  That's what I thought the entire time.

1   Q.  Okay.

2   A.  Including that time.

3   Q.  Nothing further.

4              MS. PERRY:  Only one follow-up, Your Honor.

5                   FURTHER RE-DIRECT EXAMINATION

6   BY MS. PERRY:

7   Q.  Do you think that the traffic stop had finished when

8   Trooper Schulte asked you, hey, can I ask another question, or

9   did you think it was continuing?

10  A.  Continuing.

11             MS. PERRY:  Nothing further, Your Honor.

12             THE COURT:  Anything else?

13             MR. CHALMERS:  No, Your Honor.

14             THE COURT:  All right.  Thank you, sir.  You can step

15  down.

16             THE WITNESS:  Thank you, Your Honor.

17             THE COURT:  Who will our next witness be?

18             MR. MC INERNEY:  Our next witness will be Trooper

19  Schulte.

20             THE COURT:  Okay.  Then, members of the jury, we are

21  going to give you your recess for the evening.  Please don't

22  forget the instructions I gave you before about not discussing

23  the case or communicating about it.  Tonight, people in your

24  home may be particularly curious about, were you selected for

25  jury duty, what's the case about, and have all kinds of

1  questions.  At the end of the case, you will be free to discuss
2  this with anyone, including attorneys and parties if you wish
3  to, but for now, if you could just -- it's going to be a very
4  short trial, so just defer any conversation or communication
5  about it, tell them you can discuss it all probably by Thursday
6  or Friday at the latest, and defer any communications about
7  that.  Also, please remember to keep an open mind, because
8  we're just starting with the evidence.  And do you think we'll
9  go past tomorrow in terms of evidence?
10      MR. MC INERNEY:  I'm terrible at guessing.  I think we
11  may go a little bit past tomorrow, perhaps 'til Wednesday
12  morning, Judge.
13      THE COURT:  Okay.  All right.  That gives you a little
14  bit of information for purposes of planning.  After the
15  evidence is done, I will instruct you about the law that you
16  will apply in the case.  Then we will have closing arguments,
17  and then the case will be placed in your hands for a decision.
18  Once you have begun your deliberations, you are in charge of
19  your schedule, so I think that's all we need to cover for now.
20  I'm going to excuse you, and talk with the attorneys for just a
21  moment, and you all have a nice evening.  You are excused.
22      (Jury left.)
23      THE COURT:  So we'll start at 9 o'clock in the
24  morning.  Mr. Chalmers, you've got a couple minutes to make an
25  offer of proof, so let's do that right now.

1      MR. CHALMERS:  Okay.  So Your Honor, the -- testimony
2  thus far has been offered by the plaintiff that they went to
3  Denver to spend a few days to see friends, travel down to
4  Colorado Springs.  Actually, when they were there, they smoked
5  marijuana.  The evidence that was found in the back of the car
6  is consistent with someone making a trip to Colorado for the
7  purpose of purchasing marijuana, to smoke marijuana and
8  possibly return to it in Oklahoma, and having opened the door
9  claiming that this is an innocent sort of trip, we ought to be
10  able to present testimony that gives the complete story to the
11  jury.  Otherwise, it gives a false impression that what
12  happened was, nothing was found of significance in this search,
13  which is not accurate.  Also, the testimony we'd be able to get
14  into with this witness, that personal amounts of marijuana are
15  located in the car, that that doesn't lead to charges.  They're
16  looking for the larger sort of person here, and so the fact
17  that there is a finding for the marijuana, and that there are
18  no charges does not reflect that there was an absence of -- of
19  illegal contraband in the vehicle.  So we would like to get
20  into that.  Furthermore, we continue to take the position that
21  the damages that were claimed in this lawsuit have been from
22  the search itself, and we ought to be able to present testimony
23  showing what the search was, and how then this witness would
24  have responded to that in his claim now that he has anxiety and
25  distress that prevents him, or prevented him from being an Uber

1  driver, that prevented him from -- from being able to deal with
2  police now without anxiety, and that that has been pushed
3  aside.  Finally, in terms of the offer of proof at this point,
4  there is -- there was testimony that plaintiff gave at the
5  request of plaintiff's counsel about his observations when he
6  was standing on the curb watching what was going on, and that's
7  the part of the tape that I wanted to show, and they've all
8  ready put evidence on that, and I shouldn't be -- I shouldn't
9  be prevented from then putting on the evidence that shows
10 exactly what was happening, as opposed to his skeletal sort of
11 description of it.  So those are the offers of proof I have.  I
12 will note that with Trooper Schulte, I'm going to want to show
13 -- without sound, I'm going to want to show the search that
14 took place, to show the contents that were actually in the
15 vehicle.  Of course, one of the issues is whether or not the
16 contents that Officer Schulte observed are consistent with
17 someone who is during a quick turnaround sort of travel, which
18 is what you would expect from someone who is trafficking
19 narcotics, or with by contrast, someone else, and I think Your
20 Honor, in your ruling on the motion for summary judgment, I
21 think the Tenth Circuit said, hey, look, this may not be any
22 different than somebody who's just camping.  This guy was not
23 just camping.  He was living out of this vehicle, and I would
24 have liked to have gotten into the topic of what car camping
25 is, because the -- to Trooper Schulte, what he observed, what

1    he saw may have been, quite likely was innocent car camping,

2    with someone who maybe got some marijuana on the side, but what

3    he saw is a quick turnaround in going from one state to another

4    in the fashion that drug traffickers do in order to -- to not

5    spend time potentially getting caught.  So those are the sorts

6    of offers of proof I'd make, Your Honor.

7            THE COURT:  I don't think that this witness is the one

8    you can prove those things through, but what's plaintiff's

9    response?

10           MR. MC INERNEY:  This may be a little bit piece-meal,

11   Judge.  I apologize.  With regard -- I'm going to work

12   backwards.  With regard to the contents of the van, I'm not

13   sure how that advances the primary question of reasonable

14   suspicion here.  All that occurred after the dog alerted to,

15   your ruling in limine, Judge, all that post-alert is out,

16   primarily because it doesn't relate to whether this trooper had

17   reasonable suspicion.  Further, to your point, the point you

18   just made at the bench, there's also a 403 problem with that,

19   and we think as we've asserted, and think as you found mention

20   or reference to -- to what was found in the van, and I'm sure

21   that this is a crack in the door to get into the bags that were

22   never tested, and whatever else they found that was never

23   submitted to a lab, and all the things they weren't cited for a

24   left-handed suggestion that there was some narcotic

25   involvement.  So that's -- I think that's our response with

1    regard to the contents of the van.  This -- the quick

2    turnaround, this is the first I've heard of it anyway.  And I

3    don't know if Mr. Chalmers is -- is testifying as to his

4    experience, or whether he intends to ask Trooper Schulte about

5    that.  They don't have an expert witness about the habits of

6    drug traffickers and quick turnaround and all that, so I'm not

7    sure -- I'm not sure where that comes from, quite frankly.

8    With respect to the first couple, I'm going to let Miss Perry

9    respond to those.  Thank you.

10        MS. PERRY:  Sure, Your Honor.  So I think the video

11   and the portion of what Mr. Chalmers wants to play, and we put

12   this in our objections, too, is very confusing for the jury,

13   because what it really shows is, well, the trooper blocks it,

14   so you can't see a clear picture of the back of the van and

15   what it looks like, but it's a totally different view than what

16   Trooper Schulte would have seen when he claims to have had

17   reasonable suspicion.  That's when he looked through here.

18   It's not when he opened up the back to see anything else in

19   there.  Moreover, there's a bunch pictures on Mr. Chalmers'

20   list that show the van after the troopers have just pulled

21   everything out and tossed it back in.  It's not organized like

22   when -- how Mr. Shaw packed it.  The only other thing I would

23   say, Your Honor, is that we would strongly oppose Mr. Chalmers'

24   suggestion that this was a drug trafficking trip.  It was a

25   brothers trip.

1          THE COURT:  Do you want to respond?

2          MR. CHALMERS:  I don't need to respond, I don't think,

3    to the last part, the contents of the van, but what I'm showing

4    is the actual taking items out of the van.  Now, the jury gets

5    to see, and that's the best evidence that we have available,

6    what it was that the trooper saw in the back of the van.

7    The -- there is still photographs that I've taken in parts as

8    it went out.  Those photographs are taken as they're pulling it

9    out, not as they are putting it back, as counsel suggests.  So

10   you know, here, the Tenth Circuit has found, and I think this

11   court found questions of fact concerning the observations that

12   Trooper Schulte made with respect to the contents in his

13   training and in his -- in his experience as to whether that

14   would be suspicious, and I should be able to present the

15   evidence what was in there, which supports what Trooper Schulte

16   is saying, and that this is not some sort of innocent camping

17   trip that the trooper looked in and said oh, that's what's

18   going on here.

19          THE COURT:  Well, he didn't know anything about the

20   camping trip at the time he acted at the scene.  I mean,

21   obviously, Mr. Chalmers, I have a very hard time following your

22   theories, because I don't understand why you're so focused on

23   the search.  As best -- correct me if I'm wrong, but the only

24   reason it seems that you're talking about the search is so that

25   you can show that the search was more likely than the detention

1  to have caused damages to plaintiff.  Very circular reasoning.

2  I mean, that doesn't make it relevant to this case.

3      MR. CHALMERS:  That's what his testimony was in his

4  deposition, Your Honor, but the -- the other reason is to show

5  the contents as it relates to the reasonable suspicion that

6  Trooper Schulte formed, and what we're -- I guess what they're

7  saying is, we don't get to look in the back of the van to see

8  what was there after the door has been opened, because it

9  wasn't opened when we looked in.  That's not I don't think

10  helpful.  I think it is evidence that tends to show the

11  contents, which would then support Trooper Schulte's

12  observations and his suspicions that he formed.

13      THE COURT:  Well, do we -- I thought that the video

14  you're talking about was the back of the van after the contents

15  have been removed and then thrown back in.

16      MR. CHALMERS:  No.  It's during the process of taking

17  them out that you can see what's in there.

18      THE COURT:  All right.  So it's not what he would have

19  seen from the outside of the vehicle through the tinted glass?

20      MR. CHALMERS:  I think it would have been what he

21  would have seen from a different vantage point, but we don't

22  have cameras showing that vantage point.  What we have is the

23  cameras showing as they're pulling it out, so you can see,

24  well, that's what was in there.

25      THE COURT:  Right, but we don't have anything that

1   shows what he would have visualized by looking at the vehicle

2   at the time.

3        MR. CHALMERS:  That's true.  Instead, what we have is

4   testimony from plaintiff saying, oh, it just looks like camping

5   equipment.

6        THE COURT:  Okay.  Yes?

7        MR. MC INERNEY:  I mean, and I don't want to beat this

8   horse if it's all ready dead.  This is a point in time

9   question, isn't it?  This is a point in time that -- at which

10  he either had, didn't have reasonable suspicion, and the only

11  point in time about the back of the van that matters is when he

12  walked back by and peered in the window.  What they found when

13  they hiked the back door up doesn't matter.  The primary point

14  is what he saw, and whether it was -- whether it meets his,

15  quote, lived-in look description.

16       THE COURT:  Uh-huh.  So I did -- I agree with

17  plaintiff's positions on all of these various points that

18  you've raised, and I don't know that there's anything I can

19  add.  I think we are dangerously near an admonition in front of

20  the jury to quit talking about the search, because I think it

21  is such of minimal relevance, and we seem to be spending so

22  much time on it, that Rule 403 is greatly implicated.  I

23  haven't heard anything which changes my mind on the motion in

24  limine or any of the other pretrial rulings, so I think we'll

25  stay the course in terms of those matters.  I do have two

1    questions.  One is, defendant has asked that the court give a

2    limine -- I'm sorry, a limiting instruction.  It's contained in

3    Document 424.  That would go along with the testimony by Chief

4    Aden.  Are you planning to offer anything in response to that?

5         MS. BRETT:  Your Honor, we filed a brief in opposition

6    to the request for the limiting instruction.  I believe that's

7    Document 426.

8         THE COURT:  Okay.  When did you file that?  I haven't

9    seen that.

10        MS. BRETT:  That was filed on -- I believe on Friday

11   afternoon.

12        THE COURT:  Okay.

13        MS. BRETT:  February 3rd.

14        THE COURT:  Do you have a proposed instruction in

15   there?

16        MS. BRETT:  We do.  We don't think an instruction is

17   necessary, but if we do, we provide an instruction.

18        THE COURT:  That's what I would like, and then Mr.

19   Chalmers, I would like for you to give me the Kansas statute

20   number of the vehicle code which says that a vehicle who sees

21   an emergency vehicle with sirens and lights ahead of them has a

22   duty to pull over, because I think that's going to come up, and

23   to be honest, I have looked and I can't find one.  Okay?

24        MR. CHALMERS:  Okay, Judge.

25        THE COURT:  All right.  We're going to take a recess

1   now.  We will see you in the morning.  Have a good evening,

2   everyone.

3         (Whereupon, court recessed proceedings.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              C E R T I F I C A T E

3

4

5        I, Nancy Moroney Wiss, a Certified Shorthand Reporter and

6    the regularly appointed, qualified and acting official reporter

7    of the United States District Court for the District of Kansas,

8    do hereby certify that as such official reporter, I was present

9    at and reported in machine shorthand the above and foregoing

10   proceedings.

11       I further certify that the foregoing transcript, consisting

12   of Day One - Testimony Only - Pages 1-115, is a full, true, and

13   correct reproduction of my shorthand notes as reflected by this

14   transcript.

15       SIGNED January 3, 2024.

16

17                     S/_____

18                     Nancy Moroney Wiss, CSR, CM, FCRR

19

20

21

22

23

24

25

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that a copy of the foregoing APPELLANT'S APPENDIX, as submitted in digital form is an exact copy of the document filed with the Clerk.

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2024, the foregoing APPELLANT'S APPENDIX was electronically filed with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I also certify that within five business days of the issuance of notice that the electronic filing is compliant, one paper copy will be delivered by Federal Express to the Clerk's Office.

DATED: April 24, 2024                    /s/ Kurtis K. Wiard