# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

BLAINE FRANKLIN SHAW, et al.,
*Plaintiffs-Appellees,*

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

———

MARK ERICH, et al.,
*Plaintiffs-Appellees,*

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

## APPELLANT'S APPENDIX VOLUME VI

Appeal from the United States District Court for the District of Kansas
Honorable Kathryn H. Vratil, Senior District Court Judge
District Court Case Nos. 19-CV-1343-KHV and 20-CV-1067-KHV-GEB

**OFFICE OF ATTORNEY GENERAL
KRIS W. KOBACH**

120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
(785) 296-2215
anthony.powell@ag.ks.gov
dwight.carswell@ag.ks.gov
kurtis.wiard@ag.ks.gov

Anthony J. Powell
*Solicitor General*
Dwight R. Carswell
*Deputy Solicitor General*
Kurtis K. Wiard
*Assistant Solicitor General*

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

Transcript of Shaw Trial, Day 2 (Excluding Hassan Aden Testimony) (ECF No. 598) ................................................................................. 1

1

2                    UNITED STATES DISTRICT COURT
                      DISTRICT OF KANSAS,
3
   BLAINE FRANKLIN SHAW,
4                                    Docket No. 19-1343-KHV

5     Plaintiff,                     Kansas City, Kansas
                                     Date: 2/7/2023
6       v.

7   DOUG SCHULTE,

8     Defendant.
   ...................
9
                          TRANSCRIPT OF
10         TESTIMONY FROM JURY TRIAL - DAY 2 -
         EXCLUDING HASSAN ADEN - IN SEPARATE VOLUME
11          BEFORE THE HONORABLE KATHRYN H VRATIL,
             UNITED STATES SENIOR DISTRICT JUDGE.
12
   APPEARANCES:
13
   For the Plaintiff :    Madison A Perry & Patrick A McInerney
14                        Spencer Fane LLP -KC
                          1000 Walnut Street, Suite 1400
15                        Kansas City, MO  64106

16                        Sharon Brett
                          ACLU Foundation of Kansas
17                        6701 W 64th Street, Suite 210
                          Overland Park, KS  66202
18
   For the Defendant:     Arthur S Chalmers
19                        Office of Attorney General - Kansas
                          120 SW 10th Avenue
20                        Topeka, KS  66612

21   Court Reporter:      Nancy Moroney Wiss, CSR, RMR, FCRR
                          Official Court Reporter
22                        558 US Courthouse
                          500 State Avenue
23                        Kansas City, KS  66101

24

25

1                        I N D E X

2
     Offer of Proof                                      220
3    RE:  Testimony of Mr. Mummulo
     Mr. Chalmers' proffer of Exhibits 814 and 815       228
4

5    Plaintiff's Witness:                                Page

6    DOUGLAS FRANK SCHULTE
       DIRECT EXAMINATION  BY MR MC INERNEY              119
7      CROSS EXAMINATION BY MR. CHALMERS                 161
       RE-DIRECT EXAMINATION BY MR. MC INERNEY           228
8      RE-CROSS EXAMINATION BY MR. CHALMERS              237
       FURTHER RE-DIRECT EXAMINATION BY MR. MC INERNEY   240
9      FURTHER RE-CROSS EXAMINATION BY MR. CHALMERS      240

10

11

12
                      E X H I B I T S
13
     Plaintiff's
14     Exhibits              Offered           Received

15          4                  126                126
          7 B                  151
16

17

18

19

20

21

22

23

24

25

1       THE COURT:  Good morning, everyone.  Members of the

2  jury, you will notice that we are short one of our jurors,

3  Miss Johnson, who was seated in the chair here on the end.  We

4  received a phone call from her indicating that she's sick and

5  would not be able to participate, so I would propose that we

6  excuse her and allow the remaining jurors to decide the case.

7  We have more than necessary for that purpose.  So any

8  objection?

9       MR. MC INERNEY:  No objection by the plaintiff, Judge.

10       MR. CHALMERS:  No objection here, Your Honor.

11       THE COURT:  All right.  Thank you.  Well, members of

12  the jury, when we recessed last evening, you will remember that

13  we had finished Mr. Shaw's examination, and so we're still in

14  plaintiff's case-in-chief, and we will ask plaintiffs to call

15  their next witness -- plaintiff call his next witness.

16       MR. MC INERNEY:  Thank you, Your Honor.  Plaintiffs --

17  plaintiff calls Trooper Doug Schulte to the stand.

18       THE COURT:  Trooper, would you please step into the

19  witness box and raise your right hand so that you can be sworn?

20       (Witness sworn.)

21       THE WITNESS:  I do.

22       MS. HARPER:  Thank you.  You may be seated.

23       MR. MC INERNEY:  Your Honor, pursuant to Federal Rule

24  of Evidence 601 C, we anticipate that because Trooper Schulte

25  is an adverse party, that we'll be entitled to interrogate him

1    by leading questions.

2              THE COURT:  Any objection?

3              MR. CHALMERS:  No, I don't object.

4              THE COURT:  Okay.  Go ahead.

5              MR. MC INERNEY:  Thank you, Judge.

6                        DOUGLAS FRANK SCHULTE,

7    Called as a witness on behalf of the plaintiff, having been

8    first duly sworn, testified as follows:

9                        DIRECT EXAMINATION

10   BY MR MC INERNEY:

11   Q.   Sir, your name for the jury?

12   A.   Douglas Frank Schulte.

13   Q.   And where are you employed, sir?

14   A.   Kansas Highway Patrol.

15   Q.   How long have you been employed there?

16   A.   I've been employed with Kansas Highway Patrol for a little

17   over 19 years now.

18   Q.   What position do you hold with the Kansas Highway Patrol?

19   A.   I'm a master trooper.

20   Q.   And do you have a particular assignment with the Kansas

21   Highway Patrol?

22   A.   At this point, I'm assigned to Troop D, Zone B, which is

23   Ellis and Russell counties.

24   Q.   How long have you had that assignment, sir?

25   A.   2008, I believe.

1   Q.  Okay.  Sir, you're from Kansas?

2   A.  I am.

3   Q.  Did you have any education before the law enforcement

4  academy?

5   A.  I did.  I grew up in a small town on a small family farm

6  outside of Victoria, Kansas.

7   Q.  Okay.  And your education consists of Barton County

8  Community College; correct?

9   A.  I have an associate's degree in fire science in Barton

10  County, yes, sir.

11  Q.  And then you attended Fort Hays State but did not graduate

12  from Fort Hayes State; correct?

13  A.  No, sir.

14  Q.  In 2004, you attended the Kansas Law Enforcement Academy?

15  A.  I did.

16  Q.  And your first assignment, sir, I think was in Gove County?

17  A.  Correct.

18  Q.  And there's a probationary period during your initial term

19  of service; correct?

20  A.  Yes.

21  Q.  About 90 days; am I right?

22  A.  Approximately, yes, sir.

23  Q.  Okay.  And then once you complete that probationary period,

24  then what rank or position do you hold?

25  A.  For the first seven years, it was just a trooper.  Once you

1    reached your seventh year, you are eligible to become a master

2    trooper.

3    Q.   And a master trooper doesn't outrank a regular trooper;

4    correct?

5    A.   Just by time.

6    Q.   Okay.  Signifies more time on the job and sometimes a

7    particular focus?

8    A.   Yes, sir.

9    Q.   I think you testified that your current assignment is Troop

10   D, and that was the assignment that you had in December of 2017

11   as well; correct?

12   A.   Yes, sir.

13   Q.   I want to direct your attention, sir, to December 20th of

14   2017.  Do you recall being at work that day?

15   A.   I do.

16   Q.   And do you recall approximately 12:25 PM, that is just

17   after noon on the 20th, did you have occasion to stop a vehicle

18   heading west on I-70?

19   A.   I did.

20   Q.   We're going to -- I'm going to show you a video.  It's been

21   admitted as Exhibit 1 here, and obviously, you've been sitting

22   here for all day yesterday, so you've seen some of that.  I'm

23   going to show you Exhibit 1, and we're going to pause it at

24   certain points.  Then I'm going to have questions for you.  If

25   we could start Exhibit 1, please, for Clip 1.  Pause me just a

1   second.  Thanks.  Sir, you're familiar with this Exhibit 1;

2   correct?

3   A.  Yes, sir.

4   Q.  And that's the dash cam, the forward looking dash cam in

5   your patrol vehicle as it captured your travel west on I-70 on

6   December 20th; right?

7   A.  Yes, sir.

8   Q.  Did you have a rear facing camera at that point?

9   A.  There is a rear facing camera.  It's not on the screen.

10  Q.  Okay.  Let's go ahead and start it.  Thank you.  Before we

11  get to the sound, let me ask you a couple questions.  There's

12  an in-car video capture system; correct?

13  A.  This is the video.

14  Q.  There is one; correct?

15  A.  Yes.

16  Q.  I'm stating the obvious.  And is it consistently running?

17  A.  It's on all the time.  It records like a 40-hour loop, and

18  once the lights are activated, after it burns that segment is

19  -- or however long, it's onto the disc.

20  Q.  Okay.  And the audio recording, however, captures when you

21  turn on your emergency equipment.  Is that true?

22  A.  The audio side?

23  Q.  Yes, sir.

24  A.  Yes, sir.

25  Q.  Sir, you saw the video quite a bit yesterday, and then

1   again just now.  That voice that we heard inside the car on the

2   radio was -- the primary voice, the louder voice was yours;

3   correct?

4   A.  Correct.

5   Q.  And at the time, you were calling your dispatch and

6   relaying the license tag on that white van; correct?

7   A.  Yes, sir.

8   Q.  Now, you never told dispatch that he appeared to be evading

9   you, did you?

10   A.  No.

11   Q.  Okay.  Never told dispatch that he had sped up; correct?

12   A.  No.

13   Q.  In fact, he didn't speed up, did he?

14   A.  I don't believe so, no.

15   Q.  Okay.  And if he had sped up and appeared to be eluding

16   you, you certainly would have alerted dispatch about that;

17   correct?

18   A.  Yes, sir.

19   Q.  And he pulled out of interstate traffic; correct?

20   A.  Yes, sir.

21   Q.  He pulled to the bottom of the ramp to the far right, as

22   you can see on Exhibit 1, the far right of that shoulder;

23   correct?

24   A.  Yes, sir.

25   Q.  Where the traffic is moving much slower?

1   A.   Yes, sir.

2   Q.   And he put his car in park; correct?

3   A.   I would assume so.

4   Q.   Okay.  Let's go to Exhibit 1, Clip 2.  Move back just a

5   little bit.  Sir, do you recall in this case making a sworn

6   declaration?

7   A.   Deposition?

8   Q.   Declaration.

9   A.   Declaration?

10  Q.   Yes.

11  A.   I believe -- yes, sir.

12  Q.   Let me show you what is all ready marked -- this may help.

13  Let me show you what has all ready been marked as Exhibit 4,

14  and if you would --

15  A.   Okay.

16  Q.   -- take a look at Exhibit Number 4, please, and

17  specifically, if you'll turn to that last page, sir, you see

18  about two-thirds of the way there on the right-hand side,

19  there's a signature line?

20  A.   Yes, sir.

21  Q.   Is that your signature?

22  A.   It is.

23  Q.   And the date just above that is April 19th of 2021;

24  correct?

25  A.   Yes.

1  Q.  And the title of that, if you'll flip back to the first

2  page, is declaration of Douglas Schulte concerning Shaw traffic

3  stop; correct?

4  A.  Yes, sir.

5  Q.  And that declaration was your chance to set out all the

6  facts and all the circumstances that contributed to what you

7  say was a reasonable suspicion in this case; correct?

8  A.  Yes, sir.

9  Q.  And you had a chance with that declaration that you did in

10 April of '21 to go back as take a look at reports?

11 A.  Yes.

12 Q.  And you had a chance to go back and take a look at other

13 documents related to the case?

14 A.  Yes.

15 Q.  Correct?  And you had a chance to even go back and take a

16 look at the entire video of the stop; correct?

17 A.  Yes.

18 Q.  From your dash cam video; right?

19 A.  Correct, sir.

20 Q.  And the idea behind that was to make sure that that

21 declaration was as accurate as it could be; correct?

22 A.  Yes, sir.

23 Q.  And if you'll flip to that very last page, that line just

24 above executed on April 19th, 2021 says what?

25 A.  Executed on the last page?

1  Q.  Yes, sir, on the last page just above the date line, what
2  does that say?
3  A.  I declare under -- excuse me, under penalty of perjury that
4  the foregoing is true and correct and executed on April 19th,
5  2021.
6  Q.  So those statements in there had to be right, didn't they?
7  A.  Yes, sir.
8  Q.  Let me direct your --
9        MR. MC INERNEY:  Judge, offer Exhibit Number 4 into
10  evidence.
11        THE COURT:  Any objection?
12        MR. CHALMERS:  Well, it's not a complete exhibit.
13  There have been parts redacted from it or removed from it, Your
14  Honor.  But I guess with that understanding, that it's not
15  complete, I don't have any objection to it.
16        THE COURT:  Received.
17  BY MR. MC INERNEY:
18  Q.  Trooper, if you will take that Exhibit Number 4, please,
19  what's been admitted as Exhibit Number 4, and turn to Page 6,
20  Paragraph 20.  Are you there, sir?
21  A.  Yes, sir.
22  Q.  Okay.  And Paragraph 20 is your list of all the specific
23  reasons that link to each basis or factor for your reasonable
24  suspicion that justified the extended detention and canine
25  search; correct?

1    A.    Yes.

2    Q.    All right.  That's what it says right there on

3    Paragraph 20?

4    A.    Yes, and it goes on to Page 7, probably 8.

5    Q.    Yeah, in fact, it goes on to Page 8, there's a number of --

6    I'm sorry, sir.

7    A.    Actually, it's Page 9.

8    Q.    It actually goes -- those bullet points go to -- Paragraph

9    Number 20 goes to Page 8.  Point being, there's a number of

10   bullet points underneath Paragraph 20; right?

11   A.    Yes, sir.

12   Q.    And each of those bullet points are in your words the

13   reasons that you had to extend that search based on the

14   reasonable suspicion; correct?

15   A.    Yes, sir.

16   Q.    If you look through all the reasons that you listed after

17   you looked at the documents and you viewed the video, you -- do

18   you see where you indicated that Mr. Shaw took too long to pull

19   over?

20   A.    Yes, that's the first bullet point.

21   Q.    Very first bullet point says B Shaw later determined to be

22   to be the driver of a 2010 -- sorry, 2010 Chrysler Town &

23   Country minivan did not timely pull over.  Did I read that

24   right?

25   A.    Yes, sir.

1  Q.  Did you include in that paragraph that you activated your

2  emergency lights before he passed you?

3  A.  In here, it's not listed, no.

4  Q.  Okay.  Did you include in there that Mr. Shaw explained to

5  you that he didn't know whether you were stopping him or

6  somebody else because you activated your emergency lights

7  before you got to him?

8  A.  Yes, sir.

9  Q.  Okay.  Did you include that in your declaration?

10  A.  No.

11  Q.  Is that an important fact?

12  A.  I think it would be.

13  Q.  Yeah.  But it doesn't show up here, does it?

14  A.  No, sir.

15  Q.  Let me direct your attention now to Paragraph 9 of your

16  declaration, sir.  Again, we're talking about you going through

17  the -- I'm sorry, are you there, sir?

18  A.  I think so.

19  Q.  Okay.

20  A.  Yes.

21  Q.  There we go.  You also stated in that sworn declaration,

22  sir, that you observed while you were walking to and from the

23  minivan vehicle that it was packed full up into the front

24  seats.  Did I read that right?

25  A.  Well, I wouldn't be -- it's the way it's written, yes, sir,

1   but I tell you if it's packed full up to the front seats,

2   wouldn't be any room for anybody to sit.

3   Q.   Wouldn't be what, sir?

4   A.   No room for anybody to sit.

5   Q.   I'm reading it as you wrote it.

6   A.   Yes, sir.

7   Q.   So it says it was packed full right up into the front seats

8   with luggage and coolers, a cot, blankets and several other

9   items.  Did I read that right?

10  A.   Yes, sir.

11  Q.   Did you have a chance to take a look at Exhibit 3, which

12  was Mr. Shaw's video that we watched yesterday?

13  A.   Excuse me, after yesterday when I viewed it, I have not

14  looked at it again.

15  Q.   Okay.  But you were here yesterday and you saw that video?

16  A.   Yes, sir, I was.

17  Q.   Did you see from Mr. Shaw's vantage point that from his

18  camera, you could see straight back to the back window of that

19  van?

20  A.   Yes.

21  Q.   Remember that?

22  A.   Yes, sir.

23  Q.   So if that van was packed full, isn't it fair to say it

24  would be tough to see out the back window?

25  A.   Yes, sir.

1    Q.   So that's not entirely accurate, is it?

2    A.   It's not packed, packed full, no, sir.

3    Q.   The luggage that you note in Paragraph 9, that wasn't any

4    different from anybody else traveling interstate on a vacation,

5    was it?

6    A.   No, sir.

7    Q.   And it wasn't -- and the cooler wasn't different than

8    anybody else traveling the interstate on a couple day trip or a

9    vacation, was it?

10   A.   No.

11   Q.   And you mentioned a cot.  Sir, you're not -- you're not

12   testifying here today that a cot has any sort of direct

13   connection with drug dealers, are you?

14   A.   No.

15   Q.   And then you mentioned that it has -- that you saw some

16   blankets.  In your experience, are drug couriers notable for

17   bringing blankets?

18   A.   They can be.

19   Q.   Can be, but you didn't mention that in your affidavit?

20   A.   No, sir.

21   Q.   Or in your declaration, did you?

22   A.   No, sir.

23   Q.   Let's go to Clip 3, please.  Sir, did you hear that

24   response on the radio?

25   A.   Yes, sir.

1    Q.   And I'm going to direct your attention to a couple

2    specific -- couple specific statements that we heard.  It was

3    NCIC negative.  What does that mean?

4    A.   He's negative for wants and warrants at that time.

5    Q.   Sorry?

6    A.   At that time, he had no wants or warrants.

7    Q.   Okay.  And no history of wants or warrants?

8    A.   No, I don't believe so.

9    Q.   Correct?  The only history you had was 2009 controlled

10   substance; correct?

11   A.   Correct.

12   Q.   Right?  And then it said I IDA?

13   A.   It did.

14   Q.   Which stands for intent?

15   A.   Intent to distribute, yes, sir.

16   Q.   Okay.  And then they said, and checking further, that's

17   going to be the only entry; correct?

18   A.   Yes, sir.

19   Q.   Okay.  So at that time, that's all you knew?

20   A.   Correct.

21   Q.   All right.  Let's go ahead and run it through 917, please.

22   Can you roll that back for ten seconds, please?  Thank you,

23   Alyssa.  Sir, that last -- last time that you spoke was you

24   calling for assistance; correct?

25   A.   Yes, sir.

1  Q.  Okay.  And who were you calling?

2  A.  397; which is Trooper James McCord.

3  Q.  And you call for assistance when you're going to ask for

4  consent to search, don't you?

5  A.  Yes, sir, usually do.

6  Q.  You don't call for assistance for a speeding ticket, do

7  you?

8  A.  No, sir.

9  Q.  So at this point, you don't have any reasonable suspicion,

10  but you're calling for back-up, is that correct?

11  A.  I have the -- the I IDA, which I IDA, didn't timely pull

12  over, and then the van has the lived-in appearance.

13  Q.  But you didn't have reasonable suspicion, did you, at this

14  point?

15  A.  Rephrase.

16  Q.  Did you have reasonable suspicion at this point in the stop

17  in the encounter?  You didn't have reasonable suspicion, did

18  you?

19  A.  I think I was working toward that.

20  Q.  But you didn't have it, did you?

21  A.  I guess not.

22  Q.  Well, it's a yes or no.  Did you have reasonable suspicion

23  or not?

24  A.  I think I was working toward the reasonable suspicion.

25  Q.  At this point in the encounter, sir, did you have

1    reasonable suspicion?

2    A.   No.

3    Q.   Let's play Clip Number 4, please.  Sir, we're paused at

4    should be about 1446, I'm sorry, it's -- I don't know where it

5    is, 15 -- 1509 or so on that tape.  Sir, at this point, you do

6    not reasonable suspicion; correct?

7    A.   Correct.

8    Q.   After you finished the contact with him and issue the

9    citation, your position is he's free to go; isn't that right?

10   A.   Yes, sir.

11   Q.   That's the end of the detention; correct?

12   A.   Correct.

13   Q.   You didn't tell him that, though, did you?

14   A.   No, I did not in so many words.  I told him -- I didn't say

15   he's free to go directly.  I had said slow down, have a safe

16   trip.

17   Q.   Yeah, told him be careful essentially; correct?

18   A.   Yes, sir.

19   Q.   Okay.  And that's because you were preparing to pull the

20   two-step on him; correct?

21   A.   Yes, sir.

22   Q.   Okay.  So that was your intent walking up as you had the

23   conversation with Mr. Shaw was to pull what we now know is

24   called the two-step?

25   A.   Yes.  During the deposition, that was a phrase you asked me

1    about, and I had never called it that, but that's what other

2    people had called it.

3    Q.  What had you called that move?

4    A.  Just broke contact and reengaged.

5    Q.  Okay.  Never heard the two-step before we brought it up?

6    A.  Well, I've heard it called that, but I've never called it

7    that.

8    Q.  You heard that in the academy, didn't you?

9    A.  I don't know if I heard that in the academy or not.

10   Q.  Did you hear that in your continuing training at KHP?

11   A.  Probably got brought up, yes, sir.

12   Q.  Okay.  And your position is that your belief is that after

13   you do the two-step, then it's a consensual encounter; correct?

14   A.  It's not at that point, if I asked -- if I can ask more

15   questions, and they give you yes or no answer.

16   Q.  So when you're turning around, and we're looking at Exhibit

17   Number 1 that's paused there, you're just turning around and

18   heading back up to the van.  Your position is that at this

19   moment, sir, the driver is free to go; correct?

20   A.  Yes.

21   Q.  And they -- because they are free to leave even if you

22   don't tell them; right?

23   A.  Correct.

24   Q.  So let's roll that clip forward about ten seconds, please.

25   Thanks, Alyssa.  Sir, at this point, you've re-approached the

1    van, and obviously, we can hear you asking the driver

2    questions; correct?

3    A.   Yes, sir.

4    Q.   Driver we know to be Mr. Shaw?

5    A.   Yes, sir.

6    Q.   And this time, you're positioned ahead of his rearview

7    mirror in what appears to be, and tell me if I'm wrong, about

8    four to six inches off the side of the car.  Is that fair?

9    A.   That's probably more than that, due to the camera that's

10   mounted on the passenger side of my vehicle.

11   Q.   Okay.  What would you estimate it to be?

12   A.   Probably more than -- probably about a foot, and it's hard

13   to tell with the depth of the field for the -- what you said by

14   the mirror.

15   Q.   Even if it's a foot, that driver's not able to pull safely

16   onto that exit ramp, is he?  You'd agree with that?

17   A.   Well, I asked him -- I wasn't that close when I asked him

18   if I could talk to him again.

19   Q.   Is it your testimony that he was free to go at this point,

20   and pull right past you onto the exit ramp?

21   A.   At this point, he said I could talk to him some more.

22   Q.   Well, I think you -- at this point, you had come up and

23   started asking him questions and making statements; correct?

24   A.   I asked if I could ask him more questions prior to that.

25   Q.   Okay.  And then you started reciting some statements and

1    questions about speeding and where they were headed; right?

2    A.   Correct, sir.

3    Q.   Okay.  You're just -- you've just completed -- at this

4    point in Exhibit 1, you've just completed that two-step, and it

5    was based on what you'd seen in the van; correct?

6    A.   Yes, sir.

7    Q.   The cot, the sleeping bag, the cooler; correct?

8    A.   Yes, sir.

9    Q.   And the fact that you -- you thought they were living out

10   of the van; correct?

11   A.   I did.

12   Q.   And his Triple I, that arrest with intent; correct?

13   A.   Yes, sir.

14   Q.   And that was about eight and a half year old criminal

15   record at that point?

16   A.   That was in --

17   Q.   The stop was in 17; sir?

18   A.   It was '9, the Triple I.

19   Q.   Correct.  And that was how old?

20   A.   That's what I'm asking, it was 2008 or '9.

21   Q.   2009.  2009, yes.

22   A.   And it's '17.

23   Q.   Approximately eight years or so?

24   A.   Yes, sir.

25   Q.   And it's also based on what you call his jumpiness and

1  nervousness; right?

2  A.  Yes, sir.

3  Q.  And that was based on your experience that drug traffickers

4  get jumpy and nervous when they're traveling with narcotics?

5  A.  Yes, sir.

6  Q.  In your experience, are people who get pulled over nervous

7  anyway?

8  A.  Some are, yes, sir.

9  Q.  So there's a normal amount of nervous, and then there's

10  extraordinary amount of nervous?

11  A.  Yes.

12  Q.  Little bit of nervous is pretty average.  Is that fair to

13  say?

14  A.  Yes, sir.

15  Q.  And generally, that's because somebody is about to get a

16  ticket for speeding or improper lane change or whatever it

17  might be?

18  A.  Yes, sir.

19  Q.  So it's not just drug traffickers who are nervous; correct?

20  A.  Correct.

21  Q.  And Blaine Shaw was answering questions at this point?

22  A.  Yes.

23  Q.  And in fact, he was pretty chatty, wasn't he?

24  A.  Yes, he was.

25  Q.  You didn't see him sweating?

1   A.  No.

2   Q.  You didn't see his hands shaking?

3   A.  Don't remember where his hands were, no.

4   Q.  Didn't say anywhere that his voice was shaking, his voice

5  was trembling?

6   A.  Pretty excited, but not trembling, no.

7   Q.  That kind of nervousness or that kind of shaking, that

8  would have been a pretty good indicator, wouldn't it?

9   A.  It would.

10  Q.  And you didn't see any of that, or at least you didn't put

11  it down, did you?

12  A.  I did not.

13  Q.  I'm going to direct your attention back to what we talked

14  about earlier, Exhibit Number 4, that declaration?

15  A.  Okay.

16  Q.  And back to Paragraph 20 again, if you will.  And again,

17  this is the list of all the reasons that you believed you had

18  reasonable suspicion at the time, and if you'll look through

19  there, you don't mention anywhere that Blaine Shaw was nervous

20  or jumpy, do you?

21  A.  I do not.

22  Q.  You also based your -- well, excuse me.  You didn't mention

23  anywhere in there that he was nervous or hand shaking or voice

24  trembling or anything, did you?

25  A.  No.

1    Q.   'Cause you didn't notice that stuff, did you?

2    A.   I did not.

3    Q.   And I think you mentioned that he had a very quick reaction

4    to your questions; correct?

5    A.   When I asked him -- told him how fast he was going, yes.

6    Q.   And that was one of the reasons that you based some

7    reasonable -- or some -- that was one of the bases for your

8    reasonable suspicion, wasn't it?

9    A.   One of the things I -- yeah.

10   Q.   Yeah, that's my fault.

11   A.   All the things that I threw in the bag for my reasonable

12   suspicion, yes, sir.

13   Q.   You also -- you also based that in part that the vehicle

14   was registered to his father?

15   A.   I did.

16   Q.   And all of this was before you issued him a ticket;

17   correct, all those reasons I just mentioned were reasons that

18   you accumulated before you issued him a citation for speeding?

19   A.   Yes, sir.

20   Q.   Okay.  And when you issued him a citation for speeding, you

21   did not have reasonable suspicion, did you?

22   A.   I was working on my reasonable suspicion.

23   Q.   But you didn't have it, did you?

24   A.   No.

25   Q.   In fact, you and I have met before at your deposition,

1   haven't we?

2   A.  Yes, sir.

3   Q.  And the deposition was in February of '21, so almost two

4   years ago?

5   A.  Sounds about right.

6   Q.  Not that I expect you to remember the date.  And your

7   lawyer was there, Mr. Chalmers?

8   A.  Yes, sir.

9   Q.  And I was there; right?

10  A.  Yes, sir.

11  Q.  Court reporter was there?

12  A.  Yes, sir.

13  Q.  And you took the same oath to tell the truth then that you

14  just took this morning, didn't you?

15  A.  Yes, sir.

16  Q.  And after that deposition was over, you had a chance to

17  take a look at it, and correct any errors or things that were

18  wrong or missing?

19  A.  Yes, sir.

20  Q.  And you didn't make any corrections?

21  A.  I don't believe I did -- being a time that's passed, I

22  don't believe I did.

23  Q.  Okay.  And all that's so that deposition is accurate and

24  truthful and exact, isn't it?

25  A.  To the best of my knowledge, yes, sir.

1 Q. Okay. Right there in front of you, there's a white binder,

2 and I'm going to have you open that up if you would to the very

3 first page. Sir, is that a copy of your deposition that was

4 taken on February 25th of 2021?

5 A. It appears to be, sir.

6 Q. Okay. Sir, would you ask -- or excuse me, would you turn

7 to Page 206, and direct your attention to the top of that page?

8 A. I'm there, sir.

9 Q. Actually, I'm going to have you flip back to 205, please.

10 And sir, there on Page 205, starting at Line 19, did I ask you

11 this question and you give me this answer? Question,

12 nevertheless, all that before you issued him the citation as

13 you just I think testified did not hit reasonable suspicion

14 yet? Answer, I was developing my reasonable suspicion.

15 Question, understood, but you didn't have it at that point?

16 Answer, no. Did I read that correctly?

17 A. Yes, sir, according to what's in the transcript, yes.

18 Q. And you didn't have any -- any objections to that

19 transcript; you didn't make any changes, did you?

20 A. I don't believe I did, sir.

21 Q. Okay. Let's roll the next clip, please, starting at -- I

22 think starting at 1511. Thank you. Sir, that -- as we just

23 saw, that was your interrogation and request of Mr. Shaw to

24 consent to a search and his refusal to do that; correct?

25 A. Yes.

1    Q.   And in that questioning, you learned that he was coming

2    from Denver?

3    A.   Coming from Oklahoma.

4    Q.   Excuse me, coming from Oklahoma and going to Denver;

5    correct?

6    A.   Yes, sir.

7    Q.   And you also learned that he refused to consent to a

8    search; correct?

9    A.   He did.

10   Q.   In the approximately three seconds between when you broke

11   off contact and did the two-step and came back, did you develop

12   any additional reasonable suspicion?

13   A.   I was going to ask more questions.

14   Q.   But did you develop anything in that short period of time?

15   A.   From what I had all ready?

16   Q.   Yes, sir.

17   A.   No, sir.

18   Q.   So when you begin the interrogation of him at the door,

19   after you said, can I ask you another question, you did not

20   have reasonable suspicion; correct?

21   A.   No.

22   Q.   You mentioned that he was coming from Oklahoma, and he

23   confirmed that, and that made you -- the fact that he was

24   coming from Oklahoma made you more suspicious, didn't it?

25   A.   Indicator.

1    Q.   What does that mean?

2    A.   Where are you coming from and where you're going.

3    Q.   Okay.  The fact that he was coming from Oklahoma by itself

4    made you more suspicious, didn't it?

5    A.   I don't know if it made me more suspicious, 'cause coming

6    from one area to another is not by itself.

7    Q.   Didn't that make you more suspicious because Oklahoma's a

8    state where people take narcotics, and he's going to a source

9    state?

10   A.   Yes, sir.

11   Q.   Okay.  So the fact that he was coming from Oklahoma made

12   you more suspicious; is that correct?

13   A.   With everything else I'd learned before, yes.

14   Q.   I'm going to go back to that deposition that you have in

15   front of you, and have you turn to Page 208, if you will,

16   please.  At Page 208, at the top, there's an answer, but the

17   question begins on 207, sir, if you would flip back and direct

18   your attention to Line 23.  Again, this is the deposition from

19   February of 2021.  Did I ask this question and you give these

20   answers?  Question, what about the fact that he was coming from

21   Oklahoma factored into your reasonable suspicion?  Answer, what

22   factor?  Question, yeah, what about that?  Answer, coming from

23   a known where people take narcotics and going -- and of course,

24   he's going west, he's going to a place that's a source state.

25   Question, okay, Oklahoma is a place where people take

1   narcotics?  Answer, they can.  Did I read all that correctly?

2   A.  Yes, sir.

3   Q.  But there's not a single state in the country, isn't it

4   true, where people can't take narcotics to; correct?

5   A.  Correct.

6   Q.  So he could have said Arkansas, he could have said Vermont,

7   he could have had said California or New York, could have been

8   any of those states.  All those are states where people take

9   narcotics; correct?

10   A.  Yes.

11   Q.  So that doesn't set Oklahoma apart at all, does it?

12   A.  No.

13   Q.  He was just coming from one state to another; correct?

14   A.  Correct.

15   Q.  So basically, it was an out-of-state car; correct?

16   A.  Yes, sir.

17   Q.  And that was part of your suspicion, wasn't it?

18   A.  When I first stopped him?

19   Q.  At that point we're talking about.

20   A.  That he's from out of state, yes.

21   Q.  Okay.  And that he -- sorry.  The fact that he was in an

22   out-of-state car was part of your suspicion, wasn't it?

23   A.  Part of it.

24   Q.  And the fact that he was traveling on an interstate from

25   what you called Oklahoma -- well, it was Oklahoma to what you

1   called a source state, that was also part of it; correct?

2   A.   Correct.

3   Q.   Then you asked Mr. Shaw about contraband, you went through

4   your list of contraband, you went through narcotics and big

5   stashes of cash, and weapons and knives and etcetera, and he --

6   you asked him all those questions, and he answered you no, no,

7   no, no; remember that?

8   A.   That's correct; yes, sir.

9   Q.   So he denied all of that?

10  A.   Yes.

11  Q.   So you didn't gather any additional basis for suspicion

12  from his answers, did you?

13  A.   No.

14  Q.   And then you asked if he would consent, and he said no, I'm

15  a criminal justice major, and that's like the Number 1 golden

16  rule.   Remember that?

17  A.   Correct; sir, yes, I do.

18  Q.   And that was suspicious to you; right, that a criminal

19  justice major wouldn't consent?

20  A.   Say that again, I'm sorry.

21  Q.   The fact that a criminal justice major would not consent

22  was suspicious to you, wasn't it?

23  A.   Yes.

24  Q.   Because I guess the criminal justice major you've asked for

25  consent tend to consent; correct?

1    A.   Well, I don't know how many people I have -- have ever told
2    me that, but I would assume so.
3    Q.   Okay.  Well, when you pull people over, you don't ask
4    what's your major, do you?
5    A.   No, sir.
6    Q.   Okay.  So when you say that in your experience, criminal
7    justice majors tend to consent, what's that based on?
8    A.   Like you said, I don't ask them what their major is, or
9    even I don't know if anybody's ever told me that.
10   Q.   Sir, I'm going to have you turn to Page 213 of your
11   deposition, and let me direct your attention -- or your
12   attention, rather, to Line 8.  My question, okay, and then you
13   said that he was a -- you noted that he was a criminal justice
14   major, yet did not consent to a search; correct?
15   A.   Yes, sir.
16   Q.   And you said -- your answer was; correct, sir.  And I said,
17   in your experience, do people who represent themselves to be
18   criminal justice majors usually consent to searches?  And your
19   answer is yes.  And then I asked why do you think that is?  And
20   your answer is, they have nothing to hide.  I read that right?
21   A.   Yes, sir.
22   Q.   So the fact that he was a criminal justice major asserting
23   his right not to be searched, not to consent to a search
24   factored into your suspicion, didn't it?
25   A.   It did.

1    Q.   And his right to refuse consent, that's a constitutional

2    right; correct?

3    A.   Yes, sir, it is.

4    Q.   And you learned that in your training, didn't you?

5    A.   Yes, sir.

6    Q.   At the academy; correct?

7    A.   Yes, sir.

8    Q.   And in subsequent continued training; right?

9    A.   Yes, sir.

10   Q.   Okay.   Pretty fundamental right, wouldn't you say?

11   A.   Yes, sir.

12   Q.   If Mr. Shaw had pulled on to that exit ramp to leave, but

13   as you were standing next to his van, fair to say he ran a risk

14   of hitting you, didn't he?

15   A.   Don't think I was that close.

16   Q.   Fact is, when you walk back up to his door, you had all

17   ready decided that he was going to be detained for a canine

18   sniff, didn't you?

19   A.   I wanted to ask more questions.

20   Q.   Well, the answers to his questions didn't matter, did they?

21   You asked him a lot of questions about what he had in the van,

22   and he said no, no, no, no, no, and you said, will you -- will

23   you consent to a search, and he said I don't consent?

24   A.   Correct; sir.

25   Q.   And then that was it; right?

1    A.   Yes, sir.

2    Q.   So the only two things you learned at that second encounter

3    was that he denied having things in his van?

4    A.   Yes, sir.

5    Q.   Correct?  And he exercised his constitutional right;

6    correct?

7    A.   Yes, sir.

8    Q.   So you decided before you even walked up to that van, he

9    was going to be held?

10   A.   I don't think I -- excuse me, I don't think I did.

11   Q.   There's a little water over there to your left, if you

12   like.  I mean, when you told him, wait right here, I'll be

13   right back, he was detained; correct?

14   A.   At that point, yes, sir.

15   Q.   No question about it?

16   A.   No.

17   Q.   Not free to go?

18   A.   Correct.

19   Q.   You walk back towards the car.  In fact, I think where we

20   paused this video, you're talking into your microphone and you

21   say refusal; correct?

22   A.   Telling dispatch, yes, sir.

23   Q.   Okay.  And if we can hit play again and run it through that

24   next portion, please.  So that was Trooper McCord you were

25   talking to; correct?

1   A.   Off to the side here?

2   Q.   Yes, sir.

3   A.   I believe so.

4   Q.   Okay.  And he asked -- he asked you about the passenger,

5   and I think you said, he doesn't say anything, never looked

6   over, got his hand in his lap, looked straight forward.

7   Remember saying that?

8   A.   Yes, sir.

9   Q.   Okay.  So Blaine Shaw at this point is nervous and jumpy

10  and responded too quickly to your questions which made you

11  suspicious; right?

12  A.   He was excited.

13  Q.   Okay.  But it made you suspicious?

14  A.   It did.

15  Q.   And the passenger didn't talk; right?

16  A.   Correct.

17  Q.   Didn't look over at you?

18  A.   No, sir.

19  Q.   Didn't make any sudden movements?

20  A.   No, sir.

21  Q.   Kept his hands where you could see 'em?

22  A.   Yes, sir.

23  Q.   Looked straight forward?

24  A.   Yes, sir.

25  Q.   And that made you suspicious?

1   A.   Yes, sir.

2   Q.   Are you familiar with advice that the Kansas Highway Patrol

3   gives to citizens regarding how to act during a traffic stop?

4   A.   I saw that yesterday.  I believe that was probably the

5   first time I saw it.  I have no idea when that was put on

6   our -- our -- our web page.

7   Q.   Okay.  Well, let me show you what's been marked for

8   identification as Exhibit 7 B.  Let me direct your attention to

9   the upper portion of Exhibit 7 B.  Does that appear to you to

10  be a screen shot from a web site?

11  A.   Yes.

12  Q.   Okay.

13  A.   It's a pretty -- it's not real clear, but yes.

14  Q.   Right, and I apologize for the font size.

15  A.   It's pretty small.

16  Q.   It is.  In the upper right-hand corner, do you see a

17  blacked out date there that says December 15, 2017?

18  A.   Upper right?

19  Q.   Upper right-hand corner, sir, it's --

20  A.   Oh, yes, sir.

21  Q.   Okay.  And if I can, let me have you take a look at the

22  third -- well, first of all, what's it titled there?

23  A.   What to do if you are stopped.

24  Q.   Okay.  And the web site address there in the address bar,

25  that's Kansas Highway Patrol.org, isn't it?

1    A.   Yes, sir, that's what it says.

2    Q.   Okay.  And the date up there in the right-hand corner is

3    December 15, 2017; right?

4    A.   It is.

5    Q.   And that's called what to do if you're stopped?

6    A.   It is.

7           MR. MC INERNEY:  Offer Exhibit 7 B into evidence.

8           MR. CHALMERS:  There's no foundation that he's seen

9    this, and counsel overlooks the date February 2018 that looks

10   on the document, December 15, '17 date.  I don't know when it

11   was put on the web site and neither does counsel, and I don't

12   think it's relevant, Your Honor.

13          MR. MC INERNEY:  Generated from an application that's

14   an archive collector, and that -- the archive is for the Kansas

15   Highway Patrol.  That screen grab is from December 15th of

16   2017.

17          MR. CHALMERS:  There's lack of foundation.  I mean,

18   now we've got counsel testifying, and again, trooper's never

19   seen it.

20          THE COURT:  Unless you have a stipulation to that

21   effect, I think you would need a witness to lay that

22   foundation.

23          MR. MC INERNEY:  Okay.  We don't have a stipulation.

24   Thank you.

25          THE COURT:  Okay.

1    BY MR. MC INERNEY:

2    Q.   Sir, do you think it's appropriate if persons who are

3    stopped keep their hands in plain view?

4    A.   Yes.

5    Q.   And don't make any sudden movements?

6    A.   Yes.

7    Q.   And remain calm?

8    A.   Yes.

9    Q.   Talk if spoken to?

10   A.   Yes.

11   Q.   And not interfere with the stop?

12   A.   Correct.

13   Q.   And all that really goes to everybody's safety, yours, and

14   the driver's and any passengers; correct?

15   A.   Yes, sir.

16   Q.   So all that's appropriate conduct, isn't it?

17   A.   Yes, sir.

18   Q.   Let's go to Clip 8, Alyssa, please.  When you re-approached

19   Mr. Shaw on the driver's side of the van as he was stopped

20   there on the side of the road, your statement to Mr. Shaw was,

21   since you refused, I've got a canine officer in route; is that

22   correct?

23   A.   I said that, yes, sir.

24   Q.   And you didn't tell him since you took too long to pull

25   over, did you?

1    A.    No.

2    Q.    Sorry?

3    A.    I did not tell him that.

4    Q.    Didn't tell him since you're driving your dad's car?

5    A.    No.

6    Q.    Didn't tell him since you're nervous?

7    A.    No.

8    Q.    Didn't tell him since your passenger won't look at me?

9    A.    No.

10   Q.    Didn't tell him since your van looks lived in?

11   A.    No.

12   Q.    You said since you refused, I've got a canine officer in

13   route; correct?

14   A.    That's my words I used, yes, sir.

15   Q.    The only reason you gave him; correct?

16   A.    That's the only thing I said to him, yes.

17   Q.    And then you told him, now you're being detained; correct?

18   A.    I did.

19   Q.    You -- and you came back to your vehicle and spoke to the

20   officer -- I'm assuming Officer McCord?

21   A.    Correct.

22   Q.    So he refused consent, and your response was to call a

23   canine officer; correct?

24   A.    Upon refusal, yes, sir, that's what I did.

25   Q.    Let's play Clip 9, please.  We just heard that conversation

1  between you and Trooper McCord.  Mr. -- or Trooper McCord asked

2  you, so is the passenger a friend or family?  You said friend;

3  correct?

4  A.  I did.

5  Q.  And said is he married, and you said no; correct?

6  A.  Correct.

7  Q.  You never asked Mr. Shaw about his marital status, did you?

8  A.  I did not.

9  Q.  You never asked him about his relationship to his

10 passenger?

11 A.  I did not.

12 Q.  Never talked to the passenger?

13 A.  I did not.

14 Q.  His marital status wasn't on his identification; correct?

15 A.  It is not.

16 Q.  And you didn't know who was in the passenger seat at that

17 point, did you?

18 A.  I did not.

19 Q.  In fact, you were wrong when you said friend; right?

20 A.  I was.

21 Q.  And you were wrong when you said that he was unmarried?

22 A.  Yes.

23 Q.  But you were suspicious because he was with a friend,

24 heading west at that point, heading to Denver; correct?

25 A.  Correct.

1    Q.   And the passenger again was calm; correct?

2    A.   I don't know word calm is what you'd use, but I thought it

3    was suspicious 'cause he just sat there.

4    Q.   He was calm.  I think you testified four minutes ago that

5    he remained calm; correct?

6    A.   I said he remained calm?

7    Q.   Yes, sir.

8    A.   Okay.

9    Q.   Kept his hands in his lap where you can see 'em?

10   A.   He did.

11   Q.   Okay.  No sudden movements?

12   A.   No.

13   Q.   And looked straight forward?

14   A.   Correct.

15   Q.   Let's look at Clip 10; please.  Sir, did you tell Mr. Shaw

16   that the dog was going to walk around the car and then jump

17   into the driver's window?

18   A.   I didn't tell him anything about what the dog was going to

19   do other than we had one there.

20   Q.   After the clip that we saw, the van was searched; correct?

21   A.   Correct.

22   Q.   And at the end of the search, you didn't recover any guns?

23   A.   No.

24   Q.   Any knives?

25   A.   No.

1    Q.   Any contraband?

2    A.   No.

3    Q.   Any cocaine?

4    A.   No.

5    Q.   Any meth?

6    A.   No.

7    Q.   Any large sums of cash?

8    A.   No.

9    Q.   Didn't arrest either one of the Shaw's?

10   A.   No, sir.

11   Q.   And the only thing you did is cited him for 91 in a 75;

12   isn't that right?

13   A.   That's correct.

14        MR. MC INERNEY:  One minute, Your Honor.  That's all

15   the questions I have for this witness, Your Honor.  Thank you,

16   sir.

17        THE WITNESS:  Thank you.

18        THE COURT:  Cross-examination.

19        MR. CHALMERS:  Yeah, I wonder if we might approach

20   real quickly, Your Honor.

21        THE COURT:  Sure.

22   (Proceedings held at the bench, outside the hearing of open

23   court.)

24        MR. CHALMERS:  Counsel concluded by asking a number of

25   other questions whether they recovered any contraband.  Of

1   course, they did, the smelly bags and contents of the bags, so

2   why doesn't that open the door?  I think it does for me to talk

3   about what they found.

4       MR. MC INERNEY:  They didn't recover anything out of

5   the smelly bags, the smelly bags themselves, they didn't

6   recover anything, and even if they had recovered it, they

7   didn't test it.  Nobody can say what it was.

8       MR. CHALMERS:  You can open the bag and you can smell

9   the marijuana, even today, and it's in one of the exhibits, but

10  he opened the door.  He said no contraband.  How do we unwind

11  that without me being able to explain what we found?

12      THE COURT:  Is this the same issue we covered

13  yesterday?

14      MR. CHALMERS:  Umm, I don't know if it's the same

15  issue we covered the other day, but it is similar.  Again, I

16  don't think before yesterday, he asked the question, injected

17  the issue, and said did you recover any contraband.  Before,

18  they'd always been cautious by saying no charges were brought.

19      THE COURT:  So, what specifically do you think is the

20  contraband that was recovered?

21      MR. CHALMERS:  The -- basically, the remnants of the

22  marijuana smell within the bags.

23      THE COURT:  What is a remnant of marijuana smell?

24      MR. CHALMERS:  That marijuana had been in the bag that

25  had been recovered, or bags.

1      THE COURT:  And that's contraband because?  Because

2   marijuana had been in it at some point in the past?

3      MR. CHALMERS:  I think that trace amounts of

4   contraband are trace amounts of contraband.

5      THE COURT:  But you don't have evidence of -- of

6   marijuana in those bags other than what you're characterizing

7   as a trace amount of an odor.

8      MR. CHALMERS:  Well, the dog alerted to narcotics.

9   We've got the odor within the bag that can be identified as

10  marijuana.

11     THE COURT:  So, last night, I was thinking back on our

12  conversation on this issue, and you -- this only goes to

13  damages, right, because you want to show that his damages are a

14  result of the search and not the detention?

15     MR. CHALMERS:  Right.  Now it goes to the fact that my

16  client is prejudiced if they're allowed to stand up and say you

17  didn't find anything in the search when we did.

18     MR. MC INERNEY:  That question --

19     MR. CHALMERS:  So in that fashion, they attempt to --

20  to imply that there is a lack of reasonable suspicion, and lack

21  for justification for the detention.  They've opened that door,

22  asked the jury to consider that, and it is now unfair not for

23  me to be able to show what we located.

24     MR. MC INERNEY:  Judge, that question was very

25  specific.  It was whether they recovered any one of those items

1    that Trooper Schulte questioned him about, and they didn't.

2    They didn't.  Not only did they not recover anything, they

3    didn't test anything, and he doesn't have a single witness who

4    will testify that anything smelled like anything.  I mean, if

5    he wants to talk about the smell of marijuana, I can walk down

6    State Avenue and smell marijuana.  That means nothing with

7    respect to these -- this plaintiff and this stop.

8            THE COURT:  You know, I agree with that.  The alleged

9    contraband that turned up in the search doesn't add anything to

10   the question whether he had a reasonably articulable suspicion

11   which justified him in prolonging the detention of plaintiff by

12   the side of the road.  It's complete hindsight.  It's not

13   relevant at all.  So the only reason it would become relevant

14   is on what I consider to be your kind of convoluted damage

15   theory.  I don't know if you think this is ironic, bud to me,

16   it seems ironic that it seems like your damage theory is along

17   the lines of, you think he was damaged by the prolonged

18   detention, look at how much we damaged him by the search.

19   That's what he's really complaining about.  I've never had that

20   kind of defense strategy is why I think it seems ironic, but if

21   we go down that path, then we get into all kinds of issues like

22   whether the search was justified at the time, and I don't see

23   that as part of this case, so...

24           MR. CHALMERS:  But the point I'm making now, and I

25   understand your ruling on -- on my damage theory.  But the

1    point that I'm making now is that he can't stand in front of

2    the jury and present testimony saying nothing was found, which

3    is in essence what he's done, open that door to ask the jury

4    to -- to consider that as part of the reasonable suspicion

5    analysis.  I don't think that's proper, but he did it, and once

6    he's done it, I should be able to cure the prejudice he's

7    caused by showing what they found.

8            THE COURT:  Umm, I don't think you are offering that

9    to show that his -- what they found was part of the reasonable

10   suspicion.

11           MR. MC INERNEY:  No, based on what I -- let me

12   respond.  Based on what I mentioned yesterday after we

13   adjourned and let the jury go, it's a point in time question;

14   right?  The reasonable suspicion analysis begins with the --

15   when he pulled him over, and ends when he calls for the dog.

16   That's it.  And so what happens after that with respect to

17   reasonable suspicion doesn't matter.  In fact, the Tenth

18   Circuit tossed that part of the case after the probable cause

19   finding.

20           MR. CHALMERS:  And yet he asked about what happened

21   after the dog had --

22           THE COURT:  But you didn't make a contemporaneous

23   objection.  It's not in front of the jury.  I don't know what

24   door he's opened.  It's the information which it is, and the

25   trooper is true, it's not false, so I don't see any prejudice,

1  let alone unfair prejudice that results from that question

2  being asked.  So you're -- I guess you're asking permission to

3  explore that on cross-examination, and I'm denying that.

4  MR. CHALMERS:  My understanding is to do that would be

5  to violate your order, and I didn't want to do that without

6  talking about it first.

7  THE COURT:  Thank you.  I appreciate that.

8  (Proceedings continued in open court.)

9  CROSS EXAMINATION

10  BY MR. CHALMERS:

11  Q.  Trooper, I want to start at the back, and then talk to you

12  about your -- about the examination that you responded to.  But

13  you -- you were asked about consent and the refusal to give

14  consent.  Was that ever part of your reasonable suspicion for

15  detaining Mr. Shaw?

16  A.  As part -- you have to speak up, Mr. Chalmers.

17  Q.  I'm sorry.  I got the microphone, and I thought that I

18  could be heard.  You were asked about consent, and you were

19  asked about the refusal to give consent, and the question is,

20  was that ever any part of the reasonable suspicion that you

21  formed to detain Mr. Shaw?

22  A.  Being the passage of time, I can't say yes or no.

23  Q.  Well, are you -- I don't know, maybe you are saying, if

24  someone doesn't consent to a search, is that part of the

25  reasonable suspicion?

1    A.   Could be suspicious, yes, sir.

2    Q.   And was it suspicious in this instance?

3    A.   I believe so.

4    Q.   How so?

5    A.   With all the indicators, or what I had before, excuse me,

6    Mr. Shaw didn't pull over when I turned my lights on

7    immediately, kind of jumpy, I thought, and then as a passenger,

8    most people, when I talk to the driver, they tend to look over

9    at me, acknowledge that I'm standing there, or they listen very

10   intently.  He did nothing.  The vehicle had what I thought was

11   a lived-in appearance.  He was going to a source state.  When I

12   find out that, coming from another state which can be an

13   indicator, and then he had a previous charge of possession of

14   narcotics and intent to distribute.

15   Q.   And maybe my question is -- is -- is missing your answer.

16   You've described in summary the reasonable suspicions that you

17   had to detain Mr. Shaw in your answer; is that right?

18   A.   Yes, sir.

19   Q.   Okay.  When you asked for consent and you weren't given

20   consent, then you had to make a decision whether to detain him

21   or not; is that right?

22   A.   I did.

23   Q.   Are you saying that the refusal to consent is a basis for

24   reasonable suspicion, or are you just saying, well, when he

25   wouldn't consent, then I had to detain him based on the

1    reasonable suspicion?  I'm trying to understand that.

2    A.  Can you rephrase that?

3    Q.  Sure.

4    A.  I'm not sure I understand the --

5    Q.  Well, and I think that's the disconnect that -- that

6    I've -- that I'm trying to follow, which is, you've provided

7    now a list of those things that were the basis for your

8    reasonable suspicion, and none of them included the refusal to

9    give consent?

10   A.  No.

11   Q.  Okay.  And -- but you had to detain him because he wouldn't

12   consent.  That was the available option to you at that

13   juncture?

14   A.  Yes, sir.

15   Q.  So when you are saying that his refusal to consent was a

16   part of a reasonable suspicion, are you saying that was in the

17   calculus of reasonable suspicion, or is that just, well, now

18   I've got to detain him for reasonable suspicion?

19   A.  I would say it was probably part of the reasonable

20   suspicion.

21   Q.  And how so?

22   A.  Refuse to consent to a search of the vehicle.

23   Q.  Well, the -- the other question I wanted to talk to you

24   about before I get into the meat of this was the matter of

25   criminal justice experience that Mr. Shaw referenced.  You --

1    you saw the tape, and it was in the second, or rather, in the

2    last conversation that he indicated to you that he was a

3    criminal justice major?

4    A.   Yes, sir.

5    Q.   Did you believe him?

6    A.   I had my doubts.

7    Q.   And why was that?

8    A.   In general, people don't -- aren't completely honest with

9    us when we're doing traffic stops.  Sometimes they make things

10   up, or they say things they don't really mean or intend.  I'm

11   not sure how to word that.

12   Q.   You remember his age at the time?

13   A.   Yeah, I don't remember how old he was, but I know -- he

14   was -- I think he was in his thirties.

15   Q.   And did that seem to be a factor to the criminal justice

16   major answer he gave you?

17   A.   You have to say that again.

18   Q.   Did that factor into your believing him about him saying he

19   was a criminal justice major?

20   A.   Thought he was a little old to be going to college.

21   Q.   So when you were hearing about the criminal justice major,

22   and looking at whether it was suspicious or not, was it because

23   he -- you doubted he was a criminal justice major, or was it

24   because he said that it's because criminal justice major's

25   won't give consents?

1  A.  I'm not sure.  Like I told the -- I can't think of his name

2  -- the --

3  Q.  Counsel?

4  A.  Counsel, with the passage of time, I don't know what --

5  what I was thinking at that time.

6  Q.  Well, let me back up now to the beginning.  You've been a

7  trooper since when?

8  A.  2004.

9  Q.  And before 2004, I understand you were in the military; is

10 that right?

11 A.  In 1987, I joined the Army National Guard.

12 Q.  And what did you do in the Army National Guard?

13 A.  I was an M 60 heavy track mechanic.

14 Q.  And how long were you with the military service?

15 A.  Approximately ten years.

16 Q.  And then after the military service, is that when you

17 transitioned to become a trooper?

18 A.  I was building fire trucks at that time for a company out

19 of Hayes, and I was also volunteer fireman.

20 Q.  And eventually, you then became a trooper in 2004?

21 A.  That's correct.

22 Q.  Tell us a little bit about what your duties are as a

23 trooper for the Kansas Highway Patrol.

24 A.  As a member of the highway patrol, of course, we patrol

25 Kansas roadways, take care of service -- render or people that

1    need assistance on the side of the road, I work accidents

2    and/or fatalities, deer strikes.  Of course, we do tickets for

3    speeding, and for a number of other things; traffic violations,

4    also to detect and detour people using the roadways of Kansas

5    for criminal activity.

6    Q.  Do you do any accident reconstruction work?

7    A.  We work accidents.  I work accidents.  As far as

8    reconstruction work, I do not do that.  We have troopers that

9    are actually specialized in that field.

10   Q.  And do you from time to time assist motorists when their

11   cars break down, or in your area of the world where the weather

12   gets bad?

13   A.  Yes, sir.

14   Q.  Now, as a highway trooper, you said one of the things you

15   do is you look for criminal activity.  Are you familiar with

16   the term interdiction?

17   A.  I am.

18   Q.  What is that?

19   A.  Interdiction is looking for people who use the Kansas

20   roadways for criminal intent.  It may be trafficking of people

21   or children, trafficking narcotics, money laundering or items

22   of such.

23   Q.  In your -- your period of time that you've worked as a

24   trooper, have you engaged in the interdiction process?

25   A.  I have.

1    Q.   Have you had occasion to stop motorists and learn that they

2    were, in fact, trafficking, whether it's people or narcotics or

3    bombs or guns?

4    A.   I have.

5    Q.   Now, in your position with the highway patrol, have you by

6    way of your experience come to think of things that are kind of

7    indicators or circumstances that might be suspicious of what

8    ultimately you found to be people trafficking in, say, drugs?

9    A.   Yes.

10   Q.   And how long have you been involved in -- in the activity

11   of this interdiction process?

12   A.   It's not an everyday occurrence.  Of course, I have other

13   duties, but when I -- if I do have a -- a car or something

14   that's going on I want to look at, we'll make a -- try to get a

15   traffic stop on the vehicle, and develop further information

16   about it.

17   Q.   Is the interdiction process done in every traffic stop?

18   A.   It's an investigative -- during a traffic stop, it's

19   investigative stop.  What you learn may roll into an

20   interdiction stop or it may not.

21   Q.   How often in your experience roughly has this interdiction

22   process led to requests to have a dog come out and sniff

23   vehicles?

24   A.   Quite a few.

25   Q.   One in two stops, or I mean, what percentage of stops?

1    A.   I would say probably a lot more than that.  One in -- for

2    myself personally, one in 50 or more, 50, I guess.

3    Q.   Now, you have engaged in training through the highway

4    patrol, and has that training included discussions of what are

5    indicators, what are suspicious circumstances that troopers

6    should consider in the interdiction process?

7    A.   Yes.

8    Q.   And have you discussed with other troopers what they find

9    in their stops, and the circumstances of their stops, what was

10   maybe suspicious that led to locating drugs or contraband?

11   A.   I have.

12   Q.   Over then this period of time that you've been a trooper, I

13   guess since 2004, do you have kind of a -- a wealth of

14   information as to what it is that people do on Kansas highways

15   that is connected with or suggests that they are trafficking in

16   drugs?

17   A.   I'm not sure what answer you want there.

18   Q.   That's not what I want.  It's a bad question.  Have you

19   over these years developed a wealth of experience in being able

20   to identify what are those indicators and factors from your

21   experience and special training that suggests that someone's

22   trafficking drugs?

23   A.   I'd like to think so, yes.

24   Q.   Now, your experience then has always been on Kansas

25   highways; is that right?

1  A.  Yes, sir.

2  Q.  Yeah.  Not necessarily on what it might be in another part

3  of the country, I take it?

4  A.  No, sir.

5  Q.  Do you have any reason to think that the Kansas

6  experience -- well, let me start -- look at that a little bit

7  differently.  Have you found that -- that because of where

8  Kansas is located, that the experience in Kansas may be

9  different than it is in other states for drug trafficking?

10  A.  I'm not really sure where you are -- what -- the answer to

11  that, being's Kansas is the center of the United States.

12  Q.  Well, is there anything unique about Kansas -- maybe there

13  isn't, is there anything unique about the Kansas highway system

14  that --

15  A.  Kansas doesn't --

16  Q.  Go ahead.

17  A.  I apologize.  Kansas has a highway system runs east to west

18  the full length of the state, I-70.  There's also several roads

19  that run north and south throughout the state, 135 coming north

20  to south at the Salina area.

21  Q.  And the -- the location of the state and the location of

22  the highways, has that given you to believe that there are

23  special indicators for trafficking of contraband through the

24  state?

25  A.  I believe that during some of the interdiction class, it

1    said that I-70 is a drug corridor where a lot of narcotics go

2    east and cash goes west.

3    Q.   You became a master trooper in 2011; is that right?

4    A.   Yes, sir.

5    Q.   And as a master trooper, did that really change your --

6    these duties that you've been talking about?

7    A.   Changed a little bit.  To become a master trooper, we had

8    to have a certain amount of additional training.  You had to

9    become certified advance accident or go to classes for that,

10   CVSA with the Commercial Vehicle Safety Alliance where we check

11   trucks, umm, the interdiction class.  I'm not sure what other

12   classes were included, but there was a list of things you had

13   to do and maintain to keep your master trooper certification.

14   Q.   And have you maintained your certification since 2011?

15   A.   I have.

16   Q.   You live in Hayes?

17   A.   I'm sorry.

18   Q.   You live in Hayes?

19   A.   I do, sir.

20   Q.   And you grew up where again?

21   A.   In Victoria, Kansas.

22   Q.   Where is -- for the benefit of the rest of us and me --

23   Victoria relative to Hayes?

24   A.   If you know where Hayes is, Victoria's a small town about

25   11 miles to the east located just off of Highway 40.

1  Q.  When you were in the military, were you stationed away from

2  the Hayes area?

3  A.  I did my basic training at Fort Leonardwood, Missouri, and

4  then my AIT, which is advance training for tanks in Fort Knox,

5  Kentucky.

6  Q.  Other than your military experience, have you lived pretty

7  much in the Hayes area?

8  A.  I have.

9  Q.  And your wife's name?

10  A.  Is Stacy.

11  Q.  And do you have children?

12  A.  I have three children.

13  Q.  What are their names?

14  A.  Son -- I have three children.  My oldest is my son Brent,

15  middle is Breana, daughter, and the youngest is also a

16  daughter, Lauren.

17  Q.  And you have grandchildren?

18  A.  I have six.

19  Q.  And who lives with you and your wife at your home in Hayes?

20  A.  At this point, my youngest daughter lives with us.  She's

21  going through a nasty divorce, and her three children are

22  part-time.

23  Q.  You have a small business on the side; is that right?

24  A.  I do.

25  Q.  What is that?

1    A.   I'm an FFL dealer, federal firearms licensed dealer, and an

2    SOT, which is special occupational tax dealer for like short

3    barrelled rifles, shotguns and suppressors.

4    Q.   And from your business on the side, what approximately is

5    your --

6          MR. MC INERNEY:  Sorry to interrupt, Mr. Chalmers.

7    Your Honor, can we approach, please?

8          THE COURT:  Sure.

9    (Proceedings held at the bench, outside the hearing of open

10   court.)

11         MR. MC INERNEY:  Judge, we're getting close to an as

12   yet unresolved area with regard to whether Mr. Chalmers can

13   inquire about this witness's financial assets, and that tees up

14   the question of whether the state's going to cover any award

15   that this jury may decide to give.  It also segregates out

16   compensatory damages from potential punitive damages.  We don't

17   yet have an answer from the state about whether they will or

18   won't indemnify this witness.  My concern is that Mr. Chalmers

19   is walking into talking about Trooper Schulte's income.  He's

20   talked about his second job.  He's talked about his kid and

21   three grandkids living with him.  That's why I'm up here.  So I

22   think pending a ruling on the motion in limine, we'd object to

23   this line of questioning.

24         THE COURT:  First of all, which motion in limine?

25         MR. MC INERNEY:  I'm sorry, yeah, it's our objections

1    to the witness list.

2            THE COURT:  Okay.

3            MR. CHALMERS:  Case law is clear that when you are

4    making a punitive damage claim, your finances of the defendant

5    are relevant, and are to be considered as one of the factors to

6    what the award might be, and what I'm planning on doing is

7    asking him what his income is, and then asking him income as a

8    trooper, and moving down the block.  Now, they come up with an

9    imaginative claim that somehow, I'm not able to do that,

10   because the state may, not shall, and I have no indication to

11   think they would indemnify someone who has a punitive damage

12   award against them.  But that's -- that's what the issue is.

13           MR. MC INERNEY:  Judge, unless -- unless and until the

14   state's willing to either say they will or they won't, this is

15   not relevant testimony.

16           MR. CHALMERS:  I'm not even -- well, the state.

17           THE COURT:  Is this funny?

18           MR. CHALMERS:  Well, no, it is -- it's not necessarily

19   funny.  It's just, I'm not really sure how to respond to that.

20   I'm not certain who it is at the state that makes that

21   decision.

22           THE COURT:  And what's the pattern, what's the

23   practice of the attorney general's office, 'cause in every one

24   of these 1983 cases, you come in and assert qualified immunity,

25   and go, oh, these poor officers shouldn't be required to even

1    answer to the claims, because under the doctrine of qualified

2    immunity, the individuals are there, and we want to protect

3    them, but then you come in and defend them, so they're not

4    providing their own defense.  You know, I don't really see that

5    any -- any of the -- the purposes of qualified immunity are

6    implemented by the way the state of Kansas effectuates the

7    defense of individual patrol -- highway patrol officers, and so

8    it seems misleading for you to come in and have this witness

9    go, poor me, I don't have enough money to respond to a punitive

10   damage award, if in fact, the state is going to defend or

11   possibly indemnify him, and I think I would want to know what

12   the state's policy and practice is on that regard.  That's what

13   I think we're opening the door to.

14          MR. CHALMERS:  I have no knowledge of the state ever

15   indemnifying a punitive damage award under the Tort Claims Act.

16   I don't know who would make that decision.  It's made per the

17   statute after the award, and probably, it would have to be by

18   the Kansas Finance Council.  I don't know how I would be able

19   to find out from the finance council what its position is.

20          THE COURT:  Who pays for settlements of claims in

21   which punitive damages are tried?

22          MR. CHALMERS:  The settlements in the past would be to

23   all claims, and would be funded through the Tort Claims Act.

24          THE COURT:  Uh-huh.

25          MR. CHALMERS:  So they'd be paid in that respect.

1    It's not to indemnify the damages.

2         MR. MC INERNEY:  Offer a little bit.  As you know --

3    in this case, as you know, Sam Shaw has resolved his claim, and

4    that claim was paid by the state treasury.

5         MR. CHALMERS:  The claim is paid through the Tort

6    Claims Act fund, which is through the treasury.  The claim is

7    paid without an admission of any liability.  There's never an

8    intent that there be a payment or indemnity payment for

9    punitive damages.  The statute talks about when you can

10   indemnify, says you may.  It does have certain exceptions when

11   you can't, but I'm not familiar with any policy from -- I'm

12   starting to feel like I can affirmatively say that there is no

13   policy.  I'm confident there isn't, but I'm not familiar with

14   any policy where it's been spelled out what would happen in the

15   punitive damage arena, and I do not know of, in the spirit it

16   has been indemnified, I know that it won't be absent the

17   decision by some decisionmaker, which would presumably have to

18   be the finance council, as I understand the statutes after a

19   punitive damage award would be made.

20        THE COURT:  And would you agree that if you go down

21   this line of questioning or open the door to who's paying for

22   the defense in this case, who paid for the defense in

23   co-plaintiff Shaw's case, who funded the settlement with him --

24        MR. CHALMERS:  No.

25        THE COURT:  -- what the state policy is with regard to

1    indemnification?

2            MR. CHALMERS:  No.

3            THE COURT:  Would you agree -- is there any insurance

4    that's available?

5            MR. CHALMERS:  There is no insurance.

6            MR. MC INERNEY:  We've asked this question months and

7    months ago, and we've continued to get this sandbag answer

8    about I don't know, and they won't decide until afterwards,

9    which allows this whole sort of fallacy to continue.

10            MR. CHALMERS:  Not asking that question to me.

11            MR. MC INERNEY:  Let me finish.  So until we have some

12    definitive answer, it is extremely prejudicial to ask this

13    witness about his personal finances; extremely prejudicial.

14            MR. CHALMERS:  Well, the case law is what it is, that

15    the finances of this individual who is -- a punitive damage

16    award is being entered against him, I don't know of any case

17    law; in fact, the Tenth Circuit case that they cite is to that

18    effect.  I don't know of any case law.  I know that there's

19    theory that in the indemnity situation, that you might be able

20    to introduce the fact that the state is going to pay when the

21    state has agreed to indemnify, but this theory that the state

22    might, therefore, we're not able to -- to determine what the

23    punitive damage award would be based on the person's finances

24    is -- is -- is unprecedented.

25            THE COURT:  Well, it's not really unprecedented.  I'm

1 required to evaluate the potential prejudicial effect and the

2 possibility of undue prejudice when I'm deciding whether to

3 admit evidence, and for you to admit this evidence without

4 putting it in the broader context of where the money really

5 comes from is highly misleading to the jury, and I think we all

6 know that based on our experience with 1983 cases.

7    MR. CHALMERS:  I don't know of any experience where

8 there's been a payment of a punitive damage award by the state.

9    THE COURT:  That's not what I'm saying.  I -- it goes

10 to the whole issue of who funds the defense and the liability

11 of individual defendants in 1983 cases.  My experience is that

12 cases with a high likelihood of punitive damages are settled by

13 the state, the state pays for the defense, and so qualified

14 immunity is completely a fiction when it talks about individual

15 officers bearing responsibility, and maybe we should put on

16 information about the state of Kansas and what its financial

17 capabilities are, if that's a path you want to go down, but

18 you're going to have to cite me some evidence which says that

19 this putting one number in there of any context of about

20 whether the money originates is appropriate.  I know what their

21 black letter case law is on punitive damages, so I think this

22 is a very unusual situation.

23    MR. CHALMERS:  I think that the court has entered the

24 ruling.  I need to in some fashion make a proffer.  Is it

25 acceptable to the court and counsel if I make the proffer by

1     saying what I would do is ask him what his income is from --

2     from his business, and he would say that it's relatively

3     nominal, maybe a few thousand dollars a year from sales mostly

4     to other friends and troopers, and that his salary works out to

5     be I think around 75 or 70,000, I'd have to ask him

6     specifically, annually a year, and that was the testimony I

7     planned to introduce. I'd like to make that proffer if it's

8     acceptable in that fashion.

9           MR. MC INERNEY: I mean, pending our objections based

10    on Rule 401 and Rule 403, he can make whatever proffer he wants

11    to outside of the hearing of the jury.

12          THE COURT: Right; I agree. I mean, that's probably

13    in line with what the jury would assume anyway, so I think it's

14    not likely to have any impact whatsoever on the outcome of the

15    punitive damage calculation if there's an award.

16          MR. CHALMERS: Well, I -- I'm not arguing with you.

17    I'm just wanting to make sure that we agree that this is an

18    adequate proffer, so that later on, if it -- if it turns out we

19    get the punitive damages, and if it turns out that there is an

20    award, that -- that I've made my record for this.

21          THE COURT: I think counsel agrees that you've made a

22    sufficient record.

23          MR. CHALMERS: Thank you.

24    (Proceedings continued in open court.)

25          MR. CHALMERS: Thank you, Your Honor.

1     THE COURT:  Before you jump back in, why don't we take

2  a morning recess.  It's 10:40, so let's take a 15-minute recess

3  and come back at five 'til 11.  Court's in recess.

4     (Whereupon court took a recess.  Proceedings then continued

5  as follows:)

6     THE COURT:  Go ahead, counsel.

7     MR. CHALMERS:  Thank you, Your Honor.

8  BY MR. CHALMERS:

9  Q.   Doug, I want to talk to you -- or excuse me, Trooper

10  Schulte, I want to talk to you about Exhibit 1.  That's the

11  dash cam video.

12  A.   Okay.

13  Q.   And I'm going to start that video at about 209, and what I

14  want to do is have you, as we go through this video, tell the

15  jury what the radio traffic between you and the dispatch is;

16  what that is?

17  A.   Okay.

18  Q.   Actually, I'm going to stop right there at basically 213.

19  There was a noise there that we heard.  What is that noise?

20  A.   That's the radar.

21  Q.   It's not the siren?

22  A.   No, sir.

23  Q.   And the radar that is reacting there, is that the rear

24  radar or the front radar, or what radar is it?

25  A.   It's hard -- excuse me, it's hard to tell which radar it

1    is.  Of course, there's radar in the back window and there's

2    one up front.  As he passed me, I don't know if I had turned it

3    on to the front mode or not.

4    Q.  Okay.  So if we back up for just a second, start over.

5    When we're -- we've got vehicles passing in front of you, and

6    those vehicles are all apparently driving within the speed

7    limit?

8    A.  Yes.

9    Q.  Then we hear that noise.  Is that the radar noise at 2.04?

10   A.  Yes.

11   Q.  Okay.  And I think what you'd indicated is that -- that

12   when your lights come on, that's when we back pedal a little

13   bit and have the video.  Is that the way that works?

14   A.  Yes, approximately, a couple minutes.

15   Q.  So will the lights be on at this point when you hear the

16   radar?

17   A.  Yeah, the rear deck of my patrol car is on at this time.

18   Q.  So then we've got the van coming by at 2.06, and it's in

19   the passing lane, westbound I-70; is that right?

20   A.  Yes.

21   Q.  Can you -- from thinking about where the radar sounded,

22   that would -- you think that would have been the rear radar?

23   A.  The initial was the rear radar.

24   Q.  Okay.  And then almost instantaneously, the van passes by

25   after the radar's triggered; is that right?

1    A.   Yes, sir.

2    Q.   And is it on that radar that it shows the 91 miles per

3    hour?

4    A.   Yes.

5    Q.   So this is where you clock Mr. Shaw when that radar came up

6    as traveling 91 in a 75-mile per hour zone?

7    A.   Correct.

8    Q.   Now, it's at 218, and Mr. Shaw's vehicle has moved from the

9    left lane to the driving lane or the curbside lane?

10   A.   Yes, sir.

11   Q.   And during that whole period of time, have your lights been

12   on?

13   A.   Yes.

14   Q.   From the video, can you tell, did you operate your -- your

15   siren as well?

16   A.   I don't believe so.  I think you would have -- you

17   definitely would have heard it inside the car on my camera.

18   This program, it also doesn't show down the corner, it usually

19   shows that we have -- that the lights are on, the microphone

20   has activated, and/or the siren is on.

21   Q.   Now, is there a reason that you wouldn't have had the siren

22   on at this point?

23   A.   No.

24   Q.   Do you routinely turn on the siren during the course of a

25   traffic stop?

1    A.   It depends how long it goes before they decide to pull

2    over.

3    Q.   And in this instance, do you recall ever turning on the

4    siren?

5    A.   I do not.

6    Q.   And what has been your experience with respect to motorists

7    when your lights are on, on how frequently it is needed for you

8    to turn on your siren?

9    A.   Usually, if we're going somewhere to an accident, we would

10   run lights and siren.  Some people, we get right up behind, and

11   they never look in the mirror, and they finally hear the siren

12   and then pull over, or they've pulled over to the side of the

13   road before you even got close enough.  'Cause they see the

14   lights coming.

15   Q.   And mine was a bad question.  When your practice -- in

16   terms of pulling over a motorist for speeding, do you typically

17   use the lights only?

18   A.   Typically only lights, yes, sir.

19   Q.   And is that typically effective to get 'em to pull over?

20   A.   Yes.

21   Q.   Is it only in the exceptional situation where you have to

22   go to the siren?

23   A.   Correct.

24   Q.   Okay.  And I've stopped it at 227.  We still have that kind

25   of humming sound.  Does that continue to be the radar?

1   A.   Yes.

2   Q.   Does the radar remain humming the whole time?

3   A.   If it's still on the transmit mode, it will.

4   Q.   Okay.  What does one do to take it off the transmit mode?

5   A.   Turn it off.

6   Q.   Okay.  So you hadn't turned off the radar, but if you --

7   then we don't hear that anymore.  Is that --

8   A.   You wouldn't hear that -- that humming noise.

9   Q.   Okay.  Now, there was a statement there that -- did you

10  hear it, what -- in terms of what they said?

11  A.   Yes, sir.

12  Q.   What was it that was being said?

13  A.   I called dispatch and advised 44 traffic.

14  Q.   What is dispatch, as you probably all ready know, but so we

15  have it in the record?

16  A.   Our dispatch is the Kansas Highway Patrol dispatch, which

17  all the state of Kansas is located in Salina, Kansas.

18  Q.   And what is the purpose of calling dispatch?

19  A.   Let dispatch know 1044 is investigate vehicle, we're

20  stopping a car on the side of the road.  We give as much

21  information about the vehicle we can and our stop location, in

22  the instance that something goes bad, that they can send

23  another officer to my location.  If they check on me in a few

24  minutes and I don't answer, they know where to send somebody

25  else.

1   Q.  So you've notified dispatch that you're pulling over a

2   vehicle at this point?

3   A.  Yes, sir.

4   Q.  And then is that your voice that is heard just then on

5   the -- on the tape at about 240 or so?

6   A.  Yes, sir.

7   Q.  What were you saying there?

8   A.  You'd have to play it again.  I just --

9   Q.  Okay.  Shortly before 250 on the tape, there's a dialogue.

10  Is that you again with dispatch?

11  A.  Yes.  We're requesting 44 traffic.  Dispatcher answered me

12  with the 44, and I give him we're westbound on I-70, I said

13  Mile Post 160, and said correction, 159, 'cause we just passed

14  that mile post, and I give as much information on the tag that

15  I can.

16  Q.  What is the purpose of giving the information of the tag

17  and the vehicle at that point?

18  A.  Giving the information to dispatch on the tag, if it comes

19  up maybe having been stolen or car has been stolen, dispatch

20  will have that in their records and other information if the

21  car had been stopped previously.

22  Q.  And then just before 256, there was a response from

23  dispatch, and what were they saying; can you interpret that for

24  us?

25  A.  Dispatch repeated what I told them.  That gives me a chance

1  that if he repeats it, I can say no, that's not what I meant or

2  said, it was a different tag number.

3  Q.  And then right before I stop the tape at 304, you were

4  talking to dispatch again?

5  A.  I was.

6  Q.  What was that?

7  A.  I was just telling dispatch we're still westbound on I-70

8  and we're taking the 159 exit.

9  Q.  What's the purpose of that?

10  A.  The car didn't stop, we're still westbound, and I took the

11  ramp, and does the vehicle pass that area and stop somewhere

12  else.

13  Q.  By the way, the rock and roll, that's yours?

14  A.  Yes, sir.

15  Q.  Okay.  Okay.  Then right before 325, there was some radio

16  traffic.  What was that?

17  A.  Advised dispatch that we were taking the 159 exit, and

18  we're stopping at the bottom of the ramp.  That again places --

19  if I don't answer the radio up, and they call me in a little

20  bit, 1017 to check on me, they know where to send somebody.  If

21  a trooper was going eastbound that location of I-70, he might

22  not see us at the bottom of the ramp due to the lower

23  elevation.

24  Q.  Now, this stop itself took place, what, around noon, about

25  1225 on December, 2017.  Is that accurate?

1   A.   That sounds about right, yes, sir.

2   Q.   And was anybody in the patrol vehicle with you?

3   A.   No, sir.

4   Q.   The patrol vehicle is a marked vehicle?

5   A.   It is.

6   Q.   And the lights that were on, where are they located on the

7   patrol car vehicle?

8   A.   It's a slip top, meaning the lights are above the driver's

9   windshield, on the mirrors, in the front bumper, or on the

10   front push bar area, in the rear out the back window of the

11   SUV, and also beside the tag.

12   Q.   The lights, did they remain on 'til the time that the

13   vehicle stopped here at the 325?

14   A.   Yes.

15   Q.   Okay.  So we talk about Exhibit 1 and your lights.  Is

16   there a time where you turned off all or some of your lights?

17   A.   I wouldn't have turned off the back lights at all 'cause

18   that lets traffic know also in the back window with the lights,

19   there's an arrow stick that if we're stopping somebody on the

20   right side of the road, we'll put it to the left that lets

21   traffic know to get over, and that something's going on right

22   there, wouldn't turn them off, and then let traffic know what's

23   going on up in front of them.

24   Q.   Did the driver of this van in your experience properly pull

25   over to the side of the road?

1   A.   He does not.

2   Q.   And for about how long a period of time did the driver

3   continue to drive after you were behind it with your lights on

4   signaling to pull over?

5   A.   I would say approximately a mile.

6   Q.   And that works out to be about -- at highway speed, about a

7   minute?

8   A.   If he's still going about 60-mile an hour, it's a minute or

9   less.

10  Q.   Did you find on your basis of the experience and training

11  that you've talked about, it's suspicious that this driver did

12  not pull over immediately or promptly, I'm sorry?

13  A.   I do.  I find that odd.  A lot of times, if people don't

14  see us, of course, then like I explained before about the

15  siren, he went by me, hit the brakes right away, got back over

16  in front of me.  So I know he saw me, continued to drive; makes

17  me think that he's talking to whoever else's in the vehicle,

18  they're hiding something or getting something ready to do me

19  harm.

20  Q.   Now, you don't know that that's what's happening, do you?

21  A.   No, sir.

22  Q.   But is that something that you suspected?

23  A.   I did.

24  Q.   And that's based on what, that -- that suspicion from --

25  from what basis would you have?

1    A.  A number of other troopers and other law enforcement

2    officers have stopped vehicles, doesn't pull over right away,

3    officer approaches, and then officer is attacked or shot.  I

4    was shot in 2011 by a driver.

5    Q.  Well, okay, but the -- you went up to talk to -- I put the

6    tape on Number 1 at 330.  By the way, before I get there, that

7    -- you're giving some information to dispatch.  What was that?

8    A.  I was trying to listen to what you were saying, too, and I

9    think it was -- I think it was registration coming back on the

10   vehicle.

11   Q.  Okay.  So who was it that was coming back there?

12   A.  That was when I first called it in, I had unknown state, I

13   wasn't sure what the state was out of, ran by, again, the tag

14   to dispatch again indicating Oklahoma.  I believe I said Osage

15   Nation tag.

16   Q.  Okay.  You tap the back of your vehicle as you were walking

17   up.  Why is that?

18   A.  In -- during training, if it's a car, lot of times, we'll

19   put our hand on the trunk lid, make sure the trunk lid's closed

20   and doesn't come up for any reason, and also puts our

21   fingerprint on the car.  If something happens later, if we

22   watch the video later, we can see that I touched the car and

23   put that fingerprint off the car, and say Trooper Schulte was

24   here, he touched this car at this point in time, and then the

25   vehicle was gone.

Q.   So this is kind of a safety purpose?

A.   Yes.

Q.   Okay.  And so you start talking to Mr. Shaw about 404 on

Exhibit 1 about the lights coming over and pulling -- not

pulling over promptly.  Why was that conversation taking place?

A.   I advised him when I made contact with him why I stopped

him, and when the lights came on, he continued to drive, and I

asked him about that situation, and he attempted to explain his

reasoning.

Q.   Did his reasoning abate or make you feel less suspicious at

that point?

A.   Did it make me feel --

Q.   Less suspicious?

A.   No.

Q.   Why not?

A.   People that don't pull over or have a reason right away, I

find it odd.

Q.   Okay.  So you had indicated to Mr. Shaw after he gave you

the explanation that you drove another mile after you were

behind him.  Is that basically because you continued to be

suspicious of his explanation?

A.   Why he drove another mile?

Q.   No, did you continue to be suspicious even after Mr. Shaw

gave his explanation?

A.   Sorry.  Yes, sir.  Still had my suspicions raised 'cause he

1  didn't pull over timely.  When he did finally get in the right

2  lane, he continued to drive a little further before he took the

3  exit ramp.

4  Q.  Okay.  Now, one of the things that you were asking for at

5  this point is insurance and also Mr. Shaw's license; is that

6  right?

7  A.  Yes.  I don't know if I asked him for his license.  He

8  handed it to me before I even asked for it.

9  Q.  And looking at the video, Exhibit 1 at 426 or a little bit

10 before then, did you see that you actually were looking at the

11 license as you were talking to Mr. Shaw?

12 A.  Yes.

13 Q.  And that would show his age at that point; is that right?

14 A.  Yes, it will have his date of birth on it.

15 Q.  Okay.  And he testified he was 34 yesterday.  You were in

16 the courtroom.  And is that consistent with your memory as to

17 the age he had?

18 A.  What the driver's license said, I could not tell you, or

19 the address.

20 Q.  Okay.  Fair enough.  But you -- at the time, you would have

21 made a note of his approximate age after you looked at the

22 license; is that right?

23 A.  Yes.

24 Q.  You had learned, if I'm not mistaken, that this van was not

25 registered in the name of the individual who handed you the

1    license.  It was a different name?

2    A.   That's correct.

3    Q.   And he -- you talked to him about that, I think at some

4    point, but was the fact that -- that he was driving a vehicle

5    that he didn't own something that was suspicious to you?

6    A.   Lot of times, people that I think it's -- I think I find it

7    odd.  My father would not allow me to take the car when I was

8    30 some years old.  Buy your own car, especially to go

9    somewhere else.

10   Q.   Well, in your experience and specialized training, does the

11   fact that someone's driving a car that they don't own play any

12   part in the interdiction process?

13   A.   It can.

14   Q.   How so?

15   A.   People don't usually use their own car if they're -- during

16   illicit criminal activity.  If it's their own car, they have --

17   it may be seized or forfeited to the state due to specific

18   contraband that's in it, false compartment or fail to -- fail

19   to pay other fines or something like that.  People usually will

20   borrow someone else's car, a friend's car, a parent's or even

21   do a rent a car 'cause I know that vehicle is not -- they're

22   not responsible for it, for the monetary value of that vehicle.

23   Q.   Well, you're not saying that it's probable that someone's

24   driving a car that they don't own, particularly if it's one of

25   their family members, that they're engaged in criminal

1    activity, are you?

2    A.  You'll have to re-state that.

3    Q.  You're not saying that it's probable that these folks are

4    engaged in criminal activity if they're driving their father's

5    car?

6    A.  Just 'cause they're driving their dad's car, no, it's not

7    probable, it's possible.

8    Q.  Okay.  But was it something that added to your suspicions

9    at that point that you were considering in the stop?

10   A.  Yes.

11   Q.  Now, you -- there was a passenger in the vehicle, and did

12   you notice the passenger during the time that you were

13   initially up talking with Mr. Shaw?

14   A.  I did.

15   Q.  And how was the passenger behaving?

16   A.  Thought it was odd that he sat there, hands in his lap,

17   facing straight forward, didn't say anything, don't recall --

18   of course, it's the passage of time, don't recall him moving,

19   sat there, looked straight forward.  Majority of the time,

20   family or friends or whatever will actually look at me when I'm

21   standing beside the window, and acknowledge I'm there, or --

22   and/or listen intently while you're stopped.

23   Q.  Due to his appearance to you, in your training and

24   experience, seemed to suggest that he just didn't want to have

25   any involvement?

1    A.   Kind of that, yeah, don't look at me, I'm not here.

2    Q.   And was that suspicious?

3    A.   I find -- most time, I don't know if it's a generation or

4    not, but I tend to look at people when I talk to him, and with

5    the passenger in the vehicle, I would assume that he would have

6    looked at me when I was talking to Mr. Shaw.

7    Q.   Why would that be something that would be suspicious,

8    though, of, well, narcotic transporting?

9    A.   People that are involved in illicit activity don't want to

10   make eye contact due to a number of reasons.  They'll look away

11   when you ask 'em questions, or they may -- their voice may

12   tremble when they speak.

13   Q.   Now, this wasn't the only observation you made of the

14   passenger.  I think you were back up to the van at least one

15   more time before a decision was made to detain the Shaw's; is

16   that correct?

17   A.   Yes.

18   Q.   Did the passenger's behavior that you observed change any

19   in the next time that you saw him?

20   A.   I think the whole time, even though I -- when I explained

21   the ticket to Mr. Shaw, to Blaine, that he -- the passenger Sam

22   never looked over at me, and never said anything, didn't

23   indicate what's this going to cost, how fast you were going.

24   Q.   So you left the -- you left Mr. Shaw.  I want to talk to

25   you about that for a moment.  Shows on the video at

1   approximately 435.  Okay.  So as you're leaving the -- talking

2   to Sam, you are looking into the window of the van.  You saw

3   that, didn't you?

4   A.  Yes.

5   Q.  What was the purpose of doing that?

6   A.  Once we get the information from a person, either on the

7   way up or the way back even, or before we get the information,

8   I look in the vehicle, how many people do you see in the

9   vehicle.  Of course, with the tinted windows, kind of hard to

10  see.  See outline of a couple people out up front.  Is there

11  additional people in the back?  What else is in the vehicle

12  that I can see from the window, and is there anybody laying

13  down in the vehicle?

14  Q.  Is there a safety concern in doing that?

15  A.  If you're standing with tinted windows, if there's a third

16  person in the vehicle, you might not see that person at all if

17  they're sitting back and they're not moving, due to the seat or

18  the tinted windows.

19  Q.  Is there an interdiction purpose for looking in the

20  windows?

21  A.  Yes.

22  Q.  What's that?

23  A.  What else could I see in the vehicle?  Does it match what

24  the occupants are going to tell me or have told me, where

25  they're coming from, where they're going, what their plans are,

1    the vehicle plans are, the vehicle owned by someone else, and

2    it has the lived-in appearance, with lots of things in it.

3    Q.  Well now, when you were following this van before it pulled

4    over, were you able to see through the back window into the

5    van?

6    A.  I don't remember looking -- being able to see through it.

7    It was far enough away.

8    Q.  If we look at Exhibit 1 at approximately 443, does that

9    indicate to you that these are tinted windows?  I think Mr.

10   Shaw said they were, but tinted?

11   A.  Yes.

12   Q.  And would that have prevented you from seeing what was

13   actually kind of going on, given tinting and your distance back

14   from the van during the time that the motorists are not timely

15   pulling over?

16   A.  Yes.

17   Q.  When you look in the van, what did you see?

18   A.  Umm, on my side of the vehicle, to be a driver's side, I

19   see a cot, it's blankets, and there's some other stuff in the

20   back, on top of that, I believe, and other maybe mentioned

21   luggage.  I don't remember what all was in the exhibit, what

22   I'd commented before, just several items in the back, the seat

23   -- there was no seats in the back -- I mean, the two front

24   seats, the driver's seat and the passenger seat were there way

25   up front, but the rest of the seats were not in the vehicle.

1   And some -- van in particular, it has ability, the seats fold
2   up and they go into the floor which allows a flat cargo area.
3   Q.  Was the contents -- or were the contents of the van that
4   you observed suspicious to you?
5   A.  I find it odd that Oklahoma is not that far away, that they
6   had -- all the seats were laid down, and that had a cot in it,
7   unless you're going to live out of the van or are living out of
8   it.
9   Q.  Did it have in any other respects a lived-in appearance?
10  A.  The -- the rest of the stuff that was inside the van, I
11  don't remember where it was located, coolers, excuse me, the
12  coolers and other such items.
13  Q.  Why -- why would a lived-in appearance, if that's the way
14  it looked, be suspicious to you in the interdiction process?
15  A.  With the cot in the back, had the lived-in appearance, it
16  appears to be that the vehicle is making a quick trip, maybe to
17  out and back, and not planning on stopping, and then of course,
18  staying overnight anywhere.
19  Q.  Why is that suspicious?
20  A.  A lot -- during narcotics trafficking, a vehicle doesn't
21  want to be parked anywhere for a lengthy period of time.  It
22  draws attention to itself.  A lot of other counties or cities
23  may run -- in their area or a rest area, may run dogs through
24  that area to -- to attempt to locate illicit activity or
25  materials.

1   Q.   So I'm now going to look back.   In fact, I'm going to look

2   back at the video and try to move it forward to about 606.

3   Okay.   Starting at 607, and I think there's going to be some

4   dialogue on the -- between you and dispatch on this video, and

5   I want you to interpret that as we did a few minutes ago.

6   Let's make sure I don't miss anything.   I'm going to start at

7   55-- start at 602.   Okay.   What did that mean?

8   A.   Told my dispatch, and asked for 27 Oklahoma.   27 is our 10

9   code for driver's license inquiry.

10   Q.   So you're asking dispatch to look at the driver's license

11   information for what purpose?

12   A.   To see if he has a valid license.

13   Q.   And is that a routine deal in any traffic stop?   I don't

14   know or not, but there's a little beeping noise.   What was

15   that?

16   A.   My computer.   It's got a fingerprint scanner on it, and if

17   you lay your hand on it, it comes up with no, not allowed to

18   activate or get logged on.

19   Q.   So it was operator error?

20   A.   It could be, yes.

21   Q.   And that voice that we just heard, was that dispatch?

22   A.   That's dispatch.

23   Q.   And it's saying --

24   A.   They're getting ready to give me the 27 information back.

25   Q.   And the 27 is the information about the license?

1   A.   Correct.

2   Q.   Okay.  So it concluded at about 637, and basically dispatch

3   gave you information back about the --

4   A.   That was me giving dispatch's -- me giving dispatch his

5   driver's license number, and requesting the 3 I for 5 D, which

6   is an index information search on criminal activity, prior

7   criminal activity.

8   Q.   And you had asked for information for prior criminal

9   activity.  Why at that point?

10   A.   Due to he didn't pull over, he was driving quick, very --

11   fairly fast, the vehicle has a lived-in appearance, I thought

12   the suspicious nature of the driver, and he's kind of jumpy

13   when I told him he was going 91 miles an hour, and then the

14   passenger's lack of -- lack of any communication or movement

15   when I was talking to his brother or his -- the driver.

16   Q.   I'm going to skip this forward a little bit to about 838.

17   Okay.  I'm starting at 832.  Now, in that little snippet, I

18   don't know if you heard it or not, was there a request for 10

19   or 1012?

20   A.   At that point, no.  1012 is if I am -- when dispatch called

21   back, they asked if I was 1012, which means is the person that

22   I run the driver's license on or the Triple I within ear shot,

23   are they next to me.

24   Q.   Okay.  So dispatch is asking you, are you alone or --

25   A.   Or with someone.

Q.   -- or with someone.  Okay.  And why does dispatch care

about that?

A.   If it's -- if they get a Triple I response back, not just

for an I IDA, or maybe it's -- maybe he has an assault on a LEO

or something like that in his record, if the person's standing

there, he knows, or he's got an open warrant, he hears that,

and he's going to possibly go to jail, the fight might be on at

that point.  It allows dispatch to know that I'm by myself, he

can't hear what he is saying.

Q.   It's a safety issue at that point?

A.   It's a safety issue at that point in time.

Q.   So if we go back and start at 656, I think I skipped.  I

know -- okay, so he's coming back with I IDA.  Okay.  And maybe

this is duplicative, but he talks about 3 of '09, controlled

substances.  What does that mean?

A.   He had possession of narcotics.

Q.   And then I IDA?

A.   Is intent.

Q.   Intent of what?

A.   During a 5 D investigation, I IDA stands for intent to

acquire narcotics with the intent to distribute or sell, so...

Q.   So now you've got some information to put out a -- about a

2009 controlled substance felony intent to sell.  Was that

suspicious to you in this instance?

A.   It was.

1    Q.   Why?

2    A.   He's had a prior violation with intent to distribute

3    narcotics, be in possession and distribute.  It was 2009,

4    March -- March of '09.

5    Q.   Yes.

6    A.   March of '09.  There have been times where we might have

7    one that's that far back in time.  I know we talked about it

8    earlier, it was eight years ago or whatever it was, but they

9    continue to do things, traffic narcotics or whatever they're

10   doing, just don't get caught.

11   Q.   So at this point, you are suspicious of Mr. Shaw and the

12   possibility that he is transporting narcotics or going to get

13   narcotics.  Is that a fair statement?

14   A.   Yes.

15   Q.   But you're not saying that you had at this point under all

16   the totality, that sort of reasonable suspicion that you need

17   to be able to stop him at that point, are you?

18   A.   I was -- I was building my reasonable suspicion for that.

19   Q.   So you at about 916, we get to it, you ask for 397 to head

20   your way.  What was 397?

21   A.   397 is a radio number for Technical Trooper James McCord.

22   Q.   And you want McCord there why?

23   A.   I was going to ask for consent to search a vehicle, and we

24   ask for another officer, we have more than one person in the

25   car.  If we consent and we're searching the vehicle, it doesn't

1  -- I'm not there searching the vehicle by myself with my head

2  in a trunk or under a seat somewhere, and the driver or

3  passenger attack somebody.

4  Q.  So you're working towards -- I think is the phrase you used

5  reasonable suspicion, and you were thinking you were going to

6  ask for consent, and you wanted a trooper there, so you called

7  him to show up.  Is that what the 397 meant?

8  A.  Yes.

9  Q.  Okay.  At that point, had you made the decision to -- that

10  you're going to actually detain Mr. Shaw for a canine sniff?

11  A.  I was going to ask for consent to search the vehicle first.

12  Q.  Okay.  And if -- so okay.  So you then left the patrol car

13  at about 1419.  So let's go there.  And on 1415, you're walking

14  back to the vehicle.  Okay.  So at this point, you are

15  returning to the -- the vehicle, and you return the license and

16  other paperwork to Mr. Shaw.  Yet, at that point, you were

17  thinking that, well, I think eventually, I'll ask for consent.

18  Is that what was going on?

19  A.  Yes.

20  Q.  So at 1508, let's go there real fast.  Okay.  So it's at

21  1508, you said on that tape to Mr. Shaw, have a safe trip,

22  drive safely; is that right?

23  A.  Yes, sir.

24  Q.  And you started walking away from Mr. Shaw towards the back

25  of the vehicle; is that correct?

A.   I did.

Q.   I'm going to come back to that.  Umm, now, as you're going back and it's shown at 1508, where are you looking?

A.   Looking back over my shoulder a little bit, make sure he hadn't got out of the vehicle.  Also looking in the back.  The tail lights came on at that time, and then the back-up lights.

Q.   Okay.  So if we look at 1509, you've got the tail lights and the back-up lights that have gone on.  You've looked at 'em, and you are now turning back towards the -- the passenger door?

A.   Driver's side door.

Q.   Yeah, I'm sorry, driver's side door.  What is the significance, if there was any, to the lights coming on at the back of the van?

A.   They weren't on before.  When you're sitting there waiting, you have to push on the brake pedal to get the car out of park in a lot of vehicles.  I assume this is one of 'em.  Brake lights went on, the white light you see is actually the gearshift coming past reverse, turning those back-up lights on.  That indicates to me the car has started, and it's been taken out of park, and getting ready to actually leave from where we're standing, or where I'm standing.

Q.   Now, you walk back up, and this is at 1509, and I'm going to -- okay, so at 1511, maybe 15 -- on Exhibit 1, you've asked Mr. Shaw, can I ask you a question, as you walk up?

1    A.   Yes.

2    Q.   And the video at that point at 1511 or 1512 thereabouts

3    shows how you are positioned by the vehicle as you're asking

4    him if he will ask some questions -- answer some questions; is

5    that right?

6    A.   Yes.

7    Q.   How far are you at that point away from the van?

8    A.   Considering the -- I'm guessing the camera, just looking at

9    it, the camera's probably -- it's located on the passenger side

10   of my car by the -- just to the right of the rearview mirror.

11   It's probably almost right in line of the center of the van, so

12   it's got a little bit of an angle.  I'm probably a foot or if

13   not more, I would probably say more at that point in time, even

14   with the angle and the distance between the D pillar of the

15   back of the van and my arm.

16   Q.   And Mr. Shaw says to you what, when you say I'd like to ask

17   a question or questions?

18   A.   When I re-approached Mr. Shaw and asked if I could ask a

19   few more questions, he said sure.

20   Q.   And we're doing this again.  And at 1512, he seems to say,

21   yeah, when you can ask a question.  Is that what you heard?

22   A.   Yes.

23   Q.   And then you proceeded to ask him a number of questions; is

24   that correct?

25   A.   I did.

1  Q.  And one of the questions you asked was at the very

2  beginning, where are you headed today.  Do you remember that?

3  A.  I do.

4  Q.  And what did he say?

5  A.  I believe he said he's going to Denver.

6  Q.  Well, what significance, if any, did him telling you he was

7  headed to Denver have?

8  A.  With what I saw before in the van, his prior Triple I

9  conviction or charge, and then the items in the van, failed to

10  pull over quickly, the nervousness, Colorado is a source state.

11  They allow recreational and personal use marijuana, and a lot

12  of narcotics come out of the Colorado area.

13  Q.  So you learned in the second time up at the -- this

14  conversation with Mr. Shaw a fact that you felt added to your

15  suspicions, then?  In the second conversation, you found out

16  something that added to your suspicions, then?

17  A.  Yes.

18  Q.  Now, after you learned he was going to Colorado, did you at

19  that junction feel that under all the totality of what you

20  knew, that there was a reasonable suspicion that Mr. Shaw was

21  engaged in or had been engaged in criminal activity?

22  A.  Yes.

23  Q.  Yet, you asked him whether you could search; is that right?

24  A.  Yes.

25  Q.  Why did you ask him whether you could search after you'd

1   formed the opinion that he had -- that you had reasonable

2   suspicion to detain him?

3   A.   Umm --

4   Q.   Go ahead.

5   A.   To search the car, I have to have a probable cause, or the

6   owner's or driver's consent to search that vehicle.

7   Q.   So reasonable suspicion does not permit a search, then?

8   A.   I don't believe so, no.

9   Q.   But does it permit detaining a driver as you understand it

10  to call for a canine sniff?

11  A.   It does.

12  Q.   And when Mr. Shaw was asked whether or not he would agree

13  to a search, he told you he would not agree to a search; is

14  that right, he would not consent?

15  A.   Yes, sir.

16  Q.   And I think you heard the testimony.  He said, I'm a

17  criminal justice major, and golden rule or something to that

18  effect, we don't consent?

19  A.   Yes, sir.

20  Q.   So at that point, you knew he wasn't going to consent.  Did

21  you make a judgment at that point to detain Mr. Shaw based on

22  the reasonable suspicions that you had, however?

23  A.   I did.  At that point, I thought I had enough reasonable

24  suspicion to detain him and to call for a narcotics dog.

25  Q.   Now, if he had consented, then of course, there would have

1   been no need for narcotics dog; is that right?

2   A.  Correct.

3   Q.  How far away was the narcotics dog from this site?

4   A.  I have no idea where -- what the mile post was.

5   Q.  Do you have a general memory as to how long it took for the

6   dog to get to the site for the sniff?

7   A.  It was quite awhile.  I don't -- I think we talked

8   yesterday.  It was 28 minutes, or I don't know if it was longer

9   than that or not.

10  Q.  If you had reasonable suspicion, as you've said you did at

11  the time that he told you that he was headed to Denver based

12  with all the other facts, what factor did him saying, I didn't

13  want to -- I didn't want you to search have in your reasonable

14  suspicion?

15  A.  You have the right to consent to search or you do not.  Law

16  allows you to say no, I don't want to be searched.  My asking

17  him if I could search his vehicle for the items I listed

18  before, and he says no, which is in his right, and I said,

19  okay, you're being detained at this time, I'm going to call a

20  narcotics dog to come sniff the vehicle.

21  Q.  Now, I think you alluded to the fact earlier in your

22  testimony that -- that you didn't necessarily believe that Mr.

23  Shaw was a criminal justice major.  That information was

24  provided to you after you had requested a search; is that

25  right?

1    A.   Yes.  I asked for the search -- asked to search his

2    vehicle, and in between after I asked him that, he said -- of

3    course, he said no, and he said, I don't consent to searches,

4    I'm a criminal justice major, and it's the number one golden

5    rule.

6    Q.   So that information was provided to you after you'd all

7    ready determined that you had reasonable suspicion on the

8    totality of the circumstances and had planned to detain Mr.

9    Shaw?

10   A.   Yes.

11   Q.   Let me go to 1548 if I can get there on Exhibit 1.  Okay.

12   You say at 1546 actually, refusal.  Are you talking to

13   somebody?

14   A.   There's somebody standing just off to the right side of my

15   car here, just off camera, and I told them that I have a

16   refusal.  I believe it was probably 397, Trooper McCord.

17   Q.   And what would be the purpose of telling them refusal?

18   A.   The -- if I would have got consent, we'd have searched the

19   car right away.  That way, the trooper knows that we're not

20   searching the car right away, and Trooper McCord and I had a

21   dialogue about calling a canine.  I believe there was two in

22   the area that day.

23   Q.   And if we go on a little bit, okay, you're talking in your

24   microphone there at about 1551.  Do you hear what you said?

25   Okay.  So you heard at about 16, just a little bit before 16 on

1  Exhibit 1 that you were talking to the microphone, and what

2  were you saying there?

3  A.  Talking to the microphone, the lapel mic, it's actually a

4  portable radio on my hip, asked dispatch -- advised them that I

5  had a refusal at this time, and if 188 or 399 were close.

6  Q.  188 and 399?

7  A.  188 radio number just like mine is 411, 188 is Trooper Ian

8  Gray and 399 at that time would have been Lieutenant Scott

9  Walker.

10  Q.  Are those dog guys?

11  A.  Those are canine handlers.

12  Q.  So in essence, what you're doing is you're asking for the

13  dog at that point to come to the site?

14  A.  Yes, sir.

15  Q.  And there wouldn't have been a need for a dog if consent

16  had been provided; is that right?

17  A.  That is correct.

18  Q.  And so the refusal part was important to know.  Okay, now

19  we need a dog, whereas if they had given consent, we wouldn't

20  have needed one.  Is that what it boils down to?

21  A.  Yes, sir.

22  Q.  So now as we're waiting for the canine to arrive, there are

23  conversations that you had with other troopers, and also I

24  think information that is on the video, Exhibit 1, about this

25  stop, and I want to go through some of that so you can

1  interpret that if it needs to be interpreted.  I'll go to about

2  1651.  Okay.  So you're -- at about 1557, you're talking about

3  the passenger; is that right?

4  A.  Correct.

5  Q.  And you're indicating what -- or at least describing to

6  this other trooper of what you thought was suspicious about the

7  passenger's behavior; is that right?

8  A.  Yes.

9  Q.  Go to 1853.  Okay.  Now, there's a conversation that's

10  coming on that's a little difficult to hear starting about 1850

11  or so, and I'm going to back that up, and I'm going to ask you

12  to help us understand what was being said.

13  A.  Okay.

14       MR. MC INERNEY:  Judge, I'm going to object to that.

15  The videotape is the best evidence of what's said, and this

16  witness's interpretation really is not relevant.

17       THE COURT:  I mean, that is true.  The video does

18  speak for itself there.  All parts that are hard to understand

19  what the words are, and since we don't have a transcript in

20  evidence, I think his recollection, this may refresh his

21  recollection as to what was said.

22  BY MR. CHALMERS:

23  Q.  Could you make that out?

24  A.  I could.

25  Q.  Okay.

1    A.   Bits and pieces of it, I know what was said.

2    Q.   Okay.  What was said?

3    A.   I'm -- Trooper McCord's standing there, or we're sitting in

4    the vehicle, I'm not sure where we were, telling that before,

5    when I was standing outside the car, that the passenger was

6    just looking straight forward and didn't pay any attention to

7    me, and then when I had the conversation just now with the

8    vehicle, then prior to that, came up behind me at 91 miles an

9    hour, passed me, and then continued to drive another --

10   approximately a mile with my lights activated before he decided

11   to pull over at the exit ramp.

12   Q.   Okay.  So these -- what's the purpose of these

13   conversations?  What are you -- why are you telling McCord

14   about this?

15   A.   Umm, Trooper McCord wasn't there the whole time.  I'm

16   letting him know what I observed.  Trooper McCord is actually

17   -- I'm with Troop D, David, Trooper McCord is with Troop N as

18   Nora, the guys that do interdiction on a daily basis.

19   Q.   And the information that you're providing him is that these

20   observations that you had at that point put together to form

21   your belief that there was a reasonable suspicion of illegal

22   activity?

23   A.   Yes.

24   Q.   Well, I'm not sure where that is now.  So at 24 -- I was

25   going to try to get to 2306, and I've got a ways to go.  Repeat

1  that again.  Okay.  Can you make out what's the discussion at

2  that point at approximately 2306?

3  A.  You'd have to play it again.  I couldn't -- you had some

4  other -- you were talking there for a little bit, and I

5  couldn't understand what was being said.

6          THE COURT:  Counsel, let me ask, what's the relevance?

7  Are we going to go through 15 more minutes of this, because

8  this all happened after the detention.  What's the relevance of

9  the conversation between this trooper and Trooper McCord?

10         MR. CHALMERS:  The purpose for it is to show the

11  intent by this trooper is to detain him based on reasonable

12  suspicion, and that that was the dialogue that was ongoing

13  between troopers as to the basis for the stop, and not for some

14  alleged purpose just to deny this guy's Constitutional rights.

15         THE COURT:  How does it show reasonable suspicion?

16         MR. CHALMERS:  It's articulating those things.  I'm

17  sorry, it's articulating those things that the trooper saw that

18  he believed amounted to in the totality of circumstances

19  reasonable suspicion, Your Honor.

20         THE COURT:  So you're saying these are prior

21  consistent statements by the witness?

22         MR. CHALMERS:  I am saying that these --

23         THE COURT:  It's hearsay.

24         MR. CHALMERS:  I am offering them to give an

25  explanation of what the dialogue was at the time concerning his

1   suspicions, to evidence that this was not offered for the truth

2   of the matter asserted necessarily, but to offer that the

3   intent of this trooper was to detain only in the event that

4   there was reasonable suspicion, and not to violate anybody's

5   Constitutional rights.

6           THE COURT:  So that's my question.  You're offering

7   this to show prior consistent -- statements by this witness

8   which are consistent -- prior statements by this witness which

9   are consistent with his testimony here in court?

10          MR. CHALMERS:  I think that it's a little bit more

11  than that, but they are consistent with his testimony in court,

12  Your Honor.

13          THE COURT:  Okay.  And show me what rule of evidence

14  would authorize this.  Let's start by looking at Rule 801.

15          MR. CHALMERS:  I'm not offering them as hearsay, I'm

16  not offering them for the purpose of proving the truth of the

17  matter asserted.

18          THE COURT:  That's what I'm saying, you're just

19  offering it.  I'll say it again third time.  You're offering

20  this to show that he said in the past something which is

21  consistent with his statements here in court today; correct?

22          MR. CHALMERS:  I am offering it to prove what his

23  intent was as it's reflected on the -- on the video at the time

24  of the stop or contemporaneous with the stop.

25          THE COURT:  Okay.  So we only know his intent by

1    looking at his statements.  You don't have any other evidence

2    that you're trying to get at.  Members of the jury, why

3    don't -- I'm going to excuse you for lunch.  This is noon.

4    Trooper, you can step down, and I will hash this out with Mr.

5    Chalmers, and we will reconvene at 1 o'clock.

6        (Hearing outside the presence of the jury.)

7        THE COURT:  So it seems to me that -- that these

8    out-of-court statements are hearsay.  It would be admissible if

9    it's consistent with his testimony here in court, and is

10    offered to rebut an express or implied charge that he recently

11    fabricated or acted from a recent improper influence on, or

12    motive in testifying, or to rehabilitate his credibility as a

13    witness which -- when attacked on another ground.  So that's

14    Rule 801 D 1 B, Subsections 1 and 2.  So unless there's some

15    exception, I'm not going to let us sit here for 20 minutes and

16    keep going through the rest of this video which is largely

17    unintelligible anyway.

18        MR. CHALMERS:  Your Honor, the statements are not

19    offered to prove the truth of the matter asserted.  They are

20    not hearsay.  So I don't think we're talking about trying to

21    fit it into a hearsay exception, whether one applies or not.

22    They are offered to show the state of mind of the trooper at a

23    time it would have been relevant to when this stop took place.

24    They're relevant.

25        THE COURT:  Can you please stand?

1          MR. CHALMERS:  I'm sorry -- I -- they are relevant

2     to -- they are relevant to rebut the claim being made by the

3     plaintiff in this case that this trooper with some intent

4     violated the Constitution, knowing that there was no basis

5     for -- for detaining this particular witness.  I should be able

6     to prove that this is what his intent was as it concerns the

7     punitive damage claim and his subjective intent which is

8     relevant to that inquiry.

9          THE COURT:  Unless the statements are true, they don't

10    really prove his intent, but -- so you are offering them for

11    the truth of the matter asserted.  Mr. McInerney?

12         MR. MC INERNEY:  Well, Judge, if they're not offered

13    for the truth of the matter asserted, they're not relevant.

14         THE COURT:  Exactly.

15         MR. MC INERNEY:  And they don't come in.  So if they

16    are offered for the truth, the exception has to do with an

17    allegation, and specifically, under the rule you cited, an

18    allegation that this declarant is lying and has recently

19    fabricated his testimony.  That's not the allegation here.

20    We're not talking about prior inconsistent statements being

21    used to impeach.  We're talking about a very different

22    situation where he's been accused of falsifying testimony or

23    recently fabricating testimony, so I think it's night and day

24    in this situation.

25         THE COURT:  You can step down if you want.

1          THE WITNESS:  Oh, thank you, Your Honor.

2          THE COURT:  Okay.  Well, over lunch break, if you want

3    to look for some part of the rules of evidence that would

4    support further exploring this line of questioning, you can let

5    me know before we resume court this afternoon.  I just have a

6    quick question, but otherwise, we're going to skip the rest of

7    this review of the video just to tease out statements by

8    Trooper Schulte.  So I -- I -- we're working on the jury

9    instructions obviously, and I have a question about this whole

10   issue of consent.  So defendant apparently claims that

11   plaintiff consented to talk to Trooper Schulte in the brief

12   conversation after the traffic stop had concluded, and as I

13   understand it, that would be like, say, 30 seconds where the

14   trooper goes back to the car and says, hey, can I ask you some

15   more questions, and then they have a brief exchange, and then

16   the trooper walks away and says, stay here, wait for me to get

17   back to you.  So is that 30 second interval, that's what you're

18   talking about when you say plaintiff consented?

19         MR. CHALMERS:  Yes, Your Honor.

20         THE COURT:  And so I don't -- I would -- I -- nobody's

21   briefed this, and I am not sure what the law is on this point,

22   but it seems to me that consent would be an affirmative defense

23   which is not raised in the pretrial order anywhere.  I don't

24   see any -- I don't even see the word consent in the pretrial

25   order, and nobody has addressed whose burden of proof it is to

1    show consent, or whether the consent was knowing and voluntary.

2    So I'm struggling with how to develop those issues in the jury

3    instructions, but before we pull an all nighter trying to

4    ferret that out with no help from the parties, let me ask

5    plaintiff, does this even matter?  Are you -- is your damage

6    claim based on that little 30 second, or is it from when the

7    trooper says, you know, don't go, stay 'til I get back to you?

8        MS. BRETT:  Sure, Your Honor.  So I think we would

9    argue that there was no consent, but it's clear, and I think

10   the parties are in agreement that he didn't consent to being

11   detained for a canine sniff, and so whether there needs to be a

12   finding about that 30 second, or I think it's actually less

13   than 30 second conversation where he just rattles off the

14   questions and asks for consent to search, and Mr. Shaw says no,

15   whether or not that is a detention without consent I think

16   doesn't matter, because we are in agreement that there was a

17   detention without consent, and therefore, needed reasonable

18   suspicion based on the moment that he says, you know, I'll be

19   right back with you.

20       THE COURT:  So you're not making a separate claim

21   based on that tiny window of time right after he says, hey, can

22   I ask you -- will you answer a few more questions?

23       MS. BRETT:  There's not a separate claim for damages

24   for those amount of seconds, no, Your Honor.  I think it's part

25   of the story of what happened to Mr. Shaw, but it is not a

1    separate and distinct claim for damages.

2         THE COURT:  Okay.  So we won't be separately

3    instructing, because the issue of consent would only apply to

4    that tiny window, and if it's not necessary to address that,

5    because you're not seeking damages separately for that, then I

6    would propose that we just omit that from the jury

7    instructions.

8         MS. BRETT:  Yeah, I think -- and I want to be precise

9    in how I'm talking about this, Your Honor.  I think that the

10   damages are about the entire detention, so I don't think we

11   would agree to an instruction that sort of separates out

12   that -- that time in any way, but I -- I also think we don't

13   think there needs to be a separate instruction about that

14   period of time at all, one way or the other.

15        THE COURT:  Well, there does if consent is an issue in

16   the case, because no one claims that he consented -- as you

17   say, nobody claims that he consented to be detained for a

18   canine sniff, and so there's only a tiny period of time where

19   this consent issue would even apply, and that's what we need to

20   have the jury focus on if this is part of the case.

21        MS. BRETT:  I think it makes sense that, you know, the

22   parties are in agreement that there needs to be a reasonable

23   suspicion, if there is not consent to being detained, and there

24   was no consent to being detained in this case.  I think the

25   parties quibble over whether there was consent to answer

1  additional questions, but -- but for purposes of the damages in

2  this case and the Fourth Amendment claim, the question for the

3  jury is what their reasonable suspicions for that detention.

4  That is the question.

5          THE COURT:  Okay.  But -- okay.  I understand what

6  you're saying, but my question is, do the jury instructions

7  need to address the issue of consent?

8          MS. BRETT:  Yeah, I don't think so, Your Honor.

9          THE COURT:  Mr. Chalmers, do you agree?

10          MR. CHALMERS:  I don't -- I don't think that the whole

11  issue about that consent for that little conversation needs to

12  be discussed in the jury instructions, no.

13          THE COURT:  Okay.  So let me ask this.  Actually, is

14  there any dispute that after the trooper said wait here, I'll

15  get back to you, words to that effect, is there any dispute

16  that that constituted a seizure?

17          MR. CHALMERS:  No, that's a seizure, that's a

18  detention at that point, Your Honor, and the question is

19  whether it's unreasonable or not, yeah.

20          THE COURT:  Okay.  So the only issue that we need to

21  address in the jury instructions is the reasonable suspicion.

22          MR. MC INERNEY:  Correct.  Correct.

23          THE COURT:  That's the only issue that the jury will

24  decide, and if they find in favor of plaintiff, of course,

25  they'll decide damages.

1    MR. CHALMERS:  That's the only issue that they need to

2    decide on liability is reasonable suspicion in my opinion.

3    MS. BRETT:  I think that's correct, Your Honor.

4    THE COURT:  Okay.  This is very helpful.  Then that

5    will help us focus the instructions more precisely on the real

6    issues.

7    MS. BRETT:  I did want to just highlight for the

8    court.  I believe during this morning's session, we sent one

9    additional proposed instruction based on the testimony from

10   Trooper Schulte.  Yeah, and Miss Perry's going to comment on

11   that.

12   MS. PERRY:  Sure.  For the purpose of the instruction,

13   we just amended one instruction.  We propose one that was a

14   limiting instruction to tell the jury what factors Trooper

15   Schulte testified that added to his reasonable suspicion are

16   permitted little weight under the court's orders.  We had

17   consent under that one, and so I just wanted to clarify since

18   he's testified multiple times today that he relied on consent,

19   we think it's appropriate for the court to instruct that

20   refusal to consent to a search is not permitted to factor into

21   the reasonable suspicion calculus.

22   THE COURT:  Okay.  We'll take a look at that.

23   MR. MC INERNEY:  One more, Judge.  We advised your

24   clerk yesterday that we have a proffer, an offer of proof to

25   make.  She indicated that now would be the right time.  We can

1  adjust the timing, whatever you want, but we brought it up

2  yesterday.

3       THE COURT:  Go ahead.

4       MR. MC INERNEY:  Judge, we would make an offer of

5  proof with regard to the testimony of Mr. Mummolo whose

6  testimony, expert testimony you have excluded from this trial.

7  Specifically, we would offer in support of the offer of proof

8  with regard to his testimony Exhibit 55, which is his expert

9  report, and Exhibit 57, which is his declaration.  Further, we

10 would offer the testimony of Troopers Jirak, J I R A K,

11 Wolting, Rohr, which is R O H R, and Rule, R U L E.  We

12 would -- if those troopers were called, they would testify

13 consistent with the deposition designations filed in this case,

14 and those specific exhibit numbers are as follows:  With

15 Trooper Jirak, it's Exhibit 36 A; with Trooper Wolting, it is

16 Exhibit 52 A; for Trooper Rohr, it's Exhibit -- sorry,

17 Exhibit 49 A; and with Trooper Rule, it is Exhibit 51 A.  I

18 should -- I guess I should say for the record that if

19 Mr. Mummolo was called, he would testify consistent with the

20 exhibits we've previously noted.  That is our offer of proof,

21 Judge.

22      THE COURT:  And what's the relevance of the offer of

23 proof?

24      MR. MC INERNEY:  It's based primarily on your

25 decision, Judge, that Mr. Mummolo was not appropriate as an

1    expert witness in this case with regard to patterns and

2    practices by the KHP.  Similarly, actually, on Jirak, Wolting

3    and Rohr and Rule, those -- those troopers as well would have

4    gone to the question of pattern and practice by the KHP.

5         THE COURT:  Okay.  I mean, I understand that.  I

6    understood that at the time of the ruling on the motion in

7    limine, but why are those relevant in this particular case?

8         MR. MC INERNEY:  Well, Judge, I -- we had sought -- we

9    had originally sought, as you know, to try this case along with

10   a separate claim regarding Mr. Bosire, the trial that's

11   schedule for next week, in addition to claim for injunctive

12   relief.  Those -- those troopers and the expert witness would

13   go toward our allegations, and I think Sharon -- I think Miss

14   Brett is going to address this more specifically, but those

15   would be in support of the allegations regarding injunctive

16   relief.

17        MS. BRETT:  In addition to that, Your Honor, the

18   testimony from the individual troopers would go to the

19   widespread use of the two-step, and the deliberate tactic

20   that's used by the Kansas Highway Patrol to essentially trick

21   motorists into giving up additional information that can then

22   allow a trooper to detain them for a canine sniff when they do

23   not have consent to search the car, and Doctor Mummolo's

24   testimony would go to that -- to the intentional targeting of

25   out-of-state motorists to do these canine sniffs and

1    detentions, which we think just calls into question whether or

2    not any trooper, and specifically, in the damages action

3    whether Trooper Schulte had reasonable suspicion, or whether

4    they are just engaging in a high volume practice of doing this,

5    and so we believe this testimony would be directly relevant in

6    this damages case.  In addition to the pattern and practice

7    that Mr. McInerney described, it has direct relevance to this

8    case as well, but respectfully, to the court's order on the

9    motion in limine, we offer it as an offer of proof.

10          THE COURT:  Okay.  I mean, I don't know that it's

11   necessary, but you're certainly free to make that offer of

12   proof.  It doesn't change my rulings with regard to the scope

13   of this trial, which I think both sides are unhappy about.  So

14   I must have hit the perfect right note, huh?  Anyway, anything

15   else before we take a brief recess and you can get some lunch?

16          MR. MC INERNEY:  Not by the plaintiff, Your Honor.

17   Thank you.

18          MR. CHALMERS:  No, Your Honor.

19     (Whereupon court took a recess.  Proceedings then continued

20   as follows:)

21          THE COURT:  So does anyone know where defense counsel

22   and Trooper Schulte are?

23          MR. MC INERNEY:  I can go knock on the door, Judge.

24          THE COURT:  Okay.

25          MR. CHALMERS:  I think I'm going to have to apologize.

1   I thought we were starting later, so the trooper went to the

2   men's room.

3          THE COURT:  Okay.  This might seem like a waste of

4   time, but this is what keeps lawyers and parties and witnesses

5   on time, so I'm sure this won't happen again.

6          MR. CHALMERS:  It will not, and I don't know how I can

7   express my embarrassment.  I -- I don't know what I heard.

8   We're late.

9          THE COURT:  Sir, you're still on the witness stand,

10  so...

11         THE WITNESS:  Oh, I'm sorry, Your Honor.

12         THE COURT:  Go ahead.

13  BY MR. CHALMERS:

14  Q.  Thank you.  You understand you're still under oath and all

15  that good stuff?

16  A.  Yes, sir.

17  Q.  All right.  First, I don't have that many questions to ask.

18  This stop took place back in 2017, and you have testified about

19  some the events.  Do you have a perfect memory as to exactly

20  what happened back in 2017 as regards to this stop?

21  A.  No.

22  Q.  And you relied then on your review of the dash cam and

23  other materials to try to reconstruct some things?

24  A.  I have.

25  Q.  Now, there was a -- I want to talk to you about just a few

1  more things, one of which is your affidavit, which if I

2  remember correctly was marked as Exhibit 3.

3          MR. MC INERNEY:  4.

4          MR. CHALMERS:  Exhibit 4.  Thanks.  Exhibit 4.

5  BY MR. CHALMERS:

6  Q.  This affidavit was something that was prepared in

7  connection with filings in this lawsuit.  You understand?

8  A.  Yes, sir.

9  Q.  And it was intended to, what, summarize your recollections,

10 your -- your -- your views as they related to this particular

11 stop; is that right?

12 A.  Yes.

13 Q.  Was it your intent to put down every specific detail that

14 you were able to reconstruct from your memory, or from your

15 memory in that document?

16 A.  No, I don't believe so.

17 Q.  Okay.  Thank you.  You believe -- or did you believe that

18 you had reasonable suspicion under the totality of the

19 circumstances viewed by you with your experience and special

20 training to detain Mr. Shaw for a canine sniff?

21 A.  I did.

22 Q.  And we can do the math in terms of how long it -- that

23 detention took place, but it ended up being around 30 minutes

24 or so; is that right?

25 A.  I don't recall the time, but it was quite lengthy.

1    Q.  And why was it that it took 30 minutes to detain him for

2    the canine sniff?

3    A.  I don't know exactly where the canine was coming from.  I

4    knew they were out in the area.  We're in basically the center

5    of Ellis County, and most counties out west are 30 miles

6    across, and I have no idea what relationship, if he was further

7    to the west or east of my location.

8    Q.  Was that a reason why you asked for consent, because of the

9    potential delay of getting the dog?

10   A.  I didn't know where -- if we had a dog local or not.

11   Q.  All right.  Now, you -- did you have some incentive to

12   conduct a dog sniff of a vehicle if you felt that you didn't

13   have reasonable suspicion?

14   A.  Did I have an incentive?

15   Q.  Did you have a reason to do that?

16   A.  Rephrase.  I don't know what you mean by incentive.

17   Q.  Do you as an officer -- well, do you personally have some

18   sort of incentive to -- to -- to conduct a dog sniff, to have a

19   dog come out and sniff somebody's vehicle if you don't have

20   reasonable suspicion to detain them?

21   A.  There's no incentive to, no.

22   Q.  Do you know what a -- a motion to suppress is in a criminal

23   case?

24   A.  Yes.

25   Q.  What is that?

1  A.   That whatever happened that the motion to suppress is

2  about, that part of the testimony or that evidence would not be

3  allowed in the evidence in the courtroom.

4  Q.   And so if there is a search, and it's found to be

5  unconstitutional, do you have some understanding as to what

6  happens to that evidence?

7  A.   If it was found to be unconstitutional, and found out after

8  a certain point of time, wouldn't be admissible.

9  Q.   Do you have any incentive to conduct a search that could be

10  found to be unconstitutional, that could result in not

11  permitting you to present to a jury evidence found during the

12  search?

13  A.   No.

14  Q.   Do you always only want to call a dog for a sniff when you

15  suspect that something is to be found?

16  A.   Say that again.

17  Q.   Do you only want to call a dog when you suspect that it's

18  going to find something?

19  A.   No; no.

20  Q.   When would you call a dog when you don't suspect it's going

21  to find something?

22  A.   If the -- if there's no other indicators, or due to the

23  conversation we had dispel that, so wouldn't call for a canine.

24  Q.   Okay.  So mine was a bad question.  Let's assume that

25  you've called and decided you're going to call the dog, do you

1   do that only when the dog's going to find something?

2              MR. MC INERNEY:  Objection, asked and answered.

3              THE COURT:  Sustained.

4   BY MR. CHALMERS:

5   Q.  Do you use just a hunch to decide to detain someone in

6   order to call a dog?

7   A.  No.

8   Q.  You were asked about the license tag on the vehicle that

9   was driven by Mr. Shaw, and you gave some testimony about that.

10  What part did the license plate play, if any, in the reasonable

11  suspicions that you formed to conclude that a dog sniff was

12  appropriate?

13  A.  Just 'cause it was an out-of-state tag by itself didn't

14  mean anything.  With the totality of everything I learned, that

15  there may be illicit activity going on.

16  Q.  So the license itself, that didn't make any difference to

17  you then?

18  A.  No.

19  Q.  Did you think that you were violating Mr. Shaw's

20  Constitutional rights when you had him wait for a dog sniff?

21  A.  I did not.

22  Q.  Did you have some reason to even question whether or not

23  his rights were being violated when you called for the dog

24  sniff?

25  A.  I did not.

1    MR. CHALMERS:  I don't have any other questions, Your

2  Honor.  I would proffer Exhibits 814, 815, which the court has

3  all ready concluded for the reasons we've discussed, that they

4  aren't going to be presented to the jury, but I would proffer

5  them just for the record.

6    THE COURT:  It is only a proffer?

7    MR. CHALMERS:  It is only a proffer, Your Honor.

8    THE COURT:  What are the exhibits again?

9    MR. CHALMERS:  814 and 815, Your Honor.

10    THE COURT:  All right.  Any further examination from

11  plaintiffs -- plaintiff?

12    MR. MC INERNEY:  Yes, Your Honor.  Thank you.

13                    RE-DIRECT EXAMINATION

14  BY MR. MC INERNEY:

15  Q.  Sir, I think you just testified that -- in response to Mr.

16  Chalmers' question that the license plate that you observed on

17  the van played no role in your decision to detain?

18  A.  I said by itself, it did not.

19  Q.  Okay.  But the fact that they were coming from Oklahoma

20  did; correct?

21  A.  With all the other information, yes.

22  Q.  Okay.  And the license plate -- and so we're clear, the

23  license plate was from Oklahoma; right?

24  A.  Correct.

25  Q.  Okay.  So the fact that they were coming from Oklahoma, had

1    an Oklahoma tag, played into your reasonable suspicion;

2    correct?

3    A.   By itself, no, but -- but with everything else, yes.

4    Q.   Well, I want to make sure we get this.  You've still got

5    your deposition there in front of you?

6    A.   Yes, sir.

7    Q.   If you would turn to Page 207 for me, please.

8    A.   The big book?

9    Q.   Are you there, sir?

10   A.   Yes, sir.

11   Q.   Let me direct your attention to Line 15, and again, same

12   deposition, sir, that we talked about before, same oath, same

13   series of questions.  Did I ask you this question and did you

14   give me this answer?  Question, did the fact that he was coming

15   from Oklahoma factor into your determination of reasonable

16   suspicion?  Your answer, it's with everything together, yes.

17   Question, okay, what about Oklahoma?  Answer, itself, no,

18   sorry.  Question, let me finish the question.  Answer, sorry.

19   What about the fact that he was coming from Oklahoma factored

20   into your reasonable suspicion?  Answer, what factor?

21   Question, yeah, what about that?  And your answer was, coming

22   from a known where people take narcotics, and going -- and of

23   course, he's going west, he's going to a place that's a source

24   state.  And my question was, okay, Oklahoma is a place where

25   people take narcotics?  And you say, they can.  Did I read that

1    accurately?

2    A.  You did.

3    Q.  Sir, you -- in line with that same series of questions, you

4    indicated I think on cross-examination in response to one of

5    Mr. Chalmers' questions, that the fact that the Shaw's were

6    headed to a source state was part of your reasonable suspicion.

7    You remember that?

8    A.  Yes.

9    Q.  Okay.  And you know that in 2017, there were 24 states that

10   had some form of legal marijuana; correct?

11   A.  I'm not sure how many, but I know there's a bunch.

12   Q.  Okay.  So the fact that they were traveling to a state that

13   had legal marijuana was -- made them -- distinguished them by

14   being one of 24 states, half the country that had legalized

15   marijuana; correct?

16   A.  Yes.

17   Q.  We were -- or you were discussing with Mr. Chalmers the

18   series of events that took place before the stop; that is, when

19   you saw Mr. Shaw's vehicle on I-70 headed west, and I want to

20   make sure that -- that I understand your testimony.  It was

21   true, wasn't it, that your lights were turned on?  You turned

22   on your lights before his van passed you; correct?

23   A.  Correct.

24   Q.  Okay.  There's no there's no dispute about that; right?

25   A.  There's no what?

1   Q.   There's no dispute about that?

2   A.   Correct; sir.

3   Q.   And then I think you cleared up something for all of us

4   when you said that the sound that we were hearing on the video

5   actually wasn't your siren, it was the radar detector; correct?

6   A.   Radar.

7   Q.   Yeah, radar, right.  You have the radar, we have the

8   detectors.  So -- so -- and that -- that that up and down sound

9   was an indication that somebody had tripped your radar;

10  correct?

11  A.   Yes, it -- the sound is the direct reflection of the speed,

12  however it translates into that.

13  Q.   Okay.  And then you said that you actually never turned

14  your siren on; correct?

15  A.   I did not.

16  Q.   Okay.  And I think you testified that you only turn your

17  siren on in exceptional situations; right?

18  A.   Yes.

19  Q.   Okay.  So this was not an exceptional situation; correct?

20  A.   No.  He'd started slow down.  He hadn't stopped right away,

21  but he started to slow down.

22  Q.   Do you still have that declaration, Exhibit Number 4, up

23  there with you?

24  A.   I do, sir.

25  Q.   Can we take a look at Paragraph 5 of Exhibit 4, please?

1          MS. PERRY:  Can we publish it?

2          MR. MC INERNEY:  Your Honor, we've all ready done it.

3     Your permission to publish Exhibit 4, Paragraph 5?

4          THE COURT:  Go ahead.

5          MR. MC INERNEY:  It's all ready admitted into

6     evidence.  Thank you.

7          THE COURT:  All right.  Go ahead.

8     BY MR. MC INERNEY:

9     Q.  Great.  Thank you.  Sir, I'm going to point you, as you can

10    see on your screen, to Paragraph 5.  And that first sentence,

11    sir, says, I turned on the patrol vehicle's overhead lights and

12    siren to signal the minivan to pull over.  Did I read that

13    right?

14    A.  You did, sir.

15    Q.  You actually never turned on the siren, did you?

16    A.  I did not.

17    Q.  And that vehicle didn't have overhead lights?

18    A.  When I say overhead light, I mean it's above my head in the

19    car.

20    Q.  You described it as a slick car?

21    A.  A slick top.

22    Q.  So it had some lights at the top of the windshield and the

23    top of the rear window; correct?

24    A.  In the front bumper, front push bar area and on the

25    mirrors.

1    Q.  Right, but no lights on top of the vehicle; correct?

2    A.  That's correct; sir.

3    Q.  Okay.  Thank you.  I think you just testified in response

4    to a question by Mr. Chalmers that -- oh, we can -- yeah, we

5    can take Exhibit 4 down.  Thank you.  You testified that part

6    of your suspicion was that Blaine Shaw offered a reason for his

7    failure to slow down and stop at what you thought was the

8    appropriate time right away, and you found that to be odd;

9    correct?

10   A.  Yes.

11   Q.  Is -- is that then -- are we to understand that if he had

12   not come up with a reason, if he had been halting, or if he

13   had -- had not responded right away, that that would have made

14   you less suspicious?

15   A.  Halting?

16   Q.  Yeah, if he hadn't given you -- if he had delayed his

17   answer?

18   A.  Oh, okay, I see what you're saying.

19   Q.  Would that make you less suspicious?

20   A.  No, I don't think that would play into it.

21   Q.  So either way he was going to answer that question, you

22   were going to be suspicious, weren't you?

23   A.  I don't know how I would be suspicious either way.

24   Q.  Well, you said you were suspicious because he answered you

25   right away, and my question was, if he hadn't answered you,

1 would you be less suspicious?

2 A.  I don't know him taking more time to give me an answer,

3 that actually would have thought about what his answer was

4 instead of just throwing it out there, I guess.

5 Q.  Okay.  You also testified I think when Mr. Chalmers was

6 asking you questions that the fact that the van was not

7 registered in Blaine Shaw's name made you suspicious; correct?

8 A.  I did.

9 Q.  And then he explained to you that it was his dad's van;

10 correct?

11 A.  Yes, sir.

12 Q.  And that he was also listed on the insurance; correct?

13 A.  He said that.

14 Q.  And then he gave you the insurance; correct?

15 A.  Yes.

16 Q.  And turns out he was listed on the insurance; correct?

17 A.  I do not remember.

18 Q.  Okay.  Nevertheless, that made you suspicious?

19 A.  I don't remember looking at his name on the insurance card

20 or not.

21 Q.  Okay.

22 A.  I looked at the -- the vehicle identification, actually

23 that car, and then what's the expiration date of that.

24 Q.  If he had not been on the insurance, that would have been a

25 factor that would have made you suspicious; correct?

1  A.  I wanted to know why he's driving his dad's car.

2  Q.  Okay.  You think that would have wound up in your

3  declaration where all the important factors are supposed to be?

4  A.  Might have, yes, sir.

5  Q.  When Mr. Chalmers asked you about Exhibit 4, your

6  declaration, he asked you whether you intended to include

7  everything important or everything relevant in the declaration.

8  Do you remember that question?

9  A.  Yes.

10  Q.  And was your answer no or yes?

11  A.  I don't think it -- I don't remember how I exactly worded

12  it.  I don't think I have everything -- everything that's

13  pertinent is in there.

14  Q.  Well, this is the only declaration you did in this case;

15  correct?

16  A.  Yes, sir.

17  Q.  Okay.  And at the time, when we talked about this earlier

18  today, at the time, you knew that that was the opportunity for

19  you to talk about all of the reasons that you think you had

20  reasonable suspicion; correct?

21  A.  Yes, sir.

22  Q.  And you did that under penalty of perjury.  In fact, that

23  very last page right above your name --

24  A.  Yes, sir.

25  Q.  -- says that; correct?

1    A.  Yes, sir.

2    Q.  And you signed that?

3    A.  I did.

4    Q.  And you knew that we were going to have it, and you knew

5    the court was going to see it?

6    A.  Yes, sir.

7    Q.  So all this had to be right?

8    A.  Yes, sir.

9    Q.  And complete?

10   A.  As far as I knew at the time, yes.

11   Q.  Was there something that you learned after this that you

12   should have included?

13   A.  Every -- lot of the things we talked about today or what I

14   heard yesterday, the recollection of what happened '20, '21,

15   when we did this.

16   Q.  Yeah, April of '21.

17   A.  Three, four years down the road, I don't remember --

18   Q.  But these --

19   A.  -- that's everything pertinent.

20   Q.  I'm sorry?

21   A.  I mean, I don't remember everything pertinent.

22   Q.  The things that we're talking about today that went into

23   your calculation of reasonable suspicion, though, all happened

24   before you executed this declaration; right?

25   A.  Yes.

1    Q.   Yeah, back in '17?

2    A.   Yes.

3    Q.   And after you'd had a chance to look at every document in

4    this case, and look at the entire video as much as you wanted;

5    correct?

6    A.   Yes.

7            MR. MC INERNEY:  One moment, Your Honor, if I may.

8    That's all the questions I have for this witness.  Thank you,

9    sir.

10            THE COURT:  Thank you.  Any re-cross?

11            MR. CHALMERS:  Yeah, it's short.  I hope.

12                       RE-CROSS EXAMINATION

13   BY MR. CHALMERS:

14   Q.   Could I have the ELMO on?  Trooper, I'm going to talk to

15   you about Plaintiff's Exhibit 4.  Exhibit 4, the affidavit you

16   talked about.  In particular, at Page 20, it's hard to kind of

17   see, you've got a copy up there in front of you, don't you?

18   A.   Yes.

19   Q.   Okay.  So at Page 20, talks about passage of time, I do not

20   remember each basis or factor for my reasonable suspicion, and

21   then goes on to say, however, after review of the dash camera

22   video and documentation, here's what they show.  And it says,

23   okay, one is that it is the driver of a Chrysler Town & Country

24   minivan did not timely pull over, and we've talked about that

25   today, haven't we?

1    A.   We have, sir.

2    Q.   And then it goes on to say, see here, Page 7, if I can find

3    it.   Very top, says the past criminal history showed his

4    involvement with the sale of illegal drugs, and we talked about

5    that today; is that right?

6    A.   We did, sir.

7    Q.   And then it says, the minivan was not registered to B Shaw,

8    and was traveling on I-70 to Colorado, a known drug corridor.

9    And the Denver destination is very relevant, because based on

10   your experience and knowledge, I-70 is a corridor to Colorado,

11   a source state for marijuana, and you believe that this added

12   to your suspicion -- I'm paraphrasing -- when combined with the

13   fact the minivan's driver was not the vehicle's owner and other

14   factors listed in this paragraph, based on your experience and

15   information, and we can read the rest of it, but we've talked

16   about that today, haven't we?

17   A.   We have.

18   Q.   And then it says, Mr. Shaw claimed he used the minivan as

19   an Uber driver, and yet, the minivan was crammed full of stuff,

20   having the lived-in look.   We've talked about that and why that

21   it's significant today, haven't we?

22   A.   Yes, sir.

23   Q.   And then it says, the passenger in the front passenger seat

24   was acting suspiciously.   He didn't say anything, never looked

25   over, never made eye contact, had his hands in his lap, looked

1   straight forward, was not moving his head, when the passenger

2   usually looks in my direction and speaks to me -- again, I'm

3   paraphrasing, but we've talked about that today, haven't we?

4   A.  We have.

5   Q.  And finally, you found it suspicious that he was a criminal

6   justice major at his age, and that he would refuse a search if

7   he were a criminal justice major.  And what was important there

8   was, is that you weren't really believing he was necessarily a

9   criminal justice major; is that right?

10  A.  That's what I thought.

11          THE COURT:  That's leading.  Let's not ask leading

12  questions.

13          MR. CHALMERS:  Okay.

14  BY MR. CHALMERS:

15  Q.  The -- counsel asked you about your affidavit being

16  complete, and you indicated it wasn't intended to be your

17  complete testimony, but is there anything that you know in the

18  affidavit that we overlooked in the state's testimony?

19  A.  We've talked about so much that --

20  Q.  Anything that you've talked about in your testimony that

21  wasn't referenced in the affidavit?

22  A.  That wasn't referenced in it?

23  Q.  In the affidavit, yeah.

24  A.  I don't think so, sir.

25  Q.  I don't have anymore, thanks.

1          MR. MC INERNEY:  Judge, I just have two questions.  I

2     promise that will be my last ones.

3          THE COURT:  Go ahead.

4                    FURTHER RE-DIRECT EXAMINATION

5     BY MR. MC INERNEY:

6     Q.   This was a list of all the reasons why you had a reasonable

7     suspicion to detain Mr. Shaw; correct?

8     A.   Okay.

9     Q.   That Paragraph 20; correct?

10    A.   Okay, yes.

11    Q.   Mr. Chalmers just asked you about the Uber driver

12    paragraph.  It says, B Shaw claimed he used the minivan as an

13    Uber driver, and yet, the minivan was crammed full of stuff and

14    had a lived-in look.  It's on Page 7.  Do you see that?

15    A.   Yes, three-quarter of the way down.

16    Q.   Trooper, you didn't find out he was an Uber driver until

17    you pulled him out of the car 20 minutes after you detained

18    him; isn't that right?

19    A.   I don't remember, sir.

20    Q.   That's all I have.

21         THE COURT:  All right.  Anything further for this

22    witness?

23                    FURTHER RE-CROSS EXAMINATION

24    BY MR. CHALMERS:

25    Q.   Do you think we could look back at the second conversation

1   that you had on the tape to see whether or not Uber was

2   mentioned?

3   A.  I don't know if it is or not.

4   Q.  All right.  I don't have anything else.  Thanks.

5           THE COURT:  All right.  Thank you, sir.  You can step

6   down.

7           THE WITNESS:  Thank you, ma'am.

8           THE COURT:  All right.  Thank you, sir.  You can step

9   down.

10          THE WITNESS:  Thank you, ma'am.

11          THE COURT:  Plaintiff have another witness?

12          MS. BRETT:  Yes.  Plaintiff calls Chief Hassan Aden.

13      (Proceedings then continued with the testimony of Aden

14  Hassan, which was previously transcribed in a separate

15  transcript.  End of proceedings of Day Two 2/7/23 - JT.)

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4

5        I, Nancy Moroney Wiss, a Certified Shorthand Reporter and

6    the regularly appointed, qualified and acting official reporter

7    of the United States District Court for the District of Kansas,

8    do hereby certify that as such official reporter, I was present

9    at and reported in machine shorthand the above and foregoing

10   proceedings.

11       I further certify that the foregoing transcript, consisting

12   of Day Two - 2/7/2023 - Pages 116-243, is a full, true, and

13   correct reproduction of my shorthand notes as reflected by this

14   transcript.

15       SIGNED January 4, 2024.

16

17                    S/_____

18                    Nancy Moroney Wiss, CSR, CM, FCRR

19

20

21

22

23

24

25

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that a copy of the foregoing APPELLANT'S APPENDIX, as submitted in digital form is an exact copy of the document filed with the Clerk.

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2024, the foregoing APPELLANT'S APPENDIX was electronically filed with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I also certify that within five business days of the issuance of notice that the electronic filing is compliant, one paper copy will be delivered by Federal Express to the Clerk's Office.


DATED: April 24, 2024                    /s/ Kurtis K. Wiard