## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

BLAINE FRANKLIN SHAW, et al.,
*Plaintiffs-Appellees*,

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

———

MARK ERICH, et al.,
*Plaintiffs-Appellees*,

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

## APPELLANT'S APPENDIX VOLUME VII

Appeal from the United States District Court for the District of Kansas
Honorable Kathryn H. Vratil, Senior District Court Judge
District Court Case Nos. 19-CV-1343-KHV and 20-CV-1067-KHV-GEB

**OFFICE OF ATTORNEY GENERAL**
**KRIS W. KOBACH**

120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
(785) 296-2215
anthony.powell@ag.ks.gov
dwight.carswell@ag.ks.gov
kurtis.wiard@ag.ks.gov

Anthony J. Powell
*Solicitor General*
Dwight R. Carswell
*Deputy Solicitor General*
Kurtis K. Wiard
*Assistant Solicitor General*

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

Transcript of Shaw Trial, Hassan Aden Testimony
    (ECF No. 599) ...................................................................................... 1

1

2                    UNITED STATES DISTRICT COURT
                        DISTRICT OF KANSAS,
3
BLAINE FRANKLIN SHAW,
4                                    Docket No. 19-1343-KHV

5    Plaintiff,                      Kansas City, Kansas
                                     Date: 2/7/2023
6       v.

7    DOUG SCHULTE,

8    Defendant.
     ...................
9
                            TRANSCRIPT OF
10           TESTIMONY OF HASSAN ADEN FROM JURY TRIAL
              BEFORE THE HONORABLE KATHRYN H VRATIL,
11             UNITED STATES SENIOR DISTRICT JUDGE.

12   APPEARANCES:

13   For the Plaintiff :   Madison A Perry & Patrick A McInerney
                           Spencer Fane LLP -KC
14                         1000 Walnut Street, Suite 1400
                           Kansas City, MO  64106
15
                           Sharon Brett
16                         ACLU Foundation of Kansas
                           6701 W 64th Street, Suite 210
17                         Overland Park, KS  66202

18   For the Defendant:    Arthur S Chalmers
                           Office of Attorney General - Kansas
19                         120 SW 10th Avenue
                           Topeka, KS  66612
20
     Court Reporter:       Nancy Moroney Wiss, CSR, RMR, FCRR
21                         Official Court Reporter
                           558 US Courthouse
22                         500 State Avenue
                           Kansas City, KS  66101
23

24

25

1                           I N D E X

2

3                                                              <u>Page</u>

4  HASSAN ADEN
      DIRECT EXAMINATION BY MS. BRETT                        3
5    CROSS EXAMINATION BY MR. CHALMERS                       47
     RE-DIRECT EXAMINATION BY MS. BRETT                      76
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      THE COURT:  Plaintiff have another witness?

2      MS. BRETT:  Yes, plaintiff calls Chief Hassan Aden.

3      THE COURT:  Sir, would you please step into the

4  witness box and raise your right hand so that you can be sworn?

5      (Witness sworn.)

6      THE WITNESS:  I do.

7      MS. HARPER:  Thank you.  You may be seated.

8                    HASSAN ADEN,

9  Called as a witness on behalf of the plaintiff, having been

10  first duly sworn, testified as follows:

11                  DIRECT EXAMINATION

12  BY MS. BRETT:

13  Q.  Good afternoon, Chief.  Can you please start by just

14  introducing yourself to the jury?

15  A.  Good afternoon.  My name is Hassan Aden and I'm a witness

16  in this case.

17  Q.  Can you spell your name please?

18  A.  H A S S A N.  Last name is A D E N.

19  Q.  Where do you live, Chief Aden?

20  A.  Alexandria, Virginia, a suburb of Washington, DC.

21  Q.  And what do you do?

22  A.  I am a consultant.

23  Q.  Have you worked in law enforcement previously?

24  A.  Yes, I have.

25  Q.  How long have you worked in law enforcement?

1   A.   Approximately three decades, and I continue -- while not a

2   practitioner, I continue to work with police departments across

3   the country.

4   Q.   Is that a part of your consultant work now?

5   A.   Yes, it is.

6   Q.   I want to begin at the beginning of your law enforcement

7   career.  What was the first position you held in law

8   enforcement?

9   A.   I was a recruit officer, and went to a police academy in

10  Alexandria, Virginia with that police department for that city.

11  Q.   Which police department?

12  A.   The Alexandria, Virginia police.

13  Q.   Okay.  Can you describe the Alexandria, Virginia community

14  for the jury?

15  A.   Yeah.  So Alexandria, Virginia is a suburb of Washington,

16  DC.  It is fairly urban, and shares some common crime and

17  disorder issues that Washington, DC and the metropolitan area

18  there share.  It's approximately 160,000 residents, and it's

19  20-square miles, so very compact.

20  Q.   When you said a common crime element, I think I forget the

21  exact words that you used, what did you mean by that?

22  A.   We have a lot of commonalities with violent crime, property

23  crimes and public order issues.

24  Q.   What year did you begin with Alexandria PD?

25  A.   1987.

1  Q.  And you said you first went to the academy there?

2  A.  I did.

3  Q.  And you were a recruit in the academy?

4  A.  I was.

5  Q.  What position did you hold after the academy?

6  A.  I was a police officer upon graduation, and I was assigned

7  to a patrol division.

8  Q.  What responsibilities did you have in patrol?

9  A.  So patrol, essentially, was -- many call it the back bone

10  of policing, but patrol is where you're in a marked vehicle in

11  a police uniform, and the responsibilities are to answer calls

12  for service, engage positively with the public, help problem

13  solve problems in communities, and generally respond to any

14  call that you are -- are summoned to in a way to -- to -- so

15  it's to help.  So for instance, you know, you get traffic

16  complaints, you get accident calls, and you have to respond and

17  take the appropriate action, take an accident report, write a

18  ticket, all of those functions.

19  Q.  So did you conduct any traffic stops?

20  A.  I did, many.

21  Q.  Did you have any experience in drug enforcement?

22  A.  I do.

23  Q.  As a patrol officer with the Alexandria police department?

24  A.  Yes, I did drug cases.

25  Q.  How long were you are a patrol officer?

1   A.   Three years.

2   Q.   And what did you do after that?

3   A.   I was transferred, a lateral transfer to a street crimes

4   unit, and street -- street crimes unit for us, it's defined

5   differently in other police departments, but for the

6   Alexandria, Virginia police department, it was a street level

7   narcotics enforcement unit.  They were quite popular at the

8   time.  Washington, DC had a lot of issues with crack cocaine,

9   and violence associated with it.  So the street crimes units

10  were intended to address and enforce drug laws at the street

11  level, not at the major investigation level.

12  Q.   In the street crimes unit, did you work with canines,

13  police canines at all?

14  A.   Yes.

15  Q.   How did you work with them?

16  A.   We would call canines to do drug sniffs on -- on cars.  If

17  the canine alerted, that gave us probable cause to search.

18  Q.   And how long were you with the street crimes unit?

19  A.   Two years, roughly.

20  Q.   Where did you go after that?

21  A.   I was then transferred to major narcotics, and that sort of

22  elevated the scope of our investigations.  We no longer were

23  responsible for the street level, but we actually trained with

24  the US Drug Enforcement Administration, and focused on several

25  levels up of drug traffickers.

1  Q.  So how did your responsibilities change when you moved from

2  street crimes to major narcotics?

3  A.  The nature of the investigations changed.  We worked much

4  more with federal agencies.  Our cases were transferred and

5  prosecuted, many of them in federal court.

6  Q.  And how long were you with major narcotics?

7  A.  Three years.

8  Q.  Approximately what year did you leave major narcotics?

9  A.  1995.

10  Q.  Where did you go?

11  A.  I became a school resource officer.

12  Q.  Okay.  How long were you in that position?

13  A.  Until 2001.

14  Q.  And where did you go from there?

15  A.  Reluctantly, I was promoted to sergeant, and left that

16  unit, and as a street sergeant, I was assigned back at patrol.

17  That's typically what happened in our organization.  You go

18  back to patrol as a learning ground on how to be a supervisor.

19  It's the first line supervisor rank.

20  Q.  What were your responsibilities as a supervisor in patrol?

21  A.  I supervised a squad of patrol officers directly, but

22  multiple squads when they were out in the street, and by that,

23  I mean, directly, I had responsibility for measuring the

24  performance of I believe at the time it was eight or nine

25  patrol officers, but when I was on the street, I would be

1  called to help, guide, lead, mentor police officers that were

2  not assigned to me, in difficult situations, to make sure that

3  they were in line with our policies and procedures and culture.

4  Q.  Would that involve reviewing their work on traffic

5  enforcement, for example?

6  A.  All of their work, any report that they did, they -- a

7  sergeant was responsible for approving and sending it to the

8  record section.

9  Q.  How long were you a sergeant in patrol?

10  A.  One year.

11  Q.  Where did you go from there?

12  A.  Again, reluctantly -- no, not reluctantly, I was assigned

13  to internal affairs, which is a position that is hand selected

14  by the chief of police in our department, and the internal

15  affairs position is probably one with the most responsibility

16  in the department in terms of, it's the position in the police

17  department that investigates the police.  We investigate

18  misconduct allegations, police shootings, and any other

19  allegations that came in.

20  Q.  Can you explain for the jury a little bit more about what

21  internal affairs does, how it operates?

22  A.  Yes.  So when a complaint comes into the department, it

23  generally comes into internal affairs.  It goes through a

24  process of intake and classification, and depending on that,

25  you decide who investigates it.  Typically, of cases that were

1   of more complexity, the internal affairs sergeants, that

2   sergeant rank in internal affairs would conduct the

3   investigation, and that investigation essentially is -- was

4   very comprehensive.  It included review of any publicly

5   available video.  At the time, we didn't have body worn video,

6   and we didn't have much in car cameras like what you saw

7   earlier.  We didn't have those.  Those were reserved for

8   traffic enforcement and DWI enforcement cars, but generally,

9   patrol officers didn't have those, so it was more publicly

10  available video, because that was becoming much more prolific,

11  and all of the reports, we conducted interviews with witnesses,

12  interviewed the police officers, which takes -- it's a

13  particular skill, as they're trained in interviewing people

14  also, and then we prepared a report.  That report would go

15  through our chain of command, so through our lieutenant, and

16  then eventually through our captain, and then onto the deputy

17  chief and the chief.

18  Q.  And so as a sergeant in internal affairs, you were

19  responsible for conducting some of those investigations?

20  A.  Primarily, yes, we were investigators, and different

21  departments do it differently, but in the Alexandria, Virginia

22  police department, because we took accountability very

23  seriously, the first line investigators in internal affairs

24  were actually supervisors.

25  Q.  What other roles did you have in internal affairs?

1   A.   In 2004, I was promoted to lieutenant, and I remained in

2   internal affairs.  I became the commander of the unit, and then

3   I supervised those sergeants that conducted all of those

4   investigations.  So I reviewed all of their work, I signed off

5   on it, or if it was incomplete or unclear in some aspects, I

6   would send it back for clarification and/or more investigation.

7   Once I was satisfied, I would sign off, and then our captain

8   would review my work, and send it on through to the rest of the

9   chain, and then the chief of police would actually determine

10  what -- what the results of the case would be, and they could

11  be -- cases could be adjudicated through being sustained, which

12  means that it was sustained against the officer, supported by

13  facts, not sustained, which means that there were -- facts were

14  not sufficient to sustain it, unfounded, that it didn't happen,

15  or exonerated, and exonerated meant that it did happen, the

16  allegation did happen, but it was within policy.

17  Q.   And so as an investigator to or a sergeant in internal

18  affairs, you would complete the investigation, and then what

19  responsibility would you have to make a recommendation

20  regarding the result of the investigation?

21  A.   I would have to support my basis, and recommend whether it

22  was sustained, not sustained, unfounded or exonerated, and

23  there was a -- a category where you could also add policy

24  failure, if there was a policy that needed to be reviewed.  So

25  we did have a lot of experience looking at our own policies,

1  and making sure that our policies were constitutional, in line

2  with the law, and in line with nationally accepted policing

3  practices.

4  Q.  So you would make a recommendation, but somebody else would

5  make the ultimate decision.  Is that fair?

6  A.  That's absolutely fact.

7  Q.  Okay.  How long were you with internal affairs in the

8  Alexandria police department?

9  A.  Until 2007, I was promoted to captain, I was -- briefly

10  remained in internal affairs, but then I was -- I was

11  transferred, I requested to be transferred.

12  Q.  And where did you go?

13  A.  I went to the US Department of Justice on loan for a period

14  of a year.

15  Q.  And what about after that?

16  A.  After that, I had several jobs I think that no one else

17  wanted, but I had -- I was transferred to be the political --

18  the department's political liaison, so I was actually assigned

19  to the mayor and to the city council to deal with any police or

20  fire issues, fire department issues, and then after I served

21  there for a year, I was assigned back to my -- my captain

22  position that I really wanted to have, which was a district

23  commander, which was responsible for full operations and

24  supervision of a police district, essentially operated like its

25  own police department.  It was responsible for a geographic

1   area, for crime control, for community relations, for all of --

2   everything that comes with policing, and I served in that

3   capacity until 2009 when I was promoted to deputy chief.

4   Q.   I want to talk about that district commander role for just

5   a second.  You said it's like its own mini police department.

6   As your district commander, did you oversee the traffic

7   enforcement work of that geographic area?

8   A.   All of the work, including the traffic enforcement, the

9   drug trafficking enforcement, the investigations, regular

10  patrol, patrol operations, and all of its administration.

11  Q.   And then in 2009, you were promoted to deputy chief, is

12  that right?

13  A.   Yes, I was.

14  Q.   What does that role entail?

15  A.   That role essentially takes the police captain, district

16  commander, up a notch, and you oversee -- I was assigned to

17  field operations, so I oversaw all of the police districts and

18  a couple of ancillary units including internal affairs,

19  personnel, various others.  So essentially, I would -- in the

20  absence of the chief, I would act -- I would be in acting

21  position of being chief of police, but I was responsible for

22  the administration of probably two-thirds of the Alexandria

23  police department.

24  Q.   How long were you deputy chief?

25  A.   Three years.

1   Q.   And I wanted to ask you what happened after you left the

2   deputy chief position, but before I move to that, you described

3   a little bit about the Alexandria community.  Are there any

4   interstate highways that go through Alexandria?

5   A.   Yes.  Major highways go through Alexandria, and then

6   smaller go -- there are major and smaller, 395, 495 which are

7   major corridors north/south, and then a full eight lane beltway

8   that feeds into 95.

9   Q.   And did the Alexandria police department do any highway

10  drug interdiction work when you were there in any of those

11  roles you just described?

12  A.   Occasionally.  The primary agency for that was the Virginia

13  state police, but we worked very closely with them, and if a

14  trooper requested back-up, they would.  There were times where

15  Alexandria police conducted traffic stops, and they led to drug

16  seizures.  We were not -- it was a concurrent jurisdiction.

17  Q.   And you spent three years as deputy chief, I believe you

18  said?

19  A.   Yes.

20  Q.   What did you do after that?

21  A.   I had planned on retiring as I had reached my 25-year mark

22  and it was a municipal police department, so with a municipal

23  retirement, and that really encouraged people to -- to retire,

24  I did so.  I sought a couple of police chief jobs, and so I

25  received an offer, and I became the chief of police of the

1   Greenville, North Carolina police department three days after

2   my formal retirement.

3   Q.   Sorry, you didn't get much of a retirement there.  So tell

4   me a little bit about Greenville, North Carolina.  What type of

5   community is that?

6   A.   Greenville, North Carolina is in the eastern part of North

7   Carolina toward the beaches, toward the outer banks.  It is

8   surrounded -- it's very rural, its surroundings, it's cotton

9   fields, it's tobacco, it's just very rural, but the city itself

10  is 35 square miles, and very urban, very poor.  The economic

11  engines are East Carolina University which is part of the U of

12  NC system, that brought in 35,000 students, and then there was

13  a major health hospital system that was there, Vidant hospital,

14  so that brought in a lot of the -- the professionals into

15  the -- the community, and then there were the students, and

16  there was a lot of drug violence and gun violence.

17  Q.   So did the Greenville police department do any drug

18  enforcement work?

19  A.   Yes.

20  Q.   Did you supervise that work as the chief of police?

21  A.   I did.

22  Q.   And are there any interstate highways that run through or

23  near Greenville, North Carolina?

24  A.   Yes, there are, 64 runs east/west.

25  Q.   After -- how long were you the chief of Greenville police

1   department?

2   A.   Little over three years.

3   Q.   Where did you go after that?

4   A.   I went back to the DC area, back to Alexandria, and I was

5   appointed director of the International Association of Chiefs

6   of Police, the IACP as it's known, and the IACP is the largest

7   police association for police executives in the world.  It's --

8   again, it's international.  It represents police executives

9   from every country.

10  Q.   What type of responsibilities did you have at the IACP?

11  A.   As the director, I was specific to research programs, all

12  of the research and all of the programmatics of the IACP

13  worldwide, as well as a more national focused, and that's the

14  National Law Enforcement Model Policy Center which drafts model

15  policies that are based on the constitution, based on case law,

16  based on nationally accepted policing practices, and they're

17  available to all members, they're off the shelf easily

18  customizable by police agencies, and most agencies around the

19  country have used policies that came out of the National Law

20  Enforcement Policy Center and made them their own, because they

21  come with a structure that provides the framework for

22  constitutional policing.

23  Q.   What exposure did you get to police standards from

24  different departments across the agency while you were at IACP?

25  A.   I got a lot of exposure.  We provided a lot of training and

1   technical assistance all over the world.  I traveled to Africa,

2   Europe, all over the United States with teams of my employees,

3   and we would conduct assessments.  We would provide feedback to

4   police agencies about their performance and how they were

5   doing, and it was all voluntary.  It was not in a scenario

6   where it was court-ordered.  That comes later.  But this was

7   police organizations that want to get better, and wanted to do

8   things better, and I loved that part of the job.

9   Q.  And I think you also mentioned model policies that were a

10  part of your work at the IACP?

11  A.  Yes.

12  Q.  Did you help develop any model policies on searches and

13  seizures?

14  A.  Yes.

15  Q.  And what about on traffic stops?

16  A.  Yes, stops, searches, arrests, all of those.  There's a

17  multitude of policies.

18  Q.  How long were you with the IACP?

19  A.  One year.

20  Q.  What did you do after that?

21  A.  When I came into the IACP, I was planning -- and the IACP

22  knew I was planning to open up a firm, my own consulting firm,

23  and then I did in 2016, it was a little over a year.  In 2016,

24  the timing was right.  I had a good selection of someone to

25  replace me.  It was -- it was a good time to -- to move on and

1    do my -- and -- and fulfill my -- my goals.  So I started the

2    Aden Group, and the Aden Group is a consulting firm that is

3    focused on helping police organizations, and again, worldwide,

4    but for American police organizations, it's helping them to

5    strike the balance, and help them get right in terms of

6    constitutional policing and how that intersects with crime

7    fighting.  That's often a challenge that police departments

8    struggle with.  It seems like it should be very easy to craft

9    your policies and all of those things, to balance those two

10   perfectly, but a lot of departments want and request help.  We

11   also help with -- that was how we started out, but we do a lot

12   of other things and --

13   Q.  So let's hear about some other things.  What projects do

14   you work on in the Aden Group?

15   A.  So we have a multitude of projects from police departments.

16   I'll give you some examples.  Police departments post-George

17   Floyd called and asked us to assess their performance with

18   crowd management and control, and -- and their policies to sort

19   of tools that they use, the weapons that they used, the force

20   that was used, all of those things, and that was all voluntary,

21   so we provide that assessment, we -- and in doing that, we

22   reviewed videos, we reviewed their policies, statements,

23   reports.  In some cases, we interviewed people.  We definitely

24   interviewed community, and then we produced reports to -- that

25   went public.

1  Q.  What other roles or projects have you worked on as a

2  consultant with the Aden Group?

3  A.  So this is the part that is court-ordered.  I served as a

4  legal monitor working for a federal judge in the Cleveland

5  consent decree, and a consent decree -- I'll just explain it

6  briefly just in case folks might have heard the term but aren't

7  familiar with exactly what it is -- it's a -- it's a settlement

8  agreement basically reached by a city after it's been sued by

9  other -- the attorney general's office of the state, or more

10  frequently, it's the US Department of Justice civil rights

11  division.  You may have seen some in the public now, some

12  cities that are undergoing that process, but after the

13  settlement agreement is reached, the federal judge responsible

14  that gets assigned the case then signs that, and frequently

15  takes the form of a consent decree that is a menu of reforms

16  that the city and the police department need to fulfill before

17  being released from it.  The role of the monitor is to be the

18  eyes and ears of the court, and inform the court on compliance

19  matters, inform the federal judge that oversees that consent

20  decree, and cities that I've performed this task in are

21  Seattle, Cleveland, Baltimore, Chicago, and a unique one, Santa

22  Barbara, California which wanted an independent police monitor

23  but is not under a court order.  They're simply in the bucket

24  of I want to get better, and they want someone that's trained

25  in critical -- critically self-assessing them, and teaching

1  them how to self-assess, and become better, become more

2  constitutional, and have more just policies.

3  Q.  What sort of work do you do as the monitor?  What are your

4  typical responsibilities in a case where you are serving as the

5  court appointed monitor?

6  A.  Interface with the federal judge assigned regularly, and

7  also manage a team of experts that conduct assessments, and I

8  actually do the assessments with them, but I also supervise

9  them that do the assessments, we look at data, we look at

10  video, we look at all sorts of information that leads us to a

11  conclusion as to whether the department is complying with the

12  requirements of the consent decree, and then there are four

13  steps to the consent decree essentially.  There's policy

14  development in line with what's been required by the court, and

15  then there is the training to those policies, and then there's

16  an implementation period where we observe to make sure that

17  those things are actually becoming a practice of the

18  department, and then we assess.  The assessment phase is

19  rigorous, and that is where compliance is determined, and once

20  compliance is determined, then the recommendation is made to

21  the federal judge to dissolve the consent decree.

22  Q.  As part of that compliance assessment, do you evaluate

23  individual stops and searches?

24  A.  Yes, thousands of 'em.

25  Q.  How were you selected to be a monitor in those different

1    jurisdictions?

2    A.   There's an interview process with the cities and with the

3    United States DOJ if it's a DOJ brought lawsuit.  In the case

4    of an attorney general, it's an interview with the city and a

5    representative of the state attorney general, whichever state

6    it's in.

7    Q.   So is it a competitive process?

8    A.   Yes, it is.

9    Q.   I want to visit now and talk a little bit about your

10   education.  Do you have an undergraduate degree?

11   A.   I do.

12   Q.   Where is it from?

13   A.   American University in Washington, DC.

14   Q.   And what is the undergraduate degree?

15   A.   It's administrative of justice from the justice law and

16   criminology section.

17   Q.   Do you have any other degrees?

18   A.   I do.

19   Q.   Please explain them.

20   A.   Also from American University, and it's a master in public

21   policy.

22   Q.   Chief Aden, have you ever received any special training on

23   nationally accepted police practices?

24   A.   Yes.

25   Q.   Can you describe that training for me please?

1    A.   Yes.  So I -- the one really that comes to mind, I was a

2    lieutenant at the time in internal affairs, and I was selected

3    for a very rigorous and selective process done -- or training,

4    but it was three full weeks.  It was put on by the police

5    executive research forum which is one of the top research

6    policing research organizations, and it was conducted -- the

7    training was actually conducted at the Harvard Kennedy school,

8    and it focused on not so much on craft of being a police

9    officer, police commander, but it focused much more on strategy

10   and how to lead a -- a just police department, and things to

11   focus in on, and basically, the -- the -- the theme there was

12   that to be an effective police leader, modern police leader, we

13   had to be firm defenders of the constitution and protect

14   people's rights.  That is the role of American policing.

15   Q.   In these decades of experience in law enforcement, have you

16   received any professional awards?

17   A.   I have.

18   Q.   What awards have you received?

19   A.   There were a lot that I can't even recall, but I think

20   probably I'll just give you the most significant one.  I was

21   inducted in the Evidence-Based Crime Policy Hall of Fame.  It's

22   basically an international policing hall of fame, and you're

23   nominated.  There's a committee that selects a few people out

24   of the world's policing executives.  Those people are vetted,

25   and then selected and inducted into the hall of fame.

1   Q.  Are you currently affiliated with any professional

2   associations with regards to policing?

3   A.  I am.  Still with the International Association of Chiefs

4   of Police, with the Police Executive Research Forum, with the

5   National Policing Institute, which is another think tank, and

6   with the Major City Police Chiefs Association.

7   Q.  And in all of this experience, have you had exposure to how

8   different law enforcement agencies across the country do

9   traffic enforcement work?

10  A.  Yes.

11  Q.  What about drug enforcement?

12  A.  Yes.

13  Q.  What about drug interdiction?

14  A.  Yes.

15  Q.  What about detentions for canine sniffs?

16  A.  Yes.

17  Q.  And what experience do you have in evaluating the law

18  enforcement activities of different officers and different

19  departments across the country?

20  A.  I mean, up until yesterday even, I was evaluating one

21  city's stops, so the experience is current, it's almost on a

22  daily basis, I'm assessing some aspect of -- of policing in one

23  city or another.

24  Q.  How do you do that evaluation?  What methodology do you

25  use?

1    A.   Well, the methodology is the first step.  We develop a

2    methodology.  We distribute the methodology of how we're going

3    to do the work, what information we're going to need to look

4    at, what we're going to produce, and what form the -- the

5    feedback is going to come.  We follow the methodology.

6    Generally, we look at data, and that data could be video, it

7    could be interviews, it could be conducting a focus group in

8    the case of trying to get at a department's culture, but it's

9    all of -- it just depends on what we're looking for.  In the

10   case of a consent decree, that methodology has to be approved

11   by the parties, the city, and if it's DOJ, the DOJ, so it's a

12   collaborative process to develop it, and then we execute it.

13   Q.   When you do these reviews, how if at all do you benchmark

14   your review of the police department's activities against

15   nationally accepted practices?

16   A.   That's in the methodology.  We write in exactly what the

17   requirements are for whatever we are assessing.

18   Q.   And I guess that maybe begs the question.  How do you

19   define nationally accepted police practices?

20   A.   So nationally accepted police practices, they're not

21   necessarily written down anywhere, but they're based on the

22   constitution, they're based on case law, they're heavily based

23   on model policies.  They're based on reports that come out from

24   the Police Executive Research Forum, from Major City Police

25   Chiefs Association, and from other associations.  They're

1  discussed at meetings, and they're adopted into the profession.

2  Q.  And based on all of this experience, in your opinion, have

3  you gained knowledge and experience about appropriate

4  indicators of criminal activity?

5  A.  Yes.

6  Q.  Have you ever been retained as an expert in a civil rights

7  case before this one?

8  A.  No.

9       MS. BRETT:  Your Honor, at this time I'd like to

10  tender Chief Aden as an expert in nationally accepted police

11  practices, and in the evaluation of law enforcement agencies

12  for compliance with nationally accepted police practices.

13       THE COURT:  You do not need to do that.  The jury will

14  be instructed that they can evaluate his expertise and

15  interpret his testimony accordingly.

16       MS. BRETT:  Thank you, Your Honor.

17  BY MS. BRETT:

18  Q.  So I want to move now to talking about how you got involved

19  in this case, okay?

20  A.  Yes.

21  Q.  When did you first learn about this case?

22  A.  It was fall of 2020.

23  Q.  And how did you first come to learn about it?

24  A.  I spoke to you about it.  We spoke.

25  Q.  When were you retained as an expert?

1    A.   Several weeks after that.

2    Q.   Are you being compensated for your work?

3    A.   Yes, I am.

4    Q.   Is your compensation contingent on producing a certain set

5    of opinions?

6    A.   No, it is not.

7    Q.   Is your compensation contingent on Mr. Shaw prevailing on

8    his claim in this case?

9    A.   No, it is not.

10   Q.   I want to walk through the opinions that you formed as a

11   result of your service in this case, but before I do that, I'd

12   like to just start by having you explain how a basic traffic

13   stop works.  So let's use in a hypothetical here a traffic stop

14   for speeding.  How does a stop for speeding begin?

15   A.   The way it begins is the law enforcement officer observes a

16   violation, a speeding violation.  Then he or she makes a

17   determination as to whether it's a violation that they're going

18   to conduct a traffic stop on.  That's really the first step.

19   If they decide that they're going to stop the vehicle based on

20   that violation, they would get behind the vehicle, observe the

21   vehicle briefly to make sure that there were no other factors

22   other than the speeding violation or whatever the violation,

23   they would then turn on their lights, their overhead or in the

24   case of unmarked or slick tops, whatever emergency equipment

25   they had in the car to alert the driver that was in front of

1    them of their presence and that they were being pulled over.

2    Simultaneously with that, they would call in the license plate

3    to dispatch, advise dispatch their location.  Once the vehicle

4    pulls over, and once the vehicle pulled over in a safe

5    location, they -- they would pull in behind the vehicle and

6    initiate the stop by exiting, walking up to the driver,

7    introducing themselves to the driver, and advising the driver

8    of the reason for the traffic stop.  Then they would request

9    documents.

10   Q.   And what documents would they request?

11   A.   So frequently, the documents are a driver's license,

12   registration, and in many, states proof of insurance; not in

13   all, but in many.  Once they received those documents, they

14   would go back to their vehicle and run checks on the documents,

15   on the license primarily, and that check would return whether

16   there are any warrants on the person, whether their license is

17   suspended, that kind of information could reveal that there's a

18   criminal history, and then they would -- you know, part of the

19   business of the traffic stop itself is to issue a -- a ticket,

20   or if they're not going to issue a ticket, then the decision to

21   issue -- either a -- a written warning, in some states they're

22   written, or a verbal warning.  They would then re-approach the

23   driver.  This process typically takes ten minutes or so, could

24   take a little longer.  They re-approach the driver.  They would

25   explain the ticket, or give the verbal warning, and ask if

1    there were any questions.  If there were, they would answer

2    them.  If there weren't, they would provide a copy of the

3    ticket or the warning, provide the documents back, and advise

4    the driver that they were free to go.

5    Q.  And how long can an officer detain a person for a traffic

6    stop?

7    A.  For traffic stop, really as long as it takes.

8          MR. CHALMERS:  Your Honor, I don't think that this is

9    a -- a proper question, and I also object for lack of

10   foundation as to how long a traffic stop would take, but I

11   don't think it's an issue in this case, and I also am wondering

12   when and if we can get some sort of limiting instruction, in

13   that it appears these national standards are nothing more than

14   what -- I think an attempt to talk about what the law is as

15   opposed to what are true policing standards.

16         THE COURT:  Do you have a limiting instruction that

17   you're proposing?

18         MR. CHALMERS:  Yes, I do, Your Honor.  It was filed on

19   the 2nd, and second page of the filing.  It's a Document 424,

20   Your Honor.

21         MS. BRETT:  Your Honor, would you like us to approach

22   on this?

23         THE COURT:  Right.  Just for the record, how is the

24   length of the detention not an issue here?  I thought that's

25   what the whole case was about.

1          MR. CHALMERS:  Well, I don't -- think that what he's

2     talking about is a different subject now, and perhaps I'm ahead

3     of myself, but I think he was going to give some estimate as to

4     what the average length of a traffic stop is, which would not

5     be a topic that has been an issue in this case.  I mean, the

6     stop ended.  Everybody acknowledges that.  It's the post-stop

7     detention that's what is at issue.

8          THE COURT:  Why don't you approach.

9     (Proceedings held at the bench, outside the hearing of open

10    court.)

11         THE COURT:  I mean, let's start by me saying I've

12    reviewed your proposed limiting instruction which was filed on

13    February 2nd, and I'm not giving that because I think it

14    distorts the law, and would be inappropriate to comment from

15    me.  Do you have a second request?

16         MR. CHALMERS:  For another limiting instruction?

17         THE COURT:  Uh-huh.

18         MR. CHALMERS:  Would have to sit down and draft one,

19    Your Honor.  I don't know that it's fair -- I don't know that

20    it's appropriate for me to try to come up with something off

21    the top of my head.  And in particular, I'm not sure what the

22    issue is with the instruction.  Aden's opinions about national

23    police practice are helpful to -- it's a violation of the

24    practice, is not a violation of the Fourth Amendment of the

25    United States is true, that they don't have to accept his

1  description of the facts.

2          THE COURT:  I know what you said.

3          MR. CHALMERS:  Okay.

4          THE COURT:  Okay.  So do you object to the instruction

5  that plaintiff proposes?

6          MR. CHALMERS:  I have to look back at it, but my

7  recollection was -- my recollection is it's a non-instruction,

8  that they did not, in fact, put any limitations on the -- on

9  Mr. Aden's opinions.  Of course, my principal problem all along

10  has been that the police practice is not evidence of a

11  violation of the constitution, and this witness just testified

12  that in coming up with these standards, what he looks at is

13  case law and the constitution among other things, and so he is

14  trying to testify as to legal standards, and not to standards

15  that would be appropriate, arguably, for an expert to talk

16  about, but what the limiting instruction is talking about is,

17  look, if you're going to talk about national practice, police

18  practices, and if they're helpful, they are not a violation of

19  Fourth Amendment.  And the jury needs to know that's -- that's

20  the nature requirement of the limiting instruction I think in

21  the case law.

22          MS. BRETT:  Your Honor, we put in Document 426 that we

23  don't think is necessary, but if Your Honor feels like one is,

24  we put a limiting instruction that we provided, is a much

25  simpler, more straight forward statement of what I think

1    Mr. Chalmers is trying to put in.

2         THE COURT:  So, I mean, I think it is a correct

3    statement of the law to say that the ultimate issue is not

4    whether Trooper Schulte violated nationally accepted police

5    practices, but whether he had reasonable suspicion to detain

6    Mr. Shaw.

7         MR. CHALMERS:  And that you'll instruct them on what

8    constitutes reasonable suspicion at the close of the case, is

9    that --

10        THE COURT:  I will.  I'm working on that right now.

11        MR. CHALMERS:  Well, I think what I heard you say,

12   which is that you're saying that Mr. Aden's opinion of police

13   practices are not conclusive whether -- or I don't remember

14   exactly how you phrased it -- are not evidence of a violation

15   of Fourth Amendment, I think is accurate.

16        THE COURT:  I didn't say that it's not evidence.  It

17   is evidence.  You've continually misquoted the law from me by

18   saying that evidence about national practices is inadmissible

19   to prove a constitutional violation.  That is not the law, and

20   I'm not going to instruct the jury to that effect.  What I

21   propose to say is that the ultimate issue is not whether he

22   violated nationally accepted practices, but whether he had

23   reasonable suspicion to detain Mr. Shaw.

24        MR. CHALMERS:  Well, actually, I don't think that's

25   the limiting instruction.  I think that the court's

1  contemplated, but if that's what you're going to say, that's

2  your ruling, Your Honor.

3      THE COURT:  What the court's contemplated is not what

4  you tendered.  That's why I asked you if you had the

5  alternative.  Tell me what's wrong with what I just read.

6      MR. CHALMERS:  Mind if I could borrow it to look at

7  it?  Well, what you're proposing to do is a limiting

8  instruction saying the ultimate issue for you to decide is not

9  whether Schulte violated nationally accepted police practices,

10  but whether -- but whether he had reasonable suspicion to

11  detain Shaw.  I guess I understand that.  I don't think it

12  communicates to the jury, and apparently, we don't agree on

13  what the law is, that national standards, or whether the expert

14  witness cannot testify to whether there's been a violation of

15  the constitution or not, which in essence is what he's doing

16  with his testimony of these national standards, which is why I

17  had asked for the statement that a violation of national

18  practice is not a violation of the Fourth Amendment of the

19  United States.  Such a violation of police practice is not the

20  absence of reasonable suspicion to detain a motorist.

21      THE COURT:  Right.  Limiting instruction does not need

22  to be given contemporaneously.  I think the Tenth Circuit -- if

23  this matter has to be reviewed, the Tenth Circuit will look at

24  the instructions as a whole, and if this is the best you can

25  offer in terms of a contemporaneous limiting instruction, then

1    I think we should give some more thought to it, and consider

2    doing it down the road as part of the ultimate instructions in

3    the case, or after you've had a chance to think of something

4    better than what you tendered in Document 424.

5         MR. CHALMERS:  I concede that I'm not able to do

6    anything that I think is better at this moment.  I think that

7    case law would say that there should be a contemporaneous

8    limiting instruction given, Your Honor.

9         THE COURT:  Can you cite me a case on that?

10        MR. CHALMERS:  I think it's a case that you cited in

11   your -- I think the Dunkle (ph) case is saying, I think this

12   type of opinion base is generally accepted practice, is

13   entirely appropriate when accompanied by a proper limiting

14   instruction.

15        THE COURT:  Right.  So it doesn't say a proper

16   contemporaneous objection.

17        MR. CHALMERS:  Not in the quote, no.  That's how I

18   interpreted it.

19        THE COURT:  Okay.  Well, do you want -- do you want

20   some time to think about it, or should we just move on?  I'm

21   happy to -- I'm more than willing to tell the jury that the

22   ultimate question is one of constitutional law as to what

23   constitutes reasonable suspicion, and that the defendant is not

24   on trial for violating national police standards.

25        MR. CHALMERS:  I guess between the two options, which

1  is to wait until instructions, I have to accept the -- your

2  limiting instruction you were going to give now.

3      THE COURT:  Okay.

4  (Proceedings continued in open court.)

5      THE COURT:  Members of the jury, I will give you a lot

6  of instructions at the end of the case about legal

7  justifications for stopping motorists or prolonging detentions

8  and so forth.  But for now, as you're evaluating this witness's

9  testimony, I just want to make sure you understand that Trooper

10  Schulte is not on trial for violating nationally accepted

11  police standards.  The constitution has its own unique set of

12  standards.  What this expert is testifying -- is testifying

13  about is relevant to that, but the actual legal standard is one

14  that I will supply to you at the end of the case in the overall

15  instructions.  Go ahead.

16      MS. BRETT:  Thank you, Your Honor.

17  BY MS. BRETT:

18  Q.  I believe the question we left off on was how long can you

19  detain a person for a traffic stop?

20  A.  As long as it takes to complete the business of that

21  traffic stop.

22  Q.  And when that business is complete, what is your

23  obligation?

24  A.  Compelled to let the driver -- to release the driver, let

25  them leave.

1   Q.   I wanted to turn now to talk about your analysis and
2   opinions that you formed in this case, okay?  Were you asked to
3   analyze Trooper Schulte's stop and detention of Mr. Shaw?
4   A.   Yes.
5   Q.   And what evidence did you consider?
6   A.   I considered a lot of the videos that was available, the
7   depositions, police reports, police policies, declarations,
8   other documents of that nature.
9   Q.   So you reviewed the video evidence in this case that has
10  been played for the jury the last few days?
11  A.   Yes.
12  Q.   And at a high level, what opinion did you form in this
13  case?
14          MR. CHALMERS:  And I don't want to have to interrupt
15  repeatedly, so I'm wondering if I can't just object to the
16  subject matter of his testimony as not being proper, not being
17  helpful under the standards that have been talked before, if I
18  can have a continuing objection to that?
19          THE COURT:  I find that those aren't very helpful
20  really for the record.
21          MR. CHALMERS:  Okay.  Well, I guess I pose the
22  objection.  I have to object because I don't think this is
23  proper subject matter for this witness to give testimony on in
24  this case.
25          THE COURT:  Okay.  I have ruled that he can give

1   testimony based on his experience and specialized expertise

2   about what are nationally accepted police practices.  Is that

3   your objection, just reiterating what we've all ready covered?

4           MR. CHALMERS:  Yeah, I have an obligation to make the

5   objection even though it's -- the motion in limine has been

6   granted, Your Honor.  That's my point.

7           THE COURT:  I understand that.  I'm just asking if

8   you're getting at something different than what we all ready

9   talked about.

10          MR. CHALMERS:  I am not.

11          THE COURT:  Same ruling.  Go ahead.  And as to that

12  narrow issue, you may have a standing objection.  It's not

13  necessary to interrupt to repeat it.

14          MR. CHALMERS:  Thank you, Your Honor.

15          THE COURT:  Go ahead.

16  BY MS. BRETT:

17  Q.  So I can go ahead and repeat the question, Chief?

18  A.  Yes, please.

19  Q.  So at a high level, what opinions did you form based on

20  that analysis?

21  A.  That Mr. Shaw's detention, based on the facts that were

22  available to Trooper Schulte and that he articulated, were not

23  consistent with nationally accepted policing practices.

24  Q.  Can you recall the facts and circumstances that Trooper

25  Schulte relied on?

1   A.   Yes.   The -- these aren't in order, but the fact that Mr.

2   Shaw was driving his father's car, even though he was on the

3   insurance, the nervousness of Mr. Shaw, I do agree that -- that

4   nervousness can be an indicator if it's in extreme cases.   What

5   I observed -- what I observed in the video was normal.   I -- I

6   get pulled over, and I'm nervous after three decades of

7   policing and carrying a retired badge in my pocket.   It's a

8   process that for most people creates some level of anxiety.

9   The fact that the car looked lived in.   That's -- that's a --

10  Q.   And Chief, I don't -- I don't mean to interrupt you, but I

11  just -- I'm wondering if you can give me the full list, and

12  then we'll go through each one by one.

13  A.   The fact that the car looked lived-in, the fact that it had

14  out of state plates, the fact that it was traveling from

15  Oklahoma to Denver through Kansas, so travel plans, the fact

16  that he came back -- that when he ran his name, it came back

17  with a criminal history, and Sam Shaw's lack of interaction.

18  Q.   And Chief, you've been sitting in the courtroom throughout

19  the testimony, is that right?

20  A.   I have.

21  Q.   Do you recall some discussion about the time it took Mr.

22  Shaw to pull over?

23  A.   Yes, that was another indicator, the time that it took for

24  him to pull over, the discussion about the lights in the front.

25  Q.   Okay.   Maybe let's start with that one.   What did you think

1  about that factor?

2  A.  When you get pulled over by a police officer, it's -- you

3  need to be properly alerted.  I think I would be confused also

4  if a police officer turned on their lights in front of me if

5  they were actually trying to pull me over, particularly if I

6  was in a different lane.  The proper procedure to pull someone

7  over is to get behind the vehicle, and as I've described,

8  activate your emergency equipment, and have them pull over to a

9  safe -- to a safe place.

10  Q.  Was the way in which --

11      MR. CHALMERS:  Excuse me, Your Honor, as to the last

12  question, which I will probably -- well, I do move to strike

13  it, but the -- he's not testifying now to a national standard.

14  He's testifying to how he believes the evidence, and what he

15  would do, and I object.

16      THE COURT:  So would you like to ask him to rephrase

17  his answer?

18      MR. CHALMERS:  Well, I think that he -- that the

19  answer should be stricken, and that he should be confining his

20  opinions to national standards, which as I understood the court

21  has said, he's permitted to give testimony.

22      THE COURT:  All right.  I'll strike the question, and

23  you can re-ask it, or strike the answer and you can re-ask it.

24      MS. BRETT:  Sure, Your Honor.  Thank you.

25  BY MS. BRETT:

1  Q.  Was the way in which Trooper Schulte pulled over Mr. Shaw

2  consistent with nationally accepted police practices?

3  A.  Not initially.

4  Q.  Why not?

5  A.  Because the lights were turned on in -- while Mr. Schulte

6  -- or while Trooper Schulte was in front of Mr. Shaw and not

7  behind him to clearly indicate that he needed to pull over.  At

8  that point, he had a responsibility to pull over once he saw

9  the lights behind him.

10  Q.  I think another thing you mentioned was the so-called

11  lived-in look of Mr. Shaw's van.  Is that correct?

12  A.  Yes.

13  Q.  Was Trooper Schulte's reliance on that factor consistent

14  with nationally accepted police practices?

15  A.  No.

16  Q.  Why not?

17  A.  Lots of people have lived-in look cars.  I give you my own

18  example.  I have a Jeep.  I like to over-land, which is car

19  camping, and I have a --

20         MR. CHALMERS:  Once again, Your Honor, I hate to

21  interrupt, but I think we're testifying to national standards,

22  and not his arguments to the points, and particularly his

23  personal experiences, and I object to the answer and ask that

24  it be stricken, and confine his answers to national standards.

25         THE COURT:  He's allowed to explain the basis for his

1   opinion.  Go ahead.

2   BY MS. BRETT:

3   Q.   Thank you.  Chief, I think you were -- you were explaining

4   something about over-landing in your Jeep.

5   A.   Over-landing's just a term -- fancy term for car camping,

6   but it's -- I have a platform in the back of my Jeep, and

7   depending on where I'm going and the weather and all of those

8   things, I sleep in the back of my Jeep as I camp, and it's --

9   it's not fixed, but it's always there.  Lived-in look.  I give

10  another family example.  My son, 17 years old, his car

11  definitely looks lived in.  I mean, he has clothes all over it,

12  he has things all over it.  Those things alone, I -- I do not

13  -- are not supported by nationally accepted policing practices

14  as a basis for suspicion of criminal activity.

15  Q.   Another factor that you mentioned was Mr. Shaw's old

16  arrest.  Was that something that Trooper Schulte relied on?

17  A.   Yes.

18  Q.   Can you explain to the jury the relevance of an arrest

19  record in forming reasonable suspicion as it relates to

20  nationally accepted police practices?

21  A.   Yes.  As it relates to nationally accepted police

22  practices, you have to analyze how recent, how many arrests

23  there are.  The fact that there is a criminal history could be

24  absolutely relevant, but you have to consider how sort of time

25  and distance.  In this particular case, and in my analysis of

1    this case, the arrest was one arrest, and it was over eight

2    years old.

3    Q.   So in your opinion, was it consistent with nationally

4    accepted police practices for Trooper Schulte to rely on that

5    arrest in forming reasonable suspicion?

6    A.   No, it was not.

7    Q.   I think you also mentioned the nervousness of the Shaw's,

8    is that correct?

9    A.   I did.

10   Q.   Can you explain what you meant by that?

11   A.   That Mr. Blaine Shaw was nervous, and that's a normal

12   reaction to being pulled over by the police; happens to me

13   still, happens to most people.

14   Q.   Under what circumstances would it be consistent with

15   nationally accepted police practices to rely on a driver's

16   nervousness in forming reasonable suspicion?

17   A.   Extreme nervousness, such as sweating profusely, shaking,

18   other abnormal indications, but what I observed on the video

19   was not that.

20   Q.   So just to be clear, were the circumstances present here as

21   far as what you could observe?

22   A.   They were not.

23   Q.   And what about the behavior of Sam Shaw, the passenger?

24   What does nationally accepted police practices tell you about

25   the suspiciousness of Mr. Sam Shaw's behavior?

1    A.   Mr. Sam Shaw wasn't addressed.  He wasn't asked any

2    questions.  He didn't volunteer any information.  He -- as far

3    as I'm concerned, he -- he was a model passenger in the car.  I

4    think that his activities aren't consistent with criminal

5    indicators in terms of nationally accepted police practices.

6    He was just sitting there, and it's not that he refused to

7    answer questions.  He wasn't asked any questions.

8    Q.   I believe you also mentioned several things regarding the

9    Shaw's travel plans.  Is that correct?

10   A.   Yes.

11   Q.   Under nationally accepted police practices, what might make

12   an officer suspicious about a driver's travel plans?

13   A.   If -- if a travel plan doesn't make sense, and I'll give

14   you an example.  If I am in Oklahoma, and I'm -- or I'm sorry,

15   if I'm -- yeah, if I'm in Oklahoma and I'm going to Kansas, but

16   I'm stopped in South Carolina, that could raise some

17   suspicions.  That just does not make sense in terms of the

18   route itself.  So I think that while it can be considered in my

19   analysis of this case, it was not consistent with nationally

20   accepted practices in terms of travel plans and the travel plan

21   given being an indicator of criminal activity.

22   Q.   Was there anything about the travel route that didn't make

23   sense, I think is the phrase that you used, such that it would

24   make it suspicious under nationally accepted police practices?

25   A.   No, the route was very direct.

1   Q.   You mentioned also Mr. Shaw driving a car registered to his

2   father, is that correct?

3   A.   Yes.

4   Q.   In what circumstances might a driver driving a car

5   registered to somebody else make that driver suspicious under

6   nationally accepted police practices?

7   A.   None stand alone.  There would have to be other indicators.

8   Q.   Can you give me some examples of third party drivers, I'll

9   call it, that -- that would rise to suspicion under nationally

10  accepted police practices?

11  A.   I imagine in the case of cars that aren't explainable as to

12  why they're driving the car, but in this case and the evidence

13  that I reviewed, he was driving his father's car, and it was --

14  and he stated that he was on the insurance, and handed that

15  insurance over to Trooper Schulte.

16  Q.   So was it within nationally accepted practices for Trooper

17  Schulte to rely on that factor in forming reasonable suspicion?

18  A.   No, that factor was explained.  It was an innocent factor.

19  Q.   Under those nationally accepted practices that we've been

20  discussing, what should a trooper do if they're provided an

21  explanation of certain things that they found suspicious?

22  A.   Law enforcement officers have the responsibility of

23  building reasonable suspicion, but as they gain information,

24  you either add to it, make it stronger or deduct.  If

25  something -- you've come across some information that makes it

1    an innocent indicator, then that indicator is -- should not be

2    considered in their analysis and in building the facts

3    necessary to detain.

4    Q.   In your opinion, were there any circumstances present in

5    this stop where that should have occurred?

6    A.   No.

7    Q.   Were there any circumstances in this stop where the

8    suspicion that Trooper Schulte had been building should have

9    been reduced?

10   A.   Yes.

11   Q.   What were those circumstances?

12   A.   The amount of time that it took for Mr. Shaw to pull over,

13   he explained that.  The fact that he was driving his father's

14   car, he explained that.  The criminal record being eight years

15   old.  Trooper Schulte had that information.

16   Q.   Under accepted practices, do troopers have to ask for

17   clarification or an explanation on everything that they find

18   suspicious about a driver?

19   A.   No.

20   Q.   But what should they do if information is offered in that

21   regard?

22   A.   It should be considered in their entire analysis, and in

23   building their facts to support their action.

24   Q.   I wanted to move now to talk specifically about one moment

25   in the interaction between Trooper Schulte and Mr. Shaw.  What

1  happened after Trooper Schulte returned Mr. Shaw's license and

2  insurance?

3  A.   He stated, have a good day or drive safely, and then he

4  turned, and started walking back toward his car, took about two

5  or three steps, roughly, two, three seconds, and then sharply

6  turned back around and re-approached the driver's side window

7  area.

8  Q.   And was that move consistent with nationally accepted

9  police practice?

10      MR. CHALMERS:  Your Honor, I think this is a

11  non-issue, isn't it, based on the conversations that we've had

12  as to whether or not there was some sort of illegitimacy about

13  asking for consent in that short, what is it, three or four

14  second conversation after the plaintiff said, sure, I'll talk

15  to you, I don't think it's relevant, and I object.

16      MS. BRETT:  I think it is plainly relevant 'cause it's

17  a part of Trooper Schulte's entire conduct during this stop,

18  and I think having Chief Aden testify about whether that move

19  and that conduct was part of nationally accepted police

20  practice is plainly relevant to this case.

21      THE COURT:  Agreed.

22  BY MS. BRETT:

23  Q.   Do you want me to repeat the question, Chief?

24  A.   Yes, please.

25  Q.   That move that you just described, was that consistent with

1  nationally accepted police practice?

2  A.   No.

3  Q.   Why not?

4  A.   The speed of that move is when he told Mr. Shaw, have a

5  good day, drive safely, or have a safe trip, drive safely, and

6  turned around, and started to walk back, that gave the

7  appearance that he was in fact free to leave, but Mr. Schulte

8  -- or Mr. Shaw never had that opportunity.  By the time the

9  trooper turned back around and was back at the window asking

10  him questions, you can see in Mr. Shaw's video that he's --

11  he's still holding the summons, he hasn't prepared to drive

12  off, and at that moment, he's not free to leave because the

13  trooper is asking him questions.  He's in his way.  If he were

14  to leave, he would risk harming the trooper, so no, he was --

15  he was not free to leave at that moment, and that is not

16  consistent with nationally accepted policing practices.

17  Q.   What happens after Trooper Schulte asks for consent to

18  search the car?

19  A.   Consent is denied, explicitly with a reason by Mr. Shaw.

20  Q.   Is it consistent with nationally accepted police practices

21  to rely on a consent refusal to justify a canine sniff?

22  A.   No, it is not.

23  Q.   Zooming out a bit and sort of putting these different

24  pieces together, as a whole, was Trooper Schulte's detention of

25  Mr. Shaw consistent with nationally accepted police practices?

1   A.   No, it was not.

2   Q.   Was his reliance on the set of indicators that he claims to

3   have relied on consistent with nationally accepted police

4   practices?

5   A.   No.

6   Q.   What was your initial reaction to seeing Trooper Schulte's

7   dash cam video in this case?

8           MR. CHALMERS:  Your Honor, I don't know how this is a

9   proper question given the responses that might be asked, but --

10  or answer, or provided, rather, and it doesn't seem to have

11  anything to do with whether there is nationally accepted police

12  practices that have been violated or not.

13          THE COURT:  Umm, why don't you rephrase your question

14  to tie it in more carefully with nationally accepted police

15  practices.

16          MS. BRETT:  Sure, Your Honor.

17  BY MS. BRETT:

18  Q.   Was there anything that stood out to you in watching the

19  video of the stop that in regard to nationally accepted police

20  practices?

21  A.   In watching the video, as it progressed, I observed a clear

22  point where the traffic encounter should have ended but it did

23  not, and a detention was started.

24  Q.   And I think I asked you this before, Chief, but you've been

25  sitting in the courtroom for the entirety of this trial,

1   correct?

2   A.  Yes, ma'am.

3   Q.  Have any of your opinions that you formed about this case

4   changed at all based on what you've heard at trial so far?

5   A.  No, they've actually been reinforced.

6   Q.  Okay.

7           MS. BRETT:  I'll pass the witness, Your Honor.

8           THE COURT:  Cross-examination.  Yes, ready for a

9   break?  Yes, let's take a break.  That's a great idea.  Thank

10  you.  We'll take a break until 3 o'clock.  Court's in recess.

11  (Whereupon court took a recess.  Proceedings then continued

12  as follows:)

13          THE COURT:  Go ahead, Mr. Chalmers.

14          MR. CHALMERS:  Thank you, Your Honor.

15                  CROSS EXAMINATION

16  BY MR. CHALMERS:

17  Q.  Mr. Hayden (sic), the business that you're now principally

18  engaged in is Hayden Group, LLC (sic), is that correct?

19  A.  Yes, sir.

20  Q.  And that's an organization that you started I think when

21  you kind of left law enforcement in 2015, is that right?

22  A.  2016 when I left the International Association of Chiefs of

23  Police.

24  Q.  Okay.  Now, the Hayden Group (sic) has a web site, does it

25  not?

1  A.  It does.

2  Q.  And the web site, it kind of advertises or at least

3  explains what your company does, is that correct?

4  A.  Yes, but it is the Aden Group.  There's no H.

5  Q.  Thank you.  Aden.  I am always mispronouncing names.  I'll

6  try not to make the mistake twice.  The Aden Group is located

7  in Alexandria, I think you indicated, Virginia, is that right?

8  A.  Yes, sir.

9  Q.  And according to your web site, it specializes in public

10  safety, and provide criminal justice reforms that focus on

11  community inclusion and empowerment.  We help our clients work

12  through complex issues pertaining to community and police

13  relations, staffing, deployment assessments, policy analysis,

14  accreditation preparation and management studies, to name a

15  few.  Is that a fair description of your organization as it's

16  contained in your web site?

17  A.  To name a few, yes.

18  Q.  Now, with respect to your web site, is it also fair to say

19  that it doesn't talk about how you are an expert on national

20  police practices as they relate to traffic stops?

21  A.  It does not explicitly.  It has my bio.

22  Q.  Now, it also talks about the areas of practice of your

23  business.  One of them is public safety management studies, and

24  that's that you provide actual management studies that are

25  focused on helping your organization resolve complex issues,

1  facing all progressive public safety organizations.  We

2  understand the real world issues facing the field, and provide

3  realistic options for resolutions.  So that's one of your areas

4  of expertise that you provide through your company, is that

5  correct?

6  A.  Yes.

7  Q.  Another is community engagement, and I could read that, but

8  community engagement, that really wouldn't have anything to do

9  with national police standards as they relate to how to conduct

10  a traffic stop, or for that matter, how to be involved in the

11  interdiction, is that correct?

12  A.  Community engagement is what it -- what it states.

13  Q.  All right.  Well, it says it takes many forms, and we can

14  help you sort through the options, and -- created explicitly

15  based on your community and unique circumstances.  We're not

16  talking about engaging in the community, isn't that right, with

17  police?

18  A.  I'm sorry, could you state that again?

19  Q.  Okay.  Well, I'll read it.  It says, there's never been a

20  more critical need for community engagement strategies than in

21  today's world of policing.  It takes many forms, and we can

22  help you sort through the options created explicitly for you

23  based on your community and unique circumstances.  Now, that --

24  that area of practice is not related to national police

25  standards as to how to conduct a traffic stop, or for that

1    matter, how to be involved in any interdiction process.  Isn't

2    that right?

3    A.   It -- it can be.  If the issues that the community is

4    facing pertain to over-policing, it -- it could go into areas

5    that are enforcement areas.

6    Q.   It could, but it doesn't.  Isn't that right?

7    A.   I have worked with communities on issues pertaining to

8    enforcement, and that can take the forms of traffic stops,

9    over-focusing with low level criminal enforcement, those kinds

10   of things, so...

11   Q.   Okay.

12   A.   It definitely could.

13   Q.   It could, but it hasn't as it relates to traffic stops and

14   interdictions, isn't that right?

15        MS. BRETT:  Objection, Your Honor.  I think this has

16   been asked and answered.

17        THE COURT:  Sustained.

18   BY MR. CHALMERS:

19   Q.   Well, another area of practice is policy and strategic

20   planning.  Says, we are leaders in innovative practice

21   involving community and policy development and strategic

22   planning.  We have designed and implemented, facilitated

23   sessions aimed at creating policies, including de-escalation

24   and use of force policies that give the community a voice and a

25   meaningful role in how they are policed.  Strategic planning

1   sessions are equally as powerful in sharing the creation of

2   your community's public safety program.  Again, policies and

3   strategic planning does not get down to the granular level of

4   how to conduct a traffic stop, or for that matter, how to and

5   what you do in connection with interdiction, does it?

6   A.   Actually, if I may answer this fully, the strategic plan,

7   the community strategic planning that's referred to was a model

8   that we established in Greenville, North Carolina where many

9   community members voiced -- when I arrived -- in community

10  meetings, voiced their displeasure with disproportionate

11  traffic enforcement and stops in minority communities.  So I

12  brought them in.  We worked together for three days, and

13  actually drafted a -- a community strategic plan that we

14  implemented in Greenville, and what we -- what came out of that

15  plan was we heard the community, and we decided that our

16  traffic enforcement would now from that moment on be based on

17  the data.  So what I mandated in my agency was to -- for

18  traffic enforcement units and patrol units, they could set up

19  radar and speed enforcement and other enforcement in areas that

20  were supported by data through accidents or citizen complaints

21  of speeding, not what might have been known as a fishing hole

22  or some other areas.  So it directly went to traffic

23  enforcement, and it changed our policies, and so this is a

24  model that I'm actually working with now a major city that is

25  engaged in the community on their particular issues with the

1   help of the Aden Group and some of my affiliates.

2   Q.   And the traffic stops, the concern that you've just

3   described has to do with disproportionate stops of certain

4   minority communities, is that right?

5   A.   That's the example, but it could be anything that a

6   community is experiencing is what I'm trying to convey.

7   Q.   And I appreciate that.  But what I want to talk about is

8   what you've done, and it's dealt with as it relates to traffic

9   stops, your concerns about disproportionate stops of

10  minorities, is that right?

11  A.   In the example that I gave you, yes.

12  Q.   Crisis communication strategies is another topic.  It's --

13  how public safety organizations communicate with the public

14  they serve is of critical importance.  Is crisis communication

15  strategy something that is addressed as national police

16  practices for traffic stops or interdictions?

17  A.   Not directly.

18  Q.   Independent police monitoring, says the Aden Group is one

19  of the leaders in the area of independent police monitoring.

20  Our consultants work or have worked on virtually every

21  police-related consent decree in the country, and then you list

22  several.  And you've talked about that with counsel in terms of

23  how you've acted as a monitor for the court when folks have

24  gotten together and reached an agreement that there should be a

25  monitor, and then make sure that they're complying with their

1   agreement.  Is that right?

2   A.   I described the consent decree process to make sure that

3   they're complying with the court's order.

4   Q.   And what I -- what I didn't hear, I suppose, when you were

5   describing the various consent decrees is that any of them

6   related specifically to allegations of a practice or policy

7   that needed to be monitoring of detaining people without

8   reasonable suspicion?

9   A.   Every one of 'em has a component that is related to stops,

10  searches, and arrests, and the legal parameters and the rules

11  around those stops, searches, and seizures, every single one.

12  Q.   That's helpful, and appreciate that, but I'm interested in

13  whether or not any of the consent decrees had as an element a

14  pattern or practice of issues with violations of -- of -- well,

15  of holding people without reasonable suspicion, or if they had

16  other issues?

17  A.   Yes.

18  Q.   And the other issues principally were misuse of force,

19  weren't they?

20  A.   No, there were issues relating to stops, reasonable

21  suspicion, probable cause, use of force.

22  Q.   Okay.

23  A.   Everything you just mentioned, sir.

24  Q.   Okay.  I'm sorry.  Did the Cleveland -- the Cleveland

25  situation, that included that as well, I assume, didn't it?

1   A.   Yes.

2   Q.   Now, if I have my numbers correct, you started working in

3   the -- with -- as a police officer in 1987, is that right?

4   A.   Yes, sir.

5   Q.   And you started looking at this case in the year 2000, is

6   that right?

7   A.   That's not correct, sir.

8   Q.   I said 2000.  2020, is that right?

9   A.   The fall of 2020, yes, sir.

10  Q.   Okay.  Thank you.  And so let's see, it had been about

11  33 years after you were last -- or when you first joined the

12  police force that you started looking into this case, is that

13  right?

14  A.   Approximately, yes.

15  Q.   Then you work as a street officer.  When you last worked as

16  a street officer, it looks like, and I'm unclear from what you

17  said, was that 1992?

18  A.   1990 as a patrol officer.

19  Q.   Okay.  I thought -- and you were a street level narcotics

20  unit, though, through '92, is that correct?

21  A.   That's not a street level officer.  That's an investigator,

22  sir.

23  Q.   So 1990, you were a street level patrol officer, and then

24  as a sergeant, I think did you go back and have some actual

25  patrol duties?

1  A.  I did, in 2001.

2  Q.  Okay.  And so for the year 2001, is that the last time in

3  your employment that you actually had parole -- or patrol

4  duties?

5  A.  No, I oversaw patrol years later also.

6  Q.  Okay.  I appreciate.  When you're actually out on the

7  street conducting the patrol, making the stops, that would have

8  been last in 2001?

9  A.  2001 as part of my direct duties as a commander, as a

10 captain, even as a deputy chief.  To be a good leader and to be

11 trusted by your officers, you need to be out on the street, so

12 I would go out on patrol and be very, very visible.

13 Q.  Okay.

14 A.  That was not my primary duty.

15 Q.  Okay.  So you were making actual stops all the time through

16 that you were a commander with the police force in Alexandria.

17 Is that your testimony?

18 A.  No, I generally would be out on the street, I would engage

19 in conducting backups if officers were doing traffic stops.

20 That was an important factor of leadership.  I would back them

21 up on calls, and just be generally seen and visible outside of

22 the office.

23 Q.  Okay.  Maybe we get at it this way.  You've heard the term

24 interdiction before, haven't you?

25 A.  I have.

1  Q.  When's the last time that you actually were the patrol

2  officer that was doing the interdiction process?

3  A.  Probably 1990 as a patrol officer.  The street crimes unit,

4  we did interdiction, that was a street level, so up to '92;

5  1992.

6  Q.  So again, as between the time you got this case before you

7  and the last time that you did interdiction on a personal

8  level, it would be approximately, what, 28 years ago, or

9  28 years in difference?

10  A.  Number of years, yes.

11  Q.  Yeah.  Now, you -- you gave a resume that listed your

12  various accomplishments along with a report in this case, did

13  you not?

14  A.  I did.

15  Q.  And in this resume, you list your time with the Alexandria

16  police force of August '87 to November 2012, and then the

17  sub-parts that you described in greater detail have to do when

18  you were first a police captain, and then ultimately, the

19  commanding police officer.  Is that how your resume reads?

20  A.  That's correct.

21  Q.  Now, in looking at the resume, and I can show it to you if

22  you don't remember it, there is no reference to teaching

23  national police practices to -- well, to national police

24  practices at all as part of your functions as either the

25  commanding officer or any of the police captains' positions.

1    Is that accurate?

2    A.   That's accurate.  That was when I was at the International

3    Association of Chiefs of Police.

4    Q.   Now, when you were with the International Association of

5    Chiefs of Police, I'm guessing that you didn't have any on the

6    ground traffic stops where you were performing interdictions,

7    is that correct?

8    A.   Absolutely correct.

9    Q.   There are organizations that teach and educate on law

10   enforcement interdiction, are there not?

11   A.   There are.

12   Q.   One of them's the highway interdiction training specialist.

13   Have you heard of them?

14   A.   No.  There are many.

15   Q.   Another is the International Narcotics Interdiction

16   Association.  Have you heard of it?

17   A.   Not specifically.  Again, there are many.

18   Q.   Desert snow training program, have you heard of that?

19   A.   No.

20   Q.   National Criminal Enforcement Association, have you heard

21   of that?

22   A.   No.

23   Q.   There are state and local organizations; the drug

24   interdiction assistance program, have you heard of that?

25   A.   No.

1   Q.  There's the El Paso Intelligence Center, I think EPIC

2  sometimes it's called.  Have you heard of that?

3   A.  I've heard of EPIC.

4   Q.  Have you -- are you a member of EPIC?

5   A.  I am not.

6   Q.  Have you taught -- well, you haven't taught to EPIC

7  interdiction or police practices, have you?

8   A.  No.

9   Q.  The domestic highway enforcement program, I think that's a

10  federal program, have you been involved in that program?

11   A.  No, I have not.

12   Q.  Homeland Security Investigations has programs where it

13  teaches on interdiction.  Have you had any involvement in that

14  program?

15   A.  I have not had involvement with HSI.

16   Q.  The national bulk cash smuggling center, have you had

17  involvement in that program?

18   A.  No, sir.

19   Q.  And I know you were with the DEA, or had some relationship

20  with the DEA for a period of time, I think three years in 1995,

21  is that right?

22   A.  That is not correct.

23   Q.  Or to 1995?

24   A.  No, sir.  I was trained by the United States Drug

25  Enforcement Administration when I was a narcotics detective in

1  major crimes.

2  Q.  Okay.  In major crimes.  Now, we've gone through these

3  organizations.  Is it also fair to say that you've not

4  participated as a trainer, or actually as someone who's

5  attended any local training on interdictions through the

6  criminal interdiction role patrol tactics, Kansas Law

7  Enforcement Training Center?

8  A.  I have never been to the Kansas Law Enforcement Training

9  Center, no.

10 Q.  Have you either acted as an instructor or -- or acted as

11 someone who is a trainer, or as someone who's been trained on

12 interdiction in the state of Kansas?

13 A.  No, sir.

14 Q.  You don't happen to remember right now the last time that

15 you actually detained a motorist based on reasonable suspicion,

16 do you?

17 A.  No, sir, I don't recall.  It's been a number of years.

18 Q.  Fair to say it probably would have been at the -- at the

19 latest -- or most recent, sometime in 1992?

20 A.  I don't recall.

21 Q.  Okay.  But before then, in any event?

22 A.  I'm sorry, sir?

23 Q.  Before then, in any event, before '92 would have been the

24 last time you did it?

25 A.  I don't recall when the last time is.  It could be after

1    '92, it could be before.

2    Q.   Do you remember the last time you called for a narcotics

3    canine sniff of a detained motor vehicle?

4    A.   Definitely before 2001.

5    Q.   You talking about the Cleveland -- well, let me -- before I

6    get to that, let me ask you a few things about your national

7    policy.  I think that you said that the national police

8    practices to which you've testified to are not written

9    anywhere, is that right?

10   A.   Not all of them, no.

11   Q.   Okay.  So when we've talked about these standards that --

12   that Officer Schulte is said to have violated, where would he

13   have looked to know what those practices and standards are?

14   A.   I mean, preferably at the Kansas Highway Patrol policies,

15   but in terms of national, nationally accepted police practices,

16   there are policies in the National Law Enforcement Policy

17   Center at the IACP that deals directly with the issues in this

18   case.

19   Q.   Now, it's fair to say that those policies are not so

20   detailed and granular that they address the specifics of the

21   things that Officer Schulte identified as reasonable suspicion,

22   isn't that true?

23   A.   That's correct.

24   Q.   With respect to Kansas, tell me about your experience with

25   Kansas.

1   A.   In terms of?

2   Q.   How many times you been to Kansas?

3   A.   This would be my third time.

4   Q.   How many times you been on I-70?

5   A.   I don't know if I was on I-70 when I came to the courthouse

6   or -- but I don't recall ever being on I-70.

7   Q.   You might have been.  You been on I-70 going out towards

8   Colorado, say around Hayes?

9   A.   No.

10  Q.   Never been to Hayes?

11  A.   I've never been to Hayes, no.

12  Q.   Have you ever been to Wichita?

13  A.   No.

14  Q.   Ever been on I-35?

15  A.   In Texas.

16  Q.   Been on I-35 in Kansas?

17  A.   Not unless I went on it, not that I know of.

18  Q.   Are you familiar with the pockets of where there have been

19  issues with people making meth in Kansas, where those are?

20  A.   No.

21  Q.   There's a -- if -- I had mentioned that Cleveland matter

22  for a moment, rather.  Let's see.  You resigned as a monitor

23  from the Cleveland program, what, October 16th this last year,

24  is that right?

25  A.   I did.  I'd served there for five years, and decided that I

1    needed to move on.

2    Q.  And well, actually, there were complaints about you.  They

3    felt that your tenure was marked with slow, high cost progress

4    and internal strife, and many people who called for your

5    resignation?

6         THE COURT:  Excuse me, is this a question or are you

7    testifying?

8         MR. CHALMERS:  Well, I was going to ask him if it was

9    true, so...

10        THE COURT:  Why don't you ask him if it was true.

11   BY MR. CHALMERS:

12   Q.  Okay.  Is it true --

13        THE COURT:  Okay, plaintiff's counsel has an

14   objection.

15        MS. BRETT:  I'd like to lodge an objection here.  This

16   is pure hearsay.

17        THE COURT:  Well, depending on how the witness

18   answers, we're not going to put in extrinsic evidence, so it's

19   not coming in further.  So you can ask your question and then

20   move on.

21   BY MR. CHALMERS:

22   Q.  Sure, thanks.  And I don't know if it's a big deal, but is

23   it true that your tenure had been -- that there had been

24   complaints called in, calling for your resignation on the basis

25   that your tenure had been marked with slow and high cost

1  progress, and internal strife?

2  A.  Is it true that there were calls for my resignation?

3  Q.  Yes.

4  A.  There were calls for my resignation, yes.

5  Q.  With respect to the Cleveland program, there were -- there

6  were policies on investigative stops that were developed while

7  you were the monitor, is that correct?

8  A.  I would need to see the policy and the date.

9  Q.  It's kind of marked up, but I can show you the first page

10  if it would help you refresh your recollection.

11          MR. CHALMERS:  If I may approach the witness, Your

12  Honor?

13          THE COURT:  Tell me where we're going with this.

14          MS. BRETT:  Thank you, Your Honor.  I was going to

15  object for lack of foundation and relevance.

16          THE COURT:  Okay.  You can show it to him if you want,

17  but don't ask any questions until you explain where we're going

18  with this.

19          MR. CHALMERS:  Okay.  Let me show it to him, then I'll

20  do that.

21          MS. BRETT:  And Your Honor, we'd also like a copy.  I

22  believed -- if it was going to be used with the witness, I

23  believe it was to be turned over.

24          THE COURT:  So you haven't seen a copy of this?

25          MS. BRETT:  I have not, Your Honor.

1          THE COURT:  Okay.  Well, put it away then.

2          MR. CHALMERS:  I'm not -- I think I heard you say put

3     it away, Your Honor.  I'm using this potentially as

4     impeachment.  I don't know that I have to produce a copy of it,

5     do I?

6          THE COURT:  Look at the order.

7          MR. CHALMERS:  Pardon?

8          THE COURT:  Pull out the order.  Plaintiff's counsel,

9     is this -- tell me what the -- here, let me look at it.  I

10    can't -- I can't tell what this is.

11         MR. CHALMERS:  I'm sorry?

12         THE COURT:  I said I can't tell what this is.

13         MR. CHALMERS:  I was going to hopefully ask some

14    questions to lay the foundation for that, and then --

15         THE COURT:  Are you the author of this document?

16         THE WITNESS:  I'm not, Your Honor.

17         THE COURT:  Okay.  So how would this be impeachment?

18         MR. CHALMERS:  Well, I thought I was going to ask him

19    whether or not he approved it as the monitor, but -- in the

20    program where he's talked about these investigative stops.

21         THE COURT:  Umm -- okay.

22         MR. CHALMERS:  I'm happy to say -- if he's not the

23    author of it, I'm happy to just establish that and move on.

24         THE COURT:  All right.

25         MR. CHALMERS:  Or that he doesn't have any

1  involvement, more accurately.

2       THE COURT:  Okay.  I don't -- having involvement

3  doesn't necessarily make that impeachment material.

4       MR. CHALMERS:  I agree.

5       THE COURT:  Okay.

6       MR. CHALMERS:  I agree.

7  BY MR. CHALMERS:

8  Q.  What I would like to get at, I guess, is, is that with

9  respect to the policy that I've shown you, as a monitor, did

10  you have -- as a supervisor of the other folks, did you have

11  any input and control over the Cleveland division police

12  policies that they generated with respect to investigative

13  stops?

14  A.  With some policies.  That policy is dated April of 2019.  I

15  wasn't appointed monitor until July of 2019.

16  Q.  Okay.  The -- the national standards that you talked about,

17  do you agree under these national standards that an officer is

18  allowed to draw on their own experience and specialized

19  training to make inferences from and deductions about the

20  cumulative information available to them that might well elude

21  an untrained person?

22  A.  Nationally accepted police practices is the term that I

23  used, not standard.

24  Q.  Okay.

25  A.  Umm, I do.

1  Q.  Do you agree that under the nationally accepted police

2  practices, that to satisfy the reasonable suspicion standard,

3  an officer need not rule out the possibility of innocent

4  conduct, or even have evidence suggesting the fair probability

5  of criminal activity?

6  A.  I do.

7  Q.  And then under your standards, do you agree that they --

8  that officers are not obligated to further investigate or

9  accept a suspect's versions of the facts or claim of innocence

10  if they otherwise have reasonable suspicion to detain based on

11  credible information known to them?

12  A.  Could you restate that please?

13  Q.  I can.

14        MS. BRETT:  Your Honor, can we approach for a moment?

15        THE COURT:  Uh-huh.

16    (Proceedings held at the bench, outside the hearing of open

17  court.)

18        MS. BRETT:  It appears at this point that counsel is

19  just reading from one of his legal briefs to the witness.  I

20  don't think this is a proper line of questioning, especially if

21  he's not allowed to testify on the ultimate issues involved in

22  this case.

23        THE COURT:  Right.  I mean, like, I was listening to

24  you, and I'm thinking, you're doing exactly what you didn't

25  want them to do.

1         MR. CHALMERS:  I've got testimony saying that there's

2    a violation of this national practice, and I've got testimony

3    saying that they're not really all in writing, and I ought to

4    be able to identify what it is the national practice that he

5    just said is a violation, and yeah, I'm reading from the law.

6         THE COURT:  I know you're just reading legal

7    platitudes from Fourth Amendment cases into the record and

8    asking him if he agrees, which is what I said they do not do,

9    and you can't do it either.  Go ahead.

10        MR. CHALMERS:  I'm trying to define what it is that he

11   claims is a national practice which he says he's violated.

12        THE COURT:  Did you hear his direct examination?

13        MR. CHALMERS:  I did.

14        THE COURT:  Okay.  So why don't you ask him -- if you

15   have confusion about what he said, ask him about his testimony,

16   ask him to clarify, but you're not going to just read in these

17   legal citations.

18        MR. CHALMERS:  Your Honor, I would proffer testimony

19   as to citations, or as under topics I've talked about, also on

20   the idea that someone -- that a police officer does not need to

21   accept as truthful, necessarily, the -- well, I would have

22   to -- I'll read it into the evidence when we're on a break.

23        THE COURT:  You all ready covered that.  He all ready

24   answered.

25        MR. CHALMERS:  Well, I've got others, and I can

1  establish that at a break, I guess.  I can proffer that

2  evidence.

3       THE COURT:  Okay.  It won't make any difference to the

4  extent that you're just doing more of the same, okay?

5       MR. CHALMERS:  I'm not suggesting it's going to change

6  your mind, Your Honor.  I'm just trying to make a record.

7       THE COURT:  Okay.

8  (Proceedings continued in open court.)

9  BY MR. CHALMERS:

10 Q.  I'm not sure where we broke off, but let me see if I can't

11 get back to a couple things.  Under the national standards that

12 you have identified, talk about a standard that might apply to

13 whether it is -- reasonable suspicion can arise if someone

14 doesn't pull over, over time.  Is that one of the standards

15 that is in writing?

16 A.  No.

17 Q.  And if I understood your testimony that if someone doesn't

18 pull over in time or promptly, that can be a basis for

19 reasonable suspicion that some sort of criminal activity is

20 a-foot if there is a clear signal to the person to pull over?

21 A.  It can be.

22 Q.  And in this instance, of course, there was -- the trooper

23 followed this vehicle with his lights on for approximately a

24 minute, maybe a mile before the vehicle pulled over.  You saw

25 that?

1   A.   I did.

2   Q.   And the lived-in look that you talked about where you said,

3   look, you do -- what did you call it, not car camping, but

4   something else?  Plate-form?  I'm -- I'm --

5   A.   Is that a question?

6   Q.   Yeah, I'm trying to remember what it was you testified to.

7   What did you call it?

8   A.   Over-landing.

9   Q.   Over-landing.  Okay.  And the national standard as you

10  related to your over-landing, is that something that's in

11  writing?

12  A.   I don't understand your question, sir.

13  Q.   Is the national standard that you said -- would say that

14  you should not consider the over-landing sort of look as part

15  of reasonable suspicion, is that in writing somewhere?

16       MS. BRETT:  Objection, Your Honor.  I think that

17  mischaracterizes the testimony that the witness gave earlier.

18       THE COURT:  Umm, if you need to correct any

19  misunderstanding about your testimony, please feel free.

20       THE WITNESS:  Can you ask that again?  I am -- I am

21  not understanding what you're asking.

22  BY MR. CHALMERS:

23  Q.   That's all right.  You've testified about the lived-in

24  look, or at least Trooper Schulte's view that there was a

25  lived-in look, and you say, look, that doesn't amount to a

1   reasonable suspicion.  That's a fair summary of what you said,

2   isn't it?

3   A.   In this particular case?

4   Q.   Yeah.  And then what I was trying to get at is whether or

5   not this national police policy that you have identified on

6   this particular point, is that something that's in writing?

7   A.   On the lived-in look?

8   Q.   Yes.

9   A.   It is not.

10  Q.   Now, I don't hear you saying, and maybe I'm wrong, but if

11  the vehicle has an appearance that someone is making a short

12  turnaround trip, doesn't want to stop, isn't that something

13  that trooper's experience would indicate is potentially

14  associated with narcotic traffickers?

15  A.   I'm not a trooper, but the rules and the factors needed to

16  indicate criminal activity would support short trips and

17  equipment in the car, but not as a stand alone, not if that's

18  all that's in there.

19  Q.   Okay.  So -- and under the national policies that you've

20  talked about, it's not a stand alone question, is it?  It's the

21  whole everything combined in the totality, isn't it?

22  A.   It's all of the factors.

23  Q.   Now, then, there was information about an arrest.  I wrote

24  down arrest warrant.  Was it your understanding that the report

25  was an arrest warrant as it concerned -- I may have written

1    that down incorrectly.  What was your understanding as to what

2    the testimony was for reasonable -- for reasonable suspicion

3    based on criminal history?

4    A.   That the criminal history came back with an arrest for

5    possession with intent.

6    Q.   Now, I don't know if it's a big point, but do you remember

7    actually hearing it was an arrest as opposed to just history of

8    contraband, or of illegal contraband with the intent?

9    A.   I don't recall, but if it's in his criminal history, it

10   would have to be an arrest at a minimum.

11   Q.   And is there in your national police practices a written

12   statement as to how long it is that officers should look back

13   and consider a criminal history as it relates to narcotics in

14   your reasonable suspicions?

15   A.   No, not specifically.

16   Q.   And in terms of your experience in Kansas, and I'm guessing

17   you probably can't answer this, but in terms of your experience

18   in Kansas, what is it -- what have troopers found in terms of

19   how far it -- it makes sense to look back and consider criminal

20   history in the traffic stops they conduct?

21   A.   I don't have a basis of knowledge for that.

22   Q.   Is there any published study that you're aware that says,

23   look, you can look back three years, but not more, or anything

24   of that effect?

25   A.   No, not that I know of.

1  Q.  Certainly, criminal history is something -- that in your

2  national police policies is something that an officer can

3  consider in your assessment of reasonable suspicion, isn't that

4  correct?

5  A.  That is correct.

6  Q.  You mentioned that Sam Shaw appeared to be, I think you

7  said, a model passenger.  Is that your testimony?

8  A.  Yes.

9  Q.  What exactly was it about Sam Shaw's behavior that you view

10  as a model?

11  A.  Well, the descriptions that were provided even in testimony

12  were that he just sat there with his hands on his lap, looking

13  forward, and didn't engage Trooper Schulte, didn't engage

14  anyone.

15  Q.  And that's the extent of your memory of Trooper Schulte's

16  description of Sam Shaw's behavior that you've discounted as

17  not being consistent with national standards or national

18  practice, is that correct?

19  A.  National policing.

20  Q.  Okay.

21  A.  Nationally accepted policing practices; that's what I

22  recall.

23  Q.  And with respect to travel plans, I'm a little unclear.  Is

24  it your testimony that under national police practices, that

25  where someone is traveling, and where they have been traveling

1    from is nothing -- is never considered as part of the

2    reasonable suspicion analysis?

3    A.    That was not my testimony.

4    Q.    Okay.  So actually, their travel route can in right

5    circumstances be suspicious, is that right?

6    A.    It can.

7    Q.    Now, as of 2017, before we got involved in this case, were

8    you aware of what the status of -- of legality of the use of

9    marijuana was in Colorado?

10   A.    I believe that it was one of the first states where it was

11   legalized recreationally.  I don't recall exactly when.

12   Q.    Yeah.  Do you remember it first being allowed to have

13   medical marijuana?

14   A.    At some point, yes.

15   Q.    And you don't know whether or not that what affect the

16   legality of medical marijuana had on the flow of drugs coming

17   from and to, or drug money coming to Colorado after its

18   legalization, do you?

19   A.    No.

20   Q.    The travel plan discussion that you had with counsel in

21   this national police policy or practices, is that something

22   that's in writing?

23   A.    No.

24   Q.    Well, with respect to visiting with -- with the individuals

25   that are in the -- in the car, can we agree that under your

1  national police policy, that a trooper, as they are engaged

2  in an investigative stop or interdiction or whatever you want

3  to call it, ought to consider both information that is

4  suspicious of criminal activity, but also information that

5  would say, oh, no, it's not criminal?

6  A.  I'm sorry, could you restate that?  The visiting part I

7  didn't understand.

8  Q.  In your description of the national policy that you've been

9  talking -- or practice that you've been talking about, I think

10  what I heard was, is that a trooper needs to look not only at

11  what might be evidence of or information that would make them

12  suspect criminal activity, but they also have to consider

13  information that would say, oh, no, this isn't criminal.  They

14  have to look at it all?

15  A.  What I testified to is that if they have some factors that

16  they're considering that support criminal activity, if those

17  factors are dispelled, that those should be considered.

18  Q.  Okay.  And with respect to whether the factors are

19  dispelled or not, under your standard national practice,

20  troopers or law enforcement still have to use their own common

21  experience, training to decide whether the explanations

22  provided actually dispel their concern, isn't that right?

23  A.  Their experience plays into it.

24  Q.  Can we agree that Kansas law enforcement would have a

25  better understanding of the methods and practices of narcotic

1  transporters in and through Kansas than you would?

2  A.  I can agree that there are particular situations and

3  conditions in Kansas, but the rules are the same across the

4  country.

5  Q.  But in terms of how narcotics transport-- transporters

6  operate through Kansas, which I think is what I was trying to

7  ask you about, you'd agree that the highway patrol troopers in

8  Kansas, that law enforcement would have a better idea of those

9  modes of practice than would you, isn't that right?

10        MS. BRETT:  Objection, asked and answered.

11        THE COURT:  Sustained.

12  BY MR. CHALMERS:

13  Q.  Well, in what fashion are your knowledge of how narcotic

14  traffickers operate in Kansas and through Kansas superior to

15  those of Kansas law enforcement?

16  A.  They're not.  I described the rules.

17  Q.  Okay.  And in fact, they're not -- they're not even equal

18  to those of Kansas law enforcement officers, are they?

19        THE COURT:  What's not equal?

20        MR. CHALMERS:  Equal.

21        THE COURT:  The question's what's not -- I'm asking

22  you what -- you said what's not equal.  I'm saying, what?  What

23  is not equal?

24        MR. CHALMERS:  What the Kansas -- well, back it up.  I

25  think your testimony was that your understanding is not equal

1  to those of Kansas law enforcement, or of how narcotic

2  traffickers operate in Kansas, and I'm saying that, in fact,

3  they're not --

4          THE COURT:  You're not supposed to testify.  It

5  doesn't matter what you're saying.  Just ask the question.  The

6  counsel wants to object, so let's make a clean record.

7          MR. CHALMERS:  Okay.  Is it true that your experience

8  with respect to the methods and practices of narcotic

9  transporters in Kansas is not even nearly equal to those of

10  Kansas law enforcement officers?

11          THE WITNESS:  My testimony was about the rules that

12  apply in the United States as a whole.  I have never worked as

13  a law enforcement officer in Kansas.  I've never gone to a

14  Kansas police academy, so I -- it's -- it's not something that

15  I purport to be an expert in.

16          MR. CHALMERS:  Appreciate that.  I don't have any

17  further questions.

18          THE COURT:  Any redirect?

19                    RE-DIRECT EXAMINATION

20  BY MS. BRETT:

21  Q.   Thank you, Chief.  So we've been talking -- or we were

22  talking about nationally accepted police practices, correct?

23  A.   Yes.

24  Q.   We weren't talking about one specific policy, is that

25  right?

1   A.   That's correct.

2   Q.   Can you explain the basis for your opinion on what goes

3   into nationally accepted police practices, what makes up that

4   set of practices?

5   A.   The constitution, case law, model policies, studies,

6   publications, that's the bulk of it, and then my experience

7   working with police departments across the country.  That's

8   specialized to me.

9   Q.   You were asked a number of questions by counsel about the

10  last years that you were actually doing street level drug

11  interdiction work.  Do you remember those questions?

12  A.   Yes.

13  Q.   When was the last time you were supervising people doing

14  street level drug interdiction work?

15  A.   All the way up until I retired in -- when I left the

16  Greenville police department, so 2015.

17  Q.   Do you need to know how to properly do drug level or street

18  level drug interdiction work in order to supervise people who

19  are doing it?

20  A.   No, you need to know the law.

21  Q.   Do you want -- expect your officers to apply that law when

22  they go out to do that work?

23  A.   Absolutely.

24  Q.   Are you supervising them to make sure they are doing that

25  work in accordance with the law?

1  A.  Absolutely, yes.

2  Q.  When you left -- when you retired from active duty law

3  enforcement work, did you end your learning about police

4  practices at that point?

5  A.  No.

6  Q.  Did you continue to learn about appropriate law enforcement

7  practices through your other positions?

8  A.  Yes.

9  Q.  Do you apply that knowledge and that learning to your

10  analysis and your opinions in this case?

11  A.  Yes.

12  Q.  Is the standard for reasonable suspicion different for drug

13  interdiction officers than it is for any other police officers?

14  A.  No, it is not.

15  Q.  They both have to follow reasonable suspicion rules,

16  correct?

17  A.  Yes.

18  Q.  And those rules are the same, regardless of what law

19  enforcement agency you work for?

20  A.  Yes.

21  Q.  You told us about your time working in Virginia.  Do you

22  remember that conversation?

23  A.  Yes.

24  Q.  Do drugs get trafficked through Virginia?

25  A.  They do.

1  Q.  Do they get trafficked on the highways in Virginia?

2  A.  Everywhere in Virginia.

3  Q.  Do drugs get trafficked through North Carolina?

4  A.  Yes.

5  Q.  On the highways through North Carolina?

6  A.  Also everywhere, highways, streets.

7  Q.  Do people come to North Carolina to buy drugs?

8  A.  Yes.

9  Q.  Do people leave the state of North Carolina with drugs?

10  A.  Yes, they do.

11  Q.  Do people make drugs like methamphetamine, for example, in

12  North Carolina?

13  A.  Yes, they do.

14  Q.  Is there any reason to think that drug interdiction work is

15  unique or different in Kansas than in the other states in which

16  you've been a law enforcement officer?

17       MR. CHALMERS:  Lack of foundation, Your Honor.

18       MS. BRETT:  I'm asking if in his opinion, he has any

19  reason to believe that drug interdiction work is somehow

20  different in Kansas than it is in the other states where he

21  served as a law enforcement officer for 30 years.

22       MR. CHALMERS:  Lack of foundation, Your Honor.  He

23  said he didn't know anything about Kansas.

24       THE COURT:  So I think that's probably -- you can

25  answer this.  Objection is overruled.

1   BY MS. BRETT:

2   Q.   Do you want me to repeat the question?

3   A.   Yes, please.

4   Q.   Do you have any reason to think that drug interdiction work

5   is different in Kansas than in the other states where you

6   worked for -- as a law enforcement officer for 30 years?

7   A.   No, I don't.

8   Q.   When was the last time you reviewed another officer's

9   detention after a traffic stop to see if it complied with the

10  constitution, i.e. whether the officer had reasonable

11  suspicion?

12          MR. CHALMERS:  Your Honor, I don't -- we're now

13  talking about constitutional standards here.  I thought we were

14  supposed to be talking about national police practices, and I

15  object to the way the question's asked.

16          MS. BRETT:  The question was about the last time he

17  has reviewed other stops by other officers for compliance with

18  the constitution.  I did not ask him what his opinion on this

19  particular stop, and whether it complies with the constitution.

20  I think it's a perfectly reasonable line of inquiry given the

21  cross-examination about his -- the temporal distance between

22  when he served as a police officer and today.

23          MR. CHALMERS:  I think this court has said that he's

24  here to testify as to some national police standards, and not

25  constitutional standards.  So last time he's looked at it as to

1    whether it's constitutional or not is beyond what he's been

2    permitted to testify to, Your Honor, and I object to the

3    question.

4         THE COURT:  He testified, I believe, without objection

5    that part of what he did was review the legality of detentions

6    and interdictions by people he supervised, and I think it's

7    fair to ask him when he last did that, if that's what your

8    question is.

9         MS. BRETT:  It's not limited to the people he

10   supervised.  It's in all of his experience including as a

11   monitor, Your Honor.  So I'm not asking what evidence of a

12   violation found, or asking him to opine on any of those stuff.

13   I'm asking temporally, at any point in time, was the last time

14   you evaluated another officer's stop and detention of a

15   motorist after a traffic stop for compliance with the

16   constitution.

17        THE COURT:  Objection's overruled.  Go ahead.

18        THE WITNESS:  Approximately three months ago.

19   BY MS. BRETT:

20   Q.  Is that a regular part of your work as a monitor?

21   A.  Yes, it is.

22   Q.  You also were asked a question by counsel about your

23   understanding of the totality of the circumstances.  Do you

24   remember that?

25   A.  Yes.

1  Q.  For your analysis in this case, you considered the totality

2  of the circumstances, correct?

3  A.  I did.

4  Q.  You considered the totality of the circumstances that were

5  present in this particular stop, correct?

6  A.  Yes.

7  Q.  You didn't do an analysis of the totality of the

8  circumstances based on another set of hypothetical facts,

9  correct?

10  A.  That's correct.

11        MR. CHALMERS:  This has been asked and answered, Your

12  Honor.

13        THE COURT:  Honestly, I don't recall.

14        MR. CHALMERS:  I think he's all ready answered it.  I

15  withdraw my objection.

16        THE COURT:  All right.  Go ahead.

17  BY MS. BRETT:

18  Q.  And again, can you just remind us, what did you find about

19  the totality of the circumstances in this particular stop as it

20  relates to nationally accepted police practices?

21        MR. CHALMERS:  Been asked and answered, Your Honor.

22        MS. BRETT:  I'll withdraw the question.  Thank you,

23  Your Honor.

24        THE COURT:  Any further cross-examination?

25        MR. CHALMERS:  No, Your Honor.

1          THE COURT:  All right.  Can this witness be excused?

2          MR. CHALMERS:  He may from my perspective.

3          MS. BRETT:  From our perspective as well.  Thank you,

4    Your Honor.

5      (END OF HASSAN ADEN'S TESTIMONY.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        C E R T I F I C A T E

3

4

5        I, Nancy Moroney Wiss, a Certified Shorthand Reporter and

6    the regularly appointed, qualified and acting official reporter

7    of the United States District Court for the District of Kansas,

8    do hereby certify that as such official reporter, I was present

9    at and reported in machine shorthand the above and foregoing

10   proceedings.

11       I further certify that the foregoing transcript, consisting

12   of 84 typewritten pages, is a full, true, and correct

13   reproduction of my shorthand notes as reflected by this

14   transcript.

15       SIGNED March 1, 2023.

16

17                    S/_____

18                    Nancy Moroney Wiss, CSR, CM, FCRR

19

20

21

22

23

24

25

## CERTIFICATE OF DIGITAL SUBMISSION

 I hereby certify that a copy of the foregoing APPELLANT'S APPENDIX, as submitted in digital form is an exact copy of the document filed with the Clerk.

## CERTIFICATE OF SERVICE

 I hereby certify that on April 24, 2024, the foregoing APPELLANT'S APPENDIX was electronically filed with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I also certify that within five business days of the issuance of notice that the electronic filing is compliant, one paper copy will be delivered by Federal Express to the Clerk's Office.


DATED: April 24, 2024      /s/ Kurtis K. Wiard