IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

BLAINE FRANKLIN SHAW, et al.,
*Plaintiffs-Appellees*,

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

———

MARK ERICH, et al.,
*Plaintiffs-Appellees*,

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

## APPELLANT'S APPENDIX VOLUME VIII

Appeal from the United States District Court for the District of Kansas
Honorable Kathryn H. Vratil, Senior District Court Judge
District Court Case Nos. 19-CV-1343-KHV and 20-CV-1067-KHV-GEB

120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
(785) 296-2215
anthony.powell@ag.ks.gov
dwight.carswell@ag.ks.gov
kurtis.wiard@ag.ks.gov

**OFFICE OF ATTORNEY GENERAL
KRIS W. KOBACH**

Anthony J. Powell
  *Solicitor General*
Dwight R. Carswell
  *Deputy Solicitor General*
Kurtis K. Wiard
  *Assistant Solicitor General*

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

Transcript of Bosire Trial, Day 1
(ECF No. 618) ................................................................. 1

<pre>
 1                 UNITED STATES DISTRICT COURT
                        DISTRICT OF KANSAS
 2


 3
     JOSHUA BOSIRE,                Case No. 19-1343
 4
        Plaintiff,                 Circuit Nos. 23-3265
 5                                             23-3267
        v.
 6                                 Kansas City, Kansas
     BRANDON MCMILLAN,
 7                                 Date: April 24, 2023
        Defendant.
 8                                 Volume 1 - (Pages 1- 30)
     ..................................
 9

10               PARTIAL TRANSCRIPT OF JURY TRIAL
             (VOIR DIRE and OPENING STATEMENTS EXCLUDED)
11
               BEFORE THE HONORABLE KATHRYN H. VRATIL
12            SENIOR UNITED STATES DISTRICT COURT JUDGE


13


14
     APPEARANCES:
15
     For the Plaintiff:
16
       Patrick A. McInerney        Sharon Brett
17     Spencer Fane, LLP           ACLU Foundation of Kansas
       1000 Walnut                 6701 W. 64th Street
18     Suite 1400                  Suite 210
       Kansas City, MO 64106       Overland Park, KS 66202
19


20
     For the Defendant:
21
       Arthur S. Chalmers
22     Office of Attorney General - Kansas
       120 SW 10th Avenue
23     Topeka, KS 66112


24
     _____
25      Proceedings recorded by machine shorthand, transcript
            produced by computer-aided transcription.
</pre>

1                          I N D E X

2
    Plaintiff's Witnesses:                              Page
3
    JOSHUA BOSIRE
4      Direct Examination By Ms. Brett                   17

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Court called to order.)

2          (Voir dire not requested to be transcribed.)

3          THE COURT:  For those of you who have been selected to

4    serve, I have about 10 minutes of instructions to give you and

5    then we will take a luncheon recess.  So, first, I would like

6    to talk about your conduct as jurors.

7          First of all, I would instruct you that, during this

8    trial, you are not allowed to discuss or communicate about this

9    case with anyone, and that means that until you retire to the

10   jury room at the end of the case to begin your deliberations,

11   you simply cannot discuss the case with anyone and that

12   includes other members of the jury.

13         So tonight may be a specially sensitive conversation

14   because you may have people in your home who want -- who know

15   you are here at the courthouse today and want to hear about

16   jury duty and know all about the case.  You cannot discuss it

17   with them.  But what you can say is that at the end of the case

18   on Thursday or Friday, you will be released from this

19   instruction.  And at that point you can discuss the case with

20   anyone or not as you please.  So please just try to kick that

21   can down the road if you get questions about it.

22         It's also important that you not use any electronic

23   devices to have any communications.  So obviously the

24   electronic devices could include cell phones, tablets,

25   computers, social media websites, Internet, texting, instant

1    messages, Twitter, Instagram, the whole gambit.  It is critical

2    that you not post anything about this case or post anything

3    about being on jury duty.  And it's also critical that you not

4    go out and research anything about this case.

5            As you understand, I know from the proceedings earlier

6    this morning, all of your decision must be based on the

7    evidence here in this courtroom that is received in accordance

8    with the Federal Rules of Evidence and that all of the jurors

9    and the parties and the attorneys see and hear and evaluate at

10   the same time.

11           That evidence also has to be part of the official

12   record that our court reporter is making because at the end of

13   the day if the case were to be appealed or if reporters or

14   members of the public want to look at this case and understand

15   how you, as the jury, returned the verdict in this case, they

16   need to be able to see the record of everything that you took

17   into account.

18           So it would be highly improper if you were to go and

19   get information about the case or the attorneys from sources

20   that are outside of the courtroom.  We would have to declare a

21   mistrial if that happened.  So we would have to start the

22   entire process over again, and I'm sure you understand how

23   frustrating and wasteful that would be to the court and the

24   parties and the other members of the jury.  So, as I said,

25   don't read or listen to anything which concerns this case in

1    any way or undertake any third person or any independent

2    research.

3            If anybody should try to talk to you about this case,

4    please let us know about that immediately because that also

5    would be highly improper.

6            It's also important that you not form any opinions

7    about this case until you have heard all of the evidence.

8    Human nature being what it is, sometimes the hardest thing we

9    ask you to do is to keep an open mind until the end of the

10   case.  But there obviously are two sides to this case or we

11   wouldn't be here.

12           And you -- in evaluating the evidence, you need to

13   understand what the law is.  So the court will be doing that at

14   the end of the case, and at that point you should consider the

15   law and apply it in an open-minded way to the evidence which

16   you have heard.

17           I also want to emphasize that you not carry on any

18   conversations here in the courthouse, parking lot, hallways,

19   things like that with anyone who might be connected with the

20   trial.  So even if you might have an entirely innocent

21   conversation with one of the attorneys or parties, it could

22   create an appearance of impropriety, and that is something we

23   also need to avoid.

24           So the attorneys are very well aware of this, and if

25   they see you coming down the hallway or in the parking lot,

1    they may turn tail and go the opposite direction.  They are not

2    being rude.  They're just trying to avoid putting your -- you

3    in a position that might be -- appear to be in violation of

4    these instructions and also keep themselves out of harm's way.

5         We do have a jury room I'll tell you about in a

6    minute, and I think it will help you in following this

7    instruction.

8         I don't know that there will be any newspaper or other

9    media accounts about this trial, but if there should be and if

10   you should accidentally come into contact with it, then it's

11   important that you let us know as soon as possible.

12        I won't repeat these instructions each and every time

13   that we take a break or enter or leave the courtroom, but they

14   are extremely important -- important and they will apply for

15   the rest of this case.  I can't overemphasize how important it

16   is for you to keep your mind a clean slate of everything except

17   what you see and hear in the courtroom.

18        The jury room is through this door and across the

19   hall, and for the rest of the trial I would like for you to use

20   that as your base of operations.  You're absolutely not

21   confined there, but I think it will be more comfortable for

22   you.

23        We have restrooms and snacks, bad coffee but coffee

24   available for you in there.  There's a refrigerator, microwave.

25   Sometimes jurors like to bring in food or, you know, donuts,

1    things like that to share.  So you're not confined there, but

2    also don't loiter in the hallways where you might run into

3    parties, attorneys or even witnesses that you haven't yet met.

4         Make a mental note of your seat.  This will be your

5    seat for the rest of the trial and it will be important for you

6    to know when we line up.  Because when we come back in the

7    court after recess, you'll line up in order of your seats and

8    file in single file to take your appropriate seat.

9         When we take a recess, we'll say, "Please rise," and

10   you all will stand.  I'll stand and go out this way.  You will

11   go out that way and go directly to the jury room.

12        You will need some information.  This is a secured

13   part of the courthouse, so members of the general public don't

14   have access to it.  You'll receive a badge and security access

15   information which will help you have -- be able to get in in

16   the morning and out as you need to.

17        I told you that we will not have notes from the court

18   reporter available to you in your deliberations, but we will

19   let you take notes.  And at this point we're going to pass out

20   some pads of paper.  I would caution you that note taking is

21   optional.  So do it if you think it will help you remember the

22   evidence.  Don't get so caught up with trying to write down

23   every single thing that you're not also watching the witnesses,

24   looking at the hard exhibits and observing the demeanor of the

25   witnesses while they're testifying.

1      If you take notes, remember that you should not

2  discuss them with other members of the jury until you begin

3  your deliberations.  Keep your notes in the courtroom.  So just

4  leave them on your seat and we'll make sure that they're safe

5  and secure when we're not -- when you're not here in the

6  courtroom.

7      So take a minute now and write your name on the

8  outside of the notebook if you can pull that piece of paper

9  out.  So if you decide not to take notes, remember that you do

10  have an individual responsibility to listen to the evidence and

11  remember it.  You can't just count on somebody else to write

12  down the evidence and fill you in while you were mentally

13  checking out during the course of the trial.

14      That's part of the beauty of the jury system is that

15  we do depend on the collective recollection and judgment and

16  common sense of each of the eight of you.

17      All right.  That's -- I do have just a few more words

18  of instructions, but I think I will wait until we reconvene

19  after lunch so that Ms. Harper can take you to the jury room

20  now, show you how that works and kind of give you the lay of

21  the land of the backside of the courthouse and also point you

22  in the direction of getting something to eat.

23      So let's resume at 1:30.  And we will just go to

24  three o'clock this afternoon, so it will be a short afternoon.

25  We'd really appreciate everybody being here right on time.

1          Court is in recess.

2     (Recess.)

3     (The jury entered the courtroom, after which the following

4 proceedings were had.)

5          THE COURT:  Well, what do you need?

6          MS. BRETT:  Thanks, Your Honor.  Just in respect of

7 the court's ruling on the motion *in limine* to seek further

8 instructions before discussing the PSU complaint investigation,

9 I wanted to highlight for the court that in Mr. Bosire's direct

10 testimony there will be testimony about the fact that he filed

11 a PSU complaint.  He has been instructed not to discuss the

12 findings or anything that happened as a result, so we don't

13 believe it violates the motion *in limine* ruling.  But the fact

14 that he filed a complaint is relative to his claim of damages.

15 I just wanted to address that with the court before we even get

16 started this afternoon.

17          THE COURT:  Is there any objection to that limited use

18 of the evidence?

19          MR. CHALMERS:  No, Your Honor.  I don't -- I don't --

20 I mean, I don't think that counsel is saying that they're

21 getting into the details of what his complaint was.  I think

22 she's simply saying that a complaint was made to the PSU, in

23 which case I don't object.

24          MS. BRETT:  That's correct, Your Honor, he'll just

25 discuss the fact that he filed a complaint and the timeline

1   around that.

2          THE COURT:  I mean, I assume that the jury will know

3   what the complaint was about because he will have testified

4   about the circumstances of the stop.

5          MS. BRETT:  That's correct, Your Honor.

6          THE COURT:  Yeah.  Okay.  All right.  That sounds

7   fine.

8          MS. BRETT:  Okay.  And just one other thing, Your

9   Honor.  There is one fact witness in this case, Trooper

10  Schulte.  So we just wanted to invoke the rule of sequestration

11  of fact witnesses.

12         THE COURT:  Any objection?

13         MR. CHALMERS:  No, Your Honor.  I've agreed to have

14  Trooper Schulte here if given reasonable notice, and I think

15  right now the expectation is he would be here Wednesday at the

16  beginning.  We'll just have him wait in the back.

17         THE COURT:  I'm sorry, you -- you're dropping your

18  voice; I didn't hear the end of that.

19         MR. CHALMERS:  Well, we're going to have Trooper

20  Schulte come.  He won't come in the courtroom.  Be back in the

21  waiting area.  I think he will -- probably first thing on

22  Wednesday is what the thought process is.

23         MS. BRETT:  I think depending on what we get through

24  today and tomorrow, yes.

25         THE COURT:  Okay.  Sounds good.  Have a nice lunch.

1          MS. BRETT:  Thank you.

2       (Recess.)

3       (The jury entered the courtroom, after which the following

4    proceedings were had.)

5          THE COURT:  All right.  I do have a few more

6    instructions and then we will go directly into the parties'

7    opening statements.

8          So I want to talk to you about what your job will be

9    as jurors.  We alluded to this before lunch, but your job as

10   jurors is to act as the judges of the facts.  You are the sole

11   judges of the facts.  And by that what I mean is that I will be

12   the judge of the law, the legal issues in the case.  You will

13   be the judge of the factual issues.

14         So when you begin your deliberations, you'll take my

15   instructions about the law, apply them to the facts as you find

16   them from the evidence before you, and hopefully that will

17   cause you to return a verdict.  You will do this duty without

18   bias or prejudice as to any party, and you will carefully and

19   impartially consider all of the evidence in the case.

20         I know I appreciate the importance of the service that

21   you're about to render and so do the parties and their

22   attorneys, so for the -- the rest of the trial it's important

23   to know that as I will be the judge with respect to the legal

24   issues, your role as judges of the facts is equally important,

25   and under the Constitution it is legally separate.

1    So I don't want you to misinterpret anything I say or

2 do as you thinking I have an opinion about how you should find

3 the facts in the case.  By the same token, I hope that you

4 would not second guess any of the legal issues that I decide in

5 the case.

6    All of us on the court appreciate the sacrifice that

7 you will make this week in order to serve, and we want to make

8 it the least inconvenient and the most productive time that we

9 can.  So if anything comes up this week that is giving you a

10 problem or an issue comes up, a concern you want to talk to us

11 about, please don't hesitate to reach out to Audra and let me

12 know.

13    We are about to begin our trial.  We will start with

14 the opening statements of counsel.  These statements are

15 intended to give you an overview of all of the evidence in the

16 case so that, when it comes into -- evidence through the

17 witnesses on the witness stand, it's easier -- easier for you

18 to follow it.

19    Sometimes people compare opening statements to the box

20 on the top of a jigsaw puzzle.  So the box, the picture on the

21 box is an excellent guide to how you will put the pieces

22 together, but it itself is not the puzzle.  And I emphasize

23 that because what the lawyers say in opening statements is not

24 evidence.  They're just trying to give you a guide of what they

25 hope or what they think the evidence will be.

1          So the evidence will consist of testimony of

2   witnesses, documents and any other tangible items that the

3   court receives into evidence and also any facts which the

4   lawyers may agree or stipulate to or that the court may

5   instruct you to find.

6          So when I talk about stipulations, a stipulation is

7   just an agreement between the parties that certain facts are

8   true.  And typically the parties would enter into a stipulation

9   to cover something that's kind of a peripheral item like an

10  exact date or authenticity of a document or something.  And

11  rather than have a witness come in and testify to something

12  that is not actually in dispute, the parties will stipulate to

13  that and then you will assume, take that for true, for purposes

14  of your deliberations.  If anything is stipulated, we will

15  clearly identify it for you as such and -- and you will know

16  that when you see it.

17         Certain things are not evidence and you cannot

18  consider them.

19         So, first of all, statements, arguments and questions

20  by lawyers are not evidence.  Basically nothing that the

21  lawyers say or do is evidence unless it is a stipulation.

22         Number two, objections to questions are not evidence.

23  So this is the Federal Rules of Civil Procedure (indicating),

24  and a big part of that is the rules of evidence.  So when the

25  parties are wanting to get evidence in at a trial, they have to

1   introduce it for a proper purpose and in a proper manner laying

2   appropriate foundation.

3           If the other side thinks that the lawyers are not

4   following these rules, then they have a duty to object.  That

5   will trigger me that I need to make a ruling whether the

6   evidence comes in or stays out.

7           You shouldn't be influenced, though, by -- either by

8   the fact that an objection is made or by my ruling on it.  So

9   if evidence is offered, somebody objects and I keep the

10  evidence out, don't worry about what the evidence was or would

11  have been if you'd heard it.  Don't speculate about why I kept

12  it out.  Those are just legal issues that I have to resolve.

13          If the evidence comes in over an objection, that does

14  not mean that it's somehow more important evidence or more

15  damaging to the other side or anything like that.  Just treat

16  it like you would any other evidence.

17          Third:  Any testimony that I may exclude or tell you

18  to disregard is not evidence.

19          Four:  Anything you may see or hear outside of the

20  courtroom is not evidence and so you must disregard it entirely

21  because, as you know, your verdict must be based on evidence

22  which is received here in open court in this courtroom.

23          I would also note that there are two kinds of evidence

24  you can consider:  direct and circumstantial.

25          So direct evidence is proof of fact -- direct proof of

1    a fact such as through the testimony of an eyewitness.  So I

2    see that Mr. Couch has a navy shirt on.  That's direct

3    evidence.

4         Circumstantial evidence is indirect evidence.  So it's

5    -- it's not direct evidence of the point you're trying to prove

6    but it's direct evidence of other facts which lead you to

7    reasonably conclude that other facts are also true.

8         An example of this would be, say, if we leave court

9    this afternoon or we go out and there's -- the streets of

10   Kansas City, Kansas are flooded with water.  We don't -- it's

11   sunny.  We don't know where the water came from or why it's

12   there, so we don't have any direct evidence of that.

13        But circumstantial evidence could be that a huge

14   thunderstorm just passed through town and the water hasn't left

15   the streets.  There could be a fire hydrant that's open that

16   could be circumstantial evidence of why the water's in the

17   street.  You could have -- it could be circumstantial evidence

18   that water in the street could be circumstantial evidence that

19   a glacier passed through town and melted.  Part of evaluating

20   circumstantial evidence is you need to figure out what

21   conclusions make the most sense.

22        So you'll hear more about that throughout the case,

23   but for now just know that both direct and circumstantial

24   evidence are entirely legitimate forms of proof, and you can

25   consider both in your deliberations.

1        At the end of the day, it will be up to you to decide

2   which witnesses to believe, which witnesses not to believe, and

3   how much of any witness's testimony you will accept or reject.

4        As I said, nothing I say or do will be suggesting how

5   you should -- what verdict -- what your verdict should be or

6   how you should evaluate the evidence, and please do not forget

7   that.

8        Finally, in your consideration of the evidence, you're

9   not limited merely to the words that the witnesses use in the

10  witness stand.  We expect you to use common sense to apply

11  sound judgment and to make such reasonable conclusions from the

12  evidence as you find are justified in the light of your common

13  knowledge and experience of life.

14       It may be necessary at times for me to have sidebars

15  with the attorneys.  And as I explained this morning, we do

16  those to avoid improperly influencing your assessment of the

17  facts.  But I want to guarantee you that we will keep those to

18  an absolute minimum because I am committed to making excellent

19  use of your time while you're here in court.  And for that

20  reason, I'm going to stop talking right now and let plaintiffs

21  proceed with their opening statement.

22       Because plaintiff has the burden of proof, plaintiff

23  gets to go first in everything:  opening statement,

24  presentation of evidence and also closing arguments.  Plaintiff

25  also gets the last word because of that burden of proof.  So at

1    all phases both sides will have the same amount of time

2    available, but they just get to allocate it differently.

3            Counsel, go ahead.

4        (Opening statements by the parties not requested to be

5    transcribed.)

6            THE COURT:  Thank you.  Shall we call plaintiff's

7    first witness.

8            MS. BRETT:  We can, Your Honor.  I see we only have

9    20 minutes left on the clock today.  Would you like for us to

10   go ahead and get started?

11           THE COURT:  Sure.  Make use of all the time we have.

12           MS. BRETT:  Sure, Your Honor.  So plaintiffs call

13   Mr. Bosire.

14           THE COURT:  Sir, will you please step into the witness

15   stand right here and raise your right hand so you can be sworn.

16                       JOSHUA BOSIRE,

17   called as a witness on behalf of the Plaintiff, having first

18   been duly sworn, testified as follows:

19                      DIRECT EXAMINATION

20   BY MS. BRETT:

21   Q.  Good afternoon, Mr. Bosire.  Could you just start by

22   stating and spelling your name for the record please.

23   A.  My name is Joshua Bosire, B-O-S-I-R-E.  Joshua the common

24   name -- common spelling, sorry.

25   Q.  And where do you live, Mr. Bosire?

1   A.   I live in Wichita, Kansas.

2   Q.   How long have you lived in Wichita?

3   A.   Fifteen-plus years.

4   Q.   Have you lived anywhere else in the United States besides

5   Wichita?

6   A.   Yes.

7   Q.   Were you born in Wichita?

8   A.   No.

9   Q.   Where were you born?

10  A.   I was born in Kenya.

11  Q.   Okay.  When did you move to the United States?

12  A.   2005.

13  Q.   And why did you move here?

14  A.   I came here for school.

15  Q.   And what level of school did you come here for?

16  A.   I came here for my college schooling.

17  Q.   Who did you move here with?

18  A.   I came alone.

19  Q.   Mr. Bosire, are you a United States citizen?

20  A.   Yes.

21  Q.   When did you become a United States citizen?

22  A.   2016.

23  Q.   Can you tell the jury a little bit about the process of

24  becoming a United States citizen?

25           MR. CHALMERS:  Your Honor, I don't really think this

1    is relevant.  I respect the fact he's a citizen; I applaud

2    that, but I don't think it's relevant for the process of him

3    becoming --

4            MS. BRETT:  I'd be happy to respond if you'd like.

5            THE COURT:  I took it from your opening statement that

6    this ties into why he reacted and what his knowledge was of his

7    rights and so forth?

8            MS. BRETT:  That's correct, Your Honor.

9            THE COURT:  Objection's overruled.

10   BY MS. BRETT:

11   Q.   Do you want me to repeat the question?

12   A.   Yes, please.

13   Q.   What was the process like of becoming a U.S. citizen?

14   A.   Depending on the -- the person who you -- is conducting the

15   process, it might take a couple of years to five to seven years

16   depending on the complexity of it.

17   Q.   And what sorts of things did you have to do in order to

18   become a United States citizen?

19   A.   First of all, placed on a probational period where they

20   issue you the current work permits while they still do

21   background checks.  They also give you books to review about

22   the Constitution, life of America, what it means -- what it

23   means to become a U.S. citizen, the Constitution, the intricacy

24   of how the laws, checks and balances, the law -- the law of the

25   land, the founders of the country.  All the intricate details

1    about America you have to know and you quiz about them during

2    your interview.

3    Q.   Sir, I think you mentioned you had to learn about the

4    Constitution; is that right?

5    A.   That's right.

6    Q.   What about the Bill of Rights?

7    A.   You are taught that as well.

8    Q.   Are you quizzed on that as well?

9    A.   Yes.

10   Q.   What is that experience like becoming a U.S. citizen?

11   A.   Considering I came here in 2005, it was right after --

12   during that same year there was Katrina and I -- lot of people

13   were dying because of the disaster.  So I felt like I had -- I

14   had to do something to assimilate or to join the movement, and

15   to me it was an appealing thing.  I wanted to do it.  I wanted

16   to be part of the community that I am currently involved with,

17   and no bigger aspiration than becoming a U.S. citizen.

18   Q.   Did becoming a U.S. citizen influence your feelings about

19   the United States and our system of government at all?

20   A.   It did.  A lot of third world countries suffer a lot of

21   corruptions -- corruption.  People -- it's not very clear how

22   things are structured.  But when you come here, it is -- you

23   have the three departments:  the judicial, legislature.  And --

24   and it all works out in -- in how the checks and balances come

25   about, and that's what I -- I aspired to -- to join.

1    Q.  I want to talk a little bit about your educational

2    background.  You said you moved here for -- for college.  What

3    college did you attend?

4    A.  I attended Wichita State University.

5    Q.  And did you obtain a degree from Wichita State University?

6    A.  I did, but that was not my first.  I got an Associate's

7    Degree in Butler Community College when I was doing my general

8    education, and then I went back to Wichita State where I got my

9    aerospace engineering and two more additional masters:

10   Master's in Engineering Management and -- and Master's in MBA

11   Finance.

12   Q.  What year did you get your degree in aerospace engineering?

13   A.  2015.

14   Q.  And this might seem like a silly question, but what is

15   aerospace engineering?

16   A.  Depending on how long it takes, they teach you how to

17   design a plane, how to model an engine, how to design the

18   structure that goes around a plane or a rocket, how to

19   calculate for payload, how to determine the performance of the

20   plane.  Not to go too much into details, but in -- in a

21   layman's term, and I mean this the most humble way, it's

22   training you to become a rocket scientist.

23   Q.  And you -- you mentioned you have a Master's Degree or is

24   it one Master's Degree or more than one Master's Degree?

25   A.  I have two.

1    Q.   And what are they in?

2    A.   I have a Master's in Business, finance consideration and

3    Master's in Engineering Management.

4    Q.   And what schools are those from?

5    A.   I go -- I got both of them from Wichita State.

6    Q.   Are you currently employed?

7    A.   Yes.

8    Q.   Where do you work?

9    A.   I work at Textron Aviation.

10   Q.   How long have you worked there?

11   A.   December would be 11 years.  But before Textron Aviation, I

12   was working for Beechcraft, but Beechcraft was bought by

13   Textron.  So it's now one company.

14   Q.   Eleven total years working for Beechcraft and Textron?

15   A.   That's right.

16   Q.   What does Textron do?

17   A.   Textron builds -- well, it's Textron Aviation.  Sorry, I

18   need to specify, because those are two different entities.

19   Textron Aviation we build planes, private jets.  We build

20   military jets.  We build some commercial planes that could be

21   used for transportation and payload, like, mail for instance.

22   Q.   What is your role at Textron?

23   A.   Currently my position is senior flight test engineer.

24   Q.   What types of things do you do as senior flight test

25   engineer?

1   A.   Depending on the day-to-day basis, I could be directing a

2   flight, sitting in the back of a plane telling the pilots to

3   execute moves, and then I see if the moves pass the smell test.

4   And if they do, then we continue with the next test.  Or I

5   could be supporting that in TM, telemetric room, where I'm on

6   the ground but they're flying and I tell them to do certain

7   things.  Or I could be sitting at my desk looking at data,

8   reviewing data, analyzing the data, and then presenting the

9   data to the Federal Aviation authority to seek approval.

10  Q.   About what time does -- do you start work in the morning?

11  A.   Again, it depends on the schedule.  Sometimes I'm in there

12  at 6:00 in the morning.  Sometimes I'm in there 8:00 -- 8:00 on

13  a base-to-base case.  So let's say if you're flying, we start

14  briefing at 5:00 in the morning and fly at 6:00.  Or if it's

15  working in the office, I'll start at 8:00 and proceed until the

16  conclusion of the day.

17  Q.   About what time do you end your day at Textron?

18  A.   It could be at 5:00 p.m.  It could be at 10:00 p.m.

19  depending on if we are doing a flight.

20  Q.   Before 2019, what did you do outside of work?

21  A.   2019?  There's several things I used to do.  I used to -- I

22  used to be a volunteer with Junior Achievement, which is

23  something working with kids mentoring.  You would go to

24  elementary schools, high schools and try to educate young kids

25  of the benefits of becoming an engineer, for instance, because

1    that's what I am.  Try to sway them from drugs and bad habits.

2        I would also -- I would also volunteer with the Kansas

3    humane -- humane department.  Football -- I'm just going to

4    list some of them because there's so many things that I do a

5    lot of the community service.  I'm a first responder for one.

6    I do a lot of mentoring through Junior Achievement and National

7    Society of Black Engineers.  I do a lot of -- I'm also the

8    President of the Society of Flight Test Engineers.  So I do a

9    lot of community involvement.

10   Q.   Through your work it sounds like?

11   A.   Yes.

12   Q.   I want to talk about the first responders for a moment.

13   What do the first responders do?

14   A.   As the name -- sorry, as the name implies, I -- it's --

15   you're trained to respond to accident -- let's say somebody has

16   an accident.  You are the first person to be called to render

17   aid.  Aid could be a broken bone, it could be somebody with a

18   heart attack, somebody with low blood sugar, anything to do

19   with that kind of emergency.  Or if it's a gas leak at a

20   building they need people to evacuate, you are the people put

21   in contact.  Or if it's somebody with any medical situation,

22   you are trained on how to handle that situation.

23   Q.   What type of training did you have to go through to become

24   a first responder?

25   A.   There's a lot of training I've done over the years.  I've

1    gone through CPR.  I've gone to AEDs.  I've gone through

2    structure -- restoring fractures when somebody has broken bones

3    or ligaments, somebody has gone through -- we have objects in

4    the eyes.  There's so many trainings.  There's blood born

5    pathogens that we've done.  Survival in rural areas, let's say

6    somebody -- we have a plane crash or we have a derailed train,

7    for instance, or we have a tornado, we are the first person

8    called to render aid.

9    Q.  Can you give us an example where you worked as a first

10   responder to respond to a natural disaster?

11   A.  I've done several.  The ones that come to top of my head

12   there, we had a tornado in Greensburg and it displaced a lot of

13   people, and some ended up dying.  And there was a call to have

14   the first responders try to go and facilitate the mobilization

15   of people, and that's something I've done.  I've also done --

16   I've helped -- there's a gentleman who collapsed and I was able

17   to revive him by rendering CPR until the EMS came and took him

18   to the hospital.

19   Q.  What other groups or entities do you work with when

20   responding as a first responder?

21   A.  It's usually first responder, so EMS, fire fighters, some

22   police involvement.  By police I mean law enforcement.  I

23   cannot name the agencies, but most of them send somebody to

24   come and help with the -- with the...

25   Q.  And that description that you just gave us of your work

1   with first responders, that was for work that you did with them

2   before 2019; correct?

3   A.   That's correct.  I only do for the first responders at

4   work.  I don't do it in public because I -- I just choose not

5   to be around law enforcement anymore.

6   Q.   And that's at this point in time?

7   A.   You're correct.

8   Q.   Okay.  I want to ask you some questions now about your

9   family, Mr. Bosire.  Where does most of your family live?

10  A.   I have a daughter here in the U.S. and the rest are back

11  home.

12  Q.   And "back home" do you mean in Kenya?

13  A.   Correct.

14  Q.   And what is your daughter's name?

15  A.   Ellianna (ph).

16  Q.   Ellianna?

17  A.   Correct.

18  Q.   Where does Ellianna live?

19  A.   She lives in Denver, Colorado.

20  Q.   Who does she live with?

21  A.   She lives with her mother.

22  Q.   How old is she?

23  A.   She just turned seven last month -- February, sorry.

24  Excuse me.

25  Q.   Can you tell us a little bit about Ellianna?

1    A.  Well, she's a typical girl in my view.  She's very

2    adorable.  She has curly hair.  She's mixed.  She's half white,

3    half me.  So she has that complexion of caramel; that's what

4    she calls herself.  She likes to do a lot of makeup, drawings.

5    Most of the time I end up being the -- the practice Guinea pig.

6    So you wake up with glitter everywhere or something, blush on

7    your eyes right here.  She likes to swim and -- and ballet.

8    She likes to dance ballet.  But she's an adorable

9    seven-year-old.

10   Q.  Do you get to see her often?

11   A.  Not as much as I would want to, but, yeah, the distance is

12   an issue.

13   Q.  I want to talk about before February of 2019, how often did

14   you see your daughter?

15   A.  Well, depending on the schedule of work and her -- her

16   opportunity in her -- because she goes to school.  So it --

17   depending on how my schedule was and her mom and obviously the

18   kid, we would -- I would plan to go at least once a month.

19   Q.  And when you saw her, how did you get there?

20   A.  In most cases, I would drive.  I used to drive.

21   Q.  What route did you take?

22   A.  I would take -- if I'm heading there, I'll be -- I'll take

23   35 north and then I-70 west.

24   Q.  What car did you drive when you would go to visit Ellianna

25   before February of 2019?

1   A.   I would either (A) drive my car during the hot parts of the

2   year, and then, when it gets cold or we have snow on the

3   ground, I would either rent a car or I would take a friend's

4   car.

5   Q.   Why is that?

6   A.   Because I have -- I have a rear wheel car, so it doesn't

7   drive very well with snow on the ground.

8   Q.   About how long does it take to get to where Ellianna lives

9   in Colorado?

10  A.   It takes about eight hours.

11  Q.   And about the same distance to get back?

12  A.   Yes.

13  Q.   How long are your visits typically -- or how long were they

14  before February of 2019?

15  A.   I would drive on Friday.  I would leave around noon.  So I

16  would go in work slightly earlier, that way I could be excused

17  in the afternoon to start driving so I could get to Denver

18  before I tuck her into bed.  And then spend Saturday and part

19  -- part of Sunday with her before drive back by midnight.

20  Q.   Why would you only go for just a short trip like that?

21  A.   It's -- as I said, my schedule was very tight and I was

22  also going through school, so I would try to maximize as much

23  opportunity to spend time with her.  I would even take her

24  study -- studying with me when I was still at school.

25  Q.   Have you seen Ellianna recently?

1   A.   Yeah, I was -- just came back from her seventh -- seventh

2   birthday this last February.

3   Q.   And how did you get there when you went for her seventh

4   birthday?

5   A.   I flew there.

6   Q.   Okay.

7            MS. BRETT:  Your Honor, I think this is a good

8   breaking point in seeing that we are just at 3:00.  Is that all

9   right?

10           THE COURT:  Uh-huh.

11           MS. BRETT:  Thank you.

12           THE COURT:  Okay then.

13           Members of the jury, tomorrow we will start at noon,

14  and, again, please remember my instruction that you can't

15  discuss the case with anyone tonight.  So think of a good alibi

16  before you get home while you're in the car, and everyone have

17  a nice evening.  Thank you.

18           You can step down.  We'll see you tomorrow.

19           Court's in recess.

20      (Proceedings adjourned to April 25, 2023.)

21

22

23

24

25

```
 1                          CERTIFICATE

 2          I certify that the foregoing is a true and correct

 3   transcript from the stenographically reported proceedings in

 4   the above-entitled matter.

 5      DATE:  February 29, 2024

 6
                         /s/Kimberly R. Greiner
 7                       KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
                         United States Court Reporter
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that a copy of the foregoing APPELLANT'S APPENDIX, as submitted in digital form is an exact copy of the document filed with the Clerk.

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2024, the foregoing APPELLANT'S APPENDIX was electronically filed with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I also certify that within five business days of the issuance of notice that the electronic filing is compliant, one paper copy will be delivered by Federal Express to the Clerk's Office.


DATED: April 24, 2024                    /s/ Kurtis K. Wiard