# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

BLAINE FRANKLIN SHAW, et al.,
*Plaintiffs-Appellees,*

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

―――――

MARK ERICH, et al.,
*Plaintiffs-Appellees,*

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

## APPELLANT'S APPENDIX VOLUME IX

Appeal from the United States District Court for the District of Kansas
Honorable Kathryn H. Vratil, Senior District Court Judge
District Court Case Nos. 19-CV-1343-KHV and 20-CV-1067-KHV-GEB

**OFFICE OF ATTORNEY GENERAL
KRIS W. KOBACH**

120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
(785) 296-2215
anthony.powell@ag.ks.gov
dwight.carswell@ag.ks.gov
kurtis.wiard@ag.ks.gov

Anthony J. Powell
 *Solicitor General*
Dwight R. Carswell
 *Deputy Solicitor General*
Kurtis K. Wiard
 *Assistant Solicitor General*

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

Transcript of Bosire Trial, Day 2
    (ECF No. 619) ...................................................................... 1

```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF KANSAS
 2

 3
     JOSHUA BOSIRE,              Case No. 19-1343
 4
       Plaintiff,                Circuit Nos. 23-3265
 5                                            23-3267
       v.
 6                               Kansas City, Kansas
     BRANDON MCMILLAN,
 7                               Date:  April 25, 2023
       Defendant.
 8                               Volume 2 - (Pages 31-158)
     ...................................
 9

10               TRANSCRIPT OF JURY TRIAL

11      BEFORE THE HONORABLE KATHRYN H. VRATIL
        SENIOR UNITED STATES DISTRICT COURT JUDGE
12

13

14   APPEARANCES:

15   For the Plaintiff:

16   Patrick A. McInerney        Sharon Brett
     Spencer Fane, LLP           ACLU Foundation of Kansas
17   1000 Walnut                 6701 W. 64th Street
     Suite 1400                  Suite 210
18   Kansas City, MO 64106       Overland Park, KS 66202

19

20   For the Defendant:

21   Arthur S. Chalmers
     Office of Attorney General - Kansas
22   120 SW 10th Avenue
     Topeka, KS 66112

23

24   _____
           Proceedings recorded by machine shorthand, transcript
25            produced by computer-aided transcription.
```

1                        I N D E X

2
   Plaintiff's Witnesses:                           Page
3
   JOSHUA BOSIRE
4     Direct Examination - continued                 33
      Cross-Examination By Mr. Chalmers              98
5

6

7                      E X H I B I T S

8     Plaintiff's
      Exhibits              Offered          Received
9
         8                    49                49
10       11                   86

11    Defendant's
      Exhibits              Offered          Received
12
        836                  100               100
13      843                   58                58
        844                   65                65
14

15

16

17

18

19

20

21

22

23

24

25

1          (Court called to order.)

2          (The jury entered the courtroom, after which the following

3     proceedings were had.)

4                THE COURT:  Good afternoon, everyone.

5                Members of the jury, you will remember that yesterday

6     when we recessed we were in the direct examination of

7     Mr. Bosire, and so that's where we will pick up now.

8                Sir, if you would please take the witness stand, I

9     would remind you that you're still under oath.

10                          JOSHUA BOSIRE

11                    DIRECT EXAMINATION - continued

12     BY MS. BRETT:

13     Q.   Good morning, Mr. Bosire.  Just to recap where we left

14     things off yesterday, do you recall having a conversation about

15     the trips you would take to and from Colorado by car?

16     A.   I do.

17     Q.   And you would take those trips to visit your daughter,

18     Ellianna; is that right?

19     A.   Correct.

20     Q.   Did you take one of those trips in February of 2019?

21     A.   I did.

22     Q.   I want to talk a little bit about that trip.  When did you

23     leave Wichita?

24     A.   I left the Friday of that weekend.

25     Q.   Would that be February 8th of 2019?

1   A.   Yes.

2   Q.   And what car were you driving?

3   A.   I rented a car from Enterprise.

4   Q.   And you might want to just put your microphone down a

5   little bit.  There you go.

6        You had rented a car from Enterprise; is that right?

7   A.   That's correct.

8   Q.   And how long was the rental for?

9   A.   It was through Sunday night.

10  Q.   About what time on Friday did you pick it up?

11  A.   It was in the afternoon.

12  Q.   And you said it was due back on Sunday?

13  A.   That's correct.

14  Q.   About what time on Sunday?

15  A.   The agreement was to return it before Monday, so Sunday

16  midnight.

17  Q.   Okay.  Had you reached that agreement when you picked the

18  car up?

19  A.   That's correct.

20  Q.   What type of car was it?

21  A.   It was a Nissan Altima.

22  Q.   What state were the plates from?

23  A.   Missouri.

24  Q.   And why were you going to Colorado that particular week?

25  A.   It was my daughter's birthday and we were planning an event

1    for her, so I wanted to go and be part of the birthday

2    celebration.

3    Q.   So it was a birthday party for your daughter?

4    A.   That's correct.

5    Q.   Where were you staying when you were in Colorado?

6         MR. CHALMERS:  Your Honor, his travel plans are

7    something he wouldn't disclose.  It doesn't seem like this

8    testimony's relevant to the questions that are before the court

9    and the jury.

10        MS. BRETT:  This testimony is about the nature and

11   duration of his trip, which is relevant to his damages.  It's

12   relevant to what he was experiencing and feeling when this stop

13   occurred.  So it's -- it's all relevant to his state of mind

14   during the traffic stop and detention and thereafter.

15        THE COURT:  I think she's probably right on that, but

16   tell me why you disagree.

17        MR. CHALMERS:  Well, his state of mind is not

18   relevant.  It's what is the state of mind of the officer, the

19   reasonable suspicions that he holds.

20        THE COURT:  Well, he's making a claim --

21        MR. CHALMERS:  I don't know how it has to do with his

22   damages.

23        THE COURT:  He's making a claim for emotional distress

24   and pain and suffering, so overruled.

25        We're not going to spend a ton of time on this?

1        MS. BRETT:  No, we're not, Your Honor.

2   BY MS. BRETT:

3   Q.   So at what time -- or when did you leave to drive back to

4   Wichita?

5   A.   I left the Sunday after the party was over.

6   Q.   Okay.  About what time was that?

7   A.   It was approximately 2:00.

8   Q.   Some time early afternoon?

9   A.   Yeah.  Yes.

10  Q.   And why were you doing such a quick trip that weekend?

11  A.   As -- as I already answered, most of my trips was scheduled

12  between Friday afternoon -- I would leave Friday afternoon and

13  come back on Sunday before -- before my day of work on Monday.

14  Q.   Did you have to be at work on -- on Monday, February 11th?

15  A.   That's correct.

16  Q.   What was the weather like when you left Colorado to drive

17  back to Wichita that day?

18  A.   The whole weekend was -- there was flurry and some snow in

19  the -- in Denver, so that's the reason why I rented a car,

20  because I drive rear wheel, so it was -- it makes -- it makes

21  it safer for me to drive.

22  Q.   And about how cold was it outside?

23  A.   We had snow, so it was below freezing.

24  Q.   What was your planned route back to Wichita?

25  A.   Same route I usually take, which would be I-70 west -- no,

1   east and then south on 35.

2   Q.  About how long is it from Denver to the border with Kansas?

3   A.  It's approximately four hours.

4   Q.  And what was the first stop that you made after you crossed

5   into Kansas?

6   A.  I stopped at Ellis County, the Love's shop.

7   Q.  Do you remember what time you stopped?

8   A.  It was approximately 8:00.

9   Q.  And why did you stop at the Love's?

10  A.  I had been driving for around six hours and the tank had

11  been depleted, so I had to refill my gas.

12  Q.  At this time I'm going to show you a demonstrative exhibit.

13          MS. BRETT:  Your Honor, may I approach the witness?

14          THE COURT:  Uh-huh.

15  BY MS. BRETT:

16  Q.  Mr. Bosire, do you recognize what this is a picture of?

17  A.  It looks like a topographic image of the Love's Travel

18  shop.

19  Q.  And that's the Love's Travel shop you stopped at?

20  A.  That's correct.

21  Q.  When you stopped at the Love's, where did you park?

22  A.  There's a roof -- there's a white roof on top.  I was

23  parked to the left of the toilet marker.

24  Q.  So for the purposes of the record, when you say the "white

25  roof on top," you're referring to the long rectangular shape

1   towards the top of the image?

2   A.   That's correct.

3   Q.   And you parked there.

4        And what do you understand is underneath that roof?

5   A.   It's a cover underneath these of gas pumps.

6   Q.   Did you, in fact, park at a gas pump?

7   A.   That's correct.

8   Q.   What happened once you parked at the pump?

9   A.   I -- I got out of the car.  I paid using my card.  I don't

10  remember if it was a debit or credit card.  And, well, the --

11  the gas would not dispense, so I went inside to ask for an

12  attendant to come and assist me with the pump.

13  Q.   So the machine accepted your credit card but no fuel came

14  out; is that right?

15  A.   That's correct.

16  Q.   And you went inside the gas station to get someone to help?

17  A.   That's correct.

18  Q.   When you went inside, were there other cars in the parking

19  lot?

20  A.   Not around me, but there were cars in front of me facing

21  where -- where you can see vehicles, that's where I was.  There

22  was some cars, including some state troopers.

23  Q.   And that large building that's just below the white

24  rectangular shape, is that the Love's convenience store?

25  A.   That's correct.

1    Q.  Who else was near you when you walked into the convenience

2    store?

3    A.  As I was walking towards the entrance of the gas station,

4    as I stated before, there was some state trooper vehicles and I

5    believe two or three troopers who were standing outside.

6    Q.  Did you walk into the store with anyone else?

7    A.  No, I was alone.

8    Q.  The vehicles that you saw outside, you said they were state

9    trooper vehicles?

10   A.  Yes.

11   Q.  How did you know that?

12   A.  They're very distinct.

13   Q.  So they had some sort of symbol or logo on them that you

14   could tell?

15   A.  Yes.

16   Q.  And you walked in by yourself; is that right?

17   A.  Yes.

18   Q.  Did you interact with anybody as you were walking into the

19   gas station?

20   A.  I -- I exchanged pleasantries with one of the state

21   troopers while he was looking at me and then -- and then I

22   proceeded for -- towards the entrance.  And there's an older

23   gentleman who was leaving the store, so I opened the door for

24   him to come outside.

25   Q.  But then you walked inside?

1    A.   That's correct.

2    Q.   Did you smell marijuana while you were entering the

3    convenience store?

4    A.   No.

5    Q.   Do you know what marijuana smells like?

6    A.   Yes.

7    Q.   If there was an odor of marijuana as you were walking into

8    the store, would you have noticed?

9    A.   Yes.

10        MR. CHALMERS:  Well, it's calling for an opinion, Your

11   Honor, I think.

12        THE COURT:  I'm sorry what?

13        MR. CHALMERS:  It's calling for an opinion, Your

14   Honor.  I don't think it's a proper question.

15        THE COURT:  Well, he -- I think he's said that he's

16   familiar with the odor, and he's entitled to express a lay

17   opinion about whether there was such an odor in the store.

18        MR. CHALMERS:  Okay.  Well, but I understood the

19   question, and maybe I misunderstood it, was whether or not

20   someone, not him, but another person would smell it, and that's

21   what I --

22        THE COURT:  I don't think that was the question but --

23        MR. CHALMERS:  So I withdraw the objection.

24        THE COURT:  Okay.  All right.

25   BY MS. BRETT:

1    Q.   So you yourself did not smell marijuana while you were

2    walking into the gas station?

3    A.   No.

4    Q.   Let me back up a little bit here.  Did you smoke any

5    marijuana while you were in Denver?

6    A.   No.

7    Q.   What about on your drive back to Kansas?

8    A.   No.

9    Q.   Did you have marijuana in the car with you on your way back

10   to Kansas?

11   A.   (No audible answer.)

12   Q.   Any marijuana on your person?

13        (Court reporter interruption.)

14        THE WITNESS:  No, that's a no.

15   BY MS. BRETT:

16   Q.   Any marijuana on your person, in your pockets, anywhere on

17   your body?

18   A.   No.

19   Q.   Did you smell marijuana at any point while you were at the

20   Love's gas station?

21   A.   No.

22   Q.   Did you smell marijuana when you got inside the convenience

23   store?

24   A.   No.

25   Q.   What happened when you got inside the store?

1    A.   There was somebody at the -- at the register, so I had to

2    wait.   Once the person was done, I proceeded to ask for

3    assistance from one of the gas attendants.

4    Q.   Were you up at the counter at the gas station at that

5    point?

6    A.   Yes, there was a divide -- I'm sorry.   There was a divide

7    between me and the person I was speaking to, so I -- I was

8    adjacent to him.

9    Q.   And what did you ask that person to do?

10   A.   I told him I paid for the gas but the gas pump was not

11   dispensing, so I asked him to come and help me outside.

12   Q.   What did you do next?

13   A.   I left, proceeded towards the gas pump.

14   Q.   Was anyone with you when you left the convenience store?

15   A.   No, but I'm sure he was following me behind, because as

16   soon as I got to the gas pump he came and fixed the -- the

17   machine.

18   Q.   And by "he" you mean the person who worked at the

19   convenience store?

20   A.   That's correct.

21   Q.   So you walk back out to your car that's parked at the gas

22   pump; is that right?

23   A.   Yes.

24   Q.   And I think you just testified that the person followed out

25   -- the person who works at the convenience store followed out

1  behind you; is that right?

2  A.   Yes.  He had to go grab something, because, as I said, it

3  was cold.  So he went to grab something, so I just proceeded to

4  the -- to the pump.

5  Q.   And what happened once you were back at the pump?

6  A.   He came, fixed the machine.  I proceeded to pump the gas

7  and was -- was -- once I was done I left towards home.

8  Q.   About how long did the conversation with the gas station

9  attendant at the pump last?

10  A.   A few seconds.  It just -- I just pointed him to the -- to

11  the machine that was having the issue.

12  Q.   So less than a minute, a matter of seconds?

13  A.   Maybe a few or -- seconds, yes.

14  Q.   Did you notice anyone else standing nearby you while you

15  were having that conversation with the gas station attendant?

16  A.   No, I was oblivious to what was happening around me.  I was

17  just trying to get my pump -- my gas.

18  Q.   Did you notice other cars at other gas pumps?

19  A.   No.

20  Q.   Do you know what a Dodge Charger looks like, Mr. Bosire?

21  A.   Yes.

22  Q.   Was there a Dodge Charger parked near you at the Love's gas

23  station?

24  A.   No, the cruisers -- I believe one of the cruisers might be

25  a Dodge Charger, but there was no car around me that I noticed.

1  Q.  Did you talk to anyone getting in or out of a Dodge Charger

2  at the Love's gas station?

3  A.  No.

4  Q.  Did you notice anything out of the ordinary at all besides

5  the fact that your gas pump was not working?

6  A.  I just remember it was freezing cold and I wanted to get

7  inside the car and proceed home.

8  Q.  And so you said you were able to successfully fill your

9  tank up with gas at that point?

10 A.  I did.

11 Q.  Okay.  And then what did you do?

12 A.  I left the Love's station heading east on I-70.

13 Q.  And do you know what time it was when you got back on the

14 road?

15 A.  As I said, it was approximately 8:00.  So it should have

16 been a few minutes after 8:00.

17 Q.  Some time after 8:00?

18 A.  Correct.

19 Q.  Okay.  Was it dark out at that point?

20 A.  It was.

21 Q.  Mr. Bosire, do you have camera -- did you have cameras in

22 your rental car that night?

23 A.  I did.

24 Q.  What type of cameras did you have?

25 A.  I had a forward-facing dash camera and a rear-facing dash

1    camera.

2    Q.  How did those cameras work?

3    A.  It's in two modes.  So one when it's not -- when the car is

4    in park, it's on the stand-by basis where if somebody impacts

5    the car it automatically records what happened around the area.

6    And then if -- if the car is running, they're continuously just

7    recording over the -- the memory stick.

8    Q.  Why did you have those cameras?

9    A.  A few years ago when I was going -- I was coming from

10   Denver, I hit a coyote on my way back home.  The insurance gave

11   me a hard time getting the repairs and paying for the repairs.

12   So I figured if I had the sure -- the dash cameras that would

13   resolve a lot of issues.

14   Q.  How often did you use those cameras when you were driving

15   to and from Colorado?

16   A.  Every -- every day of drive I install in whichever car I'm

17   driving or if it's mine I just put them there.

18   Q.  Would you use them, say, for example, when you were

19   traveling for work?

20   A.  Yes.

21   Q.  Were those cameras on at the time that you were at the

22   Love's gas station?

23   A.  I don't recall if they were on.  I didn't check.  It's not

24   like you can check.  There's no ding or it did not have

25   announcer saying it's working.  In my head I thought they were

1    working, but they were not.

2    Q.   They were not, in fact, working?

3    A.   Correct.

4    Q.   And when did you learn that?

5    A.   When I got back to Wichita.

6    Q.   You went to check to see if there was a recording and there

7    was none?

8    A.   That's correct.

9    Q.   I'm going to show you a second demonstrative at this point.

10          MS. BRETT:  Your Honor, may I approach the witness?

11          THE COURT:  Yes.

12   BY MS. BRETT:

13   Q.   Mr. Bosire, I'm showing you a second demonstrative now,

14   again not marked for evidence in this case.  Do you recognize

15   this?

16   A.   I do.

17   Q.   And what is it?

18   A.   It's the topographic image of I-70 with a -- with Ellis

19   road.

20   Q.   And do you see the Love's gas station that you had stopped

21   at in this image?

22   A.   Yes.

23   Q.   Can you point it out to the jury?

24   A.   (Indicating.)  It's -- it's right here.

25   Q.   Okay.  And for the record you're pointing to sort of the

1   lower left quadrant of the photo; is that right?

2   A.   That's correct.

3   Q.   Okay.  And this shows I-70 just north of the Ellis gas

4   station that you stopped at?

5   A.   That's correct.

6   Q.   Okay.  When you got back on the highway, what direction

7   were you traveling on I-70?

8   A.   I was traveling east.  So I got onto the on-ramp and then I

9   joined I-70 heading this direction to the right.

10  Q.   At some point when you got back on the highway, did your

11  radar detector in your car go off?

12  A.   It did.

13  Q.   What did you notice after your radar detector went off?

14  A.   There was a trooper who was parked in the median, the

15  center median.  He was facing west.  And as soon as I passed,

16  he turned around and started following me.

17  Q.   Did that trooper have any overhead lights or siren on at

18  that point?

19  A.   No.

20  Q.   Did that trooper follow you on I-70?

21  A.   He did.

22  Q.   About how long was the trooper following you?

23  A.   It was approximately 7 minutes.

24  Q.   What happened after that?

25  A.   As soon as -- there was a slower car that was in front of

1  me, so I sped up around the car.  And I was going over the -- I

2  was going around it, he activated the lights.

3  Q.  So at some point a Kansas Highway Patrol trooper traveling

4  behind you activated his overhead lights?

5  A.  That's correct.

6  Q.  And what did you do at that point?

7  A.  I pulled over to the shoulder.

8  Q.  Do you know if there were any recordings made of when the

9  officer pulled you over?

10  A.  Yes.

11  Q.  How do you know?

12  A.  Because I received a copy of the traffic stop from the

13  Kansas Highway Patrol.

14  Q.  And, again, your in-car camera that you had mounted, did

15  that record you getting pulled over?

16  A.  No.

17  Q.  Were there any other recordings that you made of your stop?

18  A.  Yes.

19  Q.  What recording did you make?

20  A.  After the traffic stop -- after he activated his lights, I

21  started recording using my cell phone.

22  Q.  Okay.  So you had your cell phone recording video as well?

23  A.  Correct.

24  Q.  Did it record the entire stop and detention?

25  A.  The way -- the way it worked is it started recording, and

1    then at some time it stopped.  I'm guessing it's an iPhone

2    feature.  And then I reactivated it.  So there was two clips.

3    Q.  I want to show you what's been marked as Exhibit 8.

4        MS. BRETT:  And I believe the parties have stipulated

5    to the admissibility of this exhibit.

6        MR. CHALMERS:  I'm not sure what it is.  Are we

7    talking about the dash cam video?

8        MS. BRETT:  That's correct.

9        MR. CHALMERS:  We have stipulated to foundation, Your

10   Honor.

11       THE COURT:  Received.

12   BY MS. BRETT:

13   Q.  Mr. Bosire, do you know what this exhibit is?

14   A.  It looks like the traffic -- the video of the traffic stop

15   that I was provided by Kansas Highway Patrol.

16   Q.  Okay.  And at this point do you know which Kansas Highway

17   Patrol trooper pulled you over that night on February 10th,

18   2019?

19   A.  At this moment in the video, no.

20   Q.  At this point today?  I'm sorry the question was unclear.

21   A.  Yes, I do.

22   Q.  And who was that trooper?

23   A.  It was Trooper McMillan.

24   Q.  Okay.  At this point I'd like to play from the beginning of

25   the video until 5:12.

1          MS. BRETT:  Sorry, I understand the demonstrative's

2     blocking the view of the jury, so let me take that down.

3     BY MS. BRETT:

4     Q.   And, Mr. Bosire, there is no audio at this part of the

5     video; is that correct?

6     A.   That's correct.

7     Q.   And the audio will come on shortly; is that correct?

8     A.   According to what I understand with the video is the sound

9     is activated once the sirens and the lights go on.

10    Q.   Thank you.

11         (Exhibit playing.)

12              JUROR NO. 1:  The time is gone.

13              MS. BRETT:  There's a glitch in the video.  Apologies;

14    one moment.

15         (Technology problems with video.)

16              MR. CHALMERS:  Could we approach, Your Honor, real

17    quick while tech issues are knocking out?

18              THE COURT:  Sure.

19         (The following proceedings were had at the bench.)

20              MR. CHALMERS:  What's being presented up on -- the

21    image on the screen, it may be part of the technical glitch, is

22    materially darker than the video that has been marked and

23    presented by plaintiff as an exhibit that I'd stipulated to the

24    production.

25              MS. BRETT:  It's the same video.  It's the one that we

1    produced to you.

2        MR. CHALMERS:  I've got on my computer the video.  I'm

3    comparing it to yours, and they're different in terms of the

4    coloring.  So I'm wondering if, as you took the clip --

5        MS. BRETT:  There's no clip.  I'm not playing a clip.

6    It's the full video.  There's a problem with the video as it

7    was produced to us where at the two-minute mark there's a

8    glitch in the software that we have.  Sometimes the software

9    does not allow us to advance past the glitch at the two-minute

10   mark.  We have worked it out in practice with it to get it to

11   go past that glitch.  They're having the same problem, but it

12   is the exact same video that --

13       MR. CHALMERS:  My problem is that the video is

14   different than what has been produced and is not showing the

15   same quality of light.  It may not be a big deal or it may be

16   depending on the argument they want to make on how dark things

17   were going on.

18       THE COURT:  So it probably has to do with your screen

19   settings and your brightness settings on your laptop and what

20   computer you're using unless you have some evidence that

21   they've manipulated the exhibit to misrepresent the conditions

22   that night.  That's a very serious allegation.

23       MR. CHALMERS:  I'm not making that allegation at all.

24   I just think the clip they're playing through their software is

25   not showing what the exhibit shows that I stipulated to in

1   terms of its agreement on foundation.

2        MS. BRETT:  We -- I will represent to the court this

3   is -- we provided a shared file to Mr. Chalmers with the exact

4   exhibits that we are using in court this entire week.  This is

5   the exhibit that we provided to Mr. Chalmers.

6        MR. CHALMERS:  I suppose the solution is that I'll

7   have to show my parts of the video that will show the proper

8   lighting.

9        THE COURT:  What do you think is improper?  I mean, it

10  was -- it was middle of the night in the middle of the winter.

11  What do you think is lighter?

12       MR. CHALMERS:  Well, I think that the light that is

13  produced in the camera shows more light that was available that

14  night where you can see the officer.  You can see the lower

15  screen, which is the camera in the back flashing, and it's --

16  this is different than what's been -- what was produced by my

17  client.  It's different than what was produced and that's been

18  marked as an exhibit by the plaintiffs.

19       MS. BRETT:  I take serious issue with those

20  allegations, Your Honor.  We don't have an independent copy of

21  the trooper's video from his dash.  The video that we have is

22  the video that was provided by defendant.  We took that video

23  into a shared file link per the court 's instructions about

24  shared exhibits back in January.  We did that.

25       MR. CHALMERS:  The video --

1          MS. BRETT:  Provided that to Mr. Chalmers.  This is

2    the first time I've heard that objection.

3          MR. CHALMERS:  This is the first time I've seen you

4    show something different than what you produced.  But the video

5    that was provided by my client was in an entirely different

6    format.  It had to be changed in format by plaintiff's counsel

7    so we can be able to present it here.  Now, I don't know if

8    that explains what's going on.  My point is that what I have

9    shows a different light condition than what they show.

10         THE COURT:  Why is that anything relevant?

11         MR. CHALMERS:  Well, that I think his argument is and

12   her claim in her opening statement was they were out here in

13   the middle of an awfully dark night and we're not going to be

14   able to see potentially what was going on with the officer as

15   he's standing up by the vehicle because of lighting.

16         I've seen the rest of it, maybe it shows it, but I'm

17   concerned that what we've got is a document -- or a

18   presentation that is showing a different lighting condition

19   than what has been produced both by my client and by -- by the

20   plaintiff.  And I imagine it's probably a setting issue as they

21   organize it on their computer for presentation, but that's --

22         THE COURT:  So what do you want me to do?  I mean, do

23   you want to make it an issue in front of the jury about whether

24   you produced an adulterated copy of the exhibit to them?

25         MR. CHALMERS:  No, what I'd like to have is have the

1    video shown in a way that isn't -- that reflects what we have.

2    I've got -- reflects what they produced.  I've got a copy of

3    that video on my computer.  I'm assuming that the documents --

4    that a copy of it contains -- if I remember correctly as one of

5    my exhibits I -- there's a mechanism that's available to show

6    the video in its proper condition.

7            THE COURT:  I'm not going to stop the trial in order

8    to have an evidentiary hearing on the technological qualities

9    of the video that you produced to them and whether they are

10   showing that one to the jury when you don't know whether this

11   is even going to be material to any issues down the road.  So

12   if you think you have evidence of they manipulated this exhibit

13   in order to prejudice your client --

14           MR. CHALMERS:  I'm not saying that.

15           THE COURT:  -- then --

16           Okay.  Then what other explanation can there be?

17           MR. CHALMERS:  Well, my guess is that they have --

18   when they have copied and recopied or whatever they've done

19   to -- however to get it presented, it no longer has the

20   qualities in terms of the light conditions as --

21           THE COURT:  That's completely speculation.  You would

22   have to have a hearing to determine that and that's what I just

23   said I'm not going to do.  So you don't know?

24           MS. BRETT:  I never --

25           THE COURT:  She's representing as an officer of the

1    court that they have not done anything to alter the lighting in

2    this video, and so that's where we are.  She's laid a

3    foundation.  This is --

4         MR. CHALMERS:  Well, I think -- and I guess that's my

5    problem.  I was asked before the video started whether this is

6    something that I've stipulated to with respect to foundation.

7    I didn't stipulate to foundation of this darkened-conditioned

8    video.

9         THE COURT:  Okay.  So what do you -- what do you want

10   me to do; I'll ask you the second time.  I haven't heard

11   anything suggested anything that's even possible.

12        MR. CHALMERS:  I don't think she should be able to

13   play the video in this condition.

14        THE COURT:  Okay.  That's overruled.

15        MR. CHALMERS:  Okay.

16        THE COURT:  Okay.  So if you want to come up with some

17   evidence that they manipulated it or you want to show me how

18   this is going to be relevant at some point down the road, then

19   we'll talk about it again, but for now we're going with this

20   video.

21        MR. CHALMERS:  Okay.

22        MS. BRETT:  Your Honor, I just ask if that gets raised

23   again it -- I would just ask if that argument gets raised again

24   it's outside the presence of the jury.  There's absolutely no

25   evidence to suggest that we manipulated this video.  We, in

1   fact, produced this exact copy of the video to Mr. Chalmers as

2   instructed by the court.  And it would be extremely prejudicial

3   to my client to have such an accusation in front of the jury.

4        (Thereupon, the proceedings continued in open court.)

5            MS. BRETT:  I think we're ready to proceed, Your

6   Honor.

7            THE COURT:  All right.  Let's go ahead.

8            MS. BRETT:  And for the record the timestamp is

9   currently 4:24 from where we are watching right now.

10       (Exhibit playing.)

11           MS. BRETT:  You can stop it there, 5:12.

12  BY MS. BRETT:

13  Q.   Mr. Bosire, does this part of the video I showed you show

14  Trooper McMillan pulling you over?

15  A.   That's correct.

16  Q.   And there appears to be two different angles on the video:

17  one on the top half and one on the bottom half.  Do you agree

18  with that?

19  A.   That's correct.

20  Q.   Do you have an understanding of what those two angles

21  represent?

22  A.   It's similar to my setup where I have a dash cam facing

23  forward recording in the front and then a dash cam in the back

24  recording the -- the back.

25  Q.   And does this video show Trooper McMillan activating his

1    lights?

2    A.   Yes.

3    Q.   What did you do when the lights came on?

4    A.   I slowed down and then pulled over to the shoulder.

5    Q.   Do you know how fast you were driving at that time?

6    A.   I believe I was doing a few miles over -- miles an hour

7    over the speed limit.

8    Q.   What was going through your mind as you got pulled over,

9    Mr. Bosire?

10   A.   At that moment he had been following me for 7 minutes --

11   approximately 7 minutes.  I knew at some point I was either

12   going to be pulled over, so I -- I was anxious but I knew it

13   was coming.  I was speeding.

14   Q.   Okay.  I want to show you at this time what's previously

15   been marked as Exhibit 843.  Before we start playing this

16   video, have you seen Exhibit 843 before?

17   A.   From the looks of it, it looks like my recording I did on

18   my cell phone.

19   Q.   Is there any part of this video that is altered from what

20   you originally recorded?

21   A.   Yes, I blurred out my face.

22   Q.   Why did you blur out your face?

23   A.   Out of privacy.

24   Q.   Privacy for yourself?

25   A.   Correct.

1    Q.  Do you still have an original version of this video without

2    the alteration?

3    A.  No.  Once you alter it, it overwrites it.

4    Q.  Does -- aside from the alteration, does this cell phone

5    video fairly and accurately depict part of your interactions

6    with Trooper McMillan during his stop and detention of you in

7    2019?

8    A.  That's correct.

9            MS. BRETT:  Okay.  At this time I'd like to move 843

10   into evidence.

11           THE COURT:  Any objection?

12           MR. CHALMERS:  No objection.  I think it's been

13   stipulated, Your Honor.

14           THE COURT:  Received.

15           MS. BRETT:  Thank you.

16           I'd like to play from 05 to 46 seconds please.

17       (Exhibit playing.)

18   BY MS. BRETT:

19   Q.  Mr. Bosire, what did you do with your window right after

20   you pulled over?

21   A.  I rolled my window all the way down.

22   Q.  Did you keep it down all the way?

23   A.  A few seconds after I -- he started moving around in the

24   back so I didn't know where he was, so I just put it back up.

25   It was cold.

1    Q.  So you put your window back up at that point?

2    A.  Yes.

3    Q.  Why did you say "this is profiling?"

4    A.  I had a hunch that the troopers who were seeing me at the

5    gas pump were following me after -- trailing me for 7 minutes,

6    that they were going to initiate contact.

7    Q.  Could you see Trooper McMillan at this point?

8    A.  No.

9    Q.  Did Trooper McMillan immediately approach your driver's

10   side door after you pulled over?

11   A.  No, he -- first of all, there's a blinding light in the --

12   coming from his car, so I could not see anything.  But I could

13   see a shadow walking through the light, so I knew that he was

14   either coming to the left or the right.  I didn't know which,

15   that's why I was -- saying I don't know where he was coming

16   from, so I don't know which window to roll down or up.

17   Q.  Got it.

18        MS. BRETT:  I'd like to play from one minute to three

19   minutes please.

20        (Exhibit playing.)

21   BY MS. BRETT:

22   Q.  When Trooper McMillan first came to your window, how far

23   did you roll it down?

24   A.  The first time or the second time?

25   Q.  That time that we just watched here, about how far down did

1    you roll your window?

2    A.   It was, I want to say, three-quarters rolled up.

3    Q.   So about a quarter of the way down?

4    A.   Yes.

5    Q.   Why didn't you roll it down all the way?

6    A.   It was cold.

7    Q.   If Trooper McMillan had asked you to roll your window down

8    all of the way, would you have done that?

9    A.   Yes.

10   Q.   Did you keep your window rolled up to mask a smell in your

11   car?

12   A.   No.

13   Q.   To be clear, did your car smell like marijuana?

14   A.   No.

15   Q.   Why not?

16   A.   I don't use drugs.

17   Q.   Could you hear Trooper McMillan when he was talking to you?

18   A.   I could.

19   Q.   To the best of your knowledge, could Trooper McMillan hear

20   you?

21   A.   Yes.

22   Q.   Could Trooper McMillan see inside your car?

23   A.   Yes.

24   Q.   Were you talking to Trooper McMillan face-to-face?

25   A.   Yes.

1    Q.  Did you recognize Trooper McMillan at that point?

2    A.  At that point I saw the Kansas Highway Patrol badge and I

3    knew it was the same officers who were at the Love's -- at the

4    Love's gas station.

5    Q.  What did that tell you about your theory that you had been

6    profiled?

7    A.  Could you repeat that question?

8    Q.  What did that tell you about the theory that you had come

9    up with that you had been profiled?

10   A.  It was confirmed.

11   Q.  Did Trooper McMillan give a reason why he stopped you?

12   A.  He say -- he stated I was speeding.

13   Q.  Mr. Bosire, did you dispute that you were speeding that

14   night?

15   A.  No.

16   Q.  What documentation did Trooper McMillan ask you for?

17   A.  He -- he asked for my -- my ID and the rental.

18   Q.  And did you give him those documents?

19   A.  I did.

20   Q.  After Trooper McMillan tells you about the speeding, what

21   was his next question to you?

22   A.  Pardon me.

23   Q.  Take your time.

24   A.  He wanted to know where I was coming from and where I was

25   heading.

1   Q.   And how did you respond to that?

2   A.   I told him I was coming from the west heading east.

3   Q.   Was that true, Mr. Bosire?

4   A.   It was.

5   Q.   Why didn't you give him more details?

6   A.   As soon as I saw that he was the same state troopers, I

7   knew something was going to happen.  I didn't feel like being

8   -- I didn't feel like conversing with him.

9   Q.   How did Trooper McMillan seem to respond to your answer?

10            MR. CHALMERS:  Well, I'll object, Your Honor.  I think

11  she can ask what he observed, but how he responded or what his

12  thought process were is beyond the scope of this witness's

13  knowledge.

14            MS. BRETT:  I'm happy to rephrase the question, Your

15  Honor.

16            THE COURT:  Okay.

17  BY MS. BRETT:

18  Q.   What was your impression of how Trooper McMillan responded

19  to you?

20            MR. CHALMERS:  I don't think that's relevant.

21            THE COURT:  Again, it goes to his damages and his

22  alleged -- his allegations of emotional distress and suffering.

23  Go ahead.

24  BY MS. BRETT:

25  Q.   Do you want me to repeat the question, Mr. Bosire?

1   A.   (Nodding head.)

2   Q.   What was your impression of how Trooper McMillan responded

3   to your answer?

4   A.   He repeated my answer and inquired about my travel plans.

5   Q.   And how did you respond after that?

6   A.   I asked him if I was obligated to answer those questions.

7   Q.   At some point did you invoke the right to remain silent?

8   A.   I did.

9   Q.   Why did you invoke that right?

10  A.   Rights are like muscles, if we don't use them we lose them.

11  And at that moment I felt he didn't need any of that and I had

12  -- I was illegally detained and invoking my -- my rights.

13  Q.   Mr. Bosire, what is -- what was your understanding at that

14  time of your right to remain silent and when you could use it?

15  A.   Any -- any time you are detained, questioned, arrested, you

16  have the right to remain silent to avoid self-incrimination or

17  get the blanket constitutional protection.

18  Q.   When did you first learn about that right?

19  A.   During the naturalization process.

20  Q.   And why was it important to you?

21  A.   It took -- it took a long time to get it.

22  Q.   At that point Trooper McMillan leaves your window and walks

23  back to his vehicle; is that right?

24  A.   Yes.

25  Q.   To the best of your knowledge, were there any other law

1  enforcement officers there at that time?

2  A.   The first time he was alone.

3  Q.   So there were no other troopers there with him at that

4  point?

5  A.   Correct.

6  Q.   About how long was Trooper McMillan back at his car with

7  your -- with your paperwork?

8  A.   A few minutes.

9  Q.   More than ten?

10  A.   No, I -- just like a normal traffic stop that I had been

11  before, a few minutes, maybe 7, 10, I don't remember.

12  Q.   So somewhere between 7 and 10 minutes --

13  A.   Correct --

14  Q.   -- sounds about right?

15  A.   -- yeah.

16  Q.   Did you understand what was happening at that point?

17  A.   I believe he was running my -- my background check on my

18  driver's license and seeing if I have any criminal record.

19  Q.   What were you feeling at this time?

20  A.   I was nervous.  I knew he had been telling me -- I had

21  confirmed that he was the same troopers who were at the gas

22  station, so I was in the middle of nowhere.

23  Q.   Did you have a criminal record?

24  A.   No.

25         MS. BRETT:  I'd like to call up what's been marked as

 1    Exhibit 844, and, again, I think this is one of the stipulated

 2    exhibits.  This is part two to Exhibit 843.

 3            MR. CHALMERS:  I have no objection to it.  I've

 4    identified as -- that exhibit for foundation purposes, Your

 5    Honor.

 6            THE COURT:  Received.

 7            MS. BRETT:  Thank you.

 8    BY MS. BRETT:

 9    Q.  I'd like to play Exhibit 844 starting at 8:55 to 12:55.

10    But before I do that, Mr. Bosire, do you recognize what this

11    is?

12    A.  From the looks of it, it's my second recording.

13    Q.  So this is the second part of your cell phone recording

14    from inside your vehicle; is that right?

15    A.  Yes, that's after I noticed I wasn't recording.

16    Q.  And there's the pixelation over your face again.  Do you

17    see that?

18    A.  I do.

19    Q.  Other than that pixelation, is this a fair and accurate

20    representation of the second cell phone video that you

21    recorded?

22    A.  It is.

23            MS. BRETT:  I'd like to play now from 8:55 to 12:55

24    please.

25        (Exhibit playing.)

1    BY MS. BRETT:

2    Q.  Mr. Bosire, I'm going to ask you a few questions about what

3    we just watched here.  What was the first thing that Trooper

4    McMillan said to you when he came back to your car that second

5    time?

6    A.  He kept asking me about somebody, where is my buddy.

7    Q.  You seem to let out a sigh at that point.  Why was that?

8    A.  I was traveling alone.

9    Q.  Did you understand what Trooper McMillan was talking about

10   when he said, "Where'd your buddy go"?

11   A.  No.

12   Q.  Why not?

13   A.  Because I was traveling alone.

14   Q.  Were you trying to evade answering Mr. -- Trooper

15   McMillan's questions?

16   A.  I was nervous.  It was in the middle of nowhere and he's

17   asking about somebody who's supposed to be with -- traveling

18   with me.  I was -- I was confused as -- trying to put together

19   what he's trying to insinuate.

20   Q.  At first you say something about another trooper who you

21   said hello to.  Who are you referencing when you tried to

22   explain that?

23   A.  He was asking that I was talking to.  So the first thing

24   that came to my mind was the troopers that were at the gas

25   station.  And then he kept asking the same question, so I

1    remembered there was another guy who said hello to me while I

2    was going to the gas -- the gas station.

3    Q.   So at this point are you trying to think of people you've

4    conversed with at the gas station?

5    A.   Correct.

6    Q.   When did you finally understand who Trooper McMillan was

7    referring to?

8    A.   After he kept insisting and insisting about somebody in a

9    hoodie in a gas -- next to the pump, that's when it clicked he

10   was referring to the -- the gas attendant.

11   Q.   And did you tell him that?

12   A.   I did.

13   Q.   What did Trooper McMillan tell you about giving you a

14   speeding ticket?

15   A.   He said I was only going five over; there's no reason for a

16   speeding ticket.  He's going to just issue a warning or

17   something of that nature.

18   Q.   Did you feel like you could leave at that point?

19   A.   No.

20   Q.   Why not?

21   A.   He was still -- he still had my documents and my driver's

22   license.

23   Q.   At this point in the encounter, what was going through your

24   head?

25   A.   He had followed me.  I had confirmed that he had followed

1    me.  He's asking me all this -- my travel plans, which I didn't

2    think he was entitled to that information, and then he's asking

3    about a fictitious passenger that I'm supposed to be traveling

4    with.  In my head I was thinking he's trying to escalate this

5    to be something more than it needs to be, and I just wanted my

6    -- I wanted to go home.

7    Q.  What did Trooper McMillan say to you about your cameras?

8    A.  He mentioned that why I had the cameras.

9    Q.  Which cameras did you think that Trooper McMillan was

10   referring to at that point?

11   A.  At that point I thought -- I was recording on my cell

12   phone, he had seen that, that was his reason for asking.  I

13   wasn't even thinking about the dash cam because they're always

14   running in the car.  It's not like...

15   Q.  So when Trooper McMillan asked you about the cameras, how

16   did you respond?

17   A.  I told him, "Because police" -- pardon the court -- "fuck

18   with people."

19   Q.  And why did you say that?

20   A.  Well, you see it every day on the news people --

21   Q.  Did you feel like that was happening to you at that point?

22   A.  Yes.

23   Q.  At the end of this encounter, did Trooper McMillan ask for

24   permission to search your car?

25   A.  He did.

1    Q.   How did you respond to that?

2    A.   I told him he needs a warrant.

3    Q.   Why did you say that?

4    A.   It goes back to what I've learned.  As a citizen, you have

5    rights to the Fifth Amendment.  You have rights to practice it

6    any time you feel like it's warranted.  I had not done anything

7    wrong and I didn't see the need -- the reason for him to pry

8    into my -- I thought the Constitution was going to help me.

9    Q.   So at that point you understood you had a right to say no

10   to a search of your vehicle?

11   A.   Yes.

12   Q.   And you understood you had a right not to answer any more

13   questions?

14   A.   That's correct.

15   Q.   What was Trooper McMillan's response to that?

16   A.   He said he's getting paid and I have a right to do that.

17   Q.   How were you feeling at this time, Mr. Bosire?

18   A.   I was nervous.  There was a second trooper there -- or

19   there was two additional vehicles that had come to the stop at

20   that point -- moment and I was scared.

21   Q.   How long did Trooper McMillan tell you that you would need

22   to wait for the K-9 Unit to arrive?

23   A.   I think the video says 10 minutes.

24   Q.   About how long did you end up waiting?

25   A.   Close to half an hour.

1    Q.  At any point while you were waiting, did Trooper McMillan

2    come back to check on you?

3    A.  No.

4    Q.  Did you get any explanation for why it was taking longer?

5    A.  No.

6    Q.  How were you feeling when you were detained for that period

7    of time?

8    A.  Again, it was in the middle of nowhere.  I knew that same

9    troopers had followed me.  Scared.

10   Q.  Why were you scared, Mr. Bosire?

11   A.  Could you repeat the question?

12   Q.  Why were you scared at that point?

13   A.  When you have people who are trailing you, they initiate a

14   lawful traffic stop but choose to extend it and then you have

15   additional units coming there, as a black man you get really

16   scared.

17   Q.  Did the K-9 Unit eventually arrive?

18   A.  It did.

19        MS. BRETT:  I'd like to go back to Exhibit 8 now and

20   play from 40:15 to 44:24 please.

21     (Exhibit playing.)

22   BY MS. BRETT:

23   Q.  Mr. Bosire, when the police dog got there, what did

24   Trooper McMillan ask you to do?

25   A.  He handed -- he told me to get outside -- outside the car.

1    He handed me my driver's license and my rental insurance -- my

2    rental paperwork.

3    Q.   Did he ask to pat you down?

4    A.   He did.

5    Q.   Did you follow his instructions?

6    A.   I did.

7    Q.   Was there anything taken off of you during the pat-down?

8    A.   No.

9    Q.   How many troopers were there at this time?

10   A.   There was two troopers and a deputy, but there's a state

11   trooper who left the scene.

12   Q.   And what were the conditions like when you were standing

13   outside?

14   A.   It was in the middle of February; it was freezing cold.

15   Q.   And the video depicts you and Trooper McMillan having a

16   conversation; is that correct?

17   A.   Yes.

18   Q.   What were you talking about with Trooper McMillan at this

19   point?

20   A.   I figured the best way to do -- try and diffuse the tension

21   and hopefully I could just go home.

22   Q.   So you were making conversation --

23   A.   Small talk.

24   Q.   -- with him?

25   A.   Yeah.

1    Q.   Sorry, I didn't catch your answer.

2    A.   Small talk.

3    Q.   You said to him at one point, "You could have talked to me

4    at the gas station."  Is that right?

5    A.   Yes.

6    Q.   What did you mean by that?

7    A.   When I left -- when I was approaching the Love's gas

8    station, I saw them, how they were looking at me.  And I

9    figured if they had any reason, they should have just

10   approached me and asked me right at the gas station where it

11   was public and there's a lot of people present.

12   Q.   What was the canine handler and the police canine doing

13   while you were talking to Trooper McMillan?

14            THE WITNESS:  Am I hearing something?

15            COURTROOM DEPUTY:  That was the drilling I asked about

16   earlier.  I'll get them to stop.

17   BY MS. BRETT:

18   Q.   Sounds like there's some construction maybe at the

19   courthouse.  Do you want me to repeat that question?

20   A.   Yes, please.

21   Q.   Sure, no problem.

22        What were -- what was the canine handler and the police

23   canine doing while you were talking to Trooper McMillan?

24   A.   They were searching for whatever they were searching for.

25   Q.   Was the canine walking around your car at that point?

1    A.   That's correct.

2    Q.   How did you feel about the police dog being there?

3    A.   I grew up with German shepherds.  I know how they act, and

4    it surprised me that he didn't have any leash on it.  I'll be

5    scared and apprehensive for the dog just running around without

6    a -- being on -- you know, being held, but he -- he -- he ran

7    around the vehicle a few times sniffing.

8    Q.   And to the best of your knowledge, did the dog find

9    anything?

10   A.   No.

11   Q.   About how long did the dog sniff around your car take?

12   A.   A few minutes.

13   Q.   What happened after that was over?

14   A.   Trooper McMillan says I'm lucky and I'm free to go.

15   Q.   Why do you think that Trooper McMillan said that?

16        MR. CHALMERS:  Well, Your Honor, I don't think his

17   thoughts as to what -- as to why Trooper McMillan might have

18   said that, his opinion on that subject is proper.  I don't

19   think that has any sort of value, and I object it's not

20   relevant.

21        THE COURT:  He has a lay opinion.  It may be relevant.

22        What is -- where are you going with this?

23        MS. BRETT:  It's just one question, Your Honor, to

24   talk about the impression that it was making on him.

25        THE COURT:  Overruled.  Objection's overruled.

1   BY MS. BRETT:

2   Q.  Do you want me to repeat the question --

3   A.  Yes, please.

4   Q.  -- Mr. Bosire?

5       What do you think Trooper McMillan meant when he said,

6   "You're in luck"?

7   A.  My perception is that a black man fits the stereotype of a

8   drug mule like the other opposing counsel branded me of being

9   with a criminal record or a drug trafficker, and apparently I

10  was in luck because I did not fit that description per the dog

11  sniff.

12  Q.  Did you feel like you got lucky at that point?

13  A.  No.

14  Q.  Why not?

15  A.  I worked so hard to be a model citizen, and to be branded

16  drug trafficker or mule is just -- it's hard.

17  Q.  At that point Trooper McMillan tells you that you're free

18  to go.  Do you immediately leave?

19  A.  No.

20  Q.  Why not?

21  A.  I know there's a running joke about takes a rocket

22  scientist to put a bulb, but it took me a few seconds to know

23  something had gone wrong.

24  Q.  Were you hoping to get some information about what had

25  happened that night?

1    A.   Yes.

2         MR. CHALMERS:  I think she's leading, Your Honor.

3    Well, withdrawn.  He's answered already.

4         THE COURT:  I don't think that's leading.  Go ahead.

5    BY MS. BRETT:

6    Q.   Were you hoping to get some information from Trooper

7    McMillan about what happened that night?

8    A.   That's correct.

9         MS. BRETT:  I'd like to now play Exhibit 8 again from

10   the point where we left off until the end.

11       (Exhibit playing.)

12        I'm sorry, actually, can you -- can you go back a

13   little bit further, please, to 42:24?

14       (Exhibit playing.)

15        Can you pause it for one second?  Can you just skip

16   ahead about 20 seconds?  Apologies for the confusion.

17       (Exhibit playing.)

18        You can keep playing.

19       (Exhibit playing.)

20        Stop it there.

21   BY MS. BRETT:

22   Q.   Mr. Bosire, what information were you trying to get from

23   the troopers in that last clip we just watched?

24   A.   I was looking for information as far as all the parties

25   that were involved.

1    Q.   What information were you looking for?

2    A.   Their names and badge numbers.

3    Q.   Why did you want that information?

4    A.   My -- my past I've worked with law enforcement before, so I

5    know they identify using their name and their badge numbers.

6    Q.   What did Trooper McMillan do when you asked for his

7    information?

8    A.   He repeated his last name and then he pointed his

9    flashlight towards the plates of his front car.

10   Q.   What was on the plates of the front -- of his car?

11   A.   His badge number.

12   Q.   What about the other trooper who was with Trooper McMillan,

13   do you know that trooper's name at this point in time?

14   A.   Yes.

15   Q.   Did you know it at that point in time during the stop?

16   A.   No.

17   Q.   What is the name of that trooper who was standing there

18   speaking with you?

19   A.   His name is Trooper Doug Schulte.

20   Q.   What did Trooper Schulte do when you asked for his

21   information?

22   A.   He yelled, "No" --

23           MR. CHALMERS:  Your Honor, Trooper Schulte is not a

24   defendant.  The stop had concluded.  I don't know how this is

25   relevant.

 1          MS. BRETT:  I think this is absolutely relevant, Your

 2     Honor.  It goes to what happened immediately after the stop and

 3     the fact that the trooper was not willing to give his

 4     information to Mr. Bosire, and then, in fact, threatened to

 5     cite him for being parked on the side of a highway, which goes

 6     to his damages.

 7          MR. CHALMERS:  That detention had ended.  There's not

 8     a defendant --

 9          THE COURT:  He's a witness.  He's a witness; right?

10          MR. CHALMERS:  Yep.

11          THE COURT:  And he'll be testifying.

12          MR. CHALMERS:  It would be a bad act that would be not

13     admissible either.

14          THE COURT:  Pardon me?

15          MR. CHALMERS:  It would be an inadmissible

16     quote/unquote bad act if you're introducing that under 609.

17          THE COURT:  An inadmissible bad act by Trooper

18     Schulte?  Don't -- just tell me what your objection is.

19          MR. CHALMERS:  Well, I'm anxious about the idea that

20     we are assailing Trooper Schulte for telling this man that he

21     needs to get off the road as if it was a bad act.  But if it is

22     introduced for that purpose to be critical of Trooper Schulte,

23     it is something that is -- conduct that is not admissible.  It

24     is -- as to his character or a specific instance of bad conduct

25     that would show anything that's relevant in the case.

 1          MS. BRETT:  I think the entirety of what happened to

 2     Mr. Bosire is relevant for his damages.  And while it is true

 3     that there is no claim against Trooper Schulte for what he said

 4     at that point in time, all of this goes to the effect that it

 5     had on Mr. Bosire as he's experiencing the end of this stop and

 6     what happens in his mind in the weeks and months after that.

 7          THE COURT:  Like, I completely agree with that.

 8     Trooper McMillan set in motion a chain of events and there's

 9     proximate causation for the jury to evaluate in deciding what

10     damages, if any, this plaintiff has suffered.  So your

11     objection is overruled.

12     BY MS. BRETT:

13     Q.  So that we have it on the record, Mr. Bosire, what did

14     Trooper Schulte say to you when you asked for his information?

15     A.  He yelled, "No," and he started telling me to -- that he's

16     going to cite me for parking on the shoulder.

17     Q.  When did Trooper McMillan give you the written warning that

18     he referenced his information would be on?

19     A.  He never gave me one.

20     Q.  Did you receive any paperwork about the stop the night that

21     the stop occurred?

22     A.  No.

23     Q.  You did not see -- receive a written warning that night

24     from Trooper McMillan?

25     A.  No.

1   Q.   Did the troopers ever apologize for holding you on the side
2   of the road?
3   A.   No, I believe he said I'm lucky.
4   Q.   Once they did eventually give you their information, did
5   they just walk back to their cars?
6   A.   He told me I'm free to go.
7   Q.   And did they then return to their cars?
8   A.   They did.
9   Q.   Did you eventually get back in your car and go back to
10  Wichita?
11  A.   I did.
12  Q.   About how long did it take you to get home from there?
13  A.   About three-and-a-half hours, four.
14  Q.   About three hours you said?
15  A.   Yeah.
16  Q.   What were you thinking and feeling as you drove home?
17  A.   I was anxious.  I was afraid that they were going to pull
18  me over again, so I drove below the speed limit and just drove
19  home.
20  Q.   About what time did you get home?
21  A.   Approximately a few minutes before midnight.
22  Q.   Were you able to return the car to Enterprise at that time?
23  A.   I did.
24  Q.   And then you eventually got back home to your residence in
25  Wichita; is that right?

1    A.  Yes.

2    Q.  Were you able to go to bed right away?

3    A.  No.

4    Q.  Why not?

5    A.  The first thing I did is I went to the dash cam to start

6    reviewing if there was any recording of what happened.

7    Q.  And by "the dash cam" you mean your dash cam camera?

8    A.  Correct.

9    Q.  And, again, you testified earlier there was no recording.

10   Is that when you realized it?

11   A.  Yes.

12   Q.  What time were you supposed to be at work the next morning?

13   A.  I believe I was supposed to be there at 8:00.

14   Q.  Did you go to work the next morning?

15   A.  No.

16   Q.  Why not?

17   A.  I knew something had happened.  I just wanted to follow up.

18   So I was distressed and couldn't be allowed to be at work in

19   that distressed state.

20   Q.  Is that a job requirement?

21   A.  Yes.

22   Q.  Can you explain a little bit about what that requirement

23   is?

24   A.  So to support any flight testing, you have to have enough

25   sleep and not be in a distressed state of mind.  You have to

1  fill out forms to evaluate how your state of mind is.  And I

2  knew I had not gotten enough sleep and my mind was not in the

3  right place.

4  Q.  So you did not go to work at all the next day; is that

5  right?

6  A.  That's correct.

7  Q.  What did you do in the few days after this stop occurred?

8  A.  So that -- that night I stayed up.  I started researching

9  about Kansas Highway Patrol, their policies, any incidents

10  similar to mine, and I filed a Kansas highway open records

11  request to the highway patrol seeking documents.

12  Q.  How did the Kansas Highway Patrol respond?

13          MR. CHALMERS:  I'm not sure how this is relevant, Your

14  Honor.

15          MS. BRETT:  This is relevant to his damages.

16          THE COURT:  Objection's overruled.

17  BY MS. BRETT:

18  Q.  How did the Kansas Highway Patrol respond?

19  A.  They sent me documents saying unresponsive, which means

20  that they could not produce any documents.

21  Q.  What did you do after you got that initial response?

22  A.  I followed -- I followed it up by calling them every lunch

23  break to request it.  And after getting the second

24  unresponsive, I finally called the Kansas Highway Patrol

25  attorney general -- general counsel.

1   Q.  Did you eventually get records from the Kansas Highway

2   Patrol?

3   A.  I did.

4   Q.  About how long did it take you to get those records?

5   A.  Approximately four months.

6   Q.  What records did you get?

7   A.  I got the dash cam recording and the policies as well as

8   citation I believe.

9   Q.  Did you get a copy of a report written by Trooper McMillan

10  that night?

11  A.  No.

12  Q.  Did you get a copy of a report written by Trooper Schulte

13  that night?

14  A.  No.

15  Q.  Did you get a copy of a canine report that would have been

16  written that night?

17  A.  No.

18  Q.  Did you get any explanation from the troopers' perspective

19  of what had happened that night?

20  A.  No.

21      MR. CHALMERS:  Once again, Your Honor, I don't know

22  how any of this is relevant.  He's talked about open records

23  request to the Kansas Highway Patrol, either damages or to the

24  issues against my client for what he's been alleged to have

25  done and damages he's alleged to have caused, and I object it's

1    not relevant.

2          MS. BRETT:  Your Honor, part of Mr. -- and I'm happy

3    to sidebar on this if you think that's appropriate.  But part

4    of Mr. Bosire's damages is the lengths that he went through to

5    get accountability for this stop that -- that he experienced.

6    And so the time it took to get responsive records from the

7    Kansas Highway Patrol and the fight that he had to go through

8    is directly relevant to how he feels about what he went

9    through, which is his emotional distress damages.

10         MR. CHALMERS:  Your Honor, the damages that are

11   recoverable under 1983 don't include the sorts of things she's

12   talking about and the effort to go get information.

13         THE COURT:  I'm sorry, they include emotional pain and

14   suffering.

15         MR. CHALMERS:  That's my point.  There are with

16   respect to emotional stress and suffering and nothing to do

17   with whatever distress he might have had trying to get records

18   from the Kansas Highway Patrol because he thought that they

19   weren't responsive enough quickly enough.

20         THE COURT:  Okay.  That is a question for the jury to

21   decide.  It's not a legal ground to exclude the evidence.  So

22   the jury will decide whether there's sufficient causal

23   relationship between the distress which he allegedly suffered

24   and what your client did or did not do.

25         MR. CHALMERS:  I understand the court's rulings.

1    Thank you, Your Honor.  I made my record I think.

2              THE COURT:  Uh-huh.  Go ahead.

3    BY MS. BRETT:

4    Q.  Mr. Bosire, what did it cost you to get the records that

5    you received through your open records request?

6              MR. CHALMERS:  Same objection.  There's -- it's not

7    something that is a recoverable damage amount for violation of

8    1983 as it relates to my client.

9              MS. BRETT:  Your Honor, can we approach on this?

10             THE COURT:  Can we just have a standing objection from

11   the defendant so that we don't have to keep interrupting the

12   testimony?

13             MR. CHALMERS:  I am pleased to have a standing

14   objection if the court's willing to accept it.

15             THE COURT:  Okay.  And your standing objection is to

16   what?  Anything which pertains to post-encounter conduct --

17             MR. CHALMERS:  Well, I think --

18             THE COURT:  -- by your client or Trooper Schulte or

19   the Kansas Highway Patrol?

20             MR. CHALMERS:  No.

21             THE COURT:  Okay.

22             MR. CHALMERS:  My objection is to the testimony as it

23   concerns difficulty that the witness claims he's had getting

24   records from the Kansas Highway Patrol and the costs that he

25   says he incurred to try to get those records, which wouldn't be

1    any of my client's responsibility or ability to respond to.

2    It's not relevant and it's not a proper measure of damages

3    under 1983.

4              THE COURT:  So this is really a closing argument.

5              Again, members of the jury, it will be up to you to

6    decide, after you've heard all of the evidence and received my

7    instructions about the law, whether Mr. Bosire is entitled to

8    recover and, if so, what damages were proximately caused by

9    Trooper McMillan.  So, as you know, what Mr. Chalmers says is

10   not evidence in the case, and so I'm just ruling on objections

11   and you should ignore this whole back and forth that we're

12   having.

13             Go ahead.

14   BY MS. BRETT:

15   Q.  Mr. Bosire, what did it cost you to get the records that

16   you requested through your open records request?

17   A.  I paid 75 bucks for the -- for the policies and the dash

18   cam recording.

19   Q.  I'd like to pull up what's been marked as Exhibit 11 if you

20   could take a look at that.  You can see it on your computer.

21             MS. BRETT:  Could you publish it just to the witness,

22   Ms. Harper?

23   BY MS. BRETT:

24   Q.  Do you see that on your screen, Mr. Bosire?

25   A.  It's -- it's blurry, but yes.

1  Q.  Do you recognize what this document is?

2  A.  Yes.

3  Q.  And what is it?

4  A.  It's a receipt -- a receipt from the Kansas Highway Patrol

5  in regards to my open records request.

6  Q.  And is it a true and accurate statement that you received

7  from the Kansas Highway Patrol in response to that request?

8  A.  Yes.

9        MS. BRETT:  At this point I'd like to move this into

10  evidence, Your Honor.

11        MR. CHALMERS:  Well, I don't think -- the foundation's

12  been laid it's true and accurate, but I don't -- I object for

13  the same reasons I object before on the basis that this isn't

14  relevant, Your Honor.

15        THE COURT:  Well, if there's no dispute as to the

16  amount that he paid, then I don't think we need this exhibit.

17  But if it turns out on cross-examination that there's a dispute

18  whether he paid something or what he paid, then you can reoffer

19  it.

20        MS. BRETT:  Thank you, Your Honor.

21        Okay.  We can pull Exhibit 11 down.

22  BY MS. BRETT:

23  Q.  After you got these records from KHP, what did you do next?

24  A.  I started researching about incidences relative to what I

25  had experienced through the open records, through Google,

1    through court documents.

2    Q.   What types of things were you researching?

3    A.   In particular I was looking for --

4         MR. CHALMERS:  Your Honor, I -- I'm sorry, it seems to

5    me that we're walking into an area that has been a subject of a

6    motion *in limine*.  I don't know how his research as it relates

7    to other events dealing with highway patrol is properly before

8    the court.

9         MS. BRETT:  Your Honor, can we approach on this

10   please?

11        THE COURT:  Uh-huh.

12        Again, members of the jury, ignore these objections

13   for your purposes.

14      (The following proceedings were had at the bench by court

15   and counsel.)

16        MS. BRETT:  Your Honor, part of Mr. Bosire's damages

17   are about the amount that he paid to get cases to file a

18   complaint.

19        THE COURT:  Get what?

20        MS. BRETT:  Case law, the *Vasquez* decision

21   specifically, to file a complaint with the Kansas Highway

22   Patrol, all of the steps that he had, all of these are things

23   that Mr. Bosire had to do as a result of what he was subjected

24   to on the night of his stop and detention.  He is going to

25   testify that he got the docket from the *Vasquez* decision from

1    Pacer and had to pay money to get that, and that was what he

2    needed in order to file his PSU complaint.

3           This has been in the pretrial order.  Our damages

4    request has been in interrogatories for the amount that he paid

5    on Pacer for the *Vasquez* decision and it's been in the pretrial

6    order as part of the damages that he seeks.  He seeks the $75

7    that he paid for his open records and he seeks 88.70 for the

8    *Vasquez* decision and court documents that he got.  And the

9    *Vasquez* decision is the decision that you have said is

10   explicitly relevant to this case; that's what he's talking

11   about.  He's not talking about other KHP cases.

12          MR. CHALMERS:  *Vasquez* is another KHP case.  Again,

13   none of this is relevant to the damages as it concerns the

14   claims against my client.  This is the sort of thing that you

15   have in terms of cost associated with preparing to bring a

16   lawsuit during the investigation which aren't recoverable.

17          THE COURT:  Okay.  Is that all?  Because if you can

18   cite me a case that says this is not recoverable under 1983

19   even though it may be proximately caused by the defendant's

20   conduct, then I'll take a look at that.  But, again, I think

21   this is a question for the jury to decide whether these kind of

22   damages are proximately caused by your client's conduct and

23   it's not some crazy theory that's so far out of bounds that we

24   would keep it out of evidence.

25          MR. CHALMERS:  No, I think that I would have to look

1   for a case.  I know there's a case that talks about what sort

2   of recoverable damages are and I can get the Tenth Circuit to

3   show the comprehensive discussion discussing those things.  But

4   to answer your question is that -- in terms of out of bounds, I

5   don't think there is any case that would say you can get

6   litigation preparation costs as damages in a 1983 case.

7          That being said, now we're walking into another area

8   here the way the question was asked what sort of research did

9   you do looking for other similar events, other similar cases,

10  and that's the very thing that the court has said that other

11  conduct by other troopers is not relevant, is not admissible,

12  isn't 403 sort of issues, is improper under the -- in the

13  motion *in limine*.

14         THE COURT:  I didn't address this issue in the motion

15  *in limine* and nobody raised it, so your objection is overruled.

16         MR. CHALMERS:  I think there was a motion *in limine* as

17  to other --

18         THE COURT:  I'm sorry; I can't hear you.

19         MR. CHALMERS:  There was a motion *in limine* as to

20  other acts in other claims in the highway patrol.

21         THE COURT:  This isn't to show other wrongful acts.

22  Offered to show what damages he sustained.  Objection's

23  overruled.

24         MS. BRETT:  Thank you, Your Honor.

25      (Thereupon, the proceedings continued in open court.)

BY MS. BRETT:

Q.   Mr. Bosire, we were just talking about the research that you conducted, and I believe that you stated that you had referenced case law; is that correct?

A.   That's correct.

Q.   What case specifically?

A.   I learned of two cases that were relative to prolonged stops.  One was the *Rodriguez* case against the USA, which the Supreme Court ruled that was unlawful --

Q.   I don't need you to give me what the case said, but --

A.   All right.

Q.   -- the *Rodriguez* case, and then what was -- you said there was a second case?

A.   Yes, the Kansas Highway Patrol versus Vasquez.

Q.   And what did you do when you learned about that case?

A.   I filed a complaint against Trooper McMillan and Doug Schulte and copied the office of the governor.

Q.   And specifically about the *Vasquez* case, what documents did you get about that case?

A.   I went to the Wichita District Court and opened the file -- filed an open records request for all the documents from the initial filing to the settlement.

Q.   What did it cost you to get those documents?

A.   It was about $88.

Q.   And then you mentioned you filed a complaint against

1  Trooper McMillan; is that right?

2  A.  Correct.

3  Q.  Approximately when did you file that complaint?

4  A.  That's after I received the documents, which was about four

5  months after.

6  Q.  So at some point after the stop in the springtime, you

7  filed the complaint?

8  A.  Correct.

9  Q.  And why did you file the complaint?

10  A.  I knew what they had done was wrong and I wanted them to be

11  held accountable.

12  Q.  What does the accountability mean to you, Mr. Bosire?

13  A.  It means same thing with checks and balances that I'd

14  spoken about as far as the Constitution, trying to afford

15  people who look like me equal rights and protection against --

16  as afforded by the Constitution.

17  Q.  And that investigation -- was there eventually an

18  investigation conducted into your complaint?

19  A.  There was.

20  Q.  And that -- does it sound right the investigation concluded

21  around August of that year?

22  A.  I believe that's when they sent me the findings.

23  Q.  Okay.  I want to move now to talking about something a

24  little bit different.  We talked about your open records

25  request and getting the dash cam footage.  Do you recall that?

1  A.  Yes.

2  Q.  In addition to filing your complaint, did you do anything

3  else with that footage?

4  A.  I did.

5  Q.  What did you do?

6  A.  I made an editorial text with a video and uploaded it on

7  You Tube.

8  Q.  When you say you made editorial text, do you mean that you

9  put text over the video?

10 A.  Correct.

11 Q.  And you said you put it up on YouTube?

12 A.  Yes.

13 Q.  Where else did you post it?

14 A.  I shared it with local press, I shared it with friends, and

15 I shared it with some of the people I'd encountered prior.

16 Q.  Why did you create this YouTube video?

17 A.  I wanted people to be aware of what the Kansas Highway

18 Patrol are doing to people like myself.

19 Q.  Did you post it to get famous, Mr. Bosire?

20 A.  No.

21 Q.  Did you want it to go viral?

22 A.  No.

23 Q.  Did you post it because you wanted to harass the troopers?

24 A.  No.

25 Q.  Mr. Bosire, it's safe to say you expressed some strong

1    sentiments in the video; is that correct?

2    A.   I did.

3    Q.   Why is that?

4    A.   I was frustrated by the stop.  I -- I was frustrated with

5    the open records request I kept filing.  I was frustrated with

6    the delays that they were doing and all this cover-up that they

7    were trying to do for the story, and I just wanted it for the

8    people to -- to see to be aware of what's going on to hold them

9    accountable.

10   Q.   Those sentiments that you express in the video in the text

11   statements, did you have those sentiments about the police

12   before you were detained in February of 2019?

13   A.   No.

14   Q.   Since that detention, how have your views changed?

15   A.   I went -- I went from working with law enforcement in

16   various capacities, we were getting trained by law enforcement

17   with first responders, we were volunteering together helping

18   the community, but once you're treated like a drug mule those

19   sentiments disappear.

20   Q.   I want to talk a little bit about that.  So what effect did

21   this detention have on your community volunteer work?

22   A.   Again, the majority of community involvement requires some

23   level of safety, which comes from law enforcement.  The

24   presence, it -- it makes me anxious.  I -- I cannot serve the

25   community if I'm not that proud of myself.  And I used to enjoy

1    it.  I don't anymore.

2    Q.  One of the community organizations that you worked with was

3    the first responders.  I believe you talked about that

4    yesterday; is that right?

5    A.  Yes.

6    Q.  How has this detention impacted your work with the first

7    responders?

8    A.  Nowadays I just do your work.  I serve as a -- as a first

9    responder only in the premise of work and nothing to do with

10   the community.

11   Q.  Have there been any events that you volunteer at where

12   you've had to leave because of the presence of law enforcement?

13   A.  I did.

14   Q.  Can you explain that to the jury please?

15   A.  Last year I was volunteering with Special Olympics.  This

16   is where we go help people with -- who are less fortunate than

17   us with the games, setting up games, volunteering your time

18   with them.  We organize and officiate games where they play,

19   like, normal sports.  Everything was going well because the law

20   enforcement were on the perimeters directing traffic.  But as

21   soon as they started coming towards where we were, I just left.

22   Q.  So you left the event early because law enforcement came to

23   you to where you were working?

24   A.  Yes.

25   Q.  And why did you leave?

1   A.   The whole process taught me that I -- there was no way I

2   was going to trust them.  I tried to hold them accountable.

3   Nothing was working.

4   Q.   What effect has this detention had on your travel or your

5   driving habits?

6   A.   Well, I travel less, during the day, nothing at night

7   unless I have somebody in my car.  If I have to travel long

8   distance, I have to plan to stay in a hotel to avoid driving at

9   night.  If I'm leaving the house, I have to have both my dash

10  cams recording and making sure that they operate before I leave

11  the parking lot.

12  Q.   Do you drive to Colorado as often as you did previously?

13  A.   No.

14  Q.   But you still sometimes drive?

15  A.   Yes.

16  Q.   Has this changed how often you can see your daughter?

17  A.   It has.

18  Q.   How do you feel about that, Mr. Bosire?

19  A.   If you're a parent, any time away from your kids is

20  important.  So I -- it's limited me, but I do my best.

21  Q.   Has it impacted you financially?

22  A.   Yes.  It costs about $80 to fill up a gas tank back and

23  forth.  It cost about 600 to fly.  I choose to fly.

24  Q.   Mr. Bosire, what are some of the effects that this stop has

25  had on you as you sit here today four years later?

1   A.   It's actually 15 -- 1,535 days since traffic stop.  It

2   would be wrong for me to say the Constitution awards us the

3   same rights as normal people.  We are -- we are second class

4   citizen clearly.  I try to practice my rights, but those are

5   the same rights that were used against me.

6        I've had law enforcement follow me for 45 minutes for no

7   reason or station outside my apartments.  Co-workers call me to

8   tell me, "Hey, there's a trooper there; avoid that."  So I have

9   to go around not because I'm doing anything illegal, it just --

10  I don't want any conflict.

11       I would say there's so many layers that come with me.  I

12  used to be a community involver.  I wanted to -- to be -- to be

13  a STEM outreach person.  I don't do that anymore because of it.

14  So how can I -- how can I say that the Constitution works in my

15  favor when clearly it doesn't.

16  Q.   Mr. Bosire, do you have anxiety around law enforcement as a

17  result of this?

18  A.   I do.

19  Q.   Have you ever sought medical attention to deal with your

20  anxiety?

21  A.   No.

22  Q.   Why not?

23  A.   I come from a very different culture where a man is

24  supposed to be revered to be stone cold, not people who wear

25  their emotions on their sleeves.  If I do, I'll be a weakling.

 1          Therapy is not cheap.  It costs about $200 an hour.  And I

 2     have a daughter and two households to support.  I don't --

 3     regardless of how ruthless it is to be labeled a victim, I

 4     don't want that for myself.

 5     Q.   Mr. Bosire, why did you file this lawsuit?

 6          MR. CHALMERS:  Your Honor, the relevance of why he

 7     filed the lawsuit is not apparent.

 8          THE COURT:  Overruled.

 9     BY MS. BRETT:

10     Q.   Would you like me to ask again, Mr. Bosire?

11     A.   Sure.

12     Q.   Why did you file this lawsuit?

13     A.   I was lucky to be sworn in as a naturalized citizen.  I was

14     proud to join the "we, the people" movement.  That's where I

15     learned about my rights, the rights to be free, free from --

16     unconditional freedom where freedom is not determined by your

17     skin color, where freedom is for everybody regardless of how

18     they look.  I filed this lawsuit because it's -- it's not easy.

19     Yes, I might look like I have a polished life, but I'm a

20     destroyed man.  If people like myself don't stand up, nobody

21     will.

22     Q.   Thank you, Mr. Bosire.

23          MS. BRETT:  Nothing further from me at this time, Your

24     Honor.

25          THE COURT:  Cross-examination.

```
 1          Members of the jury, can you go for another hour
 2   without a break?
 3          JUROR NO. 1:  I need a break.
 4          THE COURT:  Okay.  All right.  Let's take a recess for
 5   10 minutes.  Be promptly back ready to go.
 6          Court's in recess.
 7      (Recess.)
 8      (The jury entered the courtroom, after which the following
 9   proceedings were had.)
10          THE COURT:  Mr. Bosire, would you, please, take the
11   witness stand again.
12          Go ahead, counsel.
13          MR. CHALMERS:  Thank you, Your Honor.
14                     CROSS-EXAMINATION
15   BY MR. CHALMERS:
16   Q.  Mr. Bosire, I want to focus on some testimony that you gave
17   just right before we took a break.  I think you were asked why
18   you filed the lawsuit.  Did I hear you correctly that you said
19   that in part it had to do with you should not be treated
20   differently because of the color of your skin?
21   A.  Yes.
22   Q.  When you were first pulled over, and we watched the video
23   clip on that, I think since you used the term profiling or
24   maybe racial profiling, is that the -- was the term you used?
25   A.  I say profiling.
```

1   Q.  And what you meant was racial profiling; is that right?

2   A.  I said profiling.

3   Q.  What you meant was racial profiling because of the color of

4   your skin; isn't that right?

5   A.  You're asking me what I meant?

6   Q.  Yes.

7   A.  I said profiling.

8   Q.  Did the color of your skin fit into the profiling that

9   you're talking about as what you meant at the time?

10  A.  In my belief I did --

11  Q.  Okay.

12  A.  -- yeah.

13  Q.  So there's no uncertainty, when you were first pulled over

14  for speeding before you were detained for the dog sniff, you

15  were persuaded that you had been a victim of racial profiling;

16  is that right?

17  A.  Yes.

18  Q.  And when you talk about not being treated differently

19  because of the color of your skin, explained why you brought

20  this lawsuit and these emotions that you've described, that's

21  because you feel you were a victim of racial profiling; isn't

22  that right?

23  A.  Yes.

24  Q.  Now, you went into the Love's store, and you have become

25  aware that there are videos that were kept at Love's that were

1   recovered as part of the investigation of your claims; is that

2   right?

3   A.  Yes, I requested them.

4           MR. CHALMERS:  I would like to move for admission of

5   Exhibit 836, which is a Love video.  It was identified and was

6   not objected to for foundation purposes in the defendant's

7   disclosures, Your Honor.

8           MS. BRETT:  No objection.

9           THE COURT:  Received.

10  BY MR. CHALMERS:

11  Q.  I'm going to put that up on the screen -- or parts of it up

12  on the screen.  I want to talk to you about it.  Here we go.

13  So do you have a screen where you can see it in front of you?

14  A.  Yes.

15  Q.  Very good.  Thank you.

16      I have shown it, and it's shown at 16:11 down at the bottom

17  left corner on the tape itself, but it also has a time

18  increment which is the 20:27:03.  Do you see what I'm referring

19  to where it says "hallway bathroom?"

20  A.  Yes.

21  Q.  I'm going to start the tape, Exhibit 836, at that point.

22      (Exhibit playing.)

23      Okay.  I stopped the tape.  Do you see a trooper walking

24  down the hallway and turn apparently towards the exit at about

25  16:20 on the tape?

1    A.   Yes.

2         (Exhibit playing.)

3    Q.   I'm pausing at 16:49 on the tape and there's a gentleman

4    walking in apparently from the doors.  That's a picture of you,

5    isn't it?

6    A.   Correct.

7    Q.   Sunglasses on your head?

8    A.   Yes.

9    Q.   And you're not wearing a coat?

10   A.   I'm sorry?

11   Q.   And you're not wearing a coat?

12   A.   Correct.

13   Q.   And this is when you would have first entered the Love's

14   store that you talked about with the -- with your counsel; is

15   that right?

16   A.   Yes, this is the part where I'm coming in to ask for the

17   attendant's help.

18   Q.   Now, I moved forward and I stopped at 16:53, and at this

19   point you've walked up kind of towards the counter; is that

20   correct?

21   A.   Yes.

22   Q.   Now, you had indicated, in your testimony with counsel,

23   that there was a lady that you had paused to allow to go in

24   before you.  Is that what you said?

25   A.   What you're not seeing is the gentleman was talking to

1    somebody on the other side, so I had to wait for him.  And

2    then, as I was approaching, I started conversing with him.

3    Q.   Okay.  So what we should be -- what the lady talked about,

4    if we move back a little bit further and start up at 15 -- see

5    if we start about 16.  I started at 16:11 I think.  You got the

6    trooper leaving.  There's a lady that walks in at 16:29, but

7    that's not who you're talking about that you open the door for;

8    right?

9    A.   There's a gentleman -- there's an older gentleman who was

10   at the door that the camera is not capturing.

11   Q.   Then you've got -- see about 16:46 there's a younger guy

12   leaving through the door?  You see that, don't you?

13   A.   Yes.

14   Q.   And then you walk in at just a little bit past 16:49.  So

15   this other man -- this other older gentleman you talked about,

16   is he kind of in the foyer area?

17   A.   No.  I believe the gentleman who just left is the one I

18   held the door.

19   Q.   Well, the gentleman that just left you think is -- back up.

20   I paused.  There's a -- there's a younger man with the black

21   shirt; that's the one you say you hold the door open for?

22   A.   I believe that's him.

23   Q.   Now, your testimony to counsel, and I maybe misheard, is

24   that it was an older lady that you were waiting on.  Apparently

25   that wasn't the case?

1    A.   No, I said gentleman, older gentleman.

2    Q.   And if it's this guy, it wasn't an older gentleman either,

3    is that --

4    A.   It might be younger than -- older than me -- or I don't

5    remember his age.

6    Q.   So it's possible that you were mistaken at least in that

7    respect as to how you came in?

8    A.   I could have been, but I held the door for somebody.

9    Q.   Then you come in at 16:48 and you walk up to the front.

10   Now, in your testimony with counsel you indicated you passed by

11   three -- two to three troopers as you walked in.  The trooper,

12   we saw just one, is that right, on the tape?

13   A.   I see one on the tape.

14   Q.   Well, do you think you could have been mistaken as to how

15   many troopers you passed by as you walked in?

16   A.   No, I saw what I saw.

17        MS. BRETT:  Your Honor, I'm just going to put an

18   objection on the record there.  I think that misstates the

19   prior testimony.

20        THE COURT:  He can clarify if it is a misstatement.

21   BY MR. CHALMERS:

22   Q.   I'm turning back on the tape at 16:55 I think and I paused

23   it at 16:59, and do you see there are two law enforcement

24   officers now leaving Love's?

25   A.   Yes.

1   Q.  And at the time they're leaving Love's, you're over talking

2   to someone at the cashier's register; is that right?

3   A.  Correct.

4   Q.  So those two officers are not the folks that you, if you

5   remember walking by, that you walked by.  And if you testified

6   they -- that you had walked by them coming in, you would have

7   been mistaken?

8   A.  I could have been.  I saw the trooper vehicles, and one of

9   them I say -- exchanged -- I exchanged pleasantries with one of

10  the troopers.

11  Q.  Now, do you recognize -- maybe you can't from this video --

12  either of the two troopers standing by the front door as you're

13  up by the front cash register?

14  A.  I cannot tell -- tell you definitively.

15  Q.  And as the troopers leave on -- on exhibit -- some time

16  shortly before about 17:00, you can see, at least the fellow in

17  the black uniform, his vision kind of looks over towards you.

18  You can see that in the video, can't you?

19  A.  I don't know if he's looking at me or...

20  Q.  Well, I'll turn the tape back on at 17:00 and we'll look at

21  it for a couple more minutes.

22      (Exhibit playing.)

23      At about 17:15 you appear to be leaving.  And I think you

24  said you left at that point after you talked to the person at

25  the cash register; is that correct?

1   A.   Correct.

2   Q.   Started back up the tape.

3        (Exhibit playing.)

4        And at 17:30 there is a man with a hoodie coming after you?

5   A.   Yes.

6   Q.   So you went back to the pump after you left the store; is

7   that right?

8   A.   Yes.

9   Q.   And you were at the pump for a very short time talking to

10  the man with the hoodie; is that right?

11  A.   Yes.

12  Q.   And during that time I think you said you weren't paying

13  too much attention to your surroundings, but is it your

14  presumption that the troopers that left were watching you at

15  the pump?

16  A.   As I said, I wasn't aware of anything that was happening

17  around me.

18  Q.   And while you were at the pump getting gas, letting an

19  attendant do whatever the attendant's magic was to get it to

20  work, you weren't wearing a coat, were you?

21  A.   From the video I wasn't wearing one.

22  Q.   The vehicle that was at Love's was a rental car.  I think

23  you rented it in Wichita; is that right?

24  A.   Yes.

25  Q.   And you rented it to go to the Denver area and then to

1   return to Wichita.  So it was a round tip -- trip; is that

2   correct?

3   A.   Yes.

4   Q.   And you were given paperwork, weren't you, as part of the

5   rental?

6   A.   Yes.

7   Q.   And you had that paperwork with you during the time of the

8   stop; is that right?

9   A.   Yes.

10  Q.   And during the course of the stop, I think Trooper McMillan

11  asked to see the rental agreement; isn't that right?

12  A.   Yes.

13  Q.   Now, looking at the rental agreement itself, it would have

14  shown that the vehicle was overdue, that it wasn't back in time

15  to Wichita; isn't that right?

16  A.   I'm sorry, could you repeat that?

17  Q.   Sure.

18      Looking at the rental agreement itself and the date and

19  time that it says it was supposed to be returned, the rental

20  car was not back in time when you showed it to Trooper

21  McMillan; isn't that right?

22  A.   That's correct.

23  Q.   Now, on -- in the rental car you had placed cameras, and I

24  think you said you had one located at the dash and one located

25  towards the rear.  Where was the rear camera located?

 1  A.   It was mounted between the headrests.

 2  Q.   So it would have been in the back seats but mounted between

 3  the two headrests in the back?

 4  A.   Yes, I -- I didn't have a way to attach it to the rental

 5  car because my -- my mounts were still in the -- in my car.

 6  Q.   By the way, as you watched the tape a few minutes ago and

 7  the two troopers, at least, that were leaving, your back was to

 8  them when they left; is that correct?

 9  A.   I believe it's side still or slightly.

10  Q.   Okay.  But you didn't see them in the store?

11  A.   No, I spoke to one outside.

12  Q.   And you don't remember seeing them when they were outside

13  either when you were at the pump?

14  A.   I believe I saw them when the -- when I was pumping gas

15  when they were outside the car, but I don't recall.

16  Q.   And moving fast forward for just a second, when you got in

17  your car after you completed it with gas, you left and get back

18  on I-70 going east; is that right?

19  A.   Yes.

20  Q.   And during that time frame that you got in your car and

21  left, you don't know where the troopers were, do you?

22  A.   I believe they left the store.

23  Q.   You didn't see them leave, though, did you?

24  A.   Again, I don't -- I wasn't paying attention to them.

25  Q.   And you weren't paying attention as to whether there was a

1   silver Dodge that was driving by about the time that you were

2   out either leaving or in the parking lot at Love's, were you?

3   A.   No.

4   Q.   No meaning -- because mine was a bad question -- that you

5   can't say that there was or wasn't a silver Dodge; is that a

6   correct statement?

7           MS. BRETT:   Your Honor, that calls for speculation.

8   Objection.

9           THE COURT:   So, sir, you should only answer, you know,

10  based on your personal knowledge.   So if you can answer that

11  question, go ahead.

12          Mr. Chalmers can repeat it for you if you don't --

13  BY MR. CHALMERS:

14  Q.   Yeah, I'm just trying to get at, because you gave an answer

15  no and I think the literal response may have been yes, trying

16  to clarify you did not see, to the best of your memory, a

17  silver Dodge while you were at the Love's stop?

18  A.   I did not see --

19  Q.   Okay.

20  A.   -- see it.

21  Q.   So let me talk to you about your cameras for a second.

22  Your testimony appeared to be today that the cameras could have

23  been activated and could have recorded, whether it was Love's

24  or whether it was the subsequent traffic stop and detention, is

25  that what you're -- what you've said?   The dash -- the cameras

1    that you mounted --

2              MS. BRETT:  Your Honor, object.  I think that

3    misstates the testimony.  Mr. Bosire testified on direct that

4    the cameras had a functionality of recording but he testified

5    very clearly on direct that they were not recording.

6              THE COURT:  That's not really a valid objection.

7    That's a speaking objection.  He can answer it if that's not an

8    accurate -- if Mr. Chalmers is misrepresenting what his

9    testimony was.

10             MS. BRETT:  Thank you, Your Honor.

11   BY MR. CHALMERS:

12   Q.  Do you remember the question?

13   A.  Could you repeat it?

14   Q.  Sure, I will.

15       Is it your testimony today that the cameras were capable if

16   they had been turned on of recording the events at Love's and

17   recording the events out on the road where you were stopped and

18   detained?

19   A.  The way the dash cams were set is they were supposed to

20   record, but for some odd reason they were -- they did not

21   record.  Once -- and that's when I found out, when I got home.

22   Q.  So your expectation was that these cameras were actually

23   recording while you were at Love's and were recording while you

24   were out on the road during the stop and detention; is that

25   your testimony today?

1    A.  Yes.

2         MR. CHALMERS:  Your Honor, may I have permission to

3    open the original exhibit -- or deposition and give to the

4    witness?

5    BY MR. CHALMERS:

6    Q.  Hand that to you.  Back in September 28, 2020, we had a

7    proceeding in this case where I was able to take your testimony

8    under oath and we did it by -- by video by Zoom.  Do you

9    remember that?

10   A.  I do.

11   Q.  And that proceeding was referred to as a deposition.  And

12   what I have handed to you is a copy of the transcription of the

13   testimony that you gave back September 28th, 2020.  Now, in

14   that deposition you remember being told that the testimony that

15   you would give was the same testimony like today under oath?

16   A.  Yes.

17   Q.  As if you were testifying in front of a judge or jury,

18   you're required to give honest answers.  Do you remember that?

19   A.  Yes.

20   Q.  And your lawyer was present during the deposition.  I think

21   she was in the same room with you at the time.  Do you remember

22   that?

23   A.  She was.

24   Q.  And I asked questions and you answered the questions during

25   the course of this deposition; is that right?

1    A.   Yes.

2    Q.   And one of the things I said to you during the -- during

3    the deposition was is that, look, you'll have an opportunity to

4    read the transcript of this deposition and look at it and --

5    and tell me that everything's been accurately transcribed or

6    for that matter if there's a question that you misunderstood

7    you had the opportunity to correct that.  Do you remember that

8    comment -- that conversation?

9    A.   I do.

10   Q.   And I don't know, did you read through the deposition

11   transcript?

12   A.   I have.

13   Q.   Did you make any corrections?

14   A.   I believe the corrections were submitted by my lawyer.

15   Q.   Now, there aren't any corrections, I believe, that have

16   been provided to the deposition transcript, but you think there

17   are some that you made that just didn't make its way back to

18   the court reporter?

19            THE COURT:  Is that what you said?  I'm sorry.

20            MR. CHALMERS:  I'm just trying to figure out -- I

21   thought he said that he made corrections but they --

22            THE WITNESS:  I said the lawyer asked me for

23   corrections, which I reviewed the deposition and submitted the

24   changes to her.  Like, when they asked about my -- my

25   daughter's name was misspelled.  Her name was misspelled.

1  There's some things -- there's some dates that are misspelled

2  that were entered wrongly, but I submitted those to my lawyer.

3  BY MR. CHALMERS:

4  Q.  Okay.  And -- and in the transcription that you have in

5  front of you, the original, do you find anything that contains

6  a correction sheet in it?

7          THE COURT:  Counsel, you're the one that handed it to

8  him; you know.  Let's not play games.

9          MR. CHALMERS:  I don't either.

10         THE COURT:  If there's a correction sheet there, why

11  don't you point it to him --

12         THE WITNESS:  Right.

13         THE COURT:  -- instead of doing this.

14         MR. CHALMERS:  I don't think there is a correction

15  sheet.

16         THE COURT:  Okay.  Well, you know because you opened

17  it and gave it to him.

18         MR. CHALMERS:  Well, I'd like him to confirm that.  If

19  not, Your Honor, the deposition transcript, I can look at it

20  real quickly.

21  BY MR. CHALMERS:

22  Q.  It's got a text version and actual version.  And there are

23  no corrections with the original transcript, are there?

24  A.  I'll take your word for it.

25  Q.  Okay.  I'd like you to turn to page 62 please.  And if

1    you'll look starting at line (sic) 62 at line 9.  The question

2    was:  "So the rental vehicle had mounted in it a couple of

3    cameras; is that correct?"

4         And the answer was:  "Yes."

5         The question was:  "And those were your cameras that you

6    added to the vehicle for the purpose of the trip; is that

7    correct?"

8         And the answer was:  "Yes."

9         Are you there?

10   A.   Yes.

11   Q.   "And when you were at Ellis, Kansas, the Love's Travel stop

12   -- shop, excuse me, were the cameras ever on while you were at

13   that location?"

14        And the answer was:  "No."

15        "How do you operate -- how do the cameras operate?  Do you

16   have to click a switch or something like that to activate

17   them?"

18        And the answer was:  "There's a time when either the car or

19   when there is a g-force or something hits it."

20        Question:  "Are they motion activated?"

21        "Yes" -- yes was the answer -- "for a limited period of

22   time."

23        "What period of time is that?"

24        The answer was:  "About 5 -- 5 to 10 seconds.  I don't

25   remember the exact setting I had for it."

1    Question:  "And the recording on these cameras, then they

2    would have been for a period of time increments?"

3    And the question (sic) is:  "I don't remember the -- I'm

4    forgetting" -- and there was some feedback.

5    And I said, "Yeah, let's come back to the cameras actually.

6    Let's talk about the convenience store and the Love's.  You

7    stopped to get gasoline there that night?

8    And the answer was:  "Yes," start -- concluding at page 63

9    at line 15.

10   So in your deposition you explained that the -- these

11   cameras were motion activated when there was a g-force or

12   something like that that hits it.  That's different than your

13   testimony today, isn't it?

14   A.  I believe, if you read the whole transcript, you would find

15   that I did clarify where -- these two instances where it's on.

16   One when you -- it's not off.  When the car is not running,

17   it's goes off of a G -- it senses the -- somebody has made an

18   impact on the car, and then the second motion is when the car

19   is running they're actively recording.

20   Q.  Let's look at page 74 then.  Turn to that starting at

21   line 6.  When you're at 74, let me know.

22   A.  Okay.

23   Q.  The question was:  "I'm going to drill down a little bit on

24   these cameras for a second.  It sounds like they both separate

25   the same way" --

1        I think that might have been operate.

2        -- "even though one is newer than the other, and they will

3    activate based on motion.  And then based on that I thought you

4    said G forces; is that right?"

5        And your answer was:  "Yes."

6        "So if you -- they're designed, if you suddenly hit your

7    brakes, they're supposed to come on; is that right?"

8        And the answer was:  "No."

9        The question was:  "No?"

10       "How does the G force activate the cameras?"

11       The question was -- answer was:  "If you are parked aside

12   and someone bumps in your car, it starts recording."

13       The question is:  "So there has to be some multitude of a

14   G force that causes it to record more so than just hitting your

15   brake suddenly; is that right?"

16       The answer was:  "Correct."

17       "But stay on if you are just running the vehicle?"

18       The answer is uh -- or the question was:  "Okay.  Are they

19   Bluetooth?"

20       And the answer is:  "No."

21       "Do you have to physically switch them on when you mount

22   them in the vehicle?"

23       The answer was:  "Yes."

24       "And were they on at the convenience store in Ellis,

25   Kansas?"

1     The answer was:  "No."

2     And the question was --

3          THE COURT:  Counsel, what -- this is not proper

4     impeachment.  Where are you going with this?  You're just

5     reading his testimony into the record and you haven't asked him

6     a direct question that relates to what you're allegedly using

7     as --

8          MR. CHALMERS:  I was going to try to use the --

9     conclude to this, Your Honor, and then I was going to point out

10    his testimony today is different than the testimony in the

11    deposition.

12         THE COURT:  I'm saying it's not proper impeachment

13    because you haven't asked him a question that this purports to

14    directly contradict.  You're just reading it in.  So you're

15    going to need to focus if you intend to --

16         MR. CHALMERS:  I'll be happy to, Your Honor.

17         THE COURT:  Okay.

18    BY MR. CHALMERS:

19    Q.  Your testimony today is the cameras were not on but could

20    have been turned on and could have recorded the events at

21    Love's and at -- and at the traffic stop; isn't that right?

22    A.  Yes, they could have been.

23    Q.  But your answer at deposition was -- or deposition that we

24    just read through, it was the G force that activate these

25    cameras?

1        MS. BRETT:  Objection, Your Honor, that misstates the

2    deposition testimony that he just read into the record.

3        THE COURT:  Sustained.

4    BY MR. CHALMERS:

5    Q.   Your cameras don't show any video of what were happening at

6    Love's; is that right?

7    A.   That's correct.

8    Q.   And when you were visiting with your counsel about cameras

9    that Mr. McMillan asked -- or Officer McMillan asked you about

10   during the second part of your stop, that's when he came up to

11   you the second time, you indicated you thought, "Oh, you must

12   be asking about the recordings I have on my cell phone."  Is

13   that correct?

14   A.   Yes, in my mind I was not thinking about the dash camera

15   system mounted on the car.

16   Q.   Well, that's because you knew that the dash camera -- the

17   dash cameras mounted on the front and back of your vehicle

18   couldn't record unless there was an event, a g-force change to

19   trigger that; isn't that right?

20       MS. BRETT:  Objection, Your Honor.  Again, that

21   misstates the prior testimony.  He explained the two situations

22   in which the cameras could activate:  one of them being g-force

23   and the other not.

24       MR. CHALMERS:  At some point I suppose there ought to

25   be a legal objection made as opposed to a speaking objection.

1        THE COURT:  Okay.  She's just doing what you did the

2   whole time, and I'm going to tell you again that is not a

3   proper form of an objection and Mr. Bosire is more than capable

4   of handling Mr. Chalmers if Mr. Chalmers is misrepresenting his

5   prior testimony.

6   BY MR. CHALMERS:

7   Q.  I lost track of what the question was.  Do you remember?

8   A.  Me too.

9        THE COURT:  Me too.

10  BY MR. CHALMERS:

11  Q.  The point is that, when you were testifying about

12  misunderstanding that the camera discussions raised by Mr. --

13  by Trooper McMillan related to your -- the mounted cameras

14  because you thought he was talking about the video that you

15  were making with your cell phone, that that mistake was because

16  you knew that your cameras in your vehicle did not operate

17  unless there was a g-force change?

18  A.  That's wrong.

19  Q.  That's what you testified to in your deposition, wasn't it?

20  A.  No, I told you there's two modes of activation.  One, when

21  the car is not running, they go off of the g-force, where if

22  it's impacted they'll try and record around the car.  Two is

23  when -- they're on when the car is running, and most dash cams

24  operate that way.

25  Q.  Now, the cameras that you say you purchased were because of

```
 1    a crash with a coyote and the insurance company gave you a
 2    problem about getting your car fixed; is that right?
 3    A.   Yes.
 4    Q.   And is that the only reason you have the cameras?
 5    A.   Accidents.
 6    Q.   The video that you made on your phone --
 7         You made, I guess, two videos on your iPhone; is that
 8    right?
 9    A.   Yes.
10    Q.   That's because some time along the way the video that you
11    made what, stopped; is that right?
12    A.   Yes.
13    Q.   And it stopped in -- the recording in the middle.  You
14    didn't know it or learned that and reactivated it?
15    A.   I knew it after the fact that it had stopped.
16    Q.   So you knew after the fact that you had stopped and then
17    restarted it?
18    A.   No, it stopped itself, so I had to restart it.
19    Q.   So the period it stopped would have been from when the
20    video ends to where you push restart; is that correct?
21    A.   Yes.
22    Q.   And the video that you have, the actual original video from
23    your iPhones, you no longer possess; isn't that right?
24    A.   Correct.
25    Q.   You downloaded a copy of that video onto your computer
```

1   though, didn't you?

2   A.   I did.

3   Q.   And then there was a crash, so that was lost?

4   A.   Yes.

5   Q.   And the video that you made -- the two videos that you

6   made, you added at some point some pixels across your face only

7   in the video; is that right?

8   A.   Yes.

9   Q.   And you put those pixels on about the time that you took

10  the videos and patched them together with other information to

11  place it on the -- well, on social media about this event; is

12  that correct?

13  A.   On YouTube, yes.

14  Q.   We don't have a way of looking at the video as it existed

15  before the pixel was on your face; is that right?

16  A.   No, the video overwrites itself.

17  Q.   So we have no way to look at that video to be able to see

18  what expressions you have or were -- how -- you facially

19  reacting to the situation, do we?

20  A.   That's correct.

21  Q.   I think you were asked in your deposition do you know why

22  you tripped the video, and you said you didn't know.  Why is

23  that?

24  A.   Maybe I misunderstood the question.

25  Q.   Let's look at --

 1          THE COURT:  This is probably not proper impeachment

 2    but --

 3          MR. CHALMERS:  Haven't got there yet.

 4          THE COURT:  If there's a direct question about whether

 5    he understood the question, then go ahead.

 6    BY MR. CHALMERS:

 7    Q.  Do you know today why you altered the video?

 8          THE COURT:  Stop.  That's not impeachment.  His answer

 9    was maybe he misunderstood the question.

10          MR. CHALMERS:  I was trying to -- well --

11          THE COURT:  Are you trying to impeach that answer?

12          MR. CHALMERS:  I'm going to ask him eventually about

13    what his position is now.  Then I'm going to ask him about the

14    answer that he gave and ask him if he misunderstood the

15    question.

16          THE COURT:  Why don't you approach and bring that with

17    you.

18       (The following proceedings were had at the bench.)

19          MR. CHALMERS:  Focusing on line 17, the sentence

20    before it too --

21          MS. BRETT:  Would you mind telling me what page we are

22    on?

23          THE COURT:  90.

24          MS. BRETT:  90.

25          THE COURT:  So I'm -- what part are you wanting to use

1   to impeach him?

2          MR. CHALMERS:  I think that at this point I was

3   backing off of the question.  I asked him whether or not he had

4   testified that he didn't know why he altered the vehicle (sic).

5   He said maybe I answered that because I didn't understand.  At

6   this point I was going to go back and ask the "here's what the

7   question was, that's what he said," and is it his position he

8   didn't understand.

9          THE COURT:  I -- I am completely lost as to what

10  you're trying to do here.

11         MR. CHALMERS:  Well, you mean what my purpose of the

12  question or --

13         THE COURT:  Right.  I don't understand your -- your

14  line of questioning here.

15         MR. CHALMERS:  I think that I wish to show that he

16  was, as part of his response to all this, changing the video

17  and then using that to put it on the YouTube as a way to harass

18  the officers.

19         THE COURT:  As a way to what?

20         MR. CHALMERS:  Harass the officers and troopers, which

21  is inconsistent with his idea that he's so fearful from them he

22  has to run --

23         THE COURT:  Okay.  So ask him if he put this up there

24  to harass the officers.  And if he says no, then you can

25  impeach him with anything in his deposition which contradicts

1    that.

2            MR. CHALMERS:  Okay.

3        (Thereupon, the proceedings continued in open court.)

4    BY MR. CHALMERS:

5    Q.  Okay.  So we were talking about your video, and we'll visit

6    with that in a second, but the video clips that you had from

7    your -- from your phone and then the clips that you took from

8    the -- from the dash cam video that you acquire, you put them

9    together with certain dialogue and then you posted them on

10   social media; is that right?

11   A.  Yes.

12   Q.  And you did that because you wanted to embarrass and show

13   that the police had been wrong, didn't you?

14   A.  No.

15   Q.  You didn't want to show Mr. -- or Trooper McMillan's face

16   only in your videos for the purposes of putting him out into

17   the public and to embarrass and punish him?

18   A.  I did that to show integrity and hold him accountable.

19   Q.  And yet when you did that you distorted your picture of

20   your face for the purpose of not being identified; isn't that

21   right?

22   A.  For privacy, yes.

23   Q.  But not for the privacy of the trooper?

24   A.  No.

25   Q.  And when you were asked why it was that you had distorted

1   the pixels or altered the video, at your deposition at

2   page 90-17 -- line 17 -- your answer at line 18 at the time of

3   the deposition was, "I don't know."  Isn't that correct?

4           THE COURT:  I don't know what?

5           MR. CHALMERS:  "I don't know," period.

6           THE COURT:  What was the question?

7   BY MR. CHALMERS:

8   Q.  Your -- the question was:  "And you sent your attorney" --

9           MR. CHALMERS:  Well, going back a question, Your

10  Honor, at line 13.

11  BY MR. CHALMERS:

12  Q.  "And what you sent to the attorney then, what you had been

13  sent a copy before with the pixels, the disruptions across the

14  face?"

15      The answer was:  "No."

16      "And why did you alter the video?"

17      And the answer was, "I don't know."

18      And that was the answer you gave back at your deposition,

19  isn't it?

20  A.  What's the page?

21  Q.  The page was page -- line -- page 90 and the lines that

22  I've just talked about were 13 through 18.

23  A.  The answer is:  "I don't know."  That's what it states.

24  Q.  I want to switch gears with you for a second.  You live in

25  Wichita; is that right?

1    A.   Yes.

2    Q.   You've been a resident of Wichita since 2005; is that

3    correct?

4    A.   There's some time I was away from Wichita.

5    Q.   Was that when you were maybe back -- well, what period of

6    time were you back away from Wichita?

7    A.   I believe it was around 2008-2009.

8    Q.   Oh.   Then can we say from 2009 you've been a resident of

9    Wichita?

10   A.   Yes.

11   Q.   Okay.   And you live alone in Wichita; is that correct?

12   A.   Yes.

13   Q.   And your daughter that you've talked about lives in the

14   Denver area with her grandmother and her mother, I guess a

15   former girlfriend of yours; is that correct?

16   A.   Yes.

17   Q.   And, during this time period that you've lived in Wichita,

18   you've been in the aerospace business as a engineer with a

19   company affiliated with Textron; is that correct?

20   A.   Yes.

21   Q.   And during the time after the stop, you were able to

22   perform your job at Textron well enough to be promoted to a

23   senior flight test engineer; is that correct?

24   A.   I'm sorry, could you repeat that?

25   Q.   During the time that you were employed by Textron after the

1    stop in November of 2019, you were able to perform your job

2    well enough at Textron to get promoted to senior flight

3    engineer; is that correct?

4    A.  I believe I was a senior during this.

5    Q.  Well, it's not worth me wasting time looking for it.

6        Let me ask you this way:  Were you promoted then after

7    February of 2019 in some position at Textron?

8    A.  No.

9    Q.  If you look at page 13 at paragraph -- excuse me, at line

10   17, question was:  "What was your title back in February of

11   2019?"

12       The answer was:  "Flight test engineer."

13       The next question is:  "So I assume -- I would assume you

14   were promoted then, in your position after February of 2019, to

15   senior flight engineer; is that correct?"

16       And the answer was:  "Yes."

17       Does that refresh your recollection that you were promoted

18   after the event?

19   A.  The answer is yes.

20   Q.  And then, sir, after -- during the time that this

21   deposition was taken in 2000 -- September 2000 (sic) I think

22   you were pursuing a separate Master's Degree; is that correct?

23   A.  Yes.

24   Q.  And you think -- I think you did get -- successfully

25   complete that Master's Degree; is that right?

1    A.   I did.

2    Q.   What was that in?

3    A.   My second master's was an MBA finance.

4    Q.   Is it your position that you trusted the police before this

5    incident, that is the -- the stop and the detention?

6    A.   I did.  I did.

7    Q.   And that you first developed the distrust that you've

8    talked about only after the stop, is that then your position --

9    or is that your testimony?

10   A.   Yes.

11   Q.   And, furthermore, you didn't have any -- according to you,

12   any level of distrust of law enforcement before the stop; isn't

13   that correct?

14   A.   That's correct.

15   Q.   And yet you -- you videotaped the stop on your iPhone;

16   isn't that right?

17   A.   I was aware of what's happening around United States as far

18   as minorities being killed and --

19   Q.   And you --

20   A.   -- it just never happened -- occurred to me that it would

21   happen to me.

22   Q.   But you had no level of distrust before the stop?

23   A.   No, I was --

24   Q.   Okay.

25   A.   I figured --

1    Q.   And you were --

2    A.   -- being a law-abiding citizen I would -- I would be

3    treated equally.

4    Q.   And you were convinced from the looks at the store by law

5    enforcement that you were going to be profiled; isn't that

6    right?

7    A.   That's correct.

8    Q.   You were convinced of that when you left the store; isn't

9    that right?

10   A.   After they started following me, I knew he was targeting

11   me.

12   Q.   Well, in your -- in your deposition if you look at that at

13   page 79 --

14   A.   You say 79?

15   Q.   Yes, sir.

16        The question was:  "You believed you were being pulled over

17   for racial profiling; is that correct?"

18        At line 1, answer:  "Yes."

19        "And you formed the opinion that you were being pulled over

20   for racial profiling at what part during the stop?"

21        And the answer was:  "At the gas station the troopers were

22   giving me a dirty look."

23        I read that correctly, didn't I?

24             MS. BRETT:  Objection, Your Honor.  Improper

25   impeachment.

1          THE COURT:  Read it again.

2          MR. CHALMERS:  "You believe you were being pulled over

3     for improper profiling; is that correct?"

4          "Yes."

5          "You formed the opinion that you were being pulled

6     over for racial profiling at what point during the stop?"

7          Answer:  "At the gas station the troopers, they were

8     giving me a dirty look."

9          THE COURT:  How is that inconsistent with what he said

10    here?

11         MR. CHALMERS:  He said he didn't form it until someone

12    was following him for 7 minutes on the highway.

13         THE COURT:  That's not how I remember it.

14         But, members of the jury, you are the only ones that

15    will decide the facts in this case.  So if -- you decide

16    whether Mr. Chalmers is mischaracterizing the testimony and

17    being unfair to this witness or whether that's what the witness

18    really said.

19    BY MR. CHALMERS:

20    Q.  I don't want to be unfair to you.  So when is it that you

21    first decided that you were going to be victimized by racial

22    profiling?

23    A.  Watching my cell phone, you'll see that I -- I say

24    profiling, and it's because I been in interaction with them and

25    they had followed me.  And once he approached me, I confirmed

1    it was them.  I was targeted.

2    Q.   Yeah, I'm talking about a time frame here.  Was it when he

3    was following you that you formed this belief?

4    A.   Yes.

5    Q.   Now, that's not consistent with your deposition testimony

6    that it was at the gas station that the troopers were giving

7    you a dirty look and that's what caused you to think you had

8    racial profiling or victimized in that fashion; isn't that

9    true?

10   A.   Could you repeat the question?

11   Q.   Mr. Bosire, today you're saying that you first figured out

12   that you believed that you were a victim of racial profiling

13   when you had somebody following you in your -- in your vehicle.

14   That's your testimony today; right?

15   A.   My testimony is when I -- when I exchanged pleasantries,

16   they looked at me with -- McMillan himself says, when he was

17   standing right next to me, "We saw your car."  It's an

18   admission that he was -- he had seen me prior to that incident,

19   and for you to try and --

20   Q.   Sir, I'm not trying to do anything but get an answer from

21   you.

22   A.   I don't know the question that you're asking.

23   Q.   Sure.  The question that has been now asked a couple

24   different times, and just so that we're clear on what your

25   position is, is that you thought that you were going to be

1    victimized by racial profiling when you saw what you thought

2    was a trooper car following you out on the highway on I-70 for

3    about 7 minutes.  Is that your testimony?

4    A.  I said there was a car following me, yes.

5    Q.  And that's when you thought you were going to be

6    victimized; isn't that right?

7    A.  I confirmed -- according to my testimony -- testament

8    earlier was I confirmed my suspicion once he approached the

9    window that those are the same troopers I'd seen at Love's

10   store and had exchanged pleasantries.

11   Q.  And you're saying you didn't have this view that you were

12   racially profiled until you talked to Trooper McMillan the

13   second time and he said, "I saw you at Love's"?

14   A.  I still don't understand what you're reaching at.  The

15   question, if you could please reword it so I can understand it.

16   Q.  Very simply when is it -- where were you when you first

17   decided that you were going to be a victim of racial profiling?

18          THE COURT:  Counsel --

19          THE WITNESS:  I never decided when I was going to be a

20   victim.

21          THE COURT:  Counsel, I think --

22          THE WITNESS:  I'm sorry.

23          THE COURT:  -- I think we've covered this.

24   BY MR. CHALMERS:

25   Q.  Well, sir, did you testify in your deposition that at the

1    gas station two of the troopers gave you a dirty look?

2          THE COURT:  Counsel, would you approach please.

3      (The following proceedings were had at the bench.)

4          THE COURT:  What are you doing?

5          MR. CHALMERS:  I'm asking the follow-up on some

6    deposition transcript where he explains that this is all taking

7    place, his view that he was a victim of racial profiling at the

8    gas station.

9          THE COURT:  And he has said that.  He's answered that

10   about four times in response to your questions.

11         MR. CHALMERS:  He said -- he said he first --

12         THE COURT:  Excuse me.

13         And you keep acting like you're impeaching him, but he

14   has said that he had the impression both at the gas station and

15   it was confirmed when the troopers approached his car.  I think

16   that's what he said.

17         MR. CHALMERS:  That's not what he said, Your Honor, I

18   think.

19         THE COURT:  Okay.  Let's get the transcript out and

20   we'll just read it back, because we've been going over this and

21   over this, and he's saying the same thing over and over.

22         MR. CHALMERS:  Well, the transcript would disagree.

23   I'll move on.

24         THE COURT:  Get the transcript.  If I'm wrong, I'm

25   wrong.

1          MR. CHALMERS:  I don't have the transcript.

2          THE COURT:  Well, the court reporter can read it back

3   to us.

4          MR. CHALMERS:  Do you want to go back to the direct

5   examination and go back to -- go back to several answers he's

6   given?

7          THE COURT:  I might have some more patience for this

8   if it were relevant, but I don't see how it has anything to do

9   with the claim.  You made your point that he thought he was a

10  victim of profiling, and I guess you're trying to say that

11  wasn't reasonable.

12         MS. BRETT:  It seems Mr. Chalmers is trying to split

13  hairs here and pin Mr. Bosire down to the specific minute or

14  moment in time in which he formulated that belief.  He

15  testified both on direct and in response to questions on cross

16  that he developed this feeling when seeing the troopers at the

17  gas station and it was confirmed for him when he was pulled

18  over.  That has been his testimony.  It has been consistent.

19  It's not inconsistent with his prior statement in his

20  deposition in any way.

21         MR. CHALMERS:  That's not what his testimony's been,

22  but I'll move on to another topic.

23         THE COURT:  Okay.  Let's -- if we're going to impeach,

24  let's impeach on things that are material to his veracity

25  instead of --

1          MR. CHALMERS:  This is material, Your Honor, because

2     all these complaints that he has flow from the testimony he

3     gave, which is that he feels like he's being victimized.  I've

4     got a emotional distress, he says, because I'm being treated as

5     a black person.  That's not having to do anything with the

6     lawsuit here, which has to do with whether or not he was

7     detained on the roadside for a period of time.  And he can't

8     recover damages for racial profiling on this case.

9          THE COURT:  That's your argument.

10          Okay.  He's -- I mean, he's not seeking damages for

11     race discrimination if that's your point.

12          MR. CHALMERS:  He's claiming emotional distress from

13     his view that he's been racially discriminated against; that

14     was his testimony.

15          MS. BRETT:  He's claiming emotional distress from

16     being subjected to an unlawful and wrongful detention, and he,

17     as a black man, has a particular experience of what that is

18     like, and that is relevant to how he experienced that moment,

19     that wrongful detention.  He doesn't have a Fourteenth

20     Amendment claim in this case.  Everything has been couched in

21     terms of whether there's a Fourth Amendment violation that

22     occurred here.  We do not need to prove a Fourteenth Amendment

23     case, but it is relevant to his damages and what he

24     experienced.

25          THE COURT:  And it may be relevant to reasonable

1    suspicion, who knows.  Let's see how the evidence unfolds in

2    that, but you need to move on.  And to the extent that you're

3    trying to impeach him while using his prior testimony, you need

4    to do it on relevant matters that pertain to this case instead

5    minutia.

6              MR. CHALMERS:  Okay.

7        (Thereupon, the proceedings continued in open court.)

8    BY MR. CHALMERS:

9    Q.  Now, just so that I'm moving on a related topic, you

10   assumed that you were being stopped on this occasion because of

11   your race even though you admit that you were speeding; isn't

12   that right?

13   A.  After being followed for 7 minutes, I knew they were going

14   to pull me over.  So I was doing four miles -- five miles an

15   hour over the speed limit on the interstate.  And if that was

16   good enough reason, I was okay with it.

17   Q.  And when Trooper McMillan asked you about why you had

18   cameras in the -- in the vehicle, your answer was:  "Police

19   fuck with people."  Isn't that right?

20   A.  That's what I said.

21   Q.  You wanted him to think that the cameras were operating

22   during the stop, didn't you?

23   A.  I was recording it on my cell phone, so I knew it was

24   working.

25   Q.  You wanted him to think that the cameras that you had

1   mounted, which he had asked you about, were operating during

2   the stop; isn't that correct?

3   A.  I have testified that I did not know if they were working,

4   and I found out after the fact.  I never stated anything to

5   that effect to McMillan.  I was only referring to my camera

6   that I was recording on my hand.

7   Q.  Even though he quite clearly was asking about the cameras

8   that you had mounted in your vehicle?

9   A.  He was asking about somebody -- a buddy I had.  It thrown

10  me off.  I don't know what questions he had directed towards

11  me.  And when he said camera, that's the only thing I was

12  thinking about, the camera on my hand and not even the ones

13  mounted on my car.

14  Q.  You expected McMillan to believe you when you said that the

15  reason that you were operating the cameras was because "police

16  fuck with people."  Isn't that correct?

17  A.  Could you repeat the question?

18  Q.  You wanted McMillan to believe you when you said the reason

19  that you had cameras were because "police fuck with people."

20  Isn't that correct?

21  A.  That's what I said in the car.

22  Q.  Now, the belief that "police fuck with people," that's not

23  consistent with your feelings that you had no negative

24  impressions about police that we testified about -- or you

25  testified about earlier before this stop, is it?

1   A.  When you have the same police trail you, follow you from a

2   gas station and tag you to a traffic stop, I think the

3   conclusions are inferred.

4   Q.  At the time that you made that statement about why you had

5   cameras was during the second conversation with -- with

6   Mr. McMillan; is that correct?

7   A.  I stated on my -- when he first approached me that he was

8   profiling.  On my second -- when the second encounter with me

9   he was asking me about why I'm recording and I said, "Police

10  fuck with people," that's all I said.

11  Q.  Let me show you some videos.

12          THE COURT:  Are these in evidence?

13          MR. CHALMERS:  Yeah.

14          THE COURT:  What exhibit numbers are they?

15          MR. CHALMERS:  Your Honor, the Exhibit 15 I believe is

16  the first one.  I'm trying to reach into it right now.  It is

17  the --

18          MS. BRETT:  Exhibit 15, Mr. Chalmers?

19          MR. CHALMERS:  No, no, no.  It's the -- what I'm

20  looking for is dash cam, Exhibit 8, Your Honor.

21  BY MR. CHALMERS:

22  Q.  I'm going to show you the second stop from this vantage

23  point if I can find it -- or second conversation.  So it would

24  be about 9 minutes if remember right.  So I'm going to start at

25  8:54.

1          (Exhibit playing.)

2          Okay, I'm starting at 20:36 on the -- on the exhibit

3    Exhibit 5.  You know what, I'm going back.

4          (Exhibit playing.)

5          20:48 if I got this right.  See, the problem is it's

6    starting -- every time I try to get it started -- I apologize.

7    Two now.

8          (Exhibit playing.)

9          It's 20:48.

10         (Exhibit playing.)

11         It's not starting where I want it to start.  Let me go at a

12   different direction.

13         The -- in the video when the conversation -- you had the

14   first video and then there's a period of time where you were

15   waiting for the trooper to come back up to your car and have a

16   second conversation, in context that's what happened; right?

17   A.   (No answer.)

18   Q.   You were stopped.  The trooper came up and visited with you

19   once, went back to his vehicle and then came up for a second

20   conversation after a while; is that correct?

21   A.   That's correct.

22   Q.   And when he came up the second time, at that point he says

23   to you -- he has a conversation -- a couple conversations with

24   you.  One is about your cameras and the other is about another

25   individual at the station at Love's; is that correct?

1    A.   There was several things addressed, but those are the two

2    that you mentioned.  He also mentioned that he's not going to

3    give me a warning -- he's not going to give me a speeding

4    ticket, as I say.  And then we spoke about the -- that's what

5    I'm saying there's several things he addressed.

6    Q.   Okay.  So if I go back to Exhibit 5, start at 22:13, I

7    think that's about the time it starts.

8              MS. BRETT:  Just for the record, Your Honor, this is

9    Exhibit 8, not Exhibit 5.

10             THE COURT:  I can't hear you.

11             Mr. Chalmers, there's an objection.  Can you -- let's

12   see what that --

13             MS. BRETT:  Just for clarification for the record, I

14   believe this is Exhibit 8, not Exhibit 5.

15             MR. CHALMERS:  Thank you.  It's dash cam video.

16   BY MR. CHALMERS:

17   Q.   I tell you what, it's actually -- I screwed up.  See if I

18   can get it started here.  I'll go back to about 15:20 and start

19   on Exhibit 8.  Starting -- I'm not giving up on this but I'm

20   going to talk to you about another exhibit, see if I can't get

21   that one working in a second.

22        I'll talk to you about the -- the videos that you took, and

23   that would be Exhibit 843 and 844, but let me talk to you about

24   843 first.  I'll put that up on the screen.  In Exhibit 843 --

25             (Exhibit playing.)

1       Sorry.  So within the first several seconds after the stop

2   before any contact by Officer McMillan, you are of a view that

3   this is profiling because you've been stopped for speeding?

4   A.   No.

5   Q.   Now, when the trooper comes up --

6        (Exhibit playing.)

7        -- the tape goes on.

8        Okay.  And so you hear the trooper at about 1 minute into

9   your tape saying, "Roll your window down please."  Do you see

10  that?

11  A.   Yes.

12  Q.   And you roll it down but not fully; is that correct?

13  A.   Yes.

14  Q.   And then the tape continues.

15       (Exhibit playing.)

16       And in the video it shows some paperwork being passed by

17  you to Trooper McMillan.  That's the rental agreement that you

18  had; is that right?

19  A.   Yes.

20       (Exhibit playing.)

21  Q.   And then the trooper asks you where you're coming from

22  tonight about a minute and 49 seconds into the video.  And you

23  remember questions being asked about where your travel had

24  been; is that correct?

25  A.   I remember the questions, yes.

1    Q.   It goes on.

2         (Exhibit playing.)

3         Play that back just a second, and I'm going back to 1:53.

4    Between the time "where you're coming" from and your answer

5    "west," there's a pause of a couple seconds; is that right?

6    A.   (No response.)

7    Q.   Play that again.

8         (Exhibit playing.)

9         I didn't go far enough back, did I?

10        (Exhibit playing.)

11        There was -- between the question there was a pause of

12   several seconds, wasn't there, before you said west?

13   A.   Yes.

14   Q.   Now, you didn't tell Trooper McMillan anything in that

15   sequence about where you were going or where you had been other

16   than you were traveling from the west to the east; is that

17   correct?

18   A.   That's correct.

19   Q.   And when he first asked those questions, you didn't say to

20   him, look, I think I've got a constitutional right not to

21   answer that question, did you?

22   A.   Repeat the question.

23   Q.   Well, before you said west, you didn't say to Trooper

24   McMillan, look, I've got a constitutional right I don't think I

25   have to answer that question or words to that affect, did you?

1   A.  I had not stated that yet.

2       (Exhibit playing.)

3   Q.  Okay.  So you asked -- it was about 2:10 into the tape

4   after he asked you a couple times you said, "Do I have to

5   answer the question?"  Is that right?

6   A.  Yes.

7   Q.  At that point you didn't say, look, I'm not going to answer

8   it because I've got a constitutional right not to answer, did

9   you?

10  A.  I had not stated that.

11      (Exhibit playing.)

12  Q.  And then he asks you what the purpose of the trip is at

13  about 20-29 or so in the tape, and I think basically you

14  said -- it's hard to understand -- but, "Do I have to answer

15  these questions?"  Is that what you were saying at that point

16  or remember saying?

17  A.  I asked him if I had to have a purpose to tell him where I

18  was.

19  Q.  Had to have a purpose?  Okay.  Thank you.

20      Now, in terms of the information that you relayed to

21  Trooper McMillan then at this point about your travel plans,

22  you were kind of evasive, weren't you, you were just saying I

23  traveled west to east?

24  A.  It's the truth.

25  Q.  I see.  It was the truth but it was evading the details of

1   what you were doing.  You didn't want to tell him that; is that

2   right?

3   A.  Could you maybe rephrase the question I can understand

4   better what you're trying to say?

5   Q.  I can try.

6       From what information that you provided to Trooper

7   McMillan, he did not know that you had been to Denver to see

8   your child, did he?

9   A.  No.

10  Q.  You never told him that?

11  A.  No.

12  Q.  He didn't know that you had traveled from Wichita to Denver

13  and were returning back to Wichita, which is where you lived;

14  isn't that right?

15  A.  My ID would have had my address but --

16  Q.  But the information that he possessed, in terms of what

17  your travel plans were, at that point was simply I'm going

18  to -- from the west to the east?

19  A.  Yes.

20  Q.  If I look at Exhibit 44 for a second, it's not real long,

21  we'll play part of it.  Exhibit 44 is the second tape that you

22  took with your phone where there was a disruption and part of

23  your video was broken; is that correct?

24      MS. BRETT:  Your Honor, again, just for the record,

25  it's 844 not 44.

1          MR. CHALMERS:  Okay.  844.  Thank you, counsel.

2          THE WITNESS:  It was the second interaction after I

3    told him I didn't want to talk to him.

4       (Exhibit playing.)

5    BY MR. CHALMERS:

6    Q.  Now, in playing part of 844 --

7          And in this video you're seated still in the driver's seat;

8    is that correct?

9    A.  Yes, I was expecting him to approach me from the same

10   direction.

11   Q.  And your window's down but maybe a third or almost half; is

12   that right?

13   A.  I can't see very clear from this direction.

14   Q.  You can't tell whether your window's down or not or you

15   just can't tell how much?

16   A.  I can't tell how much, but it looks -- I'll take your word

17   for it.

18      (Exhibit playing.)

19   Q.  Okay.  You viewed this video before, and so we can save

20   some time.  The window remained down in the position shown

21   during the whole time that this tape -- which goes on for about

22   12 minutes; isn't that right?

23   A.  12 minutes?  No, because he approached the other direction.

24   I rolled it back up.

25   Q.  Okay.  Well, if we start at the beginning of the tape, the

1  window's down.  You can see that; right?

2  A.  Yes, it's down.

3  Q.  And if we -- let's see.  So looks like I captured when it

4  went back up, and you can see that's at 8:58 or 8:59 when the

5  trooper came from the other side; is that right?

6  A.  Yeah, because I was expecting him to come from that

7  direction because that's where he was.

8  Q.  So for, what, 9 minutes or so you sat in your car with the

9  window partially down in the conditions that you had described

10  as being brutally cold; is that correct?

11  A.  The window was rolled over my head, so I had the heater

12  going.

13  Q.  Well, you had the heater going the whole time until you

14  left the vehicle and had to turn it off so the dog could do its

15  dog sniff; isn't that right?

16  A.  Yes.

17  Q.  And looking at 844 and going to about 11:03 -- start at 11

18  -- I think that's about where it is.

19      (Exhibit playing.)

20      Go back a little bit.

21      (Exhibit playing.)

22      Okay.  So if I go back a little bit more, I think the first

23  dialogue actually takes place a little after eight --

24      (Exhibit playing.)

25      Here we go.  You roll the window back at about 9:01.  So

1    let me start the tape again.

2        (Exhibit playing.)

3        So "Where did your buddy go?"

4        You said, "Do you see two people?"

5        He said, "Yeah, when you were getting gas."

6        And your testimony is you thought he was talking about

7    inside when you saw two people.  At the time you denied seeing

8    the other guy -- or being with the other guy.

9    A.  He asked me if I had a buddy.  I didn't have any buddy.  I

10   was driving alone.

11       (Exhibit playing.)

12   Q.  And he asks you, "You don't remember talking to a guy at

13   the gas pump?"

14       And your initial reaction -- or statement was no; isn't

15   that right?

16       You thought he was talking about somebody inside; is that

17   your testimony?

18   A.  At that moment I didn't know who he was referring to.

19       (Exhibit playing.)

20   Q.  He says, "I was at Love's.  I saw you."

21       And you responded, "Me?" as a question.

22       At that point you still were denying having visited

23   somebody at the -- at the pump?

24   A.  He's asked me about a buddy of mine, who I didn't know, and

25   I was traveling alone.  He's asked about people I was talking

1    to.  I said I spoke to the trooper and there was a -- the gas

2    attendant.  There's several people I spoke to, so I don't know

3    who he was referring to as far as speaking to.  And then when

4    he specified at the gas pump, and that's when it clicked he was

5    referring to the gas attendant who was helping me with the

6    pump.

7    Q.  He'd already specified it was the gas pump a couple times.

8    We just listened to it then; isn't that right?

9    A.  Yeah, but I'm trying to recollect what all the people I

10   spoke to around the gas station.

11   Q.  From the information that you communicated to Trooper

12   McMillan, he's listening to you, do you agree that what he

13   would have heard was, "Where is the guy that you're talking to

14   at the gas pump?" and you would be saying, "I don't know what

15   you're talking about.  Wasn't me -- it wasn't me"?

16          MS. BRETT:  Objection.  As phrased calls for

17   speculation.

18          THE COURT:  I don't even actually understand the

19   question.  Would you rephrase it?

20          MR. CHALMERS:  You know, I just think I'll go on with

21   the tape.

22      (Exhibit playing.)

23   BY MR. CHALMERS:

24   Q.  He said, and you heard it, There's a white guy with a

25   hoodie that was walking right by him at the gas pump,

1    paraphrased.  And your answer was, "Huh-uh," wasn't it?

2    A.   That's what I said, yes.

3         (Exhibit playing.)

4    Q.   So after -- we're now at 10:17 at the end of that dialogue.

5    You said, "Oh, that's one of the attendants that was at the gas

6    pump."  That's the first time you mentioned the attendant,

7    isn't it?

8    A.   Yes.

9         (Exhibit playing.)

10   Q.   And his questions was, as you heard it, "You have all these

11   cameras mounted.  Why?"

12        And your explanation and your testimony is today, oh, I

13   thought you were talking about the -- the iPhone camera; is

14   that what you're saying?

15   A.   I was trying to process everything that he was asking.

16   He's asking me about a buddy I didn't know.  And after I

17   clarified it was a gas attendant and repeatedly asking the same

18   question over and over again, I was confused.  I didn't know

19   what he wanted me to say so they could just let me go.

20   Q.   And your iPhone wasn't mounted, was it?

21   A.   It was in my cup -- it was a cup holder, so it was mounted

22   in the cup holder -- or placed.

23        (Exhibit playing.)

24   Q.   Okay.  And I stopped at about 11:19, and my recollection

25   is, when I first started visiting with you, you couldn't

1    confirm whether or not Officer McMillan had actually seen you

2    at the gas station?

3    A.   He stated himself he saw me at the gas station.

4    Q.   Okay.  So you're not basing this on your recollection.

5    You're basing this statement that "you saw me at the gas

6    station" on what he told you as opposed to your observations at

7    the gas station; is that your testimony this afternoon?

8    A.   I don't know.

9    Q.   Well, it goes on.

10       (Exhibit playing.)

11       Okay.  And then, after talking with the trooper about the

12   mounted cameras you thought were the cell phone and talking to

13   the trooper about these messing with people, it's at that point

14   that you say I've got a constitutional right, I don't want to

15   answer any more questions; is that right?

16   A.   I said it before the first interaction.

17   Q.   Not in the second interaction.  This is the first time, the

18   second interaction --

19   A.   I did say it during the first interaction.

20   Q.   Pardon?

21   A.   I did state that during the first interaction; you just

22   didn't play it.

23   Q.   I think you misunderstood my question or I misstated it.

24       In the second interaction, when he was up the second time

25   after he's had these two conversations with you about the

1    mounted cameras that you thought were a cell phone about "the

2    police mess with people," then it's at that point you, for the

3    first time in that second conversation, says, "I don't want to

4    talk to you.  I got a constitutional right not to."  Isn't that

5    right?

6    A.  I'll go on record saying that I state it first the first

7    time and I stated it the second time after.

8    Q.  Stated it just what we showed on the video after that

9    conversation?

10   A.  Correct, but you did not play the first one.

11   Q.  You're talking about the first --

12   A.  Interaction.

13   Q.  Okay.  Now, if we wanted to know the length of time between

14   when you were pulled over, stopped, until when Trooper McMillan

15   first walked up to your car on the second occasion, we'd be

16   able to figure that out by looking at the -- the dash tapes

17   recordings, wouldn't we?  It gives us the durations.

18   A.  I guess so.

19   Q.  And the -- it works out to be about 13-and-a-half minutes;

20   is that consistent with your memory?

21   A.  I don't know.

22   Q.  Then you have the second conversation, and that took

23   place -- we just went through that.  What, that's about four

24   minutes long; is that consistent with your memory?

25   A.  I'm assuming you're right.

1   Q.  I'm just asking you if you have a memory.

2   A.  I don't know.

3   Q.  We could look back or -- and we could say, okay, here's

4   where it is on the video, here's where it stopped and here's

5   where it started.  We'd be able to say whether it was four

6   minutes about or that time frame, couldn't we?

7           THE COURT:  Could we just stipulate the video is a

8   accurate real-time exhibit that reflects the amount of time?

9           MR. CHALMERS:  That's fine with me, Your Honor.

10          THE COURT:  Okay.  Is that okay with plaintiff?

11          MS. BRETT:  Yes, Your Honor.

12  BY MR. CHALMERS:

13  Q.  And then the dog arrived more than 10 minutes after you

14  were told that the dog was going to be there; is that right?

15  A.  Yes.

16  Q.  You don't know where the dog had to travel from to get to

17  your stop, do you?

18  A.  No.

19  Q.  And then you were outside during the time the dogs (sic)

20  ran around the vehicle.  But up until that time, as you were

21  sitting in the vehicle, you had the heater on; is that correct?

22  A.  Yes.

23  Q.  And then you got outside and you had to stand away from the

24  vehicle for a period of time when the dog ran around, and that

25  took, what, about 3 minutes?

1    A.   I don't know the exact time.

2    Q.   Whatever the video shows?

3    A.   Yes.

4    Q.   And the time that it took for the dog to run around while

5    you were standing out roadside in the cold was about the same

6    time that you spent outside without a coat at Love's trying to

7    pump gas; isn't that right?

8    A.   I don't know.

9             MS. BRETT:  Objection, Your Honor.  Assumes facts not

10   in evidence.

11            THE COURT:  Overruled.  But if you want to know how

12   long he was outside of the gas station, you should just ask him

13   directly.

14            MR. CHALMERS:  Well, I think he just said --

15   BY MR. CHALMERS:

16   Q.   You don't know how long you were outside at the gas

17   station?

18   A.   I don't know.

19   Q.   Now, the longest period of time that you stood in the

20   security airport is about an hour-and-a-half minutes in Denver,

21   is that right, in security airport's line?

22   A.   I don't know.

23   Q.   We can look, but your testimony in your deposition was:

24   "Is it about an hour-and-a-half to 45 minutes" --

25            Well, you know, let me get that right.

1        A half hour to 45 minutes is probably about the longest

2    period of time that you stood in a security line at the airport

3    in Denver; isn't that right?

4            MS. BRETT:  Objection, Your Honor, improper

5    impeachment again.

6            THE COURT:  Where are you going with this?

7            MR. CHALMERS:  I'm not trying to impeach.

8            THE COURT:  What?

9            MR. CHALMERS:  I'm not trying to impeach him.  I'm

10   asking him how long he's had to stand in Denver at the security

11   line at the airport.

12           THE COURT:  So how would that be relevant?

13           MR. CHALMERS:  I think that the duration that he's

14   detained ends up being less than what it would -- we've become

15   accustomed to standing in line at the airport.

16           THE COURT:  We usually do that voluntarily.

17           MR. CHALMERS:  It goes to emotional stress having to

18   wait.

19           THE COURT:  I don't think those are comparable

20   situations.  I don't think it's sufficient relevancy to

21   overcome the waste of time.

22           MR. CHALMERS:  I would ask him -- I assume I'll get

23   the same ruling -- as to the longest time he's had to be in

24   customs on an international flight.

25           THE COURT:  You don't need to do this.  You can put it

1    in argument at the end of the case.  It's not proper

2    examination given my rulings.

3    BY MR. CHALMERS:

4    Q.   You were -- I think your testimony was that you were

5    frightened at the get-go, at the beginning of the stop, is that

6    correct, frightened of Mr. McMillan and other law enforcement?

7    A.   Yes.

8    Q.   And that the anxiety you talked about, that gain -- or

9    began, rather, the moment that you were pulled over; isn't that

10   correct?

11   A.   Yes.

12   Q.   And you've indicated that you were afraid all the time that

13   the stop took place; is that right?

14   A.   Yes.

15   Q.   And the anxiety and the fear that you exhibited during the

16   stop, could that be seen when you were talking to the law

17   enforcement officers and insisting that they provide their

18   information after you were told you could leave?

19   A.   Yes.

20   Q.   And you've explained that despite this anxiety that you

21   feel, you've concluded that you don't want to seek medical

22   attention for it; is that right?

23   A.   I've stated my reasons.

24   Q.   Okay.  And that this anxiety that you feel that prevents

25   you from traveling as frequently to -- to see your daughter as

1    you'd like, that anxiety is not sufficient that you want to

2    seek medical treatment; is that correct?

3    A.   I've stated my reasons.

4    Q.   And the anxiety that you described that prevents you from

5    -- from participating in a -- certain volunteer activities.

6    Again, you felt that seeking some sort of medical treatment for

7    that anxiety for the reasons you stated is not sufficient to

8    try to avoid the inability to volunteer; is that correct?

9    A.   I've stated my reasons.

10   Q.   And when you were talking to the trooper on the video, and

11   we've heard recently -- I'm not going to go back to it -- you

12   asked him whether it's hard to work with cameras on his face or

13   words to that effect.  You remember that, don't you?

14   A.   I do.

15   Q.   And you were trying to at that point, what, embarrass him?

16   A.   I stated before I was making small talk.

17   Q.   This small talk asking whether or not it's hard to work on

18   cameras at the face wasn't aimed at trying to harasses or -- or

19   respond to what you thought was your unfair treatment?

20   A.   No.

21   Q.   Finally, I think you testified that you were being followed

22   for about 7 minutes by the trooper's vehicle?

23   A.   Approximately.

24   Q.   Okay.  So the -- that would be at highway speed, what,

25   7-8 miles?

1    A.   I would have to do the math for -- on that.

2    Q.   Okay.  Well, 60 miles per hour is -- is -- you can do the

3    math on that pretty quickly.  Six minutes to go 10 miles.

4    A.   Well, the speeds vary.

5    Q.   So you're talking about a number of miles that you're

6    testifying that he was driving -- driving behind you?

7    A.   I said approximately 7 minutes.  So given that he was

8    probably speeding to catch up to me from a stand stop, that's

9    what I'm saying time was would vary.

10   Q.   Well, wouldn't vary from your perspective.  It might be

11   from his, but I won't quarrel with you on that.

12        Let me -- let me rephrase the question a little bit.  Just

13   as you were possibly mistaken about your memory on somebody

14   entering at the same time, whether it was an older man or woman

15   at the gas station, just about your other potential memory

16   issues that we talked about at the very beginning of this

17   cross-examination, could you be mistaken that the vehicle that

18   was traveling behind you was a trooper?

19   A.   If I can answer your question, but just to address what you

20   said about the older gentleman.

21   Q.   Well, let me -- let me get it --

22   A.   Play the video of the --

23   Q.   -- let me get the question a little bit differently.

24        Can you be mistaken about the fact that there was a

25   trooper, as you've testified, driving behind you for about

1  7 minutes before you were stopped?

2  A.  No.

3  Q.  And based on that conviction, that's where you felt that

4  you were being racially profiled when you were stopped even

5  though you were speeding; isn't that correct?

6  A.  Yes.

7          MR. CHALMERS:  I don't have anything else at this

8  time, Your Honor.

9          MS. BRETT:  Your Honor, I only have less than

10  10 minutes of redirect if it's possible to do that.

11          THE COURT:  Well, he's going to be here tomorrow;

12  right?

13          MS. BRETT:  He is.

14          THE COURT:  Okay.  Let's do it tomorrow.  I told the

15  jury we'd be done at 4:00 and I'd like to keep with that

16  schedule.

17          MS. BRETT:  Okay, Your Honor.  Thank you.

18          THE COURT:  Okay.  Members of the jury, we are going

19  to take our evening recess.  I would just remind you what I've

20  said before:  keep an open mind until you've heard all of the

21  evidence and don't discuss or communicate with anybody about

22  this case or do any independent research.  Tomorrow we'll start

23  at 10:00 and we'll have a full day going until 5:00 a.m.

24          Do you expect -- so first 10 minutes or 15 minutes

25  with cross-examination -- or redirect and any possible recross.

1    Then who's your next witness?

2            MS. BRETT:  The defendant, Trooper McMillan.

3            THE COURT:  Okay.  All right.  Thank you.  Have a

4    great evening.  Court's in recess.

5        (Proceedings adjourned.)

6

7

8                        CERTIFICATE

9        I certify that the foregoing is a true and correct

10   transcript from the stenographically reported proceedings in

11   the above-entitled matter.

12       DATE:  February 29, 2024

13
                    /s/Kimberly R. Greiner
14                  KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
                    United States Court Reporter
15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that a copy of the foregoing APPELLANT'S APPENDIX, as submitted in digital form is an exact copy of the document filed with the Clerk.

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2024, the foregoing APPELLANT'S APPENDIX was electronically filed with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I also certify that within five business days of the issuance of notice that the electronic filing is compliant, one paper copy will be delivered by Federal Express to the Clerk's Office.


DATED: April 24, 2024                    /s/ Kurtis K. Wiard