## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

BLAINE FRANKLIN SHAW, et al.,
*Plaintiffs-Appellees*,

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

———

MARK ERICH, et al.,
*Plaintiffs-Appellees*,

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

## APPELLANT'S APPENDIX VOLUME X

Appeal from the United States District Court for the District of Kansas
Honorable Kathryn H. Vratil, Senior District Court Judge
District Court Case Nos. 19-CV-1343-KHV and 20-CV-1067-KHV-GEB

120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
(785) 296-2215
anthony.powell@ag.ks.gov
dwight.carswell@ag.ks.gov
kurtis.wiard@ag.ks.gov

**OFFICE OF ATTORNEY GENERAL
KRIS W. KOBACH**

Anthony J. Powell
  *Solicitor General*
Dwight R. Carswell
  *Deputy Solicitor General*
Kurtis K. Wiard
  *Assistant Solicitor General*

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

Transcript of Bosire Trial, Day 3
(ECF No. 620) ..................................................................... 1

1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF KANSAS
2

3
JOSHUA BOSIRE,                    Case No. 19-1343
4
   Plaintiff,                     Circuit Nos. 23-3265
5                                              23-3267
   v.
6                                 Kansas City, Kansas
BRANDON MCMILLAN,
7                                 Date: April 26, 2023
   Defendant.
8                                 Volume 3 - (Pages 159-397)
   ...................................
9

10                     TRANSCRIPT OF JURY TRIAL

11
              BEFORE THE HONORABLE KATHRYN H. VRATIL
12            SENIOR UNITED STATES DISTRICT COURT JUDGE

13

14
   APPEARANCES:
15
   For the Plaintiff:
16
   Patrick A. McInerney           Sharon Brett
17 Spencer Fane, LLP              ACLU Foundation of Kansas
   1000 Walnut                    6701 W. 64th Street
18 Suite 1400                     Suite 210
   Kansas City, MO 64106          Overland Park, KS 66202
19

20
   For the Defendant:
21
   Arthur S. Chalmers
22 Office of Attorney General - Kansas
   120 SW 10th Avenue
23 Topeka, KS 66112

24
   _____
25     Proceedings recorded by machine shorthand, transcript
          produced by computer-aided transcription.

1                         I N D E X

2
   Plaintiff's Witnesses:                              Page
3
   JOSHUA BOSIRE
4    Redirect Examination By Ms. Brett                 161

5  BRANDON MCMILLAN
     Direct Examination By Mr. McInerney               163
6    Cross-Examination By Mr. Chalmers                 225
     Redirect Examination By Mr. McInerney             281
7    Recross-Examination By Mr. Chalmers               293

8  HASSAN ADEN
     Direct Examination By Ms. Brett                   313
9    Cross-Examination By Mr. Chalmers                 348
     Redirect Examination By Ms. Brett                 387
10

11

12                      E X H I B I T S

13   Plaintiff's
     Exhibits              Offered           Received
14
        9                   193                193
15       15                  230                230
         20               171, 287             288
16
     Defendant's
17   Exhibits              Offered           Received

18      841                 242                242
        842                 244                244
19      846                 252                252

20

21

22

23

24

25

1       (Court called to order.)

2       (The jury entered the courtroom, after which the following

3  proceedings were had.)

4           THE COURT:  Good morning, everyone.  Members of the

5  jury, when we recessed last night, we had just finished direct

6  examination and cross-examination of Mr. Bosire, and

7  plaintiff's counsel has a chance to do some redirect.

8               So, sir, will you, please, step into the witness stand

9  again.  You're still under oath.  And we will pick up where we

10  left off.

11                      JOSHUA BOSIRE

12                  REDIRECT EXAMINATION

13  BY MS. BRETT:

14  Q.  Good morning, Mr. Bosire.

15  A.  Good morning.

16  Q.  Yesterday you had testified that you had rented a car you

17  drove in that February trip from Enterprise car rental;

18  correct?

19  A.  Yes.

20  Q.  And was that car rental location in Wichita, Kansas?

21  A.  Yes.

22  Q.  And you received paperwork for at the time you rented the

23  car; is that right?

24  A.  I did.

25  Q.  And you believe you testified to Mr. Chalmers that you

1   handed that rental agreement over to Trooper McMillan during

2   your stop; is that correct?

3   A.   I did.

4   Q.   That paperwork that you reference -- or that agreement that

5   you referenced, did that say the location of the Enterprise car

6   rental lot where you had rented the car?

7   A.   It did.

8   Q.   It noted that it was in Wichita, Kansas?

9   A.   Correct.

10  Q.   And I believe you testified on direct that the car rental

11  was due back at midnight; is that right?

12  A.   No.

13  Q.   You -- when was the car rental due back?

14  A.   It was on the 24-cycle.  So when I rented a new one, it was

15  supposed to be -- on the paperwork it's supposed to be returned

16  at noon.  But I spoke to the Enterprise people and they told me

17  to drop off the keys at the drop box before midnight the day of

18  the return.

19  Q.   So you had gotten permission from the Enterprise to return

20  the car before midnight?

21  A.   That's correct.

22  Q.   But that was not reflected in the rental agreement that you

23  handed over to Trooper McMillan?

24  A.   Sorry?

25  Q.   Was the fact that you had gotten that agreement reflected

1    in the paperwork that you turned over to Trooper McMillan?

2    A.   No, it was not stated there.

3    Q.   Did Trooper McMillan ever ask you about the fact that the

4    rental agreement said your car was due back earlier in the day?

5    A.   He never asked anything about the rental agreement.

6    Q.   Okay.

7            MS. BRETT:  I have no further questions, Your Honor.

8            THE COURT:  Cross-examination?

9            MR. CHALMERS:  Nothing here, Your Honor.

10           THE COURT:  Thank you, sir.  You can step down.

11           THE WITNESS:  Thank you.

12           THE COURT:  Plaintiff's next witness.

13           MR. MCINERNEY:  Plaintiff calls Brandon McMillan to

14   the stand.

15           THE COURT:  Sir, would you, please, step into the

16   witness box and raise your right hand so you can be sworn.

17                         BRANDON MCMILLAN,

18   called as a witness on behalf of the Plaintiff, having first

19   been duly sworn, testified as follows:

20                        DIRECT EXAMINATION

21   BY MR. MCINERNEY:

22   Q.   Good morning, sir.

23   A.   Good morning.

24   Q.   Your name for the jury.

25   A.   Brandon McMillan.

1          MR. MCINERNEY:  And, judge, I should have said this

2    just a second ago, it is my intent to examine this witness

3    consistent with Rule 611(c).  Thank you.

4    BY MR. MCINERNEY:

5    Q.   Sir, where are you employed?

6    A.   Kansas Highway Patrol.

7    Q.   How long have you been there?

8    A.   Since March 24th, 2010.

9    Q.   And what rank do you hold?

10   A.   Technical trooper.

11   Q.   Do you have a specific troop assignment?

12   A.   I'm assigned to Troop T, which is our aircraft unit.

13   Q.   Okay.  Do you also patrol on the highways that cross

14   Kansas?

15   A.   Yes.

16   Q.   How much time do you spend with Troop T in the plane?

17   A.   I can't give a specific answer to that.  It depends on our

18   calls for service if I'm needed for -- across the state for car

19   chases or searches.  I mean, it varies.  One week I could be

20   there doing it 8-hour shift and other weeks I could be doing it

21   just an hour or two a week.

22   Q.   Safe to say most of your time is spent on the road?

23   A.   I would say -- I don't know that most of my time.  Maybe

24   50/50.

25   Q.   Okay.  Thank you.

1        And, sir, you're from Garden City, Kansas originally?

2   A.   Yes.

3   Q.   And you attended Garden City -- excuse me -- yeah, Garden

4   City Community College; right?

5   A.   Yes.

6   Q.   And you achieved a criminal justice degree?

7   A.   An Associate's Degree in Criminal Justice.

8   Q.   And after you graduated from there, you went to work for

9   the Gardner City Police Department; right?

10  A.   Yes.  Well, I began while I was in college but...

11  Q.   Okay.  And that involved attending a police academy?

12  A.   Yes, after graduation from community college when I was 21.

13  Q.   What police academy was that?

14  A.   Kansas Law Enforcement Training Center in Hutchinson,

15  Kansas.

16  Q.   And if I say 2008-2009, was that about the right time

17  frame?

18  A.   2006-2007.

19  Q.   Okay.  And you took training at the Kansas law enforcement

20  academy regarding traffic stops, didn't you?

21  A.   Yes.

22  Q.   And you were taught about proper police procedures when it

23  comes to pulling over motorists on any road; correct?

24  A.   Yes.

25  Q.   And then in 2010 you joined the Kansas Highway Patrol;

1    correct?

2    A.   Yes.

3    Q.   And did you then go back to a law enforcement academy?

4    A.   I was required to go through Kansas Highway Patrol's

5    training academy in Salina.

6    Q.   And that's 24 weeks; correct?

7    A.   Yes.

8    Q.   And some of your training involved consensual searches;

9    correct?

10   A.   Yes.

11   Q.   And retraining on vehicle stops?

12   A.   Yes, I went over the same training that I had already gone

13   through since it was law enforcement.  Since it was required

14   courses, I just had to go through it again --

15   Q.   Okay.

16   A.   -- that academy.

17   Q.   And then you had a probationary period as a trooper where

18   your responsibilities were road duties and traffic enforcement;

19   is that right?

20   A.   Initially out of the academy I was assigned to road duties,

21   yes.

22   Q.   Okay.  And then in 2013 am I right you applied to be a

23   canine handler; correct?

24   A.   Correct.

25   Q.   And you didn't become a canine handler; right?

1   A.   I was not selected, correct.

2   Q.   And then you got your pilot's license in late 2014 and

3   transferred to Troop T; correct?

4   A.   I transferred to Troop T in late 2014 and got my license I

5   think in March or April of 2014.

6   Q.   Okay.  As a Kansas Highway Patrol trooper, you undertake

7   continuing education, don't you?

8   A.   Yes.

9   Q.   Is there a required number of hours per year?

10  A.   Forty hours required for law enforcement officers.

11  Q.   And those are so you get regular continuing education;

12  correct?

13  A.   Yes.

14  Q.   Including updates on the law?

15  A.   Yes.

16  Q.   Including changes in policy or procedure; correct?

17  A.   Yes.

18  Q.   So fair to say that if an important court decision is

19  issued, KHP trains its troopers on that court decision; is that

20  correct?

21  A.   Yes.  In some manner or form, yes.

22  Q.   Sorry?

23  A.   Well, we'll receive paperwork or documentation on it if

24  it's not an actual physical class that we attend.

25  Q.   So sometimes they push it out, say, in an e-mail or in the

1   internal system at KHP?

2   A.   Correct.

3   Q.   Okay.  And other times they'll hold classes for you?

4   A.   Yes.

5   Q.   And those classes are taught by lawyers typically who work

6   for the Attorney General's Office?

7   A.   Typically just our KHP general counsel --

8   Q.   Okay.

9   A.   -- for us.

10  Q.   Sir, I'm going to direct your attention to February 10th of

11  2019.  You've been sitting here for two days, so you probably

12  know that's the date that we're talking about; correct?

13  A.   Yes.

14  Q.   Were you working that day?

15  A.   I was.

16  Q.   What was your duty and responsibility that day?

17  A.   So that day I was on aircraft obviously.  So I was just out

18  working the road waiting for aircraft requests or working

19  traffic.

20  Q.   Okay.  And let me further direct your attention to about

21  eight o'clock or so in the evening.  Do you recall being at a

22  Love's convenience store, Love's gas station, convenience store

23  around Ellis, Kansas?

24  A.   Yes, I was.

25  Q.   And am I right about that time, roughly 8:00 or 8:30?

1    A.    Yes.

2    Q.    Who were you with?

3    A.    I had met with Trooper Doug Schulte there just for a break.

4    Q.    Taking one of a couple breaks that you take per shift?

5    A.    Usually just take one a shift but...

6    Q.    Okay.  Depending on workload I guess?

7    A.    Correct.

8    Q.    You generally get, what, a couple 30-minute breaks?

9    A.    Yes.

10   Q.    You and Trooper Schulte went to the Love's.  Did you spend

11   all 30 minutes there?

12   A.    I don't know how long we were there.

13   Q.    Okay.  And as you -- as you got ready to leave the store,

14   you approached the double glass doors that led to the parking

15   lot; correct?

16   A.    I eventually had to go through those to exit the store to

17   my patrol vehicle.

18   Q.    And so that a yes?

19   A.    Yes, I did go through those doors.

20   Q.    And you've testified that several persons walked in the

21   doors as you were standing there and you smelled the odor of

22   marijuana emitting from more -- from one or more of them.  Do

23   you remember that testimony?

24   A.    I do, but I was never able to elaborate on that.  You

25   didn't give me a chance to follow up.

1  Q.  So, well, let me ask you -- let me direct you first to

2  Exhibit 20 and we'll -- we'll walk through that for a second.

3          MR. MCINERNEY:  Put 20 up for me please.

4  BY MR. MCINERNEY:

5  Q.  So you've got a big book in front of you, and it's got a

6  lot of tabs.  If you would open that book and turn to Tab 20

7  for me please.

8  A.  Okay.

9  Q.  Do you see Tab 20 there?

10 A.  I do.

11 Q.  Okay.  That's a three-page exhibit.  Would you turn to the

12 third page for me please.

13 A.  I'm there.

14 Q.  Do you see at the very bottom on the left-hand side where

15 it says, "Respectfully, Brandon D. McMillan Technical Trooper"?

16 A.  Yes.

17 Q.  And then if you can turn back --

18         MR. CHALMERS:  I apologize for interrupting, but this

19 exhibit is not in evidence, Your Honor.

20         MR. MCINERNEY:  I'm in the middle of laying a

21 foundation, judge.

22         THE COURT:  Okay.  Go ahead.

23 BY MR. MCINERNEY:

24 Q.  So if you'll flip back to the first page, can you identify

25 that document?

1    A.   It's a letter I wrote to our internal investigation unit.

2    Q.   Okay.  And what's the date on that letter?

3    A.   May 17th, 2019.

4    Q.   And you know there was, as you just said, an internal

5    investigation into this, this matter; correct?

6    A.   Yes.

7    Q.   And as a part of that you were required to give a

8    statement; correct?

9    A.   Yes.

10   Q.   And you gave a statement.  As you said this was directed to

11   the Lieutenant Joseph Bullock?

12   A.   Yes.

13   Q.   And in this statement you had an opportunity to lay out all

14   the facts and circumstances around this stop; correct?

15   A.   Yes.

16   Q.   So agree with me that it was important to include all of

17   the relevant details here?

18   A.   Yes.

19   Q.   And certainly important to tell the truth?

20   A.   Yes.

21   Q.   Let me --

22        MR. MCINERNEY:  So I'd offer Exhibit No. 20 into

23   evidence, judge.

24        THE COURT:  Any objection?

25        MR. CHALMERS:  Well, it's a hearsay statement.  I

```
 1   mean, it may be offered to impeach, I guess, but he's not been
 2   asked to -- anything that would impeach him on it, so I do
 3   object.
 4          MR. MCINERNEY:  It's this witness's statement.  He's
 5   just confirmed that it's his statement.  And he indicated, when
 6   I asked him regarding his exit from Love's, that -- that he had
 7   some misrecollection about that.  So we're going to talk about
 8   his initial statement.
 9          THE COURT:  Well, isn't it hearsay?
10          MR. MCINERNEY:  It's his statement, judge.
11          THE COURT:  Right, but it's out of court.  Is it under
12   oath?
13          MR. MCINERNEY:  It's not under oath.  It's a prior
14   inconsistent statement, judge.
15          THE COURT:  Prior consistent or inconsistent?
16          MR. MCINERNEY:  Inconsistent statement.
17          THE COURT:  Okay.  Then I think you need to use that
18   for impeachment rather than offering it as an independent
19   freestanding exhibit based on what you've shown so far.
20          MR. MCINERNEY:  Sure.
21   BY MR. MCINERNEY:
22   Q.  So, trooper, let me direct you to the third paragraph --
23   excuse me, the second paragraph of Exhibit No. 20, and
24   specifically the line toward the middle of that.  And this is
25   -- I want you to tell me if I'm reading this the right way.
```

1    "As we were walking toward the door, there was a group of

2    several people walking inside the shop as we were still inside.

3    We waited by the doors until we could exit.  As the individuals

4    entered the store, I smelled the odor of marijuana emitting

5    from one or more of them as they walked by Master Trooper

6    Schulte and I.  We exited the store when we were clear to do

7    so."  Did I read that accurately?

8    A.  Yes.

9    Q.  Is that your statement in May of 2019?

10   A.  It is.

11   Q.  Is that statement the truth?

12   A.  It was miss -- I gave the wrong entry or exit doors of

13   where I passed the people.

14   Q.  Okay.  Let me -- well, let me show you what's been marked

15   and stipulated to as Exhibit 836 already in evidence.  And just

16   before we start that, let me ask you:  Did you enter and leave

17   the Love's convenience store more than once that night?

18   A.  I did not.

19        MR. MCINERNEY:  Let's start at 27:23 on that please.

20      (Exhibit playing.)

21        Let's pause right there.

22   BY MR. MCINERNEY:

23   Q.  Sir, let me direct you to Exhibit 836 in the upper

24   right-hand corner of this video screen.  Do you see yourself?

25   A.  Yes.

1    Q.   And that's with your left hand on the door?

2    A.   That is me.

3    Q.   And just behind you is Trooper Schulte; is that correct?

4    A.   That is correct.

5    Q.   Okay.

6              MR. MCINERNEY:   Go ahead and play please.

7         (Exhibit playing.)

8              Pause.   Thanks.

9    BY MR. MCINERNEY:

10   Q.   There -- trooper, there wasn't a group, was there?

11   A.   Correct, they were actually on the other doors you see

12   walking from --

13        If you'll go back a few seconds.

14   Q.   Sorry?

15   A.   If you'll go back a few seconds.

16   Q.   Okay.  Let's go back a few seconds.

17   A.   This letter was written almost four months after the stop,

18   so I got to where I saw them simply confused and mixed up.

19   Q.   Well, it was written four months after the stop when your

20   memory was still pretty fresh; correct?

21   A.   I wouldn't say it was real fresh, but it was four months

22   prior.  So...

23   Q.   Did you make any other statements about this incident after

24   May of 2019?

25   A.   I don't understand what you're asking.

1   Q.  Did you provide a deposition in this case?

2   A.  Yes.

3   Q.  Did you make a declaration in this case?

4   A.  Yes.

5   Q.  Okay.  And those were both made after this statement;

6   correct?

7   A.  Yes.

8   Q.  Would you agree with me that generally memory's better

9   close to an incident than it is further away?

10  A.  I would say this was a group of doors that I walk through.

11  It wasn't really a huge -- I didn't realize it was that big of

12  a deal to point out or -- it was a group of doors I walked

13  through, and I mentioned the wrong ones in my initial

14  statement.  So...

15  Q.  Well, sir, it wasn't just a group of doors.  Your statement

16  was, "There was a group of several people walking into the shop

17  as we were still inside.  We waited by the doors until we could

18  exit.  As the individuals entered the store, I smelled the odor

19  of marijuana emitting from one or more of them as they walked

20  by Master Trooper Schulte and I."

21  A.  Yes, at the other group of doors that I misspoke about.

22  Q.  Yet I think I just asked you, but I want to be really clear

23  about this, you told me that you entered and exited just once;

24  is that correct?

25  A.  There was an entrance into the restaurant we were sitting

1    in that is inside the store.

2    Q.   Okay.  So -- so it wasn't the exit doors?

3    A.   That I saw that I smelled the marijuana at or what are you

4    asking?

5    Q.   I'm asking you your statement now is it was not the exit

6    doors?

7    A.   I passed by the group of people in the entrance-exit doors

8    to the Subway, which is inside of the Love's gas station.

9    Q.   Okay.  Okay.  Your -- your statement in May said as you

10   were exiting the shop; correct?  It's right there in front of

11   you in the second paragraph.

12   A.   The shop -- I'm considering the shop as the entire

13   building.

14   Q.   Okay.  Do you remember being deposed in this case when I

15   took your deposition?

16   A.   Yes.

17   Q.   And that was in February of 2021.  Do you recall that?

18   A.   I don't remember the date, but, yes, I remember.

19   Q.   That sound about right?

20   A.   Yes.

21   Q.   And when I took your deposition, Mr. Chalmers was there as

22   your lawyer; right?

23   A.   Yes.

24   Q.   And you took an oath at the outset to tell the truth;

25   correct?

1   A.   Yes.

2   Q.   And I -- I even asked you at one point if I -- if you don't

3   understand my question, stop me and say so and I'll rephrase

4   it.  Do you remember that?

5   A.   Yes.

6   Q.   I'm going to show you -- I just laid in front of you a copy

7   of your deposition from February of 2021.  I'm going ask you,

8   if you will, sir, to turn to page 162.

9   A.   Okay.

10  Q.   Let me direct your attention down to the bottom of that

11  page and toward the top of the next.  Did I ask you this

12  question and did you provide me this answer?

13       "In the second paragraph of Exhibit 9, your sentence begins

14  on the third line, 'As we were walking toward the doors, there

15  was a group of several people walking inside the shop as we

16  were still inside.  We waited by the doors until we could exit.

17  As the individuals entered the store, I smelled the odor of

18  marijuana emanating from one or more of them as they walked by

19  Master Trooper Schulte and I.  We exited the store when we were

20  clear to do so.'"

21       And my question is:  "Did I read that correctly?"

22       Your answer was:  "Yes."

23       Then I asked you:  "Do you know if Mr. Bosire was one of

24  the people you say entered the store?"

25            MR. CHALMERS:  Your Honor, there's an errata page.  I

1  assume you're going to read the response that became a filed

2  response to the deposition.

3          MR. MCINERNEY:  I'm sorry, what did you say?

4          MR. CHALMERS:  There's an errata sheet that was filed.

5  I'm assuming you're going to read the response that's in the

6  errata sheet as -- as --

7          MR. MCINERNEY:  You're free to do that.

8          MR. CHALMERS:  Well, Your Honor, if he's going to

9  impeach with the deposition, he impeaches with the deposition

10 testimony.  He's free to say what the change was.

11         THE COURT:  I'm -- I have not seen what the change is

12 or whether it's material, so --

13         MR. MCINERNEY:  Give me just a second.  Why don't we,

14 if we can, judge, to the side?

15         THE COURT:  Sure.

16         MR. MCINERNEY:  Thank you.

17    (The following proceedings were had at the bench.)

18         MR. MCINERNEY:  Your Honor, we don't have any record

19 of any errata sheet being received by Mr. Chalmers regarding

20 Trooper McMillan's deposition.

21         MR. CHALMERS:  Do you have the original deposition

22 transcript?

23         MR. MCINERNEY:  I've got a copy of it.

24         MR. CHALMERS:  Do you have the original?

25         MR. MCINERNEY:  I'm sure we do.

1          MR. CHALMERS:  Well, it will have the errata sheet

2     with it.

3          MR. MCINERNEY:  We didn't get an errata sheet.

4          MR. CHALMERS:  This is the errata sheet that was

5     filed.

6          THE COURT:  Well, if they didn't get it, they didn't

7     get it.

8          MR. CHALMERS:  I'm sure they did.

9          THE COURT:  How are you sure?

10         MR. CHALMERS:  Because the court reporter would have

11    the obligation to include that with the original transcript.

12         THE COURT:  Well, sometimes mistakes are made.

13         MR. MCINERNEY:  I mean --

14         THE COURT:  Can you double-check?

15         MR. MCINERNEY:  Sure we can.  As for this line of

16    questioning, I think he can certainly ask about the errata

17    sheet on cross.

18         THE COURT:  Can we see the errata sheet?

19         MR. CHALMERS:  Sure.

20         THE COURT:  And what -- what was the date of it and

21    when -- so the deposition was February 12?

22         MR. MCINERNEY:  Correct.

23         MR. CHALMERS:  Then within the "x" period of time the

24    court reporter set -- was it 30 days or something like that?

25         THE COURT:  I would need to look at the rules.  Don't

1   these have to be notarized and signed by the defendant?

2            MR. CHALMERS:  I think it was.  That's the copy of it.

3   I have my errata sheet that was filed.  I think it was sent to

4   the court reporter by e-mail, so I have a copy of it on my

5   computer.

6            THE COURT:  I can't hear you.

7            MR. CHALMERS:  I said I'm sure I have a copy of it on

8   my computer, what is signed and notarized by -- by Trooper

9   McMillan.  This is just my copy of it that I have with the

10  transcript so I know what the changes were.

11           THE COURT:  Do you have a copy of the deposition that

12  has the errata sheet?

13           MR. CHALMERS:  I'm not sent the original.  So the

14  procedure, as I understand it, is that the deposition

15  transcript is sent to me.  He signs it, returns it with the

16  errata sheet with these changes, which has happened.  The court

17  reporter should then include the errata sheet with the original

18  when she sends the original to plaintiff's counsel as the party

19  that took the deposition.

20           THE COURT:  So I don't know what you want me to do

21  with your objection, because they say they didn't get any

22  errata sheet.  You haven't shown me one which is signed by the

23  witness or notarized, and we don't really have an adequate

24  record for me to preclude about asking him about the original

25  deposition at this point.

1        MR. CHALMERS:  Well, to use the deposition at this

2    point you need to have the original.  He's not using it.  He's

3    using the copy.

4        THE COURT:  Sorry what?

5        MR. CHALMERS:  He's using a copy of the deposition.

6    He's not using the original of the deposition.  Okay, that's

7    fine, he can do that if it's an accurate copy.  Apparently this

8    doesn't have the errata sheet.  He says he's got the original.

9    Find the original.

10       MR. MCINERNEY:  I'm sure we do.  I don't have it on my

11   desk.  I can tell you we don't know of any errata sheet, and

12   I'm fairly --

13       THE COURT:  Where is the original?

14       MR. MCINERNEY:  I don't know is the short answer.  I'm

15   sure if we got it we could put our hands on it, but, yeah, I

16   apologize, I don't know if -- I'm -- I can tell you with some

17   confidence that there was no -- there was not an errata sheet,

18   but we'll certainly take a look.

19       MR. CHALMERS:  That's just dead wrong, but I don't

20   know that we need to make it a big deal if he wants to go ahead

21   and use those.

22       THE COURT:  He doesn't want to; that's the point.

23       MR. CHALMERS:  He could use those sheets, explain what

24   the answer was, the ultimate answer.  And if you -- I think the

25   rules say he's allowed to talk about the change and talk about

1   the original answer after that.

2           MR. MCINERNEY:  Well, this witness made the statement

3   that he made about the exit doors to the convenience store in

4   his deposition.  He made it again in his declaration later.  I

5   don't know when this errata sheet showed up, but if it was a

6   30-day deadline, then he doubled down on his statement that he

7   just made in direct without any correction about Subway doors

8   or anything in his declaration.  So, again, I think it's a

9   proper matter for cross-examination.

10          THE COURT:  I mean, I think you can definitely get

11  into him changing his story, but you need to find out where the

12  original deposition is.

13          MR. MCINERNEY:  Agreed.

14          THE COURT:  So can you --

15          MR. MCINERNEY:  We'll put somebody to work on that.

16          THE COURT:  Can you either put another witness on

17  while you look through that or talk to him about other things?

18          MR. MCINERNEY:  I can -- I'll move past this and then

19  we'll come back.

20          THE COURT:  Okay.

21          MR. MCINERNEY:  Thanks.

22      (Thereupon, the proceedings continued in open court.)

23  BY MR. MCINERNEY:

24  Q.  Sir, with regard to your exit from the shop, as you say in

25  Exhibit 20, you even specified at one point that the odor you

1    smelled was the odor of raw marijuana; correct?

2    A.   Yes.

3    Q.   And you know from your experience as a trooper there's a

4    big difference between the smell of raw marijuana and burnt

5    marijuana; correct?

6    A.   Yes.

7    Q.   Would you -- would you describe -- would you say that

8    there's really no mistaking the two?

9    A.   I would agree with that.

10   Q.   Okay.  And let me direct your attention back to

11   Exhibit 836.  There's a still shot on it right now that's

12   paused at 27 minutes and 51 seconds.  Do you recognize

13   Mr. Bosire in that still shot?

14   A.   Yes, I do.

15   Q.   He's in the center of the screen at the desk; is that a

16   fair description?

17   A.   Yes.

18   Q.   After you and Trooper Schulte left the convenience store,

19   you stood outside the doors for a moment and you briefly spoke;

20   is that correct?

21   A.   Yes.

22   Q.   And it was there when you were briefly speaking with

23   Trooper Schulte that you first noticed a blue Nissan Altima at

24   the pumps; correct?

25   A.   Yes.

1    Q.   As you exit those doors, you were facing that bank of

2    pumps; is that correct?

3    A.   Yes.

4    Q.   And that's the first time you saw Mr. Bosire; right?

5    A.   Yes.

6    Q.   He was already out at the pumps; correct?

7    A.   Yes.

8    Q.   And the first time you saw him -- the first time you

9    noticed him, he was standing next to a white man in a white

10   hoodie; is that correct?

11   A.   It was a hoodie.  I don't -- I don't know if it was white

12   for sure.  That's how I remember it, yes.

13   Q.   But a white man in a hoodie?

14   A.   Yes.

15   Q.   And you didn't see Mr. Bosire around a group of people, did

16   you?

17   A.   Not at the gas pump.

18   Q.   Okay.  Did you see him around a group of people at any

19   point?

20   A.   No, just when I saw him at the gas pump with the other

21   white male.

22   Q.   Because if you'd seen him with a group of people, that

23   would be an important fact that would kind of loop back to what

24   happened inside the convenience store; correct?

25   A.   I guess it could have been.

1  Q.  If you -- if you suspected that you smelled marijuana, that

2  could potentially be an important fact that you would have

3  included in Exhibit 20; correct?

4  A.  If I knew it was coming off a specific person, yes, it

5  would be very important.

6  Q.  Okay.  You don't recall any other vehicles other than a

7  blue Nissan; right?

8  A.  Not at that time, just the blue Nissan.

9  Q.  Okay.  And you didn't notice any other black males at the

10  Love's at that time?

11  A.  Correct.

12  Q.  There were other cars that were at the pump; correct?

13  A.  Yeah, I don't remember their positions, but the blue Nissan

14  was not the only one that was there.

15  Q.  Okay.  And you didn't record any details about the other

16  cars that were at the pumps, did you?

17  A.  I don't believe so.

18  Q.  Okay.  You -- as you stood there with Trooper Schulte just

19  outside those doors looking at the pumps, you noticed a radar

20  detector in the blue Altima; correct?

21  A.  Yes.

22  Q.  And you noticed a camera; correct?

23  A.  Yes, I saw the front dash camera.

24  Q.  Didn't see the rear camera at that point?

25  A.  No.

1   Q.   And the radar detector is legal; correct?

2   A.   Correct.

3   Q.   And there's nothing unlawful about the camera; correct?

4   A.   Correct.

5   Q.   And you noticed it had out-of-state license plates?

6   A.   Yes.

7   Q.   From Missouri?

8   A.   Yes.

9   Q.   And you saw -- you testified that you saw a barcode sticker

10  on the window of that car that told you that it was a rental?

11  A.   Well, it didn't tell me.  It -- just I could see it from

12  there, so I assumed it was a rental at that time.

13  Q.   Okay.  Consistent with a rental car; right?

14  A.   Yes.

15  Q.   And that -- according to you, that stuck out to you because

16  rental cars are used for drug trafficking; correct?

17  A.   They can be.

18  Q.   But at that point, as you stood there after you'd seen the

19  Altima at the gas pumps, you've seen Mr. Bosire, you saw a

20  camera, you saw a radar detector and what you thought was the

21  indication of a rental car, as you stood there you did not have

22  reasonable suspicion, did you?

23  A.   I also saw the white male with him, but, no, I did not have

24  reasonable suspicion.

25  Q.   And from that point you didn't see the white man get into

1    the Altima, did you?

2    A.  I did not.

3    Q.  You didn't see him talking to anybody else; correct?

4    A.  That's right.

5    Q.  And it was at that point that you checked the registration

6    of the Altima; right?

7    A.  I don't remember if I checked it when I was standing there

8    or if I checked it as I was driving away in my car.

9    Q.  Safe to say that when you saw the -- excuse me.  When you

10   checked the registration of the Altima, you hadn't seen the

11   Altima move yet; correct?

12   A.  That's correct.

13   Q.  Did you check the registration of any other cars that were

14   in the parking lot that night?

15   A.  I did not.

16   Q.  Did you have any reason to stop the blue Altima at that

17   point?

18   A.  I did not.

19   Q.  And this is as you're pulling out of the parking lot;

20   correct?

21   A.  Yes.

22   Q.  And then you say you saw a silver Dodge Charger driving

23   west on the street just north of the Love's parking lot;

24   correct?

25   A.  Yes.

1    Q.   You didn't see the driver; correct?

2    A.   I did not.

3    Q.   You didn't see the man in the hoodie that Mr. Bosire was

4    talking to at the pumps in the Charger, did you?

5    A.   I did not see him get in the Charger or drive the Charger;

6    correct.

7    Q.   You didn't see him anywhere near it, did you?

8    A.   No.

9    Q.   And the Charger never stopped; correct?

10   A.   Correct.

11   Q.   You didn't see the Charger in the parking lot; correct?

12   A.   It could have -- so on -- in the parking lot there's two

13   exits on the north side there that you were talking about.  I

14   was leaving on the northwest exit.  I didn't see it leave from

15   the parking lot, but it's possible it could have turned from

16   that other exit.

17   Q.   My question is only about what you saw.  You didn't see

18   that Charger in the parking lot, did you?

19   A.   I said I did not see it in the parking lot.

20   Q.   Okay.  You didn't see Mr. Bosire anywhere near the Charger;

21   correct?

22   A.   That's correct.

23   Q.   You didn't see him wave or signal to the Charger?

24   A.   No.

25   Q.   You didn't see the driver of the Charger wave to

1   Mr. Bosire?

2   A.  I didn't -- I said I didn't see the driver, so...

3   Q.  Didn't hear the Charger honk at Mr. Bosire?

4   A.  No.

5   Q.  And your -- your report says that -- and I think you

6   testified this way -- the -- excuse me.

7       Your report says that the Charger appeared to be a rental

8   and your suspicions grew because I-70 is a known drug corridor;

9   is that correct?

10  A.  Yes.

11  Q.  Your testimony -- in fact, your testimony was or your

12  statement was it looked like a rental; correct?

13  A.  Yes, for the same reason that I noticed on the Altima.

14  Q.  Okay.  But you didn't run the tags of the Charger, did you?

15  A.  No, because it was driving away from me and I didn't turn

16  around.

17  Q.  You didn't follow it, right, so you didn't see it get onto

18  I-70?

19  A.  No.

20  Q.  Because that would have been in your statement; correct?

21  That would be important.

22  A.  I said I saw it driving west; that's where I saw it.

23  Q.  Okay.  If you had seen it enter I-70, that would have been

24  an important fact; correct?

25  A.  I don't know.  It could have been.

1   Q.  Okay.  You would have included it in your report anyway?

2   A.  Yes.

3   Q.  You didn't see the Altima follow the Charger out of the

4   parking lot; correct?

5   A.  Correct.

6   Q.  That would have been important; right?

7   A.  Yes.

8   Q.  And even though you saw no contact between the two at all,

9   you came to the conclusion that they were perhaps caravanning?

10   A.  The two vehicles, yes.

11   Q.  And you thought they were caravanning because drug couriers

12   caravan; correct?

13   A.  Sometimes.

14   Q.  So -- and that's where one car acts as a decoy and draws

15   the attention of law enforcement while the other car has the

16   drugs; right?

17   A.  Yes.

18   Q.  And when that -- in -- in February of 2019 that had

19   actually never happened to you, never been your experience;

20   correct?

21   A.  Are you asking me if I've ever stopped a car that was

22   involved in caravanning or...

23   Q.  Yeah, I'm looking at from the perspective of February '19,

24   on that night you had never come across a caravan personally,

25   had you?

1    A.  I have not.  I was -- I have worked while other -- while it

2    was happening with other troopers car stops, but I was never a

3    part of their stops.

4    Q.  Had you -- so you had been present when caravanning had

5    happened?

6    A.  I had been working as it happened.  I was not on scene.  I

7    could hear the radio traffic.

8    Q.  So you only knew about caravanning from what you heard at

9    that point; correct?

10   A.  In training also.

11   Q.  Okay.  But that -- yet that was your thinking at that

12   point, that the Altima and the Charger may have been

13   caravanning?

14   A.  That's correct.

15   Q.  You also stated again that the -- that the silver Dodge

16   Charger was driving westbound on the street just north of the

17   Love's; correct?

18   A.  Yes.

19   Q.  And the first time you ever saw the Charger is when it was

20   driving westbound on that northern street; correct?

21   A.  Yes.

22   Q.  You never saw the Dodge Charger parked?

23   A.  No.

24   Q.  And you never saw it entering or exiting the convenience

25   store; correct?

1    A.   Correct.

2    Q.   I'm going to show you what is marked as -- I'm going to

3    actually have you flip to Tab 9 if you will.  Are you there?

4    A.   I am here.

5    Q.   Okay.  What is that?

6    A.   My declaration.

7    Q.   Front page says Declaration of Brandon McMillan; correct?

8    A.   Yes.

9    Q.   And that's in this case; right?

10   A.   Yes.

11   Q.   Would you please turn to page 13 of that document.  And up

12   toward the top of that do you see a signature line there?

13   A.   Yes.

14   Q.   Do you see your signature on it?

15   A.   I do.

16   Q.   And just above that it says, "I declare under penalty of

17   perjury that the foregoing is true and correct," executed on

18   April 22nd, 2021.  Do you see that?

19   A.   Yes.

20   Q.   Let me direct your attention to paragraph 21 of that

21   document.

22   A.   Okay.

23   Q.   And about halfway down in your declaration I'm going to

24   direct you to a sentence that starts with "I felt."  Do you see

25   that?

1    A.   Yes.

2            MR. CHALMERS:  Excuse me, Your Honor, I don't have any

3    objection to the admission of Exhibit 9.  I think it ought to

4    be admitted before we start talking about its contents.

5            MR. MCINERNEY:  Offer Exhibit 9, judge.

6            THE COURT:  Doesn't that have the same issue that we

7    talked about with the other one?

8            MR. MCINERNEY:  Excuse me?

9            THE COURT:  Is this -- it's an out-of-court statement

10   of the witness.  Are you offering it as a consistent statement

11   or as impeachment or what?

12           MR. MCINERNEY:  As a prior inconsistent statement

13   again, judge, yes.

14           THE COURT:  All right.  Inconsistent?

15           MR. MCINERNEY:  Yes.

16           THE COURT:  And --

17           MR. CHALMERS:  I don't have any objection.  I think it

18   probably is hearsay, but I don't have any objection to its

19   admission.

20           MR. MCINERNEY:  It's his sworn statement from April of

21   '21, and I'm going to offer it as a prior inconsistent

22   statement with his testimony.

23           THE COURT:  Okay.  I thought the rules didn't

24   authorize extrinsic evidence of tangible -- of inconsistent

25   statements, but since there's no objection we'll receive it.

1          MR. MCINERNEY:  Okay.

2          THE COURT:  Okay.  It's in.

3          MR. MCINERNEY:  Yes.  Thank you.

4          Can you put up 9 please at paragraph 21?  Can you blow

5     that up a little bit for me please and specifically on -- in

6     the middle this -- the sentence that begins with I felt -- "I

7     felt that."  Thank you.

8     BY MR. MCINERNEY:

9     Q.  Trooper, from your sworn declaration April 22nd of 2021,

10    you say in the middle of your screen there, "I felt that the

11    silver Dodge Charger, which I had seen leaving the convenience

12    store, could be associated with the white man at the gas pump

13    seen talking with Mr. Bosire and therefore caravanning with

14    Mr. Bosire."  Did I read that correctly?

15    A.  Yes.

16    Q.  That's the very first time, isn't it, that you made the

17    allegation -- the sworn allegation that you had seen the Dodge

18    Charger leaving the convenience store; is that correct?

19    A.  I had so many things -- or documents that I wrote and

20    reviewed, and I don't know when the first time was that I wrote

21    it.

22    Q.  You'd agree with me that leaving the convenience store is

23    quite a bit different than driving westbound on the road north

24    of Love's; correct?

25    A.  Leaving the convenience -- this is still the same thing

1   that I said in the -- that I saw the silver Dodge Charger on

2   that street driving west; That's all I ever saw.

3   Q.   Okay.  That's -- your statement in your sworn declaration

4   is quite a bit -- is different because that puts the Charger in

5   the same parking lot as the Altima at about the same time;

6   correct?

7   A.   That's not how I was trying to convey that.  Any time I saw

8   the Dodge Charger, I was driving on the street.  That's what I

9   wrote, that's what I testified to, and that's still what I'm

10  saying the only time I saw it.

11  Q.   So at that point in time your suspicion, to the extent you

12  have it, is based on the fact that you had smelled marijuana

13  just inside the store coming from a group of people, the Dodge

14  that drove by Love's appeared to be a rental, although you

15  didn't run the tags, the Altima was a rental and had a camera

16  and a radar detector and Missouri tags, and they were both near

17  I-70, which you called a drug corridor; is that right?

18  A.   Yes.

19  Q.   And you at that point suspected that you had come across a

20  drug conspiracy?

21  A.   It's possible.

22  Q.   A drug conspiracy involving two vehicles, at least two

23  people, and you didn't stop either vehicle at that point, did

24  you?

25  A.   No.

1    Q.   You didn't get the Charger's license plate number?

2    A.   That's correct.

3    Q.   And you -- in fact, you didn't make a stop until after the

4    Altima got on the highway; correct?

5    A.   Correct.

6    Q.   And that was for speeding?

7    A.   Yes.

8    Q.   Part of the reason you didn't make a stop when you

9    suspected that you'd come across a drug caravan or a drug

10   conspiracy is because the owners of convenience stores like

11   Love's don't like the Kansas Highway Patrol making stops around

12   their stores; correct?

13   A.   Not necessarily Kansas Highway Patrol.

14   Q.   Law enforcement?

15   A.   Businesses don't like us in their parking lots because it

16   deters customers.  So, no, I was not wanting to make a show in

17   their parking lot.

18   Q.   Despite the fact you thought you had come across a drug

19   conspiracy; correct?

20   A.   That's right.

21   Q.   You exited the Love's parking lot before the Altima left,

22   didn't you?

23   A.   Yes.

24   Q.   And at that point Trooper Schulte, who had been with you,

25   was positioned in the median of the highway just east of

1    Love's; correct?

2    A.  I don't know where he was.  I left before him I think, so I

3    don't know where I went or if he -- I don't know who left

4    first.

5    Q.  Do you recall, as part of the internal investigation in

6    this matter, giving a statement to Lieutenant Bullock?

7    A.  Yes, I did.

8    Q.  Do you recall that that statement was recorded?

9    A.  It was over the phone, so it may have been.  I don't know.

10   Q.  Okay.

11          MR. MCINERNEY:  Can we go to Exhibit 19, Appendix P.

12   BY MR. MCINERNEY:

13   Q.  About what time did you get back on the interstate?

14   A.  I don't know, after 8:30 some time.

15   Q.  Does it sound right about 8:35 your radar detected a

16   vehicle heading west bound at about 82 miles an hour?

17   A.  That seems right.

18   Q.  Does that appear to be that blue Nissan from Love's?

19   A.  I couldn't tell at the time.  I was on the opposite side of

20   the highway traveling west.

21   Q.  Okay.  And what did you do?

22   A.  I had to go -- I was going to perform a traffic stop on it.

23   Q.  Okay.

24   A.  So that vehicle that I had at the time was eastbound.  I

25   was westbound.  So I had to switch lanes, go into the median

1    and turn around and catch up to it.

2    Q.   Okay.  And you did that; correct?

3    A.   Yes.

4    Q.   And you did that by activating your emergency lights?

5    A.   I didn't turn my lights on until I pulled the car over.

6    Q.   Correct.  But ultimately you did; right?

7    A.   Yes.

8    Q.   And when your emergency lights are activated, several

9    things happen, including your in-car dash cam video system

10   activates; correct?

11   A.   Yes.

12   Q.   In fact, does it back up for a period of time before you

13   hit the -- your lights?

14   A.   Yes.

15   Q.   How long?

16   A.   I think it's two minutes is what they're programmed to do.

17   Q.   Okay.  And once you got the car stopped, what did you do?

18   A.   So as far as pulling the car over, I got out to go speak

19   with the driver.

20   Q.   Okay.

21        MR. MCINERNEY:  Let's go to Exhibit 8, clip 1 please.

22   (Exhibit playing.)

23        Let's run clip 2 if we can please up through -- up

24   through 8:26 please.

25   (Exhibit playing.)

1    Sir, on your first approach to the Nissan Altima, you

2  observed a notebook that was partially covered by a blanket and

3  you considered that to be suspicious; is that correct?

4  A.   In the totality of things, it was suspicious in this

5  traffic stop, yes.

6  Q.   Because you thought it might be a ledger?

7  A.   That's correct.

8  Q.   Because in your experience drug dealers write down

9  information in ledgers?

10 A.   Some do.

11 Q.   In your experience, do they leave their ledgers partially

12 uncovered?

13 A.   In the vehicle.

14 Q.   The notebook wasn't open, was it?

15 A.   That one was not, no.

16 Q.   And you didn't see any writing on the notebook?

17 A.   I saw a closed binder with a blanket over the top of it and

18 I saw it -- half of it appearing to be sticking out that was

19 uncovered.

20 Q.   Did you see anything that looked like a log or did you see

21 any facts and figures written down?

22 A.   It was a closed binder.

23 Q.   Okay.  So that's a no?

24 A.   I did not see anything written.

25 Q.   Was there anything on what you saw -- and I know it was

1    partially covered.  Was there anything on what you saw that

2    indicated what was inside?

3    A.   No, it was a closed binder.

4    Q.   Okay.  So what you thought was a ledger or a notebook;

5    right?

6    A.   Could have been.

7    Q.   Okay.  At what point did you find out it was a Bible?

8    A.   I never found that out until reading one of these --

9    something.  I still don't know how -- if he said it was a Bible

10   or if -- I don't know how that ever came about.

11   Q.   Okay.  Mr. Bosire told you that he was coming from west to

12   east, and that was insufficient because you were looking for a

13   geographic location a city or a state; correct?

14   A.   I was.

15   Q.   And you asked him his travel plans, where he was going,

16   where he was coming from, and you asked him Kansas or Colorado;

17   correct?

18   A.   Yes --

19   Q.   Did you hear that?

20   A.   -- I mentioned those two states.

21   Q.   And then he said he has a right to remain silent.  Do you

22   remember that?

23   A.   I do.

24   Q.   And that would be a Fifth Amendment right to remain silent;

25   correct?

1    A.    Yes.

2    Q.    And that's right out of the Constitution, isn't it?

3    A.    Yes.

4    Q.    And at that point, when you first approached and he rolled

5    his window down, you didn't smell marijuana, did you?

6    A.    No.

7    Q.    Not raw marijuana?

8    A.    I didn't smell marijuana.

9    Q.    Not burnt marijuana?

10   A.    That's included in that.  I didn't smell marijuana.

11   Q.    Okay.  Not any marijuana; right?

12   A.    I did not smell marijuana.

13   Q.    He told you that he was coming from the west and going

14   east, and you asked him specifically about Colorado, in fact,

15   several times; right?

16   A.    I remember saying, "Are you coming from Kansas or

17   Colorado?"

18   Q.    And you told him at a point that you have a right to ask

19   those questions about where he was coming from; correct?

20   A.    Yes.

21   Q.    Right to ask him about his travel plans; right?

22   A.    Yes.

23   Q.    And -- and that's because where somebody's coming from or

24   somebody's going to is relevant to whether you have reasonable

25   suspicion; correct?

1   A.   It could be.

2   Q.   Those could be relevant factors in you determining whether

3   you have reasonable suspicion; right?

4   A.   Yes.

5   Q.   Yes?

6   A.   I said yes.

7   Q.   And that's because specifically Colorado is a source state

8   for drugs, isn't it?

9   A.   It has legal marijuana there, if that's what you're asking.

10  Q.   Well, I'm asking if you consider it to be a source state

11  for drugs?

12  A.   It could be, yes.

13  Q.   Okay.  And, in fact, that topic is the subject of KHP

14  training that troopers go through and that you've gone through;

15  right?

16  A.   That Colorado is a source state?

17  Q.   About source states -- source states and source cities for

18  drugs?

19  A.   Yes.

20  Q.   And I think we talked about probably 20 minutes ago the

21  fact that you receive pretty regular education on case law that

22  affects your job; right?

23  A.   Yes.

24  Q.   Are you familiar with a case -- well, that includes Fourth

25  Amendment cases; right?

1   A.   Yes.

2   Q.   And Fourth Amendments -- the Fourth Amendment in part

3   addresses searches and seizures; correct?

4   A.   Yes.

5   Q.   And what's required?

6   A.   Yes.

7   Q.   Are you familiar with a case called *Vasquez versus Lewis*?

8   A.   I've heard of it, yes.

9   Q.   Okay.  It's an important case, isn't it?

10  A.   Yes.

11  Q.   It's important enough that, in fact, the KHP advised all

12  the troopers about the case; right?

13  A.   I do remember it was, I think, one of those e-mails that

14  was pushed out to us.

15  Q.   Okay.  And it applies to you and how you do your job?

16  A.   Yes.

17  Q.   And it applies to how you detain people; correct?

18  A.   Yes.

19  Q.   And in 2019, in February of 2019, that court case, *Vasquez*,

20  applied to the way you do your job; right?

21  A.   I don't remember when the case came out.

22  Q.   If I tell you it came out in 2016, would your answer be

23  that it did apply?

24  A.   Then it would apply if it --

25  Q.   Okay.

1    A.  -- came out in 2016.

2    Q.  And that case talked about factors that can be considered

3    in determining reasonable suspicion; right?

4    A.  Yes.

5    Q.  And it also talked about things that can't be considered;

6    correct?

7    A.  Yes.

8    Q.  And *Vasquez* said that travel from a drug source city or a

9    drug source state is so broad as to be indicative of almost

10   nothing.  Do you remember that?

11   A.  I -- I don't remember.

12   Q.  That's -- you know that that's the rule that the Tenth

13   Circuit, that Court of Appeals where we sit now, handed down in

14   2016 against a KHP trooper and that it applied to you on

15   February 10th of 2019; right?

16   A.  Yes.

17          MR. MCINERNEY:  Let's play -- let's play Exhibit 8,

18   clip 3 please.

19      (Exhibit playing.)

20   BY MR. MCINERNEY:

21   Q.  Sir, that's you contacting the dispatcher and asking her to

22   check on Mr. Bosire's background information and potential

23   record; correct?

24   A.  Yes.

25   Q.  And at the very end of that you contact Trooper Schulte and

1    ask him to respond to your location?

2    A.  Yes.

3    Q.  The check that the dispatcher ran for you ultimately came

4    back with no record; correct?

5    A.  Correct.

6    Q.  Not even arrest; correct?

7    A.  I don't know -- from what I knew, he had never been

8    arrested.  I don't know what -- all the files that looked into.

9         MR. MCINERNEY:  Let's play Exhibit 8 clip 4 please.

10   (Exhibit playing.)

11   BY MR. MCINERNEY:

12   Q.  Sir, there is a conversation in that clip about Code 1 and

13   Code 3.  Did you hear that?

14   A.  I did.

15   Q.  And those are code for race and gender; correct?

16   A.  Yes.

17   Q.  So Code 1 is a white male, Code 3 is a black male?

18   A.  Yes.

19   Q.  And KHP has, in your experience, used codes for race and

20   gender since you started; correct?

21   A.  Yes.

22   Q.  From that clip Trooper Schulte was looking for a -- a

23   Code 1 and a Code 3, a black male and a white male in a

24   Charger; correct?

25   A.  Right.

1  Q.  But you'd already stopped Mr. Bosire.  You'd already

2  stopped a black male; correct?

3  A.  I realized that when I walked up to his window and saw that

4  it was a black male, yes.

5  Q.  But you already knew that when Schulte said that he was

6  looking for a white male and a black male in a Charger; right?

7  A.  I knew I had the black male stopped, yes.

8  Q.  Okay.  But you didn't correct him, did you?

9  A.  No.

10           MR. MCINERNEY:  Let's play clip 5 please.

11      (Exhibit playing.)

12  BY MR. MCINERNEY:

13  Q.  Did you hear Trooper Schulte say to you, "You ask?"

14  A.  Yes.

15  Q.  What did he mean?

16  A.  I think he asked -- the way I took it was he -- did I ask

17  if I was going for consent to search his car.

18  Q.  And what was your answer?

19  A.  No, and that he probably wasn't going to let me.

20  Q.  Okay.  Do you have reasonable suspicion at this time to

21  hold Mr. Bosire past the purpose of the stop?

22  A.  Yes, I think I did.

23  Q.  You had cameras which were legal; correct?

24  A.  Yes.

25  Q.  And you had a radar detector which was lawful; right?

1    A.   Yes.

2    Q.   And you had this Charger that had driven by a gas station;

3    right?

4    A.   Yes.

5    Q.   And Mr. Bosire would not tell you his travel plans?

6    A.   Correct.

7    Q.   Which was his right; correct?

8    A.   Correct.

9    Q.   He didn't roll his window down all the way; correct?

10   A.   Correct, I had to ask him to roll it down.

11   Q.   He rolled his window down, just not all the way; right?

12   A.   When I walked up the first time, it was down about an inch.

13   When I asked him to roll it down, he rolled it down 3 or

14   4 inches.

15   Q.   And there's a notebook in the back seat?

16   A.   Right.

17   Q.   And did you know at that time he was late returning his

18   rental car?

19   A.   Yes, I had known.  I had his rental agreement.  I knew it

20   was back one o'clock or so --

21   Q.   I'm sorry?

22   A.   I think it was one o'clock or noon that afternoon it was

23   due.

24   Q.   Due back in Wichita; right?

25   A.   Yes.

1    Q.   Where Mr. Bosire lived?

2    A.   Yes.

3    Q.   And, as you sat there just outside of Ellis, Kansas, how

4    far were you from Wichita?

5    A.   I don't know, couple hundred miles.

6    Q.   Okay.  Several hours anyway?

7    A.   Uh-huh.

8    Q.   Yes?

9    A.   Yes.

10   Q.   And you didn't ask him what time his rental was due back,

11   did you?

12   A.   I was going -- it was on the paperwork.

13   Q.   And you never called the rental car company to confirm that

14   it was late, did you?

15   A.   No.

16        MR. MCINERNEY:  Let's play Exhibit 8, clip 6 please.

17        (Exhibit playing.)

18   BY MR. MCINERNEY:

19   Q.   That's the return information from the dispatcher about

20   Mr. Bosire's criminal history; correct?

21   A.   Yes.

22   Q.   And there was none; right?

23   A.   That's correct.

24   Q.   No warrants, no arrests, not even traffic tickets?

25   A.   I don't know about traffic tickets, but, yeah, there was no

1    -- nothing on his criminal check that showed he was arrested or

2    had any prior legal problems, I guess, criminal problems.

3    Q.   She didn't mention traffic tickets, did she?

4    A.   On the driver's license, the driver's license check they'll

5    just -- they usually tell us if they have a valid license.  She

6    says he's valid.

7            MR. MCINERNEY:   Okay.  Let's play the next clip, 7

8    please.

9        (Exhibit playing.)

10   BY MR. MCINERNEY:

11   Q.   Did you hear you telling Trooper Schulte that you didn't

12   think you could hold him for a dog if he doesn't consent?

13   A.   Yes.

14   Q.   So you had no reasonable suspicion to detain him for a

15   canine sniff; correct?

16   A.   At that time I was on the fence about it.  I didn't think I

17   did, so I wanted more information -- try to get more

18   information from the driver to see -- either dispel my

19   suspicions or gain real suspicion to hold him for a canine.

20   Q.   So your testimony is you could hold him for more questions

21   but not for a canine?

22   A.   Right.

23   Q.   So you had reasonable suspicion to hold him for questioning

24   but not to call for a canine sniff?

25   A.   I didn't know how long it would take for a canine.  There

1    wasn't one available at that time that was on duty.

2    Q.  But at that point your position is you had reasonable

3    suspicion to detain him; correct?

4    A.  Yes.

5    Q.  So is it your belief, sir, that you can extend the stop to

6    ask more questions but not call a canine?

7    A.  Yes, that's how I thought.

8    Q.  Well, you weren't trained that there's two different levels

9    of reasonable suspicion, were you?

10   A.  No, but like I said, I wanted more reason to -- if I was

11   going to call a canine, I didn't know how long it was going to

12   take.  So I didn't want him to be there for unnecessary amount

13   of time, so I wanted more information.

14   Q.  Do you think there's one kind of reasonable suspicion to

15   question someone and hold them and a different kind to hold

16   them for a canine sniff?

17   A.  No.

18   Q.  But you just said that you didn't have enough reasonable

19   suspicion to hold him for a canine yet you had enough to hold

20   him for a additional questions.  Are there two different

21   levels?

22   A.  Reasonable suspicion is reasonable suspicion.

23   Q.  Period; right?

24   A.  Yes.

25   Q.  So if you don't have reasonable suspicion, you can't hold a

1  driver past the purpose of the stop; is that true?

2  A.  Yes.

3  Q.  That's your training, isn't it?

4  A.  Yes.

5  Q.  And in the video you said you were going to question him,

6  ask him additional questions, didn't you?

7  A.  I did.

8  Q.  And you're trained -- you're trained that there's no

9  difference between the reasonable suspicion to ask questions

10  and the reasonable suspicion to call for a canine sniff;

11  correct?

12  A.  Yes.

13      MR. MCINERNEY:  Can you get Exhibit 9 ready please?

14      Judge, can we approach?

15      THE COURT:  Uh-huh.

16  (The following proceedings were had at the bench.)

17      MR. MCINERNEY:  I plan to impeach this witness on his

18  last statement regarding reasonable suspicion.  I plan to use

19  his declaration to do it.  It's a statement of a party opponent

20  and it's an exception to the hearsay rule under 801(d)(2).

21      THE COURT:  Is this the one writing?

22      MR. CHALMERS:  It's already been admitted.

23      MR. MCINERNEY:  This is the declaration; right?

24      THE COURT:  Okay.  I just wanted to make the record

25  that there's not -- there's not a question about admissibility.

1  801(d)(2)?

2        MR. MCINERNEY:  801(d)(2).  You're better than me.

3  Thanks.

4        THE COURT:  Okay.  So what did you find out about the

5  deposition original?

6        MS. BRETT:  So the reporting company doesn't send hard

7  copies unless we request it.  I think we're able to go back

8  through archives and actually find the errata, which was

9  delivered to us more than 30 days after the deposition, but it

10  does appear to have been notarized, but we didn't have a hard

11  copy of it.  We didn't have hard copies.  There's no original

12  in the same sense that Mr. Chalmers has an original in an

13  envelope.  We were able to find a copy of the errata sheet, but

14  we have raised the issue previously what is actually written in

15  the errata sheet is not corrections to the transcripts.  It's

16  Trooper McMillan is essentially --

17        THE COURT:  Changing his story.

18        MS. BRETT:  Exactly.  He's gone back and watched the

19  video after his deposition and is now trying to correct his

20  testimony through an errata based on what he watched in the

21  video.  We think that's an improper use of an errata, but we do

22  -- we were able to physically locate a copy of the errata

23  sheet.

24        THE COURT:  Okay.  But it was not timely filed?

25        MS. BRETT:  It was not provided to us with the

1   original deposition that we got.  We received it at some later

2   date.

3              THE COURT:  And was it filed -- was it submitted

4   within 30 days after he had the original transcript?

5              MS. BRETT:  I think it appears that it is notarized on

6   the 30-day mark from when the transcript was provided, but we

7   did not receive it until some time after that.  I'm not sure

8   exactly when.

9              MR. CHALMERS:  I found an e-mail from the court

10  reporter acknowledging receipt of the errata sheet that was

11  provided within the time period the document was reviewed, and

12  acknowledging that she had the errata sheet and she would

13  forward it along.

14             MS. BRETT:  I'm not contesting that.  I'm just telling

15  you --

16             THE COURT:  I think that's what she just said.

17             MR. CHALMERS:  Well --

18             MS. BRETT:  -- it appears --

19             THE COURT:  Why are you shaking your head?

20             MR. CHALMERS:  I don't think that's exactly what she

21  said.  She was questioning the timing on it.

22             MS. BRETT:  I said it appears to have been notarized

23  and submitted properly the exact 30-day mark, and it was

24  provided by the court reporter to us at some point after that.

25  I don't know exactly when.

1      MR. CHALMERS:  They never requested the original, so

2  they didn't have the -- they got the errata sheet but didn't

3  have it with the original.

4      MS. BRETT:  We received it separately at some point

5  later down the line.

6      THE COURT:  I understand.

7      (Thereupon, the proceedings continued in open court.)

8  BY MR. MCINERNEY:

9  Q.  Sir, I had -- we had just been talking about your training

10  and reasonable suspicion and whether it's your training and

11  understanding that there are a couple different levels of that.

12  Would you turn to Exhibit 9 for me please?

13  A.  I'm there.

14      MR. MCINERNEY:  Can you put up paragraph 26 please?

15  BY MR. MCINERNEY:

16  Q.  Sir, let me direct your attention to the second line in the

17  middle that that sentence starts, "By this time, while I had

18  stated to Schulte that I did not believe I had sufficient

19  reasonable suspicion to extend the stop to conduct a dog sniff,

20  I felt that I had reasonable suspicion to detain Mr. Bosire for

21  additional questions."  Did I read that correctly?

22  A.  Yes.

23  Q.  And that was your sworn statement in April of 2021, wasn't

24  it?

25  A.  Yes.

1          MR. MCINERNEY:  Your Honor, can we approach please?

2          THE COURT:  Uh-huh.

3      (The following proceedings were had at the bench.)

4          MR. MCINERNEY:  Judge, at this point, based on this

5  witness's testimony, we would respectfully move the court for

6  an instruction at this time or later regarding Trooper

7  McMillan's testimony and specifically a limiting instruction

8  directing them that as a matter of law there is no difference

9  in the amount of reasonable suspicion a police officer needs to

10 hold someone for questioning versus a canine sniff; that

11 officers must have reasonable suspicion to detain a driver any

12 longer than is necessary to complete the purpose of the traffic

13 stop.  The level of reasonable suspicion needed to detain

14 someone does not vary on the reason for the detention.

15         THE COURT:  So why are you asking for this?

16         MR. MCINERNEY:  I'm sorry?

17         THE COURT:  Isn't that what he just testified about.

18         MR. MCINERNEY:  I just impeached him on his sworn

19 declaration there are two levels of reasonable suspicion:  one

20 to question and one for a canine sniff.

21         THE COURT:  Right, but then he testified -- then I

22 thought he agreed with you it's all one standard.

23         MR. MCINERNEY:  I don't know that that was clear from

24 his answer.

25         THE COURT:  It seemed clear to me.  Maybe you can go

1    back and look at the transcript, but I think he said reasonable
2    suspicion is reasonable suspicion.
3            MR. MCINERNEY:  Okay.
4            THE COURT:  It's just one.  I'm not inclined to give
5    this right now because I think it unduly emphasizes that point.
6    It looks like I'm weighing in on what he just said, what I
7    understood you to say.
8            MR. MCINERNEY:  Okay.  We'll renew that at the
9    appropriate time.
10           THE COURT:  Okay.
11           MR. MCINERNEY:  Thank you, judge.
12      (Thereupon, the proceedings continued in open court.)
13           MR. MCINERNEY:  Can you, please, play clip 8 for me,
14   Ron?  Thank you.
15      (Exhibit playing.)
16   BY MR. MCINERNEY:
17   Q.  Did you ever determine whether there was any connection or
18   relationship between Mr. Bosire and the gas station attendant?
19   A.  Just from what I asked him at the car or what?
20   Q.  At any time at all during this investigation did you
21   determine any connection between --
22   A.  He told me it was gas --
23   Q.  Well, let me finish my question so the records's not a
24   mess.
25           Did your investigation determine any connection whatsoever

1  between Mr. Bosire and the guy in the hoodie you saw him with

2  at the gas station?

3  A.   It turned out it was a gas station attendant, yes.

4  Q.   So when you -- when you walked up and said, "Where's your

5  buddy?" you were completely wrong about that?

6  A.   I was asking him about the guy that he was with at the gas

7  station.

8  Q.   And Mr. Bosire was clearly confused about what you were

9  asking; right?

10 A.   He didn't seem confused.  It seemed like he was lying about

11 the person he was talking to.

12 Q.   You didn't explain what you had seen and the basis for your

13 question about his buddy?

14 A.   I said several times --

15 Q.   Did you --

16 A.   -- the guy at the gas pump you were talking to.

17 Q.   You didn't describe him, did you?

18 A.   He was talking to one person.  So I said "the guy you were

19 talking to" several times.

20 Q.   Do you remember saying the guy you were traveling with?

21 A.   I don't remember saying that.

22 Q.   Well, you were wrong about anybody traveling with

23 Mr. Bosire; correct?

24 A.   I didn't say anyone was traveling with him.

25 Q.   But, nevertheless, all that added to your suspicion;

1   correct?

2   A.   Yes.

3   Q.   Because at that point, as you just said, you thought that

4   Mr. Bosire was lying; right?

5   A.   Yes.

6   Q.   And when he explained -- when he finally understood what

7   you were talking about and explained it was the gas station

8   attendant, that really didn't make any difference to you, did

9   it?

10  A.   I didn't believe him right then.

11  Q.   You didn't make room for that at all that he was being

12  truthful with you, did you?

13  A.   Not with the way the traffic stop was going, no, I didn't

14  have any reason to believe him.

15  Q.   Turns out it was you who had it wrong though; right?

16  A.   Yeah.

17  Q.   So, in addition to what you had before with that first

18  contact, with the second contact you have him being confused

19  about your mistaken assumption that he was traveling with

20  somebody, the white guy from Love's; correct?

21  A.   I don't understand what you're asking.

22  Q.   I said, in addition to what you have from the first

23  encounter, you also have him being confused about your

24  questions regarding traveling with somebody else; right?

25  A.   He didn't seem -- like I said, he did not seem confused to

1    me at this time.  He seemed like he was lying to me, but, so,

2    yes, that was part of my suspicion.

3    Q.  You'd agree that you'd mistakenly thought he was lying?

4    A.  Later on.

5    Q.  Okay.  And you had you telling him several times that

6    you're suspicious; correct?

7    A.  Yes.

8    Q.  Suspicious because of his cameras; right?

9    A.  That's one of them, yes.

10   Q.  And suspicious because he won't answer questions?

11   A.  Yes, being evasive.

12   Q.  Okay.  And then you tell him -- when he says, "I have the

13   right to remain silent," you say, "No, you don't, that's when

14   you're arrested --"

15   A.  That's --

16   Q.  -- is that correct?

17   A.  -- not what I said.

18   Q.  Was that the gist of what you explained to him?

19   A.  I thought he was going to get into interrogation stuff, so

20   that was -- I wasn't interrogating -- interrogating him.  I was

21   asking him questions.  He wasn't in custody.

22   Q.  But you know he was a -- well, he was detained, wasn't he?

23   A.  He was detained.

24   Q.  He wasn't free to go?

25   A.  No.

1    Q.   And you know, as a Kansas Highway patrolman -- state

2    trooper, rather, that individuals have a right to remain silent

3    no matter what they're asked by police; correct?

4    A.   Yes.

5    Q.   So when you said -- when you told him he didn't have the

6    right to remain silent, that you're entitled to ask those

7    questions and he had to answer, that wasn't accurate, was it?

8    A.   I didn't say he had to answer questions.

9    Q.   So you had the conversation about the guy he's traveling

10   with, you have him -- telling him that you're suspicious, and

11   then you have his refusal to consent to a search of his car;

12   right?

13   A.   Yes.

14   Q.   And when you asked him for that consent, you already knew

15   you were going to call for a canine, didn't you?

16   A.   I did.

17   Q.   So it didn't really matter what he said to your question

18   about search; correct?

19   A.   Correct.

20   Q.   And your -- your position then was that added enough --

21   added up to enough reasonable suspicion to detain him for a

22   canine sniff; right?

23   A.   I felt comfortable calling for a canine now.

24        MR. MCINERNEY:  Let's play clip 9 please.

25   (Exhibit playing.)

BY MR. MCINERNEY:

Q.   Sir, when you were talking to Trooper Schulte, you asked

him to call for the canine; correct?

A.   He was already on the phone with him, so I had him have him

go ahead and respond.

Q.   And you mentioned that he would not answer questions;

right?

A.   Yes.

Q.   And then you said -- well, you didn't say that you thought

he was lying about the guy -- the white guy in the hoodie from

the gas station, did you?

A.   Never came up.

Q.   You didn't mention it, did you?

A.   No.

Q.   Even though that was the factor that finally put you over

the edge in the reasonable suspicion, wasn't it?

A.   I -- there wasn't a need to tell Doug that.

Q.   But that was the final factor that secured reasonable

suspicion for you, wasn't it?

A.   It was one of the factors that helped, yes.

        MR. MCINERNEY:  Let's play clip 10 please.

     (Exhibit playing.)

BY MR. MCINERNEY:

Q.   When you turned your flashlight on the front of your car,

was that pointed at your license plate on the front of your

1    vehicle?

2    A.   Yes.

3    Q.   And does that have your badge number on it?

4    A.   It does.

5    Q.   That was your response to Mr. Bosire when he asked you what

6    your badge number was?

7    A.   Yes.

8    Q.   Were you there when Trooper Schulte explained to Mr. Bosire

9    that he was parked on the side of the road and he couldn't be

10   parked on the side of the road?

11   A.   I heard him say that he was free to leave, and when he

12   wasn't leaving parked there, yes.

13   Q.   You heard Trooper Schulte make those statements?

14   A.   Yes.

15   Q.   Do you understand what he meant by that?

16   A.   I wasn't really paying attention at the time, but I just

17   could hear it, him speaking.

18   Q.   My question is:  Did you understand what he meant at that

19   time?

20   A.   Yeah, you're parked illegally on the road, you need to

21   leave is the way I understood.

22   Q.   Leave or get a ticket?

23   A.   I don't know that he was going to give him a ticket.  We

24   don't give parking tickets.

25        MR. MCINERNEY:  Let's go to clip 8 for a moment.

1    Clip 8.

2         (Exhibit playing.)

3    BY MR. MCINERNEY:

4    Q.  I'm going to show you -- we just looked at this a few

5    minutes ago, but I want to show you the front part of clip 8 of

6    Exhibit 8.  This is the second approach that you made to

7    Mr. Bosire's vehicle.

8              MR. MCINERNEY:  Go ahead and play it and I'll pause

9    it.

10        (Exhibit playing.)

11   BY MR. MCINERNEY:

12   Q.  That's your first question to Mr. Bosire, "Where'd your

13   buddy go?"  Correct?

14   A.  Yes.

15   Q.  Okay.

16             MR. MCINERNEY:  Hit play please.

17        (Exhibit playing.)

18             Pause it.

19   BY MR. MCINERNEY:

20   Q.  Second one, "The guy that you were with at Love's."

21   Correct?

22   A.  Yes.

23             MR. MCINERNEY:  Go ahead.

24        (Exhibit playing.)

25   BY MR. MCINERNEY:

1   Q.  "The gas station you were at."  Is that right?

2   A.  Yes.

3          MR. MCINERNEY:  Okay.  Go ahead and hit play.

4       (Exhibit playing.)

5   BY MR. MCINERNEY:

6   Q.  Did you just -- correct me if I'm wrong, you told

7   Mr. Bosire, "Do you know what I'm talking about, the guy at

8   Love's?"  Correct?

9   A.  I said -- he was asking, "What guy at Love's?"

10       I think I said, "The guy at Love's, the one you were --"

11          MR. MCINERNEY:  Okay.  Hit play please.

12       (Exhibit playing.)

13  BY MR. MCINERNEY:

14  Q.  So then you said finally, "The guy at the gas pumps that

15  was with you."  Correct?

16  A.  I think I said it a couple times before that also, but...

17  Q.  Well, we can go back through it.

18  A.  I don't -- we've watched it several times.  I said several

19  times, "The guy you were with at Love's at the gas pump."

20       I don't know why we need to keep watching it over and over.

21  Q.  Well, because I'm asking the questions; that's why.

22       The first -- this clip you just saw was the first time you

23  said, "The guy at the gas pumps."  Right?

24  A.  I don't know.

25          MR. MCINERNEY:  Let's go back and play it again.

1        (Exhibit playing.)

2    BY MR. MCINERNEY:

3    Q.   Did you say "the guy at the gas pumps" then?

4    A.   No.

5             MR. MCINERNEY:  Hit play.

6        (Exhibit playing.)

7        Stop.

8    BY MR. MCINERNEY:

9    Q.   Did you say "the guy at the gas pumps"?

10   A.   No.

11            MR. MCINERNEY:  Go ahead.

12       (Exhibit playing.)

13   BY MR. MCINERNEY:

14   Q.   Didn't say "the guy at the pumps," did you?

15   A.   No.

16       (Exhibit playing.)

17   BY MR. MCINERNEY:

18   Q.   That's the first time you say "gas pump," isn't it?

19   A.   You are correct.

20            MR. MCINERNEY:  One moment if I can, Your Honor.

21            That's all the questions I have for this witness,

22   judge.  Thank you.

23            THE COURT:  Cross-examination.

24                        CROSS-EXAMINATION

25   BY MR. CHALMERS:

1   Q.  I hope not to be too repetitive, but I need to go over a

2   few things with you.  You've been a trooper since when?

3   A.  March 24th, 2010.

4   Q.  So you had been in law enforcement where you had been

5   conducting traffic stops at the time of this stop how long?

6   A.  2019, this time it was 13 years.

7   Q.  And part of that was when you were with what, Garden City?

8   A.  Yes.

9   Q.  And you are a pilot, you said that; is that correct?

10  A.  Yes.

11  Q.  And you've explained that in your pilot role about half

12  time you spend flying and about half time patrolling; is that

13  right?

14  A.  Probably -- throughout the year probably half and half, so

15  it equals...

16  Q.  Now, the area -- when you patrol, what area are you out

17  patrolling?

18  A.  And so our aircraft is based in Hays at the airport, so I

19  generally stay close to Hays.  So usually just in Ellis County

20  on I-70 because I need to be available for -- to respond

21  quickly for aircraft callouts.

22  Q.  Are you married?

23  A.  Yes.

24  Q.  How long have you been married?

25  A.  Fifteen years.

1    Q.   Got any kids?

2    A.   Two daughters.

3    Q.   How old are they?

4    A.   11 and 8.

5    Q.   And I think you just indicated you live in the Hays area;

6    is that correct?

7    A.   Yes.

8    Q.   How long you been in the Hays area?

9    A.   Since I got on aircraft at the end of 2014.

10   Q.   And other than your job with the highway patrol, do you

11   have any other occupations outside that?

12   A.   I still have outside employment working for Nabisco.

13   Q.   What do you do for them?

14   A.   I just unload their truck for them at the local stores.

15   Q.   Let me talk to you about your duties with the Kansas

16   Highway Patrol when you're on the road.  Is giving out traffic

17   tickets your only responsibility?

18   A.   No.

19   Q.   What are the other responsibilities you have out on the

20   road?

21   A.   Also respond to medical emergencies on the interstate or

22   state highways or traffic collisions or motorists that break

23   down, respond to them and assist them if we can.  If not, we'll

24   make sure they get the assistance they need.

25   Q.   Have you heard the term interdiction?

1    A.  Yes.

2    Q.  What does that mean?

3    A.  Intercepting or stopping certain things as they are coming

4    through the highway before they happen --

5    Q.  What do you mean?

6    A.  -- along the highway.

7    Q.  What do you mean certain things?

8    A.  Drugs or trafficking people, things like even identity

9    theft, things like people that steal other people -- we've had

10   people that we've stopped we've found, like, multiple IDs and

11   things that don't belong to them.  So there's different types

12   of criminal interdiction.

13   Q.  Okay.  So when you talk about interdiction in the context

14   of highway patrol and your responsibilities, what -- what

15   responsibilities, if any, do you have for interdiction?

16   A.  Just try to find it.

17   Q.  And how would you do that?

18   A.  Through traffic enforcement.

19   Q.  Is there a percentage of stops that you can say that you've

20   had where you are -- actually will do interdiction work?

21   A.  For me it's very low because that's not my priority with

22   the unit I'm assigned to.

23   Q.  Is there --

24   A.  So it would definitely be less than 1 percent for me.

25   Q.  Is there a percentage of stops where you would detain

1    someone as part of the interdiction process?

2    A.   It would be very low also.

3    Q.   Let me talk to you about the stop on February 10.   You

4    prepared a citation, is that correct, in that stop?

5    A.   Well, yes, for us.  It's a warning, but a citation to us

6    would be, like, a traffic ticket.  But, yes, it's a warning.

7    Q.   It's a paper document?

8    A.   Yes.

9    Q.   And is that a document then that you provided to

10   Mr. Bosire?

11   A.   Yes, he was provided one.

12   Q.   When did you give him a copy of it?

13   A.   I gave him a copy right before he exited the vehicle and I

14   patted him down.

15   Q.   Are you talking about right before the dog sniff?

16   A.   Yes.

17   Q.   What else did you give to him at that time if anything?

18   A.   His driver's license and the rental agreement were handed,

19   all three to him at once.

20   Q.   And you've listened to the dash cam tape now on multiple

21   occasions.  Did you remember hearing on the tape mention of

22   returning his paperwork to him?

23   A.   I think I said, "Here's your information back so I don't

24   forget to give it to you."

25   Q.   And that's when the citation was provided to him?

1  A.  Yes.

2  Q.  I want to show you a copy of the citation real quick.  What

3  I'm not sure is whether Exhibit 15 is in evidence or not.

4          MR. CHALMERS:  Your Honor, I would offer the

5  Exhibit 15 into evidence if it hasn't been.  I think the

6  foundation's been stipulated to.

7          THE COURT:  Any objection?

8          MR. MCINERNEY:  No objection, judge.

9          THE COURT:  Received.

10  BY MR. CHALMERS:

11  Q.  So Exhibit 15 is up on the screen and you see it.  Is that

12  a copy of the citation that you've just been referring to?

13  A.  Yes.

14  Q.  That citation has some information on it.  How is that

15  information entered?

16  A.  So on our -- the system we use, everything's done

17  electronically.  So on my laptop I have in my car, I'll have

18  his driver's license, and I'll just kind of fill in the blank

19  thing.  So I'll fill in his, you know, height, weight, address,

20  his name, driver's license, then the vehicle information.  Then

21  that bottom where it says, like, 1, 2, 3, 4, 5, 6, that's where

22  we list the charges that we have and if there are warnings or

23  if it's, like, a ticket.

24  Q.  The -- there is a reference to a time right afterwards

25  that's 10 day of February, 2019.  Do you see that?

1    A.   Yes.

2    Q.   What does 20:53 mean?

3    A.   So that would be 8:53 p.m.

4    Q.   Is that what we call sometimes military time then?

5    A.   Yes.

6    Q.   And would that have reflected -- what does that reflect in

7    terms of what happened?

8    A.   So that time is when I created the new warning document.

9    So one of the icons is "new," which would be new ticket.  So

10   when I click that, it automatically populates that time and

11   date into there.

12   Q.   So the actual stop itself would have been some time before

13   20:53 then?

14   A.   Right, a few minutes before that.

15   Q.   Now, it also reflects a location down here.  Do you see

16   that on the exhibit?

17   A.   Yes.

18   Q.   And the location, what is that?

19   A.   That would be I-70 eastbound at milepost 153.

20   Q.   And what is a milepost?  Probably everybody knows but maybe

21   me.

22   A.   So they start at zero depending on the highway.  So I-70

23   will start at zero, and every mile you go east it will add a

24   number.  So we're 153 miles into Kansas according to this on

25   I-70.

1   Q.  Is that supposed to reflect then where the vehicle was

2   speeding or where it was stopped?

3   A.  The general area of where we observed it and stopped it.

4   Q.  So the vehicle might have been stopped a little bit further

5   down the road than at 153?

6   A.  Right.  I have 153.  I probably put 153 in there at the

7   time because we had just passed Exit 153 so I knew we were

8   close, but I think exit -- or milepost 154 may have been where

9   we were actually at.

10   Q.  There has been discussion of a stop in Ellis, Kansas.  So

11   are you familiar with what the milepost is at the Ellis stop?

12   A.  Ellis is at Exit 145.

13   Q.  So this stop took place approximately how many miles from

14   Ellis entrance and exit?

15   A.  Eight to nine.

16   Q.  And the speed limit -- I don't know if it's reflected on

17   the exhibit or not -- in that stretch of road between Ellis and

18   Hays was what?

19   A.  75.

20   Q.  And you have traveled from Ellis past that -- that

21   location, the stop that you just talked about, which was near

22   milepost 153 on a number of occasions; is that right?

23   A.  Yes.

24   Q.  Can you give kind of an estimate on how many?

25   A.  Numerous times a day just going back and forth.

1   Q.   About how long does it take to drive from the Ellis exit to

2   153?

3   A.   Five minutes or so.

4   Q.   Now, you gave a warning for 82 miles per hour; is that

5   right?

6   A.   Yes.

7   Q.   And how did you determine that?

8   A.   On whether I was going to give him a warning or citation;

9   is that --

10  Q.   Well, the rate, 82 miles per hour?

11  A.   I'm not understanding your question.  How did I determine I

12  got him going that fast?

13  Q.   Yeah.

14  A.   I checked his speed on radar.

15  Q.   And when you were checking the speed on radar, where was

16  your car approximately in relation to the vehicle that you

17  clocked speeding?

18  A.   I was moving -- I was driving westbound on I-70 going back

19  towards the Ellis area, and the vehicle I had checked on radar

20  was traveling eastbound.  I don't know how far it would have

21  been ahead of me.  Quarter mile or so.

22  Q.   It was dark?

23  A.   Yes.

24  Q.   Could you see the occupants of the vehicle that you clocked

25  as speeding when you clocked it speeding?

1   A.   No.

2   Q.   When could you first see the occupants of the vehicle that

3   you clocked speeding?

4   A.   When I walked up to the passenger side and looked through

5   the driver's -- or the passenger window.

6   Q.   This would have been after the stop?

7   A.   Yes.

8   Q.   The vehicle that you have has dash cam videos in it; is

9   that correct?

10  A.   Yes.

11  Q.   And then there's a microphone that somehow is connected to

12  the dash cam.  How does that work?

13  A.   Yes, we have a wireless camera that we're -- or microphone

14  that we're required to wear with our camera system, just a

15  little -- I don't know, a little plastic piece we clip

16  somewhere on our uniform.

17  Q.   So the sound that we've been hearing on the dash cam, is

18  that on the microphone that was on your uniform?

19  A.   Yes.

20  Q.   And then the dash cam video that you've seen in the

21  evidence, is that then something that is retrieved from your

22  patrol vehicle?

23  A.   Yes.

24  Q.   And you've seen exhibit -- well, you've seen Plaintiff's

25  Exhibit I think it's eight, the dash cam video, you've seen

1   that, and it to the best of your recollection pretty fairly and

2   accurately depicts what you can hear from your side of the

3   conversation and what you can see from the vehicle that

4   happened during the course of this stop; is that correct?

5   A.   Yes.

6   Q.   I want to back up for just a second.

7           MR. CHALMERS:  I wonder if we could put on the Elmo if

8   it's not on.

9   BY MR. CHALMERS:

10  Q.   So I've got a real rough diagram up here on the screen I

11  may need to use with you to assist the jury in understanding

12  where things happened at the Love's store.  And in first place,

13  when you went into the Love's store I think you testified was

14  what, about what time?

15  A.   Around -- around eight o'clock.  Might have been a little

16  bit before that, but around there.

17  Q.   And you and Doug Schulte went in together; is that right?

18  A.   I don't remember if one of us was already there, but, yes,

19  we met each other there.

20  Q.   And when you were -- after you'd -- you went into the

21  little place that's over here on the side here.  Is that where

22  the restaurant's located?

23  A.   Yes, we would have been back a little --

24  Q.   How do you access the restaurant from the rest of the

25  store?

1    A.   There's a couple entrances, but we access -- accessed it

2    through the door that was pointed out earlier on the north side

3    of Love's.  Kind of where it elbows right there at the

4    90-degree angle, there's a door right there.

5    Q.   Okay.  And I don't want to suggest something, so maybe can

6    you stand up and point to the jury about where that elbow is

7    you talked about?

8    A.   The door, it's going to be about right here.

9    Q.   And where is the door that is the exit of Love's then?

10   A.   It's the same entrance and exit to Love's right here and

11   then there's a hallway that runs across right here and there's

12   doors right here that lead into the Subway, which is right

13   here, and there's a Dairy Queen right here and a Godfather's

14   Pizza.

15   Q.   Okay.  So my -- my question wasn't all that great, but

16   there are doors that you have to travel through to get into the

17   restaurant; is that what you just said?

18   A.   Yes.  So the hallway right here, then there's doors right

19   here that lead into the restaurant area.

20   Q.   Now, you have talked about where you smelled marijuana and

21   where people were.  To the best of your recollection, where

22   were you when you thought you smelled the marijuana?

23   A.   We were exiting the doors is when I first smelled it, and I

24   could just smell it through the hallway just because it's...

25   Q.   Which doors are you talking about?

1   A.   The doors right here that lead into the restaurant.

2   Q.   Okay.  And then you proceeded on to exit then through the

3   doors to go outside?

4   A.   So we exited these doors that lead into the restaurant,

5   walked down the hallway, exited right here to go outside.

6   Q.   And you provided some statements to the effect that you

7   smelled marijuana on a group of people as you were walking and

8   exiting the actual store itself; is that right?

9   A.   I smelled the marijuana on coming -- when I first noticed

10  it, we were walking out these doors that lead into the

11  restaurant as a group of people was walking past.

12  Q.   Okay.  There's been some discussion that you said that you

13  smelled the marijuana as you were actually exiting the store.

14  A.   I could smell it from the time I exited here until I exited

15  the other doors.  Once I smelled it, I smelled it until I was

16  out of the building.

17  Q.   But the people you were passing were located more towards

18  the restaurant, is what you're saying?

19  A.   Yes, that's where I walked by the people.

20  Q.   So let's look at a video for a second as soon as I can get

21  that out.  This is in evidence as Exhibit 836.  I didn't mean

22  to show you guys to go through...

23       Okay.  So I'm just going to land at the stop here at 8:05.

24       (Exhibit playing.)

25            MR. CHALMERS:  Is that on the screen?  If we could

1   show please?  Thank you.

2   BY MR. CHALMERS:

3   Q.  The hallway that you've talked about that works its way

4   back to the -- to the restaurant, can you get up and show the

5   jury what you're talking about there?

6   A.  So that's the exit to go outside.  Then there's a little

7   foyer -- foyer area right there.  But the entrance -- Subway,

8   if you keep walking straight up that hallway, there's a set of

9   glass doors up there also.

10  Q.  So I want to play part of the tape then.

11      MR. CHALMERS:  I'm sorry, Your Honor, don't have my

12  notebook.

13      THE COURT:  Would this be a good time to take a recess

14  for lunch?

15      MR. CHALMERS:  Fine with me, Your Honor.

16      THE COURT:  All right.  Members of the jury, we will

17  reconvene at one o'clock, and that's it.  Court's in recess.

18      (Recess.)

19      (The jury entered the courtroom, after which the following

20  proceedings were had.)

21      THE COURT:  Trooper, if you'll take the witness stand.

22  You're still under oath.

23  BY MR. CHALMERS:

24  Q.  Mr. McMillan, when we took our break, we were talking about

25  the Love's store and I was going to show you a video.  And this

1   video is part of 836 if I remember correctly, Exhibit 836.

2   Started about 16:09.  So if we could show that on the screen.

3   Here it goes.

4        (Exhibit playing.)

5        Now, I just started -- I'm going to stop or pause about

6   16:18 on the screen, but do you see a trooper there in the

7   video?

8   A.   Yes.

9   Q.   Do you know who that trooper is?

10  A.   I'm not sure who he was.  I think he was passing through

11  and he was -- knows Doug, Trooper Schulte.  I think he stopped

12  in to say "hi" for a couple minutes.

13  Q.   Did you have any conversation with this trooper about --

14  about anything other than passing, the "hi, how you doing" sort

15  of thing?

16  A.   No.

17  Q.   Moving forward a little bit, do you know if you had any

18  communications with this trooper between the time that we're

19  seeing on the screen leaving Love's until the time that

20  Mr. Bosire's stop and detention were concluded?

21  A.   No, I never had any contact with him.

22  Q.   Was there some conversation, agreement among the troopers

23  that they were going to search out and seek Mr. Bosire or

24  others in particular as part of a -- to stop them?

25  A.   No.

1    Q.   So now going back to the tape.

2         (Exhibit playing.)

3         Okay.  I'm going to pause it about 16:39 on the exhibit,

4    and you see a couple guys walking down a hallway.  Is that the

5    hallway that you described that takes you to the restaurant?

6    A.   Yes.

7    Q.   And I don't know, can you see the doors or the doorway in

8    the exhibit that are between the convenience store and the

9    restaurant?

10   A.   It's right out of the view of the camera.

11   Q.   Okay.  You mean just above the top head of this guy who's

12   walking down the hallway?

13   A.   Yes.

14   Q.   Started the tape back up.

15        (Exhibit playing.)

16        And then about 16:50 I paused it, and that's where I think

17   we see Mr. Bosire enter the -- the -- the travel shop; is that

18   right?

19   A.   Yes.

20        (Exhibit playing.)

21   Q.   And then I paused it about 16:57, and is that you walking

22   down the hallway?

23   A.   Yes.

24   Q.   And before you walked down the hallway, you observed on the

25   video there were four people kind of walked down along that

1   hallway before you?

2   A.   Yes, I saw the two that came in from the entry there, and

3   then there's just other foot traffic that was walking in and

4   out.

5   Q.   And where you stopped by an entranceway or an exit and

6   testified you first smelled the odor of marijuana, where was

7   that as we look at it on this video?

8   A.   Would have been in that area.  As you see my feet just

9   coming into the screen, that's where the entryway into the

10  restaurant was.  That's where I first noticed the smell and

11  walked by that group of people that I mentioned.

12  Q.   So the delay walking you're talking about are at the doors

13  in the -- between the convenience store and the restaurant, and

14  then you smelled people and you show those on the tape?

15  A.   Yes.

16  Q.   I don't -- you never actually had a conscious recollection

17  of seeing Mr. Bosire at the convenience store; is that right?

18  A.   Correct.

19  Q.   You left the convenience store.  You exited, I think you

20  testified, with Trooper Schulte.  What did you do then?

21  A.   We stood right outside the exit door for a few minutes.

22  Just talked for a couple more minutes.

23  Q.   I'm going to see somewhere up there should be a notebook

24  plaintiff -- or defendant's exhibits.

25  A.   It's this one?

1    Q.   No.   I'm not sure where the notebook is, but let me handle

2    it differently.   Let me show it to you.

3         MR. CHALMERS:   If I approach the witness, Your Honor,

4    I have it anyway.

5    BY MR. CHALMERS:

6    Q.   I'm going to show you what's been marked as Exhibit 841,

7    and that's a photograph, is it not?

8    A.   Yes, it is.

9    Q.   And what's shown in the photograph is what?

10   A.   That's the north side of the Love's gas station.

11   Q.   And does that photograph fairly and accurately depict kind

12   of the condition of the north side of the gas station as it

13   existed back in February of 2019?

14   A.   Yes.

15   Q.   It is light.   It's not dark.   You can see the -- can you

16   see in that photograph then the configuration --

17   A.   Yes.

18   Q.   -- of the -- of the Love's?

19        And are you able on that photograph to generally describe

20   where it was that you and Trooper Schulte were standing?

21   A.   Yes.

22        MR. CHALMERS:   I move for admission of Defendant's

23   Exhibit 841.

24        MR. MCINERNEY:   No objection.

25        THE COURT:   Received.

1          MR. CHALMERS:  If I could get the Elmo on now.

2     BY MR. CHALMERS:

3     Q.  All right.  And once again if you don't mind if you could

4     stand up and show the jury generally about where you and

5     Trooper Schulte would have been standing on the exhibit.

6     A.  I don't remember the exact spot, but I'm thinking right

7     over here.  Our cars were parked right along the side of that

8     building (indicating).

9     Q.  And you're showing towards the right side of the exhibit

10    maybe behind it is a black or gray car; is that what you just

11    showed?

12    A.  Yeah, we were standing around that area somewhere.

13    Q.  While I've got you up, let me show you another exhibit that

14    is Exhibit 842.  Is that a photograph?

15    A.  Yes.

16    Q.  And what does that photograph seem to depict?

17    A.  That would be the northeast corner of the parking lot and

18    looking towards the northeast towards I-70.

19    Q.  So that would show kind of the -- would that show the path

20    that one would take to leave the travel shop, the Love's shop

21    to get onto I-70?

22    A.  Yes.

23    Q.  And does it fairly and accurately depict the conditions

24    that existed back in February of 2019 with respect to how you

25    get on the highway?

1   A.  Yes.

2          MR. CHALMERS:  Move for admission of the Exhibit which

3   I believe was 8 --

4   BY MR. CHALMERS:

5   Q.  What was it?

6   A.  842.

7          MR. CHALMERS:  -- 842.

8          MR. MCINERNEY:  No objection, Your Honor.

9          THE COURT:  Mr. Chalmers, can you keep your voice up

10  please; I'm really straining to hear you.

11         MR. CHALMERS:  I will.  Thank you, Your Honor.  I --

12  among my many bad habits that's one, not to talk loud enough.

13  BY MR. CHALMERS:

14  Q.  Go ahead and have a seat if you don't mind.

15     Okay.  So if we try to place where you were as shown on

16  Exhibit 841, you'd been standing somewhere by the L-corner that

17  we show on the diagram that we discussed earlier; is that

18  correct?

19  A.  Yes.

20  Q.  And at the time that you were out standing there with

21  Trooper Schulte, did you observe a Nissan parked by the gas

22  pumps?

23  A.  Yes.

24  Q.  Now, were you looking for -- what were you looking for when

25  you were standing out there with Trooper Schulte?

1   A.  Well, like I say, we were just talking.  I don't remember

2   about what.  But having smelled the odor of marijuana, I --

3   just being aware of my surroundings, I was just looking around

4   for anything that could be connected with that.

5   Q.  And when you saw the Nissan, you saw a few other cars; is

6   that right?

7   A.  Yes, there was other -- other cars parked there.  I don't

8   know how many, but a couple.

9   Q.  And did you look at those cars to -- and vehicles as part

10  of an assessment of maybe this was the potential transporting

11  source of the marijuana that you'd smelled?

12  A.  Yes.  I mean, I figured whoever I smelt that from came from

13  a car that was out in the parking lot somewhere, so I was just

14  looking at the different vehicles.

15  Q.  When you were focusing on the Nissan, did you then at some

16  point observe anyone standing by the Nissan?

17  A.  Yes, I saw the blue Nissan and it was facing me.  Then I

18  saw there was a black male and a white male standing next to

19  it.

20  Q.  Now, looking at the Nissan that was facing you, about how

21  far away were you from it?

22  A.  I guess that's probably 50 to 75 feet.

23  Q.  And what observations did you make of the Nissan, if any,

24  that raised suspicions that it was maybe connected with the

25  smell of marijuana that you had -- had, I guess, experienced in

1    the -- in the Love's?

2    A.  I just saw the camera mounted in the front on -- I think it

3    was by the rearview mirror, and then I saw then it was a radar

4    detector.  I thought that's what it was.  Then the vehicle just

5    appeared to be a rental vehicle because I saw that barcode

6    there on the front windshield.

7    Q.  Why were these things of interest to you as far as

8    suspicions of transporting the marijuana that you had smelled?

9    A.  Well, having said earlier I understand that having a camera

10   mounted in your car is not illegal, however it's something I

11   don't come across very often.  So it stood out to me.  I mean,

12   there may have been a legitimate reason for it.

13        Then the radar detector I thought I saw, people want to be

14   warned that -- if we're running our radar, they don't want to

15   get pulled over by us or when we do transmit our radars, that's

16   when their signal will go off that there's police around.  So

17   those things can be used to try to -- the radar detector, for

18   him to -- for somebody, whoever's driving it, to know that

19   we're around so they may try to behave -- make sure their

20   driving's good, that kind of thing.  So that's what some people

21   use radar detectors for.  Some people use them to simply not

22   get a speeding ticket.

23        Then the camera, however, that's something that can be used

24   to help facilitate the possible transportation of drugs if that

25   car is carrying drugs.  It could be anywhere from the person

1    that's in charge to have video of the -- whoever's hauling the

2    drugs or whatever they're hauling so they know where they're at

3    and they have full video of what's going on with their delivery

4    or it could be as a deterrent because people -- as seen in my

5    video, I was questioned many times "does it bother you that

6    cameras are in your face." Well, people -- some officers, yes,

7    it does bother them. They don't want anything to do with

8    cameras in their case. And that -- so that could be trying to

9    use those cameras as a deterrent if we see the cameras in there

10   so, no, we don't want to mess with that car because they're

11   going to post videos or do whatever they're going to do with

12   it. So it could be possibly used as a deterrent. So that's...

13   Q.  Now, the rental car itself, being a rental car, was that

14   anything that at that time you found suspicious?

15   A.  Being a rental car, it's -- being a rental car, I found it

16   a little suspicious that there would be cameras mounted in

17   there, especially it looks like they were -- from what I could

18   tell it looked like it wasn't professionally installed or

19   anything, just a quick -- a quick install of it, like, thrown

20   on there just for a quick trip. So I felt it was kind of weird

21   that was mounted in a rental car.

22   Q.  The two fellows that you saw standing by the Nissan, did

23   you make any conscious observation of them as to what they were

24   doing?

25   A.  I couldn't tell. It looked like they were just talking to

1   each other at the back of the car, and it looked like -- I

2   can't remember for sure.  I think that the gas hose was into

3   the car, but I don't know if they were currently fueling.  I

4   just saw two people talking to each other.

5   Q.  Were there anything suspicious about the two individuals

6   exclusive from the vehicle that you were looking at?

7   A.  Then it just looked like a white male and black male

8   talking to each other at the car.  That's...

9   Q.  The fact you had a white male with a hoodie, was that

10  something that fit into your suspicions?

11  A.  It's me thinking that there's possible drug activity going

12  on other than maybe they were together.  That's...

13  Q.  And the fact that the other gentleman turned out to be

14  Mr. Bosire was -- was black, did that fit into your suspicions?

15  A.  Could you rephrase the question?  I'm sorry.

16          THE COURT:  Could you rephrase it in a way that's not

17  leading?

18          MR. CHALMERS:  Sure.

19  BY MR. CHALMERS:

20  Q.  With respect to the second gentleman, Mr. Bosire, any

21  suspicions that you formed, did his race or color, were they a

22  factor?

23  A.  No.

24  Q.  Now, you -- did you ever see any of the two gentlemen that

25  you discussed get into the Altima that you found suspicious?

1   A.  No, I did not know who the driver of that car was at the

2   time.

3   Q.  And were you watching these two individuals the whole time

4   that you and Trooper Schulte were standing where we talked

5   about outside the Love's store?

6   A.  Me and Trooper Schulte were, as I said, having a

7   conversation, and I wasn't just solely focused on this Nissan

8   Altima.  I -- just I would look over at it a couple times, but

9   my -- I wasn't hundred percent focused right on that car.

10  Q.  So after a period of time did you leave the Love's parking

11  lot?

12  A.  Yes.

13  Q.  How did you do that?

14  A.  We were standing -- I believe our patrol cars were just to

15  the left of us.  So I got in my car and I exited in the

16  northwest corner of the parking lot.

17  Q.  Did Trooper Schulte leave when you left?

18  A.  We left at the same time.  I don't know if he left right

19  before me or if he left after me.  I wasn't watching him, so...

20  Q.  What -- did he leave in his own separate patrol vehicle?

21  A.  Yes.

22  Q.  When the two of you left -- or, well, let me rephrase that.

23  When you left in your patrol vehicle, when had you last seen

24  the Nissan Altima?

25  A.  I drove -- as I was exiting -- the last time I seen it was

1    on right below where it says north, that's, like, the frontage

2    street there to get back onto I-70.  So I turned right and I

3    was going down that street.  And so, as I drove by it, it would

4    have been on my right side.  That's the last time I saw it, and

5    that's when I ran the plate I think.

6    Q.  About how much time elapsed then from the time that you

7    last saw -- or that you -- that you left to go get in your

8    vehicle until you next saw the Nissan Altima?

9    A.  I don't remember, 20 minutes after that maybe.

10   Q.  Would there have been sufficient time for the -- who

11   ultimately ended up being the driver of the Nissan to have gone

12   -- gotten into the car when you left?

13   A.  After I left there would have been time for him, whoever

14   the driver was, yes, to get into their car.

15   Q.  But you didn't see who got into the car?

16   A.  Correct.

17   Q.  Would there have been time for one of these two gentlemen

18   that you saw to have traveled and got into another vehicle?

19          MR. MCINERNEY:  Judge, I'm going to object to the

20   speculation that this calls for.

21          THE COURT:  Sustained.

22   BY MR. CHALMERS:

23   Q.  Well, can you -- do you have a recollection then, your best

24   recollection -- I think you said 20 minutes -- between the time

25   that you last saw and looked at the Altima and the time that --

1    that you next looked at it as you were driving?

2    A.   I'm trying to understand.  There -- there was a break in

3    time from I -- from when I left.  I think there was still time

4    for them to -- for whoever to be at the gas station before they

5    got back on I-70.  Does that answer your question?

6    Q.   Well, what I'm trying to do is not focus on that -- on them

7    so much as the increment of time.  So let me see if we can't

8    backtrack for a moment.  You -- when you last saw the Altima,

9    you had two people standing by the Altima; is that correct?

10   A.   Correct.

11   Q.   And then you went and got your patrol car.  And the next

12   time you saw the Altima was as you were departing from Love's;

13   is that correct?

14   A.   Yes, as I was leaving, it was still there.

15   Q.   And at that point you couldn't see if there was anybody in

16   the vehicle or did you notice one way or the other?

17   A.   I saw there -- there was still the two people standing

18   outside of it.

19   Q.   Okay.  And then you proceeded to leave the -- the Love's at

20   that point?

21   A.   Yes, and that's when I saw the -- that's when I saw the

22   Dodge Charger drive by also.

23   Q.   Let's get to that.  Now, you talked about it a little bit,

24   but if I could use the -- I got the Elmo in front of me.

25        The path that you took, if you get up and kind of show the

1    jury where you traveled from your parking spot to exit the

2    Love's on the diagram.

3              MR. MCINERNEY:  What exhibit number is this?

4              MR. CHALMERS:  This is just a -- it isn't an exhibit;

5    it's been used as demonstrative.

6              MR. MCINERNEY:  Judge, I'd like just this exhibit or

7    this demonstrative marked if the witness is going to use it to

8    testify.

9              MR. CHALMERS:  I don't have any objection to that if

10   you want to.

11             THE COURT:  Okay.  Go ahead.  What number is it?

12             MR. CHALMERS:  Let's call it Exhibit 844.

13             THE COURT:  Exhibit 844 is -- are you just, like,

14   making that number up?

15             MR. CHALMERS:  844 is the next in sequence, Your

16   Honor.

17             THE COURT:  All right.  Exhibit 844 is received.

18             MR. CHALMERS:  Is it 46?  Your Honor, I misspoke.

19   When I looked at my notebook 844 was the last one that popped

20   up, but it looks like it should be 846.  If we could use 846

21   instead.

22             THE COURT:  846 is received.

23   BY MR. CHALMERS:

24   Q.  All right.  So I think what I was trying to ask you to do

25   is get up on 846 and show the pathway that you took with your

1   vehicle as you left.

2   A.   And can I clarify the previous question that you asked me?

3   I was kind of walking over my words.

4   Q.   Sure.

5   A.   The last time I saw the two individuals standing outside by

6   the Altima is when I got in my patrol vehicle and left, and

7   that would lead to what I'm going to now.

8   Q.   Okay.

9   A.   So the path I would have taken I would have exited on this

10  side (indicating), and then there's an exit up there and turned

11  right and headed east.

12  Q.   And the right turn would have been on kind of the area just

13  underneath the depicted road that says north; is that correct?

14  A.   Yes.

15  Q.   And then the -- the area that's depicted in a larger road,

16  I guess, is what street?

17  A.   Right here?

18  Q.   Yes.

19  A.   So this is Ellis Avenue.

20  Q.   And Ellis Avenue takes us where?

21  A.   It will take you north to the interstate or south into the

22  town of Ellis.

23  Q.   Now, where were you when you ran the tags of the Altima?

24  A.   Would have been on that street right underneath where it

25  says north, and I was driving east.  I probably glanced over

1    and got the tag number and then ran the tag.

2    Q.  And when you glanced over and got the tag number, do you

3    have a recollection of seeing either of the two people standing

4    by the Altima?

5    A.  No, I don't remember then.  I don't remember seeing anyone.

6    Q.  And then there has been discussion of a silver Dodge.  Did

7    you see a silver Dodge when you were around the Love's?

8    A.  Yes, this would have -- the first time I saw the Dodge,

9    would have been as I was probably running -- this all happened

10   all at once.  As I was running the plate, it was driving west

11   on that street (indicating).

12   Q.  So the street you're talking about is the one that's right

13   under north?

14   A.  Correct.

15   Q.  And where does that street head or exit?

16   A.  It goes to Ellis Avenue and then it -- I don't know how

17   much farther west it goes.

18   Q.  And is that the access street that one would take if we

19   were going to turn into the Love's?

20   A.  Yes.

21   Q.  And what observations did you make about the silver Charger

22   at the time you first saw it?

23   A.  It appeared to be a rental to me.  Also just based on, I

24   don't know, stickers on the side of it, again, that's --

25   usually nine times out of ten those will end up being a rental

1   car when I check the plates.

2   Q.  What sort of conclusions were -- did you draw about having

3   seen a second rental if any?

4   A.  That's where I thought maybe there was caravanning going

5   on.

6   Q.  You didn't see who was in the Dodge Charger, did you?

7   A.  I did not.

8   Q.  And help us understand why you thought that the Dodge

9   Charger could somehow be associated with the smell of pot that

10  you had experienced in the Love's.

11  A.  Like I said, some of the drug carriers -- drug

12  transportation involving caravanning vehicle -- a second

13  vehicle, and what I had seen so far, then I saw the second

14  rental vehicle, I thought maybe they could possibly have been

15  tied together.  So just drew my attention.

16  Q.  You'd been at the Love's store before?

17  A.  Yeah, I go there quite a bit.

18  Q.  And is it -- was it typical to have two rental vehicles at

19  the Love's at the same time?

20  A.  I mean, it's not -- not uncommon if they're not.

21  Q.  Did you see any other vehicles that -- when you were kind

22  of canvassing the area with Mr. Schulte that caused you to be

23  suspicious of them for reasons that are similar to what you've

24  described of the Altima?

25  A.  No.

1    Q.   You can have a seat.

2         So you left the Love's, and what direction did you go?

3    A.   After leaving Love's, I went back to patrolling on I-70 and

4    I went east.

5    Q.   So that would be basically taking a right turn on that

6    street -- that frontage road that we're talking about on

7    Exhibit 846; is that right?

8    A.   Yes, and then turned left on that bigger north-south road

9    you have there.

10   Q.   And I-70's a four-lane highway; correct?

11   A.   Yes.

12   Q.   Divided by a median?

13   A.   Yes.

14   Q.   And when you left, the Altima was, as you last saw it,

15   still parked where?

16   A.   It was still in the same position.  I never saw it leave

17   the gas pump.

18   Q.   So were you in front of it if you both were going to be

19   traveling east?

20   A.   Yes.

21   Q.   Ultimately, you -- you clocked the Altima for speeding.

22   How did that happen if you were in front of it?

23   A.   So when I got on I-70, I don't know how far east I went, I

24   might have went to the milepost 153 there where there's an

25   exit, and I turned back around and headed back west just

1   driving back and forth.

2   Q.  So you went for some distance east, turned around to go

3   west.  Did you do that more than once before you clocked the

4   Altima?

5   A.  I can't say yes or no for sure, but I think just once.

6   Like, I just went east, turned around once and headed back

7   west.

8   Q.  What's the purpose for going back and forth on the

9   interstate?

10  A.  Traffic wasn't real heavy that night because I was just

11  concentrating on one area just staying -- staying in that area.

12  Q.  Is that something that is routine practice on your part?

13  A.  I don't really have a routine.  I mean, just I go out and

14  drive and look for things.

15  Q.  Were you looking for any particular vehicle as you

16  patrolled back and forth on I-70 that evening?

17  A.  I wasn't looking for a certain vehicle, no.

18  Q.  Were you parked in a median at some point trying to watch

19  for traffic?

20  A.  During this time I was never parked in the median.

21  Q.  You were going what direction when you clocked what ended

22  up being the Altima as speeding?

23  A.  I was driving west.

24  Q.  And how did you get behind the Altima?

25  A.  I turned through the median, did a U-turn, caught back up

1  east.

2  Q.  We talked -- we talked about mileposts just a little bit

3  earlier I guess before lunch, and about what was the milepost

4  if there was that you can most closely assign to where you did

5  a U-turn and through the median?

6  A.  Around milepost 150.

7  Q.  And at the time that you -- and I think what we looked at

8  is that the -- it was 152.  Was that -- was that your

9  recollection of when this -- where this stop took place?

10  A.  It was right past the Yocemento exit, which is Exit 153,

11  right after that exit milepost 154.  So it's right on the

12  border there, milepost 153 and 154.

13  Q.  Were you following the Altima before you clocked it for

14  speeding?

15  A.  Only from the time I made a U-turn on it until the time it

16  caught me -- to catch up to it.

17  Q.  Did it take you 7 minutes to follow up to it and catch up

18  to it and clock it for speeding?

19  A.  No.

20  Q.  What distance did you have to travel when you turned at

21  that milepost 150 to try to catch up with the vehicle to stop

22  it?

23  A.  Probably one or two miles when it came back into my view.

24  Q.  And is it -- at the rate of speed that you were traveling

25  -- well, let me ask it a different way.

1      If you'd been following this vehicle for 7 minutes before

2   you pulled it over, where would your vehicle have had to have

3   been when you first started following it?

4   A.   Around Ellis or a little bit west of there.

5   Q.   And you weren't there?

6   A.   No.

7   Q.   Was there another trooper vehicle following Mr. -- the

8   Altima to your knowledge?

9   A.   I seen on my camera I didn't come across any other vehicles

10  -- any other trooper vehicles, and to my knowledge there was

11  nobody following him.

12  Q.   You stopped the Altima and -- and you stopped it when it

13  was eastbound on I-70.  But before you stopped it, did you run

14  the tag?

15  A.   I was running the tag as I was pulling it over.

16  Q.   And tell us exactly what "running the tag" means.

17  A.   Running the registration plates.  I'm calling the tag

18  number into my dispatch just to get a reading on who the owner

19  is and where it's from and if it's got -- making sure it's not

20  expired or suspended for any reason.

21  Q.   When you ran the vehicle, did you get a response from whom?

22  A.   From one of the dispatchers.

23  Q.   Okay.  What did they tell you?

24  A.   It was the return of that 20 -- 2019 Nissan Altima,

25  registered to EAN Holdings, which the same plate I had run

1    myself at Love's.

2    Q.   So that confirmed that you're dealing with the same

3    vehicle?

4    A.   Yes.

5    Q.   You got out of your patrol vehicle, and we've seen the

6    tape, walked up to the vehicle and you had a flashlight; is

7    that correct?

8    A.   Yes.

9    Q.   What would -- what did you use the flashlight for as you're

10   approaching the vehicle?

11   A.   To look into the vehicle to make sure there's -- observe

12   the contents obviously for my safety, make sure there's no one

13   in there with weapons.

14   Q.   And when did you first note that there was only one

15   occupant in the vehicle?

16   A.   As I was walking up the passenger side, I could just see

17   the driver in there.

18   Q.   And, again, we've had the video.  I don't want to play

19   that, but do you remember there being some discussion about the

20   window?

21   A.   So originally I went up to the passenger side, observed the

22   contents of the vehicle.  Then I walked back behind the vehicle

23   and I approached the driver's window.  It was down maybe an

24   inch if that.  So I asked him to roll it down further, and he

25   rolled it down a couple more inches.

1   Q.  So the video we looked at would show the positioning of the

2   window after he rolled it down at your request?

3   A.  Yes.

4   Q.  And when he rolled down the window, did you attempt to

5   determine if the odor of marijuana was in the vehicle?

6   A.  I didn't stick my head in there, but I kind of held my head

7   close to the window to see if I could get the odor of

8   marijuana.

9   Q.  What did you smell if anything?

10  A.  I couldn't smell anything.

11  Q.  Were you convinced then that -- that there was no odor of

12  marijuana in the vehicle?

13  A.  I just couldn't smell it.  I mean, I don't -- you can't

14  smell it every time.  People will use masking agents also to

15  cover up the odor of marijuana.  So I couldn't smell it, but I

16  didn't -- that didn't mean I still didn't think there was

17  marijuana in the vehicle.

18  Q.  So when you approached the vehicle and saw that there was

19  just one occupant, did that surprise you?

20  A.  I thought there would be either two occupants in there or

21  -- or one.  Just possibly the people that were at the gas pump

22  with the vehicle, I was expecting to see one of them in there.

23  Q.  Seeing only one of the -- of the individuals that had been

24  at the Nissan, did that add to your suspicion concerning

25  caravanning?

1   A.   Yes.  So I thought --

2   Q.   How --

3   A.   -- maybe that Dodge Charger might have held the other

4   person I saw at the gas pumps.

5   Q.   Well, please explain to the jury how it would have been

6   possible that -- that the second guy could be in the Dodge

7   Charger that you saw driving west on the street north of the

8   Love's?

9            MR. MCINERNEY:  Objection.  Speculation.

10           THE COURT:  Sustained.

11  BY MR. CHALMERS:

12  Q.   Did you believe that it was possible --

13           MR. MCINERNEY:  Same objection that I -- same

14  objection, same question.

15           MR. CHALMERS:  Haven't got there yet.  I'm asking

16  whether or not he believed it was possible that the driver that

17  -- or the individual that he saw standing by Mr. Bosire was the

18  driver of the -- of the Dodge.

19           THE COURT:  So as -- from the questions you're asking,

20  you're asking him to project backwards and not ask what he

21  thought at the time.  So, first of all, you'll need to rephrase

22  your question to ask what he was really thinking.

23           MR. CHALMERS:  Sure.  I -- and I appreciate that, Your

24  Honor.

25  BY MR. CHALMERS:

1   Q.  I'm wanting to know what you thought at the time that you

2   were standing beside Mr. Bosire during the first conversation

3   about the Dodge Charger, and at that time did you think it was

4   possible that the driver --

5           MR. MCINERNEY:  Judge, can we approach?

6           THE COURT:  That's the same -- that's the same

7   question.

8       (The following proceedings were had at the bench.)

9           MR. MCINERNEY:  I'm sorry to drag everybody up here.

10  It's the third time on the same question, and he's leading.

11  He's leading him everywhere.

12          THE COURT:  Right.  This is your witness.  You can't

13  ask him leading questions like this.

14          MR. CHALMERS:  I assume this is cross-examination, but

15  I'm trying not to lead, and I'm trying to get him to answer the

16  question that has been objected to I don't think has been

17  answered yet.  I'll do my best to rephrase it.

18          THE COURT:  So the problem is you're -- you're trying

19  to put words in his mouth about whether -- whether it's

20  possible that -- that somebody could have jumped in or out of

21  the other car, but there's nothing in the record that I've seen

22  or heard in the five -- four or five years it's been in front

23  of me that suggests he even was thinking about that.

24          So from what I recall he was expecting the person to

25  be in Mr. Bosire's car, which is why he said, "Where's your

1    buddy?"  So it sounds like you're trying to rewrite the facts

2    through your questions.  That's what it sounds like.

3              MR. CHALMERS:  I appreciate that.  Actually, in his

4    declaration he explains that he is surprised and that he

5    thought that the second guy was in perhaps the Charger.  And

6    what I'm trying to get at and what I was trying to ask is how

7    can you even say that's possible, and that's --

8              THE COURT:  Okay.  Why don't you say did you

9    previously say "x" --

10             MR. CHALMERS:  Okay.

11             THE COURT:  -- and take it from there?  That's --

12             MR. CHALMERS:  Okay.

13             THE COURT:  Okay.

14             MR. MCINERNEY:  Thank you.

15        (Thereupon, the proceedings continued in open court.)

16   BY MR. CHALMERS:

17   Q.  So we were talking about the second individual who you had

18   seen by what turned out to be Mr. Bosire, and I want you to

19   focus on the time that you went up and you only saw Mr. Bosire

20   in the Nissan vehicle.  At that time has it been your previous

21   testimony that you thought, well, the other individual, not

22   Mr. Bosire, that you saw, maybe he's in the Dodge Charger?

23   A.  That's exactly what I was thinking, yes.

24   Q.  Well, how would that have been possible?

25             MR. MCINERNEY:  Same objection, judge.

1          THE COURT:  You can testify about why you thought

2    that.

3    BY MR. CHALMERS:

4    Q.  Why did you think that?

5    A.  Because there was two people at the gas pumps at Love's,

6    there's only one people in this car, and I thought he might

7    have been in the other car.

8    Q.  In the time that elapsed between when you last saw these

9    two individuals and then pulled Mr. Bosire to the side of the

10   road in the Nissan, about how long was that?

11   A.  Less than a 20-minute time frame.

12   Q.  Okay.  So you had your first conversations with Mr. Bosire

13   -- Bosire in this -- in the car, and what observations, if any,

14   did you have that caused you to be suspicious that Mr. Bosire

15   might be involved in transporting the marijuana?

16   A.  As mentioned earlier, as I walked up to the passenger side

17   is when I saw the binder in the back seat, the cameras.  I

18   walked back around the vehicle up to the driver, and him only

19   having that window down an inch kind of told me he didn't want

20   me to smell anything that was in the vehicle.  And I asked him

21   to roll his window down.  He rolled it down a couple more

22   inches.  Still most people roll their window all the way down.

23   So it was a little odd to me he only did it a few inches.  I

24   thought he was still trying to hide an odor from me, and that's

25   when I requested his driver's license and his rental agreement.

1   Q.   Well, it was cold out, wasn't it?

2   A.   Yes.

3   Q.   Did you find it unusual that -- that he wouldn't roll his

4   window down fully because of the weather?

5            THE COURT:   Mr. Chalmers, this is leading.

6   BY MR. CHALMERS:

7   Q.   Did you find anything unusual because of the weather on how

8   he operated the window?

9   A.   No.

10  Q.   Now, you then asked Mr. Bosire about where he'd been; is

11  that right?

12  A.   I asked where he was coming from.

13  Q.   Okay.  And you asked a series of questions that were all

14  aimed at trying to determine what?

15  A.   Just what his travel plans were, just trying to get an idea

16  of what he was doing, what he was up to.

17  Q.   And how did Mr. Bosire respond?

18  A.   Told me he was traveling from the west to the east.

19  Q.   And did you understand when he was saying, "I'm traveling

20  from the west to the east," that he was asserting some sort of

21  constitutional right not to respond?

22  A.   No.

23  Q.   What did you think about his statements that he was

24  traveling only from the west to the east?

25  A.   Just being evasive and didn't want me to know where he was

1   coming from or where he was going.

2   Q.   And why would that be or if it was relevant to whether or

3   not he was transporting drugs?

4   A.   Because it could have told me potentially where he may have

5   purchased or received drugs and where he was taking them to.

6   Q.   You -- so at the time that you were first visiting with

7   Mr. Bosire, had you noticed anything -- you've talked about

8   some things.  I don't know, did you notice anything in the back

9   of the vehicle?

10  A.   That second camera and that binder that I had mentioned.

11  Q.   Okay.  We've covered the binder then.

12       Well, if you didn't smell the marijuana, did you continue

13  to be suspicious?

14  A.   Yes.

15  Q.   Why?

16  A.   Because it could have been in the second vehicle that I

17  suspected of caravanning or I just possibly could not have

18  smelled it in that vehicle that I was -- had stopped.

19  Q.   In Exhibit 9 that's been introduced into evidence there is

20  a -- kind of a transcription of your first exchange with

21  Mr. Bosire at paragraph 12.  Is that a transcription that you

22  verified as part of the -- the declaration?

23  A.   Yes.

24  Q.   Now, you obtained a -- Mr. Bosire's license and I think you

25  looked at his rental agreement; is that correct?

1    A.   Yes.

2    Q.   I can't recall, did you take the rental agreement with you?

3    A.   Yes.

4    Q.   What did the rental agreement show that you found

5    noteworthy?

6    A.   Just a short term 48-hour rental agreement.

7    Q.   Why is that noteworthy?

8    A.   I'm sorry, why is that...

9    Q.   Why is that noteworthy?

10   A.   I still didn't hear you.

11   Q.   Why is that noteworthy?

12   A.   Oh, it's just a short -- short-term rental.  It's only for

13   48 hours.  I mean, it's not a whole lot of time to do anything,

14   especially around Hays or Ellis, Kansas.

15   Q.   Nothing illegal about renting a car for a couple days, is

16   there?

17   A.   Not in itself, not -- no, not illegal at all.

18   Q.   So how did the short term potentially fit into your

19   suspicions as you've said?

20   A.   Well, he wasn't from Hays or Ellis, which is the area we

21   were at.  He was from Wichita.  And just rose my suspicions

22   because it's for 48 hours.  Can't go very far in 48 hours.

23   Q.   You returned to the patrol vehicle and were seated in the

24   patrol vehicle for a period of time before you went up the

25   second time and saw Mr. Bosire; is that correct?

1    A.  Yes.

2    Q.  What was happening in the patrol vehicle while you were

3    waiting the second time?

4    A.  Just going over the rental agreement again, checking his

5    driver's license, and I was completing the -- the warning on

6    the computer.

7    Q.  During that time period, did Trooper Schulte arrive?

8    A.  Yes.

9    Q.  What conversations generally did you have with Trooper

10   Schulte when he arrived?

11   A.  I just explained to him what I had seen in the car and the

12   limited information I had received from the driver.

13   Q.  And I think that video's been played.  You were here where

14   they played that portion of the video, those discussions going

15   on, weren't you?

16   A.  Yes.

17   Q.  So I'm not going to repeat it.

18       Did you and Trooper Schulte discuss the -- the silver

19   Charger when you were -- during that time period?

20   A.  As I was completing the paperwork, the warning in my patrol

21   car, you can hear in the background other radio traffic of

22   other troopers looking -- actively still looking for the Dodge

23   Charger.

24   Q.  Did you overhear whether or not Trooper Schulte had run the

25   license on the -- on the Dodge Charger?

1    A.   I heard him run it and --

2    Q.   How would you hear that?

3    A.   Just on our -- the police radio.  He ran it over -- he had

4    a dispatcher run it for him.  I don't know where he saw it at

5    or where he ran it at, but it was somewhere on I-70 east.

6    Q.   So during this time you had a conversation with Trooper

7    Schulte where I think you indicated, "I don't think I can hold

8    him for a dog."  Do you remember that testimony?

9    A.   Yes.

10   Q.   With reasonable suspicion --

11        And how long, as you understood it, could you detain

12   somebody on reasonable suspicion?

13   A.   I don't think there's a set time limit, but a reasonable

14   amount of time.

15   Q.   A reasonable amount of time for what?

16   A.   To either gain probable cause or to -- I mean, like I said,

17   I don't understand the question again.  Ask it again.

18   Q.   Well, yeah, I'm just trying to get a handle on -- well, let

19   me look at it this way.

20        If we look to Exhibit 9 -- you have that still, sir?

21   A.   Yes.

22   Q.   And turn to page 9, paragraph 26.  Now, you and counsel

23   went over a portion of this but not the entire paragraph.  I

24   want you to read for a second a part of it out loud, but it

25   starts out, "I then walked to the passenger side window of the

1   Altima and spoke to Mr. Bosire for a second time.  By this time

2   I had stated to Schulte that I did not believe I had sufficient

3   reasonable suspicion to extend the stop to conduct a dog sniff.

4   I felt that I had reasonable suspicion to detain Mr. Bosire for

5   additional questions."  And then would you read the next

6   sentence -- two sentences I think that -- that counsel didn't

7   talk to you about.

8   A.  "I believed additional questioning would either abate

9   suspicion that Mr. Bosire was involved in criminal activity or

10  establish it was reasonable to detain Mr. Bosire ten or more

11  minutes for a dog sniff.  About 12 minutes had passed from when

12  I had stopped the Altima."

13  Q.  And when you talked about the additional time in that

14  particular paragraph, what -- what were you concerned about?

15  A.  I just wanted to be sure that I ought to make him wait for

16  a dog.  I just wanted -- because I didn't know how long it was

17  going to take.  So to hold him there on the highway longer, I

18  just wanted to have more information from him before I had that

19  dog respond.

20  Q.  As you understood the rules then in terms of the length of

21  time you could detain --

22          THE COURT:  Counsel, you're leading again.

23          MR. CHALMERS:  Well, okay.

24  BY MR. CHALMERS:

25  Q.  -- that pertain to the length of time that Mr. Bosire could

1  be detained, was the -- the -- was the waiting for a dog sniff

2  duration relevant?

3          MR. MCINERNEY:  Objection, judge.  It's leading and

4  it -- quite frankly, it's not relevant.

5          THE COURT:  Sustained.

6  BY MR. CHALMERS:

7  Q.  You had a second conversation then with -- with Mr. Bosire.

8  And if we look at Exhibit 9, paragraph 27, is that, to your

9  knowledge, an accurate description -- and we're talking about

10 Exhibit 9 -- an accurate description of your second

11 conversation with Mr. Bosire?

12 A.  Yes.

13 Q.  When Mr. Bosire responded to what's going on with the

14 cameras, did you understand his response, "Because police fuck

15 with people," to be something to --

16     Well, let me ask you:  Did that response cause you to be

17 more suspicious?

18         THE COURT:  Counsel, I'm not going to warn you again.

19 Quit leading the witness.  You're not testifying.

20         MR. CHALMERS:  I am, of course, sorry.  Let me see if

21 I can't put it this way.

22 BY MR. CHALMERS:

23 Q.  During that second conversation, did your -- did your

24 suspicions abate or did they grow?

25 A.  They grew.

1    Q.  And how so?

2    A.  His answer to me that people fuck with police, that wasn't

3    -- I mean, someone's got cameras in the car, they have no

4    reason to say, yeah, I've got this camera in my car.  It's -- I

5    know what I know now because of his testimony "because I was in

6    a car accident, so I just want this to be there for me in case

7    that happens again."  But his comment or his response to me was

8    people fuck with police, I didn't know how to take that.

9    Definitely could be that he was definitely hiding something

10   because we're trying to eff with him.  So that made my

11   suspicion grow on the cameras, and that wasn't a valid reason

12   for me to dispel that suspicion I had.

13   Q.  Okay.  And were there other parts of that conversation that

14   you found relevant to your suspicions?

15   A.  Yeah, it was the whole totality of this traffic stop, his

16   evasiveness -- evasiveness of my -- and the questions.  And

17   then when I asked him about the person that he was with at

18   Love's, he denied being with him several times.  Eventually

19   said -- told me who it was.  But based on everything else I'd

20   already learned from the traffic stop, I didn't believe him at

21   all about what was going on in the situation.

22   Q.  So you made a decision to detain him at the conclusion of

23   the second conversation.  Has that been your testimony?

24           THE COURT:  Counsel.

25   BY MR. CHALMERS:

1   Q.  When did you make a decision to detain him?

2   A.  I felt comfortable calling for a K-9 Unit after my second

3   discussion with him.

4   Q.  Okay.  And please summarize then the totality of what you

5   were looking at to explain why you felt comfortable to call for

6   a canine at that time?

7   A.  Okay.  Just starting from the beginning, when I left the

8   gas station what first got my attention was the odor of

9   marijuana.  Second was when I saw the two individuals standing

10  outside of that Nissan Altima, saw the cameras mounted, saw it

11  was a rental vehicle, saw that there was a radar detector in

12  there.  Then, when I was leaving, I saw the second vehicle

13  which appeared to be a rental.  So I thought it was possibly a

14  second person involved.  One -- could have been one of the two

15  that was standing at the gas pumps.

16      Made the traffic stop.  I saw the binder, which could be a

17  possible ledger of the activities that were being done on that

18  -- on that trip.  His evasiveness when asked questions, him not

19  rolling his windows down for me, his comments people fuck with

20  police, and then the denial of seeing the other guy -- of being

21  with the other guy at Love's, So I felt I had plenty of

22  reasonable suspicion to hold him there to have a dog run around

23  the vehicle.

24  Q.  Mr. Bosire -- Bosire quizzed you about cameras on your

25  face.  You heard that testimony?

1    A.  Yes.

2    Q.  Did you hear that you had responded, "I'm not doing

3    anything wrong"?

4    A.  Yes.

5    Q.  What did you mean?

6    A.  I think he was trying to intimidate me a little bit with

7    the camera in my face.  Because when we were standing at the

8    front of his car, he had his cell phone -- it wasn't right in

9    my face but it was up there.  He was pointing it at me, and I

10   think he was just trying to -- he didn't want me to do things

11   because I was doing them illegally.  And I didn't believe I

12   was, so I told him it didn't bother me.

13   Q.  What incentive does the Kansas Highway Patrol provide, if

14   any, for you to conduct a dog sniff on a vehicle if you don't

15   have reasonable suspicion?

16   A.  Nothing.

17   Q.  Do you know how a motion to suppress in a criminal case

18   works?

19   A.  Yes.

20   Q.  What happens if a stop is, as you understand it, conducted

21   without -- detention is conducted without reasonable suspicion?

22          MR. MCINERNEY:  Objection.  Lack of foundation and

23   relevance.

24          THE COURT:  What is the relevance here?

25          MR. CHALMERS:  Well, I think it's to show that not

1    only does he not have incentive to conduct a dog sniff without

2    reasonable suspicion but he understands that if he does, then

3    whatever he might find --

4              THE COURT:  Don't testify.

5              MR. CHALMERS:  Well, yeah.

6              THE COURT:  What element of your case -- what element

7    of plaintiff's case does this go to?

8              MR. CHALMERS:  Actually, it goes to their punitive

9    damage claim.

10             THE COURT:  That's not clear to me how.  So do you

11   need to approach?

12             MR. CHALMERS:  Sure.

13             THE COURT:  I'm not asking you to approach.  Can you

14   -- if we can do this without approaching, that would be better

15   because it takes less time.

16             MR. CHALMERS:  Well, it goes to the -- the intent that

17   he has or doesn't have to conduct canine sniffs without

18   reasonable suspicion.

19             THE COURT:  All right.  Well, you asked him if he

20   understood how motions to suppress work.  I don't think that

21   lays a sufficient foundation for the follow-up question you

22   asked, So I agree with the objection.

23   BY MR. CHALMERS:

24   Q.  Were there --

25             MR. CHALMERS:  Well, I'll see if I can lay a little

1    bit more foundation.

2    BY MR. CHALMERS:

3    Q.  Where there's a lack of reasonable suspicion for a

4    detention but that in the course of the stop contraband is

5    located, how does -- is it your understanding a motion to

6    suppress works?

7            MR. MCINERNEY:  Well, judge, again, it's still not

8    sufficient foundation, and he's calling for a legal conclusion

9    by this witness as well with respect to motions to suppress,

10   which are not on the same standard as the issues in this case.

11           THE COURT:  I agree with that.  I think that

12   considerations under Rule 403 make this -- whatever slight

13   probative value this would have is substantially outweighed by

14   the danger -- the danger of confusion and waste of time.

15   BY MR. CHALMERS:

16   Q.  Do you have any rewards provided to you by the KHP for

17   calling a dog out if nothing is found?

18   A.  No.

19   Q.  Is it your practice to only call for a dog --

20           MR. MCINERNEY:  Objection.  Leading.

21           THE COURT:  Sustained.

22   BY MR. CHALMERS:

23   Q.  What is your practice regarding when you would call for a

24   dog, what conditions would have to exist?

25   A.  Reasonable suspicion that there's drugs in the vehicle.

1  Q.  Now, with respect to what you have described as your

2  reasonable suspicions, were -- were they a hunch?

3  A.  No.

4          THE COURT:  It's leading again.

5  BY MR. CHALMERS:

6  Q.  Did you think that you were violating Mr. Bosire's --

7          MR. MCINERNEY:  Can we approach, judge, before he ends

8  this question?

9          THE COURT:  Yes.

10     (The following proceedings were had at the bench.)

11         MR. MCINERNEY:  My tally says seven times he's been

12 admonished not to lead.  I'm going to move to strike this

13 testimony if he continues to ignore the court's orders.  He

14 continues to lead, often times the very next question.  So I

15 would move to strike that answer and the last answer.

16         MR. CHALMERS:  I don't think it was leading.  I'm

17 certainly not trying to disrespect the court.  I don't think

18 there was an objection made that was contemporaneous and --

19         THE COURT:  I'm sorry what?

20         MR. CHALMERS:  The last question, I didn't even get to

21 ask the next question.  Wasn't that the question before last?

22         MR. MCINERNEY:  Every one of your leading questions --

23         THE COURT:  I think you're about to say did you

24 believe you were violating Mr. Bosire's constitutional rights.

25         MR. CHALMERS:  Yes.

1          THE COURT:  Yeah, so that's leading.  And I think he

2    was right to jump up and cut that off before you got it out of

3    your mouth because it was obvious what the question was going

4    to be.

5          MR. CHALMERS:  I -- I guess I have a different vision

6    of what's a leading question, and that's me I guess.  But

7    you're saying I can't ask if he had some reason to detain

8    Mr. Bosire in violation of his constitutional rights?

9          THE COURT:  You already asked him if he got a --

10   rewards for doing this, which is kind of an odd question.  But

11   having -- what are you getting at?

12         MR. CHALMERS:  The theory that has been advanced for

13   punitive damages is that my client has some sort of incentive

14   to go out and violate people's constitutional rights.

15         MR. MCINERNEY:  That's actually not the theory.

16         THE COURT:  No, I've never heard that theory before.

17         MR. MCINERNEY:  No.  No, it's not.

18         MR. CHALMERS:  The testimony of your expert.

19         But, you know, I don't -- at this point what I propose

20   to do is ask him about whether the license of the vehicle was

21   relevant to give reasonable suspicion and ask him whether the

22   fact that it was on I-70, which has been described as a drug

23   corridor, is relevant to the suspicion, and that's probably all

24   I can ask without running afoul what the court has found to be

25   legal.

1              THE COURT:  Do you object?

2              MR. MCINERNEY:  I do because he just asked this

3     witness to list all the factors -- in an appropriate question

4     to list all the factors that supported reasonable suspicion,

5     and this witness answered.  He's looking to add to that list

6     now with his questions --

7              MR. CHALMERS:  No --

8              MR. MCINERNEY:  -- and it's improper.

9              MR. CHALMERS:  -- I'm not trying to.  I'm trying to

10    confirm that he didn't.

11             MR. MCINERNEY:  You asked him.  He gave you a full

12    answer.  And by your questions you're suggesting additional

13    factors or things that were absent, and I think it's improper.

14             THE COURT:  Well, I mean, I think he can say I asked

15    you about what factors he considered in giving reasonable

16    suspicion.  You didn't say thinking about the license plate;

17    correct?  Did you consider the license plate?  I think that's

18    fair.  It's -- it's cumulative, and I think we're beating a

19    dead horse, but I would let him ask that question.

20             MR. CHALMERS:  Okay.

21             THE COURT:  But so you have a habit of acting like

22    we're all in agreement here at the bench and then going to the

23    podium and doing something different, and I'm going to hold you

24    to that as well as the leading question issue.  Okay?

25             MR. CHALMERS:  I'll do my best.

1          THE COURT:  Just so we're understood.

2      (Thereupon, the proceedings continued in open court.)

3          MR. CHALMERS:  Thank you, Your Honor.

4   BY MR. CHALMERS:

5   Q.  You had testified and listed those things that were his

6   factors or elements or circumstances that went to your

7   reasonable suspicions.  Did you list -- or you did not list,

8   rather, that this vehicle had an out-of-state license; isn't

9   that true?

10  A.  Correct.

11  Q.  And you did not list that this vehicle was driving on a

12  drug corridor; isn't that true?

13  A.  True.

14         MR. CHALMERS:  Thank you, Your Honor.  I have no

15  further questions of this witness at this time.

16         THE COURT:  Thank you.

17         Any redirect?

18         MR. MCINERNEY:  I do have redirect, judge.

19         THE COURT:  What?

20         MR. MCINERNEY:  I do have some redirect.

21         THE COURT:  Go ahead.

22                    REDIRECT EXAMINATION

23  BY MR. MCINERNEY:

24  Q.  Sir, we're back to Exhibit 836.  As I understand --

25         MR. MCINERNEY:  Can we -- can we put that to --

1          Give me just a second.

2          Can we put that to clip 2 please?  Thanks.

3     (Exhibit playing.)

4          MR. MCINERNEY:  Pause 8:36 please.

5  BY MR. MCINERNEY:

6  Q.  Sir, you just testified, in response to your lawyer's

7  questions, that the doorway you were talking about where you

8  smelled this raw marijuana was a doorway that was back down

9  that hallway that you and Trooper Schulte came; correct?

10 A.  Yes.

11 Q.  And that was the doorway that entered into the Subway;

12 correct?

13 A.  Yes.

14          MR. MCINERNEY:  Can we pull up 20 please?

15 BY MR. MCINERNEY:

16 Q.  I'm going to ask you to turn to Exhibit 20, sir.  That's

17 your statement to Lieutenant Bullock in the internal

18 investigation; correct?

19 A.  Yes.

20 Q.  And this is the same statement we talked about a while ago

21 that was given in May of 2019?

22 A.  Yes.

23 Q.  In the second paragraph there I want you to follow with me.

24 I'm going to read that second paragraph.  You tell me if I get

25 it right.  "At approximately 8:20 p.m. to 8:25 p.m.,

1  Master Trooper Doug Schulte and I were exiting the Love's

2  Travel Shop in Ellis, Kansas.  Master Trooper Schulte and I had

3  just completed a break inside the shop and we were leaving

4  through the north entrance/exit area."  Did I read that

5  correctly?

6  A.  Yes.

7       MR. MCINERNEY:  Can you put 836 back up please?  Run

8  it five seconds please.  Thank you.

9  BY MR. MCINERNEY:

10 Q.  Those are the north entrance-exit doors that you and

11 Trooper Schulte just walked through; correct?

12 A.  Yes.

13 Q.  It goes on to say, "As we were walking towards the doors,

14 there was a group of several people walking inside the shop as

15 we were still inside.  We waited by the doors until we could

16 exit.  As the individuals entered the store, I smelled the odor

17 of marijuana emitting from one or more of them as they walked

18 by Master Trooper Schulte and I.  We exited the store when we

19 were clear to do so."  Did I read that right?

20 A.  Yes.

21 Q.  Where in there does it say it's Subway?

22 A.  It doesn't.

23 Q.  Where in there does it say at the end of the hall?

24 A.  It doesn't.

25 Q.  It says the north entrance/exit doors; correct?

1    A.   That's how I recall it when I wrote the letter.

2    Q.   The doors this Exhibit 836 just showed you and Trooper

3    Schulte walking through; correct?

4    A.   Yes.

5    Q.   You still have that deposition in front of you, sir?  I

6    think it's the gray binder.  This is the same deposition we

7    talked about a little earlier that I took from you under oath

8    with your lawyer present; correct?

9    A.   Yes.

10   Q.   And this was -- your PSU statement was in May of '19.  This

11   was in February of 2021; correct?

12   A.   Yes.

13   Q.   If you would please, turn to -- turn to page -- turn to

14   page 185.  Are you there?

15   A.   Yes.

16   Q.   In the middle of that page did I ask you this question:

17   "All right.  I have -- I have a video as I mentioned.  The

18   Bates number, it is marked for the record as -- it's marked as

19   Exhibit No. 7."  Did I read that right?

20   A.   Yes.

21   Q.   Okay.  And this was the exhibit that I showed you during

22   your deposition that's the same as 836; correct?

23   A.   Yes, I think that's right.

24   Q.   Okay.  If you would, I'm not going to make you read every

25   line here, but as you turn to page 186 and through the end of

1    page 187, if you would read that and tell me when you're

2    finished reading it please.

3    A.   (Reading.)  Okay.

4    Q.   If you'll turn to -- and that -- so does that establish for

5    you we're talking about the video that's numbered 836?

6    A.   Yes.

7    Q.   Okay.  Turn to the bottom of page 187.  I want you to tell

8    me whether the following questions and answers were given under

9    oath in your deposition.  At the bottom starting at line 16, "I

10   can help this along a little bit.  I'm going to advance it

11   because I know where we're going.  All right.  We're at

12   20:26:58.  Now we're at 20:27."

13        Then it indicates that Exhibit No. 7, which was the number

14   in the deposition, is playing.

15        Your answer:  "That was another trooper that passed by."

16        And I asked you, "Okay.  And that mark was about 20:27:15

17   or so?"

18        And you answer:  "Yes."

19        And then -- then you say, "Okay, that's Trooper Schulte."

20        And I say, "Okay.  It appears to be two people there?"

21        Your answer is:  "Yes."

22        My question is:  "First one is who?"

23        Your answer is:  "That's me."

24        Next question:  "Okay.  Right behind you is Trooper

25   Schulte?"

1    Your answer:  "Yes."

2    "Okay, this is as you appear to be exiting the Love's?"

3    Answer:  "Yes."

4    Did I read that right?

5  A.  Yes.

6  Q.  And those were your answers to my questions during your

7  deposition; correct?

8  A.  Yes.

9  Q.  Let me move your attention to page 189, the very next page.

10 I'm going to direct your attention to line 8, and this is still

11 regarding the video exhibit.

12   My question:  "If you would, I'm going to hit play and I

13 want you to tell me where to pause it where this group of

14 individuals walks in.  Okay?  Is that okay?"

15   And you say, "Yes."

16   Then the video plays and you ask:  "Are there cameras in

17 the foyer there?"

18   And my answer is:  "I'm just talking about this video."

19   And your answer is:  "Okay, there is no group."

20   And I say, "Okay."

21   And the court reporter asks you again:  "You said there's

22 no group?"

23   And you say, "No group."

24   Is that accurate?

25 A.  Yes.

1   Q.  And that was under oath; right?

2   A.  Yes.

3   Q.  There's not a word about a Subway there, is there?

4   A.  No.

5   Q.  Not a word about a long hallway?

6   A.  No.

7   Q.  Not a word about any other entrances or exits other than

8   that north door; correct?

9   A.  That's correct.

10  Q.  That was February of 2021; correct?

11  A.  Yes.

12  Q.  If you would turn to page -- or excuse me, turn to

13  Exhibit No. 9.

14          MR. MCINERNEY:  Judge, if I haven't -- I'm backing up

15  a little bit.  If I haven't offered 20, I'd offer it at this

16  time.

17          MR. CHALMERS:  I think it was offered and objected to

18  on the basis that it's hearsay.

19          MR. MCINERNEY:  Judge, it's not hearsay and we --

20  subject to 801(d)(2) is the opposing parties' statement.

21          THE COURT:  Any objection?

22          MR. CHALMERS:  I don't think it falls within the

23  exception.  I object to it, Your Honor.

24          THE COURT:  Well, I can get it out.  It's a statement

25  by an opposing party offered against -- let me see.

```
1          MR. MCINERNEY:  Judge, can we approach for a second?
2          THE COURT:  Sure.
3          MR. CHALMERS:  Your Honor, I don't want to belabor the
4    point.  It's no that big of deal to me.  I'll just waive my
5    objection.  No objection.
6          THE COURT:  Okay.  Well, I think it is admissible
7    under Rule 801(d)(2)(A) and (C).  Go ahead.  Received.
8          MR. MCINERNEY:  Thank you, judge.
9          Can you put Exhibit 9 up please.  Great.  And
10   paragraph -- excuse me, paragraph 17.
11   BY MR. MCINERNEY:
12   Q.  Sir, this is Exhibit No. 9 we talked about earlier today.
13         MR. CHALMERS:  Am I mistaken, I thought Exhibit No. 9
14   was the statement to Lieutenant Bullock, and I think you're
15   showing the -- at least up here it appears that you're showing
16   the affidavit or declaration, rather.
17         MR. MCINERNEY:  No. 9 is the defendant's declaration.
18   BY MR. MCINERNEY:
19   Q.  This -- I know it's up on your screen.  If you would --
20   just to reorient us, if you would turn to the last page of
21   Exhibit 9 and confirm for me that this was your statement, your
22   declaration under oath from April of 2021; correct?
23   A.  Yes.
24   Q.  And it's signed there by you on the last page?
25   A.  Yes.
```

1  Q.  And, in paragraph 17 of your under oath declaration, you

2  indicate that about 10 minutes before the stop you had seen a

3  blue Nissan Altima at a gas pump in Love's travel shop in

4  Ellis, Kansas, sometimes referred to as convenience store.  "I

5  and another trooper, Master Trooper Doug Schulte, had been at

6  the convenience store on a food break.  While exiting the

7  store, Schulte and I smelled the odor of marijuana seemingly

8  coming from people around or who had been around the entrance

9  of the store.  Then, after standing outside the convenience

10  store for less than five minutes, I noticed two men, one black

11  and the other white, standing and talking by the Altima.  While

12  not knowing if either man was one of the people that I

13  associated with the marijuana smell, I believe that both -- one

14  or both could have been."  Did I read that accurately?

15  A.  Yes.

16  Q.  And that was your statement under oath in April of 2021,

17  correct; is that right?

18  A.  Yeah, whatever the date was, that's correct.

19  Q.  And there's nothing about the Subway entrance in that

20  declaration, is there?

21  A.  I was just using the door as -- that's how I refer to the

22  store as doors.

23  Q.  It doesn't say anything about the Subway entrance, does it?

24  A.  I don't think I elicit the title of any store.  I may

25  have -- I said the store as I remember.

1   Q.   I think you specified the Love's convenience store?

2   A.   Okay.

3   Q.   Doesn't say the Subway doors, does it?

4   A.   Doesn't say which doors, just "the doors."

5   Q.   Sorry?

6   A.   Just says "the doors."

7   Q.   No indication it's doors inside the convenience store;

8   correct?

9   A.   It says entrance-exit doors.

10  Q.   Entrance of the store; correct?

11  A.   Whichever part of the store, yes, I was referring to doors.

12  I don't know if I -- what more you want me to say to that.

13  Q.   When you -- just so we're clear, when you observed the

14  Charger heading west on the street north of Love's, you didn't

15  at that point or ever after that run the tags of the Charger;

16  correct?

17  A.   I did not.

18  Q.   So you never confirmed that it was a rental, did you?

19  A.   Trooper Schulte ran the plates of a silver Dodge Charger on

20  I-70.

21  Q.   Okay.  But you never ran the plates; correct?

22  A.   I didn't.

23  Q.   And when you approached Mr. Bosire's car for the first time

24  on that initial encounter, you didn't smell any masking agents,

25  did you?

1  A.  I didn't smell anything.

2  Q.  Okay.  And including masking agents; right?

3  A.  I didn't smell anything.

4  Q.  Okay.  And you didn't ask him to roll his window all the

5  way down, did you?

6  A.  I asked him to roll it down once, and he rolled it down a

7  few inches.  So...

8  Q.  And you didn't ask him to roll it all the way down, that's

9  my question.

10  A.  No.

11  Q.  When -- when your lawyer was asking you questions, you

12  testified, I think, that you found the rental to be suspicious

13  because there -- it was a two-day rental, a short-term rental,

14  and there was not enough time to do much with a two-day rental;

15  correct?

16  A.  Correct.

17  Q.  And he wasn't from Hays or Ellis you testified; correct?

18  A.  According to his driver's license he's from Wichita.

19  Q.  Right.

20      And he was on I-70, wasn't he?

21  A.  He was.

22  Q.  And he was heading towards Wichita, wasn't he?

23  A.  I don't know where he was going.  He didn't tell me.

24  Q.  Well, he was headed in the direction of Wichita, wasn't he,

25  he was headed east?

1  A.  Yeah, but Wichita's south.  I don't know where he was

2  going.

3  Q.  Well, he wasn't at the intersection of 70 and 135 so he

4  could go south to Wichita yet, was he?

5  A.  That doesn't mean that's where he was going.  I had no

6  idea.

7  Q.  I'm asking you where he was when you stopped him.  He was

8  -- he was west of the intersection of 135 that leads to Wichita

9  and I-70; correct?

10 A.  Yes, I didn't understand that's what you were asking me.

11 Q.  Yes, that's what I was asking.

12 A.  Okay.

13 Q.  When -- when Mr. -- excuse me.

14    When you approached his car the second time to go up and

15 ask more questions, Mr. Bosire was detained, wasn't he?

16 A.  Yes.

17 Q.  And he was detained from the time that you walked up and

18 said, "Where's your buddy?" up through the time that you

19 advised that you were going to call for a canine; correct?

20 A.  Yes.

21 Q.  When you exited the Love's with Trooper Schulte and you

22 smelled that odor you say of raw marijuana, you didn't stop and

23 question anybody, did you?

24 A.  No.

25 Q.  You didn't advise the owner of the convenience store that

1    you had smelled raw marijuana in the store; correct?

2    A.   No.

3    Q.   You didn't do any investigation to determine the source of

4    it, did you?

5    A.   Not in there.

6              MR. MCINERNEY:  If I can have just a moment, judge.

7              That's all the questions I have for this witness,

8    Your Honor.  Thank you.

9              THE COURT:  Thank you.  Any redirect -- or, rather,

10   recross?  Recross?

11                     RECROSS-EXAMINATION

12   BY MR. CHALMERS:

13   Q.   Do you have Exhibit 9 in front of you?  That's the

14   declaration I'm talking about.

15   A.   Yes.

16   Q.   Yeah.

17        And when we turned to paragraph 17, will you do that for me

18   for a moment?

19   A.   Okay.

20   Q.   It says in the third sentence that I think counsel read to

21   you, "While exiting the store," quote, "Schulte and I smelled

22   the odor of marijuana seemingly coming from people around or

23   who had been around the entrance of the store."  Did I read

24   that correctly?

25   A.   Yes.

1    Q.  Has that been your testimony today?

2    A.  My testimony was I -- whatever doorway I was in, I smelt

3    marijuana coming from people that were walking around me.

4    Q.  If I look at Exhibit -- if you look at your deposition,

5    please, go to paragraph 188 -- or excuse me page 188.

6    A.  You said on the -- on the deposition?

7    Q.  Your deposition, yeah.  Counsel asked you about the

8    questions on 189 asking you to hit pause where you saw a group

9    of individuals walk by.  Do you remember that testimony?

10   A.  Yes.

11   Q.  If we look at 188, the question reads at line 14 -- or

12   doesn't the question read at line 14:  "Where on the record

13   that he started -- "

14              MR. MCINERNEY:  I'm sorry to interrupt.  What exhibit?

15              MR. CHALMERS:  This is the deposition at 188.

16              MR. MCINERNEY:  I'm sorry to interrupt.

17              THE COURT:  Okay.  You're also leading again.

18              MR. CHALMERS:  I'm trying to lay a foundation, Your

19   Honor, for the question that was asked and --

20              THE COURT:  You can just ask him to read it --

21              MR. CHALMERS:  Okay.

22              THE COURT:  -- to himself.

23   BY MR. CHALMERS:

24   Q.  Please read to yourself question -- let's see if we start

25   on page 188 the questions from 188, line 14 through page 189 in

1    where he's asking you to pause it at page -- looks like page 12

2    -- or line 12.

3    A.   Okay.

4    Q.   Were you given a start point in the video that you were

5    asked to review and then pause?

6    A.   It says on line 17, "So for the record the two of you first

7    appear at 20:27."

8    Q.   And then it goes, what, 20:27:48?

9    A.   Yes.

10   Q.   Now, your testimony then related to the pause after that

11   time.  Is that what you were answering in your deposition?

12            MR. CHALMERS:  It's literally what's asked.  I don't

13   know how to ask it otherwise.

14            THE COURT:  You could say --

15            THE WITNESS:  He's asking me -- I believe he's asking

16   if that's the time that the two of us were exiting, and I said

17   yes.

18   BY MR. CHALMERS:

19   Q.   But when was the tape that you -- at what point did he

20   start running the tape for you -- and ask you to pause it?

21            MR. MCINERNEY:  Judge, if he wants to read the

22   transcripts and ask him whether that's accurate, his questions

23   and answers, that's fine.  It's inappropriate recross.

24            THE COURT:  I agree.  Sustained.

25            MR. CHALMERS:  I'll back up and read the questions

1    that predate it.  I'll be happy to do that.

2    BY MR. CHALMERS:

3    Q.  So at line -- at page 188 at paragraph 17 -- or at line 17

4    he says, "For the record the two of you first appear at 20:27.

5    So if I pause it there, as you guys are exiting, it looks

6    like -- "

7            THE COURT:  Wait.  Wait.  Mr. Chalmers, so you're just

8    going to read in his deposition testimony, is that what you're

9    doing?

10           MR. CHALMERS:  I'm trying to establish -- well --

11           THE COURT:  You're trying to lead him in to explain

12   his answer.  So if you -- if you can ask him if he was

13   confused, maybe he will say yes, maybe he'll say no.  But

14   you're just trying to tell him what answer to give, and that's

15   leading.

16           MR. CHALMERS:  Well, the question that was asked was

17   whether he paused it, and I'm trying to establish without

18   leading when the tape started that he was asked --

19           THE COURT:  I think he already answered that.  Didn't

20   he?  Yes.

21           Why don't we take a short recess while Mr. Chalmers is

22   figuring that out.  So let's just take 15 minutes and be back

23   here ready to go promptly at 10 minutes until 3:00.

24           Court's in recess.

25       (Recess.)

1      (The jury entered the courtroom, after which the following

2  proceedings were had.)

3            THE COURT:  Go ahead.

4            MR. CHALMERS:  Is the screen up there now?  Thank you.

5  BY MR. CHALMERS:

6  Q.  I have put up on the screen Exhibit 836 and I started at

7  basically 10:20:27.  That was the time that the counsel gave in

8  the deposition that we talked about.  I'm going to play it.

9      (Exhibit playing.)

10     And I'm going to pause at 16:41.  And what do you observe

11  towards the top of the -- the hallway, trooper?

12  A.  It looks like there's two people walking side-by-side and

13  maybe one in front of them walking.

14  Q.  Okay.  I'm going to start it again.

15     (Exhibit playing.)

16     Pause it again at 16:54.

17            MR. MCINERNEY:  Judge --

18            I'm sorry to interrupt you, sir.

19            -- I'm going to object as beyond the scope of

20  redirect.

21            THE COURT:  Tell us where you're headed with this.

22            MR. CHALMERS:  I think that he went through the

23  testimony in the deposition where he suggested that -- that the

24  officer did not -- or did not pause when he saw a group of

25  people coming in, and I'm now showing what that video is and

1    identifying people that were in the hallway.

2         MR. MCINERNEY:  Judge, I -- I think I can find my

3    questions to Mr. -- Trooper McMillan's statements about the

4    north doors and his exit with Trooper Schulte of the north

5    doors and his failure to specify that it was anything or

6    anywhere other than the north doors.

7         THE COURT:  I don't remember anything about pausing.

8    Did you ask -- did you ask about him pausing?

9         MR. CHALMERS:  The question that was started at --

10   that counsel had him read through started at page 189 and it

11   says, "I'm going to hit play.  And when you tell me where to

12   pause, where would these group of people walk in."  Okay,

13   that's -- that was the question he phrased.

14        THE COURT:  That was the question he asked or the

15   question you pulled from the deposition?

16        MR. CHALMERS:  That was the question he asked in the

17   deposition and that's the question that he referred to in his

18   redirect.  And if you page back to 88 (sic), it talks about

19   where he starts the tape.  And I'm wanting to show the tape for

20   the jury to see what it is that the witness would have seen

21   that during that time period.

22        THE COURT:  During which time period?

23        MR. CHALMERS:  The time period from when -- at 10:27

24   counsel started the tape until when he stopped the tape and

25   asked his question.  There's only part of the tape.

1          THE COURT:  So I have an idea.  The jury will have

2    this videotape and they know the exact markers on the --

3          MR. CHALMERS:  Okay.

4          THE COURT:  -- time and they can watch this as many

5    times as they want to and sort all this out, and I'm sure they

6    will watch it.  So I don't think we need to watch it again as a

7    group and have Trooper McMillan just reiterate what he's seeing

8    on the screen.  So let's move on.

9          MR. CHALMERS:  Will do.

10   BY MR. CHALMERS:

11   Q.  If you take your deposition transcript out for a moment

12   please.

13   A.  It's out.

14   Q.  And turn to page 162.  And if you start down at line 23,

15   read for yourself the question that is phrased through 163,

16   line 4.

17   A.  Okay.

18   Q.  And then you were asked at page 163, line 5 and 6 the

19   following question:  "Do you know if Mr. Bosire was one of the

20   people you say entered the store?"  Do you see that question?

21   A.  Yes.

22   Q.  In the deposition there is a -- an errata sheet.

23          MR. CHALMERS:  If I may approach.

24          MR. MCINERNEY:  Request we approach.  I'm sorry, can

25   we approach, judge?

1           THE COURT:  Yes.

2       (The following proceedings were had at the bench.)

3           MR. MCINERNEY:  Do you have a copy of the errata

4    sheet?

5           THE COURT:  I do not.

6           MR. MCINERNEY:  So I'm trying to figure out how to do

7    this.  We would object to any use of this errata sheet for a

8    couple reasons.  First of all, it -- we didn't receive it

9    within the appropriate time, but much more importantly this

10   errata sheet purports to change his substantive answers in his

11   deposition after he looked at the video.  In fact, he says that

12   in the errata sheet itself:  I looked at the video and I want

13   to change my answer.

14          And, judge, we would cite you -- we'd cite you to

15   *Garcia versus Pueblo Country Club*, a Tenth Circuit case.  The

16   docket number is 01-1363.  It's at 299 Fed. 3rd 123 and

17   specifically to the Tenth Circuit's admonition with regard to

18   substantial changes via errata to deposition testimony.

19          At the end of the -- the footnote No. 2 they

20   specify -- in fact, they're quoting they specify that a

21   deposition is not a take home exam, and that's exactly what --

22   what's going on here.  He -- I don't know when he came up with

23   these, but these are substantive changes.

24          THE COURT:  I mean, it looks like -- I assume from the

25   fact that this is on your computer and you don't have a copy of

1    the actual errata sheet that -- that you wrote these?

2            MR. CHALMERS:  I typed them up or -- well, I don't

3    know if I typed them up.  They were typed up in my office, yes.

4            THE COURT:  Okay.  Are you the one that made the

5    changes based on what the videotape shows?

6            MR. CHALMERS:  No.  He made the changes based on what

7    his -- well, on what he said in his -- it's his testimony.

8    There's --

9            THE COURT:  And are you --

10           MR. CHALMERS:  Here's where he signed it.  Here's when

11   it was filed.

12           THE COURT:  So what --

13           MR. CHALMERS:  Here's when the deposition was signed,

14   on April 1st.

15           THE COURT:  What are you attempting to do with this

16   line of questioning?

17           MR. CHALMERS:  Counsel has asserted that you testified

18   to "x" in your deposition and then you doubled down in your

19   affidavit or declaration as if it is coming up for the first

20   time in testimony here at trial that he is not contending that

21   there was several people near the entrance of the door, and

22   that's what he provided in his errata sheet, however, in

23   April 1st of 2021.

24           THE COURT:  So -- you're trying to introduce this as a

25   prior statement that is consistent with his testimony here at

1   trial?

2           MR. CHALMERS:  I think it fits in that category, yeah.

3           THE COURT:  Okay.  So I think for that reason it's not

4   admissible --

5           MR. CHALMERS:  Well, I think --

6           THE COURT:  -- if you're not charging that he

7   recently --

8           MR. CHALMERS:  I think it --

9           THE COURT:  -- fabricated something.

10          MR. CHALMERS:  Well, he suggested it.

11          THE COURT:  What did you say?

12          MR. CHALMERS:  I think he suggested it in his

13  questioning.  And, furthermore, that I think a prior --

14          THE COURT:  I think it's the --  let me just finish my

15  thought.  I think it's the opposite.  He's -- he's saying that

16  he previously testified to something different and now he's

17  trying to change his testimony.  And you're trying to offer

18  this as proof that he may have changed it during trial but he

19  also changed it in the errata sheet.

20          MR. CHALMERS:  What counsel has done is tried to leave

21  the impression that this is a witness who's the first time at

22  trial testifying differently, and what I want to show is that

23  he explained his position in a prior consistent statement with

24  his testimony today.  And my understanding is the prior

25  consistent statement is admissible when it is used in the

1    context of establishing and responding to the contention that

2    there had been a change in testimony.

3         MR. MCINERNEY:  Well, it's to the -- whether there's

4    an allegation of recent fabrication --

5         THE COURT:  Show me the --

6         MR. MCINERNEY:  -- and that's not what happened.

7         THE COURT:  That's my understanding.

8         MR. MCINERNEY:  Judge, I've got a copy of that

9    highlighted from *Garcia*.

10        THE COURT:  Does this say anything about admissibility

11   or is this just --

12        MR. MCINERNEY:  It's mostly about use of an errata

13   sheet to change substantive testimony.

14        MR. CHALMERS:  I believe it's 801(d)(B)(i),

15   potentially (ii).

16        THE COURT:  So it says, "The declarant..."

17        "Hearsay means a statement..."

18        "Hearsay is not a statement where the declarant

19   testifies and is subject to cross-examination about a prior

20   statement and the statement is consistent with the declarant's

21   testimony and is offered to rebut an express or implied charge

22   that the declarant recently fabricated it or acted from a

23   recent improper influence or motive when so testifying."

24        So that -- I don't think that applies.  How -- what's

25   your theory that would apply?

```
1            MR. CHALMERS:  I don't have it in front of me.

2            THE COURT:  Is it the next one?

3            MR. CHALMERS:  Maybe.

4            THE COURT:  "To rehabilitate the declarant's

5    credibility as a witness when attacked on another ground."

6            MR. MCINERNEY:  Judge, I don't think I attacked him on

7    any other ground other than he made three prior inconsistent

8    statements with his testimony today and that's -- I didn't

9    infer a recent fabrication.  The jury gets to draw what

10   conclusions they get to draw from that.

11           MR. CHALMERS:  Well, this testimony rehabilitates the

12   witness in that it explains when it is that he remarked and

13   said what his position was and whether or not the individuals

14   were in the entrance of the store.  By the way, I don't think

15   it's all three times.  I think one is consistent, but that's

16   another point.

17           THE COURT:  I'm inclined to sustain the objection,

18   especially to the extent that you are apparently planning to

19   read from the errata sheet and say isn't it true your errata

20   sheet says this, that and the other.  I want to take a quick

21   look at the Advisory Committee notes before I rule.  So is

22   there anything else you want to ask him about?

23           MR. CHALMERS:  I think that was -- well, there was

24   maybe one other question, Your Honor.

25           THE COURT:  Okay.  Well, why don't you --
```

1        MR. CHALMERS:  No, in fact, it isn't because I think

2  I've already asked it.  So this will be the last one.

3        THE COURT:  Okay.  Give me a couple minutes.

4        MR. MCINERNEY:  Yep.  Thank you, judge.  Do you need

5  this?

6      (Thereupon, the proceedings continued in open court.)

7        THE COURT:  Counsel, will you approach for a second

8  please?

9      (The following proceedings were had at the bench.)

10        THE COURT:  So the gist of 801(d)(B) seems to say that

11  prior inconsistent statements can -- prior consistent

12  statements can be admissible to rebut charges of recent

13  fabrication or improper influence or motive but not as

14  substantive evidence.  And I think if I were to receive these

15  under an exception to the hearsay rule, the errata sheet would

16  come in as substantive evidence and not just merely as

17  impeachment.  So I think that his prior statements both in the

18  errata sheet and in his deposition testimony would be relevant

19  on the subject of impeachment.  I'm not going to admit it

20  substantively as evidence of the truth of what the errata sheet

21  says.  Understood?

22        MR. CHALMERS:  I do.  What -- how would you want me to

23  -- you're not going to send it back to the jury obviously?

24        THE COURT:  Correct.

25        MR. CHALMERS:  Am I permitted to have him read the

1    errata sheet, just answer it, or how do you...

2              THE COURT:  No, that's not what I had in mind.

3              MR. CHALMERS:  Okay, well, that's what I'm --

4              MR. MCINERNEY:  Judge, we think Rule 30 also prohibits

5    this.  I mean, this is -- this is akin to calling a witness

6    that's not on the witness list.  These are substantive -- and

7    that's why we showed you *Garcia*.  These are substantive changes

8    to his deposition and way outside the purpose of an errata

9    sheet.  If he wanted to make a subsequent sworn statement,

10   that's a different matter.  But these are substantive changes

11   to a prior sworn statement.

12             THE COURT:  So, I mean, he's -- these really are prior

13   sworn statements because he's attached -- hasn't attached an

14   affidavit to them.  But I suggest you deal with this on

15   cross-examination of various iterations of his testimony and

16   use it for impeachment.

17             I think I should tell the jury that -- that you are

18   not receiving this as evidence that what the errata sheet says

19   is true but only insofar as it might impact the jury's

20   assessment of his credibility.

21             MR. MCINERNEY:  Yeah, I think we've stated our

22   objection, judge, and the grounds for it.  We don't --

23   specifically under the Rule 801(d)(1) we don't think it's -- we

24   don't think he's met his burden showing that it was implied or

25   expressly stated that this witness recently fabricated his

1    testimony.

2              THE COURT:  So that's why I'm not receiving it into

3    evidence.

4              MR. MCINERNEY:  Understood.

5              THE COURT:  But it is a prior -- I agree with you on

6    that.  But I think any statements he previously made are fair

7    game on the issue of credibility, but you're not going to get

8    out there and read these into the record or have him read them

9    into the record.  You can ask him if he has previously made

10   statements that are consistent or inconsistent, but I'm not

11   sure how you're going to approach it.  But --

12             MR. MCINERNEY:  I just want to make sure we got some

13   guardrails here.  So if I can, judge, your ruling regarding

14   these is that they won't be received as substantive evidence.

15             THE COURT:  Uh-huh.

16             MR. MCINERNEY:  That he can ask whether statements

17   have been made that are consistent with his testimony today.

18             THE COURT:  Yeah.  So -- so you think he's -- he's

19   testified.  You've impeached him with prior statements.  So you

20   can try to rehabilitate him with prior statements, but then

21   it's, you know, up to you to come back on re-redirect I guess.

22             MR. MCINERNEY:  Okay.  Is it -- is it part of your

23   ruling that this will not be -- the errata sheet is not allowed

24   to be used as part of this -- this recross?

25             THE COURT:  Well, it's not going to be read into the

1    evidence.  And, I mean, I guess he can testify that he did

2    submit an errata sheet.  When he had a chance to review his

3    depositions, that he changed his answers, and that he changed

4    his answers to be consistent with his testimony here today.

5              MR. CHALMERS:  Okay.

6              MR. MCINERNEY:  Thank you.

7              MR. CHALMERS:  Thank you, Your Honor.

8         (Thereupon, the proceedings continued in open court.)

9    BY MR. CHALMERS:

10   Q.  Mr. McMillan, after your deposition was taken in February

11   of 2021, did you read through it and make some changes to your

12   testimony?

13   A.  Yes.

14   Q.  And the -- you were asked questions by counsel concerning

15   when you observed a group of people and where they were at

16   Love's at the time you smelled marijuana.

17             MR. MCINERNEY:  Judge, objection.  This form is

18   improper.

19             THE COURT:  That's exactly what I said we're not going

20   to do.  I gave you the script.

21             MR. CHALMERS:  Well, Your Honor, I'm just trying to

22   let the jury know -- well...

23   BY MR. CHALMERS:

24   Q.  There are questions that you were asked and that counsel

25   discussed with you on cross-examination.  Did you at the time

1  that you made the changes to your deposition change the answers

2  to be consistent with what the testimony is that you've given

3  here in trial today?

4  A.  Yes.

5  Q.  Okay.

6        MR. CHALMERS:  I don't have any further questions.

7        THE COURT:  Cross-examination?

8        MR. MCINERNEY:  Nothing further, judge.  Thank you.

9        THE COURT:  All right.  Thank you, trooper.  You can

10  step down.  Thank you.

11        Plaintiff's next witness.

12        MS. BRETT:  Plaintiffs call Chief Hassan Aden please.

13        MR. CHALMERS:  I wonder if I could approach real

14  quickly, talk to the judge real quickly.

15        THE COURT:  Sure.

16   (The following proceedings were had at the bench.)

17        MR. CHALMERS:  At plaintiff's request I have had

18  Trooper Schulte here today to give testimony.  I was pretty

19  much sure that he would be on, the way we thought the schedule

20  would go this morning.  And so he's driven from Hays to be here

21  and he's been sitting in the witness room all day.  Now it

22  looks like we're moving to a different tactic and we're not

23  going to reach Trooper Schulte.

24        My proposal is that if they're certainly going to call

25  him as a witness they should call him now.  If not, then I

1  don't -- he's not under subpoena.  I don't know that I have any

2  obligation to have him come back for trial testimony tomorrow.

3         THE COURT:  What do you mean pretty much assured?

4         MR. CHALMERS:  I'm sorry?

5         THE COURT:  What do you mean you're pretty much

6  assured that he would testify today?

7         MR. CHALMERS:  Well, my recollection is that first we

8  didn't know exactly how long it would be, but my recollection

9  was, in discussions with plaintiff's counsel, that it would be

10  today that he would be placed on the stand, and because that

11  was important to me to be able to say when do you need to be

12  here to Trooper Schulte.  But I -- I perceive this as being a

13  change in order and a situation where I'm doubtful that we'll

14  reach Trooper Schulte.

15         MS. BRETT:  Your Honor, we never gave any promise that

16  Trooper Schulte would be put on today.  We were asked to

17  provide a day when we anticipated his testimony beginning, and

18  we said that we anticipated that it would begin earlier than

19  today.

20     (Court reporter interruption.)

21         MS. BRETT:  We said that we would anticipate it

22  beginning no earlier than today, so he should be made available

23  starting today.

24         Now with the different hours of court this week, we

25  didn't know how much we would get through on a daily basis.

1    And so we are moving as fast as we can in the case and we

2    have -- Chief Hassan Aden has a flight out tomorrow.  So we've

3    made the decision to put him on now so he can catch his flight

4    out tomorrow morning if possible.  And -- and we have never

5    promised that any particular time period in which Trooper

6    Schulte goes because we can't promise that.  We don't know how

7    the court day goes.

8            THE COURT:  This is the only witnesses left to

9    testify; right?

10           MS. BRETT:  That's right.

11           THE COURT:  They're both in the same situation.  I

12   don't see any reason to upset this gentleman's flight to make

13   it more convenient for Trooper Schulte or vice versa.  So I'll

14   just go with the order of what was told us when to call

15   witnesses.

16           MR. CHALMERS:  That's your call.  I just want to put

17   them on notice that I don't feel that I have an obligation to

18   produce him.

19           THE COURT:  Well, I do.  I do believe you have an

20   obligation to produce him.  If that -- if what they said is

21   true that you agreed to producing him, no -- that he would not

22   be needed earlier than today, if it was a problem to produce

23   him later, then you should have let somebody know before now.

24           MR. CHALMERS:  I had told them that I would produce

25   witnesses without a subpoena in the event that I was given

1   appropriate advanced warning.  And the warning I was given was

2   it would be today.

3           THE COURT:  They don't -- they say that's not what

4   they told you.  Do you have anything in writing?

5           MR. CHALMERS:  I'd have to look back at the e-mails

6   exchanged.

7           THE COURT:  Okay.  Why don't you do that.

8           MS. BRETT:  I think we've been clear from the

9   beginning we don't know how quickly we will get witnesses off

10  the stand.  I think our agreement we would try to anticipate a

11  day by which we wouldn't anticipate him to go before that so

12  he's not sitting around for four days.

13          This is a four-day trial.  He was going to go today or

14  he was going to go tomorrow, but we did not have him sitting in

15  a courtroom on Monday or Tuesday because we knew we would not

16  get to him.  We were trying to accommodate our needs as well as

17  our witness's needs and that's why we said Wednesday.

18          MR. CHALMERS:  But no effort to accommodate Trooper

19  Schulte's needs.

20          THE COURT:  I'm sorry; I can't hear you.

21          MR. CHALMERS:  I said no effort to accommodate Trooper

22  Schulte's needs.

23          THE COURT:  What are his needs?

24          MR. CHALMERS:  Pardon?

25          THE COURT:  What are his needs?

1      MR. CHALMERS:  Well, he has to drive from Hays, Kansas

2  to come to attend this trial and is not under subpoena, and now

3  I guess he drives back to Hays, Kansas and without a subpoena I

4  guess comes back tomorrow to give testimony.  And the needs

5  were to identify with reasonable certainty when he would be

6  here and give testimony, and it all fit today being the day

7  because I think it was the day they gave me as to when they

8  anticipated calling him.

9      THE COURT:  Why don't you check your e-mail and we'll

10  see if that's what they told you.  Hays is not that far.  I

11  drove it recently two ways.  And he doesn't have to go back

12  tonight.  He can spend the night in Kansas City.  There's a

13  hotel right across the street.

14      MR. MCINERNEY:  Judge, can we get Chief Aden started?

15      THE COURT:  Yeah, we're just delaying it for now.  You

16  can let me know see if you can find something.  Go ahead.

17    (Thereupon, the proceedings continued in open court.)

18      THE COURT:  Chief Aden, will you please stand and be

19  sworn.

20                      HASSAN ADEN,

21  called as a witness on behalf of the Plaintiff, having first

22  been duly sworn, testified as follows:

23                    DIRECT EXAMINATION

24  BY MS. BRETT:

25  Q.  Good afternoon, chief.  Could you, please, state and spell

1    your name for the record.

2    A.   Hassan Aden, H-A-S-S-A-N, A-D-E-N.

3    Q.   Where do you live, Chief Aden?

4    A.   Alexandria, Virginia right outside of D.C.

5    Q.   What do you do?

6    A.   I, at this point, am a consultant.

7    Q.   Have you worked in law enforcement previously?

8    A.   Yes, for three decades.

9    Q.   What was your first position in law enforcement?

10   A.   Very first position was recruit officer in the police

11   academy going into service with the Alexandria, Virginia Police

12   Department.

13   Q.   What year did you begin there?

14   A.   1987.

15   Q.   Can you tell us a little bit about the Alexandria, Virginia

16   community?

17   A.   Yes.  It is a very compact metropolitan area right outside

18   of D.C.  It's 20 square miles with about 160-170,000 residents.

19   Q.   And I believe you stated you started as a recruit.  Can you

20   explain what that means?

21   A.   Before you get certified as a police officer, you have to

22   go to a police academy in most places, and that police academy

23   was three-and-a-half months at the time.  And then at that

24   point if you pass and pass a state test, you can go on to serve

25   in your police department.

1   Q.   This might seem like a silly question, but did you pass

2   your test?

3   A.   I did.

4   Q.   And then what position did you have?

5   A.   I was a patrol officer for three years.

6   Q.   What were your responsibilities as a patrol officer?

7   A.   Patrol officers generally respond to calls for service.

8   They do -- respond to traffic accidents, any flag-downs.  Any

9   problems that the community needs addressed and they call the

10  police for, patrol officers are generally the first to respond.

11  Q.   What experience did you have conducting traffic stops in

12  that position?

13  A.   I conducted numerous traffic stops.  As a recruit officer,

14  you generally get put on the worst shift.  So I was on midnight

15  shift for starters.  And after a certain amount of time,

16  traffic is what you -- the only thing out there that you can do

17  proactively.

18  Q.   What about any experience that you gained in drug

19  enforcement during your time as a patrol officer?

20  A.   Yes, I conducted many traffic stops that led to -- to drug

21  seizures.

22  Q.   Did those involve canine sniffs of vehicles?

23  A.   Yes, they did.

24  Q.   How long were you a patrol officer?

25  A.   Three years.

1    Q.   And what happened after that?

2    A.   I was laterally transferred to Street Crimes Unit, which is

3    a street level narcotics unit in my department.  It means

4    different things in different departments.  In ours it was

5    essentially street level narcotics enforcement.

6    Q.   What is street level narcotics enforcement?

7    A.   We focused on street corner drug deals.  And, you know,

8    rewinding back the clock, that was around 1990.  And in the

9    D.C. area, like lots of metropolitan areas, there was a lot of

10   crack hitting the street and violence associated with it.  So

11   our unit specifically was tasked with taking care of the street

12   level narcotics distribution.

13   Q.   In that unit did you work with the K-9 Unit at all?

14   A.   We did.  We didn't have one in -- in the unit, but we often

15   called for canine.

16   Q.   How long were you in the Street Crimes Unit?

17   A.   Two years.

18   Q.   And what happened after that?

19   A.   I was transferred to Major Narcotics.

20   Q.   What is Major Narcotics?

21   A.   Major Narcotics essentially takes it as a notch up.  And,

22   again, this is all in the context of the Alexandria, Virginia

23   Police Department, because it means different things in

24   different places.  For us I was transferred to do more major

25   investigations, traffickers, not street level dealers.  And I

1    was trained by the Drug Enforcement Administration, worked with

2    the Drug Enforcement Administration on task forces and really

3    focused on the -- the more serious traffickers.

4    Q.   Did that work involve something by the term interdiction

5    work?

6    A.   Yes, it did.

7    Q.   How long were you in Major Narcotics?

8    A.   Approximately three years.

9    Q.   Where did you go from there?

10   A.   I needed a break from that kind of work and we were

11   starting a school resource -- School Resource Officer Unit, and

12   I thought that would be a great place to sort of reset and

13   reengage with community in a different way.

14   Q.   How long were you in that position?

15   A.   Six years.

16   Q.   And what did you do after that?

17   A.   I was promoted to sergeant in 2001.

18   Q.   What department were you in when you were promoted to

19   sergeant?

20        Actually that's a bad question.  What unit were you in when

21   you were promoted to sergeant?

22   A.   In the Alexandria Police Department, as I think is pretty

23   common with most police departments, when you get promoted to

24   that first level supervision, you go back to patrol to learn

25   the craft of supervising officers.

1    Q.   So you were a sergeant in the Patrol Division?

2    A.   Yes, I was.

3    Q.   Where did you go from there?

4    A.   I served there for approximately one year supervising

5    street level -- street patrol officers, and I was assigned to

6    Internal Affairs.

7    Q.   When you were a sergeant in patrol, were you responsible

8    for supervising other officers who were conducting traffic

9    stops?

10   A.   Yes, I was.

11   Q.   What supervision role did you play for interdiction work?

12   A.   Any time that they needed any assistance with determining

13   the legality of the stop or evaluating what they had in terms

14   of reasonable articulable suspicion or probable cause or just

15   any questions, our officers called for sergeants to arrive to

16   the scene -- to come to the scene and help them sort through

17   things that was my role.

18        My role was also one of accountability.  If I saw policy

19   violations, I would have to address those with the officers.

20        My role was also to sort of intervene with conflicts with

21   community.  If the community called and had an issue with an

22   officer, I was often the one to address that.

23   Q.   And then I believe you testified you went to Internal

24   Affairs; is that correct?

25   A.   Yes, I did.

1   Q.   And you were a sergeant in Internal Affairs?

2   A.   Initially, yes.

3   Q.   What happened after that?

4   A.   I was promoted to lieutenant within Internal Affairs.

5   Q.   How long were you a lieutenant in Internal Affairs?

6   A.   Three years.

7   Q.   Were you promoted after that as well?

8   A.   Yes, I was.

9   Q.   What were you promoted to?

10  A.   I was promoted to captain.

11  Q.   How long were you a captain in Internal Affairs?

12  A.   A very brief time, and then I was assigned to the United

13  States D.O.J. on one.

14  Q.   Can you tell us a little bit about what an Internal Affairs

15  department does?

16  A.   Generally Internal Affairs departments investigate --

17  they're the ones investigating misconduct complaints against

18  police and a variety of other policy violations that are

19  internal.

20  Q.   Does some sort of Internal Affairs department exist in

21  every police department?

22  A.   I would say, yes, some form.

23  Q.   Is there an Internal Affairs department in the Kansas

24  Highway Patrol?

25  A.   There is.

1    Q.   What is it called?

2    A.   Professional Standards Unit.

3    Q.   How long were you in Internal Affairs all told?

4    A.   Five years.

5    Q.   And then you testified you went to D.O.J.?

6    A.   Yes, I was -- I didn't change jobs.  I was temporarily

7    assigned there on -- still as an Alexandria police captain.

8    Q.   What did you do after that position?

9    A.   I was assigned to be the police liaison.  So I worked with

10   the mayor and city council issues concerning police and fire.

11   Q.   How long were you in that position?

12   A.   One year thankfully.

13   Q.   What position did you hold next?

14   A.   After that I was assigned at my request to be a district

15   commander, so I took over one of our police districts as the

16   head of the district.

17   Q.   What does a district commander do?

18   A.   I supervised our commanders, our lieutenants and all of our

19   sergeants, but I had responsibility for financial

20   responsibility, accountability responsibility, and all of the

21   operations of a district that encompassed half of the city.

22   Q.   How long were you a district commander?

23   A.   Two years.

24   Q.   And what position did you hold after that?

25   A.   I was promoted to deputy chief.

1    Q.    Deputy chief of the Alexandria Police Department?

2    A.    Yes, and, I'm sorry, one year.

3    Q.    Okay.  One year and --

4    A.    As district commander.

5    Q.    -- and then deputy chief?

6          How long did you serve in that role?

7    A.    As deputy chief?

8    Q.    Yes.

9    A.    Until 2012.

10   Q.    And where did you go from there?

11   A.    2012 I retired from the Alexandria Police Department and

12   contemporaneously was appointed chief of police in Greenville,

13   North Carolina.

14   Q.    Can you tell us about the Greenville, North Carolina

15   community?

16   A.    Yes.  It's -- if you're familiar with North Carolina, the

17   Outer Banks are the beaches on the east.  Greenville is about

18   an hour-and-a-half internal but it's still eastern

19   North Carolina.  It's 35 square miles, about 150,000 residents,

20   very rural.  Outside of the city are essentially just tobacco,

21   corn and cotton fields, but the city is very urban and very

22   poor.

23   Q.    How long did you serve as chief of the Greenville Police

24   Department?

25   A.    Three years.

1    Q.   As a leader in Alexandria Police Department and the

2    Greenville Police Department, what responsibility did you have

3    for overseeing traffic stops by officers in your department?

4    A.   All of it.  In Alexandria I was in charge of operations, so

5    anything that happened on the street level, whether it be a

6    traffic stop or an arrest or a use of force, I had

7    responsibility for all of it.  Same in Greenville.

8    Q.   What about for reviewing detentions of drivers by officers

9    in your department?

10   A.   Yes, all the way through my career.

11   Q.   And what about evaluating the constitutionality of those

12   decisions?

13   A.   Yes.

14   Q.   After leaving the Greenville Police Department, where did

15   you go?

16   A.   I was appointed director at the International Association

17   of Chiefs of Police.

18   Q.   And what is that organization?

19   A.   That's the largest police executive organization in the

20   world, and its membership spans -- it's global, but in the

21   United States it's the -- probably the premier police executive

22   organization.

23   Q.   What were your responsibilities there?

24   A.   I oversaw all of the training and technical assistance

25   worldwide, and I also oversaw all of the research and

1   evaluation projects that we had worldwide.  In addition, I

2   oversaw and helped create the National Model Policy Institute

3   which created policies that organizations could comfortably

4   take off the shelf and customize and feel confident that they

5   had been fully vetted by legal teams and subject matter

6   experts.

7   Q.  What did you need to learn about policing standards from

8   across the country in order to do that job?

9   A.  I had to learn how to evaluate police actions, learn about

10  accountability, learn about every aspect of policing, which in

11  three decades I did.

12  Q.  Did that give you exposure to how different departments do

13  things?

14  A.  Yes.  I often traveled with my teams to on-site evaluations

15  and assessments of police departments, sheriff's offices,

16  tribal law enforcement, all of it, state police.

17  Q.  And I believe you testified that you helped create model

18  policies; is that correct?

19  A.  Yes.

20  Q.  What topics did those policies cover?

21  A.  They covered every -- every topic that a police

22  organization might need from vehicle pursuits to use of force

23  to stop searches and arrests to how to conduct home

24  inspections.  I mean, it was -- it was the whole gambit.

25  Q.  So safe to say it covered traffic stops, for example?

1   A.   Yes.

2   Q.   How long were you with the IACP?

3   A.   One year.

4   Q.   What did you do after that?

5   A.   I started my firm, the Aden Group, LLC.

6   Q.   What year was that in?

7   A.   That was 2016.

8   Q.   What motivated you to start your own firm?

9   A.   Based on the work at the IACP very early on, I communicated

10  to my colleagues that I would be starting a firm.  When the

11  time was right, I did.  A lot of them helped me to do that.

12  But the main reason why I started the firm was, throughout all

13  this work I saw, that police agencies really struggled to sort

14  of -- to get to the intersection of effective crime fighting

15  and constitutional policing.  There was a huge gap there, and

16  that gap continues today.

17       It's most of the work that I'm still engaged in, but that

18  -- that was the driver for me.  And I felt that myself and all

19  of the consultants and the attorneys that I hired would be able

20  to help law enforcement gain that experience and put it into

21  practice and keep themselves out of trouble.

22  Q.   What sorts of projects does your firm engage in in that

23  respect?

24  A.   They're all in that respect, but they're basically three

25  lines of work.

1      One is I work for federal judges overseeing consent

2  decrees.  And consent decrees are essentially when a police

3  department is taken under the supervision of the court for a

4  variety of reasons.  And my teams help the -- the judge -- work

5  with the judge to determine compliance with that consent

6  decree.  So those cities include and included -- some of them

7  are out of consent decrees now -- Seattle, Cleveland, Chicago

8  currently Baltimore.  That's one line of work.

9      Another one is departments call us in to help themself

10  assess and teach them how to critically self-assess to look at

11  themselves and determine where they're vulnerable in terms of

12  constitutional policing, effective crime fighting, and that is,

13  again, an equal part of the work that I do.

14      A third part is we assist state attorney generals' offices

15  in conducting pattern and practice investigations into police

16  departments that are -- that bring negative attention to

17  themselves legally and do so enough that the state attorney

18  generals' offices want to start investigations.  And we help

19  their attorneys work through the complexities of that.

20  Q.  On that first bucket of work that you were discussing, your

21  work for the federal courts, what is the title that you have in

22  that role?

23  A.  Federal monitor.

24  Q.  And how are you selected to be the federal monitor in the

25  cases that you mentioned?

1    A.    To be the lead monitor and also to be a deputy monitor or

2    an associate monitor, those are the three tiers, it's a

3    competitive process.  But the lead monitor has to compete for

4    the position, be approved by the city that's under the consent

5    decree and under the United States D.O.J. in terms of a federal

6    consent decree or the state attorney generals' offices --

7    basically the parties.  Once that person is selected, then the

8    judge has to have an interview and determine whether that

9    person is suitable to work with them.

10   Q.    I want to pivot for a moment and talk a little bit about

11   your educational background, Chief Aden.  What degrees do you

12   have?

13   A.    Bachelor's and a Master's, Master's in Public

14   Administration.

15   Q.    And where is that from?

16   A.    American University.

17   Q.    And where is your Bachelor's from?

18   A.    Also American University.

19   Q.    What is the subject of your Bachelor's Degree?

20   A.    It's criminal justice essentially.

21   Q.    Chief Aden, have you received any special training on

22   nationally accepted police practices?

23   A.    I have.  I've attended lots of executive level training

24   that -- that focuses on nationally accepted policing practices.

25   Q.    Do you have any specific examples you could share with us?

1   A.   One would be the Senior Police Management Institute.  It's

2   put on by the police executive research forum, and essentially

3   it's -- it's -- it targets people that are at a senior command

4   level in the police department across the country.  Actually,

5   it's worldwide at this point.

6        At the time it was mostly focused on the United States and

7   brings them into the -- at the Harvard Kennedy School and

8   brings them into an environment where they're basically taught

9   how to lead a police department in a modern environment.  And

10  it also covers the gambit of constitutional policing, fair and

11  impartial policing, how to deal with community at very

12  difficult times.

13  Q.   And I guess I maybe should have asked the first question

14  that I just asked you about training on nationally accepted

15  police practices.  What are nationally accepted police

16  practices?

17  A.   Essentially nationally accepted police practices, you know,

18  come from case law primarily, but also events that occur

19  throughout the country where these think tanks and groups get

20  together such as the International Association of Chiefs of

21  Police, Major City Chiefs of Police, Police Executive Research

22  Forum, we convene regularly when things happen.

23       Like, the latest incident in Memphis, there was a convening

24  to talk about that and the issues around recruitment, around

25  all that sort of wrapped into that.  We talk about it and we

1    start working on remedies for that and how -- how to prevent

2    that from reoccurring.

3    Q.   And is it your testimony that all of that goes into

4    nationally accepted police practices?

5    A.   Yes, it is.

6    Q.   Have you received any professional awards?

7    A.   I have.

8    Q.   Are you affiliated with any professional associations

9    related to law enforcement?

10   A.   The ones I just named and probably a few others, but

11   National Academies of Science where I serve as an expert on

12   research, Police Executive Research Forum, the International

13   Associations of Chiefs of Police, Major City Chiefs.

14   Q.   Did those associations give you exposure to nationally

15   accepted police practices?

16   A.   Yes.

17   Q.   Based on the experiences you just walked us through, have

18   you had exposure to how different agencies across the country

19   conduct drug interdiction work?

20   A.   Yes.

21   Q.   And what experience do you have in evaluating law

22   enforcement activities of different officers in different

23   departments across the country?

24   A.   I have a lot of experience.  A lot of them, primarily the

25   monitoring work for the federal judges, is all around gaining

1    compliance.  So in the case where I was the lead monitor, I

2    would convene a group of subject matter experts and we would

3    look at -- and I would also look at it, but we would develop a

4    methodology so that the parties could agree to the methodology

5    of the assessment and then an instrument.

6        And through that instrument we would look at a lot of

7    components, but traffic stops, use of force, fair and impartial

8    policing, all of those things needed -- all of those topics,

9    and all of those stops would get assessed.  And in some cases I

10   can think of a city where we assessed over 1,500 stops,

11   searches and arrests.

12   Q.  What knowledge and experience have these experiences given

13   you about appropriate indicators of criminal activity?

14   A.  That's exactly what we look for.  In our instruments we

15   look at, you know, was there reasonable articulable suspicion.

16   In the case of an arrest, you know, when did that transition to

17   probable cause.  All of those are factors that we look at, and

18   each case takes a while to look at.  It's not a cursory look.

19   We look deep.  And the reason for that is because we're

20   informing a federal judge about compliance matters.  So it's

21   thorough and it's done by experts.

22   Q.  Do you review documents associated with different stops and

23   detentions?

24   A.  Documents, videos, compare those to policies and compare

25   those to law and compare those to the court's order.

1   Q.   Chief Aden, when did you first learn about this case?

2   A.   Fall of 2020.

3   Q.   And were you retained by Mr. Bosire to serve as an expert

4   in his case?

5   A.   Yes.

6   Q.   Around that same time, fall of 2020; correct?

7   A.   Yes.

8   Q.   Are you being compensated for your work?

9   A.   Yes, I am.

10  Q.   Is your compensation contingent on producing certain

11  opinions in this case?

12  A.   No.

13  Q.   Is your compensation for serving as an expert contingent on

14  Mr. Bosire prevailing on his claims in this case?

15  A.   No.

16  Q.   I want to walk through the opinions that you formed related

17  to the traffic stop and detention of Mr. Bosire.  But before we

18  get to that, can you please explain to the jury how a simple

19  traffic stop should work if it was following nationally

20  accepted police practice?

21       MR. CHALMERS:  Your Honor, I've listened carefully to

22  what the definition is of nationally accepted police practice,

23  and it sounds like he's trying to testify to what case law

24  says, and that's not a proper subject for this testimony from

25  this witness, and I object.

1         THE COURT:  So, members of the jury, at the end of the

2    day I'll give you very comprehensive instructions about the law

3    that you will apply in the case, but one of those instructions

4    is that Trooper McMillan is not on -- he's not on trial for

5    failing to conform to nationally accepted police practices.

6    He's on trial for failing to conform to constitutional

7    practices.  So I will instruct you what those standards are,

8    but I think the purpose of this is to inform you about how

9    reasonable police officers -- what's the reasonable state of

10   police practice in contemporary society, and it's to help you

11   understand the art and science of policing.

12        MR. CHALMERS:  My problem, Your Honor -- and I agree

13   with your statements altogether.  But my problem is that the

14   testimony this witness has given is that these national

15   standards that he's talking about or practices are what he

16   reads and perceives from case law.  He's doing nothing more

17   than trying to take your job and give testimony.

18        THE COURT:  No, he's not.  I disagree with that.  And

19   if you want to cover that with him on cross-examination, please

20   feel free.  But I think one of the sources of national police

21   standards is case law, and I think that's a fair comment to

22   cross-examine him on.  Go ahead.

23   BY MS. BRETT:

24   Q.  Chief, just to clarify on that point really quick before we

25   move on, I believe your testimony earlier was that case law is

1    a part of nationally accepted police practice, was that

2    correct?

3    A.   That's correct, there are policies and practices and lots

4    of other things that go into what makes a national nationally

5    accepted police practice.

6    Q.   Thank you.

7        So I believe before that I asked you to explain how a

8    traffic stop should work if it was going along with nationally

9    accepted police practice.

10   A.   Yes.  Essentially a police officer would observe some sort

11   of a traffic violation, would get behind the vehicle, would

12   observe it for a brief moment.  Then at that point the officer

13   would have to make a decision of do I actually stop this

14   vehicle or do I not take any action.

15       If the officer -- if he or she decides to stop the vehicle,

16   they would activate their lights and then they would call into

17   dispatch the plate, the tag number and then effect the traffic

18   stop.

19       The vehicle would pull over.  The police officer would get

20   behind the vehicle.  And once they got the return on the

21   license known -- or on the tag knowing that it was not wanted

22   for anything, all officer safety things -- concerns were

23   alleviated, the officer would approach the vehicle.

24       Generally the officer would ask for -- and I say generally

25   because some states you can ask for a little bit more such as

1    proof of insurance, but generally it's license and

2    registration.  In some states it is license, registration and

3    proof of insurance.  They would get those documents.  And

4    obviously there would be some sort of interaction prior to that

5    where they would introduce themselves and let the driver know

6    why they were pulled over.

7         Obtain the documents, go back to the car and then conduct

8    the actual business of the traffic stop, which is run the

9    license itself, wait for that to return, wait for a wants and

10   warrants, which is essentially just checking to see if the

11   person is wanted, and then either issue a ticket, a warning or

12   a verbal warning.

13        Go back up to the car, issue that, whatever consequence

14   they were going to -- to issue.  Return the documents and

15   advise the person that they were free to leave and end the

16   traffic stop.

17   Q.  And based on this nationally accepted police practices, how

18   long can you detain a person for the traffic stop?

19   A.  As long as the traffic stop takes.

20   Q.  And by "as long as the traffic stop takes," what do you

21   mean by that?

22   A.  The business of the traffic stop.  If there's a delay in

23   getting the -- the status of the license back, those kinds of

24   things could very briefly extend the traffic stop.

25   Q.  And when the business of the traffic stop is over, what is

1    the officer's obligation?

2    A.   The officer's compelled to let the driver go, let them know

3    they're free to leave.

4    Q.   Chief Aden, you were asked to analyze Trooper McMillan's

5    stop and detention of Mr. Bosire; correct?

6    A.   Yes, I was.

7    Q.   What documents did you review as part of that analysis?

8    A.   I reviewed depositions.  I reviewed declarations.  I

9    reviewed the Professional Standards Unit documents, police

10   reports.  I believe that's --

11   Q.   Did you review any video?

12   A.   I did.  In addition to the documents, I reviewed several

13   videos, including the video that we saw today.

14   Q.   And that is the dash cam video; is that right?

15   A.   Yeah and video, yes.

16   Q.   And what standards did you use to analyze the stop and

17   detention of Mr. Bosire?

18   A.   I compared it to national policing standards.

19   Q.   At a high level, what opinions did you form in this case?

20   A.   That Mr. Bosire's --

21         MR. CHALMERS:  Excuse me.  I object to the -- and

22   maybe I can have an ongoing objection so I don't have to

23   interrupt, but this is not a proper subject for expert

24   testimony; that the national policing standards are -- are

25   nothing but, in this instance, his -- his view of what case law

1    is, and that the question whether or not there's reasonable

2    suspicion or not ultimately is a question of law upon which

3    this testimony would not be helpful.

4              THE COURT:  I think you addressed all those in the

5    motion *in limine* and I have previously ruled on all of those.

6    They are overruled, but you have a standing objection.

7              Go ahead.

8    BY MS. BRETT:

9    Q.  At a high level, Chief Aden, what opinions did you form in

10   this case?

11   A.  My opinion was that based on the reasonable articulable

12   factors or -- I'm sorry, based on the reasonable -- the factors

13   that were articulated by Trooper McMillan to gain his

14   reasonable articulable suspicion, those were not consistent

15   with nationally accepted police practices.

16   Q.  I want to ask you about the opinions that you formed in

17   each stage of the interaction with Mr. Bosire.  So let's start

18   at the encounter at Love's.  You've been in the courtroom

19   throughout the testimony this week; correct?

20   A.  Yes, I have.

21   Q.  And so you've reviewed both the documents that you just

22   mentioned plus you've watched the live testimony?

23   A.  Yes, I have.

24   Q.  What is your understanding of what Trooper McMillan

25   observed about Mr. Bosire at the Love's?

1        MR. CHALMERS:  This is not a proper topic for an

2   expert to try to talk about his understanding of what the facts

3   are, Your Honor, I object.

4        THE COURT:  I think you may have to come at it at a

5   different angle.  Ask him his opinion and then ask him what

6   facts he relied upon would be I think fair.

7        MS. BRETT:  Sure.  Well, Your Honor, just to save some

8   time here, since we've established that Chief Aden has been in

9   the courtroom all week --

10  BY MS. BRETT:

11  Q.  Do you recall hearing Trooper McMillan discuss the smell of

12  marijuana at the Love's gas station?

13       MR. CHALMERS:  The question is leading.  And once

14  again the question is testimony as to what he heard, what his

15  opinions are as to the what the facts are.  That's for the

16  jury, not for this witness.  And I would object, Your Honor.

17       THE COURT:  How would you like her to phrase the

18  question so that you won't object?  Because he's entitled to

19  offer the grounds on -- the factual grounds on which he based

20  his opinion.  So it's a question of semantics here.

21       MR. CHALMERS:  I think you suggested the answer.  He

22  states his opinion and states those facts that he thinks are

23  pertinent to that opinion.  My concern is that his statement of

24  those facts may be not statements of fact but a weighing of the

25  evidence, which is improper which is part of the reason why I

1    take the position that this witness should not be permitted to

2    testify.

3          THE COURT:  So, members of the jury, as I told you

4    before, you are the only judges of the facts.  And so you are

5    the ones who will ultimately decide what happened, what the

6    video shows, what the witnesses said and whether it's credible.

7          But as an expert opinion -- as an expert on the

8    subject matter which pertains to this case, this witness is

9    allowed to express expert opinions and to tell you the factual

10   basis on which his opinions are founded.

11         Now, if at the end of the day you find the facts are

12   different, then you don't have to accept what he says, but he

13   is allowed to testify about the factual basis for his opinions.

14   BY MS. BRETT:

15   Q.  Chief Aden, was Trooper McMillan's statements about the

16   smell of marijuana at the Love's gas station something that you

17   based your opinion in this case?

18   A.  Yes.

19   Q.  And what opinion did you have about those statements?

20   A.  That the smell of marijuana that he smelled was not

21   attributed to Mr. Bosire.  It was in the air.  It was more

22   random and, again, not attributable directly to Mr. Bosire.

23   Q.  And, Chief Aden, what is your opinion regarding whether

24   Trooper McMillan's statements regarding the marijuana smell at

25   Love's -- strike that.

1      Was it consistent, in your opinion, for Trooper McMillan to

2  rely on this factor in forming reasonable suspicion?

3           MR. CHALMERS:  Leading.

4  BY MS. BRETT:

5  Q.  Was it consistent with nationally accepted police

6  practices --

7           MR. CHALMERS:  Leading.

8           THE COURT:  It's not suggesting what the answer is, so

9  in that sense it's not leading.  Go ahead.

10  BY MS. BRETT:

11  Q.  Was it consistent with nationally accepted police practice

12  for Trooper McMillan to rely on this factor in forming

13  reasonable suspicion?

14  A.  No, it was not.

15  Q.  Why not?

16  A.  It was of a vague, random factor not tied to any other

17  factors attributed to Mr. Bosire.

18  Q.  Did you hear testimony over the last few days concerning

19  cameras in Mr. Bosire's car?

20  A.  I did.

21  Q.  Based on nationally accepted police practices, what might

22  make an officer suspicious about somebody having cameras in

23  their car?

24  A.  Well, I mean, this stop was in 2019, and certainly today

25  vehicle cameras are ubiquitous, whether they're built into the

1    car or mounted on the car such as Go Pros or they -- even

2    mounts exist where you can mount your iPhone to your car.  A

3    lot of people do that for accident purposes and for documenting

4    those.

5         But under these circumstances and from 2019 to today,

6    standalone that is not a factor.  I think it could have been in

7    2000 if you had a car with lots of cameras mounted in it, but

8    not with today's modern technology.

9    Q.   You also understand from the testimony that Trooper

10   McMillan knew Mr. Bosire's car was a rental car; correct?

11   A.   Yes.

12   Q.   Based on nationally accepted police practices, when might

13   you be suspicious of a rental car?

14   A.   Just the sheer fact it's a rental car never.  Rental cars

15   are used by millions of people to conduct trips -- business,

16   pleasure trips daily across America's highways and cities.  I

17   think, you know, there could be some circumstances I might

18   consider it to be -- to be suspicious.  And one of those

19   circumstances would be if I looked at the rental agreement and

20   it was rented in Denver, returnable to Wichita but he was

21   stopped or someone was stopped in South Carolina, that might

22   raise some suspicion about what -- you know, what they're

23   doing.

24   Q.   What about the duration of a rental agreement?

25   A.   No, people can rent cars for 24 hours if they want to.

1    It's whatever the need is of the person.

2    Q.  Do you recall testimony earlier in this trial about the

3    concept of caravanning?

4    A.  Yes.

5    Q.  Was Trooper McMillan's conclusion that the cars were

6    caravanning with one another consistent with nationally

7    accepted police practice?

8    A.  No.

9    Q.  Why not?

10   A.  That the Dodge Charger wasn't tied into Mr. Bosire in any

11   sort of way.  It was, you know, near the lot.  It was not

12   stopped.  Mr. Bosire didn't have any contact with it.  It was

13   just a random occurrence in a parking lot that was used to --

14   that was used as a -- as a factor.

15   Q.  I want to move now to talking about the first time Trooper

16   McMillan goes up to Mr. Bosire's car with what I'll call the

17   first approach.  Do you understand what I mean by that?

18   A.  I do.

19   Q.  What additional indicators did Trooper McMillan develop as

20   he first approached Mr. Bosire?

21   A.  That Mr. Bosire didn't roll his window down all the way and

22   that there was a notebook in the -- in the car that was

23   partially covered, and that Mr. Bosire didn't reveal his travel

24   plans other than, you know, stated that he was going west to

25   east.

1    Q.  I want to talk about each of those.  In your opinion, under

2    nationally accepted police practices, what was suspicious about

3    Mr. Bosire not rolling his window down all the way?

4    A.  Nothing.  It's -- it was February.  It was cold.  He rolled

5    it down enough to communicate with the trooper, which is what a

6    driver's -- that's the driver's responsibility.  He was asked

7    to roll it down a little further.  He did so.  And in the

8    videos that I observed, you could -- they could communicate

9    without obstruction.

10   Q.  What new information did Trooper McMillan learn from that

11   first approach?

12   A.  Beyond those three?

13   Q.  I guess I'm asking a poorly worded question.  When Trooper

14   McMillan goes up to the window and has that first conversation

15   with Mr. Bosire, what else did he learn while he was standing

16   at the window?

17   A.  Well, he didn't smell --

18        MR. CHALMERS:  Once again, Your Honor, again, the way

19   the question's phrased, she's asking what this witness

20   perceives to be the facts from the testimony.  She's not even

21   asking what the facts are that he relies on his opinion and I

22   object.

23        THE COURT:  Again, I think you should phrase your

24   questions to elicit the facts which he -- on which he based his

25   opinion.

1   BY MS. BRETT:

2   Q.  Did you consider anything in forming your opinion in this

3   case that -- regarding what Trooper McMillan learned during

4   that first approach with Mr. Bosire?

5   A.  Well, he learned that Mr. Bosire invoked his Fifth

6   Amendment right to -- to not communicate anymore.  He also

7   learned -- he stated that he did not smell any marijuana coming

8   from the vehicle.

9   Q.  Under nationally accepted police practices, what should

10  that -- what impact should that have had on Trooper McMillan?

11  A.  I -- I mean, most officers would realize that the person

12  understands their constitutional rights and would -- would

13  consider that for the rest of the encounter.

14  Q.  What about the lack of smell of marijuana?

15  A.  That -- there might not be drugs in the car.

16  Q.  You also mentioned the notebook.  Under nationally accepted

17  police practices, when might a police officer find a notebook

18  in the back seat of a car to be suspicious?

19  A.  The only circumstance I can think of is in the case of owe

20  sheets, what they call O-W-E.  These are ledgers used by drug

21  traffickers and they have essentially names and amounts that

22  people owe them, and they could be tied to whatever that

23  trafficking trip involves.  But for that to be a factor, the

24  book would have to have been open and there would have had to

25  be some articulation of why the trooper thought that it was an

1    owe sheet of sorts.  I didn't see any of that.  The book was

2    closed.  In fact, it turned out to be a Bible.

3    Q.   Was Trooper McMillan's reliance on the notebook consistent

4    with accepted practices?

5    A.   No.

6    Q.   Why not?

7    A.   Because a notebook is not illegal.  Many people travel with

8    notebooks in their cars.  It's not a factor that criminal

9    activity is afoot.

10   Q.   And I want to go back to what you were speaking about a

11   moment ago about the invocation of the Fifth Amendment.  What

12   information can an officer demand from a driver during a

13   traffic stop under nationally accepted police practices?

14   A.   The documents.  They can demand driver's license,

15   registration, proof of insurance, in this case the rental

16   agreement, and in some other states there might be some other

17   required documents.  But as far as conversation, they really

18   can't force any conversation or force any dialogue that's

19   unwanted by the driver.

20   Q.   Can they ask questions?

21   A.   They can ask questions, yes.

22   Q.   And what should happen if the driver does not want to

23   answer these questions?

24   A.   The questioning should cease.

25   Q.   And was any part of your opinion about this stop based on

1    Trooper McMillan's reaction to Mr. Bosire saying he didn't want

2    to answer the questions?

3    A.   As far as my opinion goes, no.  I mean, the facts are the

4    facts.  But his reaction was a negative reaction to him, which

5    I think caused the reproach and the continuation after

6    Mr. Bosire was detained.

7    Q.   Chief Aden, at this point in the traffic stop, had you

8    formed any opinions about whether Trooper McMillan had enough

9    facts and circumstances to detain Mr. Bosire consistent with

10   nationally accepted practice?

11   A.   No, I determined that he did not.  And observing the video,

12   he said he did not himself.

13   Q.   And under accepted practice, what should an officer do if

14   they don't think they have enough reasonable suspicion to

15   detain a driver?

16   A.   They should conclude the traffic stop.  They should go back

17   up to the vehicle, provide the documents, either issue the

18   citation or issue the warning and advise the driver that they

19   are free to leave.

20   Q.   Based on your observation of the video, what does Trooper

21   McMillan do in this case?

22   A.   He walked back up to the vehicle and continued the

23   questioning then even asking if he could search the vehicle.

24   Q.   Do you recall a conversation between Trooper McMillan and

25   Mr. Bosire regarding Mr. Bosire's buddy?

1    A.   Yes, that was the continuation of the questioning.   He

2    walked back up and asked, you know, "Where's your buddy?"   And

3    Mr. Bosire was understandably confused as he was traveling

4    alone.

5         MR. CHALMERS:   You know, Your Honor, I -- I move to

6    strike that last part.   He's now trying to give his evaluation

7    of what Mr. Bosire's reaction was and how whether it was

8    confusing or not to him.   These are not things a witness --

9    quote/unquote expert is permitted to testify on and I do

10   object.

11        THE COURT:   Well, he did -- he did review the video

12   and I think it's fair statement to say that he was confused.   I

13   don't know about the editorializing that if he was

14   understandably confused, because I think that's part of what

15   the jury will decide, but objection is overruled.

16   BY MS. BRETT:

17   Q.   Was it consistent with nationally accepted police practice

18   to continue asking questions at that point?

19   A.   No, it was not.

20   Q.   Why?

21   A.   At that point it was a detention.

22   Q.   And what is your understanding of the answer that

23   Mr. Bosire gave to Trooper McMillan about his question

24   regarding Mr. Bosire's buddy?

25   A.   I'm sorry, can you restate that?

1          MR. CHALMERS:  Again, his understanding is not

2    relevant, Your Honor, in my opinion.

3          THE COURT:  You can rephrase it.  Ask him what he saw

4    in the video that made him think that.

5    BY MS. BRETT:

6    Q.  Chief Aden, do you recall hearing testimony that -- and

7    hearing on the video that you reviewed in forming your opinions

8    in this case that Mr. Bosire eventually explained who the

9    person was at the gas station?

10   A.  Yes.

11   Q.  Under nationally accepted police practice, what should that

12   information have done in Trooper McMillan's mind?

13   A.  When he explained that it was the gas station attendant

14   helping him with a problem with the gas pump, Trooper McMillan

15   should have considered that as an innocent factor and not

16   considered it in his building of reasonable articulable

17   suspicion.

18   Q.  Was it within accepted practice to continue to detain

19   Mr. Bosire for a canine sniff at this point?

20   A.  No, it was not.

21   Q.  Why not?

22   A.  Because detention -- there was no reasonable articulable

23   suspicion at this point, and the detention extended the

24   business of the traffic stop which should have been over.

25   Q.  I'm going to switch gears for just a moment, chief.  If an

1    officer were following accepted police practices -- nationally

2    accepted police practices, would they document their reasons

3    for calling out a K-9 Unit?

4    A.    Yes.

5    Q.    How would they document it?

6    A.    Either in a report or in the case of agencies that have

7    available technology, either in body worn cameras or in this

8    case a microphone attached to a dash camera, you could

9    articulate it right on the audio creating the record stating

10   explicitly what your reasonable articulable suspicion factors

11   are.

12   Q.    And when should that document be created?

13   A.    It should be contemporaneous.  Memories -- memories fade.

14   Officers conduct many stops even in one shift and facts could

15   get crossed.  And those facts are critically important to each

16   particular case, particularly when you're, you know, engaged in

17   one of government's most intrusive acts of stopping a person.

18   Q.    Under what circumstances should that type of documentation

19   be created?

20   A.    Under any circumstance where a person is stopped.

21   Q.    What about if there's no contraband found?

22   A.    Even if there's no contraband found.

23   Q.    What if the canine doesn't alert?

24   A.    Even if a canine doesn't alert it's still a detention.

25   Q.    And to the best of your knowledge, did Trooper McMillan

1    formally document his reasons for detaining Mr. Bosire on the

2    night that the stop occurred?

3    A.   No.

4    Q.   And is that consistent with nationally accepted police

5    practices?

6    A.   No, it is not.

7    Q.   Since I've asked you this once or twice already, but just

8    to confirm, you've been here throughout the entirety of the

9    trial; correct?

10   A.   Yes, I was.

11   Q.   Has any of the testimony that you've heard so far changed

12   the opinions that we've just discussed?

13   A.   No, they've actually just reaffirmed my opinions.

14   Q.   And based on everything that you reviewed and heard, had

15   Trooper McMillan gathered enough facts and circumstances to

16   detain Mr. Bosire consistent with nationally accepted police

17   practice?

18   A.   No, he had not.

19          MS. BRETT:   One moment.   That's all.   Thank you.

20          THE COURT:   Cross-examination.

21                       CROSS-EXAMINATION

22   BY MR. CHALMERS:

23   Q.   I want to talk to you about the opinion you expressed last,

24   and that is that Trooper McMillan should have documented

25   contemporaneously the basis for his reasonable suspicions to be

1    compliant with national police practices.  That national police

2    practices is written where?

3    A.   Nationally accepted police practices?

4    Q.   Yeah, where are those nationally accepted written

5    practices?

6    A.   Some of them are written in National Model Policy, as I

7    explained earlier, through the International Association of

8    Chiefs of Police.  Others are in journals.  Others are distinct

9    publications put out by the Police Executive Research Forum.

10   Major City Police Chiefs puts out very incident specific

11   practices and evaluations of incidents.  So they come in

12   various forms and some are just discussed.

13   Q.   Yeah.  Sure.

14        You, when you agreed to be an expert in this case,

15   understood that you would prepare a report that would summarize

16   your opinions and provide the factual basis for those opinions?

17   A.   Yes.

18   Q.   And you understood that report then would be provided to

19   the other side for them to know and for the court to know what

20   your testimony would be at trial, didn't you?

21   A.   Yes.

22   Q.   And you did prepare such a report; is that correct?

23   A.   I did.

24   Q.   And in your report you don't list or identify any of these

25   model policies, journals that supposedly say that there is a

1    standard that officers need to contemporaneously document

2    traffic stops and -- and in terms of their reasonable

3    suspicions when they detain someone; isn't that true?

4    A.   That's true, I did not put that in my report.

5    Q.   And you're aware I think from the review of materials that

6    at the time of this stop -- not today but at the time of this

7    stop, under Kansas Highway Patrol policies there was no

8    requirement for the trooper to document contemporaneously his

9    reasonable suspicions or hers?

10   A.   I am aware of that.

11   Q.   So your complaint is that the highway patrol itself didn't

12   require the trooper to document under what you perceived to be

13   nationally accepted practices standards, not that the trooper

14   failed to do so?

15   A.   I'm sorry, could you explain what my complaint is, sir?

16   Q.   Your opinion of -- for whatever it's worth has to do with

17   highway patrol's former policy, not with the conduct of the

18   individual trooper?

19   A.   It's with my -- my opinion is based on nationally accepted

20   policing practices that officers should document their

21   reasonable articulable suspicion contemporaneously with the

22   stop to avoid -- to avoid having memories fade and facts get

23   crossed between stops.

24   Q.   And with respect to that national standard, you're talking

25   about what a agency should direct its officers to do, aren't

1   you?

2   A.   Yes.

3   Q.   All right.  And with respect to your understanding of

4   reasonable suspicion, whether it's documented or not

5   contemporaneously, doesn't answer the question whether the

6   trooper had reasonable suspicion to detain someone; isn't that

7   true?

8   A.   That's true.

9   Q.   And in this case you listened to the dash cam video of --

10  from Trooper McMillan's vehicle.  And in the course of that

11  stop, Trooper McMillan did eventually -- essentially dictate

12  several of the things that he said were the basis for his

13  reasonable suspicions, didn't he?

14  A.   What I heard him say was that he did not have reasonable

15  suspicion -- that he didn't have anything and he didn't have

16  enough for a dog.

17  Q.   Okay.  Well, let's talk about that in just a second.  But,

18  first of all, he did dictate, or maybe you didn't hear it on

19  the video, the basis for his reasonable suspicions to detain

20  Mr. Bosire in this case, didn't he?

21  A.   Not that I recall.

22  Q.   Didn't hear it?  Don't remember it?

23  A.   What I heard was a conversation with Trooper Schulte about

24  what he saw at Lowe's -- or at Love's.

25  Q.   Then with respect to the conversation with Trooper Schulte

1   in which Mr. McMillan said, "I'm not certain I've got enough to

2   hold him for a dog," that's what he said, isn't it basically?

3        We can look back at the quote, but that was the key

4   statement, wasn't it?

5   A.  Basically.

6   Q.  Now, you talked about some of the standard traffic

7   procedures as you understand them up until the time that

8   there's a detention.  Let's assume that an officer has

9   reasonable suspicion under all the circumstances, and that's --

10  is that the national standard that it's under all the

11  circumstances you look at to decide if there's reasonable

12  suspicion?

13  A.  I'm sorry, what's -- what's your question?

14  Q.  It's -- the standard that you are saying is the nationally

15  accepted practice is that the officer should look to all the

16  circumstances, not in isolation but together, to determine if

17  they have reasonable suspicion?

18  A.  The officer should consider all of the factors that they

19  are relying on, yes.

20  Q.  Okay.  Well, all the circumstances at the particular stop;

21  isn't that right?

22  A.  There are factors they would rely on to establish the

23  reasonable articulable suspicion, that is what they should

24  consider.  That should be the circumstances around the stop,

25  but there are specific factors to establish reasonable

1    articulable suspicion.

2    Q.  Once they have reached what you -- under these nationally

3    accepted practices are reasonable suspicions in your view, they

4    have a right to detain a motorist for the purposes of

5    additional inquiry to either dispel the fact that there is some

6    sort of criminal conduct going on, that is to prove that it's

7    not there, or to maybe further verify its existence, don't

8    they?

9    A.  No.  Reasonable articulable suspicion gives you the

10   authority to detain.  There aren't different levels of

11   reasonable articulable suspicion:  one for asking additional

12   questions and another one for doing more intrusive searchs.

13   Q.  I don't know that you understood my question.

14       Once there is reasonable suspicion, then you, under the

15   nationally accepted practices as you understand it, there is an

16   ability to detain the motorist; correct?

17   A.  Yes.

18   Q.  And you detain the motorist for the purpose of finding out,

19   do you -- or are there explanations that would or information

20   that would dispel the suspicions, take them away, or

21   information that would further lead to the idea that there is

22   probable cause to take action; isn't that what you do?

23   A.  At that point they can investigate.

24   Q.  Okay.  And the point that you can investigate, the time

25   that you can take to investigate, even if you have reasonable

1  suspicion under these nationally accepted practices, is only so

2  much time as is reasonable; is that correct?

3  A.   It's as long as you need to investigate.

4  Q.   Then your suggestion is, under these nationally accepted

5  practices, that one could be held at the side of the road and

6  could be -- could be required to wait even where there is

7  reasonable suspicion for a day or two for a dog to appear?

8  A.   No, it has to be reasonable and so you can get from

9  reasonable articulable suspicion to probable cause.

10 Q.   So there has to be, in that process, a reasonable duration

11 as well?

12 A.   Yes.

13 Q.   Okay.  Now, you indicated that you are charging for your

14 time, and your hourly rates are, what, $275 per hour; is that

15 right?

16 A.   I believe so.

17 Q.   And that's time that you spend reviewing materials,

18 providing your consultation analysis and writing the report, as

19 well as the testimony that you provided here this afternoon; is

20 that correct?

21 A.   And various calls with -- to case attorneys, all the

22 business associated with this, yes.

23 Q.   It also includes the time that you spent traveling to and

24 being present during this trial; is that correct?

25 A.   I don't charge for travel time.

1    Q.  All right.  So the time you've been present during trial;

2    is that correct?

3    A.  Yes.

4    Q.  And without knowing the exact figures, are you talking

5    about thousands of dollars that you have billed the attorneys

6    in this instance for your work?

7    A.  I don't know the exact amount.  It is in the thousands,

8    yes.

9    Q.  All right.  And providing expert testimony, that's part of

10   your business, Aden Group, LLC, that you started in 2016; is

11   that correct?

12   A.  It is.  It's not a primary part.

13   Q.  Now, in your website when you describe what your -- what

14   your business is, it says Aden Group, LLC specializes in public

15   safety and more broadly criminal justice reforms that focus on

16   community inclusion and empowerment.  Is that what is the

17   description of your -- what your agency does in your website?

18   A.  That sounds accurate to what's on my website, yes.

19   Q.  Now, in your report you also attached a copy of a resume

20   that provided the basic information that counsel went through

21   with you during your examination; is that right?

22   A.  Yes.

23   Q.  There are no reference in your resume to any teaching that

24   you have provided on how to conduct investigatory stops of the

25   character that you've been testifying to today; is that

1   correct?

2   A.  That's correct.

3   Q.  There is no reference in your report of any classes or

4   seminars that you have attended concerning investigatory stops

5   of the character that you mention today -- that we've discussed

6   today?

7   A.  Is that the question?

8   Q.  I don't know.  Probably not.

9       There's nothing in your resume that references any training

10  that you've received in a seminar or a conference on

11  investigatory stops of the character or the type we've been

12  talking about this afternoon?

13  A.  No, there would not be.  That would not be something that I

14  would put on my resume.

15  Q.  You're familiar with the term interdiction, are you not?

16  A.  I am.

17  Q.  And in law enforcement across the country, interdiction is

18  a well-known term that refers -- that talks about basically the

19  investigation that officers will involve themself in trying to

20  stop certain illegal activity; is that correct?

21  A.  Yes.

22  Q.  And interdiction will concern such things as trying to

23  detect and stop human trafficking, gun running, the transfer of

24  explosives as well as drugs and narcotics; isn't that true?

25  A.  Yes.

1  Q.  And the nature of an investigatory stop is part of a

2  interdiction process, is it not?

3  A.  It's -- yes, it is and also other processes, but yes.

4  Q.  And interdiction is recognized as acceptable behavior under

5  these national standards for police practices, is it not?

6  A.  The drug -- or interdiction, yes, but it's still within the

7  parameters of the Constitution and laws.

8  Q.  The nature of a interdiction activity is, in fact, part of

9  law enforcement duties for patrolling officers like the highway

10 patrol officers, isn't it?

11 A.  Yes.

12 Q.  That's part of their job?

13 A.  Yes.

14 Q.  Now, it's possible, under these national practices that

15 you've talked about, to engage in an interdiction, that is stop

16 someone, detain someone, even search the vehicle, and find

17 nothing that is -- that is contraband or illegal; isn't that

18 true?

19 A.  That is absolutely true.

20 Q.  Because the interdiction process contemplates that you're

21 looking for -- based on reasonable suspicion to detain

22 somebody; is that right?

23 A.  Reasonable articulable suspicion.

24 Q.  And even under this national standard that you've -- that

25 you've talked about, that's something different than and much

1    lower than probable cause, isn't it?

2    A.   It's definitely lower.

3    Q.   Do you agree that, in your opinions under these national

4    police standards or practices, that troopers should endeavor to

5    enforce all Kansas laws not just traffic rules?

6    A.   Yes.

7    Q.   Do you agree that under these national practices that

8    troopers, that is with law enforcement, should look for

9    criminal activity being conducted on route -- roads and

10   highways?

11   A.   Yes.

12   Q.   Do you agree that there are good reasons as understood by

13   the national standards and practices that you are testifying

14   about to address drugs, to address the transport of illegal

15   weapons, to address the transport of bombs, and to address the

16   problem with human trafficking?

17   A.   I do.

18   Q.   These standards recognize that there are public safety

19   interests that are promoted by proper interdiction; isn't that

20   correct?

21   A.   That is correct.

22   Q.   Now, you have indicated that there are national police

23   practices for interdiction --

24        Well, let me ask you:  Are there written national police

25   practices for interdiction or investigatory stops?

1    A.   Is that your question, sir?

2    Q.   Yes.

3    A.   Yes, there are.  There's a specific policy on stop searches

4    and arrests that addresses the circumstance of investigatory

5    stops.

6    Q.   And in your report you do not identify a single written

7    national police practice for interdiction that you're relying

8    upon; is that correct?

9    A.   That's correct.

10   Q.   There are organizations that teach or educate on the

11   interdiction process, aren't there?

12   A.   There are many.

13   Q.   Are you a member of the Highway Interdiction Training

14   Specialists?

15   A.   I am not.

16   Q.   Have you ever been?

17   A.   I have never been.

18   Q.   Are you a member of the International Narcotics

19   Interdiction Association?

20   A.   I am not.

21   Q.   Have you ever been?

22   A.   I have never been.

23   Q.   Have you been to any national interdiction conference

24   coordinated and energized by Desert Snow Training Program and

25   the National Criminal Enforcement Association?

1    A.   I have not.

2    Q.   Have you attended any state and local drug interdiction

3    assistance programs on -- on how to conduct interdictions?

4         Let me give you examples.  For instance, the Drug

5    Interdiction Assistance Program, the DAIA, have you attended

6    that?

7    A.   No, but I've been formally trained through the Drug

8    Enforcement Administration as I testified to earlier.

9    Q.   And have you attended the El Paso Intelligence Center, the

10   EPIC programs on drug interdiction?

11   A.   No, I have not.

12   Q.   The Domestic Highway Enforcement, the DHE program on drug

13   interdiction?

14   A.   No, I have not.

15   Q.   The Homeland Security Investigations programs on

16   interdiction?

17   A.   I have not.

18   Q.   The National Bulk Cash Smuggling Centers Programs on

19   Interdiction?

20   A.   No, I have not.

21   Q.   You did work with the DEA for a while.  Did you attend any

22   particular instruction on interdiction with the DEA?

23   A.   I don't recall if it was particular -- particularly to

24   interdiction, but it was extensive investigative training.

25   Q.   And I am certain that you don't have any local training on

1    interdiction that was given in Kansas, whether it's through the

2    criminal interdiction patrol tactics or Kansas enforcement

3    training center; is that correct?

4    A.   No, sir.  I've only been to Kansas a handful of times.

5    Q.   In your resume you don't indicate any training that you

6    received on interdiction or investigatory stops; is that

7    correct?

8    A.   I don't include any training at all.

9    Q.   And in your website for your business, Aden Group, LLC, you

10   don't identify interdiction or traffic stops as areas of

11   specialty; is that correct?

12   A.   That is correct.

13   Q.   Well, let's -- I don't want to belabor the point, so I'll

14   move on real quickly.  But you've been -- I think indicated in

15   Kansas just a few times; is that right?

16   A.   That's right.

17   Q.   Not been to Hays?

18   A.   Never.

19   Q.   Never been to Ellis?

20   A.   Never.

21   Q.   I think when we last visited you thought maybe you were on

22   I-70 coming from the airport to get to the courthouse, but

23   other than that that's the only time you were on I-70; is that

24   right?

25   A.   I do recall that comment.  I think that's probably correct.

1    Although, now I might have been on I-70 again this week.

2    Q.   At Alexandria -- Alexandria, Virginia, you were last

3    employed as a deputy chief; is that correct?

4    A.   Yes, sir.

5    Q.   And that retirement was in 2012 or about 10 years ago now?

6    A.   Yes.

7    Q.   And Alexandria's a town the size of 160,000 people

8    approximately; is that right?

9    A.   It's a city of 160,000, yes.

10   Q.   And south of Washington, D.C.; is that right?

11   A.   Yes.

12   Q.   Do you know of a similar sized city in Kansas 160,000

13   people?

14   A.   I don't.

15   Q.   In that particular city there's an interstate for a few

16   miles.  What is that interstate that kind of is around or in

17   Alexandria?

18   A.   There are several actually.  It's 395, 495, and 95.

19   Q.   And looking at the map, the 395 is what?  To the north of

20   Alexandria, is that right, west -- maybe through West

21   Alexandria?

22   A.   Yes.

23   Q.   Is West Alexandria City a different city than Alexandria?

24   A.   No, same city.

25   Q.   And the -- 95 is kind of a southern road; is that correct?

1    A.   Yes.

2    Q.   About what number of miles actually on those roads

3    intersect Alexandria?

4    A.   I don't actually know that.

5    Q.   Would you agree that it's probably about only 6 or 7 miles?

6    A.   Maybe slightly more but not much more than that.

7    Q.   And Alexandria itself has a square mileage of -- the whole

8    city together is, what, about 20 square miles; is that correct?

9    A.   That's correct.

10   Q.   You left Alexandria in 2012 and then you became the former

11   -- well, became the police chief of Greensville (sic) police

12   department in Greensville, North Carolina; is that correct?

13   A.   That is not correct.

14   Q.   You became the Greensville police department in

15   Greensville, North Carolina chief of police, didn't you?

16   A.   I was the chief of police in Greenville, North Carolina.

17   Q.   Okay.  I added an "s."  Thank you.

18        And you were in that position for about two years; is that

19   right?

20   A.   Three years.

21   Q.   Three years.

22        You started November of 2012; is that right?

23   A.   Yes.

24   Q.   Concluded January of 2015?

25   A.   Yes.

1    Q.   My math's not perfect but that's closer to two years than

2    three; isn't that right?

3    A.   Yes.

4    Q.   You were last a law enforcement officer than -- than 2015;

5    is that correct?

6    A.   Yes.

7    Q.   And the size of the Greenville, North Carolina is what,

8    about 89,000 people; is that correct?

9    A.   Yes, it grows with the -- when school is in session.  East

10   Carolina University is there; brings in about 40,000

11   additional.

12   Q.   There are about 35 square miles involved in that city; is

13   that right?

14   A.   Yes.

15   Q.   Do you know a similar-sized city in Kansas?

16   A.   I do not.

17   Q.   There is an interstate highway to the west on I -- that's

18   I-587; is that correct?

19   A.   64.  I don't know 587 as an interstate.

20   Q.   Is 64 the same as Alternate 64?

21   A.   Yes.

22   Q.   In any event, would you agree that the length of miles of

23   interstate that's actually transversed through Greensville

24   police are about 7 or 8 miles?

25   A.   Probably right.

1   Q.   Now, the State of Virginia has a Virginia State Police
2   Department; is that correct?
3   A.   They do.
4   Q.   And it is the Virginia State Police Department's primary
5   jurisdiction to patrol and police the interstates that we've
6   talked about both as to Alexandria and Greenville; isn't that
7   correct?
8   A.   Greenville would be the North Carolina Highway Patrol, but
9   in Alexandria --
10  Q.   Oh, you're right.  You're right.  I'm sorry.
11  A.   In Alexandria, our highways, the primary responding agency
12  was state police.  And when they were not available, we were
13  called to respond.
14  Q.   Okay.  But you're not -- your police department in Virginia
15  was not out patrolling those interstate highway miles; is that
16  correct?
17  A.   That is correct, we had our own issues to deal with.
18  Q.   Because I've got the two states lumped together, the same
19  is true in North Carolina, that is your police department was
20  not out patrolling the interstate highways in that
21  jurisdiction?
22  A.   Correct.
23  Q.   It's accurate that the last time that you were on patrol as
24  a law enforcement officer was probably in 1990; isn't that
25  correct?

1    A.   No.

2    Q.   When was the last time?

3    A.   2001 I was a patrol sergeant.  So I was on -- my

4    responsibilities were on the street to supervise patrol

5    officers.

6    Q.   You were on the streets.  But in terms of being the

7    patrolling officer conducting stops, the last time would have

8    been in 1990; is that correct?

9    A.   As a patrol officer, yes.  I did conduct traffic stops as a

10   sergeant and backed officers up as a sergeant.

11   Q.   And the last time that you would have performed an

12   interdiction would have been maybe in 1990 or maybe in 1992; is

13   that correct?

14   A.   That's correct.

15   Q.   So that would have been between 31 and 33 years ago; is

16   that right?

17   A.   Not very good with math, but it sounds right.

18   Q.   I am not certain, have you ever had a traffic stop where

19   you performed interdiction and seized property for forfeiture?

20   A.   Yes.

21   Q.   When was the last time you've done that?

22   A.   Probably in the early '90s.

23   Q.   In the early '90s when you last did interdiction or

24   forfeiture, do you remember the status of what cell phones were

25   like?

1    A.   I'm sorry?

2    Q.   Do you remember the Razor cell phone --

3    A.   I do.

4    Q.   -- the flip phone?

5         Do you remember that back in the early '90s that that's

6    what we had available to us, not the sort of --

7              MS. BRETT:  Objection.

8    BY MR. CHALMERS:

9    Q.   -- portable computers that we have today?

10             MS. BRETT:  Relevance.

11             THE COURT:  What is the relevance, counsel?

12             MR. CHALMERS:  Well, he's testifying as to reasonable

13   suspicions that troopers should have in 2019, some of which

14   relate to technology, and I'm establishing that his personal

15   experience on that is dated.

16             THE COURT:  Go ahead.

17             THE WITNESS:  Can you ask --

18   BY MR. CHALMERS:

19   Q.   I think you probably don't remember the question, do you?

20   A.   No.

21   Q.   Well, the status of the cell phones in the early 1990s,

22   when you last were involved in interdiction and forfeiture, are

23   much different than they are today?

24   A.   Yes.

25   Q.   The kind of the portable computers that we have today were

1  not available back then; isn't that right?

2  A.  That is correct.

3  Q.  The ability to keep -- take videotapes was not available

4  back then?

5          THE COURT:  Okay.  We can list every item of

6  technology that's changed, but I think you've made your point.

7  Shall we move on?

8          MR. CHALMERS:  I'll move on, yes, Your Honor.

9  BY MR. CHALMERS:

10  Q.  The status of portable surveillance -- surveillance

11  cameras?

12          THE COURT:  I thought we were -- I thought we were

13  moving on.

14          MR. CHALMERS:  I think it's important that we talk

15  about cameras, because he's expressed opinions as to whether or

16  not in this instance cameras are something that should be

17  considered part in the reasonable suspicion analysis, Your

18  Honor.

19          THE COURT:  Okay.  Go ahead.

20  BY MR. CHALMERS:

21  Q.  The status of portable surveillance cameras for vehicles in

22  1980s -- or 1990s, do you know if they were even available?

23  A.  I don't recall, but I doubt it.

24  Q.  So at least when you were doing your work, you didn't have

25  the personal experience of trying to evaluate whether or not a

1   surveillance camera mounted in a vehicle led to suspicions or

2   not; isn't that right?

3   A.   That's correct.

4   Q.   And you were last called for a narcotic canine -- or you

5   personally last called for a canine sniff to detain a motorist

6   vehicle about when?

7   A.   Somewhere in the early '90s.

8   Q.   Maybe 1992?

9   A.   Somewhere in the early '90s.  I really can't recall beyond

10  that.

11  Q.   You've not been to the Love's shop in Ellis; is that right?

12  A.   No, sir.

13  Q.   And you've never been a law enforcement officer in Kansas;

14  is that correct?

15  A.   That is correct.

16  Q.   Are there any detailed or granular written national police

17  practices that spell out specific indicators or factors in the

18  reasonable suspicion analysis?

19  A.   Not that I know of.

20  Q.   And certainly you didn't identify any in your report; is

21  that correct?

22  A.   I did not.

23  Q.   But rather you said these national standards police

24  practices -- for police practices are primarily based on case

25  law; is that right?

1  A.  They're -- they have a component that's --

2          MS. BRETT:  Objection, Your Honor, this has been asked

3  and answered a number of times now.

4          THE COURT:  Sustained.

5          MR. CHALMERS:  I think maybe -- well...

6  BY MR. CHALMERS:

7  Q.  Now, you agree that the -- when you talk about your

8  assessment of what is a national accepted police practice, that

9  is based in part on your reading of case law; is that correct?

10         MS. BRETT:  Objection.  Asked and answered.

11         THE COURT:  Sustained.

12 BY MR. CHALMERS:

13 Q.  Under these nationally accepted police practices, you agree

14 that even innocent activities can appear suspicious to a

15 trooper with special experience and training; is that correct?

16         MS. BRETT:  Objection, Your Honor.  Can we approach on

17 this?

18         THE COURT:  Yes.

19    (The following proceedings were had at the bench.)

20         MS. BRETT:  I believe at this point what Mr. Chalmers

21 is asking and what he is going to continue to ask is read case

22 law into the record and ask Chief Aden if he agrees with that

23 statement or if that statement from case law is consistent with

24 nationally accepted police practices.  During the previous

25 trial you specifically said he was not allowed to do that as we

1   are not allowed to read case law to him in our direct

2   examination.  So I would ask those questions be avoided.

3           MR. CHALMERS:  I don't plan on reading case law to him

4   at all.  I'm trying to get a handle on what he claims are

5   nationally accepted police practices, which I think is more

6   than his understanding of what the law is, and I don't think

7   it's part of the testimony.  I ought to be able to at least

8   find out if, under his standards that he's trying to apply,

9   innocent activities appear suspicious a trooper can still

10  produce reasonable suspicion based on their special experience

11  and training.

12          THE COURT:  Okay.  That question I'll let you ask, but

13  I know where we're headed with this.  And the last time you got

14  up and took random platitudes out of different cases that you

15  were basically using to have him parrot your legal theories of

16  the case, and that's what we're not going to do.

17          MR. CHALMERS:  I don't plan on doing that.  Not in my

18  outline, Your Honor.

19          THE COURT:  Okay.

20          MS. BRETT:  Thank you, Your Honor.

21     (Thereupon, the proceedings continued in open court.)

22          MR. CHALMERS:  All settled?

23  BY MR. CHALMERS:

24  Q.  The question I was asking:  Would you agree, under these

25  nationally accepted police practices, that even innocent

1    activities can appear suspicious to a trooper with special

2    experience and training?

3    A.   I think what I stated was that when they're evaluating the

4    factors, they have to evaluate innocent factors and weigh them

5    and consider them in building their reasonable articulable

6    suspicion.

7    Q.   I don't know that you and I are communicating.  These

8    innocent factors or these factors that they look at in building

9    their reasonable suspicion, they can actually be innocent

10   activities but still appear suspicious to the trooper based on

11   the trooper's special experience and training under your

12   understanding of the nationally accepted police practices;

13   isn't that a true statement?

14   A.   If they are articulated they could be.

15   Q.   If -- these national police practices that you're talking

16   about, are they aspirational?

17   A.   No.

18   Q.   Is your view of how law enforcement across the country

19   performs its job; is that what your testimony is?

20   A.   No, it's their -- they're guidelines for modern policing

21   and constitutional policing.

22   Q.   Kind of best practices?

23   A.   They're nationally accepted practices that -- we don't

24   refer to them as best practices.

25   Q.   And these practices, are they uniformly applied by law

1   enforcement across the country based on your understanding?

2   A.   They are not.  They're available to and they're guidelines

3   for agencies that want to operate constitutionally.

4   Q.   So let me ask you a few questions about your specific

5   opinions.

6          MR. CHALMERS:  I think I'm missing part of my outline.

7   BY MR. CHALMERS:

8   Q.   You now indicated, if I understood correctly, that your

9   opinion concerning the trooper's suspicions at the Love's store

10  was premised on the fact that he didn't smell marijuana that he

11  could attribute to Mr. Bosire; is that correct?

12  A.   That he smelled marijuana in the air and it was not

13  attributable to Mr. Bosire, yes.

14  Q.   The Love's convenience store, you haven't been there, but

15  it's not a particularly large store, is it?

16  A.   Never been there.

17  Q.   Okay.  It's in Ellis, Kansas, and you understand that to be

18  a small community, don't you?

19          MS. BRETT:  Objection.  Lack of foundation.

20          THE COURT:  Sustained.

21  BY MR. CHALMERS:

22  Q.   When you testified concerning the smell being in -- or not

23  being attributed to Mr. Bosire, you would agree that a smell of

24  marijuana, particularly marijuana that hadn't been burned, in a

25  rural convenience store might cause troopers to evaluate and

1   assess what transportation -- or what vehicles were

2   transporting the drugs, wouldn't you?

3   A.   The way that I would respond to that would be if a trooper

4   smells marijuana, they would need to determine where that

5   marijuana came from and attribute it to that source.  I think

6   that's what you're asking.  Your question is a little bit

7   unclear, sir.

8   Q.   No, I think what I'm asking is, in a small rural

9   environment with few people in the store and few vehicles

10  around it, whether a trooper could wonder and be suspicious of

11  particular vehicles transporting the marijuana?

12          MS. BRETT:  Objection.  Now it calls for speculation.

13          THE COURT:  And that's a different question than you

14  actually did ask.

15          But if you can answer that question without

16  speculating, go ahead.

17          THE WITNESS:  Could you ask that again, sir?

18          MR. CHALMERS:  I hate to do it; would you read it

19  back?

20      (Requested question read back by the reporter.)

21          THE WITNESS:  Yes.

22  BY MR. CHALMERS:

23  Q.   You talked about cameras in 2019 being I think you said

24  ubiquitous.  I think I interpret that to mean they're

25  everywhere; is that what you're saying?

1    A.   They're quite common.

2    Q.   In terms of out in rural Kansas on I-70, do you have some

3    -- some statical analysis or analysis as to how common it is to

4    have cameras mounted in rental vehicles?

5    A.   I do not.

6    Q.   And you wouldn't be able to dispute then that that really,

7    frankly, is an uncommon occurrence, would you?

8         MS. BRETT:   Your Honor, that's calling for speculation

9    as well.

10        THE COURT:   Again, I think he's answered this he

11   doesn't know.

12   BY MR. CHALMERS:

13   Q.   And you answered standing alone cameras, that wouldn't give

14   rise to suspicion having been in a vehicle; is that what your

15   testimony would be?

16   A.   I believe so.

17   Q.   Okay.  But combined with other circumstances, the presence

18   of surveillance cameras in a vehicle could make a trooper

19   suspicious under the national standard practices that you

20   described; isn't that true?

21   A.   I don't know what those circumstances would be.

22   Q.   Then the rental car you -- I think you testified that just

23   a two-day rental is -- is not suspicious in and of itself of a

24   rental car; is that right?

25   A.   That's correct.

Q.   There are circumstances under which, however, a rental car
might be a suspicious feature in the totality of the
circumstances under the national practices you talked about;
isn't that true?

A.   There could be, and I described one such circumstance.

Q.   And caravanning, was that even something that was in your
experience going on back in Virginia or -- or in
North Carolina?

A.   Yes.

Q.   So the prospect of two vehicles or more getting together to
try to -- one acting in a way to try to deflect attention so
that the other vehicle with the drugs could travel on was a
known scenario in your -- your neck of the woods; is that
correct?

A.   That's correct.

         MS. BRETT:  Your Honor, can we approach for a moment?

         THE COURT:  Uh-huh.

   (The following proceedings were had at the bench.)

         MS. BRETT:  I'm just wondering if we can get a sense
of how much time is left in the cross-examination.  We had
represented earlier Chief Aden does have a flight early in the
morning.  This does appear it's being drawn out quite a bit
with just a repetition of the exact same things that were asked
about on direct examination without any difference of
questioning being asked and done so in a very deliberately slow

1    manner.  The -- the witness would have liked to have been off

2    the stand today.

3              THE COURT:  What time is his flight?

4              MS. BRETT:  7:30 in the morning.

5              Or is it possible to stay a little bit later today so

6    we can conclude a very quick redirect?

7              MR. CHALMERS:  I don't know that I have that much

8    more, and I do have more.  I don't know why I should have to be

9    fenced in on cross.

10             THE COURT:  Well, I won't keep the jury here.  They

11   are not very interested in this.  If you look at them, I don't

12   know if you're reading their body language or their vacant

13   stares, but I get the sense that they believe we should be

14   moving this along a lot faster.

15             MR. CHALMERS:  Okay.

16             THE COURT:  And so if we stay, it's going to be, you

17   know, kind of on you to make it worth their time.

18             MR. CHALMERS:  Okay.

19             THE COURT:  Okay.

20             MS. BRETT:  Thank you, Your Honor.

21        (Thereupon, the proceedings continued in open court.)

22             THE COURT:  So, members of the jury, I hate to be the

23   bearer of bad news, but this is not -- this is going a lot

24   slower than we expected.  And I had told you we would be done

25   at 5:00, but this gentleman has a flight at seven o'clock in

1    the morning and he needs to be on his way to the airport 4:00

2    or 5:00 or something.  So unless you want to come in really

3    early tomorrow to let him finish, I think we should let him

4    finish today.  So we're going to push a little bit past 5:00

5    and see if we can wrap this up and let him get back home.  I'm

6    sorry, I know I said 5:00.

7            JUROR NO. 1:  Is a short break possible?

8            THE COURT:  Yes, that would be fine.

9            JUROR NO. 1:  Sure.

10           THE COURT:  Let's take a 10-minute recess and we'll be

11   back at five after -- then after 5:00.

12       (Recess.)

13       (The jury entered the courtroom, after which the following

14   proceedings were had.)

15   BY MR. CHALMERS:

16   Q.  Mr. Aden, I'll try real quick.  Didn't you agree, during

17   this typical traffic stop you described in your direct

18   examination, that under nationally accepted practices it is

19   acceptable for a trooper to ask about travel plans?

20   A.  I think you can ask whatever questions you want to ask.

21   Q.  You can multitask just as long as you don't extend the

22   traffic stop doing the other aspects of the traffic stop; is

23   that right?

24   A.  In -- in a traffic stop, the primary mission is to conduct

25   the business of the traffic stop and then release the driver.

1   You can ask questions and you can engage in conversation until

2   the person stop -- no longer wishes to do so.

3   Q.   Now, let me -- rather than going through each one of your

4   opinions and specifics, is it fair to say that in your report

5   that you don't reference a study, whether it's scientific or

6   not, any literature, and you don't specify any specific

7   experience that is the basis for your ultimate opinions that

8   evasive answers, that the cameras in the vehicle in this stop,

9   that the rental with cameras in the vehicle, the partially

10  covered book all from a vehicle coming from a rural area

11  convenience store where marijuana had been smelled don't add to

12  suspicions to become reasonable suspicion?

13  A.   Not specifically.  There is a reference to the police --

14  police executive research forums sort of guiding policy on

15  canine use and documenting canine use.

16  Q.   And canine use, this has to be documenting when canines are

17  used -- actually, whether there's a use of force by canines;

18  isn't that true?

19  A.   Yes.

20  Q.   Now, as to national standards, national practices that you

21  talked about apparently not all law enforcement follows, how

22  would Trooper McMillan know what those standards and practices

23  are if they're not in writing somewhere or published somewhere?

24  A.   Many of them are widely available and a lot of organization

25  -- police organizations use them to draft their own policies.

1    Q.  But -- maybe I misunderstood, but your previous testimony

2    was that there is no written documentation at a granular level

3    that will identify this under the facts like this case is not

4    sufficient reasonable suspicion; isn't that correct?

5    A.  That's correct.

6    Q.  So there's nothing in writing that these institutions have,

7    although you've not referenced them, that Mr. McMillan could

8    look at and say, oh, I'm violating national practices that

9    apparently not everybody follows?

10   A.  At the granular level, no.

11   Q.  And just a couple housekeeping matters, in your report you

12   indicate that -- that the detention was for 36 minutes, that is

13   the time that the detention started until the dog arrived.

14   That's wrong, isn't it?  In fact, it was about 28 minutes.

15          MS. BRETT:  Objection, Your Honor.  Your Honor,

16   improper impeachment.  I don't know exactly what he's

17   referencing from the report and hasn't laid a foundation.

18          THE COURT:  Why don't you be more specific in your

19   question.

20          MR. CHALMERS:  Sure.

21   BY MR. CHALMERS:

22   Q.  In your report you expressed an opinion as to the duration

23   of the detention and the amount of time that Mr. Bosire was out

24   of the car.  Do you have a copy of the report?

25   A.  I don't.

```
 1    Q.   I could show you.

 2         MS. BRETT:  It's been marked as an exhibit, Your

 3    Honor.  So it should be in front of you in that giant exhibit

 4    book, Chief Aden --

 5         THE WITNESS:  Oh.

 6         MS. BRETT:  -- at 56.

 7         THE WITNESS:  This is Trooper McMillan -- got it.

 8    BY MR. CHALMERS:

 9    Q.   And you can check, but I was thinking maybe you would know.

10    In your report you said that the duration of the stop was

11    36 minutes; isn't that right?

12    A.   I'm getting to it.  What page?

13    Q.   I think it's at page 9.  I could be wrong.

14    A.   Yes.

15    Q.   And you said that the time out of the vehicle was

16    7 minutes, is that right, while the dog was running before

17    Mr. Bosire was told he could leave?

18    A.   Yes, until he was released.

19    Q.   And these are things that you wanted the parties and the

20    court to rely on in terms of what those durations were.  That's

21    why you put it in your report; is that correct?

22    A.   That's correct.

23    Q.   But isn't it true that 36 minutes was really about

24    28 minutes?

25    A.   I went off the video itself and timestamps on the video
```

1    that I reviewed.

2    Q.  And you would have to compare the time stamps between,

3    what, 41:53 and 14:01, wouldn't you?

4    A.  I don't recall.

5    Q.  And then you say it was 7 minutes and actually it was -- if

6    you compare the timestamps it was about 4 minutes, 41:53?

7            THE COURT:  Counsel, are you testifying?  Where is

8    this coming from?

9            MR. CHALMERS:  It's coming from the camera, Your

10   Honor.

11           THE COURT:  Let's put it up and be fair to the witness

12   if you're going to -- if you're going to do this.

13           MR. CHALMERS:  You know, for the purposes of my

14   question, I just want to know whether or not he agrees that

15   it's 3 minutes and 56 seconds.  I mean, the jury --

16           THE COURT:  He said he didn't --

17           MR. CHALMERS:  -- the jury can --

18           THE COURT:  -- he said he did not recall.

19   BY MR. CHALMERS:

20   Q.  My question ultimately I was getting to is if those times

21   are wrong, that if you have exaggerated the amount of the

22   car --

23           THE COURT:  Excuse me, but if you can't lay a better

24   foundation that those are wrong, it's not fair to this witness.

25   So --

           1    MR. CHALMERS:  I was hoping not to have to but I --

           2    THE COURT:  Well, I was hoping not to have to do it

           3  either, but if you're going to ask those questions then you

           4  need to be fair to him and show him the video so that he can

           5  decide if the times are wrong.

           6    MR. CHALMERS:  Make sure this isn't up because they're

           7  not supposed to be seeing that.  So I've got up on the screen I

           8  hope -- okay, there it is -- what is Plaintiff's Exhibit 8,

           9  Your Honor.

          10  BY MR. CHALMERS:

          11  Q.  And you'll see down at the bottom of it it has a time

          12  46:28.  Bottom right, can you make that out?

          13  A.  I'm having trouble seeing that.  It looks like 46.  I can't

          14  see the what seconds are.

          15  Q.  That's what it is, about 46.  So let's go to --

          16    (Exhibit playing.)

          17    To be fair, so it's at about 44:45 when they're telling him

          18  he can go ahead and leave.  So at that point the dog has

          19  already -- has already gone through, not alerted; is that

          20  right?

          21    MS. BRETT:  Your Honor, I'm going to object here

          22  again.  I think there's a lack of foundation.  He's not made

          23  any record of when he's starting the record or he -- what point

          24  in time he's asking Chief Aden's -- whether Chief Aden's prior

          25  statement was inconsistent with -- we're sort of just jumping

1    around in the video here and I'm not sure what we're getting

2    at.

3            MR. CHALMERS:  Your Honor, I'm trying to show the time

4    differences that you would calculate.

5            THE COURT:  Okay.  Well, you haven't -- you haven't

6    established a starting point, so --

7            MR. CHALMERS:  Start first as opposed to the end and

8    subtract.

9            THE COURT:  I don't know what events you're trying to

10   bookend and the times you're using to bookend them, so this is

11   very confusing to me.

12   BY MR. CHALMERS:

13   Q.  I tell you what, I really don't want to keep us much longer

14   here, so let me see if I can't get it this way.  Let's talk

15   about what we would see on the video that would describe the

16   timestamp for when the detention begins and then the timestamp

17   for when the detention ended.  The detention began when I think

18   in your --

19           MS. BRETT:  Objection, Your Honor, he's testifying

20   now.  And you have asked him if he would like to impeach the

21   witness that he needs to put evidence in front of him with

22   which to impeach him.  That -- also this -- this exhibit is in

23   evidence.  The jury can watch it for themselves at what time

24   different things happened and what time stamp's on the video.

25           THE COURT:  I agree and I don't think it's appropriate

1   for you to tell the jury when the detention began.

2           MR. CHALMERS:  I'm trying to get him to say, when the

3   jury looks at the video, what would be the beginning detention

4   point, Your Honor, and then as he's calculated it and then what

5   would be --

6           THE COURT:  Why don't you just ask him --

7           MR. CHALMERS:  I was.  I'm sorry, I interrupted.  I

8   apologize.

9           THE COURT:  Ask him if -- his opinion when the

10  detention started.

11  BY MR. CHALMERS:

12  Q.  Looking at the video, what would we see, in your opinion,

13  when the detention started?

14  A.  In looking over my report, Mr. Bosire was detained for

15  36 minutes.  I watched the video from the time he was stopped

16  until the time that canine arrived.  The detention --

17  reasonable articulable suspicion detention began when Trooper

18  McMillan went back up to the vehicle the second encounter and

19  did not end the business of the traffic stop and continued with

20  his questioning.

21  Q.  And you -- so we've got the two base points in which we'll

22  be able to look on the video and then say this was the

23  duration.  Which is what you say you did; is that right?

24  A.  Yes.

25  Q.  And then the 7 minutes that we talk about, additional

1    minutes when he was out of the vehicle while the -- while the

2    pat-down and the canine search is going on without alerted --

3    that ended with the unalerted, the unlawful detention, in your

4    view, that you say was 7 minutes; is that right?

5    A.   Until he left -- until he left the stop.

6    Q.   Oh, you're saying --

7    A.   The stop was --

8    Q.   -- until he left as opposed to when he had -- he was told

9    he could leave?

10   A.   Yes.

11   Q.   Right.

12        So the actual time period in which he was outside before he

13   was told he could leave would have been, by your recollection,

14   less than the 7 minutes that you say in your report; is that

15   right?

16        MS. BRETT:  Objection, Your Honor.  Counsel's

17   testifying again.

18        MR. CHALMERS:  It's cross-examination.  Asking him

19   "correct."

20        THE COURT:  You can answer.

21        THE WITNESS:  Can you ask that again, sir?

22   BY MR. CHALMERS:

23   Q.   What you're saying, when you put seven additional minutes

24   down he's out of the vehicle, you're talking about the time

25   period that included after he was told he could leave; right?

1    A.   Yes.

2    Q.   And when you say Mr. Bosire was detained for 36 minutes

3    until the canine arrived, at page 9 of your report you're

4    saying that 36 minutes was not the time he was detained but

5    rather included from the time the stop began?

6    A.   Yes.

7    Q.   And yet the report says it's the 36 minutes from which he's

8    detained; isn't that right?

9    A.   It uses the term detained.  It does not reference the

10   actual detention based on the reasonable articulable suspicion.

11   Q.   And the report also uses 7 minutes that -- as the stopping

12   point, both of which the 36 minutes and the 7 minutes tend to

13   extend -- tend to exaggerate the time he's both (A) stopped

14   from detention and (B) the time that he's out of his vehicle

15   until he's told to leave; isn't that correct?

16   A.   Those were my calculations at the time that I reviewed the

17   video.

18            MR. CHALMERS:  I don't have anything else.  Thank you.

19            THE COURT:  Any redirect?

20            MS. BRETT:  Yes.

21                      REDIRECT EXAMINATION

22   BY MS. BRETT:

23   Q.   Just a few questions for you, chief.  Do you recall

24   speaking with me on your direct examination about your work as

25   a monitor for federal courts; is that correct?

1   A.   Yes.

2   Q.   Do the agencies that you monitor for federal courts do

3   interdiction work?

4   A.   Yes, they do.

5   Q.   Have you had occasion, as part of your monitoring work, to

6   review the stops and detentions that those agencies conduct?

7   A.   Yes.

8   Q.   How recently have you been involved in reviewing those

9   stops and detentions?

10  A.   The last few weeks.

11  Q.   And that includes interdiction related stops and

12  detentions?

13  A.   Correct.  It could be narcotics stops.  There -- they run

14  the gambit.

15  Q.   And I believe Mr. Chalmers had some questions for you about

16  highways that run through Alexandria.  Do you recall that?

17  A.   Yes.

18  Q.   And highways that run through Greenville as well.  Do you

19  recall that?

20  A.   Yes, I do.

21  Q.   Are -- was there -- at the time that you were serving as

22  chief of police or deputy chief of police in those agencies,

23  was there drug trafficking happening on those highways?

24  A.   Yes.

25  Q.   Did your agency do interdiction work on those highways?

1    A.   Occasionally.

2    Q.   Did you work with other law enforcement agencies to do

3    interdiction work on those highways?

4    A.   Yes, we did.

5    Q.   County law enforcement?

6    A.   County, city, state and federal.

7    Q.   And that would include state highway patrol in those

8    agencies?

9    A.   Yes, they were part of our task forces.

10   Q.   Were all of those agencies following the same nationally

11   accepted police practices that you discussed in your testimony?

12   A.   Yes.

13   Q.   What are the differences between the nationally accepted

14   police practices for highway interdiction and nationally

15   accepted police practices for conducting any other sort of

16   roadside detention?

17   A.   There are no differences.

18   Q.   Do you recall Mr. Chalmers asking you a number of questions

19   about the last time that you were involved in patrol level

20   work?

21   A.   Yes.

22   Q.   At what point did you stop your education on appropriate

23   standards for conducting detentions?

24   A.   Continues today.

25   Q.   And how do you apply that knowledge to the evaluations that

1   you are conducting today of stops and detentions that occur

2   recently?

3   A.   It -- I mean, it's evolving and those practices evolve, and

4   that's how I apply it.

5   Q.   The evaluations that you -- the evaluation that you did of

6   the stop and detention in this case, did you apply knowledge

7   from back when you were a street level narcotics officer in the

8   '90s?

9   A.   No.

10       MR. CHALMERS:  She's leading, Your Honor.

11  BY MS. BRETT:

12  Q.   What knowledge were you applying to your evaluation of the

13  stop that you evaluated for your opinion in this case?

14  A.   My knowledge of modern and current national policing --

15  nationally accepted policing practices.

16       MS. BRETT:  Okay.  Nothing further, Your Honor.

17       MR. CHALMERS:  I only have about 20 more minutes.  No,

18  nothing more.

19       THE COURT:  I'm sorry, was that a joke?

20       MR. CHALMERS:  It tried to be.

21       THE COURT:  I couldn't hear you, so I don't know if it

22  was.  Probably or not.

23       MR. CHALMERS:  Probably.  I shouldn't repeat it.

24       THE COURT:  Does that mean no more questions?

25       MR. CHALMERS:  No more questions, Your Honor.

1          THE COURT:  I'm sorry.  All right.  Sir, you're

2    excused.

3          THE WITNESS:  Thank you.

4          THE COURT:  And I hope you have a safe flight home.

5          THE WITNESS:  Thank you, Your Honor.

6          THE COURT:  Enjoy the new airport.

7          Members of the jury, tomorrow we will start at

8    9:00 a.m. and go until 4:00.  I think we just have one witness

9    left, is that right, Trooper Schulte?

10          MS. BRETT:  That's correct, Your Honor.

11          THE COURT:  So I expect that some time tomorrow we

12   will get the case in your hands for you to begin your

13   deliberations.  And I have a few things I need to talk about

14   with the attorneys, so I'm going to excuse you and all of you.

15   Remember my instructions I've given you before about keeping an

16   open mind, don't discuss the case.  Be here ready to go at

17   nine o'clock and have a nice evening.  You're excused.

18      (The jury left the courtroom, after which the following

19   proceedings were had.)

20          THE COURT:  All right.  Please be seated.  Just a

21   couple quick questions.  First of all, I need to get an

22   estimate of trial time for next week.  What do you think?

23          MR. MCINERNEY:  Judge, likely the full week next week.

24          THE COURT:  Tell me what witnesses and so forth.

25          MR. MCINERNEY:  I can give you a list of witnesses.

1          MS. BRETT:  I think the plaintiffs have 16 or 17 on

2     their witness list.  Some of those are videotape depositions

3     that we have designated that we would like to play as part of

4     the testimony, and then I can let defendant speak for himself,

5     but we -- we have 16 or 17 witnesses on our list.

6          THE COURT:  Okay.  What about you?

7          MR. CHALMERS:  There's -- there's quite a bit of

8     overlap.  I think that there probably that I can think of are

9     maybe three witnesses that aren't on plaintiffs' list that I

10    might call.  There's a question as to whether one officer will

11    have to come in and testify that has to do with cross

12    designations of depositions.  I suppose there's questions as to

13    how you want to present the presentation of the deposition

14    testimony itself.  But the plaintiff has not shared with me the

15    order of their witnesses.  I don't know when I'm supposed to

16    produce people.  At this point I'm trying to guess.

17         THE COURT:  So, in fair disclosure, we've been looking

18    real hard at the issues about the injunctive relief that we

19    talked about at our status conference earlier this -- or later

20    this -- earlier this winter, and, you know, I'm coming back to

21    the same point of -- that I originally expressed.  I have grave

22    doubts about the feasibility of the relief that you're seeking,

23    and I've thought it might be appropriate to enter an order to

24    that effect and decided to go ahead and let you put on your

25    case and see if that changed anything.  I don't think it will.

1          But, I mean, I'm wondering if, in the interest of

2    economy and so forth, you would consider making just a offer of

3    proof of some kind.  It might be more work than calling the

4    witnesses at this point, but I hate to put you through a

5    week-long trial if I think at the end of the day you won't be

6    getting the equitable relief which you're seeking.

7          MR. MCINERNEY:  Well, we hadn't considered a long

8    offer of proof, judge.  We considered presenting evidence to

9    the court through witnesses and -- and exhibits.  Kind of don't

10   know how to respond to what you're saying.  And I -- I think I

11   understand the direction that you're hinting at, but I'm not

12   sure I understand how -- or know how to respond to it.

13         I think our position standing here today is that we

14   would very much prefer to present the evidence to you that we

15   have prepared in support of the injunctive relief that trial

16   three is about.

17         To the extent that it's a -- it's a time and labor

18   concern, I do think there -- obviously there's more.  There's

19   -- as -- as Ms. Brett said, there's 16 or 17 witnesses.  I do

20   think it will be, you know, somewhat more streamlined without a

21   jury.  But, you know, we're kind of in the position of really

22   needing to present to you what we believe supports the

23   injunctive relief, and I don't know if there's a -- there's a

24   terribly convenient way around that.

25         THE COURT:  I mean, I don't begrudge you the time that

1    it will take.  I think this is very interesting and it's

2    important.  I'm just saying from your standpoint I don't want

3    you to feel like I'm leading you down a path that's just going

4    to be wasteful knowing in advance, you know, that I'm not going

5    to enter the order that -- that you've requested in the

6    pretrial order.

7           MR. MCINERNEY:  Well, I think if there's an order that

8    you're prepared to enter at pretrial that, you know, forecloses

9    that or that as a matter of law makes the relief that we're

10   seeking unavailable, then, I mean, that's certainly your

11   prerogative, but we would obviously have -- we would obviously

12   differ with you about that and whether that is -- whether it's

13   appropriate.

14          And, quite frankly, we also believe that taken

15   together, the first trial, this trial and what we would present

16   next week present a strong case for injunctive relief.  And

17   particularly -- and I'm not -- I am not predicting how this

18   turns out whatsoever, but taking the first trial and the first

19   outcome as -- as some indicator, we're of the opinion, and we

20   would present this fully to you next week, that injunctive

21   relief is critical in this situation based on the evidence from

22   the last trial, based on evidence today and evidence we would

23   present next week.

24          THE COURT:  Okay.  Well, I've got that off my chest.

25   I'm just throwing it out there.  I'm not going to require you

1    to do this on a proffer basis.  So let -- I need to look more

2    specifically at the trial since it will be chopped up a little

3    bit next week similar to this week, but I'll give you a

4    specific schedule that you can plan around.  And since we won't

5    have a jury, I think it should be more -- less inconvenient.

6          So what are you saying?  How many days do you think it

7    will be?

8          MS. BRETT:  I think if we're not going full days, Your

9    Honor, then -- then probably setting it for the full five days

10   is important.

11         THE COURT:  Well, tell me how many full days of trial

12   you have and then I'll look at the calendar and see what we are

13   actually anticipating.

14         MS. BRETT:  I think for plaintiffs three-and-a-half or

15   four for the case in chief.

16         THE COURT:  Okay.  And then for defense?

17         MR. CHALMERS:  Mindful of your comments today, I'm

18   thinking that I'm looking at maybe one day to one-and-a-half

19   to -- the witnesses that come in.  Again, it has a little bit

20   to do whether or not I've got to bring in a witness I think

21   from Junction City or not.  I don't know at this point.

22         THE COURT:  All right.  Well, that's helpful.

23   Tomorrow I'll give you a schedule for next week.  I would like

24   to meet with you all at eight o'clock in the morning to go over

25   the instruction conferences because I -- looks like we'll be

1   ready to get to closing arguments before lunch.  We have some

2   instructions drafted ready to go.

3            And, Laurel, if you would either give them a hard copy

4   or e-mail them right now that would be great.

5            So we will meet informally up in my chambers like we

6   did before at eight o'clock in the morning, then we'll come

7   down and make our formal record, deal with Trooper Schulte,

8   instruct the jury and then go straight into closing arguments.

9   Okay?

10           MR. MCINERNEY:  Thank you.

11           MS. SCOTT:  I will send an e-mail so you don't have to

12  wait around for a hard copy.

13           MS. BRETT:  Just to flag one thing, Your Honor.  We

14  did file that additional requested jury instruction today.  We

15  understood that Your Honor did not want to give it in the

16  middle of testimony.  We filed the proposed one and handed it

17  up to the bench.

18           MR. MCINERNEY:  One more thing:  We're going to have

19  an offer of proof that will be about five minutes tops tomorrow

20  at the close of our case similar to what you saw the last time.

21           THE COURT:  Okay.  If you can do that in writing, that

22  would be even better.

23           MR. MCINERNEY:  Yes, even better, yeah.

24           THE COURT:  All right.  Well, I'll see you in the

25  morning.  Thank you.

1        (Proceedings adjourned.)

2

3                          CERTIFICATE

4        I certify that the foregoing is a true and correct

5   transcript from the stenographically reported proceedings in

6   the above-entitled matter.

7        DATE:  February 29, 2024

8
                        /s/Kimberly R. Greiner
9                        KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
                        United States Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that a copy of the foregoing APPELLANT'S APPENDIX, as submitted in digital form is an exact copy of the document filed with the Clerk.

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2024, the foregoing APPELLANT'S APPENDIX was electronically filed with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I also certify that within five business days of the issuance of notice that the electronic filing is compliant, one paper copy will be delivered by Federal Express to the Clerk's Office.


DATED: April 24, 2024                    /s/ Kurtis K. Wiard