# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

BLAINE FRANKLIN SHAW, et al.,
*Plaintiffs-Appellees*,

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

———

MARK ERICH, et al.,
*Plaintiffs-Appellees*,

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

## APPELLANT'S APPENDIX VOLUME XI

Appeal from the United States District Court for the District of Kansas
Honorable Kathryn H. Vratil, Senior District Court Judge
District Court Case Nos. 19-CV-1343-KHV and 20-CV-1067-KHV-GEB

120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
(785) 296-2215
anthony.powell@ag.ks.gov
dwight.carswell@ag.ks.gov
kurtis.wiard@ag.ks.gov

**OFFICE OF ATTORNEY GENERAL
KRIS W. KOBACH**

Anthony J. Powell
  *Solicitor General*
Dwight R. Carswell
  *Deputy Solicitor General*
Kurtis K. Wiard
  *Assistant Solicitor General*

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

Transcript of Bosire Trial, Day 4
    (ECF No. 621) ...................................................................... 1

UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

```
JOSHUA BOSIRE,                    Case No. 19-1343

   Plaintiff,                    Circuit Nos. 23-3265
                                              23-3267
   v.
                                 Kansas City, Kansas
BRANDON MCMILLAN,
                                 Date:  April 27, 2023
   Defendant.
                                 Volume 4 - (Pages 398-457)
..................................
```

PARTIAL TRANSCRIPT OF JURY TRIAL
(CLOSING ARGUMENTS EXCLUDED)

BEFORE THE HONORABLE KATHRYN H. VRATIL
SENIOR UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:

```
Patrick A. McInerney            Sharon Brett
Spencer Fane, LLP               ACLU Foundation of Kansas
1000 Walnut                     6701 W. 64th Street
Suite 1400                      Suite 210
Kansas City, MO 64106           Overland Park, KS 66202
```

For the Defendant:

```
Arthur S. Chalmers
Office of Attorney General - Kansas
120 SW 10th Avenue
Topeka, KS 66112
```

Proceedings recorded by machine shorthand, transcript
produced by computer-aided transcription.

1                          I N D E X

2
    Plaintiff's Witnesses:                              Page
3
    DOUG SCHULTE
4     Direct Examination By Mr. McInerney                400
      Cross-Examination By Mr. Chalmers                  421
5     Redirect Examination By Mr. McInerney              436
      Recross-Examination By Mr. Chalmers                437
6
    Plaintiff's Offer of Proof
7                                                        440

8   Rule 50 Motion by Plaintiff                          443
    Rule 50 Motion by Defendant                          444
9
    Jury Instruction Conference                          444
10
    Verdict                                              453
11
                          E X H I B I T S
12
        Plaintiff's
13      Exhibits              Offered          Received

14          10                  440
            11                  440
15          12                  440
            13                  440
16          14                  440
            17                  440
17          18                  440
            19                  440
18          20                  440
            21                  440
19          22                  440
            23                  440
20          24                  440
            25                  440
21          26                  440
            27                  440
22          28                  440

23

24

25

1        (Court called to order.)

2        (The jury entered the courtroom, after which the following

3    proceedings were had.)

4        THE COURT:  Good morning.  Members of the jury, you

5    will remember last night we stayed a little past five o'clock

6    so we could get Chief Aden on his way back home, and so we are

7    starting with a new witness this morning.

8        And plaintiffs will call their next witness.

9        MR. MCINERNEY:  Thank you, Your Honor.  Plaintiffs

10   call Doug Schulte to the stand.

11       THE COURT:  Sir, would you, please, step into the

12   witness box and raise your right hand so you can be sworn.

13                       DOUG SCHULTE,

14   called as a witness on behalf of the Plaintiff, having first

15   been duly sworn, testified as follows:

16                    DIRECT EXAMINATION

17   BY MR. MCINERNEY:

18   Q.   Good morning, sir.

19   A.   Good morning, sir.

20   Q.   Your name for the record please?

21   A.   Doug Schulte.

22   Q.   And, Mr. Schulte, where are you employed?

23   A.   Kansas Highway Patrol.

24   Q.   How long have you worked for the Kansas Highway Patrol?

25   A.   A little over 19 years now.

1    Q.   Do you have a specific assignment now?

2    A.   I'm a road trooper in Ellis -- in Troop D in Ellis and

3    Russell County.

4    Q.   You said Troop D?

5    A.   D.

6    Q.   Thank you.

7         And how long have you been assigned to Troop D?

8    A.   Since I first been employed in 2004.

9    Q.   Okay.  And what are your duties and generally your

10   responsibilities as a trooper assigned to Troop D?

11   A.   Work the road.  And in those counties, provide traffic

12   control, work accidents and so forth.

13   Q.   Okay.  Thank you.

14        The -- I think you joined the KHP in 2003; correct?

15   A.   '4.

16   Q.   '4.  Thank you.

17        And prior to that, or maybe at the same time, you attended

18   the Kansas law enforcement academy; correct?

19   A.   Correct, sir.

20   Q.   And that's off the top of my head a 24-week course;

21   correct?

22   A.   I believe it was 22 then.

23   Q.   Okay.  And it covers education and training regarding all

24   manner of law enforcement, including traffic stops; correct?

25   A.   Correct.

1   Q.   Including what's required to pull over a motorist for a

2   traffic stop?

3   A.   Yes, sir.

4   Q.   Including what's required to detain a motorist after a

5   traffic stop; correct?

6   A.   Yes, sir.

7   Q.   Including the law around reasonable suspicion and probable

8   cause in searches and seizures?

9            MR. CHALMERS:  Your Honor, I think I'm going to have

10   to object.  I'm not sure how this is relevant to this case as

11   to this witness's experience with reasonable suspicion and the

12   like.

13           MR. MCINERNEY:  Judge, the evidence is going to show

14   that Trooper Schulte was at the scene and had a conversation

15   with the defendant regarding the -- the existence of reasonable

16   suspicion, so I'm asking about his training and his education.

17           MR. CHALMERS:  I think it best then if he's going to

18   try to get into some opinion that Trooper Schulte had or may

19   have had, that's not a proper subject that's relevant.

20           THE COURT:  Why don't we wait until we get there then.

21           MR. CHALMERS:  Okay.

22   BY MR. MCINERNEY:

23   Q.   Do you remember my question?

24   A.   Could you repeat it, sir?

25   Q.   Sure.

1          The training that you took, sir, at the Kansas law

2     enforcement academy included, among other things, the law and

3     practices around reasonable suspicion; correct?

4     A.   Yes.

5     Q.   And around probable cause?

6     A.   Yes.

7     Q.   And conducting roadside detentions and searches; true?

8     A.   Yes.

9     Q.   Thank you.

10         Let me direct your attention if I might to February 10th of

11    2019 at, almost about -- better than four years ago now.  Do

12    you recall whether you were working that day?

13    A.   Was it February or was it January?

14    Q.   It was February, sir.

15    A.   Okay.

16    Q.   Okay.

17    A.   Yes, I was.

18    Q.   Okay.  And more specifically do you recall what shift you

19    were working that day?

20    A.   It was the night shift.

21    Q.   And the night shift runs from what time to what time?

22    A.   It varies what day of the week it is.  If it was a Friday

23    or Saturday, it was probably 5:00 or 6:00 until 1:00 or 2:00 in

24    the morning.  If it was during the week, probably three o'clock

25    to eleven o'clock.

1    Q.   Either way you were working at about 8:00 or 8:30 that

2    evening?

3    A.   Yes, sir.

4    Q.   Okay.  Do you know a Brandon McMillan, the defendant seated

5    here in the courtroom?

6    A.   I do.

7    Q.   And how do you know him?

8    A.   He's a pilot assigned to Troop D area and also works the

9    road.

10   Q.   Okay.  Works the road you said?

11   A.   Works the road, yes, sir.

12   Q.   So let me direct your attention to that February 10th.  If

13   I tell you it was a Sunday, I know you probably don't remember

14   that, but I know you know the facts and circumstances here.  Do

15   you remember having some contact with Mr. McMillan?

16   A.   I do.

17   Q.   Okay.  And where was that first contact that you recall

18   with Mr. McMillan?

19   A.   We had taken a break at the Love's truck stop.

20   Q.   And the Love's truck stop is in Ellis, Kansas, correct?

21   A.   Ellis, Kansas, yes, in Ellis County.

22   Q.   And you took about a 30-minute break or so at that point?

23   A.   That's probably correct.

24   Q.   Okay.  And you're familiar with the Love's store there in

25   Ellis?  You've been there before?

1    A.   Yes, sir.

2    Q.   Is it a regular stop for you to take a break and get a

3    meal?

4    A.   It varies.  Some -- there's a Subway and a Dairy Queen in

5    there also.  It's either there or if we're in Hays or in --

6    we're in Russell.

7    Q.   Okay.  And you were at that Love's convenience store for

8    roughly half an hour.  Does that sound right?

9    A.   Approximately probably.

10   Q.   And then you exited the Love's convenience store along with

11   Trooper McMillan; is that correct?

12   A.   Yes.

13   Q.   And as you were exiting the store, you came across and

14   smelled the odor of burned marijuana, didn't you?

15   A.   Yes, sir.

16   Q.   Okay.  And from your years as a law enforcement officer

17   working the road, I'm assuming coming across narcotics in the

18   course of your job?

19   A.   Yes, sir.

20   Q.   Including doing some interdiction work; correct?

21   A.   Yes, sir.

22   Q.   So I'm assuming that you know that there's a distinct

23   difference between the odor of burned marijuana and the odor of

24   raw marijuana; correct?

25   A.   Yes, sir.

1   Q.   No mistaking the two?

2   A.   No, sir.

3   Q.   And it was burned marijuana you came across; correct?

4   A.   I believe so, yes, sir.

5   Q.   So once you left the -- the Love's convenience store with

6   Trooper McMillan, you saw, observed a blue Altima vehicle in

7   the parking lot; correct?

8   A.   Yes, sir.

9   Q.   What did you notice about that blue Altima in the parking

10  lot?

11  A.   It was at the gas pumps facing to the south and another car

12  sitting beside it.  And I believe it -- I'm not sure what the

13  tag was, but had a tag on it and assumed it was a rental car at

14  that time.

15  Q.   Okay.  And what was -- what was your assumption it was a

16  rental car based on?

17  A.   The -- it was -- if it was a Colorado tag, I'm not sure

18  what it was, Missouri, the letters are usually different,

19  different color.

20  Q.   Okay.  So because it was out of state you figured it was a

21  rental; fair statement?

22  A.   The colors, letters on the tag will make it -- make it a

23  rental car, can make it a rental car in some states.

24  Q.   Okay.  And as you stood there with Mr. -- Trooper McMillan

25  outside the store, what else did you notice about that vehicle?

1   A.  Could tell -- now looking back and even looking at the

2   video, I have no idea.

3   Q.  Okay.  Did you notice at that point another car at or near

4   the Love's, and specifically a Dodge Charger?

5   A.  Yes, sir.

6   Q.  Where did you first observe that Dodge Charger?

7   A.  It was at the pumps next to the Altima.

8   Q.  The Dodge Charger was?

9   A.  Yes, dark color, dark gray maybe.

10  Q.  Did you get a look at the driver of that car?

11  A.  There's people there, but I don't remember what they look

12  like.

13  Q.  Okay.  When --

14      Did you see -- did you observe Mr. Bosire near the Altima?

15  A.  I did.

16  Q.  But you didn't observe him near the Charger; correct?

17  A.  They were side by side pretty much, just on other side of

18  the island.

19  Q.  Okay.  Did you -- did you run the license plate of either

20  vehicle?

21  A.  I don't think I did.  I'm not sure.

22  Q.  And when you left Love's, you didn't follow that Charger;

23  correct?

24  A.  No, sir.

25  Q.  Okay.  And when you left Love's, you got onto

1   Interstate 70; correct?

2   A.   Correct.

3   Q.   Which direction?

4   A.   I believe I went west.

5           MR. MCINERNEY:  Can we play Exhibit 8, clip 3 please?

6   BY MR. MCINERNEY:

7   Q.   Sir, while they get that queued up, I know you're familiar

8   with the dash cam video in this matter.  I'm going to show you

9   the beginning of this.  Fair to say you've seen this before;

10  correct?

11  A.   I guess so.  Once it starts playing, I'll be able to tell.

12  Q.   Okay.  When we get to -- when we get to the point at

13  clip 3, we'll start playing it and I'll ask you if you've -- if

14  you're familiar with the video.

15      (Exhibit playing.)

16      Do you remember the number assigned to you and your vehicle

17  back in February of 2019?

18  A.   To my vehicle?

19  Q.   Yes, sir.

20  A.   The -- it's always the same since you get out of the

21  academy.  Mine is 411.

22  Q.   Always been 411?

23  A.   Yes, sir.

24  Q.   Did you hear a voice ask 411 to stop by?

25  A.   I did.

1   Q.  Okay.  Whose voice was that?

2   A.  Trooper Brandon McMillan's.

3   Q.  Did you recognize that because you're familiar with his

4   voice from working together?

5   A.  Yes, sir.

6   Q.  And at that point you knew that Trooper McMillan had

7   stopped the car for speeding; correct?

8   A.  I knew he had stopped the car.  I'm not sure what for.

9   Q.  Okay.  And where were you at the time?

10  A.  Probably somewhere west of there.  I have no idea how far.

11  Q.  Okay.  And then you made your way to where Trooper McMillan

12  was; correct?

13  A.  Yes, sir.

14          MR. MCINERNEY:  Let's play Exhibit 8, clip 4.

15      (Exhibit playing.)

16  BY MR. MCINERNEY:

17  Q.  Do you recognize your voice in that clip?

18  A.  Yes, sir.

19  Q.  And did you recognize Trooper McMillan's voice?

20  A.  Yes, sir.

21  Q.  At one point, sir, you told someone that it will be a black

22  Dodge Charger with a Code 1 and a Code 3.  Did you hear that

23  part?

24  A.  Yes, sir.

25  Q.  And -- and Code 1 and Code 3 meaning a black male and a

1   white male; correct?

2   A.  Correct, sir.

3   Q.  Not in that order?

4   A.  Correct, sir.

5   Q.  But you knew at that time that Trooper McMillan had already

6   stopped a car with a black male in it; correct?

7   A.  I knew he'd stopped the car but I don't know if I had --

8   knew what he -- I don't know if I listened or heard his traffic

9   when he ran or who it was.

10  Q.  Okay.  And these radio transmissions are occurring as

11  you're making your way to Trooper McMillan's location; correct?

12  A.  Correct.

13          MR. MCINERNEY:  Okay.  Let's play No. 5 please.

14      (Exhibit playing.)

15  BY MR. MCINERNEY:

16  Q.  We just played that video clip of a conversation between

17  you and Trooper McMillan; correct?

18  A.  Yes, sir.

19  Q.  And correct me if I'm wrong, but I believe the two of you

20  were standing between the two vehicles; correct?

21  A.  Should have caught on the back end if we're standing behind

22  it.

23  Q.  Okay.

24  A.  I'm not sure where we were standing.

25  Q.  In back of his, in front of yours?

1    A.  Correct, sir.

2    Q.  Okay.  Thank you.

3        And you heard Trooper McMillan say, "I can't smell

4    anything.  So if he doesn't let me, I don't think I can hold

5    him for a dog.  What do you think?"  Do you remember that?

6    A.  It was pretty hard to hear but --

7    Q.  We can -- I'm happy to wind it back.

8    A.  If you would, please, sir.

9           MR. MCINERNEY:  Wind it back.  Yeah, let's do the

10   whole clip.  I think it would be hard to find the very

11   beginning of it.

12       (Exhibit playing.)

13   BY MR. MCINERNEY:

14   Q.  Did you hear that?

15   A.  I didn't hear any part he couldn't hold him for a dog.  I

16   heard he couldn't smell anything.

17   Q.  Let me back up a little bit.  You heard Trooper McMillan

18   explain to you what he had at that point; correct?

19   A.  Yes, sir.

20   Q.  And he asked you -- you asked him, "Did you ask?"  Do you

21   remember that?

22   A.  Yes.

23   Q.  And what did you mean when you asked Trooper McMillan "did

24   you ask?"

25   A.  If he asked for consent to search.

1   Q.   Okay.  And he said that he had not?

2   A.   I believe so, yes.

3   Q.   And he said, "I can but he won't."

4   A.   Say that again.

5   Q.   Sure.  Trooper McMillan said to you in response, "I can but

6   he won't."

7   A.   He won't meaning Mr. --

8   Q.   I guess that's my question to you.  When he responded to

9   you, "I can but he won't," did you understand what he meant?

10  A.   If -- if I heard it correctly, then I would assume now that

11  it would meant even if he asked he's going to get a no answer.

12  Q.   Okay.  At a point Trooper McMillan asked you if you wanted

13  to take a smell; correct?

14  A.   Yes, sir.

15  Q.   And you declined to do that; right?

16  A.   Correct.

17          MR. MCINERNEY:  Okay.  Let's play clip 7 please.

18      (Exhibit playing.)

19  BY MR. MCINERNEY:

20  Q.   Again, understanding the audio's a little rough, but were

21  you able to hear your conversation with Trooper McMillan?

22  A.   Most of it, yes, sir.

23  Q.   And do you remember when Trooper McMillan said, "I can't

24  smell anything.  So if he doesn't let me, I don't think I can

25  hold him for it for a dog.  What do you think?"  Do you

1    remember that?

2    A.   Yes, I could hear it in there during this clip.

3    Q.   Okay.  Let me break that down a little bit.  When -- when

4    he said, "I can't smell anything, so if he doesn't let me," did

5    you have an understanding what he meant by "if he doesn't let

6    me"?

7    A.   If he said -- the way he took it and the way I took it from

8    him, that he, the gentleman, would not let him search the car,

9    he wouldn't be able to or would say no to consent.

10   Q.   Okay.  Thank you.

11       And the rest of that statement after "if he doesn't let me"

12   was, "I don't think I can hold him for it for a dog.  What do

13   you think?"  Did you have an understanding, at that time that

14   Trooper McMillan said, "I don't think I can hold him for it,"

15   that that meant he didn't have a reasonable suspicion to hold

16   that driver?

17            MR. CHALMERS:  Not a proper question to him ask what

18   his thoughts were as to what Trooper McMillan believed.  And if

19   he's trying to get into opinion that the officer has as to

20   what's reasonable suspicion or not, that's not a proper subject

21   for this witness, Your Honor, and I object.

22            MR. MCINERNEY:  Judge, I asked this witness if he had

23   an understanding what Trooper McMillan meant.  I'm not asking

24   him to offer an opinion, just what he understood at the time.

25            THE COURT:  Lay interpretation of their conversation;

1   correct?

2          MR. MCINERNEY:  Correct.  He was a party to the

3   conversation.

4          THE COURT:  Objection's overruled.

5   BY MR. MCINERNEY:

6   Q.  Do you remember my question, sir?

7   A.  Yes, sir.

8   Q.  Okay.

9   A.  At that point I would say that Brandon -- Trooper McMillan,

10  if the guy -- the gentleman would have said no and he said he

11  couldn't smell anything other than what he had -- what he saw,

12  if he had anything else to go off of, at that point I'd say he

13  might not -- may not have had enough for a dog.

14  Q.  Okay.  And by "enough for a dog" you mean may not have had

15  a reasonable suspicion?

16         MR. CHALMERS:  Objection, Your Honor.  He's now again

17  calling for a legal conclusion.

18         THE COURT:  He was a party to the conversation and I

19  think he's competent to testify as to how much he understood

20  the statements by Trooper McMillan.

21  BY MR. MCINERNEY:

22  Q.  And I am just asking for what your understanding at the

23  time that statement was made was.  Okay?

24  A.  Yes, sir.

25  Q.  Did you understand, when Trooper McMillan said, "I can't

 1    hold him for a dog," that he meant he didn't have reasonable
 2    suspicion to detain him further for a canine sniff?
 3              MR. CHALMERS:  Same objection, Your Honor.
 4              THE COURT:  Same ruling.
 5              THE WITNESS:  I didn't hear what you said.
 6    BY MR. MCINERNEY:
 7    Q.  She overruled his objection.
 8              THE WITNESS:  I'm sorry, judge.
 9              Yes, sir.
10    BY MR. MCINERNEY:
11    Q.  Okay.  You didn't respond by saying I think you've got
12    enough, did you?
13    A.  No.
14    Q.  And you didn't respond by saying I think you do have
15    reasonable suspicion, did you?
16    A.  I did not say that.
17    Q.  Because at that point you didn't think he had enough to
18    call for a canine sniff; correct?
19    A.  I didn't know what he had, but his --
20              MR. CHALMERS:  Again, you're calling now for his
21    opinion as to whether there was reasonable suspicion.  We're
22    not longer -- any longer -- clearly talking about
23    interpretation.  I object, Your Honor.
24              THE COURT:  Well, they were both at the scene.  They
25    were both making decisions.  They were communicating about

1   their respective states of mind, and your objection is

2   overruled.

3   BY MR. MCINERNEY:

4   Q.  At the end of that exchange between you and Trooper

5   McMillan, I think your comment was "he's playing the game"?

6   A.  Yes, sir.

7        MR. MCINERNEY:  Let's play clip 9 from Exhibit 8

8   please.

9      (Exhibit playing.)

10  BY MR. MCINERNEY:

11  Q.  Were you able to hear that conversation, sir?

12  A.  Yes, sir.

13  Q.  And that conversation took place, didn't it, after Trooper

14  McMillan had reapproached the car then come back; is that

15  right?

16  A.  I believe so.

17  Q.  And you weren't able, while Trooper McMillan was at the

18  car, to hear his exchange with the driver; correct?

19  A.  No.

20  Q.  So that -- and that wasn't broadcast over the radio or

21  anything; it was -- it was just between the two of them

22  although it was recorded?

23  A.  Correct, sir, on his in-car camera.

24  Q.  And then Trooper McMillan comes back to -- to your car and

25  the two of you have a conversation.  He begins, didn't he, by

1    saying that Bosire won't answer questions.  Do you remember

2    that?

3    A.  Yes, sir.

4    Q.  And then -- and he told you that the driver advised him

5    that he was wasting his time.  Do you remember that?

6    A.  Yes, sir.

7    Q.  And then there was some conversation back and forth between

8    the two of you about the gas station attendant and a white guy

9    driving a Charger.  Do you recall that too?

10   A.  Yes, sir.

11   Q.  Did you know at that point whether a Charger had been

12   stopped anywhere?

13   A.  I did not.

14   Q.  And at the end of that conversation, Trooper McMillan says,

15   "I'm going to go sit in my car."  Correct?

16   A.  Yes, sir.

17   Q.  At the end of that conversation, after the discussion about

18   his refusal to answer questions and wasting time and the gas

19   station attendant, did you have an understanding from Trooper

20   McMillan whether he believed he had reasonable suspicion to

21   continue that detention?

22   A.  From what he told me at that time?

23   Q.  Yes, sir.

24   A.  I didn't know what -- I didn't know what he had at that --

25   at that point in time, just what he told me.

1    Q.  Sir, you -- you stayed -- you stayed there with Trooper

2    McMillan until the canine officer arrived; correct?

3    A.  I did.

4    Q.  Do you recall about how long you sat in your car?

5    A.  I do not.

6    Q.  Did you at any point contact your supervisor or another

7    trooper and advise that Trooper McMillan did not believe he had

8    reasonable suspicion?

9    A.  I did not.

10   Q.  Did you write a report or maybe even a notes entry on your

11   in-car recorder that Trooper McMillan did not believe he had

12   enough to hold him for a dog?

13   A.  I don't think I made any notes.

14        MR. MCINERNEY:  Let's play clip 10, Alyssa, please.

15      (Exhibit playing.)

16   BY MR. MCINERNEY:

17   Q.  So, sir, at the end of that search, once it was complete,

18   the dog didn't alert; correct?

19   A.  No, sir.

20   Q.  Didn't alert for marijuana?

21   A.  No.

22   Q.  Didn't alert for weapons?

23   A.  Most time a dog won't alert for weapons.

24   Q.  Didn't alert for other narcotics?

25   A.  No, sir.

1   Q.   And then Mr. Bosire wanted your information and the

2   information from your -- your colleagues there; correct?

3   A.   It was hard to hear what he was asking.

4   Q.   Okay.  Well, at a point did you hear yourself say, "The

5   information's on the ticket"?

6   A.   If that was me or that was Trooper McMillan, I don't know,

7   but, yes, I know that was said.  I could hear that.

8   Q.   Sorry?

9   A.   I could hear that.

10  Q.   Yes.

11       And Mr. Bosire was looking for names and numbers from each

12  one of you; right?

13  A.   I guess so.

14  Q.   And then at a point Mr. Bosire asks whether your

15  information is going to be on the ticket.  Did you hear that?

16  A.   Yes.

17  Q.   And did you hear Trooper McMillan say that will all be on

18  the call list?

19  A.   Yes.

20  Q.   Did you provide Mr. Bosire a call list?

21  A.   I did not.

22  Q.   Did Mr. -- did Trooper McMillan provide him a call list?

23  A.   Not that I know of.

24  Q.   Okay.  Did anyone?

25  A.   I don't -- I don't believe so.

1   Q.  Did you tell him what a call list was?

2   A.  I didn't.

3   Q.  So -- so nobody gave him a call list and you didn't provide

4   your name or your badge number; right?

5   A.  I don't believe so, no.

6   Q.  So instead, after 45 minutes of being parked on the side of

7   the highway and after he was cleared by this dog, you told him

8   that he couldn't be parked there?

9           MR. CHALMERS:  Your Honor, it's argumentative and it's

10  also been asked and answered.

11          THE COURT:  It's not argumentative.

12          MR. MCINERNEY:  I haven't asked this question yet.

13  I'm asking about his statement to Mr. Bosire.

14          THE COURT:  Okay.  Go ahead.

15  BY MR. MCINERNEY:

16  Q.  Sir, you told Mr. Bosire after all that that he couldn't be

17  parked on the side of the road; correct?

18  A.  Correct.

19  Q.  And that was your way of threatening to give him a citation

20  for being parked on the side of the highway, wasn't it?

21  A.  No, it would have been my way to just you're free to go.

22  Q.  You come in contact with citizens every day on your job?

23  A.  Several.

24  Q.  Do you talk to all the citizens that way?

25  A.  It varies.

1           MR. MCINERNEY:  That's all the questions I have for

2    this witness, judge.  Thank you.

3           THE COURT:  Cross-examination.

4                        CROSS-EXAMINATION

5    BY MR. CHALMERS:

6    Q.   Trooper Schulte, would you describe for the jury the

7    neighborhood that surrounds the Love's truck stop in Ellis that

8    you talked about?

9    A.   The Love's truck stop sits on the north side of Ellis just

10   to the south of the interstate.  It's a business area --

11   business area -- district area but there's also a lot of also

12   regular housing around it also.

13   Q.   And the size of the Love's truck stop, approximately how

14   large is it?

15   A.   How big is that?  I have no -- it's a good-size building.

16   I couldn't tell you how big it is.

17   Q.   And you've been there frequently?

18   A.   Yes, sir.

19   Q.   And about -- when you've gone there, about approximately

20   how many people will be coming and going into the Love's

21   stores?

22   A.   There's usually people coming and going very regularly.

23   Q.   At any given time, how many people would be in the Love's

24   stores in your experience?

25   A.   15-20, maybe less -- more or less.

1    Q.   Then there's a bank of cars -- excuse me.  There's a

2    bank -- there's a bank of pumps that's outside the Love's

3    store; is that correct?

4    A.   To both the north and the south.

5    Q.   And on the north side, would you describe that please?

6    A.   The building sets longways east to west and the pumps run

7    east to west in that parking lot just to the north of the

8    building.

9    Q.   And the Love's is situated relative to I-70 where?

10   A.   Just south of the interstate.

11   Q.   To get -- if you travel from Love's to get on I-70, how do

12   you access it?

13   A.   How do you access I-70 from there?

14   Q.   How do you travel from Love's to get on I-70?

15   A.   You leave the parking lot either out of the north entrance

16   or out of the -- on to the main street, Washington Street,

17   which goes directly north, and you travel maybe an eighth of a

18   mile and you come to the on-ramp on eastbound I-70.  A little

19   further you find westbound on there.

20   Q.   And north of I-70 on the road that you discussed that you

21   would travel on to access I-70, what's there?

22   A.   What's there?

23   Q.   What is north of -- well, let's see if I can't get you

24   situated here.  You have to drive on a road going north to be

25   able to access I-70; I think that's what you said?

1    A.    Correct, sir.

2    Q.    Does that road, does it continue on north?

3    A.    It does.

4    Q.    What is located on the north on that road?

5    A.    Out in the -- goes into the country, rural farm areas.

6    Q.    So now you smelled the odor of marijuana in the Love's

7    store at some point; is that correct?

8    A.    Yes.

9    Q.    Couldn't identify it was -- well, could you identify it was

10   from a particular person or persons?

11   A.    Could not.

12   Q.    After you and Trooper McMillan -- well, after you smelled

13   the marijuana at least, did you leave the Love's store?

14   A.    Yes, sir, we went outside.

15   Q.    And what did you do?

16   A.    Went to our cars.

17   Q.    Did you go directly to your cars after you left the -- the

18   building?

19   A.    I don't know.

20   Q.    You saw the Altima -- Nissan Altima I think you told

21   counsel.  Where were you when you saw the Altima?

22   A.    Probably when I first -- first come out the doors.

23   Q.    And you saw the Dodge Charger -- Charger.  When did you

24   first see it?

25   A.    Probably about the same time.

1    Q.   Now, did you leave the Love's store before the Dodge

2    Charger or the Dodge Charger or the Nissan in the -- still in

3    the area of Love's when you left?

4    A.   I believe they were still at the pumps when I left the --

5    left them to get back on the interstate.

6    Q.   Did you see either -- either of those vehicles that you

7    felt was potentially suspicious?

8    A.   Just two different vehicles.  Couple -- there was a

9    conversation I believe going on between whoever was there.

10   Other than that, I could not tell you.  It's been a little time

11   ago.

12   Q.   Were you considering, as you were leaving the Love's store,

13   what the source of the marijuana might be?

14   A.   I was.

15   Q.   How -- what were you looking for then to consider what the

16   source was?

17   A.   Walking in and out of the Love's travel, it's a -- sit --

18   inside the building there's a Dairy Queen and a Subway, and we

19   were sitting in there taking a break.  And you walk down the

20   hallway past the restrooms and then into the truck stop area.

21   If you keep going straight, there's exit doors right there also

22   on the north side of the building.  And coming out you look at

23   the people the odor may have come from.

24   Q.   Did you look for people the odor might have come from?

25   A.   Yes.

1    Q.   What did you see?

2    A.   I don't remember how many people were out in the parking

3    lot or in the -- in the building there.  I couldn't tell you.

4    Q.   In your training that counsel referred to -- referred to,

5    is there any training about caravanning by drug traffickers?

6    A.   There is.

7    Q.   What is caravanning by drug traffickers?

8    A.   Someone will, like, a decoy car or load will be put in

9    another car, and hopefully the -- the car that did not have

10   anything in it gets stopped and then the actual load car can

11   continue to its destination.

12   Q.   Have you, in your experience, actually found caravanners?

13   A.   I have not.  I know troopers that have.

14   Q.   And in your -- in observing as you came out of Love's as

15   you described, were you looking for potential caravanners?

16   A.   It's possible.

17   Q.   Now, it was dark when you left; is that correct?

18   A.   Yes.

19   Q.   The Dodge Charger that counsel talked to you about, what

20   are your recollections of the Charger when you first saw it?

21   A.   Dark color I thought, but it was -- you could hear me

22   talking to another trooper on the radio saying it was kind of a

23   dirty silver color.

24   Q.   And you made some observations or did you about the

25   occupant of the -- of the Dodge Charger?

1    A.   I think there was two occupants of that car.

2    Q.   When you left the Love's store, I think you -- you said was

3    that before the Dodge Charger?

4    A.   Before it left?

5    Q.   Yes.

6    A.   Yes, I left before the vehicles left.

7    Q.   Let me play a part of the tape, the dash cam tape, and I

8    think the exhibit is Exhibit -- I always have to look back --

9    Exhibit 8.

10        COURTROOM DEPUTY:  Just let me know when you have it

11   up there, Mr. Chalmers, and I'll start it.

12        MR. CHALMERS:  I think it's approximately close.  This

13   started here.  It's a little bit -- yeah, it's ready.  I have

14   it playing.  It's ready.

15        COURTROOM DEPUTY:  You have it ready?

16        MR. CHALMERS:  Yeah.

17   BY MR. CHALMERS:

18   Q.   I have it started at 8:40 and that's -- we'll start at

19   7:00.  That's a little bit further back than I wanted to go.

20        (Exhibit playing.)

21        Somehow it skipped to nine-something.  Let me go back

22   further.  I apologize.

23        (Exhibit playing.)

24        We're starting at 8:07 on the tape.

25        (Exhibit playing.)

1    I want to pause.  At the tail end there was some

2 communication that Mr. McMillan had with dispatch.  Did you

3 hear whether he had asked someone to stop by?

4 A.   Yes.

5 Q.   And who was he asking to stop by?

6 A.   That had been me.

7      (Exhibit playing.)

8 Q.   Stopped at 10:58 into the tape.  There was communication

9 between Mr. McMillan and somebody else.  Who was that?

10 A.   That was me.

11 Q.   And what was the communication about as you were listening

12 to it?

13 A.   He advised -- Trooper McMillan advised that the other

14 person that was -- we saw there at the pumps was not in the car

15 with Mr. Bosire and they might have been in the other car that

16 we observed.

17 Q.   What other car were you -- was -- were you guys talking

18 about as you understood it?

19 A.   The Dodge Charger.

20 Q.   And did you hear him say that you ran the Charger?

21 A.   I did.  I heard that.

22 Q.   What does that mean?

23 A.   If it -- say that I ran the tag.

24 Q.   So at that point you had run the tag of the Charger.  And

25 what was Mr. McMillan asking you about that at that point?

1    Maybe play a little bit more?

2    A.  I think he just asked me if the other -- if I was -- he

3    asked me before if I would come to his location.

4    (Exhibit playing.)

5    Q.  Okay.  I'm going to stop for a second.

6    Did you at some point see the Charger out on I-70 after you

7    left Love's?

8    A.  If I read a tag I did.

9    Q.  And did you stop it?

10   A.  I did not.

11   Q.  Why not?

12   A.  Didn't have any -- any traffic violation to stop that car

13   at that point.

14   Q.  Now, we can go through the tape, but as the stop

15   progressed, did you continue to look for the Dodge Charger?

16   A.  I did not.  I went to Trooper McMillan's location.

17   Q.  Did you request others to look for the Charger?

18   A.  I -- my other shift partner is in Russell County, 281 is

19   Master Trooper Merle Nye (ph), and asked him if he was at the

20   office, asked him if he would look for it.

21   Q.  Why were you looking for the Dodge Charger or asking others

22   to look for it?

23   A.  We didn't know if it was two vehicles were traveling

24   together.

25   Q.  Was it your suspicion then that the two vehicles were

1    traveling together at that point?

2    A.   They could have been.

3    Q.   You were asked at the very tail end of -- of your direct

4    examination about conversations you had with Mr. Bosire after

5    he was told he could leave.  Do you remember that testimony?

6    A.   Yes, sir.

7    Q.   Why didn't you give your name and badge number?

8    A.   I really don't know if I didn't understand what he asked or

9    what he was asking Trooper McMillan.  I don't know why I

10   didn't.

11   Q.   Why did you want him off the side of the road?

12   A.   You've heard traffic going by.  Side of the road's a

13   dangerous place to be.

14   Q.   Now, during your conversations with Mr. Bosire, at that --

15   at that point you observed his demeanor, how he was acting?

16   A.   What -- when we were talking there beside the car?

17   Q.   Yes.

18   A.   Yes, sir.

19   Q.   How was he acting?

20   A.   Just he had his camera up if I can remember right and

21   seeing the video.  He was asking questions.  He does have a --

22   what's a good word -- speaks a different -- has a -- not a

23   slang but --

24          MR. MCINERNEY:  Can we approach for just a second?

25          THE COURT:  Sure.

1           (The following proceedings were had at the bench.)

2           MR. MCINERNEY:  I think Mr. Chalmers is asking this

3    witness to comment on the -- to comment on Mr. Bosire's speech

4    pattern or whatever from Exhibit 8.  This trooper wasn't

5    present during the event and he knows what he sees on the video

6    and the video speaks for itself.  So I'm confused on the

7    commentary.

8           MR. CHALMERS:  The video does speak for itself and it

9    does show a dialogue between the trooper and Mr. Bosire.  And

10   I'm just asking about what his observations were about the

11   demeanor of Mr. Bosire who at that point I think testified he

12   was fearful or afraid.

13          THE COURT:  He was what?

14          MR. CHALMERS:  Fearful, afraid, and anxious.

15          THE COURT:  Okay.

16          MR. CHALMERS:  And I'm going to ask -- hopefully ask

17   this trooper what he observed in terms of his -- his demeanor,

18   the way he was acting and what sort of emotional state he

19   appeared to be in.

20          THE COURT:  Okay.  That's not really what you asked

21   him.  What he was starting to talk about is his speech.

22          MR. CHALMERS:  I think he went past what I asked.

23          THE COURT:  Yeah.

24          MR. CHALMERS:  I think I just asked him about his

25   demeanor.

1    MR. MCINERNEY:  I'm going to object to this line.

2    It's -- it's not relevant.  (B) he hasn't laid any foundation

3    for this witness's ability to testify about those questions,

4    His demeanor or whatever.  So I'd object on both those bases.

5         MR. CHALMERS:  A lay person can do that I think.

6         THE COURT:  I'm sorry what?

7         MR. CHALMERS:  A lay person can testify to their

8    observations and what they see in terms of a person's demeanor.

9         THE COURT:  I think the objection is he didn't have a

10   vantage point to observe.  Is that what you're saying?

11        MR. MCINERNEY:  Exactly.  He hasn't -- he hasn't laid

12   the foundation.  He wasn't part of --

13        MR. CHALMERS:  I may have to go back to lay the

14   foundation.

15        MR. MCINERNEY:  Let me finish.  He wasn't a party to

16   any conversation.  He was present in the same general area but

17   he wasn't part of that conversation he's asking him about.

18        THE COURT:  So you will need to lay a better

19   foundation, not from him watching the video but from what he

20   saw and observed at the time on the scene.

21        MR. CHALMERS:  Sure.  Okay.

22        (Thereupon, the proceedings continued in open court.)

23   BY MR. CHALMERS:

24   Q.  I think before we took a quick break I was going to try to

25   ask you about your observations on the roadside of Mr. Bosire

1    after he was told that he could leave.  Were you present at the

2    time that Mr. McMillan told Mr. Bosire he could leave?

3    A.   I was.

4    Q.   And could you hear that?

5    A.   Yes, I heard that.

6    Q.   And could you see Mr. Bosire at that time and then the few

7    minutes afterwards before he left?

8    A.   Yes, we were standing relatively -- relatively close.

9    Q.   And could you hear his -- what he was saying and what

10   others were saying to him?

11   A.   I could -- what I said before, his accent makes it a little

12   tougher to hear and then, of course, the wind doesn't help at

13   all.  I don't know exactly what he was saying.

14   Q.   Were you close enough and did you have sufficient

15   observation of him to have a recollection of what his demeanor

16   was, that is to say his emotional state as you observed it?

17   A.   When he started asking questions and stuff, I just -- I was

18   thinking maybe he was argumentative.

19   Q.   In terms of his demeanor from an emotional standpoint, did

20   you see anything other than just that?

21   A.   No.

22   Q.   Now, going back to a question that counsel asked you about

23   what you smelled in the Love's store, I think he said it was

24   burnt marijuana and you agreed; is that correct?

25   A.   I don't know if we smelled -- I can remember that now.  I

1    don't know if we smelled burnt or raw, I couldn't tell you.

2    Q.   One of the two?

3    A.   One of the two.

4    Q.   Then with respect to your deposition, you remember being

5    deposed in this case?

6    A.   I'm sorry, sir?

7    Q.   Do you remember sitting down and having plaintiff's counsel

8    ask you questions --

9    A.   Yes, sir.

10   Q.   -- in this case?

11        That's referred to as a deposition?

12   A.   Yes, sir.

13   Q.   That was back around what time, February of 2001 (sic)?

14   A.   If you say so.  Been a little while.

15   Q.   During the course of that deposition, the -- you went to

16   the offices of the -- the plaintiff's attorneys, what, in

17   Overland Park; is that right?

18   A.   I believe so.

19   Q.   And who was present as you recall generally, not name but

20   position or -- or relative position, I guess, there, whether

21   they're attorney or not, in the courtroom -- or in the room

22   with you during the deposition?

23   A.   Of course Mr. Chalmers was there and counsel was there and

24   young lady seated next to him I believe.  There was a -- a

25   video -- videographer-type person and court reporter I believe.

1    Q.  And was anybody also appearing at the deposition virtually?

2    A.  There was a computer screen with --

3            MR. MCINERNEY:  May we approach please?

4            THE COURT:  Yes.

5        (The following proceedings were had at the bench.)

6            MR. MCINERNEY:  Judge, we're pretty clearly headed

7    toward discussion of Mr. Bosire's deposition conduct.  I'd

8    object because it's beyond the scope of my direct examination.

9    And if he wanted to raise this, he should have raised it when

10   Mr. Bosire was on the stand.  So those -- so for those reasons

11   I believe it's improper cross-examination.

12           THE COURT:  Why do you think he should have raised it

13   when Mr. Bosire was on the stand?

14           MR. MCINERNEY:  Well, if he wanted to establish that

15   it happened, then he should have asked Mr. Bosire about it.  It

16   is -- it's beyond what I asked this witness about, so it's not

17   a proper subject for impeachment -- or for cross-examination,

18   excuse me.

19           THE COURT:  Do you all have any agreement that the

20   witnesses only need to appear once they testify and technically

21   in your case in chief, but if Mr. Schulte -- Trooper Schulte

22   stayed around and -- and testified in defendant's case in chief

23   would that be a problem?

24           MR. MCINERNEY:  Well, he reserved the right, I think,

25   to call the witnesses on our list.  So if there's an objection,

1   I would raise it at that time.

2           THE COURT:  I mean, it seems kind of silly to say he

3   can't testify about this right this second, but after you rest

4   your case Mr. Chalmers can call him back and put him now in his

5   case.  Is that what you're asking for?

6           MR. MCINERNEY:  Judge, I'm just -- I'm simply telling

7   you it's beyond the scope of my direct.

8           THE COURT:  I know but you're asking me to do

9   something, which is to prevent him from testifying.

10          MR. MCINERNEY:  Look, I mean, I think -- I think the

11  objection's appropriate and I think that's -- that's the

12  objection that we're going to make, judge.

13          THE COURT:  Okay.  I'm going to overrule it and let

14  him -- in the interest of timing and economy of effort let him

15  testify now.

16          MR. MCINERNEY:  Okay.  Thank you judge.

17      (Thereupon, the proceedings continued in open court.)

18  BY MR. CHALMERS:

19  Q.  I think we were talking about the -- Mr. Bosire appearing

20  virtually.  Describe how that took place.

21  A.  It was a -- what I can remember is a computer screen that

22  was -- the camera on it that was facing me and he had just a

23  log-on picture on his computer -- on the computer screen.

24  Q.  Could you see Mr. Bosire on the screen?

25  A.  It was not him.  It was just some log-on picture.  I

1  couldn't tell you what it was.

2  Q.  And could you tell whether it was Mr. Bosire that had --

3  that was virtually attending?

4  A.  I don't know.  I mean, it's who it was supposed to have

5  been I guess.  I couldn't tell you.

6  Q.  Okay.

7       MR. CHALMERS:  In which case I don't have any further

8  questions.  Thank you, Your Honor.

9       THE COURT:  Any redirect?

10      MR. MCINERNEY:  Yes, judge.  Very briefly.

11                   REDIRECT EXAMINATION

12  BY MR. MCINERNEY:

13  Q.  Sir, on -- just now you and counsel discussed the Charger,

14  the Dodge Charger; correct?

15  A.  Yes, sir.

16  Q.  Let me ask you a couple specifics.  Before you arrived at

17  the location where Trooper McMillan was, you encountered a

18  Dodge Charger and ran the tag; correct?

19  A.  I did.

20  Q.  Okay.  And that tag came back to a Florida Dodge Charger;

21  correct?

22  A.  I believe so.

23  Q.  Okay.  And, in fact, you advised Trooper McMillan that this

24  was not the car; is that right?

25  A.  If that's what the video showed, yes, sir.

1   Q.  Okay.  And then I think you mentioned master trooper --

2   Master Trooper Merle Nye at one point; is that right?

3   A.  Yes, sir.

4   Q.  Also a KHP trooper who has responsibilities in the same

5   geographic area issue?

6   A.  Yes, sir.

7   Q.  And do you recall that Trooper Nye (ph) also ran a Dodge

8   Charger tag that night as well?

9   A.  I heard he did, but what -- I don't remember what it was.

10   Q.  Okay.  If -- do you remember that that -- that car was

11   stopped?

12   A.  Was it stopped?

13   Q.  I'm asking you.  Do you recall that it was stopped?

14   A.  I don't believe it was stopped.

15   Q.  Okay.  Do you recall that any occupants of any Dodge

16   Charger were ever contacted that night?

17   A.  Not that I know of, sir.

18   Q.  Okay.

19        MR. MCINERNEY:  That's all the questions I have for

20   this witness, judge.  Thank you.

21        THE COURT:  Any recross?

22        MR. CHALMERS:  Mostly to pick up my laptop.

23                   RECROSS-EXAMINATION

24   BY MR. CHALMERS:

25   Q.  But let me clarify:  When you ran the tag for the Dodge

1    Charger, it came back with a Florida tag; is that correct?

2    A.   I believe so.

3    Q.   Does it also provide you the information of who the owner

4    was of the vehicle?

5    A.   Yes and I don't remember what it was.

6    Q.   The information in terms of the -- you may not remember the

7    specific name -- but did you give you any information in the

8    response as to whether it was a rental car or not?

9    A.   I believe so.

10   Q.   And what did it show?

11   A.   I don't know what it was.  I mean, which company I don't

12   know.

13   Q.   Okay.  But what did it tell you if it told you anything

14   about whether it was a rental car?

15   A.   I guess I don't understand your question.

16   Q.   Could you tell from what had been run and the information

17   that you received whether or not the Dodge Charger was a

18   rental?

19   A.   Oh, if it came -- if it was a rental car, it would have

20   came back.  They wouldn't have said rental car.  May have come

21   back to Avis or Hertz or another company, a third-party

22   company.

23   Q.   Did you determine it was a rental car or not?

24        MR. MCINERNEY:  Objection, judge.  Asked and answered

25   twice now.

1          THE COURT:  Sustained.

2          MR. CHALMERS:  I'm not sure if he did answer it.

3    Maybe he did, Your Honor, but I'll -- I have no further

4    questions.

5          THE COURT:  Okay.  Thank you.  I assume this witness

6    can be excused?

7          MR. MCINERNEY:  He may by the plaintiff, judge.

8          THE COURT:  I'm sorry, Mr. Chalmers, what did you say?

9          MR. CHALMERS:  He may.

10         THE COURT:  Okay.  Thank you.

11         THE WITNESS:  Thank you, Your Honor.

12         THE COURT:  Does plaintiff have any further witnesses?

13         MR. MCINERNEY:  We have an offer of proof for the

14   court.

15         THE COURT:  Okay.  How long will that take?

16         MR. MCINERNEY:  Four minutes.

17         MS. BRETT:  Yeah, four minutes.

18         THE COURT:  Okay.  Members of the jury, I'm going to

19   have you take a recess right now for 15 minutes.  Come back at

20   10:25 and hopefully we will be ready to instruct you at that

21   point with regard to the law that you will apply in the case,

22   and then we'll move on from there to closing arguments.  So I

23   do have a couple legal issues to take up with the attorneys,

24   but you're free to go.  Thank you.

25         (The jury left the courtroom, after which the following

1    proceedings were had.)

2          THE COURT:  All right.  Let's have plaintiff's offer

3    of proof.

4          MS. BRETT:  Sure, Your Honor.  So plaintiffs would

5    like to make two different offers of proof.

6          The first one is based on what we had submitted

7    previously that was overruled in Your Honor's ruling on the

8    motion *in limine* regarding our deposition designations from

9    other troopers and other individuals' experienced stops.  We

10   understand the court's ruling on that, but that is at

11   Document 421.  That includes deposition exhibits which have

12   been marked as 44A to 45C, 46A to C, 48A to C, 49A to C, 51A

13   through B, 52A to B and 53A to D.

14         Plaintiffs also have a second offer of proof with

15   regard to the findings of the PSU investigation.  And in

16   particular, although Your Honor concluded that that was not

17   proper evidence to go before the jury, we believe it is proper

18   for the consideration of whether qualified immunity should

19   apply, which we believe defendant will argue for in this case.

20   So we offer the PSU documents, which are at Exhibits 10 through

21   14 and 17 through 28.

22         If it may not go to liability, then if it is relevant,

23   we believe, for the purposes of qualified immunity, we can

24   submit a brief that we have done on that matter, but wanted to

25   do so at the conclusion of evidence when we saw that -- whether

1    or not the door would have been opened to the PSU investigative

2    findings.  So we can submit on that.

3             THE COURT:  Okay.  Give me -- give me a 25-word

4    summary of how it would be relevant to qualified immunity?

5             MS. BRETT:  Sure.  So -- so there's evidence that

6    Mr. Bosire -- well, there's evidence that the professional

7    standards documents show that no officer would have understood

8    that this action, this conduct on the night in question was

9    consistent with the Fourth Amendment.  In fact, Trooper

10   McMillan's own agency found that it was inconsistent with what

11   Trooper McMillan should have done.  They made a finding in that

12   regard.

13            So the PSU investigation basically concluded that this

14   was not consistent with Fourth Amendment standards with the

15   established law in this regard.  So we believe that goes to the

16   clearly established prong.  They found it to not be consistent

17   with clearly established law and issued that finding against

18   him as part of the PSU investigation.

19            So we believe that because that is a part of the

20   qualified immunity analysis, the findings of the PSU are an

21   important component of that even if they cannot go before the

22   jury for the first question in the qualified immunity standard

23   which is whether constitutional violation occurred.

24            THE COURT:  Okay.  All right.  I'll accept your offer

25   of proof.  Do you have any further witnesses?

1      MS. BRETT:  We don't have any further witnesses, but I

2   believe there's a --

3      MR. MCINERNEY:  Right.  We have a motion, judge.  So

4   at this point we would rest and offer to the court a motion

5   pursuant to Rule 50 and ask the court -- the court whether you

6   would prefer oral argument?

7      THE COURT:  So we haven't given defendant -- you're

8   asking for judgment as a matter of law?

9      MR. MCINERNEY:  At the conclusion of our case, yes,

10  ma'am -- yes, sir -- yes, Your Honor.

11     THE COURT:  Without giving defendant a chance to

12  present evidence?

13     MR. MCINERNEY:  Well, I think we would renew the

14  motion if and when the defendant has evidence to offer.

15     THE COURT:  Okay.  Well, let's not get ahead of

16  ourselves here.

17     Mr. Chalmers, plaintiff has rested.  Do you intend to

18  call any witnesses?

19     MR. CHALMERS:  No, Your Honor.

20     THE COURT:  Okay.

21     MR. CHALMERS:  And I would like to say, however, we

22  will make a Rule 50 motion ourselves.

23     THE COURT:  Let's not get ahead of yourself yet, okay.

24     Mr. McInerney, if you want to make your motion, go

25  ahead.

1          MR. MCINERNEY:  Thank you, Your Honor.

2          THE COURT:  And so we need to make a record on the

3     instructions before the jury comes back in because we need -- I

4     have an important conference at noon, so I want to get the jury

5     instructed and get finished with arguments before noon.  Okay?

6          MR. MCINERNEY:  Understood.

7          Judge, we filed for the court's consideration our

8     motion pursuant to Rule 50 with regard to the evidence that the

9     court has seen in this case.  And, as we discussed an hour ago

10    or so, this comes down to one element.  This comes down to the

11    question of whether Trooper McMillan had reasonable suspicion.

12    And we would suggest to you, judge, that for a host of factors

13    evidence-based factors the -- there's not a reasonable jury --

14    no reasonable jury could find in favor of the defendant in this

15    case for -- for four primary reasons.

16         THE COURT:  Excuse me just a second.  You say you have

17    filed this in writing?

18         MS. BRETT:  We will.

19         MR. MCINERNEY:  I thought it was done.

20         MS. BRETT:  It has not been filed yet.  It will be

21    filed.

22         THE COURT:  Okay.  Why don't I read it instead of --

23    because I think I have, at this point, a very clear

24    understanding.  And if it's already written, then I'll just

25    review it so that we can save time.  I know you've gone to a

1    lot of trouble preparing this.  I'm going to say the same thing

2    to Mr. Chalmers when he gets up and makes his motion for

3    judgment as a matter of law.

4            MR. MCINERNEY:  Understood.  We'll submit it on the

5    brief.

6            THE COURT:  Okay.

7            MR. MCINERNEY:  Thank you.

8            THE COURT:  I will take it under advisement once I've

9    read it.

10            Mr. Chalmers.

11            MR. CHALMERS:  The defendant does have a motion under

12    Rule 50 concerning qualified immunity and I understand that you

13    wish to defer ruling on it until it can be provided to you in

14    some sort of brief or short format, and I would be happy to do

15    that.

16            THE COURT:  Okay.  That would -- that would be fine.

17    I mean, I think the evidence has come in very much the same way

18    the summary judgment motions teed up the evidence, and at the

19    time I found that neither party was entitled to judgment as a

20    matter of law.  I think the same observation still pertains,

21    so -- but I will take both motions under advisement and read

22    them.  And if I come to a different conclusion, you will be the

23    first to know.

24            Let's take up the proposed jury instructions.  I,

25    first of all, want the record to reflect that at the close of

1    court yesterday we distributed draft instructions and a

2    proposed verdict form to counsel.  This morning at

3    eight o'clock I met informally with counsel for an hour off the

4    record and we discussed various points, made certain changes in

5    the proposed instructions and we now have a clean draft which

6    incorporates the changes that we made.

7            Let me start by asking:  Does anyone have an objection

8    to the proposed instructions 1 through 9?

9            MS. BRETT:  None from the plaintiff.

10           MR. CHALMERS:  None from the defendants.

11           THE COURT:  What about 10 through 13?

12           MS. BRETT:  None from the plaintiff.

13           MR. CHALMERS:  Defendant objects to the proposed

14   Instruction 12 -- or the court's Instruction 12.

15           First, we do not think that it should list out the

16   weightings that are applied to certain circumstances based on

17   the *Shaw* decision, which was decided based on all inferences in

18   favor of the plaintiff, and we think that's improper.

19           But if you're going to do that, then we think that you

20   should give the proposed instruction to track the *Shaw*

21   language, which we're in -- or the proposed interrogatory --

22   excuse me, instruction that was sent and filed last night that

23   we discussed.

24           Lastly, there are circumstances that are never claimed

25   as part of reasonable suspicion in this case as they relate to

1   the I-70 and drug corridor, and we object to inclusion of that

2   language in the instruction as being prejudicial.

3          Finally, in Document 398, we had additional language

4   that we requested the court add to the instruction that

5   clarifies the totality of the circumstances test and clarifies

6   that there should be -- the jury should accept and defer to the

7   trooper's training and specialized experience in the reasonable

8   suspicion language, and it's not clear in the interrogatory,

9   Your Honor.

10         THE COURT:  It's not in the interrogatory?

11         MR. CHALMERS:  I keep saying something other than

12  instruction.  I don't know why.  Not included in the

13  instruction.

14         THE COURT:  All right.  Well, you threw a lot of

15  things at me right there.  I'm not sure I remember each of

16  them.

17         But, first of all, I recognize it's not typical that

18  we would evaluate -- we would itemize the different categories

19  of evidence and tell the jury what weight to assign to the

20  various components.  We discussed this in the *Shaw* case.  As I

21  read the Tenth Circuit opinion, it's articulating legal

22  standards on what degree of weight the jury is required or

23  allowed to assign to various categories of evidence.  So,

24  again, I -- I agree this is unusual, but that's how I read the

25  case and that's what I think is an appropriate instruction.  I

1    think it accurately describes what the Tenth Circuit held.  So

2    to the extent you're arguing otherwise, I would overrule that.

3          I think the Tenth Circuit does two things:  Tells the

4    jury or tells a person who's evaluating reasonable suspicion

5    how to weigh different components; that's what I'm instructing

6    on.  There -- the Tenth Circuit also has a lot of commentary on

7    just generally weighing the evidence.  And, on a lot of those

8    peripheral matters it would be, number one, difficult to

9    instruct the jury and, number two, I think commenting on facts

10   rather than trying to apply the law.

11         So I think by saying that the jury -- strike that.

12         Because we're instructing the jury that it can

13   evaluate other factors which Trooper McMillan cites and give it

14   such weight as the jury believes it may believe aside from the

15   Tenth Circuit authority, that should cover any of the factors

16   on which Trooper McMillan said he relied.

17         That is a really awkward sentence.  I guess what I'm

18   saying is I think that Instruction 12 is an accurate summary of

19   the law and is appropriately tied to the evidence here.

20         The -- I don't -- the instruction with regard to the

21   totality of the circumstances and instructing the jury that it

22   needs to defer to the judgment of the officers is I think

23   legally incorrect and unnecessary.  We do note that in forming

24   reasonable suspicion officers can draw on their own experiences

25   and specialized training and make inferences from that

1    information which might well escape an untrained person.  I

2    think that covers the point that we need to make.

3            Anything else on this instruction?

4            MR. CHALMERS:  Not from the defendants' standpoint.

5            MS. BRETT:  Nor from the plaintiffs.

6            THE COURT:  Instruction Nos. 14 through 19?

7            MS. BRETT:  No objection from the plaintiff.

8            MR. CHALMERS:  We do object to Instruction 17.  We

9    don't think that the standard for punitive damages is

10   adequately explained.  It's a subjective standard unlike the

11   objective standard that relates to reasonable suspicion.  And

12   -- and also we had a proposed instruction as part of

13   Document 398 that contained what we thought were the proper

14   standards that if -- they would let the jury understand the

15   subjective nature of the query.

16           Secondly, in the interrogatory -- excuse me, in the

17   instruction there is a laundry list of the things the jury

18   should review in terms if it wishes to award punitive damages.

19   This should include the finances of Mr. McMillan, Your Honor,

20   and otherwise the jury is not properly instructed in terms of

21   the amount that they could potentially award.  We object to the

22   instruction for those reasons.

23           THE COURT:  Those objections are overruled.  First of

24   all, the subjective nature of the punitive damage issue is

25   extremely clear from Instruction No. 17.  There -- I don't see

1   any language which even suggests that there's an objective

2   component that the jury should be applying.

3          Also, there is no evidence about the financial

4   situation of Trooper McMillan.  So I think if we tell the jury

5   it should consider that, we would be inviting it -- we would be

6   inviting the jury to speculate and render a verdict which is

7   outside the scope of the evidence.

8          Anything on Instructions 20 through 23?

9          MS. BRETT:  None from the plaintiff.

10         MR. CHALMERS:  No, Your Honor, not from the

11  defendants.

12         THE COURT:  Any objection to the proposed form of

13  verdict?

14         MS. BRETT:  None from plaintiff.

15         MR. CHALMERS:  The defendant had proposed in a amended

16  proposed jury instruction filed -- excuse me, in the amended

17  proposed verdict form that's been filed with the court that

18  certain special questions should be asked which we think are

19  necessary for the court to be able to decide the qualified

20  immunity issue, and we would ask that the court include those

21  special questions.  We do not otherwise object to the verdict

22  form.

23         THE COURT:  I disagree that the answers to those

24  questions are necessary for the court to assess qualified

25  immunity, and therefore, I don't think it would be helpful to

1    include those in the verdict form and it would be potentially

2    confusing to the jury.

3              All right.  Anything else?

4              MR. CHALMERS:  Not for the defendant, Your Honor.

5              MS. BRETT:  Not for the plaintiff.  I know the jury

6    was going to get called back in.  If we could have two minutes

7    to use the restroom.

8              THE COURT:  Okay.  Let's -- quickly, quickly, two

9    minutes.

10             MS. BRETT:  Thank you.

11             THE COURT:  Court's in recess.

12        (Recess.)

13        (The jury entered the courtroom, after which the following

14    proceedings were had.)

15             THE COURT:  So let me ask plaintiffs, do you have any

16    further witnesses to call?

17             MR. MCINERNEY:  We do not, Your Honor.

18             THE COURT:  So, members of the jury, that is all of

19    the evidence which you will hear in plaintiff's case in chief,

20    And now the defendant has a chance to present additional

21    evidence if he wishes.

22             Mr. Chalmers, do you wish to present any additional

23    evidence?

24             MR. CHALMERS:  The evidence is in, Your Honor.  We

25    don't have any additional evidence to present.

1          THE COURT:  So defendant rests?

2          MR. CHALMERS:  We rest.

3          THE COURT:  Okay.  So that is all of the evidence that

4    you will hear in the case and the time has come for the court

5    to instruct you about the law that you will apply.

6          You will each have a copy of these instructions with

7    you in the jury room, so please don't feel that you need to try

8    to take notes and write down everything I'm going to cover.  I

9    think your time is probably better spent just listening

10   carefully to the instructions as I give them.  This will

11   probably take about 30 minutes and then, as I said, we'll go

12   into the closing arguments.

13      (Jury instructions read by the court.)

14         THE COURT:  Can I see counsel briefly at sidebar?

15      (The following proceedings were had at the bench.)

16         THE COURT:  So there's a typo on page 15 spelled --

17   auto-correct I think says defendant was a notebook in the back

18   of the car.  I think I will change that to saw a notebook.  And

19   other than that -- well, first of all, I assume there's no

20   objection to that?

21         MR. CHALMERS:  No.

22         MR. MCINERNEY:  No.

23         THE COURT:  Other than that and other than what you've

24   already made part of the record, is there any objection to the

25   jury instructions which the court has just given?

1          MS. BRETT:  No, Your Honor.

2          MR. CHALMERS:  No.

3          THE COURT:  Twenty minutes.  How do you want to split

4     your time?

5          MR. MCINERNEY:  Told Audra split 15 and 5 with

6     two-minute warning on the first part.

7        (Thereupon, the proceedings continued in open court.)

8          THE COURT:  Members of the jury, we now get to the

9     last part of the trial which is the closing arguments of the

10    attorneys.  I think I told you a few days ago that because

11    plaintiff has the burden of proof, plaintiff gets to speak to

12    you both first and last.  Each side has 20 minutes for closing

13    argument but plaintiff is allowed to split his time.  So I

14    think Mr. McInerney is going to use 15 minutes and then reserve

15    five minutes for rebuttal at the end.

16         MS. BRETT:  Ms. Harper, do you mind turning on the

17    screen.  Thank you.

18         THE COURT:  Also, I want to remind you that these

19    closing arguments are not evidence in the case, but I think you

20    will find that they are extremely helpful in jump-starting your

21    deliberations.

22         Go ahead.

23       (Closing arguments not requested to be transcribed.)

24       (Final jury instructions read by the court.)

25         THE COURT:  Will the bailiffs come forward and be

1    sworn.

2       (Bailiff sworn.)

3          THE COURT:  Audra, will -- the court will provide

4    lunch for you, and I don't know what the details of that is.

5    But at this point you are in charge of your own schedule and

6    you are free to go to the jury room now to begin your

7    deliberations.

8          Court is in recess.

9       (Recess.)

10      (The jury entered the courtroom, after which the following

11   proceedings were had.)

12         THE COURT:  So, ////////, it looks like you might

13   have a verdict in your hand.  Are you the foreperson?

14         JUROR NO. 6:  I am.

15         THE COURT:  And has the jury returned -- is the jury

16   ready to return a verdict?

17         JUROR NO. 6:  We are.

18         THE COURT:  Would you pass the verdict form to the

19   bailiff please?

20         All right.  Would you, please, read the verdict.

21         COURTROOM DEPUTY:  In the matter of *Joshua Bosire*

22   *versus Brandon McMillan*, we, the jury:

23         Question No. 1:  Do you find, under Instruction

24   No. 12, by a preponderance of the evidence that defendant

25   lacked reasonable suspicion to extend plaintiff's detention?

1          They answered yes.

2          No. 2:  Do you find, under Instructions 14 through 16,

3     that plaintiff sustained damages on account of defendant

4     extending his detention?

5          They answered yes.

6          If your answer to Question 2 is yes, state the amount

7     of damages you award:  $20,000 -- $20,163.70.

8          No. 4:  Do you find, under Instruction No. 17, that

9     plaintiff is entitled to punitive damages?

10         They answered yes.

11         No. 5:  If so, state the amount of any punitive

12    damages which plaintiff should be awarded.

13         They answered $20,000.

14         Dated by the foreperson on today's date.

15         THE COURT:  Would you, please, poll the jury.

16         COURTROOM DEPUTY:  Juror No. 1, was this and is this

17    your verdict?

18         JUROR NO. 1:  Am I No. 1?

19         COURTROOM DEPUTY:  Yes.

20         JUROR NO. 1:  Yes.

21         COURTROOM DEPUTY:  Juror No. 2, was this and is this

22    your verdict?

23         JUROR NO. 2:  Yes.

24         COURTROOM DEPUTY:  Juror No. 3, was this and is this

25    your verdict?

1             JUROR NO. 3:  Yes.

2             COURTROOM DEPUTY:  Juror No. 4, was this and is this

3    your verdict?

4             JUROR NO. 4:  Yes.

5             COURTROOM DEPUTY:  Juror No. 5, was this and is this

6    your verdict?

7             JUROR NO. 5:  Yes.

8             COURTROOM DEPUTY:  Juror No. 6, was this and is this

9    your verdict?

10            JUROR NO. 6:  Yes.

11            COURTROOM DEPUTY:  Juror No. 7, was this and is this

12   your verdict?

13            JUROR NO. 7:  Yes.

14            COURTROOM DEPUTY:  Juror No. 8, was this and is this

15   your verdict?

16            JUROR NO. 8:  Yes.

17            THE COURT:  Thank you.

18            Members of jury, first of all, I again thank you for

19   your service here this week.  I hope that this has been a good

20   experience for you, and I know that the parties and the

21   attorneys greatly appreciate the sacrifice you made to serve

22   here.

23            At this point I do release you from all of the

24   instructions I've given you in the case.  So if you want to

25   discuss this matter with anyone, you certainly are free to do

1    that.

2         By the same token, you're not required to.  Sometimes

3    the attorneys and the parties in the case are interested in

4    visiting with the jury after the verdict for two reasons:  one,

5    it helps the lawyers get feedback that helps them improve their

6    trial advocacy skills, and it also helps the parties and the

7    attorneys better understand the thought process behind your

8    verdict.

9         We do have a local rule which says that they are not

10   allowed to contact you in any way unless they come to the court

11   and I give them permission.  If I give permission, it will be

12   some time down the road after any time for appeals or motions

13   for new trial, anything like that might happen.  But if we do

14   get a motion, I will be in touch with you.  And if I agree to

15   let them talk with you, we'll reach out to see if you're

16   agreeable to that, and only in that situation would I give them

17   approval.

18        I'm sure with these attorneys and these parties you're

19   not going to have any problems at all in that regard.  But if

20   anything should happen that makes you feel uncomfortable,

21   please don't hesitate to reach out to us and we'll take it from

22   there.

23        I would like to personally stop by the jury room and

24   shake your hand before you go and answer any questions you may

25   have about jury service or hear any suggestions you might have

1    on how we might make this a better process.

2            Counsel, thank you all for your hard work and

3    professionalism this week.

4            We will stand in recess.  Court's in recess.

5        (Proceedings adjourned.)

6

7

8                        CERTIFICATE

9        I certify that the foregoing is a true and correct

10   transcript from the stenographically reported proceedings in

11   the above-entitled matter.

12       DATE:  February 29, 2024

13
                    /s/Kimberly R. Greiner
14                  KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
                    United States Court Reporter
15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that a copy of the foregoing APPELLANT'S APPENDIX, as submitted in digital form is an exact copy of the document filed with the Clerk.

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2024, the foregoing APPELLANT'S APPENDIX was electronically filed with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I also certify that within five business days of the issuance of notice that the electronic filing is compliant, one paper copy will be delivered by Federal Express to the Clerk's Office.


DATED: April 24, 2024                     /s/ Kurtis K. Wiard