---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

---

BLAINE FRANKLIN SHAW, et al.,
*Plaintiffs-Appellees*,

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

———

MARK ERICH, et al.,
*Plaintiffs-Appellees*,

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

---

## APPELLANT'S APPENDIX VOLUME XII

---

Appeal from the United States District Court for the District of Kansas
Honorable Kathryn H. Vratil, Senior District Court Judge
District Court Case Nos. 19-CV-1343-KHV and 20-CV-1067-KHV-GEB

---

120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
(785) 296-2215
anthony.powell@ag.ks.gov
dwight.carswell@ag.ks.gov
kurtis.wiard@ag.ks.gov

**OFFICE OF ATTORNEY GENERAL
KRIS W. KOBACH**

Anthony J. Powell
  *Solicitor General*
Dwight R. Carswell
  *Deputy Solicitor General*
Kurtis K. Wiard
  *Assistant Solicitor General*

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

Transcript of Bench Trial, Day 1
    (ECF No. 564) ...................................................................................... 1

1

2                        UNITED STATES DISTRICT COURT
                             DISTRICT OF KANSAS,
3
    JOSHUA BOSIRE, ET AL/
4   MARK ERICH, ET AL,

                                      Docket No. 19-1343-KHV
5                                                20-1067-KHV

6    Plaintiffs,                      Kansas City, Kansas
                                      Date: 5/1/2023
7      v.

8   HERMAN JONES in His
    Official Capacity,
9
     Defendant.
10  ..................

11                           TRANSCRIPT OF
                           DAY ONE - BENCH TRIAL
12               BEFORE THE HONORABLE KATHRYN H VRATIL,
                  UNITED STATES SENIOR DISTRICT JUDGE.
13
    APPEARANCES:
14
    For the Plaintiff :      Madison A Perry, Patrick A McInerney,
15                           Owale Akinmoladun & Leslie Greathouse
                             Spencer Fane LLP -KC
16                           1000 Walnut Street, Suite 1400
                             Kansas City, MO  64106
17
                             Sharon Brett & Kunyu Ching
18                           ACLU Foundation of Kansas
                             6701 W 64th Street, Suite 210
19                           Overland Park, KS  66202

20  For the Defendant:       Arthur S Chalmers
                             Office of Attorney General - Kansas
21                           120 SW 10th Avenue
                             Topeka, KS  66612
22
    Court Reporter:          Nancy Moroney Wiss, CSR, RMR, FCRR
23                           Official Court Reporter
                             558 US Courthouse
24                           500 State Avenue
                             Kansas City, KS  66101
25

```
 1                        I N D E X

 2
      Opening Statement by Ms. Brett                    4
 3
      Video Deposition Designations of Trooper Justin  92
 4    Rohr played

 5
      Plaintiffs' Witnesses:                          Page
 6
      SHAWNA MALONEY
 7      DIRECT EXAMINATION BY MS. CHING                 15
        CROSS EXAMINATION BY MR. CHALMERS:             53
 8
      MARK ERICH
 9      DIRECT EXAMINATION BY MS. CHING                 57
        CROSS EXAMINATION BY MR. CHALMERS              82
10

11

12

13                      E X H I B I T S

14    Plaintiffs'
        Exhibits          Offered          Received
15
              29             25                25
16    32 (First Page)        66                66
              34             39                39
17            35             41                41
              36             19                19
18    36 (In Entirety)       51
              87             92                92
19            88             92                92
              89             92                92
20            90             92                92
              91             92                92
21            92             92                92
              93             92                92
22            94             92                92
          Page 0126          19                19
23           127             28                28

24

25
```

1         THE COURT:  Good morning.  Let me apologize for the

2    delay.  I call Shaw, et al versus Jones, Case Number 19-1343

3    and the companion case.  I don't have the case numbers in front

4    of me.  Who's got that information handy?

5         MS. BRETT:  20-1067, Erich et al V Jones.

6         THE COURT:  Thank you.  Would you all enter your

7    appearances please?

8         MS. BRETT:  Good morning, Your Honor.  Sharon Brett

9    from the ACLU on behalf of the plaintiff, and if I could just

10   take a moment and introduce our clients who are also in the

11   room.  We have Mr. Joshua Bosire, Mr. Blaine Shaw, Mr. Mark

12   Erich and Miss Shawna Maloney today.

13        THE COURT:  All right.  Thank you.

14        MS. CHING:  Good morning, Your Honor.  Kunyu Ching for

15   the plaintiff ACLU.

16        MR. MC INERNEY:  Morning, Your Honor.  May it please

17   the court, Pat McInerney for Spencer Fane for the plaintiffs,

18   along with Owale Akinmoladum, Madison Perry and Leslie

19   Greathouse all from Spencer Fane.

20        MR. CHALMERS:  Appearing for the defendant Herman

21   Jones is Art Chalmers of the Kansas Attorney General's office,

22   and this is Colonel Herman Jones, Your Honor.

23        THE COURT:  Good morning.  All right.  I assume

24   everybody's here and ready for trial.  Do you want to give

25   opening statements?

1           MS. BRETT:  Yes, Your Honor.

2           THE COURT:  All right.

3           MS. BRETT:  Please.  Good morning, Your Honor, and may

4   it please the court.  This case was initially filed in 2019,

5   but it really began back in 2016 when the Vasquez v Lewis

6   decision came down from the Tenth Circuit, and the Kansas

7   Highway Patrol decided to largely ignore it.  As you know,

8   Vasquez was a Fourth Amendment case brought against a highway

9   patrol trooper, and in Vasquez, the Tenth Circuit made two

10  things clear.  First, they said it's time to abandon the

11  pretext that takes citizenship as a permissible basis upon

12  which to justify the detention and search of out-of-state

13  motorists.  They also said innocent travel indicia such as

14  state of origin or destination are, quote, so broad as to be

15  indicative of almost nothing, end quote.  We are here today

16  because three different sets of plaintiffs involved in three

17  totally unrelated traffic stops knew their rights.  They were

18  detained without reasonable suspicion by the Kansas Highway

19  Patrol in violation of Vasquez and the Fourth Amendment based

20  in part on their travel to or from Colorado, and they knew what

21  happened to them was wrong.  In two of these stops, juries have

22  all ready found that the KHP troopers involved detained the

23  drivers without reasonable suspicion, and in the third stop,

24  the court will hear about that today involving Mr. Erich and

25  Miss Maloney.  The court will hear evidence this week that they

1  too were subjected to a prolonged roadside detention without

2  adequate justification.  In each of these stops, the plaintiffs

3  were detained in part because of their travel plans to or from

4  Colorado, despite the Vasquez decision, and each of these

5  drivers knew their rights enough to file a lawsuit.  This is

6  not a case about travel plans that are inconsistent or

7  nonsensical.  This is about Kansas Highway Patrol troopers

8  having continued the practice of relying on the mere fact that

9  people are travelling from places that have legalized drugs,

10  which today is virtually every state that surrounds Kansas.

11  You'll hear evidence that troopers continue to rely on travel

12  to or from, quote, drug source states in forming reasonable

13  suspicion to this day, but you will not hear any evidence to

14  suggest that the KHP's unlawful practices have been abated to

15  any degree.  In fact, you'll hear that the KHP trains its

16  officers to do exactly what they did to our clients.  But

17  unlike our clients, many people do not know their rights and

18  would never know to complain.  Plaintiffs are asking for

19  injunctive and declaratory relief because they want this to

20  stop.  They don't want other people to have to go through what

21  they went through and then fight for four years to get any

22  measure of accountability.  This is not a case about money for

23  them.  It never has been.  And we know that in these sorts of

24  cases, damages are not always available.  We saw that in the

25  trial of Mr. Blaine Shaw.  But even where damages are rewarded,

1    they are a drop in the bucket for the KHP budget.  They do not

2    and will not meaningfully deter this conduct, and we know that

3    because Vasquez is a case that resulted in a payment of damages

4    in the end, but the evidence will show that nothing changed as

5    a result.  And we also know that because the two trooper

6    defendants in the trials, as this court has all ready heard,

7    admitted that they learned nothing from Vasquez, and they

8    didn't think that they did anything wrong in the stops of our

9    clients.  The evidence will show that the Kansas Highway Patrol

10   continues to target out-of-state drivers for traffic stops and

11   roadside detention for canine searches in part because of their

12   state of origin or destination, and they will not stop unless

13   this court steps in.  The scope of the court's equitable powers

14   is broad, and in fact, it's at its broadest when -- and most

15   flexible when important public rights such as Constitutional

16   rights are at stake.  We believe that at the end of this trial,

17   the evidence will demonstrate not only that prospective

18   equitable relief is proper, it's required.  The legal standard

19   for success on the merits in this case is straight forward, and

20   the court has all ready recognized this in previous orders.

21   The plaintiffs must show an ongoing violation of federal law,

22   and they must show a causal nexus between the defendant's

23   conduct and that continuing violation.  And here's how the

24   plaintiffs are going to meet that standard.  First, on the

25   ongoing violation of federal law, we have two jury verdicts

1    now.  The stop and detention of the third set of plaintiffs,

2    Mr. Erich and Miss Maloney, will demonstrate that they were

3    detained while driving their newly purchased RV on a road trip

4    with their kids from Colorado to Alabama.  You'll also hear

5    testimony from other individuals who were subjected to

6    prolonged roadside detentions in part based on their travel

7    plans or their state of origin or destination, including one

8    person detained as recently as September.  This will all show

9    that this is not just an isolated incident or two.  It's

10   widespread across troopers, across different KHP units, and

11   across the entire agency.

12        You'll hear testimony from our expert Doctor Jonathan

13   Mummolo who conducted a statistical analysis of KHP stops and

14   detentions for canine sniffs, and found that KHP systematically

15   targets out-of-state motorists for traffic stops, and then

16   detains them at a rate far higher than their share of the total

17   traffic on the roads.  KHP stop and detention practices cannot

18   be explained by a policy that is neutral to in-state versus

19   out-of-state motorists.  And the evidence will suggest that KHP

20   uses pretextual stops to target these out-of-state drivers, and

21   then once they are stopped, the troopers do the very thing that

22   Vasquez told them they cannot do.  They cannot assume that

23   someone is trafficking drugs just because they are coming from

24   out-of-state.  In fact, multiple troopers will testify that

25   they still consider Colorado to be a drug source state, they

1  consider I-70 to be a drug trafficking corridor, and for those
2  reasons, they rely on travel plans to or from Colorado across
3  I-70 in forming a reasonable suspicion.  We will also put on
4  evidence about KHP's use of the Kansas two-step, and it will be
5  shown to be a manipulative tactic to get inside people's cars.
6  KHP believes that when they are taking two steps away for as
7  little as a second at times and then re-approaching, that they
8  are converting the encounter from an involuntary detention for
9  a traffic stop to a voluntary consensual contact so that they
10  can continue questioning drivers and then ask for consent to
11  search the vehicle.  The testimony will show that when the
12  two-step is employed, the answers given do not matter.  In
13  fact, the evidence will show that drivers do not feel free to
14  leave during these so-called consensual encounters; yet, KHP
15  trains their troopers to use this tactic anyway.  The evidence
16  will show it is designed to disarm drivers into giving up their
17  rights, and this tactic directly contributes to the
18  Constitutional violations at issue in this case, and that's why
19  plaintiffs are asking the court to put an end to it.
20      The second element, the causal nexus between the
21  superintendent and the ongoing Constitutional violations.
22  Superintendent Jones will tell you that the buck stops with
23  him.  He's in charge of policy, training, oversight, discipline
24  of his troopers.  But the evidence will show that Jones either
25  passes the buck, relying on other people to do his job, and

1    failing to step up to fix the issues within his agency, or he's

2    created a system where the buck never gets to him at all.  It

3    will show you that Superintendent Jones fails to ensure that

4    troopers understand Vasquez and that they follow it.  It will

5    show you that Superintendent Jones did not even think to

6    require troopers to document their roadside detentions unless

7    the canine alerts, and a search was conducted and contraband

8    was found.  Even after the Tenth Circuit had fired its warning

9    shot about these very practices in Vasquez, you will hear Chief

10   Aden, our other expert, explain that that lack of documentation

11   means there has never been anyone confirming that these

12   seizure-less roadside detentions are done above board.  The

13   testimony will demonstrate that there are huge holes in the

14   type of information that KHP collects, which allows

15   Superintendent Jones to be willfully ignorant of the problems

16   occurring under his watch.  Superintendent Jones does not

17   collect information on stops and detentions that do not result

18   in canine alerts, or when the canine does alert but no

19   contraband is found.  He doesn't address issues that are

20   adjudicated in the courts and in the context of motions to

21   suppress.  He doesn't have any way of systematically analyzing

22   continuing problems within his agency and then taking action to

23   fix those problems.  Testimony from people involved in the

24   agency's internal affairs unit, the Professional Standards

25   Unit, the PSU, will show that allegations of Constitutional

1   violations are not taken seriously, and there's no meaningful

2   internal accountability mechanism to prevent, detect and

3   appropriately respond to continued violations of law across the

4   agency.

5       The evidence will show that the PSU is entirely

6   reactive.  Its only function is to respond to complaints from

7   people who knew their rights were violated.  The PSU conducts

8   no meaningful analysis of whether there are systemic issues

9   occurring within the agency.  They focus only on individual

10  incidents, only when people complain, and once those incidents

11  are resolved, the superintendent moves on.

12      You will hear testimony from expert Chief Aden that

13  will show that Jones' hands-off approach in this regard is

14  completely inconsistent with how an agency should be run, and

15  undoubtedly leads to Constitutional violations occurring under

16  his watch, and all of this will show that Superintendent Jones

17  engages in a conscious abdication of his responsibilities as

18  the head of this law enforcement agency, and this abdication

19  directly results in Constitutional violations, the ones that

20  the plaintiffs experienced and that other motorists will

21  continue to experience if not stopped.

22      So plaintiffs will provide ample evidence to show that

23  Superintendent Jones should be held liable here, and that then

24  to get an injunction, the plaintiffs will show that irreparable

25  harm will continue if an injunction does not issue, that the

1    threatened injury to the plaintiffs and others like them

2    without an injunction outweighs any conceivable harm that an

3    injunction might cause to Superintendent Jones, and that an

4    injunction would not adversely impact the public interests.

5    The evidence in this case will show that there is no adequate

6    remedy available at law.  It is more than mere speculation that

7    this could occur again, that it's continuing to occur now.  The

8    plaintiffs will testify and have testified in the prior trials

9    that they continue to drive across the state with out-of-state

10   plates.

11        Evidence from Doctor Mummolo will show you that

12   out-of-state drivers are systematically targeted for this type

13   of conduct, and the evidence will show you that the KHP has

14   failed to adequately instruct its troopers on Vasquez, and many

15   troopers still rely on things that the Tenth Circuit in Vasquez

16   says that they may not rely on or that are indicative of almost

17   nothing.  We will show you that there is no adequate remedy at

18   law, that it is hard to bring 1983 lawsuits.  There are

19   structural and economic barriers to doing so, including to --

20   including barriers to locating counsel who can represent you in

21   the exact type of conduct we are talking about here this week.

22   We will show you that through Curtis Martinez, and we have all

23   ready shown you that through the trial of Mr. Blaine Shaw.

24   Drivers should not have to wait until their rights are violated

25   to obtain relief from an ongoing practice.  As a matter of law,

1    Constitutional violations constitute irreparable harm in and of

2    themselves, but the failure of Superintendent Jones to ensure

3    adequate discipline through the KHP for violations of Vasquez

4    creates an assumption that this misconduct will continue

5    without an adequate remedy.

6         The evidence will also show that the balancing of

7    harms tips in plaintiffs' favor.  The Kansas Highway Patrol

8    will not and cannot make any colorable argument that they must

9    be able to continue to violate federal law, or that they are

10   somehow harmed if they are required to comply with the

11   Constitution.  A carefully tailored injunction can ensure that

12   any state interest in drug trafficking detection is balanced

13   against the overall interests in upholding drivers'

14   Constitutional rights.  Chief Aden will testify that it is

15   possible to police in a way that is both consistent with public

16   safety and the Constitution.  The United States Constitution

17   requires some inefficiency, sometimes by design to limit abuses

18   of power.  As Justice Scalia observed, the Constitution is not

19   a road map for maximally efficient government, but a system of

20   carefully crafted restraints designed to protect the people

21   from improvident exercise of power; requiring the KHP to follow

22   the law and respect motorists' Fourth Amendment right to be

23   free from unreasonable searches and seizures is clearly within

24   the public interests.  It is why there has been attention on

25   this case and why the plaintiffs have kept at this for so long,

1   for four years.  Police should not be permitted to abuse their

2   power under the guise of public safety.  Indeed, public safety

3   and public interests are supported, not diminished when all

4   people including police officers follow the law.  We believe

5   that all of this taken together will show that the plaintiffs

6   are entitled to the relief that they seek.  The plaintiffs will

7   ask the court at the end of this case to find in their favor,

8   and if the court has concerns about the contours of the relief

9   to which plaintiffs are entitled, the court can issue a limited

10  injunction, and direct the parties to engage in a remedial

11  process to structure what that relief should look like, but in

12  the end, plaintiffs believe they will demonstrate that the

13  continued pattern of Constitutional violations merits both

14  declaratory and injunctive relief.

15          Again, we are here this week because these plaintiffs,

16  this group of plaintiffs knew their rights, and they stood up

17  for those rights.  They had the tenacity and the strength to

18  keep at this case.  It should not take this level of herculean

19  effort to get the KHP to comply with the law.  The

20  superintendent has the power to fix this, and he hasn't done

21  it.  The evidence will show that this conduct has gone on for

22  years, and it will continue to go on after he leaves his

23  position this summer if the court does not take action, because

24  it's pervasive.  That is why the plaintiffs are turning to you,

25  Your Honor.  The broad equitable powers of this court exist for

1   a reason, and it is to provide a check on unlawful conduct by

2   other agencies of government.  The plaintiffs will prove that

3   KHP continues to violate Vasquez and the Fourth Amendment as a

4   whole through its use of the two-step and its practice of

5   continuing to detain drivers based in part on the fact that

6   they are from Colorado or are headed to and from that

7   direction, and when we prove this at the end of the case, we

8   will respectfully ask that the court step in and end this

9   pervasive practice for good.  Thank you.

10          THE COURT:  Thank you.  Mr. Chalmers.

11          MR. CHALMERS:  Your Honor, if you would allow,

12   defendant would defer its opening statement to the close of

13   plaintiffs' case if it's necessary at that point.

14          THE COURT:  Sure.  I'm not going to require anybody to

15   make an opening statement.  All right.  Plaintiffs will call

16   their first witness then.

17          MS. CHING:  Your Honor, the plaintiffs call Shawna

18   Maloney to the stand.

19          THE COURT:  Thank you.  Ma'am, would you please step

20   here into the witness box, and raise your right hand so you can

21   be sworn?

22      (Witness sworn.)

23          THE WITNESS:  I do.

24          MS. HARPER:  Thank you.  You may be seated.

25          THE COURT:  Go ahead.

1                    SHAWNA MALONEY,

2     Called as a witness on behalf of the plaintiffs, having been

3     first duly sworn, testified as follows:

4                    DIRECT EXAMINATION

5     BY MS. CHING:

6     Q.   Good morning, Miss Maloney.  Could you please state your

7     name and spell it for the record?

8     A.   Shawna Maloney.  S H A W N A.  M A L O N E Y.

9     Q.   And where do you live?

10    A.   Willowick, Ohio.

11    Q.   Have you always lived there?

12    A.   No.

13    Q.   Where did you live before Willowick?

14    A.   Loveland, Colorado.

15    Q.   When did you live in Colorado?

16    A.   From 2016 to 2021.

17    Q.   What is your highest level of education?

18    A.   Associates' degree.

19    Q.   Are you employed?

20    A.   Yes.

21    Q.   What do you do?

22    A.   I'm a bartender.

23    Q.   Do you work full-time or part-time?

24    A.   Part-time.

25              THE COURT:  Ma'am, could you pull the microphone down

1   closer?

2        MS. CHING:  Thank you, Your Honor.

3   BY MS. CHING:

4   Q.  Are you married?

5   A.  Yes.

6   Q.  Who is your spouse?

7        THE COURT:  Closer; it's not picking up your voice.

8        THE WITNESS:  Mark Erich.

9   BY MS. CHING:

10  Q.  Can you tell us a little about your family?

11  A.  Mark and I live together, and we have three children;

12  Dylan, Michael and Berlin.

13  Q.  Do you ever take vacations as a family, you, your husband

14  and the kids?

15  A.  We do.

16  Q.  What sorts of places do you visit on vacation?

17  A.  We like to go to NFL games, the beach, and we go camping.

18  Q.  How do you usually travel to those places?

19  A.  We drive.

20  Q.  Do you ever travel through Kansas for those trips?

21  A.  Yes.

22  Q.  Did you take a family vacation in March of 2018?

23  A.  Yes.

24  Q.  Where were you living at that time?

25  A.  Loveland, Colorado.

```
 1   Q.   And where were you going on that trip?

 2   A.   Huntsville, Alabama.

 3   Q.   What was the purpose of that trip?

 4   A.   To visit family.

 5   Q.   What was your planned route from Colorado to Alabama?

 6   A.   We would take I-70 east through Kansas.

 7   Q.   Were you stopped by the police on your way there?

 8   A.   Yes.

 9   Q.   How were you getting to Alabama?

10   A.   We were driving our RV.

11   Q.   When did you buy that RV?

12   A.   February 14th.

13   Q.   Of 2018?

14   A.   Yes.

15   Q.   How did you feel about purchasing that RV?

16   A.   We were so excited.  Umm, we had saved for a very long

17   time.  Umm, we were looking forward to spending time with our

18   family together.

19   Q.   What kind of condition was the RV in when you bought it?

20   A.   It was used.

21   Q.   Did it need any kind of work done to it before you drove it

22   off the lot?

23   A.   Yes.

24   Q.   What kind of work?

25   A.   The flooring needed to be replaced and the surround in the
```

1    shower needed to be replaced.

2    Q.  And when was that work done?

3    A.  Before we purchased it.

4    Q.  And who did that work?

5    A.  The dealership.

6    Q.  I'm going to show you now what has been previously marked

7    as Exhibit 36, Bates Number Erich/Maloney 0122 through 29 that

8    should be in your binder in front of you, Exhibit 36.

9    A.  36?

10   Q.  Yeah, if you could take a moment to flip through all those

11   pages, and let me know when you're done.

12   A.  Okay.  Okay.

13   Q.  Have you looked through all of them?

14   A.  Yes.

15   Q.  Okay.  Have you seen Exhibit 36 before?

16   A.  Yes.

17   Q.  What is it?

18   A.  It's a picture of the shower and toilet in the bathroom of

19   the RV.

20   Q.  Are you sure you're on Exhibit 36?  Should be tab

21   Number 36.

22   A.  Maybe I'm one before it.  I was one before it.  So this is

23   a picture of the driver's side of the RV.

24   Q.  Okay.  What else is in Exhibit 36?

25   A.  There's a picture of the front of the RV, also the rear.

1    Q.  Okay.  Who took these photos?

2    A.  I did.

3    Q.  When did you take them?

4    A.  When we returned home from the trip.

5    Q.  Okay.  And are these photos in Exhibit 36 a fair and

6    accurate depiction of how the RV looked at the time of the

7    stop?

8    A.  Yes.

9            MS. CHING:  Your Honor, I move to admit.

10           THE COURT:  Any objection?

11           MR. CHALMERS:  I don't think they're relevant.  I

12   mean, I -- it may be that there's some photograph that is, but

13   I don't think they're relevant, Your Honor.

14           MS. CHING:  Well, Your Honor, I intend to ask her

15   specifically about one of the photos, and that photo will show

16   the exterior of the RV, which was a factor in Trooper Rohr's

17   purported reasonable suspicion for detaining them.

18           THE COURT:  Do all of the pictures show that, or is

19   just one of them relevant?

20           MS. CHING:  I mean, I would argue that they're all

21   relevant, Your Honor, but I'm focusing specifically on one of

22   them.

23           THE COURT:  Which is number what?

24           MS. CHING:  The fifth page.  That should be -- look

25   here, I believe it is Bates Stamped Erich/Maloney 0126.

```
 1            THE COURT:  So we'll receive that one, and then if the
 2   others become relevant, we'll take that up at that time.
 3            MS. CHING:  Thank you, Your Honor.
 4            THE COURT:  What exhibit number is that -- Page 06 of
 5   --
 6            MS. CHING:  This is Exhibit 36, the fifth page, which
 7   is bates stamped in the lower right-hand corner Erich/Maloney
 8   0126.
 9            THE COURT:  Okay.  Go ahead.
10            THE WITNESS:  I'm sorry, could you please repeat that?
11   BY MS. CHING:
12   Q.  What was the question?
13   A.  Could you repeat what you said?
14   Q.  Yes, the fifth page.
15   A.  Okay.  Thank you.
16   Q.  Okay.  What does this photo show, Miss Maloney?
17   A.  It shows the rear of the RV.
18   Q.  What kind of license plate did the RV have at that time?
19   A.  Our temporary tag from Colorado.
20   Q.  I'd like to direct your attention to the middle of the back
21   of the RV.  There are some horizontal stripes running across
22   the back of the RV right below the word Chalet.  Do you see
23   that?
24   A.  Yes.
25   Q.  And in the middle of the RV below those stripes, what do
```

1   you see there?

2   A.  I see a discolored spot that looks different from the rest.

3   Q.  Why does it look different?

4   A.  It's my understanding that there was a decal that had been

5   removed before we purchased the vehicle.

6   Q.  Okay.  Going back to your trip to Alabama, who was doing

7   the driving?

8   A.  Mark.

9   Q.  Where were you sitting?

10  A.  In the passenger seat.

11  Q.  Was anyone else in the RV with you?

12  A.  Yes.

13  Q.  Who?

14  A.  Dylan and Michael.

15  Q.  And how old was Dylan and Michael at that time?

16  A.  10 and 13.

17  Q.  What day did you leave on your trip?

18  A.  We left on March 8th, 2018.

19          MS. CHING:  You can take that down.

20  BY MS. CHING:

21  Q.  About what time of the day did you leave?

22  A.  In the evening time, later evening time.

23  Q.  Why did you choose to leave at that time?

24  A.  We thought it would be easier to drive with the kids while

25  they were sleeping.

1  Q.  So you drove through the night?

2  A.  Yes.

3  Q.  Is that a typical thing for you to do on a family vacation?

4  A.  Yes.

5  Q.  Did your planned route require you to go through Denver?

6  A.  It did.

7  Q.  Okay.  And did you encounter any traffic coming through

8  Denver?

9  A.  Yes, we did.

10  Q.  About how long did it take you to reach the Kansas border?

11  A.  It was more than four hours.

12  Q.  Prior to being stopped by the KHP, did you take any breaks

13  from driving?

14  A.  Yes.  Yes, we -- we had stopped for dinner, we stopped for

15  fuel, and then we had stopped at a rest area off of I-70.

16  Q.  Okay.  What time did you stop at that rest area?

17  A.  It was about 5:00 AM.

18  Q.  Okay.  Was it still dark at that time?

19  A.  Yes.

20  Q.  How long was that break?

21  A.  It was about ten minutes.

22  Q.  And what did you do during that break?

23  A.  We made hot chocolate.

24      MR. CHALMERS:  Your Honor, excuse me.  I hate to

25  interrupt, but we're talking about a stop, not the travel I

1    don't think, and I don't see how it's relevant.

2            MS. CHING:  I'm moving on, Your Honor.

3            THE COURT:  Okay.  Overruled.

4    BY MS. CHING:

5    Q.  What happened after your rest break?

6    A.  Shortly after we continued on I-70, we were pulled over by

7    the Kansas Highway Patrol.

8    Q.  Are you aware that there was a dash cam video recording

9    things from the trooper's car?

10   A.  I'm aware.

11   Q.  And have you seen that video?

12   A.  Yes.

13   Q.  I'd like to play some parts of that video for you now

14   what's been marked as Exhibit 29, and I believe the parties

15   have stipulated to this exhibit.

16           MR. CHALMERS:  No, we haven't, Your Honor.  The

17   exhibit contains some inadmissible hearsay or really doubled,

18   multiple hearsay, and so we haven't stipulated to it.

19           THE COURT:  You know, number one, I can't hear you,

20   you have to keep your voice up, and number two, this is not a

21   jury trial, and so I'm going to be a lot more lenient in

22   letting evidence in, because I can decide after the fact

23   whether it contains hearsay or whether it is sufficiently

24   relevant.  So let's not get too bogged down with objecting to

25   every other question.  Okay?

 1              MR. CHALMERS:  I appreciate that, and I will try not

 2      to, but for the record, parts of it contain inadmissible

 3      hearsay, Your Honor.

 4              THE COURT:  Okay.  And on the video, is what -- what

 5      part should I be looking for that's inadmissible hearsay?

 6              MR. CHALMERS:  It has to do with statements made by

 7      troopers that are not listed as witnesses, will not be here at

 8      trial concerning what they smelled or didn't smell in the -- on

 9      the vehicle, Your Honor.

10              THE COURT:  Okay.

11              MS. CHING:  It's my understanding, Your Honor,

12      statements of troopers are statements of Superintendent Jones'

13      agents or employees within the scope of the employment

14      relationship, so this is not hearsay under Rule of Evidence

15      803, or sorry, 801 D 2 D.

16              THE COURT:  And why is that incorrect, Mr. Chalmers?

17              MR. CHALMERS:  Well, you're talking about a statement

18      of an agent for the purpose of speaking for the -- for the

19      highway patrol.  That exception doesn't go to the idea that

20      someone is an employee, now whatever they say is admissible

21      with respect to their employer and an exception to hearsay.  I

22      don't --

23              THE COURT:  I think it just speaks of statements made

24      within the scope of their responsibilities and agency, but

25      it -- for our purposes, let's just watch the video.  I'm

1   familiar with the rule.  I can figure this out later.  Go

2   ahead.

3         MS. CHING:  Thank you, Your Honor.  Could you please

4   begin the video at 12 seconds and play until 1 minute 32.

5   (Video playing).  Miss Maloney, is that your RV?

6         THE WITNESS:  Yes.

7   BY MS. CHING:

8   Q.  Let's keep playing until 315, please.  Sorry.  One moment,

9   Your Honor.  I think we're having an issue with the sound.

10   Your Honor, could we take a five-minute recess please to figure

11   this out?

12         THE COURT:  Let's do that.  Court's in recess.

13         (Whereupon court took a recess.  Proceedings then continued

14   as follows:)

15         THE COURT:  We all set?

16         MS. CHING:  Yes, I believe so, Your Honor.  Before we

17   start, I'm not sure Exhibit 29 was admitted, so I'd like to

18   move to admit it at this time for purposes of the record.

19         THE COURT:  Received.

20         MS. CHING:  Thank you.  Could we begin playing

21   Exhibit 29 from the beginning, and play it until 315, please?

22         (Video playing).

23         MR. CHALMERS:  Your Honor, I don't think they're

24   syncing the sounds to the tape as it's being played.

25         THE COURT:  Well, what do you think it should say?

1          MR. CHALMERS:  Well, they had the conversation

2    starting when he was behind the vehicle walking up to it.

3    It's -- the conversation is on the tape, it's just not synced

4    to the tape, it's not running correctly.

5          THE COURT:  That's not what I saw.  Back it up and

6    let's double-check, but it looked like it was syncing to me.

7        (Video playing).

8    BY MS. CHING:

9    Q.  Miss Maloney, what was the name of the trooper who pulled

10   you over.

11   A.  Trooper Justin Rohr.

12   Q.  And is Trooper Rohr the one who did all the talking to you?

13   A.  Yes.

14   Q.  Did any of the other troopers talk to you?

15   A.  Not me personally.

16   Q.  Who appeared to be in charge, to you?

17   A.  Trooper Rohr.

18   Q.  Okay.  Can we please continue playing Exhibit 29 until 430?

19   Miss Maloney, did you and Mr. Erich do any painting on the RV?

20   A.  No.

21   Q.  Do you know if the dealership did any painting on the RV?

22   A.  It's my understanding that they did not.

23          MR. CHALMERS:  Wait.  Your Honor, I think she's asking

24   for hearsay at this point.  I don't -- I object.

25          MS. CHING:  Withdrawn, Your Honor.

1           THE COURT:  Okay.

2   BY MS. CHING:

3   Q.  At this point, you'd owned the RV for a few weeks, and

4   you've been sitting in it overnight.  Did you smell any

5   paint-like odors during that time?

6   A.  No.

7   Q.  Do you know what bondo is?

8   A.  Yes.

9   Q.  Do you know what it smells like?

10  A.  I do.

11  Q.  Would the smell of bondo or paint have been something that

12  you would have noticed at that time?

13  A.  Yes, it would have.

14  Q.  Why is that?

15  A.  I was three months pregnant at the time of the stop, and I

16  was suffering from severe morning sickness.

17  Q.  Can we continue playing Exhibit 29 until 512 please?  In

18  this portion that we just watched, the other trooper said that

19  the paint is fresh and it was on his hands.  Was there any wet

20  paint on the back of the RV?

21  A.  No.

22  Q.  Trooper Rohr noted that Mr. Erich had paint on his hand.

23  Do you recall that?

24  A.  I do.

25  Q.  Did Mr. Erich have paint on his hand?

1  A.  Yes.

2  Q.  Do you know where that paint on his hand came from?

3  A.  Yes.

4  Q.  Where was it from?

5  A.  It was from work.  He had been contracted to paint trim

6  that day.

7  Q.  How much paint was on his hand?

8  A.  Very small amount.

9  Q.  Okay.  I'm going to show you what's been marked now as

10  Exhibit 127, Bates Number Erich/Maloney 0111.  So if you could

11  flip in your binder to Exhibit 127, Tab Number 127.  Do you

12  recognize this photo?

13  A.  Yes.

14  Q.  Who took this photo?

15  A.  Mark.

16  Q.  When did he take this photo?

17  A.  While we were in Alabama on our trip.

18  Q.  And is that what his hand looked like during the stop as

19  far as you can remember?

20  A.  Yes.

21       MS. CHING:  Your Honor, I'd move to admit Exhibit 127.

22       MR. CHALMERS:  No objection.

23       THE COURT:  Received.

24  BY MS. CHING:

25  Q.  Could you smell the paint on Mr. Erich's hand?

 1   A.   No.

 2   Q.   Okay.  Could we go back now to Exhibit 29, the dash cam

 3   video?  What happened next, do you recall?

 4   A.   Umm, Trooper Rohr gave Mark his documents back.

 5   Q.   Can we please skip ahead to 1035 in Exhibit 29 and play

 6   until 1053?  When Trooper Rohr said have a safe trip, drive

 7   careful, and walked away, what was going through your head?

 8   A.   That we were free to go.

 9   Q.   Why did you feel that way?

10   A.   Because he had given Mark his documents back, and it was my

11   understanding at that time, his investigation was over.

12   Q.   Can we continue playing and pause at 1059, please?  When

13   Trooper Rohr came back and wanted to ask more questions, what

14   were you thinking?

15   A.   I was confused.  I didn't understand why he wanted to ask

16   more questions, and it made me scared to leave.

17   Q.   Why were you scared?

18   A.   Because of his position of authority.

19   Q.   Okay.  What about his position of authority caused you to

20   be scared?

21   A.   He had a gun, and he was standing directly next to the

22   vehicle.

23   Q.   When he came back to ask more questions, did you feel free

24   to leave?

25   A.   No.

1    Q.  Why not?

2    A.  It was too dangerous with him standing right next to the

3    vehicle, and he was engaged in conversation, and I felt that I

4    had to answer those questions.

5    Q.  Can we please keep playing until 1127?  When Trooper Rohr

6    said you're free to go, did you think that you were free to

7    leave at that point?

8    A.  At that point, I did.

9    Q.  Why?

10   A.  Because he said we were, and I trusted him.

11   Q.  And when he said that he was detaining you, how did you

12   feel?

13   A.  I was fearful.  I was -- I didn't know what to expect.  I

14   was worried.

15   Q.  What were you worried about?

16        MR. CHALMERS:  Your Honor -- I'm failing to see how

17   this is relevant, Your Honor.

18        THE COURT:  Okay.  I think it's relevant.  Go ahead

19   and answer.

20        THE WITNESS:  I had a lot of things going through my

21   head.  I didn't know where he was going with his questions.  I

22   didn't know what he was going to have us do.  I was scared for

23   the children in the back.

24   BY MS. CHING:

25   Q.  Can we continue playing until 1201 please?  Did Trooper

1  Rohr ever ask for an explanation of the paint on Mr. Erich's

2  hand?

3  A.  No, he did not.

4  Q.  And could you see Trooper Rohr's face as he was talking?

5  A.  Yes, I could.

6  Q.  And what did you observe of him when Mr. Erich explained

7  the paint on his hand?

8  A.  He didn't look like he was even listening to Mark speak.

9  He looked very un-impressed, and looked distracted.

10  Q.  At this point, did you smell any paint?

11  A.  No.

12  Q.  Can we please continue playing until 1233?  What reason or

13  reasons did Trooper Rohr give for detaining you?

14  A.  He believed we had a false compartment in the RV.

15  Q.  And when he said he planned to conduct a canine sniff on

16  your RV, what were you thinking?

17  A.  I was confused as to why.  I didn't understand where he was

18  going with that.  I was concerned about us getting out of the

19  vehicle in the dark on the side of the highway.

20  Q.  What was the weather like?

21  A.  It was very, very cold.  It was enough for the kids to be

22  shivering even with down comforters around them.

23  Q.  Can we please continue playing until 1345?  Was that you

24  speaking just now on this part of the video?

25  A.  Yeah.

1  Q.  Who were you speaking to?

2  A.  Mark.

3  Q.  What were you saying to Mr. Erich?

4  A.  I was asking him to grab Dylan's hand so he would be safe

5  walking along the side of the road.

6  Q.  What were you concerned about?

7  A.  I was concerned for his safety.  It was dark.  There was

8  trucks screaming by us, and it's a very dangerous spot to be.

9  Q.  Can we continue playing until a minute 14 please?  Who was

10  that that just got out of the RV?

11  A.  Dylan.

12  Q.  Can we continue playing until 1544?  And who was that now

13  that just got out of the RV?

14  A.  That was Michael.

15  Q.  Can we continue playing until 1557 please?  And who was

16  that that just exited the RV?

17  A.  It was me.

18  Q.  Why didn't you exit the RV immediately?

19  A.  I could not find Michael's shoes, and I did not want him

20  being out in the elements without protective gear on his feet.

21  Q.  What were you doing during this time?

22  A.  I was moving blankets and rugs on the floor looking for his

23  shoes.

24  Q.  Where did Trooper Rohr direct you to stand after you got

25  out of the RV?

1  A.  Parallel to the passenger side of the vehicle about five

2  feet in the ditch.

3  Q.  How many troopers were there at the scene at that time you

4  got out of the RV?

5  A.  Three.

6  Q.  What happened next after you all were out of the RV?

7  A.  Trooper Rohr notified us that his drug dog would be

8  sniffing the RV.

9  Q.  Okay.  Can we skip ahead in Exhibit 29 to minute 17 and

10  play until 1917 please?  Miss Maloney, did you watch the canine

11  sniff take place from where you were standing?

12  A.  Yes, I did.

13  Q.  And what did you notice about the canine sniff?

14  A.  He was very uninterested in the vehicle.  He was not -- he

15  was paying more attention to the traffic than he was to the

16  actual vehicle.  If it wasn't for Trooper Rohr smacking the

17  side of it, he wouldn't have even paid attention to it.

18  Q.  What were you thinking of while the sniff was going on?

19  A.  I was -- I was scared and nervous.  I was -- I was mad, and

20  I was very upset.  I felt it was a waste of our time, and the

21  kids are standing out in the cold freezing for nothing.

22  Q.  Let's skip ahead a bit to 1941 please, and keep playing

23  until 2034.  When Trooper Rohr told you that the canine had

24  alerted to the scent of drugs, what was your reaction?

25  A.  I was like, why is he lying?  There's no drugs in the

1    vehicle.

2    Q.  Were there any drugs?

3    A.  No, just prescription medications.

4    Q.  Did those medications include any illegal narcotics?

5    A.  No.

6    Q.  What were those medications for?

7    A.  For Dylan's autism, bipolar and ADHD, there was medication

8    for my high risk pregnancy, and there was also Albuterol

9    inhalers for our asthma.

10   Q.  When were you supposed to take that medication?

11   A.  6 o'clock AM.

12   Q.  6:00 AM mountain time?

13   A.  Yes.

14   Q.  Did you need to take it during the detention?

15   A.  I did.

16   Q.  Did you ask the troopers if you could take it at that time?

17   A.  Yes.

18   Q.  What did they tell you?

19   A.  They said no, hang tight.

20   Q.  The troopers offered to let you sit in the police car to

21   stay warm.  Did you take them up on that offer?

22   A.  No.

23   Q.  Why not?

24   A.  I didn't feel safe being separated from the children, and

25   standing next to him, I felt was the best way that I could

1    protect him.

2    Q.  Standing next to whom?

3    A.  Michael.

4    Q.  Did the kids take them up on the offer to sit in the

5    vehicle?

6    A.  They did.

7    Q.  How many police cars were at the scene?

8    A.  Three.

9    Q.  And which cruiser were you standing next to?

10   A.  The first one right behind the RV.

11   Q.  Where was Mr. Erich?

12   A.  In the cruiser behind us, Cruiser Number 2.

13   Q.  And where was Dylan?

14   A.  Dylan was in Cruiser Number 2.

15   Q.  What did Michael do when he got in the cruiser?

16   A.  He noticed that there was a picture and diagram of an RV

17   that was the same make and model of the one we had, and he

18   asked me why he had a picture of our RV on his computer.

19   Umm --

20   Q.  What did you see on the computer?

21   A.  I -- I did see the picture of the RV, I saw the diagram,

22   but I noticed it was a different year.

23   Q.  What year did you see on the computer?

24   A.  2005.

25   Q.  And what year was your RV?

1  A.  2006.

2  Q.  What's the difference between the 2005 and 2006 models?

3         MR. CHALMERS:  Lack of foundation, Your Honor.

4         THE COURT:  If you don't know, then don't answer, but

5  if you do know, go ahead.

6         THE WITNESS:  Okay, thank you.  I do know.  The 2005,

7  the spare tire is kept on the back of the vehicle, and the

8  model that we owned, the 2006, it's kept underneath the

9  vehicle.

10  BY MS. CHING:

11  Q.  How many troopers went inside the RV to do the search?

12  A.  Two.

13  Q.  What could you see of the search?

14  A.  Through the back window, I could see their silhouettes,

15  their flashlights, I could see them moving around, and the

16  things that they were dumping on the carpets.

17  Q.  Could you hear the search going on?

18  A.  Yes.

19  Q.  How were you able to hear it?

20  A.  The door to the RV was open, and I could also hear voices

21  through Trooper Rohr's radio.

22  Q.  What did you hear?

23  A.  I heard him sighing a lot and breathing heavy.  I heard

24  what sounded like our things breaking.  I heard him ask his

25  partner if he had found anything.

1   Q.  About how long did you wait while the search was going on?

2   A.  It was about 20 minutes.

3   Q.  What was going through your head while you were waiting for

4   them to finish searching?

5        MR. CHALMERS:  Your Honor, I -- again, I don't know

6   what the relevance is of this to the -- to whether there was

7   reasonable suspicion.

8        THE COURT:  I'd like to hear what she has to say, so

9   there's no need to keep objecting.

10       MR. CHALMERS:  All right.

11       THE WITNESS:  While we were waiting, I had to --

12  excuse me -- (crying) -- Michael had asked me a series of

13  questions regarding why we were getting searched.  Umm, I had

14  to explain to Michael that we were getting searched for drugs,

15  and my child didn't know what drugs were, so I had to explain

16  to them what drugs were, on the side of the highway while our

17  family RV is being searched.

18  BY MS. CHING:

19  Q.  Let's skip ahead in the video to 3850 and play until 4021,

20  please.  When Trooper Rohr told you you could get back in the

21  RV, how did you feel?

22  A.  I was really nervous, because that was now the third time

23  that he had said we were free to go, and I questioned if it was

24  true or not.

25  Q.  At that point, did you think you were free to go?

1    A.   Yes.

2    Q.   Why did you keep answering his questions?

3    A.   I was scared that if I didn't, that I would be arrested for

4    not cooperating with him.

5    Q.   Did you feel that way even though they didn't find any

6    drugs?

7    A.   Yes.

8    Q.   When you got back into the RV, what did you see?

9    A.   Umm, as I walked up the stairs, I noticed that the CB radio

10   had been dis-assembled and taken apart.  The dash had been

11   taken apart.  All of the domes for the lights and the smoke

12   detectors had been removed, and some had been stepped on and

13   broken.  They had gone through the refrigerator and all of the

14   cupboards.  All of our clothes had been dumped out of our

15   backpacks.  The mattress was moved and the hoses underneath the

16   settings were messed up.  The bathroom door was hanging off of

17   the frame.  The towel rack had been broken.  The panel that

18   goes underneath the shower had been removed and broken.  Our

19   toilet no longer worked.

20   Q.   I'm going to show you now what has been previously marked

21   as Exhibit 34, Bate Stamp Number Erich/Maloney 0114 through

22   0119.  Can you flip in your binders to Tab Number 34 please?

23   A.   Yes.

24   Q.   If you could take a minute and flip through all the pages

25   in Exhibit 34, and let me know when you're done.  Do you

1   recognize Exhibit 34?

2   A.  Yes.

3   Q.  What is it?

4   A.  This is pictures of the door frame not being attached to

5   the wall anymore for the bathroom.

6   Q.  Who took these photos?

7   A.  I did.

8   Q.  When did you take them?

9   A.  When we returned home from our trip.

10  Q.  And are the photos in Exhibit 34 a fair and accurate

11  depiction of the condition of the RV bathroom door immediately

12  following the search?

13  A.  Yes.

14      MS. CHING:  Your Honor, I move to admit.

15      MR. CHALMERS:  Not relevant to the issue whether

16  there's reasonable suspicion.  It was done during the course of

17  the search apparently, which was after a dog alert gave

18  probable cause.

19      THE COURT:  There's a lot of issues here that will

20  come to bear on the question whether I grant any equitable

21  relief, and I think that understanding how the troopers do

22  their jobs is very important to that consideration, so your

23  objection is overruled.  There are a lot of issues here besides

24  reasonable suspicion.  Go ahead.

25      MS. CHING:  So Exhibit 34 is admitted, Your Honor?

 1           THE COURT:  I'm sorry, yes.

 2    BY MS. CHING:

 3    Q.   Thank you.  Miss Maloney, how many photos are in

 4    Exhibit 34?

 5    A.   So there are -- excuse me, there are six photos, but three

 6    of them are duplicates.

 7    Q.   Can you please flip to the first photo of Exhibit 34?

 8    A.   Okay.

 9    Q.   What is shown in this first photo?

10    A.   This photo shows that the bathroom door frame is not

11    attached to the dry wall anymore.

12    Q.   Okay.  Let's go to the second photo now.  What's shown in

13    the second photo?

14    A.   That is a duplicate of the first.

15    Q.   Oh, I'm sorry, the third photo, third page?

16    A.   Umm, so this shows the damage that was done to the wall

17    from it being pulled away.

18    Q.   Okay.  And then let's flip to the fifth page.  What is

19    shown on this photo?

20    A.   This shows damage done to the frame and the hinge.

21    Q.   I'm going to show you now what's been marked at Exhibit 35,

22    Bates Number Erich/Maloney 0120 through 21.  If you could flip

23    to the next tab, Tab 35.

24    A.   Okay.

25    Q.   Do you recognize Exhibit 35?

1    A.   Yes.

2    Q.   What is it?

3    A.   That's a picture of our bathroom in the RV.

4    Q.   Who took these photos?

5    A.   I did.

6    Q.   When did you take them?

7    A.   When we returned home from the trip.

8    Q.   And is Exhibit 35 a fair and accurate depiction of the

9    condition of the RV immediately following the search?

10   A.   Yes.

11        MS. CHING:  Your Honor, I move to admit.

12        MR. CHALMERS:  Not relevant, Your Honor.

13        THE COURT:  Same ruling.  Received.

14        MS. CHING:  Thank you, Your Honor.

15   BY MS. CHING:

16   Q.   What does this photo show?

17   A.   So this photo shows that the panel below the shower had

18   been removed and broken, and it -- I mean, it -- I guess it

19   doesn't show the greatest picture for the toilet, but the

20   toilet was also inoperable.

21   Q.   Did the damage shown in Exhibit 34 and 35 exist before the

22   troopers went into the RV and searched it?

23   A.   No.

24   Q.   Okay.  You can take that down please.  How did you feel

25   when you saw the condition of the RV after the search?

1          MR. CHALMERS:  Your Honor, it's not relevant.  Goes to

2     the search itself, that goes to whether there's probable cause

3     or not.  Never been an issue in this case, and we object.

4          THE COURT:  Probable cause has never been an issue in

5     this case; what does that mean?

6          MR. CHALMERS:  It means that there's never been a

7     claim in this case that there was lack of probable cause for

8     the purpose of conducting the search of this -- of this RV, nor

9     has lack of probable cause ever been a claim as part of what

10    they want for injunctive relief, which all has to do with their

11    contention that there are roadside detentions being taken --

12    take place without reasonable suspicion, Your Honor.

13         MS. CHING:  Your Honor, this isn't about probable

14    cause.  This evidence is about the relative harms that the

15    plaintiffs have sustained, and those similarly situated to them

16    have sustained as a result of these kinds of searches.

17         MR. CHALMERS:  The Shaw case says that you don't --

18    that if there's probable cause, then you don't get into the

19    issue of the search and the damage of the search.  I mean,

20    that's -- their idea that you get injunctive relief arising

21    from damages in connection with the search has never been part

22    of this suit, nor is it viable under the Shaw decision, Your

23    Honor.

24         THE COURT:  I -- honestly, I don't understand your

25    objection.  So what's your response?

1          MS. CHING:  Your Honor, the harms -- the evidence

2     about the harms is important for the court to hear so that you

3     can have a full understanding of all the hardships when you

4     engage in the balancing analysis for an injunction.

5          THE COURT:  Mr. Chalmers, why is that wrong?

6          MR. CHALMERS:  The harm that they are articulating

7     flows from the roadside detention for a canine sniff, and the

8     alleged damages that would might flow from that.  This

9     testimony has to do with the search of the vehicle that was

10    done with probable cause after a dog alert that the Shaw case,

11    and -- and not only before this court, but the Shaw case before

12    the Tenth Circuit said look, if you've got probable cause at

13    that point, then you have the ability to conduct the search.

14    So if this search was done inappropriately, that is not

15    anything that is relevant to the issues that are being claimed

16    which is that there has been Constitutional violations from --

17    from detentions without allegedly reasonable suspicion.

18         THE COURT:  I'm going to go ahead and hear the

19    evidence, because it's more efficient use of time to sort this

20    all out later, and go ahead and receive all of the evidence.

21    It will not be prejudicial, because I can give it such weight

22    as it deserves at the end of the day.  Go ahead.

23         MS. CHING:  Thank you, Your Honor.

24    BY MS. CHING:

25    Q.  Miss Maloney, earlier you described other damage besides

1  that which we saw in Exhibits 34 and 35.  Did you do anything

2  with that before you continued on your way to Alabama?

3  A.   No, the only thing that I did was clean up the broken

4  pieces so that the children wouldn't step on them, and I put

5  the medication in a safe place.

6  Q.   To the best of your recollection, about how long did your

7  entire encounter with the KHP last?

8  A.   It felt like hours, but it was only about 40 minutes.

9  Q.   Okay.  And after forcing you to spend 20 minutes in the

10  dark cold weather, trying to keep your kids calm, making you

11  miss your medication, did the troopers ever find any illegal

12  drugs in the RV?

13  A.   No.

14  Q.   Any guns?

15  A.   No.

16  Q.   Any large sums of cash?

17  A.   No.

18  Q.   Any contraband?

19  A.   No.

20  Q.   Did they find anything illegal whatsoever?

21  A.   Nothing illegal.

22  Q.   How did you feel as you drove away?

23  A.   I felt -- I felt violated because this was our home while

24  we were on the road, and they did not have my permission to go

25  through our things.  I was scared for my children, and it

1 ultimately took away from our very first family vacation in

2 that RV.

3 Q. Did you have any further contact with the KHP on that trip?

4 A. We did. Umm, about -- after we left the stop with Trooper

5 Rohr, we stopped at a rest area so I could take my medication.

6 After that rest area, it was a while, it was maybe about

7 40 minutes or so, there was a Kansas Highway Patrol in the

8 median taking radar. As we passed him, he immediately pulled

9 out and was straddling the back of the vehicle just like

10 Trooper Rohr did previous. We became very, very nervous, very

11 scared. We didn't know what was going on. Mark could see in

12 his mirror that he was on his radio. He veered around us,

13 turned his emergency lights on, and turned around in the

14 median. We did not get pulled over.

15 Q. Okay. What effect did this experience with the KHP have on

16 you in the days immediately following on your way to Alabama

17 and while you were in Alabama?

18 A. It greatly took away from the experience that we were

19 trying to have with the children. It ruined the vacation. We

20 were supposed to be camping in the RV, and instead, we had to

21 use facilities at family members' houses because ours had been

22 broken. I had a lot of anxiety about being on the road.

23 Q. On your way back home from Alabama, what route did you

24 take?

25 A. We went through Texas instead of driving through Kansas.

1   Q.   Why did you choose to take that route instead?

2   A.   We did not want to risk getting pulled over again.

3   Q.   What experience did this have -- I'm sorry, what effect did

4   this experience have on you in the following months after the

5   trip was over?

6   A.   It affected me greatly to the point where I couldn't even

7   drive my own personal vehicle for about three months.  I had to

8   participate in therapy to learn tools that I could use to help

9   myself and my children.  I wasn't able to do daily tasks or go

10  to the grocery store on my own.

11  Q.   What effect did this experience have on your employment?

12  A.   I was no longer able to work full-time.  I wasn't able to

13  keep focus.  I went down to part-time.

14  Q.   Okay.  What effect did this experience have on your mental

15  health?

16  A.   It affects me everyday.  It affects me even when I'm not in

17  a vehicle.  It affects how I trust law enforcement.

18  Q.   Have you sought any medical treatment for any of these

19  affects?

20  A.   No.

21  Q.   But as --

22  A.   Just therapy.

23  Q.   Okay.  What impact did this experience with the KHP have on

24  your subsequent family vacations?

25  A.   We were not able to take another family vacation for about

  1   three years because the kids were too scared.  Umm, and when we

  2   would travel, we would take rental cars instead of using our

  3   own vehicle, personal vehicle.

  4   Q.  Why did you want to use rental vehicles instead of your own

  5   vehicle?

  6   A.  Because they would not have a Colorado tag.

  7   Q.  Why did you think that there was a significance to the

  8   Colorado tag?

  9   A.  Recreational marijuana is legal in Colorado.

 10   Q.  Okay.  On these trips when you rented a car, did the car

 11   rental agency ever offer you a car with Colorado tags?

 12   A.  No.

 13   Q.  Did you ever have to request a car without Colorado tags?

 14   A.  No, luckily.

 15   Q.  Did you ever try to take another trip in that RV?

 16   A.  Yes, Mark and I did.

 17   Q.  What happened on that trip?

 18   A.  Oh, it did not go well.  We had another encounter with

 19   police.  Our -- we went to Arkansas.  It was for my birthday.

 20   It was very hot and humid, and we needed a place to plug in so

 21   that we could have air conditioning.  We had gotten a flat

 22   tire, and so our vehicle was just kind of limping, limping

 23   along, so we pulled into a parking lot to plug in, and the

 24   store manager had called the police, and had them ask us to

 25   move due to the fact that they were closed and it was after

1    hours.  When they knocked on the door, I saw his badge through

2    the window, and I immediately just shut down and went into

3    fight or flight mode, and I couldn't -- I was -- I couldn't

4    even breathe.  My heart was pounding in my chest, and Mark had

5    to do all the interactions.

6    Q.  Was that the only other time you attempted to take a trip

7    in the RV?

8    A.  Uh-huh.

9    Q.  What happened to the RV?

10   A.  Oh, we had to sell it.  The kids wouldn't even go back in

11   it.

12   Q.  How did you feel about selling it?

13   A.  Awful.  My heart broke.

14   Q.  Why?

15   A.  Because that was something that we always wanted to do as a

16   family, and we had saved for it for quite a while.

17   Q.  Have you driven through Kansas since March 2018?

18   A.  Yes.

19   Q.  More than once?

20   A.  Yes.

21   Q.  How do you feel about driving through Kansas now?

22   A.  I don't feel safe driving through Kansas anymore.

23   Q.  How did this experience being stopped by the KHP affect the

24   way you travel through Kansas?

25   A.  It affects how we travel through.  Like I said, we'll use

1    rental cars, not our own personal vehicles.  It affects the

2    length of the stay, and -- and if we have a choice, we don't

3    bring the children along.

4    Q.  When you say it affects the length of the stay, what do you

5    mean by that?

6    A.  We won't spend as much time here as we would, because it's

7    not as enjoyable.

8    Q.  How did you feel about law enforcement prior to your

9    experience with the KHP?

10   A.  I trusted them.

11   Q.  And how do you feel about law enforcement now?

12   A.  I don't trust them, and it makes me very scared.

13   Q.  Do you know any law enforcement officers personally?

14   A.  Yes.

15   Q.  What's their relationship to you?

16   A.  A former brother-in-law, and Mark's cousin.

17   Q.  Are law enforcement officers?

18   A.  Yes.

19   Q.  Have your feelings toward your former brother-in-law and

20   Mark's cousin changed?

21   A.  Yes.

22   Q.  In what way?

23   A.  I won't ask them for help for anything, not advice, not

24   anything.

25   Q.  Have there been situations where you might have called the

1  police, but because of this experience, you avoided doing so?

2  A.  Yes.

3  Q.  Tell me about those situations.

4  A.  In the last year, I had gotten back from the grocery store

5  with Berlin, and I had noticed that the window to the front

6  door had been broken, and our dog crate was not in the place

7  that it was when I left.  I assumed somebody was in the home,

8  so I grabbed Berlin and I locked us in the car.

9  Q.  Was there another incident?

10 A.  We had trespassers on our property.  I had asked them to

11 leave.  They came back the following day, and I told them that

12 if they came back again, that I would call the police, but when

13 they came back again, I was too scared, so I didn't call.

14 Q.  How did your fear of that person who might have broken into

15 your home or that repeat trespasser compare to your fear of the

16 police?

17 A.  Doesn't compare.

18 Q.  Did you ever consider writing or calling the KHP to

19 complain about your encounter with Trooper Rohr?

20 A.  Yes, I did write a complaint that was given to our previous

21 lawyer, but I don't know what happened to that.

22 Q.  Did you decide to take any other action against the KHP?

23 A.  Yes, we decided to sue them.

24 Q.  And that's this lawsuit for which you're testifying today?

25 A.  Yes.

1   Q.  Why did you bring this lawsuit?

2   A.  Very, very important to speak up, because there's -- this

3   is happening to other families, this is happening to other

4   people, and a lot of these people are too afraid to stand up

5   for themselves, and it would prevent Kansas Highway Patrol from

6   targeting other families with out-of-state tags.

7   Q.  And what are you asking the court to do?

8   A.  I'm asking for an injunctive relief.

9   Q.  Okay.  What would an injunction mean to you?

10  A.  It would mean protection for other families.

11       MR. CHALMERS:  Your Honor, I don't think this is a

12  proper subject for fact testimony, and I object in terms of its

13  relevance, in terms of what she wants or not in that

14  connection.

15       THE COURT:  Overruled.  You can answer.

16       THE WITNESS:  It would mean protection for other

17  families, and it would also mean that they would be protected

18  even if they didn't know their own rights, and even if they

19  did.

20       MS. CHING:  One moment please, Your Honor.  Your

21  Honor, I would like to move to admit the remaining photos in

22  Exhibit 36 for two reasons.  One, because as evidence has

23  shown, Trooper Rohr thought that they were driving a slightly

24  different year of RV, and also the evidence has shown that the

25  body of the RV was relevant to why Trooper Rohr pulled them

1  over.

2          THE COURT:  So what's -- what's the basis for your

3  argument that he thought they were driving a different year of

4  RV?

5          MS. CHING:  That was the -- the evidence that we heard

6  from Miss Maloney about the wrong year model that was on

7  Trooper Rohr's computer inside his vehicle.

8          THE COURT:  That doesn't really say anything that he

9  believed.  It just shows that there was a picture of a

10  different model year in his vehicle.

11          MS. CHING:  The other reason is still that the body

12  and the outside of the RV is relevant to why Trooper Rohr

13  pulled them over.

14          THE COURT:  Okay.  The back.  What evidence are you

15  relying on in that statement?

16          MS. CHING:  There was the back.  There was also the

17  sniff conducted around the remainder of the vehicle.

18          THE COURT:  After the stop.

19          MS. CHING:  Correct.

20          THE COURT:  Okay.  So I thought you said the body of

21  the vehicle was why he stopped them.

22          MS. CHING:  Umm, yes.  Later evidence will show also

23  that there were other portions of -- of the body of the RV that

24  was relevant to why he pulled them over.

25          THE COURT:  Umm, I think you'll have to re-offer those

1    at a different time.  I don't think there's sufficient

2    foundation at this point.

3         MS. CHING:  Okay.  Your Honor, I will pass the

4    witness.

5         THE COURT:  Okay.  So we're going to take a lunch

6    break, but not until 1 o'clock, so let's go ahead with

7    cross-examination.

8                   CROSS EXAMINATION

9    BY MR. CHALMERS:

10   Q.  If we could put the exhibit up on the screen.  I believe

11   it's been marked as Exhibit 29 as the dash cam.  I'm going to

12   start at 3905, stopped it at 3933.  So you had a conversation

13   with the trooper in which he repeated that he'd smelled the

14   small odor of paint or bondo that was shown on that clip;

15   right?

16   A.  Yep.

17   Q.  And he showed you the back of your RV with the -- with the

18   flashlight, and you acknowledged that's where it looked like

19   there had been fresh paint, didn't you?

20   A.  I acknowledged that that spot looked different.

21   Q.  Yeah.  Now, you had testified I think briefly about a

22   decal.  Did you know that there had been a decal removed when

23   you had this conversation with Trooper Rohr?

24   A.  Yes.

25   Q.  And the removal of the decal, was that ever brought to

1   Trooper Rohr's attention?

2   A.  Many times, yes.

3   Q.  When was that brought to his attention?

4   A.  When he spoke with Mark.

5   Q.  And so that would be on the video somewhere?

6   A.  Yes.

7   Q.  Okay.  Then with respect to the photographs that you showed

8   of your husband's hand, he did have white paint on his hands;

9   is that right?

10  A.  Yes.

11  Q.  And the white seemed to match the back of the white of the

12  van, didn't it?

13  A.  No.

14  Q.  Not -- you couldn't tell that the white was the same?

15  A.  Mark had interior paint on his hand.

16  Q.  Okay.  Well -- but in terms of color, it appeared to be the

17  same, didn't it?

18  A.  No.

19  Q.  Let's look at that.  It's Exhibit 127 which is in evidence,

20  and I put it up there for a moment.  And does that fairly and

21  accurately depict the color of the white on your husband's

22  hands when he took the photograph, what, the day after the

23  event?

24  A.  Yes.

25  Q.  Or was it the day of the event?

1    A.   It was -- it was that morning when we got to family.

2    Q.   Okay.  And you agree that the photograph shows it's white

3    paint?

4    A.   It is white paint.

5    Q.   If we look at the back, Exhibit 36, the photograph that's

6    in evidence, can't see that.  I think it was Number 5, if I

7    recall.  That's the photograph that was in evidence of the back

8    of your -- of your van; is that correct?

9    A.   Back of the RV, yes.

10   Q.   Okay.  And the back of the RV is, of course, painted white?

11   A.   It wasn't painted.

12   Q.   Well, it was painted at some point.  I mean, it wasn't that

13   way originally.  It is white, let's put it that way.

14   A.   White or cream.

15   Q.   Now, the trooper told you that the dog had alerted after

16   the dog ran around the RV; is that correct?

17   A.   Yes.

18   Q.   And it wasn't until after the dog ran around the RV and

19   alerted that the troopers then conducted the search of the van;

20   is that correct?

21   A.   Yes.

22   Q.   The -- just -- it's kind of a footnote, but you testified

23   that you had an experience with some other police recently, an

24   encounter had to do with a flat tire, and you were being asked

25   to move.  Where was that?

1   A.   It was in a Wal-Mart parking lot, Arkansas.

2   Q.   So that was in Arkansas, not Kansas?

3   A.   Correct.

4   Q.   The -- the -- one of the first things that the trooper said

5   when he came up and indicated that you were detained was that

6   he smelled a strong odor of paint; isn't that correct?

7   A.   No.

8   Q.   What did he say?

9   A.   He believed we had a false compartment.

10  Q.   Didn't he say he had a strong odor of smell -- smelled a

11  strong odor of paint or bondo?

12  A.   Not when he said he was detaining us.

13  Q.   Never -- never told you that?

14  A.   Not me, no.

15  Q.   Or that you overheard.  You watched the video in which one

16  of the other officers indicated to the trooper that he had

17  actually touched the back of the van and had paint on his hand.

18  You saw that in the video, didn't you?

19  A.   I saw that, yes.

20  Q.   You're just saying that that didn't happen?

21  A.   There was no fresh paint.

22  Q.   When you -- then I guess lastly, when the trooper came up

23  and indicated that -- gave paperwork back and said you were

24  free to go, you felt free to go at that point?

25  A.   At that point, I did, yes.

1    Q.   Okay.  The trooper then said, can I ask you some more

2    questions, and your husband said, do I have to answer them, and

3    didn't; isn't that true?

4    A.   Yes.

5    Q.   He felt free to not respond to the trooper apparently?

6    A.   He knew his rights.

7    Q.   Okay.

8              MR. CHALMERS:  I don't have anything else, Your Honor.

9              THE COURT:  Any redirect?

10             MS. CHING:  No redirect, Your Honor.

11             THE COURT:  Thank you, ma'am.  You can step down.

12             THE WITNESS:  Thank you.

13             THE COURT:  Uh-huh.  Plaintiffs' next witness?

14             MS. CHING:  Your Honor, the plaintiff calls Mark

15   Erich.

16             THE COURT:  Sir, would you please step into the

17   witness box and be sworn so that you can testify?

18        (Witness sworn.)

19             THE WITNESS:  I do.

20             MS. HARPER:  Thank you.  Please be seated.

21             THE COURT:  Go ahead.

22                        MARK ERICH,

23   Called as a witness on behalf of the plaintiffs, having been

24   first duly sworn, testified as follows:

25                     DIRECT EXAMINATION

```
 1    BY MS. CHING:

 2    Q.  Good afternoon, Mr. Erich.  Can you please state your name

 3    and spell it for the record?

 4    A.  It's Mark Erich.  M A R K.  E R I C H.

 5    Q.  You live in Willowick, Ohio; is that right?

 6    A.  Correct.

 7    Q.  Where did you live before Willowick?

 8    A.  Loveland, Colorado.

 9    Q.  What years did you live in Colorado?

10    A.  2016 through 2021.

11    Q.  What is your highest level of education?

12    A.  High school graduation.

13    Q.  Are you currently employed?

14    A.  Yes.

15    Q.  Where are you employed?

16    A.  CT Consultants.

17    Q.  And what kind of company is that?

18    A.  It's an engineering firm with a -- a land surveying branch

19    on it.

20    Q.  Were you also employed when you lived in Colorado?

21    A.  Yes.

22    Q.  Where did you work in 2018?

23    A.  With a company called A2B Solutions that was a property

24    maintenance handyman and bed bug medication company.

25    Q.  You're married to Shawna Maloney; is that right?
```

1    A.   Yes.

2    Q.   And you have three kids; Dylan, Michael and Berlin?

3    A.   Yes.

4    Q.   And you were here for Miss Maloney's testimony earlier;

5    correct?

6    A.   I was.

7    Q.   Do you agree with her description of your family's vacation

8    habits?

9    A.   Yes.

10   Q.   So I'd like to ask you some questions about that family

11   vacation in March of 2018.  We heard Miss Maloney's description

12   of that trip and the stop, and now I'd like to ask you about

13   your perspective, your version of these events.  Okay?  Where

14   were you going on that vacation?

15   A.   We were going to Alabama to visit my brother.

16   Q.   And what was your planned route?

17   A.   Take I-70 east through Texas -- or through Kansas.

18   Q.   And you were stopped by the KHP on your way to Alabama;

19   correct?

20   A.   I was, yes.

21   Q.   Is that stop by the KHP why we're here today?

22   A.   Yes, it is.

23   Q.   How were you getting to Alabama?

24   A.   We were driving.

25   Q.   What kind of vehicle were you driving?

1  A.  A 2006 mini Winne Chalet RV.

2  Q.  By mini Winne, what do you mean?

3  A.  Mini Winnebago.

4  Q.  Okay.  When did you purchase that RV?

5  A.  In February of that year.

6  Q.  Okay.  What kind of condition was it in when you purchased

7  it?

8  A.  Used.

9  Q.  Did it need any kind of work done when you bought it?

10  A.  Yes.  Needed -- the flooring needed to be replaced and the

11  surround on the tub needed to be replaced.

12  Q.  Okay.  Was there any external cosmetic work done to the

13  outside of the RV?

14  A.  There were decals all over it that were removed.

15  Q.  I'm going to show you what's been previously admitted as

16  Exhibit 36, that fifth page.  If you could flip to Exhibit 36

17  in your binder.  Are you on the fifth page?

18  A.  Umm, yeah.  Yes.

19  Q.  Okay.  The RV had temporary tags from Colorado; correct?

20  A.  Yes.

21  Q.  I'd like to direct your attention to the middle of the back

22  of the RV.  There's the horizontal stripes running across the

23  middle.  Right below the stripes, what do you see there?

24  A.  Discoloration.

25  Q.  What is that discoloration?

1  A.  There was a -- there was a decal there that was removed,

2  and when it was removed, it left a film.  The dealership tried

3  to clean it off, and that was the end result.

4  Q.  You were doing the driving when you left Colorado for this

5  trip; correct?

6  A.  Yes.

7  Q.  What day did you leave Colorado?

8  A.  The 8th.

9  Q.  The 8th of?

10  A.  Umm -- March or -- yeah.

11  Q.  So March 8th, 2018?

12  A.  2018, yeah.

13  Q.  About what time of the day did you leave on the 8th?

14  A.  That was early evening.

15  Q.  And you drove through the night of March 8th; correct?

16  A.  Yes.

17  Q.  And I understood that you took some breaks on your way

18  before you were stopped by the KHP; is that right?

19  A.  That is correct.

20  Q.  Okay.  Did you take a rest break around 5:00 AM?

21  A.  Yes.

22  Q.  And what happened after that break?

23  A.  We got back on the road, traveled for a few minutes, and

24  then a car pulled up, up to about my 7 o'clock, which ended up

25  being the police while we were driving; I pulled over.

1   Q.  I'd like to play some parts of that dash cam video for you;

2   what's been previously admitted as Exhibit 29.  Can we please

3   cue up the video at 1 minute 5 seconds and play until 131

4   please?  Is that your RV on the screen?

5   A.  Yes.

6   Q.  Where is Trooper Rohr's car in relation to your RV at this

7   time in the video?

8   A.  So he would be at my 7 o'clock position.

9   Q.  Can we please continue playing Exhibit 29 until 205?  Do

10  you remember the trooper's car coming up behind you?

11  A.  Yes.

12  Q.  What do you remember about that?

13  A.  Just I remember bright lights coming up, and then kind of

14  they came up fast; and then started just kind of hovering in

15  that spot.  Their lights were bright in my mirror; and kind of

16  blinding me, distracting me a little bit.

17  Q.  What did you think about that car at that time?

18  A.  Umm, I became concerned.  I didn't know was it like a drunk

19  driver, or you know, someone that was coming up trying, you

20  know, get us off the road to try and do us harm.  You know,

21  it's a dark highway with no lights and in the middle of

22  nowhere.

23  Q.  About how long did he hover beside you at that 7 o'clock

24  position?

25  A.  It felt like a long time, but it was probably 15 seconds.

1   Q.   And what did you do?

2   A.   Umm, I just kind of kept an eye on him, thought about

3   pulling over and letting him pass me, but before that could

4   happen, I went over the fog line, and then he got behind me and

5   turned his lights on.

6   Q.   When did you realize that that car was actually a police

7   car?

8   A.   When his lights went on.

9   Q.   And how did you feel upon discovering that it was an

10  officer?

11  A.   I was relieved that it wasn't someone coming to do us harm,

12  but also confused on why I was being pulled over.

13  Q.   Can we please continue playing Exhibit 29 until 403?  What

14  did you do when Trooper Rohr asked for your license and proof

15  of insurance?

16  A.   I provided it.  I provided it to him.

17  Q.   Can we continue playing until 442, please?  At this point,

18  you'd owned the RV for a few weeks, and you'd been sitting in

19  it driving overnight.  Did you smell any paint or paint-like

20  odor during that time?

21  A.   No.

22  Q.   Would the smell of paint have been something you would have

23  noticed then?

24  A.   Yeah.

25  Q.   Why?

1   A.   'Cause I know what paint smells like, and also, my wife was

2   very nauseous, so any kind of smells, she'd throw up and

3   complain about.

4   Q.   What is that trooper looking at in the video right now at

5   442?

6   A.   That discolored spot.

7   Q.   Okay.  Can we continue playing until 512 please?  In this

8   video clip that we just watched, Trooper Rohr noted that you

9   had paint on your hand.  Did you have paint on your hand at

10  that time?

11  A.   I did.

12  Q.   Can you describe that paint on your hand for us?

13  A.   It was white interior paint.

14  Q.   What do you mean by interior paint?

15  A.   It was used for an interior low odor, you know, quick

16  drying kind of paint.  I painted trim at work the day we left.

17  Q.   How much paint was on your hand?

18  A.   Just a little bit.

19  Q.   I'd like to show you what has been previously admitted as

20  Exhibit 127, if you can flip to Tab 127 in the binder.  Who

21  took this photo?

22  A.   I did.

23  Q.   And when did you take it?

24  A.   Some point on our trip.

25  Q.   On your trip to Alabama?

```
 1   A.  Yeah, uh-huh.
 2   Q.  Okay.  The other trooper said that the paint is fresh, and
 3   it was on his hands.  Was there fresh paint on the back of the
 4   RV?
 5   A.  There was not.
 6   Q.  Did you or Miss Maloney ever personally do any painting on
 7   the RV?
 8   A.  No.
 9   Q.  Can we go back to Exhibit 29 please, and let's skip ahead
10   to 820 and play until 909.  So in this portion that we just
11   watched, Trooper Rohr mentioned an area on the back side of the
12   RV.  What is happening in the video when he says that?
13   A.  He's talking to another officer about the paint on my hands
14   and the smell that he says he's smelling, then says something
15   about a Triple I.
16   Q.  Do you know what he meant by a Triple I?
17   A.  No.
18   Q.  Can we continue playing until 939 please.  So the
19   dispatcher said positive for Type B para, but it was 2004.  Do
20   you know what she was referring to?
21   A.  I'm guessing that the -- I was arrested in 2004 with drug
22   paraphernalia on me.
23   Q.  How many years are there between 2018 when the stop
24   occurred and 2004?
25   A.  14.
```

```
 1   Q.   How old were you in 2004?

 2   A.   I was 19 years old.

 3   Q.   Can we please skip ahead to 1035 and play until 1053?  What

 4   did Trooper Rohr hand you?

 5   A.   He handed me my documents plus a warning.

 6   Q.   I want to show you what's been previously marked as

 7   Exhibit 32, Bates Number Erich OAG 000004 through 08, and I'm

 8   only going to ask you about the first page.  If you could turn

 9   to Tab 32.  Is that first page of Exhibit 32 what Trooper Rohr

10   handed to you?

11   A.   Yes.

12          MS. CHING:  Your Honor, I move to admit.

13          MR. CHALMERS:  Sure, what are we admitting, the first

14   page of 32?

15          MS. CHING:  The first page.

16          MR. CHALMERS:  I don't have any objection to that.

17          THE COURT:  Received.

18          MS. CHING:  Thank you.

19   BY MS. CHING:

20   Q.   I'd like to direct your attention to the left side where

21   there's a box with a Number 1 in it.  Do you see that?

22   A.   Yes.

23   Q.   And if you look immediately to the right of that, it says

24   violation.  Do you see that?

25   A.   Yes.
```

```
 1   Q.   What does it say after violation?
 2   A.   Improper driving on lanes, roadway, use of center lane.
 3   Q.   Now, further down, there is a line for total due.  Do you
 4   see that?
 5   A.   Yes.
 6   Q.   What does it say for the total due?
 7   A.   Warning.
 8   Q.   And right below that, there's a line that says notice to
 9   appear, must contact or pay court on or before, and then
10   there's a line.  Do you see that?
11   A.   Yes.
12   Q.   What does it say on that line?
13   A.   A warning.
14   Q.   Okay.  And at the bottom, there's an empty box.  Do you see
15   that?
16   A.   Yes.
17   Q.   And right below that empty box, it says resolution.  Do you
18   see that?
19   A.   Yes.
20   Q.   What does it say after resolution?
21   A.   Signed personal recognizance -- I can't say the word.
22   Recognizance.
23   Q.   Recognizance?
24   A.   Yes.  Thank you.
25   Q.   Did you ever sign anything?
```

1    A.  I did not.

2    Q.  You testified a minute ago that Trooper Rohr handed you

3    back your documents plus this warning strip.  When he said have

4    a safe trip, drive careful, what was going through your head?

5    A.  That I was free to go.

6    Q.  Why did you think you were free to go?

7    A.  Because his investigation was now over, and he handed me my

8    driver's license.

9    Q.  Can we go back to Exhibit 29 please, and start at 1050 and

10   play to 1059?  How long was Trooper Rohr gone before he came

11   back?

12   A.  Like two seconds.

13   Q.  In the time between when he walked away and came back, was

14   that enough time for you to leave?

15   A.  No.

16   Q.  Can we continue playing until 1127, please?  When Trooper

17   Rohr came back and wanted to ask more questions, what were you

18   thinking?

19   A.  That he was going to start fishing for information.

20   Q.  Did you feel like you had to answer his additional

21   questions?

22   A.  No.

23   Q.  Why not?

24   A.  Because like I said earlier, once he handed me my documents

25   and the warning, his investigation was over, and at that point,

1    it would have been a consensual conversation.

2    Q.  How do you know that?

3    A.  I've done research on line, I've watched videos, I've --

4    you know, stuff like that.

5    Q.  What kind of research specifically?

6    A.  About your civil rights, about what you can do during a

7    traffic stop, what your rights are, what the police can do, and

8    what's -- you know, stuff like that.

9    Q.  Why did you do that research?

10   A.  Because I believe -- I believed possibly back in 2004 when

11   I was arrested, that that was the result of my rights also

12   being violated, and I wanted to make sure that if it ever

13   happened again, that I could either prevent it or would know.

14   Q.  So based on this research, you understood that the traffic

15   stop was over, and you should have been free to leave?

16   A.  Yes.

17   Q.  Why didn't you just drive away if you knew the traffic stop

18   was over and you didn't have to talk to Trooper Rohr anymore?

19   A.  I didn't feel it was safe to drive away as close as he was

20   to the vehicle.

21   Q.  And if you knew that you were free to go, why did you ask

22   him if you were free to go?

23   A.  I wanted him to say it out loud.  Excuse me, I wanted him

24   to say it out loud.  I wanted it to be on record that he said I

25   was free to go.

1    Q.  And when he said you are free to go, did you believe that

2    you were actually free to go at that point?

3    A.  At that point, yes.

4    Q.  And when he said that he was detaining you because you

5    might have a false compartment in your RV, how did you feel?

6    A.  I was blown away.  I was shocked, confused.  I didn't

7    really understand it.

8    Q.  Can we continue playing until 1201, please?  You were

9    having a face to face conversation with Trooper Rohr; right?

10   A.  Yes.

11   Q.  And what did you observe about him when you explained why

12   you had paint on your hand?

13   A.  He didn't seem to care.  He was emotionless.

14   Q.  When he asked you to explain the fresh paint on the back of

15   the RV, what did you say to him?

16   A.  I said there's not fresh paint on the back of the RV.

17   Q.  Can we continue playing until 1233 please?  When Trooper

18   Rohr said he planned to conduct a canine sniff on your RV, what

19   were you thinking?

20   A.  I felt that it was just going to be a dog and pony show,

21   just for him to gain access to the inside of the vehicle.

22   Q.  What was the weather like?

23   A.  It was cold, windy.

24   Q.  Why did you ask Trooper Rohr for his name and badge number?

25   A.  I had planned on filing a complaint against him.

1  Q.  Can we continue playing until 1333 please?  What happened

2  after you exited the RV?

3  A.  He told me to go stand in front of it off to the side, and

4  then he went and talked to his officers, and then Shawna called

5  me back over to help the kids get out of the vehicle.

6  Q.  So a little before -- before you went and stood?

7  A.  Oh, they patted me down.  They did a pat-down search, told

8  me to leave my phone in the vehicle.

9  Q.  How did you feel when he patted you down?

10  A.  Felt like I was -- I mean, I was annoyed, was getting

11  nervous at that point, getting scared at that point 'cause I

12  wasn't sure what was going to happen.

13  Q.  Trooper Rohr asked you to leave your phone in the vehicle,

14  but said you could keep recording.  Were you recording this

15  encounter on your phone?

16  A.  I was attempting to, and I never was able to get to the

17  recording, but -- so no.

18  Q.  And it sounded like there was a sigh after Trooper Rohr

19  asked you to leave your phone.  Was that you sighing?

20  A.  Yes.

21  Q.  Why did you sigh?

22  A.  Again, I was annoyed, and I felt that now, he's -- even by

23  not letting me have my phone, now, I don't have -- you know,

24  I'm not going to have my video, I'm not going to have my

25  version.

1   Q.  Where did Trooper Rohr direct you to stand after you exited

2   the RV?

3   A.  To the front right of it towards the median.

4   Q.  How far away from the RV were you?

5   A.  About five feet.

6   Q.  Were you able to watch the canine sniff take place from

7   where you were standing?

8   A.  Part of it, yeah.

9   Q.  What did you observe about the canine sniff?

10  A.  It seemed like the dog wasn't interested in the RV.  He had

11  to keep -- keep its attention on the RV, hitting -- you know,

12  touching spots, directing it where to go.

13  Q.  What was the dog paying attention to instead?

14  A.  It just seemed like it wasn't interested in the vehicle;

15  looking around, looking at traffic, whatever, looking.

16  Q.  And what were you thinking while the sniff was going on?

17  A.  That he was going to -- he was going to tell me that the

18  dog hit so he could gain access to the inside of the vehicle,

19  search it?

20  Q.  Can we skip ahead here until 1941 and keep playing until

21  2041 please?  When Trooper Rohr told you that the canine had

22  alerted to the scent of drugs, what was your reaction?

23  A.  I didn't believe him.  I was annoyed.  I knew that there

24  was no drugs in the vehicle, but I said -- I kind of gave him

25  like an okay, whatever, kind of attitude.

1  Q.  Why did you suggest to Trooper Rohr that might have been a

2  decal pulled off the back of the RV?

3  A.  'Cause that was the first time that -- that was the first

4  time I knew at that point what he was referring to is fresh

5  paint.  So that's what was my explanation of what he was

6  looking at.

7  Q.  What happened next?

8  A.  They put the kids in the cars, and then they had my wife

9  stood next to the one and I stood next to the other one, and

10  then he conducted a search.

11  Q.  Can we please skip ahead to 2124 and play until 2208?  In

12  this part of the video, Trooper Rohr sniffs and says, smells

13  like paint in here.  Did you smell paint inside the RV?

14  A.  No.

15  Q.  How many troopers went inside the RV to do the search?

16  A.  Two.

17  Q.  And from your vantage point, could you see the troopers

18  while they searched?

19  A.  Just through the window.

20  Q.  Okay.  Although you only saw a little bit of it through the

21  window, did you later come to understand what parts of the RV

22  they searched?

23  A.  Oh, yes.

24  Q.  How?

25  A.  By the mess that they left behind, the clothing and the

1   damage that was done.

2   Q.  Can you describe that a little more for us?

3   A.  Umm, so when we were finally free to go, and when we got

4   back in the RV, I noticed that the CB radio was taken apart,

5   the dashboard was taken apart.  I looked back into the cab, and

6   I could see my wife kind of clearing some stuff off the ground

7   that was broken.  I could see the door hanging off the hinge

8   and the clothing, our clothes kind of thrown about.

9   Q.  Did you talk to anyone while the search was going on?

10  A.  Umm, I -- I -- fourth officer showed up, just asked me how

11  I was doing.  I told him just standing on the side of the road

12  freezing my F-ing A off for no reason, and then I also told

13  Dylan to shut up.

14  Q.  Did Dylan talk to anyone during this time?

15  A.  The officer that -- the car that he was sitting in, there

16  was an officer in that car that he -- that was asking him

17  questions.

18  Q.  What did the officer ask Dylan?

19  A.  He asked him how old he was, and who we were going to see

20  in Alabama.

21  Q.  Did the officer ask your permission before he questioned

22  your child?

23  A.  No.

24  Q.  Did Dylan answer those questions?

25  A.  He did.

1  Q.  What happened next?

2  A.  I told him to shut up.

3  Q.  About how long did you wait while the search was going on?

4  A.  About 20 minutes.

5  Q.  And what was going through your head while you were waiting

6  for them to finish their search?

7  A.  Umm, I just wasn't sure, I was -- I was scared, 'cause I

8  didn't know what they were doing to the inside of my RV.  I

9  mean, it's our home on wheels, you know, and you know, it's

10  being held against your will and on the side of the road with

11  three armed men, you know, while they're going through your

12  family's belongings isn't a really good feeling, so you know,

13  didn't really know what the outcome was going to be.

14  Q.  Besides the inside of the RV, what other parts did you see

15  them search?

16  A.  They searched the boxes underneath the -- the stowaway

17  boxes underneath.

18  Q.  And about how long did that take?

19  A.  Five minutes, maybe.

20  Q.  Can we please skip ahead to 4021 and play until 4110?  When

21  Trooper Rohr handed you back your keys and apologized for

22  wasting your time, how did you feel?

23  A.  Well, I agreed that he wasted my time.  I felt relieved

24  that it was -- that we were finally allowed to leave.  I was

25  still angry -- I was pretty angry about that, you know, still

1    annoyed.

2    Q.  And Trooper Rohr mentioned that the hood of the RV had been

3    painted.  What did you think about that comment?

4    A.  I didn't really understand what that had anything to do

5    with, considering that the spot in question was in the back of

6    the RV, and I didn't understand what the significance of the

7    hood being painted had anything to do with.

8    Q.  How long was the RV?

9    A.  It was about 30-foot.

10   Q.  When Trooper Rohr told you to have a safe trip, did you

11   believe the encounter was over?

12   A.  I did.

13   Q.  At that point, what was your understanding of whether you

14   were free to go?

15   A.  That I was, in fact, free to go.

16   Q.  And there's just a little bit left in this video, so let's

17   finish it.  If you could play Exhibit 29 to the end.  What

18   happened in this last part of the video?

19   A.  I was detained for a third time while he searched the roof

20   of the RV.

21   Q.  And how were you feeling at this point?

22   A.  I was really annoyed at this point, really just wanted to

23   get out of there, and just not happy.

24   Q.  To the best of your recollection, about how long did your

25   entire encounter with the KHP last?

1   A.  About 40 minutes.

2   Q.  And in those approximately 40 minutes, how many times do

3   you remember Trooper Rohr suggesting or implying that the

4   encounter was over?

5   A.  Three.

6   Q.  Did the troopers ever find any drugs?

7   A.  No.

8   Q.  Any cocaine?

9   A.  No.

10  Q.  Marijuana?

11  A.  No.

12  Q.  Heroin?

13  A.  No.

14  Q.  Meth?

15  A.  No.

16  Q.  Did they find anything illegal whatsoever?

17  A.  No.

18  Q.  And earlier, you mentioned that there was some other damage

19  as a result of the search.  Did you take photos of that damage

20  inside the RV besides the ones that we've all ready seen today?

21  A.  We did not.

22  Q.  Why not?

23  A.  Because once we were kind of free to go, it was just kind

24  of get in and go.  We cleaned up.  You know, the rest of our

25  trip was going to be in there, so we, you know, had to put

1   things back and clean up, and -- and carry on.

2   Q.  How did you feel as you drove away?

3   A.  Umm, I felt -- I knew I was -- my rights had been violated,

4   so I was angry about that.  I was upset.  I felt bad for my

5   wife and my kids having to stand on the side of the road and

6   watch their -- you know, watch -- my kids had to watch their

7   parents be treated like criminals, and search for drugs, and --

8   Q.  What happened after you left the scene?

9   A.  Little bit later, we were driving, and we saw a -- another

10   KHP taking radar in the median.  He ended up pulling out, drove

11   up to about my 7 o'clock position just like Officer Rohr did.

12   He hovered there for a few minutes, and ultimately, he ended up

13   pulling away.

14   Q.  How did that make you feel?

15   A.  I thought we were going to get pulled over again,

16   thought -- all the feelings came right back.  I actually kind

17   of told everybody to be prepared for another stop and search.

18   Q.  What effect did this experience with the KHP have on you in

19   the days immediately following on the way to Alabama and while

20   you were in Alabama?

21   A.  So it definitely ruined the trip, it ruined the excitement,

22   you know, it was our very first family vacation in this RV, so

23   kind of -- it took away from that.  It was definitely a topic

24   of -- you know, for the whole time we were there, so...

25   Q.  And on your way back home to Colorado, you went through

1  Texas instead of Kansas; correct?

2  A.  Correct.

3  Q.  Why did you choose to do that?

4  A.  We felt that it was safer than driving back through Kansas.

5  Q.  What effect did this experience have on you in the

6  following months after the trip was over?

7  A.  Umm, so because my wife was in -- had so much anxiety and

8  was unable to drive, my kids were, you know, same way, you

9  know, my daily -- the tasks, you know, became greater 'cause I

10  had to make sure that I was available to take them to and from

11  places that they were too afraid to go by themselves, you know,

12  watching my kids duck down in their seats as they -- we drove

13  past police officers, it just, you know, crushes you.

14  Q.  Have you sought any medical attention as the result of this

15  experience?

16  A.  I have not.

17  Q.  But did it impact you nevertheless?

18  A.  Absolutely.

19  Q.  How?

20  A.  Umm, because it impacted my family the way it did, and it's

21  hard to watch your loved ones go through something like that,

22  and also deal with it yourself in your own way.

23  Q.  How did you deal with it in your own way?

24  A.  I mean, I kind of shoved my feelings into the pit of my

25  stomach, but I mean, I -- you know, I was angry.  I wasn't

1   happy.  I probably lashed out at my, you know, family, because

2   I was angry about it.  When it would get brought up, I would,

3   you know, feel that way.

4   Q.  Have you driven through Kansas since that trip in

5   March 2018?

6   A.  Yes.

7   Q.  Will you have a reason to travel through Kansas again in

8   the future?

9   A.  Yes.

10  Q.  What are those reasons?

11  A.  We still have family and friends in Colorado, living in

12  Ohio now, so we'll be traveling through.

13  Q.  Would you drive to visit those friends and family?

14  A.  Yes.

15  Q.  Would you take I-70 through Kansas?

16  A.  I would.

17  Q.  How do you feel about driving through Kansas now?

18  A.  I mean, I don't like it.  I get nervous, get -- you know,

19  anxiety definitely is risen, and it's -- we try to -- we don't

20  kind of lollygag.  We definitely just try to get through.

21  Q.  How did this experience being stopped by the KHP affect the

22  way you travel through Kansas?

23  A.  So we won't use -- if we have -- if we're -- we won't use

24  our cars.  Especially if they are from upstate that has

25  legalized marijuana, we'll get a rental car.  We'll -- like I

1    said, we don't kind of stick around.  We make our way through
2    as quickly as possible.  We don't drive at night.
3    Q.  Does Ohio have legalized marijuana?
4    A.  No, just medical.
5    Q.  How do you feel about law enforcement now after having had
6    this experience with the KHP?
7    A.  I don't trust them.
8    Q.  Have there been times when you could have called the
9    police, but felt that you couldn't or shouldn't?
10   A.  Yeah.
11   Q.  Can you tell us about those times?
12   A.  There was a -- what we thought was a possible attempted
13   break-in to our home that we didn't call.  We've also had, you
14   know, teenager issues where he, you know, got mad, he'd run
15   away, and instead of call the police to go look for him, we
16   went ourselves and searched for him.  We felt that if we called
17   the police and they found him, he would just run away from them
18   and cause, you know, bigger problems, so...
19   Q.  Earlier, you testified that you asked for Trooper Rohr's
20   name and badge number because you wanted to file a complaint
21   against him with the KHP.  Did you ever end up doing that?
22   A.  No.
23   Q.  Why not?
24   A.  I had asked my then attorney to do so, and I don't think he
25   ever did.

```
 1   Q.  Did you decide to take any other action against the KHP?

 2   A.  Yes.

 3   Q.  What action?

 4   A.  We -- this lawsuit.

 5   Q.  Why did you bring this lawsuit?

 6   A.  'Cause we want change; we don't want another family to go

 7   through this.  We don't want other innocent people to have to

 8   stand on the side of the road, another family to go through any

 9   of this stuff.

10   Q.  What are you asking the court to do?

11   A.  For injunctive relief.

12   Q.  And what would an injunction mean to you?

13   A.  They would stop doing this, stop doing this to innocent

14   people, stop -- you know, if it doesn't stop, if it just keeps

15   happening, it's just going to -- it's awful.  It's -- it would

16   mean -- it would mean a lot to me, like --

17           MS. CHING:  Your Honor, I will pass the witness.

18           THE COURT:  Why don't we take our luncheon recess now,

19   and then we'll do cross-examination when we get back.  We'll

20   resume at 20 minutes after 2.  Court is in recess.

21      (Whereupon court took a recess.  Proceedings then continued

22   as follows:)

23           THE COURT:  Thank you.  Cross-examination.

24                        CROSS EXAMINATION

25   BY MR. CHALMERS:
```

1  Q.  It's Mr. Erich?

2  A.  Yes.

3  Q.  Thank you.  Mr. Erich, you had seen the dash cam video of

4  your traffic stop, both here in the courtroom and before; is

5  that right?

6  A.  Yes.

7  Q.  We've watched several times; is that right?

8  A.  Yes.

9  Q.  Now, in that video, at some point; there was a -- a --

10  someone volunteered that the vehicle was just purchased in

11  talking with Trooper Rohr; is that correct?

12  A.  Yes.

13  Q.  And it had just been just purchased; is that correct?

14  A.  I'm sorry?

15  Q.  It had just been purchased; is that correct?

16  A.  Recently; yeah.

17  Q.  And when you meant recently, you had told Trooper Rohr it

18  was February 14th, Valentine's Day; is that correct?

19  A.  Yes.

20  Q.  The stop would have been about, what, three weeks later?

21  A.  Roughly.

22  Q.  So now, when Trooper Rohr first came up, he asked you if

23  anyone -- did you guys just paint it, and your answer was no;

24  is that correct?

25  A.  Yes.

1   Q.  And he says at one point to you, it smells like paint, and

2   your answer was, I don't know, wasn't it?

3   A.  No, he didn't; no.

4   Q.  Well, we can play the video, but did you -- let me see if I

5   can do it this way.  When he first raised the question about

6   whether it smelled like paint out there, you were -- your

7   response was, I don't know, wasn't it?

8   A.  Yes.

9   Q.  Okay.  And then your wife volunteered that she'd turned on

10  the heater.  Was that to suggest that maybe that's the reason

11  you didn't smell the paint?

12  A.  I believe that was to suggest, if you're smelling

13  something, it could be that.

14  Q.  Okay.  Now, at the end of the first conversation, Trooper

15  Rohr had not heard anything about there had been a decal that

16  had been removed from the car, had he?

17  A.  I'm -- repeat that again.

18  Q.  Well, by the end of the first conversation when Trooper

19  Rohr came up to your RV and then when he left, nothing was said

20  during that time-frame about there having been a decal on the

21  RV.  So I mean, a correct statement, nothing had been said; is

22  that correct?

23  A.  Yes.

24  Q.  All right.  During the second conversation, Trooper Rohr

25  returned your paperwork and told you, have a safe trip, drive

1 careful, and you felt free to go at that point.  Is that what

2 your testimony is?

3 A.  Yes.

4 Q.  Okay.  Then he came back to you and asked to ask some

5 questions, and you told him you would prefer not to answer the

6 questions; isn't that correct?

7 A.  No.

8 Q.  Well, he said, can I ask you some questions, and your

9 answer was, you don't have -- do I have to?  Where were you

10 going, he asked, and you said, do I have to, and you said you'd

11 prefer not to answer the questions, didn't you?

12 A.  I asked him if I was free to go.

13 Q.  And you said you'd prefer not to answer the questions,

14 didn't you?

15 A.  After he told me that I was free to go, yeah.

16 Q.  Okay.  So in that second conversation before -- when he

17 told you you were free to go, again, the decal wasn't raised,

18 was it?

19 A.  No.

20 Q.  The decal -- the question of the decal and when that came

21 up was after you had been told that you were being detained for

22 a dog sniff; is that correct?

23 A.  After -- the decal got brought up after we were removed

24 from the vehicle and we saw exactly what he was referring to,

25 what the spot or fresh paint or whatever was referring -- he

1   was referring to.

2   Q.  This is after you'd been told you were detained?

3   A.  This was after we were detained, yes.

4   Q.  And when you were told before the dog ran the -- ran around

5   your RV, you were asked if anyone had done any recent painting,

6   and your answer was, as far as I know, no, wasn't it?

7   A.  Correct; I did not know.

8   Q.  Okay.  And then when you were asked about the decal --

9   well, I wrote it down wrong.  Let me see if I can't get it

10  right.  You said -- what you said was, is it probably was a

11  decal had been removed, didn't you?

12  A.  I'm not exactly sure what my exact words were.

13  Q.  You didn't know if a decal had been removed, did you?

14  A.  I did know a decal had been removed.

15  Q.  You did?

16  A.  I did know.

17  Q.  But what you told the trooper, for what's it worth, is that

18  it probably is the decal; is that right?

19  A.  Referring to the spot that he was reaching -- that he's

20  pointing out, yeah.

21  Q.  Yeah.  Okay.  I don't have anything else.  Thanks.

22          THE COURT:  Any redirect?

23          MS. CHING:  Nothing further, Your Honor.

24          THE COURT:  Thank you, sir.  You can step down.

25  Plaintiffs' next witness.

1          MS. PERRY:  Your Honor, we're going to play deposition

2     designations of Trooper Justin Rohr.

3          THE COURT:  Okay.

4          MR. CHALMERS:  Your Honor, before you proceed with the

5     deposition or with playing the video, I -- I don't think that

6     is up there, but I'm not sure what procedure is, what they're

7     intending to show with the video.  There is a dispute about the

8     designation.  There's a dispute about objections to part of the

9     deposition transcript, some of which concern Trooper Rohr's

10    deposition video.  I don't think it's right to play a video

11    that is certainly not indexed to the -- to line and page for us

12    to know what they're including, what they haven't included.

13         MS. PERRY:  Sure, Your Honor.  So the video, and I

14    believe it's Trooper Rohr's -- Trooper Rohr's deposition video

15    that we'll be playing does have line and page, and it was cut

16    per the designations that we filed on April 3rd.

17         MR. CHALMERS:  Am I to understand then it does not

18    have reference to the objections, nor does it have the

19    cross-designations?

20         MS. PERRY:  Correct.

21         MR. CHALMERS:  I don't think that's a proper way to

22    present it, Your Honor.  I did -- the local rule and concerning

23    with deposition guidelines would have required them to provide

24    the edited videotape in advance for us to consider and review,

25    and certainly, as part of the Rule 56 A 4 -- excuse me, 32 A 4,

1  as well as 162 B 3, there's the requirement to make the

2  designations, counter-designations presented to the court for

3  objection and ruling.  To now play the video without showing

4  everything, I don't think that's proper.

5        MS. PERRY:  Sure, Your Honor.  So per the court's

6  pretrial order, we designated on April 3rd.  Mr. Chalmers had

7  the opportunity to counter-designate or object by his deadline.

8  He did not do anything.  He did then on the Thursday after his

9  deadline -- and I can get specific dates if we need to -- sent

10  in highlighted designations with the red, blue, and green color

11  coding in the court's pretrial order.  We filed a motion to

12  strike his objections and counter-designations.  That is

13  Document 488.  It explains that once he did not designate any

14  counter-designations or objections by his deadline, we had the

15  video cut.  It also explains that we intended to play the

16  videos during trial.  We did provide the court highlighted

17  designations on Monday, April 24th after we met and conferred

18  with Mr. Chalmers.  It stated our position that we were asking

19  the court to take up objections as we played the video at

20  trial.  We do not object to Mr. Chalmers playing his

21  designations as he counter-designated, other than the

22  objections stated in 488 that we think that they should be

23  stricken.

24        MR. CHALMERS:  Maybe I misunderstood.  You're saying I

25  can play counter-designated that you don't object to, but not

1    those -- I'm not sure what she's -- well, my position is quite

2    simple, Your Honor, and that is, is that if you look at the two

3    rules that apply with respect to when the designations took

4    place, and what the remedy is for failure to designate, which

5    was inadvertent here, the document was prepared, a document was

6    filed, but I thought was the counter-designation and the

7    objections.  It turned out to be a little bit different.

8    The -- the appropriate information was provided to plaintiffs'

9    counsel so that we'd be able to present it to the court with

10   the color copies and so forth, and it's after that that I

11   learned that, oh, gosh, the original document wasn't filed, but

12   there is no prejudice.  It's completely harmless in terms of

13   the timing of the cross-designations, other than what is

14   attempting to happen here, which is not to present the entirety

15   of the evidence.

16          THE COURT:  So you -- you didn't respond in time.  You

17   were late, and you admit that.  So what's wrong with letting

18   them go ahead and do the edits, and play the deposition, and

19   you will just do yours separately?

20          MR. CHALMERS:  I don't have a video, and they were

21   required to provide a video of everything with the edits, Your

22   Honor.  That's part of it, but I can present it separately, I

23   suppose, by having it read in.

24          THE COURT:  Okay.  Let's do it that way.

25          MS. PERRY:  So for the record, these are plaintiffs'

1    deposition designations that were filed on April 3rd and are

2    going to be played.  There is -- there are exhibits discussed

3    in the deposition designations, and those will also be pulled

4    up for the court.

5         MR. CHALMERS:  And am I to understand then what I am

6    required to do is object at the appropriate time so that the

7    court can rule on what they've not edited?

8         THE COURT:  Isn't -- all that's in front of me; right?

9         MS. PERRY:  Defendant's objections, yes, are now in

10   front of you, Your Honor.

11        THE COURT:  Okay.  So why can't I just sort through

12   this as I'm reviewing the deposition testimony and preparing an

13   order on the bench trial at the end of the case?

14        MS. PERRY:  I'm fine with that, Your Honor.  I would

15   say that we have not had -- we did not file responses to each

16   other's objections.  So to the extent Mr. Chalmers had an

17   objection, I think that they're largely all ready covered by

18   the court's ruling that agency comments or employees of the

19   Kansas Highway Patrol's comments made on dash cam videos are

20   not hearsay.  I think that was the majority of Mr. Chalmers --

21        THE COURT:  They are hearsay.  They are hearsay,

22   'cause he's saying they're hearsay so they shouldn't come in.

23        MS. PERRY:  Correct.

24        THE COURT:  Yeah, right.

25        MS. PERRY:  And so I believe the court's ruling on

1   that covers Mr. Chalmers' objections, but we have not

2   responded.  If the court would like any response, we're happy

3   to do so.

4           THE COURT:  If I need a response later, I'll let you

5   know.

6           MR. CHALMERS:  Your Honor, if I am to understand then

7   that my written objections which go to the line and page are

8   contemporaneously made, and you'll rule on them as you find

9   appropriate, that's fine with me to play the video.  That makes

10  sense.

11          THE COURT:  We're not going to repeat them

12  contemporaneously here.

13          MR. CHALMERS:  That's what I'm saying.

14          THE COURT:  Okay.  All right.  That's fine.

15          MS. PERRY:  For the record, we'll begin playing the

16  deposition of Officer Trooper Rohr.

17      (Video deposition of Trooper Rohr played).

18          MS. PERRY:  Your Honor, if I could approach and

19  present our exhibit binder to the court.

20          THE COURT:  I think I have it right here.

21          MS. PERRY:  Oh, okay.

22          THE COURT:  Go ahead.

23          MS. PERRY:  Excuse me, Your Honor, what did you say?

24          THE COURT:  Okay.  I don't have 105 if it's the same.

25          MS. PERRY:  So the trial exhibits here that we're

1    talking about are going to start at Trial Exhibit 88, then go

2    from there.  Okay, 87.  We could go ahead with the deposition.

3        (Video deposition continuing to be played of Trooper Justin

4    Rohr).

5        MS. PERRY:  Your Honor, if I could move to admit Trial

6    Exhibit 87.  It's the Deposition 105 that was referenced.

7        MR. CHALMERS:  I have no objection to 87.

8        MS. PERRY:  And while we're paused, Your Honor, it

9    doesn't look like there were objections.  Anyway, it's Trial

10   Exhibit 88, Trial Exhibit 89, Trial Exhibit 90, Trial Exhibit

11   91, Trial Exhibit 92, Trial Exhibit 93 and Trial Exhibit 94.

12   I'll go ahead to move to admit if there is no objection.

13       MR. CHALMERS:  There is an objection, 'cause they're

14   not relevant, and I don't think I had to say they were

15   irrelevant for the purposes of -- of the objection list, Your

16   Honor, because that doesn't talk about 402 or 403, but I do --

17   or do contend they're irrelevant when I objected to the

18   deposition portions.

19       THE COURT:  I'll receive them all and give them

20   whatever weight I believe is appropriate.

21       MS. PERRY:  Thank you, Your Honor.  Pardon me, Your

22   Honor, you mentioned 5 o'clock to the cut-off day.  This is

23   getting ready to shift from the Erich/Maloney stop.  We have

24   about 25 to 30 minutes left in this deposition designation, or

25   if you wanted to pause for the evening.

1          THE COURT:  I thought we would go to 5:30 today.

2     Let's do 5:30.  Let's stop at 5:30.

3          (Video deposition of Trooper Justin Rohr continued.)

4          THE COURT:  Why's the transcript sometimes different

5     from the -- like he'll say yes and the transcript will say no

6     or vice-versa.  Why is that?

7          MS. PERRY:  That's how we received the transcript from

8     the court reporter, Your Honor.

9          THE COURT:  So what's the actual written copy of the

10    deposition say?

11         MS. PERRY:  What is scrolled there in that text is the

12    text of the written deposition.

13         THE COURT:  Hmm, okay.

14         MS. PERRY:  For logistics purposes, Your Honor, was

15    that taken down into the record, or should we -- can we mark

16    that is an exhibit then?

17         THE COURT:  We need to -- would need to have the

18    actual -- well, we need to receive the videotape into evidence,

19    but we also need to have a hard copy of the deposition.

20         MS. PERRY:  Sure, Your Honor.

21         THE COURT:  Okay.

22         MS. PERRY:  One other issue, Your Honor, I believe

23    Miss Greathouse would bring up.

24         MS. GREATHOUSE:  Your Honor, we simply were wanting to

25    make sure we're bringing this to your attention and to give

1    notice to the defendant.  We have a witness whose deposition we

2    took under subpoena.  We've gone back out for a subpoena.  It

3    appears that house was empty, did a skip trace, new house

4    appears to be empty, so cannot get a subpoena for this witness,

5    and we were planning to bring them here live.  We did do their

6    deposition, and so we did -- you know, we did not do a

7    deposition designation because we believed we would be able to

8    get a subpoena like we did before, and so pursuant to Federal

9    Rule of Civil Procedure 32 A 4, we are asking the court for

10   permission to use the deposition of Randy Moon.  He was the --

11   he's former superintendent of the Kansas Highway Patrol, and he

12   was in the superintendent's cabinet, not Superintendent Jones,

13   but prior to superintendent --

14           THE COURT:  Can I interrupt you for a second?  Have

15   you discussed this with Mr. Chalmers?

16           MS. GREATHOUSE:  No, it's new, and we wanted to do it,

17   to get it on.  If you want me to meet and confer with him

18   first, then we can raise it in the morning.  That's fine.

19           THE COURT:  Okay, 'cause I said I need to leave at

20   5:30, and it's 5:30, so I don't want to take up anything new

21   right now, but we'll discuss that, and we can take it up first

22   thing in the morning, which will be 10:30.

23           MS. BRETT:  Your Honor, just one thing pretty quick.

24   You had previously excused Ms. Maloney and Mr. Erich from being

25   here at trial.  So I just wanted to let you know that they will

1    be taking off today.  They have child care problems for their

2    four-year old back home.

3            THE COURT:  Sure, that's fine.  Okay.  So tomorrow at

4    10:30.  Court's in recess.

5        (Whereupon court recessed proceedings.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1
2                      C E R T I F I C A T E
3
4
5        I, Nancy Moroney Wiss, a Certified Shorthand Reporter and
6    the regularly appointed, qualified and acting official reporter
7    of the United States District Court for the District of Kansas,
8    do hereby certify that as such official reporter, I was present
9    at and reported in machine shorthand the above and foregoing
10   proceedings.
11       I further certify that the foregoing transcript, consisting
12   of Day One - Pages 1-96, is a full, true, and correct
13   reproduction of my shorthand notes as reflected by this
14   transcript.
15       SIGNED September 28, 2023.
16
17                      S/_____
18                      Nancy Moroney Wiss, CSR, CM, FCRR
19
20
21
22
23
24
25
```

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that a copy of the foregoing APPELLANT'S APPENDIX, as submitted in digital form is an exact copy of the document filed with the Clerk.

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2024, the foregoing APPELLANT'S APPENDIX was electronically filed with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I also certify that within five business days of the issuance of notice that the electronic filing is compliant, one paper copy will be delivered by Federal Express to the Clerk's Office.


DATED: April 24, 2024                    /s/ Kurtis K. Wiard