## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

BLAINE FRANKLIN SHAW, et al.,
*Plaintiffs-Appellees,*

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

———

MARK ERICH, et al.,
*Plaintiffs-Appellees,*

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

## APPELLANT'S APPENDIX VOLUME XIII

Appeal from the United States District Court for the District of Kansas
Honorable Kathryn H. Vratil, Senior District Court Judge
District Court Case Nos. 19-CV-1343-KHV and 20-CV-1067-KHV-GEB

120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
(785) 296-2215
anthony.powell@ag.ks.gov
dwight.carswell@ag.ks.gov
kurtis.wiard@ag.ks.gov

**OFFICE OF ATTORNEY GENERAL
KRIS W. KOBACH**

Anthony J. Powell
*Solicitor General*
Dwight R. Carswell
*Deputy Solicitor General*
Kurtis K. Wiard
*Assistant Solicitor General*

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

Transcript of Bench Trial, Day 2
    (ECF No. 568) ........................................................................ 1

1          UNITED STATES DISTRICT COURT
                 DISTRICT OF KANSAS
2

3

4   BLAINE SHAW, et al.,                    )
                                            )
5      Plaintiffs,                          )
                                            )
6      v.                                   )    Case No. 19-1343
                                            )
7   HERMAN JONES, in his official           )
    capacity as the Superintendent          )
8   of the Kansas Highway Patrol, et al.,   )
                                            )
9      Defendants.                          )
                                            )    Kansas City, Kansas
10  _____ )    Date:  May 2, 2023
                                            )
11                                          )    Day 2
                                            )    (Pages 97-248)
12  MARK ERICH, et al.,                     )
                                            )
13     Plaintiffs,                          )
                                            )
14     v.                                   )    Case No. 20-1067
                                            )
15  HERMAN JONES, in his official           )
    capacity as the Superintendent          )
16  of the Kansas Highway Patrol, et al.,   )
                                            )
17     Defendants.                          )
    .........................................

18

19              TRANSCRIPT OF BENCH TRIAL

20      BEFORE THE HONORABLE KATHRYN H. VRATIL
21      SENIOR UNITED STATES DISTRICT COURT JUDGE

22

23

24
    _____
25      Proceedings recorded by machine shorthand, transcript
           produced by computer-aided transcription.

1                        A P P E A R A N C E S

2     For the Plaintiffs:

3      Patrick A. McInerney              Sharon Brett
       Leslie A. Greathouse              Kunyu L. Ching
4      Wale Akinmoladun                  ACLU Foundation of Kansas
       Madison Perry                     10561 Barkley Street
5      Spencer Fane, LLP                 Suite 500
       1000 Walnut                       Overland Park, KS 66212
6      Suite 1400
       Kansas City, MO 64106

7

8     For the Defendants:

9      Arthur S. Chalmers
       Office of Attorney General
10     120 SW 10th Avenue
       Topeka, KS 66112

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2
     Plaintiffs' Witnesses:                                    Page

3
     SCOTT PROFFIT
4      Direct Examination by Mr. McInerney                    103
       Cross-Examination by Mr. Chalmers                      143
5      Redirect Examination by Mr. McInerney                  168
       Recross-Examination by Mr. Chalmers                    174
6    SUZANNE MARIE DUNN
       Direct Examination by Mr. Akinmoladun                  177
7    JAMES LEE MCCORD
       Direct Examination by Mr. McInerney                    211
8      Cross-Examination by Mr. Chalmers                      227
       Redirect Examination by Mr. McInerney                  242
9      Recross-Examination by Mr. Chalmers                    244
       Further Redirect Examination by Mr. McInerney          245
10   CHANDLER RULE
       Deposition                                             246

11

12

13                        E X H I B I T S

14    Plaintiffs'
      Exhibits              Offered           Received

15
         99                 247               247
16       100                247               247
         118                230               230
17       119                213               213
         121                181               181
18       122                181               181
         128                139               140
19       129                141               142
         954                105               105

20
     Defendants'
21   Exhibits              Offered           Received

22       953                147               147

23

24

25

1                    P R O C E E D I N G S

2         (10:33 a.m., proceedings commenced).

3         THE COURT:  Good morning, everyone.  Are we ready for

4    our next witness?

5         MS. BRETT:  Before we call our first witness this

6    morning, I think we had a few things to address with the court.

7    The first is that the plaintiffs would like to invoke the rule

8    of sequestering fact witnesses, unless there's any objection.

9         THE COURT:  I assume there's no objection to that.

10         MR. CHALMERS:  No.

11         THE COURT:  Go ahead.

12         MS. BRETT:  The second thing is that yesterday we

13    played the deposition designations video from Trooper Rohr.

14    We're going to mark that as Exhibit 130 and submit it on a

15    flash drive to the court, and we will mark the transcript as

16    130A, Exhibit 130A.

17         And then the last thing, Your Honor --

18         THE COURT:  Can I ask a question?  There are places

19    where the transcript clearly does match -- does not match the

20    testimony.  Is that noted on the transcript or was there like a

21    correction sheet which was supplied by the deponent?

22         MS. PERRY:  There's nothing noted on the transcript.

23    The transcript that was scrolling is the transcript we have.

24    There was an errata sheet signed by Trooper Rohr.  It does not

25    have any corrections, but we will include that errata sheet on

1   the transcript we submit to the court.

2        THE COURT:  I would like for you all to also file

3   something which notes the places where the transcript is

4   clearly wrong, and I assume that you can do that by stipulation

5   because it's real easy to figure out.  I just don't want to sit

6   through it and watch it looking for it myself.  So if you could

7   do that, I would appreciate it.

8        MS. PERRY:  We'll include it.

9        MS. BRETT:  Thank you, Your Honor.  The last thing

10  that we wanted to bring up before we get started for today is

11  that the defendant has objected to our ability to put on

12  testimony involving the stop of Curtis Martinez.  We think we

13  need to take that up now as the first witness is the trooper

14  involved in that stop.  We have listed both the trooper and

15  Mr. Martinez on our witness list, and the defendant filed an

16  objection.  We filed a response to that objection to brief the

17  issue for the court.  That's at Document 483.  I'm happy to

18  have the defendant raise his objection and respond to that if

19  the court would like to hear argument on that.

20       THE COURT:  What is the objection?

21       MR. CHALMERS:  Well, Your Honor, I don't -- right now

22  I'm not sure that I'm going to push the objection.  Your

23  intent -- is it plaintiffs' counsel's intent I would ask to the

24  court to call Mr. Martinez or are we just calling Trooper

25  Proffit?

1        MS. BRETT:  We had wanted to call Mr. Martinez and had

2    a flight arranged for him to come yesterday afternoon.

3    Unfortunately his stepmom was killed in a hit-and-run about

4    three weeks ago, and his sister attempted suicide this week,

5    and so he was not able to get on the flight yesterday because

6    he's dealing with some very tragic family issues right now.

7        So our intent was to call Trooper Proffit and then

8    make a proffer of Mr. Martinez's declaration, which has already

9    been filed on the docket at Document 358-1.  We believe that if

10   Mr. Martinez was able to be with us in person, that his

11   testimony would be substantially similar to that in the

12   declaration recognizing that we cannot submit a declaration

13   into evidence as it is hearsay.  We would just make a proffer

14   of the facts as stated in that declaration for the court to

15   consider as appropriate.

16       MR. CHALMERS:  If the only testimony concerning the

17   Martinez stop is going to come from Trooper Proffit, then I

18   don't object to calling Trooper Proffit.  I guess I'll wait to

19   hear about the declaration, but they concede it's not

20   admissible.

21       THE COURT:  Okay.

22       MS. BRETT:  Thank you, Your Honor.

23       MR. MCINERNEY:  Good morning, Your Honor.  Then that's

24   what we would do is call Scott Proffit to the stand.

25       THE COURT:  Sir, would you please come to the witness

1  box and raise your right hand so you can be sworn.

2                    SCOTT PROFFIT,

3  called as a witness on behalf of the Plaintiffs, having first

4  been duly sworn, testified as follows:

5                  DIRECT EXAMINATION

6  BY MR. MCINERNEY:

7  Q.   I'll get those binders out of your way.

8       Morning, sir.  Your name for the court, please.

9  A.   Scott Proffit.

10 Q.   And, sir, where are you employed?

11 A.   With the Kansas Highway Patrol.

12 Q.   How long have you been employed there?

13 A.   Since 2004.

14 Q.   What is your current assignment?

15 A.   Field lieutenant over three counties.

16 Q.   What are those three counties?

17 A.   Riley, Gary, and Dickinson County.

18 Q.   What are your duties and your responsibilities in your

19 position?

20 A.   I'm a first line supervisor over some road troopers in

21 those counties, so basically supervising them and also

22 conducting patrol myself.

23 Q.   How many troopers do you supervise in that capacity?

24 A.   Right now six.

25 Q.   And you said that your rank is lieutenant, correct, sir?

1  A.  Yes.

2  Q.  I'm going to direct your attention to September 5th of

3  2022, last year, roughly a little over six months ago or so and

4  specifically to a traffic stop you conducted on that date near

5  I-70.  If I give you those details, they're pretty vague, but

6  do you know what I'm talking about?

7  A.  Yes, sir, I do.

8  Q.  You were working that day, sir.  What shift were you

9  working?

10  A.  I believe that was a day shift.

11  Q.  Okay.  And at some point during your shift did you execute

12  a U-turn across the median of I-70 in order to pursue a traffic

13  stop?

14  A.  Yes, I did.

15  Q.  When you executed that U-turn across the interstate there,

16  what caused you to execute the U-turn?

17  A.  I was checking speed of violators, and I had seen actually

18  two vehicles speeding -- or I had -- I don't want to say

19  "seen."  I registered two vehicles speeding on my radar and

20  visually watching them speeding.

21  Q.  When you take action like that and activate your emergency

22  lights or indicators I'll call them, that that activates an

23  in-car video and audio recording system; is that right?

24  A.  That's correct.

25  Q.  It has the ability to loop back a couple minutes before you

1   actually activate your lights and your sirens in order to begin

2   recording at that point, correct?

3   A.   As we activate, it would go back and get two minutes of

4   video, but the audio would start probably right at that time.

5   Q.   Great.  Thanks for the clarification.  Sir, in connection

6   with that, have you reviewed a video and audio clip of the stop

7   of a man by the last name of Martinez?

8   A.   Yes, I have.

9   Q.   Okay.  Let's play clip number one from Exhibit 954.

10           MR. CHALMERS:  Do we want to admit Exhibit 954?

11           MS. BRETT:  I'm actually going to lay some foundation

12   and then I'm going to offer it.

13           MR. CHALMERS:  I don't know why you are showing it if

14   you haven't offered it first.  I don't object to the admission

15   of 954, Your Honor.

16           THE COURT:  Should we just go ahead and receive it

17   then?

18           MR. MCINERNEY:  I was going to lay one more piece of

19   foundation, Judge.

20           THE COURT:  Apparently it's not necessary.

21           MR. MCINERNEY:  I guess not.  Then I'd offer 954.

22           THE COURT:  Received.

23           MR. MCINERNEY:  Thank you.

24   BY MR. MCINERNEY:

25   Q.   Sir, you've reviewed that video clip before?

1  A.  Yes, sir.

2  Q.  And in that clip we watched you stop that silver car that

3  was depicted.  At what point -- at any point did you ever lose

4  sight of that vehicle?

5  A.  Yeah.  As he exited, yeah, I would have lost sight.

6  Q.  At the time you lost sight of him, he wasn't accelerating

7  his speed, was he?

8  A.  No.  He's actually in the -- well, as I'm turning around,

9  I'm always losing sight because I can't watch in my mirror.

10  After I turn around, there's some other cars, and then he goes

11  down the off-ramp, so I lost sight of him just for a second

12  there as well.

13  Q.  You saw him take that off-ramp, right?

14  A.  Yes.

15  Q.  His speed slowed on that off-ramp, didn't it?

16  A.  Yes, it did.

17  Q.  It appears as though he took a left-hand turn?

18  A.  Yes.

19  Q.  And when you took that left-hand turn, he stopped pretty

20  promptly, correct?

21  A.  Yes.

22  Q.  Let's play clip number two, please.

23      Sir, during the clip we just watched, you had a

24  conversation with Mr. Martinez about the registration of his

25  vehicle, right?

1  A.  Correct.

2  Q.  And he explained to you that it was his wife's car,

3  correct?

4  A.  That's what he said.

5  Q.  And he -- well, that was his explanation, wasn't it?

6  A.  Yes.

7  Q.  And he also -- you asked him why the car was registered to

8  a different name, and he explained that the car was his wife's

9  and his wife was listed on the insurance; is that correct?

10  A.  I think -- I think he said his mother-in-law is what he was

11  saying was the name on the insurance.

12  Q.  Yeah, I'll correct that.  He explained to you that his

13  mother-in-law was carrying the insurance, correct?

14  A.  Correct.

15  Q.  And then you told him that you were suspicious because he

16  got off at that exit?

17  A.  Yes.

18  Q.  Okay.  And you were suspicious -- and he explained that he

19  was looking for a place to go to the bathroom, correct?

20  A.  That's what he said.

21  Q.  Right.  And then you asked him I think -- well, sorry.  At

22  that point you had in your hand his Colorado driver's license,

23  correct?

24  A.  Yes, I believe I did.

25  Q.  Okay.  And that indicated obviously he wasn't from anywhere

1   around that exit, right?

2   A.   Correct.

3   Q.   And wasn't in fact from that part of Kansas, was he?

4   A.   Well, in my area with all the Fort Riley and college kids,

5   Colorado license doesn't mean they're from Colorado, but I

6   assumed he was probably not from that area, but that exit is

7   near Fort Riley.  I deal with out-of-state licenses on a daily

8   basis with people that live right there.

9   Q.   Based on what you knew at that point, you knew he had given

10  you evidence of Colorado residency, correct?

11  A.   Yes.

12  Q.   Because the address listed on his license was a Colorado

13  license, wasn't it?

14  A.   Correct.

15  Q.   And nevertheless, you found it suspicious, didn't you,

16  because there wasn't a rest area at that exit, correct?

17  A.   Yes.

18  Q.   And you asked him about his travel plans?

19  A.   Yes.

20  Q.   We'll get to that a little bit later.  But at that point

21  when you turned around and walked back to your vehicle, your

22  KHP vehicle, you knew that he had explained -- offered an

23  explanation about the car, correct?

24  A.   Correct.

25  Q.   And he explained to you that he was looking for somewhere

1    to relieve himself?

2    A.   Correct.

3    Q.   And you knew he was from Colorado, correct?

4    A.   Well, I knew his license was from Colorado.

5    Q.   Correct.  Let's play clip number three, please.

6         Sir, in that clip, clip number three of Exhibit 954, you

7    contacted your dispatcher and relayed information regarding the

8    driver to her, correct?

9    A.   That's correct.

10   Q.   And the information that you requested included a request

11   for III.  Did you hear that?

12   A.   Yes, I did.

13   Q.   III is a request specifically about information about

14   drugs, correct?

15   A.   It's criminal history, but what I requested in addition to

16   that would be drug history.

17   Q.   And is that the 5D?

18   A.   Yes, sir.

19   Q.   Got it.  And you understand from your training, sir, that a

20   III inquiry is premised on officer safety, correct?

21   A.   Premised on officer safety?

22   Q.   Correct.

23   A.   Okay, yes, sir.

24   Q.   Do you agree with that?

25   A.   Well, yes, and it's also -- I was picking up details on --

1   I was looking for his criminal background and drugs as well.

2   Q.   Okay.  And the 5D is a separate inquiry specifically about

3   drugs, right?

4   A.   I was asking about drugs from what I was met with that day.

5   Q.   Do you know also from your training that a request for a 5D

6   inquiry is not an ordinary request?

7   A.   It's not an ordinary request?

8   Q.   Not a request that you make on every traffic stop, is it?

9   A.   Correct.

10  Q.   At that point you had some suspicion there was narcotics

11  activity?

12  A.   Yes, sir.

13  Q.   You didn't have reasonable suspicion yet, did you?

14  A.   I was suspicious, yes.

15  Q.   Did you have reasonable suspicion at that point?

16  A.   I would say yes.  I was suspicious that there was criminal

17  activity going on and specifically drug.

18  Q.   Let me ask you specifically.  Is it your testimony that at

19  that point when you received the information that he had no

20  criminal history and no warrants, not even arrests, was it your

21  position that you had reasonable suspicion to detain him for

22  longer?

23  A.   Yes.  I thought there was criminal activity, specifically

24  drug, going on.

25  Q.   And that was based in part on the fact that he was coming

1  from Colorado?

2  A.  No.

3  Q.  That was based in part on the fact that he was -- he had

4  pulled off the highway and taken that left-hand turn in what

5  you thought was an evasive maneuver, correct?

6  A.  Yes.

7  Q.  What else was it based on?

8  A.  When I got to the back of the car, the loud music like

9  they're not -- they're trying to stop my presence with them.

10  That rarely happens, and every time that has happened, it has

11  been a situation with something in the car going on.  When I

12  went up there, he pulls his driver's license out of a wallet

13  with a picture of to me it was El Chapo.  I have been trying to

14  replay it forever in my mind.  I keep seeing maybe Jesus

15  Malverde, which either one of them would have made me

16  suspicious of what he's trying to connect himself to or who he

17  would idolize for whatever reason.

18      I did seven years on our DEA task force interviewing

19  people.  I wasn't stopping cars; I was interviewing people.  So

20  when I'm seeing one person insured, one person on the

21  registration, the driver not either one of them, this is stuff

22  that I was dealing with on federal cases and seeing and

23  interviewing people on that connection.  When I didn't see the

24  -- what I wanted to on the insurance registration and driver's

25  license matching up to what I could maybe kind of follow, it

1  was really blurry, so I leaned down and asked the passenger who

2  had been staring straight ahead -- and actually from him I was

3  getting an officer safety vibe, just he was kind of defiant.

4      When I asked for him to identify himself, he said no.  He

5  was trying to get rid of the car stop from the get-go.  I

6  wasn't speeding; it was the other car.

7      There were a lot of things going on there that some of them

8  I knew were lies.  He was speeding.  He's telling me no.  I do

9  not believe he needed to go to the bathroom.  I don't believe

10  that, and I won't believe that even though I know you're going

11  to say it's a possibility, but I don't believe that.  I think

12  he was trying to evade me.

13      So I was reasonably suspicious before I even went back to

14  the car that that's going on.  That's why my hat was still in

15  the car because I was hoping to get consent to search.

16  Q.  So I want to make sure I understand your testimony here.

17  You said that contributing to your reasonable suspicion was the

18  loud music, it was a factor, correct?

19  A.  I knew they were defiant to me, not wanting to deal with

20  law enforcement, so as far as loud music towards drugs

21  specific, no, just defiant towards my presence.  I didn't know

22  what it was at first.

23  Q.  You considered the loud music to be part of that, what you

24  called defiance?

25  A.  Yes.  I don't know what else to call it.

1   Q.   You also say that you saw an image on his wallet of El

2   Chapo?

3   A.   I thought it was El Chapo that day and that's what I

4   remember.  As I think back and think back trying to look at

5   that emblem, El Chapo and Jesus Malverde.  I mean, Jesus

6   Malverde has several pictures.  A lot of them are plastic and

7   wax looking and not as good of an emblem as that.  I think it

8   was El Chapo, yes, sir.

9        THE COURT:  I'm sorry.  Can I interrupt?  I didn't

10  understand why it was significant to mention you left your

11  car -- your hat in the car because you wanted to get consent

12  for a search.

13       THE WITNESS:  Can I answer that?

14       MR. MCINERNEY:  It's her question; you can answer

15  whatever she asks.

16       THE WITNESS:  If I fear officer safety or if I ask for

17  consent to search, I'm not taking my hat up.  What I intended

18  if they consent to it, have them move away from the vehicle and

19  I'm going to be looking underneath car seats and I have my head

20  in the car.  If an officer safety arises or if I intend to ask

21  for -- to search a car because I feel like I have reason to

22  think something is going on, on my second approach I'm leaving

23  that in the car because I already feel suspicious of what's

24  going on.

25       THE COURT:  So an informed driver would know that if

1  you approach their car without your hat, they're about to be

2  searched?

3         THE WITNESS:  Well, if the wind is really bad, I would

4  approach on the first incident.  But, yeah, I've been through

5  enough cases and done enough interviews that the people I'm

6  interviewing do learn through court testimony on things to do

7  to combat us to try to trip us up during our investigation.

8         THE COURT:  All right.  Good.  Sorry.

9         MR. MCINERNEY:  You don't have to apologize to me,

10  Judge.

11  BY MR. MCINERNEY:

12  Q.  And you said that people learn through observing court

13  testimony how to put one over on you as a KHP trooper?

14  A.  I think law enforcement in general.  I did a number of

15  interviews.  They weren't --

16  Q.  I just trying to understand.  I didn't ask you to explain.

17  I'm asking you your testimony.

18  A.  I do believe through court cases or people's own previous

19  cases or organizational cases, to say if you're talking about a

20  drug organization, I do think they take knowledge and try to

21  pass it off to that their couriers.

22  Q.  At that point you didn't have any indication whatsoever

23  that Mr. Martinez was connected with a drug organization, did

24  you?

25  A.  No.  My concern was when I dealt with --

1  Q.  I'm sorry --

2  A.  Yes.  Yes.

3  Q.  Sorry, hate to keep interrupting you.  Just say yes or no.

4  A.  I would say, yes, I was suspicious about it.

5  Q.  About his connection with a drug organization?

6  A.  Yes.

7  Q.  And you believe -- and I'm kind of keying off what you

8  provided to the court here and you believe that because you

9  suspected he was connected with a drug organization, that you

10  weren't going to believe his answers, what he had to say to

11  you, correct?

12  A.  That -- thin that question down a little bit.

13  Q.  Sure.

14  A.  I would -- I don't know what question you're talking about.

15  Q.  Okay.  Let's leave it at this, at that point as you

16  approach before you had that second contact with him, you

17  believed that he was potentially part of a drug organization,

18  correct?

19  A.  Correct.

20  Q.  And I think you just testified all of those things put you

21  in a place that you had a reasonable suspicion, correct?

22  A.  I believe so.

23  Q.  And you knew that reasonable suspicion allows you to detain

24  a motorist past the original purpose of the stop, don't you?

25  A.  That's correct.

1  Q.  Do you know that from your training?

2  A.  Yes, sir.

3  Q.  Let's go to clip four, please.

4      Sir, when you walked back up to Mr. Martinez's window, the

5  driver's side there, you didn't tell him he was detained, did

6  you?

7  A.  No.

8  Q.  You didn't tell him that you had reasonable suspicion that

9  you believe he was part of a drug organization, did you?

10 A.  No.  I'm still dealing with the car stop at that time.

11 Q.  But your position is that at that point you had reasonable

12 suspicion sufficient to detain him, correct?

13 A.  Say that again.

14 Q.  You had reasonable suspicion sufficient to detain him,

15 correct?

16 A.  I felt so.

17 Q.  Let's pick it right back up, please.

18     I'm referring to the time stamp -- I'm sorry, sir.  It's up

19 on your screen.  I'm referring to the time stamp in the bottom

20 left-hand corner of that at 12:09 on that you walked away and

21 you immediately turned back around, didn't you?

22 A.  12:29.

23 Q.  Took a second for you to turn around and say "can I ask you

24 something," didn't it?

25 A.  Yes.

1  Q.  And he had already pulled a few feet away, correct?

2  A.  Correct.

3  Q.  You know that move in shorthand as the Kansas two-step.

4  Have you ever heard it called that?

5  A.  I've heard it called that.

6  Q.  And that's something that you are trained on, correct?

7  A.  The Kansas two-step?  No, I've been taught to show a break

8  in the car stop.

9  Q.  If we can agree between ourselves that for these purposes,

10  that maneuver, that step away and step right back that took

11  about a second, can we agree and call that the Kansas two-step?

12  A.  I was breaking contact.  I don't understand the reason we

13  call it the two-step.  Somebody named that.

14  Q.  Whatever we want to call it, it's something you as a KHP

15  trooper are trained to do, correct?

16  A.  Yes.

17  Q.  And the idea is that that break in contact as you say

18  establishes a voluntary contact after that; is that fair?

19  A.  That's fair.  And I don't know that they're trained to do

20  that anymore.  I know there's actually people saying now don't

21  even step away, so as far as what they got trained, I know what

22  I got trained.  I don't want to point at the other troopers.

23  Q.  I'm specifically referring to you and this -- the exercise

24  that we've witnessed on Exhibit 954, fair?

25  A.  Fair.

1  Q.   And the idea behind that is that anything you ask that
2  driver after that is a voluntary provision of information by
3  the driver, fair?
4  A.   Correct.
5  Q.   And following that, you advise Mr. Martinez that you were
6  overly suspicious?
7  A.   I did.
8  Q.   And you advised that you believed he was possibly carrying
9  drugs?
10 A.   Yes.
11 Q.   And you asked him for his consent to search?
12 A.   Correct.
13 Q.   And he refused that, didn't he?
14 A.   He did.
15 Q.   He's got a right to do that, doesn't he?
16 A.   He does.
17 Q.   In fact, that's a constitutional, right?
18 A.   Absolutely.
19 Q.   All of those questions didn't really matter, did they,
20 because whatever he said, he was going to be detained?
21 A.   I felt like I was going to detain him, yes.
22 Q.   He was going to be detained from the minute you got out of
23 your car and started that approach?
24 A.   Unless for some reason I picked up a different sense on
25 what was going on.

1  Q.   And you understand that in order to detain him, you have to

2  have reasonable, articulable suspicion, correct?

3  A.   Correct.

4  Q.   And there are things that you can consider in that calculus

5  and there are things you can't consider, correct?

6  A.   Correct.

7  Q.   So I want to make sure that we're on the same page.

8  Between the time that you -- excuse me.  Let me rephrase that.

9       From the point at which you stepped out of your KHP

10  vehicle, before you ever asked him any questions, it was your

11  intention to detain him for a canine sniff, correct?

12  A.   I stepped out of my car twice so I want to clarify.

13  Q.   So we just watched what I'm calling for the record clip

14  three.

15  A.   So on my second approach.

16  Q.   Yes, sir.

17  A.   Yes, sir.

18  Q.   When you had the warning ticket, correct?

19  A.   Correct.  Well, warning and a citation for registration,

20  but my paperwork, yes.

21  Q.   Both of those things in your hand and you were on your way

22  to give those back, correct?

23  A.   Correct.

24  Q.   That's the approach I'm talking about and I want to be

25  clear.  It was your intention to detain Mr. Martinez for a

1  canine sniff the moment you stepped out of your car to have

2  that second encounter?

3  A.   My intent was hopefully get a consent to search, and if

4  not, I was fully ready to detain them unless something would

5  have changed.

6  Q.   Either way he was going to be detained, wasn't he?

7  A.   Well, if it's voluntary -- if it's voluntary consent to

8  search, he's not detained.  I was going to detain him if he did

9  not consent to a voluntary search.

10  Q.   Even if he consents to a search, he's not free to go, is

11  he?

12  A.   If he said I'm no longer comfortable with this, the search

13  would end, and at that time if I wouldn't have found a dog, I

14  would have said I'm done with you.

15  Q.   So your testimony is with a voluntary search if someone

16  says I'm not comfortable now, then you stop the search?

17  A.   Absolutely.

18  Q.   Even though you had reasonable suspicion to begin it?

19  A.   Reasonable suspicion, yes.  And if they give me voluntary

20  consent, I'm going to search, and if they say stop, I stop.

21  Q.   Okay.  Let's play clip number five.

22       I want to set the scene a little bit here.  You returned

23  then to your car, sir, correct?

24  A.   Correct.

25  Q.   Did you make a call for a canine?

1  A.   I notified the dispatcher to check with our agency on both

2  sides of the troop lines and then the two counties we were

3  bordering there.

4  Q.   That was for the purpose of conducting a canine sniff?

5  A.   Yes, sir.

6  Q.   Go ahead.  Thank you.

7       That's your voice we hear on the phone, correct?

8  A.   Not on the phone but on the radio, yes.  On the phone it's

9  the Riley County officer.

10 Q.   Okay.  That conversation we just heard, who are you talking

11 to?

12 A.   The Riley County officer.

13 Q.   Okay.

14 A.   I'm sorry, I can't remember his name.

15 Q.   That's okay.  And what was the purpose of talking to the

16 Riley County officer?

17 A.   I think he called -- he wanted to be in contact with me

18 about finding out what the situation was.

19 Q.   Okay.  And the very first thing you said to him was

20 Colorado tags, correct?

21 A.   I started describing the situation.

22 Q.   And the very first thing you said to him was Colorado tags,

23 true?

24 A.   That's one of the things that was during that first part,

25 yes.

1   Q.   Sir, in that clip, the second part of clip number 5 of

2   Exhibit 954, you then mentioned a refusal, correct?

3   A.   Correct.

4   Q.   And that was a reference to the driver's refusal to consent

5   to a search, correct?

6   A.   Correct.

7   Q.   Sir, in that clip you mention -- well, first you ask about

8   whether the Riley County officer is 108, that means whether

9   he's in service?

10  A.   Whether he's working at that time, yes.

11  Q.   At a point you said you were concerned it was going to go

12  32, which I'm assuming means you were anticipating a possible

13  chase?

14  A.   Correct.

15  Q.   You also say in that clip that you were worried about his

16  hands.  Did I hear that, right?

17  A.   Yes.

18  Q.   And that was a reference, sir, to your concern for violence

19  for these men in the car, correct?

20  A.   That's correct.

21  Q.   And that was -- and that was after you had contacted the

22  dispatcher about the driver, correct?

23  A.   Correct.

24  Q.   And his record came back with not even an arrest, correct?

25  A.   Correct.

1  Q.  So no reference to violence of any kind, right?

2  A.  Correct.

3  Q.  Let's pick back up.

4      You mentioned in that that both of these men in the car

5  were pretty heavily tatted up, correct?

6  A.  Well, the passenger has some tattoos, but the driver is the

7  one that is really tatted up.  I don't remember if I said both

8  of them, but maybe I did.

9  Q.  Okay.  And you have a discussion about the registration of

10 the car again, and you mentioned that his wife had a different

11 last name, correct?

12 A.  Well, the registration had a different last name than his

13 -- if it is his wife.

14 Q.  Well, the woman he advised you was his wife had a different

15 last name, correct?

16 A.  Correct.

17 Q.  Okay.  And then you clarified for the Riley County officer

18 that the insurance was, as you understood, in his

19 mother-in-law's name, correct?

20 A.  Correct.

21 Q.  And then you mentioned that they are both Hispanic,

22 correct?

23 A.  Yes.

24 Q.  You make a reference to a different lifestyle, correct?

25 A.  Is that what I said, lifestyle?  Yes.

1  Q.  And, sir, is it -- it's not some sort of an indicator of

2  criminal activity that a man and his wife have different last

3  names, is it?

4  A.  No.

5  Q.  Okay.  And you understand that that is more common in the

6  Hispanic culture than it is in other cultures; is that fair?

7  A.  I don't know about all cultures, but I do know after seven

8  years of experience of interviewing a range of cultures, but I

9  did find that, to them, common law marriage, they would

10  regularly say wife and I'd find out that they'd never been

11  married.  So, yes, I had seen that.

12  Q.  That was an indicator to you as a common law marriage as

13  opposed to what kind of a marriage?

14  A.  A common law marriage where they don't take on the other

15  person's name like the official marriage and take the last

16  name.

17  Q.  So unofficial marriage?

18  A.  Ask your question again.

19  Q.  I'm trying to figure out what you mean by common law.

20  A.  Like living together, never went to the judge, never went

21  to a preacher, got married, took somebody's last name.

22  Q.  That is, as you say, common in your experience in the

23  Hispanic culture?

24  A.  I'm going through my experience of interviewing people.

25  Q.  That's all I'm asking you about.

1  A.  I did find that somewhat regular during my interviews, yes.

2  Q.  Do you have any understanding that in the Hispanic culture

3  married couples often use different last names?

4  A.  Ask your question again.

5  Q.  Are you familiar with the fact that in the Hispanic culture

6  persons who are married still use different last names?  Do you

7  know that?

8  A.  Do I know that?  No.  I just -- I have seen different names

9  with people that said they were married.

10  Q.  And as you're going through this list with the Riley County

11  officer, this is your explanation of all the reasons why you

12  detained these men for a canine sniff, correct?

13  A.  It's not all the reasons.

14  Q.  There were more reasons than you listed?

15  A.  Yeah, I wasn't trying to list with him everything that I

16  had seen.

17  Q.  But the two of you are discussing the reasons for the stop,

18  correct?

19  A.  Not the reasons for the stop.

20  Q.  Okay.

21  A.  Well, we talk about the stop.

22  Q.  And the contact between you and the Riley County officer

23  was for purposes of him being aware that you were executing

24  this stop?

25  A.  Ask it -- why I'm detaining him?

1  Q.  No, I'm sorry.  Why are you talking to the Riley County

2  officer?

3  A.  He was wanting to respond at my request, and he was asking

4  basic questions about the stop and detention.

5  Q.  And if I call that a backup, same page?

6  A.  A backup?

7  Q.  He was your backup on that stop?

8  A.  He's the canine.  He's the -- yeah.  If I would have just

9  called for backup, I wouldn't have called for somebody -- I

10  would called for anyone close.

11  Q.  Understood.  So this is the canine officer who you have

12  requested to respond to your location?

13  A.  Correct.

14  Q.  And you're talking to him about the stop and your reasons

15  for the stop including your observations of the people in the

16  car, correct?

17  A.  Yes, he's getting some of the observations and some of the

18  reasons.

19  Q.  And back to that last criterion that we heard in that clip,

20  you had talked about his wife having a different last name and

21  I think I asked you some questions about last names.  Let me

22  ask you as a last question about that.  You're aware that women

23  use their maiden name oftentimes after they're married as a

24  matter of personal preference?

25  A.  Correct.

1  Q.  You're aware of that?

2  A.  That can happen, yes.

3  Q.  Let's start that clip back up.

4      Sir, in that clip you described the men in the car as

5  angry, correct?

6  A.  Yeah, I feel like they were trying to be abrasive towards

7  me to end the stop.

8  Q.  You actually used the word abrasive, didn't you?

9  A.  Did I use abrasive?  I did now.  I don't remember if I said

10 it then.

11 Q.  I think you said something about them being agitated,

12 correct?

13 A.  Yes.

14 Q.  And then again you advised the Riley County officer that

15 you were watching hands, correct?

16 A.  Correct.

17 Q.  Let's go to clip number six, please.

18     Sir, you knew that Mr. Martinez was video recording this

19 interaction, correct?

20 A.  Yes, I think both men were.

21 Q.  And you knew you were being recorded at the time?

22 A.  Well, I knew I was recorded by myself and I assume they

23 were.  I didn't figure they were pointing their cameras or

24 their phone at me without recording.

25 Q.  You saw them holding the phones like that?

1   A.   Yes.

2   Q.   You didn't object to either one of them recording this,

3   correct?

4   A.   Not until the dog hit.  With probable cause, sometimes --

5   I'm generally alone after probable cause, and I change how I do

6   things then, but with that second officer, I didn't have a

7   problem with them videoing it.

8   Q.   My question is, you did not object to or stop them from

9   videotaping the entire search; is that correct?

10  A.   Correct.

11       MR. MCINERNEY:  Okay.  Let's pull Exhibit 128 up,

12  please.  I'd like to put this just on the witness' screen to

13  ask him one more foundational question if I can do that.

14       I'm sorry, Judge, we're trying to get our exhibit

15  lined up here.  Can you publish that, Audra, or are you already

16  published to the witness?

17       COURTROOM DEPUTY:  Yeah, it's only been restricted

18  from up here.

19       MR. MCINERNEY:  Got it.

20       THE COURT:  Is it a problem if I see it?

21       MR. MCINERNEY:  I've got --

22       THE WITNESS:  There's a picture up.

23       THE COURT:  I've got it too.

24       MR. MCINERNEY:  Okay.  Then why don't we put it up all

25  around, please.

1        COURTROOM DEPUTY:  Sorry.  I've only got two options.

2        MR. MCINERNEY:  I'm just trying to be probably too

3   careful.

4        Can you hit play, please.

5        MR. CHALMERS:  Your Honor, if we could stop for a

6   moment so I can impose an objection.

7        MR. MCINERNEY:  I haven't offered it yet.

8        MR. CHALMERS:  Well, you're publishing it.

9        Your Honor, there's no foundation for it.  This was an

10  exhibit that was never produced in discovery and appears to be,

11  if I understand what little I've heard about it, is a video

12  that someone else took that probably would just be cumulative.

13       MR. MCINERNEY:  Judge, a couple things:

14  Foundationally, I've got one more question.  I'm going to ask

15  this witness whether he recognizes himself in this and

16  recognizes that to be the stop.  Quite frankly, I'm waiting for

17  him to get a little bit closer to the camera so he can see his

18  face.  And second of all, it's on our exhibit list.  It's 128

19  and 129.

20       MR. CHALMERS:  You misunderstood my objection -- or I

21  apologize, he misunderstood my objection.  The document was

22  never produced in discovery.  I saw it for the first time when

23  it was an exhibit that was listed.

24       THE COURT:  What document, a video?

25       MR. CHALMERS:  This video was never produced in

1  discovery.  It was first provided a copy to me when they

2  included it in their exhibit list for trial.

3       THE COURT:  Okay.  Typically we wouldn't refer to this

4  as a document.  That's what was confusing me.

5       MR. CHALMERS:  I'm sorry.  The video, Your Honor.

6       MR. MCINERNEY:  Judge, some of this falls in line with

7  what Ms. Brett argued to you earlier.  This stop happened on

8  September 5th of last year.  We didn't learn about it until the

9  13th, and we requested to reopen discovery.  That request was

10  denied.

11       Nevertheless, the exhibit itself was produced to the

12  government in this case, and it has been known to them since

13  September, which is kind of the foundation of the argument that

14  Ms. Brett made for this evidence at all at the beginning of

15  this trooper's testimony.

16       MR. CHALMERS:  Your Honor, maybe counsel's being

17  careful with his wording, but if he's implying that the video

18  was provided to me in September, that's absolutely untrue.  I

19  knew that there was a question about this stop.  I objected to

20  reopening discovery.  The magistrate agreed to reopening

21  discovery was not proper.

22       Then for the first time I get a copy of this video is

23  when they list, what, just before trial, a week before trial or

24  two weeks, the exhibit and provide a copy of it at that point.

25  They did not provide it -- they actually filed a supplemental

1   Rule 26 disclosure out of time after the deadline the court had

2   placed and had identified Mr. Martinez.  Did not identify the

3   video or produce a copy of it at that point, Your Honor.

4        THE COURT:  So are you offering this for impeachment?

5   What are we doing here and is it worth digging into the

6   documents about whether it was untimely, is this prejudicial to

7   somebody?  What's the relevance and where are we going?

8        MR. MCINERNEY:  I'm offering it into evidence, Judge.

9   Not for impeachment.  This witness can lay the foundation for

10  it.  And he's -- he will testify that he -- he was aware of the

11  recording, that he knew he was being recorded, that he didn't

12  object.  I was going to have him identify himself in the

13  recording.  It's the recording of the incident that we've been

14  talking about as taken by Mr. Martinez in two pieces, and we

15  think it's relevant, Judge, for the perspective that this video

16  provides away from the dashcam.

17        THE COURT:  In what way is it relevant and not

18  cumulative?

19        MR. MCINERNEY:  I'm sorry?

20        THE COURT:  How is it not cumulative?

21        MR. MCINERNEY:  The dashcam doesn't show the search of

22  the vehicle.  The entire search of the vehicle as conducted by

23  this witness and his Riley County colleague is depicted on 128

24  and '29.

25        THE COURT:  And what is the search relevant to?

1        MR. MCINERNEY:  We believe that it's -- again, when we

2   get to the relief in this matter, it's our contention that this

3   trooper lacked reasonable suspicion and that as a result of the

4   sniff and the subsequent search, this is the kind of harm that

5   we are requesting the court issue an injunctive order against.

6   So we think that this -- the way this search was conducted and

7   the search itself is evidence the court should consider when

8   balancing the harms.

9        THE COURT:  Why don't you -- you didn't produce it

10  during discovery?

11       MR. MCINERNEY:  It was produced during discovery.

12       MS. BRETT:  Your Honor, if I could respond to this

13  quickly.  Discovery closed in June for this case with the

14  anticipated --

15       THE COURT:  2022.

16       MS. BRETT:  In 2022 with the anticipated trial date

17  being in February of 2023.  This stop didn't occur until

18  September 5th of 2022.  There was no way to have produced this

19  in the course of normal discovery.

20       When we learned about this stop, we immediately

21  contacted defendant and asked for consent to reopen discovery

22  for the limited purpose of obtaining the dashcam video from

23  this stop and any paperwork that was completed as a result of

24  this stop.  The defendant declined our request to do so.

25       We took it to the magistrate two or three days later.

1    The magistrate declined to reopen discovery to allow us to

2    access the dashcam footage.  And we submitted a declaration to

3    the court with Mr. Martinez's account of the events, and we

4    also amended our Rule 26 disclosures to include Mr. Martinez

5    and Trooper Proffit.  That included both of them on our witness

6    list and included this exhibit on our exhibit list in

7    preparation for this trial and produced a copy of it to the

8    defendant before we received a copy of the dashcam footage.

9           So we had produced this even before we received a copy

10   of the footage that the defendant had in his custody and

11   control for the entirety of those six months, and they had, you

12   know, that evidence and access to it.  We did not get that

13   until just two weeks ago.  And we produced this in accordance

14   with the timelines that the court set for pretrial deadlines

15   and production of exhibits, and he has had it for that time.

16          THE COURT:  So I mean, I think you all know one of the

17   concerns I have with regard to the request for injunctive

18   relief is that some of the underlying stops are pretty remote

19   in time from the trial and the date when I will be assessing

20   whether there's an ongoing violation of federal constitutional

21   law, so I'm interested in as much current information as I can

22   get, so --

23          MR. MCINERNEY:  Part of our obligation, Judge, here is

24   to show that there is a pattern or practice by the Kansas

25   Highway Patrol, so what we've tried to present over the last

1  two trials and then again in this one are a series of events

2  that show that pattern being put to work and what that practice

3  looks like in reality.

4      So the recency of this I think demonstrates that that

5  pattern continues, it continues on unabated, and the concerns

6  that the previous two stops that we've litigated raised remain

7  today, and we think that that is one of the more compelling

8  basis for this court to issue an injunction against this

9  conduct.

10      THE COURT:  So, Mr. Chalmers, you're not surprised by

11  this?

12      MR. CHALMERS:  I was surprised when I got the exhibit,

13  yeah, a couple weeks ago.

14      THE COURT:  Okay.  Well, I'm overruling your

15  objection.  But I think the better way to approach it would be

16  to ask him to describe the search, if it's inconsistent with

17  what the tape shows.  You can show it for purposes of

18  impeachment, and we will take it from there.

19      MR. MCINERNEY:  Understood.  If I can have just a

20  minute.

21      So let's start the video and run it for one minute,

22  and I'll have a couple questions for this witness, please.

23      MR. CHALMERS:  Your Honor, I may be confused.  I think

24  that's exactly what you said he wasn't going to do, and I

25  objected for lack of foundation and still for the other

1    reasons.

2        MR. MCINERNEY: Judge, this is not going to be offered

3    to impeach this witness. This is offered as substantive

4    evidence of what occurred because the dashcam that the state

5    provided us doesn't show the search, doesn't show how it was

6    executed, doesn't show the communication back and forth during

7    the search back and forth between this witness, his colleague,

8    and Mr. Martinez.

9        THE COURT: What I asked you to do is first ask him to

10   describe it in testimony, the search, and then if he's not

11   accurately describing what happened, then use it for

12   impeachment and then we'll revisit this.

13       MR. MCINERNEY: Okay. Thank you.

14       Can we go back to clip six of what's already admitted

15   as 954, please.

16   BY MR. MCINERNEY:

17   Q.  Sir, in that clip which we've labeled clip number six, the

18   canine officer arrives and walks the dog around the car you

19   stopped, correct?

20   A.  Correct.

21   Q.  And at some point you are advised that the dog has

22   indicated the presence of narcotics?

23   A.  I guess he would give me -- I think he gave me a thumbs up,

24   but he was trying to tell me it detected a known drug odor.

25   Q.  Was that your interpretation?

1  A.  Yes.

2  Q.  And you instituted a search of the vehicle at that point,

3  right?

4  A.  Correct.

5  Q.  Because it was your position that at that point you had

6  probable cause to search the vehicle, correct?

7  A.  Correct.

8  Q.  Let's play clip number seven, please.

9      Sir, you just watched clip number 7 of Exhibit 954, and it

10  ran to the end of that whole video, didn't it?

11  A.  Yes.

12  Q.  Yet the search continued after that point, correct?

13  A.  For a little while, yes.

14  Q.  Okay.  And your dashcam did not capture that portion of the

15  search, correct?

16  A.  I do not recall.  I don't recall from watching this video

17  if it did -- or if it did or did not.

18  Q.  Okay.  Queue up Exhibit 128, 25 minutes in, please.

19      Don't play it yet.  Are you there?

20      Sir, at the very end of this search you did not find a

21  large sum of currency, did you?

22  A.  No, we did not.

23  Q.  Did not find any marijuana?

24  A.  The one little piece of vegetation, it was not tested.

25  Q.  You never recovered any marijuana, did you?

1  A.   Correct.

2  Q.   You didn't recover any cocaine?

3  A.   Negative.

4  Q.   No weapons?

5  A.   We did not.

6  Q.   In fact, no controlled substance at all, correct?

7  A.   Correct.

8  Q.   Sir, I'm going to -- what is displayed on the scene right

9  now is Exhibit 128, approximately 25 minutes in.  Let me ask

10  you first, at the end of the last video clip we looked at, had

11  you yet opened the hood of the car?

12  A.   Yes, I believe I went to the hood originally.

13       MR. MCINERNEY:  Okay.  Judge, it's my intention to

14  play this from the point at which this witness' dashcam cut off

15  to show the rest of the search of the vehicle.  It begins

16  approximately 25 minutes in to Exhibit 128 and then picks up in

17  Exhibit 129.  I will absolutely do what the court prefers, but

18  that's my representation to the court about what those two

19  exhibits are, and with that we would offer 128 and 129.

20       MR. CHALMERS:  Lack of foundation as to 128 and 129.

21  It's not authenticated, it's not showing any of the basic

22  ingredients as to when you would put a video into evidence.  In

23  addition to that, it was not timely-produced during discovery

24  or evenly timely produced after it became apparent they were

25  going to use it as an exhibit.  It should not be introduced.

 1          THE COURT:  So I assume he can lay a foundation, but

 2    what is untimely about their production after they discovered

 3    it?

 4          MR. CHALMERS:  Well, they apparently -- I don't know

 5    when they had the video.  What I do know is that when they came

 6    to me saying we'd like to have the dashcam video, I want to

 7    reopen discovery, and the magistrate said no, months went by,

 8    and it isn't until right before trial when we had the deadline

 9    that says now produce your exhibits that they provide me a copy

10    of the exhibits.

11          THE COURT:  And is that prejudicial to you?

12          MR. CHALMERS:  Is it prejudicial?  Is it harmless, no.

13    I think --

14          THE COURT:  Is it prejudicial?

15          MR. CHALMERS:  Well, I have no way to verify the

16    exhibits I guess.  So, yeah, from that standpoint it's

17    prejudicial.

18          THE COURT:  It's your witness that will verify it,

19    so --

20          MR. CHALMERS:  I don't know -- well, if he can lay

21    foundation for it.

22          THE COURT:  All right.  Then go ahead and see if you

23    can lay a foundation through this witness.

24    BY MR. MCINERNEY:

25    Q.  Sir, I'm going to play a brief portion of Exhibit 128 from

1    the point at which it's displayed on the screen forward and

2    then I'm going to stop it.

3         So let's play ten seconds of 128, please.

4         Thank you.

5         Sir, do you recognize that that's shown on the screen in

6    Exhibit 128 as the September 5th search of Mr. Martinez's

7    vehicle?

8    A.   Yes, I do.

9              MR. MCINERNEY:  We would offer 128.

10             MR. CHALMERS:  Your Honor, I think if you're going to

11   authenticate a video, you have to say it fairly and accurately

12   depicts what's shown on the video.  He's not said that.  He's

13   not watched the entire video.  All we have is a statement that

14   there's one slide or two slides on the video that appears to

15   relate to this search.  We don't have the basic foundation to

16   know whether the document has been changed or what it might

17   show.

18             THE COURT:  I think those are things you can cover on

19   cross-examination if you're concerned about plaintiffs' lawyers

20   tampering with the evidence, and I don't think those are magic

21   words that you need to use, but if you want to invoke them and

22   say the mantra of does this fairly and accurately depict the

23   scene as you remember it from the day in question, please feel

24   free.

25   BY MR. MCINERNEY:

1   Q.  Did you hear the Judge's question just now, sir?

2   A.  I did.

3   Q.  What's your answer to that from what you've seen so far?

4   A.  From what I've seen so far, from this angle, this is the

5   car stop.

6   Q.  Okay.  Thank you.

7          THE COURT:  Can I ask a question?  If you see

8   something which makes you think that plaintiffs have

9   intentionally tampered with this, will you let us know?

10          THE WITNESS:  I will.

11          THE COURT:  Okay.  Thank you.

12          MR. MCINERNEY:  Was 128 admitted, Your Honor?

13          THE COURT:  Received, yes.

14          MR. MCINERNEY:  Thank you.

15          Let's hit play on 128, please.

16          THE COURT:  Excuse me just a second.

17          MR. MCINERNEY:  Can we proceed, Your Honor?

18          THE COURT:  Yes.

19          MR. MCINERNEY:  Thank you.

20          Great.  Can we go to Exhibit 129, please.

21   BY MR. MCINERNEY:

22   Q.  Sir, I'm going to do the same thing.  We're going to watch

23   ten seconds of it and I'm going to ask you that short series of

24   questions.  Okay.

25   A.  Yes.

1  Q.  Sir, we've just shown you, about ten seconds or so of

2  exhibit -- what's marked as Exhibit Number 129, do you

3  recognize that as a continuation of the search that was

4  depicted on Exhibit No. 128?

5  A.  That's what it looks like.

6  Q.  From what you've seen, sir, is that a fair and accurate

7  representation of the search that you and the Riley County

8  officer conducted on September 5th of last year?

9  A.  I believe it's an accurate photo from that angle -- or

10  video from that angle.

11  Q.  Thank you.  And same -- I'll make the same statement to you

12  that the court did, if you see a point at which it appears it's

13  been altered or changed in any way, would you please say the

14  word "stop"?

15  A.  Yes, sir.

16  Q.  Thank you.

17       MR. CHALMERS:  I assume that the court has admitted

18  the exhibit, Your Honor, if we're going to play it over my

19  objection with respect to the lack of foundation.

20       MR. MCINERNEY:  I actually haven't offered it, but I

21  will offer it right now.

22       THE COURT:  Given the identification by this witness,

23  what is your objection to foundation?

24       MR. CHALMERS:  I think all he said is he saw one part

25  of it and appears to be accurate.  I think for him to be

1   authenticated, he's going to have to show more connection to it

2   just than the fact he's seen that one part of it to have the

3   foundation to show it depicts what is supposed to be shown,

4   he's going to have to watch the whole thing.

5           THE COURT:  I'm quite certain he is going to see the

6   whole thing and that I can conditionally receive it subject to

7   excluding it from testimony if we find out your fears about

8   tampering and alteration of the evidence are well-founded.

9           Go ahead.  It's received.

10          MR. MCINERNEY:  Thank you, Your Honor.

11  BY MR. MCINERNEY:

12  Q.   Sir, you watched the balance of what is marked as

13  Exhibit 129, correct?

14  A.   Yes.

15  Q.   Did you see anything along Exhibit 129 that appeared

16  altered or somehow edited?

17  A.   There was a couple breaks in the video, but I don't see

18  that it's edited.  I don't know what happened there.  It looks

19  like it's just on electronic glitch, but not edited.

20  Q.   As you look back at September 5th of last year, is that

21  consistent with your memory of events?

22  A.   Actually I forgot some of that just because I hadn't seen

23  it.  But, yeah, I do remember some of those items now.

24  Q.   Okay.  And at the very end of it there you advise

25  Mr. Martinez that he was wrong on the law, don't you?

1  A.  They were trying to say probable cause from the beginning

2  and didn't understand the difference between it and reasonable

3  suspicion.

4  Q.  You told him that he was wrong on the law, right?

5  A.  Well, I do believe he was wrong on that.

6       MR. MCINERNEY:  That's all the questions I have for

7  this witness, Your Honor.  Thank you.

8       THE COURT:  Cross-examination.

9                      CROSS-EXAMINATION

10 BY MR. CHALMERS:

11 Q.  Lieutenant, did you receive training on how to conduct

12 traffic stops as part of your occupation?

13 A.  Yes, I did.

14 Q.  Could you briefly describe the training that you received

15 to the court, please.

16 A.  I went to like a 22- or 23-week academy at the Kansas

17 Highway Patrol.  During that time you're learning a wide range

18 of things.  Part of is making a traffic stop.  You will do some

19 scenario training in the academy.  Then you will go out and do

20 a little bit more hands-on training, and then you spend roughly

21 77 days with a training officer where there's another trooper

22 with you and you are out conducting enforcement and making

23 traffic stops and them instructing you at that time.

24 Q.  And not to belabor it, but is there any additional

25 continuing training after the academy training and kind of the

1   initial phase out with your backup or your supervising officer?

2   A.   What was the last part?  Additional training, yes.

3   Q.   Tell me just briefly, describe the additional training that

4   you would receive with respect to traffic stops after the

5   academy training and after the ride-alongs.

6   A.   There are additional classes afterwards that would go into

7   maybe some specific scenarios like say truck inspections, truck

8   investigations, accident investigations, but if we're sticking

9   on car stop, there would be a criminal interdiction class,

10  advanced criminal interdiction class, and then there's the

11  in-service items every year where we come back and take a lot

12  of general classes.  Most of them wouldn't focus on necessarily

13  traffic stops.  And then occasional scenarios that we might set

14  up with us and maybe another agency where we would do car stops

15  and then felony arrests or practice going through the process

16  of a next level investigation or the next level officer safety

17  issue.

18  Q.   You mentioned interdiction.  What's that?

19  A.   Interdiction would be trying to locate criminal activity

20  that's being conducted out on the roadways.

21  Q.   Did you receive or get any of this additional training on

22  interdiction that you've described?

23  A.   Yes, I went through the general interdiction class and the

24  advanced criminal interdiction.

25  Q.   You in response to direct talked about some relationship

1   you had with the DEA.  What was that the relationship?

2   A.   I was a task force officer for seven years, so I was in

3   plain clothes and responded to mostly highway patrol car stops

4   that had turned into a criminal investigation.  Did assist the

5   DEA in other investigations that weren't related to highway

6   patrol or traffic stops as well.

7   Q.   Were you a DEA employee?

8   A.   I am employed by the highway patrol but assigned to DEA.

9   At that time for most of it I was assigned out of Wichita, and

10  our unit changed our -- which part of the DEA we were connected

11  to right at the end of my stint with that job.

12  Q.   Would you briefly describe then your experience with

13  respect to interdiction work and perhaps as it relates to the

14  DEA task force?

15  A.   Prior to the interdiction task force I was fairly active in

16  trying to criminally interdict.  I was in counties where there

17  was no I-70, so a lot of these stops that I had weren't

18  necessarily producing large loads distribution.  It was more

19  personal use type items.  I did have a few what I would call

20  distribution, you know, a pound or two of marijuana or maybe

21  30, 40, 100 pills of some sort that would be, you know, local

22  distribution, not necessarily cross-country distribution.  A

23  couple those were from one state to another but still on the

24  smaller size.

25       Prior to that I was actually a crisis negotiator force

1   dealing with a lot with talking with people and trying to move

2   forward through their scenarios and then through my time with

3   the interdiction world -- or not the interdiction world, my

4   normal job in interdicting, really worked hard on my

5   interviewing skills, and then when I went into the DEA, a lot

6   of what I was doing was interviewing people after the fact.

7   Q.   Now, in the experience and the training that you've talked

8   about, would you explain to the judge perhaps what -- if you

9   have any special knowledge concerning locating trafficking of

10  drugs?

11  A.   Do I have special -- yeah.

12  Q.   Go ahead and describe that.

13  A.   We do go through our interdiction class and we try to look

14  at some not necessarily -- they're not set in stone.  Maybe

15  some commonalities or tendencies or some things to look for

16  that would tell you to be suspicious of criminal activity.  So

17  that would be during my interdiction and criminal interdiction

18  type classes.

19       And then during my I guess negotiation type classes that

20  weren't even part of the negotiation world, a lot of that had

21  to do with listening to people and try to pick up whether they

22  were being honest with you or not.  Again, there's no set in

23  stone whether they are or not but trying to pick up to their

24  verbiage towards you.

25       With the -- when I was with the DEA, I wasn't for the most

1   part generating my own cases.  I may have generated a couple

2   investigations, but they would have stemmed off of car stops.

3   But I was reading reports, watching video, and interviewing

4   people from car stops, and then through that, every interview,

5   every investigation I would slowly but surely learn more and

6   more about that criminal world, and then also the other DEA

7   agents or other task force officers that may have been working

8   with me, they may have had more extensive knowledge in an area

9   to point me into a more in-depth investigation or help me

10  create knowledge about what I was looking at for the

11  investigation that I was on.

12  Q.  I'm going to try to hand you Exhibit 953.  It should be in

13  the box up here.  It will be under tab 953.

14  A.  Yes, sir.

15  Q.  Looking at Exhibit 953, does that appear to be a copy of a

16  citation that you issued to Mr. Martinez?

17  A.  Yes, it does.

18        MR. CHALMERS:  I move for admission of Exhibit 953.

19        MR. MCINERNEY:  No objection.

20        THE COURT:  Received.

21  BY MR. CHALMERS:

22  Q.  Put that up on the ELMO.  There we go.

23    So I placed Exhibit 953 up on the ELMO.  Now would you

24  indicate on this exhibit where it shows the traffic stop took

25  place?

1  A.  Well, it's about a fourth of the way down.  It says

2  location.  Now, it's talking about where the violations would

3  have been seen, so that was I-70 westbound at 319.  I don't

4  know why it said 319.  It would have been more like 322 or 321.

5  Q.  What is the 319 or 322 or 321 related to?

6  A.  It's talking about the mile post on I-70.

7  Q.  When Mr. Martinez was stopped, he had exited I-70 which is

8  what we talked about earlier, correct?

9  A.  Correct.

10 Q.  Is there a mile post associated with that exit?

11 A.  That's the 322.

12 Q.  The 322 exit is about how many miles away from the mile

13 post for Junction City, if you know?

14 A.  One of the first intersections at Junction City is the 295.

15 The last one -- it goes from Junction City to Grandview Plaza

16 and Fort Riley.  It all gets clumped into one so at the end of

17 Fort Riley is the 303.  Junction City, last one would be I

18 think the 299.

19 Q.  So the distance from the 299 to the exit ramp at 322 would

20 be what distance?

21 A.  23 miles.

22 Q.  Is there -- could you describe to the court -- well, let me

23 back up.  You're familiar with, aren't you, the -- I-70, that

24 stretch from Junction City to where this stop took place?

25 A.  Yes, I am.

1   Q.   Are you familiar as well with the stretch of I-70 that's
2   eastbound that goes past where the stop took place?
3   A.   Yes, I am.
4   Q.   How familiar?
5   A.   Fairly familiar.
6   Q.   Is that part of your routine patrol?
7   A.   The 322 is the edge of my county and the edge of Troop C,
8   so going east of there just doesn't happen that regularly, but
9   it does happen.
10  Q.   Is there a rest stop to the east of the 322 stop?
11  A.   Yes.
12  Q.   What mile post is that, if you know?
13  A.   The first now is a gas station at -- I think it's the 329,
14  I think it's intersection with K-99.  There's also a rest area
15  nine miles before the 322.
16  Q.   So --
17  A.   I'm sorry, 13 miles before the 322 there's a rest area.
18  Q.   That would be at, if we do my math right --
19  A.   309.
20  Q.   -- 309.  Okay.  Mr. Martinez, when you saw his vehicle, was
21  traveling what direction?
22  A.   It was eastbound.
23  Q.   You didn't know exactly where he had come from; he never
24  indicated that?
25  A.   I had no idea where he came from.

1  Q.   But working back to the west, the rest stop available with

2  a restroom would have been at the 309?

3  A.   Correct.

4  Q.   And you knew that at the time of the stop?

5  A.   Yes, I did.

6  Q.   And then before that there were places to stop -- were

7  there places to stop in Junction City?

8  A.   There's several along Junction City.

9  Q.   Then as to the rest stop that you mentioned, there would

10  have been to the east, would there have been markings on the

11  highway that you're aware of to indicate that before the 322,

12  the rest stop was coming?

13  A.   As I recall, yes.  I know it's there and I don't even look

14  for the sign anymore.

15  Q.   So you've -- in the citation you indicate a violation for

16  speeding or do you?

17  A.   Yes, I do.  It's the number two there, 8-1558 is the state

18  statute for speeding.

19  Q.   You clocked Mr. Martinez's vehicle as traveling at what

20  speed?

21  A.   What was your last --

22  Q.   At what speed did you clock Mr. Martinez?

23  A.   I believe I had him at 91.  There was another vehicle I was

24  picking up at 89.

25  Q.   And how -- if you would describe it to the court, were you

1  able to clock him when you were traveling in the other

2  direction?

3  A.   Using -- our vehicles have a Stalker DSR 2X radar.  It's

4  able to pick up traffic in front and behind, moving away or

5  coming towards, and I actually pick up two vehicles, pick up

6  the fast or the -- and/or the largest vehicle.

7       And on this day -- I normally don't run radar regularly.  I

8  leave it off so people with radar detectors, I can catch them.

9  In his situation his vehicle was visually fast.  I generally

10  don't just leave my radar on and hit that many cars, I'm

11  looking for the faster ones.

12  Q.   When you're actually alerted to the speed of Mr. Martinez's

13  vehicle, where is it in relation to your vehicle?

14  A.   It was coming at me in front.  It was in front of me coming

15  at me going east and I'm going west.

16  Q.   And from Mr. Martinez's perspective, where would your

17  vehicle have been?

18  A.   I was in the left lane of the westbound lanes, and I

19  actually started braking and moving over towards the grass

20  median, you know, using that little bit of inside shoulder, so

21  it probably would have been quite obvious that that vehicle on

22  the opposite side was doing something that the other traffic

23  wasn't.

24  Q.   Were there any obstacles or obstructions between

25  Mr. Martinez's vehicle and your vehicle at that time which

1  would explain him not being able to see your patrol car

2  starting to stop him and move towards the median?

3  A.  No.

4  Q.  You I think responded to counsel's -- maybe you didn't.

5  When you saw Mr. Martinez's vehicle leave, did you make any

6  communication to dispatch?

7  A.  Yes, I did.

8  Q.  What did you do?

9  A.  I was trying to notify them and actually any officer

10  listening in a vehicle, I turned on a vehicle and basically

11  meaning that I was going to go stop a vehicle and it was

12  basically taking evasive maneuvers to avoid being caught by me

13  or detected by me.  I wanted them to know we were turning off

14  the roadway, and if other officers were listening, for them to

15  be heightened into listening to my car stop and whether I might

16  need assistance or not.

17  Q.  You had your first contact with Mr. Martinez at the side of

18  his vehicle after he was stopped after leaving the 322 exit; is

19  that right?

20  A.  Correct.

21  Q.  Tell us about the eastbound 322 exit.  What's around that

22  exit, if anything?

23  A.  Really nothing.  The exit, the 322 eastbound and westbound

24  just comes down to the -- to a road that goes below the

25  interstate, and north and south it turns into dirt road.  It's

1    a road that the local farmers and ranchers would use, not the

2    motoring public.  Well, I would say not usually the motoring

3    public.

4    Q.   And that location, the 322 exit, has that had any

5    significance in interdiction proceedings by the Kansas Highway

6    Patrol in the past?

7    A.   Yes, it has.

8    Q.   How so?

9    A.   I know there was a trooper on the interdiction team that

10   would set up ruse lanes there which was him basically putting

11   up signage that said drug check ahead or canine in use.  I'm

12   not sure what sign he used, but that was his usual location for

13   setting up a ruse lane.

14   Q.   You went up and after you had visited with Mr. Martinez, I

15   think your testimony was is you had at that point reasonable

16   suspicion that you felt was appropriate to detain him; is that

17   correct?

18   A.   That's correct.

19   Q.   I don't want to be too repetitive, so we've got a complete

20   summary of it, would you describe to the court, please, the

21   basis for the reasonable suspicion that you had after the

22   conclusion of the first contact with Mr. Martinez.

23   A.   Okay.  Trying to think of these things.  There wasn't a

24   concrete set of how his connection was to the possible owner or

25   the insured person.  That being said, I do know there's

1   cultural differences, and it's kind of hard for me to inquire.

2       I felt a decent amount of abrasiveness from them that I

3   thought questioning further would actually shut down the

4   investigation.  I want to keep things moving forward.  I want

5   to ask questions, and my background with crisis negotiation and

6   interviews, if I'm not what I would call on solid ground

7   thinking my question could go forward, I try not to delve in

8   too far and shut them off and get them more abrasive and get no

9   answers.

10      So I wasn't sure 100 percent what to do with that.  I

11  didn't like the scenario that none of the pieces really fit

12  together.  That being said, I'm aware of, you know, the tag was

13  expired for roughly a year.  I am familiar with drug

14  organizations buying cheap, previously-salvaged vehicles,

15  getting them fixed up, and using them as load cars or

16  distribution cars.

17      A drug organization -- I don't mean to just say drug

18  organizations, somebody sometimes doing criminal activity will

19  use that cheap car so they're not utilizing one of their own

20  cars that might be more expensive.  Then they also won't

21  necessarily insure it in their name, register it in their name.

22  They try to leave a trail to help cover up who's actually in

23  control of what's going on in that car.

24      So the tag not being registered for a year is kind of an

25  addition to the insurance and registration and driver, me not

1    being able to match all that together.

2         THE COURT:  Why would it make sense for a drug dealer

3    to drive around with an out-of-compliance registration sticker?

4         THE WITNESS:  I've never understood that, and I've

5    seen it multiple times.  I've seen them without insurance,

6    stolen plate off another car.  We've had hundred pound loads

7    where the people were driving in the 90s across -- I mean,

8    well, similar today.  I mean, they were 90s; that's going -- or

9    89, if I was wrong on which one it was, but he was doing at

10   least 89.

11        But they have drawn attention to themselves, and

12   troopers that I don't even interdict have had 100-pound loads

13   because they were ticketing somebody for 95.  I don't know why

14   they do that.

15        I have had a situation where they literally used

16   neighbors or a local person or a local junky to go -- they give

17   them money, you go buy insurance for this car.  They'll find

18   somebody else, you go by insurance for that car.  They keep

19   compartmentalizing so they can avoid having their name attached

20   to anything.

21        And I learned that more once I did the DEA as I looked

22   at nationwide or even in investigations that went outside the

23   United States, that compartmentalization is fairly important.

24   They're not maybe afraid of losing one load.  They're not

25   afraid of that person in the car getting arrested because

1   they've compartmentalized themselves for that.  It might even

2   be, you know, a test runs where they'll throw them out there

3   knowing they have something that's going to get them stopped

4   and see if they can get through the process.  May not have any

5   drug in the car, but it can be a test run.

6           Also the accompanying vehicle, you have situations

7   where a second vehicle can be with them and everything

8   perfectly good with it, but the accompanying vehicle might draw

9   the attention, get the stop, it may drive poorly, it may have

10  something wrong with it so an officer gets its mind and

11  eyesight off of a vehicle with a load, but gets drawn to a

12  vehicle that is clean per se.

13          I never fully understood how some of these larger

14  loads I saw with literally tags that said you're going to have

15  a chance of getting stopped the entire time across the country

16  or whatever distance that was.

17          THE COURT:  I've got another question.

18          THE WITNESS:  Yes, ma'am.

19          THE COURT:  Are troopers classified as interdiction

20  officers and then kind of like others?

21          THE WITNESS:  No.  We have a team that's an

22  interdiction team.  That goes out and looks for criminal

23  activity.  But every -- hopefully every trooper is trying to do

24  more than just stop cars for speeding and failing to maintain a

25  lane or following too close.

1              THE COURT:  That's my question.

2              THE WITNESS:  Yes.

3              THE COURT:  So we've heard a lot of evidence about

4      people being stopped for technical traffic violations, and then

5      the trooper like -- it's almost like they're trying to trick

6      the person into saying contradictory things or trying to what

7      you call build probable cause so you can take the dog in there

8      and sniff and it's more like a drug investigation under the

9      pretext of traffic stops.

10             Is that something that only interdiction officers do

11     or does everybody do that?

12             THE WITNESS:  I'm not sure what all your question is

13     referring to, but I would regularly look for criminal activity.

14     A big one for me was just change in demeanor.  If you saw me

15     and say you went from doing two over the speed limit to seven

16     under the speed limit, I thought that was unusual.

17             To the simplest violations I could find, I could find

18     people with no driver's license, find people with a misdemeanor

19     warrant.  I had a 20-year old and he's got a case of beer in

20     the back in his SUV as I walked up.

21             I don't know if I'm answering the question you came

22     with.  For me I was looking for criminal activity, not

23     necessarily drugs.  I did -- I have found -- one of my favorite

24     was just a slew of fake ID or fake ID's and fake checks in a

25     car door, they had pried it apart and put it in there, but it

1   was totally from their demeanor.  And it wasn't on the highway.

2   I walked into Arby's, saw their face at my presence, went to

3   the bathroom, came out, and they were gone.  As I walked

4   outside, they were backing out in a vehicle.  It looked like

5   their vehicle had literally took a turkey, it was just

6   shattered, so I made just a wave-car-stop stop, and in the

7   middle of that they were making their own checks and going to

8   Walmart stores and under their fake ID's getting 2 or $300 at a

9   time.

10          THE COURT:  But --

11          THE WITNESS:  I'm sorry.

12          THE COURT:  That's okay.  So to the answer to your

13  question is you don't have to be specifically trained as an

14  interdiction trooper in order to kind of do this method of --

15          THE WITNESS:  No.

16          THE COURT:  -- crime investigation.

17          THE WITNESS:  I think every officer should be looking

18  for criminal activity.  You think of the Oklahoma bombers.

19  That was over a light not working.  I've never watched a video

20  to see what verbiage was done then, but every car stop, I don't

21  care who, I don't care where they're from, I'm trying to listen

22  and watch and see if what they're saying and their actions make

23  sense to me.

24          Sometimes it's little to nothing, and I do nothing

25  with it.  Sometimes it's more, and I delve into whether I

1    should look further, and sometimes it's so much that I will

2    say, okay, I need to push further.

3            THE COURT:  All right.  Thank you.

4            THE WITNESS:  Yes, ma'am.

5    BY MR. CHALMERS:

6    Q.   I think the questioning started a lot of these inquiries

7    what were -- for you to outline all the reasons of reasonable

8    suspicion, and I'm not sure that you completed that.  But what

9    I'd like to do is kind of -- because I think they're in the

10   record otherwise, just move to another question if I can.

11   A.   Yes, sir.

12   Q.   One of the things that you talk about was a wallet that had

13   something to do with El Chapo or something similar.  How does

14   that fit into anything?

15   A.   When he pulled out his wallet and he was getting his

16   driver's license on the first approach, it looked like to El

17   Chapo to me.  That's not the normal photo I see.  The normal

18   photo I see would be Jesus Malverde.  I don't see too many

19   people that want to publicize connection to -- and I never

20   understood how to pronounce his first name, Joaquín "El Chapo"

21   Guzmán or Jesus Malverde.

22       I have listened to arguments of how they can be looked up

23   to by some people.  I don't understand that.  But, you know,

24   one being a drug lord, drug trafficker, committing a lot of

25   crime; the other one being -- I still thought it was El Chapo.

1  I'd love to go back and see it, but that's not the normal photo

2  I see.  But I don't know too many people that want to advertise

3  that a drug lord or even Jesus Malverde is somebody they want

4  to associate with.

5  Q.  I'm not -- maybe you've told us, but how did the fact that

6  you got a photograph of a drug lord or some other criminal, how

7  did that figure into your suspicions?

8  A.  I don't know that somebody wants to -- I would not want to

9  put a photo of something that is a huge probably negative in

10  society and attach it to me.  To me it's almost like he's

11  worshipping or saying I like this lifestyle, I'm in this

12  lifestyle, I'm doing something with this lifestyle.

13  Q.  Did you have discussions with Mr. Martinez about whether he

14  was speeding?

15  A.  Yes, when I went up and indicated I stopped him for

16  speeding.

17  Q.  What did he say?

18  A.  He immediately said he wasn't speeding and it was another

19  vehicle.

20  Q.  Did that fit into your suspicions?

21  A.  I have occasionally somebody pull off and try to hide.

22  I've regularly found criminal activity.  Most of those, if it's

23  just speeding, they just commonly admit to, yeah, I was

24  speeding.  He wanted to be kind of bully and abrasive and kind

25  of shove back at me I guess is my terminology like he wanted to

1   take away -- like he was already trying to be the defense

2   during a citation for speed like, no, that wasn't me, he was

3   trying to shut that down right then and there, almost like he

4   was playing the lawyer, courtroom lawyer at that time, like you

5   have no reason to be talking to me.

6   Q.   And you probably already just answered this, but how did

7   his courtroom lawyer-type behavior add to suspicion, if it did,

8   that he was engaged in some illegal activity?

9   A.   I think I have -- you know, unfortunately I have some

10  experience where the law enforcement is almost like we're

11  trying to point the finger at you, we're going to be abrasive

12  back to you, we're going to let you know whatever you do, we're

13  going to attack you.

14       Unfortunately -- and, well, I'm not saying unfortunate, but

15  I am saying unfortunate.  It seems like my profession is under

16  attack or what we're doing is under attack where there are

17  officers I can tell you right now that are probably shying away

18  from doing their job because they don't want to be sitting in

19  this seat where I am; they don't want to be on video.  We

20  actually have some that don't want to go to the courtroom for

21  just arguing a simple speeding ticket.

22  Q.   You heard I think on both the video a couple different

23  times statements from Mr. Martinez that he was looking for a

24  restroom.  Did you believe him?

25  A.   No, I did not.

1  Q.  Why not?

2  A.  There's no advertisement there for a restroom, and it

3  happened right after I turned through the median.  It was --

4  unfortunately I've seen it before, and I have no -- I have no

5  doubt in my mind that was trying to not be found by me.  There

6  is no reason to pull off there looking for a restroom.

7  Q.  You returned the paperwork and then told him there was a

8  warning.  Did you give him a ticket for --

9  A.  The registration was a citation.

10  Q.  And how did you -- he had indicated that he had proper

11  registration; he just didn't have it with him.  Do you remember

12  that?

13  A.  Well, that was part of my reasonable suspicion as well.  As

14  I thought he was fighting through making things hard for me to

15  figure out, he indicated his wife was at the pool with the

16  kids, which I'm not sure how he would know that, but I guess

17  that's possible, but it seemed more like putting another

18  tripping hazard out there like I'm going to take away any

19  ability you have to figure out the connection of me and this

20  registration and insurance.  He was saying like we've got

21  current tags; they're just not on.

22  Q.  Did you do anything to try to sort out whether the

23  registration was actually enforced?

24  A.  I just asked the dispatcher the expiration date on the tag,

25  and it was expired in 2021.  If I recall, 9, 10, 11 months

1  previous.

2  Q.  Would that have been consistent with what Mr. Martinez was

3  telling you?

4  A.  No, it was not.

5  Q.  Now -- so you returned the paperwork to Mr. Martinez, and

6  you gave him the ticket which is exhibit -- or the citation

7  which is Exhibit 953, and then what did you do?

8  A.  Basically explained the citation.  I don't remember if I

9  said have a safe day or whatever.  The verbiage sometimes get

10  ticklish on how you end the car stop when his car is not

11  registered so it legally can't be moved off the roadway.  It's

12  sometimes kind of ticklish to say drive safely.  But said

13  something to him at the end of the car stop and basically

14  started moving towards my vehicle.

15  Q.  Now I'm going to -- well, and then you returned back and

16  talked to him again; is that right?

17  A.  Correct.

18  Q.  And the upshot from that was that you asked to search and

19  he said he didn't want to be searched?

20  A.  Correct.

21  Q.  Then what happened?

22  A.  After he said no, I kind of voiced my opinion that things

23  were overly suspicious, the -- him trying to avoid me and

24  turning off there and the other things that I had seen.  I told

25  him I was going to detain him at that time.

1  Q.  I'm going to look to Exhibit 954, which is the dashcam, and

2  I'm going to start playing it at about 12:03.  Whoops, I guess

3  I need to get the sound on and make sure that we're ready to

4  go.

5      Mine is playing, but it's not on the screen.  That's

6  because I don't have it plugged in.  Okay.  Let me stop again.

7  Okay.

8      So at 12:18 probably works.

9      So I stopped the exhibit at 13:10.  After you told

10 Mr. Martinez he's being detained, does the video show that he

11 moved his car up?

12 A.  Yes, it does.

13 Q.  And at that point what was your thought?

14 A.  I actually thought it was about to turn into a car chase.

15 Q.  I think you referenced that in response to counsel's

16 question.

17 A.  Yeah.  When I called him the 32, but that would be a car

18 chase.

19 Q.  Okay.  So a search was conducted.  Well, before I get to

20 that, you had asked for consent to search.  Why do you ask for

21 consent to search if you've got reasonable suspicion?

22 A.  Well, I can't search it with just reasonable suspicion.

23 Q.  Why ask, why not just go ahead with your reasonable

24 suspicion detain for a dog?

25 A.  If I had consent to search, I could probably knock that out

1  way quicker without waiting on a canine.  I don't have a dog

2  working next to me.  A lot of the interdiction team might be

3  paired up with a dog, but I'm out working the road like a

4  regular road trooper.  I have no idea where the nearest dog is.

5  I'd rather not bother them and make the process a whole lot

6  quicker.

7  Q.  At the conclusion of the second video taken from the cell

8  phone, there was a conversation about some green substance.  Do

9  you remember that -- seeing that video?

10  A.  Yes, I did.

11  Q.  What was that about?

12  A.  I had seen it also as well.  There was some green

13  vegetation if I recall in the center console area or cup

14  holder.  I'm not looking for scraps.  Honestly I'm not looking

15  for dime baggies in somebody's pocket of marijuana as well.  I

16  can find marijuana almost on a daily basis on I-70, so the

17  officer was addressing -- the canine officer was talking about

18  maybe reasons why his canine alerted.  You'd have to ask him.

19  I think his last name is Childs.  It might be Jeff, I don't

20  remember now, but Childs.  But he was calling me on some of the

21  things he'd seen in the vehicle during his assistance with me

22  in searching.

23  Q.  The dog did alert to the odor of some sort of marijuana.

24  Is that what he was explaining?

25  A.  Well, it alerted to a known drug odor.  So the -- you need

1  to let that canine officer explain it to you.  And I'm going to

2  go from the layman's view, it would have to be a drug odor that

3  dog was trained on.  It was probably one of those odors, and,

4  yeah, the dog indicated probably as quick as I've seen any dog

5  ever indicate.

6  Q.  And after the vehicle was searched and this green substance

7  was found but nothing else, what did you tell Mr. Martinez?

8  A.  I pointed out that they had something hanging out below his

9  car.  I really wasn't certain what it was if that's what you're

10  asking me.  But the way it was flapping around, he was probably

11  going to have a vehicle breakdown if it actually got back on

12  his tire and rubbed through.

13  Q.  And then what did you tell Mr. Martinez after you advised

14  him --

15  A.  I was making sure he knew who I was, my badge number on his

16  citation, and ended the contact with him.

17  Q.  And then what did you tell him?

18  A.  I don't recall.

19  Q.  You eventually tell him he's free to go?

20  A.  Yes, I don't remember how I verbalized it.  But, yeah, I

21  would ended it and said you're no longer needed here, you're

22  free to go, something along those lines.

23  Q.  The circumstances and the factors that you reviewed in

24  concluding that you had reasonable suspicion to call for a dog,

25  was the fact that this had an out-of-state license a factor?

1          MR. MCINERNEY:  Objection; leading.

2          THE COURT:  Sustained.

3    BY MR. CHALMERS:

4    Q.  Well, I don't know that I'm suggesting that it was.  Let's

5    put it this way, in the laundry list that you provided of

6    things that were factors, did you include the out-of-state

7    driver's license?

8    A.  No.

9    Q.  Did you include the residence of the driver?

10   A.  No.

11   Q.  At points in the video you had conversations with

12   Mr. Martinez where he wanted to know what reasonable suspicion

13   is.  Do you remember that testimony?

14   A.  I think they kept going with early on they wanted to know

15   what my probable cause was to detain them, and I was trying to

16   say reasonable suspicion as I'm trying to use the proper

17   language.  I think they told me I'm out of my jurisdiction.

18   There was a lack of knowledge on his part maybe on what he was

19   intending to ask.  But, yeah, I do remember the discussion back

20   and forth.

21   Q.  Did you ever list your reasonable suspicions for

22   Mr. Martinez?

23   A.  No, I don't do that.

24   Q.  Why?

25   A.  I'm generally not going to tell them that stuff at that

1    time.

2            MR. CHALMERS:  I don't have any other questions, Your

3    Honor.

4            THE COURT:  Any redirect?

5                    REDIRECT EXAMINATION

6    BY MR. MCINERNEY:

7    Q.   In fact, not even the Kansas Highway Patrol requires you to

8    list your suspicions for reasonable suspicion, does it?

9    A.   No.

10   Q.   In this case you didn't write a report about why you pulled

11   over Mr. Martinez, right?

12   A.   At that time, no.

13   Q.   And you didn't fill out a list of all the reasons that you

14   based reasonable suspicion on, did you?

15   A.   Not at that time.

16   Q.   Because you didn't have to?

17   A.   No, I didn't have to.

18   Q.   You had some conversations on the radio with the officer

19   from Riley County.  We talked about where you were talking

20   about a series of observations you had.  Do you recall that?

21   A.   Yes.

22   Q.   In that series of observations you never mentioned a wallet

23   with El Chapo, did you?

24   A.   No.

25   Q.   Today is the first time you talked about this wallet with a

1   picture of El Chapo on it or someone, correct?

2   A.   There's other people that I would have mentioned it to.

3   But to you, yes.

4   Q.   So it was -- I think you described, it was part of what led

5   to you having reasonable suspicion, right?

6   A.   Correct.

7   Q.   Does it -- let me ask you this:  Does it -- as an officer

8   with the kind of experience you have, does it make sense to you

9   that someone who you suspect is part of a drug organization

10  would carry a photograph or an image of somebody who is known

11  to law enforcement officers like you as a narcotics kingpin

12  let's say?  Does that make sense?

13  A.   It's never made sense, but I see a lot of emblems and

14  things posted as they're proud about it and are advertising in

15  their little world.

16  Q.   And wouldn't -- I mean, using your common sense and your

17  experience, wouldn't that actually heighten the suspicion of a

18  law enforcement officer like you to display a picture of

19  somebody who's known and certainly to you as a narcotics

20  trafficker?

21  A.   I think it would.  It may not to every officer.  It does to

22  me.

23  Q.   I'm not going to make you watch the video again, but toward

24  the end of that -- the second contact you had with

25  Mr. Martinez, that is where you returned his documents to him

1  and issued the citation and the warning.  Do you remember you

2  said "have a safe day" -- or sorry, "have a safe one"?

3  A.  Is that what I said?  I usually end it somehow.

4  Q.  No reason to disagree with that, correct?

5  A.  Correct.

6  Q.  I think we saw the video just a second later you turned

7  around and asked if you could ask more questions, right?

8  A.  Correct.

9  Q.  And I think you testified just now though that you were

10  surprised after you said "have a safe one," you were surprised

11  that he moved forward in his car?  Was that your testimony?

12  A.  I think -- we're not talking about that few feet.  I think

13  we're talking about after he was detained and he went maybe 100

14  feet off to the side.  I think that's two different movements

15  there.  I wasn't surprised when he felt free to go and after

16  being detained, I think those are two different movements and

17  different reactions to them.

18  Q.  And you recall watching your dashcam when he -- after you

19  advised him that he was detained, he moved over towards the

20  side of the road, correct?

21  A.  Correct.

22  Q.  He was placing the car, understanding that he was detained,

23  further out of the roadway, correct?

24  A.  Yes.

25  Q.  Safe move, correct?

1  A.  That's what it looked like.

2  Q.  When you got to the bottom of that ramp, before you pulled

3  Mr. Martinez over, as you came off of I-70 and got to the

4  bottom of that ramp and located him, you didn't see any other

5  cars down there, did you?

6  A.  No.

7  Q.  You didn't see anybody waiting for Mr. Martinez down there,

8  did you?

9  A.  No.

10  Q.  And while you had him stopped, you didn't see any other

11  cars make their way down there and pause and leave, did you?

12  A.  I do not recall, but no.

13  Q.  And you didn't see any other persons come down to that exit

14  ramp, correct?

15  A.  Other than that last officer and then Officer Childs.  I

16  think his name is Jeff, but Officer Childs.

17  Q.  No other civilians come down there, correct?

18  A.  I do not recall what happened behind me if they came down

19  and reentered or anything, but as far as where we were, no.  As

20  I've indicated before, there's hardly anybody down there.

21  Q.  Correct.  If you had seen somebody down there, you would

22  remember it, wouldn't you?

23  A.  I don't know.  My mind was thinking of that incident then,

24  so if somebody crossed...

25  Q.  And you said there was some conversation about mile markers

1  and exit ramps around Junction City.  You -- Mr. Martinez told

2  you that he pulled off and he was looking for a restroom,

3  correct?

4  A.   Yes.

5  Q.   Looking to use the restroom I think were his words?

6  A.   I'm trying to remember his words.  I think he said looking

7  for a restroom.

8  Q.   And you didn't have any reason to believe he had ever been

9  down that exit ramp before, did you?

10 A.   I have no idea if he's been down that exit.

11 Q.   And when he said he was looking to use the restroom,

12 obviously I'll state the obvious here, it doesn't require a

13 building or a toilet, does it?

14 A.   It does not.

15 Q.   I want to make sure we're clear about the comments from the

16 Riley County officer at the end of that search.  He said that

17 there was supposedly green vegetation material, correct?

18 A.   I think that's how he stated it.

19 Q.   Okay.  And nobody from the Kansas Highway Patrol or Riley

20 County ever recovered that, did they?

21 A.   No, we did not.

22 Q.   So it was never tested, correct?

23 A.   Correct.

24 Q.   There wasn't even a field test done, correct?

25 A.   Correct.

1  Q.  So nobody -- fair to say, nobody is in a position to say

2  what in the world that was, correct?

3  A.  Correct.

4  Q.  I think you -- in your cross-examination testimony

5  Mr. Chalmers asked you whether you were familiar with that

6  particular exit ramp, and your -- maybe I got this phrase

7  wrong.  Your answer involved a ruse lane?

8  A.  Yes.

9  Q.  That is a, as I understand, correct me if I'm wrong, a

10  series of signs that falsely indicate that there's a drug

11  checkpoint up ahead, correct?

12  A.  Correct.

13  Q.  On the assumption if somebody sees that sign and they're

14  doing something wrong, they're going grab the exit before that,

15  correct?

16  A.  Correct.

17  Q.  But that wasn't set up that day, was it?

18  A.  No.

19  Q.  And you don't have any indication or any information that

20  Mr. Martinez had ever been on or near that exit ramp, do you?

21  A.  No, I do not.

22  Q.  And when you're suspicion as you described it begin to

23  build in your first contact, when he talked about his wife and

24  he talked about his mother-in-law, you never asked him for

25  telephone information for his mother-in-law, did you?

1   A.   I wouldn't the way it was going.  Being confronted that way

2   with questions, I didn't want to delve in too far.

3   Q.   You never asked for it, did you?

4   A.   No.

5   Q.   You never asked for his wife's telephone number, did you?

6   A.   No.

7          MR. MCINERNEY:  One moment, Judge, please.

8   BY MR. MCINERNEY:

9   Q.   Do you remember when Mr. Martinez offered to call his wife?

10  A.   He mentioned he couldn't contact his wife because she was

11  at the pool with the kids.

12  Q.   You don't recall that Mr. Martinez mentioned that his wife

13  was with -- at the pool with the kids but offered to call her?

14  A.   That's not how I recall it.

15         MR. MCINERNEY:  Okay.  That's all the questions I have

16  for this witness, Judge.  Thank you.

17         THE COURT:  Any recross?

18                    RECROSS-EXAMINATION

19  BY MR. CHALMERS:

20  Q.   I'm going to put up Exhibit 954.  I'm going to try to start

21  it at about 45:15 on the tape, and I think I've got it set up

22  and ready to go.  Let's see.

23         MR. MCINERNEY:  Judge, I'm going to object as beyond

24  the scope at this point.  I'm not sure what this is about.

25         MR. CHALMERS:  Well, I think it goes to the wallet.  I

1  think you said he mentioned it for the first time today, the

2  tape where he talks about it.

3          THE COURT:  I thought -- was the wallet mentioned in

4  redirect?

5          MR. CHALMERS:  Oh, yeah.

6  BY MR. CHALMERS:

7  Q.  We've listened to part of that clip.  Did you hear mention

8  of wallet?

9  A.  Yes, sir.

10          MR. MCINERNEY:  Judge, I'm going to offer the same

11  objection.  I couldn't make it out very well.  I might have

12  heard wallet.  I didn't hear the point of that conversation

13  which was a wallet with an image of El Chapo on it.

14          THE COURT:  Where are we going with this?

15          MR. CHALMERS:  I stopped too early because he uses the

16  word El Chapo next.  Where we're going is whether questioning

17  counsel included in his line of questioning suggested his

18  wallet is an explanation of some sort of pretext and the wallet

19  didn't come up until his testimony today.  And what I played

20  just now mentioned the wallet, and I'm going to pull back a

21  little bit.  And I think it also mentions El Chapo, and if I

22  wrote down my -- wrote down it accurately, I think he said he

23  forgot to mention the wallet in his earlier conversation with

24  county police officer.  That's where it's going.

25          THE COURT:  Go ahead.  I mean, like I said before, I

1  can weigh this and decide what's relevant and not.  So go ahead

2  and put it in.

3          MR. CHALMERS:  I'll start it at 45:21 again.

4  MR. CHALMERS:

5  Q.  Okay.  It was maybe difficult to hear, but did you hear

6  reference to El Chapo in that clip.

7  A.  Yes, I did.

8  Q.  During the time that you were stopped or that you stopped

9  the -- Mr. Martinez through the time that the search began, did

10  Mr. Martinez say or do anything more about trying to seek out a

11  restroom?

12  A.  Never.

13          MR. CHALMERS:  I don't have anything else.  Thank you,

14  Your Honor.

15          THE COURT:  Anything further from plaintiff?

16          MR. MCINERNEY:  No.  Thank you, Judge.

17          THE COURT:  All right.  Why don't we take our luncheon

18  recess now.  Sir, you're excused.  And the rest of us will come

19  back at ten minutes after 2:00.  The court is in recess.

20      (Recess taken at 1:08 p.m.)

21          THE COURT:  All right.  Thank you.  Sir.

22          MR. AKINMOLADUN:  Good afternoon, Your Honor.

23  Plaintiffs call Suzanne Dunn.

24          THE COURT:  Ms. Dunn, would you please step into the

25  witness box and raise your right hand so you can be sworn.

1                      SUZANNE MARIE DUNN,

2   called as a witness on behalf of the Plaintiffs, having first

3   been duly sworn, testified as follows:

4              THE COURT:  Go ahead.

5                      DIRECT EXAMINATION

6   BY MR. AKINMOLADUN:

7   Q.   Good afternoon.

8   A.   Hi.

9   Q.   Please state your full name for the record.

10  A.   Suzanne Marie Dunn.

11  Q.   What is your current city and state of residence?

12  A.   Arlington, Virginia.

13  Q.   How long have you resided in Virginia?

14  A.   Most of my life.

15  Q.   Are you currently employed?

16  A.   Yes.

17  Q.   What is your employer's name?

18  A.   I'm self-employed.  It's A Therapeutic Alliance.

19  Q.   Do you own A Therapeutic Alliance?

20  A.   Yes.

21  Q.   What does your business do?

22  A.   As a social worker and mental health therapist we provide

23  therapy to a broad spectrum of people, Medicaid, Medicare, and

24  other insurance-paid claims.

25  Q.   Are you a therapist?

1   A.   Yes.

2   Q.   What kind of therapist are you?

3   A.   Mental health with some specialties with LGBQT and sex

4   therapy.

5   Q.   Ms. Dunn, I want to focus your attention to February 4th

6   and 5th of 2021?

7   A.   Okay.

8   Q.   Did you have travel plans on February 4th and 5th of 2021?

9   A.   Yes.

10  Q.   What were your travel plans?

11  A.   I was going to drive to Denver over the course, spending

12  one night on the way, to pick up a van that was being converted

13  to a camper van because my sister and I are hiking the AT, and

14  it had been ready for a couple weeks and that was the weekend I

15  could do it.

16  Q.   Did your travel plans begin in Virginia?

17  A.   Yes.

18  Q.   When did you leave Virginia?

19  A.   The 4th in the morning.

20  Q.   Did you use your personal car or a rental?

21  A.   A rental because I couldn't drive two cars back.

22  Q.   What was the make and model of the rental?

23  A.   Some sort of Mercedes.

24  Q.   What color was the rental?

25  A.   Black.

1   Q.   Did you request a Mercedes?

2   A.   No.

3   Q.   What did you request?

4   A.   A crossover so it would be comfortable for the long drive,

5   and they didn't have any.

6   Q.   Why didn't you get a -- so you didn't get a crossover

7   because they didn't have any?

8   A.   Yeah.

9   Q.   Did you complete your drive from Virginia to Colorado on

10  February 4th?

11  A.   No.

12  Q.   Did you stop somewhere?

13  A.   Yes.

14  Q.   Where did you stop?

15  A.   It was an exit with the Ozarks on it and a motel right off

16  the exit.

17  Q.   The Ozarks in Missouri?

18  A.   Yes.

19  Q.   When did you leave Missouri?

20  A.   Early in the morning.

21  Q.   What were your travel plans after leaving Missouri?

22  A.   Go straight to Denver.

23  Q.   Did you drive on a Kansas interstate highway on February 5,

24  2021?

25  A.   Yes.

1   Q.   What interstate highway did you drive on?

2   A.   70.

3   Q.   What direction on I-70 were you headed --

4   A.   West.

5   Q.   -- were you headed on February 5, 2021?

6   A.   West.

7   Q.   While driving through Kansas on February 5, 2021, were you

8   stopped by law enforcement?

9   A.   Yes.

10  Q.   How long had you been driving in Kansas before you were

11  stopped?

12  A.   Hour or two.

13  Q.   Was the February 5th stop the first time you had been

14  stopped by law enforcement during your drive from Virginia that

15  started February 4th?

16  A.   Yes.

17  Q.   What law enforcement agency stopped you?

18  A.   The KHP.

19  Q.   Do you now know the name of the KHP trooper who stopped

20  you?

21  A.   Yes.

22  Q.   What is the trooper's name?

23  A.   Chandler Rule.

24  Q.   How did you learn Trooper Rule's name?

25  A.   After I received a written warning in the mail that I had

1   requested, it had has name on it.

2   Q.  Was there a dashcam video regarding your February 5, 2021,

3   stop?

4   A.  Yes.

5   Q.  Have you reviewed the dashcam video of your February 5,

6   2021, stop?

7   A.  I have.

8   Q.  Is the dashcam video you reviewed one complete video or is

9   the dashcam video broken up into parts?

10  A.  Parts.

11  Q.  How many parts?

12  A.  Two.

13  Q.  Do the dashcam videos accurately reflect Trooper Rule's

14  February 5, 2021, stop that involved you?

15  A.  Yes.

16          MR. AKINMOLADUN:  I move to admit Exhibits 121 and 122

17  into evidence.

18          MR. CHALMERS:  No objection.

19          THE COURT:  Received.

20          MR. AKINMOLADUN:  Ms. Seacat, please play Exhibit 121

21  from the beginning and pause at one minute and 40 seconds.

22  BY MR. AKINMOLADUN:

23  Q.  Ms. Dunn, was that your rental driving past two trucks in

24  this clip?

25  A.  Yes.

1  Q.  Are the two trucks in the right lane?

2  A.  Yes.

3  Q.  Does this clip start by showing Trooper Rule first passing

4  other vehicles in the right lane and then the two trucks before

5  he catches up to you?

6  A.  Yes.

7  Q.  When did you first notice Trooper Rule while you were

8  driving west on I-70?

9  A.  I was coming over some sort of like hill, and I saw the

10  police vehicle parked on the side of the road.  And I was

11  talking to a friend on the phone, and I was like, oh, my gosh,

12  I think I'm going to be pulled over for speeding.  And I looked

13  down and I wasn't really speeding.  So I was like, oh, win, you

14  know.  And that was the first time.

15  Q.  When did you next notice Trooper Rule?

16  A.  When he pulled up besides me in that video, kind of in my

17  peripheral vision I saw the bars on the front.

18  Q.  How much time passed between when you first noticed him and

19  when you noticed him again?

20  A.  The minimum, five minutes.

21  Q.  While you were driving on February 5th, did you see Trooper

22  Rule pull besides you as shown in the clip?

23  A.  Yeah, from my peripheral vision.

24  Q.  What were you thinking when he pulled besides you?

25  A.  I was like, oh, maybe I am going to get pulled over, but I

1  still wasn't speeding.  And I was like just hoping and talking

2  to my friend like please don't let me get pulled over.

3          MR. AKINMOLADUN:  Ms. Seacat, please continue playing

4  and pause at 2:30.

5  BY MR. AKINMOLADUN:

6  Q.  Ms. Dunn, could you hear dog noises coming from Trooper

7  Rule's vehicle before you pulled over to the side of the road

8  on February 5, 2021?

9  A.  No.

10 Q.  Could you hear dog noises coming from Trooper Rule's

11 vehicle while you were pulling over to the side of the road?

12 A.  No.

13 Q.  Could you hear dog noises coming from Trooper Rule's

14 vehicle when you came to a complete stop?

15 A.  No.

16         MR. AKINMOLADUN:  Ms. Seacat, please continue playing

17 and then pause at three minutes.

18 BY MR. AKINMOLADUN:

19 Q.  Ms. Dunn, what did Trooper Rule say was the reason he

20 pulled you over?

21 A.  For driving in the left lane.

22 Q.  Did he say anything about your speed?

23 A.  No.

24 Q.  What Kansas law did Trooper Rule explain to you?

25 A.  That you're not allowed to drive in the left lane; it's

1  only for passing.

2  Q.  Do you agree with Trooper Rule that you violated a Kansas

3  left lane law?

4  A.  No.

5  Q.  Why do you disagree with that?

6  A.  Because I was passing cars and then the trucks, and then he

7  was in the right lane, so I couldn't get back in the right

8  lane, and then when he got to the left lane, I moved to the

9  right lane.

10      MR. AKINMOLADUN:  Ms. Seacat, please continue playing

11  and pause at 3 minutes 27 seconds.

12  BY MR. AKINMOLADUN:

13  Q.  Ms. Dunn, did you have any thoughts about Trooper Rule's

14  questions about your travel plans?

15  A.  Yeah.  I thought if I was going to get a ticket, I should

16  just get a ticket, and if I wasn't, you know -- but he was

17  asking, so I answered.

18  Q.  What comment did you make about COVID?

19  A.  I drove across country because of COVID.  I wasn't fully

20  vaccinated.  I had an underlying autoimmune disease and was

21  taking a medication that suppressed my immune system, and I

22  didn't want to take a commercial flight.

23      MR. AKINMOLADUN:  Ms. Seacat, let's move to

24  Exhibit 122.  Let's move to Exhibit 122.  Please start playing

25  at 2:30 and pause at 3 minutes 4 seconds.

1   BY MR. AKINMOLADUN:

2   Q.   What did Trooper Rule hand you in this clip?

3   A.   I thought he handed me my warning and my rental agreement

4   and my ID.

5   Q.   What warning did you think you were getting from Trooper

6   Rule?

7   A.   For driving in the left lane.

8   Q.   Did you hear Trooper Rule mention something about slowing

9   down as you sat in your car on February 5, 2021?

10  A.   Yeah.

11  Q.   Is that the first time Trooper Rule mentioned your speed?

12  A.   Yes.

13  Q.   Did you hear Trooper Rule tell you to have a safe trip?

14  A.   Yes, I did.

15  Q.   Did you respond with a comment?

16  A.   Thank you.

17  Q.   When you -- when he told you to have a safe trip, what were

18  you thinking?

19  A.   As soon as he gets back to his car, I'll leave.

20  Q.   Did you see Trooper Rule step away from your car?

21  A.   Yes.

22  Q.   What did you think when Trooper Rule was going to do next

23  after he stepped away from your rental?

24  A.   Walk back to his car.

25  Q.   Were you prepared to leave at this point in the video at

1    the 3:04 mark in Exhibit 122?

2    A.    Yeah.  I was taught though to wait until they got back in

3    their vehicle.  My dad was a police officer, and he gave us

4    very specific instructions about stops and what to do and how

5    to behave.  So I was going to wait until he safely got in his

6    car before taking off.

7    Q.    Did you want to leave?

8    A.    Yes.

9    Q.    Did you think that you had a right to leave?

10   A.    Yes.

11   Q.    How so?

12   A.    He said I really didn't do anything wrong, just like I'm

13   going to give you this warning about driving in the left-hand

14   lane, and he said have a nice trip, whatever, and I was ready

15   to go.

16            MR. AKINMOLADUN:  Ms. Seacat, please continue and

17   playing at 4 minutes 8 seconds.

18   BY MR. AKINMOLADUN:

19   Q.    Did you say anything to bring Trooper Rule back to your

20   rental?

21   A.    No.

22   Q.    Did you do anything to bring Trooper Rule back to your

23   rental?

24   A.    No.

25   Q.    When Trooper Rule re-approached your rental and commented

1   about wanting to ask you questions, what was your response?

2   A.   Sure.

3   Q.   Why did you respond "sure"?

4   A.   I was still trying to be polite.  And during that time of

5   the pandemic lots of people were buying vans and lots of

6   people, friends were asking me questions, strangers were asking

7   me questions, so I didn't think it was terribly weird that he

8   was curious until he started asking prices, and it felt a

9   little weird.

10  Q.   Did you feel like you could drive off at this point?

11  A.   No.

12  Q.   Why not?

13  A.   Again, if he had gone back to his car, I would have driven

14  off because he was still talking to me, I was still going to be

15  polite, I was still going to answer his questions because

16  that's how I was taught.

17  Q.   Was Trooper Rule's body completely outside of the rental in

18  this clip?

19  A.   No.

20  Q.   What parts of his body were inside your rental?

21  A.   His head, his shoulders, hands, like and elbows.

22  Q.   If you could, Ms. Dunn, please summarize your discussions

23  with Trooper Rule in this clip.

24  A.   Yeah, he started asking details about the rental van, like

25  if I bought it out there or where I lived.  I told him I bought

1  it online.  He asked about like how it was configured, where I

2  got it configured, the prices of the van itself and the

3  conversion part of it.  I showed him pictures of a like-van

4  from the website.

5           MR. AKINMOLADUN:  Ms. Seacat, please continue playing

6  and then pause at 4 minutes 32 seconds.

7  BY MR. AKINMOLADUN:

8  Q.  What were you and Trooper Rule talking about in this clip?

9  A.  Continuing talking about the conversion and the

10 modifications because there's like pull-out drawers with stuff

11 in them and just more detail.

12 Q.  What was going through your mind at this point in time?

13 A.  Can we be done already?

14          MR. AKINMOLADUN:  Ms. Seacat, please continue playing

15 and then pause at 4 minutes 45 seconds.

16 BY MR. AKINMOLADUN:

17 Q.  What was your response to Trooper Rule's question about

18 what you do for a living?

19 A.  That I'm a therapist and I work with LGBQT population.

20 Q.  What did you think of that question?

21 A.  It felt now that he was asking questions that were

22 intrusive.  The van was like people are curious, but then it

23 just felt different.

24 Q.  When you say "different," what do you mean by that?

25 A.  Like intrusive, like it was going to lead to something.

1  The questions about like what I do for a living, he had

2  mentioned earlier I think about the expense of the rental car

3  and it felt connected with that, like what do I do and if I can

4  afford things or and the price of the van and stuff like that.

5  Q.  Did you feel like you were free to leave at this point?

6  A.  Still no.

7  Q.  Did you want to leave?

8  A.  Yes.

9  Q.  Why didn't you leave?

10  A.  Again, my dad was a cop, and he was very clear on how

11  unsafe it is for police when they do pullovers and that the

12  best thing to do is to be polite and answer their questions and

13  wait until they get back in their car before you leave.

14          MR. AKINMOLADUN:  Ms. Seacat, please continue playing

15  and pause at 5 minutes 15 seconds.

16  BY MR. AKINMOLADUN:

17  Q.  Did Trooper Rule comment about your rental agreement?

18  A.  Yes.

19  Q.  What did he say?

20  A.  He talked about the expense of the car.

21  Q.  What did you think about his rental agreement questions?

22  A.  Well, he had already asked me a question about the rental

23  car, and I told him that like the car I had wanted wasn't

24  there.  It was during the time when no rental cars were

25  available and that this was the only thing they had left or a

1   Suburban.  And I drive a Prius, a 2014 Prius at home, so this

2   was more like-sized and it would be comfortable, so I picked

3   that one.

4   Q.   What did you say in response to Trooper Rule's question

5   about why you are driving instead of flying?

6   A.   I told him earlier as well that it was COVID and I had the

7   underlying autoimmune disease and I wanted to be safe, safe for

8   my family, safe for me, and I wasn't making many stops, but

9   that I was choosing to drive across country instead of flying.

10  Q.   Did you feel like Trooper Rule was listening to you?

11  A.   No.  I mean I had to repeat myself on multiple times on the

12  same kind of question.

13  Q.   When Trooper Rule asked you how you were feeling and if you

14  were tired, what was your response?

15  A.   I was like no, I just got up a couple hours ago, and I told

16  him I had stopped in the Ozarks to sleep.

17  Q.   What did you think of these questions?

18  A.   It got progressively more intrusive and weird, and I didn't

19  know where he was heading with it because we had already

20  finished the traffic stop, so I didn't -- I felt like uneasy I

21  guess.

22          MR. AKINMOLADUN:  Ms. Seacat, please continue playing

23  and then pause at 5 minutes 47 seconds.

24  BY MR. AKINMOLADUN:

25  Q.   Ms. Dunn, as you sat in your rental on February 5, 2021,

1    listening to Trooper Rule discuss the trafficking of guns,

2    drugs, and illegal cash, what were you thinking about?

3    A.   Well, he said crazy things happen in Kansas, and at that

4    very moment like this thought rushed through my head that I was

5    going to be in the next like *Criminal Minds* episode or *SVU* that

6    I was going to be in the field in like 20 minutes.  I got like

7    acutely scared when he said that.

8        And then when he started asking those questions, I was like

9    of course I don't have any of these things in my head, and I

10   said out loud I did not have them.

11   Q.   How did you feel when Trooper Rule asked you about guns in

12   your rental?

13   A.   I tried not to laugh because I don't believe in guns.

14   Q.   How did you feel when Trooper Rule asked you about drugs in

15   your rental?

16   A.   Again, not something that I am familiar with.

17   Q.   How did you feel when Trooper Rule asked you about large

18   sums of cash in your rental?

19   A.   Honestly when he said that, I said in my head I wish I had

20   large sums of cash.  But, no, unfortunately I don't.

21   Q.   When Trooper Rule asked you if you could search your car

22   what was your response?

23   A.   I rather you not.

24   Q.   Why did you respond that way?

25   A.   He had told me when he pulled me over that, you know, it

1  was just kind of a warning to remind me not to drive in the

2  left-hand lane, I really hadn't done anything wrong.  So why

3  was he now asking me if he could search my car.  It was really

4  hard to say no because, again, trained to, you know, say yes,

5  be nice, be polite, and it took a lot to say no.  But I had

6  done nothing wrong.

7  Q.  What did you think when he questioned your refusal to allow

8  him to search your car?

9  A.  I thought it was kind of like a technique to like push my

10  wall of like I think it was clear to him that I was

11  uncomfortable saying no, and he was going to try again.  And I

12  just was like gritting my hands, and I'm going to say no.

13          THE COURT:  You know, I missed almost all of the

14  conversation here because I have never seen this video before,

15  and it doesn't have the words down below like the other

16  transcript did.

17          Are you going to go through this at some point and

18  have either this witness or somebody else repeat for the record

19  what is being said on the video?  Or do you have a transcript?

20          MR. AKINMOLADUN:  Your Honor, I think we can attempt

21  to get a transcript for you.  I know that there are parts where

22  it's inaudible, but what we can do is try and get you a

23  transcript that memorializes what can be -- what can be heard.

24          THE COURT:  Okay.

25  BY MR. AKINMOLADUN:

1   Q.   Ms. Dunn, what was going through your mind at this point?

2   A.   I mean, I felt unease, and I couldn't believe that he was

3   actually asking me those questions, but I was trying to remain

4   polite even with the refusal of letting him open the trunk.

5         MR. AKINMOLADUN:  Ms. Seacat, please continue and stop

6   at 5 minutes 52 seconds.

7   BY MR. AKINMOLADUN:

8   Q.   What was your understanding about Trooper Rule's request to

9   have a dog run around the outside of your car?

10  A.   I thought that I would remain in the car and the dog would

11  just run around the outside of it.

12  Q.   Did you consent to Trooper Rule having a dog run around the

13  outside of your car?

14  A.   Yes.

15  Q.   Why did you consent?

16  A.   Well, again, I thought I didn't have to get out of the car.

17  If he said you're going to have to get out of the car, I would

18  have said no because I would have known that that had a right,

19  but I thought if I was in the car and the dog just ran around

20  the outside, that I couldn't -- like it was kind of a

21  rhetorical question, I'm just going to have the dog run around

22  the car.

23  Q.   Have you ever had a police dog search the inside or outside

24  of your vehicle -- of a vehicle you drove before February 5,

25  2021?

1    A.   No.

2    Q.   How long have you been driving before February 5, 2021?

3    A.   Since I was 15 and a half.

4    Q.   Have you ever had a police dog search the inside or outside

5    of a vehicle you drove since February 5, 2021?

6    A.   No.

7            MR. AKINMOLADUN:   Ms. Seacat, please continue playing

8    and pause at 6 minutes 30 seconds.

9    BY MR. AKINMOLADUN:

10   Q.   What were you thinking when you stepped outside of your

11   rental?

12   A.   I didn't know they were going to ask me to step outside of

13   my rental is what I was thinking.

14   Q.   Trooper Rule also asked if you had anything on you, but he

15   did not search you, correct?

16   A.   Correct.

17   Q.   Do you know the name of the other officer who approached

18   your rental?

19   A.   I do not.

20   Q.   Did the officer identify himself?

21   A.   No, he did not.

22   Q.   Ms. Dunn, is that you wearing a face mask?

23   A.   Yes.

24   Q.   Did you have a face mask on the entire time of your stop?

25   A.   No.

1  Q.  When did you put the face mask on?

2  A.  After he left the vehicle the first time because I didn't

3  expect him to put his whole head and shoulders in the car, so I

4  put it on for when he returned.

5  Q.  Did you have any concerns with the two troopers not wearing

6  a face mask?

7  A.  Just Officer Rule because he was the only one in my car.

8  Q.  Did the unidentified officer say something to you in the

9  clip we watched?

10  A.  Yeah.  I turned to look back as I was walking away, and he

11  said keep your head forward and go where I told you to.

12  Q.  What did you think of his directions?

13  A.  He sounded really angry and intimidating.

14  Q.  How were you feeling at this time?

15  A.  I felt that why don't they want me to look back to see

16  what's going on and I got more scared.

17        MR. AKINMOLADUN:  Ms. Seacat, please continue playing

18  and pause at 7 minutes 45 seconds.

19  BY MR. AKINMOLADUN:

20  Q.  Ms. Dunn, as you stood in front of the rental, did you

21  watch the dog search?

22  A.  Yes.

23  Q.  Explain to the court what you heard and observed the dog

24  doing.

25  A.  They walked it around.  The dog was going kind of crazy,

1  whining, barking.  It scratched the car, grabbed open the

2  handle, which I eventually saw was cracked, but just going kind

3  of bonkers around the car.

4  Q.  Other than the scratches and the damage to the door, was

5  there anything other damage to the rental?

6  A.  No, just that passenger back door to the end there was

7  damage.

8  Q.  What did you think when Trooper Rule informed you that the

9  dog alerted to the presence of narcotics?

10  A.  I was like -- the first thought was, is Enterprise muling

11  drugs across country, and I'm unwittingly the person.

12  Q.  This was a rental vehicle, correct?

13  A.  Yes.

14  Q.  This was not your car?

15  A.  Not my car.

16  Q.  When you picked up the rental, did you smell anything in

17  the car that made you think that there were narcotics?

18  A.  No.

19  Q.  How did the vehicle smell to you when you picked it up?

20  A.  Like a car.

21      MR. AKINMOLADUN:  Ms. Seacat, please continue playing

22  and pause at 8 minutes 48 seconds.

23  BY MR. AKINMOLADUN:

24  Q.  Why did you want your phone?

25  A.  I wanted to video what was happening and talk to my friend

1   that was still on the phone.

2   Q.   Why did you want to record what was happening?

3   A.   Because I knew I didn't have drugs, guns, or money in the

4   car, and I wanted proof like of whatever they were going to

5   come up with.  I wanted to know what was happening.

6   Q.   And you mentioned that you were talking to a friend?

7   A.   Yeah.  Jennifer Greenberg.

8   Q.   Jennifer Greenberg?

9   A.   Yes.

10       MR. AKINMOLADUN:  Ms. Seacat, please continue playing

11   and pause at 9 minutes 10 seconds.

12   BY MR. AKINMOLADUN:

13   Q.   From where you were standing, could you hear one of the

14   officers say there was nothing in your rental or something

15   along those lines?

16   A.   Could not hear it.

17   Q.   From where you were standing did you hear one of the

18   officers say there's got to be something or something along

19   those lines?

20   A.   Could not hear it.

21   Q.   Where were the officers at in the rental when they made

22   those comments?

23   A.   In the front seats.

24   Q.   When you previously watched this video, what did you think

25   about the officer's comments?

1   A.   Well, he had originally asked me to pop the trunk, and they

2   hadn't even done that yet, so them saying that they couldn't

3   find anything seemed premature since they hadn't searched where

4   the dog was going crazy or the trunk, so I just thought that

5   was weird when I watched it the first time.

6   Q.   Did the officers ultimately search your entire rental?

7   A.   Yes.

8   Q.   At the point in time that the officers made those comments

9   had they searched the entire car?

10  A.   No.

11       MR. AKINMOLADUN:   Ms. Seacat, let's jump to 11 minutes

12  10 seconds and then watch the end of Exhibit 122.

13  BY MR. AKINMOLADUN:

14  Q.   What did you say when Trooper Rule asked you if you had any

15  questions?

16  A.   Not a one.

17  Q.   Why did you say "not a one"?

18  A.   The adrenaline from being scared had diminished when he

19  said they found nothing, and now I was just mad and I just

20  wanted to get out of there.   I didn't want to talk to him.   I

21  didn't want to be polite.   I wanted it to be over.

22  Q.   Why were you mad?

23  A.   Well, I mean, I hadn't been doing anything.   I guess

24  driving in the left-hand lane he said was wrong.   But I hadn't

25  done anything wrong.   It had escalated seemingly very quickly

1  to something that was very scary.  And, you know, in the moment

2  of being scared, watching the dog go crazy, I was like, oh, my

3  gosh, like I'm scared, wonder if it was a person of color how

4  scared they would be because I'm a middle-age white woman.

5      And it just -- I was just so mad that all the things I had

6  been teaching my kids about trusting police and being polite

7  and doing the right thing, and I didn't know if I -- when I

8  told them this story if I could stick with the same story I had

9  been telling them over the years.

10 Q.  Was Ms. Greenberg still on the phone when you reentered the

11 rental?

12 A.  Yes.

13 Q.  Did you talk with Ms. Greenberg when you reentered the

14 rental?

15 A.  Oh, yes.

16 Q.  What did you talk with Ms. Greenberg about?

17 A.  The stop, the stop, the stop, everything about the stop.

18 Just -- I was super heightened and mad and just nothing but the

19 stop.

20 Q.  After you left the stop location, where did you go next?

21 A.  I went to the next rest stop that wasn't commercial, just

22 one of the places where you go to the bathroom.

23 Q.  While you were at the rest stop, what did you do?

24 A.  I immediately looked for the warning because I wanted

25 proof -- I wanted to look at who it was, what happened, what

1   they wrote down, and I discovered that it was only my rental

2   agreement, not a warning.  There was nothing proving that that

3   whole thing had happened.

4   Q.   After you learned that Trooper Rule did not give you a

5   citation, what did you do next?

6   A.   I made a slew of calls to the KHP.

7   Q.   How many calls did you make to the KHP on February 5, 2021?

8   A.   Probably around eight.

9   Q.   Why did you make eight calls?

10  A.   Well, I didn't know where I had been.  I didn't know what

11  mile marker because I didn't have any proof I had been pulled

12  over.  I didn't know their names.

13      So I called a number, and they were like those aren't our

14  people, and then I called another number, called a number, and

15  they kept passing me around thinking of where I was based on

16  how far I thought I was from Kansas City until finally somebody

17  directed me to Officer Rohr.

18  Q.   Is that Lieutenant Justin Rohr?

19  A.   Yes.

20  Q.   What did you discuss with Lieutenant Rohr?

21  A.   I wasn't as polite and I discussed like -- I wanted to know

22  who they were.  I wanted a written -- a written warning.  I

23  wanted to understand -- like I called it probable cause, but he

24  told me it was reasonable suspicion of -- that I wanted to

25  know, like why they even thought they could search my car.

1    And I wanted all of that information, and he said -- and I

2  wanted the body cam footage, and he said I would never get

3  that, but that all of the information that I needed, because I

4  wanted to write an op ed about what had happened, and I just

5  wanted proof that it all happened.

6  Q.  Other than your eight calls to the KHP on February 5th, did

7  you make any other calls on February 5, 2021?

8  A.  Yes.

9  Q.  What calls?

10 A.  I called each of my children, I called my sister, called a

11 couple more friends.  I had several hours left to drive to

12 Denver and spent all that time on the phone talking to people

13 and kind of like just venting and getting it all out because I

14 was still very agitated.

15    And I also called the ACLU because if I was going write

16 this op ed, I didn't want to step on any toes, so I just called

17 and left a message with whoever answered that I wanted to know

18 if it was okay if I wrote an op ed, and they took down my

19 information and said somebody would call me back.

20 Q.  Do you recall who you spoke to at the ACLU on February 5,

21 2021?

22 A.  I don't recall -- I know at one point I talked to Madison.

23 I don't know if that's the day I talked to Madison.

24 Q.  When you say Madison --

25 A.  One of the attorneys.

1  Q.  What did you talk to the ACLU about?

2        MR. CHALMERS:  Your Honor, I'm not sure how this is

3  relevant.  I have to object.

4        MR. AKINMOLADUN:  Your Honor, it goes to the effect

5  that the stop had on her on February 5, 2021, and the lengths

6  that she went to try and get additional information, to learn

7  more about the stop, to learn more about her rights, so we

8  think that her testimony is relevant on this point.

9        THE COURT:  Objection is overruled.  Go ahead.

10  BY MR. AKINMOLADUN:

11  Q.  What did you specifically talk about to the ACLU on

12  February 5, 2021?

13  A.  Well, I wanted again to make sure that if I wrote an op ed,

14  it wouldn't like mess up anything that was going on in the

15  state, that they might be doing.  I gave kind of like the blow

16  by blow of what had happened, and they had just said they would

17  have somebody get back to me.

18  Q.  You mentioned something about writing an op ed piece?

19  A.  Yes.

20  Q.  Did you write an op ed piece?

21  A.  I didn't because eventually the ACLU called me back and

22  said they thought I had known they had a class action suit

23  going on and I said I didn't, I was just trying to find out if

24  I could write an op ed, and instead of doing that, I chose to

25  participate, you know, however they needed it, if they needed

1    it.  I chose to do that instead of writing the op ed.

2    Q.   Other than calling the KHP, family members, friends, the

3    ACLU all on February 5, 2021, did you make any other calls on

4    February 5, 2021?

5    A.   Not that I can remember.

6    Q.   Was February 5th the only time that you called the KHP?

7    A.   No.  Rohr and I had a back and forth over the next couple

8    of days of gathering the information, and then I finally got

9    the warning in the mail.

10   Q.   How many days did it take for the KHP to provide you the

11   information that you requested?

12   A.   I want to say it was about two weeks that I got the

13   printed.  He had told me -- Rohr had told me that he found the

14   people, that he was going to get them to send me the warning.

15   He told me on the phone what the reasonable suspicion was and

16   that -- and then he had explained what the probable cause was

17   after, to search the car.  He explained all that to me, and

18   I -- he was readily available to answer all of those questions.

19   Q.   And from February 5, 2021, how long did it take you to get

20   the information that you received?

21   A.   Probably the oral stuff was maybe 3 to 5 days later and

22   probably two weeks for the written thing.

23   Q.   Did you ultimately pick up the van in Colorado?

24   A.   Yes, that same night.

25   Q.   Did you return the rental?

1    A.    Yes, same night.

2    Q.    Do you recall your earlier testimony about observing the

3    dog damaging the rental?

4    A.    Yes.

5    Q.    Did you explain the damage to the rental company?

6    A.    Yes, I did.  When I got there, I was still rather heated so

7    I told the whole story again and showed them the damage and

8    repeated what Officer Rule had said about reminding them that

9    my registration was out of date, and I said, oh, and they told

10   me the registration was out of date and they were appalled, so

11   they didn't charge me for the vehicle at all and they didn't

12   even ask me for Rohr's information to pay for the damage that

13   the dog had done.  They just were like go home.

14   Q.    Before you dropped off your rental, did you have any

15   thoughts about how the rental company would respond to the

16   damage to the rental?

17   A.    Yeah, I thought I was going to have to pay for it.  Rohr

18   said I wouldn't, but I didn't have any documentation to give to

19   the rental car agency to say, hey, Kansas says they're going to

20   pay for it, so I just -- I was worried.  I don't drive those

21   kind of cars, and that it would be expensive to fix it.  I just

22   worried about that.

23   Q.    After picking up the van in Colorado, did you return to

24   Virginia?

25   A.    Yes, the next day.

1  Q.  When you were returning to Virginia, did you drive through

2  Kansas?

3  A.  Yes, I did.

4  Q.  Did you have any concerns driving through Kansas?

5  A.  Yes.

6  Q.  What concerns did you have?

7  A.  Well, now I was driving a car with payload capacity, and if

8  I was going to get pulled over again -- I looked at alternate

9  routes, but there was a big storm coming through.

10  Q.  You mentioned you're driving a car with payload capacity.

11  What does that mean specifically?

12  A.  Well, they pulled me over in a Mercedes that was like a

13  small sedan, coup-ish kind of thing, and were asking me about

14  large amounts of cash, weapons, and drugs, and now I'm in like

15  this white, you know, pure white cargo van that could look

16  suspicious, you know, if you're driving across country.

17      And so now I was worried it was going to happen all over

18  again, and I was ready just to say I'm not doing anything, call

19  Rohr; I'm not doing anything, call Rohr.  I was chanting that

20  in my head all the way across.

21  Q.  What were you feeling driving that cargo van through

22  Kansas?

23  A.  I was scared.  I was like I don't want to do this again.  I

24  don't want to, you know -- but I was just going to keep saying

25  call Rohr before you do anything.

1   Q.   Were you scared the whole time that you drove through

2   Kansas?

3   A.   Oh, yeah.

4   Q.   Did any other law enforcement agency stop you on your

5   return back to Virginia?

6   A.   No.

7   Q.   Did you file a complaint with the Kansas Highway Patrol?

8   A.   No, no.

9   Q.   Why not?

10   A.   I -- I thought if I complained to them and they're the

11   arbiter of my complaint, what was the point if the ACLU was

12   going to potentially be doing something in the state that was

13   going to be like a larger complaint against them and that it

14   would be safer to stick with the ACLU.

15   Q.   Ms. Dunn, when Trooper Rule and another law enforcement

16   officer searched your rental, did those officers find large

17   sums of cash?

18   A.   No.

19   Q.   Did the officers find guns?

20   A.   No.

21   Q.   Did the officers find drugs?

22   A.   No.

23   Q.   Did the officers find anything illegal?

24   A.   No.

25   Q.   How has that February 5, 2021, stop and detention impacted

1   you?

2   A.   It's changed the way I talk to my kids about the police.

3   Before I was always, you know -- your grandfather was a police

4   officer and this is, you know -- it's a hard job, be polite.

5   And it's not like I'm telling them to be rude, but I'm

6   reminding now that they have rights.  I have learned now what

7   my rights are, and I have been teaching them they are allowed

8   to say no and they are allowed to say it politely.  I would

9   like to say it politely, but they're allowed to say no.

10  They're allowed to assert their rights and to know their rights

11  and refuse when a police officer asks them for something,

12  whether it's a stop in a car or a stop on the street.

13  Q.   Has that stop and detention changed your thoughts about law

14  enforcement?

15  A.   Yeah.

16  Q.   How so?

17  A.   I do think it's a hard job, but if you're giving people

18  reason to doubt you because you're doing things that are out of

19  hubris or out of -- you know, I'm not going to say it was

20  giggles, but it's unnecessary and I had done nothing wrong.

21  There was no reasonable suspicion.  You know, the dog found

22  nothing, and so a lot of doubts and a lot of trepidation about

23  the police.

24  Q.   Ms. Dunn, earlier you testified about your discussions with

25  Lieutenant Rohr?

1   A.   Uh-huh.

2   Q.   And that you had discussions with him on February 5, 2021?

3   A.   Uh-huh.

4   Q.   What did Lieutenant Rohr tell you was the reasonable

5   suspicion for your stop?

6   A.   He told me because I was driving across country and that I

7   had copious snacks.

8   Q.   Ms. Dunn, you understand that in this lawsuit you are not a

9   named party, correct?

10  A.   Yes.

11  Q.   And just to be clear -- let me take a step back.  Is that

12  the only reasonable suspicion fact that Lieutenant Rohr said

13  was the cause for why you were stopped?

14  A.   Yeah, driving across country and my copious snacks of

15  seaweed, Smartwater, and carrots.

16  Q.   The copious snacks was the only fact that Trooper Rule

17  supported his reasonable suspicion?

18  A.   Driving cross country.

19  Q.   You understand you're not a named party?

20  A.   Yes.

21  Q.   Did you travel to testify for this trial?

22  A.   Yes, I did.

23  Q.   Where did you come from?

24  A.   Virginia.

25  Q.   When did you arrive in Kansas City?

1   A.   Yesterday.

2   Q.   When do you leave Kansas City?

3   A.   5:30.

4   Q.   Why did you decide to testify today?

5   A.   Because it's not right and, you know, I -- an upper-middle

6   class white woman with the ability to advocate for myself, you

7   know, before the stop, after the stop, but if I was a person of

8   color or another marginalized population, it's harder and it's

9   just not okay to abuse the law like that.

10          MR. AKINMOLADUN:  No further questions at this time.

11          THE COURT:  Cross-examination.

12                        CROSS-EXAMINATION

13  BY MR. CHALMERS:

14  Q.   I hope to clarify something.  The conversations that you

15  had after the stop over the phone with Lieutenant Rohr, that's

16  not the same as Chandler Rohr [verbatim], who was the trooper

17  that stopped you?

18  A.   No, because it's Chandler Rule.

19  Q.   Chandler Rule, yes.  So I think that when the -- when

20  counsel said the reasons that the trooper gave you for

21  reasonable suspicion in these telephone conversations, you were

22  referring to what Lieutenant Rohr said, not Chandler Rule;

23  isn't that, right?

24  A.   Rohr said he talked to Rule.  Rule told Rohr.  Rohr told

25  me.

1  Q.  So you were hoping that Lieutenant Rohr had accurately

2  reflected what Chandler Rule had told him?

3  A.  I assumed he accurately reflected.

4         MR. CHALMERS:  Okay.  I don't have any other

5  questions.

6         THE COURT:  Anything else?

7         MR. AKINMOLADUN:  No further questions, Your Honor.

8         THE COURT:  Thank you.  You're free to go.  Have a

9  safe trip.

10        THE WITNESS:  Thank you very much.

11        THE COURT:  Plaintiffs' next witness.

12        MR. MCINERNEY:  Judge, we will go a little out of

13  order and call Trooper James McCord after some conversations

14  with the state and as a courtesy to them and their schedules.

15        THE COURT:  So you're calling him as your witness or

16  Mr. Chalmers is calling him as his witness?

17        MR. MCINERNEY:  I'm going to call this trooper as my

18  witness.  Mr. Chalmers made him available.

19        And, Judge, just for your own information, we will

20  play selected deposition designations from Chandler Rule

21  regarding the stop you just heard about following this witness.

22        THE COURT:  Sir, would you step into the witness box

23  and raise your right hand so you can be sworn.

24                   JAMES LEE MCCORD,

25  called as a witness on behalf of the Plaintiffs, having first

1  been duly sworn, testified as follows:

2                  DIRECT EXAMINATION

3  BY MR. MCINERNEY:

4  Q.  Good afternoon, sir.  Your name for the court.

5  A.  Trooper James Lee McCord.

6  Q.  Sir, where are you employed as if it isn't obvious?

7  A.  With the Kansas Highway Patrol.

8  Q.  How long have you been employed?

9  A.  21 years.

10 Q.  What is your assignment?

11 A.  Troop N out of Hays.

12 Q.  What are your duties and responsibilities as a trooper

13 assigned to Troop N?

14 A.  Enforce traffic laws of Kansas.

15 Q.  Does Troop N have a particular focus when it comes to law

16 enforcement?

17 A.  Yes.

18 Q.  That's interdiction?

19 A.  Criminal interdiction, yes.

20 Q.  As opposed to civil interdiction?

21 A.  Correct.  We enforce Kansas traffic laws.

22 Q.  Sir, let me direct your attention if I can to May 27th of

23 2020.  Do you recall whether you were working that day?

24 A.  Yes, I do.

25 Q.  Were you working a dayside shift?

1   A.   Yes, I was.

2   Q.   And let me further direct you to about 1:15 that afternoon

3   in or near Russell County, Kansas.  Is that within the

4   geographic area of your patrol duties?

5   A.   Yes.

6   Q.   And did you find yourself at about 1:15 in Russell County,

7   Kansas?

8   A.   Correct, yes.

9   Q.   Do you recall, sir, patrolling eastbound on I-70 at about

10  that time?

11  A.   Yes.

12  Q.   And do you recall pulling over a car that displayed

13  California license plates driven by a man named Daniel Kelly

14  during that shift?

15  A.   Yes, I do.

16  Q.   I'm going to show you what's marked as Exhibit 119 and ask

17  you to identify it for us.  But first let me ask you, you're

18  aware I'm sure that your in-car audio and video system records

19  traffic stops as a measure of providing an account as to what

20  happened, correct?

21  A.   Correct.

22  Q.   And I think I've got this right.  When you activate your

23  emergency lights, the recording allows about two minutes of

24  video before the activation of those lights to be recorded,

25  correct?

1    A.   Yes.

2    Q.   And that's -- I should specify.  The video -- the audio

3    actually starts with the lights, correct?

4    A.   Correct.

5    Q.   Thank you.  Can we start with clip 1 of Exhibit 119,

6    please.

7         Okay.  First, sir, you've seen this video before; correct?

8    A.   Correct.

9    Q.   You recognize that to be a fair and accurate representation

10   of the video that was recorded on May 27, 2020, involving your

11   stop of Mr. Kelly?

12   A.   Yes.

13        MR. MCINERNEY:  Your Honor, we would move Exhibit 119.

14        MR. CHALMERS:  No objection.

15        THE COURT:  Received.

16   BY MR. MCINERNEY:

17   Q.   Now, that video, sir, shows Mr. Kelly's car in the

18   right-hand lane, correct?

19   A.   Yes.

20   Q.   And then you came up behind him, correct?

21   A.   Yes.

22   Q.   And then when you -- as your car approached his, you then

23   slowed down, correct?

24   A.   Yes, I did.

25   Q.   And in fact it appeared to be, correct me if I'm wrong, as

1  if you had passed Mr. Kelly's car and then slowed to fall back

2  behind him; is that right?

3  A.  I pulled along side, yes.

4  Q.  And at some point you took notice of a pickup truck that he

5  was following; is that correct?

6  A.  Yes.

7  Q.  It looks from the video -- and again I want you to correct

8  me if I'm wrong to be -- it looked as though Mr. Kelly's car

9  was about 8 or 9 lane dashes behind this pickup truck; is that

10 fair?

11 A.  At what time?

12 Q.  At the time that you approached and that was captured on

13 your dashcam?

14 A.  Yes.  At that exact time as I caught up to Mr. Kelly?

15 Q.  Yes, sir.

16 A.  Yes.

17 Q.  What had you observed before that?

18 A.  Before that as the vehicle was traveling up the hill and I

19 was approximately a quarter mile behind him, I observed him

20 right on the bumper of that truck at seven-tenths of a second

21 that I checked multiple times on a stopwatch.

22 Q.  You decided to pull Mr. Kelly over for the traffic offense

23 of following too closely?

24 A.  Correct.

25 Q.  That is a warnable offense, correct?

1   A.   Correct.

2   Q.   Not a mandatory ticket?

3   A.   Correct.

4   Q.   And at that point when you approached Mr. Kelly's car still

5   moving down I-70, you noticed that he had California tags,

6   correct?

7   A.   Yes.

8   Q.   And you know as a trooper and you have been trained with

9   the KHP that California is a source state for drugs, correct?

10  A.   Any state could be a source state for drugs.

11  Q.   Okay.  Including California, correct?

12  A.   Yes.

13  Q.   Let's play clip number two, please.

14       Sir, in that first contact, almost right away you began

15  asking Mr. Kelly about his travel plans, correct?

16  A.   Correct.

17  Q.   And he told you that he was picking up his nephew in

18  Shawnee, Kansas, correct?

19  A.   Yes.

20  Q.   And in fact you asked him why his brother was unable to

21  pick up the nephew, correct?

22  A.   Yes.

23  Q.   And then he told you that he usually spends time with he

24  and his brother's mother but that his brother had to work,

25  correct?

1   A.   Yes.

2   Q.   And he told you that he was off his job at a hotel because

3   I think he said things are slow?

4   A.   Yes.

5   Q.   And he was driving a rental car, correct?

6   A.   Yes.

7   Q.   And he gave you -- in fact he showed you on his phone the

8   rental agreement, correct?

9   A.   Yes.

10  Q.   And there wasn't anything inconsistent about what he said

11  regarding his plans and what you saw in the rental agreement,

12  correct?

13  A.   Yes.

14  Q.   What you knew at that point is that he was driving on I-70,

15  correct?

16  A.   Yes.

17  Q.   And he had California tags?

18  A.   Yes.

19  Q.   And KHP has trained you that I-70 is a drug corridor,

20  correct?

21  A.   All roads can be drug corridors, correct.

22  Q.   And I-70 is a primary drug corridor because it crosses

23  across the country, correct?

24  A.   Correct.

25  Q.   That's your training at KHP?

1   A.   Yes.

2   Q.   So at that point you had some suspicion he was trafficking

3   drugs; is that right?

4   A.   Yes.

5   Q.   Let's play clip number three, please.

6        Sir, what we just heard was the dispatcher responding your

7   request for information, correct?

8   A.   Yes.

9   Q.   And when you requested that information, you requested

10  information that I think you called III?

11  A.   Yes.

12  Q.   What does that stand for?

13  A.   Criminal history.

14  Q.   And you also requested information regarding 5D. Do you

15  remember that?

16  A.   Yes.

17  Q.   5D, sir, is what?

18  A.   Prior drug offenses.

19  Q.   You know that requesting 5D information is not ordinary.

20  You don't request that with every stop, do you?

21  A.   No.

22  Q.   You only request it where you suspect there's narcotics

23  activity, correct?

24  A.   Or criminal activity, yes.

25  Q.   Or criminal activity.  So at that point when you asked for

1   that information, you were convinced that you'd come across a

2   drug trafficker, correct?

3   A.   A possible drug smuggler, yes.

4   Q.   You learned some information back from the dispatcher of

5   the criminal history of a Daniel Kelly, correct?

6   A.   Yes.

7   Q.   You didn't ask dispatch for the date of those prior

8   offenses that she reported to you, did you?

9   A.   No, I did not.

10   Q.   You didn't ask if they were recent or if he was on

11   probation for any of them, did you?

12   A.   No, I did not.

13   Q.   So you didn't know whether those were offenses from the

14   year prior or 20 years prior, did you?

15   A.   No, I did not.

16   Q.   And she didn't provide you any information about that

17   individual being on supervised release, correct?

18   A.   Correct.

19   Q.   All you knew is that he had some priors that responded to

20   the III question and the 5D question; is that fair?

21   A.   Yes.

22   Q.   Let's play clip number four, please.

23       Sir, when you approached that vehicle the second time, you

24   provided him a warning for following too closely, correct?

25   A.   Yes.

1   Q.   You handed his documents back to him, correct?

2   A.   Yes.

3   Q.   And then he started explaining to you about his truck

4   driving experience and he planned to be safe from that point,

5   correct?

6   A.   Yes.

7   Q.   At that point you didn't have reasonable suspicion to

8   detain him any longer, did you?

9   A.   Yes, I did from the prior contact.

10  Q.   But you didn't detain him, did you?

11  A.   From the first contact?

12  Q.   Yes, sir?

13  A.   No.

14  Q.   In fact, you listened to him, and then at a point you said

15  "okay, yep," and then you turned back around and re-approached.

16  Did you see that?

17  A.   Yes.

18  Q.   And the length of time between the time you said "okay,

19  yep," and turned and when you turned back around was one

20  second, wasn't it?

21  A.   Approximately, yes.

22  Q.   And then you asked him a question about his nieces and

23  nephews; do you remember that?

24  A.   Yes.

25  Q.   And you asked him a question about how often he got to see

1   his nieces and nephews, correct?

2   A.   Yes.

3   Q.   You didn't care about either one of those?

4   A.   I did, yes.

5   Q.   You cared about his nieces and nephews and how often he saw

6   them?

7   A.   Yes.

8   Q.   After you executed that two-step move that we've talked

9   about and asked him those questions, you then asked him whether

10  he was carrying illegal substances, correct?

11  A.   Yes.

12  Q.   And that move, that two-step move away from and then right

13  back to the car, that's something you're trained on at the

14  Kansas law enforcement academy, isn't it?

15  A.   Yes.

16  Q.   And it's something you practice in the course of your

17  employment as a Kansas Highway Patrol trooper?

18  A.   Yes.

19  Q.   Your understanding or the premise, rather, is that it

20  changes the encounter from one that's not voluntary to one

21  that's voluntary, correct?

22  A.   Yes.

23  Q.   You never told Mr. Kelly he was free to go, correct?

24  A.   I didn't say those exact words, no.

25  Q.   Did you tell him to have a safe day?

1   A.   I don't remember if I did or not.

2   Q.   Did it you tell him to be careful?

3   A.   When I issued the warning that he needed to leave more room

4   between vehicles.

5   Q.   Did you tell him to be careful at the end of that

6   encounter?

7   A.   I don't recall if I did.

8   Q.   Did you tell him that he was free not to answer your

9   questions?

10  A.   No, I did not.

11  Q.   In fact at that point, sir, you just began asking the

12  questions about how often he got to see his nieces and nephews,

13  right?

14  A.   And his travel plans, correct.

15  Q.   And those -- those were questions that you already had the

16  answers to from the first encounter; is that right?

17  A.   Yes.

18  Q.   So the answers to those questions really didn't matter to

19  you, did they?

20  A.   To see if he had the same answers, correct.

21  Q.   You already had that information though, didn't you?

22  A.   I like to reaffirm travel plans.

23  Q.   And, again, at that point it really didn't matter what he

24  said because it was your plan to detain him, correct?

25  A.   I was going to ask for consent to search, yes.

1   Q.   But it was your plan to ask those questions and then detain

2   him for a canine sniff; is that correct?

3   A.   If he refused, yes.

4   Q.   And in fact -- well, you asked him about cash and he said

5   no?

6   A.   Correct.

7   Q.   You asked him about drugs and he said no?

8   A.   Yes.

9   Q.   You asked him about -- I think you used the word contraband

10  and he said no, correct?  He didn't say he had contraband in

11  the car, did he?

12  A.   No.

13  Q.   You asked him if you could search and he refused, correct?

14  A.   Correct.

15  Q.   At that point he was detained, correct?

16  A.   Yes.

17  Q.   And you know that in order to detain a motorist in a

18  situation like that, you have to have reasonable suspicion,

19  correct?

20  A.   Correct.

21  Q.   In fact, you're trained on that, right?

22  A.   Correct.

23  Q.   And you know that reasonable suspicion is a requirement of

24  the Fourth Amendment to the constitution, correct?

25  A.   Yes.

1   Q.   And there are things that you can consider and things that

2   you can't consider; isn't that right?

3   A.   Yes.

4   Q.   And as a trooper, part of your job is to stay up on legal

5   developments around things like stops and searches and

6   seizures; is that fair to say?

7   A.   Yes.

8   Q.   And you're supposed to know that as a state law enforcement

9   officer; is that right?

10  A.   Yes.

11  Q.   You, sir, have had heard of a case called *Jimenez*?

12  A.   That was out of Nebraska?

13  Q.   Not out of Nebraska, out of Kansas.

14  A.   No.

15  Q.   Not familiar with that?

16  A.   Not familiar, no.

17  Q.   Have you heard of a case called *State of Kansas vs.*

18  *Schooler*?

19  A.   No, I have not.

20  Q.   Have you heard of a case called *State of Kansas vs. Lowry*?

21  A.   No.

22  Q.   So you don't know that those cases limit what troopers can

23  ask about during traffic stops?

24  A.   I guess I did not realize that, no.

25  Q.   In fact, the *Jimenez* case spells out the circumstances when

1    law enforcement can ask about travel plans.  You don't know

2    that case?

3         MR. CHALMERS:  Your Honor, he's testifying what the

4    *Jimenez* case is which is a state law case.  He's already

5    established the witness didn't know anything about it.  I don't

6    think it's proper examination by the Plaintiff.

7         MR. MCINERNEY:  He may not recognize the name, Judge.

8    I want to tell him what the premise of the case was.

9         THE COURT:  I agree.  Objection is overruled.

10   BY MR. MCINERNEY:

11   Q.  Do you remember my question?

12   A.  No, I do not.

13        MR. MCINERNEY:  Do you mind reading that back, please?

14        (The requested portion of the record was read by the

15   reporter.)

16        THE WITNESS:  No, I do not.

17   BY MR. MCINERNEY:

18   Q.  Sir, have you heard of a case called *Vasquez*?

19   A.  No, I have not.

20   Q.  Did you ever take a test about the case law that applies to

21   stops and searches and seizures?

22   A.  Not that I recall.

23   Q.  Ever do any role-playing with the -- in the Kansas law

24   enforcement say annual training or annual re-education, ever do

25   any role-playing about citizen encounters from car searches?

1  A.  No.

2  Q.  Let's look at clip five, please.

3      Sir, you were standing forward of the car with Mr. Kelly

4  correct?

5  A.  Yes.

6  Q.  And the canine trooper or the canine officer who ran the

7  dog around the car then came up and told you that the dog had

8  alerted, correct?

9  A.  Yes.

10  Q.  And that's how you found out, correct?

11  A.  Yes.

12  Q.  And did you see the dog go around the car and then jump in

13  through the driver's window?

14  A.  Yes.

15  Q.  But the trooper didn't tell you whether the dog alerted

16  outside or inside the car, correct?

17  A.  No.

18  Q.  He just told you that it alerted, right?

19  A.  Yes.

20  Q.  And your training tells you when a dog like that alerts,

21  you've got probable cause to search?

22  A.  Yes.

23  Q.  And that's what happened, right?

24  A.  Yes.

25  Q.  You and the other officer conducted a search of that

1  vehicle, correct?

2  A.   Yes.

3  Q.   And at the end of the search I think it was, I believe it

4  was you, might have been the other officer, recovered what you

5  said was a vape pen?

6  A.   Yes.

7  Q.   And what's a vape pen?

8  A.   It's a THC marijuana cartridge with a battery.

9  Q.   Did you recover that?

10  A.   Yes, I did.

11  Q.   Did you take it to the lab?

12  A.   No, I did not.

13  Q.   You didn't have it tested?

14  A.   No, I didn't.

15  Q.   Did you do a field test for the contents?

16  A.   No, I did not.

17  Q.   So you don't know what that contained, do you?

18  A.   The vile of the cartridge said THC on it.

19  Q.   The contents were never tested by you or anyone at the KHP,

20  correct?

21  A.   No, they were not.

22       MR. MCINERNEY:  If I could have just a minute, Your

23  Honor.

24       That's all the questions I have for this witness.

25  Thank you.

1      THE COURT:  Mr. Chalmers, cross.

2                    CROSS-EXAMINATION

3  BY MR. CHALMERS:

4  Q.   Trooper, where are you stationed out of?

5  A.   Out of Ellis County.

6  Q.   Where is Ellis County?  Can you put a city around that for

7  us in Eastern Kansas?

8  A.   Hays.

9  Q.   Hays.  Now you have been a trooper how long now?

10  A.   21 years.

11  Q.   And in those 21 years how long have you been with Troop N?

12  A.   Since 2009 when it was created.

13  Q.   Again what is Troop N?

14  A.   It is our criminal interdiction task force basically.

15  Q.   Do you receive any special training to become a member of

16  Troop N?

17  A.   Yes, I have.

18  Q.   What training did you receive?

19  A.   When we first started, I attended Operation Desert Snow

20  which teaches criminal interdiction.

21  Q.   Where was that taught?

22  A.   That was brought to Topeka when -- it's an outside agency

23  that teaches.

24  Q.   Have you received any other additional training in

25  interdiction through -- as part of Troop N?

1    A.   Yes, I've attended multiple EPIC/DIAP conferences.

2    Q.   DIAP?

3    A.   DIAP.

4    Q.   What does that stand for?

5    A.   I'm not -- I'm not sure of the exact acronym, but I know

6    D-I-A-P.

7    Q.   And those are -- where were those conferences?

8    A.   Throughout the United States, Kansas City.  I've been to

9    San Antonio, Texas; Indianapolis.

10   Q.   Summarize if you will basically what it is that would be

11   taught or --

12   A.   It's a week-long training in criminal interdiction and

13   apprehension.

14   Q.   Does it -- what does it say about tactics or what it does

15   say about techniques or anything?

16   A.   Following trends and different classes and scenarios.

17   Q.   You have the routine trooper training I take it; is that

18   correct?

19   A.   Yes.

20   Q.   What is that training?

21   A.   At my -- at the time I was employed, it was a 20-week

22   training academy in Salina.

23   Q.   You have also the routine annual continuing education?

24   A.   Yes.

25   Q.   In terms of the continuing education, could you kind of

1   generally describe what it is that you have been learning as it

2   might relate to your job at Troop N?

3   A.   We have a basic trooper in-service.  Then I have attended

4   multiple conferences and also outside trainings also in

5   criminal apprehension.

6   Q.   In Troop N is there any effort to try to share information

7   as to what might be circumstances that could be suspicious on

8   the road?

9   A.   Yes.

10  Q.   What's done?

11  A.   I have work partners that we talk with all the time and

12  troopers throughout the State of Kansas that I talk with and

13  also other law enforcement agencies that I talk with.

14  Q.   Could you give a rough approximation of, I don't know, the

15  number of vehicles where you have had reason to call a drug dog

16  sniff?

17  A.   How many vehicles I have --

18  Q.   Yeah.  Just a rough approximation.

19  A.   Over 1,000 probably.

20  Q.   In your behavior -- or your job, rather, is a drug dog

21  called on every traffic stop?

22  A.   No.

23  Q.   Can you kind of give an approximation?

24  A.   When we have reasonable suspicion to detain individuals who

25  refuse consent to search a vehicle is when a canine is called.

1    Q.  In terms of trying to give us a quantity or number, can you

2    give us a percentage to the best of your understanding about

3    how frequently there is a drug dog called on one of the traffic

4    stops that you handled?

5    A.  One or two percent maybe.

6    Q.  Now, you issued a citation in this case; is that correct?

7    A.  It was a warning.

8    Q.  Okay.  I'm going to show you what has been marked as

9    Plaintiffs' Exhibit 118.

10          MR. CHALMERS:  Well, I'll just ask whether I -- I move

11   for admission of Plaintiffs' Exhibit 118.

12          MR. MCINERNEY:  No objection, Judge.

13          THE COURT:  Received.

14   BY MR. CHALMERS:

15   Q.  I'll put that up on the screen real quickly.

16       The exhibit is a citation that was given to Mr. Kelly; is

17   that correct?

18   A.  Correct.

19   Q.  Is that the citation for the stop that we've been

20   discussing here this afternoon?

21   A.  Yes.

22   Q.  Now, it shows a place where the stop took place.  Where is

23   that shown on the document?

24   A.  I-70 eastbound mile marker 192.

25   Q.  What is approximately around mile maker 192?

1    A.   Bunker Hill.

2    Q.   Are there a couple towns you can reference to give --

3    A.   Bunker Hill would be the town that is right there at mile

4    marker 193.  There's an exit.

5    Q.   And for those of us that aren't generally familiar with

6    Bunker Hill, what's the next road east or -- next city east,

7    rather?

8    A.   Be Wilson -- or correction, Dorrance, Kansas.

9    Q.   And the next town to the west?

10   A.   Then it would be Wilson.

11   Q.   And where are they, say, in relation to, say, Russell,

12   Kansas?

13   A.   To the east approximately 10 and 20 miles I believe.

14   Q.   The document shows the reason for the stop where?

15   A.   It would be in the number one box.  It says following too

16   closely.

17   Q.   And did you observe Mr. Kelly's vehicle following another

18   vehicle too closely?

19   A.   Yes, I did.

20   Q.   How did you make that observation?

21   A.   I witnessed the vehicle following the pickup truck.

22   Q.   I think maybe in your direct examination you reference some

23   sort of thing you did with the clock?

24   A.   Our radar has a stopwatch function.

25   Q.   So how did that fit into the following too closely?

1  A.  That's what I used to time the vehicle from when the truck
2  passed a mark on the road and when Mr. Kelly's vehicle passed a
3  mark.
4  Q.  You gave a warning in this case; is that right?
5  A.  Yes.
6  Q.  Why?
7  A.  There was no accident.
8  Q.  I think counsel referred to it as a warnable -- warnable
9  offense.  I don't know what that means.  Does that mean you
10  can't give a ticket for following too close?
11  A.  We can give a citation, yes.
12  Q.  Is that within your discretion not to?
13  A.  Correct.
14  Q.  And why then did you actually exercise your discretion
15  again not to give the ticket for following too closely?
16  A.  We try to use an education process, and it was better just
17  to advise him he shouldn't be following a vehicle too closely.
18  Q.  After you stopped Mr. Kelly, you went up and visited with
19  him and gathered some information as part of the traffic stop;
20  is that correct?
21  A.  Yes.
22  Q.  At the conclusion of that first conversation with
23  Mr. Kelly, did you have suspicions that he was involved in some
24  sort of criminal activity?
25  A.  Yes, I did.

1   Q.   And I think you indicated, but let's confirm, did you

2   believe that you had reasonable suspicion at that point that he

3   was involved in criminal activity?

4   A.   Yes.

5   Q.   You went back to your -- back to your patrol vehicle after

6   a first interaction with Mr. Kelly and what did you do?

7   A.   I ran his driver's license and requested a criminal history

8   check.

9   Q.   And before you went back and talked to Mr. Kelly again, did

10  you get a response to the criminal background check?

11  A.   Yes, I did.

12  Q.   And what response did you receive?

13  A.   Several entries for possession of 5D with intent of -- what

14  they consider white, which would be cocaine, meth, and heroin.

15  Q.   And was there some reference to a sawed-off shotgun?

16  A.   Correct.

17  Q.   What was that reference again?

18  A.   Just a weapons charge.

19  Q.   Weapons charge against whom?

20  A.   Mr. Kelly.

21  Q.   And the information that you ran to try to -- to relate

22  this information -- the criminal history to Mr. Kelly, how did

23  you -- what did you tell dispatch that they know is the right

24  guy?

25  A.   Went through his driver's license.

1  Q.  So after you gathered that information, did you prepare the

2  citation at that point?

3  A.  As I ran the driver's license, I was typing the citation.

4  Q.  Once the citation is typed, is there a printer in your car

5  that prints it out?

6  A.  Yes.

7  Q.  Once it was printed out, what did you do?

8  A.  I returned to the vehicle and issued the warning.

9  Q.  Now.  You during the second conversation -- or the second

10  time you went up and talked to Mr. Kelly, did you ask his

11  permission to ask some additional questions?

12  A.  Yes, I did.

13  Q.  What did he say?

14  A.  He said yes.

15  Q.  And then you had a brief conversation with him; is that

16  right?

17  A.  Yes.

18  Q.  At the time that you had that brief conversation with

19  Mr. Kelly, did you believe that you had at that point

20  reasonable suspicion to detain him?

21  A.  Yes, I did.

22  Q.  But you went ahead and asked for consent to search; is that

23  right?

24  A.  Yes.

25  Q.  Why did you do that?

1  A.  Because consent is a better way to go about it.  It's more

2  voluntary.

3  Q.  Well, why if it's more voluntary makes it a better way?

4  A.  Because we try to get consent first before utilizing a

5  canine.

6  Q.  The canine that you used in this particular case, where was

7  it out of?

8  A.  He was based out of I believe Russell -- not Russell.

9  WaKeeney at the time, but he was working in the area with me

10 and another trooper.

11 Q.  So he was about how far away in terms of trying to get him

12 to your stop as you understood at the time?

13 A.  On the video he was approximately four-and-a-half minutes

14 away.

15 Q.  Were you aware that he was only four-and-a-half minutes

16 away when you asked for consent?

17 A.  No, I wasn't.  I knew he was in the area.

18 Q.  So there is discussion about this -- about the two step I

19 think.  Maybe that's what it was referred to.  Why did you step

20 away at some point after you gave the warning materials to

21 Mr. Kelly?

22 A.  Kansas law requires that we have a break in the contact and

23 basically initiate a consensual encounter.

24 Q.  Did Mr. Kelly give you consent to search?

25 A.  No, he did not.

1   Q.   And what did you do after he said he didn't want to consent

2   to search?

3   A.   I advised Mr. Kelly he was going to be detained for a

4   canine.

5   Q.   Now, in determining that Mr. Kelly was going to be kept for

6   a canine, on what basis did you do that?

7   A.   The indicators of criminal activity that I believe I had.

8   Q.   So that's the reasonable suspicions we've been talking

9   about?

10  A.   Yes.

11  Q.   Well, now did the refusal to consent to a search, was that

12  part of the reasonable suspicion?

13  A.   No, it was not.

14  Q.   So list for us, if you will, what it was that you knew or

15  felt at that point that caused you to believe that you had

16  reasonable suspicion to detain Mr. Kelly for a dog sniff?

17  A.   Nervousness upon the first contact after Mr. Kelly was

18  advised he was going to be issued a warning.  He was bouncing

19  his leg, trembling hands as he handed over documents, and also

20  a nervous smile.  And also indicators I saw in the vehicle.

21  There was a suitcase placed on the passenger seat, fresh

22  fingerprint on the trunk lid, and also to me suspicious travel

23  plans.

24  Q.   Is that it?  Do I need to --

25  A.   Then alone with the criminal history, previous criminal

1   history.

2   Q.   Is that it before I start talking about the details?

3   A.   Yes.

4   Q.   Okay.  So the first one was the nervousness that you

5   observed.  Was this nervousness somehow different than what you

6   see in a typical traffic stop?

7   A.   Yes.

8   Q.   And you may have already explained that, but describe that

9   to the court if you won't mind.

10  A.   He was trembling as he handed over documents.  Most

11  individuals are nervous during a traffic stop until they

12  realize that they're maybe not getting a citation or it's not

13  going to cost them money.  And upon the first contact when I

14  advised of the violation, I advised Mr. Kelly it was only going

15  to be a warning and no fine was going to be issued, and the

16  nervousness never subsided.

17  Q.   That nervousness you've talked about is that something that

18  in your training and experience has been relevant to criminal

19  interdiction?

20  A.   Yes.

21  Q.   How so?

22  A.   Most innocent motoring public, once advised they're not

23  going to get a citation and it's not going to cost them money,

24  it's a sigh of relief like instant, like now it's okay, and

25  nervousness typically subsides in those individuals.

1  Q.   The suitcase you were talking about, what -- how did that

2  fit into your suspicions?

3  A.   When trafficking large quantities of drugs, individuals

4  don't want to open the trunk, so they will place their personal

5  belongings on the passenger seat or on the backseat of the

6  vehicle.

7  Q.   And then there was -- let's see, you talked about

8  fingerprints.  How did that fit?

9  A.   They were fresh fingerprints on the trunk deck, and like I

10  said, his luggage was on the passenger seat.

11  Q.   You had discussions in the first conversation and the

12  second conversation with Mr. Kelly about his travel plans; is

13  that correct?

14  A.   Yes.

15  Q.   I don't know whether that was in your list or not.  Were

16  his travel plans, were they part of your reasonable suspicions?

17  A.   Yes, they were.

18  Q.   How so?

19  A.   Traveling from a long distance to pick your nieces and

20  nephews up, when an airplane -- you could have flown out,

21  picked his nieces and nephews up, and drove them back.  But

22  instead he decided to drive a two-day drive to Kansas and then

23  pick his nephews up and drive them back.

24  Q.   What makes that implausible as a travel plan in your mind?

25  A.   I would not let my family travel -- for me, my brother, I

1   would not allow him to come pick my kids up and take them all

2   the way across the country.

3   Q.   You --

4         THE COURT:  Why?  I'm sorry.  Why?

5         THE WITNESS:  Because I travel with my kids if they're

6   going to be away from me an extended time.

7         THE COURT:  Say that again.

8         THE WITNESS:  If my kids were going to be away from me

9   for an extended period, I'd want to spend as much time with

10   them as possible until they reached their destination.

11         THE COURT:  You wouldn't let your kids travel with

12   their uncle?

13         THE WITNESS:  No, I would not.

14         THE COURT:  That's suspicious to you?

15         THE WITNESS:  Yes.

16         THE COURT:  Okay.

17   BY MR. CHALMERS:

18   Q.   Well, whether it's -- what I'm wondering is how that fits

19   to suspicion of criminal activity.

20   A.   Trying to clarify and justify a story.

21   Q.   Were you -- you were questioning then his explanation for

22   why he was traveling, where he was traveling?

23   A.   Yes, and the reason for the travel.

24   Q.   How did again fit into a suspicion there might be illegal

25   activity involved?

1  A.   He's trying to use a trip to justify the travel across the

2  country.

3  Q.   And then finally there's the -- I think you mention

4  criminal history, and I think as counsel pointed out, you

5  didn't know how distant that was in the past?

6  A.   No, I did not.

7  Q.   Why did that fit into your suspicions?

8  A.   That he has been -- a tendency to travel and traffic

9  narcotics in the past.

10  Q.   What has your experience and training said about the

11  remoteness of the criminal history, if anything?

12  A.   What do you mean by that?

13  Q.   That's a bad question.  What has your training and

14  experience told you about whether -- how important it would be

15  that the criminal history be current or remote in time?

16  A.   I have arrested several individuals with past criminal

17  history from 20 years ago that did -- either were placed in

18  prison and then tried to straighten their lives up and come on

19  hard times and start trafficking again.  It's easy money.

20  Q.   The dog alerted you were told by the individual that ran

21  the dog; is that correct?

22  A.   Yes.

23  Q.   And the individual that ran the dog was with which agency?

24  A.   He is with the highway patrol.

25  Q.   And you and that trooper searched the vehicle; is that

1  right?

2  A.   Correct, yes.

3  Q.   And you found a vape pen.  Did you find anything else?

4  A.   Then in the trunk was a duffel bag.

5  Q.   What did you find in the duffel bag that you found relevant

6  to the search?

7  A.   There was green vegetation in the bottom of the duffel bag

8  that was empty for the most part.

9  Q.   You didn't take it and sample it or test it, did you?

10  A.   No, I did not.

11  Q.   Why not?

12  A.   Because at that point we're looking for large quantities of

13  drugs.

14  Q.   And did you have a conversation with Mr. Kelly about the

15  vape pen?

16  A.   Yes, I did.

17  Q.   Tell us what you remember about that conversation.

18  A.   I advised we found a vape pen under the passenger seat, and

19  he said it wasn't his.

20  Q.   So what happened to the vape pen?

21  A.   I disposed of it.

22  Q.   And after the search and after your conversation with

23  Mr. Kelly about the vape pen, did you release him to return on

24  his trip?

25  A.   Yes.

1    MR. CHALMERS:  I don't have any other questions.

2 Thank you.

3    THE COURT:  Redirect.

4                    REDIRECT EXAMINATION

5 BY MR. MCINERNEY:

6 Q.  Sir, I think you just listed the factors that you say gave

7 you a reasonable suspicion.  Did you ever -- did you write a

8 report that day about the reasons for your reasonable

9 suspicion?

10 A.  No, I did not.

11 Q.  Because you weren't required to, correct?

12 A.  Correct.

13 Q.  Without an arrest or a seizure, you don't have to, right?

14 A.  Correct.

15 Q.  And did you ever -- did you ever record those factors on

16 your in-car audio system?

17 A.  Which factors?

18 Q.  The factors that gave you what you say is reasonable

19 suspicion?

20 A.  No, I did not.

21 Q.  I think one of the factors you indicated was fingerprints

22 on the back lid of the trunk, right?

23 A.  Yes.

24 Q.  When you did the search, you opened up the trunk, and you

25 found luggage in there, didn't you?

1  A.  There was a duffel bag, yes.

2  Q.  This green leafy substance that was in the duffel, did you

3  test it?

4  A.  No.

5      (Court reporter interruption for clarification).

6      (Court reporter read back the last question).

7  BY MR. MCINERNEY:

8  Q.  Did you field test it, and his answer was no, sir; is that

9  right?

10  A.  Correct.

11  Q.  You also testified that it struck you -- in addition to

12  kids riding with their uncle, it struck you as odd they didn't

13  fly, correct?

14  A.  That he wouldn't have flown to Kansas City to pick them up,

15  yes.

16  Q.  You'll agree with me there's a big difference between the

17  cost to drive and a cost to fly across the country, correct?

18  A.  Correct.

19  Q.  And we were talking, as you understood, about two or

20  perhaps three individuals flying, correct?

21  A.  Correct.

22  Q.  Nevertheless, that lent to your reasonable suspicion?

23  A.  Yes.

24  Q.  I want to make sure I understand your testimony.  You're

25  not testifying here today that there is no difference between

1  criminal history that is recent and criminal history that is

2  removed in time; is that your testimony?

3  A.   It's criminal history.

4  Q.   So regardless of when it occurred, criminal history is

5  criminal history, correct?

6  A.   In my training, yes.  And my personal experiences, yes.

7  Q.   Even if those -- the criminal history that was listed for

8  you was 20 or 25 years old, doesn't matter as far as you're

9  concerned, correct?

10 A.   Correct.

11      MR. MCINERNEY:  That's all I have for this witness,

12 Judge.  Thank you very much.

13      THE COURT:  Any recross?

14                  RECROSS-EXAMINATION

15 BY MR. CHALMERS:

16 Q.   Your citation won't show Mr. Kelly's age, will it?

17 A.   It will have his date of birth on there.

18 Q.   Will it?  Okay.  So if I could find it, Exhibit 943, where

19 do we find date of birth?

20 A.   It would be below his address.  Date of birth:  7/20 of

21 1968.

22 Q.   So he was born in '68.  At the time of this accident [*sic*]

23 about how old was he?  Or the time of this stop, rather?  2020?

24 A.   Been approximately in his mid or late 40s, early 50s.

25 Q.   The criminal history reports that you got back were for

1   multiple violations?

2   A.  Several violations, yes.

3   Q.  And the violations, these would not include violations that

4   would include when someone was a juvenile, would they?

5   A.  No, they would not.

6           MR. CHALMERS:  I don't have anything else.

7           THE COURT:  Anything further?

8           MR. MCINERNEY:  One, Judge.

9                   FURTHER REDIRECT EXAMINATION

10  BY MR. MCINERNEY:

11  Q.  The stop occurred in May of 2020, correct?

12  A.  Yes.

13  Q.  About two months after COVID?

14  A.  Yes.

15  Q.  You remember nobody was flying in May of 2020, don't you?

16  A.  There were individuals flying, yes.

17          MR. MCINERNEY:  That's all I have.

18          THE COURT:  Anything else further?

19          MR. CHALMERS:  No.

20          THE COURT:  You're excused.

21          THE WITNESS:  Thank you.

22          THE COURT:  Plaintiffs' next witness.

23          MS. PERRY:  Your Honor, we call Trooper Chandler Rule

24  by deposition designation.  And for purposes of the record and

25  with the court's comments yesterday, we will be marking this as

1    Exhibit 131.

2         THE COURT:  So I had the same problem -- stop.  I had

3    the same problem with the last video from the car cam.  Do you

4    have a transcript of that?

5         MS. PERRY:  We'll work on getting you transcripts for

6    all the stops.

7         THE COURT:  Okay.  Thank you.  Go ahead.

8         MR. CHALMERS:  Just so the record is clear and I have

9    an understanding what we're playing is only what you

10   designated, don't include my designations and don't include any

11   objections that I've made?

12        MS. PERRY:  Correct.  These are plaintiffs' deposition

13   designations.

14        MR. CHALMERS:  And so I think it's clear on the

15   record, Your Honor, you're going to review I think the

16   objections at some point and rule on them, that they're

17   considered to be contemporaneously made, so I don't have to

18   stand up and down during the deposition.

19        THE COURT:  Right.  I don't know if I said I'm going

20   to rule on them.  I said you can play them, and I will sort it

21   all out at the end of the case.

22        MR. CHALMERS:  I may have overstated.  I want to make

23   sure I've got a contemporaneous objection is all.

24        (Deposition of Chandler Rule played.)

25        MS. PERRY:  Your Honor, I'd also move to admit trial

1   Exhibit 99, which was referenced there as deposition

2   Exhibit 17, and also trial Exhibit 100, which was referenced

3   there as deposition Exhibit 41.

4           THE COURT:  Any objection?

5           MR. CHALMERS:  No objection to 99 and no objection to

6   101 [*sic*], Your Honor.

7           THE COURT:  Received.  So I think it's time for a

8   recess.  Time for everybody to get up and walk around and get

9   some fresh air.  Tomorrow we will start at 10:30 and go until

10  5:00.  Anything we need to take up before we go to recess for

11  the evening?

12          MR. MCINERNEY:  Not by us, Judge.

13          MR. CHALMERS:  No.

14          THE COURT:  Okay then.  Everybody have a great night.

15  Thank you.

16      (The proceedings were adjourned at 4:56 p.m.)

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2       I, Danielle R. Murray, a Certified Court Reporter and the

 3   regularly appointed, qualified, and acting official reporter of

 4   the United States District Court for the District of Kansas, do

 5   hereby certify that the foregoing is a true and correct

 6   transcript from the stenographically reported proceedings in

 7   the above-entitled matter.

 8       SIGNED 2nd of October, 2023

 9
                        /s/Danielle R. Murray
10                      DANIELLE R. MURRAY, RMR, CRR
                        United States Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that a copy of the foregoing APPELLANT'S APPENDIX, as submitted in digital form is an exact copy of the document filed with the Clerk.

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2024, the foregoing APPELLANT'S APPENDIX was electronically filed with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I also certify that within five business days of the issuance of notice that the electronic filing is compliant, one paper copy will be delivered by Federal Express to the Clerk's Office.

DATED: April 24, 2024                    /s/ Kurtis K. Wiard