## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

BLAINE FRANKLIN SHAW, et al.,
*Plaintiffs-Appellees*,

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant*.

———

MARK ERICH, et al.,
*Plaintiffs-Appellees*,

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant*.

## APPELLANT'S APPENDIX VOLUME XIV

Appeal from the United States District Court for the District of Kansas
Honorable Kathryn H. Vratil, Senior District Court Judge
District Court Case Nos. 19-CV-1343-KHV and 20-CV-1067-KHV-GEB

**OFFICE OF ATTORNEY GENERAL
KRIS W. KOBACH**

120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
(785) 296-2215
anthony.powell@ag.ks.gov
dwight.carswell@ag.ks.gov
kurtis.wiard@ag.ks.gov

Anthony J. Powell
  *Solicitor General*
Dwight R. Carswell
  *Deputy Solicitor General*
Kurtis K. Wiard
  *Assistant Solicitor General*

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

Transcript of Bench Trial, Day 3
  (ECF No. 565) ................................................................................. 1

1

2                    UNITED STATES DISTRICT COURT
                        DISTRICT OF KANSAS,
3
    JOSHUA BOSIRE, ET AL/
4   MARK ERICH, ET AL,

                                    Docket No. 19-1343-KHV
5                                              20-1067-KHV

6     Plaintiffs,                   Kansas City, Kansas
                                    Date: 5/3/2023
7       v.

8   HERMAN JONES in His
    Official Capacity,
9
      Defendant.
10  ..................

11                      TRANSCRIPT OF
                   DAY THREE - BENCH TRIAL
12          BEFORE THE HONORABLE KATHRYN H VRATIL,
              UNITED STATES SENIOR DISTRICT JUDGE.
13
    APPEARANCES:
14
    For the Plaintiff :    Madison A Perry, Patrick A McInerney,
15                         Owale Akinmoladun & Leslie Greathouse
                           Spencer Fane LLP -KC
16                         1000 Walnut Street, Suite 1400
                           Kansas City, MO  64106
17
                           Sharon Brett & Kunyu Ching
18                         ACLU Foundation of Kansas
                           6701 W 64th Street, Suite 210
19                         Overland Park, KS  66202

20  For the Defendant:     Arthur S Chalmers
                           Office of Attorney General - Kansas
21                         120 SW 10th Avenue
                           Topeka, KS  66612
22
    Court Reporter:        Nancy Moroney Wiss, CSR, RMR, FCRR
23                         Official Court Reporter
                           558 US Courthouse
24                         500 State Avenue
                           Kansas City, KS  66101
25

1                          I N D E X

2

    Deposition Designation of Lieutenant Greg Jirak          337
3   played
    Deposition Designation of Trooper Ryan Wolting           337
4   played

5

    Plaintiffs' Witnesses:                                  Page

6

    JONATHAN MUMMOLO
7     DIRECT EXAMINATION BY MS. BRETT                        251
      CROSS EXAMINATION BY MR. CHALMERS                      301
8     RE-DIRECT EXAMINATION BY MS. BRETT                     332

9   MITCHELL CLARK
      DIRECT EXAMINATION BY MS. GREATHOUSE                   339
10    CROSS EXAMINATION BY MR. CHALMERS                      371
      RE-DIRECT EXAMINATION BY MS. GREATHOUSE                375

11

12

13

14                      E X H I B I T S

15  Plaintiffs'
      Exhibits              Offered              Received
16

          19                  367                  368
17        55                  300
          72                  341                  341
18        74                  362                  362
          97                  337                  337
19        98                  337                  337
         101                  338                  338
20    Page 213                367                  368

21  Defendant's
      Exhibits              Offered              Received
22

          19                  375                  375
23       911                  308
         912                  312
24    OAG 8503                375                  375

25

1          THE COURT:  Good morning.

2      (Various attorneys said morning.)

3          THE COURT:  Are we ready for plaintiffs' next witness?

4          MS. BRETT:  Yes, Your Honor.  Plaintiffs call Doctor

5   Jonathan Mummolo.

6          THE COURT:  Sir, would you please step into the

7   witness box and raise your right hand so that you can be sworn?

8      (Witness sworn.)

9          THE WITNESS:  I do.

10         MS. HARPER:  Thank you.  You may be seated.

11         THE COURT:  Go ahead.

12                      JONATHAN MUMMOLO,

13  Called as a witness on behalf of the plaintiffs, having been

14  first duly sworn, testified as follows:

15                      DIRECT EXAMINATION

16  BY MS. BRETT:

17  Q.  Good morning.  Could you please start by stating and

18  spelling your name for the record?

19  A.  Good morning.  My name is Jonathan Mummolo.  J O N A T H A

20  N.  M U M M O L O.

21  Q.  Where do you live?

22  A.  I live in Princeton, New Jersey.

23  Q.  And what is your occupation?

24  A.  I'm an assistant professor of politics and public affairs

25  at Princeton University.  I was just promoted.  Effective

1    July 1st, I'll be an associate professor with tenure.

2    Q.   Congratulations.

3    A.   Thank you.

4    Q.   How long have you been at Princeton?

5    A.   This is the end of my sixth year.  I arrived in 2017.

6    Q.   Have you had any other prior academic position?

7    A.   Prior to working at Princeton, I was in graduate school at

8    Stanford University pursuing my PhD in political science.

9    Q.   And did you get a PhD in political science?

10   A.   I did.

11   Q.   What year?

12   A.   2017.

13   Q.   Do you have any other degrees?

14   A.   Yes, I have a master's in government from Georgetown

15   University, and I have a bachelor's degree in history and

16   journalism from New York University.

17   Q.   Doctor Mummolo, what is your research for this area?

18   A.   I study policing in the United States, mostly using

19   quantitative statistical methods.  I study a range of questions

20   about policing, so everything from how various policing reforms

21   impact police behavior, how civilians think about police

22   officers, and how their actions shape those opinions, and I

23   also do methodology work on developing improved statistical

24   methods for estimating discrimination in police behavior.

25   Q.   Do you have any publications in this area?

1    A.   Yes, I do.

2    Q.   Approximately how many publications do you have?

3    A.   In total, I have about 20 peer reviewed publications.

4    Q.   What does peer reviewed mean?

5    A.   Peer review is a process for quality control in academic

6    writing, so when researchers submit a study to a journal, the

7    journal editor will send it out to peers in the field, so other

8    researchers who studied the same topic but did not work on that

9    research, and they will give independent assessments of the

10   quality of the research.  An article may be rejected, or

11   revisions may be requested based on those evaluations, and

12   eventually, it will only be published if the editor is

13   satisfied that the research has been deemed of sufficient

14   quality.

15   Q.   So does publishing in a peer reviewed journal mean anything

16   about the validity or the methodology's reliability of the

17   article that's published there?

18   A.   Yes.  As I said, it's meant to be a mechanism for quality

19   control.  So at the very least, it's a signal that the article

20   has undergone independent scrutiny by other researchers.

21   Q.   In addition to your research, do you teach any courses at

22   Princeton?

23   A.   Yes, I teach a few different courses.  I teach an

24   undergraduate lecture called the politics of policing.  I teach

25   a master's level class called the politics of public policy,

1  and I teach the intro-statistical methods class to the PhD

2  students in the politics department.

3  Q.  What topics do you cover in your politics of policing

4  course?

5  A.  This is a wide ranging lecture course that covers topics

6  that include the political origins of policing in the United

7  States, how civilians view police, how to think about topic --

8  current topics like discrimination in policing, things of that

9  nature.

10  Q.  And what about your statistical methods course, what do you

11  cover in that?

12  A.  This is an introductory course for PhD level students who

13  are going to be using statistical methods in their own

14  research.  So the course starts with some introductory concepts

15  about the use of statistics in social science, and then focuses

16  heavily on a sub-field of statistics that's wildly used called

17  causal inference.

18  Q.  What is causal inference?

19  A.  So causal inference is a sub-field of statistics.  It's a

20  set of tools that's aimed at parsing correlation from

21  causation.  So we all may have heard the expression correlation

22  does not necessarily imply causation.  Just because two things

23  are associated or tend to happen together in the world doesn't

24  mean that one causes another.  So for example, we might observe

25  that as summer approaches, ice cream sales go up in cities, and

1    we also see more drownings in public pools.  That does not mean

2    ice cream sales cause drowning.  They're both happening because

3    of this third factor which is weather, although sometimes there

4    are correlations in the world that represent a causal

5    relationship such as rain fall and plant growth, and so causal

6    inference is basically a set of statistical tools that helps us

7    rule out alternative explanations to see if some other

8    underlying causal relationship is at play.

9    Q.   Can you explain the rain fall and growth analogy that you

10   just gave us?

11   A.   So we might observe -- in fact, we do observe that in

12   nature, increased rain fall is associated and correlated with

13   increased plant growth, but that's not merely a correlation.

14   There is a causal biological mechanism by which plants grow due

15   to rain fall.

16   Q.   And do you use causal inference methodology in your

17   research?

18   A.   Yes, I do, especially as it pertains to the study of

19   discrimination in law enforcement.  Discrimination is often

20   studied in causal terms.  We want to know if different groups

21   of people are treated differently by the police, what is the

22   reason for that disparity, and that touches on the causal

23   questions.

24   Q.   Doctor Mummolo, do you have any grants or fellowships on

25   these topics for research in these areas?

1   A.   Yeah, I'm currently supported by two grants.  One is from

2   the Microsoft Corporation, and that's aiding a study that's

3   aimed at developing techniques to analyze police body worn

4   camera footage.  Another is from a non-profit group called

5   Arnold Ventures which funds criminal justice research, and that

6   is to aid in a development of a generalizable tool kit that can

7   be used in different police agencies to measure discrimination.

8   Q.   Do you give any lectures or presentations in academic or

9   non-academic settings about your work in this area?

10  A.   Yes, I'm often invited to lecture my research at other

11  universities or at conferences.

12  Q.   And in addition to your academic work, do you also have a

13  consulting business?

14  A.   Yes, I do.

15  Q.   What is that consulting business?

16  A.   So I co-own a business called Knox and Mummulo LLC which is

17  co-owned with my frequent research collaborator Dean Knox who

18  is a professor at the University of Pennsylvania, and we

19  provide statistical consulting services in litigation such as

20  this involving the behavior of law enforcement.

21  Q.   Doctor Mummolo, were you retained as an expert in this

22  case?

23  A.   Yes, I was.

24  Q.   When?

25  A.   In late 2020.

1  Q.  By whom?

2  A.  By the plaintiff -- plaintiffs.

3  Q.  Are you being compensated for your work on this case?

4  A.  Yes, I am.

5  Q.  Is your compensation contingent on the results of your

6  analysis?

7  A.  No, it is not.

8  Q.  Is it contingent on the outcome of the litigation?

9  A.  No, it is not.

10  Q.  Did you produce a report in this case?

11  A.  Yes, I did.

12  Q.  Okay.  And are the conclusions that you reached in this

13  report reliable to a reasonable degree of certainty in your

14  field?

15  A.  Yes, they are.

16  Q.  What questions were you asked to answer in that report that

17  you produced?

18  A.  I was asked to quantitatively analyze data on traffic law

19  enforcement by the Kansas Highway Patrol to see if there was

20  any evidence that Kansas Highway Patrol enforces traffic law

21  differently when dealing with in-state verses out-of-state

22  motorists.

23  Q.  Can you give the court a high level summary of your overall

24  findings and conclusions based on the research that you

25  conducted for this report?

1   A.   Yes.   The first finding in my report is that out-of-state

2   motorists are much more likely to be stopped by the Kansas

3   Highway Patrol than in-state motorists, given their prevalence

4   on the road.   I further find that this disparity is of a large

5   magnitude, too large to be plausibly explained by differential

6   rates of speeding behavior by these groups of motorists.   I

7   then examined data on canine sniffs conducted by the Kansas

8   Highway Patrol, or KHP, and I find that similarly, out-of-state

9   non-residents are much more likely to be subjected to canine

10  sniffs, and this can't be simply explained by the fact that

11  out-of-state motorists are more likely to be stopped, they are

12  disproportionally subjected to these canine sniffs over and

13  above rates of stopping, and finally, I find no clear evidence

14  of differential rates of the discovery of illegal drugs or

15  contraband at the conclusion of these canine sniffs when

16  comparing in-state versus out-of-state motorists.

17  Q.   Before we walk through those opinions in detail, I want to

18  walk through the type of information that you relied on in

19  conducting your analysis.   So what was the first source of

20  information that you relied on to produce your report?

21  A.   The first data set was data provided to me through

22  plaintiffs' attorneys from the Kansas Highway Patrol that was a

23  record of roadside detentions, traffic stops conducted by KHP.

24  Q.   And what was included in that data?

25  A.   So the data arrived in two separate but overlapping Excel

1  spreadsheets.  One was a record of stops statewide that

2  included the date, time, location of stops.  The second sheet

3  was -- or spreadsheet was records of stops on interstates, and

4  in addition to the date, time and location, it also contained

5  the state of origin for the vehicle that was stopped and the

6  reason that the stops occurred.

7  Q.  Did you have to sort out any of the data in order to

8  conduct your analysis?

9  A.  Yeah.  So because neither of these sheets contained all the

10  information necessary, I cross-referenced them, and basically

11  took the overlapping portion of the two, which was stops on

12  interstates where I'm able to determine state of origin, reason

13  for the stop, date, time and location, and so yes, I had to do

14  some data management to make that happen.

15  Q.  What was the second source of data that you relied on?

16  A.  The second source of data is measures of traffic volume by

17  hour of the day, and also the speed of that traffic volume.

18  That's collected from the Kansas Department of Transportation

19  or K-DOT, and this is collected via road censors throughout the

20  state that K-DOT maintains.

21  Q.  Do you know which data sensors or where those sensors were

22  located?

23  A.  Most of the ones in this analysis are located along Route

24  I-70.  There are a couple that touch on other interstates like

25  335 and 35.

1   Q.   What was the third data set that you relied on?

2   A.   The third data set was a commercial data set purchased from

3   the vendor SafeGraph, and this is a mobile location data set,

4   so this is data on the home locations of visitors to businesses

5   in Kansas, and I used this as part of a process to determine or

6   to approximate the composition of drivers on the road versus --

7   in-state versus out-of-state.

8   Q.   What does the SafeGraph data measure exactly?

9   A.   So SafeGraph --

10          MR. CHALMERS:  If I might interrupt here, Your Honor.

11   The SafeGraph data is inadmissible hearsay, and it's going to

12   be a problem with respect the opinions he's offering which were

13   based on inadmissible hearsay, and it is not only inadmissible

14   hearsay, but his opinions are predicated on -- are crucially

15   set by hearsay, and in addition to that, it is -- it is an

16   opinion of SafeGraph after it's massaged its data.  So I

17   certainly object to this witness talking about SafeGraph

18   hearsay or the SafeGraph information, and I will object to his

19   opinions when it comes forward to the extent they rely on this

20   sort of inadmissible data.

21          THE COURT:  So is this the same objection you made in

22   the motions in limine?

23          MR. CHALMERS:  Yes and no.  In the motions, I think

24   you're referring to the Daubert motion, Your Honor.  I don't

25   recall a separate motion.  There might have been one, but there

1    is a motion --

2           THE COURT:  Excuse me, I'm sorry, I misspoke.  Go

3    ahead.

4           MR. CHALMERS:  No, I -- there may be a separate motion

5    in limine beyond the Daubert.  I don't recall right now.

6           THE COURT:  Does it matter?

7           MR. CHALMERS:  No.

8           THE COURT:  Okay.

9           MR. CHALMERS:  But the second -- or one part of that

10   -- of that motion had to do with excluding this witness's

11   testimony because it's based on hearsay, which was separate

12   from the Daubert analysis, Your Honor.

13          THE COURT:  But it's also -- it's the exact same point

14   you just made about the data being hearsay and so forth, so I'm

15   just asking you, is there the same objection that you've all

16   ready made and that I've all ready ruled upon?

17          MR. CHALMERS:  I don't think you've ruled upon the

18   second part of it on the hearsay, Your Honor.  I do not recall

19   that.  I think you found that he was -- that he could provide

20   testimony under the Daubert standards.

21          MS. BRETT:  We've briefed this a number of times, this

22   exact issue, and the court has all ready ruled that Doctor

23   Mummolo is competent to testify.  If Mr. Chalmers would like to

24   cross-examine him about the SafeGraph data or the methodology

25   that he used here, he's welcome to do so, but experts are

1  allowed to rely on hearsay in forming their opinions, and

2  that's exactly what Doctor Mummolo did here.

3      MR. CHALMERS:  Of course, the rule says they may

4  consider the hearsay, but it's not admissible.

5      THE COURT:  I'm sorry, I can't hear you.

6      MR. CHALMERS:  The hearsay itself is not admissible.

7  The rule would provide if they rely on; in other words, if they

8  formulate their own opinion, and they are expressing their

9  opinion, yes, part of that may be discussion of hearsay, but

10  that's not presented as part of the opinion, Your Honor.  And

11  so the problem you've got here is, is that the lynchpin of his

12  opinion is hearsay studies and data.

13      THE COURT:  I will let you lay a foundation for this,

14  but this is also the issue that we've been addressing the first

15  two days of trial, which is, this is a bench trial.  I am

16  capable of sorting the wheat from the chaff in terms of

17  inadmissible hearsay versus admissible evidence, and I will do

18  that when I reach my opinion in this case.  Go ahead.

19      MS. BRETT:  Thank you, Your Honor.

20  BY MS. BRETT:

21  Q.  So I think where we left off is you were explaining how --

22  what SafeGraph data measures?

23  A.  Yes.  So SafeGraph maintains a panel or over time data set,

24  roughly ten percent of cell phone users in the United States,

25  so it's via the apps that we all have on our cell phones.

1   These phones emit signals that determine the location of the

2   phone at given points in time.  SafeGraph abrogates and tracks

3   those signals, and then uses those signals in part to determine

4   the home location of cell phone users as well as document their

5   visits to various other points of interest around the country.

6   Q.  Can you explain a little bit about how exactly it does

7   that?

8   A.  Yeah.  So as I said, the company is tracking cell phone

9   users' locations over time, and to determine home location,

10  what it does is it takes a sample of location records from a

11  given user that were collected during overnight hours when

12  people tend to be at home or asleep, and it determines the most

13  common location of the phone during those overnight hours, and

14  infers that that is the home location of the user, and then it

15  periodically takes new samples, and updates that measure for

16  users over time.

17  Q.  And do you understand that because you've studied the

18  SafeGraph methodology?

19  A.  Yes.

20  Q.  Can you conceptualize how that works in an example?

21  A.  Sure.  So if you, say, consider one of my colleagues who

22  works in Princeton, New Jersey, they would -- who lives and

23  works there, their phone would be located overnight hours at

24  their home in Princeton, New Jersey, and if they were tracked

25  by SafeGraph when SafeGraph took a sample of their data,

1    SafeGraph would learn that that's where their phone tends to be

2    during those overnight hours, and make an inference that they

3    reside in Princeton, New Jersey.

4    Q.   Why did you obtain the SafeGraph data for your analysis?

5    A.   So it's very important when studying the enforcement

6    activity of KHP to compare it to some benchmark; in other

7    words, some characterization of who's on the road at a given

8    time, and what opportunities KHP had to conduct traffic stops

9    and take further action.  So I sought different ways of doing

10   this.  One data set that I requested from KHP was images that

11   are generated by license plate readers, some devices that take

12   pictures of passing cars that many law enforcement agencies

13   use.  I was given a sample of that data, but it was quickly

14   apparent that the images were illegible with respect to the

15   state of origin on the license plate, and they couldn't be used

16   for this purpose.  So I turned to the SafeGraph data as an

17   alternative to characterize the composition of people visiting

18   businesses very close to the interstates that I'm studying as

19   an approximation of the composition of road traffic in a place

20   and a time, and this is also a methodology for characterizing

21   human movement and home location that's being increasingly

22   applied in peer reviewed research.

23   Q.   To your knowledge, have other academics used data from

24   SafeGraph in conducting studies of human movement?

25   A.   Yes.  So there have been several recently published

1  studies, human movement during the CoVid-19 pandemic, that

2  sought to estimate the degree to which people complied with

3  lockdown quarantine orders.  So While, et al 2020 and Holts, et

4  al 2020, both published in the National Academy of Sciences.

5  Both relied on SafeGraph data to study that issue.  There's

6  also a study that specifically sought out to validate the

7  accuracy of SafeGraph data for home location.  I'm happy to

8  discuss that.

9  Q.  Please.

10  A.  Lane, et al 2022 published in a peer reviewed journal, and

11  what it does was it studies visitors to Yellowstone National

12  Park, and gave traditional surveys to visitors as they entered

13  the park, and had them self-report where they were traveling

14  from, so their state of origin, and then it collected SafeGraph

15  data from Yellowstone National Park over the same period of

16  time, and compared the two sources to judge SafeGraph's

17  accuracy, and the study found that SafeGraph is highly accurate

18  in determining the shares of visitors from a -- to a place that

19  are coming from a particular state.

20  Q.  And I think you mentioned this, but that was published in a

21  peer reviewed journal?

22  A.  Yes, it was.

23  Q.  And again, that means that researchers, other academics in

24  the field found the reliance on SafeGraph to be

25  methodologically sound?

1  A.  Yes.

2  Q.  Okay.  Is SafeGraph a perfect proxy for home location?

3  A.  No.  Like any social science data set, there is bound to be

4  some amount of error in this data.

5  Q.  Is there any reason to think that SafeGraph data would be

6  less reliable in the context of motorists on a highway versus

7  the visitors to the national park like you just discussed?

8  A.  So there definitely are some issues to think through, and

9  because those are different situations, and I spent a long time

10  thinking about this, and I discuss this in my report, the main

11  issue is that SafeGraph is counting cell phones, but ideally,

12  we would want to count cars, and so issues can arise as a

13  result of that.  For example, you might have more than one

14  person in a car.  For example, you might have three or four

15  people traveling in a car, and they're all from Kansas, and if

16  they're tracked from SafeGraph, we would count them four times

17  when they visit a local business, to take an extreme example.

18  So I've done a lot of work trying to think through whether that

19  type of error could overturn the findings in my report, and

20  happy to discuss the details of that, but the bottom line is

21  that the disparities that I see in the report are of such a

22  magnitude that even if we considered very extreme examples of

23  that type of measurement error, that there would still be

24  disparities that remain.

25  Q.  And I want to talk about that when we walk through your

1    opinions in just a moment.

2    A.   Uh-huh.

3    Q.   So we've covered the traffic data from KHP, the K-DOT data

4    and the SafeGraph data.  What other data sets did you rely on?

5    A.   So I was provided with roughly 1,000 reports documenting

6    canine sniffs conducted during KHP traffic stops.

7    Q.   Okay.  And I want to just for the court's reference call up

8    a demonstrative here.  Could we please bring up Exhibit 55,

9    Page 45 of that PDF, please?  Is this an example of the type of

10   canine reports that you were provided?

11   A.   Yes.

12   Q.   We can bring that down.  How many canine reports were you

13   provided with?

14   A.   Roughly a thousand.

15   Q.   And were all of these from the Kansas Highway Patrol?

16   A.   No, a small percentage of them were documents from other

17   agencies that assisted Kansas Highway Patrol during their

18   traffic stops.  So on occasion, if Kansas Highway Patrol stops

19   a motorist, and they want to perform a canine sniff, and the

20   canine is not available, another nearby agency may come and

21   assist, and so the report would be coming from that agency.

22   Q.   How many of these canine reports did you use for your

23   analysis?

24   A.   Depending on the analysis, I used between roughly 430 and

25   920 of these thousand canine reports.

1    Q.  Why didn't you use all of the 1,000 that you were given?

2    A.  A combination of reasons.  So in some cases, the documents

3    didn't contain complete information, or at least the pieces of

4    information that I needed for my analysis.  So things like the

5    state of origin of the detained person, detained vehicle, the

6    date, time, location and whether any drugs or contraband were

7    discovered at the conclusion of these sniffs.  In addition, in

8    the analysis, I'm comparing or I'm cross-referencing the canine

9    sniff data against the other data sets I mentioned, and I have

10   to limit my analysis to places where all those data sets are

11   present at the same time.

12   Q.  And what was the final data set that you used in your

13   report?

14   A.  I also -- so the last data drawn are data from the Centers

15   For Disease Control on traffic fatalities by location in Kansas

16   and Colorado.

17   Q.  Why was that data source important to your analysis?

18   A.  I used this in a supplementary analysis in Opinion Three.

19   So Opinion Three basically finds that even if out-of-state

20   motorists tended to speed at much, much higher rates than

21   in-state motorists, we would still see disparities in speeding

22   stops that disfavored out-of-state motorists.  And so I wanted

23   to try to gauge the possibility of out-of-state motorists

24   exhibiting drastically higher rates of speeding.  Speeding is

25   highly correlated with road fatalities, and so an observable

1    implication of that hypothetical is that drivers in Colorado

2    may exhibit much higher road fatalities than drivers in Kansas,

3    and that's why the CDC data was used.

4    Q.   And we'll get to that specific opinion finding in a moment.

5    A.   Sure.

6    Q.   So let's begin walking through these opinions.  What was

7    the first opinion that you formed in your report?

8    A.   The first opinion is that out-of-state motorists are much

9    more likely to be stopped than in-state motorists who are

10   travelling in the same places and times.  Put differently,

11   out-of-state motorists are stopped disproportionately relative

12   to their share of drivers on the road.

13   Q.   How did you form this opinion?

14   A.   So using a combination of the data sets I've described, I

15   conducted a data set where each row in the data pertains to a

16   particular time and place, so a particular stretch of an

17   interstate highway in a particular county during a particular

18   four-hour period on a particular day, and in each of those

19   place, time observations, I measure the volume of passing

20   traffic, the composition of passing traffic in terms of

21   in-state, out-of-state status and KHP's stopping activity.

22   Q.   Is there a name for that type of analysis?

23   A.   Yes, this is a benchmark analysis, so named because I'm

24   comparing the activity of KHP and KHP in stopping motorists of

25   a particular group to that group's prevalence in the area at

1    that time.

2    Q.  Why do a benchmark analysis?

3    A.  It's very difficult to make sense of law enforcement data

4    without -- in situations like this without some sort of

5    benchmark.  So for example, if I just examined data on stops

6    made by KHP, and I observed that 20 percent of their stops are

7    of out-of-state motorists, I have no idea whether that's a high

8    percentage or a low percentage, or a percentage that's

9    different than what I should expect, because I don't know how

10   many opportunities KHP had to stop an out-of-state motorist.

11   It could be that that's a perfect representation of the drivers

12   on the road, and so to determine that, you need to characterize

13   the benchmark population, which in this case is the composition

14   of overall drivers on the road.

15   Q.  So what data did you need to do that benchmark analysis?

16   A.  So the KHP stopping data to measure the stopping activity,

17   and then a combination of the K-DOT traffic censor data which

18   measures traffic volume, and the SafeGraph mobile location data

19   which measures the composition of visitors to nearby

20   businesses.

21   Q.  Why did you need to rely on the SafeGraph data?

22   A.  So again, I need a way of characterizing the composition of

23   drivers on the road.  The K-DOT data is very helpful.  It tells

24   me on an hour by hour basis how many passing cars there are and

25   even what speeds they're traveling at, but it doesn't give me

1    the state of origin for those cars.  So as a proxy for that

2    proportion, I used the SafeGraph data which measures the state

3    of origin of cell phones that are known to have visited

4    businesses that are located within quarter mile of the

5    interstates I'm studying, so basically businesses that are

6    right off the interstate highway, and I can use the proportions

7    represented in the SafeGraph data in combination with the

8    traffic volume data to determine how many out-of-state cars

9    there were on the road at a given time.

10   Q.  Was data of that nature available from the Kansas Highway

11   Patrol as you understand it?

12   A.  No, it was not.

13   Q.  Why not just look at the total number of stops of people

14   who are coming from out-of-state, for example?

15   A.  So if the question -- and the question I'm trying to answer

16   is whether out-of-state drivers are more likely to be stopped

17   than in-state drivers, so that requires an estimate of the

18   probability that a member of one of these groups is stopped,

19   and so to estimate that, we would want -- we would need to know

20   how many stops occurred for that group out of the total number

21   of times a stop could have occurred, all right, so total number

22   of times a member of that group passed by that stretch of road.

23   If I just looked at stop total, I would only have the numerator

24   in that fraction, and similar to the explanation for why use a

25   benchmark analysis, it would be un-interpretable on its own.  I

1   wouldn't know without the reference population data whether it

2   was a lot of stops or a little stop, you know, very few stops.

3   Q.   So just wouldn't tell you much?

4   A.   That's right, for this particular question, yeah.

5   Q.   And so when you conducted your benchmark analysis, what

6   disparity did you find?

7   A.   So I expressed the -- first, I should explain the final

8   statistic that's computed in this analysis.  So basically, what

9   I do is go through each of these places and times using this

10  combination of data, compute the probability that an

11  out-of-state motorist is stopped, and subtract from the

12  probability that an in-state motorist is stopped.  If there's

13  no difference in those rates, that disparity would be 0.

14  Whatever the disparity is, I then multiply it by the number of

15  out-of-state stops that occurred at that time, and that gives

16  me an estimate of the number of excess out-of-state stops in

17  that place and time, over and above what we would expect if the

18  two groups were stopped at equal rates.  So then I do that for

19  each place and time, and aggregate across those places and

20  time, and I produce an estimate of the number of excess stops

21  of out-of-state drivers.

22  Q.   And so what did you find here?

23  A.   So that estimate in this case was over 50,000 excess

24  out-of-state stops that are due to the fact that that group is

25  stopped at a higher rate, that they have a higher chance of

1  being stopped in the same places and times.  To put that in

2  context, that's more than seventy percent of the out-of-state

3  stops that occurred by -- that were conducted by KHP in those

4  places and times.

5  Q.  So more than seventy percent of the stops conducted by KHP

6  were in excess of what you would expect to see based on the

7  percentage of out-of-state drivers on the road at the places,

8  times, dates that you study.

9  A.  That's right.

10  Q.  Okay.  I'd like to call up another Demonstrative Exhibit

11  55, PDF Page 41, please, so should go to Page 41.  One moment,

12  Your Honor.

13       THE COURT:  Uh-huh.

14  BY MS. BRETT:

15  Q.  Okay.  Doctor Mummolo, called up what is Exhibit 4 from

16  your report, which is Trial Exhibit 55 and PDF Page 41.  What

17  does this chart show?

18  A.  So this is a type of chart called a scatter plot.  So it

19  examines two features of data point, and tells you how they

20  correspond to one another.  So along the X axis or the

21  horizontal axis is a measure of the proportion of drivers on a

22  road who are out-of-state at a given place and time, and along

23  the Y axis, the vertical axis is the proportion of KHP stops in

24  that place and time made up of drivers from out-of-state, and

25  each of these dots represents one of those place, time

1    observations I've described, so characterizing the traffic in a

2    particular county or on a particular highway during the

3    four-hour period on a day.  And so -- oh, and in addition, the

4    dots are scaled such that times and places where more stops

5    occurred appear larger.  So this is basically comparing whether

6    the proportion of drivers on the road were out-of-state

7    corresponds to the proportion of drivers in the KHP stop data

8    who are out-of-state.  The dashed 45-degree line represents

9    parody.  So if an observation is on that line, it means that

10   the KHP stops are representative of the composition of on the

11   road in terms of in-state, out-of-state status, and any dot

12   above that line mean out-of-state drivers are overrepresented

13   in KHP stops relative to their share on the road.

14   Q.   So if KHP was stopping individuals of out-of-state plates

15   in rough proportion to the total population that out-of-state

16   drivers are on roadways that you studied, where would you

17   expect to see the plots in this chart?

18   A.   You would expect to see these data points clustered around

19   this diagonal 45-degree line.

20   Q.   And instead, where do we see most of the plots here?

21   A.   Vast majority of data points and the corresponding to the

22   vast majority of stops is situated above the 45-degree line,

23   which indicates dramatic overrepresentation of out-of-state

24   drivers in KHP stops.

25   Q.   We can pull this down.  Thank you.  Doctor Mummolo, could

1   that disparity that you found just be a fluke, like the result

2   of a particularly odd data set or something like that?

3   A.   Yes.  So one of the main goals in statistical analysis is

4   to try to test for exactly this possibly to -- there's

5   uncertainty in any analysis, and we want to have a principled

6   way of characterizing that uncertainty.  In particular, we want

7   to know the probability that a particular result is due to

8   chance.  So we know -- like we have a sample of data, we know

9   that if we went out and got a new sample of data, did the same

10  analysis, we'd get slightly different numbers.  There would be

11  sample to sample variation in those results, and so what I do

12  in my report is use very well established statistical

13  techniques to estimate what are the chances of observing a

14  disparity in stop rates this extreme, if in fact, it were the

15  case that there's no disparity in stop rates.

16  Q.   What did you find?

17  A.   I found that the probability of that would be around one

18  percent, which is well below the standard threshold of five

19  percent for determining a statistically significant disparity.

20  Q.   So does that one percent tell you anything about whether

21  the disparity that you found in the data that you examined was

22  unrepresentative of the highway patrol's practices in some

23  degree?

24  A.   Yes, it tells me there's an extremely low likelihood that

25  this disparity is due to any form of sampling error, and so at

1    conventional levels of certainty in social sciences, we can

2    reject the hypothesis of equal stopping rates between these two

3    groups.  That's not what's going on according to the data.

4    Q.  Is it possible that the SafeGraph data that you relied on

5    to reach this conclusion overestimates the total share of

6    out-of-state drivers or in-state drivers that are on the

7    highways that you studied?

8    A.  Umm, yes, if there's error in the data set, there could be

9    miscalculations in the shares of in-state versus out-of-state

10   drivers, and give the result.  The particular concern would be

11   if the SafeGraph data was underestimating the share of

12   out-of-state drivers on the road, because if that share is

13   artificially small, it's going to be easier to determine that

14   there's overrepresentation of out-of-state drivers in the KHP

15   stopping data, and that's something I spent a long time

16   examining.

17   Q.  And what did you find in that examination?

18   A.  I basically found that the disparity is so large that even

19   if there was an implausibly extreme amount of this type of

20   measurement error in the data, we would still conclude that

21   out-of-state drivers are overrepresented in the KHP stopping

22   data, and it's actually very straight forward to use some of

23   the top line numbers in the report to demonstrate that.

24   Q.  Could you demonstrate that for us?

25   A.  Yes.

1           MS. BRETT:  Your Honor, is it okay if Doctor Mummolo

2    uses the white board to demonstrate what he's talking about?

3           THE COURT:  Sure.

4           MS. BRETT:  I believe there's a pen there, Doctor

5    Mummolo.

6           THE WITNESS:  Umm, so if you look at Opinion One, it

7    finds that 66 percent of KHP stops are out-of-state, or OOS,

8    and so the question is, can measurement error in the SafeGraph

9    data lead us to the faulty conclusion that this is over and

10   above what we would expect based on their composition on the

11   road?

12          THE COURT:  Can I just stop and ask you a question

13   just so the record is crystal clear?  Are you citing the

14   case -- the case -- SafeGraph data as you're relying, even

15   though it's hearsay, you're relying on it for your opinions,

16   and that's why the court should consider it?

17          THE WITNESS:  So questions about hearsay I think

18   are -- are legal in nature.  I can speak to the validity of the

19   data and the accuracy of the data.

20          THE COURT:  Okay.  First of all, let me just ask.  Did

21   you rely on the SafeGraph data in forming the opinions which

22   you reach in your expert report?

23          THE WITNESS:  Yes, I did.

24          THE COURT:  Okay.  That's all I need to know.  Thank

25   you.  Go ahead.

1          THE WITNESS:  Okay.  So as -- as we said, there may be

2     some error in this data.  One of the main concerns is that the

3     data are counting cell phones, when ideally, we'd be wanting to

4     count cars.  So if we just think of a simple example based on

5     the results in the report, let's consider 100 cell phones

6     detected at a business along the interstate.  What I find is

7     that 22 out of 100 of these phones are out-of-state, and 78 out

8     of 100 are in-state phones.  So the concern here is that we're

9     overestimating this group and underestimating this group.  How

10    could this happen?  Well, this could happen if more than one

11    Kansan is in a car and goes to a particular business.  So say

12    there's four Kansans in the car, and four of their phones are

13    counted, that might lead to overrepresentation.  But as is the

14    case with all the uses of the SafeGraph data in the report,

15    this is only a concern if that measurement error is

16    differential between the two groups.  So if that error applies

17    to both groups roughly equally, there's no issue.  So what we

18    can do is consider a very extreme implausible example of this

19    type of error, recalculate the result, and then see if this

20    still represents an overrepresentation.  So why don't we

21    consider the scenario where every single out-of-state driver is

22    riding alone, so this actually represents 22 cars, which would

23    be the largest this group could be, the most conservative

24    assumption given the SafeGraph data.  And then let's assume

25    that every Kansas cell phone or every Kansas motorist has four

1    people to a car, and so what this would mean is that this 78

2    out of 100 doesn't represent 78 cars, it actually represented

3    78 divided by four cars, or 19 cars.  So what does this mean?

4    What is the share of out-of-state drivers on the road if this

5    is what's going on?  It would mean that the share of

6    out-of-state drivers on the road is 22 out of 22 plus 19 cars

7    rather than 100 cell phones, which is approximately equal to 54

8    percent, which is still way less than the 66 percent

9    composition we see in the KHP stop data.  So even in this

10   extreme example where every single Kansan has four persons to a

11   car, and every single out-of-state driver is riding alone, both

12   of which we know not to be true, we would still determine that

13   out-of-state drivers are overrepresented in the data.  In fact,

14   you would have to increase the scenario to a spot where Kansans

15   are riding seven to a car, and out-of-state drivers are riding

16   all solo before these numbers reach a parody.  And so that's

17   why I conclude that while there may be some error in the data,

18   the overall conclusion of disproportionate stopping is not

19   being driven by that error, it can't be plausibly driven by it;

20   the disparity is just too large.

21   BY MS. BRETT:

22   Q.   Thank you, Doctor Mummulo.  So does that opinion that you

23   formed Opinion One, does that tell you the reasons why KHP

24   might be stopping out-of-state drivers at a disproportionate

25   rate?

1   A.   It does not directly tell me the reasons they're being

2   stopped.  It rules out a lot of possible implied explanations

3   dealing with road conditions, because we're looking at drivers

4   in similar places and times, but it doesn't -- it doesn't relay

5   every explanation.

6   Q.   Let's move on to Opinion Two, then.  Did you examine how

7   the behavior of different drivers might impact KHP's stop

8   practices?

9   A.   Yes.  So Opinion Two takes direct aim at this.  And I'll

10   turn -- I think the leading alternative explanation, aside from

11   disparate enforcement, which is that out-of-state drivers

12   simply violate traffic law more often, and that's why they're

13   stopped at such high rates.  And so Opinion Two examines the

14   potential for differential speeding behavior to account for the

15   disparity in KHP stops.

16   Q.   What did you examine in your analysis for Opinion Two?

17   A.   So I examined -- it's very similar to the analysis in

18   Opinion One, except I'm sub-setting the data to focus on stops

19   that were made for violating speed limits on the interstate,

20   and I'm using that to try to approximate whether out-of-state

21   drivers who are speeding are more likely to be stopped than

22   in-state drivers who are speeding, and determining whether

23   disparities remain when looking at the data in this way.

24   Q.   Why -- why speeding?

25   A.   For one, speeding is the most common reason given for a

1    stop in the KHP data set.  It's also something that I have some

2    leverage on in terms of being able to measure the ground truth

3    in the driving population, because the K-DOT traffic sensor

4    data records the speed of each passing car, so I can

5    characterize the size of the speeding population in each place

6    and time.

7    Q.  And what -- how did you do the analysis for Opinion Two?

8    A.  So Opinion Two does the same thing.  It goes place by

9    place, time by time, and says, what is the approximate chance

10   of an out-of-state driver who is speeding being stopped for

11   speeding, and subtracting off the chance of an in-state driver

12   speeding being stopped for speeding, and then multiplying by

13   the number of out-of-state speeding stops to determine if there

14   are excess speeding stops of out-of-state drivers.

15   Q.  And is that a physically reliable methodology for doing

16   this type of analysis?

17   A.  Yes.

18   Q.  Did you have any reliable data on the share of speeding

19   cars on Kansas highways that are in-state versus out-of-state

20   drivers?

21   A.  So I don't have a direct measure of the share of speeders

22   from each group, and so similar to the example we just walked

23   through, what I do in Opinions Two and Three is try to consider

24   what are plausible rates of speeding for these two groups, and

25   then how much would speeding behavior have to diverge between

1    these two groups to eliminate excess speeding stops of

2    out-of-state drivers.  And so in Opinion Two, I basically used

3    as a starting off point the assumption that the two groups

4    speed at equal rates; that is, the share of speeders made up of

5    out-of-state drivers is the same as the share of out-of-state

6    drivers on the road, and then I later relaxed that assumption

7    to see if -- how large of a speeding behavior differential

8    would have to be to eliminate the result.

9    Q.   And what did you find as a part of this analysis?

10   A.   So in Opinion Two, when we assumed equal speeding behavior

11   across the two groups, I find more than 20,000 excess speeding

12   stops in these places and times of out-of-state drivers, which

13   is again more than 70 percent of the out-of-state speeding

14   stops conducted by KHP in the same places and times.

15   Q.   Did you say more than 70 percent or around 70 percent?  I

16   didn't hear you.

17   A.   That's right.  I believe it's just under 70 percent.

18   Q.   And so that would mean how many -- what -- roughly what

19   percentage of interstate speeding traffic would be

20   out-of-state?

21   A.   Interstate or --

22   Q.   Sorry, of the highway speeding traffic would have been from

23   out-of-state drivers?

24   A.   So in this analysis, the estimate is -- it was roughly

25   35 percent of speeding traffic would be out-of-state.

1   Q.  And again, here, why not just look at the total number of

2   stops for speeding to get the measurement you're looking for?

3   A.  Umm, the speeding stops in isolation wouldn't tell us if a

4   group is over or underrepresented in the data.  We have to have

5   some approximation of the population of speeders in each group

6   on the road, and so this analysis is a jumping off point for

7   that investigation.

8   Q.  And what does that tell you, if anything, about the highway

9   patrol's enforcement practices regarding speeding?

10  A.  So Opinion Two on its own says that if it is the case that

11  the two groups speed at roughly equal rates, out-of-state

12  drivers are more likely to be pulled over for speeding than

13  in-state drivers, far more likely.  In other words, even though

14  they're in the same places and times and behaving in the same

15  way, they're subjected to different enforcement activity.

16  Q.  So that brings us to Opinion Three, I believe.  Did you

17  study any alternative explanations for the disparity in

18  speeding stops between in-state and out-of-state drivers?

19  A.  Yes.  So Opinion Three is called a sensitivity analysis.

20  Similar to the previous example, a sensitivity analysis is

21  basically asking how wrong would these estimates have to be to

22  overturn the finding, to overturn the conclusion, and I think I

23  took this very seriously, because as I said, I'm using a proxy

24  measure in Opinion Two for the share of speeders represented by

25  out-of-state drivers.  If it's the case that out-of-state

1  drivers speed more than in-state drivers, perhaps this

2  disparity is explainable in that way.  And so what Opinion

3  Three does is essentially consider many, many incremental

4  increases in the share of speeders represented by out-of-state

5  drivers, and tests how much will we have to increase that share

6  before excess stops go to 0?

7  Q.  And what did you find?

8  A.  So the way I did this was I went through, again, each of

9  these place, time observations, and took the share of speeders

10  represented by out-of-state drivers, and increased that one

11  percentage point at a time, and I did that for the whole data

12  set, recomputed the disparity, and then moved to the next

13  increment, and what I found was that we have to increase that

14  proportion, again, the proportion of speeders made up of

15  out-of-state drivers by 23 percentage points before the

16  estimated disparity in speed stops disappears.  So it's a very

17  large increase, especially since the estimates are that

18  out-of-state drivers only occupy between 25 and 35 percent of

19  the road, and you can do some Algebra with that result, and

20  reexpress it, and another way of stating that is, it would have

21  to be the case that roughly 88 percent of out-of-state drivers

22  speed in these places and times, while only 29 percent of

23  in-state drivers speed in these places and times for these

24  stopping rates to be equal.

25  Q.  Did you visualize the findings of your sensitivity analysis

1    in your report?

2    A.   Yes.

3    Q.   I'd like to call up Exhibit 55, PDF Page 42, please.

4    Should be the next one.  There we go.  And can you zoom in on

5    that chart, please, or graph?  Can you explain what we can see

6    in this graph, Doctor Mummolo?

7    A.   Yes.  So this is a visual representation of that

8    incremental sensitivity analysis I described.  So on the bottom

9    axis, the horizontal axis is the hypothetical

10   overrepresentation of out-of-state drivers among speeders, so

11   at the 0 mark on the horizontal, is the -- basically the

12   assumption in Opinion Two.  It's that out-of-state drivers are

13   -- make up the same share of speeders that they do of the

14   general driving population, so there's no overrepresentation.

15   The vertical axis or the Y axis is the estimated proportion of

16   discriminatory stops, or stops that cannot be explained by

17   differential behavior, or differential conditions, according to

18   the analysis I just described.  And so the X in the upper left

19   corner of the plot is the estimate from my analysis in Opinion

20   Two, which is that roughly 70 percent of out-of-state stops are

21   excess stops, and then as we move to the right, I'm basically

22   asking what would be the estimate of excess stops if

23   out-of-state drivers occupied a larger and larger share of the

24   speeding population, and you can see that the estimated

25   disparity declines along this curve until we reach about a 23

1    percentage point increase at which point there's no disparity.

2    Q.   Do you discuss the rate or level of disparity in your

3    report?

4    A.   Yes, I did.

5    Q.   Okay.  And did your analysis show that out-of-state drivers

6    would have to speed at about three times the rate of in-state

7    drivers to account for the disparity in speeding stops that are

8    conducted by KHP?

9    A.   Yes.  So another way of expressing the same result is to

10   say that to get this disparity to go to 0, it would have to be

11   the case that 88 percent of out-of-state drivers speed, where

12   only 29 percent of in-state drivers speed, so roughly three

13   times the rate of speeding in one group verse the other.

14   Q.   Is there any reason to think that might be the case?

15   A.   Not to my knowledge.

16   Q.   Did you do any analysis to test whether or not that might

17   be the case?

18   A.   Yes.  So given the large disparity in speeding behavior

19   that would be necessary to eliminate this finding, three times

20   the rate of speeding, I thought that a plausible implication

21   might be that drivers from out-of-state tend -- are more likely

22   to die in road fatalities.  If they're speeding at three times

23   the rate, we would predict that they would get in more fatal

24   road accidents.  So this is where I used the aforementioned

25   Centers For Disease Control data on traffic road fatalities to

1    compare the rates of road deaths in Colorado to the rates of

2    road deaths in Kansas.

3    Q.  And what did you find?

4    A.  I find that there's actually a slightly higher rate of road

5    fatalities in Kansas than in Colorado, and so it's basically

6    the opposite of what we would express if Colorado drivers sped

7    at three times the rate of Kansas drivers.

8    Q.  So what does that suggest to you with regards to the

9    highway patrol's speeding stop practices?

10   A.  Umm, out-of-state drivers are more likely to be stopped,

11   they're more likely to be stopped for speeding, and based on

12   the totality of these analyses, it's my opinion that a

13   differential speeding behavior cannot plausibly explain that

14   disparity.  The amount of excess speeding that would have to be

15   going on in the out-of-state group seems implausibly large.

16   Q.  I want to move now to your fourth opinion, Doctor Mummolo.

17   A.  Uh-huh.

18   Q.  Did you examine the highway patrol's canine sniff practices

19   following traffic stops?

20   A.  Yes, I did.

21   Q.  What analysis did you conduct?

22   A.  So the first analysis was another form of a benchmark

23   analysis like in the stopping analysis where I sought to ask or

24   to estimate whether out-of-state drivers are more likely to be

25   subjected to a canine sniff than in-state drivers using two

1   different benchmarks.

2   Q.  Can we talk through the first of those benchmarks?

3   A.  Yes.  So the first -- pardon me, the first benchmark

4   analysis uses the SafeGraph mobile location data to

5   characterize the composition of drivers on the road in the

6   places and times where canine sniffs were occurring.  And so

7   taking the overlap of those two data sets, I analyzed about 430

8   canine sniff reports, estimate the composition of the drivers

9   and the canine sniff events, and compare that to the

10  composition of drivers on the road at that time.

11  Q.  And what did you find?

12  A.  So I find that out of about 430 canine sniffs, 399 are of

13  out-of-state drivers.  So more than 90 percent of the canine

14  sniffs are of out-of-state drivers.  However, the SafeGraph

15  data indicates that out-of-state drivers represent only about

16  35 percent of the drivers on the road at that time.

17  Q.  And was that the full analysis you did for Benchmark One?

18  A.  Yes, for Benchmark One.

19  Q.  And then what about Benchmark Two?

20  A.  So one explanation for the inordinate share of out-of-state

21  drivers in the canine sniff data is as we just saw,

22  out-of-state drivers just tend to be stopped more often, so

23  could be the case that just because they're stopped more often,

24  this sort of mechanically leads to a greater chance of a canine

25  sniff.  And so in the second benchmark analysis, I benchmark

1    against the KHP stopping data rather than the driving

2    population.  And so I ask, given the share of out-of-state

3    drivers in these places and times that were stopped by KHP, are

4    we seeing more canine sniffs of out-of-state drivers than we do

5    in-state drivers?

6    Q.  What did you find?

7    A.  I found that even if the -- even relative to the KHP

8    stopping data, so they're stopped, you know, around 77 percent

9    of cases in the KHP stopping data, they still represent over

10    90 percent of cases in the canine sniff data.  So it's not

11    simply the case that out-of-state drivers are subjected to

12    canine sniffs because they're stopped more often.  Even after

13    they're stopped, they're more likely to be subjected to a

14    canine sniff.

15    Q.  Did you test for the statistical significance of those two

16    findings?

17    A.  Yes, I did.

18    Q.  And what did you find?

19    A.  Those disparity tests are statistically significant in both

20    cases.

21    Q.  And does that mean that the likelihood of this disparity

22    happening by chance is low?

23    A.  Yes, the chance of observing disparities that large if it

24    were the case, but in a sample of data, if it were the case

25    that no disparities existed are approaching 0 in these cases.

1    Q.   I think that brings us to Opinion Five now.  Did you

2    examine whether canine sniffs of out-of-state drivers at

3    disproportionate rates led to the discovery of more drugs?

4    A.   Yes, I did.

5    Q.   How did you conduct that analysis?

6    A.   So Opinion Five features a very common analysis in the

7    statistical literature on discrimination called an outcome

8    test.  It's also sometimes called a hit rate analysis.

9    Q.   What's the logic of an outcome test or a hit rate analysis?

10   A.   So an outcome test in a law enforcement context, typically,

11   we ask -- we want to know whether one group of people is being

12   subjected to searches by police according to a different

13   standard of reasonable suspicion than the other.  So in other

14   words, whether officers have a lower bar for determining

15   whether they should search somebody in one group verse the

16   other, and what an outcome test say, basically that's very hard

17   to determine, but one observable implication of that pattern

18   would be that we would be less likely to find contraband at the

19   end of the searches in one group than the other, because if the

20   officers are implementing a lower bar, they're searching with

21   less evidence to do so, we would expect them to be less

22   successful in discovering contraband in that group.  And so

23   what the hit rate analysis does is say, out of all the canine

24   sniffs of in-state and out-of-state drivers, how often are

25   drugs or contraband discovered, and then we compare those

1  rates.

2  Q.  So what did you find?

3  A.  I found that the estimated hit rate for the discovery of

4  some measurable amount of illegal drugs was actually higher

5  when searching in-state motorists than out-of-state motorists.

6  However, there is a lot of uncertainty -- statistical

7  uncertainty around those estimates.  So my ultimate conclusion

8  is that we can't reject the hypothesis that there's actually no

9  difference in hit rates; in other words, there's no evidence

10  that searches, canine sniffs lead to the discovery of drugs at

11  a higher rate in one group verse the other.

12  Q.  So you didn't find a likelihood that out-of-state drivers

13  would be found to have contraband more than in-state drivers?

14  A.  Correct.

15  Q.  Did you study different types of contraband or different

16  quantities of contraband in this analysis?

17  A.  Yeah.  So there were I think two -- two plausible outcomes

18  that I could code given the content of the canine sniff

19  reports.  So I did this in two different ways.  One was the

20  discovery of some amount of drugs, and the other was the

21  discovery of either what was described as drug residue or drug

22  gleanings, or drug paraphernalia such as a pipe at the

23  conclusion of a search.

24  Q.  And was there a difference between those two categories in

25  terms of the hit rate that you found?

1  A.  So the hit rates were different, but the ultimate

2  conclusion is the same, which is that there's no detectable

3  difference in hit rates between in-state and out-of-state

4  drivers.

5  Q.  And what's the purpose of engaging in this hit rate

6  analysis?

7  A.  Umm, we want to have some idea of whether officers are

8  applying the same standards when electing to conduct canine

9  sniffs versus one group -- in one group verse another.

10  Q.  So based on this outcome test, do you have any opinions

11  about whether the highway patrol is more likely to find drugs

12  when they search out-of-state drivers?

13  A.  Yes.  I would say based on this analysis, there's no

14  statistical evidence that out-of-state drivers are more likely

15  to be found holding illegal drugs or contraband at the

16  conclusion of a canine sniff.

17  Q.  How do all of these various opinions that we just walked

18  through interact with one another or hang together?

19  THE COURT:  Before we go to that, can I ask kind of a

20  related question?  You're talking just about the residents

21  in-state or out-of-state of the driver or the car.  We've heard

22  a lot of testimony about other factors that the troopers may

23  consider to be suspicious, like are they traveling at day, are

24  they traveling during the night, are they -- when they stop, do

25  they seem nervous, do they seem not nervous, do they make eye

1  contact, do they not make eye contact, do they have candy

2  wrappers in the car, I mean, are they traveling to meet their

3  nephew, you know, and is there any data base validation for any

4  of these factors as being like a tool that validly separates

5  innocent conduct from culpable conduct?

6  THE WITNESS:  Yeah.  So this is precisely the

7  motivation behind the design of the outcome test, is that

8  officers have some reason to determine that in this case, a

9  canine sniff is likely, and we can't observe all the reasons

10  that might be.  Even if we had very detailed documentation, we

11  might not know what's going on in an officer's head.  So the

12  outcome test is designed to be sort of an indirect test of a

13  differential standard to say that whatever their reasons are

14  for searching these two groups, if they're holding the two

15  groups to the same standard, we should discover drugs at the

16  same rate.  And so it's sort of an indirect way of getting at

17  those reasonable suspicion probable cause determinations.

18  THE COURT:  But -- so I guess -- so within the field

19  of forensic evaluation of reasonable suspicion standards, is,

20  is this just junk science to say that if a person is traveling

21  at night, they're more likely to be a criminal, and if they're

22  traveling during the day, they're not likely to be a criminal

23  or vice-versa?  I mean, is there any legitimacy tested and

24  proven for any of these factors?

25  THE WITNESS:  Umm, in terms of whether features of

1  like the circumstances or the behavior of suspects can predict

2  the likelihood of possessing drugs?

3          THE COURT:  Uh-huh, right, or contraband.

4          THE WITNESS:  Yeah, I think you would certainly see

5  these in data on police stops.  There are differential rates of

6  discovering things at night verse during the day, and according

7  to my recollection, I'd have to examine data to be sure, but

8  again, the outcome test is sort of designed to account for

9  these things, but by examining how the encounters end up at the

10  end of the day.

11          THE COURT:  Uh-huh.

12          MS. BRETT:  Can I ask a follow-up question that might

13  be clarifying here as well, Your Honor?

14          THE COURT:  Sure.

15  BY MS. BRETT:

16  Q.  Doctor Mummolo, in the canine reports that you were given

17  to code, did you see a list of reasonable suspicion factors in

18  every canine report that you received?

19  A.  No, there was wide variation in the amount of detail

20  contained in these reports.

21  Q.  Did some reports contain no justification for detention at

22  all?

23  A.  Yes.  So often, a report will be just a canine handler

24  saying, I was called to the scene, I approached the vehicle,

25  and I started my search, and here's what happened.

1  Q.  Would there have been any way to code the list of factors

2  that the court was just describing to you to test an outcome

3  test based on those factors?

4  A.  No.  There's limited information in these documents, so we

5  know that -- we know the date, time, location, state of origin,

6  and the outcome.  Beyond that, sometimes you get more detail,

7  sometimes you don't, but they're not consistently recorded in a

8  way that they could be used in the analysis.

9  Q.  So there would be no way to analyze the hit rate for

10  something like the time of night that the person was driving?

11  A.  There -- the data -- actually, we do have time of day, but

12  there's not enough observations to consider this as an

13  additional factor.

14  Q.  What about candy wrappers in the car?

15  A.  Yeah.  We wouldn't know in every case whether there was a

16  candy wrapper in the car, or whether the officer considered

17  that in their reasoning.

18  Q.  Okay.

19      MS. BRETT:  Does that help, Your Honor?

20      THE COURT:  Uh-huh.

21  BY MS. BRETT:

22  Q.  So I think I was asking you, how do all the opinions that

23  you formed in the course of your analysis interact with one

24  another?

25  A.  Umm, I would say that they are indicative of a -- a series

1  of decisions, a chain of decisions that officers are making

2  when enforcing traffic law in Kansas.  So policing is a

3  multi-stage process.  Officers make a series of decisions that

4  can end up having a great impact on civilians from the decision

5  to stop somebody to the decision to search somebody, to cite

6  them, use force, etcetera, and what this is showing is that

7  there appears to be disparity enforcement against out-of-state

8  drivers at several of those decision points, so out-of-state

9  drivers are more likely to be stopped, they're more likely to

10  be stopped for speeding based on an implausible speeding

11  indicator, and they're more likely to be subjected to canine

12  sniffs, but they're not more likely to be found to be holding

13  illegal drugs.

14  Q.  At any point in your engagement in this case, were you

15  asked to analyze a claim by the defendant that it's

16  statistically unlikely that any particular person will be

17  stopped by the Kansas Highway Patrol?

18  A.  Yes.  So sometime last year, I was asked to review a

19  document I believe submitted to the court by the defendants

20  that made such a claim.

21  Q.  Can you explain what the argument was that you were asked

22  to respond to?

23  A.  Yes.  As I recall, the document purported to show estimates

24  of traffic censor activations from K-DOT, so the same data

25  source I'm relying on, measuring how many cars passed by

1   various locations around Kansas in a given year.  It then used

2   data on traffic stops by KHP recorded over the same period of

3   time.  It divided the number of traffic stops made by the

4   number of traffic censor activations, and came up with a

5   percentage that I believe was less than one percent, and

6   concluded that the average motorist has less than a one percent

7   chance of being stopped by the KHP in Kansas.

8   Q.  What was your response to that analysis, or argument, I

9   should say?

10  A.  Yeah, I -- I took issue with this analysis for several

11  reasons.  I don't think that conclusion follows from the data.

12  So the first issue is that the K-DOT data are not measuring

13  motorists, they're measuring passing cars, and we know

14  motorists can activate these censors multiple times.  Anybody

15  commuting to and from work would activate the same sensor at

16  least twice.

17           THE COURT:  Like, where are these sensors, and what

18  are they measuring?  I'm not familiar with them.

19           THE WITNESS:  Sure.  In my -- they're all over the

20  state.  In my report, I'm looking at the ones primarily

21  situated west to east along I-70, and so these are censors in

22  the road that say every hour of the day how many cars pass by

23  X, and what is -- I'm sorry, what is the distribution of speed

24  of those cars.  So how many were going five miles under, five

25  miles over, etcetera, and these are possibly collected every

1    hour of the day and maintained by K-DOT for these locations.

2             THE COURT:  And so they're embedded in the pavement?

3             THE WITNESS:  That's my understanding, yes.

4             THE COURT:  And do you know why they want this data?

5             THE WITNESS:  Yeah.  Departments of transportation

6    want to keep records on traffic volume because they can help

7    inform things like how often road maintenance needs to be -- to

8    be done, they may inform road safety or road hazard conditions,

9    so if they see a spike in activity around an area, they might

10   want to look up putting up signage or things of that nature.

11            THE COURT:  Sorry to interrupt.  Go ahead.

12            MS. BRETT:  No, no problem.

13   BY MS. BRETT:

14   Q.  So what was your response to the argument that was set

15   forth by the defendant in what you read?

16   A.  Yeah, so again, the claim was that because the share of

17   traffic censor activations that corresponded with traffic stop

18   is low, the average motorist has a low chance of being stopped.

19   The first problem is that the traffic censor activations are

20   not counting unique motorists.  The same motorists can activate

21   these censors many times.  So if, for example, a motorist

22   crossed in Kansas would activate at least five of these

23   censors, and be counted five times just on a one way trip.  If

24   they -- if they went there and back in the same year, which is

25   very likely, they would be counted ten times.  And so right

1    away, we could see that using the activation data as a measure

2    of the number of the unique individuals can be off by several

3    orders of magnitude, and the result, it's going to drastically

4    understate the probability that any one motorist is going to be

5    stopped.  That's the first issue.

6    Q.   What's the second issue?

7    A.   The second issue is that the analysis claims not only to

8    show the risk of being stopped for the average motorist, but

9    the risk of being stopped for the plaintiffs in this case, and

10   as my analysis shows, the probability of being stopped by KHP

11   differs drastically based on whether the motorist is in-state

12   versus out-of-state, but there -- just in this analysis, the

13   author is just using one blanket probability to cover all

14   motorists.  In a sense, this analysis is sort of assuming away

15   deferential enforcement activity towards out-of-state drivers,

16   which is precisely what's at issue.

17   Q.   Doctor Mummolo, have we reviewed all of the opinions and

18   conclusions that you use reached in your report?

19   A.   Yes.

20   Q.   Did we miss anything?

21   A.   No.

22   Q.   Is there any reason to think that your analysis is not

23   sound?

24   A.   No.

25   Q.   To your knowledge, did the Kansas Highway Patrol complete

1    an independent analysis that was similar to yours?

2    A.   No, not to my knowledge.

3    Q.   Were you ever asked to review a rebuttal expert report

4    produced by the defendant?

5    A.   No.

6    Q.   And I'd like to go back for just a moment.  We've been

7    looking at parts of Exhibit 55.  Do you recognize what Exhibit

8    55 is?

9    A.   I'd have to --

10   Q.   You can turn to it.

11   A.   Okay, thank you.  Yes, this is my expert report.

12   Q.   Is this a true and correct copy of the report that you

13   wrote in this case?

14   A.   Yes, it is.

15   Q.   And does this fairly and accurately represent the analysis

16   and expert opinions you offered in this case?

17   A.   Yes.

18        MS. BRETT:  At this time, Your Honor, I'd like to move

19   in Exhibit 55, not for the truth of the matter asserted

20   therein, but to assist the court in understanding the context

21   of the calculations and opinions that Doctor Mummolo has

22   discussed in his testimony today, and given that this is a

23   bench trial, the court can give it whatever weight the court

24   deems appropriate, but because of the complicated analyses that

25   he conducted, I'd like to offer it just for the limited purpose

1   of assisting the court in analyzing the evidence heard.

2            MR. CHALMERS:  I don't understand the assisting the

3   court to analyze the evidence position.  It's -- or not, it's

4   hearsay and it's cumulative, Your Honor.

5            THE COURT:  I agree, I think his testimony is clear.

6   I think I followed it.

7            MS. BRETT:  Okay.  Well, thank you, Your Honor.  So at

8   this time, I'll pass the witness.

9            THE COURT:  Cross-examination.

10            MR. CHALMERS:  Yes.

11                        CROSS EXAMINATION

12   BY MR. CHALMERS:

13   Q.  Professor, the analysis that you did of the various data,

14   none of which went to whether the stops that are reported were

15   illegal; is that right?

16   A.  Yes.  That's not what I was tasked with analyzing.

17   Q.  Where it was reported that the vehicle was stopped for

18   speeding or some other reason, your report and your statistics

19   don't address that or question its validity, do they?

20   A.  No, they don't.

21   Q.  Now, with respect to whether there was reasonable suspicion

22   for a canine search, likewise, your reports don't address that

23   issue, do they, your statistics?

24   A.  Only to the extent that there may be differential standards

25   of reasonable suspicion being applied.

1  Q.  Okay.  And that's the outcome test that you talked about?

2  A.  Yes.

3  Q.  And that's the test where you found you couldn't find any

4  statistically difference then?

5  A.  Yes, the hit rates between the two groups were not

6  statistically distinguishable.

7  Q.  So in terms of your statistics and your analysis, you

8  couldn't find that there was any different treatment from

9  in-state to out-of-state drivers based on the reasonable

10  suspicion?

11  A.  If the question of reasonable suspicion as I apply it, I

12  would say, yeah, the outcome test is the only analysis that

13  speaks to that, and it was inconclusive.

14  Q.  Now, you were provided data about the number, I think you

15  said they were in Excel sheets about the number of citations

16  that were issued; is that right?

17  A.  The citations were included in the data, yes, for the

18  interstate highway stops only.

19  Q.  Okay.  For interstate highway stops only, and those numbers

20  came up to about what on average annually?

21  A.  I did not analyze citations in my analysis.

22  Q.  You came up with a figure I think in your report somewhere

23  about in excess of 200,000 a year in citation, isn't that

24  right?

25  A.  I don't recall that estimate.  Can you point me to that?

1  Q.  Well, let's ask the question a little bit differently

2  rather than going through that approach.  The number of canine

3  sniffs that you were provided data on were a vastly smaller

4  number than the number of citations that you were reviewing,

5  isn't that right?

6  A.  I did not review citations in my report.  I think you may

7  be referring to the number of stops conducted.

8  Q.  Yes, citations and stops.  I think sometimes I equate them,

9  but let me see if I could be specific then.  The number of

10  stops, maybe you don't remember in your report, but

11  approximately how many stops were you finding in the data on an

12  annual basis?

13  A.  Over the period of -- so there's roughly 200,000 stops in

14  the data; in the mean analysis that we covered 2018 to 2020,

15  there was roughly I think 120,000 stops that made it into that

16  analysis based on the overlap across those data sets over that

17  two-year period.

18  Q.  Okay.  So focusing just at --

19  A.  Or two to three year period.

20  Q.  Focusing just on the highway, you were coming up to stops

21  of 120,000 in the areas where there had been canine sniffs?

22  A.  No.  So I'm referring to the analysis in Opinion One.  The

23  canine sniff analysis does not use all of the stopping data,

24  because canine sniffs were not conducted in all of the places

25  and times where stops occurred, and so it's some -- it's some

1    sub-set of that, I would have to -- I would guess it's between

2    70 and 80,000 stops being covered in that analysis.

3    Q.   Okay.  Now, if we go back, though, and talk about the

4    number of -- in the data that was provided to you as to the

5    number of stops on an annual basis, what did you -- what did

6    you find in terms of what you've evaluated?

7    A.   So I don't compute the number of annual stops in my report,

8    but I can -- I can make an educated guess based on my knowledge

9    of the data.

10   Q.   Do you have a copy of your report in front of you?

11   A.   Yes.

12   Q.   If you'd turn to Page 35.  Okay?

13   A.   Okay.

14   Q.   And do you see that there's reference to the KHP traffic

15   stop data saying that the information you were provided between

16   2016-2021 was a little bit more than a million stops?

17   A.   Yes, over that multi-year period.

18   Q.   And then looking at the stops between 2019 and 2021 in the

19   sections that you're interested in were just the interstate

20   highways that worked out to be about 260,000 stops; is that

21   right?

22   A.   Not in the final analysis.

23   Q.   Okay.  In the final analysis, you pared down the data in

24   terms of the number of stops to kind of remove some of the

25   stops from your evaluation?

1   A.   I eliminated records of stops only to the extent that the

2   places and times in which they occurred did not correspond to

3   the other data sets that I was working with.

4   Q.   Oh, so if you didn't have any SafeGraph data, then you

5   would remove from your calculation those stops that the highway

6   patrol conducted; is that right?

7   A.   Yeah, in the benchmark analysis.  That's 'cause there would

8   be no way to benchmark those stops.

9   Q.   And are you aware of what the testimony has been as to how

10  frequently any of the plaintiffs travel through the state of

11  Kansas?

12  A.   No.

13  Q.   Or where they travel when they go through the state of

14  Kansas?

15  A.   No, I don't have those particulars.

16  Q.   Would you agree that although I think you disagree as to

17  the one percent figure, that there is a very small percentage

18  chance that any motorist in Kansas is going to be stopped for a

19  traffic violation on a given day?

20  A.   Umm, it would really depend on your interpretation of the

21  word small.

22  Q.   Okay, well --

23  A.   And I don't know what that percentage would be.

24  Q.   Would you agree that it's probably five percent or less?

25  A.   I have no way of knowing that.

1  Q.  You use a benchmark analysis in your report, and does this

2  benchmark analysis extend to each of the opinions that you

3  reached?

4  A.  Umm, no, it does not.

5  Q.  Which opinions does it not apply to?

6  A.  There are aspects of the analysis of canine sniffs that do

7  not employ a benchmark.

8  Q.  And that's the outcome analysis where you found there was

9  no statistically significant difference; is that right?

10  A.  Yes, that's right.

11  Q.  Okay.  Now, in the benchmark analysis, putting it in simple

12  terms, you're comparing the highway patrol data concerning

13  canine sniffs and/or stops, and the data concerning mobile

14  phones that are located within, what, a quarter mile of the

15  road; is that right?

16  A.  That's correct.

17  Q.  The -- the SafeGraph data does not tell us where the mobile

18  phones were, or do not tell us where the mobile phones were on

19  the highway.  Let me rephrase that.  The Safelight (sic) data

20  does not report mobile phone locations on the highway, does it?

21  A.  No, it records them when they visit points of interest that

22  are very close to the highway.

23  Q.  Okay.  And the data or these points of interest you're

24  talking about are businesses; isn't that right?

25  A.  That's right.

1  Q.  Churches?

2  A.  Umm, I don't recall any churches in the data set.  These

3  are -- is roughly 2,000 businesses in the data.  They're all

4  located right along the highway, so the most prevalent

5  businesses are hotels, motels, restaurants.

6  Q.  Let me give this to you.  May I approach to give the

7  witness the books here?

8          THE COURT:  Uh-huh.

9          MS. BRETT:  Mr. Chalmers, can I ask what you're

10  showing him?

11          MR. CHALMERS:  I'm sorry, counsel, I didn't hear.

12          MS. BRETT:  Could I ask what you're showing him so I

13  can find it?

14          MR. CHALMERS:  It's going to be Exhibit 911.  If I

15  hand this to you, you'll see that there are tabs, and that will

16  get you where you go.

17  BY MR. CHALMERS:

18  Q.  You have before you a copy of -- well, you have Exhibit

19  911, which is a two-page document, and that is -- what can you

20  tell from reviewing it?

21  A.  Umm, this is a traffic flow map that is generated by the

22  Kansas Department of Transportation that displays traffic

23  counts in the -- average daily traffic counts in various road

24  segments around the state.

25  Q.  And is this the information that you used, in part, in

1   calculating traffic counts, and doing this sort of analysis

2   that you did in your statistics?

3   A.   Umm, I believe it's generated from the same traffic

4   censors, but I did not rely on this map for those numbers.  I

5   was provided by the Department of Transportation spreadsheets

6   that tabulated hourly counts.

7   Q.   I thought I remembered seeing in your report a copy of

8   this --

9   A.   Yes.

10  Q.   -- map.  Okay.  It is a K-DOT map, and I move for admission

11  of Exhibit 911.

12       MS. BRETT:  Your Honor, I'm going to object only

13  because this is not the same K-DOT map that he did rely on his

14  report.  The one produced by Mr. Chalmers in Exhibit 911 is

15  from -- it looks to be 2021, and that is not the same data that

16  Doctor Mummolo was relying on in his report.

17       MR. CHALMERS:  The purpose of my questions is really

18  not relevant whether it's the same data.  It's just showing the

19  location so we can talk about that.

20       THE COURT:  Why don't you use the right map then?

21       MR. CHALMERS:  I don't think -- I thought I had a copy

22  of the right map, the 2020, but I don't have that.

23       MS. BRETT:  The map that's used in Doctor Mummolo's

24  report is on Page 38 at Exhibit 2, 38, Exhibit 2 of his report.

25       MR. CHALMERS:  Once again, it's an official record of

1    the state, Your Honor.  It's going to be helpful to be able to

2    describe the locations that the data from SafeGraph was taken,

3    and I renew my offer of Exhibit 911.

4         MS. BRETT:  Your Honor, there's a lack of foundation

5    here.  Doctor Mummolo has not seen this particular exhibit, and

6    it was not provided in discovery.  It's not a -- something he

7    relied on in his report, and if there is a need to use a map of

8    the K-DOT censor data, I would ask that it be the one he

9    actually looked at in forming his report.

10         MR. CHALMERS:  The map was identified in discovery,

11    Your Honor, in a Rule 26 disclosure before the deadline.  It is

12    authenticated by -- on its face, and it is a governmental

13    document that sets the adequate foundation for its admission.

14         THE COURT:  Why can't we use the one in the report?

15         MR. CHALMERS:  Well, mostly 'cause it's not in color.

16         THE COURT:  I can figure it out if it's just in black

17    and white.

18         MR. CHALMERS:  Well, we'll try.

19         THE COURT:  I'm sure I can.

20    BY MR. CHALMERS:

21    Q.   Let me show you Page 38 then of your report, if we could

22    put that up on the screen.  So let's focus on -- see, there's

23    Salina.  Let's focus on Topeka.  Do you see Topeka is located

24    kind of over there by Waubansee on I-70?  Actually, it's

25    further over there.  Can you locate --

1   A.   I can't see the word Topeka, but I know generally where it

2   is on the map.  Yes, I see it.

3   Q.   Now, in your analysis, do you know if any of the businesses

4   that SafeGraph had gathered data on were in the Topeka area?

5   A.   Umm, SafeGraph definitely gathers from the Topeka area.

6   Whether we use them -- whether we use those data points or not

7   would depend on the specific road segments we were examining.

8   Q.   And as you are here this afternoon, or this morning rather,

9   you don't know whether you used any of the data as to a stop

10  that was conducted in Shawnee County?

11  A.   So we did look at road segments in Shawnee County.  As this

12  map actually shows, we look at a stretch of I-70, a stretch of

13  470, and a stretch of 335 in Shawnee County.

14  Q.   So if we're looking at -- as your analysis worked out, you

15  would say, here's where the stop was, it was in this county?

16  A.   Uh-huh.

17  Q.   And then you would look for the whole county in the

18  SafeGraph data that was available for that county to get your

19  counts of the people that you thought were on the road from

20  out-of-state?

21  A.   No, that's not correct.

22  Q.   What would you look at then?

23  A.   So I would determine which businesses.  So let's take

24  Shawnee County, I-70, for example.  There's a segment of I-70

25  that's only in Shawnee County.  There would be businesses

1　within a quarter mile of I-70 in Shawnee County that we could

2　precisely geo-locate based on their addresses, and those would

3　be the SafeGraph businesses that would enter into the analysis

4　of that road segment.

5　Q.　Those are the businesses within a quarter mile of I-70; is

6　that right?

7　A.　In Shawnee County.

8　Q.　In Shawnee County.　So you would look at all of the

9　businesses that are within a quarter mile of I-70 in Shawnee

10　County to reach your conclusions as to what the Safelight (sic)

11　data showed for that segment of the road?

12　A.　As -- yes, as to use the SafeGraph data to estimate the

13　road composition right around I-70 in Shawnee.

14　Q.　And for instance, there are state office buildings that are

15　located near the highway.　Do you know if those buildings were

16　included in your SafeGraph analysis?

17　A.　They may have been.　I'm not sure.　There were 2,000 points

18　of interest in the data.

19　Q.　There are churches, and you don't know whether or not the

20　churches are involved?

21　A.　Umm, if they were within a quarter mile of the highway,

22　they may have been, but they were not prominent in the data.

23　Q.　There are -- well, you can kind of see -- not real well.

24　If you flip the page and look at 912 for a moment, please.　And

25　do you recognize as traffic inserts that would show

1    information, closer detail to the cities that go along with the

2    traffic flow map that you used as part of your report?

3         MS. BRETT:  Your Honor, same objection here.  This is

4    dated 2021, and it was not something that Doctor Mummolo relied

5    on for his report.

6         MR. CHALMERS:  For purposes of my question, whether he

7    relied on it for the report, Your Honor, is not pertinent, Your

8    Honor.  It's whether or not it shows what it does, which is the

9    traffic traveling through these different cities so we can talk

10   about how he gathered his data sets.

11        THE COURT:  So I mean, it's not clear what you're

12   asking.  Does he have a different version of this report in his

13   report?

14        MR. CHALMERS:  No, I don't think he mentions it in his

15   report.

16        THE COURT:  So are you just meaning to ask him a

17   question, or are you offering it into exhibit or what?

18        MR. CHALMERS:  I'm offering it into evidence, Your

19   Honor, as an official governmental document with on its face

20   the sufficient identification to make it admissible.

21        MS. BRETT:  Your Honor, it's hearsay, and there's no

22   foundation for it.  Doctor Mummolo didn't rely on it, hasn't

23   even seen it before, as far as I know.

24        THE COURT:  Let's back up and try and do a better job

25   of laying a foundation.  Somebody has to identify it as an

1    official governmental document, for example.

2            MR. CHALMERS:  I think it identifies itself, Your

3    Honor, as an official government --

4            THE COURT:  Tell me the rule you're citing.

5            MR. CHALMERS:  Well, the authentication rule -- I'll

6    grab it -- is Rule 901.  The -- the rule in terms of hearsay,

7    if that's the objection, goes to a public record, which is 803,

8    8.  Umm, I think in the federal rules, that's the appropriate

9    rule.

10           THE COURT:  So I mean, as a proponent of the evidence,

11   you have to introduce evidence which is sufficient to support a

12   finding that the item is what you claim it is, i.e., a document

13   that was recorded or filed in a public office as authorized by

14   law, or a purported public record or statement from the office

15   where the items of this kind are kept.  That's under Rule 901 B

16   7.  Usually, we would do that by getting a certificate from the

17   records custodian or someone so they don't have to come to

18   court, but I don't think it's sufficient for you just to lay it

19   out there and say, here's a government document, take my word

20   for it.

21           MR. CHALMERS:  I agree with Your Honor.  I think the

22   case law would say, though, that the document can be reviewed,

23   and it can authenticate itself.  You can look at it, and you

24   can see that it's an official government record from Kansas

25   Highway Patrol, or excuse me, from Kansas Department of

1  Transportation.

2  THE COURT:  I think what I said is just the opposite

3  of that.  This witness certainly doesn't have any basis for

4  testifying that it's a valid public record under Kansas law.

5  MR. CHALMERS:  Well, I don't know if he does or not.

6  Let me ask, Your Honor, and I'll move on.

7  BY MR. CHALMERS:

8  Q.  Sir, the Exhibit 912, do you recognize that as information

9  that's provided by the Kansas State Department of

10  Transportation as the blow-ups of the areas shown on the map

11  that you used in your report?

12  A.  It's -- it visually appears similar to maps I've seen on

13  K-DOT's web site, but I'm not sure of the validity or

14  provenance of this particular map.  I can't confirm that.

15  Q.  Well, see if we can't attack this a little bit different

16  direction.  Umm, within the highway areas that you were

17  considering the SafeGraph data, it included the Kansas City,

18  Kansas area; is that right?

19  A.  Umm, I believe that we excluded areas that were in or near

20  major cities, because it would be difficult to use the K-DOT

21  censors on the interstate highway segments that stretch out

22  into the counties to reliably estimate traffic flows there,

23  since traffic flows in cities are very different than on the

24  highway.

25  Q.  So if I understand, when you're talking about traffic flows

1   now under the SafeGraph data, if a -- we need to remove from

2   our consideration any traffic within the cities?

3   A.   So I think there's some confusion.  The SafeGraph data does

4   not measure traffic flows.  The K-DOT data measures traffic

5   flows.

6   Q.   No, I think -- I think that is the point.  The SafeGraph

7   data measures mobile phone pings within a -- within a business?

8   A.   Correct.

9   Q.   And the mobile phone pings within businesses within cities,

10  you apparently excluded that from your analysis?

11  A.   Yes, in some cases, we did.  All the -- all the sites that

12  we examined are listed on this map in my report.

13  Q.   For instance, around Junction City, was -- was that removed

14  from your analysis?

15  A.   Umm, it would depend on the -- I mean, it would depend on

16  the particular highway segment and the county that you're

17  talking about.  The highway segments and counties that I

18  include are listed here in this exhibit.

19  Q.   So we understand, would it include the area where there is

20  the military base?

21  A.   You'd have to point me to the road segment, sir.

22  Q.   Umm, well, if we look at the map, oops, here's Salina.  Do

23  you see why I didn't want to use this map, Your Honor --

24  Shawnee.  Can you identify on your Page 38, maybe you can see

25  better than I can where Junction City is to be able to tell us

1  if that was included within your analysis?

2  A.  I'm not seeing it, but the answer to what's included is

3  stated in the exhibit.  It's just these county highway road

4  segments that are listed in each of these insets in the figure.

5  So if the military base or any other point of interest is

6  located on one of those segments in the county, then we

7  examined it.

8  Q.  Okay.  So again, how about the highway that crosses by

9  Lawrence, is that included?

10  A.  I'd have to be shown the precise location.  If it's on one

11  of these highway segments, then yes.

12  Q.  Douglas County?

13  A.  We do examine highways in Douglas County.

14  Q.  And how about around Hayes, Kansas?

15  A.  I'm sorry, I'm not familiar with that area.

16  Q.  How about Sherman or Thomas County?

17  A.  Yeah.  So we examined I-70, and Sherman -- and both Sherman

18  and Thomas County as indicated in the exhibit.

19  Q.  And it also shows Ellis County, does it not?

20  A.  Yes.

21  Q.  And Ellis County is Hayes; did you know that?

22  A.  Hayes is located in Ellis County, is that what you're

23  saying?

24  Q.  Yes.

25  A.  No, I did not.

1   Q.   And you've got Dickinson County; is that correct?

2   A.   Yes.

3   Q.   Saline, Russell and Ellsworth are all included in that?

4   A.   Yes, the stretches of I-70 in these counties.

5   Q.   Now, when you are looking at the vehicles on the road, you

6   assigned whether they were in-state or out-of-state based on

7   either the license of the driver or based on the tag on the

8   car; is that right?

9   A.   No, to determine the composition of in-state and

10  out-of-state drivers, I used a combination of the K-DOT road

11  censor data and the SafeGraph mobile location data which

12  conveys the home state of origin of visitors to businesses

13  right along side of the highway.

14  Q.   Mine might have been a bad question.  When -- when you were

15  looking at the data to say who actually was stopped, what the

16  cars are, the people traveling on the highway, you used

17  information about the driver's license or their license tag; is

18  that right?

19  A.   KHP provided a column in their stop data that said -- that

20  indicated the state of the vehicle -- the state associated with

21  the vehicle, and that's what I relied on.

22  Q.   Okay.  So in -- in your numbers, seeing who was on the

23  highway at a given time, if -- if they had a license from, say,

24  Virginia, but were living in Junction City in the military, you

25  would have counted them as an out-of -- out-of-state driver?

1  A.  So in the traffic stop data, the KHP tells me the state

2  associated with the car.  So it's not pertaining -- first of

3  all, it's not pertaining to everybody on the highway.  This

4  would just be an individual who was stopped.

5  Q.  So it pertains to the location or where the registration of

6  the car, rather than whether you're dealing with someone who is

7  a -- effectively, on a temporary basis, a Kansas resident?

8  A.  Yes, which is the information that would be visible to the

9  officer when seeing the car on the road.

10  Q.  Same is true as to someone who is at either Fort Hayes

11  State or at Manhattan College or at KU who may have an

12  out-of-state license or tag?

13  A.  Uh-huh.

14  Q.  If they're driving on the highway, you're considering them

15  an out-of-state motorist; is that right?

16  A.  It depends on their car.

17  Q.  Well, it has an out-of -- registration or their license is

18  out-of-state?

19  A.  So the KHP -- it would be KHP's determination in the case

20  of stopping.  Actually looked into this possibility of college

21  students and military personnel, and any associated measurement

22  error that might be associated with that, and I'm happy to

23  discuss what I learned if that's a concern.

24  Q.  No, I just want to make sure first how you went about your

25  methodology.  Okay.  So if you're talking about who is actually

1  physically on the road, what you are looking at and defining

2  them as an out-of-state motorist, it is not necessarily where

3  they're living, rather, it is what their -- their license or --

4  or license plate shows; is that correct?

5  A.  If we're talking about the KHP stop data, it's the license

6  plate associated with the car.

7  Q.  Okay.  Now, then we've got on the other part of this

8  benchmark analysis the SafeGraph data, and that is not

9  apparently from all businesses that are along the stretch of

10  I-70?

11  A.  If they're within a quarter mile, they should be included.

12  Q.  Well, then for instance, state office buildings within a

13  quarter mile, I'll represent to you for purposes of a

14  hypothetical of one of the interstates that goes through

15  Topeka.  Is the state office building that part of the

16  SafeGraph data?

17  A.  I would have to check, so as I said, there's about 2,000

18  points of interest in the data.  The most prominent points of

19  interest are gas stations, road stops, motels, hotels.  That's

20  the majority of the data.  Whether a particular point of

21  interest in the data, I'd have to review the records.

22  Q.  And the SafeGraph data, does it reflect anything about

23  access to that particular business, what roads would be

24  accessible to the business?

25  A.  It does not.

1  Q.  So if I'm a business along the road in Shawnee County that

2  is not near an entrance or an exit of I-70, that would be

3  included in the SafeGraph data?

4  A.  Can you repeat the question?

5  Q.  If I'm a business that's within a quarter mile of I-70, but

6  not by the entrance or exit of I-70, that's included in the

7  SafeGraph data?

8  A.  It could be, yes.

9  Q.  Would you expect that businesses like that would have a

10  higher frequency of in-state travelers?

11  A.  Yes, but a much lower volume.  According to the K-DOT

12  traffic records, the volume of traffic along the interstate is

13  -- tends to be about ten times as large as any businesses that

14  are near the interstate that are accessible within this quarter

15  mile bandwidth, and so that's actually something I considered

16  very closely, and similar to the other examples I just talked

17  to, there just simply isn't enough traffic volume even if

18  Kansans are frequenting these businesses via local roads to

19  make up for the disparities in the data.

20  Q.  With respect to the Safelight (sic) data, now it shows a

21  ping on a phone inside the business, and then attempts to align

22  that phone to a home location; is that right?

23  A.  Yes.  It doesn't do that at the same time, but yes.

24  Q.  All right.  So yeah, 'cause that's part of what SafeGraph

25  does is they take their data, and they manipulate, and they

1  offer their opinion as to what it shows; isn't that correct?

2  A.   No, that's not how I would describe their methodology.

3  Q.   Their methodology is -- does require some sort of analysis

4  and review and modification to get to their ultimate

5  conclusions as to the number of visitors at a particular stop,

6  doesn't it?

7  A.   So they get direct information about the number of visitors

8  according to the cell phones they're tracking, and then they --

9  they track those cell phones over time to determine the home

10  location of the user, and as I said, they may make errors in

11  doing so, but the reason I find the data reliable is that it's

12  been independently identified in peer review research as being

13  accurate for home location.

14  Q.   Let's talk about that in just a second, but let's be clear

15  on the data.  The data includes not only the folks -- the

16  phones, rather, that are -- folks that are visiting the

17  businesses or working at the business, but it includes people

18  that are working at the business, doesn't it?

19  A.   It could if they're tracked by SafeGraph.

20  Q.   And SafeGraph's methodology says it does include employees,

21  doesn't it?

22  A.   Yes, I think, you know, if they're in the SafeGraph panel,

23  and they visit that location, then they are counted as visiting

24  that location, which is accurate.

25  Q.   Okay.  If I've got a restaurant by -- by a highway within a

1  quarter mile, say, off of Hayes, in the Hayes area, rather, but

2  not at the Hayes -- one of its Hayes exits, the pings at that

3  restaurant there's going to be part of your calculation?

4  A.  They may be included, yes.

5  Q.  And in that scenario, wouldn't you expect that there would

6  be a higher percentage of Kansas residents by way of home state

7  going to that restaurant?

8  A.  There may be, but there would be a drastically smaller

9  number of overall visitors, and that's sort of what's relevant

10  for the accuracy of the analysis.

11  Q.  And if you have, say, in Hayes a grocery store located

12  within a quarter mile, which is accessible from the variety of

13  different roads not including -- but not excluding I-70, that

14  would be included?

15  A.  It could potentially be included.

16  Q.  So as you did your analysis up here on your board, you

17  talked about the possibility that there could be multiple

18  phones in a car, and that that might in some fashion or other

19  skew your -- your benchmark, and in some respects invalidate

20  your analysis, wouldn't it?

21  A.  No, I came to the opposite conclusion.

22  Q.  No, I mean, you decided that after reviewing that, that a

23  -- four full different wouldn't be significant by itself in the

24  number of phones, because in the scenario you gave, four family

25  members have their phone in the car, they're from Kansas, and

1   one on the highway; is that right?

2   A.   You asked if I thought it invalidated my analysis, and I'm

3   saying I came to the opposite conclusion.  I'm saying that in

4   this extreme hypothetical example, where every single

5   out-of-state driver is traveling alone, which we know to be

6   false because some of them have passengers, and every single

7   in-state driver has four people in their car all from Kansas,

8   which we know to be false since some Kansas drivers drive

9   alone, it would still not overturn the finding in the report.

10  Q.   With respect to this analysis, though, trying to talk

11  about, you get four folks from Kansas with the four phones?

12  A.   Correct.

13  Q.   The assumption that there are four phones -- four folks

14  with four phones on the road from Kansas is tied to the number

15  of folks pinged on the side of the road?

16  A.   I'm not sure what you're asking in terms of tied to.

17  Q.   Well, okay, so we've got -- and I don't want to belabor

18  this too much.  We're driving through Topeka now, and we've got

19  a restaurant that is part of this SafeGraph data, and it shows

20  over the span of time, that you've reviewed a certain

21  percentage of in-state and out-of-state phones; is that

22  correct?

23  A.   Okay, yes, that could happen.

24  Q.   Okay.  And you used that percentage aggregated with

25  everything else to say, well, that's how many phones or how

1  many people in Kansas are on the road at any given time?

2  A.  The proportion of drivers on the road, yes.

3  Q.  Even though they're at a restaurant that is not easily

4  accessible to the highway?

5  A.  Yes.  So this -- you're -- you're discussing a potential

6  source of measurement error here.

7  Q.  Okay.  Well, and that's what I'm -- and even though the

8  pings go not only to people that have a home phone in Kansas

9  that are -- can -- that may be traveling, but also include

10  workers that work at that particular facility day in, day out;

11  is that right?

12  A.  Umm, it may include employees, yes.

13  Q.  Now -- so now, you've got -- if we look -- use your numbers

14  now, let's say there's a magnitude at that particular -- at

15  that particular restaurant of 20 folks that are associated as

16  being in-state residents because that's where their home

17  location is on their phone, you're not representing that that

18  is suggesting that there are 20 motorists out on the road that

19  are Kansas residents at the time, are you?

20  A.  So they may be counted in our analysis if they got there

21  via the interstate.  That would be correct.  If some portion of

22  them got there only through local roads, that would be

23  measurement error, and -- but my conclusion about that concern

24  is that the traffic volume on these local roads is just

25  insufficient to overcome the traffic volume that's being

1  detected on the interstate highways, and overturn the

2  disparities in the analysis.

3  Q.  Okay.  And I think I appreciate that, but the -- you're

4  using this insignificant traffic volume on the side roads in

5  these particular businesses to try to calculate who is a Kansas

6  resident on the highway at any given time, aren't ya?

7  A.  Yes.

8  Q.  Now, with respect to this benchmark, and it is used to make

9  a comparison that is essential to each one of the opinions that

10  you reached other than the outcome opinion; is that correct?

11  A.  Umm, yes, that's correct.

12  Q.  And if the benchmark is not representative of the number of

13  Kansas motorists on the road versus out-of-state motorists,

14  then all the statistics that you've done are not going to be --

15  are not going to reflect the opinions that you've reached, are

16  they?

17  A.  I would disagree with that.  I would be happy to explain

18  why.

19  Q.  Well, let's say that the benchmark is -- is different, and

20  the real benchmark is 50 percent of the motorists on the road

21  are Kansas motorists, 50 percent of the motorists on the road

22  are out-of-state motorists, that would change your opinion,

23  each one of your opinions that there is a disproportionate

24  enforcement of either speeding or of traffic stops generally,

25  wouldn't it?

1  A.  No.  So let's take that example.  Let's say that true

2  number -- the true proportion on the road of out-of-state

3  motorists was 50 percent.  66 percent of KHP stops are of

4  out-of-state motorists, so I would still reach the conclusion

5  that KHP disproportionately stops out-of-state motorists, so

6  my -- my overall point is that I think we are -- your questions

7  are conflating the presence of measurement error with the

8  ability of measurement error to overturn the finding.  The

9  ability of conflating measurement error is something I took

10  very seriously in my analysis.  I would say every social

11  scientific analysis has some error in it, and the duty of the

12  analyst is to determine, is this error severe enough to lead me

13  to the wrong conclusion, and that's what I looked at, and the

14  answer is no.

15  Q.  Okay.  So to use your answer, so I understand it and think

16  everybody understands it then, if the -- if the error is such

17  that 68 percent of the motorists at the time that you reviewed,

18  in the stretch of road that you reviewed were out-of-state

19  motorists, then there would be no disparity?

20  A.  So if it was the case that the error was of such a

21  magnitude that it caused a deflation in the estimated

22  proportion of out-of-state motorists to the point where had the

23  error not existed, the shared in the stop data would match the

24  shared in the road composition data, then yes, that would lead

25  me to the wrong conclusion.

1    Q.   And the larger number of folks that are counted as Kansas

2    residents in the Safelight (sic) data, the larger that number

3    gets, the less disparity to the extent, or if there is any

4    disparity in the stops under your analysis; is that right?

5    A.   Yes, and that is actually explicitly what I look at in

6    Opinion Three.

7    Q.   Now, with respect to statistical confidence, I think what

8    you've used is sometimes referred to as the plotting and so

9    forth, is regression analysis; is that right?

10    A.   No, that's not right.

11    Q.   What is it?

12    A.   So I'm performing what's called a key square test within

13    each of the times and places that I'm examining, and that's a

14    test that analyzes whether two proportions are statistically

15    different from one another.

16    Q.   And in that test, it will assign a level of confidence, a

17    statistical confidence; is that right?

18    A.   Yes, it will produce something called a P value, which I

19    referenced in my testimony.

20    Q.   Now, the P value that you talk about has to do with whether

21    the data that you put in as it relates to each other seems to

22    show a relationship that you've described; is that right?

23    A.   It's not quite right.

24    Q.   Okay.

25    A.   So the P value describes a very particular probability, and

1  what it's doing is saying, let's assume that there's some state

2  of the world; in statistics, we would call that the null

3  hypothesis.  Here, the null hypothesis I'm testing is that

4  there is no disparity in the stop rates between these two

5  groups of motorists and what the P value is, asking if there

6  is, in fact, no disparity in the world, what are the chances of

7  drawing a sample of data that would reflect a disparity of the

8  magnitude we see here.

9  Q.  Okay.  But the statistical analysis, this P value you're

10  talking about and level of confidence, it doesn't validate or

11  invalidate whether or not the benchmark that you used is

12  appropriate, does it?

13  A.  No, the P value is speaking to a concern about sampling

14  error, not the validity of the underlying data.

15  Q.  In your analysis as you went forward, I think you said you

16  aggregated your numbers; is that right?

17  A.  Yes.

18  Q.  So you might expect to see a different mixture of --

19  assuming your benchmark of travelers out in, say, western

20  Kansas than what you might see around Topeka?

21  A.  That's correct.

22  Q.  And then you just -- when you aggregated them, when you

23  just multiply them altogether, and divide it by the number, and

24  get an average?

25  A.  It depends on which statistic you're talking about, so I

1    think the most relevant one is the statistic reflecting the

2    number of excess stops that are conducted, so that's an

3    aggregate statistic, and that's summing across all the places

4    and times I'm examining, so within even place and time, the

5    number of excess stops is computed, and then the aggregate

6    result is the summation of those excess stops.

7    Q.   Now, with respect to -- I had just one line -- one question

8    I wanted to talk to you about, and I've lost my page.  Well,

9    with respect to the use of Safelight (sic) or SafeGraph data in

10   the literature, you testified about that, that data was always

11   being used to talk about what the actual attendance was at the

12   businesses that SafeGraph -- or SafeGraph was reporting on,

13   wasn't it?

14   A.   Umm, it was being used to describe -- it's being used to

15   describe human movement in a number of ways.

16   Q.   Okay.  But ultimately, when they were trying to use that

17   data, it always had to be the movement into or onto the places

18   where SafeGraph keeps its data; isn't that right?

19   A.   So for example, in the studies of the CoVid-19 pandemic,

20   they're not only interested in who goes to businesses, they're

21   basically interested in who travels away from their home, and

22   so they need to be able to use the SafeGraph data to know where

23   people live.

24   Q.   So they were again focusing on that graph whereby the data

25   showing where the people live then?

1    A.   Is a combination, yeah.

2    Q.   And then they would show businesses, and then would show

3    where people were visiting, is that right, at the business?

4    A.   That's my understanding, yeah.

5    Q.   There's not a single study that has used the SafeGraph data

6    to try to estimate traffic within a quarter mile of the

7    businesses that it collects data on; isn't that true?

8    A.   Not to my knowledge.

9    Q.   You're not aware of any expert in the field other than you

10   has ever used such data, have you -- are you?

11   A.   For the purpose of studying traffic?

12   Q.   Yes.

13   A.   No, I'm not.

14   Q.   Now, with respect to -- with respect to the use of the

15   data, then in this case, as a benchmark, you're not saying that

16   this is the sort of data that an expert would ordinarily

17   consider and use, are you?

18   A.   I am not aware of another case in which SafeGraph data has

19   been used to study traffic flows, which is why I took such care

20   to assess the validity of the data and the degree to which

21   measurement error could be driving my results.

22   Q.   And with respect to ways that are available to try to

23   survey and conduct analysis of actual traffic counts, there are

24   ways to do that, aren't there?

25   A.   Umm, so one could commission a study where individuals

1    stand by the side of the road and try to document passing cars.

2    I think there's been some criminology work that's done that.

3    In this case, I'm trying to retrospectively examine years of

4    data and hundreds of thousands of traffic stops that have all

5    ready occurred, and so it wasn't possible to go back in time

6    and characterize the traffic flows in those places and times.

7    I had to rely on data that was collected at the same time.

8    Q.  And for that matter, in your -- your opinions and in

9    your -- your conclusions, they all refer to data that -- with

10   the most recent data is 2021; is that correct?

11   A.  Umm, I believe it's late 2020.  That was ended up being

12   used in the analysis, yeah.

13   Q.  And if we're going to try to apply that today in 2023, we'd

14   have to assume that the traffic patterns were the same now as

15   they were back then; is that right?

16   A.  Yes, in order to extrapolate the findings from some time

17   period to a future period, I'd have to rely on several

18   assumptions.  The best way to know for sure would be to go out

19   and get more data and check.

20   Q.  And one other way might be to conduct one of these surveys

21   that you talked about to try to find out what the actual mix is

22   of traffic; is that right?

23   A.  Yes, one could certainly design a study to do that.

24   Q.  Okay.  I don't have anything else.  Thanks.

25           THE COURT:  Any redirect?

1                    RE-DIRECT EXAMINATION

2    BY MS. BRETT:

3    Q.  Just one follow-up question on that last point, Doctor

4    Mummolo.  If you were to go out and study this all over again,

5    what other data would you also need to collect to replicate the

6    analysis that you did for your report?

7    A.  Well, I would need updated versions of all the data sets I

8    used, so updated versions of the KHP stop data, updated K-DOT

9    traffic censor data, updated SafeGraph mobile locations data,

10   canine sniff reports, etcetera.

11   Q.  Was there a reason for the temporal cut-off in the data

12   that you used to form your report?

13   A.  Yes.  So when I was retained in late 2020, I began working

14   with the plaintiffs' lawyers to obtain the necessary data for

15   the analysis.  That took many months of back and forth between

16   the lawyers, KHP, K-DOT, SafeGraph, all these entities.  I got

17   all this data together sometime in 2021, and was given a

18   deadline a few months later to produce the report.  So at the

19   time, my analysis basically reflected the most recent possible

20   data to use.

21   Q.  So you had a deadline you needed to complete your report in

22   this case?

23   A.  Yes.

24   Q.  Is there any reason to think that you would not find the

25   same results today?

1    A.   It's hard to speculate.  The -- again, as a data analyst,

2    I'd always want to see the new data and know for sure, and I'd

3    also want to know more about what's gone on in the agency in

4    the intervening period.  For example, like, whether any major

5    policy changes have taken effect.

6    Q.   If there had been no major policy changes when it comes to

7    traffic stops and then canine sniff detention practices, would

8    you expect to see a significant change from what you studied to

9    the data up through, let's say, yesterday?

10          MR. CHALMERS:  I think this is calling for

11   speculation, Your Honor, as he just said, and I object.

12          THE COURT:  He can handle it.  If it's speculation,

13   you'll say so; right?

14          THE WITNESS:  Okay.  Okay.  Yes.  Yeah, I don't know.

15   I don't know for sure without seeing the data.  If you told me

16   there were no major policy changes, I would think that the

17   chances of finding something very different would be much

18   smaller, and then you know -- but again, like, you would have

19   to do the analysis to be sure.

20          MS. BRETT:  Thank you.  No further questions, Your

21   Honor.

22          MR. CHALMERS:  Nothing here, Your Honor.

23          THE COURT:  Okay.  Can this witness be excused?

24          MS. BRETT:  Yes, Your Honor.

25          THE COURT:  Okay.  Thank you very much, sir.

1          THE WITNESS:  Thank you, Your Honor.

2          MS. BRETT:  Your Honor, I'm assuming the court would

3    like to break for lunch at one point soon.  I had one matter to

4    bring up, if that's okay.

5          THE COURT:  Sure.

6          MS. BRETT:  So I am -- I've been informed about some

7    of the ECF notifications about an evidentiary hearing that's

8    set for June 6th and 7th on the issue of qualified immunity

9    from the trial last week, and we were hoping to get some

10   further clarification from the court about what the court would

11   like to see at that hearing.  We are anticipating putting on

12   evidence, some of the evidence that explicitly excluded from

13   the jury trial last week that is relevant to qualified immunity

14   that we put in the brief regarding its relevance to qualified

15   immunity.  We're expecting to put that evidence on in our trial

16   this week, 'cause it is also relevant to the claims against

17   defendant Jones.  So we are just wondering if we could take the

18   opportunity to get some clarification from the court on that.

19         THE COURT:  So you were the one that asked for a

20   hearing, that's why I set it, and I assumed that you had

21   something in mind that you wanted me to consider that wasn't

22   otherwise part of the record.

23         MS. BRETT:  I see.  So I think there might have been a

24   miscommunication in our briefing, and I apologize for that.  We

25   wanted the court to consider evidence outside -- that was not

1   presented to the jury, understanding the court's ruling on the

2   motion in limine.  We believe we have presented that evidence

3   in the form of documents in the proffer that we put forward

4   that I offered to your clerk, and we anticipate that you will

5   also hear additional testimony about those documents during the

6   case this week, so it's our position that there's not

7   additional evidence that would need to be put on for the

8   purposes of that, beyond what the court will all ready hear

9   this week, so I apologize for the lack of clarification on that

10  point.

11          THE COURT:  I mean, certainly, I will consider

12  anything that's received into evidence in this trial.  I'm not

13  sure what proffer you're referring to.  Is it something you

14  filed?

15          MS. BRETT:  It was filed -- I believe the document I

16  read into the record, the document -- the exhibit numbers I

17  read into the record last week.

18          THE COURT:  Okay.

19          MS. BRETT:  When the jury was out.

20          THE COURT:  Okay.

21          MS. BRETT:  As part of our proffer.

22          THE COURT:  Okay.  Well, not as part of your proffer,

23  that is your proffer.

24          MS. BRETT:  Yes, that, and then we filed the -- the

25  specific reasons why we were offering that evidence about the

1    documents.

2         THE COURT:  Okay.  So everything that you want the

3    court to consider has been formally filed with the court and is

4    in CM/ECF; right?

5         MS. BRETT:  It has been formally filed, and we will

6    hear about it in live testimony this week as well.

7         THE COURT:  Okay.  Then, like I said, I was only

8    setting that for hearing because you asked for an evidentiary

9    hearing.  Mr. Chalmers, is there any reason why you needed to

10   have an evidentiary hearing?

11        MR. CHALMERS:  No, I don't -- I don't think there is,

12   Your Honor.  I would probably object to the evidentiary hearing

13   at this point, but -- so, no.

14        THE COURT:  It's all ready set.  Too late.

15        MS. BRETT:  Well, hopefully, it gives Your Honor a

16   couple days back on the calendar again.

17        THE COURT:  So that would be cancelled.

18        MS. BRETT:  Thank you, Your Honor.  Would you like to

19   proceed?

20        THE COURT:  Well, we might as well break for lunch,

21   but who is your next witness?

22        MS. PERRY:  Sure.  It's going to be a deposition

23   designation of Trooper Jirak.

24        THE COURT:  Okay.  All right.  How long will it be?

25        MS. PERRY:  55 minutes, and the one is 30 minutes.  We

1    don't have the trouble we had with the video.  It's just the

2    deposition designation.

3            THE COURT:  All right.  Then court will be in recess.

4    Let's resume at ten 'til 2.

5        (Whereupon court took a recess.  Proceedings then continued

6    as follows:)

7            THE COURT:  All right.  Let's bring on the next video.

8            MS. PERRY:  Your Honor, plaintiffs are going to play

9    the deposition designation of Lieutenant Greg Jirak, and for

10   purposes of the record, we'll mark that as Exhibit 132.

11           THE COURT:  Okay.  Go ahead.

12       (Deposition being played).

13           MS. PERRY:  Your Honor, I'd like to move to admit

14   Trial Exhibit 97 and Trial Exhibit 98.  The Trial Exhibit 97 is

15   referred to in the deposition as Exhibit 64, and Trial

16   Exhibit 98 is referred to as Exhibit 90.

17           THE COURT:  Any objection?

18           MR. CHALMERS:  97 and 98 are the two that you're

19   talking about?

20           MS. PERRY:  Yes.

21           MR. CHALMERS:  No, I don't have any objection.

22           THE COURT:  Received.

23           MS. PERRY:  Your Honor, we'll begin with the next

24   deposition designation, which is Trooper Ryan Wolting.

25       (Deposition played).

1          MS. PERRY:  Your Honor, with that, I'd move to move

2    into evidence Trial Exhibit 101 which is referred in the

3    deposition as Exhibit 56.

4          THE COURT:  Any objection?

5          MR. CHALMERS:  I think 101 might all ready be

6    admitted; maybe I'm mistaken, but I don't object to

7    Exhibit 101, whether it's been admitted or not.  I don't object

8    to Exhibit 101, whether it's been admitted or not.  I think

9    maybe it has been.

10         THE COURT:  All right.  Received.

11         MS. PERRY:  Thank you, Your Honor, and thanks for

12   bearing with us on the video deposition.  We're done with the

13   troopers who are out of the hundred mile range and couldn't be

14   brought in.

15         THE COURT:  All right.  Next witness.

16         MS. GREATHOUSE:  Yes, we would like to call Trooper

17   Clark, Captain Clark.

18         THE COURT:  Let's just take a five-minute recess so we

19   can all stretch.  Court's in recess.  Why don't we get him and

20   have him ready to go.

21      (Whereupon court took a recess.  Proceedings then continued

22   as follows:)

23         THE COURT:  All right, Trooper, would you please step

24   into the witness stand, raise your right hand so you can be

25   sworn?

1      (Witness sworn.)

2          THE WITNESS:  Yes.

3          MS. HARPER:  Thank you.  You may be seated.

4          MS. GREATHOUSE:  Good afternoon, Captain.

5                    MITCHELL CLARK,

6   Called as a witness on behalf of the plaintiffs, having been

7   first duly sworn, testified as follows:

8                    DIRECT EXAMINATION

9   BY MS. GREATHOUSE:

10  Q.   Could you please state your name for the record?

11  A.   My name is Mitchell Clark.

12  Q.   And your rank is still captain since the last time we

13  talked; is that correct?

14  A.   No, it's not.

15  Q.   What is it?

16  A.   Major.

17  Q.   Major.  Thank you.  And are you currently the commander of

18  the Professional Standards Unit for the KHP?

19  A.   No, I am not.

20  Q.   Okay.  You have a new position?

21  A.   Yes, I do.

22  Q.   What is your new position?

23  A.   Well, to back up, to give you chronological order, a year

24  ago, I did a lateral transfer from the Professional Standards

25  Unit to the Public and Government Affairs Unit.  Just within

1    the last few days then, I was promoted to major.

2    Q.   Okay.  Okay.  Congratulations.

3    A.   Thank you.

4    Q.   You gave a deposition in this case on January 27th of 2022;

5    is that correct?

6    A.   That is correct.

7    Q.   And at that point in time, you were the commander of the

8    Professional Standards Unit; is that correct?

9    A.   That is correct.

10   Q.   And when you gave that deposition, you were giving your

11   deposition, or you understood that your testimony at that time

12   was the official testimony of the Kansas Highway Patrol on

13   certain topics; is that correct?

14   A.   That's correct.

15   Q.   All right.  And when you were the commander of the

16   Professional Standards Unit, who did you report to in that

17   role?

18   A.   The superintendent.

19   Q.   All right.  If you could look at the manual in front of you

20   for Exhibit 72.  Is it all right if I approach, Your Honor?

21          THE COURT:  Yes.

22          THE WITNESS:  Okay.  See all the way to 65.  Am I

23   missing something?

24   BY MS. GREATHOUSE:

25   Q.   Do you recognize Exhibit 72?

1  A.  Umm, this is the Kansas Highway Patrol Policy Admin 07,

2  complaints, reporting and administrative investigations.

3  Q.  And is that a document you're familiar with?

4  A.  Yes, it is.

5  Q.  And it is a policy that went into effect on October 1st of

6  2019; is that correct?

7  A.  Correct.

8  Q.  And does the document appear to you to be a true and

9  accurate copy of the Kansas Highway Patrol's policy?

10  A.  Yes, it does.

11        MS. GREATHOUSE:  I move to enter Exhibit 72, Your

12  Honor.

13        MR. CHALMERS:  No objection.

14        THE COURT:  Received.

15  BY MS. GREATHOUSE:

16  Q.  So Exhibit 72 is the KHP's internal policy for reporting

17  complaints about KHP personnel; is that correct?

18  A.  That is correct.

19  Q.  And this policy is also the internal policy on how the PSU

20  conducts internal investigations; is that correct?

21  A.  Correct.

22  Q.  And I suppose real quick, we should define the acronym PSU.

23  PSU stands for the Professional Standards Unit; is that

24  correct?

25  A.  Correct.

1  Q.  And it's accurate that the PSU is the Kansas Highway

2  Patrol's internal affairs unit; is that correct?

3  A.  Correct.

4  Q.  If you could turn to Sections 6 and 7, Roman 6 and 7 of

5  this policy.  Those describe the duties that you had when you

6  were the commander of the PSU; is that correct?  Go ahead and

7  look.

8  A.  That is correct.

9  Q.  Okay.  And those duties included among others the fact that

10 you were supervising the receipt, processing and investigations

11 of complaints; is that correct?

12 A.  That's correct.

13 Q.  And similarly, in special investigations that were directed

14 by the superintendent; is that correct?

15 A.  Correct.

16 Q.  In that role, you developed the investigative policies, the

17 internal investigative policies for the KHP; is that right?

18 A.  I'm sorry, I don't understand your question.

19 Q.  In that role, one of your jobs was to develop the

20 investigative policies for the KHP; is that correct?

21 A.  Well, when you're saying develop the policies, change this

22 policy?  Are you saying -- I just want to clarify, counsel.

23 Q.  Certainly.  Please look at on Page 10 under Roman 7 F.  I'm

24 sorry, Exhibit 72, Roman 7 F.  It's on Page 10 of Exhibit 72.

25 A.  Correct.

1  Q.  Okay.  So that indicates that one of your jobs was to

2  develop investigative policy and procedure consistent with

3  current administrative case law?

4  A.  Correct.

5  Q.  All right.  Again, one of your duties as the commander of

6  the PSU was to notify the superintendent of complaints about

7  KHP personnel that contained serious allegations of misconduct;

8  is that correct?

9  A.  That is correct.

10  Q.  And in your role, you were to submit weekly reports to the

11  superintendent on the status of active administrative

12  investigations; is that correct?

13  A.  That is correct.

14  Q.  And one of the things that you did was, you were in charge

15  of making sure that the public could figure out how to make

16  complaints to the KHP; is that correct?

17  A.  That is correct.

18  Q.  And complaints could either be submitted by the public via

19  a phone call, a written document, or via the web site; is that

20  correct?

21  A.  That is correct.

22  Q.  And then finally, you were the liaison with KHP legal

23  counsel and the attorney general in matters involving

24  administrative investigations; is that correct?

25  A.  Correct.

1   Q.   Okay.  And if you would look on Page 2 of Exhibit 72, we're

2   going to focus on Section B for a moment.

3   A.   Receiving complaints?

4   Q.   Yes.  Just a second, I'm waiting for the screen to catch up

5   with us, Page 2, Section B.  And so this portion of the policy

6   describes how PSU complaints are received, is that correct, B,

7   not D?

8   A.   B as in boy; that is correct.

9   Q.   Sorry, I was communicating with the people that are running

10   the screens, I apologize.

11   A.   My apologies.

12   Q.   So B is the section that describes how PSU complaints are

13   received; is that correct?

14   A.   That is correct.

15   Q.   And one of the major pieces of policy in Section B is that

16   all KHP employees are not to discourage reporting by somebody

17   from outside the KHP; is that correct?

18   A.   That is correct.

19   Q.   Okay.  And then looking at Exhibit or Section C that's

20   right beneath it there, that section sets out the obligation of

21   KHP employees to report misconduct internally; is that correct?

22   A.   That is correct.

23   Q.   And that section identifies a duty on behalf of every

24   employee in the KHP to -- when someone -- when it appears that

25   someone in the KHP has violated a person's Constitutional

1  rights, they're obligated to report it under this section; is

2  that correct?

3  A.  That is correct.

4  Q.  In your time in the PSU, and as of the date that you gave

5  your deposition in January of '22, the PSU hadn't received a

6  single internal allegation of a Constitutional violation; is

7  that correct?

8  A.  None had ever been received during my time there, and I was

9  not aware of any at any time.

10  Q.  Okay.  So not only -- so you're saying that no internal

11  report of a Constitutional violation came in while you were the

12  commander of the PSU; is that correct?

13  A.  That's correct.

14  Q.  And that you're not aware of any such internal report

15  having been made ever inside the KHP?

16  A.  I'm not aware of any.

17  Q.  Okay.  In your deposition, we discussed morale issues that

18  might arise if one employee complains about another.  Do you

19  recall that?

20  A.  Not specifically.

21  Q.  Okay.  Well, let's -- let's try it this way.  Do you

22  recall -- is it accurate that a complainant is more likely -- a

23  complainant, so the person making the complaint is more likely

24  to experience a morale problem or a difficult situation after

25  they've made a complaint than the person that is the subject of

1    the complaint?

2    A.   It's possible.

3    Q.   Is it possible or is it more likely that they are going to

4    experience a difficulty if you make a complaint rather than if

5    a complaint is made against you?

6    A.   In -- and just to be clear, we're talking as -- as another

7    law enforcement officer complaining on another law enforcement

8    officer; is that what you're talking about?

9    Q.   We are talking about one person inside the KHP making a

10   complaint about another person inside the KHP.

11   A.   Yeah, it would -- it would -- it can affect.

12   Q.   And this is because if a complainant uses their own name in

13   submitting the complaint, their name will be revealed to the

14   subject of the complaint; is that right?

15   A.   That's correct.

16   Q.   And as a matter of KHP policy?

17   A.   That's correct.

18   Q.   Now, back to -- well, and let me ask.  Is that more

19   difficult situation that a complainant is going to experience

20   going to be as the result of co-workers retaliating against

21   them?

22   A.   You're asking if it makes it more difficult that they fear

23   the retaliation?

24   Q.   My question is, is the difficulty that they will experience

25   by making a complaint the fact that their co-workers might

1  retaliate against them?

2  A.  I think it's difficult anytime you're making -- having to

3  be brought forward and make a complaint on another colleague.

4  I'm not going to sit here and say that they fear retaliation.

5  It's just a difficult position to be in.

6  Q.  Right.  So it's more likely that perhaps they would be

7  ostracized by their co-workers for having registered a

8  complaint?

9  A.  Very likely, yes.

10  Q.  Okay.  Back to Exhibit 72, looking at Page 5 now, and

11  actually, Section 5 on Page 5, that particular section of the

12  policy describes how the PSU conducts investigations; is that

13  correct?

14  A.  That's correct.

15  Q.  All right.  We're going to come back to 72 in a moment.

16  Can we look at 73 please, and if you would please look at

17  Exhibit 73 in your manual, or in your notebook?

18  A.  I'm there.

19  Q.  Okay.  And Exhibit 73 is an earlier version of Exhibit 72;

20  is that correct?

21  A.  That is correct.

22  Q.  So Exhibit 73 merely covers the time between June 2019

23  until I think it's October of 2019 when Exhibit 72 comes into

24  play; is that correct?

25  A.  That's correct.

1    Q.  All right.  And is it accurate to say that both 72 and 73

2    stated the official policy of the KHP during the periods of

3    time in which they were in effect?

4    A.  Correct.

5    Q.  All right.  Let's go back to 72.  And looking at the list

6    of your -- or of the -- the investigative responsibilities of

7    the PSU that are in -- on Page 5 in Section 5, one of these

8    duties that -- actually, let's talk about what your duties are.

9    I apologize for being confusing.  I actually want to see

10   Page 11.  And that Section O on Page 11 lays out what your

11   duties were as a commander of the PSU.  Is that accurate?

12   A.  That is correct.

13   Q.  Okay.  And one of those duties was to prepare an annual

14   administrative review of all complaints; is that correct?

15   A.  Correct.

16   Q.  And you were doing that reporting of common causes of

17   complaints that might need to be addressed by the KHP; is that

18   correct?

19   A.  Yes.

20   Q.  And a second category to be included in your review and

21   report is identification of employees receiving a relatively

22   high number of complaints; is that correct?

23   A.  Correct.

24   Q.  And that would be done so that appropriate remedial steps

25   could be taken with any employee that is -- has an exceedingly

1   high number of complaints; is that correct?

2   A.   That -- that's one of the things; yes.

3   Q.   Okay.  And in your first report to the executive command --

4   well, let's ask this first.  The first report that you made to

5   the executive command when you were over the PSU was the report

6   in 2020; is that correct?

7   A.   That is correct.

8   Q.   And is it -- it's accurate that your first report in 2020

9   did not contain a review and report or identification of

10  employees receiving a high number of complaints; right?

11  A.   I believe that's correct.

12  Q.   And that happened because you followed the form that had

13  been used by prior commanders of the PSU; correct?

14  A.   That is correct.

15  Q.   And so prior to you and the forms that you followed, no one

16  had been including a review and identification of employees

17  with a relatively high number of complaints.  Is that accurate?

18  A.   Based off the one that I had copied before, that there

19  wasn't anything from that previous year.

20  Q.   All right.  Okay.  So back to our discussion of your duties

21  as laid out in Exhibit 72, one of those is to notify the

22  superintendent immediately of complaints containing serious

23  allegations of misconduct; is that right?

24  A.   That is correct.

25  Q.   And on Page 2 in Section C of this policy -- there you go.

1   Thank you. They're getting it up on the screen behind you. So

2   Section C 1 A identifies the serious allegations of misconduct

3   that you would have been required to immediately report to the

4   superintendent; is that correct?

5   A.   That is correct.

6   Q.   And specifically, C 1 A includes among these serious

7   allegations to be immediately reported conduct which appears to

8   constitute a violation of a person's Constitutional rights; is

9   that correct?

10   A.   That is correct.

11   Q.   So according to this policy, every time a complaint comes

12   in to the PSU containing a serious allegation of a violation of

13   a person's Constitutional rights, you are supposed to

14   immediately report it to the superintendent; is that correct?

15   A.   That's correct.

16   Q.   Now, let's talk about the investigative or the

17   investigatory duties of the PSU. A major function of the PSU

18   is investigating allegations of misconduct made by any person

19   against a patrol employee; is that correct?

20   A.   That's correct.

21   Q.   And the PSU has investigators who conduct those

22   investigations; right?

23   A.   Correct.

24   Q.   And this policy sets out how those PSU investigators gather

25   information on a complaint; correct?

1 A. Correct.

2 Q. And when there's an allegation of misconduct against a

3 patrol employee, one of the first steps that's taken is that

4 the employee is notified of the complaint; right?

5 A. Correct.

6 Q. And then after an investigator completes their

7 investigation, they prepare a report on their investigation;

8 correct?

9 A. Correct.

10 Q. And the components of such a report include a finding of

11 fact and conclusions; is that correct?

12 A. That is correct.

13 Q. And the investigators are also to note in their report

14 discrepancies in policy or training or equipment when that

15 discrepancy might be important to the KHP; is that correct?

16 A. That is correct.

17 Q. Now, in the report, there are classifications of the

18 allegations that are made; is that correct?

19 A. That is correct.

20 Q. And the investigators, in fact, classify their PSU reports

21 under your guidance; is that correct?

22 A. Correct.

23 Q. And there are six classifications that can be given to a

24 final PSU report; correct?

25 A. Correct.

1    Q.   And those are identified in Section Q, which is on Pages 8

2    and 9 of Exhibit 72, and I'd like to talk about those

3    classifications, so let me know when you're there.

4    A.   I am there.

5    Q.   Okay.  So the first classifications -- well, and let's

6    clarify.  When you get a complaint, there are -- there's maybe

7    one allegation.  There's maybe more than one allegation in a

8    complaint; right?

9    A.   There can be, yes.

10   Q.   Right.  So there could be one, there could be multiple;

11   correct?

12   A.   Correct.

13   Q.   And so when the report's being classified, each of the

14   allegations would receive their own classification; correct?

15   A.   Correct.

16   Q.   And they may be different; correct?

17   A.   That is correct.

18   Q.   All right.  So one of the classifications would be that the

19   allegation is unfounded; is that right?

20   A.   That is correct.

21   Q.   And an unfounded allegation is one that's not supported by

22   facts; right?

23   A.   Correct.

24   Q.   Okay.  And then we've got exonerated, and exonerated means

25   that whatever is alleged didn't occur; is that right?  Or no,

1    wait.

2    A.   Says it did occur.

3    Q.   Yeah, the allegation is factual and did occur.  However,

4    the employee acted lawfully and properly.  So in other words,

5    they did what they were alleged to have done, but what they did

6    was legal; is that correct?

7    A.   That is correct.

8    Q.   Okay.  And then we've got not sustained, and not sustained

9    means that there was insufficient evidence in order to prove or

10   disprove the allegations; is that right?

11   A.   That is correct.

12   Q.   Okay.  Now, the next sentence in not sustained.  It talks

13   about -- it starts with this disposition.  Do you see that?

14   A.   Yes.

15   Q.   Could you read that sentence, please?

16   A.   This disposition shall also be assigned to any anonymous

17   complaint which after investigation lacks corroborative

18   information or events.

19   Q.   What does that mean by lacking corroborative information or

20   evidence?

21   A.   Umm, allegation that not -- not in view of the camera.

22   They're making a complaint that an officer used force or

23   touched them in an inappropriate way, something off camera that

24   -- but also doesn't fit the scenario due to, you know, whatever

25   the sound may have been captured by or what-not.

1  Q.   But this sentence is specifically about an anonymous

2  complaint; right?

3  A.   For not sustained?

4  Q.   Yes.

5  A.   Correct.

6  Q.   So anytime there is an anonymous complaint which cannot be

7  corroborated, it gets a not sustained classification; right?

8  A.   It can.

9  Q.   No, this says shall; is that right?

10  A.   It does say shall.

11  Q.   Right.  So if there's an anonymous report that comes in and

12  you can't corroborate it, it will be given a not sustained

13  classification; is that correct?

14  A.   Correct.

15  Q.   Now, when we were talking about employee -- internal

16  employee complaints, one employee complaining about another,

17  it's correct that an employee would be allowed to make an

18  anonymous complaint; is that correct?

19  A.   That is correct.

20  Q.   And so then their name wouldn't be on it; is that correct?

21  A.   That's correct.

22  Q.   But if they didn't put their name on it, then it's going

23  to -- well, let's just ask.  Is it going to get a not sustained

24  if you can't get ahold of someone to interview them to figure

25  out what happened?

1    A.   Yes.

2    Q.   All right.  The next classification is sustained, and that

3    is where an allegation is determined by the investigation to be

4    factual, and is substantiated by competent evidence that is

5    found by the PSU investigators; is that correct?

6    A.   Correct.

7    Q.   All right.  So a sustained allegation means that the

8    trooper did it.  Is that a short way of saying that?

9    A.   In this -- a situation where -- where a trooper was -- was

10   alleged to have done something, yes.

11   Q.   Okay.  The next one is called misconduct not based on

12   complaint.  That one's a little more fuzzy, but as I understand

13   it, and tell me if I'm wrong, what that means is that during

14   the investigation, the PSU investigator found something that

15   wasn't in the allegations that came in on the complaint; is

16   that correct?

17   A.   That's correct.

18   Q.   And then finally, the last one is closed, and that's where

19   an investigation of an allegation is terminated sort of midway;

20   is that correct?

21   A.   Correct.

22   Q.   All right.  So when an investigatory report is completed by

23   PSU investigators, the next step, at least in the policy, is

24   that you review it as the commander; is that correct?

25   A.   That is correct.

1  Q.  And at that point in time, you could make changes to the

2  report if you wanted to?

3  A.  I could.

4  Q.  All right.  And -- but once you're satisfied with the

5  report, it is then sent through the chain of command; is that

6  correct?

7  A.  That is correct.

8  Q.  And at this time, it will have gotten one of those

9  classifications; is that correct?

10  A.  Correct.

11  Q.  And that report is also supposed to include any

12  recommendation from the PSU on measures to correct

13  deficiencies; is that correct?

14  A.  Correct.

15  Q.  In other words, the PSU will include recommendations for

16  some corrective measures that should be taken with regard to

17  that trooper; is that correct?

18  A.  Correct.

19  Q.  So other than something like some training recommendations

20  that might come through this recommendation, the PSU has no

21  other input and makes no recommendation on what happens to a

22  trooper that is subject of a PSU investigation; is that

23  accurate?

24  A.  That's accurate.

25  Q.  So after you have reviewed the report, it makes its way to

1    the superintendent; is that correct?

2    A.   That's correct.

3    Q.   And at the time you were in charge of the PSU, that would

4    have been Colonel Jones; is that correct?

5    A.   That's correct.

6    Q.   And after -- so after the report is finished, and it's

7    headed on its way up the chain of command, the employee about

8    -- or the trooper about which the complaint has made is

9    notified that the investigation is done; is that correct?

10   A.   Correct.

11   Q.   And they're told that it's been submitted to the

12   superintendent; is that correct?

13   A.   Correct.

14   Q.   Now, eventually, the complainant will also be notified

15   about what the result of the PSU investigation is, but it's not

16   at this point in time; correct?

17   A.   That is correct.

18   Q.   So the complainant is only told about it after the

19   executive command has seen the report and made a decision; is

20   that correct?

21   A.   That's correct.

22   Q.   So let's assume that the PSU makes the finding that a

23   person's Constitutional rights were violated, and that finding

24   is contained in the report as sustained, it's the executive

25   commander who will decide what corrective action or discipline

1    should be required of the trooper; is that correct?

2    A.   That's correct.

3    Q.   Does the KHP have a policy and procedure addressing

4    corrective action and discipline that is to be applied to

5    sustained PSU findings?  Let's do this.  Look at Exhibit 74,

6    please.

7    A.   I'm there.

8    Q.   Okay.  Do you recognize Exhibit 74?

9    A.   I do.

10   Q.   Could you identify it for the record?

11   A.   That's ROCO 5, discipline and/or corrective action.

12   Q.   Okay.  And this document is the KHP's policy addressing

13   corrective action and discipline?

14   A.   It is.

15   Q.   And is that the policy that is to be applied once there is

16   a sustained finding in a PSU complaint?

17   A.   Correct.

18   Q.   So let's talk about what is corrective action and what is

19   discipline, all right, as defined in this policy?

20   A.   Yes.

21   Q.   Okay.  So corrective action is something like counseling or

22   a verbal reprimand or remedial training; right?

23   A.   Correct.

24   Q.   So corrective action is designed to help correct what the

25   trooper has done; is that correct?

1  A.  Yeah, to correct, prevent it from happening again.

2  Q.  Right.  Corrective action isn't punishment.  It's helping

3  them do better.  Is that accurate?

4  A.  That is accurate.

5  Q.  Discipline, on the other hand, is pretty different, because

6  it includes options like suspending or demoting someone; is

7  that correct?

8  A.  That is correct.

9  Q.  All right.  So Exhibit 74 addresses corrective action on

10  Pages 1 and 2; is that correct?

11  A.  Yes.

12  Q.  And then Pages 3 through 5 address discipline.  Do I have

13  that right?

14  A.  That is correct.

15  Q.  All right.  So when you look at those pages starting with

16  corrective action on Page 1, moving through discipline on

17  Page 5, does the policy identify sort of a scale from fairly

18  mild to fairly severe in the corrective action to discipline

19  matrix?

20  A.  In comparison through counseling session to possible

21  suspension or termination, yes.

22  Q.  So it starts out on Page 1 with things like counseling,

23  duty change, and verbal reprimands; is that correct?

24  A.  That is correct.

25  Q.  And that's among those things that are corrective action?

1    A.    Yes.

2    Q.    All right.  And one of the things that is considered

3    corrective action is remedial training and counseling, and

4    that's on Page 2 of this policy in Roman 4 B; is that right?

5    A.    That is correct.

6    Q.    What are the categories of corrective action that are less

7    serious than remedial training and counseling?

8    A.    I'm sorry, your question again?

9    Q.    Yes.  What are the categories of corrective action that are

10   less serious than remedial training and counseling?  Let me see

11   if I can help you out here.  If you're looking at remedial

12   training and counseling in Roman 4 B; is that correct?

13   A.    That is correct.

14   Q.    And if I remember correctly, in that exhibit, it's part way

15   down Page 2; is that right?

16   A.    If you're talking Day One -- Day One, Small A, Number 1

17   through 5.

18   Q.    No, I'm sorry, I'm looking at Page 2, Roman 4 B, Page 2.

19   Are you on Exhibit 74?

20   A.    I am.

21   Q.    Okay.

22   A.    I am at B, remedial training and counseling.

23   Q.    Okay.  Now, the items of corrective action that are above

24   on -- physically on the piece of paper that are above remedial

25   training and counseling, or on the bottom of Page 1,

1    immediately preceding are the types of corrective action that

2    are less serious than remedial training and counseling.  Is

3    that accurate?

4    A.  Yeah, if you're talking about 7, 8, and 9.

5    Q.  I am talking about at the top of Page 2.

6    A.  Yes.

7    Q.  We have 6 through 9 that are listed; is that correct?

8    A.  That is correct.

9    Q.  And then at the bottom of Page 1, we have 1 through 5; is

10   that correct?

11   A.  That is correct.

12   Q.  So there are nine categories or items of corrective action

13   that are less serious than remedial training and counseling;

14   correct?

15   A.  That are less than remedial training?

16   Q.  Yes.

17   A.  Well, if I understand your question, umm, there's an

18   administrative leave with pay, recommended suspension or

19   dismissal.  That's -- I would take a -- a counseling session

20   before I would take any of those.

21   Q.  Umm, which sections are you looking at?

22   A.  On the top of Page 2, bottom of Page 1.

23   Q.  Okay.  So let's go through those.  And these are the items

24   that are before remedial training and counseling in this

25   Exhibit 74; is that correct?

1   A.  That is correct.

2   Q.  You know, before I forget, Your Honor, I'd like to move 74

3   into evidence.

4            THE COURT:  Any objection?

5            MR. CHALMERS:  No, Your Honor.

6            THE COURT:  Received.

7   BY MS. GREATHOUSE:

8   Q.  All right.  So looking -- and I will start at the bottom of

9   Page 1, the items that are listed here in Roman 4 A are

10  counseling; is that right?

11  A.  That is correct.

12  Q.  Denying personal requests?

13  A.  Correct.

14  Q.  What is a denial of a personal request?

15  A.  Somebody wants to go to training, somebody wants a day off,

16  certain times off, things like that.

17  Q.  All right.  And then we have documenting information for

18  evaluation purposes; is that correct?

19  A.  That is correct.

20  Q.  Does that mean that a supervisor is going to write down

21  what happened to use it in an evaluation?

22  A.  That's how I would interpret that.

23  Q.  All right.  So that's considered a corrective action?

24  A.  For things that are going to be documented for the

25  performance evaluation.

1   Q.   'Cause some wouldn't be documented for performance

2   evaluation; right?

3   A.   Correct.

4   Q.   All right.  So another corrective action would be to change

5   duty house or get extra duty assignments; is that correct?

6   A.   That is correct.

7   Q.   Another one that's less than a remedial training or

8   counseling is a verbal reprimand; is that correct?

9   A.   That's correct; yeah.

10  Q.   That's sort of like a correction that's not documented;

11  right?

12  A.   Right.

13  Q.   Then the next one is a written reprimand; is that correct?

14  A.   Yes.

15  Q.   And then we have administrative leave with pay; is that

16  correct?

17  A.   That is correct.

18  Q.   So that's kind of like a free day off; is that right?

19  A.   One can interpret it that way.

20  Q.   Okay.  Then there's a recommend-- a recommendation of

21  suspension or dismissal; right?

22  A.   Yes.

23  Q.   So it's not actually a suspension or dismissal, it's that a

24  corrective action could be that someone recommends that you be

25  suspended or dismissed; right?

1    A.   Supervisor could make those recommendations.

2    Q.   Okay.  And then number nine is that the KHP could demand

3    repayment for state property that is damaged as a result of

4    something that a trooper does; is that correct?

5    A.   That's correct.

6    Q.   Okay.  So we have those nine things that could happen to a

7    trooper on a sustained finding; right?

8    A.   Correct.

9    Q.   And then the next level of corrective action is remedial

10   training and counseling; is that right?

11   A.   Correct.

12   Q.   Now, explain to me what you understand the meaning of

13   remedial training and counseling to be.

14   A.   Umm, performance, not performing as to standards, to

15   policy.  Remedial could be a correction of a driving, having

16   different instances supervisors addressing with that employee.

17   It progresses.  The employee may be -- may be involved in an

18   accident driving -- as a result of driving, you know,

19   improperly.  We would then do a remedial, send them to our

20   academy, have our driving team address the issues.  We could do

21   those -- those steps.

22   Q.   All right.  So if you would look at Section 4 B 2.  Do you

23   see that?

24   A.   Remedial training?

25   Q.   Yes.

1  A.  Yes, I do.

2  Q.  So the policy says that remedial training is to be used as

3  the first option when addressing minor rule violations in

4  adequate job performance or deficient work habits; is that

5  right?

6  A.  That's correct.

7  Q.  So you're only supposed to use remedial training and

8  counseling for a minor rule violation, and then those other

9  areas; right?

10  A.  That's what it says.

11  Q.  Well, that's the policy; right?

12  A.  Yes.  Yes.

13  Q.  Okay.  So to summarize, just to make sure that we've got

14  this all down.  Additional training is corrective action and

15  not discipline; is that correct?

16  A.  Correct.

17  Q.  And counseling a trooper is corrective action, not

18  discipline; is that correct?

19  A.  Correct.

20  Q.  Are you familiar with the PSU investigation that happened

21  with regard to the stop of Joshua Bosire?

22  A.  Umm, not familiar in terms of that I was involved in it.  I

23  knew more or less a complaint had been taken, or a call had

24  been received, but I don't -- I don't know the full intricacies

25  of it.

1    Q.  And in your deposition, you were designated to testify

2    about the PSU investigation involving the stop of Joshua

3    Bosire; is that correct?

4    A.  Yes.

5    Q.  And so you have given testimony in this case about that

6    stop?

7    A.  Yes.

8    Q.  Is that correct?

9    A.  That's correct.

10   Q.  Okay.  If you could please find Exhibit 19, Page 213.  It's

11   a big exhibit, I'm sorry.

12   A.  I seem to not be seeing the page numbers that you're --

13   Page 219; is that right?

14   Q.  213.

15   A.  13?  They're not numbered.  Okay.

16         MR. CHALMERS:  The bates number.

17   BY MS. GREATHOUSE:

18   Q.  The bates number on it, so if you look at the number in the

19   lower right-hand, it's going to say OAG 008501?

20   A.  Uh-huh, correct.  Okay.  Thank you.

21   Q.  Thank you.

22   A.  I am there.

23   Q.  Okay.  Have you seen this document before?

24   A.  I believe I have, yes.

25   Q.  Does it help you if I -- if I reminded you that that was a

1  document that you saw during your deposition that you gave in

2  the case?  Is that where you're thinking you saw it?

3  A.  I'm sure you likely showed it to me then.  I'm not

4  recalling that's when I saw it.

5  Q.  But you do believe you've seen the document before?

6  A.  Correct.

7  Q.  Can you please identify it for the record?

8  A.  This is an internal letter.  It's on KHP stationary

9  letterhead.  This is more or less a -- a -- a letter that was

10  completed by the captain who was in charge of Trooper Brandon

11  McMillan.

12  Q.  All right.  So is Exhibit 19, Page 213 the kind of document

13  that would be kept in the PSU file on a particular complaint?

14  A.  Yes.

15  Q.  And this appears to be a document that was from the PSU

16  file related to the complaint against Trooper McMillan by Mr.

17  Bosire; is that correct?

18  A.  I believe that would be correct.

19        MS. GREATHOUSE:  Your Honor, I'd like to move

20  Exhibit 19, Page 213 into evidence.

21        MR. CHALMERS:  I don't have any objection to the one

22  specific page.  I don't -- it doesn't say 213 in my copy, but I

23  think it's OAG 008501.  So if we're talking about the same

24  thing, I don't have any objection.

25        MS. GREATHOUSE:  That's the correct bates number on

1   it, and thank you for that clarification.

2           THE COURT:  All right.  Received.  All right.

3   BY MS. GREATHOUSE:

4   Q.  If we would go to Page 13 of Exhibit 19.  This is the

5   problem with electronic documents versus hard documents.  He's

6   got it.  It's the letter we were just talking about, the one

7   from the captain of Troop T to Trooper McMillan.  You've got

8   that in front of you; right?

9   A.  I do, yes.  Yes.

10  Q.  Okay.  So this is a letter dated August 5th of 2019; is

11  that correct?

12  A.  That is correct.

13  Q.  And this is the letter informing Trooper McMillan that the

14  investigation regarding him has been completed, and has been

15  submitted up the chain of command; is that correct?

16  A.  Correct.

17  Q.  So the executive command has not yet decided what's going

18  to happen as a result of the complaint, but it's just telling

19  Trooper McMillan that it's now up at the superintendent's

20  office; is that correct?

21  A.  That is correct.

22  Q.  All right.  And this letter also identified the two

23  allegations that Mr. Bosire made against Trooper McMillan, and

24  the conclusions that the PSU came to with regard to those

25  allegations; is that correct?

1    A.    That is correct.

2    Q.    And Mr. Bosire made two allegations against Trooper

3    McMillan; is that correct?

4    A.    That's correct.

5    Q.    One of them was that he believed his race played a role in

6    the stop; is that correct?

7    A.    That's correct.

8    Q.    And the PSU determination was that race was not a factor;

9    is that correct?

10   A.    Correct.

11   Q.    However, the second allegation was, in fact, a sustained

12   allegation; is that correct?

13   A.    I believe that's correct.

14   Q.    And it was determined that Trooper McMillan held Mr. Bosire

15   longer on the roadside than was necessary; is that correct?

16   A.    Correct.

17   Q.    All right.  And then the next paragraph of the letter,

18   which is -- which starts with, as a result of your actions.  Do

19   you see that?

20   A.    Yes, I do.

21   Q.    All right.  So would you please read that paragraph?

22   A.    As a result of your actions to hold Bosire longer than

23   necessary during a traffic stop and subsequent canine sniff,

24   you shall complete a one hour legal review with legal counsel

25   at a date to be determined to ensure you are up to date with

1    current legal standards of proof related to traffic stops and a

2    search and seizure.  You are also to ride with troop supervisor

3    for one shift where the legal review will be put into practical

4    application to further ensure you understood the search and

5    seizure process.

6    Q.   All right.  So this letter does inform Trooper McMillan of

7    some corrective action that is going to occur with regard to

8    the sustained finding that he held Mr. Bosire for longer on the

9    roadside than was necessary; is that correct?

10   A.   That's correct.

11   Q.   It's accurate that Trooper McMillan was not disciplined in

12   any way for violating Mr. Bosire's Constitutional rights; is

13   that right?

14   A.   That is correct.

15   Q.   He was only given corrective action?

16   A.   That's correct.

17   Q.   He had to do some additional training; is that right?

18   A.   Correct.

19   Q.   And he was going to get some counseling; is that correct?

20   A.   Correct.

21   Q.   Do you recall that at your deposition, we discussed how the

22   KHP views Constitutional violations?

23   A.   I don't recall.

24   Q.   Okay.  Well, would you agree that a Constitutional

25   violation is just a minor rule violation, or is it something

1   bigger than that?

2   A.  It's bigger than that.

3   Q.  Right.  And corrective action is only supposed to be used

4   for a minor rule violation; is that right?

5   A.  Correct.

6   Q.  That didn't happen here, did it?

7   A.  No.

8   Q.  So to conclude, in response to a sustained finding of a

9   Constitutional violation, the KHP only gave Trooper McMillan

10  corrective action and not discipline; is that right?

11  A.  That's correct.

12          MS. GREATHOUSE:  I pass the witness for now.

13          THE COURT:  Cross-examination?

14                      CROSS EXAMINATION

15  BY MR. CHALMERS:

16  Q.  I want to talk to you about KHP Policy 74, so might grab

17  that real fast.  Put that up on the screen.  If you turn to --

18  to Page -- well, to Page 2 of the document.

19  A.  I am there.

20  Q.  Okay.  And it says under B 1, as a function of corrective

21  and disciplinary systems, remaining training and/or counseling

22  may be employed by itself or in conjunction with one or more of

23  the other elements of the corrective action slash disciplinary

24  system.  Was that your understanding of the policy?

25  A.  That's as I read it.

1   Q.  Is that your understanding as to how the policy was

2   employed when you were with PSU?

3   A.  I don't have a specific instance to draw from.

4   Q.  Okay.

5   A.  But that's -- that's what we would look at.

6   Q.  Now then, looking further at the document, we get to

7   specific acts for which disciplinary action may be assessed at

8   Page 3 of the document.  Do you see that?

9   A.  I do, yes.

10   Q.  And it references the Kansas Civil Service Act, does it

11   not?

12   A.  It does.

13   Q.  And in that context, your -- you are an employee of the

14   Kansas civil service; is that right?

15   A.  That is correct.

16   Q.  The obligations of the state employer with respect to its

17   employees and what discipline can be meted out, do you

18   understand that that falls under the provisions of the Kansas

19   Civil Service Act?

20   A.  Yes.

21   Q.  And so if we look at this policy, does it go forth -- or

22   does it set forth the terms under which discipline --

23   discipline can be meted out consistent with that act?

24   A.  That is correct.

25   Q.  I'm not going to ask you to go through it exactly, but if

1  you look at the policy, Page 3 starting at Paragraph 3 under A,

2  where it talks about KSA 752949 E, there's the non-exclusive

3  list for what you can do if you want to dismiss, demote,

4  suspend an employee statutorily; is that right?

5  A.  That is correct.

6  Q.  And is that part of the -- as you are involved with PSU,

7  has that been part of the policy with the highway patrol?

8  A.  Yes.  Yes, it has.

9  Q.  And the policy of the highway patrol with respect to what

10  discipline it metes out and so forth, is it then -- then

11  described then in these provisions we talked about, or in

12  the -- in the statute?

13  A.  Yes, that is correct.

14  Q.  If we get to Exhibit 19 for a second, if you could pull

15  that up, that's that other -- you're probably close to the

16  page, so the letter that I think counsel told -- showed you was

17  at OAG 0503, which has now been introduced as Exhibit 19.

18  Looking at that letter, it talks about that Mr. Bosire --

19  excuse me, that -- whoops, maybe I've got the wrong number

20  here.  Let's see if I got the right one.  It's 8501 is what I

21  want you to look at.  I'm sorry.

22  A.  Correct.

23  Q.  In 8501, it talks about the corrective action that the

24  employee's now going to have to undergo; is that correct?

25  A.  Correct.

1  Q.  Does that signal to you that this particular letter and

2  this decision had all ready worked its way up -- worked its way

3  up to the chain of command to Colonel Jones before it was

4  written?

5  A.  Do I believe this letter had made it to Colonel Jones?

6  Q.  Yeah.

7  A.  Umm, this is a closing letter.  I'm sitting here before the

8  court.

9  Q.  Well, let me ask you it differently, 'cause I don't want

10  you to guess.  Do you know whether or not the decision with

11  respect to whether there had been a sustained violation had

12  worked its way up to Colonel Jones before this letter had been

13  reached or issued?

14  A.  No.  No.

15  Q.  You don't know one way or the other?

16  A.  I don't know that.

17  Q.  If we look at the same -- same document which has been

18  marked generally as Exhibit 19, if we look at 8503, is that a

19  document that you recognize as being part of the PSU file?

20  A.  Yes.

21  Q.  And what's the date on that document?

22  A.  July 25th, 2019.

23  Q.  And it is -- it has a signature line on it, does it not,

24  for both Superintendent Jones and for Lieutenant Bullock?

25  A.  Correct.

1  Q.  And it would have been dated then before the letter that

2  you were looking back, the August 5, 2019, letter; is that

3  right?

4  A.  That is correct.

5          MR. CHALMERS:  Your Honor, I would move for admission

6  of Document OAG 8503 as part of Plaintiff's Exhibit 19.

7          THE COURT:  Any objection?

8          MS. GREATHOUSE:  No objection.

9          THE COURT:  Received.

10  BY MR. CHALMERS:

11  Q.  So looking at 8503, does that confirm that the decision was

12  made with the colonel's input at least by July 25, 2019, and

13  before the letter that went out on August 5th?

14  A.  That's correct.

15          MR. CHALMERS:  I don't have anything further.  Thank

16  you.

17          THE COURT:  Any redirect?

18          MS. GREATHOUSE:  Just a couple, Your Honor.

19                    RE-DIRECT EXAMINATION

20  BY MS. GREATHOUSE:

21  Q.  If you would please look again at Exhibit 74.

22  A.  I am there.

23  Q.  Okay.  So you were discussing portions of the Kansas Civil

24  Service Act that are addressed on Pages 3 through 5 of that

25  policy with Mr. Chalmers; is that correct?

1  A.  Correct.

2  Q.  Let's look at a couple of those sections specifically.

3  Down under -- so it's Roman 6 A 3, that is a non-exclusive list

4  of grounds for dismissal, demotion, or suspension; is that

5  correct?

6  A.  I'm sorry, what page are you on, counsel?

7  Q.  I'm on Page 3.  I'm sorry.

8  A.  And please tell me again which one.

9  Q.  So you were discussing with Mr. Chalmers this -- this list

10  that starts on Page 3 of Exhibit 74 and continues on; is that

11  correct?

12  A.  Correct.

13  Q.  All right.  So if you would look at -- under A 3, A 3 is a

14  non-exclusive list of grounds for dismissal, demotion, or

15  suspension; is that correct?

16  A.  That is correct.

17  Q.  And under small E, that includes employees who lack

18  knowledge of the application of laws required to be enforced;

19  is that correct?

20  A.  That is correct.

21  Q.  So troopers who don't know the law might be included there.

22  Is that accurate?

23  A.  That's accurate.

24  Q.  And then under J, employees who disregard agency policies,

25  procedures, or directives; is that correct?

1  A.  That is correct.

2  Q.  Is it fair to say that not violating someone's

3  Constitutional rights would be an agency policy?

4  A.  It would be.

5  Q.  All right.  And turning to the next page under 4, this is a

6  non-exclusive list, another non-exclusive list of grounds for

7  dismissal, demotion or suspension; is that correct?

8  A.  That is correct.

9  Q.  And C includes employees who do not obey all applicable

10  laws, regardless of the jurisdiction involved; is that correct?

11  A.  That is correct.

12  Q.  So is it correct that of those three we just read, two on

13  Page 3 and one on Page 4, any of those could apply to a trooper

14  who has violated someone's Constitutional rights?

15  A.  That's correct.

16  Q.  All right.  And let's look up at again on Page 3 at A 1,

17  this section isn't suggesting that the state of Kansas or an

18  employee of the state of Kansas can violate -- can violate

19  someone's rights without being disciplined, does it?  And feel

20  free to pause to read it.

21  A.  Would you repeat your question again, counsel?

22  Q.  My question was whether this section is somehow a

23  suggestion, or that the state of Kansas, an employee of the

24  state of Kansas can violate someone's Constitutional rights

25  without being disciplined; right?

1  A.  I'm having trouble following your question.  You're asking

2  me that somebody's violating somebody's civil rights, that

3  they -- you're asking can they be disciplined?

4  Q.  Right.  Well, when you were talking to Mr. Chalmers, I was

5  having some trouble following, 'cause it appeared the argu--

6  that what was being suggested is that this language, or perhaps

7  it was the Kansas Civil Service Act altogether protected state

8  employees who violate the Constitutional rights of the average

9  person.

10 A.  I don't know that I can interpret it that way.

11 Q.  That's not the way you understand it.  Is that accurate?

12 A.  That's correct.

13 Q.  Thank you.

14       THE COURT:  Any questions?

15       MR. CHALMERS:  Nothing else, Your Honor.

16       THE COURT:  Okay.  Thank you.  You're excused, sir.

17 Plaintiffs' next witness.

18       MS. GREATHOUSE:  Your next witness, we call Randy

19 Moon, and we are doing that by deposition.

20       THE COURT:  Okay.  And we are going to stop promptly

21 at 5 o'clock, whether he's done then or not.

22       MS. GREATHOUSE:  Yeah, that's just fine.

23       MR. CHALMERS:  Your Honor, the -- the deposition

24 has -- I've made certain objections to parts of the deposition.

25 I filed a -- I received her designation last night.  I filed

1    those objections I think of record.  I think that I anticipate

2    the court will follow the previous proceedings and consider

3    those when you go through the exhibit, but I do want to assert

4    those objections as I did to the other depositions.

5         THE COURT:  Right.  I have them.

6         MS. GREATHOUSE:  Right.  And so this video will

7    include both our designations and the counter-designations.

8    The objections are solely in the written version.

9         THE COURT:  Okay.

10    (Part of video deposition being played of Randy Moon.)

11         THE COURT:  So let's cut.

12         MS. GREATHOUSE:  Topic changes right here.  We were

13    watching that.  The one thing I want to say, Your Honor, is

14    that we are still sending you tonight a colored copy of this,

15    so that will be coming in.  I just -- I think I said that you

16    all ready -- we'd all ready done it, and we haven't, but we

17    will.

18         THE COURT:  So tomorrow is a shorter day.  We'll start

19    at 12:30 and go to 3:15, and that's all I have.  Anything else

20    you need?

21         MR. MC INERNEY:  Are we still on the calendar for

22    Friday, Your Honor?

23         THE COURT:  Friday, 10:30 'til 1.

24         MR. MC INERNEY:  Great, thank you.

25         THE COURT:  All right.  Court is in recess.

1     (Whereupon, court recessed proceedings.)

2

3              C E R T I F I C A T E

4

5

6     I, Nancy Moroney Wiss, a Certified Shorthand Reporter and

7  the regularly appointed, qualified and acting official reporter

8  of the United States District Court for the District of Kansas,

9  do hereby certify that as such official reporter, I was present

10  at and reported in machine shorthand the above and foregoing

11  proceedings.

12     I further certify that the foregoing transcript, consisting

13  of Day Three - Pages 249-380 is a full, true, and correct

14  reproduction of my shorthand notes as reflected by this

15  transcript.

16     SIGNED September 28, 2023.

17

18                 S/_____

19                 Nancy Moroney Wiss, CSR, CM, FCRR

20

21

22

23

24

25

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that a copy of the foregoing APPELLANT'S APPENDIX, as submitted in digital form is an exact copy of the document filed with the Clerk.

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2024, the foregoing APPELLANT'S APPENDIX was electronically filed with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I also certify that within five business days of the issuance of notice that the electronic filing is compliant, one paper copy will be delivered by Federal Express to the Clerk's Office.


DATED: April 24, 2024                    /s/ Kurtis K. Wiard