# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

BLAINE FRANKLIN SHAW, et al.,
*Plaintiffs-Appellees,*

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

―――――

MARK ERICH, et al.,
*Plaintiffs-Appellees,*

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

## APPELLANT'S APPENDIX VOLUME XV

Appeal from the United States District Court for the District of Kansas
Honorable Kathryn H. Vratil, Senior District Court Judge
District Court Case Nos. 19-CV-1343-KHV and 20-CV-1067-KHV-GEB

**OFFICE OF ATTORNEY GENERAL
KRIS W. KOBACH**

120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
(785) 296-2215
anthony.powell@ag.ks.gov
dwight.carswell@ag.ks.gov
kurtis.wiard@ag.ks.gov

Anthony J. Powell
  *Solicitor General*
Dwight R. Carswell
  *Deputy Solicitor General*
Kurtis K. Wiard
  *Assistant Solicitor General*

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

Transcript of Bench Trial, Day 4
    (ECF No. 564) ...................................................................... 1

1        UNITED STATES DISTRICT COURT
              DISTRICT OF KANSAS
2

3

4   BLAINE SHAW, et al.,                    )
                                            )
5      Plaintiffs,                          )
                                            )
6      v.                                   )   Case No. 19-1343
                                            )
7   HERMAN JONES, in his official           )
    capacity as the Superintendent         )
8   of the Kansas Highway Patrol, et al.,   )
                                            )
9      Defendants.                          )
                                            )   Kansas City, Kansas
10  _____      )   Date:  May 4, 2023
                                            )
11                                          )   Day 4
                                            )   (Pages 381-435)
12  MARK ERICH, et al.,                     )
                                            )
13     Plaintiffs,                          )
                                            )
14     v.                                   )   Case No. 20-1067
                                            )
15  HERMAN JONES, in his official           )
    capacity as the Superintendent         )
16  of the Kansas Highway Patrol, et al.,   )
                                            )
17     Defendants.                          )
    .......................................

18

19            TRANSCRIPT OF BENCH TRIAL

20      BEFORE THE HONORABLE KATHRYN H. VRATIL
21      SENIOR UNITED STATES DISTRICT COURT JUDGE

22

23

24
    _____
25      Proceedings recorded by machine shorthand, transcript
           produced by computer-aided transcription.

1                    A P P E A R A N C E S

2    For the Plaintiffs:

3     Patrick A. McInerney              Sharon Brett
      Leslie A. Greathouse              Kunyu L. Ching
4     Wale Akinmoladun                  ACLU Foundation of Kansas
      Madison Perry                     10561 Barkley Street
5     Spencer Fane, LLP                 Suite 500
      1000 Walnut                       Overland Park, KS 66212
6     Suite 1400
      Kansas City, MO 64106

7

8    For the Defendants:

9     Arthur S. Chalmers
      Office of Attorney General
10    120 SW 10th Avenue
      Topeka, KS 66112

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2
     Plaintiffs' Witnesses:                              Page
3
     RANDY MOON
4      Continued deposition                              385
     JOSEPH BULLOCK
5      Direct Examination by Ms. Greathouse              385

6

7                        E X H I B I T S

8
     Plaintiffs'
9    Exhibits              Offered            Received

10        12                392                392
          13                393                393
11        14                412                412
          19                404                405
12        20                395                395
          24                401                402
13        27                417                417
          71                397                398
14        73                434                434
         110                412                412
15       134                385                385

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2          THE COURT:  Good afternoon.  Are we ready for

3    plaintiffs' next witness?

4          MS. GREATHOUSE:  Yes, Your Honor.  We were still doing

5    the deposition of Randy Moon.

6          THE COURT:  That's right.

7          MS. GREATHOUSE:  And we -- I've talked to opposing

8    counsel, and we were going to suggest that perhaps we just

9    submit the rest of that video to you along with the transcript.

10   That would give you the opportunity to review it when you would

11   like.  We could preserve courtroom time and move forward if you

12   wanted us to do that.

13         THE COURT:  Are we running short of time?  How are we

14   doing on our schedule?

15         MS. GREATHOUSE:  We are trying to conserve as much

16   time as possible because of things like college graduations and

17   a variety of things that happen at the end of next week and

18   other scheduled things, and so we are trying to compact things

19   to make sure that we can do all of that if possible.  If not

20   possible, we will be here.

21         THE COURT:  Well, I mean, I would rather watch it like

22   in the sequence of the rest of the trial, and I think it's --

23   you know, I've seen some things in those depositions that

24   have -- number one, informed me that the transcripts aren't

25   correct and informed other issues, so if we can do it, I would

1  rather go ahead and -- I hate to waste your time.

2          MS. GREATHOUSE:  It's not wasting our time.  We were

3  trying to preserve the court's time and help everyone else out.

4  But we will do either way you would like.

5          THE COURT:  I understand.  Let's see if we can push

6  through it.

7          MS. GREATHOUSE:  If you're ready, Your Honor, we can

8  get and start the transcript.

9          THE COURT:  Sure.

10      (Continued deposition of Randy Moon).

11         MS. GREATHOUSE:  That completes that testimony, Your

12  Honor.

13         The plaintiffs would like to call Trooper Bullock.

14         Your Honor, we should move that deposition into

15  evidence, and it is Exhibit 134.

16         THE COURT:  Mr. Chalmers, any objection to admitting

17  that videotaped deposition into evidence?

18         MR. CHALMERS:  No, Your Honor.

19         THE COURT:  134 is received.

20         MS. GREATHOUSE:  For the record, it does include both

21  our designations and the counter-designations.

22                       JOSEPH BULLOCK,

23  called as a witness on behalf of the plaintiff, having first

24  been duly sworn, testified as follows:

25                     DIRECT EXAMINATION

1   BY MS. GREATHOUSE:

2   Q.  Good afternoon.  Could you please say your name and spell

3   it for the record.

4   A.  Joseph Bullock, J-o-s-e-p-h B-u-l-l-o-c-k.

5   Q.  Is your rank still lieutenant?

6   A.  It is.

7   Q.  All right.  Thank you.  What year did you start with the

8   KHP?

9   A.  2000.

10  Q.  In 2016 you started working in the Kansas Highway Patrol

11  Professional Standards Unit; is that correct?

12  A.  Correct.

13  Q.  And if I use the acronym PSU for Professional Standards

14  Unit, you'll know what I'm talking about, right?

15  A.  Yes, ma'am.

16  Q.  So in between the time that there were captains that

17  weren't in the PSU, you actually were the interim leader of

18  that unit; is that correct?

19  A.  Technically, yes.  My title was lead worker.

20  Q.  All right.  And you left the Professional Standards Unit in

21  the fall of 2021, correct?

22  A.  I would have to check the date on that.  I believe it was

23  more towards summer, maybe.  But correct.

24  Q.  So you left at some point in sort of middle to -- 2021; is

25  that correct?

1    A.    Yes, ma'am.

2    Q.    The point being you were in the PSU throughout 2019?

3    A.    I was.

4    Q.    All right.  And in 2019 your direct supervisor in the PSU

5    was Captain Pitman; is that correct?

6    A.    Yes.

7    Q.    And he reported directly to Colonel Jones; is that right?

8    A.    Correct.

9    Q.    Now, the PSU is the investigative arm of the

10   superintendent's office, correct?

11   A.    Yes.

12   Q.    And the PSU has two main functions; the first of which is

13   investigating complaints from the public about interactions

14   with KHP personnel; is that correct?

15   A.    Yes.

16   Q.    And the second function is to conduct administrative

17   investigations; is that correct?

18   A.    It is.

19   Q.    And the administrative investigations are those things that

20   the superintendent's office asks the PSU to investigate,

21   correct?

22   A.    Yes.

23   Q.    So PSU investigations, whether they are instigated by a

24   complaint from outside or assigned by the supervisor's office

25   or what might be referred to as internal affairs, right?

1  A.  Yes.

2  Q.  And internal affairs investigations are generally those

3  where you are looking into allegations of misconduct; is that

4  correct?

5  A.  Correct.

6  Q.  In your time in the PSU is it correct that you would not do

7  an investigation on something unless someone lodged a formal

8  complaint or the superintendent's office directed the PSU to

9  investigate; is that correct?

10  A.  Correct.

11  Q.  It's the only two ways things came to you, right?

12  A.  Yes, ma'am.

13  Q.  We've heard from Captain Clark already who talked about the

14  PSU process, so I'm not going to belabor the details of that,

15  but I want to make sure that we have the same understanding

16  about how you were doing PSU investigations in your time in the

17  unit.  All right?

18  A.  Okay.

19  Q.  So understanding that all investigations are different, the

20  PSU receives a complaint; is that correct?

21  A.  Yes.  I'm sorry.  I wasn't sure you said that -- are we

22  going to go through all the different ways that -- because

23  that's the only way so that's why I wasn't sure what you meant.

24  Q.  Okay.  So I'm going through -- and understanding that not

25  all of them are the same, but the first step that happens is

1   that the PSU receives the complaint, it comes to you somehow;

2   is that correct?

3   A.   Yes.  If it was a citizen contact-based --

4   Q.   All right.

5   A.   -- investigation.

6   Q.   But you would also receive a -- so you're saying it could

7   also come as an administrative investigation instead of a

8   complaint?

9   A.   Correct.

10   Q.   So whatever it is, the allegations come to the PSU; is that

11   accurate?

12   A.   Yes.

13   Q.   And then you identify what those allegations are of

14   misconduct, correct?

15   A.   Yes.

16   Q.   And the next step is that you notify the commander of the

17   trooper's unit that you're starting an investigation of that

18   trooper; is that correct?

19   A.   Trying to think of which order it goes in.  Sorry, it's

20   been a long time since I've been in there and done that.  I

21   believe that would be the next step.

22   Q.   All right.  And then the trooper is notified --

23   A.   Yes.

24   Q.   -- is that correct?  And then you begin to conduct your

25   investigation, correct?

1   A.   Yes.

2   Q.   And when you're done with all you think you need to

3   investigate, you generate a PSU report, correct?

4   A.   Yes, ma'am.

5   Q.   And that report is then given to the trooper's commander

6   for review; is that correct?

7   A.   Yes.

8   Q.   And once it's reviewed by the troop commander, then it

9   continues its way up the chain of command; is that correct?

10  A.   It is.

11  Q.   And it eventually will make its way all the way up to the

12  colonel, the head of the KHP, correct?

13  A.   Yes, ma'am.

14  Q.   After it's reviewed there, it comes back down to the PSU,

15  but it's essentially resolved at that point from the viewpoint

16  of the PSU?

17  A.   Yes, from my viewpoint as an investigator.

18  Q.   And then the PSU sends out what's called a citizen's

19  closing letter; is that right?

20  A.   Correct.

21  Q.   And that letter lets the complainant know the findings of

22  the investigation, correct?

23  A.   Correct.

24  Q.   All right.  So if a PSU report states that the complaint is

25  sustained, just making sure we have the same understanding, it

1  means that the investigation found that the misconduct actually

2  occurred?

3  A.  Yes.

4  Q.  All right.  Now, the PSU is not involved in disciplining

5  troopers, correct?

6  A.  Correct.

7  Q.  So if you were conducting an investigation and made a

8  finding that sustained a motorist complaint, someone else would

9  make the decision about what would happen to that trooper; is

10  that correct?

11  A.  Yes.

12  Q.  All right.  In 2019 you conducted an investigation

13  regarding Trooper Brandon McMillan based upon a complaint made

14  by Joshua Bosire, correct?

15  A.  It is.

16  Q.  That investigation related to a traffic stop where Trooper

17  McMillan stopped Mr. Bosire, right?

18  A.  Yes, ma'am.

19  Q.  That investigation followed the usual steps for a PSU

20  investigation; is that correct?

21  A.  It did.

22  Q.  When it came in, you sent some acknowledgment letters to

23  Mr. Bosire regarding the allegations that he was making; is

24  that correct?

25  A.  Yes, I believe so.

1  Q.  So if we could have Exhibit 12, please.  Oh, actually I

2  should have him look at it.  Hold on here.  The books are not

3  in front of you.

4      If you would please look at Exhibit 12 in that book.

5  A.  Okay.  I see Exhibit 12.

6  Q.  And is that a letter that you sent to Mr. Bosire?

7  A.  It appears so.

8  Q.  All right.  And is this the kind of standard letter you

9  would send out from the PSU?

10  A.  It is.

11  Q.  Does this appear to be a record that would have been kept

12  in the PSU's files?

13  A.  Yes.

14  Q.  Okay.

15      MS. GREATHOUSE:  I would move the admission of

16  Exhibit 12.

17      MR. CHALMERS:  Actually I think a copy was admitted

18  yesterday, but I don't have any objection to this document as

19  well, Your Honor, just for clarity of the record.

20      THE COURT:  All right.  Exhibit 12 is received.  We'll

21  check and see if it's a duplicate.  Go ahead.

22      MS. GREATHOUSE:  Thank you.

23  BY MS. GREATHOUSE:

24  Q.  And in this letter you were simply informing Mr. Bosire

25  that you had received the complaint and that the investigation

1   would be starting and would proceed over the next 45 days or

2   so; is that correct?

3   A.   Yes.  If you'd like me to read it, I can.  I'm not sure

4   exactly what it says at this point.

5   Q.   Please feel free to read the letter.  You don't have to

6   read it out loud, but if you want to look at it, go ahead,

7   certainly.

8   A.   Okay.  I have reviewed it.

9   Q.   Okay.  And so that's the letter that sort of explains the

10  process to Mr. Bosire; is that accurate?

11  A.   Yes.

12  Q.   All right.  Then if we -- if you could turn to the next

13  exhibit, Exhibit 13.  Take a moment to look at that.

14  A.   Okay.  I have reviewed that one.

15  Q.   Is Exhibit 13 a letter that you sent to Mr. Bosire dated

16  June 4th of 2019?

17  A.   I believe so.

18  Q.   And this is the type of document that you would generate in

19  the PSU and keep in the PSU's file; is that correct?

20  A.   Yes.

21          MS. GREATHOUSE:  All right.  I would move Exhibit 13.

22          MR. CHALMERS:  No objection.

23          THE COURT:  Received.

24  BY MS. GREATHOUSE:

25  Q.   And one of the things that you were doing in Exhibit 13 was

1   noting that there were some new allegations that were being

2   brought into the PSU complaint in addition to those that had

3   been previously made by Mr. Bosire; is that correct?

4   A.   Yes, ma'am.

5   Q.   And one of those was that Master Trooper Schulte was being

6   added to the investigation at that point in time, correct?

7   A.   Yes.

8   Q.   Okay.  So after this you would begin the process of

9   collecting information for your investigation; is that correct?

10  A.   Well, we would have started collecting information as soon

11  as we began when we first have contact with the citizens, so

12  that was already ongoing.

13  Q.   All right.  And the information you collected included

14  things like the video, the dashcam video from the car; is that

15  correct?

16  A.   Yes.

17  Q.   And you spoke to Mr. Bosire and asked him a series of

18  questions; is that correct?

19  A.   I don't independently remember that, but I do remember I

20  spoke to him multiple times.

21  Q.   Okay.  And Trooper McMillan was given an opportunity to

22  respond to the complaint; is that correct?

23  A.   Yes.

24  Q.   And he gave you a written response; is that correct?

25  A.   Again, I haven't seen a lot of this stuff for a long time,

1  so I assume he gave me a written response, but I can't

2  remember.

3  Q.   Okay.  If you would look at Exhibit 20, please.

4  A.   I will.  Yes, I believe that is a written response.

5  Q.   And that is a written response from Technical Trooper

6  McMillan to you dated May 17th of 2019; is that correct?

7  A.   Correct.

8  Q.   Is this the type of document that would have been kept in

9  the PSU file?

10  A.   Yes.

11       MS. GREATHOUSE:  I would move Exhibit 20.

12       MR. CHALMERS:  No objection.

13       THE COURT:  Received.

14  BY MS. GREATHOUSE:

15  Q.   And in this statement of Trooper McMillan, he was

16  describing to you from his perspective what happened in his

17  stop of Mr. Bosire; is that correct?

18  A.   Yes.

19  Q.   And you were using this in order to measure it against what

20  you had learned from Mr. Bosire in order to determine whether

21  Mr. Bosire's allegations were accurate; is that correct?

22  A.   I wouldn't say I was using it -- I believe you said I was

23  using it against it.  It's just additional information.  It's

24  the other side of the story.

25  Q.   Okay.  And in fact, you measure the two stories and make a

1   determination about which is accurate as part of your job as an

2   investigator, correct?

3   A.   Well, I guess the way you say that, you said which is

4   accurate, as in it sounds like one of them -- they both can be

5   accurate.  It's just different versions of their sides of the

6   story, if that makes sense.

7   Q.   Right.

8   A.   One doesn't have to be wrong.

9   Q.   Agreed.  But you were making a determination, a factual

10  determination about what happened; is that correct?

11  A.   I guess I'm just getting a little confused there as far

12  as -- a written response from somebody doesn't give me enough

13  information to decide what happened at that point.  We just

14  have to take it all in and --

15  Q.   Clearly.  It is an item that is used in your investigation

16  to help you make your determination; is that correct?

17  A.   It is.

18  Q.   And you interviewed Trooper Schulte because he was also

19  present at the stop; is that correct?

20  A.   That I can't remember.

21  Q.   All right.  Would you look at Exhibit 71.

22  A.   I will.  My book does not go to 71.

23          MS. GREATHOUSE:  May I approach, Your Honor?

24          THE COURT:  Uh-huh.

25          THE WITNESS:  Okay.  I have Exhibit 71.

1   BY MS. GREATHOUSE:

2   Q.   And can you identify what Exhibit 71 is, please?

3   A.   Exhibit 71 appears to be a note-keeping for lack of a

4   better word, a timeline of things -- an informal timeline of

5   things I used to do during an investigation to keep track of

6   things.

7   Q.   All right.  So Exhibit 71 is a list you created of your

8   activities in the PSU; is that correct?

9   A.   Correct.

10  Q.   This is a document that would typically be kept in the PSU

11  file; is that correct?

12  A.   Well, this is a document that I generated on my own over

13  time.  As I was processing cases, I learned that this was a

14  good way to keep track of information.  Again, it was informal.

15  This only became part of the case that they would keep on file

16  in the -- I believe they called it the working file basically

17  where we put our notes.  That's where it would have ended up.

18  Q.   It ended up in a file in the PSU; is that accurate?

19  A.   Yes.

20       MS. GREATHOUSE:  All right.  I would move the

21  admission of Exhibit 71.

22       THE COURT:  Any objection?

23       MR. CHALMERS:  I don't know how this is particularly

24  helpful or relevant, Your Honor.  It is hearsay.  If it's being

25  offered to refresh his recollection in some respect, I don't

1  think the whole document needs to come in.  I object.

2       MS. GREATHOUSE:  It is a chronological list of each

3  step he took in the investigation of Mr. Bosire's complaint

4  including what he did on any given day.

5       MR. CHALMERS:  I don't know why that's relevant, Your

6  Honor, is what it boils down.  But once again, it's hearsay,

7  and I don't think it would be admitted --

8       THE COURT:  Well, I think under Rule 801(2)(D) it

9  would be admissible because she's offering it against a

10 party-opponent about matters within the scope of his agency and

11 responsibilities, so it's not hearsay.

12      MR. CHALMERS:  I'm not sure how it's being offered

13 against them, but I tell you what, I don't think it's relevant

14 and I think that it is not being used properly as for

15 impeachment or to refresh recollection, Your Honor.

16      THE COURT:  I don't think she's offering it for

17 impeachment or to refresh his recollection.  Again, I can -- if

18 your objection is relevance, I'll figure that out later.

19     Go ahead.  Objection is overruled.  Exhibit -- what's the

20 number again?

21      MS. GREATHOUSE:  71.

22      THE COURT:  71 is received.

23 BY MS. GREATHOUSE:

24 Q.  All right.  If you would look at Exhibit 71 on the third

25 page of it, there are a series of items that are listed as

1  having occurred on July 22nd of 2019.  Do you see that?

2  A.   I do.

3  Q.   And do you see that one of those says Schulte interviewed

4  in person at the PSU?

5  A.   Yes.

6  Q.   Does that refresh your recollection that you interviewed

7  Mr. Schulte in the PSU as part of this investigation?

8  A.   I'm going to say yes, although it just says Schulte was

9  interviewed; it doesn't say I did it.

10  Q.   Was anyone else involved in conducting this investigation?

11  A.   I don't remember if anybody assisted.  We routinely

12  assisted each other with cases, so I'm not sure.

13  Q.   All right.  Would you have recorded that somebody else was

14  helping you out if they conducted the interview in this kind of

15  rather meticulous recordkeeping?

16  A.   Well, it does look kind of meticulous; however, I do want

17  to state that this isn't every action I did every day on a

18  case.  I tried to note -- again, this started out as a

19  recordkeeping thing for myself and I started to note things

20  when I had time or if it came to mind.

21      In other words, this wasn't something that was done by

22  policy.  There's no rhyme or reason to it.  It was something I

23  came up with myself, but I can tell you, you mentioned earlier

24  this has everything I did on the case every day; that's not

25  factual because there are some days I would have worked on a

1   case and done multiple things, and if it wasn't something that

2   I thought needed to be in here, then I wouldn't put it down.

3   Again, this is just kind of for my own recordkeeping is why I

4   did this originally.

5   Q.   Thank you for the explanation.

6        But this does establish that Schulte was interviewed as

7   part of the investigation?

8   A.   It does establish that.

9   Q.   All right.  Thank you.  Now, you also indicated Captain

10  Hogelin in the investigation as a subject matter expert; is

11  that correct?

12  A.   I believe so.

13  Q.   All right.  I'm not necessarily referring to anything on

14  Exhibit 71.  I'm just asking you whether you included Captain

15  Hogelin as a subject matter expert in this investigation.

16  A.   Yes.

17  Q.   And that was because Captain Hogelin was the commander of

18  the unit that conducts criminal interdiction, and the Bosire

19  stop involved interdiction activity; is that accurate?

20  A.   It is.

21  Q.   So does it sound correct that you would have sent to

22  Captain Hogelin Trooper McMillan's statement, his written

23  statement at the time you received it?

24  A.   That's not something that is standard depending on the

25  case.  But I do remember being questioned about that before in

1   my deposition, so I believe I did do that.

2   Q.  Okay.  Why don't we -- why don't you look at Exhibit 24.

3   A.  I have 24.

4   Q.  Okay.  And you -- that would indicate -- well, describe

5   what Exhibit 24 is.

6   A.  Exhibit 24 originally on May 17th of '19 was an e-mail from

7   myself to Captain Hogelin, and according to this e-mail, it

8   does say that attached you will find a PDF of the written

9   response to allegations that was provided to us today, us being

10  the PSU.

11  Q.  Let's get this identified for the record first.  So this is

12  an e-mail that you sent and then a responsive e-mail that you

13  received; is that correct?

14  A.  Yes, ma'am.

15  Q.  And it's in relation to the Bosire investigation, correct?

16  A.  It is.

17  Q.  And it was the kind of thing that would have been kept in a

18  recordkeeping system in the PSU; is that accurate?

19  A.  No.  We don't -- we didn't have a recordkeeping system for

20  e-mails.

21  Q.  All right.  So but it was an e-mail that would have been in

22  your e-mail account; is that accurate?

23  A.  Yes.

24      MS. GREATHOUSE:  I'm going to move the admission of

25  Exhibit 24.

1          MR. CHALMERS:  No objection.

2          THE COURT:  Received.

3     BY MS. GREATHOUSE:

4     Q.  All right.  Now, you've already acknowledged that this

5     exhibit shows that you sent the statement to Captain Hogelin;

6     is that correct?

7     A.  I did.

8     Q.  And then Captain Hogelin responded to you; is that correct?

9     A.  Yes.

10    Q.  Could you please read his response?

11    A.  Written response makes the video and circumstances more

12    palatable.  Thanks for passing it along.  I would still be

13    interested in the pointed question about his prior statement on

14    video.

15    Q.  Do you understand what Captain Hogelin was referring to

16    when he said, I would still be interested in the pointed

17    question about his prior statement on video?

18    A.  I do not.

19    Q.  All right.  You prepared a report at the end of your

20    investigation; is that correct?

21    A.  Yes, ma'am.

22    Q.  If you would please look at Exhibit 19.  For the record,

23    Exhibit 19 is a fairly thick exhibit.  Would you please just

24    take sort of a glance through what it is and then I will ask

25    you some questions.

1    A.   You're correct, it's very lengthy.  What kind of glance?

2    Do you want me to look at everything that's in it?

3    Q.   No, I do not.  Do you recognize what Exhibit 19 is?

4    A.   At the beginning of it, it appears to be my PSU report.

5    Q.   All right.  And would a PSU report that you generate be

6    lengthy as that particular document is?

7    A.   There are a lot of documents here.  A normal PSU report is

8    not this long.  So I'm not sure what all is in here.

9    Q.   All right.  So if you look at the front part of Exhibit 19,

10   the front page refers to it as the PSU report; is that correct?

11   A.   Yes.

12   Q.   And then when you turn in, I don't remember whether it's a

13   page or two, there is a table of contents; is that correct?

14   A.   Yes.

15   Q.   And that table of contents lists the contents of your

16   report; is that correct?

17   A.   Correct.

18   Q.   Does the cover page and the table of contents appear to be

19   what would have made up your report, your PSU report?

20   A.   It does appear so.

21   Q.   All right.  And can you look through that table of contents

22   and identify what you think in Exhibit 19 is your report and

23   what you think isn't?

24   A.   When you say "PSU report," looking at this, the initial

25   16 pages, it looks like, that section, that is what we

1   generally refer to as the PSU report.  Everything else as you

2   stated is appendix and reference material, and there's

3   obviously a lot in this one.

4   Q.  All right.  So I think I understand what you're saying is

5   that Exhibit 19 contains the actual report you wrote and then

6   the appendix of materials that was submitted with that report;

7   is that correct?

8   A.  That's what it appears to me.

9         MS. GREATHOUSE:  I'd like to move Exhibit 19 into

10  evidence.

11        MR. CHALMERS:  I don't think I have any objection.

12  Exhibit 19 references appendix as -- appendixes, rather -- some

13  videos, and I don't think that's in the exhibit.  I think

14  there's just reference to it.  Is it the intention to introduce

15  the videos or make those part of the evidence?  I'm trying to

16  figure out what is being offered at this point.

17        MS. GREATHOUSE:  We're not offering the video.  We're

18  offering the documentary pages, the physical report, not any

19  audio or video that may have also been submitted.

20        MR. CHALMERS:  I don't have any objection, but I

21  should note for the record that there are redactions to this

22  document that I can either visit with him on cross-examination,

23  but it is in that respect not a complete document.  It's

24  redacted for attorney-client privilege --

25        THE COURT:  You either object or don't object.  That's

1  all I need to know.  You can cover that with him on

2  cross-examination.

3          MR. CHALMERS:  I guess I don't object.  Yeah.

4          THE COURT:  All right.  Received.

5  BY MS. GREATHOUSE:

6  Q.   And if you would look at the second page of that, that's

7  where the table of contents is that we were just discussing; is

8  that correct?

9  A.   Yes, ma'am.

10  Q.   And so that indicates that the investigative report has

11  four sections, and those are at the top; is that correct?

12  A.   Yes.

13  Q.   And then the appendix items are A through R; is that

14  correct?

15  A.   Correct.

16  Q.   So you mentioned the first 16 pages.  Those are the pages

17  that you wrote; is that accurate?

18  A.   Yes.

19  Q.   And as Mr. Chalmers stated, a series of those pages have

20  large swaths of blacked out information; is that correct?

21  A.   Yes, ma'am.

22  Q.   So if you would look at this, the parts of your report are

23  that -- there's a synopsis and that synopsis is sort of your

24  summary of the facts that occurred; is that correct?

25  A.   Some of the facts, yes.

1  Q.  The facts -- the report contains the facts that you thought

2  were important and necessary to review of the information; is

3  that right?

4  A.  Well, again, I haven't seen this report in a few years.

5  I'd have to read it, but I believe generally that's what a

6  synopsis is, is the --

7  Q.  You weren't including a bunch of facts that you didn't

8  think mattered, right?

9  A.  Correct.

10  Q.  And you wouldn't leave out facts that you thought weren't

11  important, right?

12  A.  Correct.

13  Q.  So this would include everything that you thought somebody

14  needed to read if they were reviewing the situation; is that

15  accurate?

16  A.  Well, no.  Because again that's just a synopsis.  To answer

17  your question, if I felt -- sorry.  To answer your question, if

18  I -- everything I felt they should read would be in all four

19  sections: the synopsis, the narrative, finding of facts, and

20  the conclusion.

21  Q.  All right.  Now, after the synopsis -- or the synopsis

22  appears to go through approximately page 6; is that correct?

23  A.  Well, I cannot tell where the next section starts because I

24  believe it's redacted.

25  Q.  Correct.  But what we can tell is that it's only synopsis

1  up through page 6, right, because there's no other headings?

2  A.  I would agree with that.

3  Q.  And then after that, everything is redacted except for a

4  couple of -- three sentences; is that right?  If you'd first

5  look at page 8, that might help you?

6  A.  Yes, there was one page on page 8 -- or one sentence and

7  two sentences on page 10, and I do believe everything else

8  looks redacted.

9  Q.  And one of the sentences on page 8 says "ignoring the fact

10  that he impermissibly extended the stop almost from its

11  inception by"; is that correct?

12  A.  No.  I don't --

13  Q.  On page 10.

14  A.  Sorry.  You said page 8.

15  Q.  Page 10.  One of the sentences that is included says

16  "ignoring the fact that he impermissibly extended the stop from

17  almost its inception by"; is that correct?

18  A.  Yes.

19  Q.  Is the "he" in that sentence a reference to Trooper

20  McMillan?

21  A.  I would have to make an assumption.  I can't read the rest

22  of what I have before that or after it.

23  Q.  And neither can I, so you're the one who wrote it, so

24  that's why I'm asking you what the reference was.

25  A.  I don't know what I wrote in this report that long ago.

1   Since I can't see what's before or after it, it would make

2   sense, but I don't know what's behind the black.

3   Q.   And did you come to the conclusion in this PSU

4   investigation that Trooper McMillan impermissibly extended the

5   stop almost from its inception?

6          MR. CHALMERS:  Your Honor, I have to object.  His

7   conclusion was part of the deliberative process.  The ultimate

8   decision was then presented to Colonel Jones who made the

9   decision.  We went through this through discovery.  That's what

10  led to the redactions in part.  That's what led to the ruling

11  by the magistrate that they weren't entitled to this

12  information that they're trying to secure from this witness in

13  this statement, Your Honor.

14         THE COURT:  So I just have a question.  It seems like

15  we're not making much progress here.  What is the point of

16  this?  Doesn't the report speak for itself and what difference

17  does it make?  Do we need to go through each line one by one

18  with him?

19         MS. GREATHOUSE:  No.  And this was the only line I was

20  going through because of the topic and the fact that it goes

21  directly to the issues.  I can't go line by line because

22  there's nothing else that we have that was included.

23         THE COURT:  And why is it redacted?

24         MS. GREATHOUSE:  It was redacted because they claimed

25  a deliberative process privilege but left in this sentence.

1      MR. CHALMERS:  It should have been redacted.

2  Apparently when my secretary redacted it, she didn't include

3  that sentence.

4      THE COURT:  Sorry, I didn't hear you.

5      MR. CHALMERS:  It should have been redacted.

6  Apparently when my secretary did the manual labor of covering

7  it up, she didn't get that sentence in there.  But the reason

8  that it was redacted, because of the deliberative process

9  privilege that says that the information from, in this instance

10 the lieutenant, from the other individuals that were involved

11 in providing information as part of the investigation, the

12 attorney and Captain Hogelin all went into what their advice

13 was to the decision that ultimately was made by the executive

14 Colonel Jones.

15      They've got that decision.  I think that's what

16 they've provided in terms of the ultimate conclusion, and

17 that's in evidence and easy to put into evidence.

18      So I don't think this is relevant, but the reason that

19 it was redacted is because -- to protect the right of

20 executives to have their underlings give them advice and

21 counsel with respect to ultimate issues that they have to

22 decide.

23      MS. GREATHOUSE:  And, Your Honor, we believed from the

24 inception that this directly was at issue and relevant to the

25 decisions that you have to make in this case, whether or not

1   the PSU system has holes in it, whether it works effectively,

2   and this was fully briefed in front of the magistrate.  We're

3   happy to discuss it again with you.  But we think that this

4   should come in, especially at this stage.

5          THE COURT:  I don't remember, did you appeal the

6   magistrate rulings to me or object to them at the time?

7          MS. GREATHOUSE:  We did not object on the discovery --

8   on the discovery of the information during that phase, no.

9          THE COURT:  Okay.  So isn't that the law of the case?

10  Water under the bridge at this point.

11         MS. GREATHOUSE:  All right.  And that's fine.  But

12  this sentence was included.  We did not know that it was

13  erroneously included, and so, you know, that's why the

14  questions now.

15         THE COURT:  Okay.  Go ahead.

16  BY MS. GREATHOUSE:

17  Q.  So did you conclude as is indicated -- on this particular

18  exhibit, did you conclude that Trooper McMillan impermissibly

19  extended the stop almost from its inception?

20         MR. CHALMERS:  I think again it goes to the privilege,

21  Your Honor, and I object.

22         THE COURT:  Overruled.

23         THE WITNESS:  McMillan and -- I don't know without

24  being able to read my report.  I no longer have access.  The

25  stuff that we did in the Professional Standards Unit stays in

1   there, so once I came out of the unit, I no longer have -- I

2   haven't read this report in years, so I don't know what it

3   says.

4   BY MS. GREATHOUSE:

5   Q.   Okay.  As you're sitting here today, you have no

6   recollection of whether or not you found that Trooper McMillan

7   impermissibly extended the stop almost from its inception?

8   A.   I don't remember what I found --

9   Q.   All right.

10  A.   -- that day.

11  Q.   At the time that you wrote this report, you -- or around

12  the time that you were writing this report, you also would have

13  sent a communication to the complainant that the report was

14  complete and was headed its way up the chain of command; is

15  that correct?

16  A.   Correct.

17  Q.   Please look at Exhibit 14.

18  A.   I have 14.

19  Q.   And is 14 that letter that you sent to Mr. Bosire that the

20  investigation was headed up the chain of command at that point

21  in time?

22  A.   Give me one second to review it.  Yes, that's what it

23  appears to be.

24  Q.   Now, you actually have signed that letter; is that correct?

25  A.   Yes.

1  Q.  And you did so on behalf of the colonel; is that correct?

2  A.  I did.

3  Q.  Now, eventually you also generated an investigation closing

4  letter that went to Trooper McMillan; is that correct?

5  A.  That would be standard procedure, yes.

6  Q.  All right.  And would that have occurred at about the same

7  time you were sending the letter to Mr. Bosire informing him of

8  the end of the investigation?

9  A.  Generally, yes.

10  Q.  Okay.  And so if you would look at Exhibit 110, please.

11  A.  I have 110.

12  Q.  Okay.  And 110 was a letter written by you?

13  A.  It appears so.

14  Q.  It contains your signature on behalf of Colonel Jones; is

15  that correct?

16  A.  It does.

17  Q.  And it was sent to Trooper McMillan -- Technical Trooper

18  McMillan on July 25, 2019?

19  A.  Yes, sir.

20       MS. GREATHOUSE:  I would move admission of Exhibits 14

21  and 110, please.

22       MR. CHALMERS:  No objection.

23       THE COURT:  Received.

24  BY MS. GREATHOUSE:

25  Q.  Okay.  Let's look a little bit more at Exhibit 110.

1  Exhibit 110 contains the determination that was made during the

2  course of the PSU investigation; is that correct?

3  A.  Would you like me to review it real quick?

4  Q.  Sure.

5  A.  Okay.  I have reviewed it.  What was your question again?

6  Q.  This letter contains the conclusions of the investigation

7  made by the Professional Standards Unit; is that correct?

8  A.  Correct.

9  Q.  And at this point this file has not yet made its way up to

10  the colonel; is that correct?

11  A.  At -- I'm sorry.  You said at this point the file has not

12  made its way up to the colonel?

13  Q.  If I said that, I apologize.  I will rephrase.

14       As of July 25th of 2019 this file had not -- or this report

15  had not yet made its way all the way up to the colonel and back

16  down the chain of command; is that correct?

17  A.  I don't know for sure the dates, that information.

18  Q.  Well, typically at this point when you are writing to the

19  complainant as you did in Exhibit 14, that the investigation is

20  complete and that it is being reviewed by the superintendent's

21  office, and on the same day you write to the technical trooper

22  identifying the conclusions of the PSU investigation, that

23  would indicate that it had not yet gone all the way up the

24  chain of command and back down; is that correct?

25  A.  Well, again, I don't know for sure.  I'd have to look back

1   and look at everything and figure out when everything was sent,

2   and I just don't know that off the top of my head.

3   Q.   Okay.  Please look at Exhibit 14.

4   A.   Okay.  I have 14.

5   Q.   And 14 says that -- that the investigation has been

6   completed, correct?

7   A.   Yes.

8   Q.   That the completed report and related materials have been

9   provided to the chain of command for review?

10  A.   Correct.

11  Q.   That after that it will be reviewed by the superintendent's

12  office; is that correct?

13  A.   Yes.

14  Q.   And after that the complainant will be notified of what the

15  findings are; is that correct?

16  A.   Yes.

17  Q.   And that happened on July 25th of 2019; is that correct?

18  A.   Yes.

19  Q.   All right.  So now if you would please look at -- now I've

20  lost my page -- Exhibit 110.

21  A.   Okay.

22  Q.   Exhibit 110 is that exact same date, July 25th of 2019; is

23  that correct?

24  A.   Yes.

25  Q.   So as of this date the report is still on its way up the

1  chain of command; isn't that correct?

2  A.   Again, that's not something that I can reference -- I can't

3  tell you that for sure right now because I don't know where it

4  was at that time.  I know this says --

5  Q.   We just read 14 that was the same date, and it says it's on

6  its way up the chain of command, right?

7  A.   Correct.

8  Q.   And so if 110 was written on the same date, it's on its way

9  up the chain of command, correct?

10 A.   Right.

11 Q.   So looking at Exhibit 110, here you have written that

12 you -- that "the PSU determined that under accepted protocols

13 for criminal interdiction investigation and the burdens of

14 proof needed therein, there was not reason to detain Mr. Bosire

15 further for a canine unit to respond to the scene for a drug

16 sniff.  This caused you to hold Mr. Bosire for a longer

17 duration than is legally acceptable."

18      Did I read that correctly?

19 A.   Yes.

20 Q.   And so that would be an indication of what you determined

21 when you were completing this investigation of Trooper McMillan

22 in the PSU; is that correct?

23 A.   Correct.

24 Q.   And this letter, Exhibit 110, again that was signed by you

25 on behalf of the colonel, correct?

1    A.   Yes, ma'am.

2    Q.   So while this was -- this report was making its way through

3    the chain of command, one of its stops would have been with

4    Technical Trooper McMillan's supervisor, Captain -- I'm not

5    sure I'm going it say this correctly -- Vanderwiede?

6    A.   Vanderwiede.

7    Q.   Is that accurate?

8    A.   Yes.

9    Q.   All right.  And if you would look at Exhibit 19.

10   A.   19?

11   Q.   Yes.

12        THE REPORTER:  Can you spell Vanderwiede for me?

13        MS. GREATHOUSE:  I will.  And you know what, I will

14   spell it for you, but I'm actually going to withdraw that

15   question.  V-a-n-d-e-r-w-i-e-d-e.  We put that into evidence

16   yesterday, so I will not waste our time.

17   BY MS. GREATHOUSE:

18   Q.   If you look at Exhibit 27.

19   A.   I have 27.

20   Q.   Okay.  Exhibit 27 is a citizen's closing letter; is that

21   correct?

22   A.   I believe that's what that is.

23   Q.   All right.  And is this the kind of document that would

24   have been kept in a PSU file?

25   A.   Yes.

1  Q.  And this document relates to the investigation related or

2  in response to Mr. Bosire's complaint, correct?

3  A.  Correct.

4      MS. GREATHOUSE:  I move the admission of Exhibit 27.

5      MR. CHALMERS:  No objection.

6      THE COURT:  Received.

7  BY MS. GREATHOUSE:

8  Q.  All right.  And on -- at the end of -- at the very bottom

9  of page 1 of Exhibit 27 -- well, let me ask this first:  Did

10 you write this letter?

11 A.  I believe so.

12 Q.  It would be typical for you to write a citizen's closing

13 letter on an investigation you were conducting; is that

14 correct?

15 A.  Yes, at least the first draft.

16 Q.  All right.  And then ultimately it might be worked on by

17 the colonel or someone on his staff before it's sent out; is

18 that correct?

19 A.  Correct.

20 Q.  Is this letter actually signed by Colonel Jones or is that

21 your signature?

22 A.  No.  This letter is signed by Colonel Jones.

23 Q.  All right.  So at the bottom of page 1 of Exhibit 27, let

24 me know if I read this correct.  "In this case after

25 considering everything we had access to and comparing what we

1   know with what occurred during your traffic contact, we have

2   determined some of your concerns had merit"; is that correct?

3   A.   Yes, ma'am.

4   Q.   And then in the second full paragraph on the second page of

5   this letter, that also contains the conclusions about the stop;

6   is that correct?

7   A.   I would need to read through that.

8   Q.   Why don't we go ahead and have you read that paragraph into

9   the record?

10  A.   The last paragraph, not the last sentence but the last

11  paragraph?

12  Q.   The paragraph that begins "this contact with you"?

13  A.   "This contact with you was not what we would consider

14  standard under the confines of investigative reasonable

15  suspicion regarding criminal interdiction.  And although, as

16  stated above, we cannot get into the mind of our officers at

17  the time they were confronted with the facts, we feel the

18  length of time you were detained roadside was unnecessary given

19  the suspicions he articulated.

20       "As should be evident, we take complaints on our personnel

21  very seriously.  During investigations we look at all aspects

22  of the incidents we review.  Please know that any noted

23  internal policy concerns we feel need addressed with our

24  troopers will be handled in accordance with our policies and

25  procedures by their respective troop commanders.  Customarily

1  this is accomplished through additional training and policy

2  reviews."

3  Q.  So part of this paragraph is to assure the complainant that

4  all of this and any results for the trooper will be handled in

5  accordance with KHP policy; is that correct?

6  A.  Correct.

7  Q.  All right.  Moving away from the Bosire internal affairs

8  investigation and more generally back to the purpose of the

9  PSU, it's correct that not all misconduct or not all alleged

10  misconduct inside the KHP is investigated; is that correct?

11  A.  Correct.

12  Q.  For example, the PSU is not charged with investigating

13  allegations in civil lawsuits brought against troopers like

14  this one; is that correct?

15  A.  The PSU could under the -- like you talked about earlier,

16  we talked about there's citizen-contacts investigations, and

17  there are administrative investigations, so if the

18  superintendent's office provided something to be investigated

19  to the Professional Standards Unit, it could be.

20  Q.  Right.  The point being that it's only if the PSU is asked

21  to investigate that it investigates, correct?

22  A.  Yes.

23  Q.  And so if there is a civil lawsuit filed against a trooper

24  and the PSU isn't asked to investigate, it's never internally

25  investigated; is that right?

1  A.  Well, I hesitate to ever say never on anything, or always.

2  But, yes, it sounds -- it seems reasonable.  I can't say in

3  every case that that is the way it would be or wouldn't be.

4  Q.  All right.  But generally unless a citizen complains and

5  they go through the actions of taking the formal steps of

6  filing, you know, affirmative action, filing a complaint with

7  the KHP, or the superintendent says please investigate,

8  generally absent those two conditions, the PSU is not going to

9  investigate something?

10  A.  Correct.

11  Q.  And that includes if people in the PSU know that there is a

12  civil suit that has been filed against troopers; is that

13  correct?

14  A.  I don't know how to answer that.  For one thing I'm not in

15  the PSU now, so I don't know what -- it may have changed or

16  what hasn't --

17  Q.  And I'm only asking you questions about when you were in

18  the PSU.  I'm not asking you to know things you couldn't

19  possibly know.  Okay?

20  A.  When I was in there, I don't know if it ever came up that

21  there was a civil suit -- I don't know if I was ever confronted

22  with that.  And honestly as an investigator, it probably

23  wouldn't have been my choice or my purview either anyway; it

24  would have been the commander of the unit.

25  Q.  At your deposition you suggested that there was an example

1   of a failure to investigate misconduct with the *Dartez* case; is

2   that correct?

3   A.   I'm trying to remember my deposition.  Okay.  I know which

4   case that is.  I'm sorry.  Repeat the question now that I know

5   which case you're talking about.

6   Q.   At your deposition you suggested one example of a failure

7   to investigate misconduct was the *Dartez* case; is that correct?

8   A.   I don't believe that was my testimony.  I don't believe I

9   would have called it a failure, but that with my time in there,

10   that was a case that we did not investigate because the citizen

11   never complained.

12   Q.   All right.  And so let's put it this way, you are aware of

13   an allegation of misconduct about KHP troopers in the *Dartez*

14   case that the PSU never investigated, correct?

15   A.   While I was in there, it was not investigated, correct.

16   Q.   All right.  And *Dartez* is a civil police misconduct case in

17   which you gave a deposition; is that correct?

18   A.   I believe so.

19   Q.   Well, you -- at your deposition you testified that you gave

20   a deposition in *Dartez*; is that not accurate?

21   A.   I don't know what that -- I guess I don't know what that

22   case was called.  I'm guessing that was *Dartez* that I was

23   pulled in on before to do a deposition.  But, again, that's

24   multiple years ago, so I'm not quite sure.

25   Q.   So *Dartez* is an excessive force case filed against the

1    KHP's Special Response Team; is that correct?

2    A.  I believe so.

3    Q.  And you understand that the allegations in that case are

4    that the Special Response Team beat Mr. *Dartez* during his

5    arrest; is that correct?

6    A.  I don't know the specifics of that case.

7    Q.  You are unaware -- well, you testified that there was

8    misconduct in *Dartez* that was not investigated by the KHP,

9    correct?

10   A.  No, that's not correct.  I did not testify that there was

11   misconduct.  There may have been allegations of misconduct, but

12   that was not something that we investigated.

13   Q.  Okay.  So you agree that *Dartez* is an allegation of

14   misconduct that was not investigated by the PSU; is that

15   correct?

16   A.  In the time I was in there, correct.

17   Q.  All right.  And you understand that *Dartez* is an excessive

18   force civil case against the KHP; is that correct?

19   A.  Yes.

20   Q.  And you gave a deposition in relation to that case; is that

21   correct?

22   A.  Yes, I believe so.

23   Q.  And you are aware that the allegations in -- the

24   allegations of misconduct related to that case had to do with

25   excessive force; is that correct?

1    A.    Yes.

2    Q.    Are you aware of the current status of the *Dartez* lawsuit?

3    A.    I am not.

4    Q.    So you are unaware that it has now been settled and

5    resolved; is that correct?

6    A.    Correct.

7    Q.    And so it's your testimony that the PSU would not

8    investigate a civil case like *Dartez* unless the motorist took

9    the affirmative action of filing a formal complaint or unless

10   the superintendent asked you to do that investigation; is that

11   correct?

12   A.    I'm a little confused by the affirmative action and

13   informal complaint verbiage.  If they would have called us --

14   that's not -- we didn't require anything special or formal or

15   -- they just had to notify us.  So I'm not sure if those legal

16   words mean anything differently.  Yes, if they would have

17   called us, we would have started a case on that, at least while

18   I was there.

19   Q.    And also while you were there, if a court found that

20   troopers had violated someone's rights, like has happened in

21   the Shaw and Bosire cases here, the PSU would not investigate

22   those findings without there being an outside request with a

23   complaint being filed or the superintendent telling you to

24   investigate, correct?

25   A.    Correct.

1  Q.  And likewise, you wouldn't investigate a court

2  determination that a trooper had done something wrong unless

3  there's an outside request or the superintendent asks for it;

4  is that correct?

5  A.  Except you said "wouldn't," like it was our choice.  It's

6  couldn't by policy.  The PSU is governed those two ways.  If a

7  citizen notifies us, we can start one, or if we're told to by

8  the superintendent's office, that's the only way cases can

9  start, So it's not a choice of would or wouldn't.

10  Q.  Exactly.

11  A.  Could or couldn't.

12  Q.  By policy the PSU cannot investigate except in one of those

13  two categories?

14  A.  Correct.

15  Q.  And I am assuming that would also be true for something

16  like a sustained suppression motion, you could not investigate

17  unless it came to you in one of the two ways we've talked

18  about?

19  A.  Correct.

20  Q.  In addition to the *Dartez* case, during your deposition you

21  identified the lawsuit brought against Trooper Schulte by

22  Blaine Shaw as another example where the PSU couldn't

23  investigate even though they knew about the allegations; is

24  that correct?

25  A.  That one I do have knowledge of.  And I was told by the

1    complainant when she called in that she did not want to start

2    the process yet and didn't want to give me information, and

3    then she told me she would call me back and then she did not.

4    So I did not start a case on that.

5    Q.    So because they never called back, the PSU didn't or

6    couldn't investigate, right?

7    A.    Correct.

8    Q.    In the time you were in the PSU or a part of the time you

9    were in the PSU, Captain Pitman was your supervisor, correct?

10   A.    Yes.

11   Q.    And he resigned, correct?

12   A.    Yes.

13   Q.    And before he resigned, a Lieutenant DiLoreto -- did I say

14   that name correctly?

15   A.    I believe so.

16   Q.    Was promoted into the PSU; is that correct?

17   A.    Yes.

18   Q.    And Lieutenant DiLoreto was not the person that Captain

19   Pitman chose to be moved into that PSU position; is that

20   correct?

21          MR. CHALMERS:  Your Honor, I don't see how this is

22   relevant to anything.  I object.

23          MS. GREATHOUSE:  Your Honor, the relevancy has to do

24   with the KHP's disregard for the PSU system.  It shows -- it

25   continues to show the holes in the system, not only that it has

1    been entirely reactive but that sometimes it's a place where

2    people are put who have no business being involved in internal

3    affairs, and so we would like to explore that with this

4    witness.

5            THE COURT:  This seems so far removed from what I

6    thought we were going to be talking about in this case, and so

7    to me it seems like we're spending way too much time on this.

8    Is there a way we can fast-forward through a lot of this

9    especially if you're concerned about time?

10           MS. GREATHOUSE:  Absolutely.  At this point then we

11   would pass the witness.  Thank you.

12           THE COURT:  Cross-examination.

13           MR. CHALMERS:  No, Your Honor.  I don't have any

14   questions of this witness.  Thank you.

15           THE COURT:  All right.  Thank you, sir.  You can step

16   down.

17           THE WITNESS:  Thank you, Your Honor.

18           THE COURT:  Plaintiffs' next witness.

19           MR. MCINERNEY:  Judge, we call Brent Hogelin to the

20   stand, please.

21           MR. CHALMERS:  I want to alert the court.  We have --

22   and the parties agreed that we would have a witness that would

23   be provided to testify out of order, Sarah Washburn.  She has

24   some national conference she has to attend for her job next

25   week, and we certainly can start Captain Hogelin.  I think

1    we've got about 15 minutes.  But I worry, are we still going to

2    be able to break then Captain Hogelin and get Ms. Washburn on

3    the stand?

4            THE COURT:  I don't know.  Are you asking me?

5            MR. CHALMERS:  Your Honor, I guess the agreement was

6    reached.  She's not available after tomorrow, and we've got a

7    limited period of time.

8            And is plaintiff now taking the position that they're

9    not going to live up to their agreement?

10           MR. MCINERNEY:  What are you -- what agreement are you

11   talking about?

12           MS. BRETT:  So I will step in here.  So we did agree

13   that we would try to get Washburn on tomorrow if the court

14   agrees to let Ms. Washburn testify.  I think that was a subject

15   of a motion *in limine* ruling, and I think there's been a

16   question of whether she's going to be allowed to testify

17   because we had moved to exclude her testimony and the court

18   granted that motion *in limine*.

19           But if that's being revisited, then we agreed to let

20   her testify tomorrow.  The problem is we have 15 minutes left

21   in court today.  We've got our next witness here, so we were

22   going to get started on him.  We could finish him up tomorrow

23   and move to Ms. Washburn if she's permitted to testify.

24           THE COURT:  Why would we revisit?

25           MS. BRETT:  I don't think we should revisit, but

1   Mr. Chalmers insisted on calling her and put her on the witness

2   list, so I think it's still an open question of whether -- at

3   least to Mr. Chalmers it's an open question.  It's not to us.

4          THE COURT:  I wasn't planning on her testifying at

5   all.  Tell me what your issue is.

6          MR. CHALMERS:  Your Honor, Ms. Washburn is going to be

7   called to talk about facts with respect to the training that's

8   been provided to troopers and trainings that she provided.  I

9   think your motion *in limine* has held that she's not being

10  permitted to express opinions, and that's not what we intended

11  to present.  She also is not going to, I think according to

12  your motion *in limine*, address the question of whether there's

13  deliberate indifference.

14         THE COURT:  I cannot understand you.  So you're

15  mumbling and you're not loud enough.

16         MR. CHALMERS:  Ms. Washburn is going to be called to

17  testify as a fact witness concerning the training that she

18  provide -- had provided, rather, to the Kansas Highway Patrol.

19         Your motion *in limine* addressed whether she would be

20  able to express opinions.  We're not offering those.  Your

21  motion *in limine* addressed whether she would have testimony

22  that would go to deliberate indifference, and we're not

23  offering it for that purpose.

24         There has been plenty of testimony in this case, the

25  allegations in this case concern the training, the lack of

1  training, and she's going to testify factually as to what was

2  provided.

3      MS. BRETT:  Your Honor, if I may, the court's ruling

4  is at Document 465.  The court explicitly says because Washburn

5  has not been designated or proffered as an expert, her

6  testimony would be limited to facts, not opinions.

7      Even so, her training, instruction, and understanding

8  of the law are not relevant to plaintiffs' claim that KHP

9  troopers continue to rely on out-of-state plates or travel

10  plans and use a maneuver called the two-step to unlawfully

11  prolong roadside detentions.

12      So you found it was subject to exclusion under 403,

13  and you see no reason why our motion which was to exclude her

14  in the entirety should not be sustained, so you granted our

15  renewed motion *in limine* with regard to Sarah Washburn.

16      MR. CHALMERS:  I think the motion was limited to

17  opinions, Your Honor, and that's what you granted.  But that's

18  why she's being offered to come in to provide fact testimony

19  with respect to training.

20      THE COURT:  Okay.  Well, tell me what specific facts.

21  Make a proffer for right now, and then I'll think about it

22  overnight.

23      MR. CHALMERS:  Sure.  She'll explain she's been

24  involved in the training process that has prepared both at the

25  academy as well as the in-service which is done annually, as

1  well as preparing updates.  She will testify to the training

2  materials that were provided, particularly the training that is

3  provided as to the two-step, as to consensual encounters, as

4  to -- she'll testify as to the training that she provided on

5  the *Vasquez* case starting I think around 2020.  She will go to

6  the allegations that they make that *Vasquez* is being ignored

7  and that it's not being trained upon, and it's just quite the

8  opposite.

9       She'll testify to the -- that ultimately her testimony

10  will go to the training as to whether or not there is this idea

11  you can rely on license plate alone or state of origin alone,

12  and she'll explain what the troopers have been told and how

13  they've been instructed on the subjects.

14       THE COURT:  So she was originally designated as an

15  expert, right?

16       MS. BRETT:  No.

17       MR. CHALMERS:  No.

18       THE COURT:  Okay.

19       MS. BRETT:  And, Your Honor, I think our position on

20  that is that the training documents are in evidence or can be

21  in evidence through other witness.  Any testimony from

22  Ms. Washburn on the content of that training would be opinion

23  testimony about the sufficiency of that training or about the

24  legal correctness of that training.  It would not be about the

25  fact of the training itself.  Ms. Washburn's testimony is not

1   necessary to describe what training is provided as there are

2   multiple other witnesses that have testified to that and could

3   testify to that.

4          So the only reason why the state would like her

5   testimony to be in is to lend legal legitimacy to the training

6   that was provided, and that's explicitly what Your Honor's

7   ruling on the motion *in limine* was about.

8          THE COURT:  So if we limited her testimony to just the

9   two-step and the *Vasquez* issue, why wouldn't her factual

10  testimony be relevant?

11         MS. BRETT:  I think it's our position that it's

12  cumulative and duplicative and that the training speaks for

13  itself.  It's in the record.  So any testimony that she would

14  provide on that training is by its very nature going to be

15  explaining why she believes in her opinion that that training

16  is sufficient or that training is legally accurate.

17         THE COURT:  That's what I said she can't testify to.

18  So what is the evidence that's cumulative?

19         MS. BRETT:  The training itself.  I think --

20         THE COURT:  No.  What exhibit numbers or what

21  witnesses will give this testimony otherwise?

22         MS. BRETT:  We put in some evidence already about --

23  from the troopers themselves saying what they were trained on

24  and what they remember from their training, so that would have

25  come from Trooper Rule -- or Trooper Rule, Trooper Rohr, Jirak,

1    and Wolting.  We will have some of that come in through Captain

2    Holland as well as through Defendant Jones, and it came in

3    through the two jury trials that the court has already agreed

4    to say that those records are considered in full for the

5    purposes of this bench trial, so that would have also been

6    Trooper McMillan and Trooper Schulte.

7            There are a few different trainings documents that

8    have already come in, and more parts of training documents will

9    come in through testimony with Captain Hogelin and others to

10   come.

11           So I think the confusion we have is what exactly is

12   Ms. Washburn going to testify about other than to offer her

13   legal conclusions that can't come in or hasn't already come in

14   through other evidence.

15           THE COURT:  So I've never really thought this was a

16   case about training, but you have argued throughout the case

17   that the reason we need an injunction is that the fact -- so

18   that we have ongoing training on illegal practices; therefore,

19   the court needs to weigh in and enter an injunction to stop

20   that.

21           So I mean, this might be a situation where we have to

22   let her get on the stand, and then you can object to specific

23   testimony that might be cumulative, but since we haven't heard

24   all the testimony, that's kind of a hard sell for me.

25           MS. BRETT:  We're happy to cross-examine her, to

1   object during her testimony I think.  We just have not been

2   clear, given the court's ruling that she's not allowed to

3   testify to legal conclusions, what exactly she's going to

4   testify to.  But we're happy to cross-examine her as necessary.

5           THE COURT:  Like I said, and I'm sure this is what was

6   in my mind when I ruled on the motion *in limine*, I don't really

7   think this is a case about training, but I've spent a lot of

8   time reviewing your response to my order to show cause with

9   regard to injunctive relief, and it seems like you think it is.

10  So I think that opens the door to testimony by Ms. Washburn and

11  doesn't seem like it will take that much time.  So let's go

12  ahead and do that, but not right now because we only have five

13  minutes.

14          MS. BRETT:  Okay.  So we are happy to do that, Your

15  Honor.  So it sounds like Ms. Washburn would like to go

16  tomorrow.  I know we have a limited court day tomorrow.  So we

17  can attempt to do Ms. Washburn and Captain Hogelin tomorrow.

18          MR. MCINERNEY:  I think it's reasonable to expect that

19  we would get Captain Hogelin on and off and Ms. Washburn and

20  probably save Mr. Jones for the next week.

21          THE COURT:  Okay.  All right.  Well, I don't know that

22  we can do much at this point other than recess, but anything

23  else you want to take up?

24          MS. BRETT:  One thing that I wanted to take up with

25  Your Honor, and we talked to Mr. Chalmers about this already,

1  one of the plaintiffs, Mr. Bosire, has had some work

2  emergencies come up and was hoping to be excused for the

3  remainder of trial.  Mr. Chalmers has no objection to that, but

4  we wanted to ask permission of the court as well.

5          THE COURT:  That's fine.

6          MS. GREATHOUSE:  I forgot to move Exhibit 73

7  yesterday, and I would like to move Exhibit 73 for the record.

8  That is the June 21, 2019, policy ADM-07.

9          THE COURT:  Any objection?

10         MR. CHALMERS:  I don't think so, but I'm not sure

11 which it is.  I have to look.

12         MS. GREATHOUSE:  Art, I can hand it to you if you want

13 to look.

14         MR. CHALMERS:  I don't have any objection to that,

15 Your Honor.

16         THE COURT:  All right.  Received.  All right.  It

17 looks like tomorrow we start at 10:30 and go until 1:00, so

18 everybody have a great evening, and we'll see you in the

19 morning.  The court is in recess.

20     (The proceedings were adjourned at 3:09 p.m.)

21

22

23

24

25

1                    C E R T I F I C A T E

2        I, Danielle R. Murray, a Certified Court Reporter and the

3    regularly appointed, qualified, and acting official reporter of

4    the United States District Court for the District of Kansas, do

5    hereby certify that the foregoing is a true and correct

6    transcript from the stenographically reported proceedings in

7    the above-entitled matter.

8        SIGNED 2nd of October, 2023

9
                          /s/Danielle R. Murray
10                        DANIELLE R. MURRAY, RMR, CRR
                          United States Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that a copy of the foregoing APPELLANT'S APPENDIX, as submitted in digital form is an exact copy of the document filed with the Clerk.

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2024, the foregoing APPELLANT'S APPENDIX was electronically filed with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I also certify that within five business days of the issuance of notice that the electronic filing is compliant, one paper copy will be delivered by Federal Express to the Clerk's Office.


DATED: April 24, 2024          /s/ Kurtis K. Wiard