IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

BLAINE FRANKLIN SHAW, et al.,
*Plaintiffs-Appellees,*

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

———

MARK ERICH, et al.,
*Plaintiffs-Appellees,*

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

## APPELLANT'S APPENDIX VOLUME XVI

Appeal from the United States District Court for the District of Kansas
Honorable Kathryn H. Vratil, Senior District Court Judge
District Court Case Nos. 19-CV-1343-KHV and 20-CV-1067-KHV-GEB

120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
(785) 296-2215
anthony.powell@ag.ks.gov
dwight.carswell@ag.ks.gov
kurtis.wiard@ag.ks.gov

**OFFICE OF ATTORNEY GENERAL
KRIS W. KOBACH**

Anthony J. Powell
  *Solicitor General*
Dwight R. Carswell
  *Deputy Solicitor General*
Kurtis K. Wiard
  *Assistant Solicitor General*

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

Transcript of Bench Trial, Day 5
    (ECF No. 570) ....................................................................... 1

1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF KANSAS
2

3

4    BLAINE SHAW, et al.,                    )
                                             )
5      Plaintiffs,                           )
                                             )
6      v.                                    )    Case No. 19-1343
                                             )
7    HERMAN JONES, in his official           )
     capacity as the Superintendent         )
8    of the Kansas Highway Patrol, et al.,  )
                                             )
9      Defendants.                           )
                                             )    Kansas City, Kansas
10    _____    )    Date:  May 5, 2023
                                             )
11                                           )    Day 5
                                             )    (Pages 436-532)
12   MARK ERICH, et al.,                     )
                                             )
13     Plaintiffs,                           )
                                             )
14     v.                                    )    Case No. 20-1067
                                             )
15   HERMAN JONES, in his official           )
     capacity as the Superintendent         )
16   of the Kansas Highway Patrol, et al.,  )
                                             )
17     Defendants.                           )
     ........................................
18

19
                     TRANSCRIPT OF BENCH TRIAL
20
                BEFORE THE HONORABLE KATHRYN H. VRATIL
21           SENIOR UNITED STATES DISTRICT COURT JUDGE

22

23

24
     _____
25        Proceedings recorded by machine shorthand, transcript
             produced by computer-aided transcription.

1                    A P P E A R A N C E S

2   For the Plaintiffs:

3    Patrick A. McInerney            Sharon Brett
     Leslie A. Greathouse            Kunyu L. Ching
4    Wale Akinmoladun                ACLU Foundation of Kansas
     Madison Perry                   10561 Barkley Street
5    Spencer Fane, LLP               Suite 500
     1000 Walnut                     Overland Park, KS 66212
6    Suite 1400
     Kansas City, MO 64106

7

8   For the Defendants:

9    Arthur S. Chalmers
     Office of Attorney General
10   120 SW 10th Avenue
     Topeka, KS 66112

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            I N D E X

2
    Plaintiffs' Witnesses:                              Page
3
    BRENT HOGELIN
4       Direct Examination by Mr. McInerney               492

5
    Defendants' Witnesses:                              Page
6
    SARAH WASHBURN
7       Direct Examination by Mr. Chalmers                439
        Cross-Examination by Ms. Perry                    473
8       Redirect Examination by Mr. Chalmers              490

9
                          E X H I B I T S
10
        Plaintiffs'
11      Exhibits              Offered              Received

12         75                   484                  484
          901                   452                  ---
13

14

15

16

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2          THE COURT:  Good morning, everyone.

3          All right.  Where are we?

4          MR. CHALMERS:  I think that the agreement is that I

5    would call Sarah Washburn out of order at this point, Your

6    Honor.

7          THE COURT:  Okay.  While she's coming in, last night I

8    was thinking about the comment Ms. Greathouse made about

9    graduations and so forth.  This is a bench trial, and other

10   than getting done in time for Mr. Chalmers to retire, whenever

11   that is set to happen, I don't think we need to be a slave to

12   the schedule here, so if anybody does have -- I know May has a

13   lot of big events, and if anybody has family circumstances

14   you'd like us to work around, let me know, and I'll see what we

15   can do.

16         MR. MCINERNEY:  Thank you, Judge.

17         MR. CHALMERS:  Go up and take a seat up there, Sarah.

18         THE COURT:  Ma'am, would you please raise your right

19   hand so you can be sworn.

20                   SARAH WASHBURN,

21   called as a witness on behalf of the defendant, having first

22   been duly sworn, testified as follows:

23                 DIRECT EXAMINATION

24   BY MR. CHALMERS:

25   Q.  Whether you've appeared before Judge Vratil or not, would

1  you introduce yourself to the court, please.

2  A.  My name is Sarah Washburn.

3  Q.  And, Sarah, where are you employed?

4  A.  Currently employed with the Kansas Bureau of

5  Investigations.

6  Q.  What do you do with the KBI?

7  A.  I am the assistant general counsel.  I handle a lot of

8  records requests, internal advisories, as well as policy

9  review, and pretty much anything else the general counsel or

10  the director tells me to.

11  Q.  How long have you been with KBI?

12  A.  I believe this is my third week.

13  Q.  Before the KBI were you employed?

14  A.  I was with the Kansas Highway Patrol.

15  Q.  What was your position at the Kansas Highway Patrol?

16  A.  I was I believe officially designated as a staff attorney.

17  Q.  And what as a staff attorney was the -- with highway patrol

18  was your duties and responsibilities before you left?

19  A.  I'm sorry?

20  Q.  Before you left, yeah.

21  A.  I was responsible for handling all of the asset forfeiture

22  cases with the patrol.  I handled quiet title matters.  I

23  provided instruction for a significant portion of the legal

24  training that the recruits receive.  I handled in-service on a

25  rotating basis with Luther Ganieany as the general counsel

1  after he started.  Prior to his coming on board, I was

2  responsible for that solely, meaning I was the only instructor.

3  I handled pretty much all legal instruction prior to Luther

4  Ganieany coming to the highway patrol, and after that it was

5  split as he deemed appropriate.

6  Q.  What was your tenure with the highway patrol then?

7  A.  I started in July of 2015, so at the time I left was a

8  little over seven and a half years I believe.

9  Q.  Now, in that seven-and-a-half-year period, you described

10  what your duties were when you left and to some degree before

11  then, but were they pretty much the same?

12  A.  They were pretty consistent throughout that seven and a

13  half years.  I don't believe I started doing quiet titles until

14  probably 2016, but the asset forfeiture and the instruction

15  remained pretty constant.  As I said with the instruction, the

16  only change really occurred after -- as far as the amount of

17  instruction I did, that change occurred after Mr. Ganieany was

18  hired as the general counsel because he took over some of those

19  duties.

20  Q.  What was it you did with the highway patrol in this

21  instruction role?

22  A.  I'm not sure I understand the question.

23  Q.  What do you mean by instruction then in terms of your

24  duties?

25  A.  The Kansas Law Enforcement Training Center is the training

1    entity in Kansas and the highway patrol academy is a satellite

2    academy.  They have a set curriculum that is the basis for the

3    curriculum at the highway patrol academy, and I was responsible

4    for instructing on most of the legal content in that curriculum

5    including but not limited to classes on Fourth Amendment,

6    warrant requirements, search and seizure.  Up to a point I did

7    use of force, and Mr. Ganieany took that over.

8         Constitution.  We added an additional class on top of what

9    was the required curriculum on vehicle stops within the last

10   three years I believe.  Primarily most of the instruction was

11   centered on, based out of, or touched upon the Fourth Amendment

12   in some way.

13   Q.   Now, that instruction at the academy would have been

14   directed to whom?

15   A.   At the academy that's just where we hold most of our

16   trainings, but we would do new recruit training out there.  We

17   would also have in-service classes, which is continuing

18   education for troopers.  That was done usually January through

19   April.  We would go out once a month -- excuse me, once a week

20   for that and provide any additional training, ongoing training

21   for current troopers.

22        Advanced interdiction and some of the other interdiction

23   courses were held in Salina at the training academy as well,

24   and I taught those.  I also taught our collegiate law.  I gave

25   a presentation on the Fourth Amendment to the collegiate law

1  class, which is not highway patrol personnel; it's college

2  students who are interested perhaps in a future in law

3  enforcement.

4  Q.   So walk us through the training that you were providing.

5  You would have new recruits.  They would get training.  Where

6  would that be provided?

7  A.   That was in Salina at the training academy.

8  Q.   In that training did any of it address the Fourth Amendment

9  issues you talked about including roadside encounters,

10  consensual encounters?

11  A.   Quite a bit of it did, yes.

12  Q.   Do you have an estimate of as to number of hours of the

13  training that might have touched on those topics where you were

14  participating?

15  A.   I know for a fact there's at least 12 hours that are

16  specifically designated as Fourth Amendment training in that

17  they are search warrants, exceptions to the warrant

18  requirement, and basic Fourth Amendment law.  But so many of

19  the other classes touch on the Fourth Amendment to some degree.

20  It's -- if I had to fashion a guess, I would say it's well in

21  excess of 20 hours.

22  Q.   Then after the new recruits, I think you said something

23  about in-service training.  What is in-service training?

24  A.   In-service is required of all sworn law enforcement

25  officers with the highway patrol.  Once a year they're required

1  to attend classes at the training academy that's about two and

2  a half to three days.  Legal always presents at least a

3  two-hour update or refresher or new legal information that they

4  need during that time period.

5  Q.  And your role in that connection was to do what?

6  A.  I sometimes drafted legal training, sometimes provided it,

7  sometimes did both.  It would depend.  Up until Mr. Ganieany

8  was hired, I was responsible for creating it -- the

9  presentations as well as presenting it.

10  Q.  The in-service training provided, was it -- the courses

11  that you were instructing, were they optional?

12  A.  No, absolutely not.

13  Q.  So who would attend then the in-service training?

14  A.  Any member of the highway patrol who was sworn and held a

15  commission.  So we have individuals who are with the capital

16  police, they would attend.  We have individuals who are

17  troopers, they would attend.  Anyone from, you know, first-year

18  trooper to the colonel and the lieutenant colonel attended.

19  Q.  What's advanced interdiction or interdiction?

20  A.  The advanced interdiction -- and I believe it may have

21  changed names in the last two years -- but that is a more

22  focused course based on car stops and any factors that law

23  enforcement officers may wish to be looking for on a car stop

24  to determine whether or not criminal activity is taking place.

25  Q.  Did you -- were you involved in the advanced interdiction

1   instruction?

2   A.   I did usually do a presentation on the Fourth Amendment

3   during that week, yes.

4   Q.   Now, you say during that week.  Where did the advanced

5   interdiction instruction fit in to the curriculum that we

6   talked about?

7   A.   It is something that is usually presented to either some

8   outside members of law enforcement, but mostly highway patrol

9   members, was usually done in May.  I believe we've -- they

10  moved it to the fall within the last year or two.  It's usually

11  done once a year.  And it was usually for troopers or other

12  members of the highway patrol who had shown a particular

13  ability to effect lawful car stops and seek out additional

14  criminal activity on those car stops.

15  Q.   Who was required to, if anyone was required, to attend the

16  advanced interdiction courses?

17  A.   I don't know that I can answer that.  My understanding is

18  that it was not a required class.  It was something that was

19  offered as sort of a career progression and development

20  educational opportunity.

21  Q.   You talked about kind of the formal instruction which were

22  part of your duties.  Were there occasions where you would

23  provide other instructions to Kansas Highway Patrol officers

24  that I've not talked about?

25  A.   Absolutely.

1  Q.  What would those have been?  Go ahead.

2  A.  Certain instances where there may have been request for

3  remedial instruction by a particular trooper's chain of command

4  and may have been to refresh them on various aspects of the

5  law, Fourth Amendment, DUI, whatever the need may be.  If it

6  had a legal component, I may have been asked to provide

7  one-on-one training in that regard.

8      I also was always on-call if a member of the patrol law

9  enforcement officer had any questions while they happened to be

10  out working or if something had come up during their duties and

11  they wanted clarification on a point of the law or what caselaw

12  said or any of those types of questions I provided, I don't

13  know I would call it officially training but answers to those

14  questions.

15  Q.  When new cases come out of interest, were they ever, while

16  you were involved in this training process, communicated to

17  highway patrol troopers?

18  A.  Yes, frequently.

19  Q.  How was that accomplished?

20  A.  Initially when I first started, it was done via e-mail to

21  the law enforcement listserv, which is all sworn members of the

22  highway patrol.  Or it would have been done during in-service

23  if it was a large change in the law, if it represented a

24  substantial change in the law.

25      For example, when *Birchfield* came out from the United

1    States Supreme Court, I believe we trained on that in

2    in-service.  It may have been mentioned briefly in an e-mail,

3    but there was more substantial training on that and several

4    other cases of that nature because it significantly changed the

5    way we did DUI enforcement.

6        Once Luther got here, we kind of got away from that less

7    formal and we went to more of a legal update bulletin where one

8    to maybe three cases would go into at most a four-page bulletin

9    and lay out the facts of the case and the legal importance of

10   those cases, and those were saved on the PowerDMS system so

11   troopers could refer back to them.

12   Q.   We've heard a little testimony about that, but what is the

13   PowerDMS system as you understand it?

14   A.   As far as I understand it, it's kind of an H.R. management

15   or an agency management system that can act as a repository for

16   a policy and procedural manual or any other documents which are

17   of common interest or use to members of the patrol.

18   Q.   Within that system is there anything that tracks if a

19   trooper has actually read the material?

20   A.   It is possible to set it up for specific training so that

21   they have to acknowledge they've read it, yes.  There may be a

22   test at the end of certain material.  Oftentimes with the

23   biased-based policing update there was a small test at the end

24   to ensure that they had in fact read it.  That's the one that

25   comes to mind most easily.

1   Q.   Focusing on the training at the academy a moment, what sort

2   of methods or techniques did you use generally to instruct your

3   students?

4   A.   The standard was kind of -- and the framework for most

5   trainings is a PowerPoint in which important points or

6   important excerpts from cases are put into that PowerPoint.

7   But I refer to the way I instruct as kind of talking around the

8   PowerPoint, so with that as my framework I oftentimes would

9   tell anecdotes or stories or provide additional information,

10  factual information that wasn't necessarily on the PowerPoint.

11       I also used other methods to instruct.  For example, using

12  the second verse of Jay Z -- I think it's Jay Z -- 99 problems

13  to talk about a car stop because I had read a Law Journal

14  article talking about effective ways to examine a car stop.

15  I've also included physical drills where they are required to

16  address the four types of law enforcement citizens encounter

17  and eight exceptions to law enforcement warrant requirement

18  while engaging in a physical activity just to keep people

19  engaged and definitely awake after lunch.

20       So I have also used clips from *The Three Stooges* and ask

21  them to watch that and tell me who they would charge with what

22  and why, anything I could think of that would keep my target

23  audience, my students engaged and working with the material.

24       I also did a lot of scenario-based trainings.  I referred

25  to them as pop quizzes in the PowerPoints.  They're a small

1    scenario where the troopers or the students would have to kind

2    of think through what they're seeing and articulate reasonable

3    suspicion, probable cause, what they could do, why.  In some of

4    those cases they were larger and they'd have to work in groups,

5    present them to the class where I would be able to grill them

6    kind of like a defense attorney might.

7    Q.   The training that you provided to these different vehicles

8    on Fourth Amendment issues concerning traffic stops, is that

9    something that you could distill into a short policy statement?

10   A.   I think the goal when we were instructing on Fourth

11   Amendment was to ensure that the students, in this case

12   troopers, recruit troopers understood what the limitations of

13   the Fourth Amendment were so they could perform lawful car

14   stops.

15   Q.   Well, in that respect you had PowerPoints.  Is that

16   something that could be written down in a paragraph or two with

17   the instruction you provided?

18   A.   I know I always provided a syllabus, and there was usually

19   a statement on there about the goals of the instruction.  But I

20   think that ultimately the goal for any of that Fourth Amendment

21   instruction was just to ensure that the students understood

22   what the limits of the Fourth Amendment and that related case

23   law would allow them to do because, as I inform them, that

24   badge and gun doesn't automatically make you Superman; your

25   authority comes from the law, comes from statutes, comes from

1  the constitution so you need to be able to operate within that.

2  Q.  The PowerPoints that were used in instruction of the

3  troopers as you've described it, were those things that you

4  would be involved in preparing?

5  A.  Yes.

6  Q.  What would have been generally your role?

7  A.  I'm the one who usually assembled them, compiled them, or

8  created them.  I will say that there is -- when I first

9  started, there was significant assistance from the KLETC.  I

10  had some suggestions from them in their curriculum, and when

11  the curriculum changed a couple of years ago, I again went back

12  and looked at their proposed materials and made sure that what

13  we were teaching was in line with the KLETC curriculum.  It's

14  not identical, but it does address the same points.

15  Q.  The PowerPoints that were you say in -- by other

16  instructors, say Mr. Ganieany, did you have any role in

17  preparation or review of those PowerPoints?

18  A.  Not unless I was specifically asked to look for them.  I

19  may have provided PowerPoints we had used in the past if it was

20  a class I had previously taught.  But if it was something he

21  was teaching, it was usually something he was probably more of

22  an expert on than I was.

23  Q.  You have in front of you that big ole thick notebook to

24  your right that is Exhibit 901.  Just open it up for just a

25  second.  And do you recognize these as PowerPoints that were

1  used in patrol or highway patrol training both by you and

2  others in these different places that we've talked about?

3  A.   Some of them I definitely recognize as ones I have used.

4  The first one in here looks like says "legal issues in car

5  stops 2020" was done by Colin Wood.  I would not have had any

6  input in creating that, but I believe that's the one he

7  presented the one time I actually saw him teach an advanced

8  interdiction.

9  Q.   So you were there when he gave that instruction.  But would

10  you look through them quickly and confirm that these are

11  PowerPoint instruction provided to highway patrol officers in

12  part of the training or whether it's in-service or

13  interdiction?

14  A.   I believe one of these it was actually one I did for

15  collegiate law, so it would not have been provided to troopers;

16  it would have been provided to college students.

17  Q.   Do you have a Bates number on that?

18  A.   I'm looking at that, and I don't have a specific

19  recollection as to whether or not I had used some similar

20  slides, and it's possible that I did both.

21       I'm trying not to break anything.

22       The slides I have specific recollection of teaching at that

23  collegiate law starts on Bates No. OAG-014245.  It's because I

24  recognize the pictures, being completely honest.  And it goes

25  through at least OAG-014255.  And now it's possible I did use

1  that to teach troopers advanced interdiction, but I do

2  specifically recollect those images as being ones I choose for

3  the collegiate law program.

4      But otherwise this does appear to be training that I

5  presented to the troopers that I do have some recollection on.

6          MR. CHALMERS:  Move for admission of Exhibit 901 with

7  the exception of OAG-014245-14255 where there's a question it

8  was provided to the troopers.

9          MS. PERRY:  Your Honor, just a minute while I pull

10  those.

11          Do you know which PowerPoint that is in, Art?

12          THE COURT:  I can't hear you.

13          MS. PERRY:  I was asking Mr. Chalmers if he knew which

14  PowerPoint that was since there's seven in here, and they're

15  not consecutive Bates numbers.

16          MR. CHALMERS:  Well, in the document they are

17  consecutive, but there are gaps, you're right.  She just said

18  OAG-14245.

19          MS. PERRY:  Maybe that's easier if you want to point

20  me to the ECF document page number.

21  BY MR. CHALMERS:

22  Q.  Ms. Washburn, to assist counsel, if you look at the

23  document that you just talked about, which is the 14245 if I

24  heard that correctly, there's an ECF number and number at the

25  top filed that shows pages, whatever it is, of 479.  Could you

1   tell me what that first page is?

2   A.  Yes, sir.

3          MR. CHALMERS:  If you want to introduce that document,

4   I don't have any objection to that at this time.

5          THE WITNESS:  The ECF number, it looks like Document

6   296-3, page 287 of 749 is what I'm seeing at the top.

7          MS. PERRY:  So, Your Honor, I would object to the

8   PowerPoint which starts at ECF page 140 and goes through ECF

9   page 307 because I don't believe Ms. Washburn has laid

10  sufficient foundation for that.  It's not something she trained

11  for for the Kansas Highway Patrol and it's not relevant.

12         MR. CHALMERS:  Your Honor, the foundation objections

13  were required to have been raised when this was identified and

14  weren't.  And I think that she has sufficient -- she's provided

15  sufficient connection identifying these trainings that is

16  provided by highway patrol to its officers and troopers.  So I

17  don't --

18         THE COURT:  I'm confused.  Is this something you used

19  to train the troopers or not?

20         THE WITNESS:  With the exception of those particular

21  pages, I distinctly remember using the items in the book or

22  being present when they were offered to troopers.  I believe

23  that I may have used the items.  I don't specifically remember

24  training troopers on to train troopers, but I have a better

25  recollection of using them when I was doing the collegiate law

1    program.

2          But my habit at that time was to take new instruction

3    material from instruction material I already created, so my

4    belief is that all of this came from instruction material for

5    troopers; I just don't have a specific recollection of using

6    those particular pages, and I do recall them for the collegiate

7    law.

8          THE COURT:  So you don't really know what pages you

9    used for what purposes?

10          THE WITNESS:  The pages I specifically identified, the

11    specific recollection I have is I know I used them for

12    collegiate law.  I don't specifically recall teaching those to

13    the troopers, but otherwise all of the other training was

14    training that was provided to the highway patrol either by

15    myself or in the instance of that first PowerPoint by Mr. Wood.

16          THE COURT:  Can we go through the exhibit and only

17    admit the pages where you can affirmatively say, yes, I taught

18    this to the troopers?

19          MR. CHALMERS:  Just the one she taught?  Your Honor, I

20    think she's identified it as training that's been provided.

21    The foundation objection that was required to have been raised

22    when the document was identified --

23          THE COURT:  I misspoke.

24          MR. CHALMERS:  Okay.

25          THE COURT:  Okay.

1          MR. CHALMERS:  I'm sorry.  Maybe I misheard.

2          THE COURT:  What I'm saying is if she doesn't have any

3    memory that these materials were taught to troopers, then they

4    shouldn't come in.

5          MR. CHALMERS:  I agree.

6          THE COURT:  And my question is, can we go through page

7    by page and let her say which ones were, according to her

8    memory, specifically taught to the troopers.  Would that

9    address your objection?

10         MS. PERRY:  Your Honor, there's 749 pages of this

11   exhibit which contain seven different trainings.  The pages

12   that she's testified to that she doesn't remember whether or

13   not they were trained to troopers, thinks -- is fairly

14   confident they were trained in her collegiate law class are

15   part of a PowerPoint.  That entire PowerPoint is at PDF pages

16   140 to 268 or Bates Nos. 1375 to 1503, and I would say that

17   entire PowerPoint should not be admitted because it's not

18   relevant.

19         We also reassert our objections, but understand the

20   court's ruling on any legal conclusions that Ms. Washburn would

21   have drafted or any legal conclusions that were provided in the

22   trainings.

23         THE COURT:  So I'm confused.

24         MR. CHALMERS:  I am too.  I think what I tried to do

25   is offer everything that she identified as confirming that it

1   was training that was provided by the highway patrol except for

2   that that she set out as she didn't remember, so that's why I

3   was saying -- and maybe I don't have it written down correctly.

4   I thought it was OAG-14245 to 14255.  Maybe I've got the

5   numbers wrong.  But I didn't try to include that with what I

6   was offering.

7           Maybe what I could do if it makes sense is have

8   Ms. Washburn identify that PowerPoint that she says she doesn't

9   remember whether it was provided to the highway patrol, and I

10  then I would offer 901 with the exception of that portion.

11          MS. PERRY:  It's a PowerPoint, Your Honor.  I

12  understand she said those ten pages are what she referred to,

13  but it would -- if those ten pages are part of the PowerPoint,

14  the PowerPoint should be excluded if it wasn't provided to the

15  Kansas Highway Patrol.

16          THE COURT:  Well, if she -- so I guess I'm not

17  following what you're saying.  If she can lay the foundation by

18  saying these specific pages were provided and these I don't

19  remember, then why shouldn't we admit the ones that she

20  remembers were provided?

21          MS. PERRY:  Right.  I don't believe she's had time to

22  look through almost the 200 pages that fall before those ten in

23  that one PowerPoint.  I think if we want to look through that

24  one PowerPoint, that's what we should do.

25          THE COURT:  I'm going to reserve ruling on this until

1    after cross-examination and we will revisit it.

2    BY MR. CHALMERS:

3    Q.  What I'd like to do is talk to you about portions of those

4    PowerPoints.  Let's start with the training that was provided

5    by Mr. Colin Woods.  You said you attended that particular

6    training?

7    A.  I was present when he provided it, yes.

8    Q.  And you -- and there are some tabs on that that are maybe

9    ways to work to it a little quicker, but could you find what

10   has been page 52 at the top of 749?

11   A.  You said 52?

12   Q.  52.

13   A.  52 of 749, yes.

14   Q.  And do you recognize that as being part of the PowerPoint

15   that Mr. Woods presented in an interdiction course?

16   A.  I believe it to be, yes.

17   Q.  And what was the date of interdiction course?

18   A.  I honestly don't have a specific recollection of that.

19   Q.  If you look at the first page.

20   A.  The first page of it?

21   Q.  Yeah.  Document 1 of 749.

22   A.  I'm sorry.  I'm not sure where you're looking.  I

23   apologize.

24   Q.  It would be 901, page 1 of 740 [sic].  I think you may have

25   your hand on it.

1  A.  It indicates he provided it in 2020.

2  Q.  And at the document page that we've referenced which is 52,

3  if we put that on the screen, please.  There is a discussion on

4  that page of the *Vasquez v. Lewis* case?

5  A.  I do.

6  Q.  Are you familiar with *Vasquez v. Lewis* case?

7  A.  Yes.

8  Q.  In your training and instruction that you provided, did you

9  talk to the troopers about *Vasquez* and it's holdings?

10  A.  Yes.

11  Q.  When did you do that?

12  A.  I believe it may have started around 2020 as well.  We

13  specifically included a particular footnote in *Vasquez* that

14  talked about exactly what the court was looking for and what it

15  required to properly articulate reasonable suspicion to extend

16  a traffic stop.

17  Q.  The *Vasquez* instruction that you provided was in what parts

18  of the instruction to the troopers?  What I mean by that,

19  whether it's the basic training, the advanced interdiction,

20  whatever parts you have.

21  A.  I believe all of it.  We started with including it in a car

22  stop class that we did for an in-service, and I want to say

23  that was probably two years ago, maybe three in 2020.  Then we

24  elected to include that in the basic curriculum for the

25  troopers at the recruit academy so they got the same class

1  which included *Vasquez*, and I believe we've also included that

2  in subsequent other in-service trainings as well as an advanced

3  interdiction.

4  Q.  In the *Vasquez* training -- well, what's your most recent

5  recollection of when *Vasquez* was provided by way of training to

6  the troopers?

7  A.  I know we've provided it because we do the car stop class

8  in the basic academy which would have been earlier this year,

9  but we also provided it as part of the in-service kind of by

10  reference.  I don't know that it was specifically included in

11  the PowerPoint, but we talked about it when we were talking

12  about reasonable suspicion and other factors that may or may

13  not be considered by the court.  So that would have been this

14  year.  In-service again runs from January to April, and we

15  would have offered that car stop class probably in January of

16  this year as well.

17  Q.  So in this last go-around, would the holding of *Vasquez*,

18  its facts, have been communicated to the troopers as part of

19  your instruction on how they are to conduct traffic stops and

20  detentions?

21  A.  In some way, shape, or form, yes.

22  Q.  With respect to -- and if we look at Exhibit 901 and go

23  down -- go up to rather page 50 at 749, there it provides in

24  901 that the decision on the analysis of reasonable suspicion,

25  it is a decision on reasonable suspicion and qualified

1   immunity.  See what I'm referencing?

2   A.  I do.  I believe it's the last bullet point on the page.

3   Q.  Did you find at some point instruction on *Vasquez* to be

4   important on what constitutes reasonable suspicion in Kansas?

5        MS. PERRY:  Objection, Your Honor.  This is asking for

6   the legal conclusion that the court has excluded.

7        MR. CHALMERS:  I can rephrase it.

8   BY MR. CHALMERS:

9   Q.  In formulating your instruction and the instruction that

10  you heard, was *Vasquez* and its holdings presented as something

11  that was important in how one identifies reasonable suspicion

12  and articulates reasonable suspicion?

13       MS. PERRY:  Same objection, Your Honor.

14       MR. CHALMERS:  Talked about what the --

15       THE COURT:  Say again what your objection is.  Was it

16  presented as important?  I'm not sure I know what that means,

17  but what is your objection?

18       MS. PERRY:  Sure.  So I believe his question was

19  whether or not she presented the holdings as she saw it as

20  important to the troopers, and the holdings as to what she

21  sees, it is the legal conclusion that we're objecting to.

22       THE COURT:  That's slicing and dicing it too thin for

23  me.  You can answer.

24       THE WITNESS:  I believe that *Vasquez* was presented as

25  another case in a long string of cases that continued to

1   explain what the courts were looking for when they were

2   authorizing law enforcement to extend a stop based on

3   reasonable suspicion.  It was presented and it was used as a

4   tool to explain reasonable suspicion and what constitutes

5   reasonable suspicion.

6   BY MR. CHALMERS:

7   Q.  The PowerPoint that we've been talking about goes on to

8   page 68, and there's reference to the Columbo Gambit, a/k/a the

9   trooper two-step.  Do you see that slide?

10  A.  I do.

11  Q.  In your instruction that you have described, did you

12  address with troopers the, quote/unquote, two-step -- trooper

13  two-step?

14  A.  I believe it's in the slides.  It's in there because it's

15  the colloquial way that the court -- not only the court but law

16  enforcement has referred to the pattern of disengaging to

17  attempt a consensual encounter, and I used it because that's

18  the way law enforcement is discussing it.

19  Q.  That instruction on the two-step that provided -- in forms

20  was that provided again?  Was it limited to one particular

21  vehicle of communicating it or how did that work?

22  A.  I'm not sure I understand specifically what you're looking

23  for.

24  Q.  Was that instruction at the basic academy?

25  A.  I believe that it may have been.  I don't have specific

1   recollections of that, but my Fourth Amendment tend to stay

2   pretty consistent with the slides.

3   Q.   Would it have been at other stages of the instruction once

4   one graduated from the basic academy?

5   A.   I'm certain it would have been done at advanced

6   interdiction.  I'm not positive we would have addressed it

7   specifically at in-service.

8   Q.   The slide at OAG -- well, at page 69 of 749 in Exhibit 901

9   describes a test.  It says "Would a reasonable person in the

10  driver's position have believed they had the right to disregard

11  the officer's request and leave?"

12       Is that the training or training like that that you were

13  providing in these different forums that you described them?

14  A.   It would have been very consistent with that because that

15  is as I understood it the test.

16  Q.   And then in slide 70 of 749 in the Exhibit 901, there are

17  various factors talking about from detention to consensual.  Do

18  you see what I'm talking about?

19  A.   I do.

20  Q.   I'm not going to read those into the record.  But is that

21  the sort of training that you were providing to troopers in

22  terms of to evaluate whether or not a reasonable person in a

23  position of the driver would believe they have the right to

24  leave?

25  A.   Very, very similar.  I believe some of my training may have

1   included that, you know, these -- it's a list, but it is not an

2   exclusive list so factors including but not limited to factors

3   very similar to what Mr. Wood has listed.

4   Q.   If we go to the exhibit at page 140, and 140 is part of a

5   PowerPoint, if you look at 1375, that you prepared or -- is

6   that right?

7   A.   Are we talking Bates number or are we talking page at the

8   top?

9   Q.   Page numbers, I'm sorry.  If we look at 140.  Let's go to

10  that first.  Laws of search and seizure, come back with a

11  warrant.  Is that one of your PowerPoints?

12  A.   Yes.

13  Q.   And so we have a clear record on this, this is not one of

14  the PowerPoints that we're -- that was used in your college

15  class?

16  A.   No, I don't believe so.  It may have been used in the

17  college class, but the text and all of that is something I

18  definitely would have used, and still until the time I left did

19  use, with the recruits.

20  Q.   And this PowerPoint doesn't have a date on it, but do you

21  have a recollection about when this instruction would have

22  taken place?

23  A.   It could have occurred any time from 2015 until

24  approximately -- well, whenever KLETC implemented the new

25  curriculum because I completely redid everything at that time,

1  and as I said, I tended to just refine and revise finer points

2  rather than completely reinvent them for each class.

3      And may I clarify something, part of my earlier testimony?

4  Q.  Sure.

5  A.  The images that I was speaking about that I believe may

6  actually be in this PowerPoint are ones I specifically remember

7  using in collegiate law, but this surrounding PowerPoint is all

8  material I would have used in a Fourth Amendment class with the

9  recruits and potentially even in-service.  I just don't

10  specifically remember those images in those other classes.  I

11  do remember using those specific images for collegiate law

12  because I thought they would relate to that particular

13  audience, but the text surrounding them, it was all text -- it

14  was instruction I would have provided to the recruits at the

15  basic academy.  And I know that's potentially splitting hairs,

16  but that's what I do specifically recall.

17  Q.  If we turn to page 23 -- or rather 232 in that PowerPoint,

18  if you're there, that's a *Rodriguez v. United States* decision

19  PowerPoint; is that correct?

20  A.  That's the title of the slide, yes.

21  Q.  So in discussing cases like *Vasquez*, the instruction that

22  you provided on that, or in the discussing for that matter

23  before we get to consensual encounters, there's some

24  instruction here about when police can extend a traffic stop.

25  Is that the sort of training that you were providing the

1  officers during the time that you were instructing them at the

2  various different locations, the academy and so forth?

3  A.  Yes, it's exactly what I would have trained on.

4  Q.  Now, what I'm not sure is whether I'm walking into an area

5  that was to the students or otherwise, but if you look at

6  Document 280, if I back that up for a moment and I go to

7  Document 269 where it says "Fourth Amendment, reasonableness is

8  the touch stone of the Fourth Amendment."  It has your name.

9  Do you find that?

10  A.  Yes.

11  Q.  269.  Is this one of your training that you provided to

12  highway patrol troopers?

13  A.  Yes.

14  Q.  Okay.

15  A.  I believe it is.

16  Q.  So if I focus then on page 280 -- well, I'll go back up for

17  a second, 279.  There you're discussing consensual encounters.

18  Did you as part of your training with the highway patrol

19  troopers discuss what a consensual encounter is and what you

20  perceive or understood to be the elements in how to engage in

21  such an encounter?

22        MS. PERRY:  Objection, Your Honor.  He asked if she

23  trained on what she perceived to be consensual encounters which

24  I believe is a legal conclusion we've objected to.

25        MR. CHALMERS:  I'm not trying to get into a legal

1    conclusion.

2    BY MR. CHALMERS:

3    Q.   Did you train on consensual encounters with your highway

4    patrol students at the training levels that we've talked about?

5    A.   Multiple times.

6    Q.   And looking at this slide 279 where it talks generally

7    about consensual encounters, is that representative of the

8    training that you provided on multiple occasions to the

9    troopers?

10   A.   Yes.

11   Q.   If we look at 280 of the exhibit, 901 there's a

12   non-exhaustive list of factors.  Is that consistent with the

13   training that you were providing to troopers?

14   A.   Yes.

15   Q.   Now, then if we look at Exhibit 281 talking about a trooper

16   two-step, did that -- was the trooper two-step included in the

17   training that you provided concerning consensual encounters?

18   A.   Not on how to do it, but on what it is oftentimes

19   considered to be, and it was trained as part of the totality of

20   circumstances specifically focusing on the break in time that

21   the courts have recognized as a factor they look at to

22   determine whether or not an encounter is consensual.

23   Q.   And the training that you provided on the two-step, you say

24   it had to do with whether it was consensual?

25   A.   I never trained on the two-step.  I used that -- because

1  that's what they said.  I want to be very clear.  I used it as
2  part of discussing whether or not a stop was voluntary and how
3  the courts were evaluating that.
4  Q.  And so if I look at slide 286 of Exhibit 901, the
5  voluntariness is what -- is referencing in that slide; is that
6  right?
7  A.  Absolutely.
8  Q.  Is that the training that you were providing to the
9  troopers regarding consent and then as a subset of that the
10  two-step?
11  A.  The slides we've referenced are a pretty good sample of and
12  representation of the training I provided, yes.
13  Q.  If we look at page 341 of the exhibit, that's 2021 advanced
14  training interdiction the beginning of 2001 [*sic*], advanced
15  training interdiction outline, is it not?
16  A.  It appears to be 2021 advanced interdiction, yes.
17  Q.  And if I look at page 392 of that exhibit, it talks about
18  reasonable suspicion.  Are you there?
19  A.  I am.
20  Q.  At that slide it says "You cannot detain a vehicle or its
21  occupants absent reasonable suspicion.  This is illegal."  Do
22  you see what I've read?
23  A.  I do.
24  Q.  Is that the instruction that you were providing to troopers
25  at the various time that you provided instructions at basic

1   training, in-service, and thereafter?

2   A.   It is similar.  What I believe my training said was that

3   you cannot extent a traffic stop or you cannot detain someone

4   beyond a traffic stop absent independent reasonable suspicion.

5   So it's worded slightly differently, but I believe the gist or

6   the thrust of the message is the same.

7   Q.   I've pushed back a little bit in the slide to page 388 of

8   749 and there it has a caption "basic indicators."  What I'm --

9   want to ask you is, in your presentation on what constitutes

10   reasonable suspicion or not, in your training did you discuss

11   basic indicators?

12   A.   Not in a list like this usually.  Usually I did it as part

13   of cases that the court had decided so that the troopers and

14   the other officers could see how the court was evaluating the

15   totality of the circumstances.

16       As an example, you know, I may have shown them -- and

17   specifically in this last in-service we had a case where the

18   court talked about the value of multiple cell phones, but they

19   also talked about whether or not energy drinks or lots of

20   caffeinated beverages were part of reasonable suspicion, so

21   while I never presented a list, I usually just test it within

22   the framework of actual cases or specific examples or fact

23   patterns that I derived from actual cases so you weren't taking

24   them in isolation.

25   Q.   Would *Vasquez*, the discussion of *Vasquez* and this recent

1    interdiction training be an example of that?

2    A.   Absolutely.

3    Q.   If we move to document -- or, rather, slide No. 576 in the

4    exhibit, drill down on which one was maybe to the college kids.

5    There's a slide "laws of search and seizure, come back with a

6    warrant."  It has -- it's starting at 576.  Is this a class

7    that you taught to troopers?

8    A.   May I have a moment?  Based on the length of the PowerPoint

9    I believe it is one I would have provided to troopers and not

10   one I would have provided to students.

11   Q.   If I look at slide 28672 -- well, I'm sorry.  At page 583.

12   A.   Yes.

13   Q.   It talks about the Fourth Amendment.  It says you can talk

14   to people all day.  If it's consensual, the Fourth Amendment

15   isn't involved at all.  Consent must always be all of the

16   following:  Knowing, intelligent, voluntary.  Do you see what

17   I've read?

18   A.   I do.

19   Q.   Is that the training that you were providing to troopers in

20   the various vehicles we've talked about whether it is at the

21   academy or in-service and otherwise?

22   A.   Yes.

23   Q.   And if we look at slide 661, there it talks about the stop

24   and some of the factors that lead someone to believe they're

25   not free to leave, and you've got a list.  Do you see that?

1  A.  I do.

2  Q.  Was that list provided to troopers for them to discern

3  whether or not from your training this was voluntary, someone

4  was voluntarily free to leave?

5  A.  Yes.

6  Q.  If we look to slide 296 -- I'm sorry.  716, 716.  We'll get

7  there.  Well, I want you to stop first at 710 and make sure

8  that we're talking about the right one.  Yeah, 710.

9      There is a PowerPoint here "vehicle stops-legal issues" by

10  you and by Mr. Ganieany.  Do you see what I'm referencing?

11  A.  I do.

12  Q.  In this particular presentation when would it have been

13  provided?

14  A.  That actually I believe was provided at in-service last

15  year, so from January to April of last year, but it's also one

16  that we have provided as part of the basic academy since that

17  time as well.  So any recruit trooper who's gone through the

18  full basic academy would have also received this class as well

19  as the in-service.

20  Q.  And looking at page 716 now in Exhibit 901, there's a

21  reference to the *Vasquez* decision.  Do you see what I'm talking

22  about?

23  A.  I do.

24  Q.  You were saying that as part of your instruction on *Vasquez*

25  you were talking about a particular footnote.  What did you

1  mean by about that?

2  A.   I believe this is the footnote I was referencing.  It was

3  one that I thought law enforcement would find particularly

4  helpful as they were on the road and engaged in their duties

5  because it very clearly explains what the court is looking for

6  and what the court requires in order to make a finding that the

7  officer's actions were within the law.

8  Q.   At page 4, or 749 of the same outline, there's a slide

9  saying "consent."  When you're there, let me know.

10  A.   I have it.

11  Q.   And this talks about things to remember and then indicates

12  in the second bullet point "consent must be knowingly and

13  intelligently and voluntarily given.  If it isn't all three

14  things, it's not valid consent."  Do you see what I've read?

15  A.   I do.

16  Q.   Is that the training that you have provided to law

17  enforcement through the years that you were with the highway

18  patrol?

19  A.   Yes, it is.

20  Q.   And then it says "the court determines the validity of

21  consent based on the totality of the circumstances, but the

22  factors previously listed are common when they analyze whether

23  consent is valid."

24     Did you in your training then -- I don't need to go back

25  here -- that you've described, would go through those things

1  that in the totality of circumstances might show that there was

2  a lack of valid consent?

3  A.   We use several different cases where the court has shown or

4  the court has given -- provided those lists, and we reiterated

5  them in several of the preceding slides, so that last slide is

6  meant to be summary slide of prior slides that indicated those

7  factors, yes.

8  Q.   So for whatever it's worth, those factors are listed on 746

9  to 748 in this particular PowerPoint?

10  A.   That appears to be correct, yes.

11  Q.   Based on the training that you've described -- well, let me

12  ask it a little bit differently.

13      Did the training that you described ever address whether

14  detention or a canine sniff can be based only on travel to or

15  from Colorado or another state?

16  A.   If we did it, it would have been through the lens of

17  *Vasquez* where we very clearly stated it could not.

18  Q.   Did your training address whether reasonable suspicion

19  could be based on citizenship, that is where the driver's --

20  particular state is of the driver?

21  A.   Again through the lens of *Vasquez* we would have trained it

22  could not have been.

23  Q.   On the basis of out-of-state license plates would there

24  have been any training that addressed whether that would be

25  part of reasonable suspicion?

1  A.  Only so far as it was part of the totality of the

2  circumstances, but it would have been of low value, so that's

3  how we would have trained.

4  Q.  Did your training say anything about drug corridors?

5  A.  Mine did not, no, unless the court listed it in a

6  particular ruling, but I don't recall ever training on drug

7  corridors.

8  Q.  Did your training tell troopers that -- well, I don't need

9  to go there.

10        MR. CHALMERS:  Your Honor, I don't have any other

11  questions of this witness right now.

12        THE COURT:  Redirect.  I'm sorry.  Direct.  Sorry

13  cross-examination, please.

14        THE WITNESS:  I'm glad I'm not the only one having

15  that moment.

16                  CROSS-EXAMINATION

17  BY MS. PERRY:

18  Q.  Good morning.

19  A.  Good morning.

20  Q.  You discussed a number of trainings on your direct exam

21  with Mr. Chalmers.  Do you remember that?

22  A.  Yes.

23  Q.  Pretty much the whole exam?

24  A.  Yes.

25  Q.  You didn't test the troopers on any of the trainings you

1  provided, right?

2  A.   Some of it I did.  There were certain pop quizzes during

3  the basic academy on Fourth Amendment matters, and I believe

4  that there are certain benchmark tests in the basic academy.

5  When it came to in-service, no, there's no test, and I couldn't

6  tell you about advanced interdiction because I was really

7  coming in just to teach a specific portion.

8  Q.   Other than the pop quizzes during your exam and other than

9  in the academy, there were no pretests?

10  A.   I'm going to try and answer your question, but may I ask

11  for clarification?  The pop quizzes as they're referenced in

12  the training material are not what I am talking about when I

13  say quizzes.  It would have been quizzes after we finished the

14  material to test their basic knowledge to make sure they

15  understood the material.  The pop quizzes are a more practical

16  and practice examples.  But other than the benchmark test and

17  those quizzes, I am not aware of any testing.

18  Q.   Do you pass those quizzes on to their supervisor?

19  A.   The recruits, it would have been passed on to the

20  lieutenant in charge of the recruit academy, and the benchmark

21  tests are administered by the training academy staff.

22  Q.   Let's set aside the training academy.  The troopers who

23  have been there 10 years, 20 years, 30 years, I think you said

24  the superintendent, you don't pass any tests that they take

25  along after their training to their supervisors?

1   A.   I did not proctor any test to them for in-service training.

2   Q.   And that would be a pretest or a post-test after you

3   trained?

4   A.   If it's before or after I trained, I wouldn't know about

5   it.  I'm not sure I'm understanding the question, so maybe I'm

6   not answering it correctly.

7   Q.   So when the troopers come in to your training, do you do

8   any pretest to see what they need trained on?

9   A.   No.

10  Q.   And after they sit through your training, I think you've

11  mentioned in-service before, is part of that in-service then

12  taking a written test to see if they've comprehended the

13  material you trained on?

14  A.   I don't provide that, no.

15  Q.   And the supervisors aren't required to conduct regular

16  scenario-based training or anything like that, right?

17  A.   That would be outside of my area, but I don't know of any.

18  Q.   And supervisors are not required to spot check dashcam for

19  any compliance with training?

20  A.   Again, out of my area.  I can't answer that.

21  Q.   Do you review or spot check whether or not specific stops,

22  troopers have complied with your training?

23  A.   Not unless I'm asked to.

24  Q.   Other than one-off incident-based knowledge when you might

25  be asked to, do you know if troopers are complying with your

1   training?

2   A.   I don't know how I could know that.

3   Q.   And the trainings that we went through today, you can't

4   provide us specific dates on which -- on when each of those

5   trainings was provided, right?

6   A.   With -- I can narrow down some of the dates.  Specifically

7   with the car stop, I know that we gave that pretty much every

8   Wednesday from the middle of January through the end of April

9   last year.  And it would be on a calendar for the basic academy

10  for each recruit class at that time and then subsequent to

11  that.  But with the others, I don't have specific dates, no.

12  Q.   And I believe you testified that your training changes at

13  least to some extent over the times that you've begun training

14  until when you left the Kansas Highway Patrol?

15  A.   It's revised based on new aspects of the law, new opinions

16  that have come out, but it remains consistent with the tone in

17  and theme.

18  Q.   We didn't go through each training you provided during the

19  time you were at KHP?

20  A.   No.

21  Q.   You didn't go through each page of Exhibit 901, right?

22  A.   Is 901, the binder, the whole thing?

23  Q.   Yes.

24  A.   Not each page, no.

25  Q.   And when you worked for the Kansas Highway Patrol and were

1   doing training, you never had final say on that, right, what

2   the training was?

3   A.   No.

4   Q.   One of the trainings in there -- and we can pick it up if

5   we need to, but I'll ask the questions first to see if we can

6   get through it.  You'd agree in doing criminal interdiction

7   work, the troopers are trained that they should consider a

8   number of factors that may indicate criminal activity, right?

9   A.   They are trained to consider the totality of the

10  circumstances to determine whether or not they have reasonable

11  suspicion to believe criminal activity is taking place.

12  Q.   And some of those factors include where a motorist is

13  coming from?

14  A.   It can.

15  Q.   And where they're going to?

16  A.   It can.

17  Q.   And KHP troopers are trained in connection with criminal

18  interdiction that a person who doesn't want to answer questions

19  is a deceptive person?

20  A.   No.  Not -- okay.  Let me rephrase that.  I have never

21  trained that, but again the totality of the circumstances is

22  that test, so that's what they're trained to look at the

23  totality of the circumstances.

24  Q.   Sure.  I'm asking if whether or not that would be one

25  factor in the totality of the circumstances whether or not

1   somebody would be deceptive because they don't want to answer

2   questions?

3   A.   That is not part of my training.

4   Q.   Did you teach criminal interdiction?

5   A.   I taught the legal aspects in criminal interdiction, yes.

6   Q.   The PowerPoint that's in that book says 2021 criminal

7   interdiction.   Did you train on that?

8   A.   Do you have a page number by any chance?

9   Q.   It starts -- the page number I have for the PDF is 341.

10  I'm not positive if that matches up with the ECF numbers, but

11  it should get you close.

12  A.   As long as gets me close, that's all I need.

13       No, that is not one I would have taught.

14  Q.   Who taught that class?

15  A.   I don't know.

16  Q.   Did you sit in on that class?

17  A.   Probably not.

18  Q.   You don't know where that PowerPoint came from at all?

19  A.   Other than what's listed here, I don't.

20  Q.   Is that a class that the Kansas Highway Patrol teaches on?

21  A.   Absolutely.

22  Q.   Who typically teaches it?

23  A.   It would probably be a member of Troop N usually at a

24  lieutenants level, but it varies from year to year I believe.

25  Q.   Do you review the trainings from the Troop N supervisors?

1   A.   Not unless requested.

2   Q.   Is that often?

3   A.   It was more of a collaborative effort than me actually

4   reviewing it, and they would ask me, hey, am I getting this

5   right, is this correct, and I would look at what they had sent

6   me and say yes or no.  It happened periodically.  I wouldn't

7   tell you it was regular.

8   Q.   I'd like to talk a little bit about motions to suppress

9   with respect to the Kansas Highway Patrol officers when you

10  were with the Kansas Highway Patrol.

11       Would you agree with me that when a motion to suppress is

12  filed, whether it's a state case or it's a federal case and

13  it's premised on the Kansas Highway Patrol trooper's failure to

14  follow the law with regard to search and seizures, that's

15  something you were almost never made aware of?

16  A.   Not unless the individual trooper or their supervisor told

17  me about it.

18  Q.   And the same would be true of an order suppressing

19  evidence, those almost never came to your attention in the

20  general counsel's office?

21  A.   Not unless it was something that was referred to me.

22  Q.   How often was that?

23  A.   Not very often.

24  Q.   Same for the motion to suppress, that was very rare?

25  A.   Yes.

1  Q.  You agree that a situation where a trooper's conduct for

2  failure to execute a lawful search that would result in a

3  dismissal of a case, that would only rarely come to your

4  attention?

5  A.  Yes.

6  Q.  And it's correct that even where a trooper has repeated

7  violations that are found by courts or internally by PSU, that

8  would probably not reach your attention in the general

9  counsel's office?

10  A.  My attention, no.  But if it was repeated, it would likely

11  be referred to PSU and then go to the general counsel.

12  Q.  And I'm only asking about your experience.

13  A.  Not mine because I was not part of discipline or employment

14  or any kind of -- that.

15  Q.  How many people are in the general counsel's office?

16  A.  When I was there, two as far as attorneys.

17  Q.  You're not aware of any procedure within the Kansas Highway

18  Patrol requiring retraining or reeducation where a trooper has

19  repeated violations of the law, right?

20  A.  I don't know the policy, but I know that it was done at the

21  request of the trooper's supervisor.

22  Q.  Is that a standard procedure?

23  A.  It's something I did numerous times.  I couldn't tell you

24  if it was standard or not.  I think it depends more on the

25  supervisor and what their concerns were and whether they could

1  handle it or they thought it needed to be escalated to legal.

2  Q.  When you say you did that a lot, the retraining or

3  reeducation when they had repeated violations of the law, how

4  did that come to your attention?

5  A.  I said it did frequently, and to me frequently is different

6  than a lot, and I'm not trying to nitpick that.  I did it at

7  least three to four times where there was substantive

8  retraining, meaning they had to sit in for more than an hour or

9  we had to meet one on one for more than an hour to have

10  retraining.

11  Q.  You did that three to four times the entire seven years you

12  were at the Kansas Highway Patrol?

13  A.  For substantive retraining, yes.  But a lot of times there

14  was, hey, can you write out something and make sure we can

15  share it and that way we're on the same page, share caselaw,

16  provide us the legal basis for this, and we can share it to

17  whoever trooper.  And that happened much more often than that.

18  Q.  I'm only asking for procedure in the Kansas Highway Patrol

19  for retraining or education for violations of the law.  You

20  don't know of any policy or procedure that requires that?

21  A.  I don't know the policy or procedure, no.

22  Q.  For substantive items, you did that three or four times

23  throughout your entire time at the Kansas Highway Patrol for

24  seven years?

25  A.  What I consider to be substantive retraining, I did that

1   three to four times, yes.

2   Q.   You were working at the Kansas Highway Patrol when the

3   *Vasquez* case came down; is that right?

4   A.   I believe I had just started when the first opinion was

5   issued, yes.

6   Q.   And the Tenth Circuit opinion came down in 2016.  You would

7   have been there at that time?

8   A.   Yes.

9   Q.   And that involved Kansas Highway Patrol troopers?

10  A.   It did.

11  Q.   When *Vasquez* was decided by the Tenth Circuit, you didn't

12  incorporate that to any of your training did you at that time?

13  A.   Not at that time because we already had *Wood* and we had

14  *Rodriguez*.

15  Q.   You didn't incorporate into your training until 2020,

16  right?

17  A.   I believe that's correct, yes.

18  Q.   And that was after this lawsuit was filed?

19  A.   I don't know when the lawsuit was filed, but I believe so,

20  yes.

21  Q.   So this lawsuit I'll represent to you was filed in 2019, so

22  you didn't incorporate *Vasquez* until after this lawsuit was

23  filed?

24  A.   Not specifically by name.

25  Q.   You didn't include it in any of your training in 2016,

1  2017, 2018, 2019, right?

2  A.   Not by name, no.

3  Q.   And when you testified at your deposition in this case in

4  August of 2021, your understanding of the *Vasquez* case was that

5  it was a totality of the circumstances or repeating *Wood*, so,

6  again, not new caselaw; is that what you said?

7  A.   That sounds like what I said at the deposition, yes.  I

8  don't believe it to be new and novel caselaw.  I believe it did

9  track along with *Wood* and *Rodriguez*.

10  Q.   You didn't think *Vasquez* had anything new to say about

11  interdiction work for the Kansas Highway Patrol?

12  A.   I believe the fundamentals of the case were covered by *Wood*

13  and *Vasquez* [sic], and we were already training with those.

14  Q.   So you didn't think it had anything new to add to Kansas

15  interdiction?

16  A.   I didn't think it had anything substantive that I needed to

17  inform the troopers on at that time.

18  Q.   When it was handed down, you didn't make any changes to

19  your training materials then?

20  A.   No.  I believe we were waiting for a determination whether

21  it would be heard on *en banc* because a petition for review was

22  put up right away, so I think we were waiting on that to

23  determine whether or not we would train on it, and then once

24  that was done, I believe we then put it in in 2020, but I think

25  that was the initial reason for the delay.

1    Q.   Was it handed down before 2021 when you put it into

2    training?

3    A.   Oh, yes, yes, yes.

4    Q.   You didn't distribute a legal update as a result of the

5    Tenth Circuit's opinion in *Vasquez* case, right?

6    A.   Not they recall, no.

7    Q.   Or when it was handed down?

8    A.   No, I don't believe so.

9    Q.   If we could take at look at Plaintiffs' Exhibit 75.  I

10   might have to switch you binders.

11   A.   Trying not to kill this one when I give it to you.

12   Q.   Do you recognize what Exhibit 75 is?

13   A.   Yes.

14   Q.   Does that appear to be the *Vasquez* case that the Tenth

15   Circuit handed down?

16   A.   It appears to be a printout from Westlaw, yes, of that

17   opinion, yes.

18   Q.   And you recognize that because you've reviewed it?

19   A.   Not recently.  But, yes.

20        MS. PERRY:  Your Honor, I move to admit Plaintiffs'

21   Exhibit 75.

22        MR. CHALMERS:  No objection.

23        THE COURT:  Received.

24   BY MS. PERRY:

25   Q.   And I know you testified that you included a footnote from

1  *Vasquez* in your training materials; is that right?

2  A.  Yes.

3  Q.  If we could take a look at Plaintiffs' Exhibit 75 on page 6

4  at the bottom.

5  A.  Yes, I think I have that.

6  Q.  And if I could direct your attention to the last paragraph

7  on that page that starts "though we analyze these factors under

8  the totality of the circumstances" do you see where that

9  starts?

10  A.  I do.

11  Q.  So it says "though we analyze the facts under the totality

12  of the circumstances" -- with the case cite -- "we first note

13  which factors have less weight in our analysis.  We start with

14  the most troubling justification:  Vasquez's status as a

15  resident of Colorado.  The officers relied heavily on Vasquez's

16  residence because Colorado is known to be home to medical

17  marijuana dispensaries, but we find this justification, in

18  isolation or in tandem with other considerations, unconvincing.

19      "As we have said previously the defendant -- that the

20  defendant was traveling from a drug source city or drug source

21  state does little to add to the overall calculus of the

22  suspicion."  There's another case cite, and then it says "Such

23  a factor is so broad as to be indicative of almost nothing."

24      Do you see that?

25  A.  Yes.

1  Q.  You didn't include that portion in any of your PowerPoints,

2  right?

3  A.  Not in the PowerPoints, no.

4  Q.  If we go down, it says -- almost to the end of the

5  paragraph, do you see where it starts "it is wholly improper"?

6  A.  Yes.

7  Q.  "It is wholly improper to assume that an individual is more

8  likely to be engaged in criminal conduct because of his state

9  of residence, and thus any fact that would inculpate every

10  resident of a state cannot support reasonable suspicion.

11  Accordingly, it is time to abandon the pretense that state

12  citizenship is a permissible basis on which to justify the

13  detention and search of out-of-state motorists and time to stop

14  the practice of detention of motorists for nothing more than an

15  out-of-state license plate."

16      Do you see that?

17  A.  I do.

18  Q.  Did you include any of that portion on your slide training?

19  A.  No.

20  Q.  If you go down to the next paragraph, the second sentence

21  that starts "even under the totality."  Do you see that?

22  A.  I do.

23  Q.  "Even under the totality of the circumstances, it is

24  anachronistic to use state residence as justification for the

25  officer's reasonable suspicion."

1       You didn't include that on a training slide, did you?

2    A.   I did not.

3    Q.   If we go to the next paragraph, the last sentence that

4    starts "and that *Vasquez*."

5    A.   I see that.

6    Q.   "And that *Vasquez* was driving on I-70 does not make his

7    otherwise innocent conduct suspicious.  I-70 is major corridor

8    between Colorado and the east coast.  It could equally be said

9    that it is suspicious to not drive from Colorado to Maryland on

10   I-70."

11      You didn't include that in your training, did you?

12   A.   I did not.

13   Q.   We've talked a little bit already about the substantive

14   remedial training that you've provided to certain troopers,

15   three or four over your time at the KHP, right?

16   A.   Yes.

17   Q.   When you do that remedial training, you don't design new

18   training material, right?

19   A.   It depends on the matter, but I don't believe it was all

20   new training material.  A lot of it was incorporated to

21   reemphasize certain court decisions and certain case law

22   pieces.

23   Q.   You basically use presentations that you had already done,

24   right, and especially true for Fourth Amendment slides you had

25   already prepared?

1   A.   The large majority of it is, yes.

2   Q.   You provided remedial training to Trooper Brandon McMillan

3   as a result of his sustained PSU complaint involving Joshua

4   Bosire, correct?

5   A.   I did.

6   Q.   Were you informed that Trooper McMillan testified in his

7   deposition that since his remedial training with you, he's not

8   changed the way he does things?

9        MR. CHALMERS:  You know, Your Honor, that's really not

10   in evidence anywhere, and I don't --

11       THE COURT:  It's what?

12       MR. CHALMERS:  That -- the question which is are you

13   informed that Trooper McMillan testified in his deposition or

14   to this effect is not testimony that's in evidence, and it

15   hasn't been presented in any trial, and it's not a proper

16   question, Your Honor; it assumes facts not in evidence.

17       THE COURT:  I think she can ask about facts that are

18   not in evidence.  It's just a yes-or-no question.  But tell me

19   what you're trying to establish.

20       MS. PERRY:  Sure.  I'm asking whether or not she's

21   been informed that her remedial training didn't work on a

22   trooper who said he's not changed anything after doing it.  My

23   question is whether or not she was informed that that's true.

24   If Mr. Chalmers wants to bring evidence that he didn't say that

25   in that deposition, we could do that.

1      MR. CHALMERS:  You know, we do have a trial here, and

2  we do have evidence rules, and McMillan is not designated as a

3  witness in this case.  That deposition is an out-of-court

4  statement, at best, that wouldn't be admissible, and you can't

5  ask a question asserting a fact that is not in evidence, Your

6  Honor.  I understand it's leading, but it's not a proper

7  question as it's phrased.

8      THE COURT:  Well, if -- would you be happy if she said

9  are you aware whether Trooper McMillan testified to that?

10     MR. CHALMERS:  Sure.  I think that's proper.

11  BY MS. PERRY:

12  Q.  Are you aware whether or not Trooper McMillan testified in

13  his deposition since his remedial training he has not changed

14  the way he does things?

15  A.  I'm not aware of anything that he testified to.

16  Q.  Are you aware that he testified that he believes Colonel

17  Jones' PSU findings regarding the stop with Mr. Bosire are

18  wrong?

19  A.  I'm not aware of anything he testified to.

20  Q.  Do you remember Mr. Chalmers asking you about whether state

21  citizenship and travel by themselves were trained in your

22  PowerPoints?

23  A.  I do.

24  Q.  And you said it was only through *Vasquez*?

25  A.  If it was -- I think what I said was that if we trained it

1  was impermissible to use those solely as the basis for

2  reasonable suspicion, we would have trained it collaterally

3  through *Vasquez,* yes.

4  Q.  And your testimony is only through *Vasquez*, right?

5  A.  I believe that's the only case I'm aware of that has said

6  that as I sit here today.  But, yes, it would have only been in

7  discussing *Vasquez*, yes.

8        MS. PERRY:  Nothing further, Your Honor.

9        THE COURT:  Any redirect?

10                REDIRECT EXAMINATION

11  BY MR. CHALMERS:

12  Q.  Just real quickly.  Can you pull up Exhibit 75.  That's the

13  *Vasquez* decision itself.

14  A.  Uh-huh.

15  Q.  Can you put that up on the screen, please.  There we go.

16        You were talking about parts of this decision through I

17  think before page 7.  In page 7 do you see where it says "the

18  court is then turning to the question of whether or not the law

19  is clearly established"?

20  A.  It says it's on -- I'm not sure where on page 7.

21  Q.  Under capital B.  "We next come to whether it's clearly

22  established"?

23  A.  Yes.

24  Q.  And the court says "a right is clearly established if it

25  would be clear to a reasonable officer that his conduct was

1  lawful in the situation."  It gives a quote.  It says

2  "Generally this means there must be a Supreme Court or Tenth

3  Circuit decision on point or clearly-established weight of

4  authority from other courts must have found the law to be as

5  plaintiff maintains."  Do you see what I've read?

6  A.   I do.

7  Q.   And then it goes on to find such a case.  If you read that,

8  that's the *Wood* decision it cites; is that correct?

9  A.   That is correct.

10  Q.   Is that the same decision as you said you were talking

11  about in explaining why *Vasquez* did not express new law for you

12  to include in your training?

13  A.   Yes.

14        MR. CHALMERS:  I don't have anything else.  Thank you.

15        MS. PERRY:  Nothing further, Your Honor.

16        THE COURT:  All right.  Thank you, ma'am.  You're

17  excused.

18        MR. MCINERNEY:  Plaintiff calls Brent Hogelin to the

19  stand.

20        THE COURT:  Sir, would you please step into the

21  witness box and raise your right hand so you can be sworn.

22              BRENT HOGELIN,

23  called as a witness on behalf of the plaintiff, having first

24  been duly sworn, testified as follows:

25        MR. MCINERNEY:  Thank you, Judge.

1              DIRECT EXAMINATION

2  BY MR. MCINERNEY:

3  Q.  Good morning, sir.

4  A.  Good morning, counselor.  How are you?

5  Q.  I'm fine.  How are you?

6  A.  Better than I deserve.

7  Q.  Your name for the record, sir?

8  A.  Brent Hogelin.

9  Q.  Where are you employed?

10  A.  Kansas Highway Patrol.

11  Q.  How long have you been employed there?

12  A.  Twenty-three years.

13  Q.  What is the rank you hold now?

14  A.  Captain.

15  Q.  Do you have a particular duty assignment?

16  A.  I do.

17  Q.  What is that?

18  A.  The highway patrol is comprised of troops.  I command Troop

19  N.

20  Q.  Does Troop N have a particular focus or mandate?

21  A.  It does.  It has six different mandates.

22  Q.  Okay.  Is it primarily focused on interdiction work?

23  A.  That's one of the six, yes, primarily.

24  Q.  Is that the primary focus or no?

25  A.  Yes.

1  Q.  Okay.  And as captain of Troop N, sir, what are your duties

2  and responsibilities?

3  A.  I manage six field lieutenants and approximately 30

4  personnel within the troop, the day-to-day activities.

5  Q.  Six lieutenants.  How many other sworn officers?

6  A.  Mid 20s.

7  Q.  Okay.  So roughly total of, what, 30 sworn?

8  A.  Thereabouts, yes.

9  Q.  And how many sworn total in KHP?  About 475, 500?

10  A.  Yes, sir, about 475-ish.

11  Q.  Of those 475 or so, about 30 under your command, correct?

12  A.  Yes, sir.

13  Q.  And 30 total assigned to Troop N, correct?

14  A.  Yes, sir.

15  Q.  Okay.  The -- and I think, correct me if I'm wrong, Troop N

16  is what KHP refers to as the domestic highway enforcement team;

17  is that right?

18  A.  Yes, sir.

19  Q.  So in addition to regular road duties, the troopers

20  assigned to Troop N, they're responsible for coordinating

21  special enforcement activities; is that fair to say?

22  A.  Yes, sir.

23  Q.  What kind of special enforcement activities?

24  A.  We can do selective enforcements where we go to an area and

25  focus traffic enforcement in that area for a particular

1  timeframe.

2  Q.  Particularly targeting criminals using Kansas roadways in

3  furtherance of criminal activity, especially narcotics

4  trafficking; is that fair?

5  A.  Enforcing all Kansas laws and regulations as far as traffic

6  is concerned, and that is one portion, correct.

7  Q.  And with respect to the interdiction work we talked about,

8  that focus is on preventing -- stopping and detecting drug

9  trafficking activity, correct?

10  A.  Criminal activity, not just drug activity.

11  Q.  Are you -- in your position as the captain of Troop N are

12  you involved from time to time in PSU investigations while

13  they're underway?

14  A.  Yes, sir.

15  Q.  Is part of that process that you review PSU files or

16  investigative files?

17  A.  Yes, sir.

18  Q.  And your responsibility, once you've taken a look at those

19  investigative files, is provide your opinion as to what should

20  happen, correct?

21  A.  If it is solicited, yes.

22  Q.  Is that usually one of the reasons why you're reviewing

23  those materials?

24  A.  Yes, sir.

25  Q.  And once you forward your opinion, you forward it up the

1    chain of command, correct?

2    A.   Yes, sir.

3    Q.   And you make a recommendation as to whether the complaint

4    should be sustained or not sustained, correct?

5    A.   Yes.

6    Q.   Do you recall being asked by Lieutenant Joseph Bullock to

7    become involved in a review of a PSU investigation involving a

8    Trooper McMillan?

9    A.   I do.

10   Q.   Do you remember that particular investigation focused on

11   the stop of a man by the last of name Bosire?

12   A.   Yes, sir.

13   Q.   And the investigation when you were contacted, the

14   investigation was already underway, correct?

15   A.   Yes, sir.

16   Q.   And you were consulted about what amounted, if you

17   remember, to an interdiction stop, correct?

18   A.   Yes.

19   Q.   And -- sorry.  Your role in the review of Trooper

20   McMillan's stop of Mr. Bosire was to offer an opinion, correct?

21   A.   Ultimately, yes.

22   Q.   And as part of that, before you offered the opinion, you

23   took a look at some dashcam video?

24   A.   I did.

25   Q.   Do you recall looking at that video?

1  A.  I do.

2  Q.  Okay.  And you looked at some additional documents that

3  were generated during that investigation including Trooper

4  McMillan's statement, correct?

5  A.  Yes.

6  Q.  And you came ultimately to an opinion about the conduct of

7  Trooper McMillan during that stop, correct?

8  A.  I did.

9  Q.  Is it fair to say that in arriving at that opinion you used

10  your experience and applied standards that the KHP expects from

11  its troopers?

12  A.  I did.

13  Q.  And the opinion that you reached in the conclusion of

14  that -- or excuse me.  The opinion you reached at the

15  conclusion of your involvement in the investigation is the same

16  one you hold today, correct?

17  A.  It is.

18  Q.  As part of that PSU process and as part of your role as

19  captain of Troop N, you've got a general familiarity with the

20  progression of discipline at KHP, don't you?

21  A.  I do.

22  Q.  In a situation like the one you reviewed involving Trooper

23  McMillan, you know that KHP actually doesn't require that

24  specific steps be taken for troopers who are found to have

25  violated constitutional requirements, correct?

1   A.   Correct.

2   Q.   And you also know that the KHP doesn't collect information

3   about troopers who violate motorist's constitutional rights,

4   correct?

5   A.   That's incorrect in part.

6   Q.   Okay.  Why don't you correct --

7   A.   It's a pretty broad statement.  If you're asking if we know

8   of every decision as an agency that affects each trooper's

9   testimony in a given criminal or traffic case, that's -- we

10  don't track that.  However, if there's something substantive

11  that is brought forth as a suppression issue in the court, we

12  do get alerted to that fact oftentimes.

13  Q.   Then let me ask you a little bit better question.

14  A.   Sure.

15  Q.   My question has to do with whether information is

16  systemically collected about troopers who violate the rights of

17  motorists on Kansas highways.  My question to you is

18  specifically you know that KHP does not collect that

19  information when it comes to troopers who violate the rights

20  of -- the constitutional rights of motorists on Kansas

21  highways, correct?

22  A.   If they're significant rulings that we're made aware of, we

23  maintain those, yes.

24  Q.   Right.  But there's not a system for maintaining

25  information about all troopers who are found to have violated

1  the constitutional rights of motorists, correct?

2  A.  Not that I'm aware of.

3  Q.  And there's no policy that requires those troopers who are

4  found to have violated constitutional rights to go through any

5  sort of retraining at the academy, correct?

6  A.  Correct.

7  Q.  And there's no policy that requires the remedial testing of

8  troopers who are found to have violated motorist rights with

9  regard to searches and seizures, correct?

10  A.  There are now.

11  Q.  What do you mean there are now?

12  A.  We have a form that as -- designated to provide more

13  oversight in certain instances where if the supervisor or

14  commander feels like there needs to be some additional training

15  or policy guidance, that that can be recommended up the chain

16  of command.

17  Q.  That's at the discretion of the supervisor, correct?

18  A.  Supervisors, correct.

19  Q.  Plural, supervisors?

20  A.  Correct.

21  Q.  And this form that you're talking about, does it come in

22  the form of a request up the chain for additional training?

23  A.  Correct.

24  Q.  And is that a form that supervisors are required to fill

25  out?

1   A.   Yes.

2   Q.   And are they required to fill that form out when a

3   constitutional violation has been determined?

4   A.   They're required to fill that form out regardless.

5   Q.   Regardless of what?

6   A.   If an event -- this is pretty narrow area that you're

7   talking about.  It's a detention checklist.  Any time someone

8   is detained for the purposes of a canine deployment, the

9   trooper or officer must fill that form out, and it must be

10  reviewed by a supervisor and supervisors.

11  Q.   Okay.  I think we're -- I understand what you're talking

12  about now.  And the form you're talking about is a checklist

13  form, right?

14  A.   It's both checklist and narrative-based.

15  Q.   And it provides boxes or items to be checked by the trooper

16  with regard to what he or she based their reasonable suspicion

17  on, correct?

18  A.   Yes.

19  Q.   And that is a -- that's a practice that was instituted last

20  year; is that correct?

21  A.   Yes, sir.

22  Q.   And that was in response to this litigation, wasn't it?

23  A.   In portion thereof, yes.  We discussed it for a number of

24  years.

25  Q.   But it never got to the approval process by the

1  superintendent until last year, correct?

2  A.   Correct.

3  Q.   Now, that form, it doesn't collect information about how

4  many, say, canine sniffs are conducted by the KHP, correct?

5  A.   No.  It's a single form for single incident.

6  Q.   Okay.  And I want to loop back for just a second.  You said

7  it had been discussed for some time, correct?

8  A.   Correct.

9  Q.   And once it was decided, Captain, that that was going to be

10 something that was instituted by the KHP, that process started

11 with -- or at what level?

12 A.   It started with troopers and lieutenants within Troop N and

13 Troop S, which is the canine unit, a low-level discussion of

14 what it would conceptually look like, what it would need to

15 have contained in it, and further worked its way up the chain

16 of command and legal for review.

17 Q.   And it's something that the superintendent solicited from

18 the persons who are his subordinates at KHP, correct?

19 A.   At what point?

20 Q.   At any point.  That this was something that the

21 superintendent was interested in and focused on at a point,

22 correct?

23 A.   Correct.

24 Q.   And ultimately after this -- the idea of this form and this

25 effort made its way up through command staff, it was presented

1  to the superintendent, correct?

2  A.   Yes.

3  Q.   And the superintendent approved that policy?

4  A.   Yes.

5  Q.   And then the policy went into effect, as you said, I think

6  sometime last year, correct?

7  A.   Yes.

8  Q.   If the superintendent -- if the superintendent wanted to

9  know other information about car stops or detentions, he could

10  certainly request that kind of information, correct?

11  A.   Yes.

12  Q.   Kind of -- in much of the way he did with this form or this

13  procedure, correct?

14  A.   Yes.

15  Q.   And I think I want to be clear about this form.  I think

16  you said that the form essentially tells you or tells the

17  trooper that they have the following choices for criminal

18  indicators, correct?

19  A.   They have the following choices and then there are portions

20  where they can add their own reasonable suspicion.

21  Q.   Okay.  That narrative portion that you mentioned, they're

22  not required to fill that portion out, are they?

23  A.   Yes, they are.

24  Q.   That's a mandatory section?

25  A.   Yes.

1   Q.   Okay.  And that allows them to -- well, let me ask you

2   this:  That form and that policy don't require troopers to

3   justify their actions on their own, correct?

4   A.   I'm not sure I follow.

5   Q.   Well, they're limited to the options provided there on the

6   boxes that they check off, correct?

7   A.   No.  They are not limited to those.  Those are -- we can

8   only fit so many certain areas of potential reasonable

9   suspicion on there, but they can certainly add additional --

10  there's a couple blocks on the front page, and then there's the

11  free-flowing narrative portion on the back where they can add

12  whatever they weren't able to select from on the front.

13  Q.   Okay.  And the indicator checkboxes, they're on the front

14  page, correct?

15  A.   Correct.

16  Q.   Those indicator checkboxes still include the out-of-state

17  origin or destination as an indicator, correct?

18  A.   Not as an indicator.

19  Q.   The form still includes that information, correct?

20  A.   It does.

21  Q.   Where does it include that information?

22  A.   At the very top.

23  Q.   And it's a note that the origin or the, I guess, state of

24  issuance of the license plate is listed on that form?

25  A.   Correct.

1  Q.  There are a number of different criteria that are listed on

2  the form including the registration state of the vehicle,

3  correct?

4  A.  Yes.

5  Q.  The origin or where the occupants said that they were --

6  that they began their trip, correct?

7  A.  Yes.

8  Q.  The destination or where the occupants claim that they were

9  traveling, correct?

10  A.  Correct.

11  Q.  The purpose of the trip, correct?

12  A.  Yes.

13  Q.  Signs of nervousness?

14  A.  Yes.

15  Q.  Whether the vehicle is a rental vehicle?

16  A.  Yes.

17  Q.  The most direct route?

18  A.  Yes.

19  Q.  Also includes whether the vehicle had a -- and I'll quote

20  -- a lived-in appearance?

21  A.  Yes.

22  Q.  It also has disclaimers for religious items, military

23  items, et cetera, correct?

24  A.  Correct.

25  Q.  So it essentially includes a pretty extensive list of what

1  otherwise would be innocuous factors; fair to say?

2  A.  Pigeonholed away, yes.

3  Q.  Those are the same factors and that's the same group of

4  criminal indicators that KHP trains on, correct?

5  A.  Correct.

6  Q.  We were talking about how this form made its way into

7  being, and we talked a little bit about the process a minute

8  ago, about the approval process by the superintendent.

9  Sir -- and I think I asked you if the superintendent

10  wanted, much like he did in this process, he could -- he could

11  direct persons under his command to collect information about

12  the number of canine sniffs that are conducted by the Kansas

13  Highway Patrol, correct?

14  A.  That's already in place, but he -- yes.

15  Q.  What do you mean by that?

16  A.  We already encapture that data, how many canine sniffs are

17  employed by the Kansas Highway Patrol.

18  Q.  What element of KHP captures that data?

19  A.  Troop S.

20  Q.  That's a voluntary capture?

21  A.  That is one of their forms that they must fill out any time

22  a canine is deployed so not a voluntary.

23  Q.  If a KHP canine is deployed, correct?

24  A.  Correct.

25  Q.  You know from your position as a captain of Troop N,

1  sometimes KHP canines are available and other times state law

2  enforcement agency canines are available, correct?

3  A.  Correct.

4  Q.  And it doesn't capture state canine officer deployment,

5  does it?

6  A.  No.  It would be counties or cities, correct.

7  Q.  And if the superintendent, sir, also wanted to track how

8  many traffic stops result in roadside detentions for canine

9  sniffs, he could order you to collect that information,

10  correct?

11  A.  Yes.

12  Q.  If he wanted to track how many roadside detentions for

13  canine sniffs wound up yielding no narcotics, he could ask you

14  to collect that information, correct?

15  A.  Yes.

16  Q.  And if he wanted to know how many cars with out-of-state

17  license plates were being stopped and detained for canine

18  sniffs, he could tell you to start tracking that as well,

19  correct?

20  A.  Yes.

21  Q.  And if he wanted to know if his troopers are stopping and

22  detaining out-of-state vehicles, out-of-state motorists more

23  than in-state motorists, he could order you to collect that

24  information too, correct?

25  A.  Yes.

1  Q.  He could even use the state auditor to collect that kind of

2  information, couldn't he?

3  A.  I'm not familiar with what you're referring to as a state

4  auditor.

5  Q.  There's -- the state has an audit function, correct?

6  A.  Legislative post audit, yes.

7  Q.  Post audit, yeah, fair to say.  He could request that that

8  information be conducted -- or collected, rather, by a

9  state-based auditing agency, correct?

10  A.  I don't know.

11  Q.  He could if he wanted to collect that information and see

12  whether it indicated that out-of-state motorists were stopped

13  more frequently than in-state motorists, he could commission a

14  study, couldn't he?

15  A.  He could.

16  Q.  But to your knowledge, Captain, he's never requested

17  information about the number of canine sniff that are completed

18  each month, has he?

19  A.  I personally do not know that, no.

20  Q.  And to your knowledge he's never requested any data or

21  information about how many detentions for canine sniffs result

22  in no alerts, has he?

23  A.  Outside of the utilization of the detention checklist, no.

24  Q.  That detention checklist doesn't indicate how many canine

25  sniffs result in no alerts, does it?

1  A.  Yes, that does.

2  Q.  It's on there --

3  A.  Well, it would be in that and it would also be in Troop S's

4  when they're mandated to fill out the form for their own

5  internal purposes when a KHP canine is utilized.

6  Q.  The superintendent has not to your knowledge requested

7  information about the -- about how many detentions for canine

8  sniffs result in no narcotics being recovered, correct?

9  A.  Not to my knowledge.

10  Q.  And he's never requested to do anything to track the

11  efficiency of trooper stops and roadside detentions, has he?

12  A.  No, that's not correct.

13  Q.  He has ordered that?

14  A.  Well, by virtue of the detention checklist, correct.

15  Q.  And so you're saying that the detention checklist is an

16  effort to track the efficiency of trooper stops?

17  A.  Efficiency, legality, and transparency of our operations,

18  yes.

19  Q.  To your knowledge, sir, the superintendent has never

20  required you to spot check troopers and their detentions for

21  canine sniffs to make sure they follow the constitutional

22  requirements, has he?

23  A.  It is policy that we're to review three videos each quarter

24  arbitrarily of each trooper's traffic stops to make sure

25  they're being conducted lawfully and reasonably.

1  Q.  So it --

2  A.  So it touches in other portions of policy.  I didn't mean

3  to cut you off.

4  Q.  No, sir.  Continue your answer.

5  A.  So I'm at the end of my answer.

6  Q.  Okay.  Would you repeat it for me because I didn't hear the

7  last part?

8  A.  Certainly.  So supervisors are required to review troopers'

9  and officers' video, three of their videos, random videos, each

10  quarter to make sure our officers and troopers are following

11  the law essentially and policy and procedure.

12  Q.  The videos that your supervisors are required to review are

13  not specifically roadside detentions, are they?

14  A.  Since they're random, they may not be.

15  Q.  So your supervisors could go months and months without ever

16  seeing a roadside detention until they happen to come upon one,

17  correct?

18  A.  Within the patrol, yes.  Within my troop, my lieutenants

19  are directed to watch a detention-type or consent car stop.

20  Q.  And your lieutenants and the other approximately 30 sworn

21  in your troop, correct?

22  A.  Not all the personnel out of my unit have road duties as it

23  were.

24  Q.  Okay.  So even fewer, correct?

25  A.  Correct.

1  Q.  And you would agree -- math is not my strong suit, but

2  you'd agree with me that the number of sworn officers in Troop

3  N is somewhere around 5 or 7 percent of the KHP as a whole; is

4  that fair?

5  A.  That's fair.

6  Q.  So when we were talking about the review of videotapes and

7  as you put -- actually I think as you clarified the random

8  review by supervisors of trooper activity on the roads, that

9  could -- and I think you agree with me, that that could result

10  in detentions, roadside detentions never being viewed by

11  supervisors, correct?

12  A.  It could.

13  Q.  So is it fair to say that the only time issues about

14  roadside detentions and whether they are appropriate get to

15  your attention is if there is a citizen complaint filed?

16  A.  No.

17  Q.  Do they come to your attention from other law enforcement

18  officers?

19  A.  They can.

20  Q.  And what other ways?

21  A.  Court rulings; like you said other, law enforcement

22  officers; the public.  Those are the most common ways that it

23  could come to our attention.

24  Q.  We've heard some testimony about the way issues are brought

25  to PSU, and basically I think the testimony -- correct me if

1  I'm wrong, you would know -- testimony is essentially that

2  there are two rows; there are citizen complaints and there are

3  internal administrative requests for investigation.  Is that

4  consistent with your understanding?

5  A.   Yes.

6  Q.   With regard to a citizen complaint about the propriety of a

7  roadside detention, at that point you may be asked to take a

8  look at the validity of a stop, correct?

9  A.   Yes.

10  Q.   Beyond that process, there's not a mandatory, not a

11  required system in place requiring you or anybody else to

12  review roadside detentions on, say, a monthly basis, is there?

13  A.   Yes, there is now.

14  Q.   Describe that.

15  A.   In the -- as far as it pertains to the detention form that

16  we have in place, so each time that that is filled out, it must

17  be sent through the chain up to my attention within ten days of

18  the traffic stop where a detention occurred.

19  Q.   And for every form you get from every roadside detention,

20  do you then go back and take a look at the dashcam?

21  A.   If it's necessary.

22  Q.   Okay.  But you're not required to, are you?

23  A.   No.

24  Q.   And the only way you find out if there is a problem with

25  the reasonable suspicion underlying an extended detention at

1  roadside is if there's a complaint or if there's an internal

2  request to take a look at it; is that fair?

3  A.   That is fair.

4  Q.   Sir, you don't know whether there is any requirement to

5  follow up specifically with a trooper after there's a sustained

6  PSU complaint; is that fair to say?

7  A.   Is there a requirement to follow up?

8  Q.   That's my question.

9  A.   That is pretty broad.  It could -- depending on the

10  trooper's chain of command, how they decide they would like to

11  follow up with the conclusion of a sustained complaint.

12  Q.   That's discretionary, isn't it?

13  A.   It just depends on each individual complaint and what the

14  recommendations are from professional standards and the

15  accelerated chain of command from that event.

16  Q.   Let me narrow my question a little bit.  I'm not sure I

17  asked it the right way.  There is not a requirement at KHP that

18  a trooper who has had a sustained PSU complaint be required to

19  undergo regular oversight on, say, a monthly basis?

20  A.   Well, it could be.

21  Q.   Could be, but it's not required; that's my question.

22  A.   I do not know.

23  Q.   Okay.  Or even a yearly basis, correct?

24  A.   It could be and I do -- each one is case-specific.

25  Q.   Is it true that if a motorist is stopped and detained for a

1   canine sniff on something less than reasonable suspicion, the

2   only way KHP would ever know to review whether reasonable

3   suspicion existed is if that motorist brings a complaint,

4   correct?

5   A.   Can you say that one more time?

6   Q.   Sure.  If a motorist is stopped and detained for a canine

7   sniff on less than reasonable suspicion, the only way KHP finds

8   out about that is if that motorist makes that complaint,

9   correct?

10  A.   Stopped for detained for less than reasonable suspicion

11  should not be detained for less than reasonable suspicion.

12  Q.   Ideally, but we're here in the middle of this case.  So my

13  question to you is:  Unless that citizen makes a complaint, an

14  affirmative complaint about that, there's no way for KHP to

15  find out, is there?

16  A.   That's not correct.

17  Q.   How do you contend KHP finds out otherwise?

18  A.   It could be from admission from the trooper.  It could be

19  another law enforcement officer on scene, a different canine

20  unit.  Those would be the primary ways we could be alerted to

21  it.

22  Q.   And when you say it could come to the attention of KHP

23  through another trooper, again is there a mandatory reporting

24  requirement for those other troopers?

25  A.   Not that I'm aware of.

1  Q.  So if the motorist makes the complaint and complains to PSU

2  believing that, say, her stop was inappropriate because there

3  wasn't reasonable suspicion, when she makes that complaint, her

4  name and her address and her phone number are necessarily

5  provided to the KHP, correct?

6  A.  Yes.

7  Q.  And the trooper then is advised that that stop is under

8  investigation, correct?

9  A.  At a point in time, he would be instantaneously.

10  Q.  Right, because the trooper is asked for his or her response

11  to the allegation, correct?

12  A.  Oftentimes, yes.

13  Q.  Well, every time, correct?

14  A.  Well, I'm not there for every time.  The ones that I have

15  knowledge of, that would be affirmative.

16  Q.  And so the trooper, once they're advised and asked for

17  their response, they know the date and the time and the

18  location of the stop that's under investigation, correct?

19  A.  Yes.

20  Q.  And they've got access to the records of the stop, correct?

21  A.  What records would that be?

22  Q.  Any report that was written, any canine search form.

23  They've got access to those records, correct?

24  A.  They could.

25  Q.  And, in fact, they often get to review the dashcam video

1   and any other materials before they provide a statement, right?

2   A.   They could.

3   Q.   They've got the option, correct?

4   A.   Correct.

5   Q.   But KHP doesn't make the dashcam video available to the

6   motorist before their statement is taken, correct?

7   A.   That I do not know.

8   Q.   You know that even if a citizen complains, KHP's policy is

9   to say that you can't have the video.  You know that to be the

10  truth, right?

11  A.   I do not.

12  Q.   Well, if the motorist makes the request of the video from

13  KHP and then turns to the Kansas Open Records Act, are you

14  aware that the KHP takes the position that that video is not

15  available to the motorist because it's part of an ongoing

16  investigation?

17  A.   I've heard that used before.

18  Q.   In what context?

19  A.   Exactly the way you described.

20  Q.   Even where there was never a citation written, correct?

21  A.   Just because there was not a citation written doesn't mean

22  there might not be a criminal investigation occurring.

23  Q.   You would agree with me, sir -- and you and I have actually

24  talked before about this -- it is a basic responsibility of

25  every officer to know the law, every KHP officer, correct?

1    A.    Yes.

2    Q.    And KHP troopers have an obligation by KHP policy to

3    conduct searches and arrests and seizures in compliance with

4    both the federal and the state constitutions, correct?

5    A.    Yes.

6    Q.    And, in fact, it is contrary to KHP's policy and training

7    for troopers to include state citizenship as a permissible

8    basis on which to justify a detention and search of

9    out-of-state motorists, correct?

10   A.    Yes.

11   Q.    But at -- that policy is not actually written down

12   anywhere, correct?

13   A.    In policy and procedure, I believe so, yes.  I couldn't

14   point to you exactly right now.

15   Q.    You were at KHP in 2016, correct?

16   A.    Yes, sir.

17   Q.    And your assignment in 2016 was what?

18   A.    In 2016 I was lieutenant.

19   Q.    And in Troop N?

20   A.    Within Troop N.

21   Q.    You recall when the -- a case called *Vasquez* came down?

22   A.    I am.

23   Q.    And at the time in '16 when that came down, the

24   superintendent was Mark Bruce, correct?

25   A.    Correct.

1   Q.   And a man named Randy Moon was assistant superintendent,

2   correct?

3   A.   Yes.

4   Q.   And you recall that after *Vasquez* came down, Colonel Bruce

5   came out in support of the patrol, did not fault KHP in that

6   case, correct?

7   A.   Yes.

8   Q.   You recall that there were bulletins that were pushed out

9   by e-mail about *Vasquez*, correct?

10  A.   Yes.

11  Q.   And those bulletins said that *Vasquez* would be applicable

12  to roadside detentions and with regard to the residence of the

13  driver?

14  A.   Applicable -- can you clean that up a little bit?

15  Q.   Sure.   Those bulletins indicated that *Vasquez* would be

16  available -- sorry, applicable to roadside detentions, correct?

17  A.   *Vasquez* would be applicable to roadside detentions?

18  Q.   Yes, sir.

19  A.   Yes.

20  Q.   In fact, that was a KHP case, wasn't it?

21  A.   Yes.

22  Q.   And there was information and some other material that was

23  pushed out that even included quotes from the *Vasquez* opinion,

24  correct?

25  A.   Yes.

1  Q.  And one of those quotes said it's time to abandon the

2  pretense that state citizenship is a permissible basis on which

3  to justify the detention and search of out-of-state motorists,

4  and it's time to stop the practice of detention of motorists

5  for nothing more than an out-of-state license plate.

6       Do you remember that?

7  A.  Yes.

8  Q.  And that was it when it came to *Vasquez;* there was no other

9  training, no other education, no other information about

10 *Vasquez;* isn't that right?

11 A.  That's incorrect.

12 Q.  There was no scenario-based training, correct?  Do you know

13 what I mean by scenario-based?

14 A.  Please.

15 Q.  Okay.  I mean training that included situational material,

16 that is where troopers would act out a situation in which

17 *Vasquez* would apply, perhaps a mock roadside detention and go

18 through those -- go through that exercise.  That's what I mean

19 by a scenario exercise.

20 A.  Yes.  We do scenario-based exercises.

21 Q.  My question has to do with *Vasquez* and whether there were

22 scenario-based exercises conducted with regard to *Vasquez.*

23 A.  Immediately after 2016's decision?

24 Q.  Actually any time, '16, '17, '18.

25 A.  Yes, as part of our advanced interdiction curriculum we do

1   scenario-based traffic stops, and one of those instances we

2   touched on, there was no reason to detain a motorist.

3   Q.  And that training didn't start until 2020, correct?

4   A.  I'd have to go back and look at the curriculum.

5   Q.  Sorry.  Go ahead.

6   A.  I took over in 2017 -- '18, '19, thereabouts.

7   Q.  Thereabouts '20?

8   A.  Maybe take away a year from that.  I'd have to really look

9   to get you a concrete answer.

10  Q.  And after *Vasquez* came down, there were no situational

11  observations that were done by trainers, correct?

12  A.  What do you mean by that?

13  Q.  I mean, trainers with the KHP didn't go out and observe

14  roadside detentions as they happened, correct?

15  A.  That would be impractical.

16  Q.  That didn't happen, right?

17  A.  For trainers?

18  Q.  Yes, sir.

19  A.  No.

20  Q.  And there were no policy changes after *Vasquez*, correct?

21  A.  No.

22  Q.  There were none?

23  A.  Correct.

24  Q.  There was -- we've talked about the *Vasquez* training that

25  in June of 2020 -- I said 2020.  I'll specify it was for you

1  that it was June.  That *Vasquez* training was actually tacked on

2  to an already-planned training that was scheduled to occur in

3  June of 2020; isn't that right?

4  A.   If you're referring to Colin Wood, that would be correct.

5  Q.   Referring to Colin Wood?

6  A.   Colin Wood's instruction, correct.

7  Q.   You're familiar with that training session, correct?

8  A.   Yes.

9  Q.   Right.  And the idea to add *Vasquez* to that training came

10  up just a couple weeks before the training, correct?

11  A.   To speak specifically to the *Vasquez* case, yes.

12  Q.   And the addition to that already-scheduled training of

13  *Vasquez* and the *Vasquez* piece was at the direction of Colonel

14  Jones, wasn't it?

15  A.   Yes.

16  Q.   And he was superintendent at that time?

17  A.   Yes.

18  Q.   Pretty unusual that the colonel of the KHP is involved in

19  setting out specific material for training, isn't it?

20  A.   For my troop, yes.  As an agency, I don't have that

21  knowledge of what he would like to be specific -- have

22  specifically instructed, if that makes sense.

23  Q.   Let me follow up.  I'm not sure it does.

24      My question to you is that it's unusual, isn't it, for the

25  superintendent of the KHP to reach in and dictate the specific

1  content of a training, isn't it?

2  A.   I don't know.  From my troop it would be, yes, because he's

3  asking something specific for our training curriculum, but

4  there's so many other training curriculums out there that we

5  instruct on that he may have a hand in making sure is taught.

6  Q.   Do you remember -- you actually had two depositions in this

7  case, didn't you?

8  A.   Yes, sir.

9  Q.   And you remember the second one on February 4th of 2022?

10  If I give --

11  A.   I'll do the best I can with what I've got to work with.

12  Q.   If I give you that date, does that sound about right?

13  A.   Yes, sir.

14  Q.   And that deposition was taken under oath just like your

15  testimony today?

16  A.   Yes.

17  Q.   And it was there with your lawyer, Mr. Chalmers, correct?

18  A.   Correct.

19  Q.   And I'm going to hand you a copy of your deposition.  And

20  I'll direct you to a specific line -- or excuse me, a specific

21  page and line.  If you would, sir, turn to page 113, and I'm

22  going to direct your attention to line 12, if I can.

23  A.   Yes.

24  Q.   Actually I'll direct your attention to line 9 where I asked

25  you a question.  And let me ask you if I asked you this

1  question and you gave me this answer.

2      "Is it -- does it frequently happen that Colonel Jones is

3  involved in setting out specific topics for training?"

4      Your answer was:  "At my level, no."

5      Did I read that accurately?

6  A.  Yes.

7  Q.  And was that my question and your answer, sir?

8  A.  It was.

9  Q.  Thank you.

10      In fact, sir, the training that Colonel Jones directed

11  would be included in that June 2020 training, that was in

12  connection with this lawsuit, wasn't it?

13  A.  Yes.

14  Q.  In fact, it was because of this lawsuit, wasn't it?

15  A.  It could have been.

16  Q.  So KHP got sued for their roadside detention practices and

17  particularly their failure to comply with *Vasquez*, and *Vasquez*

18  got inserted into training at virtually the last minute?

19  A.  No, that's not accurate.

20  Q.  Did -- after *Vasquez* did your practices change?

21  A.  Our practices didn't change.  We've always taught to be --

22  to utilize the totality of the circumstances and never taught

23  to utilize the state registration of a vehicle for the sole

24  purposes of detaining them as part -- as the only factor for

25  reasonable suspicion.

1  Q.   So your practices effectively did not change after *Vasquez*;

2  is that right?

3  A.   Correct.

4  Q.   And the Kansas Highway Patrol -- let me loop back for a

5  minute.

6       We talked about a couple depositions you gave.  The second

7  deposition was as a representative of the KHP, correct?

8  A.   Yes.

9  Q.   So we talked a lot about policy and a lot about procedure;

10  remember that?

11  A.   I do, portions I do.  We got into quite a bit of stuff.

12  Q.   The Kansas Highway Patrol does not rely on what *Vasquez*

13  said about out-of-state license plates, correct?

14  A.   Does not rely?

15  Q.   Correct.

16  A.   We've always relied on that in our training.  Just saying

17  that a state's origin for their license plate is not to be

18  utilized as a sole reasonable suspicion factor, whether to

19  detain for canine sniff or not.

20  Q.   So my question has to do specifically with *Vasquez*.  And I

21  understand your point in the larger context of KHP, but with

22  respect to *Vasquez* my question is:  Does KHP rely on what

23  *Vasquez* said about out-of-state license plates?

24  A.   In part we would.  Yes, we would.

25  Q.   And, well, let me direct your attention there to your

1  deposition.  Let's this time turn to page 111, and I'm going to

2  direct you to line 8 there.  I'm sorry.  Give me just a minute.

3      Sir, I'm going to hand you now your first deposition, a

4  transcript for that.

5  A.  Okay.

6  Q.  Thank you.  And let me direct your attention if I can to

7  page 111, and specifically -- well, beginning at the very top

8  of page 111.

9      My question was:  "But you said that it affirmed that you,

10  the KHP, was conducting itself consistent with the law as it

11  was set out in *Vasquez*."

12      And your answer:  "We were maintaining our position

13  independent of the *Vasquez* decision as far as moving forward.

14  We do not rely on the factors that they are presenting in

15  *Vasquez* as it relates to the state of origin of the license

16  plate."

17      My question was:  "Okay.  And that's still is the policy of

18  KHP today, isn't it?"

19      And your answer was:  "Yes."

20      Did I ask you those questions and did you give me those

21  answers?

22  A.  You did.

23  Q.  So KHP still uses state of origin as a factor in

24  determining reasonable suspicion today, don't they?

25  A.  Well, we talked -- you asked me several questions on when

1  they may or may not be appropriate, and my answer today is the

2  same as it is in the depositions as far as it pertains to the

3  state of origin of the license plate.

4  Q.  And the answer is that it is still used in considering

5  reasonable suspicion, correct?

6  A.  No.

7  Q.  It's not used?

8  A.  No.

9  Q.  Okay.  And is that -- is your testimony now that that's

10  consistent with the *Vasquez* opinion?

11  A.  There were a lot of things in the *Vasquez* decision.  One of

12  those, the primary point you're driving home is do we utilize

13  the state of the origin in determining whether that is

14  something we use for reasonable suspicion on whether or not to

15  detain the violator.  And we do not.

16  Q.  And the answer to that is that the KHP doesn't, correct?

17  A.  Correct.

18  Q.  Your troop, Troop N has two primary zones, right: east and

19  west?

20  A.  As far as the interdiction on the highway is concerned,

21  that is correct.

22  Q.  Each of them led by a lieutenant, correct?

23  A.  Yes.

24  Q.  One of them is Lieutenant Jirak?

25  A.  Who has since retired, correct.

1  Q.  And he has -- had the western part of Troop N's

2  jurisdiction, correct?

3  A.  Yes.

4  Q.  And then Lieutenant Doug Rule has the east, correct?

5  A.  He has since retired also, but he had the east.

6  Q.  Each of them during your time as commander of Troop N had

7  those respective zones, correct?

8  A.  Yes.

9  Q.  And they each supervised supervisors, correct?

10  A.  Yes.

11  Q.  And each of them served as a direct line supervisor for the

12  troopers they supervised, right?

13  A.  Yes.

14  Q.  And in that capacity your lieutenants, Lieutenant Rule and

15  Lieutenant Jirak, sometimes provide trainings on interdiction

16  practices for other troopers, correct?

17  A.  Yes.

18  Q.  And those trainings have to be approved by you as

19  commander, right?

20  A.  As well as others, yes.

21  Q.  And as part of those trainings they are instructing other

22  troopers on how to properly do interdiction work, right?

23  A.  Yes.

24  Q.  And include the impact of case law and relevant court

25  decisions?

1   A.   Yes.

2   Q.   And isn't it true that even after *Vasquez*, Lieutenant Rule

3   conducted trainings for troopers that indicated -- that said,

4   directed troopers that the two most important questions they

5   should be asking drivers are where they're coming from and

6   where they're going to; isn't that true?

7   A.   Yes.

8   Q.   And that's because it is the job of the troopers under your

9   command to know whether drivers are coming from a drug source

10  area, correct?

11  A.   No.

12  Q.   Or traveling to a drug destination area, correct?

13  A.   No.

14  Q.   Those are not factors?

15  A.   In the context you're putting it as the most important

16  question that they get asked, no.

17  Q.   I'm not talking about the most important question they

18  could ask.  When I talked about that, I asked you whether it

19  was the training provided by Lieutenant Rule that the two most

20  important questions had to do with where drivers were coming

21  from and where they were going to.

22  A.   Yes.

23  Q.   You're aware of that?

24  A.   Yes.

25  Q.   And that's because troopers are responsible for knowing in

1    the course of their interdiction enforcement, troopers are

2    responsible for knowing whether motorists are coming from drug

3    source cities or states, correct?

4    A.   Troopers are responsible for knowing if the violator they

5    have pulled over is under the influence, able to answer certain

6    baseline questions, and everyone should know where they're

7    coming from and going to just to develop a relationship with

8    the driver.  We're not ticket-dispensing robots.

9    Q.   Understood.  But those two questions, where the driver is

10   coming from, where the driver is going to are critical

11   questions, critical pieces of information for troopers doing

12   interdiction work, correct?

13   A.   They use those as part of their investigatory stop.

14   Q.   And the reason they use those is because they're trying to

15   determine whether motorists are coming from a drug source city

16   or state or headed to a drug source city or state; isn't that

17   right?

18   A.   They would like to know if the violator is able to answer a

19   simple question.  Are you dealing with a mute driver?  Are you

20   dealing with somebody that's under the influence?

21   Q.   No, sir.  I'm asking you the purpose behind those

22   questions.  And if you can't answer that, that's fine.  But my

23   question is:  The reason they ask those questions is because

24   they're trying to figure out where people are coming from and

25   whether they're coming from a drug source city or state and

1   where they're going to, whether it's a drug source city or

2   state; is that accurate?

3   A.   Portions, yes.

4   Q.   The questions about destination, the questions about where

5   they're coming from and going to are the basis of everything

6   troopers do, true?

7   A.   Where they're coming from and going to?

8   Q.   Yes, sir.

9   A.   Portions, yes.

10  Q.   And even though *Vasquez* -- we talked about *Vasquez*.  Even

11  though *Vasquez* says that travel to or from a drug source state

12  or city is so broad as to be indicative to be almost nothing,

13  your troopers are still training on destination and origin;

14  isn't that right?

15  A.   Yes.

16  Q.   I want to talk a little bit about Troop N and the focus of

17  Troop N.  Troopers who find themselves assigned to Troop N --

18  and I don't pretend that it's random, but troopers who are

19  assigned to Troop N are there because they have a particular

20  focus on interdiction.  I think we talked about that; fair to

21  say?

22  A.   Yes.

23  Q.   And because they're there, because they're in Troop N, they

24  get more interdiction training than troopers who are not in

25  Troop N; is that fair to say?

1   A.   Yes.

2   Q.   We have heard in this action the names of a number of

3   troopers in this lawsuit, and I want to mention a couple of

4   those.  At least as of 2021, if I can have you recall back, the

5   troopers -- well, lieutenant Greg Jirak obviously, Trooper

6   Wolting was in Troop N?

7   A.   Yes.

8   Q.   And Trooper James McCord?

9   A.   Yes.

10  Q.   So those troopers, fair to say, have more interdiction

11  training than other KHP troopers; is that fair?

12  A.   Yes.

13  Q.   I just put what's marked and admitted as Exhibit 901 in

14  front of you.  I would ask you if you would, please -- the way

15  that 901 is arranged, or disarranged, is there are several

16  numbers.  If you would turn approximately halfway through that,

17  what we're looking for is a page that says 350 of 749 up there

18  near the top.

19  A.   Good grief.

20  Q.   Sir, do you have page 350 of 749 in front of you?

21  A.   I do.

22  Q.   That -- does that look to be an organizational chart?

23  A.   Yes.

24  Q.   And if we take a look at that chart, there are -- at the

25  very top is your name right next to captain, do you see that?

1  A.  I do.

2  Q.  And then there are six individuals who are lieutenants

3  immediately under you, correct?

4  A.  Correct.

5  Q.  There are -- and understanding that this is from 2021

6  except for -- I want to make sure I get this right here.  Other

7  than the fifth row over -- and by that, I mean the troopers

8  listed under Lieutenant Riedel -- there are at that point about

9  24 people or so in Troop N?

10  A.  Yeah, I'm just trying to add or subtract.  That's about

11  right.

12  Q.  I think you testified earlier it's expanded a bit to

13  roughly 30, right?

14  A.  Expanded and contracted, yes.

15  Q.  At that time about 24.  Now, not all of the people assigned

16  to Troop N are engaged in active role on a day-to-day basis,

17  correct?

18  A.  Correct.

19  Q.  As captain you probably don't do too much active patrol, do

20  you?

21  A.  Not too much.

22  Q.  More administrative work?

23  A.  Yes, sir.

24  Q.  And, sir, you'd agree that at least as of 2021 that list

25  did not include Trooper Doug Schulte, did it?

1    A.   It did not.

2    Q.   Did not include Brandon McMillan?

3    A.   It did not.

4    Q.   Justin Rohr, Scott Proffit, or Chandler Rule; is that fair?

5    A.   Yes.

6    Q.   And we talked a little bit about training.  Advanced

7    interdiction for the troopers in Troop N isn't required until

8    they get to Troop N; is that fair?

9    A.   No.

10   Q.   Are all troopers required to take advanced interdiction?

11   A.   Yes.

12   Q.   And we talked about the different patrol zones.  Is it fair

13   to say -- and I think you said this.  Lieutenant Jirak and

14   Lieutenant Rule are direct line supervisors for those troops --

15   or those troopers who are listed underneath them, correct?

16   A.   Yes.

17   Q.   So for instance, at that point Lieutenant Rule would be

18   responsible for making sure that Trooper Wolting under his

19   chain of command complies with KHP policy and the law, right?

20   A.   Yes.

21   Q.   And Lieutenant Jirak would be responsible for making sure

22   that Trooper McCord under his chain of command does the same,

23   follows KHP policy and follows the law, correct?

24   A.   Yes.

25   Q.   And then as Jirak's and Rule's immediate supervisor, you're

1   responsible for making sure they know the law, correct?

2   A.   Yes.

3   Q.   That's pretty much the way the chain of command works.

4   Then obviously up from you ultimately to the superintendent,

5   correct?

6   A.   Yes.

7           THE COURT:  We'll need to take a break here in a

8   second.

9           MR. MCINERNEY:  Sure.  We can break right now.  I'm

10  moving to a different exhibit, Judge.

11          THE COURT:  All right.  So I'm sorry to ask you to

12  come back, but we do have to recess at 1:00, and it's just a

13  few minutes until 1:00.  So thank you.  And we will reconvene

14  on May 10th at 8:00 a.m.  Court is in recess.

15      (The proceedings were adjourned at 12:57 p.m.)

16                  C E R T I F I C A T E

17     I, Danielle R. Murray, a Certified Court Reporter and the

18  regularly appointed, qualified, and acting official reporter of

19  the United States District Court for the District of Kansas, do

20  hereby certify that the foregoing is a true and correct

21  transcript from the stenographically reported proceedings in

22  the above-entitled matter.

23     SIGNED 2nd of October, 2023

24

25          /s/Danielle R. Murray
            DANIELLE R. MURRAY, RMR, CRR
            United States Court Reporter

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that a copy of the foregoing APPELLANT'S APPENDIX, as submitted in digital form is an exact copy of the document filed with the Clerk.

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2024, the foregoing APPELLANT'S APPENDIX was electronically filed with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I also certify that within five business days of the issuance of notice that the electronic filing is compliant, one paper copy will be delivered by Federal Express to the Clerk's Office.


DATED: April 24, 2024         /s/ Kurtis K. Wiard