---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

---

BLAINE FRANKLIN SHAW, et al.,
*Plaintiffs-Appellees*,

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

———

MARK ERICH, et al.,
*Plaintiffs-Appellees*,

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

---

## APPELLANT'S APPENDIX VOLUME XVII

---

Appeal from the United States District Court for the District of Kansas
Honorable Kathryn H. Vratil, Senior District Court Judge
District Court Case Nos. 19-CV-1343-KHV and 20-CV-1067-KHV-GEB

---

**OFFICE OF ATTORNEY GENERAL**
**KRIS W. KOBACH**

120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
(785) 296-2215
anthony.powell@ag.ks.gov
dwight.carswell@ag.ks.gov
kurtis.wiard@ag.ks.gov

Anthony J. Powell
*Solicitor General*
Dwight R. Carswell
*Deputy Solicitor General*
Kurtis K. Wiard
*Assistant Solicitor General*

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

Transcript of Bench Trial, Day 6
       (ECF No. 589) ...................................................................... 1

1                UNITED STATES DISTRICT COURT
                     DISTRICT OF KANSAS
2


3


4  BLAINE SHAW, et al.,                    )
                                           )
5     Plaintiffs,                          )
                                           )
6     v.                                   )    Case No. 19-1343
                                           )
7  HERMAN JONES, in his official           )
   capacity as the Superintendent          )
8  of the Kansas Highway Patrol, et al.,   )
                                           )
9     Defendants.                          )
                                           )    Kansas City, Kansas
10 _____)    Date:
                                           )
11                                         )    Volume 6
                                           )    (Pages 533-737)
12 MARK ERICH, et al.,                     )
                                           )
13    Plaintiffs,                          )
                                           )
14    v.                                   )    Case No. 20-1067
                                           )
15 HERMAN JONES, in his official           )
   capacity as the Superintendent          )
16 of the Kansas Highway Patrol, et al.,   )
                                           )
17    Defendants.                          )
   ........................................

18

19                TRANSCRIPT OF BENCH TRIAL

20         BEFORE THE HONORABLE KATHRYN H. VRATIL
21         SENIOR UNITED STATES DISTRICT COURT JUDGE

22

23

24
   _____
25      Proceedings recorded by machine shorthand, transcript
           produced by computer-aided transcription.

1    APPEARANCES:

2    For the Plaintiffs:

3     Patrick A. McInerney          Sharon Brett
      Leslie A. Greathouse          Kunyu L. Ching
4     Madison Perry                 ACLU Foundation of Kansas
      Spencer Fane, LLP             10561 Barkley Street
5     1000 Walnut                   Suite 500
      Suite 1400                    Overland Park, KS 66212
6     Kansas City, MO 64106

7

8    For the Defendants:

9     Arthur S. Chalmers
      Office of Attorney General
10    120 SW 10th Avenue
      Topeka, KS 66112

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2
     Plaintiff's Witnesses:                              Page

3
     BRENT HOGELIN - continued
4      Direct Examination By Mr. McInerney               536
       Cross-Examination By Mr. Chalmers                 547
5      Redirect Examination By Mr. McInerney             614
       Recross-Examination By Mr. Chalmers               630
6
       HERMAN JONES
7      Direct Examination By Mr. McInerney               632
       Cross-Examination By Mr. Chalmers                 691
8      Redirect Examination By Mr. McInerney             698

9      HASSAN ADEN
       Direct Examination By Ms. Greathouse              703

10

11

12                       E X H I B I T S

13   Plaintiffs'
     Exhibits              Offered           Received
14
           67                541               541
15

16   Defendants'
     Exhibits              Offered           Received
17
          901                545               545
18        902                562               562
          903                563               563
19        904                566               566
          905                584               584
20        907            576,  581
          914A               559               560
21        917                570
          918                572
22

23

24

25

1      (Court called to order.)

2           THE COURT:  Good morning.  This was my courtroom for

3    about 25 years, and I haven't been back here since I took

4    senior status.  Nice, isn't it?

5           MR. MCINERNEY:  Nice to have windows.

6           THE COURT:  All right.  Well, let's pick up where we

7    left, Mr. McInerney.

8           MR. MCINERNEY:  Thank you, judge.  We were in the

9    midst of the direct examination of Brent Hogelin, so we would

10   recall him please.

11          THE COURT:  Sir, you're still under oath, so if you

12   would, please, take the witness stand.

13          Good morning.

14                     BRENT HOGELIN

15                DIRECT EXAMINATION - continued

16   BY MR. MCINERNEY:

17   Q.  Good morning, sir.

18   A.  Good morning, counselor.

19   Q.  When we had left off last week, we had talked about a lot

20   of things.  We had spoken, I think just briefly, about the

21   manner in which KHP advises troopers of new case law or new

22   rules around their jobs, so that's just to kind of reorient

23   you.

24       And, sir, when significant cases or major cases are

25   released, it's true that KHP initially advises their troopers

1   via e-mail; correct?

2   A.   Yes, sir.

3   Q.   And that's -- I think you call that the PowerDMS system.

4   A.   E-mail and PowerDMS, correct.

5   Q.   And those are two different things?

6   A.   Yes.

7   Q.   Right.

8        So, for instance, when cases like that are important around

9   the Fourth Amendment, cases like *Schooler* and *Jimenez* and *Lowry*

10  come out, those are advised to troopers via an e-mail; correct?

11  A.   Yes.

12  Q.   And when those case updates come out via e-mail, KHP relies

13  on the troopers to read those e-mails and to understand the

14  cases; correct?

15  A.   Yes.

16  Q.   When those e-mails come out, there's not a test or a quiz

17  associated with the case law that is pushed out in those

18  e-mails; is that fair to say?

19  A.   Yes, that's fair.

20  Q.   And you don't test the troopers, sir, under your command on

21  the extent to which those cases should change their practices,

22  do you?

23  A.   Do I test them?  No.

24  Q.   And you don't test your lieutenants who train your troopers

25  on their understanding of the law so they can adequately

1   supervise their troopers; correct?

2   A.  Correct.

3   Q.  And you don't always conduct scenario-based training when

4   the changes in the law come out; correct?

5   A.  Not necessarily.  We do have training-based scenarios, yes.

6   Q.  And I think you testified last week, correct me if I'm

7   wrong, that the interdiction squad does, that is Troop N, does

8   some narrow based training; correct?

9   A.  Correct.

10  Q.  With regard to the rest of the KHP troopers, that is

11  troopers not signed to Troop N, there's not necessarily

12  scenario-based training when new case law comes out, is there?

13  A.  I can't speak to what would be taking place at the new

14  trooper academies that have came on since relevant court

15  rulings.  I can't speak to that.

16  Q.  I'm sorry, can you say that again?

17  A.  There may be some relevant training in the new trooper

18  recruit academy.  I'm not aware if there is or if there isn't

19  relevant to case law that's came up in advanced interdiction

20  classes.

21  Q.  So you're not aware whether there is or there isn't;

22  correct?

23  A.  Correct.

24  Q.  And there's not a requirement that -- that the video that

25  supervisors are required to review quarterly is video of stops

1   or detentions; correct?

2   A.   Except for my troop, I do require that.

3   Q.   I think you -- last week I think you referred to random

4   review by supervisors of video on a quarterly basis; correct?

5   A.   Statewide, that is correct, yes, sir.

6   Q.   Statewide.  Okay.

7   A.   Yes, sir.

8   Q.   Troop N, which is, I think we agreed, less than 5 percent

9   of the KHP troopers; right?

10  A.   Right.

11  Q.   Troop N may require that, but nobody else does; correct?

12  A.   As far as I know.

13  Q.   And there's no regular follow-up required for troopers who

14  have -- who are found to have violated motorist rights;

15  correct?

16  A.   There's no follow up?

17  Q.   Correct.

18  A.   Not necessarily.  I mean, depending on if it was a

19  complaint or for a claim as an internal issue, there could be,

20  yes.

21  Q.   I want to make sure we're talking about the same thing.

22  There is not a requirement for regular follow-up for troopers

23  who are found to have violated motorist rights; true?

24  A.   True.

25  Q.   So when a -- when a trooper, whether internally or

1   externally, is found to have violated the constitutional rights

2   of a motorist, there's not a required retraining that the

3   trooper must go through; correct?

4   A.   Not that I'm aware of.

5   Q.   And there's no KHP policy that requires it; right?

6   A.   Not that I'm aware of.

7   Q.   Sir, I'm going to show you what is marked -- actually, I'm

8   going to ask you, in that gray folder in front of you, to turn

9   to the exhibit marked No. 6 please.  Okay.  Are you there, sir?

10  A.   Yes, sir.

11  Q.   Do you recognize that, the first page?

12  A.   An e-mail.

13  Q.   Yes, sir.  Who's that e-mail from?

14  A.   It is from Sarah Washburn.

15  Q.   And then who appears there on the cc line?

16  A.   Myself.

17  Q.   That's an e-mail that you got, sir, in June of 2018 from

18  Ms. Washburn; correct?

19  A.   Yes.

20  Q.   And at the time Ms. Washburn was who with respect to the

21  Kansas Highway Patrol?

22  A.   Our legal counsel.

23  Q.   And that -- that training attached the KHP's Fourth

24  Amendment reasonableness training, which was a presentation by

25  Ms. Washburn; correct?

1    A.  Yes.

2    Q.  I guess it's easy to tell that from -- by flipping to the

3    second page.  Do you see that?

4    A.  I do.

5    Q.  Sir, I'm going to have you flip to the fourth -- excuse me,

6    the 12th page of that.  Give me just one moment.

7            MR. MCINERNEY:  Judge, I'd offer Exhibit 67.

8            MR. CHALMERS:  No objection.

9            THE COURT:  Received.

10   BY MR. MCINERNEY:

11   Q.  The -- when I say page 12, it's not necessarily marked 12.

12   It's got a number in the lower right-hand corner that ends in

13   749.

14   A.  Okay.

15   Q.  Do you see that?

16   A.  I do.

17   Q.  And we'll have it -- well, let's talk about it.  It will be

18   up on the screen here momentarily.

19       (Off record for technology.)

20   BY MR. MCINERNEY:

21   Q.  Thank you.  Thanks for your patience, sir.

22       What we have on the screen and what you've had in front of

23   you for a couple minutes is Exhibit No. 67.  And on page 12,

24   sir, do you see that slide entitled Trooper-Two Step?

25   A.  Yes.

1   Q.  So as part of KHP's training on consensual encounters,

2   there is a training on what's known as the trooper two-step;

3   correct?

4   A.  Correct.

5   Q.  And the KHP trains that it is not necessary for anyone to

6   take -- actually take two steps away; isn't that right?

7   A.  That is.

8   Q.  I'm sorry?

9   A.  That is right.

10  Q.  And, in fact, if you'll flip to the -- to the next page,

11  page 750.  In the bottom right-hand corner, KHP trains at that

12  second bullet it's not even mandatory to disengage; correct?

13  A.  Correct.

14  Q.  And that slide says as long as a person -- a reasonable

15  person in the suspect's position would feel free to leave;

16  correct?

17  A.  Correct.

18  Q.  And KHP emphasizes that troopers do not need to physically

19  disengage; right?

20  A.  Correct.

21  Q.  It trains KHP troopers they don't even have to tell

22  motorists that they are free to go; correct?

23  A.  Correct.

24  Q.  If you'll let me have you turn to page marked 753 in the

25  bottom right-hand corner, and specifically that second bullet

1   point training troopers that they don't have to use any magic

2   phrase like "you're free to go."  Correct?

3   A.   Correct.

4   Q.   In fact, KHP trains troopers not to say that, not to use

5   that phrase; right?

6   A.   Correct.

7   Q.   Because if they say that, they actually have to let the

8   person go, and the whole point of a trooper two-step is to get

9   them to continue answering questions?

10  A.   Consensually.

11  Q.   Right.

12       But to continue answering their questions; right?

13  A.   Correct.

14  Q.   So KHP wants its troopers, particularly interdiction

15  troopers, to use a different phrase like "have a safe trip" or

16  "take care" or "have a good day."  Right?

17  A.   Correct.

18  Q.   And if you turn to the next page, 754 in the bottom

19  right-hand corner, it even suggests some of those -- some of

20  those phrases, doesn't it?

21  A.   It does.

22  Q.   Because when you say "have a safe trip" or "take care" or

23  "have a good day" and then turn around and begin questioning,

24  you can keep the motorist there; correct?

25  A.   If it's consensual.

1   Q.  And these are -- these are cars that have been pulled over

2   on the side of the highway; right?

3   A.  More often times than not.

4   Q.  Right.

5       And the highway typically is active with fast-moving

6   traffic?

7   A.  Yes.

8   Q.  And so drivers can't really just pull away back into

9   traffic when they're being questioned by a trooper, can they?

10  A.  That's subjective to each driver.

11  Q.  But you don't tell them, do you?

12  A.  We do not tell them.

13  Q.  You don't tell them.  You don't ask them for permission, do

14  you?

15  A.  Permission for what, I'm sorry?

16  Q.  To continue to hold them there, do you?

17  A.  That's up to each individual officer or trooper however

18  they conclude the traffic stop.

19  Q.  Well, isn't the whole object of this to stop and search as

20  many cars as possible?

21  A.  No.

22  Q.  Let me show you what is marked as Exhibit 901.

23      MR. MCINERNEY:  Can you pop up that page on 901

24  please.

25  BY MR. MCINERNEY:

 1  Q.  Sir, I'm going to show you --

 2        MR. MCINERNEY:  Judge, I think for the record this has

 3  been conditionally admitted and you were going to make a

 4  decision later with regard to the entire exhibit.  That's my

 5  memory from last week.

 6        THE COURT:  Yeah.  So jog my memory, what is

 7  Mr. Chalmers' objection?  Mr. Chalmers?

 8        MR. CHALMERS:  I don't have an objection.  I offered

 9  it, Your Honor.

10        THE COURT:  Oh, I'm getting confused then.  Then is it

11  in evidence?

12        MS. PERRY:  Your Honor, this is the exhibit where

13  Ms. Washburn testified that she didn't remember if some pages

14  were part of the collegiate school training or whether they

15  were part of KHP training.  So most of it's in and admitted.

16  There's a dispute to a few pages you were going to take under

17  advisement.

18        THE COURT:  So do we need to take up the dispute as to

19  those few pages right now?

20        MS. PERRY:  No.

21        THE COURT:  Okay.  All right.  So it's received.

22        MR. MCINERNEY:  Thank you, judge.

23        THE COURT:  Go ahead.

24  BY MR. MCINERNEY:

25  Q.  Sir, can you see that slide lower right-hand corner the

1  last three are 402?

2  A.  Yes.

3  Q.  Do you recognize that as a training slide that is offered

4  by the Kansas Highway Patrol?

5  A.  I'm not sure where it originated.  Like, the other one had

6  an e-mail attached to it, but I recognize the format, yes.

7  Q.  Okay.  And it's consistent with the format of other

8  training slides?

9  A.  Yes.

10  Q.  KHP trains troopers to be successful -- to be a successful

11  trooper, a trooper must be able to look past the traffic

12  violations for indications of criminal activity; correct?

13  A.  Yes.

14  Q.  That's that fourth bullet there; right?

15  A.  Yes.

16  Q.  So KHP troopers are trained to stop as many cars as they

17  can; right?

18  A.  Yes, we must --

19  Q.  Sorry?

20  A.  -- we must make high volume of traffic stops, yes, that's

21  correct.

22  Q.  Right.

23       And that really is the key, a high volume of traffic stops,

24  isn't it?

25  A.  Yes.

 1   Q.  Because the higher the volume, the better the odds are of

 2   conducting criminal interdiction; isn't that true?

 3   A.  Well, the better the odds of affecting traffic safety and

 4   visibility on the road and physical deterrent.

 5   Q.  And affecting criminal interdiction; right?

 6   A.  That would be a portion, yes.

 7        MR. MCINERNEY:  Your Honor, that's all the questions I

 8   have right now for this witness.  Thank you.

 9        THE COURT:  Cross-examination.

10        MR. CHALMERS:  I think this is 901.  Is the --

11        (Off record technology.)

12                    CROSS-EXAMINATION

13   BY MR. CHALMERS:

14   Q.  Captain, would you look at the notebook that's at the top

15   there, and it has Exhibit 67 in it.  And would you go to I

16   think what works out to be page 15, which would be a slide

17   OAG2752 down at the bottom.  Are you there?

18   A.  Yes, sir.

19   Q.  Okay.  And the top of the slide -- so that we're on the

20   same page, I'm sorry, it's 2753, I want to talk to you about.

21   Are you there?  It's the next page?

22   A.  Okay.

23   Q.  At the top of the page, so I want to make sure we're the

24   same, there it says *Ohio versus Robinette*; is that right?

25   A.  Yes.

1   Q.  Would you, please, read for the court -- this comes, by the

2   way, from Exhibit 96 that -- 67 that you just discussed with

3   counsel.  Would you, please, read from that page what it says

4   under the -- the decision *Ohio versus Robinette*?

5   A.  "There's no bright line rule for the end of an

6   investigatory detention and the beginning of a consensual

7   encounter.  You don't have to use any magical -- or magic

8   phrase like free to go to signal a transition."

9   Q.  And then it gives a case cite?

10  A.  Yes, *Ohio versus Robinette,* 519 U.S. 33, 1996.

11  Q.  Okay.  And is that the training that you were discussing

12  with counsel indicating that you don't necessarily have to --

13  been trained you don't necessarily have to have a physical

14  disengagement?

15  A.  Yes.

16  Q.  Would you go now to the slide above that where it says at

17  the top troopers two-step, and would you read that for the

18  court please?

19  A.  752?

20  Q.  Yes.

21  A.  "To require physical disengagement in order for a

22  subsequent encounter to be deemed consensual would be to

23  require a bright line rule that the U.S. Supreme Court says

24  can't exist."

25      Bullet point two is, "So you don't have to physically

1    disengage or two-step, but it is a factor," and that was *State*

2    *versus Thompson*, 284 Kansas 763 in 2007.

3    Q.  Once again, is that the training that is provided to

4    highway patrol that you were discussing with counsel?

5    A.  Yes.

6    Q.  On Friday we talked a little bit about your -- about your

7    position.  You are a captain with what division?

8    A.  Troop N.

9    Q.  And how long have you been with Troop N?

10   A.  Continuously for 10 years.

11   Q.  And how long have you been with the Kansas Highway Patrol?

12   A.  Twenty-four years.

13   Q.  Have you gone through training that's been described

14   variously in this trial to become a Kansas Highway Patrol

15   officer?

16   A.  I have.

17   Q.  How would you generally describe that training?

18   A.  It was 22 weeks of law enforcement training at our

19   headquarters for the training academy in Salina known as

20   Troop J.  It was on-site for 22 weeks.  And at the completion

21   of the 22 weeks, if we were successful, we were subjected to 77

22   working days with a field training officer, seasoned trooper in

23   the field, and observed and graded during that time.  If we

24   successfully passed field training officer status, then we were

25   fully commissioned on the road as a trooper.

1   Q.  And you went through this?

2   A.  Yes.

3   Q.  What does fully commissioned mean?

4   A.  Well, you're fully commissioned coming out of the academy,

5   so that's a bad choice of words, but you're -- essentially

6   you're on your own to go out there and patrol your designated

7   county of residence and area around it.

8   Q.  Do troopers have to have any sort of certification or

9   licensing to be fully commissioned?

10  A.  Yes.

11  Q.  What is that?

12  A.  It's from the Kansas Law Enforcement Training Center --

13  commissioned through the Kansas Law Enforcement Training

14  Center.

15  Q.  And then to maintain that commission, what are the

16  requirements that were imposed on you?

17  A.  Had to have 40 hours of continuing education each year as a

18  law enforcement officer.

19  Q.  And have you had then 40 hours of continuing education as a

20  law enforcement officer?

21  A.  Yes, each year since I came on in '99.

22  Q.  Are you familiar with the policies, the written policies of

23  the Kansas Highway Patrol?

24  A.  I'm familiar.

25  Q.  How did you become familiar with the policies?

1   A.   When I came on, the Kansas Highway Patrol was in a book

2   much the size of these book -- binders.  It's -- now it's

3   online through a program called PowerDMS.

4   Q.   Are -- are you required to -- to read these policies?

5   A.   Yes.

6   Q.   Is the same true to all other troopers in the highway

7   patrol?

8   A.   Yes.

9   Q.   How is it -- or is it determined whether troopers have done

10  what they're required to do as far as reading the policies?

11  A.   How is it determined?

12  Q.   Yeah.

13  A.   Through the PowerDMS system they must sign off that they

14  have opened and read and -- the effected policy or any effected

15  policy.

16  Q.   Now, as a highway patrol trooper, you're, what, an employee

17  of the state; is that correct?

18  A.   Yes.

19  Q.   And just, in a general sense, because I don't think it's in

20  the record, what are the duties and the responsibilities of a

21  highway patrol trooper in Kansas?

22  A.   The general duties are to patrol Kansas highways, state

23  highways, the U.S. highways, interstate highways enforcing

24  traffic laws, responding to traffic collisions, uncovering

25  criminal activity that might be encountered on Kansas highways,

1    assisting other agencies, both county, state, federal, local

2    entities with anything they might need assistance with,

3    parallel capacities in a nutshell.

4    Q.   Does the Kansas Highway Patrol have a -- a kind of

5    enforcement jurisdiction of its own?

6    A.   It does.

7    Q.   What is that?

8    A.   The entire state of Kansas.

9    Q.   And does it have a -- some particular emphasis on any

10   particular highway to roads in the state of Kansas?

11   A.   Does it have an emphasis in what degree?

12   Q.   Does its enforcement actions have any particular emphasis

13   on any particular roads or highways in Kansas?

14   A.   There can be, yes.

15   Q.   What are they?

16   A.   Your more traveled roadways where collisions and traffic

17   laws are more apt to be disregarded:  interstates, U.S.

18   highways.

19   Q.   Now, you started out as a trooper, and tell us just briefly

20   your career path that brought you up to captain.

21   A.   I was first stationed north of Topeka in Jackson County for

22   a couple years as a road trooper, meaning just responded to

23   collisions, calls for service, enforce traffic laws.  Then

24   transferred to Osage County a few years later, similar type of

25   career engagement:  traffic laws, accidents, assisting the

1  locals.

2       After a period of about seven years on the road as a --

3  what you identify as a road trooper, I transferred to the

4  special -- Special Operations Division of the highway patrol

5  for our partnership with the Drug Enforcement Administration

6  for four years as a task force officer.  It was a non-uniform

7  position where we investigated federal drug crimes.

8       After four years on that assignment, I transitioned over to

9  a newly formed interdiction team within the Kansas Highway

10  Patrol that was obtained through a grant.  That would have been

11  about 2010.

12       I didn't date any of these others, but this is just the

13  general timeline.  Spent one year on the Interdiction Task

14  Force, then I went to our Motor Carrier Safety Division, or

15  Trucking Division Troop I, as a lieutenant as a promotion and

16  oversaw administrative responsibilities there with grants.

17       After two years at Troop I, I went back into the Special

18  Operations Division of the Kansas Highway Patrol, which is

19  Troop N, as the administrative lieutenant.  Also I oversaw the

20  DEA task force, our asset forfeiture program as well as our FBI

21  TFOs.

22       After approximately four years in that position, I was

23  promoted to captain where I currently remain and have oversight

24  over our FBI task force, DEA task force, asset forfeiture,

25  evidence, road interdiction and our Fusion Center.

1    Q.  Did you, during your career path, take on any supervisory

2    responsibilities of other troopers?

3    A.  Yes.

4    Q.  When did that first start?

5    A.  Would have been 2011.

6    Q.  Are you familiar then with what are the responsibilities

7    and duties of a frontline supervisor for troopers?

8    A.  I am.

9    Q.  Could you generally describe what those are within the KHP?

10   A.  Generally they are ensuring that every 10 to 15 days

11   they're submitting their 10 or 15 day's worth of activity:

12   what they've done during that time frame; how many citations,

13   warnings or accidents, arrests they've made; also review any

14   reports they have written day to day; also make sure that

15   they're attending required classes, keeping their uniform and

16   their patrol cars in operating capacities, seeing what their

17   agenda for any upcoming special enforcements or training might

18   be, tending to their vacation requests, sicknesses.

19   Q.  Does the supervision of the frontline officer reach issues

20   of whether troopers are performing their jobs correctly?

21   A.  Yes.  We also, as a first line supervisor, and even at my

22   level, we do annual performance reviews on our employees.

23   Q.  Are there responsibilities that frontline supervisors have

24   of troopers to review certain aspects of their subordinate's

25   work?

1  A.  Yes.

2  Q.  What are those?

3  A.  Review their written reports online.

4  Q.  In frontline supervising of troopers out on the road,

5  generally -- well, were there occasions where you would ride

6  along with the troopers?

7  A.  Certainly.

8  Q.  How would that work?

9  A.  It was not a requirement.  It's best practice.  The

10  troopers would ride with a supervisor or supervisor would ride

11  with the troopers just to go out and work together as a measure

12  of additional safety.  It could also be as a measure of

13  oversight.  It could be for a special event, any number of

14  things.  It's not uncommon.

15  Q.  Did the frontline supervisor have any responsibility with

16  respect to training or instructions of their subordinates?

17  A.  Yes.

18  Q.  What were those?

19  A.  To ensure that any new policies that are coming out via the

20  PowerDMS system we've talked about is being reviewed and signed

21  off by their troop -- what trooper's under their command, also

22  ensuring that they receive the required 40 hours of continuing

23  education every year.  It is encouraged, my troop at least, to

24  have at least quarterly meetings -- lieutenants to have

25  quarterly meetings with their subordinates or troopers.

1  Q.  You had mentioned, in response to some of your questions to

2  counsel, that there is some review of -- of videos?

3  A.  Yes.

4  Q.  What is that?

5  A.  There's a quarterly review of at least three videos at

6  random from troopers -- what used to be DVDs.  It's all -- it's

7  all on the cloud now, so you can go in there and just pick

8  three videos and watch -- watch three videos and make sure that

9  we're in compliance with policy and procedure, of course the

10 law.

11 Q.  Could you -- I don't know a way to describe this, but if

12 you could do it for the court, what are the sort of contacts on

13 a daily or weekly basis between a supervisor and a trooper if

14 they exist?

15 A.  Speaking on my own, if -- as a first line supervisor, there

16 was usually daily contact with the troopers I would supervise

17 and speak to.  It would be over the phone or at the very least

18 e-mail, sometimes in person.  In my instance, my personnel were

19 spread across the state, so it was not logistically feasible to

20 see them in person every day.

21 Q.  In the supervision system with the frontline supervisor,

22 was the supervisor available to identify and respond to any

23 problematic behavior by troopers that they may have learned

24 about?

25 A.  Yes.

1  Q.  How so?

2  A.  Depending on how the supervisor is notified.  I mean, if it

3  was happening in real-time and that supervisor was on duty at

4  the same time and provided they were working in the same area,

5  be incumbent on the supervisor to respond to the scene.  That's

6  a whole litany of what ifs on that one.

7  Q.  Now, with respect to the -- you became a captain.  Did you

8  continue to have supervisory responsibilities, and, if so, what

9  were those?

10  A.  Yes, they were supervising six lieutenants.

11  Q.  And the nature of the supervision that you provide to the

12  six lieutenants is what?

13  A.  It's more a managerial role and to ensure that they have

14  what they need to be successful in the role as a supervisor,

15  make sure they also are receiving their 40 hours of required

16  law enforcement continuing education each year, reviewing the

17  same policies and procedures, make sure that they are

18  documenting their quarterly vehicle reviews, video reviews, and

19  annual reviews on their subordinates.

20       MR. CHALMERS:  May I approach and provide the witness

21  with an exhibit?

22       THE COURT:  Go ahead.

23  BY MR. CHALMERS:

24  Q.  914A.  I've handed you what's a document that's 914A, and

25  will you look through that real quickly and identify what that

1   is?

2   A.   It's an organization chain of command for the Kansas

3   Highway Patrol.

4   Q.   What -- is it a policy?

5   A.   Yes, it's a policy.

6   Q.   And if you look a little bit further down you'll see that

7   -- you see about, oh, 12 pages in there is a second policy?

8   A.   Yes.

9   Q.   And these are both policies -- written policies of the

10  highway patrol; is that correct?

11  A.   Yes.

12  Q.   And if we go another couple pages, there's a third policy;

13  is that right?

14  A.   Yes, there's a third policy.

15  Q.   The first policy I think you said was organization chain of

16  command, and generally what is that?

17  A.   The rank and structure of the Kansas Highway Patrol makeup

18  of the colonel on down to the trooper trainee.

19  Q.   The second policy is policies and procedures, what is that?

20  A.   Essentially just establishes where policies and procedures

21  would be maintained, how to access them.

22  Q.   And then the third policy that's attached in Exhibit 914A

23  is employee development and training.  Do you see what I'm

24  referring to?

25  A.   I do.

1   Q.   What is that?

2          MR. MCINERNEY:  Do you have a page reference, counsel,

3   please?

4          MR. CHALMERS:  Down at the bottom it would be OAG3960.

5          MR. MCINERNEY:  Thank you.

6          THE WITNESS:  It's our training form.  Anytime we

7   complete a training, it's presented to our members.

8          MR. CHALMERS:  I move for admission of Exhibit 914A.

9   It's the same as 914 that was marked, Your Honor, for the court

10  but I have removed some things that inadvertently were included

11  that weren't exhibits so -- or were not policies, rather.  So

12  that's what the difference is.  I don't think there was any

13  foundation objection by counsel, but I move for its admission.

14         THE COURT:  Any objection?

15         MR. MCINERNEY:  Can you specify the pages you removed

16  please?

17         MR. CHALMERS:  I'd have to go back and look.  I mean,

18  there were, I think, some journal entries regarding -- about

19  some forfeiture.  There might have been a couple of other

20  policies that weren't included in here.

21         MR. MCINERNEY:  So, judge, we had objected to pages 34

22  through 39 --

23         MR. CHALMERS:  They're not part of this.

24         MR. MCINERNEY:  Yeah, I just want to make a record

25  here.

1      -- 34 through 39, which, in fact, were not KHP

2   policies.  They look like they were civil forfeiture filings.

3   And if what counsel is representing is that those have been

4   removed, then we don't have an objection.

5           THE COURT:  All right.  Received.

6   BY MR. CHALMERS:

7   Q.   So if we look at 914A up on the screen, it discusses the

8   chain of command as the written policy; is that right?

9   A.   Yes.

10  Q.   Okay.  Now, you've talked about where a frontline

11  supervisor is and where our -- a -- where your position is in

12  the captain, but will this policy set out the entire chain of

13  command all the way up to the colonel?

14  A.   Yes.

15  Q.   And if we look to 12 pages in, the policies and procedures,

16  which is ADM-02, will that describe what you had testified to

17  about where the policies are put in place and how they're

18  accessible and how they have to be accessed by troopers in the

19  PowerDMS?

20  A.   Yes, that's correct.

21  Q.   Under the policy at Roman numeral II.B, it indicates the

22  "hold employees accountable for reading and complies with

23  policies and procedures as set forth in the PowerDMS.

24  Ignorance shall not serve as a defense to any disciplinary

25  action brought against an employee for violating any of the

1    patrol's policies or procedures."  Do you see what I've read?

2    A.  Yes.

3    Q.  So does the KHP make it the responsibility of troopers to

4    actually review, read and know their written policies?

5    A.  Yes.

6    Q.  And then going a few more pages to ADM-10, employee

7    development and training, do you see what I'm referring to?

8    A.  I do.

9    Q.  Just by way of example, it says, under General Provisions

10   B, that the highway patrol requires -- I'll paraphrase -- all

11   sworn troopers complete basic law enforcement training, and

12   then it outlines that training and then it talks about career

13   training and development.  Does this outline in writing those

14   things that we talked about that you went through to become a

15   trooper and to maintain your commission status?

16   A.  It does.

17   Q.  The book I'm going to hand to you now, would you look at

18   Exhibit 902 please.  And what is Exhibit 902?

19   A.  It's our enforcement guidelines.

20   Q.  And is this a Kansas Highway Patrol policy -- one of the

21   written policies that are discussed in the -- the other

22   policies that we were just visiting about?

23   A.  Yes.

24   Q.  And enforcement guidelines, what does that generally refer

25   to?

1  A.  How we enforce traffic laws, criminal laws, whether an

2  arrest, a warning or citation's given.

3        MR. CHALMERS:  I move for admission of Exhibit 90 --

4  902.

5        MR. MCINERNEY:  No objection, judge.

6        THE COURT:  Received.

7  BY MR. CHALMERS:

8  Q.  You've described the general purpose of 902 and that is

9  a -- starts a policy.  Then the policy talks about

10  responsibilities of officers.  Would you read that first

11  sentence under policy, please, for the court.

12  A.  "The basic responsibility of an officer is to know the law.

13  If an officer is not familiar with the basic elements of the

14  law, it is difficult to enforce the law fairly and uniformly."

15  Q.  Now, in Exhibit 902 there is a subcategory -- well, maybe

16  it's going another -- another place.  Well, actually what I

17  want to talk to you about is the Exhibit 903, the next one.

18  I'm sorry, would you turn to Exhibit 903 and tell us what that

19  is?

20  A.  It's our criminal interdiction traffic enforcement policy.

21  Q.  And it has a policy number, does it not?

22  A.  It does.

23  Q.  What is that?

24  A.  ENF-07.

25  Q.  Again, is this one of the policies that we've discussed

1    that the highway patrol has and requires its troopers to read,

2    understand and abide by?

3    A.  Yes.

4           MR. CHALMERS:  I move for admission of Exhibit 903.

5           MR. MCINERNEY:  No objection, Your Honor.

6           THE COURT:  Received.

7    BY MR. CHALMERS:

8    Q.  Now, Exhibit 903 is entitled Criminal Interdiction and

9    Traffic Enforcement.  Is criminal interdiction limited only to

10   your troop?

11   A.  No.

12   Q.  There's been some discussion about advanced interdiction

13   training.  Is that limited only to and provided only to members

14   of your troop?

15   A.  No.

16   Q.  Who takes that -- those courses?

17   A.  Troopers and officers within the Kansas Highway Patrol as

18   well as outside agencies.

19   Q.  Who is required to take that?

20   A.  Within the Kansas Highway Patrol?

21   Q.  Yes.

22   A.  Those wishing to advance to the next rank in the Kansas

23   Highway Patrol's career plan.

24   Q.  As a practical matter then, among troopers in the highway

25   patrol, who takes that course?

1    A.   Troopers that have been on from one to five years.

2    Q.   Are there troopers then that don't take the course?

3    A.   Very few.

4    Q.   With respect to the -- the general provisions, it says

5    under A, "Officers are expected --" Roman numeral II.A,

6    "Officers are expected to keep their troop commander fully

7    informed of any CITE arrests, procedures, investigations that

8    they initiate or involved in as soon as is practical to do so."

9    What does that mean?

10   A.   That officer/trooper should let their commander know as

11   soon as they can anytime that they have a seizure that's

12   significant enough to warrant notification.

13   Q.   Are there requirements when there is a -- an interdiction

14   that results in an arrest or a forfeiture that that brought --

15   that that be brought to the attention of -- of the commander or

16   frontline supervisor of the trooper that makes that arrest or

17   takes that forfeiture?

18   A.   Yes.

19   Q.   What are those responsibilities?

20   A.   Well, oftentimes it is through a dispatch through what's

21   called a drug arrest report indicating who has made a stop, the

22   seizure of a significant amount of contraband.  It could also

23   be through the daily command logs the effected captain could be

24   notified.  It could also be through e-mail from that trooper or

25   that trooper's lieutenant to the captain.

1   Q.  The policy in Roman numeral III.B says, "Officers who are

2   not trained in the application of criminal interdiction

3   techniques should request appropriate assistance when criminal

4   activity is suspected in part."  Is that the practice of the

5   highway patrol?

6   A.  Yes.

7   Q.  Now, the policy talks about CITE, or C-I-T-E, up in policy

8   Roman numeral II.A before then.  What -- just summarize for the

9   court what is CITE.

10  A.  Criminal interdiction while completing traffic stops.  I

11  mean, you're looking for criminal activity.  It could be drugs.

12  It could be guns.  It could be currency.  It could be human

13  trafficking victims.  It could be someone under the influence

14  of alcohol.  It could be someone has warrants.  It could be

15  someone that has committed a homicide, robbed a bank.  It's not

16  narrowly focused just to drugs or currency.

17  Q.  I'd turn your attention now to Exhibit 904 please.  904 is

18  another highway patrol policy; is that correct?

19  A.  Yes.

20  Q.  What policy does this address -- or what does this policy

21  address?

22  A.  Criminal procedure, the arrest, the search and the seizure.

23  Q.  And does it have a number?

24  A.  Yeah, OPS-39 -- 39.

25  Q.  When we were talking about Exhibit 903, we were talking

1  about policy number ENF-07.  Does that have a effective date on

2  it?

3  A.  An effective date of July 26th of 2019.

4  Q.  What does that mean?

5  A.  That would be the most recent revision and acceptance as

6  being mandated to be used by our personnel.

7  Q.  And I'm going to get ahead of myself for a second -- well,

8  no, I'm not.

9      There are policy changes periodically; is that correct?

10 A.  Yes.

11 Q.  And how are those policy changes published or put out to

12 the troopers?

13 A.  Through PowerDMS.

14 Q.  And the same procedure we talked about where the troopers

15 have to read them and certify they've read them?

16 A.  Yes.

17 Q.  I'll talk to you about 904 first, and that's the policy

18 that we were just visiting about, which is the OPS-39.

19      MR. CHALMERS:  And I move for admission of

20 Exhibit 904.

21      THE COURT:  Any objection?

22      MR. MCINERNEY:  We have no objection, Your Honor.

23      THE COURT:  904's received.

24 BY MR. CHALMERS:

25 Q.  Now, Exhibit 904, the purpose of this policy, as it's

1   listed in the exhibit, is to do what?

2   A.  To provide guidelines for arrests, searches and seizures.

3   Q.  And in Roman numeral III there are definitions of -- one of

4   which is an investigatory stop.  Do you see what I'm referring

5   to?

6   A.  I do.

7   Q.  And what is an investigatory stop under the KHP policy,

8   which is Exhibit 904?

9   A.  "A brief detention based on specific articulable reasonable

10  suspicion that a crime is being, is about to be, or has been

11  committed," and then it goes on if you would like me to read

12  that.

13  Q.  Please.

14  A.  "These detentions are justified by K.S.A. 22-2402 and

15  should only be long enough to either confirm or dispel an

16  officer's concerns about the illegal activity.  In order to

17  confirm or dispel the officer's concerns, he or she should use

18  all reasonable investigative techniques and tools available at

19  that time.  These may be included but are not limited to

20  holding the suspect for identification, using a canine to sniff

21  for illegal substances, standardized tests or contact with

22  dispatch or other law enforcement officers with relevant

23  specialties.  All detentions shall be based on the totality of

24  the circumstance which includes articulable reasonable

25  suspicion and the individual officer's training and

1    experience."

2    Q.  And the policy itself at page 6 of the policy, which is

3    part of Exhibit 904, describes what an administrative -- or an

4    investigative detention is again; is that correct?

5    A.  Yes.

6    Q.  Now, I'm not going to ask you to read it again, but

7    essentially it tracks just what we read in terms of the

8    definition of an investigatory stop, does it not?

9    A.  It does.

10   Q.  So is this a description then of the underlying policy that

11   troopers receive and training on when they can detain someone

12   or not detain someone?

13   A.  It is.

14   Q.  And under this written policy, then that detention

15   requires, as it's described, reasonable suspicion; is that

16   correct?

17   A.  It is.

18   Q.  Looking to the next couple of pages of the exhibit --

19   actually, it's page 7 of 8 of the Form OPS-39, Exhibit 904,

20   there are consent searches.  Do you see what I'm talking about?

21   A.  I do.

22   Q.  And in that section it says -- does it provide instruction

23   on when a consent search can be done legitimately?

24   A.  Yes.

25   Q.  What does it say in 12.a?

1  A.  "Search by consent is a search performed by an officer

2  after the subject of the search or all person or persons

3  present having privacy interest in the location to be searched

4  give consent provided the consent is given knowingly and

5  voluntarily and without coercion.  It is not sufficient if the

6  subject merely acquiesces to a claim of authority by a law

7  enforcement official.  A sworn officer should be able to

8  articulate the circumstances indicating the consent was

9  voluntary."

10  Q.  And is that consistent with the training that is provided

11  that you've generally described on when one can obtain consent?

12  A.  It is.

13  Q.  Turning to the last page of OPS-39 -- turning over one page

14  it says, "Consent may be documented in writing whenever

15  possible," and then it says, "consent may be given orally."  Is

16  there a mandate or an instruction that would tell troopers

17  either when they need to have it in writing and when they need

18  to have it orally?

19  A.  There is.

20  Q.  What is that?

21  A.  We use shall or may in this instance.  We indicate the

22  consent may be given orally.

23  Q.  Is it then left to the trooper 's discretion?

24  A.  It is.

25  Q.  And, lastly, under the policy in subsection C on page 8 of

1   the policy, and so I've got that it would be Roman

2   Numeral IV.C, would you read what's under C.1?

3   A.   "Members of the agency are expected to remain current in

4   the knowledge of laws and judicial opinions as they apply to

5   the issue of search and seizure.  Whenever possible, the agency

6   will provide such updated information."

7   Q.   There should be an exhibit binder up there.  Exhibit 917,

8   find that.  I took these from the courtroom across the way.

9          MR. CHALMERS:  If I may approach, Your Honor.

10  BY MR. CHALMERS:

11  Q.   Here's Exhibit 917.

12  A.   Okay.

13  Q.   Did you find 917, captain?

14  A.   Yes.

15  Q.   And what is 917?

16  A.   It's a Kansas Highway Patrol internal legal update

17  document.

18  Q.   What's the date of the document?

19  A.   April 28th of 2022.

20  Q.   Is this an example of the highway patrol providing

21  information to troopers so they understand their

22  responsibilities under the policies we just talked about?

23  A.   Yes.

24         MR. CHALMERS:  I move for admission of Exhibit 917.

25         MR. MCINERNEY:  Well, judge, we'll object on the basis

1    that this is hearsay.  It's not subject to an exception to the

2    hearsay rule.  It is an incomplete exhibit, and I don't know

3    what the relevance of this legal update is.  It is -- it's from

4    April of last year.  It -- on its face it appears to concern a

5    case called *U.S. v. Frazier*.  So those are the basis of our

6    objections, judge.

7          MR. CHALMERS:  I don't know why he indicates it's

8    incomplete.  I don't have any -- any reason to think that, but

9    I can ask the witness if he can determine if it's incomplete or

10   not, but I'm not offering it to prove the truth of anything but

11   to give an example of the updates that are provided by the

12   highway patrol on issues relevant to their duties, and in this

13   case their duties on -- on post traffic stop detentions.

14         THE COURT:  I mean, that really is the truth of the

15   matter asserted, because unless it is what you say it is, it

16   would not be relevant.  It would not be evidence of notice

17   or...

18         MR. CHALMERS:  I'm -- I'm not following.  It doesn't

19   make any difference whether I follow or not, Your Honor.

20   Whether the statements contained in the update are truthful or

21   not, I'm not offering it for that.  I mean, I -- I'm offering

22   it just simply to show that legal updates are provided

23   pertaining to cases and cases relating to responsibilities of

24   troopers in roadside detentions.

25         THE COURT:  I'll try and be more clear.  So if it's

1   not -- if that document is not an update on the law, then it's

2   not admissible for the purpose you just said.  If it is, then

3   you're offering it for the truth of the matter asserted in the

4   document.

5            MR. CHALMERS:  I think I follow the court's ruling.  I

6   would proffer Exhibit 918, Your Honor, which is the legal

7   update concerning the *United States versus Frazier* decision of

8   April 13.

9            THE COURT:  Okay.  I mean, it's marked as a proffer.

10           MR. MCINERNEY:  Okay.  And the ruling on the

11  objection, Your Honor?

12           THE COURT:  Is sustained.

13           MR. MCINERNEY:  Thank you.

14  BY MR. CHALMERS:

15  Q.   Now, switch gears for just a second real quickly.  Troop N

16  and its functions and purposes, you talked about those a little

17  bit with counsel, but what -- what is interdiction and why does

18  Troop N get involved in interdiction?

19  A.   Interdiction was -- is the basic tenets of why the Kansas

20  Highway Patrol was formed back in 1937:  to combat bootlegging

21  as it crossed state lines and county lines.  So the very

22  genesis of the highway patrol was for interdiction that was

23  uncovering criminal activity by individuals using roadways in

24  Kansas and vehicles in Kansas to traffic in illicit booze.

25           So the only thing that's changed in the matter of

1   80-90 years is the contraband that is being utilized by newer

2   vehicles and updated roads.  So interdiction is out there

3   trying to actually intercept contraband and criminals as

4   they're using roadways to get from one point to another to

5   further their criminal activity.

6   Q.  With respect to your responsibilities with criminal

7   interdiction, do you gather data?

8   A.  Yes.

9   Q.  What sort of data do you gather?

10  A.  Gather a lot of -- a lot of data.  Counselor, would you be

11  more specific?

12  Q.  Well, what sort of data do you gather concerning roadside

13  detentions as part of the interdiction process?

14  A.  We gather who made the detention, what trooper or officer's

15  engaging in a roadside detention for the purposes of a canine

16  deployment, the date, the time, the location, vehicle

17  information, reasonable suspicion factors.  It's a form that we

18  have that officer or trooper fill out.

19  Q.  Do you gather data concerning forfeitures?

20  A.  We do.

21  Q.  What sort of data do you gather?

22  A.  We have internal databases that monitor the same:  who the

23  trooper or officer was that made a seizure of an item that is

24  being solicited for forfeiture.  We track the date, the time,

25  the vehicle, the item, the supervisor, but additionally we also

1   are mandated by the legislature to fill out tracking

2   information through the Kansas Bureau of Investigations asset

3   forfeiture portal each year -- well, each time we have a

4   forfeiture, but there is a report generated each year on any

5   forfeitures.

6   Q.   In this data that is gathered, is -- how is it used?

7   A.   Internally?

8   Q.   Yes.

9   A.   To make sure that we are proceeding lawfully and within

10  time frames and that we are tracking and being good stewards of

11  any property or forfeitable items that come into our contact

12  and they're, you know, started and adjudicated within the time

13  frame set out within the -- in law.

14  Q.   Are you looking for trends?

15  A.   In forfeitures there's trends that can be gleaned

16  certainly.

17  Q.   Well, you also talked about roadside detentions.  Are you

18  looking for trends?

19  A.   It could certainly find trends, yes.

20  Q.   What sort of trends are you looking for?

21  A.   Well, one of the most common trends is what smugglers are

22  utilizing as a means to conceal their contraband.  There was a

23  time when predominantly an area in a vehicle such as a gas tank

24  or a tire was being used to smuggle contraband.  As that is

25  uncovered, they'll use a different method to hide their

1   contraband.  It's kind of a cyclical...

2   Q.   Is any of this data reviewed to assure that troopers are

3   being accountable to following policy?

4   A.   Yes.

5   Q.   How so?

6   A.   The detention form and policy that we talked about

7   enumerates -- has the trooper or officer enumerate all of his

8   reasonable suspicion he possibly can, both in a check mark and

9   narrative fashion, as well as that trooper or officer's

10  immediate supervisor, they must review that detention form for

11  policy violations, training recommendations or equipment issues

12  as well as the troop captain over that troop lieutenant over

13  that member also gets to review the form.  And the form

14  ultimately comes to Troop N for dissection and review and

15  historical filing.  It also goes to our Profession Standards

16  Unit for the same purposes.

17  Q.   There are -- there's data with respect to forfeitures.  Are

18  there any responsibilities to report the data concerning

19  forfeitures to Troop N?

20  A.   Yes.

21  Q.   What are they?

22  A.   The same.

23  Q.   Now, I'll show you what's been marked as -- well, can you

24  find Exhibit 97 -- 907 in your -- one of your notebooks?  What

25  is Exhibit 907?

1   A.   It's an Excel worksheet document indicating the state of

2   registration for vehicles that were involved in significant

3   highway patrol contraband seizures.

4   Q.   Did you have any involvement in the preparation of

5   Exhibit 907?

6   A.   I did.

7   Q.   And what was your involvement?

8   A.   I originated this document and then passed it along to some

9   of my successors to keep updated and apprised.

10  Q.   Is this a type of analysis that you've done in considering

11  forfeitures and other activities by troopers in roadside

12  detentions?

13  A.   Yes.

14        MR. CHALMERS:  I move for admission of Exhibit 907.

15        THE COURT:  Any objection?

16        MR. MCINERNEY:  Yes, judge.  907 is -- looks to be a

17  compilation of information.  It may have been gathered by this

18  witness, but it is based on hearsay and it's inadmissible,

19  judge, under 801.  And this is -- if you'll note the title of

20  the document refers to states of registration for vehicles

21  involved in significant KHP contraband seizures, I don't know

22  why that's relevant to the issues presented in this case.  So I

23  think between the hearsay and 401, judge, this exhibit's not

24  admissible.

25        MR. CHALMERS:  Well, the records that are used, as

1    he's described them for this report, are -- are official

2    reports of the highway patrol.  They were part of their -- I

3    don't know, business records isn't the correct description of

4    it.  Part of their records.  So it falls within that hearsay

5    exception.  But it's offered to show an example of the analysis

6    that's being done by the highway patrol in Troop N of data.

7            THE COURT:  So is it a summary or compilation?

8            MR. CHALMERS:  It is a summary, yes.

9            THE COURT:  So have you complied with Rule 1006?  Are

10   all of the underlying documents here in the courtroom?

11           MR. CHALMERS:  No, I don't -- well, the answer is, no,

12   I don't think it would be introduced as a summary for that --

13   well, I don't -- I don't think that that rule, in terms of how

14   I'm offering it, is a summary of what I envision this document

15   to be.  It is -- it is a -- on its face a spreadsheet showing

16   data prepared from other data.  It is not -- it is not offered

17   as a summary of other data for the purpose of its introduction,

18   but rather as it's -- on its own face is what it shows.

19           THE COURT:  That sounds kind of circular to me.

20           MR. CHALMERS:  Well, may I -- I may be mistaken, my

21   understanding of the summary of data is when you are taking

22   something and creating a document that is not a official record

23   itself.  It is not what would be otherwise substantive evidence

24   but is a summary of other substantive evidence.  That's what

25   not -- that's not what this is being offered as.  This is a --

1  a spreadsheet that he uses and prepares in his analysis of data

2  in essentially his supervision of -- of forfeitures.

3        THE COURT:  Okay.  I don't think you've laid a

4  sufficient foundation for that to be a business record, but you

5  can try again if you want.

6        MR. CHALMERS:  Okay.

7        THE COURT:  Okay.

8  BY MR. CHALMERS:

9  Q.  And so, captain, talking about Exhibit 907, tell us what

10  data is used to be able to populate the spreadsheet that is

11  Exhibit 907.

12  A.  Okay.  So this data comes from very specific places within

13  the highway patrol.  Any time a significant seizure is made,

14  typically a 1 pound or more of drugs, there is a drug arrest

15  report that is generated from Kansas Highway Patrol dispatch

16  that indicates who the suspect is, who the suspect was arrested

17  by, what they were driving, and the vehicle's registration

18  plate at the time of the stop and the seizure.

19        So that is taken from dispatch.  It is taken from the

20  trooper that made the arrest or the forfeiture or seizure's

21  report.  It can also be taken -- it is also taken from our

22  digiTicket, our tickets or warnings that are maintained by the

23  highway patrol's IT system.

24        So essentially this is concrete information that I was able

25  to obtain essentially saying if we seized 1 pound of marijuana

1    from someone, what was the state issuance on the tag associated

2    to that 1 pound of marijuana seizure or cocaine or whatever it

3    may have been.

4    Q.  So the -- the information from dispatch is obtained by

5    dispatch and stored how?  Kept how?

6    A.  On their servers.

7    Q.  So is it a -- a written document then that dispatch has

8    that it prepares in its course of its -- its business?

9    A.  It's even more secure than that.  It's through the Kansas

10   -- KC JIS system portal maintained by KBI and the FBI where you

11   would check someone's driver's license or their registration

12   information.  So it's maintained there.  It's disseminated to

13   the Kansas Highway Patrol who further disseminates it for

14   records and reports.

15   Q.  Once again, those records that are maintained by dispatch,

16   then are those records that are retained and collected by the

17   governmental agency?

18   A.  Yes.

19   Q.  And then those records are provided -- or information from

20   those records are provided to you for the purposes of

21   Exhibit 907?

22   A.  Yes.

23   Q.  And then the reports you've talked about, what are the

24   reports that you accessed for the -- for the spreadsheet?

25   A.  Arrest reports, offense reports, narrative reports that

1    were generated by a trooper or officer that was involved in the

2    seizure.

3    Q.   And are those reports also prepared as part of the regular

4    business of the highway patrol?

5    A.   Yes.

6    Q.   And then, in addition to the arrest reports and the

7    dispatch reports, I think you said there was digiTicket

8    information.  What is a digiTicket?

9    A.   It's essentially a ticket or a warning that we would give

10   them, a violator, when you pull them over for a traffic

11   infraction.

12   Q.   Okay.  And that record is prepared when?

13   A.   Most of the time at the -- at the conclusion of a traffic

14   stop.  However, it can be after the scene of a traffic

15   collision a ticket is warranted to be issued.

16   Q.   And that written record is retained then by the highway

17   patrol, is it?

18   A.   Yes.

19   Q.   How?

20   A.   That would be through our IT division.

21   Q.   And is the record that -- from -- from digiTicket a record

22   that is prepared in the ordinary course of the highway patrol's

23   business?

24   A.   Yes.

25   Q.   And then using those records that are prepared and

1  governmental records and the report information, you have a

2  summary that you use in analyzing data; is that correct?

3  A.  Yes.

4  Q.  And that's what Exhibit 907 is?

5  A.  Yes.

6      MR. CHALMERS:  Once again I move for admission of

7  Exhibit 907.

8      MR. MCINERNEY:  Judge, I think we need to pick a lane

9  here.  It's either a summary exhibit or it's not.  If he's

10  offering it as a summary exhibit, the documents that he

11  mentions are not in evidence.  They're required to be under

12  1006.

13      We still would renew our hearsay objection, would

14  renew our relevance objection, and what -- I think what you

15  just heard was a business records foundation for everything

16  that was used to go into this report but not this report

17  itself.

18      We don't have evidence, we don't have testimony from

19  this witness that Exhibit 907 is kept in the ordinary course of

20  business.  In fact, the latest date recorded there is August of

21  2021.  It appears from his testimony as though this was a

22  one-time compilation that he put together from all the sources

23  you just heard about, and, judge, every one of those sources

24  relies on hearsay.  It's reports.  It's dispatch reports.  It's

25  -- it's the digiTicket and the other sources.

1           So I hate to pile on here, but I think we would renew

2    the existing objections and then object to the foundation as

3    business record.

4           THE COURT:  I think that objection is well taken.

5           MR. CHALMERS:  Well, I will proffer the exhibit, Your

6    Honor.  And I suppose I might mention that the reason that I

7    think it's relevant and I think the foundation for the purposes

8    of its relevance has been properly laid, is that one of the

9    allegations in this case is that the highway patrol is not

10   looking at data and is not analyzing data for trends.  So

11   here's an example of where the highway patrol is doing just

12   that.

13          THE COURT:  I think the objection is not to relevance.

14   It's whether this is information which is kept in the course of

15   a regularly-conducted activity of the Kansas Highway Patrol.

16   BY MR. CHALMERS:

17   Q.  Well, the -- the next thing I want to talk to you about

18   then is Exhibit 905, if you could find that in one of those

19   notebooks.

20   A.  Yes.

21   Q.  Would you describe what Exhibit 905 is please?

22   A.  It's the policy on the criminal interdiction traffic

23   enforcement.

24   Q.  And then go a few more pages after the fourth page down,

25   what is that?

1    A.   I'm sorry, can you repeat?

2    Q.   The fourth page into the exhibit is what?

3    A.   Okay.

4    Q.   What is the fourth page into the exhibit?

5    A.   Fourth page is the Vehicle Detention Report.

6    Q.   Policy?

7    A.   FOR-44.

8    Q.   So that we're clear, we've got Exhibit 905 is policy number

9    EFN-07 and also policy number FOR-44 that you've described is

10   the Vehicle Detention Report; is that correct?

11   A.   Yes.

12   Q.   Now, we had talked about, in Exhibit 903, Exhibit ENF-07,

13   that had an effective date of 7/26/19.  Do you see what I'm

14   referring to?

15   A.   I do.

16   Q.   And Exhibit 905, when it talks about ENF-07, has an

17   effective date of what?

18   A.   September 19th of 2022.

19   Q.   So the exhibit -- first three pages of Exhibit 905, is that

20   the now current version of ENF-07?

21   A.   Yes.

22   Q.   And ENF -- and, rather, the policy that we were just

23   talking about refers to a form, and that's the Vehicle

24   Detention Report, which is the FOR-44 that is attached as the

25   remaining part of the exhibit; is that correct?

1   A.  Yes.

2   Q.  We've talked about requirements that certain reports should

3   be made available pertaining to detention, and is this the

4   policy that is addressed -- addressing that issue?

5   A.  Yes.

6         MR. CHALMERS:  I move for admission of Exhibit 905.

7         MR. MCINERNEY:  No objection, Your Honor.

8         THE COURT:  905 is received.

9   BY MR. CHALMERS:

10  Q.  Now, to begin with 905 has an effective date 9/19/22.  Does

11  that mean that's the date that it replaced the previous policy

12  that we've talked about?

13  A.  Yes.

14  Q.  And going to the form FOR-44 in the exhibit, that has the

15  same effective date; is that correct?

16  A.  It does.

17  Q.  Were those changes to the policy in that form adopted at

18  the same time by the highway patrol?

19  A.  They were.

20  Q.  Now, the form gives a purpose.  Would you read that into

21  the record, Roman numeral I?

22  A.  "To provide a record of events that occur when a subject or

23  subjects are detained based on articulable reasonable suspicion

24  or probable cause for the purpose of a canine sniff.  This form

25  allows supervisors to monitor the legality of detentions, track

1  the frequency of detentions, and show training deficiencies and

2  improve transparency."

3  Q.  The first page of Exhibit 905 under general provisions F

4  provides -- would you read that into the record?

5  A.  "Detentions for canine sniffs shall only be conducted when

6  the officer has articulable reasonable suspicion or probable

7  cause to believe that the occupants of a vehicle are involved

8  in criminal activity and all such detentions shall be

9  documented on a Vehicle Detention Report, the HP-141."

10  Q.  Now, was this a different requirement that was in place

11  than what was in place before September 19th, 2022?

12  A.  Yes.

13  Q.  How so?

14  A.  With the advent of the detention form, Vehicle Detention

15  Report.

16  Q.  Before September 19, '22, if there was a detention that

17  resulted in a forfeiture or an arrest, was there a requirement

18  that a report would be completed by a trooper?

19  A.  Yes.

20  Q.  What was that requirement?

21  A.  If an arrest or forfeiture was completed by a trooper, then

22  the applicable arrest reports or an offense report or narrative

23  would have had to have been -- and a case number obtained would

24  have been had to have been completed.

25  Q.  And in the reports that were provided, were troopers or --

1    and those reports that you just described, were troopers

2    instructed to outline the basis for any reasonable suspicions

3    they had in the event that the detention was based on

4    reasonable suspicion?

5              MR. MCINERNEY:  Objection.  Objection to leading.

6              THE COURT:  Sustained.

7    BY MR. CHALMERS:

8    Q.  In those reports, what were troopers trained to say about

9    reasonable suspicion, if anything?

10   A.  Where an arrest or forfeiture was made?

11   Q.  Yes.

12   A.  Everything they possibly could within the confines of the

13   applicable laws and as it pertained to that stop and that

14   ultimate arrest and seizure.

15   Q.  Then if there was no arrest or no forfeiture before

16   September 19, 2022, what responsibilities, if any, did troopers

17   have to include a report outlining their reasonable suspicions?

18   A.  Other than the KHP canine that would have been summoned to

19   the scene to perform a canine sniff, the trooper would not have

20   had to complete a report.

21   Q.  And the canine sniff report, what was the training with

22   respect to including the detailed statements of reasonable

23   suspicion?

24   A.  What was the training?

25   Q.  Yes.

1   A.  It was prepared in policy and rolled out via PowerDMS as

2   well as any additional questions that may be solicited from out

3   in the field and some additional commentary provided to each

4   troop commander.

5   Q.  If the -- if the trooper who ran the dog is different than

6   the trooper that conducted the stop and the detention, what was

7   the practice of outlining the basis for reasonable suspicion,

8   if any?

9        MR. MCINERNEY:  I'm going to object to the leading.

10       THE COURT:  I'm going to overrule this one.  He saved

11  the question by asking if any.

12       THE WITNESS:  Prior to this form?

13  BY MR. CHALMERS:

14  Q.  Yes.

15  A.  There -- there was no requirement for the trooper making

16  the stop to complete any paperwork.

17  Q.  Now, under the new form effective 9/19/22, what are the

18  requirements for identifying reasonable suspicions, if any?

19  A.  What are the requirements?

20  Q.  Yes.

21  A.  Well, that's on each individual officer or trooper that is

22  conducting the traffic stop feeling like they have uncovered

23  criminal activity afoot.

24  Q.  Well, procedurally how do they -- do they record that

25  somehow?

1    A.   They do on this -- on a specific form.

2    Q.   And is that the form, FOR-44?

3    A.   It is.

4    Q.   Now, the form FOR-44 has routing disposition on page 9 of

5    11.  Do you see that?  It's actually page 406, yeah.

6    A.   I do.

7    Q.   And there it talks about the form shall be sent to the

8    immediate supervisor as well as being sent to Troop N, which is

9    your troop; is that correct?

10   A.   In -- not necessary -- part of what you said is true.  As

11   you get on down further, yes.

12   Q.   Okay.  What is that that is not right?

13   A.   Well, I'm looking at something different on the screen.

14   I'm sorry, can you maybe -- yes, you are correct.  That's

15   better.

16   Q.   So the immediate supervisor is required to look at this

17   form as it's completed by the trooper --

18   A.   Yes.

19   Q.   -- is that the procedure?

20        And then your troop is also to review the form?

21   A.   Yes.

22   Q.   And you've described how you use the data that you have

23   employed when you get these forms; is that correct?

24   A.   Yes.

25   Q.   Well, is someone looking at the forms in your office to

1   make sure that the reasonable suspicions outlined are

2   appropriate?

3   A.   Yes.

4   Q.   And is that also the supervisor's responsibility under the

5   routing that we just talked about?

6   A.   Yes.

7   Q.   The form itself, is that what is the last two pages of

8   Exhibit 905?

9   A.   It is.

10  Q.   The form has -- did you have any involvement in preparation

11  of the form?

12  A.   I did.

13  Q.   What involvement did you have?

14  A.   Initiating the structure of the form and what it needed to

15  contain.

16  Q.   The form has statements in it that says vehicle make,

17  vehicle model, registration state, origin, destination, purpose

18  on its first page.  Do you see what I'm referring to?

19  A.   I do.

20  Q.   What is the intent as you, the drafter of the report, as to

21  how that information would be part of what the trooper is

22  preparing?

23  A.   Well, a lot of that information at the top of the form is

24  similar to what is already on arrest reports, offense reports,

25  our ticketing system, digiTicket.  It's metrics gathering.

1   Q.  Is that information part of the laundry list provided below

2   where you would check either yes, no, or not applicable on

3   possible basis of reasonable suspicion?

4   A.  No.

5   Q.  And are troopers required to, in addition to completing the

6   checklist, provide a synopsis of their -- of their basis for

7   their reasonable suspicion?

8   A.  Yes.  We request that everything that they mark on the

9   front page as a basis for a reasonable suspicion be articulated

10  in a condensed fashion in their officer synopsis and that they

11  need to go further and write a narrative and attach it to this

12  form.

13  Q.  Then on the last -- or the second page of the form there is

14  the supervisory report -- or review, and it has a name for the

15  supervisor, a signature and date.  We talked about how it's to

16  be sent to the supervisor.  What is the supervisor supposed to

17  do with the report?

18  A.  Review the report and its contents and ensure that he

19  agrees that there was reasonable suspicion or potentially not

20  reasonable suspicion to detain someone.

21  Q.  And then it says vehicle detention review.  What is that on

22  the form?  Who performs that review?

23  A.  The immediate supervisor.

24  Q.  You mentioned 10-day or 15-day reports earlier.  What are

25  those?

1   A.   Summarizes each trooper or officer's activities on a

2   day-to-day basis:  how many tickets they write, how many

3   warnings they write, how many accidents they investigate, how

4   many people they arrest.  There's 30 or 40 different metrics on

5   there for each trooper/officer's day-to-day activities.

6   Q.   In your position in Troop N before the new form, you would

7   -- you would get reports concerning forfeitures.  We talked

8   about that.  Did you, in that connection, look for trends --

9   look for in whether there were departures from proper

10  procedures?

11  A.   Yes.

12  Q.   The -- you were asked about you have to have a large number

13  of traffic stops by counsel here this morning.  Potentially, as

14  part of forfeiture -- or excuse me, as part of interdiction

15  activities, why is it you need a large number of traffic stops?

16  A.   To be successful.

17  Q.   Well, let me ask it this way:  Do you have an idea of

18  approximately what the percentage of traffic stops lead to --

19  to a post traffic stop detention?

20  A.   I do not.

21  Q.   In your experience, how frequent is it that the traffic

22  stops that you make for traffic violations result in a post

23  stop detention?

24          MR. MCINERNEY:  Objection to relevance.

25          THE COURT:  What's the relevance?

1        MR. CHALMERS:  Well, I think it's going to the point

2    that counsel makes that you have to make a bunch of traffic

3    stops to be able to have detentions.  He does traffic work

4    himself, he's testified to that, and he needs to do -- as a

5    captain, he should be able to describe generally if he knows

6    what ratio -- general ratio there is between the number of

7    stops he has to make and those that result in detention.

8        MR. MCINERNEY:  That was not the question he asked

9    him, if his experience in his stops what the ratio was, and

10   it's not relevant for this case.

11       MR. CHALMERS:  His experience is relevant.

12       THE COURT:  I mean, he can answer.  I don't know that

13   it really is relevant, but it -- I am curious about how often

14   all these totality of the circumstances result in actual

15   apprehensions and hits for drugs.  But, again, it's just

16   anecdotal; it doesn't tell us very much about the actual

17   procedures of the department as a whole.

18   BY MR. CHALMERS:

19   Q.  Are you aware of how often traffic stops result in alerts

20   for drugs?

21   A.  I don't have the data sets in front of me, but, yes, I

22   could tell you.

23   Q.  From your recollection of those data sets, do you have a

24   general idea of what the percentages are?

25   A.  I would be comfortable saying approximately 10 percent of

1   the time some level of contraband is located and out of the

2   hundreds of thousands of traffic stops we make each year.

3          THE COURT:  So 90 percent of them result in nothing;

4   they're just wasting time?

5          THE WITNESS:  I wouldn't -- no, ma'am, Your Honor, I

6   would not say that.

7          THE COURT:  What would you say?

8          THE WITNESS:  I would say the other times -- that is

9   specific for narcotics related seizures.  There could be

10  warrant arrests.  There could be driving while suspended.  It

11  could be a stolen tag, a stolen vehicle.  It could be a suspect

12  that had murdered his family and is fleeing the state of Kansas

13  to Oklahoma.  It could be a robbery suspect.  It could be

14  identity theft and credit card embossers.  We've run across

15  those quite often recently.  Human trafficking, also

16  something -- criminal activity we're seeing more and more of

17  out there.

18         So if you're specifically germane to large amounts of

19  drug seizures, and I categorize that as a 1 pound or more of --

20  of most drugs, about 10 percent of the time there are large

21  amounts located or reportable amounts located.

22  BY MR. CHALMERS:

23  Q.  10 percent of the time of what?

24  A.  The traffic stop.

25  Q.  Of each there are -- I think there was testimony there are

1   over a million traffic stops over the course of about five

2   years in Kansas?

3   A.  Yeah, that would be accurate.  About 300,000 a year is what

4   number I was using, 300,000 a year and about 3,000 searches

5   each year.

6   Q.  Okay.  So when --

7   A.  This is --

8   Q.  -- you're talking about the searches, the 3 percent, the

9   searches are approximately 10 percent of the stops?

10  A.  From what I can recall, yes.  I have absolutely zero

11  information sitting in front of me.

12  Q.  Okay.  I understand.

13      And then when you talk about the 10 percent then, is that

14  of the 3,000 searches or is that --

15      MR. MCINERNEY:  Judge, I'm going to object to this

16  line because there's no foundation.  The witness just told you

17  he doesn't know.  He doesn't have the data in front of him.

18  And so to ask him pure speculation and without specific

19  reference to data, I'd object.

20      THE COURT:  Well, and, I mean, part -- part of the

21  issue is that the examples you gave, things like stolen

22  vehicles and fugitives and things like that, that's not

23  something that you would discover by prolonging a roadside

24  stop; that would be information that came to you right away

25  when you stop the vehicle; right?

1        THE WITNESS:  Not necessarily on a -- let's use human

2   trafficking, for example --

3        THE COURT:  I'm not talking about human trafficking.

4   I'm talking about things like -- things that involve the

5   registration, driver's license and all those points of

6   information that you verify immediately after a stop, because

7   we're not concerned about those in this case.

8        THE WITNESS:  The registration on a vehicle could be

9   correct at face value.  But if you check the VIN information,

10  that might show a discrepancy, or the federal label or maybe

11  equipment that's being hauled on a trailer that is not -- you

12  can't actually see the -- the VIN visibly at the time of the

13  traffic stop.

14       THE COURT:  I mean, if there's data on this, it seems

15  like we should be looking at the actual data instead of his

16  recollection of what the data might show.

17       MR. CHALMERS:  I don't disagree, Your Honor.  I'm

18  ready to move on.  I just wanted to clarify what his answer is

19  when he gave 10 percent.  We kind of opened that door, and I

20  don't know whether he's talking about the 10 percent of the

21  3,000 searches that are conducted or if he's talking about

22  10 percent of the 300,000 stops that are conducted.  That's

23  what I was trying to clarify.

24       MR. MCINERNEY:  Judge, that's been asked and answered

25  and his answer was I don't know.

1          THE COURT:  Do you know?  I mean, is that your answer?

2          THE WITNESS:  I don't know anything conclusive.  I can

3    say we make about 300,000 traffic stops a year and about 3,000

4    searches a year.

5    BY MR. CHALMERS:

6    Q.  And but when you talked about 10 percent show contraband,

7    what is that -- what are you --

8    A.  I misspoke.

9          MR. MCINERNEY:  I'm sorry to interrupt you, captain.

10          I'm going to object again.  It is speculation.  He

11   just said he doesn't have the data in front of him, so he's

12   reduced to making estimates or guesses.  And there's been no

13   foundation laid for his knowledge of the data that's collected

14   or not collected actually and -- and the basis for what he's

15   testifying about.

16          THE COURT:  Let's get the actual data if we're going

17   to talk about this.

18          MR. CHALMERS:  Your Honor, all I'm trying to do is

19   have a -- I don't want counsel arguing the 10 percent of all

20   stops.  It's only 10 percent of -- I don't know what 10 percent

21   he's talking about result in contraband.

22          THE COURT:  He said 30,000 traffic stops a year.

23   3,000 result in contraband.  So that seems pretty obvious what

24   he's talking about.  That's -- the math is 10 percent right

25   there.

1          MR. CHALMERS:  Okay.  And so I guess the only

2     follow-up question I'm trying to get at, and I think he hasn't

3     -- he says he doesn't know, is what percentage of that 300,000

4     traffic stops a year are -- result in a roadside detention for

5     a canine sniff?

6          MR. MCINERNEY:  Same objection, judge.

7          THE COURT:  Do you know?

8          THE WITNESS:  I do not know.

9     BY MR. CHALMERS:

10    Q.   Now, you were asked about travel discussions when -- when a

11    trooper would first come up to a motorist after a stop, and

12    we're shown a slide saying interdiction talking about travel

13    could be the most important thing.  Why do you talk about

14    travel with a motorist at the very beginning?

15    A.   There again it's to find out if the driver can answer the

16    very most basic question to gauge whether you have someone that

17    is -- has their faculties about them, see if they are going to

18    be truthful from the very onset as best you can gauge if they

19    can tell you where they're coming from, where they're going,

20    and that's even independent of interstate travel.  It's also

21    used to put the motorist at ease to a degree.

22    Q.   Talking about training, and we've talked generally about

23    what your training was, but what involvement have you had in

24    preparation of training for troopers?

25    A.   What preparation have I had?

1  Q.  Preparation of training materials.

2  A.  Well, I review any -- any training materials that are to be

3  given to new classes, existing classes through recruit school

4  or advanced interdiction or to outside agencies.

5  Q.  Have you acted as a trainer?

6  A.  In the past I have.

7  Q.  And with respect to the training that is -- you provided,

8  what generally was it?

9  A.  Interviews, interrogations, a -- long-term criminal

10  investigations, compartments that are used to conceal

11  contraband in vehicles.

12  Q.  Have you acted as, or did you in the past, as a trainer in

13  the interdiction classes?

14  A.  I did.

15  Q.  And you no longer do that I think is what you indicated?

16  A.  Correct.

17  Q.  But what role have you had in the materials that are used

18  by the folks that continue to teach these interdiction classes?

19  A.  Review them for applicability to make sure that the -- our

20  legal staff has reviewed them as well as the commander of the

21  training facilities reviewed and all the approvals for

22  presentation are -- are notated before actually rolling the

23  class out.

24  Q.  Are you then familiar with the training that is provided by

25  Kansas Highway Patrol concerning traffic stops, roadside

1    detentions, consent searches?

2    A.   Yes.

3    Q.   How so?

4    A.   Reviewing their lesson plans and the PowerPoints and any

5    associated media that they would like to use during their

6    training.

7    Q.   Have you also attended training on these subjects?

8    A.   I have.

9    Q.   In the continuing training that troopers received, have you

10   attended training that touches on these subjects or addresses

11   these subjects?

12   A.   I have.

13   Q.   Does KHP, in its training, address whether a trooper may

14   conduct or direct a canine sniff for drugs based solely on the

15   trooper's belief that the driver is traveling to or from

16   Colorado?

17   A.   No.

18   Q.   They don't train on that?

19   A.   Do they train that they --

20   Q.   Yeah.

21   A.   -- can do that based on that?

22   Q.   Now you may be a step ahead of me.  Does the training

23   address that?

24   A.   Yes.

25   Q.   And what does the training say about solely relying on the

1   belief that a driver is traveling to or from Colorado?

2   A.  You cannot do that.

3   Q.  Does KHP training address whether a trooper may extend a

4   vehicle stop or search a vehicle based only on a driver's

5   travel origin or destination?

6   A.  No.

7   Q.  It doesn't train on that?

8   A.  I'm sorry, yes, it does train on that.

9   Q.  What is the training?

10  A.  That you cannot do that.

11  Q.  Does KHP training address whether troopers may include the

12  state of citizenship as a permissible basis upon which to

13  justify a detention and search out-of-state motorists and to

14  detain motorists for nothing more than out-of-state license

15  plate, does it provide that training?

16  A.  Yes.

17  Q.  And what does the training say?

18  A.  That you cannot do that.

19  Q.  Let me show you what is marked as Exhibit 901 if you could

20  actually find that.  That's a big, thick binder.  If you'd turn

21  in 901 to page 498.  You see the page numbers are at the very

22  top?

23  A.  Okay.  I'm there.

24  Q.  And looking at Exhibit 498, it says, "Ordinarily this also

25  includes questions relating to motorist's travel plans," and

1  then explains travel plans typically are related to the purpose

2  of a traffic stop because the motorist is traveling at the time

3  of the stop, and then it gives an example.  Is that consistent

4  with the training that you have either reviewed or approved or

5  participated in at the Kansas Highway Patrol?

6  A.  It is.

7  Q.  And that's basically an explanation of what I think you

8  said as to why travel plans are something you bring up in your

9  stop?

10  A.  Correct.

11  Q.  If you look to page 513 of the exhibit, so that's going to

12  be a few pages down, it provides an officer may also inquire

13  about the driver's travel plans and the identity of individuals

14  in the vehicle, and is that consistent with the training that

15  you've received from the highway patrol?

16  A.  It is.

17  Q.  Moving backwards to page 29.  When you're there, let me

18  know.

19  A.  Okay.  I'm there.

20  Q.  That's a description of what is reasonable suspicion.  Do

21  you see that?

22  A.  I do.

23  Q.  Are troopers trained on what is reasonable suspicion?

24  A.  They are.

25  Q.  And what are troopers told, if anything, about the

1  necessity of reasonable suspicion in order to detain somebody

2  absent consent?

3  A.  You must have reasonable suspicion to detain someone absent

4  consent.

5  Q.  And are they trained that it is based on the totality of

6  the circumstances and is viewed in terms as understood by those

7  versed in law -- the field of law enforcement?

8  A.  Correct.

9  Q.  You go to -- go back to the very back, 528.

10  A.  Okay.

11  Q.  This is a slide that refers to a Supreme Court decision,

12  and I won't read it for you but it talks about reasonable

13  suspicion as being the totality of the circumstances.  Is that

14  the training that the Kansas Highway Patrol has provided to its

15  troopers?

16  A.  Yes.

17  Q.  And then looking back at 42 --

18  A.  Okay.

19  Q.  -- there are reasonable suspicion factors that are

20  discussed.  Is the -- is these -- is this the sort of

21  discussion as part of the training that you've been at and

22  approved to the Kansas highway troopers?

23  A.  It is.

24  Q.  So when you were asked if there was training on whether a

25  driver's travel origin or destination could be used to extend a

1   stop or a search based on only that, is it this sort of

2   training that you were talking about?

3   A.  It is.

4   Q.  Switching to Exhibit 901 at 583 --

5   A.  Okay.

6   Q.  -- this refers to the Fourth Amendment and talks about

7   consent.  Is there training that is provided of this character

8   to troopers on what consent is necessary --

9   A.  There is.

10  Q.  -- to -- well, to conduct a search or to detain someone?

11  A.  Yes.

12  Q.  And is this consistent with the training that's received

13  that the consent must always be all the following:  knowing,

14  intelligent and voluntary?

15  A.  It is.

16  Q.  Going to 749 in Exhibit 901, are troopers trained that in

17  -- that consent is based on the totality of the circumstances

18  on whether it is knowing, intelligent and voluntarily given?

19  A.  It is.

20  Q.  And if it isn't those three, what is the training?  If you

21  don't have knowing, intelligent and voluntarily given consent,

22  what is the training?

23          MR. MCINERNEY:  Objection.  Leading.

24          THE COURT:  Sustained.

25  BY MR. CHALMERS:

1  Q.  What is the training if you don't have knowing, intelligent

2  and voluntary given consent?

3          MR. MCINERNEY:  Same objection.  Same question; same

4  objection.

5          THE COURT:  I'm kind of confused by what your question

6  is.  Are you asking what if -- if there's no knowing, voluntary

7  and intelligent consent what are they training officers to do?

8          MR. CHALMERS:  Yes.

9          THE WITNESS:  All right.

10          THE COURT:  You can answer that.

11          THE WITNESS:  If you don't have all three, you don't

12  have valid consent.

13  BY MR. CHALMERS:

14  Q.  Turning to page 9 -- 397 of Exhibit 901, that slide shows

15  potential concerns about consent.  Do you see what I'm

16  referring to?

17  A.  I do.

18  Q.  Are troopers provided training about what concerns there

19  might be as to whether under the totality of the circumstances

20  the consent is those three things we just talked about?

21  A.  Yes.

22  Q.  And with respect to these concerns, what generally are --

23  is the instruction to troopers then?

24  A.  That you don't --

25  Q.  What are they told?

1   A.  To release the violator.

2   Q.  If you have what?

3   A.  If you don't -- if you don't have reasonable suspicion, you

4   don't have valid consent.

5   Q.  You've been present in training concerning the Kansas

6   two-step; is that correct?

7   A.  Yes.

8   Q.  And you've reviewed the materials and approved the

9   materials and the training concerning the quote/unquote

10  two-step; is that right?

11  A.  Yes, depending on which exhibit you're talking about.

12  Q.  Okay.  Well, I want you to look at 901 page 284 please.

13  A.  Okay.

14  Q.  That references the *Ohio* decision.  And I'm not sure we

15  didn't already talk about this, but is it the -- is the

16  training of the highway patrol troopers that there is no bright

17  line for the end of an investigatory detention and the

18  beginning of a consensual encounter?

19  A.  That's correct.

20  Q.  And that you don't need to use the magic phrase like free

21  to go?

22  A.  That's correct.

23  Q.  In fact, I think counsel showed you a slide saying you

24  probably ought to avoid using the phrase free to go is what the

25  current training is; is that right?

1    A.   Yes.

2    Q.   Why?

3    A.   To not confuse the situation.

4    Q.   And in the training at 281, so back a couple pages in 901,

5    the training talks about a definition of the two-step and then

6    says not necessary but also not prohibited.  Is that the

7    training that -- that is provided by the highway patrol?

8    A.   Yes.

9    Q.   Does the highway patrol require its troopers to use a

10   two-step?

11   A.   No.

12   Q.   In Exhibit -- same Exhibit 901, page 285 it says, "To

13   require physical disengagement in order for a subsequent

14   encounter to be deemed consensual would be to require a bright

15   line that the U.S. Supreme Court says can't exist."  Maybe we

16   talked about this before, maybe we haven't, but is that the

17   training the highway patrol provides?

18   A.   Yes.

19   Q.   And then the question is posed in -- in Exhibit 901 on

20   page 283 as part of training, and it says, "If you decide to

21   two-step then ask if the driver will speak to you and they

22   decline, what do you do?"  What is the training of the highway

23   patrol as to what the trooper is to do?

24   A.   If they decline and you're in a consensual encounter, then

25   you are to let them go.

1   Q.  In Exhibit 96 that was introduced last Friday at

2   page 29203, it's up on the screen, it references a decision,

3   *State versus Gonzalez*, Kansas Court of Appeals decision I

4   think.  Are you familiar with that decision?

5   A.  Yes.

6   Q.  And in that *Gonzalez* case, do you recall basically what the

7   concern was as to whether the trooper had consent or not?

8   A.  I do.

9   Q.  What was that?

10  A.  That he did not have consent.

11  Q.  And did you remember what the basis of the court's

12  conclusion that he lacked voluntary consent?

13  A.  He was touching the vehicle at the conclusion of the

14  traffic stop while trying to gain consent.

15  Q.  What is the training of the Kansas Highway Patrol, if you

16  know, concerning touching the vehicle?

17  A.  You're not to do that once you're attempting a consensual

18  encounter.

19  Q.  You were asked on Friday about the *Vasquez versus Lewis*

20  case.  Do you remember that line of questioning?

21  A.  Yes.

22  Q.  And in the *Vasquez* case, which is Exhibit 75, I've got a

23  couple things I want you to look at if I can get to it.

24          THE COURT:  Let's take a recess at 10:30.

25          MR. CHALMERS:  Yeah.  I'm sorry, yeah.

1    BY MR. CHALMERS:

2    Q.  If you look at the bullet point two in the *Vasquez* -- do

3    you have Exhibit 75 up there?  If not, can you read it on the

4    screen?

5    A.  Yep, I can do that.  Yes, No. 2.

6    Q.  Yeah.

7    A.  "We now turn to whether an officer" --

8            MR. MCINERNEY:  I'm sorry to interrupt.

9            Judge, 75 is already in evidence, and I don't know

10   what the relevance is of this officer reading the -- the

11   Section 2 there.

12           MR. CHALMERS:  I just want him to read it to himself

13   but that --

14           THE COURT:  Okay.

15   BY MR. CHALMERS:

16   Q.  The question that I want to propose is, as we analyze these

17   facts in the totality of the circumstances, talks about the

18   most troubling justification, and that is Vasquez's status as a

19   resident of Colorado.

20       And, again, with respect to the highway patrol's training

21   based on the policies we looked at and the materials that you

22   reviewed, what is the training on use of residence of Colorado

23   in forming reasonable suspicion?

24   A.  It's not to be utilized as a sole factor.

25   Q.  And then it talks about, well, that currently 25 states

1    permit marijuana use for medical purposes, and it lists those.

2    What is the training that the highway patrol provides

3    concerning the -- the fact that the driver is departing from a

4    state that has legalized marijuana in the reasonable suspicion

5    calculous?

6    A.   It's given little weight.

7    Q.   And is it -- how is it to be considered with the other

8    factors or is it?

9    A.   The totality of all the factors must be considered.

10   Q.   You were then asked whether the *Vasquez* holding --

11        Well, one other point in here.  It talks about absent a

12   demonstrated extraordinary circumstance, the continued use of

13   state residency as a justification for the fact or contribution

14   of a stop is impermissible, and I think it also talks about

15   license.

16        What is the status of Kansas Highway Patrol's training with

17   respect to use of the state of residency or the license, that

18   is the driver's license of the vehicle -- or the driver and the

19   vehicle?

20   A.   We don't condone the use of that.

21   Q.   You were then asked about your deposition testimony on

22   Friday, and at page 111 I think counsel asked you to read, "We

23   are maintaining our position independent of *Vasquez* decision.

24   As far as moving forward, we do not rely on the factors that

25   are presented in *Vasquez* as it relates to the state of origin

1  of the license plate."  Do you see what I've read?

2  A.  I do.

3  Q.  Okay.  Now, I want to put that in context.  At page 110 of

4  your deposition at line 1 Mr. McInerney --

5       MR. MCINERNEY:  Judge, I'm not sure what counsel's

6  doing with this witness's deposition.  If he's using it for

7  impeachment, he hasn't laid that foundation.  It appears as

8  though he's just reading portions -- selected portions into the

9  record.

10      MR. CHALMERS:  Well, counsel attempted to use a

11  portion of this deposition --

12      THE COURT:  Why don't you take it down for a second.

13      Go ahead.

14      MR. CHALMERS:  Counsel attempted to use a portion of

15  the deposition, Your Honor, as impeachment and took it out of

16  context, and what I want to do is -- be able to do is show the

17  context of the question and the answer that was given.

18      THE COURT:  Okay.  Well, I think you should ask him

19  what the context was and what he understood the question to be,

20  but just reading in the deposition would not be appropriate.

21      MR. CHALMERS:  Okay.  The problem --

22  BY MR. CHALMERS:

23  Q.  Well, when you were asked, "We are maintaining our position

24  independent of *Vasquez* decision.  As far as moving forward,"

25  what was the context of the answer of the -- or you gave that

1    answer.  What was the context of the answer that you were

2    giving?

3    A.  That we use the totality of the circumstances in the --

4    determining whether there's reasonable suspicion to detain

5    someone for a canine deployment or not.

6    Q.  And you said, "As far as moving forward after the *Vasquez*

7    decision," what were you referencing?

8    A.  Our training.  Our training had touched on that ad nauseam.

9    Q.  And you're talking about training before *Vasquez*?

10   A.  Correct.

11   Q.  Well, is it your testimony then that nothing was different

12   -- that there was nothing different that came out of the

13   *Vasquez* decision as far as what you had previously trained?

14   A.  We continued to train before the *Vasquez* decision and after

15   it's the totality of the circumstances.  And we highlighted the

16   *Vasquez* decision in subsequent training once that was ruled

17   upon, but it just reinforced our current -- our current and

18   previous methodologies.

19          MR. CHALMERS:  Exhibit 101 I have -- I show as being

20   in evidence.  Is that -- is that consistent with the court's

21   records, because if it is --

22          COURTROOM DEPUTY:  Yes.

23   BY MR. CHALMERS:

24   Q.  I want to show you what's been marked as Exhibit 101, and

25   you can see from this that this is an e-mail from John Rule to

1   -- excuse me, from others within the highway patrol.  Do you

2   see that?

3   A.   Yes.

4   Q.   And who is John Rule?

5   A.   He was a lieutenant, a supervisor over our interdiction --

6   some of our interdiction personnel.

7   Q.   If I remember correctly, in your previous testimony you

8   supervised him; is that correct?

9   A.   Yes.

10  Q.   And in Exhibit 101 there is a -- there's also an e-mail a

11  little bit below that where your name is mentioned.  Do you see

12  that?

13  A.   Yes.

14  Q.   In Exhibit 101, the highlighted part, it says, "In my

15  opinion, the trooper made a big mistake saying he was

16  interested in the truck because it had California plates.  A

17  license plate is never a factor for a traffic stop, and failed

18  to articulate any reasonable suspicion before calling for a

19  dog."  Do you see what I'm talking about?

20  A.   Yes.

21  Q.   Is that what the training was, that the license plate is

22  never a factor in reasonable suspicion?

23  A.   Yes.

24  Q.   Now, as the individual that is responsible for the review

25  of detention reports and in your supervisory role and review of

1   -- of troopers as well as the review of the reports associated

2   with forfeitures and arrests, do you feel that you are familiar

3   with whether there are or are not patterns of violations by

4   troopers in the course of roadside detentions?

5           THE COURT:  Why don't we take -- let's take our recess

6   here --

7           MR. CHALMERS:  Okay.

8           THE COURT:  -- and we'll deal with that question when

9   we come back.  And plaintiff's counsel has an objection, so

10  we'll take that up also.  Let's take a 15-minute recess and

11  resume at 10:45.  Court's in recess.

12      (Recess.)

13          THE COURT:  All right.  Where were we?  What was the

14  question you asked, Mr. Chalmers?

15          MR. CHALMERS:  I think I'll rephrase the question,

16  Your Honor.  I'm not sure it will be the exact same one.  I

17  don't know.

18  BY MR. CHALMERS:

19  Q.  The question I was getting at is, in your role as a

20  supervisor or your review of data as you have explained, have

21  you observed any sort of pattern of multiple violations of

22  highway patrol policy and training concerning roadside

23  detentions?

24  A.  I have not.

25  Q.  Have you reviewed such multiple -- a pattern of multiple

1  violations of KHP training or policy concerning consensual

2  encounters?

3  A.  I have not.

4  Q.  And with respect to a practice, if that's somehow different

5  than a pattern, have you observed any practice of violations of

6  KHP training or policy concerning either roadside detentions or

7  consensual encounters?

8  A.  I have not.

9       MR. CHALMERS:  I don't have any further questions.

10      THE COURT:  Redirect.

11                REDIRECT EXAMINATION

12  BY MR. MCINERNEY:

13  Q.  Was your testimony just now that you are unaware of in

14  practice any violations of constitutional rights in roadside

15  detention situations?

16  A.  In patterns.

17  Q.  But his last question was practice.  You're aware that

18  there are several examples of violations of motorists'

19  constitutional rights in the context of roadside detentions,

20  aren't you?

21  A.  As it pertains to the highway -- Kansas Highway Patrol?

22  Q.  Yes, sir.

23  A.  Yes.

24  Q.  And including the allegations in this case; correct?

25  A.  Correct.

1  Q.  Do you have a Exhibit 905 in front of you?  Thank you.

2     Do you have that in front of you, sir?

3  A.  Yes, sir.

4  Q.  And 905, just to refresh you, is the policy with regard to

5  the completion of a form, I think you call it 144, regarding

6  roadside detentions; correct?

7  A.  141, yes.

8  Q.  141.  My bad.

9  A.  Yeah.

10  Q.  If you would, sir, turn to page 10 of 11 in Exhibit 905.

11  A.  Yes, sir.

12  Q.  This is -- this is the form, is it not, that was introduced

13  and implemented last year -- in September of last year with

14  regard to roadside detentions; correct?

15  A.  Yes.

16  Q.  And you know that September of last year was three months

17  after the close of discovery in this case; correct?

18  A.  I'm not aware of when it closed; I'm sorry.

19  Q.  Directing your attention to page 11, there at the very top

20  subparagraph C indicates that the 141 shall be noted on HP-155.

21  What is HP-155, sir?

22  A.  It's a form acknowledging any other documents that might be

23  submitted with the trooper's case and aren't normally able to

24  be submitted through our normal online reporting system.

25  Q.  Okay.  And it continues "and forwarded to records and to

1   the Professional Standards Unit as a non-electronic document."

2   Correct?

3   A.  Correct.

4   Q.  Have you look a little ways down on that Form 141.  There

5   are -- there's a top block that's bordered by a heavy line, and

6   then just below that about a third of the way down that page on

7   the right-hand side it says registration state, doesn't it?

8   A.  Yes.

9   Q.  And that's the state in which the license plate is

10  registered; correct?

11  A.  Yes.

12  Q.  And then below that on the far left it says origin.  Do you

13  see that?

14  A.  Yes.

15  Q.  And it says destination next to that?

16  A.  Yes.

17  Q.  And it says purpose next to that?

18  A.  Yes.

19  Q.  Okay.  And these are all fields for the troopers to fill

20  out; correct?

21  A.  Yes.

22  Q.  And your testimony is not if -- for instance, a motorist is

23  traveling from Colorado.  Your testimony is not that the

24  trooper would not record Colorado in the origin block, is it?

25  A.  If the driver's saying their origin of their trip is --

1  Q.  Colorado?

2  A.  -- they would.

3  Q.  Okay.  They would record that in that field, wouldn't they?

4  A.  Yes.

5  Q.  In fact, during a routine traffic stop, sir, say for

6  speeding, when an officer asks a driver where he or she is

7  coming from and the driver responds Colorado or some other

8  state that KHP says is a drug source state, the trooper can

9  consider that as one of several factors in forming reasonable

10  suspicion; correct?

11  A.  Not in the manner you're describing, I don't believe, no.

12  Q.  So your testimony is it is inappropriate, among other

13  factors, for a trooper to consider the state of origin?

14  A.  If you're determining it along with the totality of the

15  traffic stop, which could be any number of things a trooper is

16  looking for there, there could have been something, a crime

17  just committed in Colorado that might be important for

18  reasonable suspicion to be included, then it would be.

19  Q.  My question has to do with a routine traffic stop.

20  A.  Routine traffic stop.

21  Q.  Yes, sir, and whether it is appropriate for Kansas Highway

22  Patrol troopers to consider the state of origin of the vehicle

23  they stop?

24  A.  No, not on a routine traffic stop.

25  Q.  Okay.  And that is KHP policy?

1   A.   That I don't know.

2   Q.   Even one factor among 20?

3   A.   For a routine traffic stop --

4   Q.   Yes, sir.

5   A.   -- to determine --

6        It's important for filling out the -- a warning or a ticket

7   or anything else to determine if the driver's an owner of the

8   vehicle and when he or she is reviewing the documents.

9   Q.   And my question is only about origin and I -- I'm --

10  A.   Sure.

11  Q.   -- trying not to ask the same question but I'm also trying

12  to get a clear answer.

13       My question has to do with whether KHP troopers can

14  appropriately consider the state of origin among many factors

15  in determining reasonable suspicion?

16  A.   Potentially.

17  Q.   We -- and when you say potentially, is that -- that's to

18  say it's permissible; correct?

19  A.   It potentially could be permissible based on whatever that

20  traffic stop and potential criminal activity might have

21  surrounding that traffic stop.

22  Q.   In a routine traffic stop; correct?

23  A.   If it's routine -- I mean, if we're separating routine from

24  indicators of criminal activity, if it's routine then, no.

25  Q.   It's not --

1  A.  They were --

2  Q.  -- inappropriate -- sorry.

3  A.  We're not applying reasonable suspicion to a routine

4  speeding violation with no other indicia of criminal activity.

5  Q.  Or a fog line violation; correct?

6  A.  The origin could be important then to see how long they've

7  been driving if you've got a sleepy, drowsy driver, distracted

8  driver.

9  Q.  So that would not be a routine situation is your testimony?

10  A.  That's fairly routine as far as sleepy or distracted

11  drivers.

12  Q.  Or following too closely violation, is that fair, that's

13  routine, isn't it?

14  A.  It's a fairly common violation.

15  Q.  You -- there's some testimony just now with regard to what

16  we've been talking about the Form 141 and what came before

17  that, and I think you testified that -- correct me if I'm

18  wrong -- that prior to 141 after this lawsuit was filed and

19  discovery closed, that there were -- there's a form for the

20  Kansas Highway Patrol to fill out with regard to the use of a

21  canine, a police service dog; correct?

22  A.  Yes.

23  Q.  I'm going to have you, if you would, turn to Exhibit

24  No. 55.  And if it's not in that book, I can make it available.

25  A.  Okay.

1  Q.  And inside page -- Exhibit No. 55, would you turn to

2  page 44 please?

3  A.  Okay.

4  Q.  Do you recognize that form, sir?

5  A.  I do.

6  Q.  What is that?

7  A.  It's a police service dog report that the highway patrol

8  canine handlers complete.

9  Q.  And that's a good example of the report that you referred

10  to as available to troopers prior to the enactment of Form 141;

11  correct?

12  A.  It's available only with the canine -- the troopers that

13  handle a canine.

14  Q.  Okay.  So this is only for -- only to be completed by

15  canine handlers; correct?

16  A.  Correct.

17  Q.  So if a trooper called for assistance, the assistance of a

18  canine handler after making a stop, the trooper that made the

19  stop doesn't have to fill this out; correct?

20  A.  Correct.

21  Q.  And the canine officer only knows what the trooper who

22  pulled him over has to say about reasonable suspicion; correct?

23  A.  Potentially.  If they're working in tandem or another

24  agency, I don't know; that's pretty broad.

25  Q.  Well, I'll make it more specific.  Provided that a trooper

1  pulls over a motorist for a routine traffic violation and then

2  contacts a canine officer, the -- the canine officer, once he

3  or she arrives, only knows what the trooper -- the initial

4  stopping trooper says about the reasonable suspicion; correct?

5  A.  Yes.  If he's not otherwise involved in the traffic stop,

6  that would be correct.

7  Q.  And if you would, take a look at that form.  I think the

8  whole form is right there at page 44, and point out for me

9  where reasonable suspicion factors are listed.

10  A.  It's not on the front page.

11  Q.  Okay.  And it's a two-page form; correct, sir?

12  A.  Yes.

13  Q.  The second page provides for a narrative; right?

14  A.  Correct.

15  Q.  And in this example, and understanding that this is -- this

16  is used for example purposes, in this particular example the --

17  the narrative regarding reasonable suspicion is in that third

18  bullet point down where it says, "Based on several indicators,

19  I believe criminal activity was present:  refused consent to

20  search the vehicle."  Do you see that second page, sir?

21  A.  Yes.

22  Q.  Did I read that accurately?

23  A.  Yes.

24  Q.  Other than that, there's nowhere on that two-page form for

25  a trooper -- a canine officer or any trooper to specify

1   reasonable suspicion, is there?

2   A.  Correct.

3   Q.  And in September that was -- that was sort of -- supplant

4   is the wrong word, but in September when 141 -- sorry, let me

5   specify.

6       The policy enacted in last September is policy FOR-44;

7   correct?

8   A.  Yes.

9   Q.  And that was the very first time that troopers had been

10  required to document their reasonable suspicion for roadside

11  detentions that resulted in canine searches -- canine sniffs;

12  correct?

13  A.  Where no contraband was located, yes.

14  Q.  Right.

15      Without an arrest or a seizure --

16  A.  Right.

17  Q.  -- or an accident, no report at all; correct?

18  A.  Correct.

19  Q.  And that was 8-9 months ago; right?

20  A.  Yes.

21  Q.  You testified early in response to the questions from the

22  state's counsel regarding training and commissioning and the

23  policies that are -- that troopers are required to say that

24  they read.  Do you remember that testimony?

25  A.  Yes.

1    Q.  Do you have an iPhone?

2    A.  I do.

3    Q.  Then you know that the user agreement on an iPhone is

4    something you can scroll all the way through all 300 pages of

5    it, click a box and then you're done; right?

6    A.  Yes.

7    Q.  And that's the way the KHP policies work, isn't it, a

8    trooper can access the policy, scroll all the way to the

9    bottom, check a box and they're done; right?

10   A.  Sometimes there are tests required or questions, yes, so --

11   Q.  I think you --

12   A.  -- not all the time.

13   Q.  Sorry.

14   A.  Not all the time is just a click and accept.

15   Q.  And the click and accept indicates that the trooper has

16   read and understands the policies; right?

17   A.  Yes.

18   Q.  Even if he or she scrolled to the bottom and just clicked;

19   right?

20   A.  Yes.

21   Q.  Now, certain supervisors can choose to quiz or test their

22   supervisees; correct?

23   A.  They could.

24   Q.  But it's not required, is it?

25   A.  No.

1  Q.  And there's no -- there's no regular testing or quizzing

2  about KHP policies for troopers; correct?

3  A.  Actually, we have those every quarter.

4  Q.  Describe for me what you're talking about.

5  A.  One of them's blood born pathogens.  Gosh, I'm trying to

6  remember.  Pursuits.

7  Q.  Tell me what you're describing, sir.

8  A.  So every quarter we must take a test on various portions of

9  policies that are of relevance to the patrol.  One of them

10  being blood born pathogens, watch a video and take a test

11  afterwards.  One of them is on pursuits.  You have to review

12  pursuits at a certain quarter of each year.  One is on use of

13  force.  So there's certain policies out there that are just not

14  click "I accept that I acknowledge I've read the policy."

15  There are certain policies out there that do require a test or

16  further exertion, as it were, by one of our employees.

17  Q.  And those -- the subjects for those tests or those reviews

18  that you just described is determined by who?

19  A.  Ultimately the superintendent.

20  Q.  And it's -- his selections are random; fair to say?

21  A.  I wouldn't say that.

22  Q.  The -- you talked also about -- in this context about

23  15-day reports.  Do you remember that testimony?

24  A.  I do.

25  Q.  And you're familiar with the content of 15-day reports

1   because you have to review them being a supervisor; right?

2   A.   Currently do not have to review them.  As a first line

3   supervisor, you have to review them.

4   Q.   In your experience as a first line supervisor --

5   A.   Yes.

6   Q.   -- you've reviewed your share of 15-day reports; right?

7   A.   Yes.

8   Q.   And it's true, isn't it, that there's not a field anywhere

9   in those 15-day reports that requires troopers to list roadside

10  detentions or canine sniffs; correct?

11  A.   Canine sniffs or --

12  Q.   Correct, canine sniffs that don't result in, as we said, an

13  arrest, a seizure or an accident?

14  A.   Correct.

15  Q.   And your review of those -- as a first line supervisor,

16  your experience is that your review of those reports

17  contributes to an annual performance review that you do of

18  troopers; correct?

19  A.   Yes.

20  Q.   And is it fair to say that you review those 15-day reports,

21  what, once a month maybe?

22  A.   Twice a month.

23  Q.   Okay.  Well, 30 days in a month; I understand that.  It was

24  your practice to review them whenever they were completed?

25  A.   Yes.

1   Q.  Okay.  And, as I think you just testified, those go into

2   the performance review of each trooper; correct?

3   A.  Yes.

4   Q.  And but in that performance review, that annual performance

5   review, it's true, isn't it, that consider -- that there's no

6   space in that review process for considerations of stops where

7   reasonable suspicion, the trooper says it was present but there

8   were no drugs or other contraband recovered; correct?

9   A.  In the performance review?

10  Q.  Yes, sir.

11  A.  That's incumbent on each supervisor.  It's a

12  narrative-based performance review.  There's not checkboxes to

13  it essentially.

14  Q.  So there's no -- fair to say there's no requirement that

15  the supervisor consider the number of roadside detentions that

16  didn't yield anything?

17  A.  That's on the merits of each supervisor, I -- how they

18  determine to fill out the performance review.

19  Q.  My question is more about whether it's a requirement or

20  not.

21  A.  It's not a requirement.

22  Q.  And it's also not a requirement that the supervisor

23  consider the number of sustained motions to suppress that a

24  trooper has over a year's time?

25  A.  Specifically that language, no.

1  Q.  The 15-day reports that you've reviewed, in your experience

2  there's also no data kept in those forms about the number of

3  out-of-state motorists who are stopped; correct?

4  A.  Correct.

5  Q.  And there's no data kept on the proportion between

6  out-of-state and in-state motorists; correct?

7  A.  On that form, no.

8  Q.  And there's no -- there's no place for troopers to list the

9  factors that gave them reasonable suspicion to detain -- to

10  extend the roadside detention; correct?

11  A.  On a 15-day report, no.

12  Q.  If you have Exhibit 901 there, it's going to be in one of

13  the -- probably the larger volumes.  Actually, I think it's its

14  own volume.  I'm going to have to -- or I'm going to ask you,

15  please, if you would turn to page 284.

16  A.  Yes, sir.

17  Q.  Sir, 284, I think we've talked about this with me

18  previously and then with state's counsel that -- I've got one

19  question for you about that -- that second bullet.  It says,

20  "You don't have to use any magic phrase like 'free to go' to

21  signal a transition."  Correct?

22  A.  Yes.

23  Q.  And I think you testified, in fact, that troopers are

24  advised not to use that phrase; right?

25  A.  Right.

1  Q.  And that's because people may actually go if they use that

2  phrase?

3  A.  Could confuse the driver or occupants.

4  Q.  You mean they -- they might believe the trooper and leave;

5  right?

6  A.  They may.

7  Q.  And that does not -- that's not consistent with the object

8  of doing stops like this when the KHP' policy and training says

9  that troopers should stop as many cars as possible; correct?

10  A.  I'm not sure I follow.  Can you reword?

11  Q.  Let me have you, if you would, turn to Exhibit 903 please.

12  903A I think we're going on.  Are you at 903, sir?

13  A.  Yes, sir.

14  Q.  Thank you.

15  That -- the first page of 903 has -- has four different

16  sections.  Let me direct your attention to Section 3.  It's

17  labeled general provisions.  Do you see that?

18  A.  Yes.

19  Q.  And under subsection A there it says, "Officers are

20  expected to keep their troop commander fully informed of any

21  CITE arrests, seizures and investigations which they initiate

22  or are involved in as soon as it is practical to do so."  Did I

23  read that right?

24  A.  Yes.

25  Q.  That provision, sir, requires -- I want to make sure I'm

1  understanding this right.  That provision requires only in the

2  case of arrests, seizures and investigations for a trooper to

3  report to their commander?

4  A.   Yes.

5  Q.   So there's not a mechanism where a roadside detention

6  results in something short of an arrest, a seizure or an

7  investigation for the trooper to notify a supervisor; correct?

8  A.   As it relates to this policy, that's correct.

9  Q.   For instance, when Trooper McCord was under your command,

10 he didn't notify you about the Kelly detention, did he?

11 A.   Not aware of the Kelly detention.

12 Q.   In your questions and answers with state's counsel, sir,

13 you discussed the *Vasquez* decision briefly.  Maybe didn't seem

14 so briefly, but do you recall that testimony?

15 A.   Yes, sir.

16 Q.   I want to make sure we're clear.  Your testimony is not

17 that the *Vasquez* decision rested on Colorado being a sole

18 factor; right?

19 A.   Correct.

20 Q.   You know that there were other reasons why Mr. Vasquez was

21 pulled over; correct?

22 A.   Correct.

23 Q.   And it's not your testimony that you view *Vasquez* as an

24 affirmation of what the KHP was doing, is it?

25 A.   In part, yes, an affirmation that we were teaching the

1    tenets of *Vasquez* before it was ruled upon and not using a

2    state registration as the sole factor for reasonable suspicion.

3    Q.  Teaching the tenets you said?

4    A.  Yes.

5    Q.  Right.

6        Teaching them from policy and in training; correct?

7    A.  Yes.

8    Q.  And you'd agree with me that if policy and practice were

9    the same thing, we wouldn't be here; fair to say?

10   A.  Sometimes.

11           MR. MCINERNEY:  If I could have just a moment, judge.

12           Judge, that's all I have for this witness.  Thank you.

13           THE COURT:  Any recross?

14                     RECROSS-EXAMINATION

15   BY MR. CHALMERS:

16   Q.  You were questioned about Exhibit 903, and that's the

17   ENF-07 policy that was enforced prior to 9/19/22; is that

18   right?

19   A.  Yes.

20   Q.  And Exhibit 905, put that up on the screen, that's the

21   policy that replaced 903; is that correct?

22   A.  Correct.

23   Q.  Now, the language that was focused on -- that counsel

24   focused on in Roman numeral III.A is the same in the new policy

25   as the old policy; is that right?

1   A.  Correct.

2   Q.  But what was different was that there is a Roman

3   numeral III.F that required completion of the form that we

4   talked about at some length and the reporting of that form to a

5   variety of different folks up the chain; is that correct?

6   A.  Yes.

7   Q.  So I don't know that your testimony was different, but so

8   that we're clear today, at least as of 9/19/22 had there been a

9   -- a detention that did not result in a -- arrest or a

10  forfeiture, now there would have to be a form completed and

11  submitted to the higher-ups; is that correct?

12  A.  Correct.

13      THE COURT:  I don't understand your question.  Can you

14  reword it?

15      MR. CHALMERS:  Sure, I will be happy to.

16  BY MR. CHALMERS:

17  Q.  Now, today, as we are under the policy ENF-07, if there

18  were a roadside detention that did not result in a forfeiture

19  and did not result in an arrest, today the report would have to

20  be prepared and forwarded up the chain for review of the people

21  you talked about; is that correct?

22  A.  Correct.

23      MR. CHALMERS:  Thank you.  I don't have any further

24  questions.

25      MR. MCINERNEY:  No.  Thank you, judge.

1           THE COURT:  Can this witness be excused?

2           MR. CHALMERS:  Yes.

3           THE COURT:  Thank you, sir.

4           THE WITNESS:  Thank you, Your Honor.

5           THE COURT:  Plaintiff's next witness.

6           MR. MCINERNEY:  Your Honor, we would call Herman

7    Jones.

8           THE COURT:  Would you, please, step into the witness

9    box, sir, and raise your right hand so you can be sworn.

10                        HERMAN JONES,

11   called as a witness on behalf of the Plaintiff, having first

12   been duly sworn, testified as follows:

13                     DIRECT EXAMINATION

14   BY MR. MCINERNEY:

15   Q.  Good morning, sir.

16   A.  Good morning.

17   Q.  Your name for the record please.

18   A.  Herman T. Jones.

19   Q.  And, sir, where are you employed?

20   A.  I'm employed with the Kansas Highway Patrol.

21   Q.  In what capacity?

22   A.  Superintendent.

23   Q.  How long have you been superintendent of the highway

24   patrol?

25   A.  Since April of 2019.

1  Q.  And does that make you the highest ranking law enforcement

2  officer in Kansas?

3  A.  For the Kansas Highway Patrol.

4  Q.  Okay.  And your direct report obligations are to who?

5  A.  I -- I'm direct report to the governor of Kansas.

6  Q.  Okay.  Sir, you are scheduled to retire July 1st of this

7  year; is that correct?

8  A.  That would be my date, yes.

9  Q.  And prior to being appointed superintendent of the highway

10  patrol, where were you employed?

11  A.  I was employed with the Shawnee County Sheriff's Office.

12  Q.  And how long were you with the Shawnee County Sheriff's

13  Office, sir?

14  A.  A little more than eight years.  So...

15  Q.  And prior to that?

16  A.  Prior to that I was with the Kansas Highway Patrol.

17  Q.  And for how long?

18  A.  About 11 years.

19  Q.  So all told I'm at -- may be off -- about 25 years or so

20  between the highway patrol and Shawnee County?

21  A.  Yes, correct.

22  Q.  Sir, the -- as superintendent, you oversee all the

23  functions of the KHP; right?

24  A.  Yes, I do.

25  Q.  You are ultimately responsible for the operations of the

1  KHP?

2  A.  Yes, sir.

3  Q.  And that includes training; correct?

4  A.  Yes.

5  Q.  And it includes policy changes; correct?

6  A.  Yes.

7  Q.  In fact, I think the policies indicate that you are -- you

8  have sole discretion on policy changes; right?

9  A.  Correct.

10  Q.  So no policy is either implemented or changed without your

11  approval; is that right?

12  A.  That is correct.

13  Q.  And you've got ultimate responsibility for the culture of

14  the organization too; right?

15  A.  I would say so, yes.

16  Q.  And that includes creating a culture of accountability with

17  the troopers who work for the KHP; correct?

18  A.  That has been my -- my attempt, yes.

19  Q.  And then ultimately, sir, you are responsible for ensuring

20  KHP's compliance with the law; isn't that right?

21  A.  That's correct.

22  Q.  And that includes constitutional requirements?

23  A.  Yes.

24  Q.  And it includes state law; correct?

25  A.  Correct.

1  Q.  In your role as superintendent, sir, I want to ask you some

2  questions about your staffing.  Do you have an executive

3  assistant?

4  A.  Yes, I do.

5  Q.  Who's your executive assistant?

6  A.  Erica Price.

7  Q.  Do you also have -- is she a sworn member?

8  A.  No, she's not.  A civilian.

9  Q.  Do you have a -- for lack of a better term, do you have an

10  executive officer who's sworn?

11  A.  Yes, I do, sir.

12  Q.  Who is that, sir?

13  A.  That is Lieutenant Colonel Jason De Vore.

14  Q.  And he's also commander of the PSU, isn't he?

15  A.  I am -- I am ultimately the supervisor of that -- that

16  position.

17  Q.  Correct.  Understood.

18      I guess my question is what are Mr. De Vore's duties and

19  responsibilities?

20  A.  He's basically, in a nutshell, the chief operating officer

21  of the agency.

22  Q.  Okay.  Does he command the PSU?

23  A.  Has some input.

24  Q.  But he's not the commander?

25  A.  No, I am.

1    Q.  Understood.

2        And, sir, it's fair to say that you for the most part

3    interact with -- is it Lieutenant Colonel De Vore?

4    A.  Correct.

5    Q.  Is that a fair statement?

6    A.  Yes.

7    Q.  And fair to say that you don't regularly meet with other

8    members of the command staff; correct?

9    A.  Can you clarify that?

10   Q.  Sure.  There are -- there's you as superintendent and then

11   beneath you there are other commanders who I'm just

12   collectively referring to as command staff.  Okay?

13   A.  Yes.

14   Q.  For the most part it's your practice to flow information

15   and instructions through Lieutenant Colonel De Vore to the

16   command staff; correct?

17   A.  Yes.

18   Q.  And you don't regularly meet with command staff; is that

19   right?

20   A.  Weekly.

21   Q.  So your testimony is that you don't regularly -- excuse me,

22   that you do regularly meet with command staff?

23   A.  Yeah, generally on Monday morning we'll have a staff

24   meeting, yes.

25   Q.  Okay.  Sir, I'm going to hand something to you.  Do you

1  recall providing a deposition in this case?

2  A.  I do.

3  Q.  And do you provide -- or do you remember, sir, that that

4  was October 6th of 2021?

5  A.  Best of my recollection, yes, sir.

6  Q.  You can cheat a little bit.

7  A.  Okay.

8  Q.  It's right there on the front page of that deposition I

9  just handed you.  And at that deposition, sir, you took an oath

10 to tell the truth and testify completely, didn't you?

11 A.  Yes, I did.

12 Q.  And at that deposition Mr. Chalmers was present; correct?

13 A.  Yes.

14 Q.  And I asked you a series of questions and you answered

15 them; correct?

16 A.  Correct.

17 Q.  Let me have you, if you would, turn to page 42 of that

18 deposition.

19 A.  I'm there.

20 Q.  And, sir, let me specifically direct your attention --

21 thanks for your patience.  Let me direct your attention, sir,

22 to page 42 at line 20.  Did I ask you this question and did you

23 provide the following response?

24     "Got it.  I want to talk a little bit about supervision and

25 how you supervise generally.  So, as superintendent, obviously

1   you are at the top of the food chain for lack of a better term.

2   Who is it that you supervise?  And, if you will, describe for

3   the record how directly you supervise individuals with the

4   highway patrol."

5       Your answer:  "Okay.  So I have a small number of

6   individuals that I have direct supervision -- "

7           MR. CHALMERS:  Your Honor, this is not proper

8   impeachment if that's what it's offered for.  He's not

9   testified inconsistently with anything he's read.

10          MR. MCINERNEY:  Well, I'm not through the portion from

11  the deposition.  There's one more question and one more answer.

12          THE COURT:  Okay.  Go ahead, and then let Mr. Chalmers

13  renew his objection if he has one.

14  BY MR. MCINERNEY:

15  Q.  Next question:  "Who are those persons?"

16      Your answer is:  "The key person is the lieutenant colonel.

17  He's the assistant superintendent where I have daily contact

18  with him, whether it be in person or by phone, and he basically

19  has -- if you would, he is the COO.  He's the operations person

20  that has oversight of the agency."

21      In that -- in your --

22          MR. CHALMERS:  Can I -- I hate to interrupt, but

23  that's not proper impeachment.  That's what he testified to

24  just a bit ago.

25  BY MR. MCINERNEY:

1  Q.  Did you -- did I ask you those questions and you provide

2  those answers?

3        MR. CHALMERS:  Same objection, Your Honor, it's

4  improper.

5        THE COURT:  So is this impeachment?  How is this

6  impeachment?

7        MR. MCINERNEY:  Judge, in that passage, when he was

8  asked about contact with supervisees and his -- his supervision

9  of command staff, he did not mention weekly meetings.  I'll

10  move past this.

11        THE COURT:  Okay.

12        MR. MCINERNEY:  Yeah.

13  BY MR. MCINERNEY:

14  Q.  The -- so let me ask you some questions about the PSU unit

15  if I can.  The PSU unit, fair to say, is one of the ways that

16  you ensure compliance with laws and with KHP policy; is that

17  fair?

18  A.  That's fair, yes.

19  Q.  And, sir, generally when there are allegations of

20  misconduct by troopers from the Kansas Highway Patrol, is that

21  investigated by the Kansas Highway Patrol's Professional

22  Standards Unit?

23  A.  Yes.  Under my direction, yes.

24  Q.  And they have direct responsibility to you; correct?

25  A.  Correct.

1    Q.   So those reports -- well, is it accurate to say that all

2    the reports of the PSU flow up to you?

3    A.   I would say all those that are investigated, yes.

4    Q.   Okay.  Are there any that aren't investigated?

5    A.   There are some reports that they will do where there's

6    statistical and other types of things they're going to do on a

7    daily basis or maybe phone calls or what have you.

8    Q.   Okay.  Where there is an investigation, ultimately the

9    results of every investigation make their way to you; correct?

10   A.   Correct.

11   Q.   And you receive, in that process, recommendations by the

12   staff?

13   A.   Correct.

14   Q.   And the recommendations can be for corrective action;

15   correct?

16   A.   Yes.

17   Q.   They can be for discipline?

18   A.   Yes.

19   Q.   But the final decision about what to do when there is

20   misconduct that is established, that falls to you, doesn't it?

21   A.   Ultimately, yes.

22   Q.   So the decision about corrective action or discipline is a

23   superintendent's decision; right?

24   A.   Yes.

25   Q.   You -- you always have the ability, is it not true, to

1  impose corrective action or even sometimes to -- to impose more

2  severe action than your PSU commander recommends; is that

3  right?

4  A.  Well, I would say PSU actually will provide the finding of

5  facts and their conclusion.  It's up to me to go with the

6  recommendations, but I have that collaboratively of the

7  executive staff.

8  Q.  So the executive staff makes a recommendation, do they not,

9  about what is appropriate, say, corrective action; is that

10 right?

11 A.  Yes.

12 Q.  Okay.  And you have the option to either accept or reject

13 that, don't you?

14 A.  Yes.

15 Q.  You can say I think that's too harsh or that's not harsh

16 enough?

17 A.  Yes.

18 Q.  And there's no check on you; correct?  You're the final

19 word.

20 A.  Yes.

21 Q.  So -- so the level of -- similarly --

22     I said corrective action, but it works that way with

23 discipline as well; right?

24 A.  Yes, sir.

25 Q.  So when -- you took the job as superintendent in 2019, sir?

1  A.  Correct.

2  Q.  Yes, sir.

3      When you took it in 2019, one of the things that you wanted

4  to focus on in KHP was accountability; correct?

5  A.  Correct.

6  Q.  And I think, in the time before you took that position,

7  isn't it true that the KHP had come in for some public

8  criticism about trooper behavior?

9  A.  Yes.

10  Q.  And that caused you to want to focus on accountability; is

11  that a fair statement?

12  A.  That's correct, yes.

13  Q.  And, again, that's because the ultimate responsibility is

14  yours; right?

15  A.  Correct.

16  Q.  The buck stops with you?

17  A.  Correct.

18  Q.  Okay.  I want to direct you to a specific investigation

19  that I believe you're familiar with.  It involved a trooper by

20  the name of Brandon McMillan, and it was about a traffic stop

21  and a detention that occurred in February of 2019.  Are you

22  familiar with that incident?

23  A.  Yes, I am.

24  Q.  You received a PSU report of that investigation, didn't

25  you?

1  A.  I did.

2  Q.  And that report came to you after the investigation was

3  complete; right?

4  A.  Correct.

5  Q.  After Trooper McMillan had offered his response to the

6  allegations that were made by the motorist; correct?

7  A.  Correct.

8  Q.  And the motorist, do you recall the name Bosire as being

9  the motorist, sir?

10  A.  Yes, sir.

11  Q.  And the -- Trooper McMillan had had the chance to take a

12  look at -- and excuse me.

13      Everybody in the PSU process has had a chance to take a

14  look at the video and the reports that were generated as a

15  result of that incident; correct?

16  A.  Correct.

17  Q.  And there was a finding that Trooper McMillan did not have

18  reasonable suspicion to prolong that roadside detention;

19  correct?

20  A.  That's correct, yes.

21  Q.  And you know -- you're familiar with the rules regarding

22  the length of roadside detentions and they come from the Fourth

23  Amendment; right?

24  A.  Correct.

25  Q.  And they come from case law that interprets the Fourth

1  Amendment; fair?

2  A.   That's fair, yes.

3  Q.   And a roadside detention -- it -- well, let me ask you,

4  sir, it's your understanding that a roadside detention in the

5  absence of reasonable suspicion is a violation of the Fourth

6  Amendment; correct?

7  A.   I'm sorry, repeat that again please.

8  Q.   A roadside detention in the absence of reasonable suspicion

9  is a violation of the Fourth Amendment, isn't it?

10  A.   That's my understanding, yes.

11  Q.   And that's established by case law, isn't it?

12  A.   Yes, it is.

13  Q.   And it's part of KHP policy, in fact?

14  A.   Yes, it is.

15  Q.   And your finding was that Trooper McMillan affirmatively

16  violated Mr. Bosire's constitutional rights; correct?

17  A.   That was the finding, yes.

18  Q.   Let me show you what is already admitted -- actually I'm

19  going to hand you -- hand you, sir, a binder, and it's turned

20  to Tab No. 27.  Do you see what's at Tab 27?

21  A.   Yes, I do.

22  Q.   And then if you would turn to the second page of that, sir.

23  Do you see your signature on that page?

24  A.   Yes, I do.

25  Q.   And what is that exhibit?

1   A.   This is the internal investigation correspondence to Mr. --

2   Q.   Bosire.

3   A.   -- Bosire.  Yes, thank you.

4   Q.   And that's a letter to you from Mr. Bosire; correct?

5   A.   Yes, sir.

6   Q.   And if you would, sir, turn back to page 2, and I'm going

7   to direct your attention to the second paragraph there and

8   specifically that first sentence.  It says there, "This contact

9   with you was not what we would consider standard under the

10  confines of investigative reasonable suspicion regarding

11  criminal interdiction."  Did I read that right?

12  A.   Yes, you did.

13  Q.   And your finding there was based on the recommendation of

14  the PSU, wasn't it?

15  A.   PSU's -- excuse me.  PSU's findings, the recommendation

16  from the executive staff.

17  Q.   Correct.

18       But you didn't dispute their findings in that regard, did

19  you?

20  A.   No, I didn't.

21  Q.   And a little bit further down, sir, you state, "We feel

22  that the length of time you were detained at roadside was

23  unnecessary given the suspicions he articulated."  Did I read

24  that right?

25  A.   You did.

1  Q.  And the "he" you refer to there is Trooper McMillan; is

2  that right?

3  A.  That's correct.

4  Q.  And Trooper McMillan also received a letter about the

5  findings of the investigation; correct?

6  A.  That's correct.

7  Q.  But the letter that Trooper McMillan received included

8  language that you softened once you got the recommendation from

9  PSU; correct?

10  A.  We made some alterations, yes.

11  Q.  Because you thought it was too harsh; correct?

12  A.  Yes, I do.

13  Q.  You wanted to tone it down?

14  A.  Yeah, I think I said that, yes.

15  Q.  From what they recommended?

16  A.  Yes.

17  Q.  And, as a result of the PSU investigation and your

18  findings, you ordered Trooper McMillan to consult with a

19  lawyer; correct?

20  A.  Correct.

21  Q.  A lawyer in the general counsel's office; right?

22  A.  Yes.

23  Q.  And to do a ride-along with one of your lieutenants; is

24  that correct?

25  A.  That's correct.

1  Q.  You -- and you understand, sir, being familiar with KHP

2  policy, that under KHP policy Trooper McMillan for this

3  violation received corrective action and not discipline;

4  correct?

5  A.  That's correct.

6  Q.  And you know the difference between corrective action and

7  discipline; right?

8  A.  Yes, sir.

9  Q.  What is that difference, sir?

10  A.  Corrective action would be something of a -- in both cases

11  it's educational.  Corrective action does not deem to be

12  discipline that goes against someone in their record.  The

13  record does have corrective action there, but it's more

14  educational and for improvement.

15  Q.  And corrective action, it includes things, like, verbal

16  reprimands; right?

17  A.  Yes.

18  Q.  Includes things, like, remedial training; right?

19  A.  Yes.  Yes.

20  Q.  Whereas discipline's a bit different.  It includes possibly

21  suspending somebody?

22  A.  Could be, yes.

23  Q.  And it could include demotion; correct?

24  A.  It could.

25  Q.  And would you agree with me that corrective action is kind

1  of a continuum:  there's light corrective action and heavy

2  corrective action?

3  A.  I'm not sure I understand that.

4  Q.  Yeah, there's some corrective action that's less severe

5  than other corrective actions; is that fair?

6  A.  No, I just look at it as corrective action.

7  Q.  What about discipline, discipline is a continuum, isn't it?

8  A.  Yes, it is.

9  Q.  So a suspension for a couple days with pay is a lot

10  different than, say, demotion; right?

11  A.  I would say so.

12  Q.  Or a transfer?

13  A.  Transfer.

14  Q.  Isn't it true, sir, that the kind of remedial training

15  you're talking about, the corrective action training, is for

16  addressing minor rule violations or, say, inadequate job

17  performance or bad work habits; is that correct?

18  A.  I would say corrective was just for remedial for a better

19  understanding of what the policies, the laws are, those types.

20  Q.  Right.

21     But is it -- it's generally in response to minor rule

22  violations, inadequate job performance or deficient work

23  habits; isn't that correct?

24  A.  I think it fits the need for what we have for the employee,

25  but, yes, that could be there, yes.

1    Q.   Is that a good description of what it's appropriate for?

2    A.   It could be.

3    Q.   You're -- sir, you're aware that in February a jury in this

4    courthouse found that Trooper Doug Schulte violated the rights

5    of a man named Blaine Shaw by unlawfully detaining him for a

6    canine sniff without reasonable suspicion; correct?

7    A.   I'm aware of that, yes.

8    Q.   And you're aware that that jury found that Trooper Schulte

9    didn't have reasonable suspicion even though Trooper Schulte

10   testified he did?

11   A.   I'm aware of that, yes.

12   Q.   And you're aware of a different jury's verdict just two

13   weeks ago against Trooper McMillan, aren't you?

14   A.   Yes, I am.

15   Q.   You know that the jury in that case found that he violated

16   Mr. Bosire's constitutional rights; right?

17   A.   I'm aware of that, yes.

18   Q.   A lot like you had found in your internal investigation;

19   correct?

20   A.   Yes.

21   Q.   And they found that he did not have reasonable suspicion to

22   detain him for a canine sniff; correct?

23   A.   I understand that.

24   Q.   That's your understanding?

25   A.   Yes.

1  Q.  You also understand that the jury heard that Trooper

2  McMillan had testified twice under oath about his reasonable

3  suspicion but then changed his story on the stand?  Do you know

4  that?

5  A.  I'm not for sure about that, but I just know the outcomes

6  of that.

7  Q.  Nobody told you about that?

8  A.  I'm not quite sure I recall that right there, but I do know

9  the outcome.

10  Q.  And you know that Trooper Schulte testified at Trooper

11  McMillan's trial as well.  Do you know that?

12  A.  Yes.

13  Q.  And you're also aware that the jury not only found that

14  Trooper McMillan didn't have reasonable suspicion, but they

15  also found that he was recklessly indifferent to the

16  constitutional rights of Mr. Bosire?

17  A.  I understand that was awarded, yes.

18  Q.  And the jury not only -- well, and because of that, the

19  jury awarded punitive damages against Trooper McMillan.  Did

20  you know that?

21  A.  Yes, I did.

22  Q.  But in the time since that jury came back with their

23  verdict and found that he had recklessly disregarded

24  Mr. Bosire's constitutional rights, he has not received a

25  written reprimand, has he?

1  A.  Not as of this date.

2  Q.  And he hasn't been given days off?

3  A.  Not as of this date.

4  Q.  Not administrative leave?

5  A.  Not as of this date.

6  Q.  And he wasn't suspended without pay?

7  A.  Not as of this date.

8  Q.  And you haven't disciplined Trooper Schulte either, have

9  you?

10  A.  Not as of this date.

11  Q.  There was no written reprimand or no days off for him;

12  correct?

13  A.  Not as of this date.

14  Q.  No administrative leave and no suspension without pay;

15  right?

16  A.  Not as of this date.

17  Q.  You haven't ordered either one of them to go back and learn

18  the law of reasonable suspicion, have you?

19  A.  Not as of this date.

20  Q.  Haven't ordered them to spend time more than an hour with

21  KHP's lawyers to talk about reasonable suspicion?

22  A.  Not as of this date.

23  Q.  Haven't required them to take tests about reasonable

24  suspicion?

25  A.  Not as of this date.

1  Q.  Haven't required them to be monitored as they conduct other

2  roadside detentions?

3  A.  Not as of this date.

4  Q.  And neither one of those troopers, isn't it true, is going

5  to have to pay those damages against them; isn't that right?

6  A.  I'm sorry?

7  Q.  McMillan was assessed punitive damages.  He's not going to

8  have to pay that, will he?  KHP's going to pay that, aren't

9  they?

10  A.  Someone's going to pay for it.

11  Q.  We talked about --

12       THE COURT:  Wait, what does that -- what does that

13  mean?

14       THE WITNESS:  I'm not sure that he will, but the state

15  will pay for it at one -- one way or another.

16       THE COURT:  And why would you do that, just out of

17  curiosity, if the jury found that he should be punished?

18       THE WITNESS:  Well, in that case right there, we take

19  the obligation of that.  So the Kansas Highway Patrol or the

20  State of Kansas will probably see fit to make that payment.

21       THE COURT:  Right, I understand that.  But why?

22       THE WITNESS:  I'm not sure.

23       THE COURT:  What -- so the jury found that he either

24  didn't know what he was doing, so he was incompetent, or he

25  intentionally violated Mr. Bosire's rights.  So why would you

1   pay the judgment against him?

2          MR. CHALMERS:  Your Honor, I don't think the decision

3   has been made, because I think it's the attorney general's

4   decision to pay those punitive damage awards.  I think the way

5   the question was phrased --

6          THE COURT:  That's not what he said.  I'm asking him,

7   not you.

8          THE WITNESS:  Well, Your Honor, I -- as the process

9   is, is I don't have that -- that extreme say with that because

10  the attorney general has that option right there whether to

11  actually go forward with the payment or not, and from that it

12  then goes to the state of the legislators.  They have the

13  actual say yea or nay.

14         THE COURT:  Right.  But you testified it would not be

15  the officer himself.

16         THE WITNESS:  Well, I apologize, I should put into --

17  this is the testimony I should say.

18         THE COURT:  Okay.  Now that Mr. Chalmers has told you

19  what to say?

20         THE WITNESS:  Well --

21         THE COURT:  I got it.

22         THE WITNESS:  Okay.

23         THE COURT:  You don't need to answer that.  Go ahead.

24  BY MR. MCINERNEY:

25  Q.  Sir, you're aware that part of the evidence in each one of

1  those trials Mr. -- excuse me, Trooper McMillan and Trooper

2  Schulte, concerned a 2016 case generally known as *Vasquez*;

3  correct?

4  A.  Correct.

5  Q.  And you've been sitting here for almost two weeks now.

6  You've heard quite a bit of talk about *Vasquez*; right?

7  A.  Correct.

8  Q.  And you know that it's the policy of KHP that troopers can

9  use the state of origin of a car or the travel origin or

10  destination as a factor in a reasonable suspicion; correct?

11  A.  As a factor --

12  Q.  As a factor.

13  A.  -- yes.

14  Q.  But ensuring compliance with that -- with the rule of

15  *Vasquez* is the job ultimately of immediate supervisors of those

16  troopers; is that fair?

17  A.  That's fair, yes.

18  Q.  But it's -- it's not you who ensures that the mandates of a

19  case like *Vasquez* are followed.  You leave that up to legal

20  counsel, don't you?

21  A.  Legal counsel -- legal counsel, our training staff as well.

22  Q.  And so legal counsel and commanders?

23  A.  Yes.

24  Q.  You're -- you're familiar with the -- the roadside stop of

25  the plaintiffs in this case, aren't you, Mr. Erich and

1  Ms. Maloney?

2  A.  Yes.

3  Q.  And that that was done by a Trooper Rohr?

4  A.  Yes.

5  Q.  And you've heard the evidence presented in this case about

6  that detention; correct?

7  A.  Correct.

8  Q.  And you've heard the evidence that was that the troopers

9  still use a state of origin in determining reasonable

10  suspicion?

11  A.  As a factor, yes.

12  Q.  And they still use what they consider to be drug source

13  states; correct?

14  A.  As a factor, yes.

15  Q.  And they still use the notion that Interstate 70 is a drug

16  corridor; correct?

17  A.  I think what I have -- what I understand is that with today

18  and even of yesteryear any highway, any state can be used as a

19  -- as a corridor, any highway in the state of Kansas can be.

20  Q.  To the point that travel on an interstate highway is

21  virtually worthless when it comes to reasonable suspicion;

22  right?

23  A.  I'm sorry, I'm not understanding that.

24  Q.  That travel on an interstate highway by itself is worthless

25  when it comes to determining reasonable suspicion; is that a

1  fair statement?

2  A.  That would be fair, yes.

3  Q.  And you know from the evidence in this case and others that

4  KHP troopers still use the fact of a rental car itself even

5  where there's no discrepancy or conflict between the agreement

6  and the other info the driver gives?

7  A.  That has been known in some cases, not all.

8  Q.  In fact, the fact of a rental car is on the new form, the

9  new policy requiring troopers to record their reasons for

10  reasonable suspicion at roadside detentions, isn't it?

11  A.  Yes, it is.

12  Q.  Even though the fact of a rental car where there's no

13  inconsistency between the information on the rental agreement

14  and the other information that the trooper gets is not a

15  factor?

16  A.  That's correct, they still have to articulate.

17  Q.  So KHP collects data obviously.  They collect some kinds of

18  data, but they don't collect other kinds; fair?

19  A.  Correct.

20  Q.  In fact, before September of last year, unless there was an

21  arrest or a seizure or a formal investigation, you never

22  required KHP troopers to report the reasons for conducting a

23  roadside detention, did you?

24  A.  No, I didn't.

25  Q.  They didn't have to, did they?

1   A.  No.

2   Q.  In fact, until recently troopers were only required to

3   write any kind of a report where they had -- where the stop

4   resulted in an arrest or a seizure or some other investigation;

5   isn't that right?

6   A.  That's correct.

7   Q.  So if someone got detained for a canine sniff and nothing

8   was found before September of last year, there was no

9   documentation of that whatsoever; correct?

10  A.  Well, not from the trooper.  I believe the -- the canine

11  handler may have done some report, but not to the -- not for

12  the officer that made the stop.

13  Q.  But those canine reports depended largely on what the

14  canine officer was told by the trooper; correct?

15  A.  What I recall, yes.

16  Q.  And there was no field on those canine reports for

17  reasonable suspicion, was there?

18  A.  No, there wasn't.

19  Q.  So there was no way for you, as superintendent, to assess

20  whether these roadside detentions were based on reasonable

21  suspicion or whether the reasons that the officer had -- the

22  trooper had were insufficient; correct?

23  A.  Absent of the supervisor's concerns, so no.

24  Q.  So at the time of the detentions in this case, there was

25  only that report -- excuse me, there was only a report required

1   where an arrest, a seizure or investigation; correct?

2   A.  Correct.

3   Q.  So there weren't any reports written by Trooper McMillan

4   after he stopped and detained Mr. Bosire; correct?

5   A.  I don't recall.

6   Q.  In fact, there wasn't anything until the PSU report

7   complaint was filed; right?

8   A.  I believe that's right.

9   Q.  And there was no report written by Trooper Schulte after he

10  stopped and detained Mr. Shaw and his brother and found

11  nothing; correct?

12  A.  Correct.

13  Q.  He didn't document his reasons for detaining them until

14  discovery started in this case.  Do you know that?

15  A.  Other than a video recording of it, but no.

16  Q.  Which he wasn't required to even review; correct?

17  A.  I'm sorry, he --

18  Q.  He was not required to even review that video until this

19  case started; correct?

20  A.  I'm not aware of that, sir.

21  Q.  And Lieutenant Rohr, I think it's Lieutenant Rohr, never

22  had to document his reasons for detaining the Erich-Maloney

23  family, did he?

24  A.  No.

25  Q.  Not until after this lawsuit was filed?

1   A.  From my understanding.

2   Q.  And you didn't require them to document their reasons for

3   detaining motorists when there was no arrest or seizure

4   because, when you came on the job as superintendent, that's

5   just the way it was; correct?

6   A.  That was the procedures at that particular time, yes.

7   Q.  Even though you knew that the very best time for troopers

8   to record factors about reasonable suspicion and factors about

9   any stop was right after the stop occurred; correct?

10  A.  Probably the best time to recall, put that information.

11  Q.  Memory is freshest closest to the event; is that fair?

12  A.  That's correct.

13  Q.  So before this lawsuit, troopers only had to come up with

14  reasonable suspicion if a complaint or a lawsuit was filed;

15  right?

16  A.  Of the old standard, yes.

17  Q.  Because there was -- there's no independent requirement

18  that they record their reasons?

19  A.  No, unless the officer felt there was a need to do it

20  independently, yes.

21  Q.  And how often did that happen?

22  A.  I couldn't tell you, sir.

23  Q.  And you only started this policy, this -- and the

24  implementation of this form in September; correct?

25  A.  The actual implementation or the start of it was sooner

1   than that simply by the -- we brought our legal counsel --

2   present day legal counsel, his objective was to enhance the

3   training and also our documentation.  So it probably started in

4   the year two thousand -- 2020 -- 2020.

5   Q.  Sorry?

6   A.  2020.

7   Q.  It was after this lawsuit was filed; right?

8   A.  I believe so, yes.

9   Q.  And the KHP voluntarily implemented that policy; right?

10  A.  Correct.

11  Q.  And it was in specific response to the allegations in this

12  lawsuit; right?

13  A.  Well, I would say that it had started that process, but

14  this augmented that -- that change.

15  Q.  The -- in fact, the allegations made in this lawsuit

16  informed the development of that policy; is that a fair

17  statement?

18  A.  I'm sorry, say it again.

19  Q.  The allegations in this lawsuit, the claims by the

20  plaintiffs in this lawsuit about their unconstitutional

21  detentions helped inform that policy; isn't that right?

22  A.  I would say so.  It helped us, yes.

23  Q.  And you -- well, you'd agree with me that as a general rule

24  you can't fix what you don't measure; is that fair?

25      If you're not measuring things, you don't see problems and

1    you can't fix them; fair?

2    A.  I've heard that, yes.

3    Q.  So you still don't know, as you sit here today, how often

4    drivers get detained without reasonable suspicion; right?

5    A.  I'm sorry?

6    Q.  You don't know, as you sit here today, how often drivers

7    are detained without reasonable suspicion?

8    A.  That could be for anything.  Without having any type of

9    recording watching every one of those stops, I would not know

10   that information right now.

11   Q.  But you, as the superintendent, you got a plethora of

12   commanders at your -- I hate to say beck and call -- but

13   they're under your command; correct?

14   A.  Correct.

15   Q.  And you could -- if you wanted to, you could direct that

16   that information make its way to you?

17       And I say that "that information," I'm talking about the

18   number of drivers who are detained in the absence of reasonable

19   suspicion.  You could get that information, couldn't you?

20   A.  I probably could, yes.

21   Q.  But you don't, do you?

22   A.  Because I -- that is filtered down to the direct

23   supervisors and the commanders to do that.

24   Q.  But that information doesn't flow to you, does it?

25   A.  Generally, if it's -- if it's something of aberrant

 1   behavior, it will come to that.  Otherwise, it's dealt with in

 2   the field.  And if it's -- if it's -- if there's no issues, we

 3   probably won't get that information.

 4   Q.  And, sir, you don't keep tabs on cases where motions to

 5   suppress evidence are sustained because troopers violate

 6   people's constitutional rights?

 7   A.  I don't have that information there.  If it were to be

 8   something, that it would be from the field from a supervisor

 9   that would have those information to submit that.

10   Q.  But you don't get a report about federal court cases where

11   motions to suppress are sustained; correct?

12   A.  No.

13   Q.  And you don't get a report where state prosecutions have

14   motions to suppress that are sustained; correct?

15   A.  No, only if it comes to the attention of a local commander

16   or a supervisor to bring that up.

17   Q.  And, likewise, sir, you don't keep any data -- I should say

18   no data gets to you about how many stops and detentions are

19   done that don't result in any contraband; is that correct?

20   A.  I don't have it, but I believe that's obtained within the

21   agency.

22   Q.  But it doesn't come to you, does it?

23   A.  No.

24   Q.  And you're not sure whether it's maintained or not, are

25   you?

1   A.   Other than from the -- from my commander over that -- that

2   unit there would have that information.

3   Q.   And you don't, sir, systemically collect and analyze data

4   related to the issues that have been presented in this lawsuit,

5   do you?

6   A.   We haven't as of -- obviously we're starting.  We've got

7   what -- the new report that we have right there; that will be

8   the data we started to work with.

9   Q.   Are you talking about the Form --

10  A.   Yes.

11  Q.   -- 14 --

12  A.   141.

13  Q.   -- 1?

14       Thank you very much.

15       Setting that data apart, you also don't get information or

16  data about cases that are submitted to prosecutors that they

17  decline to file for constitutional violations; correct?

18  A.   No, I don't have that report.

19  Q.   But you could have one of your commanders go get that data,

20  couldn't you?

21  A.   We probably could, yes.

22  Q.   And there's still a very limited number of spot checks on

23  troopers to determine compliance with the law?

24  A.   I'm sorry?

25  Q.   You -- I'm going to refer back to some other testimony that

1  I think you heard from -- from the table.  There is -- there's

2  still a limited number, four per quarter per supervisor, of

3  spot checks to determine compliance with the law; correct?

4  A.  I would say that's a minimum.

5  Q.  Okay.  And you also know from what you've heard here today

6  that Troop N, which accounts for less than five percent of the

7  troopers, the sworn members of KHP, is the only one that

8  reviews roadside detention footage; correct?

9  A.  I would not say that's completely true in that you will

10  still have field troopers that will make a stop beyond Troop N,

11  they could still be reviewed by their supervisors.

12  Q.  It's kind of accidental because those reviews are random as

13  opposed to the way Troop N does it; correct?

14  A.  Well, restate that please.

15  Q.  The extent to which other supervisors review video footage

16  of stops or video footage of trooper activity is a random

17  selection on a quarterly basis of dash cam video; correct?

18  A.  Correct.

19  Q.  So there's no targeted effort to -- and this is outside of

20  Troop N -- to take a look at the way non-Troop N troopers do

21  roadside detentions; isn't that right?

22  A.  I would not say completely true to that simply for the fact

23  there are still reports other than just videos and there are

24  other information that would be disseminated to the supervisor

25  that could do those inspections or checks.

1  Q.  I'm -- I'm just talking about the video review --

2  A.  Okay.  Sorry.

3  Q.  -- that supervisors do.

4  A.  Sure.

5  Q.  So if they come across a roadside detention by a

6  non-Troop N trooper, it's luck of the draw; right?

7  A.  It could be random they could pick that.

8  Q.  And the only system for investigating whether those

9  roadside detentions -- whether those violations actually take

10 place still depends on the citizen complaint process, doesn't

11 it?

12 A.  Or it could be another -- another officer from within or

13 external.

14 Q.  And you've heard testimony in this case that that's a rare

15 thing, right, one trooper reporting another?

16 A.  I think, yes.  Well -- yes.

17 Q.  So that review process depends almost entirely on citizen

18 complaints?

19 A.  A good majority of it.

20 Q.  And that's when a citizen has a sense that something wrong

21 has taken place; isn't that right?

22 A.  Yes.

23 Q.  So there's -- there's really no proactive system of data

24 analysis at KHP to determine whether there are broader problems

25 when it comes to unconstitutional detentions that need to be

1  addressed; correct?

2  A.  I think other than our policies, our reports, our videos

3  that we have right there, there is none specific to what you're

4  seeing.

5  Q.  Okay.  And I think you just testified that in large part --

6  I think my -- my word was majority of and I think you said in

7  large part -- complaints about violations of constitutional

8  rights come from citizens; right?

9  A.  Those that I have seen, yes.

10 Q.  So -- so that is to say that in large part your system of

11 oversight depends on reports by the very people who are

12 victimized by the unconstitutional practices; is that right?

13 A.  I'm not sure -- restate that please.

14 Q.  Sure.  If the majority of complaints get to you get into

15 the system because citizens make them, then your system of

16 review and oversight depends largely on reports by the very

17 people who've been victimized by the unconstitutional

18 practices; that's true, isn't it?

19 A.  Not all the complaints that come in are from constitutional

20 practices necessarily.

21 Q.  But the large majority come from citizens; correct?

22 A.  Correct.

23 Q.  And those that concern constitutional violations come

24 through that pathway; correct?

25 A.  There are those that come in, yes.

1  Q.  And that makes up the large majority of complaints; right?

2  A.  No, I wouldn't say that, sir.  I don't have that

3  information, but I would say that those are -- there are --

4  might be a complaint because of the attitude of the officer.

5  There's nothing constitutional about that.

6  Q.  Understood.  My question concerns constitutional

7  violations.

8  A.  Okay.

9  Q.  And my question is whether it's true that in large part --

10  not majority but in large part your system of oversight about

11  unconstitutional practices depends on the victims of the

12  unconstitutional practices themselves making a report; isn't

13  that right?

14  A.  That's been the case.

15  Q.  And it is only after this case was filed and depositions

16  started that you figured out this was a big problem; right?

17  A.  I realized it was a issue, yes.

18  Q.  So you order your command staff to change the procedure and

19  to start requiring documentation by troopers even where there's

20  no arrests or seizure that occurs; right?

21  A.  Correct.

22  Q.  And that order from you came in a meeting, and you don't

23  have any memory about who was at the meeting; correct?

24  A.  Some of those meetings I was not in attendance because it

25  was the -- those with training, those with Troop N and those

1   individuals that have maybe, if you will, sub-meetings that

2   went on with that.

3   Q.  I understand that there was a process, but the ultimate

4   order from you, as superintendent, was a verbal order that was

5   -- came in a meeting with your commanders; correct?

6   A.  Correct.

7   Q.  And there aren't any minutes of that meeting, correct,

8   because you don't keep them; right?

9   A.  No, we don't.

10  Q.  And then you didn't formally implement this policy until

11  many months later, many months after that started; right?

12  A.  Correct.

13  Q.  And this new report writing policy about reasonable

14  suspicion went out through PowerDMS; correct?

15  A.  Correct.

16  Q.  And correctors had to -- or excuse me.  Troopers had to

17  scroll through and check a box that they had read it; right?

18  A.  Correct.

19  Q.  This policy -- I think I asked you before, this was a

20  voluntary policy; right?

21  A.  Correct.

22  Q.  And you are superintendent, so any change or modification

23  of policy is your job; right?

24  A.  Correct.

25  Q.  So you could rescind this policy at any time, couldn't you?

1   A.  I could.

2   Q.  You could rescind it tomorrow?

3   A.  I could.

4   Q.  In fact, it can be rescinded on July 2nd, the day after you

5   leave?

6   A.  That would be up to the -- whoever takes the position.

7   Q.  There's nothing compelling the KHP to maintain this policy

8   of recording reasonable suspicion, is there?

9   A.  I would -- I would say in the direction that we're going it

10  would probably stay, but I have -- that's speculation whether

11  that happens.

12  Q.  Right.

13      There's nothing that makes it permanent?

14  A.  Other than being in policy.  Policies do change.

15  Q.  And if that happened, it would be back to business as

16  usual; right?

17  A.  Whatever business as usual is.

18  Q.  Sir, the KHP has a -- has a data analysis function;

19  correct?

20  A.  Yes.

21  Q.  Where does that function live at KHP?

22  A.  Currently it would be with our -- as far as -- excuse me,

23  what data?

24  Q.  Right.

25      I think you testified earlier that KHP collects a lot of

1   data; right?

2   A.  Correct.

3   Q.  Okay.  Well, let me ask you this:  To the extent that data

4   is used and analyzed, it is -- tends to be a self-driven

5   process by the commanders; is that correct?

6   A.  Again, it depends on what data.

7   Q.  Okay.  Again, we're talking about data around traffic

8   stops, around detentions, around searches, things like that.

9   A.  Correct.

10  Q.  Okay.  So that -- that is the job of that level of

11  commander, correct, troop commanders?

12  A.  Correct.

13  Q.  And you, as superintendent, don't deal with any particular

14  KHP function that uses data to make policy or practice

15  determinations for troopers, do you?

16  A.  Depending on what it is.  You know, we have crash data that

17  we would give direction on when we enforce, you know, such as

18  we have crash data that may involve fatalities, and from those

19  fatalities we determined that individuals that are not wearing

20  seat belts or maybe child restraints.  We can direct those type

21  of things like that.

22  Q.  Setting that aside, let's talk about traffic stops and

23  roadside detentions and canine sniffs and things like that.

24  My -- so my question is this --

25      Understanding that that's -- those are the guardrails here,

```
 1   my question is this:  In those areas, you don't deal with any
 2   KHP function that uses data to make policy, that kind of data
 3   to formulate policy; is that fair?
 4   A.  I believe I understand that, yes.
 5   Q.  Is that a fair statement?
 6   A.  Sure.
 7   Q.  And the PSU process is an investigation process that lives
 8   inside KHP; correct?
 9   A.  Correct.
10   Q.  And as we've just talked about, complaints that make their
11   way to the PSU are investigated; right?
12   A.  Correct.
13   Q.  And those results make their way to you?
14   A.  Correct.
15   Q.  But that's a very reactive process, isn't it?
16       It has to be a complaint first.  Whether it comes from a
17   citizen or a trooper, has to be a complaint; right?
18   A.  Correct.
19   Q.  And there's not a -- there's not a proactive sort of
20   analytic function that PSU plays; correct?
21   A.  They do.
22   Q.  What -- how do they do that?
23   A.  Well, when they -- we receive the annual information there
24   as far as data, car stops, pursuits, use of force, those type
25   of things like that.  And then from there we will gauge where
```

1   we need to go with our training if we see there's an issue such

2   as we've seen where our complaints have gone down simply

3   because of our training that we're instituting with our direct

4   supervisors as far as leadership accountability and those type

5   of things.  So we have seen a downward fall of that right there

6   simply by instituting training.

7   Q.  Okay.  My question has to do with PSU and the investigative

8   function and the analytic function that lives there, okay, and

9   my question is this:  We've talked about PSU as primarily a

10  reactive function inside KHP; correct?

11  A.  It has been, yes.

12  Q.  Okay.  And so my question really is whether PSU

13  affirmatively goes out and gathers data on their own -- not

14  just annual reports but gathers data on their own and uses that

15  to formulate training and policy?

16  A.  As far as data, no.  But they have been proactive by

17  meeting with the commanders to talk about ways in which we can

18  mitigate issues before they got to PSU, such as better

19  accountability in the field, the trends that we're seeing, what

20  they see in investigations of complaints.

21  Q.  And when it comes to the reporting that makes its way up to

22  you about that, about that function, I think it's -- it's

23  correct, isn't it, that once a month you get a report about

24  what activities are happening.  But as far as every day, you

25  don't have much interaction; correct?

1   A.  No.  No.

2   Q.  Sir, you're familiar by this time with what's been called

3   the Kansas two-step or the trooper two-step --

4   A.  Correct.

5   Q.  -- different forms?

6       And so when I use that phrase, you're familiar with what

7   we're talking about; correct?

8   A.  Correct.

9   Q.  And it is a -- it's a maneuver that's employed by KHP;

10  correct?

11  A.  Correct.

12  Q.  In fact, it's trained upon; correct?

13  A.  It's been trained.  It's been taught, yes.

14  Q.  Taught at the academy?

15  A.  Well, I would say the name has come in there, but the

16  actual -- the legalities of the stop comes in -- has been

17  taught in training.

18  Q.  Okay.  And I'm just talking about the maneuver itself right

19  now.

20  A.  Oh.

21  Q.  And you saw the training slide that we put up from -- that

22  had been used to train troopers that said trooper two-step;

23  right?

24  A.  Correct.

25  Q.  Okay.  And it's a -- it's a practice or a custom at KHP,

1    isn't it?

2    A.  Yes, it is.

3    Q.  And it's passed down from -- first in training, but it's

4    certainly passed down from trooper to trooper too; correct?

5    A.  Yes.

6    Q.  And it's part of -- you know, we heard about the academic

7    part of training and then we heard about -- in fact, I think

8    Captain Hogelin testified about the probationary process for

9    troopers.  Do you remember that?

10   A.  Yes.

11   Q.  And that involves what sometimes are called field training

12   officers along with brand new sworn troopers; correct?

13   A.  Correct.

14   Q.  And that's one of the ways that the older, more experienced

15   troopers pass down this practice of the trooper two-step to

16   younger troopers; is that fair to say?

17   A.  Amongst many other things.

18   Q.  Correct.  But that's one of them, isn't it?

19   A.  Right.

20   Q.  And so certainly KHP embraces that practice.  They train on

21   it and they apply it on the roads every day; right?

22   A.  Well, it's used.  I wouldn't say every day, but it's used,

23   yes.

24   Q.  And is it your understanding about the use of the trooper

25   two-step that troopers advise motorists that you are free to go

1   but I would like to ask some questions?

2   A.   Rephrase, I'm sorry.

3   Q.   Sure.  As you sit here today, is it your understanding that

4   when troopers engage in this maneuver, the trooper two-step,

5   that it's their practice to advise motorists you're free to go

6   but I'd like to ask you some questions?

7   A.   It's my understanding there's a delineation from the car

8   stop and then working to a consensual conversation with them or

9   asking them questions.

10  Q.   But I'm specifically talking about the language that's used

11  by troopers.  Is it still your understanding today that

12  troopers advise motorists that they are free to go but they

13  would like to ask them some more questions?

14  A.   There's different language that's used obviously.

15  Q.   But KHP trains troopers not to use that phrase, don't they?

16  A.   It -- it is a technique.  Not everyone will use that, but

17  just as long as the officer feels there's a delineation of the

18  stop to more toward a consensual.

19  Q.   In fact, no troopers use "you're free to go," do they?

20  A.   I don't know that.

21  Q.   Because motorists might believe them and take off; right?

22  A.   I don't know that for a fact.

23  Q.   And that would defeat the purpose of pulling them over in

24  the first place, which is to get in the car and search it;

25  correct?

1   A.  I'm not at every stop, sir.

2   Q.  The trooper two-step, true or false, is a tactic designed

3   to get more information from drivers; is that fair?

4   A.  That would be fair as getting more information.

5   Q.  And -- and it's designed also to keep drivers from knowing

6   that they're free to leave; correct?

7   A.  I wouldn't say that.

8        (Court reporter interruption.)

9   A.  I would not say that.

10  Q.  And it's something that troopers know to do because it's

11  endorsed by the KHP; correct?

12  A.  Correct.

13  Q.  Because KHP thinks it's an effective tactic -- tactic to

14  get consent to search a car; right?

15  A.  It's an effective tactic, yes.

16  Q.  Or they think it's an effective tactic to ask more

17  questions to try to get enough to hold for a canine sniff;

18  right?

19  A.  For whatever it needs, it is a tactic to believe more -- to

20  gain more information.

21  Q.  And you're aware the evidence in this -- in these cases is

22  that troopers do the two-step even if they think they already

23  got reasonable suspicion; correct?

24  A.  I understood that, yes.

25  Q.  Because it's easier for them to get consent and search that

1  way; right?

2  A.  Yes, it is.

3  Q.  And then they don't have to justify the detention at all,

4  do they?

5  A.  Well, it's just you can get more information --

6  Q.  But they --

7  A.  -- as they said.

8  Q.  But if you can get consent to search, then you don't have

9  to justify the detention, right, because the motorist has

10  consented?

11  A.  Correct.

12  Q.  But trooper -- troopers don't advise people that they have

13  the right to say no; correct?

14  A.  I'm not sure about that for sure.  I do know they're

15  trained that if the person says to stop -- if it's consensual

16  and they say stop, the officer has to stop.

17  Q.  Well, let me ask you a better question.  They don't advise

18  people that they don't have to answer the questions; correct?

19  A.  I could not say that for every trooper.

20  Q.  Their whole -- this whole tactic and the whole approach is

21  really designed to get folks to just go along and answer the

22  questions, isn't it?

23  A.  It would be easier, yes.

24  Q.  And it makes it easier to get inside the car, doesn't it?

25  A.  Easier to get more information for your investigation.

1   Q.  Right.

2       And that makes it easier to get inside the car?

3   A.  If that's what it needs to be, yes.

4   Q.  Whether it's immediate PC or whether it's quote/unquote

5   reasonable suspicion to call for a dog sniff; correct?

6   A.  Whatever it takes to get more information.

7   Q.  And -- and getting inside the car is important to troopers;

8   correct?

9   A.  I think to gain better information for a successful

10  investigation, whether it be for criminal activity or to

11  nullify their suspicions.

12  Q.  Well, there's -- there's actually incentive for the

13  troopers to conduct as many searches as they can; correct?

14  A.  I'm sorry?

15  Q.  There's incentive for the troopers who are doing

16  interdiction to conduct as many searches as they can?

17  A.  Can you explain to me incentive?

18  Q.  Well, sure.  For the troopers doing interdiction, one of

19  the factors you look at when you're assessing their performance

20  is the number of seizures they had; right?

21  A.  That is one element, yes.

22  Q.  And even though you've done away with quotas, you still

23  want them to be proactive as much as possible, and proactive

24  means getting inside the car; correct?

25  A.  Proactive is being visible and enforcing the laws of the

1   State of Kansas.

2   Q.  And when you're looking at -- let's talk about Troop N.

3   When you're looking at the interdiction troop, squad and you're

4   considering promoting troopers in that interdiction unit, Troop

5   N, you look at how many seizures they had; correct?

6   A.  I'm sorry, you're saying to -- to move into Troop N; is

7   that your question?

8   Q.  When you're considering promoting troopers in Troop N, you

9   take a look at how many seizures they had in considering

10  whether to promote them; correct?

11  A.  Let me get a clarification.  Promote within Troop N or

12  promote into Troop N, that's my --

13  Q.  To promote within.

14  A.  Within?

15  Q.  Yes.

16  A.  That is a factor.  That is not the sole factor.

17  Q.  I understand it's not, but the number of seizures is

18  certainly a factor in promoting a trooper; correct?

19  A.  It can be, yes.

20  Q.  And it -- and you've -- I think I've asked this.  You've

21  done away with so-called quotas, but you still need hard on

22  troopers to be as proactive as they possibly can?

23  A.  Yes.

24  Q.  So they've got motivation because of that to get in as many

25  cars as they can and search as many as they can and seize as

1   much as they can; correct?

2   A.   In Troop N, we want them to be active -- proactive in

3   trying to mitigate criminal activity.

4   Q.   Sir, let's -- let's talk about some stop practices, and

5   let's -- let's start with this, pretextual stops.  You know

6   what I mean by pretextual stop?  Those are legitimate law

7   enforcement tools; correct?

8   A.   Correct.

9   Q.   Whether it's going six miles an hour over on I-70 or

10  drifting over the fog line once or even following too closely,

11  those are -- those may be pretextual but the law says pretext

12  is okay; correct?

13  A.   Correct.

14  Q.   And, in fact, they're taught at the Kansas Law Enforcement

15  Academy; right?

16  A.   I believe so, yes.

17  Q.   And -- and that is followed by questioning about travel

18  plans and destination and origin; correct?

19  A.   Correct.

20  Q.   And that's followed often times by the two-step maneuver

21  we've talked about?

22  A.   If the officer chooses to use that, yes.

23  Q.   And that's followed by additional questions to the

24  motorist?

25  A.   If they've given consent to continue on that.

1  Q.  Well, under the -- even though you don't tell them they're

2  free to go; right?

3  A.  If the officer chooses not to, yeah.

4  Q.  Correct.

5      And even though the break sometimes is less than a second,

6  it's still the KHP's position that's a consensual encounter;

7  right?

8  A.  Correct.

9  Q.  And the whole point is to get beyond that traveler -- the

10  traffic stop -- the reason for the initial traffic stop; right?

11  A.  Correct.

12  Q.  And look for evidence of additional criminal activity?

13  A.  Yes.

14  Q.  Because, I mean, you'd agree with me a one-time drift over

15  a fog line is really not a public safety issue, is it?

16  A.  It can be.

17  Q.  And driving five or six miles an hour over the speed limit

18  where the speed limit is 75 is not a huge public safety issue,

19  is it?

20  A.  It could be if the individual was under the influence or

21  maybe medical issue or maybe just distracted.

22  Q.  But by itself six over is not a public safety issue; right?

23  A.  Not necessarily, no.

24  Q.  It's a violation?

25  A.  Violation, yes.

1  Q.  And troopers pretty rarely stop people going five or six

2  over on I-70; right?

3  A.  I would say it depends on the officer.

4  Q.  Right.

5     Because the officer makes choices about who they stop?

6  A.  They have discretion, yes.

7  Q.  And one part of the choices is to see who might be up to

8  additional criminal activity; right?

9  A.  Correct.

10  Q.  Because every officer -- every sworn officer in the KHP has

11  a responsibility to do interdiction work; correct?

12  A.  Every officer has an obligation to enforce state laws of

13  this state as well as to remove or try to apprehend criminal

14  activity.

15  Q.  And interdiction work is a big part of that; correct?

16  A.  It's a good part of that, yes.

17  Q.  And we know -- we've heard evidence about Troop N, and

18  that's really their focus; right?

19  A.  Correct.

20  Q.  But they're not the only ones.  Everybody has that

21  obligation; right?

22  A.  Correct.

23  Q.  We heard a little bit of testimony earlier about

24  forfeiture, and by forfeiture I mean the seizure and transfer

25  of currency or other property that -- that comes up in

1  interdiction work.  Does that make sense?

2  A.  Yes.

3  Q.  And forfeiture is certainly a big tool for enforcement;

4  right?

5  A.  It is a tool, yes.

6  Q.  And the forfeiture process in Kansas actually leads to

7  money making its way to the Kansas Highway Patrol; correct?

8  A.  I'm sorry, restate that please.

9  Q.  Sure.  Actually, I'll reword it.

10     The Kansas Highway Patrol shares in forfeitures of currency

11  such that part of that currency makes its way to the KHP;

12  right?

13  A.  It does sometimes, yes.

14  Q.  And that money that's seized on highways in Kansas or

15  wherever in Kansas, that could be used for training and

16  overtime for the KHP; right?

17  A.  It has certain limitations, yes.

18  Q.  Correct.

19     But it can appropriately be used for training and overtime;

20  right?

21  A.  Yes.

22  Q.  So each time you come across currency, it is money to the

23  KHP for training and overtime; right?

24  A.  Not necessarily.

25  Q.  Give me an example of some time when it's not.

1   A.  Not all money comes to us.  Sometimes it's held and it's

2   returned to the individual.

3   Q.  Right.

4       Where there's -- where there's a finding that that person

5   innocently carried the currency and it's not related to illegal

6   activity; correct?

7   A.  Correct.

8   Q.  Setting that aside, where large sums of currency are

9   seized, part of that money, not all of it but part of it, makes

10  its way to KHP; right?

11  A.  It can, yes.

12  Q.  And that's why troopers routinely ask, among this litany of

13  questions to motorists, whether they are carrying large sums of

14  currency; isn't that right?

15  A.  I think that's one of the questions they use for their

16  investigative skills.

17  Q.  Right.

18      And then when they -- if they get into the car, whether

19  it's through a canine alert or an indication, rather, or even

20  if it's consent, when they search for drugs and currency, part

21  of that currency at least goes to KHP; right?

22  A.  Yes.

23  Q.  I want to go back for just a minute to the policy regarding

24  recording of reasonable suspicion factors, and we talked about

25  the fact that -- well, sorry, I'm not going to speak for you.

1    Let me ask you.  When you became aware of a sustained complaint

2    about unlawfully extended roadside detentions, you spoke to

3    your executive staff; correct?

4    A.  Correct.

5    Q.  And you ordered that -- you verbally ordered some training

6    around that; correct?

7    A.  Correct.

8    Q.  And there was no memo that came from you.  That was all

9    verbal; right?

10   A.  Correct.

11   Q.  And after that you left it to the command staff to

12   formulate that and get it to the point where it could be

13   implemented by your approval; right?

14   A.  Correct.

15   Q.  And policy changes like that are -- are what I think you've

16   called significant; correct?

17   A.  I'm sorry?

18   Q.  A policy change like that, like the reasonable suspicion

19   recording form, is a policy change that you call significant;

20   is that right?

21   A.  It can be, yes.

22   Q.  And this policy went out on PowerDMS; correct?

23   A.  Correct.

24   Q.  And the troopers using DMS get it through the KHP's

25   internal system; right?

1   A.  Yes.

2   Q.  Kind of like an e-mail?

3   A.  Yeah.  I guess you can say that, yes.

4   Q.  The DMS pushes out a lot of information like holidays and

5   schedules and policy changes; correct?

6   A.  No, that DMS -- PowerDMS is primarily for training as well

7   as our policies that we have.

8   Q.  Okay.  And then, when troopers got that through PowerDMS,

9   they had to electronically check a box indicating that they'd

10  read it; right?

11  A.  Yes.

12  Q.  It wasn't discussed in -- well, it wasn't discussed at roll

13  call because KHP doesn't do roll call; right?

14  A.  I believe it was brought up in in-service training

15  particularly for Troop N.

16  Q.  Okay.

17  A.  It's been brought up -- generally speaking, when we put

18  something of significance of that right there, it's always --

19  it's going to follow up not only in PowerDMS but also legal, or

20  someone's going to do an in-person or some more -- augment that

21  training -- or augment training that goes along with that

22  policy.

23  Q.  With Troop N, the in-persons with Troop N; correct?

24  A.  For all the agencies.  It's specifically for Troop N, but

25  it will also transfer -- transfer over to the rest of the

1   field.

2   Q.  Okay.  And I -- I think you have said it before, correct me

3   if I'm wrong, that the criminal interdiction squad, Troop N,

4   might get direct instruction from legal counsel; correct?

5   A.  The field does too, but definitely for them they'll get

6   that in-service-type training scenario based on all the type of

7   things like that.

8   Q.  Because -- because that's the business of Troop N; right?

9   A.  Right.

10  Q.  They spend most of their time doing interdiction work;

11  right?

12  A.  Correct.

13  Q.  And I think we've heard, you know, some numbers, but

14  there's roughly 30 sworn personnel in Troop N; right?

15  A.  That's about right, yes.

16  Q.  Among a KHP sworn staff of somewhere around 475?

17  A.  Correct.

18  Q.  When those legal changes come out, those policy changes

19  that are -- that reflect legal developments, there's not

20  pretesting that's done before those policies are distributed;

21  correct?

22  A.  I don't recall any of that.

23  Q.  Okay.  There's not post testing, is there?

24      And by that I mean there's not post distribution testing;

25  right?

1  A.  There is some testing.  PowerDMS may have some questions

2  that follow up to make sure that you actually read material or

3  at least that you're correct on that.

4  Q.  May have or you don't know?

5  A.  I'm sorry?

6  Q.  So I'm talking about a couple different things.  Before the

7  -- the policy is distributed and made public to the troopers,

8  my question is do they take a pretest to determine what their

9  state of knowledge is?

10  A.  No.

11  Q.  Okay.  And after it's rolled out, after it's distributed

12  and they click that they've read it and they understand it, is

13  there a post distribution test that troopers must take?

14  A.  Yes.  Prior to -- prior to clicking that you have -- have

15  read everything, you have to take a post test.  And then once

16  you take that test and it shows you satisfactorily passed that,

17  then it shows that you have completed that.

18  Q.  Is that for all policies?

19  A.  That's for specific certain policies such as what we have:

20  abuse of force, pursuits, those type of things like that.

21  Q.  Okay.  It's not for all new policies, is it?

22  A.  Not for all new.

23  Q.  Okay.  In your -- sir, in your role as superintendent, any

24  clear patterns of misconduct by troopers or policy violations

25  by troopers are ultimately your responsibility; right?

1  A.  Correct.

2  Q.  And you have delegated the job of communicating about

3  training to your commanders; correct?

4  A.  Correct.

5  Q.  But you've come across a situation of repeated similar

6  policy violations by troopers now; correct?

7  A.  Correct.

8  Q.  And holding people accountable for those kinds of

9  violations includes imposing discipline on troopers'

10  supervisors, doesn't it?

11  A.  It can.

12  Q.  Did you discipline Trooper Schulte's supervisor for his

13  constitutional violations in this case?

14  A.  I don't recall any of that, no.

15  Q.  And you didn't discipline Trooper McMillan's supervisor for

16  his constitutional violations in this case, did you?

17  A.  I don't recall.

18  Q.  You may have but you just don't recall?

19  A.  I don't recall.

20  Q.  Fair to say, sir, that given that the kind of a job the

21  trooper has, given the nature of that job, supervisors don't

22  often have the opportunity for close supervision of the

23  troopers under their command?

24  A.  Not necessarily.  Depending on what their -- their job

25  duties are and their proximity --

1  Q.  A lot of time on the road required?

2  A.  Oh, yes, yes.

3  Q.  And typically single trooper cars; correct?

4  A.  Correct.

5  Q.  So the nature of the job dictates that that sort of close

6  one-on-one supervision is not really a very possible thing;

7  correct?

8  A.  Not necessarily, but we train them to be independent.

9  Q.  Sure.

10     A lot different than, say, an urban police force; correct?

11  A.  There is a difference, yes.

12  Q.  And you'd agree with me, wouldn't you, that that makes it

13  all that much more important for you, as superintendent, to

14  closely supervise the supervisors?

15  A.  I would say that we have that in check with the executive

16  command staff as commanders to do that.

17  Q.  But ultimately you as superintendent?

18  A.  Yes, yes.

19  Q.  You have said, sir, that the culture of the Kansas Highway

20  Patrol is one of service, courtesy and protection?

21  A.  Correct.

22  Q.  Remember that?

23  A.  Yes.

24  Q.  And you reviewed the facts of all these cases; correct?

25  A.  Correct.

1  Q.  You've watched the videos in these cases?

2  A.  I've seen them, yes.

3  Q.  And you know that both cases so far have resulted in

4  verdicts distinctly against the KHP?

5  A.  It appears that way, yes.

6      MR. MCINERNEY:  One moment, Your Honor.

7      That's all the questions I have for this witness.

8  Thank you.

9      THE COURT:  Thank you.  Cross-examination.

10                 CROSS-EXAMINATION

11 BY MR. CHALMERS:

12 Q.  I'm going to start at the end and then work backwards.  I

13 think that counsel asked you, and I tried to write it down,

14 that you've come across repeated violations by troopers.  Now,

15 what violations are you talking about?

16 A.  Repeated violations of such as we've had individuals that

17 are not performing well in their duties.

18 Q.  Well, let me ask you a little bit differently.  Are you

19 talking about the cases in this courtroom, or what are you

20 talking about in terms of repeated violations that you've come

21 across?

22 A.  Talking about a multitude, not just of this case right here

23 but some others that have done some things that we've

24 disciplined them.

25 Q.  And these others that you've talked about that are repeated

1  violations, do they have to do with roadside detentions?

2  A.  No.

3  Q.  Okay.  Do they have to do with the two-step?

4  A.  No.

5  Q.  So if we're focusing only on repeated violations as it

6  relates to roadside detentions without reasonable suspicion or

7  if it concerns lack of required consent, the information that

8  you have about repeated violations is what?  Only what you've

9  heard in the courtroom?

10  A.  That's correct.

11  Q.  Now, just so that we have it of the record -- have it as of

12  record, your agency is a state agency; is that correct?

13  A.  That is correct.

14  Q.  And you report I suppose through the governor; is that

15  correct?

16  A.  That's correct.

17  Q.  And you are an employee of the state; is that correct?

18  A.  That's correct.

19  Q.  And the functions of the Kansas Highway Patrol are

20  functions of that -- as that of a state agency; is that right?

21  A.  That's correct.

22  Q.  Okay.  So you testified about discipline of troopers and

23  that you are the final decision-makers when there's been a

24  finding that you've upheld by PSU of some policy violation; is

25  that correct?

1   A.   That's correct.

2   Q.   And there is an exhibit, Exhibit 74.  Hand that to you.

3   What is Exhibit 74?

4   A.   Exhibit 74 is our policy.  It's rules of conduct, ROC-05,

5   discipline and corrective actions.

6   Q.   And with respect to that policy, it -- it does set out,

7   does it not, information about civil service statutes?

8   A.   Yes, it does.

9   Q.   The troopers are, as you are, a -- they're employees of the

10  state; is that correct?

11  A.   That is correct.

12  Q.   As you understand your policies and your options to

13  discipline, do they have to fall within the provisions of the

14  Civil Service Act in Kansas?

15  A.   Yes, they do.

16  Q.   The -- you started with the agency when -- when was your

17  start date?

18  A.   Well, been with the agency three different times.  This is

19  my third time.  So I was a trooper 1982 to 19 --

20  Q.   Okay.  Mine's a bad question; I'm sorry.

21       You became superintendent when?

22  A.   In April of 2019.

23  Q.   And when you became supervise -- or when you became the

24  superintendent in April of 2019, was Mr. Moon still with the

25  agency?

1  A.  No, he wasn't.

2  Q.  He was from the prior administration?

3  A.  That's correct.

4  Q.  And now your retirement date is July 1st, 2023?

5  A.  Yes, it is.

6  Q.  With respect to the -- the decision that you meted out to

7  respond to the McMillan stop of Mr. Bosire, what is it you

8  ultimately decided should be done?

9  A.  Well, ultimately, it was a decision that we felt that this

10 was a better need for retraining, if you will, a rehab on what

11 he needs to know and understand of the legalities of a stop and

12 detention of someone.  It was spend some time with our legal

13 counsel -- directly with our legal counsel and also put him in

14 the -- in the vehicle of making some stops with a more

15 experienced trooper.

16 Q.  Why did you at the time not direct more severe punishment?

17 A.  I think it was -- it was just my discretion that I think we

18 could probably salvage and correct his behavior by doing this.

19 Q.  And the decisions on when discipline is meted out to a

20 trooper, how are they published if they are?  Who's told?

21 A.  Actually, the -- the individual trooper and commander for

22 something such as that right there.  Obviously an executive

23 staff would know that, but basically it's kept within close

24 confines.

25 Q.  Why is it kept within close confines?

1   A.  It's a personnel matter.

2   Q.  You were asked how often drivers are detained without

3   reasonable suspicion and if you have those statistics.  Do you

4   know if KHP is detaining drivers without reasonable suspicion?

5   A.  I don't have any data to show that either way.

6   Q.  Do you have data or information that there is a trend of --

7   of KHP troopers violating their training and detaining

8   motorists without reasonable suspicion or obtaining invalid

9   consent for searches or conversations?

10  A.  No data or concerns have come to my attention by way of

11  supervisory.

12  Q.  With respect to an incentive that a trooper may have to

13  conduct a search of a vehicle, is there, in your system of

14  rewards or within the KHP, some advantage to a trooper to

15  illegally search or seize -- search a vehicle or seize

16  property?

17  A.  Illegally, no.

18  Q.  Is there any advantage to conduct searches that are

19  illegal?

20  A.  No.

21  Q.  There are incentives, I guess, to -- to enforce the law,

22  and that might include searches however; is that correct?

23  A.  That's correct.

24  Q.  In your experience in your position and your previous

25  involvement with law enforcement of the KHP, is there any

1   incentive to a trooper to have a court suppress or throw out

2   charges because of a violation of the Constitution?

3   A.   No.

4   Q.   Now, forfeitures, I think you indicated that there are

5   instances where money may be seized and then has to be returned

6   to the owner; is that correct?

7   A.   That's correct.

8   Q.   Is there an incentive to a trooper to seize money that a

9   court will find has to be returned because the search was

10  illegal or unconstitutional?

11  A.   No.

12  Q.   Are there disincentives for troopers to conduct a

13  forfeiture that has to be returned because they didn't properly

14  follow Constitution in their search or seizure?

15  A.   I'm sorry, can you --

16  Q.   Are there disincentives to a trooper in seizing property

17  that has to be returned because a court finds that the search

18  or seizure was illegal?

19  A.   No.

20  Q.   Briefly talking about PSU, what is its function in your

21  agency?

22  A.   It's basically for -- to conduct internal investigations or

23  administrative investigations into the agency basically for

24  accountability and credibility.

25  Q.   Is it supposed to be independent?

1   A.  Yes, it is.

2   Q.  How so?

3   A.  In that no other entity within the agency is involved with

4   that -- with their investigations other than my office.

5   Q.  And has PSU brought to your attention any information about

6   trends that are causing it concerns that might require

7   retraining or other remedial action?

8   A.  No, other than what I've said.  We've seen some trends of

9   the pursuits, use of force, those type of things right there,

10  but not of what we've been talking about today.

11  Q.  Has PSU brought to your attention any information about

12  trends showing that there are violations of citizens' rights in

13  the course of detentions that are being done without reasonable

14  suspicion or consent that's being illegitimately obtained?

15  A.  No, sir.

16  Q.  Now, independent of PSU, do you have other sources of

17  information that is provided to you by your staff about the

18  operations of -- of your troopers?

19  A.  Executive staff, commanders, supervisors.

20  Q.  And do any of these various command staff members, have

21  they come to you with information about a trend or a concern

22  that troopers are conducting roadside detentions without

23  reasonable suspicion?

24  A.  No, sir.

25  Q.  Have they come to you with information about a trend that

1    troopers are improperly obtaining consent in order to get --

2    search vehicles?

3    A.   No.

4    Q.   The new forms that have been discussed now at some length

5    that came out in September of 2022, I'm not clear on your

6    testimony.  Those -- was there training provided on those new

7    forms?

8    A.   Yes, there was.

9    Q.   Now, with respect to the new forms, do you have knowledge

10   that they are being completed and turned down -- turned in by

11   troopers now?

12   A.   Yes.

13   Q.   And with respect to those new forms and the information

14   about detentions with -- that are made, whether it's consensual

15   or -- or whether it is with reasonable suspicion, has anyone --

16   has PSU, who get a copy of the forms, or Troop N's commanders,

17   who get a copy of the forms, or any of the supervisors who get

18   a copy of the forms, come to you telling you that they have

19   evidence of a trend of unconstitutional conduct by troopers?

20   A.   Since the installation of that, no.

21        MR. CHALMERS:  Your Honor, I don't have any other

22   questions of the superintendent at this time.

23        THE COURT:  Thank you.  Redirect?

24             REDIRECT EXAMINATION

25   BY MR. MCINERNEY:

1  Q.  Sir, you testified about the outcome of the McMillan

2  process, the PSU process; correct?

3  A.  Correct.

4  Q.  Are you aware that under oath Trooper McMillan, when he was

5  asked "what did you learn from the investigation and the

6  findings," his response was "I didn't learn anything"?

7           MR. CHALMERS:  Your Honor, that's not in evidence.

8           MR. MCINERNEY:  I'm asking if he's aware of it.

9           MR. CHALMERS:  Well --

10  BY MR. MCINERNEY:

11  Q.  Do you know that?

12           MR. CHALMERS:  -- I don't think you can proffer

13  something that's not in evidence.

14           THE COURT:  He's not proffering anything.  And I

15  realize that it's not in evidence here, but I thought I was

16  going to continue everything that was in the other two trials

17  as well.

18           MR. CHALMERS:  He didn't say it in the other trial

19  either, Your Honor.  That's -- that's my concern.  What they're

20  referencing is part of a deposition transcript.  It's not in

21  evidence and it's not even a complete rendition of what

22  Trooper McMillan said, and that's why I object to the question.

23           THE COURT:  Okay.  Well, I'm going to let him answer

24  it, but I will only go by what's actually in the record of the

25  other trial and what the evidence is here.  So...

1          MR. MCINERNEY:  Understood.

2     BY MR. MCINERNEY:

3     Q.  So, sir, my question is:  Are you aware that, when Trooper

4     McMillan was asked under oath in his deposition "what did you

5     learn from the investigation and the findings," his answer was

6     "I didn't learn anything"?

7     A.  I don't recall that -- that specific statement.

8     Q.  You weren't aware of that?

9     A.  No.

10    Q.  Sir, were you also aware in the same deposition, when asked

11    "do you agree with that finding," that is your finding, his

12    answer was "no"; and when he was asked "do you believe that

13    Colonel Jones got it wrong" his answer was "yes," are you aware

14    of that?

15         MR. CHALMERS:  Same objections, Your Honor.

16         THE COURT:  Same ruling.

17         THE WITNESS:  I don't recall that.

18         MR. MCINERNEY:  That's all I have for this witness,

19    judge.  Thank you.

20         MR. CHALMERS:  Nothing, Your Honor.

21         THE COURT:  Okay.  Thank you, sir.  You can step down.

22         THE WITNESS:  Thank you.

23         THE COURT:  Plaintiff's next witness.

24         MS. GREATHOUSE:  We will call Chief Aden.  I need to

25    get him on the Zoom.

1          THE COURT:  Let's take a five-minute recess then while

2     we do that.  Court's in recess.  Maybe 10 minutes.

3          (Recess.)

4          MS. GREATHOUSE:  Your Honor, one administrative thing.

5     So we do believe that Chief Aden's testimony will go past

6     two o'clock today.  The parties just conferred, and it appears

7     this is the last live witness, but we aren't going to get him

8     done by 2:00.  So we didn't know if there was any possibility

9     of going a little bit beyond 2:00 today or whether we'll just

10    have to start again on a different day.

11         THE COURT:  Right.  So, I'm sorry, we will need to do

12    that, because I've got a conflicting meeting that starts this

13    afternoon.  So -- and we have a little bit of a wrinkle on that

14    because this courtroom is in use tomorrow, so we will have to

15    move back to the other courtroom which doesn't have Zoom

16    capability.  So probably we would need to resume his testimony

17    on Friday and take up other witnesses tomorrow.

18         MS. GREATHOUSE:  We believe this is the last live

19    witness of the trial.

20         THE COURT:  For both sides?

21         MR. CHALMERS:  Yeah, the only -- we have depositions

22    that we had -- that we made designations on that need to be

23    presented to the court.  I had proposed, and I think

24    plaintiff's counsel is agreeable to it if the court is, that we

25    take those deposition transcripts, mark them as an exhibit,

1   show what my designations are, what the other designations are

2   along with the objections, and allow the court to consider that

3   as evidence rather than having someone read it live in the

4   courtroom.  But if you want to have someone read those

5   experts -- excerpts, rather, in the courtroom, then we do have

6   something to do, I guess, potentially tomorrow.

7          THE COURT:  Well, I mean, my personal preference would

8   be that we just take them and read them in chambers.  But there

9   is some public interest in this case and I think there's

10  something to be said for having all the evidence aired in open

11  court.  What do you think?

12         MR. CHALMERS:  I think, honestly, these additions,

13  which are supplemental to what are already provided in the

14  deposition, are probably not going to be the thing the public

15  is not interested in, but I defer to what the court wants.

16         MS. PERRY:  Your Honor, we plan to submit the

17  deposition designations.  What he's talking about tomorrow are

18  the counter-designations.  So I think that's still pending the

19  court's ruling on our motion to strike them, what I would say

20  first.  Second, we are fine submitting them to the court.  We

21  could file them online as exhibits if that's preferable.

22         THE COURT:  So there would be public access?

23         MR. CHALMERS:  That's fine.

24         THE COURT:  All right.  Why don't we do that.

25  All right.  Are we ready?

1          MS. GREATHOUSE:  We are.

2          THE COURT:  Chief Aden, would you, please, raise your

3    right hand so that you can be sworn.

4                         HASSAN ADEN,

5    called as a witness on behalf of the Plaintiff, having first

6    been duly sworn, testified as follows:

7                      DIRECT EXAMINATION

8    BY MS. GREATHOUSE:

9    Q.  Will you, please, state your name for the record.

10   A.  It's Hassan Aden, H-A-S-S-A-N.  Last name is Aden, A-D-E-N.

11   Q.  All right.  Chief, you have gone through your background,

12   education and experience before, so we're not going to go

13   through that again at this time as you've covered it in the

14   other trials, but there are a couple of things that I wanted to

15   address out of your background real quickly.

16        Now, am I correct in my understanding that your job has

17   had -- or your jobs have had some component of Internal Affairs

18   since 2001?

19   A.  Yes.  I first served in Internal Affairs as a sergeant in

20   2001 until 2007, at which point I had risen through the ranks

21   and was the rank of captain, but that entire period I went

22   through as an investigator in IA to a supervisor, then the

23   commander of IA, and then I -- I left IA for other jobs but was

24   still consulted by the chief -- by several chiefs on IA

25   matters.

1   Q.  All right.  And you have continued to have a component of

2   Internal Affairs review at the time that you were at -- both

3   at -- in leadership at Alexandria and Greenville; is that

4   correct?

5   A.  That's correct.

6   Q.  And at the international association of police chiefs; is

7   that correct?

8   A.  Yes, at the International Association of Chiefs of Police,

9   yes, IACP.

10  Q.  And then also in your time in the Aden Group?

11  A.  Yes, and still currently a lot of organizations -- police

12  organizations contact me for consultation on IA matters and

13  real-time technical assistance on cases.

14  Q.  Thank you.

15       In your prior testimony, you've mentioned that you've

16  worked for federal judges overseeing consent decrees.  Can you,

17  please, explain how that works?

18  A.  Yeah.  So I've worked for federal judges in Seattle,

19  Cleveland, Baltimore, and Chicago, and three of those are

20  federal consent decrees.  The Chicago consent decree was

21  brought on by the Attorney General's Office, and essentially

22  the services we provide are essentially monitoring.

23       So the settlement agreement, once that's signed, the

24  agreement takes whichever form.  These forms are consent

25  decrees.

1      So they have prescribed paragraphs.  Most of them are

2   around 450 paragraphs that the agencies and agency cities must

3   comply with.  In the case of Chicago, it's over 800 paragraphs.

4      So they're fairly complex, and we are essentially the eyes

5   and the ears of the judge where we review the parties'

6   submissions, we mediate with the parties, and then we make

7   recommendations to the judge on compliance matters.

8   Q.  So when you're doing that work, approximately how often are

9   you reporting to or interacting with the judge?

10  A.  Very often.  It's at least monthly in person in some of

11  them, but it's more often than that on various matters.

12  Q.  Now, you mentioned that in some of these it's a consent or

13  settlement decree.  Would it work any differently if it were

14  actually a -- an order of a judge?

15  A.  Yes.  If there wasn't a settlement agreement between

16  parties that outlined all of the paragraphs, the -- a judge's

17  order is very direct and would require monitoring for

18  compliance but in a much more simplified way.  It would not

19  require all of the legal process that happens when you have

20  lawyers for the city, lawyers for the police department,

21  lawyers for the monitoring team.  Essentially the compliance

22  would be by a monitor or monitor-like function, and that person

23  or that team would report back to the judge as to the -- the

24  level of compliance and the progress on compliance.  So it's

25  much more simplified.

1   Q.  How does monitoring ensure not just the policies are

2   changed but that the actual practices of an organization change

3   from top to bottom?

4   A.  Essentially if there's an order given or there are

5   requirements to be met, the monitoring team would start with

6   observing the policy development, providing technical

7   assistance on that policy development to ensure that it met the

8   components required by the judge.  Then the monitor would be

9   present and participate in the training development that

10  accompanies those policies.  And then beyond that it's a matter

11  of observing the implementation, how it's rolled out into the

12  agency, and then ensuring that it's in practice through

13  assessments.

14       And I'll give an example on that.  If it's a new form that

15  is required, the monitor would request data on that form and

16  compare that form to policy and ensure compliance across a wide

17  swath of the organization --

18  Q.  When you say a monitor would request data -- I'm sorry, I

19  think I cut you off.

20  A.  -- and then report that back to the court.  I'm sorry.

21  Q.  When you mentioned that a monitor would use data, can you

22  describe what kind of data you would receive on your example of

23  implementation of a new form?

24       MR. CHALMERS:  Your Honor, I don't see how this is

25  really relevant to this particular lawsuit.  And, I mean, it

 1    may go to -- he's talked about his qualifications, I suppose,

 2    as an expert in some respect, but how he monitors consent

 3    decrees I don't think has any relevance to any issues in this

 4    case.

 5         MS. GREATHOUSE:  My question was how would a monitor

 6    ensure that; what kind of data would they request to make sure

 7    that there would be implementation from top to bottom.  And

 8    we've already heard about a new policy being rolled out, and so

 9    this is going to be an example of how that would be done, in

10    his opinion, correctly.

11         MR. CHALMERS:  Which, of course, is an undisclosed

12    opinion.  That's not in his report, so now I guess we're --

13    we're getting to an opinion that's not disclosed, an opinion

14    that I don't think is relevant to begin with, and it's beyond

15    where I thought the question was going initially, which was to

16    talk about his qualifications, and I object.

17         THE COURT:  I'm not sure it's opinion testimony, but

18    he does need to stick within the four corners of his expert

19    report.  That said, I think this overall subject is relevant to

20    any relief that the court might grant, so objection is

21    overruled.

22    BY MS. GREATHOUSE:

23    Q.  All right.  Chief Aden, do you recall the question?

24    A.  Would you ask the question again please?

25    Q.  I can.

1    In the example that you gave of a new policy being rolled

2    out and a monitor requesting data to confirm its

3    implementation, what kind of data would the monitor be looking

4    to get?

5         MR. CHALMERS:  Again, Your Honor, I think this is

6    beyond the scope of his report, and I get now you're saying it

7    may be relevant, but still it's outside the scope of his report

8    and it was required for him to testify -- or identify, rather,

9    not only his opinions but the facts he relies upon in his

10   opinions.

11        THE COURT:  I haven't heard him express an opinion.

12   This sounds to me she's asking about factually in his

13   experience what would be involved.  So objection's overruled.

14   BY MS. GREATHOUSE:

15   Q.  You can answer.

16   A.  So I think it begins with ensuring that the organization

17   has the capacity to collect the data before we really get into

18   any of the analysis of the data.  So it's ensuring that there

19   are systems available to collect -- if there's a new form to

20   actually get that data entered into a system like a RMS, or a

21   record management system, where then the data could be

22   extracted and reviewed.

23        In the case of a form like this, it would be the components

24   of the form and it would be across -- in the case of the KHP,

25   would be across various troops and it would have to be a

1   statistically significant number of reviews to then be able to

2   determine whether compliance was -- was achieved.  But, again,

3   it starts with analyzing the agency or exploring whether the

4   agency has the systems to compile the data to eventually

5   critically self-assess itself but, meanwhile, to have the

6   monitor assess whether they're in compliance or not.

7   Q.  Thank you.

8       In your prior testimony about your experience, you also

9   mentioned that you do pattern and practice investigations into

10  law enforcement organizations that have problems.  How does

11  that work?

12  A.  I work with several state attorney generals' offices and

13  essentially work with their pattern and practice lawyers and

14  help them navigate the police agencies that they're

15  investigating by being present, conducting interviews, and also

16  guiding them through where they might find information and

17  important interviews that they need to conduct, the kinds of

18  people that they need to -- meaning rank and assignments that

19  they need to interview, and then help them assemble that --

20  that data.  And then it goes deeper into actually analyzing

21  body-worn video and often accountability structures, either an

22  IA or with the review most commonly with Internal Affairs or

23  with the review of force incidents.

24  Q.  All right.  So I want to talk -- or I want to walk through

25  the opinions that you formed related to the traffic stop and

1   detention involving Mr. Erich and Ms. Maloney.  All right?

2   A.  Yes.

3   Q.  You previously testified that your -- your testimony was

4   according to nationally accepted police practices; is that

5   correct?

6   A.  Yes, it is.

7   Q.  And the testimony you'll be giving here in this case is

8   similarly based on that same standard; is that correct?

9   A.  Yes, it is and my experience.

10  Q.  Were you asked to analyze Trooper Rohr's stop and detention

11  of Mr. Erich, Ms. Maloney and their kids?

12  A.  Yes, I was.

13  Q.  What evidence did you consider?

14  A.  KHP policy, KHP -- other documents and video from the dash

15  cam as well as depositions.

16  Q.  All right.  At a high level, what opinion did you form

17  about this stop?

18  A.  My opinion was that, based on the facts and circumstances

19  available and articulated by Trooper Rohr at the time, neither

20  of the two detentions of Mr. Erich, Ms. Maloney and their kids

21  was consistent with nationally accepted police practices.

22  Q.  I want to ask you about the opinions you formed at each

23  stage of Trooper Rohr's detention of Mr. Erich, Ms. Maloney and

24  the kids.  With each stage I want to ask you for your analysis

25  of Trooper Rohr's conduct against that benchmark you just

1   mentioned, nationally accepted police practices.  All right?

2       So let's talk about when Trooper Rohr first saw the vehicle

3   that Mr. Erich was driving.  Do you recall what kind of vehicle

4   they were driving?

5   A.   It was a recreational vehicle often referred to as an RV,

6   and he stated that it was traveling westbound on I-70 as he was

7   traveling eastbound on I-70.

8   Q.   And can you describe just briefly that RV?

9   A.   Yes, it was a -- appeared to be an older RV.  It had a

10  pickup-truck-style front with a box-truck-like rear, which

11  consisted of the living compartment of the RV.  So it was a

12  tall, wide, boxy vehicle.

13  Q.   All right.  And what did Trooper Rohr observe about the

14  time of day that this RV was traveling?

15  A.   Very early morning.

16  Q.   What would make you suspicious about an RV?

17  A.   In and of itself an RV is not suspicious.  There are RV --

18  there are thousands of RVs traveling on American roadways every

19  day 24 hours a day, so, again, in and of itself nothing.

20  Q.   What about an RV traveling east at 5:00 in the morning

21  would make you suspicious?

22  A.   Again, nothing.  It's an RV.  It is used for vacationing,

23  and -- and people are free to travel at any time of the day.

24  Q.   Was it consistent with nationally accepted policing

25  practices to find that an RV traveling west across -- or east

1  across Kansas in the very early morning was suspicious?

2  A.   The RV was traveling westbound and it was early in the

3  morning, and, no, there's nothing suspicious about that.

4  Again, people are free to travel in whichever vehicles they

5  choose, and it's in accordance to people's personal travel

6  plans as to what time they leave and what time they want to

7  arrive to a destination.

8  Q.   What did Trooper Rohr do after he first observed the RV?

9  A.   Trooper Rohr turned around in the grassy median as he was

10  traveling eastbound, and he redirected his cruiser westbound to

11  catch up to the RV.

12  Q.   I think I misled you with that because of my mistake

13  earlier.  Do you mean that Trooper Rohr was headed westbound

14  and he turned to go eastbound?

15  A.   Yes.

16  Q.   Yeah?

17  A.   Yes.

18  Q.   I made that mistake and then I led you right into that, and

19  I apologize.

20      And after he crossed the grassy median, what did

21  Trooper Rohr do next?

22  A.   He accelerated to catch up to the RV.

23  Q.   And where did he position himself with regard to the RV?

24  A.   Based on the video, it appeared that he was in the left

25  rear quarter panel in the vehicle's blind spot.

1   Q.  Quickly I want to ask you some questions about Trooper Rohr

2   crossing the grassy median and catching up to the RV.  First of

3   all, are you familiar with Kansas law on the operation of

4   emergency vehicles?

5           MR. CHALMERS:  None of this is relevant --

6           THE WITNESS:  I am.

7           MR. CHALMERS:  -- Your Honor.  We're getting into, I

8   guess, whether Trooper Rohr accelerated without turning his

9   lights on or whether he caused the -- the van to sway off the

10  lanes, I suppose that's where they're headed with the opinion

11  here.  It's a factual opinion.  Wouldn't be proper for expert

12  testimony anyway, but it's not relevant to the issues in the

13  case, which has to do with reasonable suspicion.

14          MS. GREATHOUSE:  This is actually contained in his

15  report.  He opined on the stop itself, and it is relevant

16  because it sort of looks at an overall disregard of what the

17  rules are surrounding the stop.

18          THE COURT:  Objection's overruled.  We probably could

19  have covered this in less time than it took to argue about

20  whether it's relevant.  Go ahead.

21  BY MS. GREATHOUSE:

22  Q.  So you developed an opinion about Trooper Rohr's turn and

23  catching up to the RV; is that correct?

24  A.  I did.

25  Q.  And what was that opinion?

1   A.  That Trooper Rohr disregarded the lawful -- the lawful

2   exemptions provided to law enforcement, and in the state of

3   Kansas they're similar to all of the other states where law

4   enforcement, in pursuit or in response to an emergency call,

5   can violate certain rules.  Those rules include speeding.  They

6   include parking rules.  They include stop signs and stop

7   lights.  But the exemptions have to be done under certain

8   conditions, and that is the -- what I've just stated, if the --

9   an officer is in pursuit or responding to an emergency

10  situation and their lights and sirens must be turned on.

11  Q.  What did you observe about --

12          MR. CHALMERS:  Your Honor, the testimony establishes

13  that he is testifying or attempting to testify to what Kansas

14  law is.  It's not a proper subject for expert testimony, and I

15  object and ask that the answer be stricken.

16          THE COURT:  Okay.  You know, I can look up the law and

17  I will, but I don't think it's a good use of our time to be

18  making these kinds of objections.  I don't think he's meaning

19  to testify as an expert on Kansas law and I don't think he's

20  been so designated.  So the objection is overruled.

21  BY MS. GREATHOUSE:

22  Q.  And what did you observe about whether Trooper Rohr had on

23  his lights or siren when he drove through the grassy median and

24  caught up to the RV?

25  A.  I did not hear sirens and did not see lights.

1   Q.  What was important to you about the fact that Trooper Rohr

2   disregarded the requirement that the sirens and the lights be

3   going in order to take these maneuvers?

4   A.  The exemptions are there for a reason and they're there for

5   public safety.  So they mandate that law enforcement, as they

6   abide by the exemptions, do certain things like lights and

7   sirens.  Just appeared to be a -- a blatant disregard for those

8   safety exemptions and just it seemed like the rules didn't

9   apply.  And he testified that -- when asked about this, that

10  law enforcement is allowed to speed.

11  Q.  So let's get back to Trooper Rohr's observations of the RV.

12  We had just -- we were at the point where it had approached on

13  -- or that the cruiser had just approached on the left side of

14  the RV; is that correct?

15  A.  Yes.

16  Q.  What did Trooper Rohr testify to about why he pulled up to

17  that spot?

18  A.  He was -- he testified that he was looking at a small piece

19  of paper, presumably a temporary license plate or temporary

20  tag.

21  Q.  Real quickly, what is a fog line?

22  A.  A fog line is the same as what I commonly refer to as a

23  lane marker, but it is a solid line to the right of the highway

24  that essentially splits the right most lane from the emergency

25  lane.

1  Q.  What did Trooper Rohr testify that he saw happens with

2  regard to the RV and the lane marker?

3  A.  He testified that he saw him cross -- that he saw Mr. Erich

4  and the RV cross the fog line or lane marker one time.

5  Q.  And what did Trooper Rohr testify to that he should have

6  seen in order to pull over a driver for a lane marker

7  violation?

8  A.  He testified that he needed to see more than once -- more

9  than one encroachment or crossing of the fog line.

10  Q.  Do you agree with what Trooper Rohr said in that regard?

11  A.  I do.

12  Q.  Does the time of day that the lane marker was crossed over

13  make any difference in the -- in this analysis?

14  A.  Not at all.

15  Q.  Were there any other factors to be considered in relation

16  to the stop of the RV because of the lane marker violation?

17  A.  At this point, no.  He should have observed to be able to

18  ascertain whether the person was impaired or -- or sleepy.  One

19  time was not enough.

20  Q.  What other considerations would a law enforcement officer

21  consider or think about when evaluating how a vehicle may move

22  across a lane marker?

23  A.  The size of the vehicle.  Larger vehicles are impacted by

24  wind.  They're, again, larger and have a tighter sort of space

25  to maneuver in.  So buses, tractor trailers, any other

1  oversized vehicle -- vehicles, RVs are susceptible to what I

2  call lane creep.

3  Q.  How would the proximity of other vehicles to a vehicle make

4  a difference in whether or not there's a lane marker violation?

5  A.  Those are environmental factors, and Mr. Erich testified

6  that he saw that there was a vehicle essentially in his blind

7  spot and that it made him very nervous, that impacted his

8  driving.

9  Q.  Quickly, do you have an opinion about the stop of the RV

10  itself?

11  A.  I do.

12  Q.  And what is that opinion?

13  A.  My opinion is that Trooper Rohr should have waited to see

14  more indicators that the driver was either impaired or sleepy

15  or had some other issue that needed to be pulled over for.

16  Q.  Now, let's look at the facts supporting your opinion that

17  Trooper Rohr pulled the RV over for a lane marker violation,

18  and let's -- we'll call this the first approach.

19      So we already are at the situation where Trooper Rohr has

20  identified that there's an RV, it's early in the morning, and

21  that there's travel to the east.  But in addition to those

22  factors, what additional indicators did Trooper Rohr develop

23  after he first approached the RV?

24  A.  He stated that he smelled Bondo or paint smell and that he

25  observed some paint on Mr. Erich's hands and that there was a

1   -- an area in the back of the RV sort of in that rear panel

2   that appeared to have been recently repaired.

3   Q.  Was there any discussion between -- or what was the

4   discussion between Trooper Rohr and Mr. Erich with regard to

5   those factors?

6   A.  There was a discussion, and Mr. Erich stated that he did

7   not paint it and that he did not know whether it was recently

8   painted because it was new to him.  It was recently purchased.

9   Q.  And were there any other factors that Trooper Rohr learned

10  in that first approach?

11  A.  Yes.  He learned that Mr. Erich, Ms. Maloney and their

12  children were traveling from Colorado to Alabama to visit

13  family.

14  Q.  In your opinion, what was suspicious about the paint or

15  bodywork smell that Trooper Rohr identified?

16  A.  Not --

17         MR. CHALMERS:  Just for the record, Your Honor, I need

18  to make the objections I've made previously before that none of

19  this is proper subject for expert testimonies in the sort of

20  issue we have here, which is whether there's been a

21  constitutional violation; that he is simply weighing the

22  evidence.  In his previous testimony, he said these national

23  standards are his understandings of constitutional law, maybe

24  some model policies, and then went forward to say they are not

25  what police actually follow.  I think those predicates are the

1   sort of things that would prevent this testimony from this

2   witness.  Lacks foundation.  It's not helpful and it's not

3   relevant.

4            THE COURT:  Do you think I can't sort this out?

5            MR. CHALMERS:  I think you are more than capable of

6   sorting it out, Your Honor, but I think I've got a

7   responsibility to make objections.

8            THE COURT:  Okay.  Overruled.

9   BY MS. GREATHOUSE:

10  Q.  In your opinion, what was suspicious about the paint or

11  paint smell or bodywork that Trooper Rohr identified?

12  A.  Nothing on its own, and there was also a conversation with

13  another trooper that did not smell the same paint smell or

14  Bondo smell.

15  Q.  What about Mr. Erich telling Trooper Rohr that he had not

16  recently painted the RV was relevant to your consideration?

17  A.  He stated that he had not painted it, and that is not

18  suspicious or deceitful.

19  Q.  In your opinion, what was suspicious about this being a

20  recently purchased vehicle?

21  A.  Nothing.  People purchase vehicles all the time, new and

22  used, so that on its own nothing.

23  Q.  In your opinion, what was suspicious about the time of day

24  they were traveling?

25  A.  Again, I think that people are free to travel based on

1   their travel plans at whatever time suits their plans, and

2   Mr. Erich and Ms. Maloney and their children determined that

3   that was a suitable -- suitable time for them to travel from

4   Colorado to Alabama.

5   Q.  In your opinion, what was suspicious about the fact that

6   they were traveling from Colorado to Alabama?

7   A.  Nothing.  People travel from state to state 24 hours a day

8   throughout the United States in RVs on American highways.

9   Q.  What was suspicious about taking all of these factors and

10  putting them together?

11  A.  Nothing.  They're all factors.

12  Q.  So was Trooper Rohr's reliance on this group of factors

13  consistent with nationally accepted policing practices?

14  A.  No, it was not.

15  Q.  Did you form any opinion regarding whether Trooper Rohr had

16  enough facts and circumstances to detain Mr. Erich, Ms. Maloney

17  and the kids at this point in time?

18  A.  I did.

19  Q.  And that opinion is?

20  A.  That he did not have enough factors to detain Mr. Erich,

21  Ms. Maloney and their children.

22  Q.  Let's move now to what I'll call the second approach after

23  Trooper Rohr reproaches the RV.  All right?

24  A.  Yes.

25  Q.  What does Trooper Rohr do when he first comes back to the

1    RV?

2    A.  He gives Mr. Erich back his documents and -- and then he

3    says, "Have a safe trip."  He then turned around, walked back

4    toward his cruiser, took three or four steps and then

5    reapproached the driver and asked him if he would -- if he

6    could answer some additional questions.

7    Q.  How did Mr. Erich respond to that question?

8    A.  Mr. Erich said -- seemed to know -- Mr. Erich seemed to

9    know that he did not have to answer any questions and asked if

10   he was free to go, at which point he was told that he was free

11   to go and then immediately told that he was being detained.

12   Q.  Under nationally accepted policing practices, what should

13   an officer do if the driver doesn't want to answer further

14   questions?

15   A.  They should stop asking questions.

16   Q.  And under nationally accepted policing practices, if an

17   officer tells a driver that they are free to go, what should

18   the driver be able to do?

19   A.  They should be able to leave -- to leave.  And if the

20   business of the traffic stop is conducted -- is completed,

21   which it was since he was given back his documents, he should

22   have been -- he should have been allowed to leave.

23   Q.  However, at this point in time, what -- were Mr. Erich,

24   Ms. Maloney and the kids detained?

25   A.  Yes, they were.

1  Q.  What additional indicators did Trooper Rohr allegedly

2  develop through his second conversation with -- or his

3  conversation with Mr. Erich at the second approach?

4  A.  He didn't articulate learning any.

5  Q.  All right.  Was it within nationally accepted policing

6  practices to detain Mr. Erich, Ms. Maloney and the kids for a

7  canine sniff at this point in time?

8  A.  No, it was not.

9  Q.  Did you form any opinions regarding whether Trooper Rohr

10  had enough facts and circumstances to detain Mr. Erich and

11  Ms. Maloney and the kids at the time of the second approach?

12  A.  I did.

13  Q.  And what was that opinion?

14  A.  Based on the facts and the circumstances that he

15  articulated, he did not have enough.

16  Q.  Now, following this detention, what was the next thing that

17  occurred in time?

18  A.  Trooper Rohr with a canine officer, and he had his dog

19  available with him and the trooper that was in the car with

20  him, so he conducted a dog sniff of the van -- or of the RV.

21  Q.  And what happened during that dog sniff?

22  A.  The dog allegedly alerted and which gave them probable

23  cause for a search.

24  Q.  And then after the dog alerted, what was the next thing

25  that happened?

1  A.  Trooper Rohr and backup troopers searched the interior of

2  the RV.

3  Q.  And what did they find?

4  A.  They indicated that they did not find any contraband.

5  Q.  And when they didn't find any contraband, what did that do

6  to the probable cause that they had to conduct the search?

7  A.  Probable cause evaporated at that point, and he actually

8  told Mr. Erich and his family and Ms. Maloney that they were

9  free to leave.

10  Q.  Now, let's move on to the third interaction.  So after the

11  troopers have completed their interior search, what did Trooper

12  Rohr do at that point in time?

13  A.  He told Mr. Erich and Ms. Maloney that they were free to

14  leave and their kids, but then he immediately detained them

15  again and was based on the fact that I think they forgot to

16  search the top of the RV.

17  Q.  And what -- they then searched the roof of the RV; correct?

18  A.  That's correct, at this point.

19  Q.  Yeah.

20     And what did they find?

21  A.  After they searched it, they found no contraband on -- on

22  the top of the RV and ended the second detention and let

23  Mr. Erich and Ms. Maloney leave.

24  Q.  Did you form any opinions regarding whether Trooper Rohr

25  had enough facts and circumstances to detain Mr. Erich,

1   Ms. Maloney and the kids in this third interaction?

2   A.   No, there were no factors articulated.  It just simply

3   appeared that he erroneously let them go due to incomplete

4   search and then detained them again to complete his search.

5   Q.   All right.  Let's move on from the search.

6        Did you form any opinions regarding how the KHP ensures its

7   troopers are following current law?

8   A.   I did.

9   Q.   And what was your opinion in that regard?

10           MR. CHALMERS:  Your Honor --

11           THE WITNESS:  My opinion is --

12           MR. CHALMERS:  Wait, wait, let me -- this is not a

13   standard that is a constitutional standard, this insurance --

14   or this vicarious liability, I guess.  And I don't think that

15   the testimony that I anticipate from the report meets the

16   standards of reliability nor the standards of relevance or

17   helpfulness.  And I'm not sure exactly what it is that at this

18   point the court is convinced the plaintiffs must prove as the

19   state of mind, but it's clear that it is not proper coming

20   from -- testimony from this witness, and I object to the

21   opinion that's coming.

22           THE COURT:  So I'm not sure what vicarious liability

23   has to do with this.  I'm not -- I don't understand the

24   objection.

25           MR. CHALMERS:  Well, it's my position that, in order

1  to establish a violation of 1983 by Colonel Jones, more

2  accurately the state, that you're going to have to prove

3  something more than one of its troopers has violated the

4  constitutional rights of an individual; that it is consistent

5  that there is no respondeat superior liability to the

6  governmental entity is the point I'm making.

7          Where the courts have said what it is you have to

8  prove, they said there is a required state of mind to show the

9  violation.  I contend that required state of mind is deliberate

10  indifference under all the different factors by analogy to

11  *Monell*, which, frankly, has been applied in *Bivens*, has been

12  applied in the -- in the analysis as it relates to supervisory

13  responsibility as well.

14          I think the court has decided that deliberate

15  indifference is not the test.  Maybe you haven't.  I don't

16  know, but there has to still be some state of mind.  And this

17  -- the idea that there is a failure to ensure is simply a

18  statement that -- that there is a liability to the KHP based on

19  a vicarious sense that the Supreme Court said can't be used to

20  attach liability under that statute.

21          THE COURT:  Everything you're talking about goes to

22  liability for money -- money damages, which is not what this is

23  about.  And I think you are correct that I have previously

24  addressed this actually many times, so objection is overruled.

25          MR. CHALMERS:  I appreciate that.  I thought maybe the

1    Supreme Court decision that said that the same standards apply

2    in a -- in a case where you're seeking injunctive or

3    declaratory relief to attach liability in that setting would be

4    persuasive, but that's the argument.

5         THE COURT:  Is this, like, a new Supreme Court case

6    that came out?

7         MR. CHALMERS:  No, Your Honor, it's one of some

8    distance in time ago.  The argument was -- shortly after *Monell*

9    came out, then there was advanced the argument that, hey, look,

10   if we're talking about equitable relief, why should we have to

11   prove a custom and policy, why should we have to prove all

12   these other elements?

13        The Supreme Court looked at it and said, look, that's

14   what the 1983 statute requires, that there's not going to be

15   vicarious liability that's going to flow over to -- to the

16   equitable relief, that that's the position that we -- we've

17   taken.  I think in a -- actually, it's set out in -- most

18   recently in a trial brief that was filed last night but had

19   been previously argued.

20        It's our position that the -- that the test, under the

21   Ex Parte Young that talks about who can be sued as the

22   governmental entity's official capacity representative, talks

23   about some connection maybe has to do with ensuring something,

24   but that's not a liability standard under 1983, Your Honor.

25        THE COURT:  Well, I grant you there's a lot we could

1  all use in the way of more clarity, but I think we are where we

2  are.  And the law of the case being what it is, objection is

3  overruled.

4  BY MS. GREATHOUSE:

5  Q.  Okay.  I'm going to guess you don't remember the question

6  because I don't remember what the question was, so I'm going to

7  ask it again.  Did you form any opinions regarding how KHP

8  ensures its troopers are following current law?

9  A.  I did, based on my training and experience, that KHP

10  doesn't effectively educate its troopers on changes and

11  developments, particularly regarding constitutional matters,

12  and specifically the Tenth Circuit *Vasquez v. Lewis* case, it

13  was not adequately communicated to KHP troopers and actually

14  involved KHP troopers.

15  Q.  What did you review when coming to this conclusion?

16  A.  That --

17      (Court reporter interruption.)

18  Q.  The court reporter is having trouble hearing.  We glitched

19  a little bit, so if you could start again.

20      I'll just ask the question again.  What else did you --

21  what did you review when coming to this conclusion?

22  A.  I reviewed depositions, training curriculum, policies,

23  memorandums, KHP memorandums.

24  Q.  All right.  And how about testimony, did you review

25  testimony?

1  A.  I did.

2  Q.  And let me ask, oh, during the course of this third trial,

3  have you had an -- well, have you received copies of the rough

4  transcripts that have been completed every day?

5  A.  Yes.

6  Q.  All right.  What else did you rely upon when you were

7  coming to this opinion?

8  A.  Nationally accepted policing practices.

9  Q.  And anything else that you relied on in coming to this

10  opinion?

11  A.  My experience.

12  Q.  What facts did you rely upon in coming to this opinion

13  about educating the troopers?

14  A.  The KHP is like many state police-type agencies, they're

15  decentralized and they work throughout the state.  So troopers

16  have a lot of flexibility in their work hours and the type of

17  work which they engage in, and they don't frequently -- because

18  of that decentralization, they're not frequently brought into a

19  roll-call-type situation where they can be given some fairly

20  quick updates on all sorts of matters and including legal

21  updates.

22      Legal updates, particularly to an organization that its

23  main function is to conduct stops, searches, and arrests by the

24  traffic stops that they conduct, training and updates on

25  constitutional stops is of the utmost importance.

1      And, additionally, through the review of depositions and

2  other documents, stop searches, arrests and seizures are

3  incentivized, and they do impact promotions, transfers, and

4  most of the public recognition and awards that are given to

5  troopers.  So they are incentivized to participate in these

6  activities.

7      The training that I did review was consistent with training

8  that was provided in the '80s and '90s in police organizations

9  where they were primarily instructor led lectures and

10  accompanied by a PowerPoint presentation to report that

11  lecture.  Occasionally the KHP does use PowerDMS, which it is a

12  software that is in use by all agencies that are CALEA

13  certified, and CALEA being the Commission on Accreditation for

14  Law Enforcement Agencies.  And, in addition to having policies

15  and procedures on there, you can push out some training that is

16  then recorded by the system itself.  So I did see that.

17      And essentially the KHP training I reviewed, it lacks adult

18  learning methods, and those would be -- there's a lot of

19  research on this that adult learning methods are beyond just

20  the simple lecture and PowerPoint.  They involve scenario

21  based.  They involve much more hands-on activities.  And,

22  again, this goes back to the KHP being heavily decentralized;

23  they just don't make that a priority.

24  Q.  Why don't you give us a description of the -- of a kind of

25  adult learning method or scenario that you're talking about.

1  A.  A scenario based -- when we're talking about traffic stops,

2  a scenario-based training event would be where the instructors

3  and the troopers actually stage a traffic stop and present the

4  trooper with various circumstances and various facts.  And the

5  trooper would have to determine (A) what they're facing in this

6  traffic stop but also build reasonable articulable suspicion

7  all the way through.  And the facts they're presented with

8  could be really challenging where they'd have to really think

9  through the law and policies where they would get evaluated on

10  those stops and learn from them.

11  Q.  You mentioned PowerDMS.  What's wrong with just relying

12  upon that technology to train troopers in conjunction with

13  maybe one-time-a-year live training?

14  A.  I think the technology is very effective, and PowerDMS is

15  certainly one of the leading technologies, but it is not a

16  standalone delivery system for training.  It is -- it should be

17  used complimentary to in-person training and particularly to

18  training that is vital to good performance and staying within

19  the legal bounds for law enforcement agencies.

20  Q.  All right.  Are there any particular areas or particular

21  cases where you think the KHP should have provided live

22  education?

23  A.  I do.  I mean, I think that the *Vasquez* case was one where

24  it directly implicated KHP troopers, and that one should have

25  been rolled out in a variety of ways.

1  Q.  In your work on this case, what did you find to be the

2  KHP's position on training regarding the *Vasquez* case?

3  A.  It seemed that it wasn't deemed important enough to present

4  a training on the *Vasquez* case up until the lawsuit was filed.

5  Q.  Just a moment.  Did you say that it was important enough or

6  it was not important enough?  I was having trouble hearing.

7  A.  It was not important enough.

8  Q.  All right.  Now, you reviewed the testimony of multiple

9  people in the KHP with regard to how the KHP handled the

10  *Vasquez* decision when it came down; is that correct?

11  A.  I did.

12  Q.  What did you learn in that review of testimony?

13      MR. CHALMERS:  You know, at this point I don't think

14  he's offering opinion or any facts to go to the opinion, Your

15  Honor.  I think he's trying to summarize other testimony, and I

16  don't think it's proper subject for his testimony.  I object.

17      THE COURT:  Where are we going with this?

18      MS. GREATHOUSE:  He's establishing what facts he

19  relied on in coming to the opinion, because there's the

20  discussion -- I mean, there's a variety of pieces here that

21  came in that he relied on and how he came to this opinion.

22      THE COURT:  All right.  So why don't you just ask him

23  that question --

24      MS. GREATHOUSE:  Okay.

25      THE COURT:  -- more directly?

BY MS. GREATHOUSE:

Q.  What testimony did you rely on in coming to this opinion as regards to the *Vasquez* case?

A.  Several depositions, including Sarah Washburn, who was a legal advisor at that time, and Deputy Superintendent Moon, who was deputy superintendent at that time, and Captain Hogelin, his testimony.

In addition to that, I also relied on several troopers' testimony -- testimonies around whether they even remembered -- whether they received or even remembered receiving training on the *Vasquez* case:  that would be Trooper Schulte, Trooper McMillan and Trooper Wolting.

Q.  Now, you just mentioned Trooper McMillan.  You did review his deposition as part of your work; is that correct?

A.  Yes.

Q.  And are you familiar with what he specifically said about what he learned about the *Vasquez* case?

A.  He remembered --

MR. CHALMERS:  Your Honor, excuse me, I don't know that his testimony has ever been presented on this topic, and I don't think it's proper to have an expert talk about something that's not in the record.

MS. GREATHOUSE:  Well, an expert can rely on the documents that are provided to them.  And to the extent he was provided the entire deposition and he reviewed it and, you

1  know, relied on it in coming to his opinion, I believe it is

2  the proper basis of his opinion.

3          MR. CHALMERS:  I don't think an expert's a vehicle to

4  get in hearsay of his character, which is what I guess it would

5  be on that statement.

6          THE COURT:  I mean, experts are expressly allowed to

7  rely on hearsay if it's something reasonable experts in their

8  field would do.

9          MR. CHALMERS:  Which I can't anticipate how someone

10  who's now talking about national standards is going to rely on

11  that.  I mean, that seems to open the door to that there is no

12  longer a hearsay exception to apply.

13          THE COURT:  Well, the exact opinion that he's

14  testifying about is --

15          MS. GREATHOUSE:  It has to do with the rolling --

16  ensuring that the troopers are kept abreast of current law, and

17  so that's directly relevant to what Trooper McMillan learned

18  about with the *Vasquez* case.

19          THE COURT:  Okay.  Did you expressly ask him if he

20  relied on that deposition?

21          MS. GREATHOUSE:  I asked him if he reviewed it, but I

22  will ask that question, Your Honor.

23  BY MS. GREATHOUSE:

24  Q.  Chief Aden, did you rely on the testimony of Trooper

25  McMillan that you read in his deposition?

1  A.  Yes, I did.

2  Q.  And what testimony did you review and rely on from Trooper

3  McMillan that related to your opinion on how the KHP ensures

4  that its troopers are following current law?

5  A.  Trooper McMillan stated that he remembered the *Vasquez* case

6  but could not remember training on it like the other troopers,

7  and he also didn't -- he wasn't able to articulate how that

8  would change his behavior with regard to traffic stop.

9  Q.  If you were the superintendent, how would you have made

10  sure that *Vasquez* was followed by the troopers after it came

11  down by the Tenth Circuit?

12  A.  I think initially --

13        MR. CHALMERS:  Well, I guess I'd have to object.  What

14  he would personally do is part of my problem.  That's not a

15  proper statement.

16        THE COURT:  We can quibble about the language, and you

17  do need to tighten up the language here.  You should ask about

18  what nationally accepted police practices would do, but it's

19  all going to come to the same point I guess.  So go ahead and

20  ask a different question.

21        MS. GREATHOUSE:  I will.

22  BY MS. GREATHOUSE:

23  Q.  So if nationally accepted policing practices were followed,

24  what would occur to make sure that *Vasquez* was followed by the

25  troopers in the KHP after it came down from the Tenth Circuit?

1   A.  I think initially the first thing that would happen would

2   be the chief executive officer or the agency head would convene

3   a meeting very quickly after the decision to go over the

4   decision.  That meeting would include top command and the legal

5   advisors to discuss the impact on the organization, and in this

6   case the impact on the KHP with regard to a KHP stop and court

7   decision.  That would be the first step.

8        That first step would identify where training needed to

9   occur, and the second step would be for the CEO or the head of

10  an agency to issue its statement to all staff, sworn and

11  civilian, of the law enforcement agency outlining the case and

12  outlining that there will be immediate training to address the

13  facts identified in this case and the components that needed to

14  change.

15       Shortly after that, the CEO or agency head would then use a

16  tool like PowerDMS to issue a baseline training on the facts

17  around the decision, and that baseline training would have a

18  pretest, the training and a post-test, and it would capture all

19  of that.  That would go out to all members of the agency.

20       Beyond that there would be scheduled in-person training

21  that would -- at the same time as all of these other activities

22  are rolling out, that would be -- that would be, in fact,

23  developed, and then it would be rolled out in in-service by

24  training instructors to include the legal advisors.

25       And then, while all of this was going on, the CEO or agency

1    head would have the policy group review all policies that are

2    touched by this decision and begin immediate updates to those

3    policies with rollouts to those policies that would coincide

4    with the actual training that was being conducted.

5    Q.  As it exists now, does the Kansas Highway Patrol's programs

6    to keep their -- its troopers up to speed on developing law

7    meet nationally accepted policing practices?

8    A.  No, it does not.

9         MS. GREATHOUSE:  Your Honor, that is a perfect

10   stopping place, and it's two o'clock straight up.

11        THE COURT:  All right.  Then let's take our recess for

12   today.  Our schedule tomorrow is to begin at 12:30 and go until

13   5:00.

14        MS. BRETT:  So I think one of the issues tomorrow is

15   Chief Aden is the only live remaining testimony, and we don't

16   have this courtroom tomorrow.  So I'm not sure that there's

17   testimony to present to the court tomorrow in your regular

18   courtroom.

19        THE COURT:  Okay.  So we're not having any more video,

20   everything is just written depositions and Chief Aden and

21   that's it?

22        MS. BRETT:  That's it.  We're just finishing up Chief

23   Aden.

24        THE COURT:  All right then.

25        MS. BRETT:  And closing arguments of course.

1          THE COURT:  Can we get that done between 10:30 and

2     two o'clock on Friday?

3          MS. BRETT:  Yes.  I mean, yes.

4          MS. GREATHOUSE:  Right, assuming...

5          THE COURT:  All right.  Then no court tomorrow and we

6     will reconvene in this courtroom at 10:30 on Friday.

7          Court is in recess.  Thank you.

8        (Proceedings adjourned.)

9

10

11

12                         CERTIFICATE

13        I certify that the foregoing is a true and correct

14     transcript from the stenographically reported proceedings in

15     the above-entitled matter.

16        DATE:  June 6, 2023

17
                    /s/Kimberly R. Greiner
18                  KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
                    United States Court Reporter
19

20

21

22

23

24

25

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that a copy of the foregoing APPELLANT'S APPENDIX, as submitted in digital form is an exact copy of the document filed with the Clerk.

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2024, the foregoing APPELLANT'S APPENDIX was electronically filed with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I also certify that within five business days of the issuance of notice that the electronic filing is compliant, one paper copy will be delivered by Federal Express to the Clerk's Office.


DATED: April 24, 2024                    /s/ Kurtis K. Wiard