## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

BLAINE FRANKLIN SHAW, et al.,
*Plaintiffs-Appellees,*

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

———

MARK ERICH, et al.,
*Plaintiffs-Appellees,*

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

## APPELLANT'S APPENDIX VOLUME XIX

Appeal from the United States District Court for the District of Kansas
Honorable Kathryn H. Vratil, Senior District Court Judge
District Court Case Nos. 19-CV-1343-KHV and 20-CV-1067-KHV-GEB

**OFFICE OF ATTORNEY GENERAL
KRIS W. KOBACH**

120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
(785) 296-2215
anthony.powell@ag.ks.gov
dwight.carswell@ag.ks.gov
kurtis.wiard@ag.ks.gov

Anthony J. Powell
*Solicitor General*
Dwight R. Carswell
*Deputy Solicitor General*
Kurtis K. Wiard
*Assistant Solicitor General*

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

Transcript of Bench Trial, Day 8
    (ECF No. 567) ...................................................................... 1

1

2                    UNITED STATES DISTRICT COURT
                       DISTRICT OF KANSAS,
3
     JOSHUA BOSIRE, ET AL/
4    MARK ERICH, ET AL,

                                  Docket No. 19-1343-KHV
5                                              20-1067-KHV

6      Plaintiffs,                Kansas City, Kansas
                                  Date: 5/26/2023
7        v.

8    HERMAN JONES in His
     Official Capacity,
9
       Defendant.
10   ...................

11                        TRANSCRIPT OF
                       DAY EIGHT - BENCH TRIAL
12            BEFORE THE HONORABLE KATHRYN H VRATIL,
               UNITED STATES SENIOR DISTRICT JUDGE.
13
     APPEARANCES:
14
     For the Plaintiff :    Madison A Perry & Patrick A McInerney
15                          Spencer Fane LLP -KC
                            1000 Walnut Street, Suite 1400
16                          Kansas City, MO  64106

17                          Sharon Brett
                            ACLU Foundation of Kansas
18                          6701 W 64th Street, Suite 210
                            Overland Park, KS  66202
19
     For the Defendant:     Arthur S Chalmers
20                          Office of Attorney General - Kansas
                            120 SW 10th Avenue
21                          Topeka, KS  66612

22   Court Reporter:        Nancy Moroney Wiss, CSR, RMR, FCRR
                            Official Court Reporter
23                          558 US Courthouse
                            500 State Avenue
24                          Kansas City, KS  66101

25

1                    I N D E X

2
     Mr. Chalmers' Closing Argument              852
3    Final Closing Argument by Ms. Brett          875
     Final Remarks by Mr. Chalmers                894
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good afternoon.  The court calls Blaine

2     Shaw and Mark Erich versus Herman Jones, Case Numbers 191343

3     and 201067.  Will counsel state their appearances please?

4          MS. BRETT:  Good afternoon, Your Honor, Sharon Brett

5     on behalf of the plaintiff.

6          THE COURT:  Thank you.

7          MC MC INERNEY:  Afternoon, Judge, Pat McInerney on

8     behalf of the plaintiffs.

9          MS. PERRY:  Madison Perry on behalf of the plaintiffs.

10          THE COURT:  Thank you.

11          MR. CHALMERS:  Arthur Chalmers on behalf of the

12     defendant, Your Honor.

13          THE COURT:  Thank you.  Let me start by apologizing

14     for the delay.  We had a little miscommunication internally

15     about what time this was going to start, so I'm very sorry to

16     keep you waiting.  I am -- I do think that closing arguments

17     would be helpful, and so that's why we set this.  Maybe this

18     will be Mr. Chalmers' last appearance in federal court before

19     his retirement, so plaintiffs, who wishes to speak?

20          MS. BRETT:  The plaintiffs gave their opening closing

21     argument at the conclusion of court two weeks ago, so I believe

22     it's time for Mr. Chalmers to give his closing, and then I had

23     reserved time for rebuttal.

24          THE COURT:  Okay.  Go ahead.

25          MR. CHALMERS:  Your Honor, I think that you had

1  allowed 40 minutes to plaintiff.  I don't know if I'll take

2  40 minutes, but I ask for it, if that's all right.

3          THE COURT:  Go ahead.

4          MR. CHALMERS:  If we could turn on the --

5          MS. HARPER:  I'm sorry, Your Honor, did you grant

6  40 minutes for closing?

7          THE COURT:  Uh-huh.

8          MR. CHALMERS:  Is the screen on or do I --

9          MS. HARPER:  Yes.

10          MR. CHALMERS:  Let me give it another shot then.  Here

11  we go.  Now, I need to -- I'm sorry.  I think I had it set up

12  and I don't know how it got disconnected.  There we go.

13          THE COURT:  Is that your cat pictures?

14          MR. CHALMERS:  That was a cat and a dog.

15          THE COURT:  Are they yours?

16          MR. CHALMERS:  Huh?  Yeah, yeah.  I don't really admit

17  it or not, but I'm proud of 'em.

18          THE COURT:  Well, this took me back to that cat video

19  during CoVid when the attorney was on the screen, couldn't get

20  it off.

21          MR. CHALMERS:  Yeah, actually, one of the dogs kind of

22  looked like that.  May it please the court?

23          THE COURT:  Uh-huh.

24          MR. CHALMERS:  There are three over-arching issues,

25  and I've listed on the screen that are in this case at this

1  juncture after trial.  They're lack of standing, prospective

2  relief demanded is improper, and that there's no violation of

3  421983.  I'm don't want to talk about the third, 'cause this is

4  closing argument, other than, and this is a little bit of a

5  foreshadowing when I discuss the Rizzo versus Goode case,

6  because frankly, it talks about each one of those subjects in

7  the case that's quite analogous to ours.  When we last ended,

8  the court mentioned that based on the argument presented by

9  plaintiffs' counsel, this case seemed to be more about law

10  enforcement having a war on drivers than a war on drugs.  It's

11  about interdiction, and I want to talk to you about that.

12  Interdiction, this is the highway patrol policy that's up on

13  the screen, says to the highway patrol officers, they are

14  committed to apprehend criminals who are on the streets and

15  highways, and the interdiction process is for the pursuit,

16  detection and apprehension of persons engaged in criminal

17  activity.  Troopers are then trained that to be successful at

18  interdiction, among other things, they have to be able to look

19  past the violations for indictments -- or for indications for

20  criminal activity, and make high volume of traffic stops,

21  because Your Honor, it's not about a war on drivers, it's a

22  numbers game.  There are approximately a million stops, or were

23  approximately a million stops between June of 2016 and August

24  of 2021.  That's about 200,000 stops and traffic citations a

25  year.

1          MS. BRETT:  Your Honor, this is not in evidence at

2     all.

3          MR. CHALMERS:  It is in evidence.  Actually, it came

4     in evidence through your expert.  Your Honor, I'd like to make

5     my closing argument without interruption.

6          THE COURT:  So I mean, I don't remember this evidence.

7     Who's --

8          MR. CHALMERS:  It was introduced in the testimony from

9     their expert, their statistician expert on my

10    cross-examination, Your Honor.

11         THE COURT:  Okay.  Well, you can go ahead with your

12    argument, and I'll have the record available, so go ahead.

13         MR. CHALMERS:  Thank you.  There are approximately a

14    million stops between June '16 and August of 2021, which works

15    out to be about 200,000 a year.  Now, Lieutenant Hogelin, or

16    Captain Hogelin, said it may have been around 300,000 a year.

17    There are about 1,000 canine sniffs in the six years that were

18    reviewed by their expert.  Now, canine sniff is an exact

19    measurement in that how many times interdiction is involved.

20    You can have interdiction where there's been a voluntary

21    search, but it is a pretty good indication.  In short, we're

22    dealing with less than maybe a quarter of one percent of the

23    stops that involve the interdiction process.  During that time

24    period, there have been successes.

25         The next couple of slides come from training materials

1   in 2020 if I recall.  Marijuana, cocaine, methamphetamine,

2   pounds, or excuse me, tons of those materials have been

3   recovered, and there have been weapons that have been recovered

4   as well.  But the case in the interdiction -- interdiction is

5   not about success in recovering those materials, nor is it

6   about fair.  It is about whether there's a violation of the

7   Fourth Amendment, and whether or not that violation extends to

8   a claim under Section 1983.  That is to say, we do not measure

9   under a reasonable suspicion calculus whether someone has found

10  or hasn't found drugs.  Reasonable suspicion is far less than

11  whether it's probable of the drugs or probable that the weapons

12  are there.  We're looking to whether or not there is a valid --

13  and I think the Supreme Court refers to as a Terry stop, and

14  the Terry recognizes the risk, and we accept it under our

15  Constitution that someone might be detained, someone might be

16  stopped, and they may be completely innocent.

17          The element of a 1983 suit as the court knows are

18  deprivation of a federal right.  Here, the Fourth Amendment's

19  what's alleged by a defendant who's a person who deprived them

20  under color of state law.  Plaintiffs claim is that defendant

21  Jones maintains a policy or practice of detaining drivers using

22  state residency and innocent travel indicia which violates the

23  Fourth Amendment rights, and when they start about, well, what

24  are the Constitutional violations, they put 'em in two

25  categories quoting their trial brief.  One, they say troopers

1   detain individuals in part based on innocent travel plans, and

2   two, they say troopers employ the two-step maneuver.  Neither

3   of those claims is a Constitutional violation.  Interdiction

4   does not equal a Constitutional violation.

5          Kansas Attorney General's highway patrol policies and

6   their extensive and ongoing training prohibit the violation of

7   the Fourth Amendment by troopers, and even plaintiffs' expert

8   Mr. Aden who reviewed all the materials from the highway patrol

9   and their training does not criticize the substance of the

10  highway patrol's training on the subject, either as it concerns

11  what is reasonable suspicion, when reasonable suspicion exists,

12  or for that matter, as it concerns the two-step.  Reasonable

13  suspicion, the training says and the slides from, if I recall

14  correctly, Exhibit 901, is you cannot detain a vehicle or its

15  occupants absent reasonable suspicion.  This is illegal.  Says

16  the facts must be taken in their totality, and the court knows

17  the test.

18         Now, of course, there's been plenty of testimony that

19  during traffic stops and even before a detention, there are

20  questions about where are you going, where have you been?

21  That's acceptable under the Tenth Circuit law.  The circuit

22  case where motorists' -- excuse me, where motorists' travel

23  have combined with other circumstances to establish reasonable

24  suspicion to detain a motorist under a traffic stop, those are

25  hundreds of them, that is not unusual.  The travel combined

1    with other issues can create reasonable suspicion.

2         Now, regarding the Vasquez case, Vasquez said, cannot

3    think of a scenario in which a combination of otherwise

4    innocent factors becomes suspicious because an individual is

5    from one of the aforementioned 25 states.  Vasquez's point, as

6    I've got underlined at the bottom, is if otherwise innocent

7    factors, it doesn't collectively amount to reasonable

8    suspicion, do not amount to reasonable suspicion, they don't

9    become suspicious simply because the driver is from -- a

10   resident of the state which sources marijuana.  That's been the

11   instruction to troopers, that it's been the application of the

12   instruction with troopers, and that's what Vasquez held, which

13   was not new law.  That law followed the law of the United

14   States versus Wood.  The Vasquez case was one in which the

15   court was looking at whether the law was clearly established.

16   And the rule, though, for looking at the totality of the

17   circumstances is described in Arivizu.  The Supreme Court's

18   rejected a lower court's analysis that gave no weight to

19   observations that were readily susceptible to innocent

20   explanation and that clearly attempted to de-limit the extent

21   to which certain factors may be considered by law enforcement

22   in making stops.  The court approved, quote, the factors which

23   they -- which by themselves are quite consistent with innocent

24   travel may collectively amount to reasonable suspicion, and

25   this is why, and the court says, we will draw, or allow

1    officers to draw on their experience and their training to make

2    inferences and deductions that are cumulative, and that might

3    well elude other untrained persons.  Vasquez doesn't change

4    that rule.

5            There was a discussion of the 0 plus 0 plus 0 equals

6    no reasonable suspicion argument in some of the closing

7    arguments, and then I think in the opening closing argument by

8    the defendant here.  Actually, in the -- in the Vasquez case,

9    that was discussed by the dissent.  Dissent says that's not a

10   valid argument.  That violates the Arivizu case.  The majority

11   agreed.  The majority said, no, what we're talking about,

12   however, in Vasquez was that officers can't just list a number

13   of factors.  They have to explain how the factors together with

14   their experience and specialized training amount to reasonable

15   suspicion.  The plaintiffs' counsel lists what seem on their

16   face to be a discussion of, well, you know, sometimes someone

17   doesn't answer, sometimes they do, sometimes they're noisy,

18   sometimes they're quiet.  Those sorts of things that seem to be

19   inconsistent with the idea that they are -- the idea that,

20   well, almost anything can amount to reasonable suspicion, not

21   true, and that's what this case that's up on the screen talks

22   about.  It says an officer's suspicion.  Well, it discussed an

23   officer's suspicion is aroused when the suspect looks at him

24   carefully or refuses to look at him, when the subject drives

25   exactly the speed limit or too slow, when they're too nervous

1    or too nonchalant.  They say, look, it is not those generalized

2    categories.  It's the specifics of the observations by the

3    troopers, what's happening that seems to be in duration to what

4    they would expect from someone who is innocent that gives them

5    in the combination of these ideas based on their training and

6    experience an articulable and reasonable suspicion.

7        What is the training about Vasquez, then?  Well,

8    here's the slide that came out in 2020.  And it says, drug

9    corridor travelling to and from a source or destination city

10   for narcotics illegal in Kansas.  They explained that the

11   defendant was traveling from a drug source in the Valdez (sic)

12   case, but it does little to add to the overall calculus of

13   suspicion, quoting Valdez (sic), and instructing the troopers

14   that's how that case applies.  And they point out, it is wholly

15   improper to assume that individuals are more likely to be

16   engaged in criminal conduct because of his state of residence,

17   and thus, any fact that would inculpate every resident of the

18   state cannot support reasonable suspicion.  Troopers are aware

19   of the Valdez (sic) case, and from all the evidence, follow the

20   Valdez (sic) case.

21       Now, there's some testimony that a driver's state of

22   residency in contrast to the trip's place of origin -- well,

23   there is actually no testimony that it's driver's state of

24   residence as opposed to, in contrast, to the trips of origin or

25   destination or the state issued a license plate are used by the

1   highway patrol as factors in the reasonable calculus or

2   reasonable suspicion calculus.  My slide's a little bit

3   confusing, but let me see if I can't rephrase it.  When you

4   talk about state of residence, when you talk about a license

5   plate, none of the two-steps that are discussed in the

6   evidence, none of the information contained in the testimony of

7   the troopers state that highway patrol are using those as

8   factors in the reasonable suspicion calculus.  There's evidence

9   that supports, on the other hand, that officers have in the

10  past included places of origin and destination in the totality

11  of circumstances in the reasonable suspicion.  That's the --

12  for instance, the Shaw and Erich stops.  That is entirely

13  acceptable.  And let's assume that it isn't.  Let's assume that

14  in, for instance, the Shaw stop, that reliance on the drug --

15  the drug corridor is something that is unpersuasive, that does

16  not make the stop a violation of the Fourth Amendment.

17          The Fourth Amendment concerns objective reasonableness

18  under the totality of the circumstances.  Consideration of

19  unpersuasive factors do not negate the -- that the otherwise

20  valid basis for his valid -- for his objectively reasonable

21  suspicion, says the court in the Lopez case.  The objective

22  subjective motivations of the trooper are irrelevant.  And in

23  Vasquez and then in Shaw, when the Tenth Circuit was looking

24  at, is there evidence that is uncontroverted and evidence that

25  shows a violation of the Constitution, they didn't stop with,

1   oh, in this instance, they relied on residence, or in this

2   instance, they relied on a drug corridor.  Instead, they went

3   forward and analyzed all the factors in the totality as

4   required by law.  So there is no violation that's been alleged

5   of the Constitution, nor a violation that's been proved of the

6   Constitution in connection with the -- the Valdez (sic) sort of

7   decision, in connection with the idea that travel is being

8   considered by troopers.  And there likewise is no violation for

9   consensual encounters under the Fourth Amendment.

10          Law enforcement officers do not violate the Fourth

11  Amendment by merely approaching individuals on the street or

12  another public place and asking if they're willing to answer

13  questions, and then putting questions to them if they're

14  willing to return them.  That's longstanding United States law.

15  A driver need not be told that he or she has the right to

16  leave.  That's also United States Supreme Court law.  It is not

17  necessary to read Miranda rights or even inform the driver that

18  they've got a right not to consent; again, the United States

19  Supreme Court law.  A driver must have an objective reason to

20  believe that he or she is not free to end -- free to end the

21  conversation and to proceed on his way, as the Hernandez case,

22  although that follows United States Supreme Court law as well,

23  in other words, the testimony that you heard by some of the

24  drivers.  Well, I'm not sure, I thought it was kind of unsafe

25  to leave.  It has to be an objective reason before you can deny

1    consent.  The argument that the two-step then by itself

2    violates the Fourth Amendment has been reviewed by courts, and

3    has been rejected on numerous occasions.  The United States

4    versus Lopez case is one that collected a number of those

5    cases.

6          So what does the two-step involve?  Now, two-step is

7    lingo, I'm not sure really it's highway patrol lingo, it's

8    lingo that the plaintiffs' counsel wanted to use, and asked the

9    troopers to use, and there is some discussion of it in a -- in

10   a very informative case, State versus Thompson, where Justice

11   Luckert for the Kansas Supreme Court discussed kind of the

12   abstract history of the two-step, and looked at the --

13   actually, the law journal articles that talk about it as well.

14   There, the Kansas Supreme Court determined that physical

15   disengagement in order -- to a subsequent encounter, to have a

16   subsequent encounter be deemed consensual, not a bright line

17   rule required by US Supreme Court.  You don't have to

18   physically engage.  What you have to do is, under the totality

19   of the circumstances, understand that there has been a

20   stoppage.  And when you get training, then what are the

21   troopers are told?  They say, well, if you have some

22   indicators, but don't think you've got sufficient reasonable

23   suspicion, and you feel you need to ask more questions, then

24   attempt a physical encounter like we've always done.  Remember,

25   consent must be knowingly intelligently and voluntarily given

1    based on the totality of the circumstances.  You gather more

2    reasonable suspicion, okay?  If they refuse consent, and you

3    don't have reasonable suspicion, send 'em down the road.

4         Now, there's also training, and there's no reason one

5    -- if someone possesses reasonable suspicion going up and try

6    to have a consensual encounter, testimony is that some troopers

7    have done that.  I don't know that we have an example of that

8    in this case.  But there is no violation of the Fourth

9    Amendment to see whether or not someone will engage in a

10   consensual encounter.  There is no evidence that troopers

11   failed to follow this training, and again, the plaintiffs'

12   expert does not criticize the training.  The consent must be

13   knowingly, intelligently and voluntarily made.  Plaintiffs'

14   evidence shows five past detentions, but they don't establish

15   an ongoing prevailing policy or practice of detaining drivers

16   using state of residency, that's their claim, which violates

17   the Fourth Amendment, nor frankly, do they provide any evidence

18   at all of a past detention based on the use of a two-step.

19        THE COURT:  Will you go back to the prior slide for a

20   second, please?  So what -- what evidence is in the record

21   about the training that troopers received in order to evaluate

22   whether consent is knowing, intelligent and voluntary?

23        MR. CHALMERS:  Well, there is training in the -- it's

24   actually in the Exhibit 901, and I think in Exhibit 96, or

25   training, I think some of the slides that we showed through the

1 testimony of -- of Miss Washburn went to that sort of training.

2 In the proposed findings of fact and conclusions of law, I

3 think I actually pinpoint the page numbers of that training,

4 Your Honor.

5      THE COURT:  But can you tell me what they say?

6      MR. CHALMERS:  That it needs to be knowingly,

7 intelligently and voluntarily given, that there are factors

8 that you can look at, that the court's looked at in terms of

9 whether it fits those categories, including the -- you know,

10 whether or not you're there pointing a gun at 'em, whether or

11 not in some instances, there's a physical connection or not,

12 those sorts of factors that are stated by the Tenth Circuit,

13 Your Honor.

14      THE COURT:  Any others?

15      MR. CHALMERS:  Well, I'd have to pull out the Tenth

16 Circuit law to pull out the entire laundry list, Your Honor.

17 That's what comes to mind.

18      THE COURT:  I'm interested in what the training is.

19      MR. CHALMERS:  It's in the training in terms of

20 setting out those things to consider, and those things that

21 would suggest that is not voluntarily consensual --

22      THE COURT:  Okay.  But you can't access it right now

23 as we -- at this state; is that what you're saying?

24      MR. CHALMERS:  No, I can't.

25      THE COURT:  Okay.  Go ahead.

1        MR. CHALMERS:  Talking about these five detentions,

2    though, only the Shaw and the Bosire detentions were found to

3    have violated the Fourth Amendment.  We contend those were

4    aberrant and isolated occurrences.  And those, the drivers'

5    residency was not a factor articulated by the defendants, which

6    is part of plaintiffs' claim, that they say that there's some

7    kind of ongoing policy.  In those, there was not a consent to

8    search.  There was no two-step that resulted in this alleged

9    illegal consent to search.  The detentions were over a

10   five-year period starting about five and a half years ago.  The

11   articulated suspicions were different.  There are a small

12   troopers -- or there are five different but a small percentage

13   of all troopers detained in the motorists, five different

14   motorists, and the detentions were five detentions out of more

15   than a million car stops.

16        We challenge that plaintiffs' claim that the Erich,

17   Kelly and Martinez detentions were illegal.  I'm not going to

18   talk about all the reasonable suspicion and factors that went

19   into those stops.  Erich, there was an investigation of a

20   hidden compartment.  Tenth Circuit have said if you can find a

21   hidden compartment, that gives probable cause for a search.

22   There was paint and bondo at a location on the vehicle where

23   there would be this sort of hidden compartment that was recent.

24   It was smelled by one trooper, it was touched and felt by

25   another trooper, and yet, there was paint on the hands of the

1  driver which he -- which suggested that he was the one that put

2  paint, or put it on -- this recent material on the -- on the

3  vehicle.

4       Kelly was excessively nervous and had an extensive

5  criminal history.  Those excessive nervousness, when someone is

6  told, hey, look, you're going to get a warning, which is what

7  happened with Kelly, has been viewed as something that is

8  suspicious, and then you combine that with criminal history, we

9  contend that he had reasonable suspicion.

10      In Martinez, without going at all to the

11  circumstances, Mr. Martinez dodged off the road to avoid being

12  pulled over, and then lied.  These detentions all took place,

13  and here are the dates.  Interestingly, Jones became

14  superintendent June of '19 after each of the plaintiffs' stops.

15  The detentions listed different categories in -- articulated

16  different suspicions, and this slide shows them.  You'll see

17  that down at the bottom, the only slide where there are really

18  multiple, the same is untruthful, or believed to be untruthful

19  responses to questions.

20      Importantly, when it's talking about in this case the

21  allegations to plaintiffs, there were no suspicions based on

22  the fact that they were Colorado residents, or by their license

23  plate, or from other states, frankly.  There are no suspicions

24  based on they were from Colorado or any particular state

25  residency.  Those claims that are the centerpiece of

1    plaintiffs' lawsuit were not involved in any of these episodes.

2    What pattern is there from this, is this, Jones is not

3    personally violating the plaintiffs' Fourth Amendment rights.

4    That ought to be evident.  He's not out there pulling people

5    over, he's not doing two-step, he's not acting without

6    reasonable suspicion, if that can be proved, and so that brings

7    into play the Rizzo versus Goode case, and Your Honor, if

8    you've not read that case recently, you may have, it may be

9    worth a re-read.  There, the United States Supreme Court found

10   that 16 to 20 Constitutional police brutality misconduct

11   violations in year's time by only a small percentage of police

12   did not warrant injunctive relief as a matter of law, reversing

13   the district court.  The Supreme Court's emphasis was that an

14   official did not engage in brutality, but was sued for failing

15   to protect against and institute steps to prevent/reduce police

16   misconduct.  Sounds a lot like failing to ensure that the crime

17   doesn't -- or that the violation doesn't occur.  The district

18   court found the officers' illegal behavior would reoccur if

19   they were not -- were not rare or isolated as a matter of fact,

20   because the defendant officials permitted and did not prevent

21   the behavior.

22        I think that's the claim here.  The district court

23   ordered a policy and program changes that were consistent with

24   generally recognized minimum standards for law enforcement.

25   Actually, what the court said is parties get together as part

1    of this injunction, work out how you will change what you are

2    doing to make sure and best assure that you don't have these

3    violations again, which is the relief the plaintiffs seek in

4    this case.

5           Supreme Court ruled there's a difference between

6    officer conduct and Constitutional violations by government

7    officials.  There must be an affirmative link, causal link.  In

8    fact, the affirmative link language that you probably heard

9    frequently, I think the genesis of it is Rizzo case, it's found

10   that individual plaintiffs probably lack standing in that case.

11   It didn't cite the case on that basis, so it's important to the

12   standing issue.  It found that there was no Section 1983

13   violation in a pattern of employees' illegal conduct without

14   active involvement by the principal in this case, it would be

15   Colonel Jones, and it's found that Section 1983 does not permit

16   an injunction that conflicts with in those circumstances the

17   principles of federalism, which gets to the third issue that is

18   raised in this case.

19          Now, there have been statistical evidence that has

20   been presented in this case.  Does it show a pattern of

21   misconduct by Jones?  The professor's outcome analysis is the

22   only opinion that he claimed might address whether troopers had

23   a valid reasonable suspicion for a dog sniff.  What he did is

24   he said, hey, look, I looked at the highway patrol data, not at

25   the phone data, and I compared what the basis for the stops

1   were for in-state and out-of-state folks, and I tried to see

2   whether or not that there was some sort of disparate treatment

3   on when drugs were discovered, because he thought that might

4   reflect that out-of-state drivers are being held to a lower

5   standard on the reasonable suspicion, and he said no, I don't

6   find that.  In fact, the rest of his suspicion, or rest of his

7   testimony went to, if you can accept it, and we think it's not

8   properly admitted, go to only whether or not there were more

9   two-steps of out-of-state drivers than in-state drivers, and

10  more detentions because there were more stops, but not whether

11  reasonable suspicion was present in any of those cases.  And of

12  course, the law is, even if you've got that sort of disparity

13  in stops, that is not a violation of the Fourth Amendment.

14          How about consensual encounters?  What's pattern?

15  Well, there was consensual detention for a canine sniff for

16  Miss Dunn.  It was voluntary.  She said she did it to be

17  polite.  There is no testimony that would suggest then, in that

18  instance, a violation of her Fourth Amendment rights to ask for

19  and to have the consensual detention for the canine sniff.

20  There is no evidence been presented, not a single episode where

21  there was a consensual detention for a search.  I think it

22  happens.  We have had inference from that from the testimony,

23  but we do not have any testimony that happened, and we don't

24  have any testimony that was done when it was un-voluntary,

25  unintelligent, and unwilling, that's not the third factor, but

1    close enough.

2              THE COURT:  Say that again?

3              MR. CHALMERS:  That's not the third factor; unwilling

4    isn't part of it.

5              THE COURT:  I'm sorry.  I don't understand the point

6    you're making there.

7              MR. CHALMERS:  Well, the point I think I'm trying to

8    make is, is that when you talk about a consensual detention for

9    a search, it's only consensual when it is voluntarily,

10   intelligently and willingly given, and there's no evidence of

11   any instance where that has not happened.  In other words, all

12   of the evidence that has been implied with respect to consent

13   by search, and we don't have an exact example, have been ones

14   where we -- we can think and believe that the troopers have

15   been complying with the Constitutional requirements.

16             So then there's Jones' state of mind.  Now, we contend

17   that in a 1983 action, that the plaintiff is obligated to show

18   some state of mind by defendant that is culpatory, and here

19   there is a difference here.  We think that it is a deliberate

20   and different standard -- not going to repeat that argument.

21   But regardless, everybody seems to agree that the plaintiffs

22   must still prove causation between Colonel Jones and the

23   claimed Constitutional violations.  We don't find any

24   violations, but there have to be causation.

25             As a reminder, the Ex Parte Young case, that -- that

 1   doctrine is limited to the award of remedies designed to end a

 2   continuing violation of federal law.  The purpose of injunctive

 3   relief is not to remedy past harm, but to protect the plaintiff

 4   from irreparable injury that will result, and in preparing for

 5   this argument, I found this Tenth Circuit line of cases.  The

 6   Eleventh Amendment bars a federal court from ordering notice or

 7   declaratory relief in a suit against the state unless it is

 8   ancillary to a judgment awarding prospective injunctive relief.

 9        So this brings us to Mr. Aden's national police

10   policies.  Mr. Aden's national police policies are dressed up

11   practices as he sees them.  But his best practice and whether

12   Colonel Jones is following those best practices are not a

13   violation of the Fourth Amendment by Colonel Jones.  With

14   respect to the delay in training on Vasquez, that happened

15   under the previous colonel.  Jones wasn't the colonel when

16   Vasquez came down.  Training, however, now exists, and it's

17   specific and not criticized by Mr. Aden.

18        With respect to supervision, that's mostly -- the

19   testimony there was mostly about Lieutenant Rohr's canine

20   reports were not changed by his former supervisor, and by

21   recommendation for more detailed description of what is

22   reasonable suspicion in a written policy.  With respect to

23   Lieutenant Rohr's dog reports, you can read his deposition

24   testimony, because that's how it's been submitted.  There's no

25   testimony that there's a failure of supervision because the dog

1  reports that don't have to, and therefore, don't list

2  reasonable suspicion weren't changed.  I guess that might

3  indicate that his reports were fine.  The language of the

4  reports shouldn't be changed anyway.  It's only whether or not

5  there should be a follow-up in the event that Lieutenant Rohr

6  was doing something wrong, and there's no evidence any trooper

7  other than these five examples that were given has ever

8  violated anyone's Constitutional rights in connection with the

9  allegations made in this case.

10       Then there is the allegations that, well, we should

11  have done a better job of collecting data in analysis.  That's

12  not a mootness issue, by the way.  I think they referred to the

13  voluntary cessation doctrine.  The point is, that today, right

14  now, when you're trying to decide whether in the future there

15  is going to be a violation, or whether there's an ongoing

16  violation, data of each one of the traffic stops, when there is

17  a roadside detention and they call dogs is reviewed by the

18  immediate supervisor, reviewed by PSU, reviewed by people

19  within Troop N, that's the interdiction group, all for the

20  purpose to see whether there's something that's untoward and

21  improper that's being done that they need to correct.  Then

22  there's the question of McMillan's punishment, and what

23  fallout.  What fallout?  I guess he was not fired, he's not

24  been suspended, he had to go through retraining.  How did any

25  of that encourage or discourage troopers to violate the law in

1    the future when don't even know that they know about it?  The

2    interesting -- the punishment issue was one of the points in

3    Rizzo.

4          THE COURT:  But isn't that the point, that they should

5    know about it, and that they should take that as a cautionary

6    tale?

7          MR. CHALMERS:  Well, no, I don't think so, because I

8    think that what happens in the McMillan case is, you're

9    focusing on whether or not the troopers would learn that you

10   can get away with something.  They're all ready trained not to

11   do what McMillan was found to have been done.  They're all

12   ready, to the best of our evidence, doing just that.  So what's

13   the point in giving it as cautionary training, other than the

14   worry that if you say, well, you know, McMillan got away with

15   this, now we can do it, too, and there's no evidence that they

16   know to have that sort of attitude.

17         Moreover, in the Rizzo case that was -- that was

18   really what -- what was persuasive to the district court there,

19   that the Supreme Court said, hey, look, that is not a

20   Constitutional violation.  That is not a violation that permits

21   an injunction.  That is not a violation that allows us to --

22   interests -- in the interests of federalism between state and

23   local government.

24         So I guess to summarize, as you analyze this case,

25   first, I ask you to think about what evidence is there of a

1  violation of Constitution by Jones that's ongoing?  And

2  frankly, none has been presented.  Second, the question is,

3  what has he caused, assuming that what he is doing is not

4  compliant with the standards that -- that Mr. Aden would want

5  him to follow, and the answer is that's not causation for a

6  Supreme Court or for a Constitutional violation on Jones' part.

7  And as a result, we contend that just on the one issue whether

8  there's been a Constitutional violation that would allow

9  remedy, that you should find that there is not.

10        Of course, then when you look to standing, which is

11  reviewed by what the facts are in the records now, not what the

12  allegations in the pleadings were, because those allegations

13  have changed.  Plaintiffs' case is an entirely different case

14  than what was alleged in the initial complaint or actually the

15  amended complaint.  We contend that these particular

16  plaintiffs' groups, there are three of them, do not have

17  standing to show and to charge that there are violations of the

18  Constitution going forward.  And how would they have standing

19  to even talk about the two-step in that none of them have been

20  subject to two -- a two-step where they gave consent, and then

21  as it goes to the third question, I think our position is set

22  out in the briefing all ready, and I think the court has

23  highlighted that before, this is not the case where the

24  injunctive relief that has been requested, which seems to

25  mirror what was issued, and what Rizzo found improper in Rizzo

1   is proper equitable relief, and violates the federalism, it --

2   it violates principles of comity as it concerns other courts

3   that would have to review the issues, and it involves the court

4   in entanglements going forward that federal courts say we don't

5   want to be involved in, and for those reasons, we would ask

6   that court enter judgment for defendant, Your Honor.

7           THE COURT:  Thank you.  Rebuttal from plaintiffs?

8           MS. HARPER:  You have 15 minutes; is that correct?

9           MS. BRETT:  I think so.

10          THE COURT:  Mr. Chalmers, can we have your POWERPoint

11  slide like we have from plaintiff?  Thank you.

12          MR. CHALMERS:  Yes, Your Honor.

13          MS. BRETT:  We have more cute pets, Your Honor, sorry.

14  Thank you, Your Honor.  May it please the court.  Defendant's

15  arguments were mostly rehashing legal arguments that the

16  parties have briefed extensively, and that the court has all

17  ready overruled for the most part and allowed this case to

18  proceed to trial, but I think a few small points are worth

19  responding to before I move on to talk about the relief that

20  plaintiffs seek.  First, a lot of defendant's arguments rely

21  heavily on KHP training policy and training, but we heard from

22  defendant Jones himself during his testimony at trial that

23  policy is not the same thing as practice.  Just because it's up

24  on a slide in a POWERPoint presentation doesn't mean that

25  troopers are adhering to that when they are patrolling the

1   highways, and in fact, plaintiffs put on significant evidence

2   that regardless of instruction given that they abide by the

3   Fourth Amendment, troopers are not, in fact, doing that in

4   practice.

5         Second, the defendant essentially brushes past all of

6   that evidence that was produced at trial.  I talked at length

7   in my initial opening argument that regardless of what the

8   Kansas Highway Patrol says, there's been numerous examples

9   beyond just the detentions of the individual plaintiffs that

10  troopers don't know the law and are not applying it correctly

11  in the field.

12        To the extent that defendant's arguments did address

13  evidence that was presented at trial, there were some

14  significant misconstruing of that evidence.  For example,

15  Trooper Schulte testified in his damages trial that he relied

16  on the fact that Mr. Shaw was a resident of the state of

17  Oklahoma, which he considered to be a drug source state or a

18  drug destination state.  He relied on that in his reasonable

19  suspicion calculus.  So there is evidence in the record in that

20  regard.  The third point I want to make here is that defendant

21  Jones is in charge.  The buck stops with him.  We've used that

22  phrase a few times throughout the course of this trial.  So

23  this is not an issue like what was present in Rizzo.  It's not

24  about failing to take certain steps to ensure that one or two

25  officers' misconduct discontinues.  It is about Jones, in fact,

1  actively encouraging troopers within the highway patrol to

2  engage in this misconduct.  He's essentially saying to the

3  troopers through that training that to be a successful trooper,

4  these are the sorts of things that you have to do.

5      The focus on Rizzo, it also ignores the fact that

6  multiple courts have, in fact, enjoined police misconduct in

7  other cases, and the plaintiffs have briefed those cases

8  extensively, and relied on them in our all ready submitted

9  conclusions of law to the court, Floyd, Melendres, Colorado

10  City and a number of others where the court has said that there

11  is a likelihood of continued misconduct here, and a likelihood

12  of continued harm, and there is an appropriate injunction that

13  can be issued.

14      One brief point on Doctor Mummolo's analysis.  He

15  couldn't reach a statistically significant conclusion on the

16  difference in hit rates between out-of-state and in-state

17  motorists, because the Kansas Highway Patrol stops so few

18  in-state motorists and subjects them to canine sniffs.  That's

19  why he couldn't do a statistically significant -- and/or he

20  couldn't reach a significant conclusion there, it's because the

21  volume of people that are subjected to this practice that are

22  in-state drivers is actually quite low.

23      And finally, the defendant mentioned that they've made

24  these changes to their reporting and data collection practices.

25  But what they've done in that respect is not a bar to relief

1    here for a few reasons.  First, their new policy and form

2    requiring the documentation of reasonable suspicion for all

3    detentions was not implemented until the 11th hour in this

4    case, literally during summary judgment briefing, and the State

5    frankly put on no evidence at trial that the policy is doing

6    anything in this regard.  There was no testimony about the

7    effectiveness of that policy and this new form that troopers

8    are allegedly filling out.  Second, that policy and form can be

9    rescinded at any point.  There's nothing holding Jones or any

10   future leader of the Kansas Highway Patrol to continuing that

11   policy.  And finally, the court can look at the new policy and

12   form for yourself, Your Honor, and see its inadequacies on its

13   face.

14          So for one thing, the new form is not stored in an

15   electronically searchable data base.  Data that's entered into

16   it cannot be searched and sorted, and there was testimony to

17   that effect.  That means that defendant Jones can't use the

18   data from those forms to conduct the tracking and cross-agency

19   analysis that's necessary to identify trends, to see if this

20   continues to be an issue, and then to address it, and the check

21   boxes on the form itself are essentially spoon-feeding troopers

22   alleged indicators.  It's telling them what to write for why

23   they found a driver to be suspicious.  It also continues to

24   direct the troopers to focus on a driver's state of origin or

25   destination, and provides no guidance in policy about how that

1  information can be used, if at all, in the reasonable suspicion

2  calculus.

3       So I want to move now to talking about relief, and why

4  the plaintiffs are entitled to it.  As I mentioned in the first

5  half of my argument, the plaintiffs are asking for two types of

6  equitable relief - declaration that the KHP's practices of

7  relying on out-of-state origin or destination or state of

8  residence to detain drivers for canine sniffs, and using that

9  manipulative tactic of the two-step violates drivers' Fourth

10  Amendment rights; and second, the plaintiffs are asking for an

11  injunction from the court that would end those practices for

12  good.

13       The test for determining whether plaintiffs are

14  entitled to the relief that they seek is relatively straight

15  forward.  So for declaratory relief, they have to show success

16  on the merits, which I talked about at length in my prior

17  opening, or in my prior closing argument, and that the

18  declaration that they seek is prospective in nature.  That's

19  clear by the language of the declaration that certain practices

20  that are still in use by the Kansas Highway Patrol today

21  violate the Constitution, and will continue to violate driver's

22  Constitutional rights.

23       For injunctive relief, the plaintiffs have to meet

24  three other elements, and I want to talk about these.  First,

25  plaintiffs have to show that there is irreparable harm with no

1    adequate remedy at law.  Constitutional violations by state

2    actors are inherently harmful.  The question is whether the

3    harm is irreparable, whether there's some other remedy at law

4    that can address the harm.  In this case, the answer's no,

5    there is not.  Your Honor, the plaintiffs have argued since the

6    inception of this case that an injunction is necessary to cure

7    the ongoing risk of Constitutional violations that plaintiffs

8    and other drivers face while they are on Kansas highways.

9    After the fact lawsuits for damages are simply not a sufficient

10   remedy when the complained of Constitutional violations are

11   widespread and ongoing.  Circumstances like this are precisely

12   why Section 1983 allows for equitable relief.  It's in

13   recognition of the fact that monetary damages don't fully

14   compensate individuals who had their freedom infringed upon,

15   and who continue to risk future violations, and the history of

16   this case demonstrates the insufficiency -- insufficiency of

17   damages actions as well.

18          This case is built on Vasquez, which was a case

19   against the highway patrol, and that resulted with a monetary

20   remedy, right, damages for Mr. Vasquez.  But you heard

21   testimony that did nothing to change the highway patrol's

22   practices.  It continues to this day the same thing that

23   happened to Mr. Vasquez.  And in many cases, damages are not

24   awarded, especially for cases where the Constitutional harm is

25   very difficult for juries to quantify, and we saw that with Mr.

1    Shaw's case when he was awarded nominal damages.  So it's also

2    the point even when damages are found by the jury, the state

3    ends up indemnifying the troopers, so the troopers never have

4    to pay anything.  So these damages awards do nothing to prevent

5    future misconduct, and that's really what we're talking about

6    here, not just past wrongs.  We're talking about ongoing risks.

7           Practically speaking, we cannot expect drivers to go

8    through what Mr. Shaw went through, four years of litigation to

9    receive a nominal damages award, and call that an adequate

10   remedy.  That relates to another point.  Because damages are

11   hard to obtain, plaintiffs have an exceedingly difficult time

12   finding representation.  We know that suppression motions are

13   also likewise not an adequate remedy, because for many people

14   including the named plaintiffs in this case, they're never

15   charged with a crime, so suppression does nothing for them to

16   vindicate their Constitutional rights.  These plaintiffs and

17   others just like them continue to travel the highways in

18   Kansas, and the disparities that Doctor Mummolo found suggest

19   that they stand a substantial risk of being targeted again for

20   a pretextual reason, like failing to maintain an adequate

21   distance or driving five miles over the speed limit, and then

22   they will have a target on their back because they're coming

23   from out-of-state or they have out-of-state plates.  Cannot

24   expect every single future driver to know how to vindicate

25   their Constitutional rights, be able to find an attorney who

1   will help them do so, and then have the stamina to pursue that

2   case to trial for four years, and then only receive at most a

3   couple thousand dollars in damages.  That's simply not an

4   adequate remedy at law.

5        Second, plaintiffs have shown that the balancing of

6   harms merits relief.  So I'm going to talk about harm for a

7   second, Your Honor.  You saw what these stops and detentions do

8   to people, to innocent people, who are traveling on Kansas

9   highways trying to make it back home safely after a weekend

10  with their daughter, or who are trying to travel with their

11  family on a road trip to visit others in a neighboring state.

12  Their lives are changed forever.  Think of Shawna Maloney.

13  Think of Suzanne Dunn who's father was a police officer, and

14  now she has extreme distrust of law enforcement.  Think of Mr.

15  Bosire, a naturalized US citizen, and what these actions by the

16  highway patrol did to him and his view of the US Constitution,

17  and how it altered his relationship to law enforcement likely

18  for the rest of his life.

19       Defendant Jones cannot possibly argue that his agency

20  would be harmed if they are forced to follow the Constitution.

21  You heard from Chief Aden that it is possible to police in a

22  way that both promotes public safety and Constitutional rights.

23  These two things are not mutually exclusive.  If the highway

24  patrol is serious about its public safety mission, then it

25  would, in fact, benefit from an injunction by this court that

1  would bring its troopers in line with the Constitution.  Chief

2  Aden backed that up, and described for you how court-ordered

3  reforms have worked in different jurisdictions.

4  The highway patrol would like the court to think that

5  the rollout of this new policy and form is all that was

6  necessary here.  The court does not need to order injunctive

7  relief, because according to Colonel Jones, they can reform on

8  their own, if they need to reform at all, which they still

9  think they do not.  Colonel Jones does not want an order from

10  this court.  He wants us to just trust him.  But the evidence

11  in this case has shown that he is not worthy of that trust.

12  The highway patrol troopers that he supervises, that he's in

13  charge of, are not worthy of that trust.

14  That brings us to the fourth element for injunctive

15  relief, ensuring that the injunction would not be contrary to

16  the public's interest.  Your Honor, ensuring that law

17  enforcement follows the Constitution is inherently always

18  within the public's interests.  It's why the court maintains

19  broad equitable powers.  Plaintiffs have clearly met their

20  burden on this final element.  So the question becomes what

21  does relief look like?  And before getting to that, it's worth

22  noting a few things about the court's equitable powers.  They

23  are broad, and they are flexible.

24  The Supreme Court said that 50 years ago, and has said

25  it many times since.  We have seen in other context that when

1    there's a widespread violation of the Constitution by an

2    administrative agency, the federal courts can and should step

3    in to offer a remedy, even when that remedy involved add just

4    some component of administrative decision-making.  In Brown v

5    Plata, which was about prison conditions, or in Brown v Board

6    of Education, those are examples of the court doing just this.

7    And it is no different in the law enforcement context.  Indeed,

8    courts have consistently held that when a law enforcement

9    agency has a persistent pattern of misconduct, that injunctive

10   relief is appropriate, even if it means some measure of

11   intrusion into how the agency conducts this business.

12        The Constitution allows for it and Section 1983 allows

13   for it.  So plaintiffs are asking this court to enjoin the

14   Kansas Highway Patrol's continued practice of using state

15   residency and state of origin and destination as part of its

16   calculus, and enjoin the use of the two-step.  The highway

17   patrol needs to make changes to policy and practice to ensure

18   that that enjoined conduct no longer occurs, and because there

19   might still be some disagreement about the details of those

20   changes, plaintiffs have asked for this court to order the

21   parties to engage in a remedial process that further defines

22   the contours of the reforms and how to put them into place.

23   That's what the court did in the Floyd litigation against the

24   NYPD stop and frisk policy, and it's a process that the

25   plaintiffs feel would be appropriate and helpful here.

1      Plaintiffs have prepared a proposed order in that

2  regard for the court to consider, and we are happy to submit it

3  should the court find defendant Jones liable or wish for us to

4  submit it for the court's consideration.  But again, the

5  question here is not -- right now is one of liability and

6  entitlement to relief.  The evidence that's come before the

7  court has made clear that relief is not only warranted, it is

8  necessary here.

9      THE COURT:  I have a question.

10     MS. BRETT:  Yes.

11     THE COURT:  So I've spent the last 30 years listening

12 to highway patrol officers and police officers testify about

13 reasonable suspicion, and I mean, I -- I admire your belief

14 that if I say you can't consider Factor X, that they won't

15 consider it.  I think they will not say they'd consider it.  So

16 what do we really accomplish?

17     MS. BRETT:  Well, I hear the court expressing some

18 futility.

19     THE COURT:  They never -- they never come in and say,

20 oh, I considered the gentleman's race, or you know, I

21 considered -- well, yeah, right, let's stick with race.  They

22 never say that, 'cause -- 'cause they know this would be a

23 violation, but I think we all know about -- enough about

24 implicit bias and actually explicit bias to know that it

25 occurs.  How does an injunction bear that out?

1    MS. BRETT:  Well, Your Honor, I think that there would

2    need to be specific reforms that are worked out to do

3    everything that we can to prevent it from happening.  I'm --

4    I'm not --

5        THE COURT:  Give me some examples.

6        MS. BRETT:  Revising training and policies and

7    disciplinary procedures to ensure that they are actually

8    tracking what's going on, paying close attention, and -- and

9    really changing the culture of the agency to not allow for it.

10       Now, there's been a lot that's been written and

11   discussed about how to actually reform law enforcement

12   agencies, and I hear -- I hear some of the same concerns that I

13   might share with the court about how these reforms have

14   actually worked in practice, but we have to try; right?  When

15   we have a demonstrated pattern of misconduct like we have in

16   this case, we owe it to the people traveling across our

17   highways to fashion a remedy that gives us a fighting chance of

18   trying to eradicate unconstitutional policing.  It's not to say

19   that it -- it will get rid of it altogether, but it certainly

20   has to be better than the status quo that we have right now.

21       THE COURT:  I mean, isn't the problem really the --

22   the entire model of -- of interdiction which depends on

23   stopping enormous volumes of people?  I mean, I don't know that

24   you can make a Constitutional case against that, but it seems

25   to me that -- that all of these issues go back to that -- the

1    policing philosophy.

2         MS. BRETT:  Sure, Your Honor.  I would point to the

3    testimony from Chief Aden that it is, in fact, possible to meet

4    the goals of the agency and still respect driver's

5    Constitutional rights, and we -- I don't want us to accept a

6    futility in that.  Recognizing that they have a mission that

7    they have to accomplish, there still are restraints and

8    practices that can be put into place to ensure not only that

9    Constitutional violations are prevented, but that when they do

10   occur, they are adequately detected and responded to, and I

11   think the problem that the plaintiffs have pointed out in this

12   case is that none of those things are happening, and that's why

13   an injunction is appropriate here, and that's what the terms of

14   the injunction would be aimed at.

15        THE COURT:  Okay.  Well, say a little more about that,

16   because let's say we enjoin them from considering state of

17   residency, so they put together forms, and they have the check

18   boxes, and the check boxes don't include state of residency,

19   but they have a lot of other ones, how do you monitor and

20   enforce and train for considering that as part of reasonable

21   suspicion?

22        MS. BRETT:  Well, Your Honor, I think -- I mean, we

23   can look to the -- the Floyd litigation in New York as a --

24        THE COURT:  I'm not going to, 'cause I don't think

25   that that was a good solution, but --

1          MS. BRETT:  There are reforms that can be put in

2     place, and I do think that it's -- in these circumstances, it's

3     where having a court-appointed neutral, it can be beneficial,

4     because it serves as a check on the agency to actually probe

5     behind whether they are implementing the changes that are

6     called for by the court's order, and doing so in a way that

7     actually changes practice, and whether we would call that a

8     neutral, a special master, a monitor, whatever name we want to

9     give it, that is the role that those entities have played in

10    overseeing court orders, and the implementation of those

11    orders, because it allows for the court to have the eyes and

12    ears watching what is happening without the court having to do

13    it itself, and -- and to evaluate really whether the changes

14    are taking hold, and what else might need to be done to ensure

15    that practices actually change.

16          But I don't think the answer -- if the concern is,

17    well, they might not follow my order, I don't think the -- the

18    answer is not issuing an order.  I think we have to have an

19    order that we put into place, which is why the plaintiffs have

20    asked for this -- this remedial process to engage in to outline

21    what that order would look like, where we actually ensure that

22    practices change, because otherwise, we'll just have a Vasquez

23    case, or a Shaw case, or a Bosire case, or an Erich/Maloney

24    case before the court every year, every two years, every three

25    years, this will keep happening, and we have to have an

1    opportunity to try to stop this from reoccurring, and that's --

2    that's what we are -- that's why we've pursued injunctive

3    relief in this case from the very beginning, because the

4    plaintiffs don't want this happening to anyone else.  They

5    don't want to go through it again themselves, and they don't

6    want anyone else to have to go through it.

7           THE COURT:  I understand, and you're in a very

8    difficult situation, I mean, in talking about the kinds of

9    relief that might actually work, but -- so let's say I enjoin

10   the officers from taking residency into account, so they don't

11   put it in probable cause affidavits, they don't testify about

12   it in suppression hearings, they don't check the boxes, so --

13   and you're saying, well, that doesn't -- and my concern would

14   be that that doesn't mean that we've rooted it out, but how --

15   how would you prove that it's continuing to occur without going

16   back to every single stop and evaluating the circumstances of

17   that particular stop, and that particular officer.

18          MS. BRETT:  So I think Chief Aden testified a little

19   bit about how he does this for this monitoring work for other

20   consent decrees which are doing very similar things; right?  So

21   maybe not doing it in the context of highway interdiction, but

22   there's very specific reforms that are called for in those

23   decrees about how they need to change practices and training

24   and response to Constitutional violations, but also how they

25   need to collect and analyze data to see if this is a problem

1    that is continually recurring.

2         THE COURT:  Right, but see, I'm assuming that they

3    won't create data which shows that the problem is recurring.

4         MS. BRETT:  But I think that the court could order the

5    collection and analysis of -- of certain data that would allow

6    circumstantial evidence that it is.  So you know, maybe they're

7    not writing it down in their forms, listing all their

8    reasonable suspicion factors, and in fact, in some of our --

9    some -- and in some of the cases that we presented to the

10   court, it hadn't been listed explicitly after the fact as a

11   reasonable suspicion factor, but through the -- the monitor in

12   this case, looking at individual cases, and doing the spot

13   check that we don't believe the Kansas Highway Patrol is going

14   to do on its own, the monitor would be able to find

15   circumstantial and sometimes direct evidence that it is still,

16   in fact, occurring.

17        THE COURT:  So give me an example.  What would be

18   circumstantial evidence that it is still occurring?

19        MS. BRETT:  I think if we look at -- if they were

20   collecting more robust data on who they are stopping and

21   detaining, which we didn't have great data on who they're

22   detaining, then there could be statistical analysis run of that

23   data to show that, oh, once again, they are overwhelmingly

24   detaining people with out-of-state plates for canine

25   detentions, and basically treating out-of-state motorists very

1    differently in all of their discretionary decision-making than

2    they treat in-state motorists, and I think that would not tell

3    us the full picture, but you could start from that data

4    collection, and then do the work that monitors do overseeing --

5    in overseeing these court orders in jurisdictions throughout

6    the United States to probe behind it and see what else might be

7    there.

8            I agree with Your Honor that if law enforcement

9    officers are relying on improper criteria for their

10   discretionary decision-making, but not reporting the fact that

11   they relied on improper criteria, that it might be more

12   difficult to root that out.  There would be less of a smoking

13   gun, so-to-speak, but I don't think the answer to that is just

14   let them continue to do what they're doing.  I think we have to

15   fashion a remedy that would cut this off and prevent it from

16   occurring as best we can, and it's not going to be perfect.  No

17   remedy is ever perfect.  But we owe it to the plaintiffs and --

18   and to everybody else who's driving across the state of Kansas

19   to give it our best shot to come up with something that will

20   prevent this from continuing to occur to the best that we are

21   able.

22           THE COURT:  Would you be satisfied if you were able to

23   figure out what percentage of drivers are in-state versus

24   out-of-state, and the traffic stops, track those percentages?

25           MS. BRETT:  I think it would have to go beyond traffic

1  stops, Your Honor, to the discretionary decision-making.

2          THE COURT:  The canine sniffs.

3          MS. BRETT:  The canine sniffs and that conduct as

4  well.  I don't think that would tell us the full story, but I

5  think that would be a start.  I think that in addition to that

6  data collection, though, what we really need to see is actually

7  bringing these issues that were raised in this case and

8  whatever the court's ruling is to the Kansas Highway Patrol

9  troopers, and actually doing things to make sure they

10  understand it, to make sure they understand the limitations on

11  their authority, so that hopefully it sinks in, because we know

12  it did not sink in after Vasquez.  The evidence that we

13  presented at trial showed it did not sink in after Vasquez, and

14  so there are affirmative steps that can be taken to more

15  adequately ensure the officers know and understand their

16  obligations under the law and will follow this court's order.

17          THE COURT:  Okay.  Go ahead.

18          MS. BRETT:  Your Honor, I'm almost done, but I'll just

19  wrap up by saying that I think it's important for us to

20  remember that the plaintiffs -- that we're here; right?  We've

21  done this trial for one particular reason, and it's because the

22  plaintiffs in this case knew and understood their

23  Constitutional rights, and had the -- frankly, the strength and

24  the tenacity to stand up for those rights for four years, and

25  the time that it took us to get to trial.  They do not want

1    themselves or others to go through this again, and the evidence

2    has shown that without an injunction, there's no chance of

3    these practices ever being curbed.  The rights of the

4    plaintiffs will continue to be violated, and those rights will

5    essentially be meaningless as a result.  So where we are right

6    now with this evidence is precisely where the plaintiffs say

7    and where the Supreme Court precedent has said that this

8    court's equitable powers are at its apex.  For these reasons,

9    we ask that you find in plaintiffs' favor on liability, and

10   that you hold that they are entitled to the relief that they

11   seek.

12           THE COURT:  So what -- what is your answer to Mr.

13   Chalmers' argument that plaintiffs lack standing with regard to

14   the two-step, because there -- that maneuver was not used in

15   any of their stops?

16           MS. BRETT:  The evidence shows that that's not the

17   case.  It was used in the -- in Mr. Shaw's case, very clearly.

18   It was used in Mr. Erich and Miss Maloney's case, very clearly.

19   It was not used in Mr. Bosire's case because when Trooper

20   McMillan's re-approached Mr. Bosire's passenger window, he just

21   immediately started asking additional questions.  He didn't end

22   the traffic stop at any point.  He just did one long continued

23   unconstitutional detention, so he never even got to the

24   two-step.  But we put on clear evidence that it did happen in

25   Mr. Shaw's case, and it did happen in the Erich and Maloney

1    plaintiffs' case, and then we heard lots of testimony from

2    troopers about how they use it in their practices every single

3    day, and it's in Kansas Highway Patrol's training.  So I would

4    say that that evidence -- or that argument from the defendant

5    lacks merit in the evidence.

6            THE COURT:  Okay.  Thank you.

7            MS. BRETT:  Thank you, Your Honor.

8            THE COURT:  Mr. Chalmers, you want five minutes of

9    rebuttal, or are you retired now?

10           MR. CHALMERS:  (Laughing.)  I feel kind of retired

11    now.  Yeah, I'll just make a couple quick comments.  We can't

12    presume violations of the Constitution in order to get to the

13    injunctive relief, but in terms of the evidence that was

14    presented, that's what plaintiffs want you to do.  There --

15    point I was trying to make on the two-step is that there is no

16    evidence that's been presented that the two-step has been

17    employed, and that a search took place when someone gave

18    consent, which is what the two-step's all about.  Certainly, in

19    the named plaintiffs' case, that didn't happen.  I think what

20    they do is they conflate the two-step a little bit to talk

21    about the consensual encounter part, when someone goes back up

22    and says, will you answer some questions, and there, the -- and

23    then in this instance, there are folks that say, yeah, we'll

24    answer questions, and then when they were asked to consent,

25    they said they will not, other than Miss Dunn, who said you can

1    go ahead and run the canine, although I do not want you to

2    search my -- I do not consent to a search.  In those instances,

3    the conduct was, the only evidence that's been presented was

4    completely voluntary in answering those, saying, we'll go ahead

5    and engage that.  Use Mr. Martinez as an example.  Not only had

6    he been told he could leave by saying have a nice day or words

7    to that effect, he starts to pull forward, and then the trooper

8    comes back, said, can I ask you a few questions, says readily

9    yes.

10           Now there's nothing constitutionally that prohibits

11   anyone from saying yes.  There's nothing that constitutionally

12   prohibits the trooper from asking for that consent, and that's

13   what the Supreme Court talks about in one of the cases I had on

14   the slide.

15           THE COURT:  So my problem with that argument is that

16   just because someone says yes does not mean it's knowing and

17   voluntary and informed.  And when you make a point to not tell

18   them their rights, the only thing that you have to rely on for

19   consent is that they either say yes or answer some questions.

20           MR. CHALMERS:  Yeah, and I think that that's the -- I

21   think that's the argument that was advanced and rejected in the

22   Ohio case, wasn't it, where the court says that you don't have

23   to tell them you've got a right to go in those cases.

24           THE COURT:  Yeah, I'm not saying that they have a

25   legal duty to inform them they're free to go, but if you don't

1  tell them they're free to go, it makes it harder to show that

2  the engagement with the officer is knowing and voluntary and

3  informed.

4      MR. CHALMERS:  I -- I don't disagree with the court.

5  It makes it harder.  What the courts do in that instance is

6  they look at the facts and circumstances in those weightings

7  (ph) that the Tenth Circuit has set forth to decide from an

8  objective person's standpoint was it knowing and voluntary, but

9  the predicate being when they say yeah.  I mean, for instance,

10  Miss Dunn's instance, she said that she did consent.  She

11  wanted to be polite, and there's no violation of Constitution

12  to ask her then, and for her to be polite, she says, I want to

13  go ahead and do the dog sniff.  The other I guess overarching

14  point that I would make is that there is no evidence of an

15  ongoing violation of any Constitutional right by any trooper

16  that's been submitted with you, with the possible exception of

17  the five or six stops that we've been talking about.  So if

18  you're going to analyze it, you're going to have to analyze it

19  against those stops by troopers, not by Colonel Jones, and

20  that's going to bring you squarely within the Rizzo decision

21  that, by the way, talked about those more famous Supreme Court

22  decisions like Brown versus Board of Education, and

23  distinguished those cases, saying in those cases where you

24  grant an injunction, where you had the active involvement by --

25  whether it's the school board or by defendant, that was

1     unconstitutional in its face.

2          So this case really has been about a lot of

3     allegations.  It's been about claims that it started out that

4     claims that Colorado people were being singled out, and that --

5     that the cars were being blocked so that they couldn't leave,

6     and then it's turned to now it's out-of-state drivers based on

7     their residence and license; but as you hear the argument, it's

8     not even that anymore.  They're saying, no, it's not based on

9     their residence or license plate, it's based on the idea that

10    they just don't have in those particular instances, reasonable

11    suspicion.  That is the sort of conduct the Rizzo court says

12    does not get you to injunctive relief against the -- in this

13    case the employer, which would be Colonel Jones.  So those are

14    the -- really, the only comments I want to make, unless you've

15    got other inquiry, Your Honor.

16         THE COURT:  No, I think that -- so this is very

17    helpful.  Good luck with your retirement.

18         MR. CHALMERS:  Thank you.

19         THE COURT:  This comes back on appeal at some point, I

20    guess Mr. -- Superintendent Jones will be retired also, so good

21    luck to both of you.  For that matter, I may be retired, so

22    we'll let the next generation sort this out if we have to.

23    Hopefully, that won't happen, but I appreciate all of your hard

24    work here, and the court will stand in recess.

25         (Whereupon court recessed proceedings.)

1

2                        C E R T I F I C A T E

3

4

5       I, Nancy Moroney Wiss, a Certified Shorthand Reporter and

6   the regularly appointed, qualified and acting official reporter

7   of the United States District Court for the District of Kansas,

8   do hereby certify that as such official reporter, I was present

9   at and reported in machine shorthand the above and foregoing

10  proceedings.

11      I further certify that the foregoing transcript, consisting

12  of Day Eight - Pages 849-898 - is a full, true, and correct

13  reproduction of my shorthand notes as reflected by this

14  transcript.

15      SIGNED September 28, 2023.

16

17              S/_____

18              Nancy Moroney Wiss, CSR, CM, FCRR

19

20

21

22

23

24

25

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that a copy of the foregoing APPELLANT'S APPENDIX, as submitted in digital form is an exact copy of the document filed with the Clerk.

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2024, the foregoing APPELLANT'S APPENDIX was electronically filed with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I also certify that within five business days of the issuance of notice that the electronic filing is compliant, one paper copy will be delivered by Federal Express to the Clerk's Office.


DATED: April 24, 2024                    /s/ Kurtis K. Wiard_____