---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

BLAINE FRANKLIN SHAW, et al.,
*Plaintiffs-Appellees*,

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

———

MARK ERICH, et al.,
*Plaintiffs-Appellees*,

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

---

## APPELLANT'S APPENDIX VOLUME XX

---

Appeal from the United States District Court for the District of Kansas
Honorable Kathryn H. Vratil, Senior District Court Judge
District Court Case Nos. 19-CV-1343-KHV and 20-CV-1067-KHV-GEB

---

**OFFICE OF ATTORNEY GENERAL
KRIS W. KOBACH**

120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
(785) 296-2215
anthony.powell@ag.ks.gov
dwight.carswell@ag.ks.gov
kurtis.wiard@ag.ks.gov

Anthony J. Powell
*Solicitor General*
Dwight R. Carswell
*Deputy Solicitor General*
Kurtis K. Wiard
*Assistant Solicitor General*

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

Transcript of Deposition Designations
      (ECF No. 521) ...................................................................... 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

Blaine Franklin Shaw, *et al.*,

    *Plaintiffs*,

v.

Herman Jones, in his official capacity as
the Superintendent of the Kansas Highway
Patrol, *et al.*,

    *Defendants*.

**Case No. 6:19-CV-1343-KHV-GEB**

---

Mark Erich and Shawna Maloney,
i*ndividually and as mother and natural
guardian of minors D.M and M.M,*

    *Plaintiffs,*

v.

HERMAN JONES, in his official capacity
as the Superintendent of the Kansas
Highway Patrol,

    *Defendant.*

**Case No. 20-CV-01067-KHV-GEB**

## ALL PARTIES' DEPOSITION DESIGNATIONS AND OBJECTIONS

With leave of Court, the Plaintiffs' submit the attached transcripts with all parties'
deposition designations and objections for Justin Rohr, Chandler Rule, Greg Jirak, and Ryan
Wolting. Pursuant to the Court's prior order, the red highlighting indicates Plaintiffs' designations;
the blue highlighting indicates Defendant's designations; and green highlighting indicates
objections. The parties maintain their objections filed at Doc. ##487 and 488.

1

The trial exhibits[1] attached are as follows:

1. Ex. 137 Rohr's Transcript[2] with all parties' Designations and Objections;

2. Ex. 138 Rule Transcript with all parties' Designations and Objections;

3. Ex. 139 Jirak Transcript with all parties' Designations and Objections; and

4. Ex. 140 Wolting Transcript with all parties' Designations and Objections.

---

[1] Only the pages of the depositions that contain designations are filed here, pages without designations have been removed before filing.

[2] The Court asked the parties to stipulate to corrections in Rohr's deposition transcript so that it conforms to what is heard on the video deposition. Corrections are included in text boxes on Ex. 137.

2

Respectfully submitted by,

**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF KANSAS**
Sharon Brett                KS # 28696
Kunyu Ching                 *Pro hac vice*
10561 Barkley Street, Suite 500
Overland Park, KS 66212
Phone: (913) 490-4110
Fax: (913) 490-4119
sbrett@aclukansas.org
kching@aclukansas.org

**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION**
Brian Hauss                 *Pro Hac Vice*
125 Broad Street, Floor 18
New York, NY 10004
Phone: (212) 549-2500
Fax: (212) 549-2654
bhauss@aclu.org

and

**SPENCER FANE LLP**
s/ Madison A. Perry
Leslie A. Greathouse        KS # 18656
Patrick McInerney           KS # 22561
Madison A. Perry            KS # 27144
Olawale O. Akinmoladun KS # 25151
1000 Walnut Street, Suite 1400
Kansas City, MO 64106
Phone: (816) 474-8100
Fax: (816) 474-3216
lgreathouse@spencerfane.com     ·
pmcinerney@spencerfane.com
mperry@spencerfane.com
wakinmoladun@spencerfane.com

*Attorneys for Plaintiffs*

App. Vol. XX, 3

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 15th day of May 2023, a copy of the foregoing was filed and served via the Court's electronic filing system on all counsel of record.

s/ Madison A. Perry
Attorney for Plaintiffs

4

App. Vol. XX, 4



# **Pohlman**USA®
## Court Reporting and
## Litigation Services

---

Trooper Justin Rohr

December 10, 2021

---

Blaine Franklin Shaw, et al.

vs.

Herman Jones, et al.

U. S. District Court of Kansas
19-1343-KHV-GEB
PLAINTIFF TRIAL EXHIBIT NO.
137

```
 1                    THE VIDEOGRAPHER:   We are on the
 2    record.   This is the deposition of Trooper Rohr.
 3    Today's date is December 10th, 2021.   The time is
 4    10:30 in the morning.
 5                    This is the case of Shaw, et al versus
 6    Jones, et al.   The Case Number is 19-1343-KHV-GEB,
 7    pending in the Federal District Court in the
 8    District of Kansas.
 9                    The deposition is being held at the
10    Salina Highway Patrol Training Facility, Troop C
11    Headquarters.
12                    My name is Corey McKee, the videographer,
13    associated with Pohlman USA Court Reporting,
14    headquartered in St. Louis, Missouri.
15                    If the court reporter would please
16    introduce herself, and swear in the witness, we'll
17    be ready to go.
18                    COURT REPORTER:   I am Debbie
19    Brightbill, the court reporter.
20                         JUSTIN ROHR,
21    of lawful age, having been first duly sworn on his
22    oath to state the truth, and nothing but the
23    truth, deposes and says:
24                    DIRECT EXAMINATION
25    BY MR. PIERSON:
```

```
1        Q.   Good morning.   How are you?

2        A.   Good morning.   I'm good.

3        Q.   We met briefly before this began today.

4   Do you mind saying and spelling your name?

5        A.   Justin Rohr.   J-U-S-T-I-N.   R-O-H-R.

6        Q.   Trooper Rohr, my name is Josh Pierson.

7   I'm an attorney for the plaintiffs in this case.

8   Thank you for being here today.   We appreciate

9   your time.

10       A.   Yes.

11       Q.   Have you been deposed before?

12       A.   No.

13       Q.   I understand you have given testimony

14   before; is that correct?

15       A.   Yes.

16       Q.   All right.   A couple of ground rules

17   before we begin.   First, everything we say is

18   being both recorded on the video, as being taken

19   down by our court reporter here.   That means a

20   couple of practical things today.

21            We can't talk over one another, if we do,

22   it makes the court reporter's job very difficult,

23   and the transcript become messy.   So I'll ask if

24   you let me finish my question before you begin

25   answering, I'll do my best to let you finish your
```

```
 1        A.   Five to six months.

 2        Q.   All right.  I should have asked you, when

 3   did you graduate from college?

 4        A.   '97.

 5        Q.   And what did you do after working for

 6   that phone company in Nebraska?

 7        A.   I moved to a phone company down here in

 8   Kansas in '98.

 9        Q.   When did you join the Kansas Highway

10   Patrol?

11        A.   2006, July.

12        Q.   And is that when you went to the Academy?

13        A.   Yes.

14        Q.   Tell me why you decided to join the

15   Kansas Highway Patrol.

16        A.   Law enforcement was something that I've

17   wanted to do for a long time.  However, when I got

18   out of high school, communications industry was

19   booming at that time, and I wanted to go to work,

20   so I did that.  And then after a couple years, or

21   almost ten years of working in the phone industry,

22   I decided to give this a try.

23        Q.   All right.  And you said, I'm sorry, it's

24   on your mother's side that you have family --

25        A.   Yes.
```

```
 1          Q.  -- in law enforcement?

 2          A.  Yes.

 3          Q.  Did that influence your decision to go

 4     into law enforcement in any way?

 5          A.  Maybe a little.

 6          Q.  So, when did you finish the Academy?

 7          A.  November of 2006.

 8          Q.  And you've been employed with the Highway

 9     Patrol ever since then?

10          A.  Yes.

11          Q.  So, tell me what did you do after

12     graduating from the academy; did you go to work at

13     a certain Troop, or in a certain location?

14          A.  I worked right here in Salina.

15          Q.  What was your title at that point?

16          A.  Trooper.

17          Q.  When you say worked in Salina, were you

18     assigned specifically to Salina, or based out of

19     Salina?

20          A.  Saline County was my assigned zone.

21          Q.  And was it a certain Troop number or

22     letter?

23          A.  Troop C.

24          Q.  And is that where you work today?

25          A.  I am with Troop /F today.
                                    S.
```

App. Vol. XX, 9

```
 1        Q.  Have you been with any other Troop
 2   besides that? C and S?
 3        A.  No.
 4        Q.  When did you make this move from Troop C
 5   to Troop F? S.
 6        A.  2014.
 7        Q.  Have you always held the rank of Trooper?
 8        A.  No.
 9        Q.  What other ranks have you held?
10        A.  Master Trooper, Technical Trooper, and
11   currently Lieutenant.
12        Q.  Talk to me about if you can recall the
13   dates that you held each one.  When did you become
14   a Master Trooper?
15        A.  Master Trooper would have been
16   approximately six years after I was employed.  So
17   about 2012.  Technical Trooper, 2014.  And then
18   Lieutenant would have been 2020.
19        Q.  So, through /today? Pretty recently?
20        A.  Yes.
21        Q.  Did you become a Technical Trooper when
22   you moved to Troop F?
23        A.  Yes.
24        Q.  All right.  Tell me what that means, to
25   become a Technical Trooper.
```

App. Vol. XX, 10

Case 6:19-cv-01343-KHV  Document 521-1  Filed 05/15/23  Page 7 of 184

or

1      A.   There's certain areas through Divisions

2   within the Highway Patrol that require technical,

3   more specialized training, and those guys are

4   considered Technical Trooper's.  As opposed to a

5   Master Trooper.

6      Q.   And so in your case, what additional

7   training did you receive?

8      A.   The K-9.

9      Q.   And can you tell me about that?  What was

10   the training like to become a K-9 handler?

11      A.   It was ten to 12 weeks of K-9 basic

12   school.

13      Q.   Did you have to apply for that job?

14      A.   Yes.

15      Q.   Was it competitive?  In other words, do

16   you know if some people were selected and others

17   weren't?

18      A.   I believe at that time I was the only one

19   that put in for it.

20      Q.   Okay.  And why did you want to -- I

21   should ask, did you apply specifically to be a K-9

22   handler?

23      A.   Yes.

24      Q.   Why did you want to be a K-9 handler?

25      A.   Mostly because of the hours of work.

```
 1    different than the Master Trooper, as in the pay
 2    scale, so I don't consider it a promotion.  More
 3    of a reallocation, is my opinion.
 4        Q.  Okay.  So if I understand you correctly,
 5    your pay didn't change from when you became a
 6    Technical Trooper, went from Master Trooper to
 7    Technical Trooper, your pay stayed the same?
 8        A.  Yes.
 9        Q.  So, I guess tell me about your duties as
10    a Technical Trooper and K-9 handler.
11        A.  Can you be more specific?
12        Q.  I'm just asking, what was your job like?
13        A.  It's pretty broad.  I mean, I guess I
14    need to be -- rephrase the question, as far as
15    more specific what you're looking for, I guess.
16        Q.  Tell me about a typical day.
17        A.  Typical day is come to work, go work the
18    road.
19        Q.  And what does that mean, to work the
20    road?
21        A.  Traffic stops, assist others if they
22    request K-9, respond to calls where a K-9 was
23    needed.
24        Q.  Okay.  As a technical trooper, as a K-9
25    handler rather, are you sitting -- or do you ever
```

```
 1    -- did you ever sit on the side of the road and

 2    watch traffic for traffic violations?

 3         A.   Yes.

 4         Q.   All right.   How much of your time did

 5    that make up, as compared to responding to calls,

 6    or responding to calls for K-9?

 7         A.   As far as a number wise, I can't give you

 8    a number.   I mean, it was -- the majority of the

 9    time was that.

10         Q.   And as a Technical Trooper, you said you

11    made your own hours; but did you have to work a

12    certain number of hours a week?

13         A.   Yes.

14         Q.   What was that?

15         A.   Forty hours a week.

16         Q.   All right.   Besides the training for the

17    technical -- to become a Technical Trooper, did

18    you have to do any sort of continuing education or

19    in-service training as a Technical Trooper?

20         A.   We have in-service training every year,

21    which we have to go to.

22         Q.   And when you say we, do you mean?

23         A.   All of the highway patrol, all of law

24    enforcement has to have, I believe 40 hours of

25    continuing education throughout the year.
```

App. Vol. XX, 13

1    Q.   Okay.   That's all highway patrol, or
2    potentially all law enforcement?
3         A.   Yes.
4         Q.   Did you have any separate or additional
5    requirements as a Technical Trooper?
6         A.   Requirements, no.
7         Q.   Okay.   Sounds like there might have been
8    others who did?
9         A.   On our own choices, you know, we go to
10   other training that we would like to go to, if we
11   could.
12        Q.   All right.   Tell me about the other
13   training you attended as a Technical Trooper.
14        A.   I've attended several classes throughout
15   the nation as the DIAP, the interdiction
16   conferences.   K-9 Cop Conference, dealing with K-9
17   training.
18             I've gone to San Ysidro, California, two
19   times, worked with the border patrol agents, and
20   hands-on experience in training down there.
21        Q.   Okay.   So DIAP K-9, and what was the
22   California town?
23        A.   San Ysidro.
24        Q.   Okay.   When did you do the DIAP training;
25   is that more than once?

App. Vol. XX, 14

```
 1         A.  Yes.

 2         Q.  How often -- when did you do it?

 3         A.  Date wise, I don't recall what the dates

 4    are.  I believe there was -- I've attended one in

 5    Cincinnati, one in Florida, I believe.

 6         Q.  All right.  You don't recall the years?

 7         A.  I do not.

 8         Q.  You said specific K-9 training?

 9         A.  K-9 Cop Conference.

10         Q.  Is that actually the name of the

11    organization?

12         A.  Yes.

13         Q.  All right, K-9 Cop.  Have you gone to

14    that more than once?

15         A.  Yes.  Nashville, I don't recall where the

16    other one was, I know there was another one was,

17    but there was another one.

18         Q.  That you've gone to?

19         A.  Yes.

20         Q.  And then San Ysidro, what was that

21    training for?

22         A.  Hands-on training with the Border Patrol

23    Agents.

24         Q.  Were you being trained by Border Patrol,

25    or were you providing to Border Patrol?
```

```
 1      A.   Being trained by border patrol.
 2      Q.   Why did you want to attend that one?
 3      A.   You know, a lot of illegal narcotics are
 4  coming out of Mexico, so we're able to work the
 5  actual border with Border Patrol agents.  They
 6  were able to provide information on vehicles,
 7  vehicle types, what they've been seeing, current
 8  trends.  False compartments in vehicles.
 9      Q.   So do you do you any immigration
10  enforcement as a Kansas Highway Patrol officer?
11      A.   I have not.
12      Q.   All right.  So it sounds like, correct me
13  if I'm wrong, that you were interested in that
14  training with Border Patrol because it related to
15  narcotics and drug trafficking?
16      A.   Yes.
17      Q.   All right.  Was that just the one time
18  you went there?
19      A.   Twice.
20      Q.   Okay.  Tell me a little bit more about
21  the DIAP; what does DIAP stand for, if you know?
22      A.   I'm not sure what it stands for.  It's a
23  criminal interdiction training, talking about
24  several areas of criminal interdiction, from
25  vehicle stops and compartments, bus interdiction,
```

App. Vol. XX, 16

```
 1  partial stops, you know, post offices, Fed Ex,
 2  UPS.      We've heard
 3       Q.   You referred to criminal interdiction
 4  a bunch in this case, but what does criminal
 5  interdiction mean to you?
 6       A.   Criminal interdiction to me means finding
 7  criminals, not necessarily involved in drugs, but
 8  could be human trafficking, suspects in murders or
 9  murderers, kidnapping, all sorts.
10       Q.   So how does that differ from the normal
11  or non-interdiction work of the Kansas Highway
12  Patrol?
13       A.   Can you rephrase, or be more specific
14  what you're...
15       Q.   Yeah.  I mean, so I understand.  Do you
16  do interdiction work as part of your duties as a
17  highway patrolman?
18       A.   Yes.
19       Q.   Is that all you do?
20       A.   No.
21       Q.   So what's different about the
22  interdiction work you do, as opposed to the other
23  duties as a Kansas Highway Patrolman?
24       A.   To me it would be up to each individual
25  person, you know.  If a trooper just wants to go
```

```
 1      out and write speeding tickets for the day, then,

 2      you know, he writes speeding tickets.

 3          Q.  So traffic enforcement is potentially

 4      different than criminal interdiction; is that what

 5      you're telling me?

 6          A.  Yes, yeah.

 7          Q.  Now there is actually an interdiction

 8      unit within the Kansas Highway Patrol; correct?

 9          A.  Yes.

10          Q.  Have you ever been a member of that --

11          A.  No.

12          Q.  -- Troop?

13          A.  No.

14          Q.  But you try to -- or do you try to

15      conduct criminal interdiction in your work, even

16      though you're not a member of the interdiction

17      unit?

18          A.  Yes.

19          Q.  If you know, is that something that the

20      Highway Patrol asks of all officers, regardless of

21      if they serve in the interdiction unit or not?

22          A.  The Highway Patrol hasn't asked, no.

23          Q.  Have you had any conversations with your

24      superiors about doing interdiction work?

25          A.  Yes.
```

```
 1          Q.  All right.  Do they seem approving of it,
 2     they would want you to do interdiction work?
 3          A.  Yes.
 4          Q.  And then finally you went to the K-9 Cop
 5     training, maybe the name is all the explanation I
 6     need, but tell me about the training.
 7          A.  It deals specifically, more specifically
 8     with K-9 training, not necessarily drug or
 9     explosive training with dogs, but also the patrol
10     bite work aspects, tracking, evidence, everything
11     else that the to dogs can do, as well.
12          Q.  Now your dog, Nico, do you still work
13     with Nico?
14          A.  I do not.                    Lieutenant?
15          Q.  Are you still a K-9 handler as we /s/it
16     /here?
17          A.  Yes.
18          Q.  All right.  Are the dogs trained across
19     multiple areas; in other words, can they do -- can
20     they sniff and find drugs, as well as explosives
21     and track individuals, or are they trained on
22     specifics, specific areas?
23          A.  The drug dogs are trained for drugs and
24     patrol, as far as tracking.  The explosive dogs
25     are trained for explosives and patrol work.  They
```

```
 1     don't have drugs and explosives on the same dog,

 2     if that makes sense.

 3         Q.  Got you.  And you say patrol; that's

 4     tracking?

 5         A.  Tracking, evidence, building search,

 6     anything where you use the dogs to locate a human

 7     being or evidence.

 8         Q.  Got it, to find a person?

 9         A.  Yes.

10         Q.  Okay.  I want to talk about your

11     performance evaluations, or how your performance

12     is evaluated as a Technical Trooper.  And first, I

13     guess, as a Lieutenant now you have people

14     reporting to you; is that right?

15         A.  Yes.

16         Q.  And how many people report to you?

17         A.  I currently have three.

18         Q.  And so do you monitor the performance of

19     the three troopers reporting to you?

20         A.  Yes.

21         Q.  And do you conduct performance

22     evaluations, formal evaluations of those troopers?

23         A.  Yes.

24         Q.  Before becoming a Lieutenant, did you

25     supervise anybody?
```

```
 1        A.   No.
 2        Q.   As a Technical Trooper, did you report to
 3   a Lieutenant?
 4        A.   Yes.
 5        Q.   And did you have annual performance
 6   evaluations?
 7        A.   Yes.
 8        Q.   Okay.  Did you have any other kind of
 9   formal evaluation, besides those annual
10   performance evaluations?
11        A.   No.
12        Q.   Okay.  So as a Technical Trooper tell me
13   about your performance evaluations.  How did they
14   -- I guess first, how did they occur; did you have
15   a meeting with somebody, or was it done over the
16   phone?
17        A.   It was a meeting with my current
18   supervisor lieutenant., yes.
19        Q.   Who was your Lieutenant, as a Technical
20   Trooper?
21        A.   Lieutenant Jason Edie was one of them.
22        Q.   Do you know how to spell Edie?
23        A.   E-D-I-E.
24        Q.   It sounds like you had more than one?
25        A.   Yes.
```

```
 1        Q.  Do you know who the others were?
 2        A.  The other one is retired.  At the time he
 3   was my supervisor, was Lieutenant Scott Moore, he
 4   retired as a captain.
 5        Q.  So did he become a captain, and that's
 6   when you got Lieutenant Edie?
 7        A.  Yes.
 8        Q.  Any other lieutenants besides those two?
 9        A.  No.
10        Q.  So how long would those meetings usually
11   take with your Lieutenant?
12        A.  Not very long.
13        Q.  Less than ten minutes?
14        A.  Fifteen.
15        Q.  And what kinds of things would you
16   discuss?
17        A.  The goals of -- for the next year, and my
18   performance for the year.
19        Q.  All right.  What kinds of -- give me
20   examples of the goals.
21        A.  To maintain proficiency with the K-9 as a
22   team, would have been one.  Continue the training
23   with the dog.  I can't remember any of the others.
24        Q.  And you when you say continue the
25   training with the dog, what do you mean by that?
```

```
 1        A.   We have weekly training with our dog.
 2        Q.   And then how would your lieutenants, well
 3   you said they reviewed your performance over the
 4   past year; is that right?
 5        A.   Yes.
 6        Q.   What kinds of thing did you discuss in
 7   that regard?
 8        A.   It really consisted of him showing my
 9   performance review, me reading through it.  In my
10   case there was never any issues, and I signed the
11   review.  He gave me a copy of it, and that was it.
12        Q.   Were there formal categories in the
13   performance review?
14        A.   Can you be more specific?
15        Q.   Yes.  Tell me what the performance review
16   document looked like.
17        A.   It was a couple pages.  Usually talked
18   about the work description that they were supposed
19   to be doing, what their duties were.  And then
20   there was a page that listed the things that had
21   been done throughout the year by myself.  And then
22   there was a spot for goals.  That's all I can
23   remember right now.
24        Q.   Did you get a rating of any kind, a
25   number, or satisfactory, or something like that?
```

```
 1        A.   I believe it's satisfactory.

 2        Q.   And sounds like you never had anything

 3   less than satisfactory; is that right?

 4        A.   No.

 5        Q.   Is that true for your entire time with

 6   Kansas Highway Patrol?

 7        A.   Yes.

 8        Q.   Would you ever discuss specific incidents

 9   in your performance evaluations with your

10   supervisor?

11        A.   No.

12        Q.   No.   Specific traffic stops, you wouldn't

13   discuss those?

14        A.   Not that I remember.

15        Q.   All right.   What about volume or number

16   of traffic stops, was that ever something that

17   came up?

18        A.   No.

19        Q.   Were you ever told to stop more or

20   fewer --

21        A.   No.

22        Q.   -- cars?

23        A.   No.

24        Q.   How about specific seizures or arrests,

25   did those ever come up in your performance
```

1   evaluations?

2        A.   No.

3        Q.   Other than in your performance

4   evaluation, did you ever discuss the numbers of

5   your traffic stops with anybody at Highway Patrol?

6        A.   No.

7        Q.   Were your performance evaluations tied to

8   raises of any kind?

9        A.   No.

10       Q.   Did you get raises as a Technical

11  Trooper?

12       A.   (No audible response).

13       Q.   Let me ask a different way, then.  Do you

14  know, do you get annual raises as a matter of

15  course with the Highway Patrol?

16       A.   Our raises are -- for the longest time we

17  didn't get any raises for like the first

18  seven years.  And then we went to a different pay

19  matrix, so it was like every three years, you just

20  get a step increase, I guess.

21       Q.   And it sounds like your understanding is

22  that's across the board for all troopers; is that

23  right?

24       A.   Yes.

25       Q.   Okay.  Are there any performance based

1    raises or salary increases of any kind that,

2    you're aware of, in the Kansas Highway Patrol?

3        A.   No.

4        Q.   Did you have to apply to become a

5    lieutenant?

6        A.   Yes.

7        Q.   And was that application competitive?

8        A.   No.

9        Q.   You think you were the only one who

10   applied for the opening?

11       A.   Yes.

12       Q.   And were you asked to apply, or did you

13   know there was an opening and just decided to go

14   for it?

15       A.   There was an opening, and I went for it.

16       Q.   Okay.  Who interviewed you first in your

17   Lieutenant position?

18       A.   It was Captain Scott Walker, Captain

19   Bruce Hyman, Captain Travis Philips.

20       Q.   Are all of those captains with Troop F?

21       A.   No.

22       Q.   Are any of them?

23       A.   Yes.

24       Q.   Which one is with Troop F?

25       A.   Captain Walker is with Troop F.

App. Vol. XX, 26

```
 1          Q.  Do you know, did the PSU always conduct
 2     an investigation if there's a shooting?
 3          A.  Yes.
 4          Q.  Is that the only shooting you've been
 5     involved in?
 6          A.  No.
 7          Q.  All right.  That sounds like the only
 8     interview you've done in connection with a PSU
 9     investigation into a shooting; is that right?
10          A.  As far as I remember, yes.
11          Q.  Okay.  Other than lawsuits, and then
12     these formal complaints that we've been talking
13     about, have you been the subject of any other
14     complaint, either from civilians or inside from
15     the KHP, that you're aware of?
16          A.  Not that I remember, no.
17          Q.  I want to talk a little bit about report
18     writing in your duties as trooper, Master Trooper,
19     and Technical Trooper; all right?
20          A.  Okay.
21          Q.  I assume you wrote reports in your
22     capacity in those roles?
23          A.  Yes.
24          Q.  All right.  Tell me, if you can, when you
25     would write a report, what kinds of things would
```

```
 1    happen to cause you to write a report?
 2         A.  Accidents or arrests or K-9 deployment.
 3    Or if you assisted an outside agency there may be
 4    a report done on that.
 5         Q.  Any other times that you would write a
 6    report as a trooper, or Master Trooper, or
 7    Technical Trooper?
 8         A.  There may be, I can't think of anything
 9    at the time.
10         Q.  An accident report, tell me what that is.
11         A.  Report of the actual findings based on
12    the accident when you get on scene.
13         Q.  By accident, you mean like a vehicle
14    accident?
15         A.  Yes.
16         Q.  A wreck on the road, of some kind?
17         A.  Yes.
18         Q.  An arrest report, again, maybe it's
19    obvious, what's in an arrest report?
20         A.  When you -- when you take someone into
21    custody for DUI, driving while suspended, revoked,
22    such, drug arrest.  Any kind of seizure that may
23    have occurred.
24         Q.  Were you required to write a report, or
25    are you required to write a report every time you
```

Case 6:19-cv-01343-KHV   Document 521-1   Filed 05/15/23   Page 25 of 184

```
 1    arrest someone?
 2        A.   Yes.
 3        Q.   K-9 Deployment, what kind of report is
 4    that?
 5        A.   It would be a deployment report that's
 6    done any time your K-9 is deployed on something.
 7        Q.   Any time you would use your K-9, you had
 8    to write a report?
 9        A.   Yes.
10        Q.   And an outside agency report, what is
11    that?
12        A.   It would be if you assisted an outside
13    agency on -- it could be vary for several things.
14    But if you thought that something you did was
15    relevant, you can write a report, a narrative.
16        Q.   Were you required to always write a
17    report any time you assisted an outside agency?
18        A.   No.
19        Q.   And then could you write any other --
20    well, strike that.  Any other times you would be
21    required to write a report that we haven't talked
22    about?
23        A.   Not that I can think of right now, no.
24        Q.   Have you written reports in other
25    situations, besides those four?
```

1      **A.**  **No.**

2      Q.  When you're conducting traffic stops in

3  general, what would cause you to pull someone over

4  for a traffic stop?

5      **A.**  **A violation.**

6      Q.  Okay.  And violation of what?  I think I

7  know what you mean; why don't you just tell me?

8      **A.**  **Traffic violation, as far as equipment**

9  **violation or moving violations.**

10     Q.  Okay.  And once you pull someone over for

11  a traffic violation, what's your understanding of

12  how long you can keep them detained?

13     **A.**  **For as long as it takes to complete that**

14  **stop.**

15     Q.  Okay.  Complete the stop, what do you

16  mean by that, can you elaborate?

17     **A.**  **Issue them a warning, or citation, and**

18  **return their documents back to them.**

19     Q.  All right.  If you want to keep them

20  longer, what would be required?

21     **A.**  **Reasonable suspicion.**

22     Q.  All right.  Tell me, in your

23  understanding, what reasonable suspicion is.

24     **A.**  **It's more than a hunch.  But they/are a**

25  **articulable totality of circumstances that you've**

```
 1    observed up to that point, that you believe there
 2    is a crime has been committed or will be
 3    committed.
 4         Q.  Okay.  And we were talking about reports.
 5    Is there anywhere, since you've been a trooper,
 6    where you make a record of that articulable
 7    reasonable suspicion?
 8         A.  No.
 9         Q.  Has anyone ever talked to you about being
10    sure you're able to articulate reasonable
11    suspicion at some later point after a stop?
12         A.  Yes, we've discussed it, yes.
13         Q.  And, but you make no record of it at the
14    time of a stop; is that right?
15         A.  There's times that I may talk into my
16    camera in the car of what I have observed at the
17    time, just so I have it, I guess on record, yes.
18         Q.  Have you ever been instructed to do that?
19         A.  Not instructed, no.  It's been talked
20    about amongst the other troopers.
21         Q.  Okay.  It sounds like, though, in your
22    time as a trooper it hasn't been a requirement; is
23    that right?
24         A.  That's right.
25         Q.  Have you ever been discouraged from
```

```
 1    you're there, and then kind of put that all

 2    together and decide, okay, I think I have enough

 3    here to talk to them more, or vice versa.

 4        Q.  All right.  Are there particular indicia

 5    of criminal activity that you look for when you're

 6    forming reasonable suspicion?

 7        A.  Yes.

 8        Q.  Can you give me examples of any of those?

 9        A.  It could be a large amount -- or air

10    fresheners in a vehicle.  Just sometimes the odor

11    in a vehicle, that may be overwhelming.

12    Nervousness.  Several cell phones.  Could be

13    wrappers from, you know, a bunch of garbage or

14    trash from fast food restaurants.  I'm not sure.

15    There's more.

16        Q.  What about wrappers or garbage from fast

17    food restaurants is indicative of criminal

18    activity?

19        A.  For me, I think it's one of those things

20    that it indicates that they've traveling over the

21    road for, you know, they haven't stopped very

22    much.  They're -- just continually that traveling,

23    not stopping to throw out trash, or throw their

24    trash out, they're just eating on the road, trying

25    to make a quick trip.
```

1      Q.   What about wanting to make a quick trip
2   can indicate criminal activity?
3      A.   Through my training and experience I've
4   seen that drug traffickers usually make quick
5   trips, you know.  They'll travel one place, be
6   there a very, very minimum amount of time and
7   travel back.
8      Q.   What training have you received in that
9   regard where you learned that?
10     A.   Through the DIAP conferences, through
11  training through the Kansas Highway Patrol, and
12  then personal experiences.
13     Q.   So does the Kansas Highway Patrol train
14  you to look for particular indicia, as I called
15  them, of criminal activity?
16     A.   Yes.
17     Q.   Okay.  So the ones you just went through,
                   overwhelming
18  air fresheners, overall odors, nervousness,
19  several cell phones, wrappers and garbage, are
20  those all things that Kansas Highway Patrol has
21  trained you to look for specifically?
22     A.   Either through the Highway Patrol or just
23  based from my experience.
24     Q.   How about the state of origin of a travel
25  area; is that something the Kansas Highway Patrol

1    has trained you can be an indicia of a criminal

2    activity?

3         A.    The State and outside agencies, or other

4    training, yes.                          and outside agencies

5         Q.    The Kansas Highway Patrol have trained

6    you that the state of origin of a vehicle can be

7    an indicia of criminal activity?

8         A.    Yes.

9         Q.    And what about the state of origin is

10   indicative of criminal activity?

11        A.    Depending on where it is.    You know,

12   through experience and training you learn where

13   large amounts of drugs and narcotics, or other
                                 or

14   criminal activity originates.

15        Q.    Where do large amount of drugs, narcotics

16   and criminal activity originate?

17        A.    Southern California, Texas, Colorado,

18   Arizona, Nevada, Oregon, Northern California, I

19   should say all of California.

20        Q.    Anywhere else?

21        A.    I'm sure there's more, but I...

22        Q.    And so have you used the state of origin

23   of a vehicle in forming a reasonable suspicion in

24   the past?

25        A.    After the traffic stop, yes.

1        Q.   And how do you determine the state of

2   origin of a vehicle?

3        A.   It's not necessarily -- I guess it should

4   be the state of origin from the vehicle, state of

5   origin of the driver, or passengers, I should say,

6   through driver's license and through talking to

7   them.

8        Q.   How about destination, would a travel

9   destination ever be something that you consider in

10  forming reasonable suspicion?

11       A.   Yes.

12       Q.   All right.   And what about the travel

13  destination is indicative of criminal activity?

14       A.   Much like the origin.   Places usually

15  east, several states out east that you know is

16  known for drugs to be trafficked to.

17       Q.   What states are known for drugs to be

18  trafficked to?

19       A.   Gosh, it could be -- that's pretty broad.

20  Anywhere east.   Even the State of Kansas.

21       Q.   And, so, have you used the travel

22  destination of motorists in forming reasonable

23  suspicion?

24       A.   In conjunction with other reasons, yes.

25       Q.   What do you mean, in conjunction with

1    other reasons?

2        A.   Other items that we had would talked

3    about earlier, it's not the sole purpose, or sole

4    reason for reasonable suspicion.

5        Q.   Well, as I understand it, there would

6    never be a sole reason for reasonable suspicion,

7    or at least that would be unusual for there to be

8    a sole reason for reasonable suspicion; right?

9        A.   Yes.

10       Q.   It's always a combination of factors;

11   correct?

12       A.   Correct.

13       Q.   And so when you have used either State of

14   origin or destination in forming reasonable

15   suspicion, it's been one of the factors you've

16   used to form reasonable suspicion?

17       A.   Yes.

18       Q.   How about travel on certain highways or

19   roads; is travel on certain highways or roads a

20   factor that has formed or played a role in your

21   formation of reasonable suspicion?

22       A.   Yes.

23       Q.   What about travel on certain roads is

24   indicative of criminal activity?

25       A.   Depends on where they're going or coming

```
1      from.   Just the particular road they may be on may
2      be out of their way, may be a longer route.
3             Q.   So it doesn't make sense that they're on
4      that road, is what that's telling you?
5             A.   Right.
6             Q.   What about just the mere fact of travel
7      on the road itself, have you ever used just a fact
8      of travel on K-10 or I-70 or I-35 as part of your
9      formation of reasonable suspicion.
10            A.   Yes.
11            Q.   All right.  And what about that fact is
12     indicative of criminal activity?
13            A.   It's a major corridor.  Your interstate
14     system, it's easy to travel on.  It's just
15     something a lot quicker than traveling back roads,
16     I guess you could say.
17            Q.   So, because it's easy to travel on and
18     quicker than back roads, it's more likely that
19     someone is engaged in criminal activity because
20     they're on those roads?
21            A.   It could shorten their trip.  And if
22     they're trying to make a quick turn around trip,
23     then, yes.
24            Q.   We talked about destinations and origin.
25     And we talked sort of broadly about States in the
```

```
 1    east.   Are there specific cities that you believe
 2    travel from or to is indicative of criminal
 3    activity?
 4         A.   There's cities that we probably see more
 5    criminal activity or, you know, criminals going
 6    to, I guess you could say, there are some cities,
 7    yes.
 8         Q.   And have you used the fact that travel to
 9    or from those cities in forming reasonable
10    suspicion?
11         A.   Yes.
12         Q.   And can you name those cities that are
13    indicative of criminal activity?
14         A.   Cleveland, Cincinnati, Nashville, St.
15    Joe, Missouri -- or St. Louis, sorry.
16         Q.   Any others?
17         A.   I'm sure there's a lot, I can't recall
18    all of them.
19         Q.   When you're observing traffic, do you
20    stop every vehicle you see violating some or any
21    traffic laws?
22         A.   No.
23         Q.   Okay.   People speed all the time; is that
24    right?
25         A.   Quite frequently, yes.
```

```
1        Q.  I imagine you would be pretty busy if all
2    you did was pull over everyone who was going over
3    the speed limit by a little bit; right?
4        A.  Yes.
5        Q.  So how do you decide, when you do decide
6    to enforce traffic violations, which vehicle to
7    pull over and which not?
8        A.  The vehicle itself, is a decision that I
9    use.  You want more?
10       Q.  Is there anything else?
11       A.  I mean, yeah.  I guess, the vehicle, if
12   I'm working daytime you know, look at the person,
13   depending on what their reaction to law
14   enforcement is.
15       Q.  Anything else?
16       A.  There's probably more, I can't think of
17   anything right now.
18       Q.  When you say the vehicle itself, what do
19   you mean by that?
20       A.  If I'm working criminal interdiction, the
21   type of vehicle.  If it's a pickup pulling a
22   trailer, the trailer's empty, a newer vehicle that
23   is traveling in the left lane or something, you
24   know, that may be something to look at.  Obviously
25   if there's -- we're looking for a specific vehicle
```

App. Vol. XX, 39

```
 1    that someone has put an erratic driver, or an
 2    attempt to locate on a vehicle, then we would wait
 3    for that.
 4        Q.   What about the newer vehicles, would make
 5    you pull them over?
 6        A.   Through training and in experience,
 7    criminal interdiction, we've learned that they
 8    like to use rental vehicles, so we'll look at
 9    rental vehicles.
10        Q.   They, being criminals?
11        A.   I should say -- yes.
12        Q.   So, rental vehicles.  So what about newer
13    vehicles?
14        A.   I guess I shouldn't have said newer
15    vehicles, as opposed to more -- the newer vehicles
16    in relation to like a rental vehicle, because most
17    of those are new vehicles.
18        Q.   A newer vehicle is more likely to be a
19    rental vehicle?
20        A.   Yes.
21        Q.   The rental vehicle is what makes you a
22    bit more suspicious?
23        A.   Right.
24        Q.   You said the person, also, if it's in
25    daytime and you can see them.  You mentioned their
```

1    reaction to seeing law enforcement.  But is there

2    anything else about the person themselves that

3    might cause you to pull someone over for a traffic

4    violation, where you wouldn't otherwise?

5         A.   No.

6         Q.   We talked about state of origin in the

7    past, or a moment ago.  Are you ever more -- have

8    you ever pulled someone over for a traffic

9    violation because of a license plate?

10        A.   Because of what?

11        Q.   Because of their license plate, the State

12   of their license plate?

13        A.   Yes.

14        Q.   Tell me about that.

15        A.   Once again, if it's an attempt to locate,

16   or on a specific vehicle, then yeah, and they've

17   given the tag, and it's an out of State vehicle,

18   then yeah, we've stopped vehicles -- or I've

19   stopped vehicles based on the State.

20        Q.   Sure.  But in terms of deciding which

21   traffic violations to enforce, have you ever

22   decided to enforce a traffic violation against

23   one car and not the other because of the State of

24   that license?

25        A.   No, I can't say that I have.

1    Q.    Are you aware of anyone else who has?

2    A.    No.

3         Q.    And then how about if you haven't

4    actually observed a traffic violation at all, do

5    you ever become suspicious of vehicles when there

6    isn't a traffic violation at all?

7         A.    Yes.

8         Q.    Okay.    What would cause you to become

9    suspicious of a vehicle that hadn't committed a

10   traffic violation?

11        A.    For instance, if I'm driving in the right

12   lane below the speed limit and a car doesn't pass

13   me, it slows way down, then yeah, I'll be

14   concerned, try to understand why they won't pass.

15        Q.    And what would you do in an instance like

16   that?

17        A.    I either slow down even more.    Or if they

18   still won't pass, then I'll move over, I'll pull

19   to the shoulder of the road and allow them to

20   pass.

21        Q.    Anything else that might make you

22   suspicious of a car that hadn't committed a

23   traffic violation?

24        A.    No.

25        Q.    Do you ever follow or observe cars for a

```
 1    longer period of time, hoping that they'll create
 2    -- that they'll violate some traffic law so you
 3    can pull them over?
 4         A.   Can you define longer period of time?
 5         Q.   Let's say follow, will you ever follow a
 6    car with the hopes that they'll violate a traffic
 7    law so that you can pull them over?
 8         A.   Yes.
 9         Q.   What would cause you to do that?
10         A.   To follow them?
11         Q.   Yes.
12         A.   Like we talked about, if it's during the
13    daytime and I observed the driver and he didn't
14    look at me.  You know, hands were at ten and two,
15    he just had that stare, may be a reason why I
16    would be like, I'm going to go follow that car and
17    just see what happens.
18         Q.   Do you ever take any action to cause a
19    car to violate some traffic law?
20         A.   No.
21         Q.   Have you heard the phrase the Kansas Two
22    Step?
23         A.   Yes.
24         Q.   Are you familiar with that?
25         A.   Yes.
```

```
 1        Q.  All right.  Can you tell me what your
 2   understanding of that is?
 3        A.  I don't know where it originated.  I've
 4   heard, years ago, an attorney here in Salina made
 5   the comment that the Kansas Two Step, and that's
 6   where I've heard it.  Talking about the trooper
 7   turning back, or officer turning back from a
 8   vehicle, supposedly only taking two steps and then
 9   turning back to recontact the driver.
10        Q.  All right.  And is that a tactic that you
11   have used?
12        A.  I separate the traffic stop and start
13   walking back to my car, yes.  It's not limited to
14   two steps, though.
15        Q.  And what's the purpose of that, using
16   that tactic?
17        A.  To separate, to end the traffic stop, so
18   they're also aware that the traffic stop has
19   ended, and to try to get consent to ask further
20   questions.
21        Q.  Okay.  So to obtain consent to ask
22   additional questions?
23        A.  Yes.
24        Q.  And those are questions you wouldn't be
25   able to ask without consent or reasonable
```

Case 6:19-cv-01343-KHV   Document 521-1   Filed 05/15/23   Page 41 of 184

```
 1    suspicion; correct?
 2         A.   That's correct.
 3         Q.   Do you tell the driver, or whoever is in
 4    the car, that they don't have to answer your
 5    questions?
 6         A.   I do not.
 7         Q.   Why don't you tell them that?
 8         A.   I just don't.
 9         Q.   Why not?
10         A.   I don't know.
11         Q.   You don't know why you don't tell them?
12         A.   No.
13         Q.   Okay.  It's not because you are hoping
14    they don't realize they don't have to answer
15    questions?
16         A.   No.
17         Q.   You would hope they do understand they
18    don't have to answer your questions?
19         A.   Yes.
20         Q.   Do you tell them the traffic stop is
21    over?
22         A.   Not all the time, no.
23         Q.   Okay, and why not?
24         A.   If I think about it, then I do.  If I
25    don't, then I don't.
```

```
 1        Q.   Are you confident that in every time you
 2   have used the Kansas Two Step, as I called it, or
 3   however else you want to call it, are you
 4   confident every time you use that tactic the
 5   driver is aware they don't have to answer your
 6   questions?
 7        A.   Yes.
 8        Q.   Have you been trained to use that tactic?
 9        A.   Yes.
10        Q.   By the Kansas Highway Patrol?
11        A.   And other agencies, yeah, or through
12   other training.
13        Q.   Do you encourage your subordinates, or
14   troopers reporting to you now, do you encourage
15   them to use the Kansas Two Step?
16        A.   No.
17        Q.   Have you ever discussed it with them?
18        A.   No.
19        Q.   Do you discourage it?
20        A.   No.
21        Q.   Do Have you ever attempted a tactic in
22   ending the traffic stop, or attempting to end the
23   traffic stop, and then reengaging the consensual
24   encounter, do you ever use that, or have you ever
25   used that tactic when you believed you had
```

```
 1   reasonable suspicion already?

 2       A.  Yes.

 3       Q.  All right.  And why would you do that?

 4       A.  To further my reasonable suspicion, try

 5   to just ask them more questions to further that.

 6       Q.  Now if you have reasonable suspicion, you

 7   would have the authority to further detain the

 8   motorist; correct?

 9       A.  Yes.

10       Q.  And you wouldn't need their consent at

11   that point if you have reasonable suspicion to

12   further detain them; correct?

13       A.  Yes.

14       Q.  All right.  So why attempt to get their

15   consent, if you already have reasonable suspicion?

16       A.  Sometimes it makes -- makes things

17   progress a little smoother, I guess.

18       Q.  I think I understand what you mean, but

19   tell me what you mean by that.

20       A.  Sometimes when you advise someone that

21   you're going to detain them, it just irritates

22   them further, so the more you talk to them.  And

23   then you can talk to them and get more answers to

24   some of your questions, and sometimes that

25   reasonable suspicion that you had, they may give
```

```
 1    answers to why certain things were a certain way,
 2    I guess.
 3        Q.   Have you ever thought you had reasonable
 4    suspicion and then conducted the Two Step and not
 5    detained someone?
 6        A.   Yes.
 7        Q.   How often do you think that happens?
 8        A.   Not very often.
 9        Q.   Do you ever try to gain consent for the
10    further detention because you're not sure you have
11    reasonable suspicion?
12        A.   Yes.
13        Q.   When you ask for consent to ask
14    additional questions, if a driver says, no, I
15    don't want to answer additional questions, what
16    does that say to you; does that mean anything to
17    you?
18        A.   If I feel that I don't have reasonable
19    suspicion at that time to detain them, I tell
20    them, have a safe trip, and let them go.
21        Q.   Okay.   And if they refuse to answer
                                but
22    additional questions, A/ike you do feel like you
23    have reasonable suspicion, the what do you do?
24        A.   I'll advise them that I'm detaining them.
25        Q.   Have you ever used the fact that
```

App. Vol. XX, 48

1    someone's refusal to answer your questions, or
2    additional questions, have you ever used that fact
3    in further supporting your reasonable suspicion?
4        **A.  No.**
5        Q.   Do you think that would be -- well, is it
6    your understanding that that would be proper?
7                 MR. CHALMERS:  Object, he's now
8    asking for some further legal conclusion the way
9    the question is phrased.  I object.
10        Q.   You can answer.
11        **A.   Would you rephrase your question, or ask**
12    **it again?  I'm sorry.**
13        Q.   Sure.  Would it be proper for you to hold
14    someone's refusal to answer your additional
15    questions against them in forming reasonable
16    suspicion?
17                 MR. CHALMERS:  Object.
18        **A.   I'm still trying to figure out what your**
19    **question is.**
20        Q.   If I understand your testimony correctly,
21    you said that you haven't used someone's refusal
22    to answer your additional questions in forming
23    reasonable suspicion; is that what you testified?
24        **A.   Yes.**
25        Q.   All right.  And my question is,

```
 1                    (WHEREUPON, a recess was had,

 2                    after which the following:)

 3                    THE VIDEOGRAPHER:  We're on the

 4      record.

 5          Q.  All right.  So Trooper Rohr, I have my

 6      laptop here in front of you, I'm going to show you

 7      a video here in a moment.  But first we talked

 8      earlier about the stop at question here.

 9              Do you recall the stop you made of Mark

10      Douglas Erich and Shawna Maloney?

11          A.  Yes.

12          Q.  And this is the transcript -- the

13      transcript of the video of that stop is what you

14      reviewed in preparing for today, or one of the

15      things that you reviewed in preparation for today?

16          A.  Yes.

17          Q.  Okay.  Did you -- well, you've been a

18      defendant in this action; correct?

19          A.  Yes.

20          Q.  All right.  And do you have a memory of

21      this stop itself?

22          A.  Yes.

23          Q.  You recall the stop itself?

24          A.  Yes.

25          Q.  All right.  And you recall -- well, do
```

```
 1    you know the day that the stop occurred?
 2         A.   Could you be more specific?
 3         Q.   Do you know the day?
 4         A.   Date or day of the week?
 5         Q.   The date.
 6         A.   I don't recall the date, no.
 7         Q.   If I told you March 9th, 2018, does that
 8    sound right to you?
 9         A.   Yes.
10         Q.   You have some documents?/ , in front of you can I ask what
                                           they are?
11         A.   My deployment report, the K-9 Deployment
12    Report.
13         Q.   Can I take a look at those, please?
14         A.   Yes.
15         Q.   There's some other document there, looks
16    like some pictures?
17         A.   Pictures of the RV.
18         Q.   All right.  Are those documents your
19    lawyers gave to you?
20         A.   Yes.
21         Q.   Did you get those in preparation for
22    today?
23         A.   Yes.
24         Q.   Can I see the stack, please?
25         A.   Yes.
```

1       Q.  Just for the record, I'm going to read

2  off the Bates labels for these.  So Trooper Rohr,

3  you have with you Erich OAG two through 32; is

4  that accurate?

5       A.  Yes, if that's what they say they are.

6       Q.  You also have with you a copy of the

7  Kansas Highway Patrol Police Service Dog Report

8  from March 9th, 2018, that you prepared; correct?

9       A.  Yes.

10      Q.  All right.  A version of that report is

11  also OAG 5990 through 5910, I'll show you that in

12  just a second; okay?  5991

13      A.  (Witness nodding head).

14      Q.  And you had another document there with

15  you at the bottom of the stack; what is that?

16      A.  Just my notes.

17      Q.  Are they notes that you prepared today?

18      A.  I prepared them yesterday.

19      Q.  All right.  Now you didn't have any paper

20  with you this morning when you were testifying,

21  correct, in front of you?

22      A.  I had all this stuff right here.

23      Q.  Right in front of you?

24      A.  Yes.

25      Q.  Okay.  Did you refer to it at all during

```
 1    your testimony?

 2         A.   I did not, no.

 3         Q.   Okay.  Can I see your handwritten notes?

 4         A.   Yeah (Witness complies).  I guess, yeah.

 5         Q.   When did you prepare these notes?

 6         A.   Yesterday while I was watching the video.

 7         Q.   All right.  I'd like to mark this as an

 8    exhibit.

 9              MR. PIERSON:  Can we make a copy of

10    this?

11              MR. GANIEANY:  I'll get a copy.

12              MR. PIERSON:  I would appreciate

13    that, thank you.

14              (WHEREUPON, the reporter marked for

15              identification Deposition Exhibit

16              No. 103).  we're going to mark this,

17         Q.   Trooper Rohr, this will be Exhibit 103.

18    So Exhibit 103 is a copy of the notes you brought

19    with you today to the deposition.  There's some

20    notes at the top above a line, can you tell us

21    just generally what those are?

22         A.   Those are notes that I had discussed with

23    my attorney yesterday on what to expect today,

24    that he talked to me about.

25         Q.   And then below the line, in the middle of
```

1    the page, can you tell us what that is on Exhibit

2    103?

3        A.   Some notes of the reasonable suspicion of

4    this traffic stop that I remembered.

5        Q.   Did you prepare those notes after

6    watching the video -- or excuse me, after

7    reviewing the transcript of the video?

8        A.   After watching the video, yes.

9        Q.   When did you watch the video last?

10       A.   Yesterday.

11       Q.   Did you have anything with you when you

12   prepared these notes, any documents with you?

13       A.   No.

14       Q.   Did you have the report with you?
             Somewhere
15       A.   Some of it, yes.

16       Q.   When you prepared this list of reasonable

17   suspicion, tell me how you selected these items.

18       A.   Through memory, and some of it may be on

19   the report here, so...

20       Q.   There's something written to the right;

21   can you read that for us?

22       A.   Yes, through training and experience.

23       Q.   Why did you write, through training and

24   experience?

25       A.   Kind of overall stuff that through my

```
 1    training and experience, these are all reasonable
 2    suspicion.
 3         Q.  Were you concerned you were going to
 4    forget that if you didn't write it down?
 5         A.  Just I like to be prepared.
 6         Q.  All right.  Have we identified every
 7    document that you have there in front of you?
 8         A.  I believe so.
 9         Q.  All right.
10         A.  I think you looked at it all.
11         Q.  All right.  Now this video I have showing
12    you, we haven't started it yet, but this looks
13    like the video that you reviewed?       beginning
14         A.  Yes.
15         Q.  And can you tell us that video you
16    reviewed, what was it?
17         A.  A traffic stop.
18         Q.  I'm sorry, where did that video come
19    from, do you know?
20         A.  From my patrol car.
21         Q.  It's a dash cam video in your patrol car;
22    is that right?
23         A.  Yes.
24         Q.  We're going to actually mark this video
25    Exhibit 104.
```

```
 1                    (WHEREUPON, the reporter marked for

 2                    identification Deposition Exhibit

 3                    No. 104).

 4                    MR. PIERSON:  If you need a copy,

 5     Art, we'll make sure you have it.  I'll make sure

 6     the court reporter has it as well.

 7          Q.  All right.  I'm going to begin playing

 8     the video now.

 9                    (Video being played).

10          Q.  Okay.  I'm pausing the video at about the

11     35 second mark.  So, Trooper Rohr, tell us what

12     you're doing in your patrol car here.

13          A.  Turning to the median.

14          Q.  And the median is truly just that, it's

15     just the median; correct?

16          A.  Yes.

17          Q.  There's not a paved roadway there; right?

18          A.  Correct.

19          Q.  You're crossing over the dirt in the

20     median between the two lane highway?

21          A.  Yes.

22          Q.  All right.  And do you remember what

23     highway this is?

24          A.  I-70.

25          Q.  And you were traveling in which
```

App. Vol. XX, 56

1    direction; do you recall?

2        A.    West.

3        Q.    What caused you to cross the median?

4        A.    I observed a RV traveling east.

5        Q.    What about that RV traveling eastbound

6    made you want to cross the dirt median and change

7    direction?

8        A.    Through training and experience, RV's,

9    and even older model RV's, are used to traffic

10   narcotics.

11       Q.    You didn't observe any violation of a

12   traffic law that that RV committed; correct?

13       A.    Correct.  No.

14       Q.    Let me ask that again.  Did you observe

15   any violation of a traffic law by that RV?

16       A.    Not at the time, no.

17       Q.    So it was solely because it was an RV

18   that caused you to make a U-turn across the

19   median?

20       A.    Yes.

21       Q.    Do you pull over every RV that you see?

22       A.    I do not.

23       Q.    Why not?

24       A.    I just -- I don't pull over every RV.

25       Q.    Okay.  But through your training and

```
 1    experience, I should say, RV's can be involved in
 2    criminal activity?
 3         A.   Can be, yes.
 4         Q.   What about this RV made you pull a U-turn
 5    on I-70?
 6         A.   The time of night, or early morning
 7    hours, made me suspicious.
 8         Q.   Do you recall the time of day?
 9         A.   It was zero, like 5:30, five something,
10    early morning.
11         Q.   Do you pull over every RV you see
12    traveling on the highway in the early morning?
13         A.   No.
14         Q.   Okay.  So, do you begin following every
15    RV you see traveling in the early morning?
16         A.   No.
17         Q.   I'm going to ask you what about this RV
18    caused you to pull a U-turn on I-70 on this
19    morning?
20         A.   Very light traffic.  Obviously I'm out
21    working the road, I see an RV, looking for
22    criminals, people involved in criminal activity.
23    Early morning, it's March, not a lot of campers
24    out on the highway this time of year.  I decided
25    to turn around and look at it.
```

App. Vol. XX, 58

Case 6:19-cv-01343-KHV   Document 521-1   Filed 05/15/23   Page 55 of 184

```
1          Q.   You'll agree there's nothing criminal
2     about driving an RV; correct?
3          A.   Correct.
4          Q.   You'll agree there's nothing criminal
5     about driving an RV early in the morning; correct?
6          A.   Correct.
7          Q.   And you would agree there's nothing
8     criminal about driving an RV early in the morning
9     in March; correct?
10         A.   Correct.
11         Q.   Nonetheless, you decided to follow this
12    RV?
13         A.   Yes.
14         Q.   At this point there's no sound in the
15    video; correct?
16         A.   Correct.
17         Q.   And do you know why that is?
18         A.   It's a two-minute prerecord from the time
19    that the emergency lights are activated.
20         Q.   Okay.  So it sounds like, if I understand
21    it correctly, whenever you activate the lights,
22    there's a -- the camera goes back two minutes and
23    saves that video?
24         A.   Correct.
25         Q.   Forward until the end of the video?
```

```
 1        A.   Correct.
 2        Q.   And it doesn't start recording sound
 3   until the lights come on; correct?
 4        A.   Correct.
 5        Q.   The night of this stop, March 9th, 2018,
 6   you were aware of all that; correct?
 7        A.   Yes.
 8        Q.   All right.  So you knew before you turned
 9   or your lights on there would be no sound; is that
10   correct?
11        A.   Yes.
12        Q.   Were you traveling with anyone else in
13   the patrol car at this time?
14        A.   Yes.
15        Q.   Who was that?
16        A.   I believe it was Technical Trooper
17   Gleason.
18        Q.   Did you say anything to Technical Trooper
19   Gleason about why you were pulling over this RV?
20        A.   I don't remember.
21        Q.   Did you say anything to Technical Trooper
22   Gleason about why you were making a U-turn?
23        A.   I don't remember.
24        Q.   You were driving; correct?
25        A.   Yes.
```

```
 1    this evening or Gleason?

 2         A.   I don't know for sure, no.

 3         Q.   All right.

 4              MR. PIERSON:   I'll begin playing it

 5    again.

 6              (Video being played).

 7         Q.   Now at this point, about 45 seconds into

 8    the video, you're now traveling which direction?

 9         A.   Eastbound.

10         Q.   Do you know how fast you're going?

11         A.   I do not.

12              MR. PIERSON:   I'll pause it there.

13    Now we're at 1 minute and 6 seconds.

14         Q.   You just changed into the left lane;

15    correct?

16         A.   Yes.

17         Q.   Why did you do that?

18         A.   It looks --if I'm seeing the video

19    correct, there may be a vehicle beginning to enter

20    on to the interstate there on the on ramp.

21         Q.   Okay, it's possible a car?

22         A.   Yes, merging in traffic.

23         Q.   All right.   And do you know how fast

24    you're going at this point?

25         A.   I do not.
```

App. Vol. XX, 61

```
 1        Q.  Do you expect you're going faster than

 2   the speed limit?

 3        A.  I don't know.

 4        Q.  You were trying to catch up to the

 5   Winnebago; correct?

 6        A.  Yes.

 7             MR. PIERSON:  I'll begin playing

 8   again.

 9             (Video being played).

10             MR. PIERSON:  I'll pause it right
                                    22
11   there.  Now we're at 1 minute and 2 seconds.

12        Q.  And it looks like we can see the Winebago

13   now; correct?

14        A.  Yes.

15        Q.  The Winebago wasn't speeding; right?

16        A.  Not that I can recall.

17        Q.  So in order to catch up with it, you

18   would have had to go faster than the speed limit

19   to catch up to it?

20        A.  Yes.

21        Q.  Do you expect you were traveling faster

22   than the speed limit when you caught up to the

23   Winnebago?

24        A.  Yes.

25        Q.  But you didn't have your lights
```

1    activated?

2         A.  Not the emergency lights, no.

3         Q.  Are you aware of any policy or directive

4    that allows you to catch up to a car and travel

5    faster than the speed limit without your lights

6    activated?

7         A.  There's a law that allows us to travel

8    faster than the speed limit.

9              MR. PIERSON:  I'll begin playing it

10   again.

11              (Video being played).

12        Q.  So at this point we're at a minute and

13   35 seconds into the video.  You're now traveling

14   in the left lane, with the Winebago immediately to

15   your front and right; correct?

16        A.  Yes.

17        Q.  Why did you drive to that location?

18        A.  To observe the tag, and observe the

19   Winebago.

20        Q.  Are you concerned at all being in the

21   Winebago's blind spot?

22        A.  No.

23        Q.  Why not?

24        A.  I didn't feel like I was in the blind

25   spot at that time.

```
 1         Q.   All right.
 2                   MR. PIERSON:   I'll begin playing
 3    again.
 4                       (Video being played).
 5         Q.   All right.   So now we're at about -- we
 6    are at two minutes and nine seconds in the video
 7    and you have just changed, or about to complete
 8    changing lanes to get behind the Winnebago and
 9    you've activated your patrol lights; correct?
10         A.   Yes.
11         Q.   Why did you do that?
12         A.   To enforce, or enact a traffic stop.
13         Q.   Why did you feel like you could conduct a
14    traffic stop at this point?
15         A.   I observed him drive on and over the
16    white line.
17         Q.   Okay.   Can you tell from the video, or do
18    you recall how many times he drove on or over the
19    white line?
20         A.   I do not.
21         Q.   If it was just once, would that have been
22    enough for you to pull him over?
23         A.   At that time of night, yes, I would have.
24         Q.   When you were driving where you were back
25    and to the left of the Winebago, were you trying
```

```
 1    to make him cross the white line?
 2          A.   I was not.
 3          Q.   Were you hoping he would?
 4          A.   No.
 5          Q.   You were hoping to pull him over, though;
 6    is that right?
 7          A.   Hoping to pull him over, I can't say, no,
 8    that I was.
 9          Q.   You can't say, no, that you were.  Were
10    you hoping to pull him over?
11          A.   No.
12          Q.   But you began following him?
13          A.   Yes.
14               MR. PIERSON:  I'll begin playing it
15    again.
16                    (Video being played).
17          Q.   Now at this point we have sound in the
18    video; correct?
19          A.   Yes.
20          Q.   I want to pause right there.  I heard you
21    say, contact, and I heard, who I assume Trooper
22    Gleason --
23               MR. CHALMERS:  Where did you pause
24    it?
25               MR. PIERSON:  Two minutes 24 seconds.
```



"Def. Obj:" Inadmissible hearsay, FRE 802 (Please note that Trooper Gleason is not listed as a witness)

1    Q.  I heard you are say, contact, and I heard

2    Trooper Gleason say, you've got it.  Did you hear

3    that? as well?

4        A.  Yes.

5        Q.  Were you speaking to Trooper Gleason when

6    you said, contact?

7        A.  Yes.

8        Q.  Were you asking him if he wanted to be

9    the one to approach the vehicle?

10       A.  Yes.

"Def. Obj:" Inadmissible hearsay, FRE 802

11       Q.  It sounds like in response he said, you

12    got it; what did you take that to mean?

13       A.  That I would make the contact.

14       Q.  Had you discussed that with Trooper

15    Gleason before you activated your lights?

16       A.  Yes/. No.

17       Q.  You two are the only people in the car;

18    is that correct?

19       A.  Yes.

20       Q.  Nico is in the car as well, in the back?

21       A.  Yes.

22            MR. PIERSON:  I'll begin playing

23    again.

24            Let me pause it right there.  We're at

25    about two minutes 50 seconds, and now we see in

1    the video that you have approached the side of the

2    Winebago and are beginning to speak with the

3    driver and the passenger; correct?

4        A.   Yes.

5        Q.   All right.   The microphone that is

6    picking up this audio was on your uniform; is that

7    right?

8        A.   Yes.

9        Q.   Okay.   So you tell me if you disagree.

10   But I think as we go along here we'll see that we

11   can hear you very clearly and then we'll sometimes

12   catch what other people are saying.

13       A.   Yes.

14       Q.   Would you agree with that, based on your

15   review of the video?

16       A.   Yes.

17       Q.   This initial conversation I'm going to

18   ask you to listen closely to, and then I'll have a

19   few questions for you about it; okay?

20       A.   Yes.

21            MR. PIERSON:   We're back on the

22   video.

23                (Video being played).

24            MR. PIERSON:   I'm going to pause it

25   right there.   That's at 3 minutes and 42 seconds.

```
 1          Q.   So you asked if they had just painted the
 2    car; correct?
 3          A.   Correct.
 4          Q.   All right.   And what caused you to ask
 5    them that?
 6          A.   Because I smelled a strong odor of paint
 7    or bondo type chemical smell, as I was walking up
 8    to the vehicle.
 9          Q.   All right.   In response to whether, your
10    question did you just paint it, Mr. Erich said no;
11    correct?
12          A.   Correct.
13          Q.   Okay.   He then tells you, we just bought
14    it; correct?
15          A.   Yes.
16          Q.   And then you asked, had it just been
17    painted, it had smells like paint out here;
18    correct?
19          A.   Yes.
20          Q.   In response to that, Mr. Erich said, I
21    don't know; correct?
22          A.   Correct.
23          Q.   All right.
24               MR. PIERSON:   I'll begin playing
25    again.
```

App. Vol. XX, 68

```
 1                    (Video being played).
 2                    MR. PIERSON:  All right, I'm going to
 3      pause it right there again at 4 minutes and
 4      6 seconds.
 5          Q.  And you ended the first conversation you
 6      had with Mr. Erich and Ms. Maloney; correct?
 7          A.  Yes.
 8          Q.  You asked them where they were headed;
 9      correct?
10          A.  Yes.
11          Q.  And they told you Alabama?
12          A.  Yes.
13          Q.  Why did you ask them that?
14          A.  To see where they were going.
15          Q.  Is there a reason why you were interested
16      in where they were going?
17          A.  Yeah.    that
18          Q.  What is their reason?
19          A.  To see if they would be involved in
20      criminal activity, to see where they were going.
21          Q.  All right.  Their answer of Alabama, is
22      that one of those states in the east that we
23      talked about earlier, that sometimes in your
24      experience criminals are traveling to?
25          A.  I don't remember if I listed Alabama
```

1    specifically, but it is one of the states in the

2    east, yes.

3         Q.   All right.  You later detained Mr. Erich

4    and Ms. Maloney; correct?

5         A.   Yes.

6         Q.   Was the fact that they were traveling to

7    Alabama one of the reasons that you detained them?

8         A.   One of them, yes.

9         Q.   Okay.  All right.

10            MR. PIERSON:   I'm going to begin

11   playing the video again.

12        Q.   But before I do, you're now standing

13   towards the back of the Winebago with your

14   flashlight and you're kind of looking at the back

15   of the Winebago; correct?

16        A.   I'm still walking back, yes.

17                  (Video being played).

18        Q.   I'm going to pause it right there again.

19   Now we're at four minutes and 16 seconds; right?

20        A.   Yes.

21        Q.   I think we now see Trooper Gleason for

22   the first time; is that right?

23        A.   He walked up earlier.

24        Q.   Okay.  My mistake.  But he's on the video

25   now?

1      A.   Yes.

2           Q.   All right.   And you asked him if he could

3      smell anything; correct?

4      A.   Yes.

5           Q.   He said, huh-uh; right?

6      A.   Correct.

7           Q.   In other words, he said, no, he can't

8      smell anything; correct?

9           A.   Yes.

10          Q.   I think you then asked him to walk

11     alongside there; right?

12     A.   Yes.

13               MR. PIERSON:   I'm going to hit play

14     again.   We're at four minutes and 16 seconds.

15               (Video being played).

16               MR. PIERSON:   I'm going to pause it

17     there.   Now we're at 4 minutes 59 seconds.

18          Q.   And you and Trooper Gleason just had a

19     little exchange about some paint that you believe

20     you see at the back of the Winebago, and also what

21     you and Mr. Erich discussed; correct?

22     A.   Correct.

23          Q.   All right.   And you told Mr. Gleason that

24     Mr. Erich said it wasn't just painted; right?

25     A.   That's what I told him, yes.

"Def. Obj:" Inadmissible hearsay, FRE 802

1    Q.  All right.  But that's inaccurate; actually

2    correct?

3        A.  Correct.

4    Q.  Mr. Erich never told you it wasn't or

5    hadn't just been painted; correct?

6        A.  Correct.

7    Q.  Mr. Erich told you he hadn't painted it;

8    right?

9        A.  Yes.

10   Q.  And when you asked him if the people he

11   bought it from had painted it, he told you he

12   didn't know; right?

13       A.  Correct.

14   Q.  You also said -- you kind of repeated a

15   little bit of what the conversation was.  You

16   said, well, was it just painted?  Oh, no, was what

17   you told Trooper Gleason Mr. Erich said.  And Mr.

18   Erich never said, oh, no; correct?

19       A.  Correct.

20   Q.  When did you first realize that mistake?

21       A.  Right now.

22           MR. PIERSON:  I'll begin playing the

23   video again.  We're at 4 minutes 59 seconds.

24           (Video being played).

25           MR. PIERSON:  I'm going to pause it

```
 1    there again.   We're now at 5 minutes and
 2    13 seconds.
 3         Q.   You just told Trooper Gleason that it
 4    looks like Mr. Erich had paint on his hands;
 5    right?
 6         A.   Yes.
 7         Q.   And then Trooper Gleason told you it
 8    looked like he has paint on his hands; right?
        looks
 9         A.   Yes.
10         Q.   Had you seen paint on Mr. Erich's hands?
11         A.   Yes.
12         Q.   All right.   Do you remember where it was?
13         A.   On his hand somewhere.
14         Q.   Okay.   And did you ever see paint on
15    Trooper Gleason's hands?
16         A.   No.
17         Q.   All right.
18              MR. PIERSON:   I'll begin playing it
19    again.
20              (Video being played).
21              MR. PIERSON:   I'm going to pause it
22    there.   It's at 5 minutes 30 seconds now.
23         Q.   It sounds like you just made contact with
24    dispatch; is that right?
25         A.   That's correct.
```

```
 1        Q.  It was a woman's voice that came on
 2   through your radio; is that right?
 3        A.  Yes.
 4        Q.  You whispered something kind of under
 5   your breath, it sounds to me like you said, God, I
 6   hate her.  Is that what you said?
 7        A.  I don't recall what I heard or I didn't
 8   hear.  I just heard whispering something.  I don't
 9   remember what I heard.
10        Q.  Okay.  Were their people in dispatch you
11   liked better than others?
12        A.  Yes.
13        Q.  All right.  Do you recall any particular
14   person in dispatch that you didn't like?
15        A.  This one here, yes.
16        Q.  Okay.  And what about her did you not
17   like?
18        A.  Just her attitude on the radio.
19        Q.  I didn't hear you say Colorado; did you
20   say Colorado?
21        A.  Possibly.
22        Q.  Were you referring to the State or were
23   you referring to the letter C, or do you know?
24        A.  Probably the State, because I was
25   requesting to run a driver's license check.
```

1      Q.  All right.  And Mr. Erich had a Colorado
2  license plate?
3      A.  I believe, yes.
4      Q.  So the license?
5      A.  No, a Colorado driver's license.  I was
6  requesting to run the driver's license, not the
7  plate.
8      Q.  Did I say plate?
9      A.  Yes.
10     Q.  My apologies.  Mr. Erich had a Colorado
11  driver's license?
12     A.  Yes.
13     Q.  And you're requesting to run that
14  driver's license?
15     A.  Yes.
16     Q.  And the plate, do you recall, I don't
17  think you can see it very well in the video, but
18  do you recall what the plate was?
19     A.  It was Colorado temporary.
20     Q.  All right.  When did you first see the
21  Colorado temporary plate?
22     A.  When I was pulling up behind the vehicle.
23     Q.  You later detained Mr. Erich and Ms.
24  Maloney, like we talked about; right?
25     A.  Yes.

```
 1          Q.  Is the fact that they had a Colorado
 2    temporary plate, one of the things that led to
 3    your reasonable suspicion?
 4          A.  No.
 5          Q.  The fact that they were from Colorado one
 6    of the things that led to your reasonable
 7    suspicion?
 8          A.  Yes.
 9          Q.  All right.  I'll begin playing again.
10               (Video being played).
11               MR. PIERSON:  All right.  I'm going
12    to pause it there.
13          Q.  It sounds to me like Trooper Gleason said
14    something under his breath; did you hear that?
15          A.  I heard him say something, I couldn't
16    make out what it was.
17          Q.  I'm going to try to go back a little bit
18    and see if we can get that, okay?  Sometimes it
19    doesn't like it when I back up, so, forgive me.
20               All right, so the video says it's at
21    5 minutes and 15 seconds.  I'm going to start
22    playing from there; okay?
23          A.  Okay.
24               (Video being played).
25               MR. PIERSON:  All right, I'm going to
```

"Def. Obj:" Inadmissible hearsay, FRE 802

App. Vol. XX, 76

```
 1    pause it there.  Now we're at 5 minutes
 2    49 seconds.
 3         Q.  Any better luck at hearing what was said
 4    under your breath both times?
 5         A.  I believe he said you have a sniffer on
 6    you.
 7         Q.  All right.  Trooper Gleason said that?
 8         A.  Yes.
 9         Q.  What did you take him to mean?
10         A.  That he could not smell the odor that I
11    was smelling.
12         Q.  And then you said something about it
13    being downwind?
14         A.  Yes.
15         Q.  Again referring to the odor, potentially?
16         A.  Yes.
17         Q.  All right.  Did you hear what you said
18    about the dispatcher that time?
19         A.  Yes.
20         Q.  Did you say, God I hate her?
21         A.  Yes.
22         Q.  Who was that dispatcher?
23         A.  I don't remember her name.
24         Q.  Okay.  I'm going to -- I don't say this
25    to be flippant.  What's coming up, I believe you
```

```
 1    say something like, got to poop?
 2        A.   Yes.
 3        Q.   I'm just going to ask you if you're
 4    referring to yourself or to Nico; do you know?
 5        A.   Probably myself.
 6        Q.   All right.  Then we'll keep going.  So
 7    we're at 5:49 we're starting.
 8                  (Video being played).
 9                  MR. PIERSON:  All right, I'm going to
10    pause it there.  Now we're at 6 minutes and
11    43 seconds.
12        Q.   I believe you just said something to your
13    dog; is that right?
14        A.   Either me or Trooper Gleason, I can't
15    tell which one of us said it.
16        Q.   Okay.  Do you know what you said, could
17    you hear it?
18        A.   Like, you ready to go, or something, and
19    he was licking himself.
20        Q.   Did you say, ready to go, buddy?
21        A.   Something like that, yes.
22        Q.   Why did you say that, if you know?
23        A.   He was probably standing -- we have a
24    slider right there, and he was probably standing
25    there, or sitting, standing, whichever, right
```

Case 6:19-cv-01343-KHV   Document 521-1   Filed 05/15/23   Page 75 of 184

```
 1    there.
 2         Q.   All right.   Had you already decided that
 3    you were going to use Nico in this stop?
 4         A.   No.
 5         Q.   Did you say:   Get ready to go, buddy?
 6         A.   I don't know what I said.   I heard the,
 7    ready to go, buddy.
 8         Q.   All right.
 9                   MR. PIERSON:   All right.   I'm going
10    to start the video again.
11                        (Video being played).
12                   MR. PIERSON:   I'm going to pause it
13    and fast forward to 8 minutes, okay?   We're at
14    8:02.   I'll start the video again.
15                        (Video being played).
16         Q.   Okay, I'm pausing it now.
17              We just heard 8:02 to 8:35, and it sounds
18    like you rolled your window down and started to speak to
19    someone else; is that right?
20         A.   Yes.
21         Q.   Who was that; do you know?
22         A.   I believe it was Trooper Dylan Franz.
23         Q.   All right.   So we're going to listen to a
24    little bit now at 8:35.
25                        (Video being played).
```

Case 6:19-cv-01343-KHV   Document 521-1   Filed 05/15/23   Page 76 of 184

1                    MR. PIERSON:   Okay, I'm going to

2      pause it now again.   We're at 8 minutes

3      54 seconds.

4           Q.   Now you just told Trooper Franz what you

5      told Trooper Gleason, that you had asked Mr. Erich

6      if he painted it, but he said no.   Was it just

7      painted?   No, right?

8           A.   Right.

9           Q.   Again, that's not true; right?

10          A.   Right.

11          Q.   Mr. Erich never said that?

12          A.   Yes.

13                    MR. PIERSON:   I'm going to start

14     playing.   This is 8 minutes and 54 seconds.

15                    (Video being played).

16                    MR. PIERSON:   I'm going to pause it

17     there.   We're at 9 minutes 17 seconds and ask you

18     about three different things that just happened.

19          Q.   First, we just heard a bit more of an

20     exchange between you and Trooper Franz; correct?

21          A.   Yes.

22          Q.   All right.   You asked Trooper Franz, is

23     that enough to say there's a compartment, or do

24     some more checking, looking first; correct?

25          A.   Yes.

1      Q.   Were you asking Trooper Franz for his
2    opinion on your reasonable suspicion?
3         A.   I was asking him to see if he knew
4    basically what the law was.  I am suspecting a
5    false compartment on this vehicle at the time.
6    And I know at some point in time, if you -- and
7    I'm unsure of the law, I guess, so I was asking
8    him his thoughts if I could go ahead and detain
9    based solely on that, or if I should talk to him
10   some more.
11        Q.   All right.  And I don't ever hear Trooper
12   Franz respond; did you hear Trooper Franz respond?
13        A.   I did not.
14        Q.   Why did you suspect a false compartment
15   at this point?
16        A.   Typically, from what I remember, and what
17   I've seen in the past, is there is usually a wheel
18   or a tire on the back of an RV, possibly.  And
19   it's hard to see on the video, but there was a
20   spot, obviously on the back, of that RV that
21   looked like it had been painted or filled with
22   bondo, whatever.  And that could be, for my
23   training and experience, you know, where a
24   place -- where someone put something over to cover
25   up a compartment in the rear of that RV.

```
 1        Q.  Not every RV has a spare tire on the

 2   back; right?

 3        A.  No.

 4        Q.  Do you even know what kind of RV it is?

 5        A.  I do believe it's a Winnebago.

 6        Q.  Do you know what year it is?

 7        A.  '06.

 8        Q.  Did you know at that time?

 9        A.  Yeah, I talked to him earlier about it.

10   I asked him what year the vehicle was. [, when I verified the insurance.]
```

Q. Mr.
Erich, you asked him?

A: Yes.

```
11        Q.  Were you aware whether '06 Winnebagos had

12   a spare tire on the back or not?

13        A.  They did/not. [I was not.]

14        Q.  Okay.  I heard someone say, see what

15   triple has; is that correct?

16        A.  I don't remember hearing that.

17        Q.  Do you know what that means?

18        A.  A triple I, possibly.

19        Q.  Okay, and what is that?

20        A.  Which is a criminal history.

21        Q.  I see.  Is that something you get from

22   dispatch after you reported the license?

23        A.  Yes.

24        Q.  The license number?

25        A.  Yes.
```

```
 1          Q.  So were you waiting at this point to hear
 2    what the criminal history was?
 3          A.  Yes.
 4          Q.  All right.  And then it sounds like
 5    Trooper Franz asked you, where is he going?
 6          A.  Yes.
 7          Q.  Did you hear that?
 8          A.  Yes.
 9          Q.  Okay.  Do you know why Trooper Franz
10    asked you that?
11          A.  For the same reason that I asked where he
12    was going.  It's a destination area that's used in
13    the reasonable suspicion.
14          Q.  So depending on where he was going would
15    be something you could use in forming a reasonable
16    suspicion and detaining him; right?
17          A.  Yes.
18                MR. PIERSON:  I'll begin playing the
19    video again.
20                    (Video being played).
21                MR. PIERSON:  I'm going to pause it
22    there.  That's 9 minutes and 41 seconds.
23          Q.  It sounds like dispatch just reported to
24    you the results of the criminal history check; is
25    that right?
```

Case 6:19-cv-01343-KHV   Document 521-1   Filed 05/15/23   Page 80 of 184

```
 1        A.   Yes.
 2        Q.   Can you translate what she said for us?
 3        A.   He had a charge of paraphernalia in 2004,
 4   is what she said.
                it.
 5        Q.   Got you.   So that would have been about
 6   14 years before this stop?
 7        A.   Yes.
 8        Q.   Okay.   Was that something that you would
 9   have used to contribute to your reasonable
10   suspicion?
11        A.   Yes.
12             MR. PIERSON:   I'll hit play again.
13             (Video being played).
14             MR. PIERSON:   All right, I'm going to
15   pause it again.   So now we're at 10 minutes 17
16   seconds.
17        Q.   It sounds like you and Trooper Gleason
18   there are talking about the spare tire we just
19   talked about a second ago?
20        A.   Yes.
21        Q.   He said he didn't know whether there
22   would be a spare tire on the back there; correct?
23        A.   Originally, yes.
24        Q.   And then he also said, I don't know if
25   all of them have it; right?
```

```
1        A.  Yes.
2        Q.  In other words, he doesn't know if all
3   Winnebagos have a spare tire right there; right?
4        A.  Yes.
5        Q.  As part of your training, do you look at
6   models of RV's?
7        A.  No.
8        Q.  And how about on your own, do you stay up
9   to date, or familiar with types of RVs?
10       A.  No.
11       Q.  Okay.  We'll hear in a second, and you
12   tell me if you disagree after we hear it.  But
13   Trooper Gleason is going to offer to Google the RV
14   for you, and see if it has a spare tire or not; do
15   you recall that?
16       A.  I don't.
17       Q.  Okay.  And so I take it since you do not
18   recall that, do you recall Trooper Gleason ever
19   telling you the results of his Google search?
20       A.  I do not.
21            MR. PIERSON:  Okay, we're going to
22   begin playing again.  This is at 10 minutes and
23   17 seconds.
24                 (Video being played).
25       Q.  All right, we're at about 10:37 and you
```

```
 1    are walking back up to talk to the driver; right?
 2         A.   Yes.
 3                   (Video being played).
 4         Q.   I'm going to pause it right there.
 5    That's 10 minutes 54 seconds; right?
 6         A.   Yes.                    right?
 7         Q.   You gave him a warning; correct?
 8         A.   Yes.
 9         Q.   Did you actually hear it printing in the
10    car a moment ago?
11         A.   Yes.
12         Q.   It actually prints there in the car?
13         A.   Yes.
14         Q.   Why did you give him just a warning?
15         A.   I give warnings a lot, I guess I didn't
16    feel that it needed a ticket.
17         Q.   What about it didn't deem a ticket, in
18    your view?
19         A.   Typically if I write a fail to maintain
20    ticket, it's like driving way over on the
21    shoulder, almost off the roadway, back, you know,
22    more of a DUI type encounter.
23         Q.   Now at this point in the video and the
24    exchange, had you decided you were going to detain
25    Mr. Erich?
```

1      A.   I believe so.

2      Q.   Okay.  Based on what?

3      A.   The probability, or what I thought was a

4  high probability of a false compartment on the

5  back side of the vehicle.  The odor, the paint,

6  the paint on his hand, which he just kind of -- I

7  don't know if I asked him at this time yet about

8  the paint on hands.  So the odor.  Where he's

9  coming from, where he's going to, traveling this

10  time of night, which is typically seen to avoid

11  law enforcement, overnight hours.

12      Q.   Anything else?

13      A.   That's all I can think of right now.

14      Q.   Now the odor, your partner Trooper

15  Gleason hadn't smelled; correct, he told you he

16  couldn't smell it?

17      A.   Correct.

18      Q.   All right.  And the false compartment,

19  the possibility of a spare tire, you weren't sure

20  about that; right?

21      A.   Correct.

22      Q.   In fact, Trooper Gleason was going to

23  Google it for you, he hadn't done that yet; right?

24      A.   Correct.

25      Q.   You hadn't asked Mr. Erich about the

"Def. Obj:"
Inadmissible
hearsay,
FRE 802

1    paint on his hands at this point; right?

2        A.  I don't recall if I have or not, no.

3        Q.  But that was enough, in your view, to

4    detain them?

5        A.  Yes.

6        Q.  Okay.  Now you said something along the

7    lines of, have a safe trip, good night; right?

8        A.  Yeah, have a safe trip is typically what

9    I tell them, yes.

10       Q.  All right.  And you didn't say you're

11   free to go; correct?

12      A.  I don't believe so, no.

13      Q.  You didn't say, I'm done asking

14   questions, you don't have to answer any more;

15   right?

16      A.  No.

17      Q.  Okay.  And you also didn't detain them at

18   this point; right?

19      A.  Correct.

20      Q.  Why didn't you detain them at this point,

21   if you already decided you had reasonable

22   suspicion?

23      A.  I like to try to further the

24   investigation.  If he would have given me the

25   opportunity to ask questions more about that, then

```
 1       I could have asked him about the RV and why it
 2       looked like it had been painted.
 3            Q.   You had asked Trooper Franz when he came
 4       up if that was enough, if you had enough to detain
 5       them; right?
 6            A.   Uh-huh.
 7            Q.   Yes?
 8            A.   Yes.
 9            Q.   And Trooper Franz, at least that we can
10       hear, didn't respond to you; right?
11            A.   Right.
12            Q.   Okay.   Were you concerned you didn't have
13       enough for reasonable suspicion?
14            A.   I just wanted to know if the spot in the
15       paint was purely enough.
16            Q.   At this point, though, when you told him
17       have a good night, and you leave the window, were
18       you worried that you didn't have enough for
19       reasonable suspicion?
20            A.   No.
21            Q.   You were confident you had enough?
22            A.   Yes.
23            Q.   Okay.   But nonetheless, we're going to
24       see here in just a second you do try to end the
25       encounter and then reengage consensually to ask
```

1    more questions; right?

2         A.   Yes.

3                   MR. PIERSON:   It's 10 minutes and

4    54 seconds, but I'm going to begin the video

5    again.

6                   (Video being played).

7                   MR. PIERSON:   I'm going to pause it

8    right there again.   We won't do this too much

9    more, just stop and start like this.

10        Q.   10 minutes and 58 seconds; right?

11        A.   Yes.

12        Q.   I counted three steps.   You took three

13   steps back from the front and then turned around;

14   correct?

15        A.   I wasn't counting the steps, so I don't

16   know.

17        Q.   Okay.   And then you say, hey, sir; right?

18        A.   Yes.

19        Q.   So did we just witness that attempt to

20   end the encounter and begin a consensual

21   encounter?

22        A.   Yes.

23        Q.   And that's a maneuver, a tactic, you've

24   been trained to do; correct?

25        A.   Yes.

Case 6:19-cv-01343-KHV   Document 521-1   Filed 05/15/23   Page 87 of 184

```
 1                    MR. PIERSON:   All right, we're at
 2    10 minutes 58 seconds, and I'm going to hit play.
 3                    (Video being played).
 4         Q.   All right, I'm going to pause it there
 5    now at 11 minutes and 15 seconds; right?
 6         A.   Yes.
 7         Q.   You asked them where they were going;
 8    right?
 9         A.   Yes.
10         Q.   And they said Alabama; correct?
11         A.   Yes.
12         Q.   And then you asked them how long are you
13    going to be out there, and then Mr. Erich asked
14    you if he has to answer these questions; right?
15         A.   Yes.
16         Q.   And you tell him, no?
17         A.   Yes.
18         Q.   All right.   He says he would prefer not
19    to.   And then you asked him if you can talk to him
20    any further; right?
21         A.   Correct.
22         Q.   And he says, no, I'm free to go; right?
23         A.   Yes.
24         Q.   All right.   And you say you are free to
25    go; correct?
```

1      **A.   Yes.**

2           Q.   That wasn't true, actually; right?

3      **A.   No.**

4           Q.   Okay.   Why did you tell them they were

5      free to go, if you had already formed reasonable

6      suspicion of their involvement in criminal

7      activity?

8           **A.   I believe if we watch it here further, I**

9      **guess when he asked if he was free to go,**

10     **originally, yes, he was.   But at that point in**

11     **that time, I was detaining him.**

12          Q.   Originally when -- when was he free to

13     go?

14          **A.   Well, he asked earlier, you know, prior**

15     **to.   So -- well, in theory, I guess he was never**

16     **free to go, because I had already based my**

17     **decision that I was going to detain, had he not**

18     **wanted to talk to me.**

19          Q.   You had decided to detain him after your

20     initial encounter with Mr. Erich; right?

21     **A.   Yes.**

22          Q.   And based on everything you had at that

23     point, you decided you had enough for reasonable

24     suspicion; right?

25     **A.   Yes.**

1      Q.   And that was before you returned his
2   license and insurance card, before you gave him
3   the warning; correct?
4      A.   Yes.
5      Q.   Like you say, so Mr. Erich was never free
6   to go in this encounter once you pulled him over;
7   right?
8      A.   I guess so, yes.
9      Q.   Okay.   So why did you tell him you were
10   free to go?
11      A.   I don't know.
12            MR. PIERSON:   All right, we're at
13   11 minutes and 15 seconds, I'm going to hit play.
14               (Video being played).
15            MR. PIERSON:   I'm going to pause it
16   right there.   We're now at 11 minutes and
17   45 seconds.
18      Q.   And so in that last exchange when you
19   finally tell Mr. Erich that he's being detained;
20   correct?
21      A.   Yes.
22      Q.   And you told him it was because you
23   believed there was a false compartment; right?
24      A.   Yes.
25      Q.   You then asked him if he had drugs in the

Case 6:19-cv-01343-KHV   Document 521-1   Filed 05/15/23   Page 90 of 184

1    car; right?

2         A.   Yes.

3         Q.   Family, he has family in the car?

4         A.   I believe so, yes.

5         Q.   And then he tells you that he has two

6    children in the back; right?

7         A.   Yes.

8         Q.   Now did you know there were children in

9    the Winnebago before that moment?

10        A.   I did not.

11        Q.   You couldn't see them from inside -- from

12   looking into the driver's window?

13        A.   No.

14        Q.   Okay.   You also told Mr. Erich that you

15   asked if there was any painting done on the

16   vehicle and he said no; did you hear that?

17        A.   Yes.

18        Q.   Now again, that wasn't true; right?

19        A.   Correct.

20        Q.   Okay.   And then Mr. Erich actually even

21   said in response to your statement that, as far as

22   I know, Mr. Erich said, as far as I know there's

23   been no painting done; correct?

24        A.   Yes.

25        Q.   So he corrected you; right?

1    **A.   Yes.**

2        Q.   Did you hear him say that?

3    **A.   Yes.**

4        Q.   All right.   Did that change your opinion

5    of your reasonable suspicion?

6    **A.   No.**

7        Q.   Did you ever communicate to Trooper

8    Gleason, or Trooper Franz, or any of the other

9    Troopers that day, that Mr. Erich corrected you

10   about that?

11   **A.   No.**

12           MR. PIERSON:   This is 11 minutes and

13   45 seconds.   We'll start the video again

14           (Video being played).

15           MR. PIERSON:   All right, I'm going to

16   pause it there now.   We're at 12 minutes and

17   37 seconds.

18       Q.   At this point you told Mr. Erich and Ms.

19   Maloney that you're going to detain them and run

20   the drug dog around the RV, and you've asked them

21   to step outside; correct?

22   **A.   Yes.**

23       Q.   This is March 9th of 2018; right?   About

24   5:30 or six in the morning; right?

25   **A.   Correct.**

```
 1        Q.  Do you recall the temperature that day?
 2        A.  I do not.
 3        Q.  I think you said, make sure you got your
 4   coats on; right?
 5        A.  Yes.
 6        Q.  Was it cold?
 7        A.  Probably.
 8        Q.  So you're making Mr. Erich, Ms. Maloney
 9   and then now what you know of their two children
10   get out on the side of the road around six in the
11   morning on a cold Kansas day, based one what?
12        A.  Reasonable suspicion that I believed
13   they're involved in criminal activity.
14        Q.  Mr. Erich told you that he's a
15   construction worker?
16        A.  Yes.
17        Q.  Okay, did that explain the paint on his
18   hands to you?
19        A.  To a point, that's what he said, yes.
20             MR. PIERSON:  All right, I'm going to
21   begin playing again.  This is 12 minutes and
22   37 seconds.
23             (Video being played).
24        Q.  Were you patting Mr. Erich down?
25        A.  Yes.
```

App. Vol. XX, 96

```
 1                    MR. PIERSON:   All right, that's now
 2   stopped at 13 minutes and 3 seconds.
 3        Q.  Mr. Erich had stepped out of the vehicle;
 4   correct?
 5        A.  Yes.
 6        Q.  You have patted him down; right?
 7        A.  Yes.
 8        Q.  That's to look for weapons, or something
 9   like that?
10        A.  Yes.
11        Q.  Did you find anything?
12        A.  No.
13        Q.  You then asked Mr. Erich to leave his
14   phone on the dash; right?
15        A.  Yes.
16        Q.  You tell him he can remain recording, but
17   you tell him to leave it there?
18        A.  Yes.
19        Q.  Why did you do that?
20        A.  I don't allow people to take their phone
21   in the ditch with them, for safety reasons.
22        Q.  What are those safety reasons?
23        A.  There are times when drug traffickers
24   travel in multiple vehicles, and for safety
25   reasons I don't want them back there calling or
```

Case 6:19-cv-01343-KHV   Document 521-1   Filed 05/15/23   Page 94 of 184



1    texting someone in another vehicle, and possibly

2    do a drive-by, or something like that.

3         Q.  As far as you know, is that something the

4    Kansas Highway Patrol requires as a matter of

5    policy?

6         A.  No.

7         Q.  Have you been trained to keep people from

8    taking their phones out of vehicles during

9    searched like these?

10        A.  Yes.

11        Q.  Okay.  Is that still the policy of the

12   Kansas Highway Patrol?

13        A.  It's not a policy.

14        Q.  Is it still something the Kansas Highway

15   Patrol trains troopers to do?

16        A.  I don't know, I haven't been through

17   their training.  It's something I do myself.

18        Q.  Are you concerned that motorists will be

19   recording things that you say or do from outside

20   of the vehicle?

21        A.  No.

22        Q.  That's not one of the reasons you ask

23   them to keep phones inside?

24        A.  No.

25                 MR. PIERSON:  All right.  We're at

"Def. Obj:" Inadmissible hearsay, FRE 802

PohlmanUSA Court Reporting
(877) 421-0099      PohlmanUSA.com

Case 6:19-cv-01343-KHV   Document 521-1   Filed 05/15/23   Page 95 of 184

```
 1    13:03, I'll begin playing the video again.
 2                    (Video being played).
 3                    MR. PIERSON:  Now I'm pausing now at
 4    14 minutes and 15 seconds.
 5        Q.  Did you hear Ms. Maloney say she can't
 6    find her shoes?
 7        A.  I heard her say something about, shoes,
 8    yes.
 9        Q.  Was she referring to her child?
10        A.  I don't remember.
11        Q.  Okay.  I also -- did you hear Ms. Maloney
12    ask someone to grab Dylan's hands; did you hear
13    that?
14        A.  Yes.
15        Q.  Okay.  Was that one of their children
16    that was walking on the side of the highway?
17        A.  It must have been, yes.
18                    MR. PIERSON:  All right, I'll begin
19    playing the video again.
20                    (Video being played).
21                    MR. PIERSON:  Okay, I'm going to fast
22    forward a little bit here to when you actually
23    deploy your dog.  Okay, now starting at 15 minutes
24    and 40 seconds, all right?
25        A.  Okay.
```

App. Vol. XX, 99

```
 1          Q.   You might have to wait just a minute.
 2   But I want to be sure we get there.
 3               (Video being played).
 4          Q.   I'm going to pause the video, we're about
 5   17 minutes and 4 seconds.  And we see it's now you
 6   and Nico in front of your car behind the
 7   Winnebago; right?
 8          A.   Correct.
 9          Q.   Okay.  So at this point I assume
10   thereafter you're going to conduct the drug search
11   with Nico; correct?
12          A.   Yes.
13          Q.   All right.  Tell me in a circumstance
14   like this, what would be the typical procedure for
15   using Nico to do a drug sniff?
16          A.   I typically down, or have the dog in a
17   sit.  I go up and we do a safety search of the
18   vehicle, make sure there's nothing sharp, anything
19   that's going to hurt the dog.  In the dogs eye's
20   mind, he thinks that in his training that I'm
21   hiding a toy, he doesn't know that I'm doing a
22   safety search.          the dog
23               I go back, give the task command to
24   search for drugs, drug odor, and work around the
25   vehicle.
```

1      Q.  You say work around; what do you mean by
2  that?
3      A.  I present areas around the vehicle.  The
4  way I do mine is clockwise, and I come back
5  counter clockwise.
6      Q.  Okay.
7      A.  Counter, then clockwise, sorry.
8      Q.  Okay.  I think you started counter
9  clockwise in this one.
10     A.  Yes.
11     Q.  Does it make a difference which
12  direction, counter clockwise or clockwise you go?
13     A.  Yes, depending on air currents. , wind,
14  Direction, whatever, yeah, it does make a
15  difference at times.
16     Q.  Is that why you do both?
17     A.  Yes.
18     Q.  Does it make a difference which one goes
19  first?
20     A.  No.
21     Q.  You said that you would present different
22  areas to Nico?
23     A.  Yes.
24     Q.  What does that mean?
25     A.  To present areas where drug odor could be

1  coming out of the RV.  It doesn't make sense to

2  present a flat spot on the RV, typically, unless

3  you feel that there could be some area where the

4  drug odor could be coming out, otherwise it's

5  usually door seams, window seams, door handles,

6  productive areas for narcotic odor to be found.

7      Q.  Tell me physically what you're doing when

8  you present a certain area to your dog?

9      A.  I'm pointing.

10     Q.  Okay.  And then what are you looking for

11 in terms of Nico's behavior to determine whether

12 or not there are drugs?

13     A.  Change in behavior.  And his alerting

14 behavior of this particular dog would start

15 bracketing his mouth, his intensity with his

16 breathing or his sniffing would increase.

17 Sometimes it would slow down.  Once he got into,

18 much like a bird dog, when there's an odor, it
   bracketing
19 starts going from wider to narrower.  Ears would

20 sometimes change.  But most generally it would be

21 just that change in the direction.  He would

22 change his searching pattern from what I had been

23 giving him.

24     Q.  Do I understand you when you say

25 bracketing, do you mean the actual location of his

```
 1   head or nose --
 2        A.   Yes.
 3        Q.   -- goes from wider to narrower?
 4        A.   Yes.
 5        Q.   Okay.   Now you've seen this video; right?
 6        A.   Yes.
 7        Q.   You just watched it yesterday?
 8        A.   Yes.
 9        Q.   Were you able to tell when you watched
10   the video yesterday, when Nico alerted?
11        A.   Yes.
12        Q.   I'll ask you to point that out to me --
13        A.   Okay.
14        Q.   -- when you first noticed that Nico
15   alerts.   This is 17 minutes and 4 seconds, I'm
16   going to hit play.
17                   (Video being played).
18        A.   Right there would be where it would have
19   been.
20        Q.   I just stopped it at 18 minutes and
21   20 seconds, and you said right there, that's where
22   you think Nico alerted?
23        A.   Yes.
24        Q.   Okay.   And what about her behavior?
25        A.   His.
```

```
 1        Q.   What about his behavior that you observed
 2   that we can see on the video?
 3        A.   As I continued to move, you can see the
 4   line get tight in my hand.  And he started going
 5   up on his own, it's not something that I presented
 6   to go up there.  He put his paws there, and he
 7   started sniffing, and more intensely, and you can
 8   probably, I think you can hear even on the video
 9   where his sniffing increased.  And then he was
10   trying to bracket, trying to locate the source of
11   the odor.
12        Q.   Okay.  Now he has presented -- or rather
13   you had presented Nico to the back of the RV
14   initially; right?
15        A.   Down low, yes.
16        Q.   Okay.  And he had put his paws on the
17   bumper that first time, also, right; do you recall
18   seeing that?
19        A.   I don't recall right now.
20        Q.   Do you dispute that?
21        A.   I don't.
22        Q.   Okay.  And so would it be unusual for
23   Nico to have not discovered the odor the first
24   time through, but then on the second time through?
25        A.   No.
```

1      Q.  Why wouldn't Nico catch the odor the

2   first time?

3      **A.  With this particular dog, he is very high**

4   **driven.  And a lot of times during that first**

5   **three to five feet of a vehicle, he's not really**

6   **sniffing, he's just trying to get that easy find,**

7   **trying to find something, and he's not sniffing**

8   **what I call really good areas, productive areas.**

9   **So that's why I start him on the left side, left**

10  **corner, and present that back side, because I know** with

11  **this dog, through training and my experience with**

12  **this dog, his productive sniffing wasn't going to**

13  **start until we got further around the vehicle.**

14     Q.  All right.  Now when you started the drug

15  dog sniff, you believed at this point that there

16  was a false compartment there where you thought a

17  spare tire should have been; right?

18     **A.  Yes.**

19     Q.  And ultimately that's where Nico alerts;

20  right?

21     **A.  Yes.**

22     Q.  Where you thought the spare tire should

23  have been?

24     **A.  Yes.**

25     Q.  Now you never end up actually finding

```
 1    drugs in this search?
 2         A.   That's right, correct.
 3         Q.   Okay.   Do you think any of your behavior
 4    would have affected Nico's alerting to the back of
 5    the RV?
 6         A.   Which behavior?
 7         Q.   Do you think you could have done
 8    something that would have made Nico alert for a
 9    false positive for the smell of drugs?
10         A.   I could have, but I didn't.
11         Q.   You could have done that, but you did
12    not?
13         A.   Yes.
14         Q.   All right.   What could you have done to
15    make Nico alert?
16         A.   I could have pointed up there and told
17    him to sit.
18         Q.   Okay.   And, but you're confident that
19    nothing you did made Nico alert incorrectly in
20    this instance?
21         A.   I am confident, yes.
22         Q.   Can you -- what other reasons a dog would
23    alert when there isn't drugs that you can find?
24         A.   He's not trained to alert on anything
25    else except for drug odor.
```

1     Q.   Right.   You searched this vehicle; right?

2     A.   Yes.

3     Q.   You didn't find any drugs; right?

4     A.   Correct.

5     Q.   So what --do you have any explanation for

6  why Nico would alert?

7     A.   No, I don't.

8          MR. PIERSON:   We're at 18 minutes and

9  20 seconds, I'm going to hit play.

10              (Video being played).

11          MR. PIERSON:   All right.   I'm going

12  to pause it there, now we're at 18 minutes and

13  32 seconds.

14     Q.   You took Nico to the right, counter

15  clockwise of the vehicle; right?

16     A.   Yes.

17     Q.   And then come back; right?

18     A.   Yes.

19     Q.   Okay.   Why didn't you end the search

20  there if Nico had alerted?

21     A.   I wanted to see if he would give me an

22  indication.

23     Q.   All right.   What is the difference

24  between an alert and an indication?

25     A.   An alert is a behavior change in the dog

1    that I as a handler will recognize, that not

2    everybody else will recognize.  The indication is

3    a change of behavior, where he actually sits and

4    stares or freezes; where anybody else that's not

5    the handler, can recognize as that's an

6    indication.

7         Q.  All right.  Now, so at this point, though

8    -- well, first all, did Nico ever indicate?

9         A.  I believe he froze.

10        Q.  Okay.  And so at this point, at

11   18 minutes and 32 seconds, you believe that

12   there's a false compartment where a spare tire

13   should be.  You think you see Nico alert to that

14   spot; right?

15        A.  I did see him alert , not think.

16        Q.  And then you pull Nico around and come

17   back, and you're hoping to see an indication;

18   right?

19        A.  Yes.

20        Q.  And then Nico does indicate?

21        A.  Yes.

22        Q.  And you don't think any of your behavior

23   would have caused Nico to indicate?

24        A.  No.

25             MR. PIERSON:  I'm going to hit play

Case 6:19-cv-01343-KHV   Document 521-1   Filed 05/15/23   Page 105 of 184

```
 1    now, 18 minutes and 32 seconds.
 2                   (Video being played).
 3         Q.   All right.   Now I'm pausing it.   You just
 4    said loose; right?
 5         A.   I said Fuss.
 6         Q.   Is that the command to stop?
 7         A.   Heel command.
 8         Q.   Is that German?
 9         A.   Yes.
10         Q.   And then we're at 19 minutes and
11    11 seconds.
12              You had just taken Nico back around the
13    RV this time; right, this time going clockwise,
14    actually?
15         A.   Yes.
16         Q.   All right.   Why did you do that, if Nico
17    had already alerted?
18         A.   Like I said before, to see if he would
19    indicate.
20         Q.   All right.   And did you see an
21    indication?
22         A.   Yes.
23         Q.   Okay, and what was the indication?
24         A.   He had his front paws up there, and he
25    started staring and he froze.
```

1       Q.  All right.

2           MR. PIERSON:  I'm going to hit play,

3  we're at 19 minutes and 11 seconds.

4             (Video being played).

5           MR. PIERSON:  Okay, that's 19 minutes

6  and 34 seconds.

7       Q.  So I stopped it at, you just said he's

8  all over the back, referring to Nico?

9      A.  Yes.

10      Q.  Speaking to Trooper Gleason or Franz?

11      A.  Franz.

12      Q.  And then you said, you might want to put

13  the kids in the car?

14      A.  Yes.

15      Q.  That's because at this point, because

16  Nico, alerted you're going to search the vehicle;

17  right?

18      A.  Yeah, alerted and indicated, and I'm

19  going to search the vehicle, yes.

20      Q.  Why did you want to put the kids in the

21  car?

22      A.  To get them out of the cold weather.

23      Q.  You then do search the vehicle; right?

24      A.  Yes.

25      Q.  All right.  I already asked you this, but

```
 1    did you find anything when you searched the
 2    vehicle?
 3         A.   No.
 4         Q.   Did you do any damage to the RV when you
 5    searched it?
 6         A.   Not that I recall.
 7         Q.   Did you move anything inside the RV, when
 8    you searched it?
 9         A.   I'm sure I did, yes.
10         Q.   Did you remove any panels, or any more
11    structural items of the RV, when you searched it?
12         A.   I don't remember if I did or not.
13    Possibly.
14         Q.   Would it be unusual for you to do damage
15    to a vehicle during a search?
16         A.   Yes.
17         Q.   All right.  Do you sometimes have to get
18    into certain compartments, or remove paneling or
19    something like that, when you're searching a
20    vehicle?
21         A.   Yes.
22         Q.   Does that sometimes cause damage?
23         A.   I have caused damage before.  We've taken
24    care of it, the patrol has.
25         Q.   What does that mean, we've taken care of
```

```
 1        A.  Yes.
 2        Q.  All right.  Did Trooper Gleason help you
 3   search the vehicle?
 4        A.  I don't remember if he did or not.
 5        Q.  All right.  And how about Trooper Franz,
 6   did he help you search the vehicle?
 7        A.  I don't remember.
 8        Q.  Okay.
 9             MR. PIERSON:  I'm going to fast
10   forward a little bit.
11        Q.  And then one of them ends up in the
12   vehicle with you, and I'd like you to identify
13   them for me, okay?
14        A.  Okay.
15             MR. PIERSON:  All right, we're at now
16   29 minutes and 50 seconds into the video, okay?
17        A.  Okay.
18             MR. PIERSON:  I'm going to hit play,
19   sometimes when we skip like this makes the video
20   lag a little bit.  So if you see it jolt a little
21   bit, that's what happens.
22                  (Video being played).
23             MR. PIERSON:  I'm going to pause it
24   there, that's 33 minutes and 40 seconds.
25        Q.  Can you tell who was searching with you?
```

1       A.   I believe it was Trooper Phil

2   Hendrickson, who was traveling through the area

3   and stopped to assist.

4       Q.   Okay.  And it sounds like you asked

5   Trooper Hendrickson if he could smell the paint;

6   right?

7       A.   Yes.

8       Q.   He said, no; right?

9       A.   Yes.

10      Q.   He said he's kind of stuffy, is what he

11  said; right?

12      A.   Yes.

13      Q.   All right.  So at this point Trooper

14  Gleason and Trooper Hendrickson have told you they

15  couldn't smell the paint?

16      A.   Yes.

17               MR. PIERSON:  I'm going to hit play

18  again.  It looks like the video got caught up

19  here, it's 33 minutes and 40 seconds.

20                    (Video being played).

21               MR. PIERSON:  I'm going to pause it

22  there, now we're at 35 minutes and 38 seconds.

23      Q.   It's a little confusing, because you and

24  the other trooper are inside the RV searching;

25  right?

"Def. Obj:" Inadmissible hearsay, FRE 802

```
 1       A.  I believe I'm at the hood area of the
 2   vehicle, I think I'm in the hood.
 3       Q.  Got you.  So you're at the front of the
 4   vehicle?
 5       A.  Yes.
 6       Q.  In any event, we can't see you in the
 7   video; right?
 8       A.  Correct.
 9       Q.  So we're just hearing the microphone,
10   from your microphone?
11       A.  Yes.
12       Q.  You tell Trooper Hendrickson to smell in
                                    hear
13   here; did you s̶a̶y̶ that?
14       A.  Yes.
15       Q.  Okay.  And you say, you smell that,
16   though, right; or you ask him if he smells
17   something; right?
18       A.  Yes.
19       Q.  And he responds, yeah, but he doesn't
20   know what it is; right?
21       A.  Correct.
22       Q.  He didn't think it smelled like paint, at
23   least at that point; right?
24       A.  Yes.
25           MR. PIERSON:  All right, we'll keep
```

"Def. Obj:" Inadmissible hearsay, FRE 802

Case 6:19-cv-01343-KHV  Document 521-1  Filed 05/15/23  Page 111 of 184

```
 1    watching from there.
 2                    (Video being played).
 3              MR. PIERSON:   I'll pause right there,
 4    that's 36 minutes and 18 seconds.
 5         Q.   You're at the hood?
 6         A.   I believe so.
 7         Q.   Okay.   You say, feel how heavy that is,
 8    and he responds, holy cow.   Do you know what
 9    you're referring to?
10         A.   I do not.
11              MR. PIERSON:   We're at 36 minutes and
12    18 seconds.   Let's hit play again, first.
13                    (Video being played).
14              MR. PIERSON:   I'll pause it there at
15    38 minutes and 7 seconds.
16         Q.   You were discussing getting a mirror or a
17    scope in some item in or on the vehicle; right?
18         A.   Yes.
19         Q.   Trying to get your foot into it and open
20    it up somehow; right?
21         A.   Try to look through a hole or something,
22    yes.
23         Q.   You don't recall what that was?
24         A.   I don't remember.
25         Q.   Do you recall if you did pull anything
```

```
 1    apart, or break anything?
 2         A.   No.
 3         Q.   That was a bad question.
 4              No, you don't recall, or no, you didn't
 5    do that?
 6         A.   I don't remember breaking anything.
 7         Q.   And then Trooper Hendrickson, or who we
 8    think is Trooper Hendrickson, said towards the end
 9    there, what year is this?  You said, '96, I think?
10         A.   I thought I said '06.
11         Q.   You said '06.  And then he said, I don't
12    know, that's why you get paid the big bucks.
13              Did you hear that?
14         A.   Yes.
15         Q.   I know he was just joking.  Was he
16    referring to any particular status between the two
17    of you?  Do you have a different title than him?
18         A.   No.
                    paid
19         Q.   You get the same amount he does?
20         A.   Yes.
21         Q.   So he's just making a joke?
22         A.   Yes.
23         Q.   Okay, got you.  I'm going to hit play
24    again, 38 minutes and 7 seconds.
25                   (Video being played).
```

App. Vol. XX, 116

1          MR. PIERSON: All right. It sounds
2    like you're 3843, or so. Trooper Hendrickson
3    leaves.
4        A. Yes.
5          MR. PIERSON: I'm going to pause it
6    there, at 39 minutes and 41 seconds; right?
7        A. Yes.
8        Q. And you ended the search, at least inside
9    there; correct?
10       A. Yes.
11       Q. And we saw one of the troopers pull off,
12   pull away from the scene; right?
13       A. Yes.
14       Q. And now that little bit we just heard,
15   you're speaking with Ms. Maloney; right?
16       A. Yes.
17       Q. Okay, and you asked Ms. Maloney if she
18   could smell paint, again; right?
19       A. Yes.
20       Q. And she said no; right?
21       A. Yes.
22       Q. You then have a conversation about that
23   spot on the back of the Winnebago; right?
24       A. Yes.
25       Q. And you actually, I think you shined your

App. Vol. XX, 117

Case 6:19-cv-01343-KHV  Document 521-1  Filed 05/15/23  Page 114 of 184

1    light on it and showed it to her; correct?

2         A.   Yes.

3         Q.   She said she could see it; right?

4         A.   Yes.

5         Q.   Did you have a conversation with Mr.

6    Erich at some point, where he told you that there

7    were decals removed, or something had been taken

8    off of that back?

9         A.   He must have, I don't recall.

10        Q.   You don't recall.  But you tell Ms.

11   Maloney that he said --

**"Def. Obj:"
Inadmissible
hearsay,
FRE 802**

12        A.   Yes.

13        Q.   -- Mr. Erich said there might have been a

14   sticker there, or something; right?

15        A.   Yes.

16        Q.   And then you again say, you asked if it

17   had been painted, and Mr. Erich said, no; correct?

18        A.   Correct.

19        Q.   Again, that wasn't accurate; right?

20        A.   Correct.

21             MR. PIERSON:  Okay, we're at 39

22   minutes and 41 seconds, I'm going to hit play

23   again.

24             (Video being played).

25             MR. PIERSON:  I'm going to pause

```
 1    there, it's 40 minutes and 3 seconds.
 2        Q.  Did you hear Ms. Maloney say, this is my
 3    first time here, so I guess I didn't know,
 4    something like that?
 5        A.  Something like that.
 6        Q.  Do you have any idea what she was
 7    referring to; or what did you take her to be
 8    referring to?
 9        A.  I don't remember.
10        Q.  All right.  Okay.
11              MR. PIERSON:  It will be 40 minutes
12    and 3 seconds, and I'm hitting play again.
13              (Video being played).
14              MR. PIERSON:  I'm going to pause it
15    there, that's 40 minutes and 23 seconds.
16        Q.  You tell them they can get back in the
17    car; right?
18        A.  Yes.
19        Q.  Make sure they have their keys; right?
20        A.  Yes.
21        Q.  Did you hear one of the children wish you
22    a good day?
23        A.  Yes.
24              MR. PIERSON:  I'm going to hit play
25    here at 40 minutes and 23 seconds.
```

```
 1                        (Video being played).
 2                    MR. PIERSON:  All right I'm going to
 3    pause it there, that's 40 minutes and 45 seconds.
 4        Q.  You're talking to Mr. Erich at that
 5    point; correct?
 6        A.  Yes.
 7        Q.  You again asked him if he noticed the
 8    paint odor in the vehicle at all, and he again
 9    says, no; right?
10        A.  Correct.
11        Q.  So, at this point Mr. Erich, Ms. Maloney
12    and two of the troopers with you have all told you
13    that they couldn't smell the paint, that you said
14    you smelled; right?
15        A.  Correct.
16                    MR. PIERSON:  I am going to hit play
17    at 40 minutes 45 seconds.
18                       (Video being played).
19                    MR. PIERSON:  I am going to pause it
20    there again, 41 minutes and 6 seconds.
21        Q.  You are talking to Mr. Erich saying, I'm
22    sorry to waste your time.
23            And what is it that you say at the end?
24    That's the way it is?
25        A.  Yeah.
```

```
1              MR. PIERSON:  This is 41 minutes and
2   six seconds, I'm going to hit play again.
3                   (Video being played).
4              MR. PIERSON:  That's 41 minutes and
5   18 seconds.
6       Q.  And you had just let Mr. Erich go.  We
7   can see in the video he's walking back to his car;
8   right?
9       A.  Yes.
10      Q.  And then you say, hey, sir, hold on just
11  one second; right?
12      A.  Yes.
13      Q.  And you again detain him; right?
14      A.  Yes.
15      Q.  Why did you do that?
16      A.  I don't recall, but I think, if I
17  remember right, I wanted to check, I remembered
18  seeing a ladder and I remembered I hadn't gone up
19  the ladder and checked the top, possibly.
20      Q.  At this point you had searched the
21  vehicle inside and out?
22      A.  Yes.
23      Q.  Not on the roof, I guess; right?
24      A.  Yes. Correct.
25      Q.  Found nothing?
```

```
 1        A.  Yes.
 2        Q.  All right.  There was nothing else that
 3   made you more suspicious at this point, than you
 4   were at the beginning, was there?
 5        A.  No.
 6        Q.  So you detain him again and ask him to
 7   step on the side, again; correct?
 8        A.  I believe so.  I don't recall watching
 9   this, I didn't watch this part yesterday.
10        Q.  All right.
11             MR. PIERSON:  So this is 41 minutes
12   and 18 seconds, and I'm going to hit play again.
13             (Video being played).
14             MR. PIERSON:  All right, I'm going to
15   stop it there at 42 minutes.
16        Q.  And so, like you say, you climbed up on
17   the ladder and looked on the roof for anything
18   else.  Climbed back down, and then let Mr. Erich
19   go; correct?
20        A.  Yes.
21             MR. PIERSON:  Okay, I'm going to be
22   done with the video there.
23        A.  Is it a good time for a break?
24             MR. PIERSON:  It would be a perfect
25   time for one.
```

```
 1                        (WHEREUPON, a recess was had,

 2                        after which the following:)

 3                        THE VIDEOGRAPHER:  And back on the

 4       record.

 5            Q.   All right.  Trooper Rohr, did you speak

 6       with anybody besides your lawyers at the break?

 7            A.   I didn't even speak with my lawyers, but

 8       I did speak with people outside the office, told

 9       them, hello.

10            Q.   Did you discuss your testimony at all?

11            A.   No, I did not.

12            Q.   About this case in any way?

13            A.   No.

14            Q.   And we took one other short break earlier

15       this morning, did you speak with anybody other

16       than your lawyers during that break?

17            A.   I did not.

18            Q.   I'm going to hand you now what we're

19       going to mark Exhibit 105.

20                        (WHEREUPON, the reporter marked for

21                        identification Deposition Exhibit

22                        No. 105).

23            Q.   Can you tell me what Exhibit 105 is,

24       please?

25            A.   This is the Kansas Highway Patrol Police
```

App. Vol. XX, 123

1    **Service Dog Report for this deployment on this car**

2    **stop.**

3         Q.   We talked about this a little earlier

4    today.   This is a version of one of the documents

5    you brought with you today; correct?

6         **A.   Yes.**

7         Q.   One of the differences between this

8    version of the document you brought with you is

9    the reviewer's initials on the bottom right; do

10   you see that?

11        **A.   Yes.**

12        Q.   On the version you have there weren't

13   those initials; correct?

14        **A.   Correct.**

15        Q.   All right.   Whose initials are those?

16        **A.   Those are, at the time were my**

17   **supervisor, Jason Edie.**

18        Q.   Okay.   And when -- well, first, do you

19   know when you prepared this report?

20        **A.   I do not know.**

21        Q.   Obviously, after March 9th, 2018?

22        **A.   Yes.**

23        Q.   I understand you don't know exactly when

24   you prepared it, but would you have normally

25   prepared it the following day, within 24 hours,

```
 1    something like that?
 2         A.   Typically, yes.
 3         Q.   All right.  Did you prepare this before
 4    you learned there was a lawsuit based on this
 5    stop?
 6         A.   I would assume so, yes, yes.
 7         Q.   Okay.  Why are you a little hesitant to
 8    say; why do you just say you assume so?
 9         A.   I don't know the exact time that I
10    prepared this report.  And I'm pretty sure the
11    lawsuit was almost two years after the fact, so
12    I'm only assuming, yes.
13         Q.   Okay.  How long -- well, I assume the
14    reviewer's initials means that your Lieutenant
15    Edie, is that his name?
16         A.   Yes.
17         Q.   Lieutenant Edie reviewed this; correct?
18         A.   Yes.
19         Q.   Do you know when he reviewed it?
20         A.   I do not.
21         Q.   Did you -- do you know how long after you
22    prepared it that he would have reviewed it?
23         A.   I do not.
24         Q.   Would that typically happened within a
25    certain amount of time?
```

1          A.   I don't know when he would have taken the
2     time to review the reports, I don't know. the/ /time/.
3          Q.   Do you know if he reviewed this before
4     the lawsuit was brought?
5          A.   I can't say for sure, yes. or no.
6          Q.   Did you discuss this document with
7     Lieutenant Edie in any way?
8          A.   Not that I remember.
9          Q.   Does he review all of your Police Service
10    Dog Reports?
11         A.   Yes.
12         Q.   Or did he, at the time?
13         A.   Yes.
14         Q.   So any of your reports would have had his
15    review -- would have had his initials on them,
16    eventually; is that right?
17         A.   Yes.
18         Q.   Do you know what his review is for?
19         A.   To make sure that the wording, check
20    grammar, punctuation, stuff like that.
21         Q.   Is he reviewing, as far as you know, for
22    the lawfulness of the stop, or detention?
23         A.   No.
24         Q.   Okay.   If -- has he ever spoken to you
25    about any of your Police Service Dog Reports, and

```
 1   had an issue with them, other than words and
 2   grammar, and that kind of thing?
 3        A.   Probably -- we probably have had
 4   discussions about describing alerting behaviors,
 5   stuff like -- -you know, the K-9 portion of it.
 6        Q.   When you say describing alerting
 7   behaviors, do you mean describing them well enough
 8   in the report?
 9        A.   Yes.
10        Q.   Okay.   This is one of the documents, or
11   your version of the documents, this is one of the
12   documents you reviewed in preparation for today;
13   correct?
14        A.   Yes.
15        Q.   Does this document contain all of the
16   things that you've considered in forming
                                detaining and
17   reasonable suspicion in ending/in the searching
18   Mr. Erich's car?
19        A.   All of them, no.
20        Q.   Okay.   Why didn't you include all of the
21   factors leading to your reasonable suspicion?
22        A.   When at the time, and even still, it's
23   just one of those things that we were never
24   trained to put all of that stuff into our reports.
25   We just always kept it brief, and somewhat short,
```

Case 6:19-cv-01343-KHV   Document 521-1   Filed 05/15/23   Page 124 of 184

1    I guess.

2         Q.   I want to direct your attention now to

3    the second page of Exhibit 105.  There's a

4    narrative here; correct?

5         A.   Yes.

6         Q.   The second full sentence you write:  As I

7    approached the driver's side of the vehicle, I

8    smelled a strong odor of paint or bondo; correct?

9         A.   Yes.

10        Q.   You don't include the fact that the two

11   troopers told you they didn't smell that; right?

12        A.   Right.

13        Q.   You don't include the fact that Mr. Erich

14   denied the smell; correct?

15        A.   Correct.

16        Q.   You also don't include the fact that Ms.

17   Maloney told you she couldn't smell it; correct?

18        A.   Correct.

19        Q.   Is there a reason you didn't include

20   those facts?

21        A.   Because these are based on my opinions

22   and my facts that I observed, not theirs.

23        Q.   This is now the second from the last

24   sentence in that first paragraph:  The driver

25   refused; do you see that?

"Def. Obj:"
Inadmissible
hearsay,
FRE 802

```
 1      A.  Yes.
 2          Q.  Okay.  The driver refused, so I advised
 3   him that I would be using my narcotics detecting
 4   K-9 to sniff the exterior of the vehicle.
 5          Did I read that correctly?
 6      A.  Yes.
 7          Q.  Refused refers to when you asked him for
 8   consent to search the vehicle; right?
 9      A.  Yes.
10          Q.  You never actually asked him for consent
11   to search the vehicle; did you?
12      A.  No, I did not.
13          Q.  When did you first realize that that was
14   a mistake in this report?
15      A.  I consider even him refusing to talk to
16   me still a refusal.
17          Q.  So you did ask him if he would speak to
18   you further?
19      A.  Yes.
20          Q.  Mr. Erich; right?
21      A.  Yes.
22          Q.  And he said he didn't want to?
23      A.  He said, sure, originally.  And then as I
24   asked him questions, that's when he basically said
25   he didn't want to talk to me any more.
```

App. Vol. XX, 129

1      Q.  Okay.  So he told you he didn't want to
2   answer any more questions.  Those are his words,
3   right? at a certain point?
4      A.  Yes.
5      Q.  You never asked him if you could search
6   his vehicle; correct?
7      A.  No.
8      Q.  Let me ask that again, and just listen
9   carefully.
10          Is it correct that you never asked him to
11  search the vehicle?
12     A.  That is correct.
13     Q.  When did you first realize that your
14  report was wrong in that regard?
15     A.  I guess right now.
16     Q.  You write -- let's go back to that same
17  sentence.  The driver refused, so I advised him
18  that I would be using my narcotic detecting K-9.
19  Do you see where I am?
20     A.  Yes.
21     Q.  Was his refusal to talk to you any part
22  of your reasonable suspicion?
23     A.  No.
24     Q.  You then write:  I had the occupants exit
25  the car and had them stand on the side of the road

```
 1    in front of the Winnebago; correct?
 2        A.   Yes.
 3        Q.   Now you identify on the front page of
 4    Exhibit 105, Mr. Erich; correct?
 5        A.   Yes.
 6        Q.   Okay.   Do you identify Ms. Maloney
 7    anywhere in this report?
 8        A.   I do not.
 9        Q.   Do you identify the children anywhere in
10    this report?
11        A.   I do not.
12        Q.   Is there a reason you left Ms. Maloney
13    and her children out of a description of the
14    occupants you had stand on the side of the road?
15        A.   I didn't feel it was necessary to put the
16    names in there.
17        Q.   Are you concerned about your Lieutenant
18    finding out that you had a family stand on the
19    side of the road, and not find anything?
20        A.   No.
21        Q.   I want to go quickly through a few other
22    reports that you have written, I believe; all
23    right?
24        A.   Okay.
25        Q.   I hand you what we'll mark Exhibit 106.
```

"Def. Obj:"
Irrelevant,
FRE 401

```
 1                 (WHEREUPON, the reporter marked for
 2                 identification Deposition Exhibit
 3                 No. 106).
 4          Q.  Here you are.
 5          A.  Thank you.
 6          Q.  Can you identify Exhibit 106 for us,
 7  please?
 8          A.  It is a Police Service Dog Report from
 9  2017.
10          Q.  Do you recall the stop that this report
11  is about?
12          A.  I do not.
13          Q.  Do you have any reason to dispute that
14  this was a stop you made?
15          A.  No.
16          Q.  All right.  So this report deals with a
17  stop that you made on November 22nd, 2017,
18  according to the report; correct?
19          A.  Correct.
20          Q.  And it says 630 -- 0630; that means 6:30
21  in the morning; right?
22          A.  Yes.
23          Q.  All right.  And according to the
24  narrative on the second page, you stopped a 2014
25  Nissan with Colorado registration; right?
```

1    A.   Yes.

2        Q.   You then write:  While talking to the

3    driver I became suspicious of criminal activity;

4    correct?

5        A.   Yes.

6        Q.   Now you don't include what led you to

7    your suspicion in this report; correct?

8        A.   Correct.

9        Q.   Is there a reason you didn't do that?

10       A.   At the time of -- throughout the years of

11   being on the K-9 unit, early on in the unit, our

12   reports were really brief.  And since then we've

13   started adding more details to our reports.  And

14   this is a very brief narrative.

15       Q.   Okay.  According to your narrative, the

16   Nissan had Colorado registration -- Colorado

17   license plate; correct?

18       A.   Yes.

19       Q.   And if you look on the front page of this

20   report, we see the two named people involved, one

21   with an address of Independence, Missouri, the

22   other with an address of Boulder, Colorado; do you

23   see that?

24       A.   Yes.

25       Q.   Was the fact of the Colorado

1    registration, or the Colorado or Missouri
2    addresses, something that might have played a role
3    in your reasonable suspicion?
4         A.   I can't say that for sure. tell you that for sure.
5         Q.   And then you had -- you go in to a dog and do
6    sniff; correct?
7         A.   Correct.
8         Q.   It looks like Nico didn't find anything;
9    right?
10        A.   There was no alerts or indications,
11   that's correct.
12             (WHEREUPON, the reporter marked for
13             identification Deposition Exhibit
14             No. 107).
15        Q.   I hand you what we've marked Exhibit 107;
16   can you identify Exhibit 107 for us, please?
17        A.   It is another Kansas Highway Patrol
18   Police Service Dog Report from 2017.
19        Q.   All right.  And is that your signature at
20   the bottom?
21        A.   Yes.
22        Q.   You prepared this report?
23        A.   Yes.
24        Q.   And it concerns a stop on June 18th,
25   2017; right?

1    A.    That's correct.

2    Q.    Time of this one is 2353, that means

3    11:53 p.m.; correct?

4    A.    Yes.

5    Q.    All right.  Do you recall this stop?

6    A.    I do not.

7    Q.    And again, if we look at the narrative

8    portion on the second page, you can read that you

9    stopped a 2007 BMW with Colorado registration, and

10   while talking to the driver you became suspicious

11   of criminal activity; correct?

12   A.    Yes.

13   Q.    Again, you don't list a cause of your

14   suspicions; right?

15   A.    Correct.

16   Q.    Is there any particular reason in this

17   stop you didn't do that?

18   A.    Same reason as before.

19   Q.    Again, you deploy Nico; correct?

20   A.    Yes.

21   Q.    And again, you don't find anything;

22   correct?

23   A.    Correct.

24   Q.    Also, again, this car bore Colorado

25   registration plates; right?

Case 6:19-cv-01343-KHV   Document 521-1   Filed 05/15/23   Page 132 of 184

1    A.  Yes.

2        Q.  And it looks like on the front page, the

3   driver was from Colorado; correct?

4    A.  Yes.

5        Q.  Was the fact that the driver was from

6   Colorado anything that played a role in your

7   formation of reasonable suspicion?

8        A.  I can't say that for sure.

9            (WHEREUPON, the reporter marked for

10           identification Deposition Exhibit

11           No. 108).

12       Q.  I hand you what is marked Exhibit 108.

13  Can you identify Exhibit 108 for us, please?

14       A.  Another Kansas Highway Patrol Police

15  Service Dog Report prepared by myself.

16       Q.  I am actually interested, I would like to

17  ask you this and Exhibit 107, they bear different

18  reviewers than the previous one?

19       A.  That would be current Captain Scott

20  Walker.

21       Q.  All right.  And 399, what does that mean?

22       A.  That's his radio number.

23       Q.  This is another stop.  You write on the

24  second page that on February 2nd, 2017, I

25  suspected criminal activity while on a stop.  I

1    asked consent to search the vehicle and was

2    refused.

3              Did I read that correctly?

4        A.   Yes.

5        Q.   Again, you don't list the cause of your

6    suspicion; correct?

7        A.   Correct.

8        Q.   And again, was there any particular

9    reason in this stop that you didn't do that?

10       A.   No.

11       Q.   Again, you deployed Nico; correct?

12       A.   Yes.

13       Q.   And again, there was no alert or

14   indication; correct?

15       A.   Correct.

16       Q.   If we look at the front page, the driver

17   from this car appears to be from Indiana; is that

18   right?

19       A.   Yes.

20       Q.   Is Indiana one of those drug source or

21   destination states we talked about earlier?

22       A.   Yes.

23       Q.   And what is the fact that the driver was

24   from Indiana something that played a role in your

25   formation of reasonable suspicion in this stop?

 1       A.   I can't say that for sure.

 2       Q.   And here it looks like she had an

 3  11-month old baby in the car with her; is that

 4  right?

 5       A.   Yes.

 6       Q.   And you allowed her to stay in the

 7  vehicle while you worked the K-9; is that right?

 8       A.   That's correct.

 9              MR. PIERSON:  I'll mark Exhibit 109

10  and hand it to you.

11              (WHEREUPON, the reporter marked for

12              identification Deposition Exhibit

13              No. 109).

14       Q.   All right.  This one, as you'll see, is a

15  little bit longer.  There's some blank pages in

16  between some of the other pages, but I can

17  represent to you that's just how it was produced

18  to me.

19              Take a moment to look through this, but

20  once you feel comfortable I'll ask you to identify

21  it for me.

22       A.   (Witness complies).  Looks like one of my

23  stops where K-9 was deployed and a currency

24  seizure was done.

25       Q.   All right.  That is a report prepared by

```
 1    Colorado Springs, Colorado, was that something
 2    that played a role in your formation of reasonable
 3    suspicion?
 4         A.   Yes.
 5              (WHEREUPON, the reporter marked for
 6              identification Deposition Exhibit
 7              No. 110).
 8         Q.   I'm going to hand you what we're marking
 9    Exhibit 110.  Can you identify Exhibit 110 for me,
10    please?
11         A.   This is a Police Service Dog Report of
12    mine from 2015.
13         Q.   There's no reviewer's initials on this;
14    do you see that on the front page?
15         A.   I do.
16         Q.   Do you know why that would be the case?
17         A.   I do not.
18         Q.   All right.  Is it possible that no one
19    ever reviewed this?
20         A.   I don't know.
21         Q.   Okay.  Again, this is about a Police
22    Service Dog Deployment, this report you prepared;
23    correct?
24         A.   Yes.
25         Q.   And it concerns the deployment and stop
```

"Def. Obj:" Irrelevant, FRE 401

Case 6:19-cv-01343-KHV   Document 521-1   Filed 05/15/23   Page 136 of 184

1   on October 9th, 2015; right?

2        A.   Yes.

3        Q.   At 6:55 in the morning?

4        A.   Yes.

5        Q.   And on the second page we can read where

6   you wrote that on 10-9-2015 I stopped a silver

7   Volkswagen with Missouri tags at a certain place;

8   correct?

9        A.   Yes.

10       Q.   You then go on to write:  During the stop

11   I observed indicators of criminal activity; right?

12       A.   Yes.

13       Q.   You don't list those indicators, though;

14   correct?

15       A.   Correct.

16       Q.   Is there any reason particular to this

17   stop that you did not list those indicators?

18       A.   No.

19       Q.   Was the fact that there was a Missouri

20   tag something that could have played a role in

21   your decision to detain this person?

22       A.   I can't say that for sure.

23       Q.   Is it possible it was, though?

24       A.   It could have been, I don't know.

25       Q.   If you look on the front page, we can see

1     that this person was from Missouri, as well?

2          A.   Yes.

3          Q.   Is the fact that they were from Missouri

4     something that could have played a role in your

5     decision to detain them?

6          A.   Possibly.

7          Q.   According to the report you deployed

8     Nico, but there were no alerts or indications;

9     right?

10         A.   Right.

11              (WHEREUPON, the reporter marked for

12              identification Deposition Exhibit

13              No. 111).

14         Q.   I'll hand you Exhibit 111.   Could you

15     tell me what Exhibit 111 is, please?

16         A.   A Police Service Dog Report of mine from

17     2015.

18         Q.   Okay.   And it concerns a stop and drug

19     sniff on August 11th, 2015, at 3:04 in the

20     morning; correct?

21         A.   Yes.

22         Q.   The people in the car, according to the

23     report and on the front page, were from Iowa and

24     Pennsylvania; is that right?

25         A.   Yes.

Case 6:19-cv-01343-KHV Document 521-1 Filed 05/15/23 Page 138 of 184

1        Q.   And actually on the second page you don't
2   identify the tags of the car; is that right?
3        A.   Correct.
4        Q.   I'm sorry, on the first page under
5   comments, it looks like it's a 2001 Ford Escape,
6   Iowa with a license plate number; correct?
7        A.   Yes.
8        Q.   On the second page of Exhibit 111 you
9   write:   During the stop I observed indicators of
10  criminal activity; correct?
11       A.   Yes.
12       Q.   You don't list those indicators; right?
13       A.   I do not.
14       Q.   And is there any reason, particular to
15  this stop, that you remember which would have led
16  you to not list those indicators?
17       A.   No.
18       Q.   Again, you deployed Nico; correct?
19       A.   Yes.
20       Q.   And then there were no alerts or
21  indications; right?
22       A.   Correct.
23       Q.   The fact that the driver or passenger
24  were from Iowa or Pennsylvania, something which
25  could have contributed to your reasonable

1    suspicion?

2         A.   Could have been.

3         Q.   I hand you what we're marking

4    Exhibit 112.

5              (WHEREUPON, the reporter marked for

6              identification Deposition Exhibit

7              No. 112).

8         Q.   Can you identify Exhibit 112, please?

9         A.   It is a Police Service Dog Report from

10   2015 of mine.

11        Q.   And you prepared this?

12        A.   Yes.

13        Q.   June 10th, 2015, is the incident that it

14   concerns; correct?

15        A.   Yes.

16        Q.   On the second page of Exhibit 112 you

17   write that you stopped a 2004 gray Acura with a

18   New York tag, in Ellsworth County?

19        A.   Yes.

20        Q.   You then write:  During the stop I

21   suspected criminal activity was present and asked

22   for consent to search the car; right?

23        A.   Yes.

24        Q.   You don't list what led to your

25   suspicion; correct?

1       A.  Correct.

2           Q.  Is there any reason in this stop that you

3       can recall, which would have prevented you from

4       listing the things that led to your reasonable

5       suspicion?

6           A.  No.

7           Q.  Was the fact that the suspect refused

8       consent to search, something that contributed to

9       your reasonable suspicion?

10          A.  No.

11          Q.  And the car's tags were from New York,

12      and then as was the driver, apparently; correct?

13          A.  Yes.

14          Q.  Was the fact that they were from or

15      heading to New York, something which could have

16      contributed to your reasonable suspicion?

17          A.  Yes.

18          Q.  We'll mark this one 113.

19              (WHEREUPON, the reporter marked for

20              identification Deposition Exhibit

21              No. 113).

22          Q.  Again, a little bit of a longer one here,

23      so take your time to review it, but once you're

24      comfortable, I'll ask you to identify it for me.

25          A.  (Witness complies).  Okay.

1      **A.   Yes.**

2          Q.   At the bottom there you have a section

3      that you wrote called Personal Observations and

4      Indicators of Criminal Activity; correct?

5      **A.   Yes.**

6          Q.   And the first observation and indicator

7      of criminal activity that you list is coming from

8      Kansas City, Kansas, a known hub for illegal drug

9      activity, and headed to Denver, Colorado, a known

10     source for illegal drugs.

11          Did I read that correctly?

12     **A.   Yes.**

13          Q.   And was that one of the indicators of

14     criminal activity, in your mind, for this stop?

15     **A.   Yes.**

16          Q.   Let me hand you what we'll mark

17     Exhibit 115.

18              (WHEREUPON, the reporter marked for

19              identification Deposition Exhibit

20              No. 115).

21          Q.   And can you identify Exhibit 115 for me,

22     please?

23     **A.   It is a Police Service Dog Report for**

24     2015. 2016.

25          Q.   You prepared this report; correct?

"Def. Obj:" Irrelevant, FRE 401

1       A.  Yes

2           Q.  One more set of initials at the bottom,

3       NM, that's the reviewer's initials; do you know

4       who that is?

5           A.  I'm assuming Mitch Matthews, he was a K-9

6       handler at the time, instructor.

7           Q.  He was an instructor?

8           A.  Yes.

9           Q.  Was he your supervisor?

10          A.  No.

11          Q.  Was he a superior of yours?

12          A.  No.

13          Q.  Do you know why he would have reviewed

14      this?

15          A.  I don't know.

16          Q.  Do you recall giving this to him?

17          A.  No.

18          Q.  Did you always turn your Police Service

19      Dog Reports in to your Lieutenant?

20          A.  Yes.  And it could have been something

21      that he delegated to this person, I don't know.

22          Q.  Do you get these back after they're

23      reviewed?

24          A.  No, only if corrections need to be made.

25          Q.  I see.  Do you know if you've seen this

1    with the initials on it before today?

2         A.  I have not.

"Def. Obj:"
Irrelevant,
FRE 401

3         Q.  Okay.  If you look at the second page,

4    your narrative, that you stopped a Chevy Cruze

5    with Missouri tags; correct?

6         A.  Yes.

7         Q.  And during the traffic stop you suspected

8    criminal activity; right?

9         A.  Yes.

10        Q.  "While talking with the renter of the

11   car, I learned that he was going to Colorado to

12   pursue a career in the marijuana industry."

13        Did I read that correctly?

14        A.  Yes.

15        Q.  You then requested to search the vehicle,

16   and they denied it; right?

17        A.  Yes.

18        Q.  You then advised them that you were

19   getting a detection K-9, and that you were going

20   to deploy him; right?

21        A.  Yes.

22        Q.  You retrieved Nico from your car;

23   correct?

24        A.  Yes.

25        Q.  You gave Nico the command to sniff;

1 correct?

2    A.  Yes.

3      Q.  And you observed an alert; right?

4    A.  Yes.

5      Q.  One of the occupants of the car then

6 admitted to you he had a blunt of marijuana in the

7 car; correct?

8    A.  Yes.

9      Q.  You found that, right, a small bud of

10 marijuana, you write?

11    A.  Yes.

12      Q.  And you then collected it and asked the

13 occupant to destroy it; is that right?

14    A.  Yes.

15      Q.  You then released them; right?

16    A.  Yes.

17      Q.  Do you know, were these people ever

18 charged for anything?

19    A.  No.

20      Q.  No, you don't know, or no, they weren't?

21    A.  No, they were not.

22      Q.  Why didn't you arrest them for possession

23 of marijuana?

24    A.  The arrest of the marijuana charge is at

25 the discretion of the officer that makes the

1 traffic stop. And this was a small amount, a

2 personal use amount, and I didn't feel it was

3 necessary to arrest him on that.

4   Q. Do you always let people go who have a

5 personal use amount of marijuana on them?

6   A. No.

7   Q. What factors into your mind when you're

8 deciding to let them go or arrest them, if they

9 have a personal use amount?

10   A. Criminal history.

11   Q. I think I know what you mean, but would

12 you explain that?

13   A. If they've been arrested before for it,

14 if they've had several priors, then I may take

15 them to jail and arrest them on that.

16   Q. Why would you take them to jail if

17 they've had other previous arrests for it, but not

18 otherwise?

19   A. Just the way I feel, I guess. If they

20 didn't learn the first time, I should say.

21   Q. Anything else that would cause you to let

22 someone go who had a personal use amount versus

23 arresting them?

24   A. Could be other reasons, I can't think of

25 anything right now.

1    Q.   Would you sometimes arrest people with
2    personal use amount even if they had no prior
3    history?
4         A.   I have before, yes.
5         Q.   Okay.  And do you recall in those
6    instances what led you to arrest them rather than
7    let them go?
8         A.   It was early in my career, so I made the
9    arrest.
10        Q.   Now, though, you wouldn't arrest somebody
11   with personal use amount with no prior history?
12        A.   It still depends.  Circumstances,
13   anything can arise, I guess.
14             THE VIDEOGRAPHER:  Can we take a
15   break?
16             MR. PIERSON:  Sure.
17                  (WHEREUPON, a recess was had,
18                  after which the following:)
19             THE VIDEOGRAPHER:  Go ahead.
20             MR. PIERSON:  All right.
21        Q.   We were looking at Exhibit 115.  Was the
22   fact that you asked the occupants to destroy the
23   marijuana and then released them, did that play
24   any role in the trainer handler reviewing this,
25   rather than your Lieutenant?

App. Vol. XX, 150

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that a copy of the foregoing APPELLANT'S APPENDIX, as submitted in digital form is an exact copy of the document filed with the Clerk.

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2024, the foregoing APPELLANT'S APPENDIX was electronically filed with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I also certify that within five business days of the issuance of notice that the electronic filing is compliant, one paper copy will be delivered by Federal Express to the Clerk's Office.


DATED: April 24, 2024                    /s/ Kurtis K. Wiard