## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

BLAINE FRANKLIN SHAW, et al.,
*Plaintiffs-Appellees,*

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

———

MARK ERICH, et al.,
*Plaintiffs-Appellees,*

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

## APPELLANT'S APPENDIX VOLUME XXI

Appeal from the United States District Court for the District of Kansas
Honorable Kathryn H. Vratil, Senior District Court Judge
District Court Case Nos. 19-CV-1343-KHV and 20-CV-1067-KHV-GEB

120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
(785) 296-2215
anthony.powell@ag.ks.gov
dwight.carswell@ag.ks.gov
kurtis.wiard@ag.ks.gov

**OFFICE OF ATTORNEY GENERAL
KRIS W. KOBACH**

Anthony J. Powell
   *Solicitor General*
Dwight R. Carswell
   *Deputy Solicitor General*
Kurtis K. Wiard
   *Assistant Solicitor General*

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

Transcript of Deposition Designations (Continued)
(ECF No. 521) ........................................................................ 1

```
 1        A.   I don't think it would have, no.
 2             (WHEREUPON, the reporter marked for
 3             identification Deposition Exhibit
 4             No. 116).
 5        Q.   I hand you what we're marking
 6   Exhibit 116.  Take a look at that.  I'll represent
 7   to you this is an e-mail which was produced to us
 8   during the course of this litigation.  Your name
 9   is listed on the two lines, the recipient line of
10   this e-mail at the top; do you see that?
11        A.   I do.
12        Q.   You see your name there?
13        A.   Yes.
14        Q.   Did you get this e-mail?
15        A.   Yes.
16        Q.   All right.  Do you recall receiving this
17   e-mail?
18        A.   I do not.
19        Q.   Read through the short e-mail there and
20   tell me when you have; okay?
21        A.   Okay.  (Witness complies.  Okay.
22        Q.   You've read it?
23        A.   Yes.
24        Q.   It's from Jason Edie; correct?
25        A.   Edie, yes.
```

```
 1        Q.   That's your Lieutenant?
 2        A.   Yes.
 3        Q.   Or was at the time?
 4        A.   Yes.
 5        Q.   Do you recognize the other names on the
 6   two lines?
 7        A.   Yes.
 8        Q.   Are they the other subordinates or
 9   officers, who reported to Lieutenant Edie?
10        A.   Yes.
               The
11        Q.CC Scott Walker, Scott Morris, and John
12   Rule; can you tell me who they are?
13        A.   Scott Walker is my current captain.
14   Scott Morris is the retired captain.  Who was a
15   Lieutenant at the time for me.  And John Rule is a
16   Lieutenant over the interdiction area.
17        Q.   And Lieutenant Edie writes about a
18   decision in a lawsuit in a law review article
19   concerning a case brought by Peter Vasquez; right?
20        A.   Yes.
21        Q.   Did you know who Peter Vasquez was before
22   this?
23        A.   No.
24        Q.   Have you read any court opinions
25   concerning him, or any stop he was involved in?
```

```
 1        A.   If I did, I don't remember.
 2        Q.   Okay.  And as Lieutenant Edie writes:
 3   I'm attaching an article written by Washburn Law
 4   finding that the 10th Circuit erred in their
 5   findings that his rights were actually violated by
 6   KHP in 2011; right?  Did I read that correctly?
 7        A.   Yes.
 8        Q.   Lieutenant Edie goes on:  The 10th
 9   Circuit divided each piece of reasonable decision,   [suspicion]
10   and examined them separately instead of looking at
11   the totality of the circumstances, as the Supreme
12   Court directs them to.  Did I read that correctly?
13        A.   Yes.
14        Q.   Okay.  What did you take Lieutenant Edie
15   to mean when he wrote that:  The 10th circuit
16   divided each piece of reasonable suspicion and
17   examined them separately?
18        A.   Exactly what he said.
19        Q.   And so, how would that be an error?
20        A.   Because they should have taken the
21   totality of the circumstances of all the
22   reasonable suspicions and put it together.
23        Q.   You don't know if you've read Vasquez's
24   case?
25        A.   I don't, I don't remember.
```

```
 1        Q.  All right.  I'm going to hand you what
 2   we'll mark Exhibit 117.
 3             (WHEREUPON, the reporter marked for
 4               identification Deposition Exhibit
 5               No. 117).
 6        Q.  This is a long document, and if you do
 7   want to review the whole thing, I welcome you to.
 8   But I am going to just direct your attention to a
 9   few pages on it.
10        A.  Okay.
11        Q.  So you let me know if you need to review
12   more of it; okay?
13        A.  Okay.
14        Q.  First the opening page, the first page of
15   Exhibit 117 says Investigative Traffic Stops, and
16   then what follows are what appear to be a bunch of
17   slides from a training; would you agree with that
18   description, at least?
19        A.  Yes.
20        Q.  Okay.  Do you know if you have seen these
21   slides before?
22        A.  I do not recall them.
23        Q.  Okay.  Does it look like the kind of
24   thing you might see during your yearly KHP
25   training?
```

```
 1      suppose they receive additional interdiction

 2      training?

 3          A.   When available, yes.

 4          Q.   I want to direct your attention to OAG

 5      29172.

 6          A.   (Witness complies).

 7          Q.   Are you there?

 8          A.   Yes, I am.

 9          Q.   This slide says:  RS versus PC and How

10      They Apply to Traffic Stops.

11               Would you assume RS means reasonable

12      suspicion, and PC means probable cause?

13          A.   Yes.

14          Q.   The author of the slide writes:  Not all

15      indicators carry the same weight.  Nervousness or

16      fast food wrappers are given less weight by the

17      Courts than a documented lie.

18               Did I read that correctly?

19          A.   Yes.

20          Q.   They go on to write:  Your courtroom

21      testimony is particularly important when you are

22      explaining indicators.  Defense attorneys try to

23      explain each indicator away.  You have to stick to

24      your guns and explain over and over you were

25      looking at the totality of the situation and not
```

```
 1    just one indicator.
 2              Did I read that correct?
 3         A.   Yes.
 4         Q.   And then totality of the situation and
 5    not just one indicator is bolded and underlined;
 6    correct?
 7         A.   Yes.
 8         Q.   All right.  Have you been trained to
 9    stick to your guns and explain over and over
10    during your testimony that it was the totality of
11    the situation and not just one indicator which led
12    to your reasonable suspicion of probable cause?
13         A.   Yes.
14         Q.   Okay.  When you have testified in the
15    past, has that been something you've tried to do?
16         A.   Yes.
17         Q.   And is that something you tried to do
18    here today, when explaining your reasonable
19    suspicion for the stop at issue?
20         A.   Yes.
21         Q.   I'll have you turn now a couple pages to
22    29174; do you see that?
23         A.   Yes.
24         Q.   There again, we have a slide that says:
25    RS versus PC and How They Apply to Traffic Stops;
```

1    Q.  Okay, why is that?

2    A.  It's not something I talk to my officers

3    about.

4    Q.  Have you received a training like this

5    with this information, if you haven't seen this

6    very one?

7    A.  No.

8    Q.  Okay, so why did you change, then?

9    A.  Based on talk from what we've heard, you

10   know, through in-service training, or just talk

11   throughout the guys throughout the patrol.

12   Q.  Do you recall when you changed your

13   practice?

14   A.  I do not -- recently.

15   Q.  Recently?

16   A.  Yeah.

17   Q.  When we were going through the video at

18   the very beginning, we talked about why you

19   ultimately activated your lights and pulled over

20   Mr. Erich and Ms. Maloney; correct?

21   A.  Yes.

22   Q.  Because they crossed the fog line; right?

23   A.  Yes.

24   Q.  And if I remember correctly, your

25   testimony was that because of the time of day, had

"Def. Obj:" Irrelevant, FRE 401; also inadmissible evidence of supposed wrongful act, FRE 404 & 608

```
 1    they crossed it just once, you would have
 2    activated your lights no matter what, otherwise;
 3    right?
 4        A.   Yes.
 5        Q.   Why don't you turn now to OAG29189?
 6        A.   (Witness complies).
 7        Q.   Are you there?
 8        A.   Yes.
 9        Q.   All right, so this slide is:  Failure to
10    Maintain a Single Lane.
11             Did I read that correctly?
12        A.   Yes.                                    1522
13        Q.   The author of the slide writes:  KSA8-152)
14    (a) requires that a vehicle be driven as nearly as
15    practicable within a single lane and shall not be
16    moved from such a lane until the driver has
17    determined that the movement can be done safely.
18             Did I read that correctly?
19        A.   Yes.
20        Q.   He goes on:  Unlike many other traffic
21    infractions, this is not a strict liability
22    offense; is that correct?
23        A.   Yes.
24        Q.   Do you have any understanding what that
25    means, this is not a strict liability offense?
```

1      A.   It would just be my opinion of what it

2   would be.

3      Q.   What's your opinion of what it would be?

4      A.   That it's not something that you can

5   write a ticket for type stuff every time, just

6   because they crossed the center line, or the fog

7   line, you're not going to write a ticket for.

8      Q.   The Courts require that you fully

9   articulate that the vehicle's deviation from the

10  lane of travel and that the degree of deviation is

11  substantial, sustained, and that it not be caused

12  by any environmental factors, such as roadway

13  debris, wind, traffic conditions.

14      Did I read that next part of the slide

15  correctly?

16      A.   Yes.

17      Q.   Finally:  A single pass on the fog line

18  is not going to cut it; right?

19      A.   Correct.

20      Q.   Have you ever been trained to this

21  effect, either with this slide or any other

22  training?

23      A.   No.

24      Q.   No one's ever told you before that

25  failure to maintain a single lane isn't a strict

1  liability offense?

2      A.  No.                    tap

3          Q.  And that a single pass on the fog line is

4  not going to cut it?

5      A.  I've heard that before.

6          Q.  Okay.  After seeing this slide, do you

7  still think it would be appropriate to pull

8  someone over, to have pulled Mr. Erich over for

9  one cross on the fog line?

10     A.  Yes.

11         Q.  Why is that?

12     A.  The time of day.

13         Q.  I'll have you turn two pages now to

14  29191.  Failure to Maintain a Single Lane.

15         Again, do you see that?

16     A.  Yes.

17         Q.  And then the first bullet point says:

18  The close presence or approach of a law

19  enforcement vehicle is a factor the Courts can

20  consider when looking at the "as nearly as

21  practicable" element of this statute.

22         Did I read that correctly?

23     A.  Yes.

24         Q.  What do you understand that to mean?

25     A.  That determining where the law

1    enforcement vehicle is in relation to the
2    violator's vehicle, it looks like they can, the
3    Courts can consider that as a reason why they
4    might have went over the lane, or something, I
     line,
5    guess.
6        Q.  When you first saw the Winnebago pass you
7    on I-70, and Mr. Erich and Ms. Maloney stopped,
8    you hadn't observed them violating any traffic law
9    of any kind; right?
10       A.  Correct.
11       Q.  I think your testimony earlier was it was
12   the time of day and it was a Winnebago, and so you
13   made the U-turn and caught up with it; right?
14       A.  Yes.
15       Q.  We saw on the video that you traveled for
16   some time back and to the left of the Winnebago;
17   right?
18       A.  Yes.
19       Q.  I think you testified it was to observe
20   the Winnebago, try to get the plates, that kind of
21   thing; correct?
22       A.  Yes.
23       Q.  It was only at that point that you saw
24   the Winnebago cross the fog line; right?
25       A.  Correct.

```
 1        Q.  Do you think your presence in your car in

 2   that location on the highway, could have led Mr.

 3   Erich to cross the fog line?

 4        A.  I don't know.

 5        Q.  Would it seem possible to you that that's

 6   the case?

 7        A.  I can't say that.

 8        Q.  You can't say that that would be a

 9   possibility?

10        A.  No.

11        Q.  What happens if you pull someone over and

12   detain them for a drug search but don't find

13   anything?

14        A.  Let them go.

15        Q.  Is there any repercussion for you when

16   that happens?

17        A.  No.

18        Q.  Do you try to understand why you thought

19   there were drugs, but there weren't?

20        A.  I guess -- can you rephrase, or be more

21   specific?  I don't understand what you're getting

22   at, or what you're wanting.

23        Q.  Well, if you detain someone because you

24   believe there's a possibility of criminal activity

25   going on, or about to occur; right?
```

```
 1        A.   Uh-huh.
 2        Q.   And you don't discover any criminal
 3   activity; right?
 4        A.   Right.
 5        Q.   So obviously some kind of mistake made;
 6   right?
 7        A.   Not necessarily.
 8        Q.   So do you not do anything then, if you
 9   stop someone, detain them, for a drug search, but
10   then don't find drugs?
11        A.   If I detain them, I'm obviously going to
12   run a drug dog.  And if the drug dog indicates and
13   I search, and I don't find anything, then I will
14   ask them to try to determine why there was drug
15   odor in the car.
16        Q.   So, in Mr. Erich and Ms. Maloney's case,
17   you start following them because they're in a
18   Winnebago, at a certain time of day.  You then
19   pull them over for crossing the fog line, and only
20   issue a warning; right?
21        A.   Yes.
22        Q.   You then detain them, and Nico does a
23   drug sniff; right?
24        A.   Yes.
25        Q.   Indicates drugs; right?
```

```
 1      A.  Yes.
 2          Q.  But then after a thorough search, you
 3    don't find anything?
 4      A.  Correct.
 5          Q.  Did you change anything about your
 6    behavior, or the way you enforce the laws of the
 7    State of Kansas as a result of the stop with Mr.
 8    Erich and Ms. Maloney?
 9      A.  No.
10              MR. PIERSON:  Give me like
11    five minutes.
12                  (WHEREUPON, a recess was had,
13                  after which the following:)
14              THE VIDEOGRAPHER:  We're back on the
15    record.
16              MR. PIERSON:  I have nothing further
17    at this time.  Thanks.
18              MR. CHALMERS; and I have a few things
19    I would like to talk to you about.
20                  CROSS EXAMINATION
21    BY MR. CHALMERS:
22          Q.  First of all, you were shown a number of
23    exhibits in which there was a dog sniff but no
24    alert or indications.  I want to talk to you about
25    that for a moment.
```

"Plfs. Obj:" FRE 401, 403, 611(a) & (b) because it is not relevant and beyond the scope of the direct examination.

Case 6:19-cv-01343-KHV Document 521-1 Filed 05/15/23 Page 161 of 184

1          When a dog alerts, is it alerting to an
2     odor?
3          A.   It's alerting to a drug odor, that he's
4     trained on.
5          Q.   And so alerting to the presence of the
6     odor, but not necessarily to the presence of
7     drugs; is that right?
8          A.   No, it's alerting to drug odor.
9          Q.   Okay.
10         A.   One of the four drug odors our dogs are
11    trained on.
12         Q.   And the sensitivity of the dog that is
13    alerting to an odor, how much by way of quantity
14    of marijuana would require for the dog to alert on
15    the drug?
16         A.   Very minimal.
17         Q.   Is that true --          odor.
18         A.   Because like a residual older.
19         Q.   Counsel used the phrase, false positive.
20    Now when a dog alerts or indicates to the odor and
21    drugs are not located, does that mean the dog is
22    mistaken, the odor is not present?
23         A.   No.
24         Q.   How is that possible?
25         A.   The odor could have been there at one

1   time and is no longer there.  Or the actual drug

2   is not there.  The odor could still be there.  It

3   could be residual, <sup>odor</sup> somebody could have drug odor

4   on their hands and touch a door handle.  You know

5   a dog could indicate or alert to that odor, the

6   residual odor off their hands.

7        Q.  So you indicated that one of the things

8   you might do after there has been a positive

9   sniff, in a search, but no drugs are located, you'll

10  then make inquiry?

11       A.  Yes.

12       Q.  To find out some explanation; is that

13  right?

14       A.  Yes.

15       Q.  How does that normally go?

16       A.  Usually after I search the car and I

17  don't find anything, then I'll talk to them and

18  ask them why.  Or if there was a reason why the

19  dog would indicate or alert to drug odor in or

20  within the vehicle.

21       Q.  What do you -- you, and I use the word

22  trainer, but someone who operates with a dog, to

23  assure yourself that a dog's alerts and

24  indications are accurate?

25       A.  We have weekly training.  We go through

Peak proficiency

1    certifications to maintain efficiency. Make sure

2    the dogs are certified. And only once they're

3    certified, are they allowed to go out and perform

4    these sniffs on vehicles.

5         Q.   Are there certain tests that the trainer

6    and dog need to pass to require the certification?

acquire

7         A.   Yes.

8         Q.   What are they?

9         A.   For detection dogs, there's several

10   tests. There's, as far as there's several finds

11   where they'll put stashes of narcotics out in

12   several different areas with natural diversions or

13   distractions placed by the judge at the time, to

14   ensure that the dog is indicating or alerting to

15   only drug odor. So those are all placed within

16   the search area.

17        Q.   And was Nico, the dog that was involved

18   in the Erich stop, certified?

19        A.   Yes, he was.

20        Q.   Did he have to pass the sort of testing

21   that you described?

22        A.   Yes, he did.

23        Q.   And if then he had alerted and indicated

24   as he did, in the Erich case, what does that

25   signal?

1    A.   That there was drug odor present at one

2  time.

3       Q.   Now in your experience with the drug

4  sniff dogs, through your agency, are there such

5  things as false positives; where the dog alerts,

6  indicates, but there's no odor?

7       A.   I don't think so, no.

8       Q.   In these exhibits, there are, that you

9  referenced, there are instances where you ran the

10  dog and did not articulate grounds for reasonable

11  suspicion.   Do you remember going through those

12  reports?

13       A.   Yes.

14       Q.   And in those reports, I think the

15  majority of them will list the type of car and

16  its, for lack of a better term, where it's

                  might     give
17  registered, maybe even the license plate number;

18  why is that?

19       A.   You know, at that time it's just

20  something we were trained to put in the reports

21  during report writing class, or something, that

22  you know, we would put that in there so we had an

23  idea what the vehicle was and where it was from.

24  That way if we needed to go back to records and

25  see, okay, this was a sniff done on this vehicle,

 1     but they wanted to know more about the vehicle,
 2     they would have the tag on it.
 3         Q.   The tag itself, and the place of
 4     registration, whether it's Kansas or Florida,
 5     would that have been an indicator or a factor in
 6     reasonable suspicion?
 7         A.   Yes.
 8         Q.   How so?
 9         A.   Depends on where the origin or
10     destination was.   You know, if there was a tag out
11     of New York, or something, and they were out of
12     New York, or if there's a New York tag and the
13     drivers were from Missouri, why are they driving a
14     vehicle with a New York tag.   Those are all
15     indicators of criminal activity.   It may be the
16     vehicle is stolen.
17         Q.   It could be easily an innocent
18     explanation?
19         A.   Yes.
20         Q.   The fact someone is from Colorado, in and
21     of itself, is that a factor in your reasonable
22     suspicion that you formed?
23         A.   No.
24         Q.   The fact that the vehicle itself has
25     Colorado registration, is that in and of itself a

1    factor in a reasonable suspicion?

2         A.   No.

3         Q.   When you were then describing for

4    counsel, that it's possible that they were from

5    Missouri, by way of example, it's possible that

6    the fact that they were from Illinois or from

7    Colorado, that figured into reasonable suspicion;

8    how is that possible?

9         A.   Your question?

10        Q.   That's a bad question.  In responding to

11   some questions to counsel, he asked you if it's

12   possible, by way of illustration in Exhibit 109,

13   whether the occupants of the car, if I'm reading

14   this correctly, from Missouri, were from Missouri

15   rather, whether that would possibly play a factor

16   in your -- can't use that one -- strike that and

17   start over.

18             Let's use Exhibit 108, 101 was the one

19   where there was a hit.  Never mind.

20             Using 108, the driver is from Indiana,

21   apparently.  And I think counsel asked you, in

22   effect, is it possible that he is from Indiana,

23   fit into your reasonable suspicion.  And I think

24   you said, it may be possible.

25             How would that be possible?



```
 1        A.   Oh, the totality of the circumstances,
 2   being from Indiana, why is he going to where he's
 3   going.  Indiana could be a known source -- or is a
 4   known source or area for illegal narcotics to be
 5   traveling to and going to.  So, if he's traveling,
 6   or she is traveling from Indiana to Nevada,
 7   California, or something, then their trip implies
 8   that they're only going to be there for two days,
 9   that could be a totality of everything put
10   together.
11        Q.   So, you're not really talking about the
                that apparently
12   fact an Indiana resident, what you're talking
13   about is the place that they left and place that
14   they're traveling?
15        A.   Yes.
16             MR. PIERSON:   Objection, leading.
17        Q.   Now, you were asked about the stop of the
18   Erichs, and you were shown a video, that I think
19   you watched, was it yesterday?
20        A.   Yes.
21        Q.   You watched part of it?
22        A.   Yes.
23        Q.   You stopped, what, when the search began?
24        A.   Yes.   didn't review
25        Q.   So you reviewed the part of the
```

"Plfs. Obj:" FRE 611(a)-(c) because it is leading.

"Plfs. Obj:" FRE 403, 611(a) because it is cumulative of the direct examination and a waste of time.

1  discussions after the search with either the

2  driver or Ms. Maloney?

3      A.  No, I did not.

4      Q.  And counsel went through it with you, or

5  at least portions of it.  And then he would show

6  it to you, and then would summarize some of the

7  statements, as he understood them, and ask if that

8  was accurate.  That's what happened here this

9  afternoon; is that right?

10      A.  Yes.

11      Q.  One of the things that, during the course

12  of the stops, was a question that you posed to Mr.

13  Erich and Ms. Maloney, apparently, which is, did

14  you paint the vehicle.  And do you remember they

15  said no, we didn't paint it?

16      A.  Yes.

17      Q.  And you learned that they acquired the

18  vehicle on Valentine's Day; that's what Ms.

19  Maloney told you, isn't it?

20      A.  Yes.

21      Q.  And that the stop was March of -- what

22  date do you have on that?

23      A.  It was March 9th, 2018.

24      Q.  Okay.  So not quite a month later that
               the vehicle
25  they had acquired -- that they had it, and they

1  said they had not painted it; is that right?

2      **A.**  **Yes.**

3      Q.  Now you smelled the odor of paint; is

4  that right?

5      **A.**  **Paint or bondo.**

6      Q.  Was it an odor that you, as you smelled

7  it, from your experience understood to be a fresh

8  odor of paint or bondo?

9      **A.**  **Yes.**

10     Q.  The fact that it was a fresh odor, and

11 that these folks were saying, we didn't paint it,

12 did that figure into your reasonable suspicion?

13     **A.**  **Yes.**

14     Q.  And they never did give an explanation,

15 did they, as to the paint that was ultimately

16 --they, at least Ms. Maloney acknowledged the new

17 paint was on the vehicle; didn't she?

18     MR. PIERSON:  Objection, leading.

19     Q.  He's objecting for the record.  This is

20 cross-examination, typically I can lead, but I'll help you out a little.

21     In the portion of the video that you

22 weren't shown here this afternoon, you may or may

23 not remember, didn't Ms. Maloney acknowledge that

24 she saw where the fresh paint had been applied to

25 this vehicle?

"Plfs. Obj:" FRE 401, 403, 611(a)-(c) because it assumes facts not in evidence and is leading

```
 1        A.   Yes.

 2             MR. PIERSON:  Objection, leading.

 3        Q.  And you talked to two troopers and asked

 4   them initially whether they smelled the odor that

 5   you smelled; is that right?

 6        A.   Yes.

 7             MR. PIERSON:  Objection, leading.

 8        Q.  And did they both confirm, initially

 9   after saying that they hadn't smelled it, that

10   they did, in fact, smell the odor?

11        A.   Trooper Hendrickson did, yes.

12        Q.  He was under the hood with you when you

13   were talking about where you could see that paint

14   had been added; is that right?

15        A.   Yes.

16        Q.  That was part of the video that you were

17   shown.  Although when counsel talked about it,
                          that
18   that you could actually visibly see the condition
                                               addition
19   of the paint; couldn't you?
        new

20        A.   Yes.

21        Q.  And Mr. Erich, you saw white paint on his

22   hand.  Subsequent/ to you questioned him about
             Subsequently,
23   where he got the white paint on his hand; didn't

24   you?

25        A.   Yes.
```

"Plfs. Obj:" FRE 611(a) and 802 assumes facts not in evidence, is a waste of time and contains hearsay.

the paint on his hand,

1  Q.  He acknowledged that he's a painter

2  didn't he?

3      A.  Yes.

the

4  Q.  Real quickly.  You testified about in Mr.

5  Erich's stop, or Maloney's stop about employing a

6  Two Step Procedure.  Is Did the way that you employed

7  the Two Step Procedure in that particular

8  instance, what the current training is as you

9  understand it at the Highway Patrol?

10     A.  I haven't had -- we haven't had any

11  current formal training.  That the last, like I

12  explained earlier, if we have reasonable suspicion

13  to detain, that we shouldn't try going into

14  consensual, we should just try to go ahead and

15  detain, or ask for that consent to search.

16     Q.  So, in this instance, under present

17  training as you understand it, what you would do

18  is you would have just gone directly into asking

19  for consent, or would have detained Mr. Erich

20  based on the information you had available; is

21  that right?

22     A.  Yes.

23     Q.  Well, I don't want to belabor this, but I

24  do want to have a clear record.  You approached the

25  Erich's vehicle, and in doing that noticed an odor

"Plfs. Obj:" FRE 403, 611 because it is cumulative of the direct examination and leading.

1  of which you found to be fresh paint or bondo; is
2  that right?
3              MR. PIERSON:  Objection, leading.
4       A.  Yes.
5       Q.  And why was that, in the context of this
6  stop, important?
7       A.  It could be a manufacture, post
8  manufactured compartment in this RV that I needed
9  -- I felt like it's my obligation to examine, and
10  see if there is something like that.
11       Q.  And in the multi-tasking that goes on
12  while you're getting license material, and while
13  you're getting insurance and so forth, you learned
14  that this was a car that they just recently
15  acquired; is that right?
16              MR. PIERSON:  Objection, leading.
17       A.  Yes.
18       Q.  In fact, I think you had testified that
19  there had been a temporary tag on the back?
20       A.  Yes.
21       Q.  Do you remember that?  Okay.  So you
22  asked them whether they had painted the car, or
23  tried to find out some explanation for the odor;
24  is that right?
25       A.  Yes.

"Plfs. Obj:" FRE 611(a)-(c) because it is leading.



1    Q.   And they said they didn't?

2    A.   Yes.

3    Q.   And they never told you that somebody

4  else painted it, did they?

5    A.   No.

6    Q.   And in fact, the only explanation they

7  may have given was that perhaps it had been

8  painted before they acquired it, which was nearly

9  a month earlier; is that right?

10        MR. PIERSON:   Objection, leading.

11   A.   Yes.

12   Q.   And when you asked about the -- well, and

13 what was the importance, then, of your observation

14 that there was paint on the hands of the driver?

15   A.   **That would indicate to me that he would**

16 **have been doing the painting.**

17   Q.   Which would have suggested they weren't

18 being level with you about not having just painted

19 the vehicle; is that right?

20        MR. PIERSON:   Objection, leading.

21   A.   Yes.

22   Q.   I'm not sure that I have a clear

23 understanding.   You were worried about a

24 compartment in the vehicle, and so there was a

25 discussion about Googling to sort out this

**"Plfs. Obj:" FRE 401, 403, 611(a)-(c) because it assumes facts not in evidence and is leading.**

**"Plfs. Obj:" FRE 401, 403, 611(a)-(c) because it assumes facts not in evidence and is leading.**

```
 1    particular Winnebago, what its configurations
 2    were; is that right?
 3         A.  Apparently, yes.
 4         Q.  But you don't remember the results of
 5    that one way or another?
 6         A.  No.
 7         Q.  One possibility is that this Googling
 8    didn't get done; so you wouldn't know one way or
 9    the other; is that right?
10              MR. PIERSON:   Objection, leading.
11         A.  Yes.
12         Q.  Saying another way.  Someone tried to
13    look it up and couldn't find anything; that's one
14    possibility, is that right?
15         A.  Yes.
16         Q.  Another possibility is was that they
17    Googled it and found that, no, they don't have a
18    compartment for this sort of thing.  Would that
                      if communicated to you,
19    have affected, /to/ any/ extent/, would that have
20    affected your view that you had reasonable
21    suspicion for the ultimate detention?
22         A.  No.
23         Q.  Why not?
24         A.  Because based on my smell, and everything
25    else, he had paint on his hand, I still felt,
```

"Plfs. Obj:" FRE 401, 403, 611(a)-(c) because it assumes facts not in evidence and is leading.

1　still feel today, that there was something going

2　on with that vehicle.

3　　　Q.　And they were also driving, I think you

4　indicated early in the morning, and why was that

5　important in your analysis?

6　　　A.　In my training and my experience, people

7　who are trafficking illegal narcotics, are

8　involved in criminal activity, will sometimes

9　travel overnight to avoid law enforcement.

10　Because that's the time when the least amount of

11　law enforcement is out and present.

12　　　Q.　You knew at the time that there was at

13　least a couple in this vehicle, I don't know if

14　they were married, that they were married, not, but that's what you

15　assumed; is that right?

16　　　A.　Yes.

17　　　Q.　And you learned that there were two

18　children in the vehicle, only after you made the

19　decision to have the dog sniff; is that right?

20　　　A.　Yes.

21　　　Q.　The fact that it's a couple, was that your

22　important to your totality of circumstances to be /

23　/ a reasonable suspicion?

24　　　A.　No.

25　　　Q.　And if you had known that there were a

1  couple kids back there, would that have been

2  important to your reasonable suspicion? *abate*

3      A.  Yes.

4      Q.  Why is that?

5      A.  I've been on traffic stops where I've

6  located illegal drugs, with children in the car.

7  And I know that through training and experience,

8  that sometimes children are used to throw law

9  enforcement officers off, trying to just let them

10  go because there are children present.

11      Q.  What's been your training and experience

12  with respect to recently acquired recreational

13  vehicles, as to how they may or may not fit into

14  reasonable suspicion of criminal activity?

15      A.  I've been involved in a couple traffic

16  stops where other officers have seized illegal

17  narcotics in false compartments.  I've been in

18  vehicles that the Highway Patrol has seized in the

19  past where there's been false compartments in

20  RV's.  And of those vehicles, they've all been

21  kind of older vehicles, not new ones.  And

22  somebody that had just recently purchased one for

23  a cheap price, put in a manufactured compartment

24  to haul illegal drugs across the United States.

25      Q.  These folks, I guess apparently were from

1    Colorado, and they were traveling to Alabama.  Was

2    that before you determined that you were going

3    that it would be appropriate to do a dog sniff?

4        A.   I don't recall at the time that I learned

5    they were going to Alabama.  I think that was

6    early on, so, yes.

7        Q.   And I think that in your report there was

8    reference to, maybe it was your written notes,

9    that the travel from Colorado and perhaps to

10   Alabama, was important; was it?

11       A.   Yes.

12       Q.   How so?

13       A.   Colorado is a known source for a large

14   amount of illegal marijuana that's been

15   transported out of there.

16       Q.   So you have a vehicle that had been

17   frequently used in the past, to transport drugs,

18   that gives indications of hidden compartments,

19   because of the odor and fresh paint, a vehicle

20   having been newly acquired by this couple,

21   traveling from a source state to a location to where you can

22   sell marijuana, and at a time when -- suspicious

23   time in terms of driving early in the morning, and

24   on top of that, they apparently give you a

25   response about the recent painting that you think

"Plfs. Obj:" FRE 401, 403, 611(a)-(c) because it assumes facts not in evidence and is leading.

```
 1   is maybe not true; is that what you had?

 2              MR. PIERSON:  Objection, leading.

 3        A.  Yes.

 4              MR. CHALMERS:  I don't have anything

 5   else, then.

 6                   REDIRECT-EXAMINATION

 7   BY MR. PIERSON:

 8        Q.  You thought the response about the recent

 9   painting was untrue?

10        A.  Yes.

11        Q.  Was that one of the things that led to

12   your reasonable suspicion?

13        A.  Yes.

14        Q.  If we look at Exhibit 103, you didn't

15   list an untruthful response in your reasonable

16   suspicion; did you?  103 is your notes you brought

17   with you today.

18        A.  Yeah, it was just I mentioned earlier

19   that they were some of the reasonable suspicion,

20   not all of them.

21        Q.  It's possible for a drug dog to be wrong;

22   right?

23        A.  Yes.

24        Q.  And you still feel today that there was

25   something going on with the vehicle?
```

1        A.  Yes.

2            Q.  You still aren't satisfied that there

3    weren't drugs in the vehicle?

4        A.  ~~Yes.~~  No.

5            Q.  You still think that Mr. Erich and Ms.

6    Maloney were up to no good?

7        A.  Yes.

8            Q.  After you search the vehicle and make

9    them stand on the side of the road for an hour;

10   call them back again.  ~~Opt to~~ climb on top of the

11   vehicle.  Have partners search around.  You still

12   think there's something wrong with that vehicle?

13       A.  Yes.

14               MR. PIERSON:  I don't have anything

15   else.

16               MR. CHALMERS:  We'll read and sign.

17

18

19

20

21

22

23

24

25

Page 218

```
 1
 2
 3
 4                              _____
                                     JUSTIN ROHR
 5
 6
 7   STATE OF KANSAS )
                     )  ss:
 8   COUNTY OF       )
 9
10                    Subscribed and sworn to before me,
11   the undersigned authority, this, the 11th day of
12   January             , 2022.
13
14
15
16                              _____
                                     NOTARY PUBLIC
17
18
19
20   My appointment Expires: Oct 22, 2024
21
22                              ┌─────────────────────────────────┐
                                │      DAWN M. VONLINTEL           │
23                              │  Notary Public - State of Kansas │
                                │  My Appt. Expires October 22, 2024│
24                              └─────────────────────────────────┘
25
```

App. Vol. XXI, 34

1    IN RE: Blain Shaw, et al vs Herman Jones.  Mark

2    Erich, Shawna Maloney vs. Herman Jones

3    Case No. 19-1343-KHV-GEB    20-1067-KHV-GEB

4         CORRECTION SHEET FOR DEPOSITION OF

5                    JUSTIN ROHR

6    Page____Line____reads as follows:_____.

7    _____

8    Should read:_____

9    _____

10   Reason for change:_____

11   Page____Line____reads as follows:_____

12   _____

13   Should read:_____

14   _____

15   Reason for change:_____

16   Page____Line____reads as follows:_____

17   _____

18   Should read:_____

19   _____

20   Reason for change:_____

21   Page____Line____reads as follows:_____

22   _____

23   Should read:_____

24   _____

25   Reason for change:_____

Page 220

```
 1  _____
 2  Page____Line____reads as follows:_____
 3  _____
 4  Should read:_____
 5  _____
 6  Reason for change:_____
 7  Page____Line____reads as follows:_____
 8  _____
 9  Should read:_____
10  _____
11  Reason for change:_____
12  Page____Line____reads as follows:_____
13  _____
14  Reason for change:_____
15  Page____Line____reads as follows:_____
16  _____
17  Should read:_____
18  _____
19  Reason for change:_____
20  Page____Line____reads as follows:_____
21  _____
22  Should read:_____
23  _____
24  Reason for change:_____
25  _____
```

Page 221

1  _____

2  Page____Line____reads as follows:_____

3  _____

4  Should read:_____

5  _____

6  Reason for change:_____

7

8

9

10              I certify that I have read my

11  deposition in the above case and request that the

12  above changes be made.

13

14  /-||-22          _____

15  (date)          Signature of Witness

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E
2     STATE OF KANSAS        )
                             )    ss:
3     SALINE COUNTY          )
4                    I, Debra L. Brightbill, Certified
5     Shorthand Reporter within and for the State of
6     Kansas, hereby certify that the within-named
7     witness was first duly sworn to testify the truth,
8     and that the deposition by him given in response
9     to the questions propounded, as herein set forth,
10    was first taken in machine shorthand by me and
11    afterwards reduced to writing under my direction
12    and supervision and is a true and correct record of
13    the testimony given by the witness.
14                    I further certify that I am not a
15    relative or employee or attorney or counsel of any
16    of the parties, or a relative or employee of such
17    attorneys or counsel, or financially interested in
18    the action.
19                    WITNESS my hand and official seal at
20    my office, this 19th day of December,
21    2021.
22                    _____
23                    Debra L. Brightbill, CSR
24
25
```

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF KANSAS
 2

 3    BLAINE FRANKLIN SHAW,
      et al.,
 4
      Plaintiffs,
 5
                   v.              Case No. 19-1343-KHV-GEB
 6
      HERMAN JONES in his official
 7    capacity as the
      Superintendent of the Kansas
 8    Highway Patrol, et al.,

 9    Defendants.
      ---------------------------------------------------------
10
      MARK ERICH, SHAWNA MALONEY,
11    individually and as mother
      and natural guardian of
12    minors D.M. and M.M.,

13    Plaintiffs,

14
                   v.              Case No. 20-1067-KHV-GEB
15
      HERMAN JONES, KHP
16    Superintendent,

17    Defendant.

18

19

20             VIDEO-RECORDED DEPOSITION OF

21                   CHANDLER RULE

22                   July 8, 2021

23

24

25
```

U. S. District Court of Kansas
19-1343-KHV-GEB
PLAINTIFF TRIAL EXHIBIT NO.
138

CHANDLER RULE 7/8/2021

```
 1                    (The deposition commenced at
 2      9:10 AM.)
 3                    VIDEOGRAPHER:  Good morning.  We are
 4      now on the record.  Today's date is July 8, 2021,
 5      and the time is 9:10.
 6                    This is the video-recorded deposition
 7      of Chandler Rule in the Matter of Blaine Franklin
 8      Shaw, et al., v. Herman Jones, et. al, Case
 9      No. 19-1343, in the US District Court for the
10      District of Kansas.  This deposition is being
11      held at 120 Southwest 10th Avenue, Topeka,
12      Kansas.
13                    The reporter's name is Vicki Kunkel.
14      My name is Dedric Moore.  I'm the legal
15      videographer.  We are with Alaris Litigation
16      Services.
17                    Would the attorneys present please
18      introduce themselves and the parties that they
19      represent.
20                    MS. BRETT:  Good morning.  Sharon
21      Brett representing the plaintiffs, Samuel Shaw,
22      Blaine Shaw, and Joshua Bosire.
23                    MR. CHALMERS:  Arthur Chalmers
24      representing the defendants.
25                    VIDEOGRAPHER:  And will the court
```

```
 1        reporter please swear in the witness.
 2                    MS. GREATHOUSE:  Do you want the rest
 3        of us to introduce ourselves too while we are on
 4        the record?
 5                    VIDEOGRAPHER:  Please.
 6                    MS. GREATHOUSE:  This is Leslie
 7        Greathouse.  I represent the plaintiffs.
 8                    MR. PIERSON:  And Josh Pierson for the
 9        plaintiffs.
10                    MS. WASHBURN:  Sarah Washburn for the
11        Highway Patrol.
12                    THE WITNESS:  Chandler Rule, Highway
13        Patrol.
14                         CHANDLER RULE,
15        called as a witness on behalf of the Plaintiffs,
16        having been first duly sworn, testified as
17        follows:
18                         EXAMINATION
19        BY MS. BRETT:
20   Q    Good morning.
21   A    Morning.
22   Q    Can you just start by stating and spelling your
23        name for the record.
24   A    Yes.  Chandler Rule.  C-h-a-n-d-l-e-r R-u-l-e.
25   Q    Great.  Mr. Rule, have you had your deposition
```

Case 6:19-cv-01343-KHV Document 521-2 Filed 05/15/23 Page 4 of 93

```
 1   Q   Did you review any video?
 2   A   No.
 3   Q   Okay.  All right.  I wanted to start by talking a
 4       little bit just about your general background.   I
 5       don't have your personnel file for anything like
 6       that.  So I'm just asking you some basic
 7       questions.  Okay?
 8   A   Okay.
 9   Q   When and where were you born?
10   A   I was born in 1994 in Hays, Kansas.
11   Q   Okay.  What is your current address?
12   A   I live in Topeka, Kansas.
13   Q   In Topeka, Kansas.  Where did you go to high
14       school?
15   A   In Hays.
16   Q   Hays?
17   A   Hays High.
18   Q   Did you go to college?
19   A   I did.
20   Q   Where did you go to college?
21   A   I graduated from Fort Hays State.
22   Q   When did you graduate?
23   A   2016.
24   Q   What did you get your degree in?
25   A   Criminal justice.
```

CHANDLER RULE  7/8/2021

| | | |
|---|---|---|
| 1 | Q | What did you do right after you graduated |
| 2 | | college? |
| 3 | A | I joined the patrol. |
| 4 | Q | So you went straight from college into the Kansas |
| 5 | | Highway Patrol? |
| 6 | A | Yes. |
| 7 | Q | Okay.  So approximately when did you start with |
| 8 | | the Highway Patrol? |
| 9 | A | July of 2016. |
| 10 | Q | Had you worked in law enforcement in any capacity |
| 11 | | before joining the Highway Patrol? |
| 12 | A | I did an internship at a jail.  Besides that, |
| 13 | | nothing. |
| 14 | Q | What did the internship entail? |
| 15 | A | I just helped at a jail like with booking and |
| 16 | | help feed and that kind of stuff.  Just very |
| 17 | | basic.  And I wasn't a corrections officer.  I |
| 18 | | was there to basically observe and help where I |
| 19 | | could. |
| 20 | Q | Were you doing clerical work while you were there |
| 21 | | like the sort of data entry for booking or -- |
| 22 | A | No.  Well, a little bit.  Yes.  They kind of |
| 23 | | showed me how the post system ran and that kind |
| 24 | | of stuff.  Mostly I was there observing. |
| 25 | Q | Okay.  Was it part of your degree at Fort Hays |

| 1 | Q | And what about Conner? |
|---|---|---|
| 2 | A | He is a trooper. |
| 3 | Q | Do you know when Conner joined KHP? |
| 4 | A | I guess two years ago. |
| 5 | Q | Two years.  Okay.  So you joined in July of 2016; |
| 6 | | correct? |
| 7 | A | Correct. |
| 8 | Q | And what rank did you come in at? |
| 9 | A | Trooper. |
| 10 | Q | Trooper.  When did you complete the Academy? |
| 11 | A | December of 2016. |
| 12 | Q | So you were accepted into KHP in July.  It's a |
| 13 | | six-month Academy then? |
| 14 | A | Correct. |
| 15 | Q | Okay.  So did you become in active service then |
| 16 | | in 2016?  You got an assignment at that point? |
| 17 | A | Correct. |
| 18 | Q | And what was your first assignment? |
| 19 | A | I was assigned to Wabaunsee County as a trooper. |
| 20 | Q | As part of your assignment to Wabaunsee County, |
| 21 | | did you have a particular station there or a |
| 22 | | troop? |
| 23 | A | Yes.  I was stationed to Troop B. |
| 24 | Q | And what were your typical duties when you first |
| 25 | | started? |

```
 1   A   The easiest way I always put it is to protect and
 2       serve the people of Kansas.
 3   Q   Can you tell a little bit more about what that
 4       means.
 5   A   Enforcing traffic law, working traffic accidents,
 6       DUI enforcement, service renders, helping the
 7       motoring public, and so forth.  Assisting other
 8       agencies.
 9   Q   Were you mainly on I-70?
10   A   I traveled everywhere.
11   Q   What other highways would you patrol as part of
12       that initial placement?
13   A   I worked I-70, US 24, US 75, K-99, K-7, K-4.  If
14       it's a highway in Kansas, I have probably worked
15       it.
16   Q   Would you say the majority of your time was spent
17       on one of those highways or --
18   A   I don't know.
19   Q   Okay.
20   A   I can't speculate how much time I spent on
21       highways.
22   Q   What is your current rank?
23   A   I am a trooper.
24   Q   Have you received any promotions between when you
25       started in December of 2016 and today?
```

Case 6:19-cv-01343-KHV  Document 521-2  Filed 05/15/23  Page 8 of 93

| 1 | A | No. |
|---|---|---|
| 2 | Q | When did you become a canine handler? |
| 3 | A | In 2018. |
| 4 | Q | Are canine handlers assigned to a particular |
| 5 |   | troop? |
| 6 | A | Yes.  Troop S. |
| 7 | Q | So in 2018 you moved from Troop B to Troop S? |
| 8 | A | Yes. |
| 9 | Q | Did that change your geographic assignment at |
| 10 |   | all? |
| 11 | A | It did. |
| 12 | Q | Can you explain. |
| 13 | A | I was stationed to Osage County. |
| 14 | Q | Did you have to move for that assignment? |
| 15 | A | I did, yes. |
| 16 | Q | Let's talk a little bit about the process for |
| 17 |   | becoming a canine handler.  First, let me ask |
| 18 |   | this.  Why did you want to be a canine handler? |
| 19 | A | Well, my father was a canine handler growing up. |
| 20 |   | So I always grew up in that line of work.  I |
| 21 |   | loved working with dogs.  I loved the training |
| 22 |   | aspect of it, and I don't particularly have a |
| 23 |   | reason.  I just like the work of working with |
| 24 |   | dogs. |
| 25 | Q | Is becoming a canine handler seen as a promotion |

| 1 | | within KHP? |
|---|---|---|
| 2 | A | No.  It's on the same pay scale. |
| 3 | Q | It's a selective process though; correct? |
| 4 | A | Correct. |
| 5 | Q | Do you have a sense from either your training, |
| 6 | | the application process you went through, or your |
| 7 | | dad's experience about why certain people are |
| 8 | | selected to be canine handlers? |
| 9 | A | Are you asking me why people are selected to be |
| 10 | | canine handlers? |
| 11 | Q | Yes. |
| 12 | A | No.  I don't have a sense of why people are |
| 13 | | specifically.  Each dog position has a bid.  You |
| 14 | | must be able to meet those bid requirements. |
| 15 | Q | What are the typical requirements for being a |
| 16 | | canine handler? |
| 17 | A | Mine, for instance, was -- you have to be able to |
| 18 | | work -- not to -- you have to be fluid with your |
| 19 | | schedule, be able to take call-outs, had to pass |
| 20 | | the dog training program which was ten weeks |
| 21 | | long, and then had to pass a basic SWAT school, |
| 22 | | which was two weeks long.  You had to pass -- or |
| 23 | | you had to have a certain number of felony |
| 24 | | arrests.  You had to show -- I think that's about |
| 25 | | it.  That's all I can remember. |

CHANDLER RULE 7/8/2021

| | | |
|---|---|---|
| 1 | | What does -- Let me rephrase that. |
| 2 | | What does the application process involve to be a |
| 3 | | canine handler? |
| 4 | A | I have to send a letter in to my supervisor |
| 5 | | saying I am interested in it.  That letter is |
| 6 | | sent in to the Troop S supervisors, and then I |
| 7 | | have got to send in a resume, and then an |
| 8 | | interview -- |
| 9 | Q | Okay. |
| 10 | A | -- for the position. |
| 11 | Q | What types of questions are you asked in the |
| 12 | | interview? |
| 13 | A | That was four years ago.  I really don't |
| 14 | | remember. |
| 15 | Q | Okay.  Were you asked at all about your |
| 16 | | productivity as a trooper; for example? |
| 17 | A | I don't remember.  I don't believe so. |
| 18 | Q | Okay.  You mentioned that one of the criteria is |
| 19 | | a certain number of felony arrests.  Can you |
| 20 | | explain that a little bit more. |
| 21 | A | Yeah.  They wanted us to be able to show we had |
| 22 | | arrested so many felons. |
| 23 | Q | So that sounds like your productivity to some |
| 24 | | degree; right?  How many people you have arrested |
| 25 | | is a consideration for whether you can become a |

CHANDLER RULE 7/8/2021

```
 1        canine handler.
 2    A   Sure.
 3    Q   Did you have to show a certain number of stops?
 4    A   No.
 5    Q   A certain number of seizures?
 6    A   I don't remember if that was on there or not.
 7    Q   Do you know how competitive the process was when
 8        you tried to become a canine handler?
 9    A   There was one other trooper.
10    Q   One other trooper that put in and you were
11        selected?
12    A   Correct.
13    Q   Okay.  Had you applied before 2018 to be a canine
14        handler?
15    A   No.
16    Q   You applied and the first time you applied you
17        were given the position?
18    A   Correct.
19    Q   Had you gotten any tips or training from your
20        father for that application process?
21    A   No.
22    Q   Did you talk to your father about this deposition
23        before today?
24    A   We talked a little bit about possible questions
25        that would come up.  Very little.
```

| | | |
|---|---|---|
| 1 | Q | I'm assuming he has been on the force for a long |
| 2 | | time.  Do you know if he has had his deposition |
| 3 | | taken before? |
| 4 | A | I believe he has had -- I think he said he had a |
| 5 | | crash investigation -- |
| 6 | Q | Okay. |
| 7 | A | -- for civil. |
| 8 | Q | Did he help prep you then for your deposition |
| 9 | | today? |
| 10 | A | It was very minimal. |
| 11 | Q | Okay.  Okay.  Okay.  I want to talk a little bit |
| 12 | | more about your training, and we will talk about |
| 13 | | the canine training again as part of this. |
| 14 | | Okay.  So you went through the |
| 15 | | six-month Academy when you first started; |
| 16 | | correct? |
| 17 | A | Correct. |
| 18 | Q | Can you talk a little bit about the training that |
| 19 | | you got as part of that Academy? |
| 20 | A | It's kind of a vague question.  What -- I was |
| 21 | | there for 23 weeks.  What are you looking for? |
| 22 | Q | Sure.  Do you take search and seizure training? |
| 23 | A | I did. |
| 24 | Q | What does that search and seizure training cover? |
| 25 | A | The Fourth Amendment and case law and whatnot. |

"Plfs. Obj:"
FRE 611(a) &
(b) because it
is beyond the
scope of the
direct
examination.

| | | |
|---|---|---|
| 1 | Q | So it covered legal standards? |
| 2 | A | Sure. |
| 3 | Q | Was there a practical aspect of it, a sort of |
| 4 | | hands-on aspect to the training? |
| 5 | A | I don't remember. |
| 6 | Q | Was any of it scenario-based? |
| 7 | A | We did have scenarios. |
| 8 | Q | Okay.  How were you evaluated as part of that |
| 9 | | training? |
| 10 | A | I don't know.  I have never been part of the |
| 11 | | Academy training program other than being a |
| 12 | | recruit in there. |
| 13 | Q | As a recruit did you have to take tests? |
| 14 | A | We did. |
| 15 | Q | What did those tests cover? |
| 16 | A | What we had learned in class. |
| 17 | Q | Did they ask you questions about case law and the |
| 18 | | Fourth Amendment? |
| 19 | A | I don't remember specific questions from the |
| 20 | | test, but if -- I'm going to assume so.  Yes. |
| 21 | Q | Would they give you a hypothetical and ask you |
| 22 | | what you would do in that situation? |
| 23 | A | I don't remember. |
| 24 | Q | Based on that training, do you know what |
| 25 | | reasonable suspicion is? |

"Plfs. Obj:" FRE 611(a) & (b) because it is beyond the scope of the direct examination.

"Plfs. Obj:" FRE 611(a) & (b) because it is beyond the scope of the direct examination.

| 1 | A | Yes. |
| 2 | Q | What is reasonable suspicion? |
| 3 | A | You are asking for a definition? |
| 4 | Q | Yes. |
| 5 | A | A legal standard that's less than probable cause |
| 6 | | but greater than the officer's hunch based on a |
| 7 | | reasonable officer and the totality of the |
| 8 | | circumstances with articulable facts that lead |
| 9 | | the officer to believe that a crime is, has, or |
| 10 | | was taking place. |
| 11 | Q | Okay.  And what's the difference between |
| 12 | | reasonable suspicion and probable cause?  You |
| 13 | | said it was less than probable cause. |
| 14 | A | Probable cause is a legal standard which is |
| 15 | | higher than reasonable suspicion.  It's the legal |
| 16 | | standard for an arrest for a search. |
| 17 | Q | Have you taken search and seizure training apart |
| 18 | | from your Academy training? |
| 19 | A | In a sense, yes. |
| 20 | Q | What do you mean by "in a sense"? |
| 21 | A | So I have gone to other interdiction trainings |
| 22 | | which is all around the Fourth Amendment. |
| 23 | Q | Can you tell me about interdiction trainings that |
| 24 | | you have taken.  Which ones have you taken? |
| 25 | A | I don't know the specific numbers and hours, but |

"Plfs. Obj:"
FRE 611(a) &
(b) because it
is beyond the
scope of the
direct
examination.

| 1 | | it's going between 180 hours -- |
|---|---|---|
| 2 | Q | Per year or total? |
| 3 | A | Total.  I went through an advanced interdiction |
| 4 | | course put on by the Kansas Highway Patrol.  I |
| 5 | | went through a DIAP conference.  I went to an El |
| 6 | | Paso interdiction conference, commercial motor |
| 7 | | vehicle interdiction course, and I went through a |
| 8 | | Desert Snow interdiction source. |
| 9 | Q | Do you know what years when you went through |
| 10 | | those different courses? |
| 11 | A | I don't know specifically. |
| 12 | Q | Were they since you became a canine handler or |
| 13 | | before you became a canine handler? |
| 14 | A | I think they are probably split half and half. |
| 15 | Q | Okay. |
| 16 | A | So some of them were after I was a canine |
| 17 | | handler, and some were before I was a canine |
| 18 | | handler. |
| 19 | Q | And were all of those required courses as a |
| 20 | | trooper in KHP or were any of them specialized to |
| 21 | | being a canine handler? |
| 22 | A | None of them were specialized to be a canine |
| 23 | | handlers.  They were all -- none of them were |
| 24 | | necessarily required to be. |
| 25 | Q | Did you take specialized training on traffic |

Case 6:19-cv-01343-KHV  Document 521-2  Filed 05/15/23  Page 16 of 93

| 1 | | specific one -- |
|---|---|---|
| 2 | Q | Uh-huh. |
| 3 | A | -- once I have made sure they are no longer |
| 4 | | speeding and have no other indicators of other |
| 5 | | crimes taking place, then the traffic stop is |
| 6 | | over. |
| 7 | Q | Okay.  Would you ask any additional questions as |
| 8 | | part of that traffic stop using the hypothetical |
| 9 | | calendar that you just gave? |
| 10 | A | Would I ask more questions during a traffic stop? |
| 11 | | I am always asking questions during a traffic |
| 12 | | stop.  I try not to be a robot.  From my |
| 13 | | experience people are typically more friendly |
| 14 | | when I'm more friendly with them and ask them |
| 15 | | questions.  But I do always make sure they are |
| 16 | | driving -- or they rightfully have possession of |
| 17 | | vehicle and so forth. |
| 18 | Q | What type of questions would you ask during a |
| 19 | | typical traffic stop? |
| 20 | A | Every traffic stop is different.  So can you be |
| 21 | | more specific on -- |
| 22 | Q | Sure.  I can give you a hypothetical, if that |
| 23 | | helps. |
| 24 | A | Sure. |
| 25 | Q | So you are driving along, and you pull a car over |

Case 6:19-cv-01343-KHV Document 521-2 Filed 05/15/23 Page 17 of 93

| 1 | | for speeding.  Let's say they are going 80 in a |
| 2 | | 75. |
| 3 | A | Okay. |
| 4 | Q | You approach the car, ask for their license and |
| 5 | | registration.  That's, I'm assuming -- |
| 6 | A | Sure. |
| 7 | Q | -- the first step.  Or insurance.  And they give |
| 8 | | it to you.  Would you ask any other questions at |
| 9 | | that point in time? |
| 10 | A | Sure.  I'm always asking questions as they are |
| 11 | | retrieving their driver's license or the |
| 12 | | insurance and the registration.  I'm asking where |
| 13 | | they are coming from, where they are going, |
| 14 | | what's taking them out there, how they know the |
| 15 | | owner of the car.  If it's their car, how long |
| 16 | | they have had it.  If I like their car.  I kind |
| 17 | | of flow with the traffic stop. |
| 18 | Q | So why ask that particular juncture "where you |
| 19 | | are coming from" and "where are you going"? |
| 20 | A | Why do I ask that question? |
| 21 | Q | Yes. |
| 22 | A | Because it's part of the traffic stop.  Well, I |
| 23 | | guess I like to know.  I believe it's important |
| 24 | | for a cop to understand why they are traveling to |
| 25 | | and from places, I guess. |

| 1 | Q | Why would it be important for a cop to understand |
|---|---|---|
| 2 |   | that? |
| 3 | A | Because people are constantly using your highways |
| 4 |   | to further criminal enterprises and so forth. |
| 5 |   | And so we can get information and talk to people |
| 6 |   | about their travel plans to decide if there are |
| 7 |   | any other crimes afoot when I stop them. |
| 8 | Q | What about a person's travel plans would tell you |
| 9 |   | if other crimes are afoot? |
| 10 | A | It's not one specific thing that would tell me. |
| 11 |   | It's the totality of the circumstances. |
| 12 | Q | Sure.  So give me an example of something that a |
| 13 |   | person could say in response to that question |
| 14 |   | that would give you an indication that crime is |
| 15 |   | afoot. |
| 16 | A | Right.  By itself it doesn't mean anything. |
| 17 | Q | Okay. |
| 18 | A | But with the totality of the circumstances, but |
| 19 |   | everything that we are seeing and the other |
| 20 |   | questions that would come along that would lead |
| 21 |   | to it.  It's not that one question that makes me |
| 22 |   | think they are involved in criminal activity, but |
| 23 |   | it's the totality of the circumstances. |
| 24 | Q | Okay.  So you are asking that question at that |
| 25 |   | particular time; right?  We were giving the |

| 1 | | hypothetical of license and registration. As |
|---|---|---|
| 2 | | they are retrieving the documents, you are asking |
| 3 | | these questions; correct? |
| 4 | A | Correct. |
| 5 | Q | **Is there an answer that somebody might give you** |
| 6 | | **to that question that would influence what you** |
| 7 | | **would do next?** |
| 8 | A | That one specific question? |
| 9 | Q | **Yes.** |
| 10 | A | All I have got is that one specific question? |
| 11 | Q | **Yes.** |
| 12 | A | No. |
| 13 | Q | **Is there an answer that somebody that would give** |
| 14 | | **you to that question that would make you ask a** |
| 15 | | **follow-up question?** |
| 16 | A | Well, sure. |
| 17 | Q | **What type of follow-up questions would you ask** |
| 18 | | **based on the answers you get?** |
| 19 | A | It depends on what they say. I can't |
| 20 | | specifically say what my next follow-up question |
| 21 | | is unless I have got a specific -- for instance, |
| 22 | | if someone said, "I'm coming from my ex-wife's |
| 23 | | house who I just killed," that may lead to |
| 24 | | another question. |
| 25 | Q | **Sure. That's understandable. But if somebody** |

Case 6:19-cv-01343-KHV Document 521-2 Filed 05/15/23 Page 20 of 93

| | | |
|---|---|---|
| 1 | | says, "I'm driving from Minnesota to California," |
| 2 | | what would you ask next? |
| 3 | A | "Oh, what's taking you to California?" |
| 4 | Q | Why would you ask that question? |
| 5 | A | Because it's typically how we speak to each |
| 6 | | other.  I'm just curious about their travel |
| 7 | | plans. |
| 8 | Q | Okay.  If somebody said, "I'm going to |
| 9 | | Disneyland." |
| 10 | A | Okay. |
| 11 | Q | Would you ask a follow-up question to that? |
| 12 | A | Possibly. |
| 13 | Q | Okay. |
| 14 | A | "How long are you going to Disneyland?" |
| 15 | Q | Why would you ask about the length of time they |
| 16 | | plan to spend at Disneyland?  And let me just be |
| 17 | | clear here.  I'm just trying to understand your |
| 18 | | thought process as you are asking these |
| 19 | | questions.  So -- |
| 20 | A | Sure. |
| 21 | Q | -- these are hypotheticals, and I'm just asking |
| 22 | | for thought process. |
| 23 | A | A lot of it is very similar to if you and I run |
| 24 | | into each other at Subway. |
| 25 | | I am like, "Hey, what brings to |

| 1 | | Subway?" |
| 2 | | You are like, "Oh, I'm here." |
| 3 | | So, you know, a lot of it is just |
| 4 | | conversation.  The other thing is it does show a |
| 5 | | story of their travel plans. |
| 6 | Q | Okay.  And can you explain why their travel plans |
| 7 | | are important for you to know at that juncture? |
| 8 | A | Why is their travel plan important at that |
| 9 | | juncture?  To make sure that there's no other |
| 10 | | potentially criminal activity afoot or anything |
| 11 | | else in that matter. |
| 12 | Q | So is it safe to say that a person's travel plans |
| 13 | | carry significant weight for you in determining |
| 14 | | whether something suspicious is afoot? |
| 15 | A | By itself, no.  But it's the totality of the |
| 16 | | circumstances. |
| 17 | Q | Okay.  So tell me from other circumstances |
| 18 | | that -- based on your training that would make |
| 19 | | you suspicious if somebody gave you travel plans |
| 20 | | that they were going from Minnesota to |
| 21 | | California? |
| 22 | A | If they are coming from Minnesota to California. |
| 23 | Q | Uh-huh. |
| 24 | A | There could be thousands of things that could |
| 25 | | bring my suspicion. |

| | | |
|---|---|---|
| 1 | Q | Okay. |
| 2 | A | For instance, if they said, "I just killed my |
| 3 | | wife." |
| 4 | | That would be a pretty big indicator. |
| 5 | | You know, I mean there's a pretty long rabbit |
| 6 | | hole we could go down. |
| 7 | Q | So setting aside people admitting criminal |
| 8 | | activity to you -- |
| 9 | A | Okay. |
| 10 | Q | -- directly in response to your questions, which |
| 11 | | I would like to think is fairly rare, in the |
| 12 | | course of conversation you said I do this to be |
| 13 | | conversational with people -- |
| 14 | A | Sure. |
| 15 | Q | -- and see whether there's anything else going |
| 16 | | on; correct? |
| 17 | A | Sure. |
| 18 | Q | In the course of that purpose, if they don't |
| 19 | | admit to committing a crime, what other things |
| 20 | | would you want to ask about based on your |
| 21 | | training? |
| 22 | A | Well, as I stated earlier, I can't possibly give |
| 23 | | you all of them. |
| 24 | Q | Sure. |
| 25 | A | So it would be limited to a few things. So are |

| 1 | | you asking for common things that -- |
|---|---|---|
| 2 | Q | Common things that you ask about in your |
| 3 | | experience as a trooper. |
| 4 | A | Okay. If someone, for instance, doesn't know who |
| 5 | | owns their car. If their travel plan doesn't |
| 6 | | make sense. If they are off the path they |
| 7 | | shouldn't be traveling on. If they don't know |
| 8 | | who they are going to go see. I could probably |
| 9 | | keep going. I mean it's pretty long. I can't |
| 10 | | specifically give you one thing -- |
| 11 | Q | Of course. |
| 12 | A | -- you know what I mean. Because it's not. I |
| 13 | | mean every situation is completely different. |
| 14 | Q | And I'm just looking for examples here, to be |
| 15 | | clear. |
| 16 | A | Sure. |
| 17 | Q | Not a list I'm going to hold you to -- |
| 18 | A | Right. |
| 19 | Q | -- or anything. If somebody gives you travel |
| 20 | | plans -- |
| 21 | A | Right. |
| 22 | Q | -- "I'm Going from Minnesota to California. I'm |
| 23 | | going to Disneyland," and they are driving their |
| 24 | | father's car. |
| 25 | A | Okay. |

```
 1    Q    And have permission to drive their father's car,
 2         is that suspicious based on your training?
 3    A    By itself, no.
 4    Q    Okay.  We got a little afield from where I had
 5         started here so I want to go back a little bit.
 6    A    Sure.
 7    Q    When there are updates to the law, a new case is
 8         decided --
 9    A    Sure.
10    Q    -- by the Kansas courts, the 10th Circuit, the
11         Supreme Court, how are those changes to law
12         communicated to you?
13    A    Either through email.  I believe they have
14         updated through our policy, our Power DMS, a
15         policy records form.  Sent through there.
16    Q    Can you tell me more about that.  What is that?
17    A    The Power DMS?
18    Q    Yes.
19    A    It's basically a system where all our policies
20         are at.
21    Q    Is it electronic?
22    A    Yes.
23    Q    So a new policy will be created?
24    A    Not necessarily.  No.  No.  They can also update
25         like a PowerPoint or so forth regarding, hey,
```

CHANDLER RULE  7/8/2021

| | | |
|---|---|---|
| 1 | | what this showed. |
| 2 | Q | Would you be informed that the PowerPoint has |
| 3 | | been updated? |
| 4 | A | Yes.  I get an email saying, "Hey, you need to |
| 5 | | check your Power DMS." |
| 6 | Q | Okay.  And then when you go to check Power DMS, |
| 7 | | you would be able to see exactly what was |
| 8 | | updated? |
| 9 | A | Yes. |
| 10 | Q | And you said emails as well; is that correct? |
| 11 | A | Uh-huh.  Sure. |
| 12 | Q | What would a typical email say communicating a |
| 13 | | change in the law? |
| 14 | A | The ones that I can recall give case summary and |
| 15 | | give a summary of the ruling and what things have |
| 16 | | changed. |
| 17 | Q | Is your knowledge of those changes in the law |
| 18 | | ever tested in any way? |
| 19 | A | Well, every time I go to court and testify.  Yes. |
| 20 | Q | What about by your supervisor just in the normal |
| 21 | | course of your job? |
| 22 | A | Are you asking me if my supervisor writes me a |
| 23 | | test based on the changes -- |
| 24 | Q | Sure. |
| 25 | A | -- or something along those lines?  No. |

CHANDLER RULE 7/8/2021

```
 1   Q   Did your supervisor ever discuss the changes in
 2       law with you?
 3   A   Yes.
 4   Q   As part of that discussion, do you have to
 5       demonstrate knowledge of the change in law in any
 6       way?
 7   A   No.
 8   Q   Okay.  Do you ever have to do any scenario-based
 9       training regarding changes in the law?
10   A   I don't know if I can -- at this -- I can't
11       recall any.  Now, I have gone through training.
12   Q   Sure.
13   A   I gave you scenarios.  So kind of.
14   Q   But if there is a significant update to the law,
15       it's not like you have to repeat a scenario-based
16       training requirement that you might have done in
17       the Academy five years ago?
18   A   That's right.
19   Q   Okay.  Let's go back and talk about that canine
20       training a little bit more.
21   A   Okay.
22   Q   I think you said it was a ten-week program?
23   A   Yes.
24   Q   And, again, not asking for every specific piece
25       of knowledge that you got from the training
```

CHANDLER RULE 7/8/2021

| 1 | A | Technical Trooper Mitch Clark -- no, not Mitch |
| 2 | | Clark. Mitch Mathews. I'm trying to think |
| 3 | | who -- there was -- our program stems out to |
| 4 | | other agencies as well. |
| 5 | Q | Uh-huh. |
| 6 | A | And so there was, I think, two Topeka Police |
| 7 | | Department trainers there. One of them's last |
| 8 | | name was Miller and the other one was Ahsteadt. |
| 9 | | There was a Shawnee County dog trainer all within |
| 10 | | the same program. His name was Matt Bowling, and |
| 11 | | I believe that's it. |
| 12 | Q | Was that the canine training program run through |
| 13 | | Kansas Highway Patrol or another agency? |
| 14 | A | Kansas Highway Patrol. |
| 15 | Q | Do all county sheriffs in the state train their |
| 16 | | canine with the Kansas Highway Patrol Canine |
| 17 | | Academy? |
| 18 | A | Not all of them. No. |
| 19 | Q | But a number of the counties do? |
| 20 | A | Correct. |
| 21 | Q | Do you receive any continuing education or |
| 22 | | in-service education for being a canine handler? |
| 23 | A | We train every week for eight hours. |
| 24 | Q | Does that count towards your 80 hours every two |
| 25 | | weeks? |

"Plfs. Obj:" FRE 611(a) & (b) because it is beyond the scope of the direct examination.

```
 1    A    Like my working?  Yeah.
 2    Q    What do those eight hours a week involve?
 3    A    So -- and it's eight hours minimum typically.  So
 4         typically we start in the morning doing tracking
 5         scenarios to where we are just practicing
 6         tracking with the dog.  And then the next four
 7         hours is narcotics work, and then the next four
 8         hours is patrol work.
 9    Q    What is involved in narcotics work?
10    A    Everything from sniffing vehicles, area searches,
11         building searches, pretty much anywhere that you
12         could imagine someone would hide narcotics.
13    Q    Can you explain the difference to me between an
14         alert and an indication?
15    A    I can.  So an alert is untrained behavior that
16         the dog elicits when he is smelling a trained
17         odor.  It's often only seen by the handler or
18         occasionally another trained dog handler.  But
19         it's each dog is different on what their alerts
20         may do.  So the handler is typically the only one
21         who would notice the alerting behavior.
22                    An indication is a trained behavior
23         that the dog elicits when he is at the source of
24         a trained odor.
25    Q    When you say that only the canine handler can
```

Case 6:19-cv-01343-KHV   Document 521-2   Filed 05/15/23   Page 29 of 93

```
 1       tell the alert -- that's correct?

 2    A  That's correct.

 3    Q  Why is that?

 4    A  Because every dog is completely different.

 5    Q  Okay.

 6    A  And we work with them, as I said, eight hours a

 7       week.  So we are seeing the fine changes that the

 8       dog is making when he is in that odor.

 9    Q  What type of behavior might be an alert for your

10       dog?

11    A  So situational dependent, huge -- for an example,

12       pretty commonly shown deep nasal breathing and

13       intensity change. quick bracketing.

14    Q  What is quick bracketing mean?

15    A  Quick bracketing, it -- for instance, each time

16       it could be different depending on what he is

17       sniffing and the environment that he is hunting

18       in.  It can be from basically a head jerk to I'm

19       at the trunk and I'm returning back and I'm

20       coming back and then returning.  Something of

21       that nature.

22    Q  So going back and forth quickly in an area?

23    A  To a sense.  Yes.  And deviating from his typical

24       searching pattern.

25    Q  What is your dog's typical searching pattern?
```

CHANDLER RULE  7/8/2021

```
 1   Q   Yes.

 2   A   It's situational dependent.

 3   Q   Are you allowed to search the car at that point?

 4   A   It depends on where the car is and the totality

 5       of the circumstances.  You need to be more

 6       specific in your question.

 7   Q   Sure.  You pull a car over for speeding.

 8   A   Okay.

 9   Q   You decide to have the canine do a search.

10   A   Okay.

11   Q   Cain, excuse me, sniffs the outside of the car.

12   A   Right.

13   Q   Gives an alert but not an indication.

14   A   Okay.

15   Q   Alerts at the back of the trunk.

16   A   Okay.

17   Q   Let's say.

18   A   Right.  The courts had ruled we then have

19       probable cause to search the vehicle.

20   Q   So you have probable cause when there is an alert

21       even if there's no indication?

22   A   Right.  The reason for that is the dog is

23       showing, "Hey, there is a trained odor here."  He

24       is not just alerting for fun.  He is alerting

25       because I'm in the odor of a trained odor, and he
```

CHANDLER RULE  7/8/2021

| 1 | | just can't pinpoint the exact source of the odor. |
|---|---|---|

2   Q   Okay.  So you are doing the search, and you start

3       your clockwise trip.

4   A   Sniff.

5   Q   The sniff.  Sorry.  Correct.  You are doing the

6       sniff.  You start the clockwise motion, and Cain

7       goes back and forth a few times -- let's say

8       three times -- by the rear passenger door.  Do

9       you have enough at that point to do a full search

10      of the car?

11  A   I would have to be there to see.  I can't

12      speculate, Counselor.

13  Q   Okay.  I'm just trying to give examples based on

14      what you said were alerting behaviors.

15  A   Right.

16  Q   So you --

17  A   But I can't possibly just sit here and tell you

18      just based off what you are saying if what he is

19      doing is an alerting behavior without me

20      physically being there and seeing it in the

21      environment.

22  Q   So there are times when doing the quick

23      bracketing, as you described it, may not be an

24      alert.

25  A   By itself, possibly.  Yes.

Case 6:19-cv-01343-KHV Document 521-2 Filed 05/15/23 Page 32 of 93

| | | |
|---|---|---|
| 1 | Q | What is it that makes that quick bracketing |
| 2 | | behavior an alert? |
| 3 | A | From the thousands of hours I have training with |
| 4 | | him. Are you saying that one specific thing? |
| 5 | Q | I'm trying to get a sense of -- you gave me a |
| 6 | | list of things that might be Cain's alerts. |
| 7 | A | Could possibly be. |
| 8 | Q | That might be. Could possibly -- |
| 9 | A | Right. |
| 10 | Q | -- be Cain's alert? |
| 11 | A | Yeah. |
| 12 | Q | I'm trying to get a sense of when you know it's |
| 13 | | an alert that leads you to search versus an alert |
| 14 | | that doesn't lead to search? |
| 15 | A | If he is alerting, as you said, he is in the odor |
| 16 | | of a trained narcotic -- |
| 17 | Q | Right. |
| 18 | A | -- such as meth or heroine. So if he is |
| 19 | | alerting, that gives us probable cause to search |
| 20 | | the vehicle. |
| 21 | Q | You just testified that sometimes he will show |
| 22 | | alerting behavior and you might not think that he |
| 23 | | is actually alerting. |
| 24 | | MR. CHALMERS: Object to the form. I |
| 25 | | don't think that's what he said. |

CHANDLER RULE 7/8/2021

| | | |
|---|---|---|
| 1 | | **necessarily?"** |
| 2 | | MR. CHALMERS:  I don't think you are |
| 3 | | accurately rephrasing testifying to what he said |
| 4 | | before.  I think he said it depended on the |
| 5 | | totality of the circumstances.  And I would ask |
| 6 | | that you ask questions as opposed to trying to |
| 7 | | restate what his testimony is.  And I object to |
| 8 | | form. |
| 9 | Q | **(By Ms. Brett) Okay.  Let me ask it in a** |
| 10 | | **different way.** |
| 11 | A | Okay. |
| 12 | Q | Can he bracket back and forth at a door and it |
| 13 | | not be an alert? |
| 14 | A | It is possible.  Yeah.  This is why it goes back |
| 15 | | to the importance of -- the canine handler is |
| 16 | | often the only one who sees the alerting |
| 17 | | behavior.  Like you see -- you are getting into |
| 18 | | mud with it because it is confusing to you |
| 19 | | because you haven't spent the hours upon hours |
| 20 | | upon hours upon hours of training the dog. |
| 21 | Q | **So after you get an alert or an indication, you** |
| 22 | | **have probable cause to search the car; correct?** |
| 23 | A | It's dependent on the circumstance. |
| 24 | Q | **So there may be times when you get an indication** |
| 25 | | **and you don't have probable cause to search the** |

CHANDLER RULE 7/8/2021

| 1 | | of events? |
|---|---|---|
| 2 | A | Not that I can recall. |
| 3 | Q | Have you ever been disciplined by KHP? |
| 4 | A | No. |
| 5 | Q | Who are your supervisors currently? |
| 6 | A | My lieutenant is Justin Rohr. |
| 7 | Q | And is Lt. Rohr the head of the canine unit? |
| 8 | A | He is the supervisor of the east region narcotic |
| 9 | | dogs. |
| 10 | Q | Sorry.  I just want to be clear of what you said. |
| 11 | | The east region narcotic unit or east region |
| 12 | | narcotics dogs? |
| 13 | A | Dogs. |
| 14 | Q | Okay.  So he is specific to canine handlers in |
| 15 | | the east region? |
| 16 | A | Correct. |
| 17 | Q | Do you work with troopers from a bunch of |
| 18 | | different troops as part of your responsibilities |
| 19 | | as an canine handler? |
| 20 | A | I do. |
| 21 | Q | How many different troops do you work with? |
| 22 | A | All of them. |
| 23 | Q | All.  I believe that you had mentioned you're |
| 24 | | assigned to Osage County; is the correct? |
| 25 | A | I was. |

```
 1   Q   You were assigned to Osage County.  Where are you
 2       assigned geographically right now?
 3   A   Topeka.
 4   Q   Topeka.  When did you move from Osage County to
 5       Topeka?
 6   A   It's been a year now roughly.
 7   Q   Why did you move?
 8   A   I was ready to move to Topeka.
 9   Q   So as a canine handler in Topeka, are you still
10       in the same troop that you were in when you were
11       in Osage County?
12   A   Yes.
13   Q   Has your patrol area changed since your move to
14       Topeka?
15   A   No.
16   Q   So what area do you typically patrol now?
17   A   I go all over the place, everywhere from I-35 to
18       I-70.  I work US 75.  Pretty much all the
19       highways from Emporia to Nebraska to Kansas City.
20   Q   Do you have the authority to go wherever in your
21       geographic area to which you are assigned in a
22       given shift or are you told specific places to
23       patrol for each shift?
24   A   No.  I can work wherever I want.
25   Q   As a canine handler, do you conduct your own
```

CHANDLER RULE  7/8/2021

| 1 | | stops or just assist other trooper stops? |
|---|---|---|
| 2 | A | I conduct my own stops. |
| 3 | Q | Do you also get called out to respond to other |
| 4 | | trooper stops? |
| 5 | A | I do. |
| 6 | Q | You talked about having an 80-hour requirement |
| 7 | | for a two-week period; is that correct? |
| 8 | A | That's correct. |
| 9 | Q | How does your work break down within those 80 |
| 10 | | hours between doing your own stops and responding |
| 11 | | to other stops? |
| 12 | A | Every day is completely different.  I can't give |
| 13 | | you a -- I mean I can't give you an answer on |
| 14 | | that because I don't know. |
| 15 | Q | So walk me through -- did you work Wednesday of |
| 16 | | last week? |
| 17 | A | Yeah, I believe so. |
| 18 | Q | Okay.  Walk me through Wednesday of last week, if |
| 19 | | you can recall. |
| 20 | A | I can't remember Wednesday. |
| 21 | Q | Okay.  Pick a day you can remember. |
| 22 | A | Okay.  So typically -- a typical day is I start |
| 23 | | my shift.  I work the road.  I have traffic |
| 24 | | stops.  If I get called to something, such as an |
| 25 | | accident, a patrol call, someone needing help, |

```
 1        sniff.  Would you have to record that activity
 2        anywhere?
 3     A  On my new 15-day I would make a mark that I
 4        sniffed the vehicle.
 5     Q  Would the trooper that called you out have to
 6        record that they asked for a canine to come out
 7        and sniff?
 8     A  I don't believe so.
 9     Q  Okay.  What made you start recording this on the
10        new 15-day report six months ago?
11     A  Because I transferred from -- when I first
12        started, I was in Troop B.  So the Troop B 15-day
13        doesn't have a dog deployment section on it, and
14        then the dog 15-day, because I became a dog
15        handler, didn't have that 15-day on it.  So it
16        was never relayed to me.  So I didn't know it
17        existed.
18     Q  So when you moved to the canine unit in 2018, you
19        didn't know that that column existed?
20     A  Correct.
21     Q  And so then the non-canine troops don't have to
22        record canine deployments in any way?
23     A  Not that I am aware of.
24     Q  So to the best of your knowledge there's no
25        record maintained of how many times troopers call
```

CHANDLER RULE 7/8/2021

```
 1        out a canine unit?
 2    A   Other than -- how many times they call out
 3        specifically?  No.
 4    Q   Is there any record made of how many times your
 5        canine alerts?
 6    A   Alerts, no.
 7    Q   Is there any record made of how many times your
 8        canine indicates?
 9    A   No.
10    Q   Is there any record made of how many canine
11        sniffs you do in a given period besides the
12        15-day report?
13    A   Yes.  I keep yearly stats for myself.
14    Q   Tell me about the yearly stats for yourself that
15        you keep.
16    A   You just -- it's very vague.  It just says the
17        number of vehicles I have sniffed.  The poundage
18        that my service dog is responsible for locating.
19        On my form there is -- it's broken down from
20        myself, KHP, and outside agency.  So basically I
21        sniff for this many people this month and
22        whatnot, and it totals up for the yearly average.
23    Q   So you say how many times or how many people you
24        have sniffed for within the KHP versus how many
25        you sniffed for outside of the KHP?
```

CHANDLER RULE 7/8/2021

| | | |
|---|---|---|
| 1 | | alert or indication? |
| 2 | A | No. |
| 3 | Q | You only record when the canine alerts and you |
| 4 | | find something as a result? |
| 5 | A | No.  Any time the dog is deployed. |
| 6 | Q | You record any time the dog is deployed? |
| 7 | A | That's correct. |
| 8 | Q | Do you make a categorization in your own record |
| 9 | | or the 15-day report for what happens when that |
| 10 | | dog gets deployed? |
| 11 | A | No. |
| 12 | Q | Do you discuss your 15-day report numbers with |
| 13 | | your lieutenant at your performance evaluation? |
| 14 | A | I don't remember it ever coming up. |
| 15 | Q | Do you discuss the records you keep on the form |
| 16 | | you were just talking about at your Performance |
| 17 | | Evaluation? |
| 18 | A | I don't remember it ever coming up in an eval |
| 19 | | either. |
| 20 | Q | Has your lieutenant ever asked you for your |
| 21 | | stats, your productivity numbers, similar to the |
| 22 | | ones that you keep on your form that you |
| 23 | | mentioned? |
| 24 | A | Yes. |
| 25 | Q | When has your lieutenant asked you about that? |

Case 6:19-cv-01343-KHV Document 521-2 Filed 05/15/23 Page 40 of 93

| 1 | A | In the last week actually. |
|---|---|---|
| 2 | Q | Why did your lieutenant ask you about that? |
| 3 | A | Because I'm leaving the Highway Patrol, and he |
| 4 | | needed my stats. |
| 5 | Q | Where you are going to? |
| 6 | A | I'm going to the DEA. |
| 7 | Q | What are you going to be doing with the DEA? |
| 8 | A | I was hired to fill a special agent position. |
| 9 | Q | When do you start that? |
| 10 | A | August -- or sorry. July 18th. |
| 11 | Q | Will you be a canine handler for the DEA? |
| 12 | A | No. |
| 13 | Q | Do you mind me asking what's going to happen to |
| 14 | | Cain? |
| 15 | A | I have passed him down to -- hopefully a new dog |
| 16 | | handler gets him. |
| 17 | Q | Will Cain have to be retrained when he gets a new |
| 18 | | dog handler? |
| 19 | A | Yes. |
| 20 | Q | Is going to the DEA considered a promotion or a |
| 21 | | step up in your career? |
| 22 | A | No. It's just a different route. |
| 23 | Q | Why did your lieutenant need to know about your |
| 24 | | productivity stats before you left to go to the |
| 25 | | DEA? |

Case 6:19-cv-01343-KHV  Document 521-2  Filed 05/15/23  Page 41 of 93

| | | |
|---|---|---|
| 1 | A | I don't know. |
| 2 | Q | Did you talk about your productivity stats when |
| 3 | | you were applying for the DEA position? |
| 4 | A | I talked with who? |
| 5 | Q | With the DEA when you were interviewing. |
| 6 | A | No.  I did not talk about my specific dog stuff |
| 7 | | with the DEA. |
| 8 | Q | Did you talk about how many drugs you have |
| 9 | | seized? |
| 10 | A | I did. |
| 11 | Q | Did you talk about how many arrests you have had? |
| 12 | A | I believe so. |
| 13 | Q | Have you ever heard of the trooper two-step? |
| 14 | A | I have. |
| 15 | Q | And what is it? |
| 16 | A | It is when a trooper makes contact at a window |
| 17 | | and then ends the traffic stop, steps away from |
| 18 | | the vehicle, and then regains or makes contact |
| 19 | | again with the driver. |
| 20 | Q | Were you ever trained on the two-step? |
| 21 | A | Yes. |
| 22 | Q | When were you trained on it? |
| 23 | A | I believe going through the KHP Academy. |
| 24 | Q | Was it ever mentioned as part of the interdiction |
| 25 | | specialty training that you got? |

CHANDLER RULE  7/8/2021

| 1  | A | Was it ever -- would you reword that. |
|----|---|---|
| 2  | Q | Sure.  So you were trained on it at the basic |
| 3  |   | Academy; correct? |
| 4  | A | Correct. |
| 5  | Q | Was it ever reinforced in additional training |
| 6  |   | that you got after the Academy? |
| 7  | A | No, I don't believe so. |
| 8  | Q | Did you take the advanced interdiction training? |
| 9  | A | I did. |
| 10 | Q | Did you take it with Ms. Washburn? |
| 11 | A | I believe she was there.  Yes. |
| 12 | Q | Okay.  This has previously been marked -- I have |
| 13 |   | to find it -- previously been marked as |
| 14 |   | Exhibit 17. |
| 15 |   | MS. BRETT:  Do you need a copy, Art? |
| 16 |   | MR. CHALMERS:  No. |
| 17 | Q | (By Ms. Brett) Do you recognize what this is? |
| 18 | A | It looks like a Fourth Amendment presentation. |
| 19 | Q | Do you recall getting this presentation at any |
| 20 |   | point in the last few years? |
| 21 | A | Yeah.  Just looking from the front page, it looks |
| 22 |   | familiar. |
| 23 | Q | Okay.  And I will have you turn to page -- what's |
| 24 |   | marked at the bottom as "749."  If you find that. |
| 25 | A | Okay. |

| 1 | Q | Can you just read to yourself what the text is on |
| 2 |  | this page. |
| 3 | A | Okay. |
| 4 | Q | Is that consistent with the training that you |
| 5 |  | have gotten on the two-step? |
| 6 | A | Yes. |
| 7 | Q | And what about on the next page which is marked |
| 8 |  | at the bottom as page "750."  Is this consistent |
| 9 |  | with your training on the two-step? |
| 10 | A | That's correct. |
| 11 | Q | Was this the training that you received as part |
| 12 |  | of the advanced interdiction class? |
| 13 | A | I don't remember.  If that's what it says. |
| 14 | Q | Okay.  What's the point of the two-step maneuver? |
| 15 | A | So that way the driver feels like he is -- he or |
| 16 |  | she free to leave and to gain a consentual |
| 17 |  | encounter. |
| 18 | Q | Why is that important to you? |
| 19 | A | Why is what important? |
| 20 | Q | Why would it be important for the driver to feel |
| 21 |  | like he or she is free to leave? |
| 22 | A | Because I am doing the trooper two-step because I |
| 23 |  | am wanting to ask them more questions and I want |
| 24 |  | the consent to be legit. |
| 25 | Q | What you mean by "be legit"? |

| 1 | A | To be voluntary and willing. |
| 2 | Q | And so by doing the trooper two-step, do you |
| 3 |   | think the consent is voluntary and willing? |
| 4 | A | Yep. |
| 5 | Q | Have you been trained to say anything at the end |
| 6 |   | of the traffic stop in particular? |
| 7 | A | I don't specifically remember exactly how it was |
| 8 |   | worded in the class, but we have always been told |
| 9 |   | to end the traffic stop with something along the |
| 10 |   | lines of "Have a safe trip" or so forth. |
| 11 | Q | Have you been told not to say something at that |
| 12 |   | point? |
| 13 | A | I don't remember that in training. |
| 14 | Q | Would you ever say you are free to go? |
| 15 | A | Would I ever say that?  I'm sure there would be |
| 16 |   | some scenarios where I would say that. |
| 17 | Q | Have you ever been trained not to say "You are |
| 18 |   | free to go" at the end of the traffic stop? |
| 19 | A | I don't recall. |
| 20 | Q | Why do you say something like "Have a good trip" |
| 21 |   | or whatever at the end of traffic stop? |
| 22 | A | To make the driver feel as they are free to |
| 23 |   | leave. |
| 24 | Q | Are they free to leave? |
| 25 | A | It's dependent on the situation. |

Case 6:19-cv-01343-KHV  Document 521-2  Filed 05/15/23  Page 45 of 93

```
 1    Q    Can you give a situation where they would be free
 2         to leave?
 3    A    Sure.  Pretty much any traffic stop.  So
 4         basically what I meant to say there was -- if I
 5         have reasonable suspicion at the point before I
 6         go into a consentual encounter, they are not free
 7         to leave because I am going to detain them if I
 8         am at the reasonable suspicion.  If I am not at
 9         the reasonable suspicion but I just have
10         suspicions, then I will do the trooper two-step,
11         ask them if I can ask them more questions, and
12         then get clarifying questions regarding the trip.
13    Q    Okay.  Let's break that down a little bit.
14    A    Okay.
15    Q    So if you have reasonable suspicion at that
16         point, would you do a two-step?
17    A    I typically do, yes.
18    Q    Why?
19    A    Because, one, to ask more questions, and
20         potentially in my experience it is easier to
21         testify in court if they give me consent as that
22         the consent was voluntary.
23    Q    If you have reasonable suspicion, why do you need
24         to ask more questions?
25                   MR. CHALMERS:  Been asked and
```

```
 1          answered.
 2                  MS. BRETT:  I don't believe it has, so
 3          go ahead.
 4     A    To continue to either confirm or dispel my
 5          suspicions.
 6     Q    (By Ms. Brett) Okay.  Once you have reasonable
 7          suspicion, what can you do next?
 8     A    That's a pretty broad question.
 9     Q    So you have reasonable suspicion.  You have a
10          canine in the back of your car.  Is it correct
11          that you need reasonable suspicion to do a canine
12          sniff?
13     A    No.
14                  MR. CHALMERS:  Lack of foundation.
15          Incomplete hypothetical.
16     A    That's not correct.
17                  MR. CHALMERS:  But go ahead.
18     Q    (By Ms. Brett) What do you need to do at a canine
19          sniff?  What type of legal standard do you have
20          to meet in order to do a canine sniff based on
21          your training?
22     A    It depends on the situation.  Every situation is
23          different.  If I am at a hotel and I have
24          permission to be in the hotel parking lot, I can
25          let the dog run anywhere.
```

CHANDLER RULE 7/8/2021

1   Q   Let's go back to the situation we were working
2       with earlier this morning.
3   A   Okay.
4   Q   Traffic stop.  Side of the highway.
5   A   Sure.
6   Q   You return the license.
7   A   Okay.  Now, it's dependent.  Am I at reasonable
8       suspicion?
9   Q   I'm saying you have reasonable suspicion.
10  A   Yes.  Then I can detain the suspect and do a
11      canine sniff.
12  Q   Okay.  So if you have reasonable suspicion, why
13      would you do the two-step if you can do the
14      canine sniff at that point?
15              MR. CHALMERS:  It's been asked and
16      answered now twice.
17  Q   (By Ms. Brett) Go ahead.
18  A   To confirm or dispel my suspicions.
19  Q   Okay.  And if you don't have reasonable
20      suspicion, that's when you would want to ask more
21      questions; correct?
22  A   If I have suspicions already.
23  Q   If you have some suspicions?
24  A   Yep.  But if I'm not at the reasonable suspicion
25      level, and I would still like to ask more

1 questions.

2 Q Can you explain to me the difference between some
3   suspicions and reasonable suspicion?

4 A Yeah.  It kind of goes back to what's more of
5   just a hunch.  We're not quite up to that
6   reasonable suspicion standard.

7 Q So some suspicion would mean you have a hunch; is
8   that correct?

9 A Yes, which is still able to be articulated for
10   me.  Correct.

11 Q And you would ask more questions to get to
12   reasonable suspicion; correct?

13 A Or to dispel my suspicions.

14 Q Based on your training, what might make you find
15   a car suspicious?

16 A That can't -- every circumstance is different,
17   and there's not one specific thing that I can
18   tell you.  It's the totality of the circumstances
19   from the scope of the traffic stop.

20 Q So I'm just asking you for you to give me some
21   examples based on your experience.  If you can
22   think of a car that you found suspicious in the
23   past during a stop, pick whatever car you want.
24   Why did you find that car suspicious?

25 A Okay.  So it's not limited to these.  Just some

## CHANDLER RULE 7/8/2021

```
 1        examples would be a third-party car, someone not
 2        knowing where they are going or seeing, how long
 3        they are going to be out there, implausible
 4        travel plans, untruthful in their story, nervous
 5        behavior, lived-in appearance in a vehicle.  We
 6        can go on and on and on.
 7    Q   All right.  Let's break down some of this.  What
 8        do you mean by third-party car?
 9    A   The car is owned by someone else.
10    Q   A relative, for example?
11    A   It would still be a third-party car.  Yes.
12    Q   And what about a third-party car makes it
13        suspicious?
14    A   By itself, nothing.
15    Q   But it's a factor that, based on the totality of
16        the circumstances, as you said, might make you
17        suspicious.  So what about the third-party car
18        adds to that suspicion calculus?
19    A   Well, it's from my prior training and experience
20        that it is common for people involved in criminal
21        activity to be using third-party cars.
22    Q   And that includes cars owned by relatives for
23        other third parties?
24    A   Potentially.
25    Q   Okay.  So what about rental cars?  Are rental
```

```
 1        cars suspicious?
 2   A    By themselves, no.
 3   Q    But you have been trained that people who -- let
 4        me rephrase.  Have you been trained that
 5        people who drive -- let me rephrase again.
 6        Sorry.  This is where the caffeine kicks in, and
 7        I haven't had lunch yet.
 8                    Have you been trained that rental cars
 9        are used for criminal activity?
10   A    No.
11   Q    So when would you find a rental car to be
12        suspicious?
13   A    By itself, a rental car is not suspicious.
14   Q    When would you consider a rental car as part of
15        your totality of your circumstances?
16   A    If -- once again, it's not limited to these, but
17        these are just examples that are coming to my
18        head.  If the a rental car -- they don't have a
19        rental agreement.  They don't know who rented the
20        car.  The rental agreement will put a timestamp
21        on their travel.  If it's a one-way rental.  The
22        rental is way too expensive for the trip.  There
23        are several factors that, with the totality of
24        the circumstances, could lead to being
25        suspicious.
```

| 1 | Q | What do you mean about the rental being way too |
|---|---|---|
| 2 | | expensive for the trip? |
| 3 | A | For instance, if you live in Wichita and you are |
| 4 | | going to Las Vegas, you are not going to rent a |
| 5 | | car -- well, you could.  But the rental from |
| 6 | | Wichita to Las Vegas is going to cost $400, an |
| 7 | | example, when you can by a plane ticket for $75. |
| 8 | Q | For $75 you said? |
| 9 | A | Yep.  To Vegas. |
| 10 | Q | You can fly from Wichita to Vegas for $75? |
| 11 | A | They used to.  Yes. |
| 12 | Q | Is there some sort of threshold that you are |
| 13 | | trained on that would make the cost of the rental |
| 14 | | car suspicious to you? |
| 15 | A | No.  It's based off of our training and our |
| 16 | | experience. |
| 17 | Q | Do you ask questions when you see an expensive |
| 18 | | rental car agreement about why the person might |
| 19 | | have chosen to drive versus to fly? |
| 20 | A | Yes. |
| 21 | Q | And if they give an explanation, is the fact that |
| 22 | | they have a rental car that is expensive still |
| 23 | | suspicious? |
| 24 | A | It's dependent on the situation. |
| 25 | Q | Can you give me an example of when an answer |

| 1 | | might not be satisfactory to you. |
|---|---|---|
| 2 | A | Something that may still -- just an example? |
| 3 | Q | Yes. |
| 4 | A | If someone claims they are traveling across the |
| 5 | | country to buy a van, and this $1,000 rental car, |
| 6 | | plus by the time you figure in the fuel and |
| 7 | | whatnot, it would be cheaper for that person to |
| 8 | | put that van on a truck and ship it to where they |
| 9 | | are from rather than spending $1,000 on a rental |
| 10 | | car. |
| 11 | Q | So is there any answer that a person in that |
| 12 | | hypothetical might be able to give to you that |
| 13 | | would dispel your suspicions as you put it? |
| 14 | A | Sure. |
| 15 | Q | What type of answer would they be able to rive? |
| 16 | A | Without being in the situation, I don't know. |
| 17 | | Like I said already, it's the totality of the |
| 18 | | circumstances. I never look at one factor alone |
| 19 | | and call it reasonable suspicion. It is the |
| 20 | | scope of entire traffic stop. |
| 21 | Q | And I'm just trying to understand how these |
| 22 | | things add up with one another. |
| 23 | A | Right. |
| 24 | Q | What does a lived-in look mean? |
| 25 | A | Typically it is associated with someone who is |

CHANDLER RULE  7/8/2021

| | | |
|---|---|---|
| 1 | | traveling hard.   Often a pillow or blanket in the |
| 2 | | backseat.   Bunch of energy drinks.   Snacks.   Car |
| 3 | | is more trashed than typical. |
| 4 | Q | What is it about having snacks or drinks in the |
| 5 | | car that might contribute to your totality of the |
| 6 | | circumstances? |
| 7 | A | By itself, once again, it's nothing, but with |
| 8 | | everything else coming into play, it is -- draws |
| 9 | | in suspicion such as it can show that they are |
| 10 | | traveling harder than the typical vacationer or |
| 11 | | someone just traveling.   Typically people stop, |
| 12 | | stop at restaurants.   They stop at hotels and so |
| 13 | | forth. |
| 14 | Q | How hard does a typical vacationer travel?   Can |
| 15 | | you give me an example what have you would in |
| 16 | | your opinion find to be a reasonable travel |
| 17 | | schedule? |
| 18 | A | I don't think I can because every situation is |
| 19 | | different.   Every family is different.   Every |
| 20 | | person's vacation or traveling is different. |
| 21 | Q | So I am trying to get at how certain things might |
| 22 | | seem out of the ordinary to you; is that correct? |
| 23 | A | Correct. |
| 24 | Q | What is the ordinary that you are comparing that |
| 25 | | to? |

CHANDLER RULE  7/8/2021

| | | |
|---|---|---|
| 1 | A | Once again, it goes to the totality of the |
| 2 | | circumstances.  I can't answer that one specific |
| 3 | | thing because one specific factor that it is |
| 4 | | unordinary for someone could be ordinary for |
| 5 | | someone else, but due to the totality of the |
| 6 | | circumstances, the situations are completely |
| 7 | | different. |
| 8 | Q | **So in that moment when you're doing the traffic** |
| 9 | | **stop, how do you make that assessment?** |
| 10 | A | It's based off on my prior training and |
| 11 | | experience. |
| 12 | Q | **So you are trained in a given traffic stop to be** |
| 13 | | **able to say those traffic plans are normal for** |
| 14 | | **that person?** |
| 15 | A | No.  Not necessarily. |
| 16 | Q | **Are you trained to be able to say those travel** |
| 17 | | **plans are abnormal for that person?** |
| 18 | A | Not necessarily by itself. |
| 19 | Q | **What do you mean by that?** |
| 20 | A | Okay.  So, as I keep saying over and over, every |
| 21 | | situation is completely different.  So we are not |
| 22 | | necessarily trained that one specific story is |
| 23 | | reasonable suspicion or suspicious by itself, but |
| 24 | | with the totality of the circumstances, it is |
| 25 | | suspicious.  Does that make sense? |

| 1 | Q | I understand the totality of the circumstances. |
|---|---|---|
| 2 | A | Right. |
| 3 | Q | Maybe I will just keep asking some more questions |
| 4 | | to see if we can nail this down a little bit |
| 5 | | more. |
| 6 | A | Okay. |
| 7 | Q | As a part of the totality of the circumstances, |
| 8 | | is the state that a person is traveling from part |
| 9 | | of your reasonable suspicion calculus? |
| 10 | A | By itself, no. |
| 11 | Q | But as part of the totality of the circumstances? |
| 12 | A | Sure. |
| 13 | Q | Is the state that they are traveling to part of |
| 14 | | your reasonable suspicion calculus? |
| 15 | A | By itself, no. But with the totality of the |
| 16 | | circumstances, yes. |
| 17 | Q | The fact that they are driving a rental car by |
| 18 | | itself is not suspicious but as part of the |
| 19 | | totality of the circumstances could be |
| 20 | | suspicious; correct? |
| 21 | A | Correct. |
| 22 | Q | What about if they -- I think you said the |
| 23 | | lived-in look of the car; correct? |
| 24 | A | Correct. |
| 25 | Q | And as part of that, it might be a bed or a |

| | | |
|---|---|---|
| 1 | | pillow or a blanket you mentioned; is that |
| 2 | | correct? |
| 3 | A | Sure. |
| 4 | Q | What about luggage?  Is the amount of luggage |
| 5 | | that somebody had suspicious? |
| 6 | A | It could. |
| 7 | Q | If they have a lot of luggage; is that |
| 8 | | suspicious? |
| 9 | A | It could be. |
| 10 | Q | If they don't have enough luggage, is that |
| 11 | | suspicious? |
| 12 | A | It could be. |
| 13 | Q | How do you assess how much luggage is the correct |
| 14 | | amount of luggage for a person's travel plans? |
| 15 | A | It's also based off my experience. |
| 16 | Q | What has your experience taught you in that |
| 17 | | regard? |
| 18 | A | Every situation is different.  For example, |
| 19 | | someone who says they are traveling -- for |
| 20 | | example, if one person is in the car and going to |
| 21 | | a bachelor party that is 200 miles down the road, |
| 22 | | they are not going to have eight suitcases in the |
| 23 | | back of the car.  That would be suspicious. |
| 24 | | Someone who says they are moving and |
| 25 | | they have got all their stuff with them, but they |

CHANDLER RULE 7/8/2021

| 1 | | have only got one suitcase in the back would be |
| 2 | | suspicious with the totality of the |
| 3 | | circumstances, of course. not itself. |
| 4 | Q | Have you ever been trained on how to write a |
| 5 | | report? |
| 6 | A | Yes. |
| 7 | Q | When did you receive that training? |
| 8 | A | At the KHP Academy. |
| 9 | Q | Have you received any in-service training on |
| 10 | | report writing? |
| 11 | A | I want to say -- I don't know.  I want to say, |
| 12 | | yes, we have gone over things about writing |
| 13 | | reports and whatnot, but I don't specifically |
| 14 | | remember an instance. |
| 15 | Q | What about when you were trained to be a Canine |
| 16 | | handler? |
| 17 | A | Yes.  We talked about dog deployment reports. |
| 18 | Q | Did you receive specific training on dog |
| 19 | | deployment reports as part of your 10- to 13-week |
| 20 | | canine academy? |
| 21 | A | Correct. |
| 22 | Q | When did you -- when do you write reports as part |
| 23 | | of a canine employment? |
| 24 | A | Anytime I deploy the dog. |
| 25 | Q | So if you initiate a stop and deploy the dog, you |

"Plfs. Obj:"
FRE 611(a) &
(b) because it
is beyond the
scope of the
direct
examination.

1        suspicion factors?

2    A   Typically, yes.

3    Q   Okay. Here is something I didn't ask you about

4        before. When you are called out by another

5        trooper to a roadside detention and they want you

6        to do a search -- do a canine sniff of the

7        vehicle, do you always have to do the sniff?

8    A   Like do I always have to respond?

9    Q   Yes.

10   A   No. I could say, "Call another dog handler."

11   Q   When you do respond, do you talk at all with the

12       trooper that called you out?

13   A   I try not to hold much of a conversation.

14   Q   Why?

15   A   Because I like to stay objective so that way I

16       can truly read the dog and what he is doing.

17   Q   Okay. So you wouldn't ask the trooper for the

18       reasons you were called out?

19   A   Not typically.

20   Q   Have you ever been called out to the scene by

21       another trooper, arrived, and then refused to do

22       the canine search?

23   A   Yes.

24   Q   Why did you refuse?

25   A   Because I walk up there, and I can either see or

CHANDLER RULE  7/8/2021

| 1 | | smell the narcotic giving him probable cause. |
| 2 | Q | But at that point you make a judgment call that |
| 3 | | the canine sniff is not needed? |
| 4 | A | Correct. |
| 5 | Q | Have there been any other circumstances where you |
| 6 | | have refused to perform the canine sniff when |
| 7 | | called out by another trooper? |
| 8 | A | I can't think of one. |
| 9 | Q | When you do the report, the deployment report, |
| 10 | | following a sniff where the sniff was requested |
| 11 | | by another trooper, what type of information do |
| 12 | | you put into the canine report? |
| 13 | A | Just the deployment part. |
| 14 | Q | Just the deployment part? |
| 15 | A | Yes. |
| 16 | Q | Do you ever ask the officer why you were called |
| 17 | | out before you write that report? |
| 18 | A | No. |
| 19 | Q | Is it your testimony that any time you initiate a |
| 20 | | traffic stop and deploy the canine you will |
| 21 | | include your reasonable suspicion factors in the |
| 22 | | deployment report? |
| 23 | A | Not every time. |
| 24 | Q | When would be the circumstances where you would |
| 25 | | not include the reasonable suspicion factors? |

```
 1   A   If there was no reasonable suspicion factors.

 2   Q   Would there be a time after a traffic stop that

 3       you initiated when you deploy your canine and

 4       there's no reasonable suspicion factors?

 5   A   I'm sorry.  I thought you meant for a sniff in

 6       general.

 7   Q   I am talking only about roadside sniffs.

 8   A   Okay.  Roadside sniffs.  Yes.  When I first came

 9       on the unit, I didn't always list all my

10       reasonable suspicion factors.

11   Q   Why not?

12   A   I just didn't really have the experience and

13       never really thought to do it.

14   Q   Had you been trained at any point to include

15       those reasonable suspicion factors in your

16       deployment reports?

17   A   No.

18   Q   Have you been instructed not to include them in

19       your deployment reports?

20   A   No.

21   Q   So it was just your personal preference to

22       include them?

23   A   Correct.

24   Q   Do you know whether other canine handlers have

25       the same practices as you?
```

Case 6:19-cv-01343-KHV  Document 521-2  Filed 05/15/23  Page 61 of 93

```
 1    A    I don't know.

 2    Q    Has your lieutenant ever talked to you about the

 3         fact that you include your reasonable suspicion

 4         factors?

 5    A    Yeah.  He said it was a good idea.

 6    Q    Have you ever heard of a case called Vasquez from

 7         the 10th Circuit?

 8    A    I have.

 9    Q    What do you know about that case?

10    A    From what I remember, it was a case regarding a

11         Kansas trooper and basically alleged that they

12         were stopping cars based off their license plates

13         or because of their license plates.  Something

14         along that line.

15    Q    What is your understanding of the holding that

16         came out of that case?

17    A    That we are not to be stopping cars based off of

18         where they are coming from or where they are

19         going, and -- yep.

20    Q    Is it just about whether you are stopping cars

21         based on that or is it about anything else?

22    A    And detaining cars.  People.

23    Q    Okay.  Did the Vasquez decision change how you

24         conduct your traffic stops?

25    A    I never detained or stopped someone based off of
```

CHANDLER RULE 7/8/2021

| | | |
|---|---|---|
| 1 | | where they are coming from or where they are |
| 2 | | going or what their license plate is. |
| 3 | Q | Well, you testified that it can be part of your |
| 4 | | reasonable suspicion calculus; correct? |
| 5 | A | Sure. |
| 6 | Q | Is it your understanding that's consistent with |
| 7 | | Vasquez? |
| 8 | A | So I think we are on different understandings. |
| 9 | | So just because I'm using a location isn't -- I'm |
| 10 | | not singling out that location for an indicator. |
| 11 | | Is that making sense? |
| 12 | Q | Can you explain a little bit more. |
| 13 | A | So, for instance, I'm not using -- for instance, |
| 14 | | let's say Colorado. I'm not using Colorado alone |
| 15 | | as an indicator of them, but they do play an |
| 16 | | effect. Colorado, that means they are traveling |
| 17 | | 1600 miles or something along that lines. So I |
| 18 | | still use where they are going, but I'm not using |
| 19 | | it as a sole factor of reasonable suspicion. |
| 20 | Q | So it's a part of the calculus but it's not the |
| 21 | | only thing? |
| 22 | A | Correct. |
| 23 | Q | And your testimony is that based on your training |
| 24 | | that's consistent with Vasquez? |
| 25 | A | From what I recall, yes. |

```
 1    Q    What about a case called Esteban?  Have you heard
 2         about a case called Esteban?
 3    A    No.
 4    Q    Give me one second.  I'm going to show you what
 5         is being marked as Exhibit 41.
 6                   MS. BRETT:  Art, this is OAGO19669.
 7         Do you need a copy?
 8                   MR. CHALMERS:  If you have got one.
 9    Q    (By Ms. Brett) And if you look about halfway down
10         the page, you will see that it's an email from
11         John Rule; correct?
12    A    Correct.
13    Q    Is that your father?
14    A    That is.
15    Q    And do you see your name in the "To" line?
16    A    I do.
17    Q    Can you just read over this email quickly.
18    A    (The witness complied with the request.)
19    Q    Do you recall getting this?
20    A    I don't remember receiving this email.
21    Q    Do you see the subject line?  Could you read me
22         the subject line.
23    A    "US v Esteban."
24    Q    And you don't remember receiving this email?
25    A    No, I don't remember.
```

CHANDLER RULE  7/8/2021

| 1 | Q | Is this the type of email that you would get when |
|---|---|---|
| 2 | | there has been an update in the law? |
| 3 | A | No, not necessarily. |
| 4 | Q | What other types of emails would you get when |
| 5 | | there has been an update in the law? |
| 6 | A | From legal staff and the other person I received |
| 7 | | emails from is Colin Woods. |
| 8 | Q | Colin Woods is a US attorney? |
| 9 | A | Correct. |
| 10 | Q | Assistant US Attorney? |
| 11 | A | Correct. |
| 12 | Q | Does your dad normally send out emails about new |
| 13 | | cases that have come out? |
| 14 | A | I won't say -- I wouldn't say normally.  No. |
| 15 | Q | Do you recall getting notified about the Esteban |
| 16 | | from KHP counsel? |
| 17 | A | No. |
| 18 | Q | Do you recall getting notified about it from |
| 19 | | Colin Woods? |
| 20 | A | No. |
| 21 | Q | Okay.  Do you recall stopping somebody by the |
| 22 | | name of Suzanne Dunn? |
| 23 | A | I do. |
| 24 | Q | What do you recall about that stop? |
| 25 | A | What specifically are you -- |

Case 6:19-cv-01343-KHV Document 521-2 Filed 05/15/23 Page 65 of 93

| 1 | Q | Do you remember when the stop was? |
|---|---|---|
| 2 | A | In February. |
| 3 | Q | Of this past year, 2021? |
| 4 | A | I believe so. |
| 5 | Q | Have you watched the video of this stop of |
| 6 | | Suzanne Dunn? |
| 7 | A | It's been awhile. |
| 8 | Q | It's been awhile? |
| 9 | A | Yes. |
| 10 | Q | You did not watch it in preparation for today? |
| 11 | A | I did not. |
| 12 | Q | Do you remember why you stopped Ms. Dunn's car? |
| 13 | A | If I remember right, she was speeding and |
| 14 | | lingering in the left lane. |
| 15 | Q | Did you review your Police Service Dog Report and |
| 16 | | other paperwork about Suzanne's stop prior to |
| 17 | | your deposition today? |
| 18 | A | I did. |
| 19 | Q | I am showing you what's now been marked as |
| 20 | | Deposition Exhibit 42. |
| 21 | | MS. BRETT: I apologize for reaching |
| 22 | | over you. |
| 23 | | Art, do you need a copy? |
| 24 | | MR. CHALMERS: Thank you. |
| 25 | | MS. BRETT: Yes. |

| 1 | Q | (By Ms. Brett) Do you recognize this? |
| 2 | A | I do. |
| 3 | Q | Can you tell me what it is. |
| 4 | A | It is my dog report. |
| 5 | Q | It's your dog report from what? |
| 6 | A | From -- regarding the sniff with Ms. Dunn. |
| 7 | Q | Okay.  I want to ask you a couple of questions |
| 8 | | about this stop in particular. |
| 9 | A | Okay. |
| 10 | Q | Trooper Frantz was riding with you when this stop |
| 11 | | occurred; correct? |
| 12 | A | Correct. |
| 13 | Q | Why was he riding with you? |
| 14 | A | We often pair up and ride together. |
| 15 | Q | Why do you ride with other people? |
| 16 | A | There would be several reasons for it, such as a |
| 17 | | huge officer safety help, makes boring days a |
| 18 | | little more exciting, just gives you somebody to |
| 19 | | talk to in the car.  We had no specific reason as |
| 20 | | to why, but we chose to ride together that day. |
| 21 | Q | Is Trooper -- what troop is Trooper Frantz |
| 22 | | assigned to? |
| 23 | A | Troop N. |
| 24 | Q | Troop N? |
| 25 | A | Troop N. |

CHANDLER RULE 7/8/2021

| 1 | Q | Is that the interdiction troop? |
|---|---|---|
| 2 | A | Yes. |
| 3 | Q | Do you often ride with another trooper from the |
| 4 | | interdiction unit? |
| 5 | A | Yeah. Once in a while. |
| 6 | Q | What do you mean by "once in a while"? |
| 7 | A | Like a couple times a month maybe. |
| 8 | Q | Okay. So you recall why you pulled Ms. Dunn |
| 9 | | over; correct? |
| 10 | A | Yes. |
| 11 | Q | Do you recall what happened before you pulled |
| 12 | | Ms. Dunn over? |
| 13 | A | No. |
| 14 | Q | Did you have a conversation with Trooper |
| 15 | | Frantz -- is Frantz or Frantz? |
| 16 | A | Frantz. |
| 17 | Q | Frantz. Did you have a conversation with Trooper |
| 18 | | Frantz before you pulled Ms. Dunn over? |
| 19 | A | Not that I can remember. |
| 20 | Q | Did you discuss at any point why you were going |
| 21 | | to pull her over? |
| 22 | A | Not that I can remember. |
| 23 | Q | Were you driving the car? |
| 24 | A | I was. |
| 25 | Q | At what point did you decide to pull her over? |

CHANDLER RULE  7/8/2021

| 1 | A | I don't know. |
|---|---|---|
| 2 | Q | Did you pull up alongside her car at any point? |
| 3 | A | Probably, yes. |
| 4 | Q | Why do you do that? |
| 5 | A | I do it for several reasons.  One to identify the |
| 6 | | driver, count the number of occupants, and make |
| 7 | | sure everyone is wearing their seatbelts. |
| 8 | Q | Okay.  Is there anything else that you are |
| 9 | | looking for when you pull up alongside a driver? |
| 10 | A | Anything obvious that would stand out. |
| 11 | Q | And you don't recall at what point you decided to |
| 12 | | pull this car over? |
| 13 | A | No. |
| 14 | Q | Could you tell that the car was a rental car when |
| 15 | | you were following it on the highway? |
| 16 | A | I don't remember. |
| 17 | Q | Can you typically tell whether a car is a rental |
| 18 | | car versus an owner-occupied car? |
| 19 | A | Typically, yes. |
| 20 | Q | What are the ways that you can tell? |
| 21 | A | Barcode sticker on the car.  Typically it's very |
| 22 | | clean.  Doesn't have any personalized things on |
| 23 | | it. |
| 24 | Q | Like a bumper sticker? |
| 25 | A | Usually doesn't have a bumper sticker. |

```
 1    Q    Did you see a barcode on Ms. Dunn's car prior to

 2         pulling her over?

 3    A    I don't remember.

 4    Q    Did you run Ms. Dunn's plates before you pulled

 5         her over?

 6    A    I don't remember.

 7    Q    Do you typically run a car's plates before you

 8         would pull it over?

 9    A    Pretty commonly.

10    Q    Pretty commonly?

11    A    Yes.

12    Q    Why would you do that?

13    A    To check and make sure the registration is good.

14         Make sure it is not stolen.  To see if there's

15         been any other contacts been made with that

16         vehicle.

17    Q    Can you tell that a car is a rental car when you

18         run the registration?

19    A    Yes.

20    Q    So you typically can tell if you run a person's

21         plates that a car is a rental car versus a

22         privately owned car prior to pulling them over?

23    A    Typically, yes.

24    Q    But you don't remember doing it in this case?

25    A    I don't remember if I did or not.
```

Case 6:19-cv-01343-KHV Document 521-2 Filed 05/15/23 Page 70 of 93

| | | |
|---|---|---|
| 1 | Q | Would it be consistent with your general practice |
| 2 | | if you had done it in this case? |
| 3 | A | Yes. |
| 4 | Q | Why did you just stop -- why did you decide to |
| 5 | | stop Suzanne Dunn's car? |
| 6 | A | Because she was speeding and lingering in the |
| 7 | | left lane. |
| 8 | Q | Do you stop most cars that you see lingering in |
| 9 | | the left lane? |
| 10 | A | I stop as many cars as I can during the day. |
| 11 | Q | Is that a typical thing that you would stop a car |
| 12 | | for? |
| 13 | A | Speeding and lingering? Yes. |
| 14 | Q | Was there anything in particular about that car |
| 15 | | that made you want to stop it for being in the |
| 16 | | left lane? |
| 17 | A | Other than she was lingering and speeding, no. |
| 18 | Q | And you had no conversation with Trooper Frantz |
| 19 | | before you decided to pull Suzanne over? |
| 20 | A | Not that I recall. |
| 21 | Q | You didn't say, "I am going to pull this car |
| 22 | | over"? |
| 23 | A | Oh, I'm sure I did. I'm sure I made a |
| 24 | | conversation about her speeding and driving in |
| 25 | | the left lane, but I don't remember what that |

CHANDLER RULE  7/8/2021

```
 1        report -- I don't know how they gain it.
 2   Q    So these numbers that you put in this PSDR report
 3        or PSDR --
 4   A    Uh-huh.
 5   Q    -- are from the KHP's numbers or your own
 6        personal numbers that you keep?
 7   A    I would have gained them from Troop N's numbers.
 8   Q    From the Troop N numbers.  Do you typically put
 9        your Troop N numbers in your PSDR reports?
10   A    Yes.
11   Q    Why?
12   A    To show experience.
13   Q    Why do you need to show experience in your
14        narrative reports?
15   A    That way when I testify in court, it shows I have
16        experience in this field.
17   Q    It looks like in this second paragraph you list
18        the reasonable suspicion factors or it looks like
19        you say "numerous indicators of criminal
20        activity."  Do you see that part?
21   A    I do.
22   Q    Can you walk me through what your indicators of
23        criminal activity were here?
24   A    Are you asking for the entire traffic stop?
25   Q    Well, I'm asking you what you wrote down on your
```

```
 1          report.
 2     A    You are asking me to recite what I wrote down or
 3          are you asking me to recite my reasonable
 4          suspicion?
 5     Q    Are there reasonable suspicion criteria that you
 6          have that are not in your report?
 7     A    Right.  But these are just factors but not
 8          explained factors, if that makes sense.
 9     Q    It doesn't.  So please explain what you mean by
10          that.
11     A    Okay.  So, for instance, I have in here traveling
12          1,677 miles to pick up a van.  Nothing illegal or
13          wrong about that, but with the totality of the
14          circumstances and when talking to her, I found
15          it -- she said that where she was going was the
16          only place that she could find this van.  And
17          from my prior experience, I found it very odd the
18          only place she could find a van to camp in was in
19          the location where she was headed, which to me
20          was an indicator -- with the totality of the
21          circumstances an indicator.  So I have got a
22          bunch of things listed here, but it doesn't
23          necessarily explain what I was thinking.
24     Q    So maybe you can explain why each of the things
25          listed here you found suspicious as part of your
```

| | |
|---|---|
| 1 | totality of the circumstances. So the first one, |
| 2 | I think, is traveling from a known narcotics hub, |
| 3 | Arlington, Virginia. How did that contribute to |
| 4 | your reasonable suspicion calculation? |
| 5 A | So it's with the totality of the circumstances. |
| 6 | She is coming from a large metropolitan area that |
| 7 | is a known narcotics hub traveling 1,677 miles to |
| 8 | Denver, Colorado. I already explained her |
| 9 | picking up the van. |
| 10 Q | Well, let's go back to the Denver, Colorado. It |
| 11 | says, "Traveling to known narcotics distribution |
| 12 | hub." What did you mean by that? |
| 13 A | It's no secret that Colorado produces more |
| 14 | marijuana than pretty much anyone in the country. |
| 15 | Right. |
| 16 Q | So the fact -- |
| 17 A | Or at the time. |
| 18 Q | So as part of your totality of the circumstances, |
| 19 | the fact that she was traveling from Arlington, |
| 20 | Virginia, out of state to Colorado contributed to |
| 21 | your reasonable suspicion; correct? |
| 22 A | Yes, with the totality of the circumstances. |
| 23 Q | Okay. Are there any large metropolitan areas |
| 24 | that are not known narcotics hubs? |
| 25 A | Metropolitan -- large metropolitan areas are |

CHANDLER RULE 7/8/2021

| | | |
|---|---|---|
| 1 | | typically known as narcotics hubs. |
| 2 | Q | Okay. If she had been traveling from rural |
| 3 | | Mississippi to Hays, would that have contributed |
| 4 | | to your reasonable suspicion calculus with these |
| 5 | | other factors here? |
| 6 | A | Well, I'm from Hays. So I could have asked her |
| 7 | | more questions about Hays, which me asking more |
| 8 | | questions would have either helped me confirm or |
| 9 | | dispel my reasonable suspicion regarding that. |
| 10 | Q | Would there be anything about Hays that was |
| 11 | | inherently suspicious? |
| 12 | A | If she said she was going to go buy this van in |
| 13 | | Hays because of the body shop work being done on |
| 14 | | it, yes, because I am aware that no one in Hays |
| 15 | | is making -- so, yeah, it would be suspicious to |
| 16 | | me. |
| 17 | Q | Okay. What about Salina? |
| 18 | A | Dependent still. I would be asking why she is |
| 19 | | traveling 1,000 miles. So, by itself, no, but |
| 20 | | with the totality of the circumstances I can't |
| 21 | | speculate. I don't know. |
| 22 | Q | But there was something about the fact that she |
| 23 | | was traveling to Colorado that was suspicious, |
| 24 | | correct? |
| 25 | A | Not by itself. |

| 1 | Q | Not by itself. But as part of the totality of |
|---|---|---|
| 2 | | the circumstances as you have testified. |
| 3 | A | Correct. |
| 4 | Q | And that's because Colorado is a known narcotics |
| 5 | | hub; correct? |
| 6 | A | Not by itself, no. |
| 7 | Q | As part of your totality -- |
| 8 | A | With everything. |
| 9 | Q | -- of the circumstances? |
| 10 | | Okay. What about the fact that she, |
| 11 | | quote, appeared nervous in her demeanor and would |
| 12 | | not make consistent eye contact with me and |
| 13 | | appeared hesitant with her answers. Can you |
| 14 | | explain that one? |
| 15 | A | Typically, especially after I have already |
| 16 | | explained that I'm just writing a warning, there |
| 17 | | is going to be no tickets, people relax. People |
| 18 | | start looking me in the eyes. We hold more |
| 19 | | cordial conversation and whatnot. But she still |
| 20 | | continued to be hesitant with her answers and |
| 21 | | constantly looked down specifically particularly |
| 22 | | at her feet, not at me, which -- and her demeanor |
| 23 | | from my prior experience was she was extremely |
| 24 | | nervous. |
| 25 | Q | From your prior experience a motorist maintaining |

```
 1        eye contact with you would make you less
 2        suspicious?
 3   A    It depends.  If she was sitting there staring at
 4        you, it would probably be the opposite way.  So
 5        once again, I can't speculate.  Every situation
 6        is different.
 7   Q    So sometimes a motorist staring at you would be
 8        suspicious and sometimes a motorist not looking
 9        at you enough is suspicious?
10   A    It could be.  Correct.
11   Q    Okay.  And you also mentioned the rental cost
12        being over $1,000, and this ks what you brought
13        up your own hypothetical earlier in our
14        conversation which I am assuming is based off of
15        Suzanne Dunn's stop; correct?
16   A    Yes.
17   Q    What about the fact that the rental cost $1,000
18        made you suspicious?
19   A    Well, as stated earlier, a $1,000 rental --
20        probably a handful of times have I seen a $1,000
21        rental unless it's like a box truck or something
22        of that nature.  So that alone -- it is just a
23        very expensive rental.
24                  For the cost that she spent on that
25        rental car, she could have paid to pick up her
```

CHANDLER RULE 7/8/2021

```
1        van and put it on a truck and had it shipped to
2        her.  Off the top of my head, those are the first
3        main things.  I may have more.
4    Q   Did you ask her questions about why she rented a
5        car to drive out there?
6    A   I did.
7    Q   How did she answer those questions?
8    A   I don't specifically remember exactly.  I do
9        remember she stated that she didn't want to fly,
10       I believe, because of Covid, and besides that, I
11       don't remember.
12   Q   Did she give you a satisfactory answer in your
13       training and experience?
14   A   She did give me an answer.  Yes.
15   Q   Was that answer satisfactory to you?
16   A   With the totality of the circumstances, I found
17       them extremely suspicious.
18   Q   Okay.  So is there an answer that she could have
19       given to that question that would have dispelled
20       your suspicions?
21   A   Yes.  But me not being in the situation right
22       now, I don't know if I can answer what that
23       question would be.
24   Q   Well, I want you to think back to the situation
25       you were in.  If there was something that she --
```

```
 1        what could she have said to you at that point in
 2        time that would have made that -- made that
 3        rental less suspicious to you?
 4    A   For instance, now we are talking hypothetically
 5        and speculating, which I -- but if she would have
 6        said something along the lines of -- you know, I
 7        don't like speculating.  I will be honest.
 8    Q   I'm not asking you to speculate.
 9    A   Right.
10    Q   I'm asking you based on your training and
11        experience what she said to you that was not
12        satisfactory.  I'm asking based on your training
13        and experience if there was something she could
14        have said to you that would have been
15        satisfactory.
16    A   I'm sure there are, but me not being in that
17        situation right now, I don't know that I can
18        answer that question.
19    Q   Just putting you back in the exact situation that
20        you were in --
21    A   Right.
22    Q   -- was there anything that she could have said to
23        you about her explanation for driving to Colorado
24        that would have dispelled your suspicions?
25    A   Yes.
```

```
 1   Q   Can you tell me what that thing would have been.
 2   A   For instance, if she was frequently -- she would
 3       had added on, "I have got family in Colorado.  I
 4       go out and see Colorado every year at this time,
 5       but due to the Covid, I wasn't able to fly so I'm
 6       going out to go see my family along with get this
 7       van," that would make more sense to spend $1,000
 8       to go down there.  But for her sole purpose to go
 9       down there to pick up a van for a $1,000 rental,
10       especially with the weather that was coming in
11       that week -- we were expecting a heavy
12       snowstorm -- that is suspicious.
13   Q   So we will talk about the weather in a minute.
14       But it's your testimony that she was going to see
15       family in addition to buying the van, that would
16       have made the $1,000 car rental less suspicious?
17   A   Once again, I'm speculating because I'm not --
18       without me being in the situation, I can't truly
19       answer it.  Being in the moment, I can't truly
20       answer it because I don't remember everything I
21       was seeing and smelling at the time.
22               But, yes, what I gave you as was a
23       reasonable, I believe, explanation.
24   Q   And the fact you also wrote the fact that she was
25       52 years old traveling halfway across the country
```

CHANDLER RULE 7/8/2021

| 1 | | by herself with inclement weather in the forecast |
| 2 | | added to your reasonable suspicion. |
| 3 | A | That's correct. |
| 4 | Q | Why? |
| 5 | A | Okay.  It is very uncommon -- now, not illegal. |
| 6 | | Nothing wrong with it, but it is uncommon, |
| 7 | | especially with inclement weather coming, to see |
| 8 | | people traveling by themselves across the |
| 9 | | country, especially the older they get, less |
| 10 | | likely they are able to do or not able to do it |
| 11 | | but less likely they are willing to do it. |
| 12 | Q | If she was 25, would it have been less suspicious |
| 13 | | for her to be traveling in inclement weather? |
| 14 | A | I would have also found that suspicious. |
| 15 | Q | Why would that have been suspicious? |
| 16 | A | Well, once again, not being in the situation, we |
| 17 | | are speculating.  You're having hypothetical |
| 18 | | questions.  I don't know.  Why would it be |
| 19 | | suspicious for a 25-year-old to be traveling |
| 20 | | across -- is that what you are asking me? |
| 21 | Q | Yes. |
| 22 | A | Because typically, especially on something to |
| 23 | | where she doesn't have -- she is going to go pick |
| 24 | | up another object, right, a van, that is probably |
| 25 | | sitting in a storage shed that doesn't have to be |

| | | |
|---|---|---|
| 1 | | picked up.  So people don't typically choose to |
| 2 | | travel through that inclement weather.  They |
| 3 | | choose to wait, especially if you are buying a |
| 4 | | brand new vehicle, they wait until the inclement |
| 5 | | weather is over and then pick up the vehicle and |
| 6 | | drive it back if they are going to do it. |
| 7 | Q | So let's set the inclement weather aside for a |
| 8 | | minute. |
| 9 | A | Okay. |
| 10 | Q | And just the fact she is a 52-year-old woman |
| 11 | | traveling alone from Arlington to Colorado. |
| 12 | A | Right. |
| 13 | Q | Was the fact that she was a woman traveling alone |
| 14 | | suspicious? |
| 15 | A | No. |
| 16 | Q | Was her age traveling alone suspicious? |
| 17 | A | No. |
| 18 | Q | It was the fact that she was traveling in |
| 19 | | inclement weather that is suspicious? |
| 20 | A | As I stated earlier, it's the totality of the |
| 21 | | circumstances.  It's everything coming or it's |
| 22 | | the whole scope of why it was suspicious. |
| 23 | Q | So I'm just trying to understand how the various |
| 24 | | things that you are pointing to contribute to the |
| 25 | | totality of the circumstances. |

| 1 | A | Right. |
| 2 | Q | That's the conversation I want to have. |
| 3 | | MR. CHALMERS: Ask questions please, |
| 4 | | not give a commentary. |
| 5 | Q | (By Ms. Brett) As part of the totality of the |
| 6 | | circumstances, a 52-year-old woman traveling in |
| 7 | | inclement weather by herself was suspicious; |
| 8 | | correct? |
| 9 | A | Correct. |
| 10 | Q | If Ms. Dunn had a passenger with her traveling in |
| 11 | | inclement weather, would that still have been |
| 12 | | suspicious to you? |
| 13 | A | It would have been less suspicious based off my |
| 14 | | prior experience. |
| 15 | Q | Okay. Is it your prior experience that people of |
| 16 | | that age typically travel in a pair when they are |
| 17 | | driving long distances? |
| 18 | A | Yes. |
| 19 | Q | Okay. Did Ms. Dunn answer all of your questions? |
| 20 | A | She did. |
| 21 | Q | Did she withhold any information from you? |
| 22 | A | I don't know. |
| 23 | Q | You asked to look in her trunk; correct? |
| 24 | A | That's correct. |
| 25 | Q | And how did she respond? |

CHANDLER RULE 7/8/2021

| | | |
|---|---|---|
| 1 | A | She said, "No." |
| 2 | Q | Was the fact that she said "no" suspicious to |
| 3 | | you? |
| 4 | A | No. |
| 5 | Q | And you did, in fact, search -- you did, in fact, |
| 6 | | deploy your canine around Ms. Dunn's car; |
| 7 | | correct? |
| 8 | A | Correct. |
| 9 | Q | And did your canine alert? |
| 10 | A | He did. |
| 11 | Q | What was the alert that your canine showed? |
| 12 | A | So I am going to revert back to my report here. |
| 13 | | "As I began changing directions to |
| 14 | | work PSD Cain in a clockwise motion, Cain began |
| 15 | | showing alerting behavior as he sniffed just |
| 16 | | behind the rear passenger door as he deviated |
| 17 | | from his typical searching pattern.  Cain |
| 18 | | initially would not leave the area" -- excuse me. |
| 19 | | "PSD Cain showed alerting behavior as |
| 20 | | he sniffed just behind" -- "as he paused, |
| 21 | | displayed deep nasal breathing, was extremely |
| 22 | | intense.  He initially would not leave the area |
| 23 | | as I continued to detail in a clockwise motion. |
| 24 | | His behavior was very frantic as I have seen |
| 25 | | numerous times in roadside sniffs when PSD cannot |

| 1 | | locate the exact source of the trained odor.  And |
|---|---|---|
| 2 | | then once again, he displayed or began showing |
| 3 | | alerting behavior after another full rotation. |
| 4 | | He displayed an intense deep nasal breathing, |
| 5 | | began bracketing, between the rear trunk and the |
| 6 | | rear passenger door." |
| 7 | Q | Based on all that, what was PSD Cain's alert that |
| 8 | | he showed? |
| 9 | A | It's all of it. |
| 10 | Q | All of that was an alert? |
| 11 | A | Every time he would go back and display the deep |
| 12 | | nasal breathing, the intense bracketing, all the |
| 13 | | way up to the very point to where he was |
| 14 | | extremely frantic at the passenger door. |
| 15 | Q | Okay.  And based on that alert, you elected to |
| 16 | | search Ms. Dunn's car; correct? |
| 17 | A | That is correct. |
| 18 | Q | Did you find anything in that search? |
| 19 | A | I did not. |
| 20 | Q | Okay.  And, again, do you have an estimate of how |
| 21 | | many times Cain alerts but a search doesn't |
| 22 | | recover any contraband? |
| 23 | A | I do not have an estimate. |
| 24 | Q | I am going to show you what I am marking as -- |
| 25 | | give me one second.  This is going to be |

Case 6:19-cv-01343-KHV  Document 521-2  Filed 05/15/23  Page 85 of 93

```
1        the fact that it was between those destinations?
2    A   I don't remember this incident.
3    Q   Okay.  When you write something like what is
4        listed here, "Odd explanation for travel," what
5        do you mean by that?
6    A   I don't know particularly this incident.  I don't
7        know what I meant.  Without reviewing the video,
8        I don't know.
9    Q   Okay.  So you don't remember anything about --
10   A   No.
11   Q   -- this stop at all?
12   A   I can't.
13   Q   Okay.  Give me just a minute.  Can we go off the
14       record for a minute?
15                  VIDEOGRAPHER:  We are off the record
16       at 12:13.
17                  (Recess taken.)
18                  VIDEOGRAPHER:  Back on the record at
19       12:15.
20   Q   (By Ms. Brett) We are all done for today.  Thank
21       you so much.  I appreciate your patience.
22   A   Of course.
23                       EXAMINATION
24       BY MR. CHALMERS:
25   Q   Trooper, I want to clarify something while we are
```

CHANDLER RULE  7/8/2021

| 1 | | on the record.  If you will take Exhibit 42, |
| 2 | | which was a copy of the Service Dog Report |
| 3 | | concerning Ms. Dunn.  Do you have that? |
| 4 | A | I do. |
| 5 | Q | I think you were asked only to focus on what was |
| 6 | | articulated in the report and not to try to |
| 7 | | explain how those things fit together for the |
| 8 | | reasonable suspicion you formed.  I may have |
| 9 | | misunderstood.  I don't know.  But what I want |
| 10 | | you to do is try to describe putting these |
| 11 | | things together in the totality of the |
| 12 | | circumstances what it was that you felt gave you |
| 13 | | reasonable suspicion for a dog sniff.  Would you |
| 14 | | do that? |
| 15 | A | Absolutely.  So she was traveling from Arlington, |
| 16 | | Virginia, which we already stated is a large |
| 17 | | metropolitan area, going to Denver, Colorado, by |
| 18 | | herself to travel 1,677 miles to pick up a van. |
| 19 | | Right off the bat, I found it -- I found it odd |
| 20 | | that she was going to travel that far to buy a |
| 21 | | van that she stated she couldn't find anywhere |
| 22 | | else.  Anyone who has drove through the eastern |
| 23 | | parts of the States know there's camping all over |
| 24 | | the place, and that people -- because this was a |
| 25 | | particular camping van she was going after.  So I |

1    found it very odd that the only place she could
2    find this van to camp in was in Colorado.
3                As I stated earlier, she had extremely
4    nervous behavior. On top of that, she left her
5    right turn signal on during the entire traffic
6    stop, which by itself doesn't sound like
7    anything, but I have seen it time and time again
8    that the only people that typically leave their
9    right turn signal on are so nervous that they
10   don't hear it blinking. And usually they are
11   nervous because of something criminal that is
12   going on.
13               Just for an example, if you sit in
14   your car and turn your turn signal on, you are
15   going to hear it tick, tick, tick, tick, tick
16   over and over, and it's going to annoy you to
17   death. So typically during a traffic stop, once
18   I explain I'm just giving them a warning, they
19   turn the turn signal off. And then so as I go
20   back, I sit in my car for several minutes writing
21   her a warning, she continued to have that turn
22   signal on just to show her nervous behavior.
23               The rental cost was over
24   $1,000, which, as I stated earlier, is an
25   extremely expensive rental, and I have only seen

```
 1   it a handful of times.  For the amount she spent,
 2   she could have -- she could have paid someone to
 3   drive it.  She could have put it on a truck and
 4   had it shipped to her rather than going down
 5   there.  All of that, with the totality of the
 6   circumstances, with her driving by herself at
 7   52-year-olds to go pick up a car with inclement
 8   weather led to me having reasonable suspicion.
 9  Q  There in your report at Exhibit 42 you reference
10   a lived-in appearance.  Did that play into this
11   reasonable suspicion and if so how?
12  A  It just showed she was making very -- it showed
13   that she was making a hard travel trip.
14   Typically people involved, especially in drug
15   trafficking, travel quickly and without stopping
16   or resting from Source A to Source B because they
17   are sleeping their cars.  They are eating in
18   their cars, and that is the appearance the car
19   gave.
20           MR. CHALMERS:  I don't have any other
21   questions at this time.  Thank you.
22                   EXAMINATION
23   BY MS. BRETT:
24  Q  I just have one or two quick follow-ups on that.
25   You mentioned in your earlier testimony again
```

| 1 | | that it would make more sense to ship the car; |
|---|---|---|
| 2 | | correct? |
| 3 | A | Correct. |
| 4 | Q | How do you know how much it costs to ship a car |
| 5 | | from Denver to Arlington? |
| 6 | A | Because I have stopped car haulers. |
| 7 | Q | Because you have what? |
| 8 | A | I have stopped car haulers in the past that have |
| 9 | | bill of ladings that would show how much a car |
| 10 | | would cost. |
| 11 | Q | Okay. And how do you typically price out what a |
| 12 | | car rental should cost? |
| 13 | A | Typically we are talking about just averages in |
| 14 | | general. I don't have a chart per se to follow. |
| 15 | | But $1,000 for a rental is expensive. You can |
| 16 | | ask anyone that and they would agree. |
| 17 | Q | Are you aware that during Covid pandemic car |
| 18 | | rental prices are much higher than they typically |
| 19 | | are? |
| 20 | A | Yes. But I was still working the road at the |
| 21 | | time, and $1,000 was still high. |
| 22 | Q | Even for your stops during the pandemic for |
| 23 | | rental cars? |
| 24 | A | It is all dependent on the situation. Like if |
| 25 | | she was planning on staying down there for a |

**CHANDLER RULE  7/8/2021**

```
1                    C E R T I F I C A T E

2

3   STATE OF KANSAS      )
                         )  SS.
4   COUNTY OF CHASE      )

5

6            I, VICKI R. KUNKEL, a Certified Shorthand
    Court Reporter, authorized by law to take depositions
7   anywhere in the State of Kansas, do certify that
    pursuant to Notice of Deposition, at the offices of
8   Office of the Attorney General, 120 SW 10th Avenue,
    2nd Floor, Topeka, Kansas 66612,

9
                         CHANDLER RULE
10
    came before me, was by me duly sworn to testify the
11  whole truth of his knowledge of the matters in
    controversy aforesaid, was examined and his
12  examination then written in shorthand by me and
    afterwards typed, the reading and signing of the
13  deposition being expressly requested; and said
    deposition is herewith returned.
14
             I further certify that I am not counsel,
15  attorney, or relative of either party, or clerk or
    stenographer of either party, or otherwise interested
16  in the event of this suit.

17           IN TESTIMONY WHEREOF, I have hereunto set
    my hand and seal this 27th day of July, 2021.
18

19

20

21                        _____
                          Vicki R. Kunkel, KS CSR 413
22                        Certified Shorthand Reporter

23

24

25
```

```
 1                      ALARIS LITIGATION SERVICES
 2
 3     July 27, 2021
 4
       MR. ARTHUR CHALMERS
 5     OFFICE OF THE ATTORNEY GENERAL
       120 SW 10th Avenue
 6     Topeka, Kansas 66612

 7     IN RE: BLAINE FRANKLIN SHAW, et al. v. HERMAN
                JONES in his official capacity as the
 8              Superintendent of the Kansas Highway
                Patrol, et al.
 9     --------------------------------------------
                MARK ERICH, SHAWNA MALONEY, individually and
10              as mother and natural guardian of minors D.M.
                and M.M. v. HERMAN JONES, KHP Superintendent
11
       Dear Mr. Chalmers:
12
       Please find enclosed your copies of the deposition of
13     CHANDLER RULE taken on July 8, 2021 in the
       above-referenced case. Also enclosed is the original
14     signature page and errata sheets.

15     Please have the witness read your copy of the
       transcript, indicate any changes and/or corrections
16     desired on the errata sheets, and sign the signature
       page before a notary public.
17
       Please return the errata sheets and notarized
18     signature page within 30 days to our office at 711 N
       11th Street, St. Louis, MO 63101 for filing.
19
20     Sincerely,
21
22
23     VICKI R. KUNKEL
24
25     Enclosures
```

```
1                          ERRATA SHEET
         Witness Name: CHANDLER RULE
2        Case Name: BLAINE FRANKLIN SHAW, et al. v. HERMAN
                    JONES in his official capacity as the
3                   Superintendent of the Kansas Highway
                    Patrol, et al.
4        -------------------------------------------
                    MARK ERICH, SHAWNA MALONEY, individually and
5                   as mother and natural guardian of minors D.M.
                    and M.M. v. HERMAN JONES, KHP Superintendent
6        Date Taken: JULY 8, 2021

7        Page #_____   Line #_____
         Should read: _____
8        Reason for change: _____

9        Page #_____   Line #_____

10       Should read: _____

11       Reason for change: _____

12

13       Page #_____   Line #_____

14       Should read: _____

15       Reason for change: _____

16

17       Page #_____   Line #_____

18       Should read: _____

19       Reason for change: _____

20

21       Page #_____   Line #_____

22       Should read: _____

23       Reason for change: _____

24

25       Witness Signature: _____
```

**CHANDLER RULE  7/8/2021**

```
 1    STATE OF _____ )

 2

 3    COUNTY OF _____ )

 4

 5    I, CHANDLER RULE, do hereby certify:

 6           That I have read the foregoing deposition;

 7           That I have made such changes in form

 8    and/or substance to the within deposition as might

 9    be necessary to render the same true and correct;

10           That having made such changes thereon, I

11    hereby subscribe my name to the deposition.

12           I declare under penalty of perjury that the

13    foregoing is true and correct.

14           Executed this _____ day of _____,

15    20___ , at _____.

16

17

18

19                             _____

20                             CHANDLER RULE

21

22                             _____

23                             NOTARY PUBLIC

24    My Commission Expires:

25
```

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that a copy of the foregoing APPELLANT'S APPENDIX, as submitted in digital form is an exact copy of the document filed with the Clerk.

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2024, the foregoing APPELLANT'S APPENDIX was electronically filed with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I also certify that within five business days of the issuance of notice that the electronic filing is compliant, one paper copy will be delivered by Federal Express to the Clerk's Office.


DATED: April 24, 2024                    /s/ Kurtis K. Wiard