# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

BLAINE FRANKLIN SHAW, et al.,
*Plaintiffs-Appellees,*

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

———

MARK ERICH, et al.,
*Plaintiffs-Appellees,*

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

## APPELLANT'S APPENDIX VOLUME XXII

Appeal from the United States District Court for the District of Kansas
Honorable Kathryn H. Vratil, Senior District Court Judge
District Court Case Nos. 19-CV-1343-KHV and 20-CV-1067-KHV-GEB

**OFFICE OF ATTORNEY GENERAL
KRIS W. KOBACH**

120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
(785) 296-2215
anthony.powell@ag.ks.gov
dwight.carswell@ag.ks.gov
kurtis.wiard@ag.ks.gov

Anthony J. Powell
 *Solicitor General*
Dwight R. Carswell
 *Deputy Solicitor General*
Kurtis K. Wiard
 *Assistant Solicitor General*

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

Transcript of Deposition Designations (Continued)
(ECF No. 521) ...................................................................... 1

```
 1          IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF KANSAS
 2

 3

 4    BLAINE FRANKLIN SHAW, et al.,

 5
               Plaintiffs,
 6
                                   Case No.
 7     vs.                         19-1343-KHV-GEB

 8
      HERMAN JONES in his official
 9    capacity as the
      Superintendant of the Kansas
10    Highway Patrol, et al.,

11
               Defendants.
12    _____

13    MARK ERICH, SHAWNA MALONEY,
      Individually and as mother
14    and natural guardian of
      minors DM and MM,
15                                 Case No.
                                   20-1067-KHV-GEB
16             Plaintiffs,

17     vs.

18    HERMAN JONES, KHP Superintendent,

19
               Defendants.
20

21

22    VIDEOTAPED DEPOSITION OF LIEUTENANT GREG JIRAK

23

24                 July 20, 2021

25
```

U. S. District Court of Kansas
19-1343-KHV-GEB
PLAINTIFF TRIAL EXHIBIT NO.
139

Case 6:19-cv-01343-KHV   Document 521-3   Filed 05/15/23   Page 1 of 84

## LIEUTENANT GREG JIRAK  7/20/2021

```
 1              (Deposition commenced at 9:04 a.m.)
 2                   THE VIDEOGRAPHER:  We are now on the
 3      record.  Today's date is July 20th, 2021, and the
 4      time is 9:04.
 5                   This is the video-recorded deposition
 6      of Greg Jirak in the matter of Blaine Franklin Shaw,
 7      et al., versus Herman Jones, et al., Case No. 191343
 8      in the US District Court for the District of Kansas.
 9                   This deposition is being held at 120
10      Southwest 10th Avenue in Topeka, Kansas.
11                   The reporter's name is Sarah Davison.
12                   My name is Dedric Moore.  I'm the legal
13      videographer.
14                   We are with Alaris Litigation Services.
15                   Would the attorneys present please
16      introduce themselves and the parties they represent.
17                   MR. McINERNEY:  I am Pat McInerney on
18      behalf of the plaintiffs.
19                   MR. PIERSON:  And I'm Josh Pierson on
20      behalf of the plaintiffs.
21                   MR. CHALMERS:  Arthur Chalmers on
22      behalf of the defendants.
23                   Luther, do you want to introduce
24      yourself as well?
25                   MR. GANIEANY:  I'm Luther Ganieany.
```

```
 1    I'm the general counsel for the Kansas Highway
 2    Patrol.
 3                THE VIDEOGRAPHER:  Will the court
 4    reporter please swear in the witness.
 5                        GREG JIRAK,
 6    being first duly sworn, testified under oath as
 7    follows:
 8                        EXAMINATION
 9    BY MR. McINERNEY:
10          Q.   Good morning, sir.
11          A.   Good morning.
12          Q.   We just met.  My name is Pat McInerney,
13    I'm one of the lawyers for the plaintiffs in this
14    case.  I don't think you and I have met before.
15               What I'd first like to do is walk
16    through some ground rules for the deposition.  If
17    you have any questions, obviously you can ask them,
18    and then we'll proceed from there.
19               Have you ever had your deposition
20    taken?
21          A.   Yes.
22          Q.   How many times roughly?
23          A.   At least once.
24          Q.   Okay.  Was that recently or has it been
25    a while?
```

Case 6:19-cv-01343-KHV   Document 521-3   Filed 05/15/23   Page 4 of 84

```
 1          A.   Yes.
 2          Q.   And without telling me at all what was
 3   said, did you also review documents in preparation
 4   for this?
 5          A.   Yes.
 6          Q.   What documents did you review?
 7          A.   Just roughly yesterday about 11:00 I
 8   got an e-mail that had attachments of kind of
 9   guidelines for giving depositions.  There were some
10   K9 reports that had my name on it.  I think the
11   original filing of the lawsuit was also attached.
12          Q.   Anything else that you can remember?
13          A.   There was a letter from our
14   professional standards unit attached.
15          Q.   Do you remember anything more about the
16   letter?
17          A.   It was a response to a complaint by a
18   citizen about my conduct.
19          Q.   Okay.  We'll talk about that.
20               Was yesterday the first time that you
21   had reviewed the complaint in this case?
22          A.   No, I had seen it before.
23          Q.   Okay.  How long have you been a Kansas
24   Highway Patrol employee?
25          A.   More than 34 years.
```

App. Vol. XXII, 4

1    college?

2         A.    31 years.

3         Q.    I'm sorry, that was a poorly asked

4    question.  I'll do that again, too.

5              Between the time you graduated from

6    high school and the time you started college, how

7    much time?

8         A.    When we're talking about college, I had

9    credits from the highway patrol academy.

10        Q.    Okay.

11        A.    For junior college credits.  I finished

12   up my junior college degree at Colby, I'm going to

13   say 1992, thereabouts.  And then I went back to

14   school to pick up my bachelor's degree at Central

15   Christian College of Kansas in 2012, graduated 2014.

16        Q.    Thank you.

17              When you graduated from high school,

18   was that the time that you did the jobs that you

19   just described, some of the pipeline work and the

20   waste hauling, things like that?

21        A.    Yes.

22        Q.    Okay.  When did you enter the Kansas

23   Highway Patrol academy?

24        A.    In June of 1987.

25        Q.    And how long was the academy?

LIEUTENANT GREG JIRAK  7/20/2021

1           A.    I think it was 16 or 18 weeks.

2           Q.    When did you -- I'll let you do the

3    math on this.

4                 When did you first become a Kansas

5    Highway Patrol trooper?

6           A.    Day one of the academy, which would

7    have been June 18th, 1987.

8           Q.    And when you graduated from the academy

9    either 16 or 18 weeks later, what was your first

10   assignment?

11          A.    My first duty assignment physically was

12   in Colby, Kansas for the purposes of field training.

13          Q.    And how long did your field training

14   period last?

15          A.    Approximately three months.  And then

16   my permanent duty station was Oakley, Kansas.

17          Q.    Where were you living at the time you

18   had that first duty assignment?

19          A.    I moved to Colby for field training,

20   and then I think it was around November 1st of 1987

21   when I moved to Oakley.

22          Q.    And your current assignment is what,

23   sir?

24          A.    I'm a first line supervisor, hold the

25   rank of lieutenant in Troop N, which is our criminal

Case 6:19-cv-01343-KHV   Document 521-3   Filed 05/15/23   Page 7 of 84

1    interdiction squad.  It's formally known as DHET,

2    domestic highway enforcement team.

3                 THE REPORTER:  I'm sorry, would you

4    repeat that?  Domestic highway --

5                 THE WITNESS:  Enforcement team.

6                 THE REPORTER:  And you said N or M?

7                 THE WITNESS:  N.

8                 THE REPORTER:  Thank you.

9    BY MR. McINERNEY:

10              Q.    And how long have you been assigned to

11   Troop N?

12              A.    Since 2009.

13              Q.    Are you the -- would you be referred to

14   as the commander of Troop N?

15              A.    No.

16              Q.    Who is the commander of Troop N?

17              A.    Captain Brent Hogelin, H-O-G-E-L-I-N.

18              Q.    Do you -- in addition to your

19   responsibilities as lieutenant with Troop N, do you

20   also have other training or continuing education

21   responsibilities?

22              A.    Yes.  Through the agency we have

23   inservice classes.  A minimum of 40 hours a year.

24   And my yearly training far exceeds that.

25              Q.    Do you conduct training as well?

App. Vol. XXII, 7

```
 1              A.    Sometimes.
 2              Q.    Okay.   What kind of training do you
 3    conduct?
 4              A.    We will have -- at least once a quarter
 5    we'll have some scenario-based training, some
 6    legislative update training, along with our range
 7    qualifications.   That's at least once a quarter.
 8              Q.    And what -- do you teach all three of
 9    those components, or what do you teach?
10              A.    No.   We have a range master so I'm not
11    part of that.   But as far as the ongoing training,
12    you know, looking at case law and maybe
13    scenario-based training, then I'm usually in charge
14    of that.
15              Q.    Okay.   Who do you work with on the
16    legislative and case law update training?
17              A.    Typically that's a trickle down from
18    our KHP legal staff.
19              Q.    So when it comes to -- well, correct me
20    if I'm wrong here.   When it comes to providing case
21    law or legislative updates to other troopers, that's
22    you doing the presentation?
23              A.    Yes.
24              Q.    Okay.   And typically is that a -- is
25    that a gathering, do you gather people in a room
```

1    like this and do a -- kind of a personal

2    presentation or is it done via e-mail or PowerPoint

3    or what?

4        A.   It's in person.

5        Q.   And do you utilize PowerPoints?

6        A.   No.

7        Q.   What do you do?  How do you conduct it?

8        A.   Typically I'll find something that I

9    think is relevant to what we're doing and we'll

10   discuss those cases.

11       Q.   And when you say that you have

12   assistance from the legal staff, is that the

13   Attorney General's Office or is that someone inside

14   KHP?

15       A.   Our KHP.  Most of the time it's from

16   Luther or Sarah Washburn --

17       Q.   Okay.

18       A.   -- that will get timely, I think.

19       Q.   Prior to -- scratch that.

20           When did you achieve the rank of

21   lieutenant?

22       A.   In 2000.

23       Q.   And prior to that, what rank did you

24   hold?

25       A.   I was a trooper.

LIEUTENANT GREG JIRAK 7/20/2021

1          Q.     In your capacity as a lieutenant when

2    you achieved that rank in 2000, where were you

3    assigned?

4          A.     I was a zone commander in Oakley for

5    Logan, Gove and Trego Counties.

6          Q.     And how long did you hold that position?

7          A.     Until I transferred into the Troop N,

8    which was 2009.

9          Q.     When you first transferred into Troop

10   N, what were your duties and responsibilities?

11         A.     I was a zone commander, which meant

12   that I was supervising personnel on a geographic

13   basis, in those three counties that I mentioned

14   earlier, providing schedule and evaluating

15   troopers' --

16         Q.     And as I understand --

17         A.     -- performance.

18         Q.     I'm sorry.  I stepped --

19         A.     Performance.  I'm sorry.

20         Q.     Thank you.

21                As I understand Troop N, as you

22   mentioned, it's the interdiction squad.  They are --

23   they have a presence that's not limited to a

24   geographic area in Kansas, correct?

25         A.     That's correct.

```
 1              Q.   As a -- as a lieutenant in Troop N
 2    today, do you have a particular geographic
 3    assignment within Troop N?
 4              A.   I supervise the -- the D head troopers
 5    in the western portion of the state.
 6              Q.   Western half of the state?
 7              A.   Pretty close.
 8              Q.   All right.  And how many troopers do
 9    you supervise?
10              A.   Currently four.
11              Q.   How big's the interdiction squad -- or
12    excuse me.
13                   How big is Troop N?
14              A.   Troop N consists of the D head teams
15    east and west, but it also encompasses the DEA.  We
16    have an intelligence unit, our FBI task force folks
17    are under the Troop N command staff.
18              Q.   So do you -- I'm sorry.
19                   Were you going to say something else?
20              A.   I think we might have a Fusion Center
21    employee, I think he's part of Troop N, too.  That's
22    the statewide intelligence.
23              Q.   Okay.  You call it the Fusion Center?
24              A.   Yes.
25              Q.   Okay.  Sounds like an intelligence
```

```
 1    analyst or someone?
 2         A.   Yes.
 3         Q.   Okay.  So all told, federal agents,
 4    state agents, about how many personnel in Troop N?
 5         A.   There's probably 22 or 23.  And I'm
 6    going to add two -- one National Guard guy and one
 7    civilian intelligence analyst.
 8         Q.   Is that a joint command situation that
 9    is federal command as well as state command?
10         A.   I'm not sure I understand your
11    question.
12         Q.   Well, you mentioned a number of federal
13    agencies that assist you in Troop N doing
14    interdiction work, FBI, DEA, etc.  I'm just curious
15    about the command structure.  Do they have a
16    separate command that's federal and your
17    responsibility is limited to state agents or how
18    does that work?
19         A.   I would say they have a parallel
20    command.  They're troopers first.  They have a --
21         Q.   Okay.
22         A.   -- KHP supervisor, but they also work
23    under the command structure of the FBI or the DEA.
24         Q.   Okay.  So they're -- I'm going to use
25    the term "cross designated."  You have KHP troopers
```

Case 6:19-cv-01343-KHV   Document 521-3   Filed 05/15/23   Page 13 of 84

 1   working group worked on drafting those proposed

 2   legislative.

 3           Q.    And was that ultimately successful with

 4   regard to the pseudoephedrine legislation?

 5           A.    Yes.

 6           Q.    Do you remember what year that was?  I

 7   mean the advisory team I noticed was 2010.  Do you

 8   remember when the legislation was enacted roughly?

 9           A.    Shortly after.

10           Q.    Okay.

11           A.    Maybe 2011 or '12.

12           Q.    So today we talked a little bit about

13   your current assignment in Troop N.  As your job

14   exist today, as your duties and responsibilities

15   exist today, can you describe them for me?  What is

16   your job about?

17           A.    Roughly 40% of my time is spent on the

18   road working traffic like the troopers that I

19   supervise.

20                 The other percentages are evaluating,

21   making schedules.  Various administrative tasks that

22   a first line supervisor would have.

23           Q.    What kind of evaluating do you do?

24           A.    I do yearly evaluations.  And, of

25   course, I'm always collecting information over the

 1    course of that review period for one year.

 2         Q.    And who do you do yearly evaluations

 3    of?

 4         A.    Technical Trooper Jerrad Goheen,

 5    Technical Trooper James McCord, Technical Trooper

 6    Phillip Scott Baker, Technical Trooper James Cody

 7    Par.

 8         Q.    Anyone else?

 9         A.    That's it.

10         Q.    Are those the four technical troopers

11    under your command?

12         A.    Yes.

13         Q.    The other troopers that you -- I

14    understand you supervise more than just those four,

15    correct?

16         A.    That is not correct.

17         Q.    Okay.  So your supervision

18    responsibilities are limited to the four people that

19    you just listed, correct?

20         A.    That is correct.

21         Q.    And they are evaluated annually?

22         A.    Yes.

23         Q.    When you -- when you track -- excuse

24    me.

25              When you evaluate their performance as

1    technical troopers, what do you take into
2    consideration?
3              A.    I look at their activities, I look at
4    the criminal cases that they initiate, I look at the
5    suitability of those cases to be prosecuted.  I
6    check accident reports that they work.  And I'll
7    have a hand in if there's a violator complaint.  Do
8    the scheduling.
9              Q.    Those different elements that you
10   listed, are those tracked?  Is that information
11   collected so you can take a look at it before or
12   while you're doing evaluation of your charges?
13             A.    Yes.
14             Q.    For instance, are the number -- if
15   you're evaluating one of these technical troopers,
16   do you take a look at the number of traffic stops?
17             A.    Yes.
18             Q.    How's that information collected?
19             A.    It's a system called digiTICKET that
20   electronically the form is filled out for tickets
21   and/or warnings.  And it's a computer system that
22   I'm able to tap into to specifically look at those
23   activities for each individual trooper.
24             Q.    Okay.  So you're able to, for lack of a
25   better term, login to digiTICKET and if you're

```
 1    reviewing one particular trooper, to recover
 2    statistics from that trooper's activities for the
 3    last year?
 4         A.   Yes.
 5         Q.   Okay.  So you track number of stops,
 6    correct?
 7         A.   Yes.
 8         Q.   Do you track number of detentions?
 9         A.   No.
10         Q.   Do you track or evaluate the number of
11    K9 searches that are conducted?
12         A.   No.
13         Q.   Do you evaluate or track the number of
14    drug recoveries?
15         A.   Yes.  Any time there's a drug seizure,
16    I -- I need to review that report and submit it to
17    my superiors.
18         Q.   So I'm just -- I'm just talking about
19    the evaluation process right now.
20         A.   Yes.
21         Q.   So when you're evaluating any one of
22    these four gentlemen that are under your command,
23    the number of drug recoveries is one of the
24    criteria, right?
25         A.   Yes.
```

```
 1              A.   That same system.  When I talk system,
 2    we have one of our asset forfeiture folks that
 3    collects that data.
 4              Q.   Okay.  Who is that asset forfeiture
 5    person?
 6              A.   Kirk Simone.
 7              Q.   And he works for the highway patrol?
 8              A.   He does.
 9              Q.   When you are doing a trooper evaluation
10    and you're looking at the number of arrests, is
11    there a difference between felony and misdemeanor
12    citations or arrests?
13              A.   Yes.
14              Q.   More -- more credit, so to speak, for
15    felony arrests?
16              A.   Not sure what you mean by "credit."
17              Q.   Well, let me ask you a better question.
18              When you're evaluating these troopers,
19    is it a positive thing in their evaluation that they
20    have a higher number of seizures, arrests, searches,
21    etc.?
22              A.   Yes.
23              Q.   How do you -- how do you give weight to
24    those things?
25              A.   I mention those numbers in their
```

 1    evaluation.  Our evaluation system has two levels.
 2    One is fails to meet expectations and the other one
 3    is meets or exceeds expectations.
 4          Q.   So A or F kind of?  I mean, you're
 5    either passing or you're not?
 6          A.   Yes.
 7          Q.   Fair to say?  Okay.
 8               So are there -- are there certain goals
 9    that troopers under your supervision have?  For
10    instance, do you say to a trooper during an
11    evaluation, look, in the next 12 months, given your
12    prior activity and given what your job is, we're
13    looking for you to make X number of seizures?
14          A.   No.
15          Q.   Do you do anything like that with
16    regard to the number of arrests?
17          A.   No.
18          Q.   So if -- if -- if I'm under your
19    command, I'm one of your troopers, and I -- my
20    number of felony arrests is lower than anybody else
21    under your supervision, do you help me set goals
22    when it comes to number of arrests?
23          A.   No, I'm not ever going to put a number
24    on it.
25          Q.   Okay.  Is there any sort of a reward

 1    for troopers who consistently maintain quality

 2    arrests, quality seizures, large seizures?

 3              A.    There's a commendation process, so I

 4    guess it would be a praise-driven reward system.

 5              Q.    How's that commendation system work

 6    from your standpoint as a supervisor?

 7              A.    For example, if somebody does a really

 8    good job, I might forward that information to my

 9    supervisor.  And it would be up to him to issue a

10    commander's commendation.  If it's even more

11    dramatic than that, then there might be a mention or

12    a letter from the superintendent's office.

13              And then during the year, too, I have

14    the opportunity to -- to nominate folks for various

15    state or national awards.

16              Q.    Do you know whether any of those

17    commendations or awards that you may nominate your

18    supervisees for comes with any sort of monetary

19    incentive?

20              A.    There's one that I can think of, and

21    that is the employee of the quarter.  I think it's a

22    $500 cash reward.

23              Q.    And is that available to -- well, let

24    me rephrase that.

25              Is employee of the quarter for the KHP?

LIEUTENANT GREG JIRAK  7/20/2021

1          A.    Yes, civilian and sworn.

2          Q.    Okay.  You answered my next question.

3                So it's not limited to just troopers?

4          A.    It's not.

5          Q.    So once you conduct these evaluations

6     of the troopers, the technical troopers under your

7     command as you described a little bit earlier, what

8     do you then do with those evaluations?

9          A.    Those are forwarded to my supervisor

10    for his input and then they're sent back down to me.

11    And then I'll go over that evaluation with that

12    employee.

13         Q.    Do you and your supervisor meet and

14    discuss the individual troopers or is it more of an

15    electronic communication?

16         A.    Electronic.

17         Q.    Who's your supervisor?

18         A.    Captain Brent Hogelin.

19         Q.    You already answered that.  Thanks for

20    saying that again.

21                And then in turn does Captain Hogelin

22    evaluate you?

23         A.    He does.

24         Q.    Based on what?

25         A.    Based on my ability to lead my unit.

1          Q.    What does he look at -- if you know,
2    what does he look at specifically in terms of the
3    criteria for analyzing whether you're doing a good
4    job?
5          A.    You know, some of the things that are
6    mentioned on my review will be my interpersonal
7    relations with the people I supervise.  One of the
8    things might also be am I appropriately recommending
9    them for recognition.  I'm just -- I'm racking my
10   brain.  I'm trying to think what -- exactly what he
11   has on it.  That's the crux of my evaluation right
12   there.
13         Q.    Do you have to do a self evaluation
14   before Captain Hogelin does your evaluation?
15         A.    No.
16         Q.    And then when he goes through these
17   categories and evaluates your performance, do you
18   get an overall score?
19         A.    A numeric score?
20         Q.    Yes.
21         A.    No.
22         Q.    Do you get any other kind of a score?
23         A.    I think you said A or F.
24         Q.    Okay.
25         A.    Yes.

Case 6:19-cv-01343-KHV   Document 521-3   Filed 05/15/23   Page 22 of 84

1           Q.   Have you ever had a less than
2    satisfactory evaluation?
3           A.   I have not.
4           Q.   Ever been awarded a raise or a one-time
5    incentive payment based on performance?
6           A.   No.
7           Q.   Ever been, I think you said, employee
8    of the quarter?
9           A.   No.
10          Q.   What bearing, if any, does disciplinary
11   action have on a trooper's evaluation?
12          A.   A disciplinary action can move an
13   employee into the unsatisfactory category.
14          Q.   It's not automatic?
15          A.   No.
16          Q.   If there's a sustained complaint
17   against a trooper, is that trooper automatically
18   moved to the unsatisfactory category?
19          A.   No.
20          Q.   What determines whether the trooper is
21   moved to the unsatisfactory category?
22          A.   It will be a totality of his -- his or
23   her performance.
24          Q.   And what goes into that totality?
25          A.   Misconduct, obviously.  Failure to make

Case 6:19-cv-01343-KHV Document 521-3 Filed 05/15/23 Page 23 of 84

 1    efficient use of their work hours.  Those would be
 2    the two things that I could think of right off the
 3    top.
 4            Q.   Okay.  Let's talk about the
 5    disciplinary element of it.  Does the severity of
 6    the violation matter?
 7            A.   It could.
 8            Q.   Who makes that decision?  Or a better
 9    question is, who makes that recommendation?
10            A.   Those -- that type of decision would be
11    made by upper command staff.  And when I talk about
12    that, I'm a lieutenant, I answer to a captain, my
13    captain answers to a major, which I think there's
14    five now, right.  And then the majors report to the
15    lieutenant colonel and the lieutenant colonel
16    reports to the colonel.  And typically those --
17    if -- if an unsat review were to happen, it would be
18    reviewed by at least the major, if not the
19    lieutenant colonel.
20            Q.   So as a first line supervisor for,
21    again, these four technical troopers, it is or it's
22    not your responsibility to recommend an
23    unsatisfactory where the conditions warrant it?
24            A.   It would be if that were to occur.
25            Q.   Okay.  And so you exercised some

```
 1    independent judgment in doing that, correct?
 2           A.   Yes.
 3           Q.   Have you ever done that?
 4           A.   An unsat?
 5           Q.   Yes.
 6           A.   No.
 7           Q.   And you've been supervising troopers
 8    since 2000?
 9           A.   Yes.
10           Q.   Okay.  Ever had a trooper under your
11    command be removed from service for violation of
12    policy or law?
13           A.   No.
14           Q.   Ever had a trooper under your command
15    suspended for the same thing?
16           A.   No.
17           Q.   As I understand, Lieutenant, a
18    suspension decision is not yours alone, correct?
19           A.   That's correct.  If a suspension were
20    to occur, I would have very little input.
21           Q.   It would be a recommendation, but then
22    it would escalate up the chain; is that fair?
23           A.   That is fair.
24           Q.   How far up?
25           A.   Lieutenant colonel.  Major, lieutenant
```

1          A.   Your basic police stuff.  You're going

2    to talk about search and seizure, first aid,

3    accident investigation.  There's --

4          Q.   Okay.

5          A.   Police stuff.

6          Q.   Let's talk about continuing education.

7    I think you mentioned early on that there's a

8    continuing education requirement for troopers,

9    correct?

10         A.   Yes.

11         Q.   And it's 40 hours per year?

12         A.   Yes.

13         Q.   Who determines the curriculum?

14         A.   The Kansas Highway Patrol Training

15   Center.

16         Q.   And generally -- well, let me ask you

17   this:  Describe the kind of continuing education

18   that you've received from the -- the training -- I'm

19   sorry, the -- you just named it, what's the

20   facility?

21         A.   Kansas Highway Patrol Training Center.

22         Q.   Thank you.

23              Describe the kind of continuing

24   education you received from the Kansas Highway

25   Patrol Training Center, please.

Case 6:19-cv-01343-KHV   Document 521-3   Filed 05/15/23   Page 26 of 84

1      A.    Every year there will be an inservice

2   class, and included in that inservice class will be

3   recertification on those risk areas like pursuit

4   driving, tactical vehicle intervention, defense

5   tactics.  You'll also be recertifying on CPR and

6   first aid.  There's always an awareness class on

7   communicable diseases.  There's always a

8   headquarters wrap session.  There's always legal

9   updates, search and seizure updates.

10             And then there'll be, you know, a

11   number of classes that aren't offered every year,

12   but they're considered germane by the training

13   staff.

14      Q.    For instance?

15      A.    Well, COVID kind of threw us off our

16   game, so there were a number of classes that were

17   offered online over this last period.  You know,

18   previous to that, there were classes on identifying

19   counterfeit goods.

20      Q.    Are there training classes that are

21   specific to your assignment?  I mean, you're in

22   Troop N, so you spend your time on interdiction

23   work.  Are there classes that are specific to that

24   assignment?

25      A.    To the patrol in general, yes.

```
 1    search and seizure case or the kind of cases that
 2    we're -- that we'll be talking about, does that
 3    information always run through legal before it's
 4    filtered down to you and the other KHP people?
 5         A.   No.
 6         Q.   Let me show you what's marked for
 7    identification as Exhibit Number 64.
 8              MR. McINERNEY:  And the OAG reference
 9    is 22453.  It's about the sixth tab from the back.
10              (Jirak Exhibit Number 64 was marked
11              for identification by Mr. McInerney.)
12              MR. McINERNEY:  Hand that to the
13    witness, please.
14              THE WITNESS:  Sixth page from the back?
15    BY MR. McINERNEY:
16         Q.   No.  I'm sorry, sir.  I was doing the
17    reference for Mr. Chalmers.
18         A.   Oh, sorry.
19         Q.   It's the sixth tab from the back.
20              I'll tell you at the outset, this is an
21    incomplete exhibit -- or an incomplete version of a
22    PowerPoint presentation.  What I'd like you to do is
23    take a look at the first three or four pages, then
24    I'll ask you some questions and we can go into some
25    detail about other parts of it.
```

1          A.     I'm familiar with this PowerPoint.

2          Q.     I'm sorry?

3          A.     I'm familiar with this PowerPoint.

4          Q.     Okay.   **The very first page of that**

5    **is a -- appears to be an e-mail from John Rule to**

6    **several people, including you, from October of last**

7    **year; is that right?**

8          A.     Yes.

9          Q.     **And who's Mr. Rule?**

10         A.     He's my counterpart for the eastern

11   part of the state, first line supervisor for Troop

12   N.

13         Q.     Okay.  **And what is this, what follows**

14   **that e-mail?**

15         A.     This is a copy of the -- it says slide

16   show, but I think it was a PowerPoint presentation

17   that Lieutenant Rule was going to -- looking for

18   input on as he was teaching the advanced criminal

19   interdiction class at the Kansas Highway Patrol

20   Training Center.

21         Q.     Okay.  **The advanced class is offered**

22   **how often?**

23         A.     Roughly every year.  And that class is

24   a promotional class.  In other words, it's required

25   of our troopers before they reach five years of

1      service in order to be eligible -- might be four

2      years now -- but to be eligible for promotion to

3      master trooper.  They must have completed advanced

4      criminal interdiction along with other classes.

5              Q.    Okay.  Who teaches it?

6              A.    This -- the advanced criminal

7      interdiction class is under the umbrella of the

8      training center.  So they approve -- review and

9      approve the curriculum, as well as our legal folks,

10     and there are various instructors.

11             Q.    How long is the program?  Is it a

12     multi-week training?

13             A.    It's at least a week, it might be two

14     weeks.

15             Q.    Have you ever taught --

16             A.    I have.

17             Q.    Okay.  What elements of the advanced

18     interdiction course have you taught?

19             A.    Report writing.  And I know I was part

20     of informant interviews or suspect interviews.  And

21     then peripherally I was -- assisted with

22     identification of hidden compartments on vehicles.

23     In the early days of this class, I wasn't a head

24     instructor, but I took an interest.  So I was

25     usually present.  And I think we originated this

App. Vol. XXII, 29

1    advanced class in about 2008 or '9.

2            Q.   And you say "we," who do you include?

3            A.   Other supervisors in Troop N.

4            Q.   Is that -- is the class -- sorry.  Let

5    me rephrase that.

6                 Is the subject matter and the contents

7    of that class, are those approved by the Attorney

8    General's Office?

9            A.   Not that I know of.

10           Q.   Are they approved by internal legal at

11   Kansas Highway Patrol?

12           A.   They certainly are now.  Now, we're --

13   I'm talking about going back to 2008, and I don't

14   know that they were approved at that time.

15           Q.   Okay.  So looking at Exhibit Number 64,

16   the first couple pages of that are -- appear to be

17   cover sheets.  I want to draw your attention to that

18   third page.  And just for the record, I'm going to

19   refer to the OAG Bates number, that third page bears

20   22483 as the Bates number.  I think you testified

21   just a minute ago that this -- your recollection was

22   that this was forwarded to you by -- is it Captain

23   Rule?

24           A.   Lieutenant.

25           Q.   Sorry, lieutenant --

```
 1          A.   He's my peer on the eastern part.
 2               THE REPORTER:  He's your what?
 3               THE WITNESS:  Peer.
 4               THE REPORTER:  Peer.  Thank you.
 5  BY MR. McINERNEY:
 6          Q.   It was forwarded by Lieutenant Rule for
 7  your review, correct?
 8          A.   Yes.
 9          Q.   Okay.  Did you offer -- based on your
10  recollection, did you offer edits or changes to --
11          A.   Can I have a minute to review?
12          Q.   Sure.
13          A.   I'm ready for your question.
14          Q.   Okay.  Thank you.
15               On that -- on that page I just
16  mentioned, 22483, at the top it says, "RS versus
17  PC," and how they apply to traffic stops.  That's
18  shorthand for reasonable suspicion and probable
19  cause, correct?
20          A.   Yes.
21          Q.   The -- and I'm going to -- we're not
22  going to walk through every word of this, but I want
23  to point out a few things.  You have a bullet there
24  lettered A that says, "The courts are starting to
25  believe we only detain people because they refuse
```

1    consent and not for reasonable suspicion."

2              Did I read that correctly?

3         A.   Yes.

4         Q.   Do you know what that's based on?

5         A.   That would be Lieutenant Rule's

6    interpretation of current events.

7         Q.   Okay.  You reviewed this, though,

8    correct?

9         A.   Yes.

10        Q.   Do you think that's an accurate

11   statement?

12        A.   I think to some degree.

13        Q.   Based on what?

14        A.   We teach our folks that a person's

15   right to refuse a consensual search is an absolute

16   right and it doesn't figure into reasonable

17   suspicion for purposes of detaining for a drug dog

18   sniff.  There are -- I have read court rulings that

19   indicated that it was a perception of the court that

20   part of the reason for detention would have been a

21   refusal of a consent search.

22        Q.   Is that an accurate perception in your

23   opinion?

24        A.   Depends on the circumstances.

25        Q.   Okay.  Let's talk a little bit about

```
 1    my -- in the way I apply it is right there in the
 2    title.  Is it probable given my experience that a
 3    crime is going to be committed, is being committed
 4    or has been committed.
 5    BY MR. McINERNEY:
 6          Q.    When you -- based on your experience
 7    and your understanding, what do you consider when
 8    you form reasonable suspicion?
 9               MR. CHALMERS:  Same objection.  Calls
10    for a legal conclusion as it's framed.
11    BY MR. McINERNEY:
12          Q.    You can go ahead and answer.
13               MR. CHALMERS:  Yeah, I'm sorry.
14    BY MR. McINERNEY:
15          Q.    Yes, sir.
16          A.    Can you rephrase?  I'm sorry.
17          Q.    Sure.
18               My question is, in determining whether
19    you have reasonable suspicion, what do you consider?
20               MR. CHALMERS:  Same objection as
21    before.
22          A.    I consider the information that is in
23    front of me, anywhere from the way that the
24    driver -- we're talking about traffic stops here?
25    BY MR. McINERNEY:
```

1        Q.    Correct.

2           A.    The way that a driver reacts to police

3    presence, any information that they might offer me,

4    whether or not that information is consistent with

5    what I consider to be normal behavior after -- given

6    my experience again.  I utilize all of my five

7    senses.  What do I smell, what do I see, what do I

8    hear, not so much what I taste, and sometimes what I

9    feel.

10          Q.    When you say -- I'm going to work

11   backwards on that.  When you say sometimes what I

12   feel, what does that mean?  Does that mean what your

13   gut tells you?

14          A.    No.  What I physically feel.  For

15   example, in the hidden compartment arena, being able

16   to feel something like an unexplained void in a body

17   panel.  That's what I mean by physically feeling.

18   And another -- another example might be when I'm

19   searching a car and I can feel a duffel bag with say

20   a brittle plastic with lumps in it, which I would

21   know to be consistent with marijuana flour

22   packaging.

23          Q.    You mentioned that one of the things

24   that you take into consideration is the reaction of

25   the person who you stop and whether that reaction

1    is, I think you said reasonable; is that correct?

2          A.    I think that's what I said.

3          Q.    Okay.  What sorts of reactions are

4    reasonable and what sorts of reactions are

5    unreasonable?

6          A.    It depends on the circumstances and the

7    totality of the circumstances.

8          Q.    Sure, yeah.  For instance?

9          A.    For example -- for instance is a low

10   level speed warning.  Is that consistent with a

11   person's heightened nervous reaction to police

12   presence.

13         Q.    As opposed to a different kind of stop?

14         A.    It could be, but everything is

15   predicated on my experience and the totality of the

16   circumstances.

17         Q.    Right.  And I understand that.  I'm

18   just -- I'm trying to understand when you say

19   reaction of the person who's been stopped, what that

20   means, whether it means nervousness or calm or what

21   exactly that means.  Let me ask you this.  Is it a

22   factor if someone is too calm?

23         A.    It could be.

24         Q.    And likewise it could be a factor if

25   someone is excessively nervous?

App. Vol. XXII, 35

```
 1          A.    Yes.
 2          Q.    Okay.  What else about a detainee's
 3  reaction goes into your evaluation of reasonable
 4  suspicion?
 5               MR. CHALMERS:  Again, seems to be
 6  calling for a legal conclusion as the way it's
 7  phrased.
 8  BY MR. McINERNEY:
 9          Q.    You can answer if you can.
10          A.    Their reaction to being detained was
11  the question?
12          Q.    Yes, sir.
13          A.    That's probably -- that's not going to
14  be part of the evaluation process for conducting a
15  detention.  People have an absolute right to refuse
16  to be searched.
17          Q.    Oh, I understand that.  And maybe I
18  didn't articulate the question the way that I should
19  have.  We're still talking about a reaction,
20  motorist reaction.  Because that's one of the things
21  that you said you take into account, along with the
22  totality of circumstances, in determining whether
23  there is reasonable suspicion.
24               Did I say that accurately?
25          A.    I'm following.
```

Case 6:19-cv-01343-KHV  Document 521-3  Filed 05/15/23  Page 37 of 84

```
 1              Q.    That -- is it fair to say that from
 2     where you sit that may go into the determination of
 3     reasonable suspicion?
 4              A.    It might.
 5              Q.    Okay.  Do you know what I mean when I
 6     say indicia of criminal activity?
 7              A.    Indicative?
 8              Q.    Yes.  Things that are -- well, do you
 9     recognize the word "indicia," things that indicate
10     criminal activity?
11              A.    Yes.
12                    MR. CHALMERS:  You asked two questions,
13     I think.
14     BY MR. McINERNEY:
15              Q.    Okay.  What are some examples of things
16     that indicate criminal activity, again, based on
17     your experience in conducting traffic stops?
18              A.    One of the big things would be the
19     conversation, information that a motorist might give
20     me.  Is it consistent with other motorists that I've
21     stopped.  Is it consistent with, you know, what I
22     see in the car.
23              Q.    Give me an example of information that
24     you're looking to be consistent with other motorists
25     you've stopped.
```

1          A.    For example, if someone's traveling for
2     work, they typically have tools associated with that
3     line of work.  So that would be a baseline.
4          Q.    And what about that?
5          A.    I'm not sure I understand the question.
6          Q.    You said if somebody's traveling for
7     work then typically you would expect to see tools or
8     materials that are consistent with that line of
9     work.
10         A.    Right.
11         Q.    Is that fair?
12         A.    Yes.
13         Q.    For instance?
14         A.    For a property appraiser, for example,
15    they usually have a ladder in the back seat.  People
16    that are traveling to set up retail displays,
17    they'll usually have a small toolbox or several.
18    That type of thing.
19         Q.    Okay.  Thank you.
20              In -- we're still talking about the
21    totality of the circumstances.  Is it ever
22    appropriate for you, based on your experience, to
23    consider the state of origin that someone is
24    traveling from when you stop them?
25         A.    That can be a consideration.

Case 6:19-cv-01343-KHV   Document 521-3   Filed 05/15/23   Page 39 of 84

1           **Q.**    **How can that be a consideration?**

2           A.    There are certain areas where drug

3  production or distribution are prevalent, as opposed

4  to other areas where it's not as prevalent.

5           **Q.**    **Give me a list of the areas where drug**

6  **distribution is not prevalent.**

7           A.    Generally speaking, rural areas.  And

8  this is -- this has changed, in my 34 years, it's

9  changed a lot.  34 years ago, those drug origin

10  areas were usually along the border, the southern

11  border.  You know, in more recent history, there are

12  more drugs being produced in northern California, in

13  Colorado.

14           **Q.**    **All kinds of drugs or certain kinds of**

15  **drugs?**

16           A.    Certain kinds of drugs.

17           **Q.**    **Such as?**

18           A.    For example, marijuana production is

19  prevalent in northern California and in Colorado.

20  That's changing.

21           **Q.**    **So are there -- again, let me go back**

22  **to the question I asked originally.  What -- what**

23  **states are not states that are -- let me rephrase**

24  **that.**

25           **You talked about certain states being**

1    origins for drug distribution, correct?

2         A.    Yes.

3         Q.    What states are not origin states for

4    drug distribution?

5         A.    That has changed.

6         Q.    Correct.

7         A.    And is changing.

8         Q.    As we sit here today.

9         A.    You know, five years ago, Colorado was

10   high on the list.  But we are seeing drugs flowing

11   from Oklahoma and Missouri because of their

12   legalized marijuana productions.  So the states that

13   aren't would be those states that currently don't

14   have legalized marijuana production.

15        Q.    Legalized medical marijuana or

16   recreational?

17        A.    Any.

18        Q.    Okay.  So I just want to understand

19   your testimony here.  Origin states that may figure

20   into the calculation of reasonable suspicion do not

21   include those states that don't have legal

22   marijuana; is that fair?

23        A.    Typically.

24        Q.    And so we talked about origin, those

25   are origin states.  Are there certain states that

Case 6:19-cv-01343-KHV   Document 521-3   Filed 05/15/23   Page 40 of 84

App. Vol. XXII, 40

Case 6:19-cv-01343-KHV Document 521-3 Filed 05/15/23 Page 41 of 84

1    are destination states for the same kind of
2    activity, the same kind of illegal drug activity?
3            A.    30 years ago there were certain states
4    or cities that were distribution hubs for illegal
5    drugs.  Now, really, any large population center
6    could be a destination.
7            Q.    For what kind of drugs?
8            A.    Any drugs.
9            Q.    Did you -- in connection with your
10   service on the methamphetamine task force -- sorry,
11   let me rephrase that.
12               In connection with your service on that
13   methamphetamine task force that we discussed a
14   little bit earlier, did -- did you learn that
15   methamphetamine impacted rural areas as well?
16           A.    Yes.
17           Q.    In your experience as a law enforcement
18   officer, is methamphetamine more of a rural problem
19   or more of an urban problem?
20           A.    Over the years, that's evolved.
21   Initially, methamphetamine was more of a rural
22   problem, but it has now displaced cocaine in -- and
23   this is just generally speaking -- in urban -- in
24   more populous areas.
25           Q.    Okay.  Well, in talking about

Case 6:19-cv-01343-KHV   Document 521-3   Filed 05/15/23   Page 42 of 84

1    destination, and I should have asked you a minute

2    ago, do you ever consider the state or the city of

3    destination in determining reasonable suspicion?

4          A.    It can be a factor.

5          Q.    So is that a yes?

6          A.    Yes.

7          Q.    You talked about distribution hubs.

8    Are there certain states or cities that are not

9    distribution hubs for drug activity?

10         A.    I mean, I can't really say with any

11   certainty, because they could be going anywhere.

12         Q.    I mean, as you sit here today, and

13   I'm -- you know, we're relying on your 30-plus years

14   of law enforcement experience.  As you sit here

15   today, are there states or cities that you consider

16   not to be distribution hubs?

17         A.    No.

18         Q.    Are there states or cities that you

19   consider not to be source locations for drug

20   activity?

21         A.    I'm going to say no, because it could

22   come from anywhere.

23         Q.    Because it's so widely spread?

24         A.    Well, and part of that is there's a lot

25   of transshipment points.  So a drug may go to this

App. Vol. XXII, 42

Case 6:19-cv-01343-KHV   Document 521-3   Filed 05/15/23   Page 43 of 84

1    Traditionally, it's been in person.

2           Q.    And it sounds like it's an informal

3    situation?

4           A.    It is.  It gives the command staff an

5    opportunity to be face-to-face with the field

6    troopers that might be in Elkhart or Garden City

7    that they wouldn't ever normally see.

8           Q.    Got it.

9                 In your training, both at the academy

10   and all your continuing training since then, did you

11   receive formal training on what kinds of motorist

12   behavior is associated with criminal activity?

13          A.    No.

14          Q.    Did you ever receive any training or

15   continuing education about certain vehicles being

16   more closely associated with criminal activity?

17          A.    Yes.

18          Q.    Describe that training, please.

19          A.    That would have been at out-of-state

20   conferences that -- and what we would be talking

21   about vehicle specific would be certain vehicles

22   that were -- lent themselves to having false

23   compartments constructed inside of them.

24          Q.    For instance?

25          A.    In early '90s a Nissan Stanza was, for

```
 1   whatever reason, was a vehicle that lent itself to
 2   having a false floor in the back.
 3           Q.    That was in the early '90s?
 4           A.    Yes.
 5           Q.    What else?
 6           A.    For a while, a short period, it was
 7   Ford F-150s building a false floor in the bed, which
 8   was visible from the wheel well area.
 9           Q.    Is that the case -- you said for a
10   while.  Is that the case now?
11           A.    It's not nearly as prevalent.
12           Q.    Okay.  What else?
13           A.    Those -- I can't really think of any
14   off hand in addition to those.
15           Q.    Today, in 2021, based on your
16   experience, are there particular vehicles that are
17   favored more than others by people engaged in
18   narcotics activity?
19           A.    No.
20           Q.    Is there anything particular about
21   rental cars being associated with criminal activity
22   and specifically drug distribution activity?
23           A.    Is your question why would a person
24   maybe use a rental car?
25           Q.    Not really.  It's more about your
```

Case 6:19-cv-01343-KHV   Document 521-3   Filed 05/15/23   Page 45 of 84

1    more weight to a possible drug carrier between a

2    rental vehicle or a privately owned.

3    BY MR. McINERNEY:

4         Q.   Okay.  So that's -- and I appreciate

5    you offering that statement about you.  My

6    question's a little broader.  It's about -- it's

7    about Kansas Highway Patrol.  So that is -- let me

8    ask it this way.

9              And you're a supervisor so you've

10   got -- you've got troopers under your supervision.

11   Is it appropriate or inappropriate for any of those

12   troopers under your supervision to consider the

13   rental status of a car in determining whether

14   there's reasonable suspicion?

15             MR. CHALMERS:  Incomplete hypothetical.

16   And it's calling for a legal conclusion as phrased.

17        A.   It depends on the totality of the

18   circumstances.

19   BY MR. McINERNEY:

20        Q.   And among those circumstances, the

21   rental status of the car, can that be considered?

22        A.   Yes.

23        Q.   Have you seen any statistical analysis

24   or scientific studies about rental cars versus

25   non-rental cars when it comes to criminal activity?

1          A.    No.

2               Q.    Is there any method by which Kansas

3    Highway Patrol, as far as you know, tracks the

4    number of rental vehicles that are stopped, searched

5    and that yield narcotics?

6               A.    That information would be available.

7               Q.    It's kept by the highway patrol?

8               A.    It would be.  And when I say that, what

9    I mean is that each drug seizure, there's a drug

10   arrest screen that's compiled.  And it includes

11   ownership of the car.

12              Q.    Where's that maintained?

13              A.    With one of our intelligence folks.

14              Q.    Is it a system that's accessible to

15   everybody in the highway patrol or is it just the

16   intelligence people?

17              A.    It would not be openly available to me.

18              Q.    Okay.  But it's available to a limited

19   number of people at Kansas Highway Patrol?

20              A.    Yes.

21              Q.    Let me go back to Exhibit 64.  And I

22   think you testified earlier that this was provided

23   to you for your review and to offer any edits or

24   changes.  If you will go back to the third page from

25   the end, and the number at the bottom is 22496.  At

1    report, to write a report that -- to follow the

2    timeline so it was easily understandable.  And to

3    clearly articulate the factors that might be

4    involved with an arrest.

5          Q.    How long is that course that you teach?

6    Is it just one class?

7          A.    I haven't taught that course since

8    about 2014.

9          Q.    Right.  When you did.

10         A.    I think it was a two-hour block.

11         Q.    Okay.  So let me ask you some questions

12   about report writing since you've taught the class,

13   it's been a little while, seven years or so, but let

14   me ask you some questions about report writing.

15              What is it -- in your job as a Kansas

16   Highway Patrol trooper or lieutenant, what causes

17   you to have to write a report?

18         A.    An arrest, a motor vehicle collision

19   investigation, use of force, pursuit.

20         Q.    Arrest, motor vehicle accident, use of

21   force or pursuit, correct?

22         A.    Those are the big four.

23         Q.    Okay.  Are there any other

24   circumstances?

25         A.    We may be called upon to write a report

Case 6:19-cv-01343-KHV   Document 521-3   Filed 05/15/23   Page 47 of 84

1   in regards to a citizen complaint, like we discussed

2   earlier.

3           Q.   Right.  Any others?

4           A.   Not that I can think of.

5           Q.   Do you have to write a report when you

6   search a vehicle?

7           A.   No.

8           Q.   Why not?

9           A.   It's not required.

10          Q.   Do you -- are you required to write a

11  report if there is a drug recovery that does not

12  result in an arrest?

13          A.   Are you talking about a custodial

14  arrest?

15          Q.   Correct.  Not a detention, an arrest?

16          A.   You are required to write a report.

17          Q.   If there's an arrest?

18          A.   If there's a custodial arrest.

19          Q.   If there is not an arrest, that is

20  if -- let's say you conduct a search of a vehicle,

21  consensual search of a vehicle and you recover a

22  miniscule amount of marijuana that doesn't -- in

23  your judgment doesn't merit an arrest, is it

24  required for you to write a report?

25          A.   No.

Case 6:19-cv-01343-KHV   Document 521-3   Filed 05/15/23   Page 49 of 84

```
 1              Q.    Ever do that, recover narcotics, drugs
 2     of any kind, that did not result in an arrest?
 3              A.    When you say recover, my definition of
 4     recover is seize.
 5              Q.    Correct.
 6              A.    If I seize drugs or any of my
 7     subordinates seize drugs, they're required to write
 8     a report.
 9              Q.    Regardless of amount?
10              A.    Yes.
11              Q.    Ever familiar with a situation in which
12     small amounts of drugs, mostly marijuana, are seized
13     and disposed of at the scene?
14              A.    No.  But to qualify that, is an
15     opportunity given to the violator to destroy their
16     own, and the answer would be yes.
17              Q.    Describe that for me, if you will.
18              A.    If there's a small amount of marijuana
19     and the violator will be given the choice, you know,
20     do you want to be charged with this, because if I
21     seize it, you're going to be charged, or do you want
22     to dispose of it on your own.
23              Q.    So that's the situation where you never
24     actually seize the drugs, correct?
25              A.    That is correct.
```

App. Vol. XXII, 49

Case 6:19-cv-01343-KHV   Document 521-3   Filed 05/15/23   Page 50 of 84

1          Q.     Who makes the decision about where that
2     threshold is on amount?
3          A.     That's an individual officer
4     discretion.
5          Q.     Is there any guidance at all from
6     Kansas Highway Patrol about the amount that must --
7     an amount that must be seized versus an amount that,
8     as an option, you can have the violator destroy?
9          A.     No.
10         Q.     So, in theory, a ten-pound discovery
11    could be subject to this -- the option that the
12    violator destroy the drugs and there would never be
13    a report about it; is that accurate?
14         A.     It would depend on the totality of the
15    circumstances.  I cannot imagine that ever
16    happening.
17         Q.     I think everybody would be surprised,
18    but my point is, there's no guideline about amounts
19    when it comes to the discretion of the trooper to
20    instruct the violator to destroy the narcotics?
21              MR. CHALMERS:  It's not a question,
22    it's a statement.  It's argumentative.
23              THE REPORTER:  Would you repeat that?
24              MR. CHALMERS:  It's not a question,
25    it's a statement.  It's argumentative.  And I

App. Vol. XXII, 50

```
 1   object.  It's also asked and answered, as I
 2   understand the question.
 3   BY MR. McINERNEY:
 4           Q.    Did you understand my question?
 5           A.    Can you rephrase?  Sorry.
 6           Q.    Sure.  Let me ask you a related
 7   question.
 8                 In that situation that you described,
 9   where the violator's given the option to destroy the
10   drugs, there wouldn't be a report of that, correct?
11           A.    Probably not.
12           Q.    In what situation would there be a
13   report?
14           A.    The officer would always have the
15   discretion on writing a report.  It wouldn't be an
16   arrest report necessarily, but certainly an
17   investigative report, he would have that option
18   always.
19           Q.    Have you ever taken advantage of that
20   option?
21           A.    Yes.
22           Q.    How many times?
23           A.    A handful.
24           Q.    Do you have your own threshold?
25           A.    Depends on the totality.
```

```
 1          Q.    For example, what?
 2          A.    It just depends.  Type of drugs is
 3    certainly a consideration.  The value maybe of the
 4    drugs would be a consideration.
 5          Q.    In what sense?
 6          A.    The sense that if you've got brick weed
 7    from the southern border, low quality, low quantity,
 8    as opposed to high dollar flour marijuana that's
 9    hydroponic or whatever, that would be a
10    consideration.
11          Q.    Okay.  So you would be more likely to
12    seize it if it was higher dollar?
13          A.    Depending on the totality of the
14    circumstances, of course.
15          Q.    No, I'm just trying to under -- yeah,
16    sorry.
17          A.    Yeah.  Is that in my mind or, you know,
18    a normal trooper's mind, is that a bigger crime,
19    yes.
20          Q.    And so the bigger crime would merit
21    seizure and arrest?
22          A.    Depending on the circumstances.
23          Q.    Yeah, I understand that.  I'm just
24    trying to get the balance that you have described
25    here.
```

1                    Have you ever written a report where

2    you've done -- taken advantage of that option, that

3    is had the violator destroy the drugs?

4          A.   And written a report?

5          Q.   Yes, sir.

6          A.   Yes.

7          Q.   What -- what caused you to write a

8    report in that circumstance?

9          A.   Just I felt the need to memorialize it.

10         Q.   Do you remember how many times has that

11   happened?

12         A.   A handful.

13         Q.   That you've written a report?

14         A.   Yes.

15         Q.   When was the last time that happened?

16         A.   A long time ago.

17         Q.   Five years?

18         A.   More than five.

19         Q.   More than ten?

20         A.   Maybe.

21         Q.   Do you -- strike that.

22              Has -- I want to go back to report

23   writing, if we might.  Anyone ever discourage you or

24   troopers under your command from writing certain

25   kinds of reports?

```
 1    BY MR. McINERNEY:

 2          Q.   You can answer.

 3          A.   If you thought that that circumstance

 4    was part of a larger crime that might come up later.

 5          Q.   Let's talk a little bit about

 6    reasonable suspicion and traffic stops.  We've been

 7    talking about that a little bit, but -- so in your

 8    capacity as a lieutenant with the Kansas Highway

 9    Patrol, when you conduct a traffic stop, how long

10    are you permitted to detain a driver when you pull

11    them over for a traffic violation?

12               MR. CHALMERS:   Calls for a legal

13    conclusion as phrased.

14    BY MR. McINERNEY:

15          Q.   You can answer.

16          A.   We follow the guidance that the courts

17    give us, and currently that's in the neighborhood of

18    45 minutes to one hour.

19          Q.   Okay.  And that's based on court

20    decisions?

21          A.   Yes.

22          Q.   Regardless of the reason for the

23    traffic stop?

24          A.   Yes.

25          Q.   You said 45 minutes to an hour.  What
```

"Def. Obj:" Questions sought legal conclusion (not proper subject for opinion testimony).

1    declining to answer those two questions?

2         A.   Yes.

3         Q.   In your experience, have you ever

4    determined that you have reasonable suspicion to

5    detain a motorist and then detain the suspect, the

6    motorist, but been unable to confirm your suspicion?

7         A.   Yes.

8         Q.   Based on what you testified regarding

9    reports, that wouldn't necessarily generate a

10   report, correct?

11        A.   Correct.

12        Q.   I think you said if you believe that

13   there was a larger scope of criminal activity it

14   may, but you're not required to write a report?

15        A.   Correct.

16        Q.   Are you familiar with a technique

17   called the -- generally referred to as the Two-Step?

18        A.   Yes.

19        Q.   What is the Two-Step?

20        A.   The Two-Step, as I recall, came out of

21   a court case where the court talked about the

22   trooper ending the traffic stop, maybe taking a step

23   or two, and re-engaging a motorist in a consensual

24   encounter.

25        Q.   Okay.   Is that an accurate description?

1        A.      Not my term, so --
2        Q.      Okay.
3        A.      It's just what I -- just my
4    understanding is what I've just described to you.
5        Q.      So setting the label aside, are you
6    familiar with that technique?
7        A.      I am familiar with the technique of
8    dis-engagement and then engagement of a consensual
9    encounter, yes.
10       Q.      Okay.  Do you have an understanding as
11   to why that's referred to as the Kansas Two-Step?
12       A.      Yes.
13       Q.      What's your understanding?
14       A.      That was a phrase coined by I think a
15   state court.
16       Q.      Do you have an understanding about why
17   the phrase "Two-Step" is included in there?
18       A.      Yes.
19       Q.      What?
20       A.      That's -- as I indicated earlier, it's
21   actually taking a few steps away and then walking
22   back up.
23       Q.      And is it your understanding that
24   taking that -- those two steps away is
25   dis-engagement?

1          A.   Yes.

2          Q.   And is it your understanding that

3     re-engagement following that is consensual?

4          A.   Yes.

5          Q.   Have you ever employed the Kansas

6     Two-Step?

7          A.   Not that I recall.

8          Q.   Ever in your career?

9          A.   Not that I recall.

10         Q.   Is it -- have you ever -- have you ever

11    engaged the technique of dis-engaging with a

12    motorist after the end of the traffic stop and then

13    causing a re-engagement?

14         A.   Yes.

15         Q.   Describe that.

16         A.   When I end the traffic stop, whether

17    I'm going to ask for consent to speak to the driver

18    or not, my closing phrase is, do you have any

19    questions before you leave.  And that clearly

20    indicates to them that they are free to go.

21              Then when a driver would make a motion

22    to engage and put the car in gear or step on the

23    brake or somehow physically indicate to me that they

24    knew that they were free to go, I would say, do you

25    mind if I ask you a few questions before you leave.

LIEUTENANT GREG JIRAK  7/20/2021

```
1          Q.    So how do you know that that is a clear
2    indication to the driver that they're free to leave?
3          A.    I think objectively it is, but
4    ultimately the court will make that decision.
5          Q.    But that's your opinion, correct?
6          A.    It is.
7          Q.    Okay.  And then I think the second part
8    of your answer indicated that if they take some
9    action, put the car in gear or something else that
10   indicates they're going to leave, you then do what?
11         A.    Then I will ask for permission to speak
12   to them.
13         Q.    And if the driver doesn't answer, what
14   happens?
15         A.    I watch them drive off.
16         Q.    If the driver says no, what happens?
17         A.    I watch them drive off.
18         Q.    Is a driver's negative response to that
19   question, does it contribute to reasonable suspicion?
20         A.    No.
21         Q.    If you ask a driver -- again, using
22   your hypothetical, if you ask a driver if they're
23   willing to answer more questions and they say no,
24   have you ever in your career then stopped that
25   driver and detained them?
```

Page 98

1          A.    Yes.

2          Q.    Based on?

3          A.    Reasonable suspicion.

4          Q.    Including their non-consent to

5     questions?

6          A.    No.

7          Q.    Then in that sort of a situation,

8     again, your hypothetical, why wouldn't you detain

9     them before you asked that question?

10         A.    Because I know that a consent search is

11    the least intrusive of any search that I can

12    conduct.

13         Q.    A consent search is, I think you said

14    is the least intrusive?

15         A.    Yes.

16         Q.    How so?

17         A.    Because the -- they're actively

18    participating in allowing me to search, as opposed

19    to me telling them that I'm going to search or

20    actually searching.

21         Q.    Right.  But it doesn't mean that you

22    can search less of the car if they consent, right?

23         A.    They can limit the scope of my search.

24         Q.    For instance, do I understand that a

25    motorist can tell you, you can search the glove

Case 6:19-cv-01343-KHV   Document 521-3   Filed 05/15/23   Page 60 of 84

```
 1    compartment but nothing else?
 2          A.   Yes.
 3          Q.   And then are you required to abide by
 4    that?
 5          A.   In the absence of reasonable suspicion,
 6    that's a consensual search, yes.
 7          Q.   It's a limited consensual search?
 8          A.   Yes.
 9          Q.   You ever explain to -- again, same
10    hypothetical.  Do you ever state to a driver that
11    they are free to leave?
12          A.   I have, yes.
13          Q.   Is that your practice?
14          A.   No.
15          Q.   I think you said a minute ago you
16    usually say, do you have any questions for me,
17    correct?
18          A.   Almost always.
19          Q.   Okay.  And that's usually the way that
20    you conclude your -- the detention?
21          A.   Or traffic stop.
22          Q.   Right.
23          A.   Yes.  The answer's yes.
24          Q.   Okay, okay.  Thank you.
25               Why is it that you ask them if they
```

1  have any questions instead of saying you're free to
2  go?

3          A.   It's a two-pronged approach for me,
4  that I found works for me.  Number one is that if,
5  in the absence of any other considerations, when I
6  ask them if they have any questions, I can answer
7  the question, do I have to pay a fine, or when is my
8  court date, or is this a warning and not a ticket.
9  I am able to have a good violator rapport that way.
10 And the other prong is that the driver knows that
11 the traffic stop is over.

12          Q.   But you don't tell them that the
13 traffic stop is over, do you?

14          A.   I tell them exactly what I told you.

15          Q.   Okay.  You don't tell them that the
16 traffic stop is over?

17          A.   I do not.

18          Q.   And you don't tell them that they're
19 free to go?

20          A.   No.

21          Q.   The object of ending the encounter with
22 that question that you asked, do you have any
23 questions for me, is to keep the driver there,
24 correct?

25          A.   No.

Case 6:19-cv-01343-KHV   Document 521-3   Filed 05/15/23   Page 61 of 84

LIEUTENANT GREG JIRAK  7/20/2021

1          Q.    That's not your goal?

2          A.    No.

3          Q.    What's the goal?

4          A.    Two-pronged approach, to let them know

5     that the traffic stop is over and to answer any

6     questions that they might have, which is pretty

7     common.

8          Q.    You don't explain to a motorist at that

9     point that if they continue speaking it may result

10    in a K9 search, do you?

11         A.    I do not.

12         Q.    Ever have a driver leave as you're

13    executing the maneuver that we call a Two-Step?

14         A.    I don't conduct that maneuver.

15         Q.    I know you don't like the name, but I

16    think we've got an agreement on what that maneuver

17    is, that is a dis-engagement and then a

18    re-engagement.

19              Is that -- is that a fair statement?

20         A.    I don't think so.

21         Q.    Okay.  Tell me how it's wrong.

22         A.    The Two-Step you're talking about

23    actually involves walking away from the vehicle and

24    walking back up to the vehicle.

25         Q.    Right.

1          A.    That's not something I do.

2          Q.    Okay.  Your technique is to conclude

3    the encounter with the phrase that you have offered,

4    that is, do you have anyway questions for me,

5    correct?

6          A.    Correct.

7          Q.    At the end of that, have you ever, in

8    your experience, had a driver put the car in gear

9    and leave?

10         A.    Yes.

11         Q.    You ever started a chase in that

12   situation?

13         A.    Yes.

14         Q.    A chase based on what?

15         A.    Reasonable suspicion that I had built

16   up to that point.

17         Q.    Are you permitted -- it sounds like

18   your belief is that you can initiate a car chase

19   based on reasonable suspicion?

20         A.    Yes.

21         Q.    Are you familiar with a case called

22   Vasquez versus Lewis?

23         A.    Vaguely.

24         Q.    Vaguely?

25               How are you familiar with it?

Case 6:19-cv-01343-KHV   Document 521-3   Filed 05/15/23   Page 63 of 84

App. Vol. XXII, 63

1          A.    I've read it.  It's been a long time
2    since I've read it, so...
3          Q.    In what context did you read it?  How
4    did you come across it?
5          A.    That was -- that's one of those cases
6    that filtered down and was also available on the
7    internet for review.
8          Q.    Okay.  We talked a little while ago
9    about case law updates and legislative updates.  And
10   I think you said that those often occurred in the
11   context of an HQ wrap.  Did I get that wrong?
12         A.    Yes.  An HQ wrap is usually more
13   informal --
14         Q.    Okay.
15         A.    -- with the head of the agency and the
16   troopers.  And the legal updates are a separate
17   block of classes.
18         Q.    A case like Vasquez, and it has been a
19   while, it's been 2016, so it's five years or so, do
20   you -- do you recall anything about that case?
21         A.    Yes.
22         Q.    Okay.  What do you recall about the
23   case?
24         A.    A stop late at night.  And I know that
25   block shapes under a blanket was part of that.

 1            Q.    Let me ask you a better question,
 2    Lieutenant.
 3                  Was that case significant in the
 4    context of traffic stops and searches?
 5            A.    Certainly we all -- I pushed it out, we
 6    all read it, we were all made aware of it.
 7            Q.    And why was it important to make
 8    everybody aware of it?
 9            A.    Because that's -- had local impact.
10            Q.    Do you recall conducting or going to
11    any formal training about the Vasquez case?
12            A.    No.
13            Q.    Okay.   Understanding that you said it's
14    been a while since you read the case.   As you sit
15    here today, do you recall the rule from Vasquez
16    articulated by the court?
17            A.    I think the court indicated that they
18    felt it was an unlawful detention.
19            Q.    Okay.   Anything more that you recall as
20    you sit here?
21            A.    I -- no.
22            Q.    Okay.   When Vasquez came down, and,
23    again, understanding that you may not remember the
24    specifics, did you change anything about the way you
25    conducted traffic stops?

Case 6:19-cv-01343-KHV   Document 521-3   Filed 05/15/23   Page 66 of 84

```
 1            A.    No.
 2            Q.    Was there a change in highway patrol
 3    policy after Vasquez?
 4            A.    No.
 5            Q.    Forgive me if I've asked this already,
 6    but was there any restraining or re-education beyond
 7    making the case available to people at Kansas
 8    Highway Patrol?
 9            A.    Not that I recall.
10                  (Jirak Exhibit Number 66 was marked
11                  for identification by Mr. McInerney.)
12    BY MR. McINERNEY:
13            Q.    I'm going to show you what's marked for
14    identification as Exhibit Number 66.
15                  MR. McINERNEY:  Counsel, this is the
16    fourth tab down, OAG19821.  Hand that to the
17    witness, please.
18    BY MR. McINERNEY:
19            Q.    If you can take a moment and review
20    that and let me know when you're finished, please.
21            A.    I'm trying to keep your exhibits in
22    order here, but I think I misplaced the one with
23    your exhibit number on it previous.  Here it is.
24    Never mind.
25            Q.    And I can sort them out.
```

"Plfs. Obj:" FRE 611 (a) & (b) because it is beyond the scope of the direct examination and a waste of time.

```
 1           A.    Okay.  I've had the opportunity to
 2    review Exhibit 66.
 3           Q.    Thank you.
 4                 What is Exhibit 66?
 5           A.    It is an e-mail from John Rule, goes by
 6    Doug, to some of his unit members and at least one
 7    dog handler.
 8           Q.    And then you're carbon copied on that?
 9           A.    I am.
10           Q.    Why were you carbon copied on that?
11           A.    This would be one of those cases that
12    we talked about earlier that we try to share,
13    disseminate, pass down.
14           Q.    And then when you receive an update
15    like this from Mr. Rule or whoever, what do you then
16    do with it?
17           A.    I will read it and disseminate.
18           Q.    To?
19           A.    My subordinates.
20           Q.    So if the situation is as you described
21    before, that you got four tactical troopers that
22    you -- or technical troopers, excuse me, that you're
23    supervising, each one of them would get something
24    like this from you, correct?
25           A.    Yes.
```

"Plfs. Obj:"
FRE 611 (a)
& (b)
because it is
beyond the
scope of the
direct
examination
and a waste
of time.

1     Q.    Okay.   Let me direct your attention

2   to -- there's a larger paragraph that was written

3   by -- I'm sorry, is it Captain Rule?

4         A.    Lieutenant.

5         Q.    Lieutenant Rule that's captioned at the

6   top, it says "Men."  And about halfway down, it's a

7   discussion of this US versus Esteban case that he's

8   providing to that list of people that you talked

9   about.   And about halfway through that paragraph

10  there's a sentence that says the following:   "The

11  trooper made a big mistake when he testified to the

12  fact the truck having California plates was what

13  sparked his interest."

14              Do you see that?

15        A.    Yes.

16        Q.    What did you understand Lieutenant Rule

17  to mean by that statement?

18        A.    I think it speaks for itself.   The

19  officer in question here testified that the truck

20  had California plates and that sparked his interest.

21        Q.    And that would -- it was your

22  understanding at the time that would be

23  inappropriate, correct?

24        A.    Yes, it is inappropriate.

25        Q.    And the next sentence, if you follow

 1    with me says, again from Lieutenant Rule, "Remember,

 2    we work on interstate highway which has cars coming

 3    from all over the country and we never do anything

 4    because of tag or race."

 5              Did I read that accurately?

 6         A.   Yes.

 7         Q.   Is that an accurate statement of KHP

 8    policy?

 9         A.   Yes.

10         Q.   That's all the questions I have about

11    66, sir.

12              (Jirak Exhibit Number 67 was marked

13              for identification by Mr. McInerney.)

14    BY MR. McINERNEY:

15         Q.   Sir, I'm going to show you what's

16    marked for identification as Exhibit Number 67.

17              MR. McINERNEY:  It is OAG23217.  It is

18    the fourth tab from the back.  Hand that to the

19    witness, please.

20    BY MR. McINERNEY:

21         Q.   If you would review 67 and let me know

22    when you're finished, please.

23         A.   (Witness complied.)

24              I've had the opportunity to examine

25    Exhibit 67.

Case 6:19-cv-01343-KHV   Document 521-3   Filed 05/15/23   Page 70 of 84

```
 1              Q.   Okay.   Every time?

 2              A.   No.

 3              Q.   What causes you to do that?

 4              A.   Just whether or not I remember.

 5              Q.   And then do you use those notes later

 6     in putting together a report if you're required to

 7     write a report?

 8              A.   Yes.

 9              Q.   How do you access those?

10              A.   I would replay that DVD disk on my

11     computer.

12              Q.   And then I guess type in the narrative

13     portion of your report from the notes?

14              A.   Yes.  Of course, the -- those notes

15     would not be limited to what I said on the DVD.

16              Q.   Understood.   Understood.

17                   It looks as though the outcome of this

18     encounter with Mr. Tucker was that he was developed

19     as a cooperating witness; is that correct?

20              A.   Yes.

21              Q.   That's not the first time that you had

22     developed a detainee and evidently a drug violator

23     into a cooperating witness, correct?

24              A.   Correct.

25              Q.   Is that always one of the objects where
```

1    you conduct a search to potentially develop someone

2    as a cooperating witness?

3            A.    Yes, and that was part of the class

4    that I taught.

5            Q.    Which class?

6            A.    The advance -- original advance

7    criminal interdiction.

8            Q.    Okay.  What part of what you taught

9    talked about corroborating witnesses?

10           A.    I had a one-hour block on cultivating.

11           Q.    Okay.  With respect to Mr. Tucker and

12   this stop, do you recall the outcome of that case?

13   Was he charged?

14           A.    I don't recall.

15           Q.    Okay.  Do you recall having to testify

16   in connection with --

17           A.    No.

18           Q.    -- his -- all right.  Let me finish

19   that and then you can say no.

20                 Do you recall having to testify in

21   connection with Mr. Tucker's case?

22           A.    No.

23           Q.    Thank you.

24                 (Jirak Exhibit Number 68 was marked

25                 for identification by Mr. McInerney.)

LIEUTENANT GREG JIRAK  7/20/2021

1    BY MR. McINERNEY:

2          Q.    I'm going to show you what's been

3    marked as Deposition Exhibit 68 for identification.

4                MR. McINERNEY:  For reference, counsel,

5    that is OAG4067.

6    BY MR. McINERNEY:

7          Q.    I'm going to ask you, Lieutenant, to do

8    the same thing with that exhibit, 67, please.

9          A.    (Witness complied.)

10               I've had the opportunity to review

11   Exhibit 68.

12         Q.    Thank you.  I think that's 67.  Is the

13   exhibit sticker up top?

14               MR. CHALMERS:  I think it's 68.  It's

15   68.

16               MR. McINERNEY:  Okay.  My bad.

17         A.    67 was the Tucker.

18   BY MR. McINERNEY:

19         Q.    You're correct.  Thank you.

20               Do you recognize Exhibit 68?

21         A.    I've never seen it before today.

22         Q.    What is Exhibit 68?

23         A.    It is Kansas Highway Patrol police

24   service dog report written by Trooper Jason Duffy.

25         Q.    And the suspect in that particular

"Def. Obj:" Irrelevant, FRE 401.

"Def. Obj:" Irrelevant, FRE 401.

LIEUTENANT GREG JIRAK  7/20/2021

1  report is Luis Alavrez; is that correct?

2       A.   No.

3       Q.   Well, let me get things straight here.

4  I'm sorry.  It's Mr. Crespo?

5       A.   Yes.

6       Q.   Thank you.

7            In -- on the second page of Exhibit

8  Number 68, in that narrative, I understand you

9  didn't write that narrative, but the narrative

10  indicates in the top bullet point about halfway

11  through, "Lieutenant Jirak advised that he was met

12  with a language barrier and had received consent to

13  search."

14            Do you see that?

15       A.   Yes.

16       Q.   Do you recall this stop?

17       A.   No.

18       Q.   What is your practice when you

19  encounter a language barrier between you and a

20  detainee?

21       A.   If they speak Spanish, I utilize my

22  limited use of Spanish.

23       Q.   Have you had Spanish courses?

24       A.   I had one.

25       Q.   When was that?

 1          A.    1990.

 2          Q.    Do you -- you said you speak limited

 3    Spanish, correct?

 4          A.    Very little Spanish, yes.

 5          Q.    Do you read Spanish or write Spanish?

 6          A.    I can read a little Spanish.  No

 7    writing.

 8          Q.    Okay.  In that kind of a situation

 9    where you say that you have limited ability when it

10    comes to Spanish, do you have the opportunity to

11    request a translator to assist you?

12          A.    I do now.  In 2017, they were not

13    readily available.

14          Q.    Were they available at all in '17?

15          A.    Not that I recall.

16          Q.    I think you testified that you don't

17    recall this search.  I guess by that you also don't

18    recall the reasonable suspicion that led to the

19    search?

20          A.    There was no search.  Oh, there was,

21    I'm sorry.  I misread.  There was a search and the

22    part -- other part of your question was, was there

23    anything located?

24          Q.    Correct.

25          A.    No.

App. Vol. XXII, 74

Case 6:19-cv-01343-KHV Document 521-3 Filed 05/15/23 Page 75 of 84

```
 1    put us off the record?
 2                MR. McINERNEY:  Yes, sir.
 3                THE VIDEOGRAPHER:  Off the record at
 4    11:59.
 5                (Recess taken.)
 6                THE VIDEOGRAPHER:  We are back on the
 7    record at 12:19.
 8                (Jirak Exhibit Number 70 was marked
 9                for identification by Mr. McInerney.)
10    BY MR. McINERNEY:
11         Q.    Mr. Jirak, I'm going to show you what
12    is marked as Exhibit Number 70.  The OAG reference
13    is 8521.  And I'm going to ask you to review that, a
14    short e-mail.
15         A.    (Witness complied.)
16                I've had the opportunity to examine
17    Exhibit 70.
18         Q.    Exhibit 70 is an e-mail from Jason
19    Vanderweide to Joseph Bullock, correct?
20         A.    Yes.
21         Q.    Mr. Vanderweide is who, sir?
22         A.    He is, at that time, the captain of the
23    aircraft unit, Troop T.
24         Q.    And when you say "at that time," we're
25    talking about September of 2019, correct?
```

App. Vol. XXII, 75

1      A.    Yes.

2          Q.    And Mr. Bullock is who?

3          A.    At that time, was a lieutenant assigned

4    to investigations of the professional standards

5    unit.

6          Q.    Do you know a man named Brandon

7    McMillan?

8          A.    Yes, I do.

9          Q.    How do you know Mr. McMillan?

10         A.    He was stationed in Oakley.  We officed

11    out of the same highway patrol office until about

12    2006 or '7 when he transferred to Hays to become

13    part -- a pilot in the aircraft unit.

14         Q.    So in September of 2019, if you know,

15    where was Trooper McMillan assigned?

16         A.    He was assigned to aircraft in Hays.

17         Q.    Did you have any supervisory

18    relationship with him?

19         A.    No.

20         Q.    This e-mail indicates that Technical

21    Trooper McMillan had completed remedial legal

22    training and also completed a ride along with

23    Lieutenant Jirak of Troop N.

24              Do you see that?

25         A.    Yes.

```
 1            Q.    What was that in connection with?
 2            A.    He -- I was assigned to take him on a
 3    ride along for one day.
 4            Q.    For what purpose?
 5            A.    I asked and I was told by my
 6    supervisor, Brent Hogelin, that it should be
 7    business as usual.
 8            Q.    Did you understand that at that time to
 9    be part of a disciplinary or reeducation/retraining
10    process?
11            A.    Yes.
12            Q.    What did you understand about that?
13            A.    Just the context of the way it
14    happened, I knew that it was a remedial.
15            Q.    And how did you become involved?
16            A.    I was assigned to conduct that ride
17    along by my supervisor.
18            Q.    Did your supervisor -- well, what did
19    you understand the purpose of it was?
20            A.    I asked specifically and I was told it
21    was business as usual.
22            Q.    Do you remember the ride along?
23            A.    Yes.
24            Q.    What did you do?
25            A.    We stopped cars.
```

LIEUTENANT GREG JIRAK  7/20/2021

Page 126

1      Q.      How long did the ride along last?

2      A.      Most of an afternoon, approximately

3  four hours.

4      Q.      Was there any discussion between you

5  and Trooper McMillan regarding proper procedure for

6  stops or searches, anything like that to your

7  memory, sir?

8      A.      No, no.

9      Q.      There was not or you don't remember?

10      A.      I don't remember there being any

11  discussion.

12      Q.      Okay.  Good.

13              You testified earlier regarding what I

14  initially referred to as the Kansas Two-Step, and I

15  think your testimony, correct me if I'm wrong, was

16  that you had in your time with the Kansas Highway

17  Patrol had not engaged in that technique, correct?

18      A.      Correct.

19      Q.      Why not?

20      A.      I've never felt it necessary to go to

21  that extreme to demonstrate a break in contact.

22      Q.      What do you mean by extreme?

23      A.      Taking steps away from the car.

24      Q.      Why do you think it's not necessary?

25      A.      Because as I testified earlier, I can

1    objectively demonstrate that that driver felt that

2    they were free to go.

3            Q.    So is that -- and I -- does that mean

4    that a -- that kind of a physical distancing, that

5    two steps away, in your -- in your experience is not

6    necessary?

7            A.    It's not necessary in my experience.

8    If it works for a guy, I'm good with it.

9            Q.    In your capacity as a supervisor and

10   sometimes a trainer of other highway patrol

11   personnel, has that topic -- has that been a topic

12   that you presented about?

13           A.    Certainly I have in regards to breaking

14   contact, reinitiating.  But specifically discussing

15   this Kansas Two-Step technique, no.

16           Q.    Let me direct your attention back to

17   2004 several years ago.  Do you recall a case,

18   federal case that was captioned United States versus

19   Gerardo Vallejo (sp) involved a 26-kilo seizure that

20   ultimately became the topic of a federal criminal

21   case?

22           A.    Yes.

23           Q.    And just for your -- for your benefit,

24   do you recall that that case involved your limited

25   Spanish, as you say?

"Def. Obj:" Irrelevant, FRE 401 - too remote in time.

1        A.    Yes.

2        Q.    In that -- in that case, and I want you

3    to tell me if I'm correct about this, there was a

4    26-kilo seizure.  And one of the questions raised

5    had to do with the consent that was obtained from

6    the driver; is that correct?

7        A.    There was discussion, yes.

8        Q.    And I -- as I understand, you asked the

9    driver a question that you believed requested

10    consent, but the court found was a request for

11    registration papers; is that correct?

12        A.    I'm not sure what the court said.

13        Q.    Okay.

14        A.    They were later reversed.

15        Q.    Okay.  Reversed and the conviction was

16    upheld, correct?

17        A.    It was -- to my knowledge, that man's

18    still a fugitive.

19        Q.    Okay.  Do you recall whether there was

20    any internal issue at Kansas Highway Patrol with

21    regard to your conduct in that case?

22        A.    There was no issue.

23        Q.    Okay.  I want to redirect your

24    attention back to exhibit -- I believe it's

25    Exhibit 68.  It's -- this is where I messed up the

Case 6:19-cv-01343-KHV   Document 521-3   Filed 05/15/23   Page 81 of 84

```
 1                      CERTIFICATE

 2

 3              I, Sarah A. Davison, a Certified Court

 4     Reporter, within and for the State of Kansas and the

 5     State of Missouri, and a Registered Professional

 6     Reporter, do hereby certify that the witness whose

 7     testimony appears in the foregoing deposition was

 8     duly sworn by me; that the testimony of said witness

 9     was taken by me to the best of my ability and

10     thereafter reduced to typewriting under my

11     direction; that I am neither counsel for, related

12     to, nor employed by any of the parties to the action

13     in which this deposition was taken, and further that

14     I am not a relative or employee of any attorney or

15     counsel employed by the parties thereto, nor

16     financially or otherwise interested in the outcome

17     of the action.

18

19     _____

20                      Sarah A. Davison, RPR
                         CCR #1397-MO  #1589-KS
21

22

23

24

25
```

App. Vol. XXII, 81

```
 1                  Alaris Litigation Services
                         1608 Locust Street
 2                   Kansas City, Missouri  64108
             Phone (816) 221-1160 * Fax (816) 221-1151
 3

 4   August 4, 2021

 5   LIEUTENANT GREG JIRAK
     c/o MR. ARTHUR S. CHALMERS
 6   KANSAS ATTORNEY GENERAL'S OFFICE
     120 Southwest 10th Avenue
 7   Memorial Building
     Topeka, Kansas  66612

 8

 9   In Re:  BLAINE FRANKLIN SHAW, et al. vs. HERMAN
     JONES in his official capacity as the Superintendant
10   of the Kansas Highway Patrol, et al.

11   Dear Mr. Chalmers:

12   Please find enclosed your copy of the deposition of
     LIEUTENANT GREG JIRAK taken on July 20, 2021, in the
13   above-referenced case.  Also enclosed is the
     original signature page and errata sheet.

14
     Please have the witness read your copy of the
15   transcript, indicate any changes and/or corrections
     desired on the errata sheet, and sign the signature
16   page before a notary public.

17   Please return the errata sheet and notarized
     signature page to ALARIS LITIGATION SERVICES'
18   PRODUCTION DEPARTMENT for filing prior to trial
     date.

19
     Thank you for your attention to this matter.
20
     Sincerely,
21

22   Sarah A. Davison, CCR

23

24   Enclosures

25   cc:   MR. PATRICK McINERNEY
```

## LIEUTENANT GREG JIRAK  7/20/2021

```
 1                    WITNESS ERRATA SHEET

 2    Witness Name:  LIEUTENANT GREG JIRAK

 3    Case Name:  BLAINE FRANKLIN SHAW, et al. vs. HERMAN
      JONES in his official capacity as the Superintendant
 4    of the Kansas Highway Patrol, et al.

 5    Date Taken:  July 20, 2021

 6
      Page #_____  Line #_____
 7
      Should Read:  _____
 8
      Reason for Change:  _____
 9

10    Page #_____  Line #_____

11    Should Read:  _____

12    Reason for Change:  _____

13
      Page #_____  Line #_____
14
      Should Read:  _____
15
      Reason for Change:  _____
16

17    Page #_____  Line #_____

18    Should Read:  _____

19    Reason for Change:  _____

20
      Page #_____  Line #_____
21
      Should Read:  _____
22
      Reason for Change:  _____
23

24

25    Witness Signature:  _____
```

Page 135

```
 1    STATE OF                    )
                                  ) ss.
 2    COUNTY OF                   )

 3
      I, LIEUTENANT GREG JIRAK, do hereby certify:
 4          That I have read the foregoing deposition;
            That I have made such changes in form and/or
 5    substance to the within deposition as might be
      necessary to render the same true and correct;
 6          That having made such changes thereon, I
      hereby subscribe my name to the deposition.
 7          I declare under penalty of perjury that the
      foregoing is true and correct.
 8

 9
                      LIEUTENANT GREG JIRAK
10

11          Executed this       day of              ,

12           , at                                   .

13

14

15    Notary Public:

16    My Commission Expires:

17

18

19

20    Signature page to:  Lieutenant Greg Jirak

21    sad/LIEUTENANT GREG JIRAK, August 4, 2021

22    BLAINE FRANKLIN SHAW, et al. vs. HERMAN JONES in his
      official capacity as the Superintendant of the
23    Kansas Highway Patrol, et al.

24

25
```

1          IN THE SUPERIOR UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF KANSAS

3

   BLAINE FRANKLIN SHAW, et al.,

4

              Plaintiffs,

5

   vs.                              Case No.

6                                   19-1343-KHV-GEB

   HERMAN JONES IN HIS OFFICIAL

7  CAPACITY AS THE SUPERINTENDENT OF

   THE KANSAS HIGHWAY PATROL, et al.,

8

          Defendants.

9  _____

   MARK ERICH, SHAWNA MALONEY,

10 Individually and as mother and     Case No.

   natural guardian of minors D.M.    20-1067-KHV-GEB

11 and M.M.,

12         Plaintiffs,

13 vs.

14 HERMAN JONES, KHP Superintendent,

15         Defendants.

   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

16

17

             VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF

18

                 TROOPER RYAN WOLTING

19

20                 JULY 12, 2021

21               10 A.M. CENTRAL TIME

22

23

           SOMMER E. GREENE, CSR, RPR, CR No. 50622

24

25

U. S. District Court of Kansas
19-1343-KHV-GEB
PLAINTIFF TRIAL EXHIBIT NO.
140

Case 6:19-cv-01343-KHV   Document 521-4   Filed 05/15/23   Page 1 of 76

```
 1                      TOPEKA, KANSAS
 2              JULY 12, 2021; 10 A.M. CENTRAL TIME
 3
 4
 5                    THE VIDEOGRAPHER:  We are on the
 6      record.  Today's date is July 12th, 2021, and the
 7      time is 9:58 a.m.
 8                    This is the video-recorded deposition of
 9      Ryan Wolting, in the matter of Blaine Franklin Shaw,
10      et al., versus Herman Jones, et al., Case Number
11      19-1343-KHV-GEB, in the United States District Court
12      for the District of Kansas in consolidated cases.
13                    This deposition is being held all remote.
14      The reporter's name is Sommer Greene.  My name is
15      Ryan Gray.  I'm the legal videographer.  We are with
16      Alaris Litigation Services.
17                    Will the attorneys present please introduce
18      themselves and the parties they represent.
19                    MR. PIERSON:  I'm Josh Pierson for Sam
20      and Blaine Shaw and Josh Bosire.
21                    MS. PERRY:  Madison Perry, also for
22      all the plaintiffs.
23                    MS. BRETT:  Sharon Brett, also for the
24      plaintiffs.  And I will just note, we may have some
25      legal -- summer legal fellows for the ACLU of Kansas
```

```
 1      joining and listening in, but they obviously are not
 2      entering their appearances on the record.
 3                  MR. CHALMERS:  Arthur Chalmers for the
 4      defendants.
 5              If somebody enters the deposition, if they
 6      could please notify that on the record.
 7
 8
 9                  TROOPER RYAN WOLTING,
10      called as a witness herein, having been first duly
11      sworn by the Certified Reporter to speak the whole
12      truth and nothing but the truth, was examined and
13      testified as follows:
14
15                          EXAMINATION
16      BY MR. PIERSON:
17          Q.    All right.  Trooper Wolting, it's nice to
18      see you.  Like I just said, my name is Josh Pierson.
19      I'm an attorney for the plaintiffs in this action.
20      Thank you for being here today.  We appreciate your
21      time.
22              Will you please state and spell your full
23      name for the record?
24          A.    Ryan Wolting, R-y-a-n, W-o-l-t-i-n-g.
25          Q.    Thank you.
```

```
 1          A.   Almost four years.
 2          Q.   All right.  And were you a deputy sheriff
 3     the entire time?
 4          A.   Yes.
 5          Q.   All right.  And did you have any particular
 6     role as a deputy sheriff while you were employed with
 7     Lincoln County?
 8          A.   No.
 9          Q.   All right.  Could you describe just
10     generally what your job duties from Lincoln County
11     included?
12          A.   Answered calls for service, any complaints
13     the public had, traffic, criminal investigations.
14          Q.   Okay.  Um, and so after leaving Lincoln
15     County, where did you work next?
16          A.   I joined the highway patrol.
17          Q.   That's when you joined Kansas Highway
18     Patrol?
19          A.   Yes.
20          Q.   Do you recall the year that you joined
21     Kansas Highway Patrol?
22          A.   2001.
23          Q.   All right.  And have you been employed with
24     them since that time through now?
25          A.   Yes.
```

```
 1          Q.    All right.   So about 20 years with KHP.
 2   Did that sound about right?
 3          A.    Yes.
 4          Q.    All right.   When you first joined KHP, what
 5   position did you hold?
 6          A.    Trooper.
 7          Q.    Okay.   And then have you held any other
 8   role with KHP since becoming a trooper or other than
 9   being a trooper?
10          A.    You're going to have to ask -- I guess
11   ask -- ask that different.
12          Q.    Sure.
13                So I understand there's sort of different
14   functions maybe you have performed in your time at
15   KHP, and we can talk about those in a little bit, but
16   in terms of your formal job title, have you ever had
17   any other job title besides trooper?
18          A.    Master trooper.
19          Q.    Okay.
20          A.    Trooper, is that what you're asking?
21          Q.    Yeah.   That might be what I'm asking.   I
22   guess, I don't know, is that a different job title,
23   master trooper?
24          A.    It's confusing to the public.
25          Q.    Okay.   So you became a master trooper at
```

 1    some point, and then any other -- any other title
 2    besides master trooper or just -- or trooper?
 3         A.   Technical trooper.
 4         Q.   All right.  And so you said it could be a
 5    bit confusing for the public.  Why -- why do you say
 6    that?
 7         A.   Because a trooper is a trooper.
 8         Q.   All right.  Very good.
 9              Do you recall when you became a master
10    trooper?
11         A.   I do not.
12         Q.   All right.  How about when you became a
13    technical trooper, do you know when you became a
14    technical trooper?
15         A.   I can guess.
16         Q.   Sure.
17              Why don't you give me your best guess?
18         A.   2013.
19         Q.   All right.  That's the role you have now.
20    Right?  You're currently a technical trooper?
21         A.   Yes.
22         Q.   Sounds like you've been doing that for
23    about seven years or a little more, eight years
24    maybe?
25         A.   Yes.

1       Q.   All right.  And then are you -- you're
2  currently in Troop N.  Is that right?
3       A.   Yes.
4       Q.   And did you join Troop N when you became a
5  technical trooper?
6       A.   Yes.
7       Q.   All right.  What troop were you in before
8  joining Troop N?
9       A.   Troop C.
10       Q.   All right.  And where was that based out
11  of?
12       A.   The troop headquarters is in Salina.
13       Q.   Okay.  Were you not based out of Salina?
14  Were you based somewhere else?
15       A.   Again, this is confusing to the public.
16  You want me to explain it to you?
17       Q.   Sure.
18       A.   Every troop has a troop headquarters, and
19  that basically is what -- where there is a
20  headquarters office.  Your troop headquarters is in
21  the troop you live in.  The troop that you live in
22  could be two, five, 20 counties.  I lived in Lincoln
23  County, which was in Troop C, and Salina was the
24  Troop C headquarters.
25       Q.   I think I got it.  So it's a pretty large

```
 1        Troop N.  Is that right?
 2             A.   Yes.
 3             Q.   Okay.  Does Troop N do anything in
 4        particular as opposed to other troops?
 5             A.   We specialize more in criminal
 6        interdiction.
 7             Q.   Okay.  It does criminal interdiction work?
 8             A.   Yes.
 9             Q.   Okay.  What -- does that criminal
10        interdiction work or specialization, what you said,
11        is that something that you were doing as a master
12        trooper in Troop C?
13             A.   Yes, it was.
14             Q.   Okay.
15                  MR. CHALMERS:  Quick break.  They
16        turned our lights off here, and I would like to -- I
17        don't want to sit in the dark.
18                  MR. PIERSON:  Oh.  Is it --  Sure.
19                  THE WITNESS:  They're on a timer.
20                  MR. CHALMERS:  Is that right?  We need
21        to move around then.  There we go.
22                  MR. PIERSON:  Are we all right?
23                  MR. CHALMERS:  Yeah.
24                  MR. PIERSON:  That's funny.  I saw
25        them go off, and then it -- Zoom must have adjusted
```

```
 1            Q.    Okay.

 2            A.    So troop --

 3            Q.    Okay.

 4            A.    -- Troop N does not do them.

 5            Q.    Okay.  And so you're not -- are you just

 6      checking motorists' VIN and saying, yep, that's the

 7      VIN in order for them to get a license?  Is that --

 8      is that what it is?

 9            A.    Short answer, yes.

10            Q.    Okay.  That's probably not exactly how it

11      works.  Right?  But -- all right.  So I understand

12      that.  So you don't do that in Troop N.

13                  Does -- do other troops, as far as you

14      know, do those VIN checks, also?

15            A.    From my knowledge, most troops do.

16            Q.    All right.  And, again, as far as you know,

17      do you not do them in Troop N because of Troop N's

18      focus on criminal interdiction?

19            A.    I have no idea why we don't.

20            Q.    All right.

21                  Okay.  Let me talk about -- let's talk

22      about your typical day on -- as a technical trooper

23      in Troop N.  We talked about this a little bit, you

24      know, when you were a -- when you weren't a technical

25      trooper, but tell me what it is you do on a normal
```

1      day as a technical trooper in Troop N.

2           A.   I'm in my patrol -- in my patrol car

3      patrolling the highways.

4           Q.   Do you have a specific shift or time you

5      normally work?

6           A.   I usually work evenings or midnights.

7           Q.   Okay.  Tell me the hours you normally work.

8      When you say "evenings or midnight," what's the time

9      to time?

10          A.   It can vary.  It's an eight-hour shift.

11     Anywhere from possibly 2 p.m. on.

12          Q.   Okay.  All right.

13               Did you work last night?  Are you up -- are

14     you up --

15          A.   Yes, I did.

16          Q.   Are we -- we're taking your deposition

17     after your workday.  Is that right?

18          A.   Yes.

19          Q.   Did you get to sleep at all before you came

20     over for this?

21          A.   Yes.

22          Q.   Okay.  Well, that's good.

23               Your -- the shift that you worked, that

24     2:00 to 10:00, or whatever it is, did -- do you

25     select those hours, or was that something that was

1           Does that 15-day or your daily log, does it
2    include the number of, I think you said the number of
3    stops you would make, number of traffic stops?
4           A.   Are we talking about service rendereds, or
5    are we talking about total numbers?  You're going to
6    have to be more specific.
7           Q.   Okay.  So -- and maybe I'll ask you a
8    different question then.  It sounds like it's -- it's
9    broken down by different categories of -- of things
10   you're doing.  Is that right?
11          A.   Yes.
12          Q.   How about -- how about traffic violations
13   themselves, are you reporting a certain number of
14   traffic violations you're pulling people over?
15          A.   Yes.
16          Q.   All right.  And is that broken down further
17   by speeding or crossing the lines --
18          A.   Yes.
19          Q.   Okay.  All right.
20               What about -- what about -- what about drug
21   sniffs, dog sniffs, do you record the number of dog
22   sniffs you call out?
23          A.   I do not.
24          Q.   All right.  If you make an arrest, do you
25   record those numbers?

Case 6:19-cv-01343-KHV   Document 521-4   Filed 05/15/23   Page 12 of 76

```
 1     I -- could I stop someone and they drug dog sniff the

 2     vehicle, would it get recorded.  Is that your

 3     question?

 4          Q.   That's one version of a detention, I

 5     suppose.  Right?  So, yeah, would that get recorded?

 6          A.   Possibly.

 7          Q.   All right.

 8          A.   Depending on the outcome.

 9          Q.   Okay.  Well, tell me more about that.  What

10     do you mean?

11          A.   If there were no drugs, no, it would not be

12     recorded by me.  If there were drugs and I arrested

13     them, yes.

14          Q.   All right.  So if you detained someone,

15     suspicious if there were drugs in the vehicle and

16     that turned out not to be true, there would be no

17     tally or record of that detention.  Is that right?

18          A.   That's correct.

19          Q.   Do you know why that's the case?

20          A.   It's above my pay grade.

21          Q.   All right.  Has anyone ever told you why

22     that's the case?

23          A.   No.

24          Q.   All right.  Any other metrics or data that

25     you're keeping as you perform your duties on a
```

```
 1          typical shift?
 2               A.   Basically everything we talked about.
 3               Q.   All right.  Do you record your job
 4          activities anywhere else besides the daily log and/or
 5          15-day report?
 6               A.   No.
 7               Q.   All right.  Let's talk about how your
 8          performance is evaluated a little bit.  All right?
 9                    Do you receive regular performance
10          evaluations?
11               A.   Yearly.
12               Q.   Okay.  Who gives you your performance
13          evaluation?
14               A.   Your supervisor.
15               Q.   All right.  Your supervisor is who?
16               A.   Doug Rule.
17               Q.   And it's -- how long has Lieutenant Rule
18          been your supervisor?
19               A.   It's a guess.
20               Q.   Sure.
21               A.   Five years.
22               Q.   All right.  Did you have any other
23          supervisors on Troop N before Lieutenant Rule?
24               A.   Yes, I did.
25               Q.   How many?
```

Case 6:19-cv-01343-KHV   Document 521-4   Filed 05/15/23   Page 14 of 76

```
 1          Q.   Okay.  Will you -- what will you discuss
 2     about them?
 3          A.   They'll just mention them.
 4          Q.   Okay.
 5          A.   You know, you had -- you had one arrest for
 6     the year; you had 37 arrests for the year; you had
 7     700 seat belt tickets for the year; you had 97 child
 8     restraint warnings for the year.  You know, those are
 9     just numbers that I'm -- that I'm giving you.
10          Q.   Those kinds of numbers you'll go over with
11     your lieutenant during the performance evaluation?
12          A.   Sometimes.
13          Q.   All right.  How about -- how about drug
14     busts or finding drugs, are those numbers that you
15     might go over with your lieutenant?
16          A.   Possible.
17          Q.   All right.  Has a lieutenant ever
18     encouraged you to do more of something, to do more
19     motorist assists, more traffic stops, anything like
20     that?
21          A.   No.
22          Q.   Has a lieutenant ever praised you for doing
23     the number that you did?
24          A.   Yes.
25          Q.   All right.  Tell me about that.  When did
```

1    that happen?

2         A.    It's common.

3         Q.    Okay.   What kinds of numbers have you had

4    that you've been praised for?

5         A.    Nothing specific that I can think of, but,

6    like I said, you know, I mean, it can be -- it can be

7    various things.   You know, it can -- it can be -- you

8    know, you've -- you've worked a lot of accidents,

9    you've helped everybody out, you know, you've taken

10   somebody gas.   I mean, it can be -- it can be various

11   things.

12        Q.    How about traffic stops, have you ever been

13   congratulated or praised for the number of traffic

14   stops you've completed?

15        A.    Not that I remember.

16        Q.    Drug busts, have you ever been praised or

17   congratulated for -- for finding drugs or the number

18   of times you've found drugs or anything like that?

19        A.    Yes.

20        Q.    Tell me -- tell me about the times when

21   that has happened.

22        A.    Boy, I -- that's just a guess.

23        Q.    And I'm sorry.   I'm not asking for the

24   number of times, but give me an example of a time

25   when that happened, when you were praised for -- for

1    the number of drug busts you had or the kind -- or a

2    certain drug bust?

3         A.    They'll say good job.

4         Q.    Okay.  Who's the "they"?  You mean your

5    supervisor or who else?

6         A.    The lieutenant, yes.

7         Q.    Okay.  And how about in your performance

8    evaluations, have you ever talked about the number of

9    times you've found drugs or your drug-find metrics in

10   your performance evaluation?

11        A.    I'm sure I have.

12        Q.    All right.  In general has -- do you get

13   the impression that your lieutenant is hoping you'll

14   find more or wants you to find as many as you can?

15        A.    I guess I don't -- I guess I don't receive

16   an impression.

17        Q.    Okay.  Do you get raises as a result of

18   your performance evaluation, or do you have a yearly

19   raise that's tied to your performance evaluation?

20        A.    No.

21        Q.    All right.  Do you get yearly raises?

22        A.    No.

23        Q.    Okay.  Um, do you get merit-based raises of

24   any kind as opposed to cost of living or just

25   standard increases?

Case 6:19-cv-01343-KHV   Document 521-4   Filed 05/15/23   Page 16 of 76

1          Q.    All right.  Tell me about your academy

2     experience, how long did it last, and what all did

3     you have to do?

4          A.    I had 22 weeks of physical and -- and

5     mental preparation.

6          Q.    Did it matter -- did -- did you have to do

7     more or less or different types of things in the

8     academy since you were coming from a sheriff

9     department already, this wasn't your first law

10    enforcement job, or do you know?

11         A.    It was -- it was the same.

12         Q.    Okay.  So everybody who joins the KHP has

13    to go through the academy even if they were a sheriff

14    someplace else or with the sheriff's department

15    someplace else?

16         A.    That is correct.

17         Q.    All right.  Do you actually live there?

18    Did you and your fellow academy members have to live

19    together and train together for those 22 weeks?

20         A.    Yes.

21         Q.    All right.  Where -- where was it?

22         A.    In Salina.

23         Q.    And did you take classes in addition to the

24    physical training?

25         A.    Yes.

"Plfs. Obj:"
FRE 611(a) &
(b) because it
is beyond the
scope of the
direct
examination.

1    Q.    What classes do you recall taking?

2    A.    It was a long time ago.  Law classes,

3  driving classes, firearms classes, car stop classes.

4    Q.    Anything else you remember?

5    A.    Defense tactic classes.

6    Q.    Did you train on the Fourth Amendment, do

7  you remember?

8    A.    Yes.

9    Q.    All right.  Did you have a specific class

10  on that, do you know?

11    A.    I cannot remember.

12    Q.    All right.  And then after the academy was

13  over, do you have -- did you have any kind of

14  continuing training requirements?

15    A.    Yes.

16    Q.    Do you have a yearly training requirement

17  of some kind, a certain number of hours or something?

18    A.    Yes, I do.

19    Q.    Tell me about that.  What -- what do you

20  have to do to do your yearly training?

21    A.    It's 40 hours a year certain classes are

22  required through the highway patrol.  There's other

23  classes you can take also.

24    Q.    Do you know what kinds of classes are

25  required?  Do they cover certain topics?

Case 6:19-cv-01343-KHV   Document 521-4   Filed 05/15/23   Page 18 of 76

TROOPER RYAN WOLTING  7/12/2021

Page 69

```
 1          A.    First aid, CPR, firearms.  I don't remember
 2    what else.
 3          Q.    And then other than the -- are -- were all
 4    those hours, are they provided for you by the Kansas
 5    Highway Patrol itself?
 6          A.    Yes.
 7          Q.    All right.  Do you ever take additional
 8    training beyond that which KHP requires or offers?
 9          A.    I have, yes.
10          Q.    Tell me about those additional trainings
11    you've done.
12          A.    I don't remember anything specific.
13          Q.    Are they just classes you've elected to
14    take or sign up for?
15          A.    Yes.
16          Q.    All right.  Desert Snow is a program I've
17    heard of.  Does that ring a bell to you?
18          A.    Yes.
19          Q.    Did you ever do the Desert Snow program?
20          A.    Yes.
21          Q.    Can you tell me what that is?
22          A.    It's a criminal interdiction class.
23          Q.    What else -- what else do you remember or
24    know about that?
25          A.    It's been 20-some years ago since I've
```

"Plfs. Obj:" FRE 611(a) & (b) because it is beyond the scope of the direct examination.

App. Vol. XXII, 103

```
 1    taken it.
 2         Q.   Where -- where is it taught?
 3         A.   All over the United States, as far as I
 4    know.
 5         Q.   Where did you take it?
 6         A.   New Mexico, possibly.
 7         Q.   And that was one of those, you did that on
 8    your own; that wasn't something KHP required you to
 9    do?
10         A.   That's correct.
11         Q.   All right.  How long a course is it?
12         A.   I don't remember.  Maybe four to five days.
13         Q.   All right.  And do you go to New Mexico or
14    wherever it is and stay there for the four or five
15    days and do the class?
16         A.   Yes.
17         Q.   All right.  What kinds of stuff did you do
18    at Desert Snow training?
19         A.   Watched videos, searched cars.
20         Q.   Okay.  Any other private or outside
21    training that you can recall having taken since
22    you've joined the KHP?
23         A.   Not that I recall at the moment.
24         Q.   Okay.  How about updates to the law itself?
25    How -- how do you stay up to date on changes in the
```

 1    law or developments in the law that affect your
 2    policing?
 3         A.   One of two different ways.   There -- there
 4    could be possible -- there could be more.   We have a
 5    legal updates class at in-service, and there's also
 6    e-mails that come out in what's called the PowerDMS.
 7         Q.   PowerDMS, what does that stand for?
 8         A.   I have no idea.
 9         Q.   Okay.   Is it different than just an e-mail
10    in some way?
11         A.   Yes, it's in -- it's in a different
12    program.
13         Q.   All right.   So is that two things, then?
14    You get e-mails and things through PowerDMS?
15         A.   Three things.   Legal updates at in-service.
16         Q.   All right.   Those legal updates
17    in-services, are -- is that a regularly scheduled
18    thing, or is that something that happens and you get
19    told about, and that's when -- and that's when you
20    go?
21         A.   Ask that again, please.
22         Q.   I'll ask it a different way.
23              Do you have -- do you have a yearly legal
24    update every year no matter what?
25         A.   I can't answer that.

Case 6:19-cv-01343-KHV    Document 521-4    Filed 05/15/23    Page 21 of 76

App. Vol. XXII, 105

```
 1        Q.   All right.  When was the last legal update
 2    you had?
 3        A.   January or February.
 4        Q.   Okay.  Who led that legal update?
 5        A.   I don't remember.
 6        Q.   Did you go to a class or attend an online
 7    class or something for it?
 8        A.   Yes, online.
 9        Q.   All right.  And was there a presenter with
10    like a PowerPoint or how -- how did it work?  Tell me
11    about the update itself.
12        A.   I can't remember for sure.  But usually
13    it's Sarah Washburn.
14        Q.   And what kinds of stuff did you go over in
15    that one, do you recall?
16        A.   I don't remember.
17        Q.   All right.  And then in the past, besides
18    that last one in January or February, do you know how
19    regularly you have those legal updates?
20        A.   I can't answer that.  I don't know.
21        Q.   Okay.  Do you typically have them about
22    once a year?
23        A.   I would say that's typical.
24        Q.   All right.  Are they typically taught by
25    Sarah Washburn?
```

1        A.   Yes.

2        Q.   What do you do --  Let me ask you a

3   different question.

4            Are you tested in any way on the

5   information that you learned in the legal updates?

6        A.   Not that I remember.

7        Q.   And have you ever -- well, tell me about a

8   time that you recall learning something in the legal

9   update and it changed the way you did your job?

10        A.   I can't remember of any.

11        Q.   You don't recall any times where you've

12   had -- you've learned something in legal update and

13   it changed how you did something?

14        A.   No.

15        Q.   All right.  What about a PowerDMS message

16   or something you've learned from a PowerDMS message

17   about changes or updates in the law, how often does

18   that happen, would you say?

19        A.   I have no clue.  I can't answer that one.

20        Q.   Do you think it happens, would you say,

21   frequently?

22            MR. CHALMERS:  Lack of foundation.  He

23   just said he couldn't answer it, Counsel.

24        Q.   BY MR. PIERSON:  You can answer my

25   question.

```
 1                    MR. PIERSON:  Please don't make
 2      speaking objections.
 3           Q.   BY MR. PIERSON:  Trooper Wolting, would you
 4      say you get PowerDMS messages with legal updates once
 5      a month?
 6                    MR. CHALMERS:  Objection.  Asked and
 7      answered.
 8           Q.   BY MR. PIERSON:  You can answer.
 9           A.   I don't know how to answer, so I'm going to
10      say several times a year.
11           Q.   Thank you.
12                How about e-mails?  Do you have any idea of
13      how often you get e-mails with legal updates?
14           A.   No, I do not.
15           Q.   Okay.  Would you say several times a year
16      again?
17           A.   Yes.
18                    MR. CHALMERS:  Asked and answered.
19           Q.   BY MR. PIERSON:  Can you recall a time
20      where you changed how you did your policing as a
21      result of a message you got through PowerDMS or an
22      e-mail?
23           A.   Not that I can recall.
24           Q.   All right.  Any other time besides in those
25      three ways, in service, PowerDMS, e-mail, any other
```

```
 1          time you can recall learning of some update to the
 2          law in any way that caused you to change how you do
 3          your job?
 4                        MR. CHALMERS:  Assumes facts not in
 5          evidence.  Object to form.
 6               Q.   BY MR. PIERSON:  You can answer.
 7               A.   Not that I remember.
 8               Q.   Okay.  Let's talk about report writing.
 9          All right?  Do you write reports as part of your
10          policing duties?
11               A.   Yes, I do.
12               Q.   Okay.  Tell me about the reports that you
13          write.
14               A.   I list the facts and the details of the
15          case in the report.
16               Q.   When would you write that report?  What
17          kinds of things would you do that would cause you
18          to -- or strike that.
19                    What would happen, either you do it or
20          something happens, that would cause you to write a
21          report?
22               A.   Could be numerous things:  Accidents,
23          arrests, agency assist, possibly a service render.
24          That could be very broad.  That could be a very broad
25          topic.
```

```
 1        Q.    Okay.  Give me some examples.
 2        A.    If I assist a tire change and the person's
 3   wanted.  If I assist somebody out of gas and they're
 4   under the influence.  We could talk about it all day.
 5   I could give you examples.
 6        Q.    All right.  Any other incidents that would
 7   result in a report from you?
 8        A.    Nothing off the top of my head that we
 9   haven't talked about.
10        Q.    All right.  Do you write reports if you
11   detain a motorist but there's no arrest?
12        A.    No.
13        Q.    Why not?
14        A.    It's not required.
15        Q.    How did you learn it was not required?
16        A.    Through training.
17        Q.    Has that been the case your entire time
18   with Kansas Highway Patrol?
19        A.    It has.
20        Q.    Do you know why it's not required?  Has
21   anyone ever shared that with you?
22        A.    No.
23        Q.    Are you prohibited from writing reports in
24   any other circumstance?
25              MR. CHALMERS:  Object to form.
```

Case 6:19-cv-01343-KHV   Document 521-4   Filed 05/15/23   Page 26 of 76

```
 1    on it?
 2         A.   It doesn't matter to me if I call them
 3    Mr. or if I don't call them Mr.  It's my report.
 4         Q.   Do you think the KHP should dehumanize
 5    suspects?
 6         A.   Well, I have no opinion.
 7         Q.   You don't have an opinion one way or the
 8    other whether the KHP should humanize suspects?
 9         A.   Yeah, it doesn't matter to me.
10         Q.   All right.  I'm going to scroll down now to
11    OAG 1323.  Do you see "REASONABLE SUSPICION" up at
12    the -- up at the top there?
13         A.   Yes.
14         Q.   All right.  In your words, what is
15    reasonable suspicion?
16         A.   It's more than a hunch, it's the totality
17    of the circumstances.
18         Q.   When do you need reasonable suspicion?
19         A.   When do you need reasonable suspicion?
20         Q.   Yes.
21              MR. CHALMERS:  I think you're asking
22    for a legal question as framed.
23              MR. PIERSON:  That's fair enough.
24    I'll ask a different question.
25         Q.   BY MR. PIERSON:  When you're doing your
```

1    wanted person are you telling me you need reasonable

2    suspicion for?

3         A.   If you're in the middle of nowhere at

4    3 o'clock in the morning, there's no other vehicles,

5    and there was a burglary or a robbery and we knew it

6    was a pick-up or a car, if we knew it was a Kansas

7    vehicle, if we knew it was a tractor, a train that

8    could possibly put -- put some -- one person or

9    multiple people in the same place at the same time.

10        Q.   Okay.  And what would you need the

11   reasonable suspicion to do in that instance?

12        A.   To detain them.

13        Q.   Okay.  Would you write a report in that

14   instance if you detained a wanted person?

15        A.   I would, yes.

16        Q.   Okay.  And would you include your

17   reasonable suspicion in your report?

18        A.   Possibly.

19        Q.   All right.  How about any other examples of

20   when you need reasonable suspicion other than a

21   wanted person?  What are -- what are some other

22   examples of when you need reasonable suspicion as a

23   trooper?

24        A.   You're going to have to ask more specifics.

25   I don't know what you want me to say.

Case 6:19-cv-01343-KHV   Document 521-4   Filed 05/15/23   Page 28 of 76

App. Vol. XXII, 112

```
 1        Q.    Well, again, I don't want you to say
 2   anything.  I -- I'm asking for an example of
 3   something you would do while on patrol that requires
 4   reasonable suspicion.  Can you think of any?
 5        A.    No, I cannot.
 6        Q.    Okay.  Do you know of any instances when
 7   you need reasonable suspicion to do something as a
 8   trooper beyond detain a wanted person?
 9        A.    I don't know what you want me to answer --
10   how you want me to answer that.
11        Q.    Well, again, I -- I want you to give me an
12   example of a time besides just a wanted person where
13   you believe you need reasonable suspicion.  And if
14   you can't think of another example, you tell me that,
15   but --
16        A.    Okay.  I'm asking for another example.
17        Q.    Okay.  So the only example that you could
18   think of a time when you need reasonable suspicion as
19   a trooper is when you're detaining a wanted person.
20   Is that right?
21                    MR. CHALMERS:  Asked and answered.
22                    THE WITNESS:  That is one example,
23   yes.
24        Q.    BY MR. PIERSON:  And you can't think of any
25   others.  Is that right?
```

Case 6:19-cv-01343-KHV   Document 521-4   Filed 05/15/23   Page 29 of 76

App. Vol. XXII, 113

Case 6:19-cv-01343-KHV   Document 521-4   Filed 05/15/23   Page 30 of 76

```
 1        narcotics (Denver, CO)."  Did I read that right?
 2             A.   Yes.
 3             Q.   All right.  Do you ever consider the fact
 4        that someone is traveling from Denver, Colorado, when
 5        you're forming reasonable suspicion?
 6             A.   Today or 20 years ago?
 7             Q.   What's -- how about today?
 8             A.   That is one factor, yes.
 9             Q.   Okay.  What about 20 years ago?
10             A.   Less likely.
11             Q.   All right.  Why is that?
12             A.   Because marijuana is legal in Denver today.
13             Q.   And it wasn't 20 years ago.  Is that right?
14             A.   Correct.  To my knowledge.
15             Q.   So have you considered the fact if someone
16        is traveling from Denver -- Denver, Colorado, in
17        forming reasonable suspicion ever since marijuana has
18        been legal in Colorado?
19             A.   I can't remember that far back.
20             Q.   Do you know when you first started
21        considering the fact that someone was traveling from
22        Denver, Colorado, when you were forming reasonable
23        suspicion?
24             A.   No, I do not remember.
25             Q.   How long -- can you estimate as to how long
```

App. Vol. XXII, 114

1                    MR. CHALMERS:  It's been asked and

2       answered.  Counsel, please ask new questions.

3            Q.   BY MR. PIERSON:  Go ahead, Trooper Wolting.

4            A.   It is more than a hunch, and it's the

5       totality of the circumstances.

6            Q.   Okay.  All right.  Thank you.

7                 And I want to ask you what you mean by

8       "totality of the circumstances."  What does that mean

9       to you?

10           A.   It's everything together.

11           Q.   All right.  Can you be any more specific

12      than that?

13           A.   It's all the information you have put

14      together.

15           Q.   All right.  Um, are there any certain

16      pieces of information that commonly play a part in

17      forming your reasonable suspicion?

18           A.   It can be anything.

19           Q.   Can anything -- so literally any piece of

20      information could play a role in forming your

21      reasonable suspicion?

22           A.   Yes.

23           Q.   All right.  Can you give me any examples of

24      something that you've used in forming reasonable

25      suspicion, say, more than once, more commonly?

```
 1        A.    Can I give you examples of what I use as
 2   reasonable suspicion?
 3        Q.    Well, slightly different.  Examples of any
 4   information, pieces of information, something you
 5   learn that you use to form reasonable suspicion.
 6        A.    Vehicle owner, travel plans, person's
 7   demeanor.  It can be a wide array of things.
 8        Q.    Okay.  What about the vehicle's owner could
 9   play a role in forming your reasonable suspicion?
10        A.    What about the vehicle's owner?
11        Q.    Right.
12        A.    What are you asking me?
13        Q.    Well, I'm just trying to understand why you
14   said vehicle owner as an example of something that
15   might play a role in developing your reasonable
16   suspicion.  What about the vehicle's owner is
17   suspicious?
18        A.    If the person -- if the owner is not there.
19        Q.    Okay.  And why is that suspicious?
20        A.    Well, usually with a stolen vehicle, the
21   owner's not present.
22        Q.    Okay.  How about beyond whether or not the
23   vehicle is stolen, does it make you suspicious of
24   anything else?
25        A.    I don't understand what you're asking.
```

1     have the vehicle?  Is there a connection between the

2     two people?

3          Q.   All right.  And if there was a connection

4     between the two people, is -- would that abate your

5     suspicion?

6          A.   Possibly.

7          Q.   What about travel plans?  What's suspicious

8     potentially about travel plans?

9          A.   The duration, the route, the reason.

10         Q.   Anything else?

11         A.   Not that I can think of.

12         Q.   Any other examples besides vehicle owner or

13    travel plans that you can give me of things that

14    might play a role when you form reasonable suspicion?

15         A.   Well, there could be anything.

16         Q.   Yeah, I understand that.  But can you give

17    me any other examples?

18         A.   Just like your document here, you're not

19    going to drive a two-ton truck that gets four miles

20    to the gallon if gas is $4 and then say you're trying

21    to save money on gas.

22         Q.   Okay.  I'm going to take this off the

23    screen now.  Okay?  I think we're done with this one.

24              When you're doing the interdiction work on

25    Troop N as a technical trooper, are you trying to

1    pull over as many cars as you can?

2        A.   Yes.

3        Q.   And why is that?

4        A.   To find criminals and criminal activity.

5        Q.   Do you always have a reason to pull a car

6    over in the first place, though?

7        A.   Yes.

8        Q.   So are you looking for traffic violations?

9        A.   Yes.

10       Q.   Is it fair to say, though, that the goal of

11   the interdiction work is to find criminals, not just

12   police traffic.  Is that right?

13       A.   I don't understand what you're meaning.

14       Q.   All right.  How about in your own words,

15   tell me what the goal of the interdiction work is

16   that you do on Troop N.

17       A.   Apprehend criminals and criminal activity.

18       Q.   All right.

19       A.   Smuggling.

20       Q.   Go ahead.

21       A.   That was the rest of my answer.

22       Q.   And do you use the traffic laws and traffic

23   stops as a way to accomplish that goal?

24       A.   Yes.

25       Q.   And would you say you're more concerned

```
 1      running a stop sign, but there's also equipment
 2      violations that fall into that that -- that if you're
 3      driving down the windshield (sic) with a broken
 4      headlight or a broken windshield, some people might
 5      not look at that as traffic.
 6           Q.   Got it.
 7                When you're pulling people over, are you
 8      hoping to search as many cars as you can?
 9           A.   No.
10           Q.   All right.  But you are looking for drugs
11      or other criminal activity?
12           A.   Yes.
13           Q.   Okay.  Um, have you ever thought you had
14      found someone engaged in criminal behavior but then
15      turned out wrong that there wasn't anything going on?
16           A.   Yes.
17           Q.   All right.  And do you write reports in
18      those instances?
19           A.   I do not recall writing any reports in
20      those.
21           Q.   And when you've suspected someone of -- of
22      criminal behavior but then been able to -- been
23      unable to confirm it yourself, have you ever called
24      down the road or let another officer to know to be on
25      the lookout for that person?
```

 1        A.   Yes.

 2        Q.   All right.  Why would you do that?

 3        A.    Because sometimes other agencies will have

 4   more information about such people.

 5        Q.   All right.  Can you give me an example of a

 6   time you did that?

 7        A.   Not that I can remember.

 8        Q.   You don't remember any -- have you done it

 9   in the last year?

10        A.   I'm sure I have.

11        Q.   All right.  Do you remember the agency or

12   other officer that you called in one of those

13   instances?

14        A.   No, I don't.

15        Q.   Do you always do that if you suspect

16   someone's engaged in criminal behavior but turns out

17   you can't find anything?

18        A.   Very rare.

19        Q.   All right.  So what would make the

20   difference in your mind between deciding to sort of

21   follow-up on it like that versus not?

22        A.   Probably a big factor would be the location

23   where the person lives.

24        Q.   How so?

25        A.   If a subject lives in Wichita, Kansas,

```
 1        versus Minneapolis, Kansas, the likelihood of the
 2        police department or sheriff's department knowing
 3        them would be a lot more likely.
 4            Q.    I see.  So if the suspect's from a bigger
 5        municipality or town, well, I guess, I -- why don't
 6        you tell me yourself.  How does that make a
 7        difference?  I'm sorry if I misunderstood you.  But
 8        which agency --
 9            A.    Generally --
10            Q.    -- hypothetically would be more likely to
11        know somebody?
12            A.    The smaller the -- the smaller the city,
13        the more likely the person would be known.
14            Q.    I see.  And so if someone's from a smaller
15        city, you might call up that city to see if there's
16        something else going on?
17            A.    Yes.
18            Q.    All right.  How about other KHP troopers or
19        other sheriffs' offices, have you ever called ahead
20        and told them to be on the lookout for someone that's
21        driving down the highway with the hopes of being able
22        to pull them over again?
23            A.    Yes.
24            Q.    All right.  And tell me what would make you
25        do that in the times that you do?
```

```
 1          A.    Why would you do that?
 2          Q.    Yeah.
 3          A.    If there was no violation, if there was no
 4   canine available.
 5          Q.    How about if you've had the canine, there's
 6   a sniff and it turned up nothing, would you ever call
 7   ahead and tell someone to be on the lookout and try
 8   again?
 9          A.    Have I or would I?
10          Q.    Let's start with have you ever done that?
11          A.    Have I?  I'm sure I have.
12          Q.    All right.
13          A.    Do I have a specific instance?  No.
14          Q.    All right.  Do you know what the Kansas
15   two-step is?
16                MR. CHALMERS:  We had some noise here.
17   I'm not sure he heard you.
18                THE WITNESS:  Did you ask a question?
19          Q.    BY MR. PIERSON:  I did.  I'm sorry.
20                Do you know what the Kansas two-step is?
21          A.    I do.
22          Q.    Tell me what it is.
23          A.    It is what some people refer as taking two
24   steps away from a car.
25          Q.    Any more than that?
```

```
 1          A.   You cut out again.
 2          Q.   I said:  Any more than that?
 3          A.   That's my version.
 4          Q.   Taking two steps away from the car is the
 5     Kansas two-step?
 6          A.   Yes.
 7          Q.   All right.  What -- why do you do -- why do
 8     you do that?
 9          A.   I don't do that.
10          Q.   You don't do the Kansas two-step?
11          A.   No.
12          Q.   Okay.  Why not?
13          A.   Because I don't.  I don't count my number
14     of steps.
15          Q.   Have you been trained on the Kansas
16     two-step?
17          A.   No.
18          Q.   Okay.  How about any method where you're
19     hoping to end the traffic stop and then reengage in a
20     consensual encounter with the driver, have you been
21     trained in any method along those lines?
22          A.   Yes.
23          Q.   Do you engage in those methods?
24          A.   Yes.
25          Q.   Okay.  Do you call that the Kansas
```

1    two-step?

2         A.    I do not call that the Kansas two-step, no.

3         Q.    Are you aware that other people including

4    courts call that the Kansas two-step?

5         A.    Yes.

6         Q.    All right.  So when I asked you if you

7    engaged in the Kansas two-step, do you know what the

8    Kansas two-step is, and you told me you don't engage

9    in the Kansas two-step.  You meant you don't take two

10   steps away; that's all?

11        A.    I mean, that I don't count my steps away.

12   I -- I end it different and, you know, I'll -- I'll

13   walk away different.

14        Q.    All right.  But you do engage in a tactic

15   where you're intentionally trying to end the

16   encounter and reengage the driver in a consensual

17   encounter.  You do that.  Right?

18        A.    Yes.

19        Q.    Okay.  Why do you do that?

20        A.    So the person feels like they're free to

21   go.

22        Q.    Are they free to go in those instances?

23        A.    Sure.

24        Q.    Has anyone ever driven away from you when

25   you've done that?

TROOPER RYAN WOLTING 7/12/2021

1      A.   Yes, they have.

2      Q.   Were you standing next to the car when that

3 happened?

4      A.   Yes, I was.

5      Q.   How often has that happened?

6      A.   It's rare.

7      Q.   Did you feel -- well, what did you do after

8 that in one of those instances?

9      A.   I got in my car and completed my notes or

10 whatever I needed to do.

11      Q.   Were you on the side of the highway when

12 that happened?

13      A.   Yes, I was.

14      Q.   Were you standing next to the car when the

15 car pulled away?

16      A.   Yes.

17      Q.   Were you on the roadside or the other side

18 of the car?

19      A.   Both.

20      Q.   Okay.  Did you think that was safe for the

21 driver to do?

22      A.   If he looked in his mirror to make sure

23 there was no other traffic, sure, it was safe.

24      Q.   Well, tell me, do you recall a specific

25 incident where that happened where someone pulled

```
 1       away?
 2            A.   I remember it happening.  I do not remember
 3       any specifics about it.
 4            Q.   Um, do you know how many times it happened?
 5            A.   More than I can count.
 6            Q.   How often when you're doing stops do you
 7       think you use the two-step?
 8            A.   Frequently.
 9            Q.   Do you think you do it every time you're
10       out?  I'm sorry.  Let me ask a better question.
11                 On every shift every time you're out
12       patrolling for the day, do you think you do it every
13       time?
14            A.   I don't think it's fair to answer that
15       question.
16            Q.   You're just not sure.  Is that what you're
17       saying?
18            A.   Yes.
19            Q.   Well, why don't you describe what you do
20       when you engage in this procedure to try to end the
21       traffic stop and reengage in a consensual encounter.
22       Describe what you do to me.
23            A.   How I break off the encounter?  Is that
24       what you're asking?
25            Q.   I want you to -- I want you to describe
```

1    that whole procedure to me.  What do you do?  So I
2    suppose breaking -- trying to break off the contact
3    is part of it.  So...
4         A.    Is that where you want me to start?
5         Q.    Sure.
6         A.    Give them all their documents back, explain
7    everything to them, ask them if they have any
8    questions.  And I'll either say "Have a safe trip" or
9    "You're free to go," and I'll turn around and walk
10   away.
11        Q.    Do you use any other phrases besides --
12   besides those two, "Have a safe trip" or "You're free
13   to go"?
14        A.    Oh.  I'm sure I have.
15        Q.    Um, what happens next when you're using
16   that procedure?
17        A.    Somewhere when I'm between the -- behind
18   their door and my front bumper, I turn around and go
19   back to the window and ask if I could ask a few more
20   questions.
21        Q.    Okay.  Do you say it just like that, or do
22   you ever say anything else?
23        A.    Can I ask more questions?  Can I ask a few
24   questions?  There can be variables.
25        Q.    All right.  Anything else you do besides

1      just telling them -- besides what you just told me,

2      anything else you do or make sure happens when you're

3      trying to get consent for an additional question?

4              A.   Anything else I do or don't do?

5              Q.   Yeah.

6              A.   I don't touch the car.  I don't lean on the

7      car.

8              Q.   Why not?

9              A.   Because I don't want them to feel like

10     they're not free to leave.

11             Q.   Okay.

12             A.   I don't want to -- if they take off, I

13     don't want to fall down.

14             Q.   Anything else besides those?

15             A.   Not that I remember.

16             Q.   What makes you decide to use this method in

17     the -- versus the times when you don't?  How do you

18     decide to use this -- this -- this method?

19             A.   Reasonable suspicion.

20             Q.   Okay.  So do you only use -- I'm calling it

21     the two-step.  Do you understand what I mean when I

22     say "the two-step"?

23             A.   Yes.

24             Q.   Okay.  Do you only use the two-step when

25     you have reasonable suspicion?

1      A.      When I have it or when I'm trying to build
2    it, if I need more to build it.
3           Q.      Okay.  Let's talk about the times when you
4    have it.  So if you have reasonable suspicion, do
5    you -- you still will use the two-step?
6           A.      Yes.
7           Q.      Why is that?
8           A.      It's easier to practice one way and do it
9    the same all the time.
10          Q.      Easier -- easier for who?
11          A.      Me.
12          Q.      Got it.
13                  What would happen if someone pulled away
14   from you in these instances when you had reasonable
15   suspicion but you were using the two-step?  What
16   would happen if that person pulled away from you,
17   rather than -- rather than agree to talk to you?
18          A.      They have.
19          Q.      Even when you have reasonable suspicion?
20          A.      Yes.
21          Q.      Okay.  And you let them go?
22          A.      Yes.
23          Q.      Has anyone ever told you not to tell
24   drivers they're free to leave?
25          A.      Not that I remember.

```
 1          Q.    Have you ever been trained on that phrase?
 2          A.    Of telling them not to say it or -- or
 3    being told not to say it?
 4          Q.    Right.
 5          A.    I don't remember ever being told not to say
 6    that.
 7          Q.    Have you ever been told it's not necessary?
 8          A.    I don't remember.
 9          Q.    Have you ever heard of a case Vasquez
10    versus Lewis?
11          A.    If I have, I don't remember it.
12          Q.    Fair to say that if you don't remember
13    Vasquez, learning about it didn't change how you did
14    your job?
15          A.    I don't remember.
16          Q.    All right.  I'm going to show you another
17    document now.  All right?  So bear with me.
18                All right.  Trooper Wolting, can you see
19    this?
20          A.    Yes.
21          Q.    All right.  And just for the record, this
22    is OAG019896.  And I'm going to mark this Exhibit 56.
23    All right?
24                      (Deposition Exhibit 56 was marked for
25    identification.)
```

```
 1        know once you've read the thing on the bottom here.
 2             A.   Okay.
 3             Q.   All right.  I'm going to scroll up.
 4                  Do you see that second e-mail?
 5             A.   Okay.
 6             Q.   All right.  And I'll scroll all the way to
 7        the top, and you can read the remainder there.  Let
 8        me know once you have.
 9             A.   Yeah, it's just what I read.
10             Q.   Okay.  Did you -- have you seen the whole
11        document then?
12             A.   Yes.
13             Q.   All right.  Do you know what this is?
14             A.   It looks like an e-mail that was sent out
15        by Lieutenant Rule, January 7th of 2018.
16             Q.   All right.  And it looks like it was sent
17        to you to me.  Would you agree with that?
18             A.   Yes.
19             Q.   All right.  Do you recall receiving this
20        e-mail?
21             A.   I do not remember reading it.
22             Q.   Do you have any reason to dispute that you
23        received this e-mail?
24             A.   No.
25             Q.   All right.  I want to direct your attention
```

Case 6:19-cv-01343-KHV   Document 521-4   Filed 05/15/23   Page 48 of 76

1    to the -- there's a parenthetical in the third line

2    of that top e-mail where Lieutenant Rule writes, "a

3    license plate is never a factor for a traffic stop."

4            Do you see that?

5        A.    Yes.

6        Q.    All right.  Do you -- do you consider

7    license plates when you're making traffic stops?

8        A.    Can there be an issue with the license

9    plate?

10       Q.    Fair enough.  Why don't we look at the

11   whole sentence in -- in context there.

12            Lieutenant Rule wrote:  "In my opinion the

13   Trooper made a big mistake saying he was interested

14   in the truck because it had California plates (a

15   license plate is never a factor for a traffic stop)

16   and failed to articulate any reasonable suspicion

17   before calling for a dog."

18            Did I read that correctly?

19       A.    Yes.

20       Q.    In making stops or becoming interested in

21   motorists when you're patrolling, do you ever

22   consider a state of origin?

23       A.    What was your question?

24       Q.    You ever consider the state of origin of a

25   car when making traffic stops?

1         A.    Are you asking me do I stop the car because
2    of a certain state?
3         Q.    No, I'm not asking you that.  I'm asking in
4    deciding who to stop, do you consider a state of
5    origin?
6         A.    I stop as many cars as I can or whichever
7    cars have violations.
8         Q.    Do you stop every violation that you see?
9         A.    I do not.
10        Q.    Okay.  And in deciding which ones to stop,
11   do you ever consider the license plate?
12        A.    Do I stop --  Okay.  Again, do I stop the
13   violation -- do I stop the vehicle because of a
14   certain state or because of a violation?
15        Q.    Yeah, let me ask a different question.
16              I assume if you -- you might stop a vehicle
17   because the tags were expired.  Is that kind of what
18   you're kind of quibbling a little bit about?
19        A.    Yes.
20        Q.    So that would be because of the license
21   plate and you would maybe stop that person.  Is that
22   right?
23        A.    Yes.
24        Q.    Okay.  Fair enough.
25              But in deciding which traffic violations to

1    pull over or which people to pull over who have

2    committed traffic violations, do you ever consider

3    the state of the license plate in making that

4    decision?

5         A.    Do I stop it because of a certain state?

6         Q.    That's not quite my question, and I -- the

7    reason --

8         A.    You're going to have to make this clearer

9    here.

10        Q.    Yeah.  So you sort of -- I don't mean to

11   retread some stuff, but you've told me, right, that

12   you don't pull over every violation you come across.

13   Right?

14        A.    I can't, no.

15        Q.    And so you do make a decision when you're

16   pulling people over for traffic violations to pull

17   certain people over and not others.  Right?  Is that

18   fair?

19        A.    Yes.

20        Q.    All right.

21        A.    That's --

22        Q.    And so in making that decision, deciding

23   which people to pull over, which people not to pull

24   over, do you ever consider a state of -- on the

25   license?

```
 1        A.    Can it be a factor?

 2        Q.    Yeah.

 3        A.    Probably.  Do I remember of one?  No.

 4        Q.    And is that something that can be a factor

 5   today when you're patrolling?

 6        A.    You're going to have to ask the question --

 7   ask more of a question.

 8        Q.    Sure.

 9              So if the state of the license plate can be

10   a factor when you're deciding who to pull over, is

11   that still the case?  That's still how you police?

12        A.    I think it's -- do I stop more out-of-state

13   cars?  Is that your question?

14        Q.    No, that's not -- that's not my question.

15              You told me that the state of the license

16   plate can be a factor you consider in deciding who to

17   pull over, and my question is just is that still the

18   case today that you -- that you might do that?

19        A.    It's possible.

20        Q.    All right.  Thank you.

21              I'm going to show you -- actually, let me

22   direct your attention to something here.  I just want

23   to ask a quick --  Well, here, let me just do this.

24              So this is Exhibit 56 still, OAG19896, the

25   one we just got done looking at.  Right?
```

Case 6:19-cv-01343-KHV   Document 521-4   Filed 05/15/23   Page 51 of 76

App. Vol. XXII, 135

1          A.   No, I cannot name a document.

2          Q.   All right.  Thank you.

3               Okay.  And so you don't remember receiving

4     Exhibit 55 or Exhibit 56.  Is it fair to say that you

5     don't remember whether or not you changed your

6     policing practices as a result of receiving those

7     documents?

8          A.   I do not remember.

9          Q.   Okay.  How are you doing?  Are you okay if

10     we keep going a little bit, or do you need a little

11     break?

12          A.   Let's keep going.

13          Q.   All right.

14               MR. PIERSON:  Sommer, are you all

15     right?

16               THE COURT REPORTER:  I'm good.  Thank

17     you.

18          Q.   BY MR. PIERSON:  All right.  I'm going to

19     show you now a different document.  This will be --

20               MR. PIERSON:  One second, please.

21     We'll be marking this Exhibit 58.  And this is

22     OAG007868.  It should be in the chat there for

23     everyone.

24               (Deposition Exhibit 58 was marked for

25     identification.)

Case 6:19-cv-01343-KHV   Document 521-4   Filed 05/15/23   Page 52 of 76

1                    MR. PIERSON:  And then just to

2      clarify, Exhibit 58 is OAG007868 and 7869.

3           Q.   BY MR. PIERSON:  Trooper Wolting, can you

4      see this document?

5           A.   I can.

6           Q.   Is it big enough to read, or do you need me

7      to zoom in a little bit?

8           A.   You better zoom in.

9           Q.   All right.  How about now?

10          A.   Yes.

"Def. Obj:"
Irrelevant,
FRE 401.

11          Q.   Okay.  We'll look through the whole thing,

12     but can you already tell what this is?  Do you know

13     what this is, just the kind of thing it is?

14          A.   It says it's a police service dog report.

15          Q.   All right.  And have you seen other police

16     service dog reports?

17          A.   Probably.  Do I remember them?  No.

18          Q.   All right.  Would you say you commonly

19     review or see police service dog reports?

20          A.   No, I do not.

21          Q.   All right.  Um, let me just scroll through

22     this one.  Okay?  So take a look at those -- that

23     little bit of information there and let me know when

24     you want me to scroll down.

25          A.   Go ahead.

TROOPER RYAN WOLTING  7/12/2021

```
 1          Q.   All right.
 2          A.   Go ahead.  Go ahead.  Go ahead.
 3          Q.   All right.  Now we're getting on to a page
 4     called "Narrative."
 5               Why don't you read the narrative, and let
 6     me know once you have.
 7          A.   Okay.
 8          Q.   All right.  Scroll down to the very bottom
 9     just so you could see the rest of it.  You see it's
10     just blank.  Right?
11          A.   Yes.
12          Q.   All right.  So my -- my first question is,
13     have you seen this document before today?
14          A.   I have not.
15          Q.   All right.  Having read the narrative
16     report there, do you recall this stop at all?
17          A.   I do not.
18          Q.   All right.  You will agree with me that the
19     narrative describes a stop that you made on
20     September 17th, 2020.  Correct?
21          A.   Yes.
22          Q.   And the report that we're looking at was
23     written by Justin Rohr.  Did I say that right?
24          A.   Yes.
25          Q.   Do you know Justin Rohr?
```

"Def. Obj:"
Irrelevant,
FRE 401.

1       A.   I do.

2       Q.   Who is he?

3       A.   He's a lieutenant with the dog unit.

4       Q.   Do you commonly -- does Justin Rohr

5  commonly search cars that you have stopped?

6       A.   You're going to have to ask that a

7  different way.

8       Q.   Yeah, I just want to -- do you -- do you do

9  anything -- do you try to use Lieutenant Rohr for

10  your dog sniffs?

11      A.   I have used Lieutenant Rohr in the past,

12  yes.

13      Q.   All right.  And -- well, why don't you tell

14  me the procedure for calling out a drug dog.

15      A.   If I have enough reasonable suspicion to

16  believe that there's criminal activity and the driver

17  refuses, then I call for a drug dog.

18      Q.   Okay.  And when you make that call, is it

19  over the radio?

20      A.   Could be.

21      Q.   How else could it be?

22      A.   On the phone.

23      Q.   All right.  And is that a phone like a

24  police phone from KHP?

25      A.   Yes.

Case 6:19-cv-01343-KHV   Document 521-4   Filed 05/15/23   Page 56 of 76

```
 1            Q.    Okay.  Do you -- do you make any special
 2      effort to call Lieutenant Rohr to do your drug dog
 3      sniffs?
 4            A.    Sometimes he's my only option.
 5            Q.    Okay.  Any other reason?
 6            A.    Like what?
 7            Q.    I don't know.  Do you like working with
 8      Lieutenant Rohr?
 9            A.    Sure.
10            Q.    Do you prefer when Lieutenant Rohr comes
11      out with his dog versus other dog handlers?
12            A.    No, it doesn't matter to me.
13            Q.    All right.  And you're not assigned to
14      specific dog handlers when you go out.  Is that
15      right?
16            A.    Nope.
17            Q.    Just based on availability and who's there,
18      that kind of thing?
19            A.    Correct.
20            Q.    All right.  Okay.
21                  So in this report from Lieutenant Rohr, it
22      turns out the dog didn't find anything.  Do I have
23      that right, at least if the report is right?
24            A.    Yes.
25            Q.    Okay.  How frequent an occurrence is that,
```

"Def. Obj:"
Irrelevant,
FRE 401.

Case 6:19-cv-01343-KHV   Document 521-4   Filed 05/15/23   Page 57 of 76

1    would you say?

2        A.    Rare.

3        Q.    And you don't recall the specific stops?

4    You don't know what happened after you got done with

5    the dog sniff here?

6        A.    I do not.

7        Q.    And I suppose that means you don't recall

8    what your suspicion was that something criminal was

9    happening.  Right?

10       A.    I do not.

11       Q.    Is there any way anybody could find out

12   what your -- what led to your suspicion in this stop?

13       A.    Not that I know of.

14       Q.    Do you know if anybody ever asked you about

15   this stop?

16       A.    I don't remember anybody.

17       Q.    All right.  We're going to do -- look at

18   another one here.

19             I'm going to show you Exhibit 59.  It

20   should just be in the chat there.

21             Do you see that, Trooper Wolting?

22       A.    I do.

23                 MR. PIERSON:  Okay.  And for the

24   record Exhibit 59 is OAG002849 and OAG002850.

25                 (Deposition Exhibit 59 was marked for

"Def. Obj:" Irrelevant, FRE 401.

"Def. Obj:" Irrelevant, FRE 401.

Case 6:19-cv-01343-KHV   Document 521-4   Filed 05/15/23   Page 58 of 76

1        identification.)

2            Q.   BY MR. PIERSON:  All right.  So we'll do

3        the same one -- same thing we did last time.  So

4        let's start at the top, and you tell me when you're

5        ready to review farther down.  Okay?

6            A.   Okay.  Go ahead.

7                 Okay.

8                 Okay.

9            Q.   Get down to the narrative here.  Let me

10       know when you've read the entire narrative.

11           A.   Okay.

12           Q.   All right.  Then I'll just show you the

13       rest.  You can see that there's nothing else on the

14       bottom of this.

15                 Do you -- have you seen this document

16       before today?

17           A.   Not that I remember.

18           Q.   And it describes a stop on July 8th, 2015,

19       that you had made.  Do you recall that stop at all?

20           A.   I do not.

21           Q.   All right.  This, again, is another

22       Lieutenant Rohr drug sniff.  Right?

23           A.   Yes.

24           Q.   Any chance you know whose initials those

25       are next to reviewer's initials?

"Def. Obj:" Irrelevant, FRE 401.

"Def. Obj:" Irrelevant, FRE 401.

Case 6:19-cv-01343-KHV   Document 521-4   Filed 05/15/23   Page 59 of 76

"Def. Obj:"
Irrelevant,
FRE 401.

1          A.    Not mine.

2          Q.    Okay.  If we look at the narrative here,

3     Trooper Rohr writes that he -- that you requested him

4     out for a canine sniff that you had stopped in

5     Lincoln County.  You'll see here, unlike Exhibit 58,

6     Trooper Rohr doesn't write anything about your

7     suspicion of criminal activity.

8               First, do you know if you suspected

9     criminal activity in this stop?

10         A.    I don't remember.

11         Q.    Okay.  Would you have potentially asked

12    people to exit the vehicle and call for a canine

13    sniff if you didn't suspect criminal activity?

14         A.    I would have had reasonable suspicion.

15         Q.    Okay.  And, again, there's nothing here

16    about your reasonable suspicion.  Is there any -- do

17    you recall your reasonable suspicion in this case?

18         A.    I do not.

19         Q.    Any way anybody could find out what it was?

20         A.    I don't know how.

21         Q.    And, again, this was one where there were

22    no drugs found, at least according to

23    Lieutenant Rohr.  Correct?

24         A.    Yes.

25         Q.    Let me ask you quickly, this case number up

1     **here, 2015-009473, do you see that?**

2        A.   Yes.

3        **Q.   Is that -- is that a different case number**

4     **than the KHP case numbers we were talking about**

5     **earlier today that required reports from you, or do**

6     **you know?**

7        A.   That's the same.

8        **Q.   Okay.  So was there a KHP case number**

9     **assigned to this stop then?**

10       A.   Yes, that's Trooper Rohr's case number.

11       **Q.   All right.  Why wouldn't you have had to**

12    **write a report for this stop if the case number was**

13    **assigned to it?**

14       A.   Why wouldn't I?

15       **Q.   Right.**

16       A.   Because I didn't arrest anybody.

17       **Q.   Okay.  Any other reason?**

18       A.   I don't know what it would have been.

19       **Q.   All right.  Okay.  Show you a few more.**

20     **All right?**

21          **I want to show -- I'm going to put what**

22     **we're marking OAG 290- -- excuse me.  We're marking**

23     **Exhibit 60, which is OAG 2905.  And I'll put that in**

24    **the chat.**

25           (Deposition Exhibit 60 was marked for

"Def. Obj:" Irrelevant, FRE 401.

1          identification.)

2          Q.   BY MR. PIERSON:   Trooper Wolting, do you

3     see this?

4          A.   Yes.

5                    MR. PIERSON:   So, for the record,

6     Exhibit 60 is OAG002905 to OAG002906.

**"Def. Obj:" Irrelevant, FRE 401.** (lines 5-6)

7          Q.   BY MR. PIERSON:   All right.  I think we'll

8     just do the same thing.  We're getting pretty good at

9     it here.  So the -- let me know once you've reviewed

10    the top here.

11         A.   Go ahead.

12              Okay.

13         Q.   We'll do the -- we can do the narrative all

14    at once.  Let me know when you're ready for that.

15         A.   Go ahead.

16         Q.   Okay.

17         A.   Okay.

18         Q.   You've read the whole thing?

19         A.   Yes.

**"Def. Obj:" Irrelevant, FRE 401.** (lines 18-19)

20         Q.   All right.  We'll look at the bottom here,

21    make sure there's nothing else, and then so have you

22    seen Exhibit 60 before today?

23         A.   No.

24         Q.   Okay.  Do you recall the incident that it

25    describes?

**"Def. Obj:" Irrelevant, FRE 401.** (lines 24-25)

App. Vol. XXII, 145

1         A.    I do not.

2         Q.    All right.  And, again, you'll agree with

3    me that this looks like a dog handler report from

4    Lieutenant Rohr.  Right?

5         A.    Yes.

6         Q.    This one's not initialed.  Any idea why

7    some would be initialed and some wouldn't be?

8         A.    I have no idea.

9         Q.    Okay.  And do you recall this stop on

10   October 8th, 2015, that you initiated?

11        A.    I do not.

12        Q.    Okay.  Any way anybody could -- well, would

13   you have had reasonable suspicion to detain this

14   motorist and call a dog sniff?

15        A.    Yes.

16        Q.    Okay.  Any way we could figure out what

17   that was?

18        A.    No.

19        Q.    Again, looks like the dog didn't alert --

20        A.    Let me see that name again.

21        Q.    Oh, sure.  The -- the -- the driver?

22        A.    Yes.

23        Q.    Okay.

24        A.    Yeah, I don't remember it.

25        Q.    Okay.  Was there one you were thinking of?

"Def. Obj:" Irrelevant, FRE 401.

Case 6:19-cv-01343-KHV   Document 521-4   Filed 05/15/23   Page 62 of 76

App. Vol. XXII, 146

1    A. Well, I had one out of Kansas City that

2  gave me a fake driver's license, and he was wanted.

3    Q. Oh. Did you end up detaining him and

4  finding that out, or did he leave?

5    A. No, I'm still looking for him today.

6    Q. I see. When was that?

7    A. Years ago.

8    Q. I got you. Okay.

9     How did you figure out that he was wanted

10  if he gave you the fake license?

11    A. I can't remember now. It's been a long

12  time ago.

13    Q. All right.

14    A. But I thought it was pretty ironic, you

15  know, he was from Kansas City, and we were that

16  close.

17    Q. Uh-huh. Was he wanted in Kansas City, or

18  do you remember?

19    A. I can't remember.

20    Q. Do you remember if you -- did you have

21  reasonable suspicion? Did you call a drug dog out

22  for that one?

23    A. I can't remember that either.

24    Q. Okay. Okay. So, again, with this stop, is

25  there any way anybody could figure out what your

"Def. Obj:"
Irrelevant,
FRE 401.

1    reasonable suspicion was for this stop?

2         A.   I don't know how.

3         Q.   All right.  Would you have had reasonable

4    suspicion for this to call the drug dog?

5         A.   I'm sure I did.

6         Q.   All right.  We're going to almost be

7    through these, okay?

8              I'm going to show you now -- this will be

9    Exhibit 61.  I'm putting it in the chat.  Can you see

10   this, Trooper Wolting?

11        A.   Yes.

12             (Deposition Exhibit 61 was marked for

13   identification.)

14        Q.   BY MR. PIERSON:  Okay.  So, for the record,

15   Exhibit 61 is OAG003700 to OAG003701.  Let's review

16   it, and let me know when you want me to scroll down.

17        A.   Okay.  Go ahead.

18             Go ahead.  Okay.

19        Q.   All right.  And I want you to read the

20   narrative report.

21        A.   Go ahead.

22        Q.   Okay.  You've seen the whole document now?

23        A.   Yes.

24        Q.   All right.  Have you seen Exhibit 61 before

25   today?

**"Def. Obj:" Irrelevant, FRE 401.** (lines 8-9)

**"Def. Obj:" Irrelevant, FRE 401.** (lines 14-15)

**"Def. Obj:" Irrelevant, FRE 401.** (lines 22-23)

1          A.    Not that I'm aware of.

2          Q.    Okay.  Again, this is a police dog handler

3    report for a stop that you made, it looks like.

4    Right?

5          A.    Yes.

6          Q.    S.R. Walker, who is that?

7          A.    Scott Walker.

8          Q.    Okay.  I assume he's a dog handler or was?

9          A.    Yes.

10         Q.    All right.  Is he still, do you know?

11         A.    Yes.

12         Q.    And he doesn't write the date of the stop

13   down in the narrative, but it looks like, if we

14   scroll up here, it happened on April 25th, 2016, at

15   about 3:30.

16               Is that 3:30 in the morning?

17         A.    Yes.

18         Q.    Okay.  Do you recall this stop?

19         A.    I do not.

20         Q.    All right.  And Trooper Walker writes that

21   based on criminal indicators, you suspected criminal

22   activity, later asked for consent, you were denied,

23   and that's when the drug dog was deployed.

24               Do you see all that?

25         A.    Yes.

"Def. Obj:" Irrelevant, FRE 401.

Case 6:19-cv-01343-KHV   Document 521-4   Filed 05/15/23   Page 65 of 76

1         Q.    Okay.  Do you know what the criminal

2    indicators were?

3         A.    I do not.

4         Q.    Would anybody be able to find out what they

5    were?

6         A.    I don't know how.

7         Q.    So for all of these stops we just looked

8    at, there was a drug dog called out.  No drugs found.

9    Right?

10        A.    Correct.

11        Q.    And there's no record of your reasonable

12   suspicion to call out the drug dog.  Right?

13        A.    No record.

14        Q.    Okay.  Did anybody in charge, one of your

15   supervisors, someone higher up, ever talk to you

16   about incorrect reasonable suspicion?

17        A.    Not that I remember.

18        Q.    Did anyone ever try to tell you what you

19   could do different to make sure you're only detaining

20   motorists when it's appropriate or when there is

21   something criminal going on?

22        A.    Not that I remember.

23        Q.    Are there ever any internal consequences of

24   any kind from management or your supervisors when you

25   are stopping and detaining motorists but fail to find

1    criminal activity?

2         A.   Have I been disciplined?  Is that what

3    you're asking?

4         Q.   Well, that's not only what I'm asking, but

5    have you been disciplined for that?

6         A.   No.

7         Q.   Has there been any other consequences,

8    training, workshop, conversation?

9         A.   No.

10        Q.   Do you sometimes find drugs on motorists

11   but throw the drugs out and let the motorist go?

12        A.   Yes.

13        Q.   Why do you do that?

14        A.   Small amounts, I could fill the jail up

15   every day if I arrested every thing -- for every

16   illegal thing there was.

17        Q.   Do you ever find felony amounts of -- of

18   narcotics and still let the driver go?

19        A.   I don't carry a scale with me and weigh it,

20   but probably.

21        Q.   Does it require work to make an arrest?  I

22   mean, besides the actual action of arresting someone,

23   do you have to do something after the fact if you

24   make an arrest?

25        A.   Take them to jail.

Case 6:19-cv-01343-KHV   Document 521-4   Filed 05/15/23   Page 67 of 76

```
 1          Q.    Okay.  How about paperwork, do you have to
 2   do any paperwork when you make an arrest?
 3          A.    Yes, there's paperwork.
 4          Q.    Okay.  How much paperwork?
 5          A.    Four, five, six pages.
 6          Q.    Okay.  How long do you think it normally
 7   takes you to fill out the paperwork after you've
 8   arrested someone?
 9          A.    I sit down and knock it out 30, 45 minutes.
10          Q.    What about follow-up, so after the night of
11   the arrest, is there work later on?
12          A.    Not much.
13          Q.    Do you ever choose to throw away drugs you
14   found because you're concerned you didn't have
15   adequate reasonable suspicion for the detention?
16          A.    No.
17          Q.    Do you know of any officers that do that?
18          A.    I do not.
19          Q.    Do you ever choose not to arrest someone
20   because you'd have to write a report if you made that
21   arrest?
22          A.    No.
23          Q.    If you arrest someone and write a report,
24   do you include your reasonable suspicion in that
25   report?
```

1          Q.    Did you discuss your deposition testimony

2     at all with him?

3          A.    Nope.

4          Q.    Okay.  At any of the other breaks today,

5     have you spoken with anybody besides your lawyer?

6          A.    Seems like there was somebody earlier.  I

7     don't remember who.

8          Q.    Okay.

9          A.    It was in passing.

10         Q.    Did you speak about your deposition

11    testimony with anybody besides your lawyer today?

12         A.    Nobody.

13         Q.    Okay.  Earlier this morning we were talking

14    about the things that might lead you to have

15    reasonable suspicion.  You mentioned vehicle owner,

16    travel plans, and demeanor.

17              I asked you about travel plans.  You broke

18    that down three more times.  You said duration,

19    route, and reason.  I want to talk about route a

20    little bit more.

21              What about the route of someone's travel

22    plans would be suspicious to you?

23         A.    Not taking the most direct route.

24         Q.    Why is that suspicious?

25         A.    Could be financially, could be several

 1    reasons.  If you're going to drive from point A to
 2    point B, you don't drive 500 miles out of your way.
 3         Q.    So what -- but what about that fact makes
 4    you suspicious of criminal activity?
 5         A.    If you're trying to avoid some other
 6    highways.
 7         Q.    Okay.  You ever consider the destination
 8    someone is heading to in their route as something
 9    that adds to your reasonable suspicion?
10         A.    It's possible.
11         Q.    Okay.  Give me an example of a time you've
12    done that.
13         A.    Nothing that I can recall --
14         Q.    Okay.
15         A.    -- particularly.
16         Q.    Well, can you give me an example of how
17    that might happen even if you don't recall it
18    particularly?
19         A.    No, I can't give you an example.
20         Q.    Where is a place someone could be traveling
21    to that you think would make it more suspicious?
22         A.    Someplace they don't have any connection
23    to.
24         Q.    All right.  Anything else?
25         A.    You don't drive to Nashville, Tennessee, to

1    visit your friend that has lived -- lived there 20

2    years ago and you don't know if he still lives there,

3    do you?

4         Q.   So you think if their story doesn't make

5    sense.  Is that what you're telling me?  Like the

6    reason for their travel destination?

7         A.   All of it together, yes.

8         Q.   Okay.  What about a known drug source, if

9    someone was travelling to a known drug source, is

10   that something you might consider in forming

11   reasonable suspicion?

12        A.   It could be, but today with being 20201,

13   the way drugs are legal everywhere, I don't know that

14   that weighs in a lot of it.

15        Q.   We were talking about destination.  What

16   about origin?  Someone traveling from a certain

17   place, what about where someone is traveling from

18   would heighten your suspicion?

19        A.   Same thing, you know, with -- with it being

20   2021 and the drugs that are legal where they're

21   legal, it would play a factor but not a large factor.

22        Q.   Do you know which states that border Kansas

23   have some form of legal drugs?

24        A.   I know that Oklahoma and Colorado.  It's

25   the only two that I know.

Case 6:19-cv-01343-KHV   Document 521-4   Filed 05/15/23   Page 71 of 76

1        Q.    And so if someone was traveling to and from
2     Oklahoma or Colorado, is it your testimony that that
3     could play a role, whatever the size, in your
4     formation of reasonable suspicion?
5        A.    It with other factors.
6        Q.    Would those other factors have to be
7     extraordinary?
8        A.    I guess your definition of extraordinary
9     and mine are different.
10       Q.    Explain yours.
11       A.    Extraordinary to me means I won the
12    lottery.
13       Q.    Okay.  So would the other factors along
14    with traveling to or from Oklahoma or Colorado have
15    to be so extraordinary it was similar to you winning
16    the lottery for you to consider those travel plans
17    suspicious?
18       A.    They could be considered suspicious.
19       Q.    Let me show you another document.
20       A.    You're going to have to speak up.  I can't
21    hear you.
22       Q.    I'm sorry.  I was sort of talking to
23    myself, wasn't I?  I'm going to show you another
24    document now.
25             I just put it into the chat.  And so we'll

```
 1                       CERTIFICATE

 2

 3           I, Sommer E. Greene, Certified Court

 4      Reporter for the State of Arizona, certify:

 5               That the foregoing proceedings were taken

 6      by me; that I am authorized to administer an oath;

 7      that the witness, before testifying, was duly sworn

 8      by me to testify to the whole truth; that the

 9      questions propounded by counsel and the answers of

10      the witness were taken down by me in shorthand and

11      thereafter reduced to print by computer-aided

12      transcription under my direction; that review and

13      signature was requested; that the foregoing pages are

14      a full, true, and accurate transcript of all

15      proceedings and testimony had upon the taking of said

16      proceedings, all to the best of my skill and ability.

17

18               I FURTHER CERTIFY that I am in no way

19      related to nor employed by any of the parties hereto

20      nor am I in any way interested in the outcome hereof.

21               DATED this ___ day of _____, 20__.

22               _____
                 Sommer E. Greene
23               Certified Court Reporter No. 50622
                 For the State of Arizona
24

25
```

```
 1                    ALARIS LITIGATION SERVICES

 2

 3      AUGUST 5, 2021

 4

        KANSAS ATTORNEY GENERAL'S OFFICE
 5      ARTHUR CHALMERS, ESQ.
        120 SW 10th Avenue, 3rd Floor
 6      Topeka, Kansas 66612
        785.296.6296

 7

 8      IN RE:  Blaine Franklin Shaw v. Herman Jones, et al.

 9

        Dear Mr. Chalmers,
10
        Please find enclosed your copies of the deposition of
11      Trooper Ryan Wolting taken on July 12, 2021, in the
        above-referenced case.  Also enclosed is the original
12      signature page and errata sheets.

13      Please have the witness read your copy of the
        transcript, indicate any changes and/or corrections
14      desired on the errata sheets, and sign the signature
        page before a notary public.
15
        Please return the errata sheets and notarized
16      signature page within 30 days to our office at 711 N
        11th Street, St. Louis, Missouri 63101 for filing.
17
        Sincerely,
18

19
        Sommer E. Greene
20

21      Enclosures

22

23

24

25
```

```
 1                        ERRATA SHEET

 2      Witness Name:  TROOPER RYAN WOLTING

 3      Case Name: BLAINE SHAW v. HERMAN JONES, ET AL.

 4      Date Taken:  JULY 12, 2021

 5

 6      Page #_____Line #_____

 7      Should Read:_____

 8      Reason for change:_____

 9

10      Page #_____    Line #_____

11      Should Read:_____

12      Reason for change:_____

13

14      Page #_____Line #_____

15      Should Read:_____

16      Reason for change:_____

17

18      Page #_____Line #_____

19      Should Read:_____

20      Reason for change:_____

21

22      Page #_____Line #_____

23      Should Read:_____

24      Reason for change:_____

25      Witness Signature:_____
```

```
 1      STATE OF                )

 2      COUNTY OF               )

 3

 4      I, TROOPER RYAN WOLTING, do hereby certify:

 5           That I have read the foregoing deposition;

 6           That I have made such changes in form and/or

 7      substance to the within deposition as might be

 8      necessary to render the same true and correct;

 9           That having made such changes thereon, I hereby

10      subscribe my name to the deposition.

11           I declare under penalty of perjury that the

12      foregoing is true and correct.

13           Executed this _____ day of _____,

14      20__, at_____.

15

16

17

18

19                         TROOPER RYAN WOLTING

20

21

22                         NOTARY PUBLIC

23

24      My Commission Expires:

25
```

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that a copy of the foregoing APPELLANT'S APPENDIX, as submitted in digital form is an exact copy of the document filed with the Clerk.

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2024, the foregoing APPELLANT'S APPENDIX was electronically filed with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I also certify that within five business days of the issuance of notice that the electronic filing is compliant, one paper copy will be delivered by Federal Express to the Clerk's Office.


DATED: April 24, 2024                    /s/ Kurtis K. Wiard