## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

BLAINE FRANKLIN SHAW, et al.,
*Plaintiffs-Appellees,*

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

———

MARK ERICH, et al.,
*Plaintiffs-Appellees,*

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

## APPELLANT'S APPENDIX VOLUME XXIII

Appeal from the United States District Court for the District of Kansas
Honorable Kathryn H. Vratil, Senior District Court Judge
District Court Case Nos. 19-CV-1343-KHV and 20-CV-1067-KHV-GEB

**OFFICE OF ATTORNEY GENERAL
KRIS W. KOBACH**

120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
(785) 296-2215
anthony.powell@ag.ks.gov
dwight.carswell@ag.ks.gov
kurtis.wiard@ag.ks.gov

Anthony J. Powell
 *Solicitor General*
Dwight R. Carswell
 *Deputy Solicitor General*
Kurtis K. Wiard
 *Assistant Solicitor General*

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

Deposition of Randy Moon
  (Trial Exhibit No. 134A)....................................................................1

*BLAINE FRANKLIN SHAW, et al. vs.*

*HERMAN JONES, et al.*

*DEPOSITION OF RANDY MOON*

*July 28, 2021*



METROPOLITAN
COURT REPORTERS
COURT REPORTING + LEGAL VIDEO

mcr@metropolitanreporters.com
www.metropolitanreporters.com
913.317.8800   800.748.7511

OUT-OF-TOWN DEPOSITIONS?
WE'VE GOT YOU COVERED!



WWW.DEPOSPAN.COM

**U. S. District Court of Kansas**
**19-1343-KHV-GEB**
**PLAINTIFF TRIAL EXHIBIT NO.**
**134A**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF KANSAS

 3

 4     BLAINE FRANKLIN SHAW, et al.,

 5                    Plaintiffs,

 6     vs.                              No. 6:19-cv-01343

 7     HERMAN JONES, in his official

 8     capacity as the Superintendent

 9     of the Kansas Highway Patrol,

10     et al.,

11                    Defendants.

12

13

14

15          VIDEOTAPED DEPOSITION OF RANDY MOON, a

16     Witness, taken on behalf of the Plaintiffs before

17     Nissa M. Sharp, CSR No. 1365, CCR No. 528, pursuant

18     to Notice on the 28th of July, 2021, at the offices

19     of Spencer Fane, LLP, 6201 College Boulevard, Suite

20     500, Overland Park, Kansas.

21

22

23

24

25
```



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850

1                        APPEARANCES

2

3    APPEARING FOR THE PLAINTIFFS:

4            Ms. Leslie A. Greathouse
             Spencer Fane Britt & Browne LLP
5            1000 Walnut Street
             Suite 1400
6            Kansas City, Missouri  64106-2140
             (816) 474-8100
7            lgreathouse@spencerfane.com

8

9    APPEARING FOR THE DEFENDANTS:

10           Mr. Arthur Chalmers
             State of Kansas
11           Office of Attorney General
             120 SW 10th Avenue, 2nd Floor
12           Topeka, Kansas  66612-1597
             (785) 368-6244
13           art.chalmers@ag.ks.gov

14

15   VIDEOGRAPHER:

16           Mr. Patrick Robinson
             Metropolitan Court Reporters
17           11880 College Boulevard
             Suite 405
18           Overland Park, Kansas 66210
             (913) 317-8800
19           Jeremy@metropolitanreporters.com

20

     ALSO PRESENT:
21
             Josh Pierson, ACLU
22

23   APPEARING VIA MOBILE VIDEOCONFERENCE:

24           Cedar Hobbs, ACLU
             Chloe Ketchmark
25           Tate Schneider



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                      July 28, 2021

Page 3

1                                    INDEX

2

3      WITNESS:                                        PAGE:

4        RANDY MOON

5          Examination By Ms. Greathouse                  4

6          Examination By Mr. Chalmers                  184

7          Examination By Ms. Greathouse               199

8

9                              EXHIBITS

10     EXHIBIT                                         PAGE
       NUMBER       DESCRIPTION                     IDENTIFIED
11
       71           Organizational Chart -              39
12                  OAG017625

13     72           3/4/17 "The Topeka                   93
                    Capital-Journal"Article
14
       73           Excerpt from Plaintiffs'            197
15                  First Amended Complaint

16

17     NOTE:  Original Moon Exhibits 71 through 73 were
              attached to the original transcript.
18

19

20

21

22

23

24

25



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                            July 28, 2021

Page 4

1    (Deposition commenced at 10:06 AM.)

2                VIDEOGRAPHER:  Good morning, my name

3    is Patrick Robinson with Metropolitan Court

4    Reporters.  Today is July 28th.  We will go on the

5    record at 10:06 AM.

6                We are here to take the video recorded

7    deposition of Randy Moon in Case No. 619-CV-01343.

8                Would counsel please state their name

9    and affiliation for the record, please?

10               MS. GREATHOUSE:  My name is Leslie

11   Greathouse, and with me is Josh Pierson, and we are

12   here for the plaintiffs.

13               MR. CHALMERS:  Arthur Chalmers for the

14   defendants with the Kansas Attorney General's Office.

15               VIDEOGRAPHER:  Nissa Sharp is our

16   court reporter today.

17               Would you please swear the witness?

18               RANDY MOON,

19   being first duly sworn, testified under oath as

20   follows:

21                    EXAMINATION

22   BY MS. GREATHOUSE:

23       Q.     Could you please state your name for

24   the record?

25       A.     Sure, my name is Randy Moon.


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 5

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                        July 28, 2021

                                                                 Page 5

1          Q.      Okay.  And, Mr. Moon, what is your

2    current address?

3          A.      I live at 34A Lakeshore Drive in

4    Marion, Kansas.

5          Q.      Have you ever had your deposition

6    taken before?

7          A.      Yes.

8          Q.      All right.  On approximately how many

9    occasions have you had your deposition taken?

10         A.      Six.

11         Q.      All right.  And were those depositions

12   all in relation to law enforcement activities?

13         A.      Yes.

14         Q.      Okay.  So, none of them were personal

15   depositions that had to do with you outside of your

16   law enforcement work; is that correct?

17         A.      That's correct.

18         Q.      Okay.  So then you're fairly familiar

19   with giving testimony, but I want to go through a few

20   of the rules just to make sure that you and I have

21   the same understanding of what we're going to do

22   today.  All right?

23         A.      Of course.

24         Q.      So, you're doing a great job so far

25   with the one speaking at a time.  I need to make sure


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                      July 28, 2021

Page 6

1    that I get my whole question out and on the record

2    before you start your answer, even if you know where

3    I'm going, so that we have a complete record.  You

4    understand that?

5          A.     Yes.

6          Q.     We also need to make sure that we have

7    verbal answers at all times, so using words like

8    "yes" and "no" instead of "uh-huh" or "huh-uh," which

9    are very hard for a court reporter to get.

10                Do you understand that?

11         A.     Yes.

12         Q.     So there may be some times where I

13   will say something like "was that a yes" just because

14   I'm trying to make sure that the record is clear.

15   All right?

16         A.     Yes.

17         Q.     If you don't understand one of my

18   questions, and there's a good chance that at some

19   point today I will ask an unclear question, will you

20   let me know that you do not understand my question?

21         A.     Of course.

22         Q.     Okay.  If you would like to take a

23   break at some point, you are welcome to ask for that.

24   The only thing that we ask is that you complete the

25   answer to a question that is pending before we take

11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 7

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                      July 28, 2021

Page 7

1  the break.  Do you understand that?

2       A.     Yes.

3       Q.     All right.  Now, counsel for the

4  Kansas Highway Patrol may object at some point to

5  some of my questions.  Those are merely for the

6  record so the judge can rule on them later if

7  necessary.  But if he objects, you can let him get

8  the objection out and on the record, and then you can

9  still answer.  All right?

10      A.     Yes.

11      Q.     Do you have any questions about those

12 rules before we move on?

13      A.     No.

14      Q.     All right.  Have you done any

15 preparation for the deposition today?

16      A.     Yes.  I printed off the "Topeka

17 Capital News" article that I was quoted in that was

18 used in at least one of your briefs.

19      Q.     Okay.  And so you read that article;

20 is that correct?

21      A.     Yes.

22      Q.     Okay.  And how did you determine that

23 that article was quoted in something we filed with

24 the court?

25      A.     Because I had went online and did just



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 8

Page 8

1   a little bit, just very little bit of research on

2   your case against the defendants.

3          Q.    All right.  So, when you researched

4   the Shaw versus Jones lawsuit, you were able to see

5   that you had been quoted; is that correct?

6          A.    Yes.

7          Q.    All right.  Have you done anything

8   else in preparation for the deposition today?

9          A.    No.

10         Q.    Have you talked to anyone about the

11  deposition today?

12         A.    No.

13         Q.    All right.  I'm just going to get some

14  sort of background information on you, so that's

15  where we'll start.

16               What was your birthday, birth date?

17         A.    I was born on January 11th, 1963.

18         Q.    Okay, and let's talk about your formal

19  education.  So you graduated from high school --

20         A.    Yes.

21         Q.    -- I think in Pratt, Pratt High

22  School; is that correct?

23         A.    That's correct.

24         Q.    Okay.  And what year did you graduate?

25         A.    1981.


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 9

Page 9

1          Q.     All right.  And did you go to college

2    after that?

3          A.     Two years of college.

4          Q.     Okay.  And where did you go?

5          A.     Barton County Community College.

6          Q.     Okay.  That's here in Kansas; is that

7    correct?

8          A.     Yes.  Out near Great Bend.

9          Q.     All right.  And what did you study

10   there?

11         A.     Administration of justice.

12         Q.     Okay.  Did you get a degree?

13         A.     Yes.

14         Q.     All right.  Have you had any other,

15   you know, formal education other than the high school

16   and then the 2-year degree from college?

17         A.     Yes.  I, during the course of my

18   employment, I attended a executive leadership

19   training course that is hosted by the Federal Bureau

20   of Investigation.  Most of the course work during

21   that 3-month training is at least at a Bachelor's

22   level, some of it Master's, and some of it higher.

23         Q.     Okay.  We'll talk a little bit more

24   about what that program covered later in the

25   deposition.


11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 • 913.317.8800 • FAX 913.317.8850

1          When did you go to that executive

2     leadership program?

3          A.     In the fall of 2010.

4          Q.     Okay.  And then is there any other

5     formal education, other than the three we have

6     listed?

7          A.     No.

8          Q.     All right.  Now, after you graduated

9     from community college, what was your first job?

10          A.     My first job was United States Marine

11    Corps.

12          Q.     All right.  Did you spend some time as

13    a patrolman in the Pratt Police Department before you

14    went into the Marines?

15          A.     No.  I went into the Marine Corps

16    first.  And then once I was honorably discharged,

17    then I went back home to Pratt and went to work for

18    the police department there in my hometown.

19          Q.     All right.  So which years -- well,

20    when did you join the Marine Corps?

21          A.     1981.

22          Q.     Okay.

23          A.     And I served through 1987.  However,

24    my active duty years were from 1981 to 1984, and then

25    the last 3 years were Reserve.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

Page 11

1      Q.     Okay.  I forgot to ask, when did you

2  actually go to the Barton County Community College?

3      A.     I actually attended not only Barton

4  County, but Cowley County, working on that degree

5  which was actually through Barton County.  So that

6  would have been in about the first 4 years of

7  employment with the Kansas Highway Patrol, so 1986 to

8  roughly 1989-ish.

9      Q.     All right.  So it was Marine Corps,

10  then community college; is that right?

11      A.     Yeah.  Yes.

12      Q.     I made an assumption that it was the

13  other way, but thank you for --

14      A.     No.  I was not ready after high school

15  for college.

16      Q.     Okay.  So, what were your assignments,

17  let's start with active duty, while you were in the

18  Marines?

19      A.     Well, I, interestingly enough, I was

20  assigned very, very early in my Marine Corps career

21  to infantry duty.  However, I never really spent a

22  day in the infantry because I was selected very early

23  to go to a specialized field in the Marine Corps.

24  And I didn't really know exactly what that was until

25  a few months down the road that I spent about a year



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                July 28, 2021

Page 12

1   at the Marine barracks in Washington D.C. while

2   awaited a security clearance which then took me to

3   the presidential retreat at Camp David, Maryland.

4   And then I served a couple of years at Camp David

5   during the Reagan administration.

6          Q.      Okay.  So, were you at Camp David

7   from, like, 1982 to '84?

8          A.      Yes.

9          Q.      And, I mean, I can make some guesses

10  about what your job looked like that, but just tell

11  me just briefly what your job duties were when you

12  were on that detail.

13         A.      Sure.  It was primarily ensuring that

14  the facility was secure when the president was there

15  and when he was not.

16         Q.      All right.  And then when you went to

17  the Reserves starting in, well, either '84 or '85,

18  what were you doing then?

19         A.      Nothing.

20         Q.      Okay.  Were you just doing the regular

21  drills that you have to do the weekends or?

22         A.      It actually ended up being inactive

23  reserve, so I didn't even have to attend drills.

24         Q.      Okay.  So after you left the

25  presidential detail in 1984, you came back to Kansas



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

1   to Pratt; is that correct?

2          A.     Yes.

3          Q.     All right.  And then that's when you

4   started -- well, what did you start doing when you

5   got back to Pratt after -- well, in '84?

6          A.     I was hired by the police department

7   in Pratt as a police officer.

8          Q.     Okay.  And how long were you with the

9   Pratt Police Department?

10         A.     For 2 years.

11         Q.     And you said you were just a police

12  officer, was that your role the whole time you were

13  there?

14         A.     Yes.

15         Q.     And give us a brief description of

16  what that entailed.

17         A.     General enforcement of local and state

18  laws.

19         Q.     All right.  Now, in mid 1986 is when

20  you began your career with the Kansas Highway Patrol;

21  is that correct?

22         A.     Yes.

23         Q.     So, you went to the academy; is that

24  correct?

25         A.     Yes.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs                     DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                          July 28, 2021

Page 14

1   Q.    And did you do that in the summer of

2   '86?

3   A.    Yes.

4   Q.    And how long was the academy at that

5   point in time?

6   A.    It was -- excuse me -- it was about

7   14 weeks.

8   Q.    And then what was your first duty

9   station after you graduated from the academy?

10  A.    I was assigned to Sumner County, and

11  so I worked in an area that entailed primarily Sumner

12  County, but also Cowley County and Butler County.

13  Q.    And, at that point, were you at a

14  trooper rank?

15  A.    I was a trooper and doing what I would

16  characterize as road, road traffic enforcement.  I

17  worked doing general trooper duties.  I was not in a

18  specialized assignment.

19  Q.    Okay.  And how long were you at that

20  first duty station?

21  A.    Until 1990, and then I transferred to

22  Wichita in the same capacity for one year.  And then

23  I transferred to Kingman County.  And I was there for

24  2 years, I believe, and then transferred back to

25  Sumner County.  And then in 1995, I believe I was



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850
COURT REPORTING ◆ LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                July 28, 2021

Page 15

1  promoted to sergeant and assigned to the governor's

2  protective services unit in Topeka.

3          Q.     All right.  So, is it fair to say then

4  from 1986 until 1995, you were doing road

5  enforcement, traffic enforcement work, as a trooper

6  with the KHP?

7          A.     That is fair.

8          Q.     Okay.  And then I saw somewhere in a

9  case view publication that you were assigned to the

10  governor's security detail in February of '96.  Does

11  that sound about right?

12          A.     That's correct.  From the time I

13  received the information and then moved and

14  everything, it would have been, yes, right after the

15  first of the year in '96.

16          Q.     Okay.  So tell us about what your job

17  entailed on the governor's security detail.

18          A.     The Protective Services Unit that

19  serve really all the governors across the nation is

20  comparatively to what the Secret Service does for the

21  president.  Much smaller scale of course and

22  certainly not the budget, nor the manpower.

23              But it's primarily to ensure that the

24  governor, the first lady and family, and anybody else

25  that the governor determines that he would like to

1    have protective services afforded, it's to ensure

2    that they are safe in doing their job and when they

3    are not doing their job.  And we also provided

4    transportation services, both ground and air.

5                And so that's a fairly general -- I

6    mean, I could go on and on, but from a large

7    overview, I suppose, that's...

8            Q.      So that assignment was largely about

9    -- was protective as opposed to policing; is that

10   accurate?

11           A.      That is accurate.  We really did no

12   policing and our primarily focus was in, you know,

13   protective, being protective of the governor, much,

14   again, much like the Secret Service is for the

15   president.

16           Q.      Okay.  And how long were you on the

17   governor's detail?

18           A.      About 4-1/2 years.

19           Q.      Okay.  So does that take us to is it

20   '99 or 2000?

21           A.      2000.

22           Q.      All right.

23           A.      2000, actually, in about '98 or '99 I

24   was promoted to lieutenant within that rank, that

25   unit.  And then in 2000, I transferred out and went



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 • 913.317.8800 • FAX 913.317.8850
METROPOLITAN
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                July 28, 2021

                                                        Page 17

1      to Hutchinson, Kansas, as a first line supervisor of

2      field troopers.  And field, meaning troopers who are

3      doing basic trooper responsibility, traffic

4      enforcement, criminal enforcement and traffic

5      investigations, accident investigations.

6              Q.      Okay.  So, before we go on to that job

7      in Hutchinson, you mentioned that you were promoted

8      to lieutenant?

9              A.      Yes.

10             Q.      And did your duties change at all when

11     you were promoted to lieutenant?

12             A.      Not while I was in the governors unit,

13     no.

14             Q.      Okay.  Did being promoted to

15     lieutenant have another impact on your career at KHP?

16                     I mean, the way you answered that

17     question it sounded -- you said it didn't have an

18     impact while you were at the governors detail.

19             A.      Uh-huh.

20             Q.      Was there some other significance to

21     that inside the KHP?

22             A.      Well, yes, I mean, in order to elevate

23     one's career, you know, one must take promotions in

24     order to move up.  So, certainly, going from sergeant

25     to lieutenant and lieutenant to captain and so forth,



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                      July 28, 2021

Page 18

1  one must take one step before the other.

2          Q.     Right.  So becoming a lieutenant meant

3  that you were now eligible to do those jobs like

4  being a first line supervisor; is that correct?

5          A.     Yes.  Yes.

6          Q.     Because would you have to be a

7  lieutenant before you could take those kinds of jobs?

8          A.     No.  Interestingly enough, during that

9  time, a sergeant initially was a first line

10  supervisor in the Highway Patrol back in the '80s.

11              And then somewhere around 1995-ish or

12  maybe a little later, I don't really remember, I want

13  to say somewhere between 96-98, the superintendent at

14  that time decided to eliminate the position of

15  sergeant and he created a second lieutenants

16  position.  We already had a lieutenants position, so

17  he created a second lieutenants position, which

18  didn't last very long, and then was just morphed into

19  a lieutenants position.

20              So there was some, some amount of

21  reallocation going on during those years.  And just

22  about anybody who was a sergeant was reallocated to

23  second lieutenant and then shortly after made a

24  lieutenant.

25          Q.     Okay.  You didn't go through that



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

1  second lieutenant step, though; is that correct?

2          A.      Yes.   Yes.   I did.

3          Q.      You did?

4          A.      Yes.

5          Q.      Okay.   So were you originally a second

6  lieutenant while you were on the governors detail?

7          A.      Yes.   And, I'm sorry, I should have

8  been a little bit more specific about that, it just

9  having been through it all, we just blended it

10  together so quickly that that second lieutenant rank

11  was here and gone in just about no time.

12          Q.      So, when did you make full lieutenant?

13          A.      Oh, gosh, that happened, again,

14  probably 2000, maybe, 2001.

15          Q.      So about the time you went to Hutch?

16          A.      Yes.

17          Q.      Hutchinson, sorry.

18          A.      Right during that time frame.

19          Q.      All right.   So when -- Hutchinson is

20  Troop F; is that right?

21          A.      Yes.

22          Q.      And so were you supervising everyone

23  in Troop F or a particular section of Troop F?

24          A.      I had, originally, I had Rice County

25  to the north, Reno County, Harper County to the south

Page 20

1  and Kingman County.  Those were the counties I

2  originally had.

3            At one point for the period of about a

4  year, maybe year and a half, I ended up taking

5  counties a little bit further west, Barton County and

6  Pratt County and Stafford and Barber County.  So, you

7  know, I supervised anywhere from four to eight

8  counties of troopers during those years.

9       Q.    How many, approximately, how many

10 troopers -- well, let me back up.

11           How long did you stay as a first line

12 supervisor in Troop F?

13      A.    I stayed until -- the end of 2005 I

14 was promoted to captain and took an assignment as a

15 captain shortly after 2006 rolled over.

16      Q.    All right.

17      A.    So, about, about, 6 years.

18      Q.    Approximately, how many troopers would

19 you have been supervising at any, you know, given

20 time in that 6-year period?

21      A.    Yeah.  Back in those days, typically

22 we had a ratio of one supervisor to about 12

23 troopers.  So, for the most part, it was one to 12,

24 except for that period of time when it was about, you

25 know, about one to 20.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 21

1   Q.   And you indicated that those troopers

2   were generally in traffic enforcement, criminal

3   investigation and those kinds of areas?

4        A.   Yes.

5        Q.   Is that correct?

6        A.   So none of them were specialized.

7        Q.   Okay.  Did you have any Interdiction

8   troopers that you were supervising?

9        A.   No.

10       Q.   All right.  Now, tell us as a line

11  supervisor what your job entailed.

12       A.   Sure.  Generally speaking, No. 1 was

13  the welfare of the troopers.  Making sure that they

14  had the equipment and the things that they needed to

15  do their job.

16            It also entailed, of course, things

17  that you might think of in terms of supervision,

18  performance reviews of those personnel, mild

19  disciplinary, a lot of, a lot of, report reviewing.

20  I mean, in a nutshell.  I could, again, go on, but.

21       Q.   Okay.

22       A.   In a nutshell.

23       Q.   So, give me a general understanding of

24  what a performance review or the performance review

25  aspect of your job was in that 2000 to 2006 time



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 • 913.317.8800 • FAX 913.317.8850
METROPOLITAN
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 22

1    frame.

2          A.    Sure.  Typically, we would meet, the

3    supervisor, would meet with an employee at the

4    beginning of a review, set some number of

5    expectations through the course of that coming year.

6                And then during the course of that

7    year, a supervisor would meet, sometimes get in and

8    ride shifts with that employee to be able to see how

9    they performed and how they worked.  Because, as you

10   may know, our troopers work really independently

11   without a lot of oversight.  So that would occur two

12   or three times a year, these meetings.

13               And then at the time of the review,

14   then I would sit down and pen out my thoughts on the

15   review form that the State of Kansas provided back in

16   those days.  And then I would sit down and meet with

17   the employee and we would discuss that.

18               At some point, the review would

19   eventually then go on up to a lieutenant and a

20   captain and make its way to the headquarters to the

21   Human Resources division.

22         Q.    Right.  Well, at that point, you would

23   have been the lieutenant reviewing them, right?

24         A.    Yes.

25         Q.    And so then they would -- okay.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850
COURT REPORTING ◆ LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 23

1        A.      Yes.

2        Q.      Now what -- you said that you would

3   set out, sort of, performance criteria at the

4   beginning of the review period that you wanted the

5   trooper to achieve for that review period; is that

6   correct?

7        A.      Uh-huh.

8        Q.      What kind of criteria, generally,

9   would that be?

10       A.      Well, we would maybe have a

11  criteria -- you know, we of course able to look at

12  the statistics of any particular trooper to see how

13  well they were performing in certain areas of

14  enforcement.  And given that we were constrained in

15  not being able to set quotas because of our agreement

16  with the Kansas State Troopers Association, you know,

17  we set goals instead.

18              Which might be, you know, I might had

19  a trooper who was expected to give public safety

20  programs, maybe to schools or to civic groups.  And,

21  you know, if that trooper had not done any of those,

22  then I might say, okay, in this coming year, you

23  know, I would like to see you perform some of those.

24  And it could be the same thing with accident

25  investigation or really any number of things.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                           July 28, 2021

Page 24

1          And, again, without really talking

2    about the actual numbers, you know, I generally would

3    just tell them, you know, this area needs to improve,

4    I need to see improvement in this through this coming

5    year, so.  So, yeah.

6          Q.     So by "improvement," you know, like

7    let's just say you used the example of giving an

8    educational course.

9          A.     Uh-huh.

10         Q.     By "improvement," you would expect

11   them to do more of them numerically; is that correct?

12         A.     Yes.

13         Q.     And would you attend them and see

14   whether they were substantively accurate?

15         A.     Not generally.  But I have, you know,

16   in the course of my career as a first line

17   supervisor, I would do that.

18         Q.     And so would other criteria or goals

19   that you were setting out in these reviews include

20   things like the number of traffic stops?

21         A.     Yes, it could.  I mean, you know, I

22   had a trooper one time who received a large number of

23   citizen complaints based on his conduct.  So one of

24   his goals, for example, was that he needed to change

25   his approach and reduce the number of citizen



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850

BLAINE FRANKLIN SHAW, et al. vs    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.    July 28, 2021

Page 25

1  complaints based on the manner in which he spoke to

2  citizens.

3          And so, you know, it wasn't always, it

4  wasn't always a numerical-based goal, it might be

5  something else like that.

6      Q.    So, but there would be a numerical

7  goal combined with other criteria; is that fair?

8      A.    Well, yes, I would think that's a fair

9  statement.  Again, without setting any type of quota,

10  by saying, well, you need to have 10 of these or, you

11  know, my expectation was if a trooper did none one

12  year and did one the next year, that was improvement.

13      Q.    Okay.  So, how would you evaluate a

14  trooper's interaction with the public, other than

15  through receiving complaints?

16      A.    Well, back in those days, and as

17  today, unless things have changed in the last couple

18  years, the Highway Patrol had in-car videos.  So, a

19  supervisor was able to review those videos, and, you

20  know, generally speaking, we didn't do that all the

21  time because we would spend all of our time just

22  reviewing video.

23          But, you know, from time to time,

24  particularly if I had a trooper who I felt that

25  either was underperforming, or in the case of the one



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 26

1  trooper that I'm talking about that seemed to have an
2  unusually high number of complaints, then I would
3  look at his videos to see how he was interacting with
4  the public to try to help him understand what was
5  generating those complaints.
6          Q.      All right.  So, how often, you know,
7  let's -- well, let me back up.
8                  Was the review period for the troopers
9  a year?
10         A.      Twelve months, correct.
11         Q.      All right.  So how many times in a
12 year would you review a stop video for a trooper?
13         A.      For one particular trooper?
14         Q.      Yes.
15         A.      Oh, it really varied, it varied from
16 zero to multiple times.
17         Q.      And what were the factors that went in
18 to you deciding whether you were going to review
19 those videos none of the time or multiple times?
20         A.      Well, oftentimes, performance was a
21 great indicator.  If a trooper appeared to be
22 underperforming in the duties that a trooper's
23 expected to do, I might look at a video to see what
24 is this trooper doing with their time through the
25 course of an 8-hour day.



BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                            July 28, 2021

Page 27

1              Now, sometimes there were explanations

2     because, for example, in the area that I worked, I

3     had one trooper who really was very, very proficient,

4     just very good at going to the schools and doing

5     educational type of training.  He wasn't so good in

6     some other areas.

7              And so as a supervisor, you know, it

8     was necessary to balance some of that.  So it wasn't

9     always necessarily that a trooper that was higher in

10    that area that was maybe lower in another area was

11    what we would consider underperforming.  It just

12    depended on what they were doing.

13             And so the reviewing of the videos and

14    just, you know, the daily contact with the troopers

15    would give me some sense of, you know, what these men

16    and women were doing during the course of their day.

17        Q.    So, correct me if I'm wrong, but it

18    sounds like you're saying there were sort of

19    categories of performance or underperformance that

20    you were looking at; is that correct?

21        A.    Yes.

22        Q.    Okay.  So we've talked about one of

23    those being community education?

24        A.    Uh-huh.

25        Q.    Is that correct?



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                    July 28, 2021

Page 28

1          A.      Uh-huh.

2          Q.      And a number of those would be traffic

3    stops; is that correct?

4          A.      Yes.  We looked at -- we looked

5    at -- and, again, I don't have -- things have changed

6    over the decades, but back in those days, you know,

7    we looked at the statistics of a trooper to see how

8    many speed citations the trooper was issuing, so

9    warnings, how many inspections of vehicles that they

10   were doing, safety inspections.  We looked at how

11   many times that they were giving aid to motorists, we

12   called those service rendered.  Safety programs.  I

13   mean, there was just a whole myriad of categories.

14              But then there was a whole list of

15   elements of time, how were they spending their time.

16   So, if they weren't doing traffic enforcement, what

17   were they doing with their time.  Were they -- were

18   they doing accident investigation, were they

19   completing reports which took them away from their

20   traffic enforcement duties.

21              As you may know, an arrest today takes

22   some amount of time for a police officer or a trooper

23   to complete all of the reports that are required.

24         Q.      You said that today it takes time for

25   a trooper to complete all the reports required for an



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

Page 29

1   arrest.

2        A.     Uh-huh.

3        Q.     Did it not take time for troopers to

4   write those reports between 2000 and 2006?

5        A.     Sure, it did.  I would say in my

6   opinion that it takes a whole lot more time these

7   days than it did back in those days.  A lot of things

8   have changed over the years, a lot more information

9   is required by the courts and the district attorneys

10  and sometimes laws change and case law occurs and it

11  just requires different, different types of reports,

12  more reports, more information.

13       Q.     All right.  And through the years from

14  the time that you were a first line supervisor

15  through the time that you left the KHP, did you keep

16  track of or generally understand how the report

17  writing requirements were changing through time?

18       A.     Yes.  We went from an old manual

19  typewriter and carbon forms to, during those times,

20  from there to computerized forms and computers in the

21  course of 15 years.

22       Q.     So, in 2000 to 2006, when you joined

23  as a first line or when you began being a first line

24  supervisor, were the troopers still using

25  typewriters?



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 30

1    A.    In 2000?

2    Q.    Yes.

3    A.    At that point, there were still a lot

4    of word processors.  Because we went from typewriters

5    to word processors to computers.  So in the late '90s

6    through the early 2000s, we were transitioning over

7    to computers.

8    Q.    All right.  So, you became a first

9    line supervisor pretty much right in the middle of

10   that; is that fair?

11   A.    Well, 1996, because a sergeant was a

12   first line supervisor back in those days.

13   Q.    Let me clarify.

14   A.    You're talking about when I became a

15   supervisor of troopers in 2000?

16   Q.    I'll rephrase my question.

17   So, when you became a supervisor, a

18   first line supervisor of field units in 2000, that

19   was right in the middle of that change from computers

20   -- or excuse me -- from typewriters to word

21   processors to computers; is that fair?

22   A.    Yes.

23   Q.    All right.  So, when you arrived in

24   Hutchinson in 2000, do you recall where the troopers

25   were in that, sort of, continuum of technology for


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 31

BLAINE FRANKLIN SHAW, et al. vs            DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                       July 28, 2021

Page 31

1  report writing?

2       A.    No.  Because it depended on the area

3  of the state.  The Patrol was rolling out the

4  computers in some fashion, maybe from west to east or

5  east to west, and I don't really remember.  At some

6  point during those years, we were fully computerized.

7       Q.    So, are you saying that by the time

8  you left the job as a first line supervisor of field

9  units, the systems were fully computerized?

10      A.    Yes.

11      Q.    All right.  And after -- well, let me

12 ask this, do you remember what computer systems were

13 being used in the time that you were in Hutchinson?

14      A.    Can you be more specific?  I don't

15 understand whether you're asking me a make of

16 computer or software or.

17      Q.    Well, why don't you tell me how a

18 trooper that you would have supervised in the time

19 that you were in Hutchinson when they first were

20 using computers, how would they write a report?

21      A.    Not very easily.  We -- back in those

22 days when they were developing this movement to

23 computers, the thought was that the computer -- or

24 the troopers would fill out information on the

25 computer in forms, and then those forms would be



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 32

1    uploaded to a central server in Salina.

2              That didn't work so well.  After a

3    number of years, they figured out that that bogged

4    the system down terribly.

5              But back in those days that's what

6    they would do.  They would take typical Kansas

7    standard offense and arrest reports or DUI forms,

8    some, some forms weren't computerized, so there were

9    still some manual filling out, but that's what they

10   did.

11        Q.    All right.  So when they were using a

12   computer, where was that computer physically located?

13        A.    In their respective office.

14        Q.    All right.  So, initially, there

15   wasn't any computing in the field?  They had to go

16   back to an office and fill out their reports on a

17   computer on their desk inside of a KHP office; is

18   that correct?

19        A.    That's correct.  Mobile data units

20   were not available in the early days.

21        Q.    Right.  So when did mobile data units

22   become available, in your memory?

23        A.    I think they were starting to surface

24   by 2006 to 2008, in that time frame.

25        Q.    And so when you say a mobile data



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

Page 33

1    unit, can you describe for me what you mean?

2          A.    A -- excuse me -- a laptop that was a

3    heavy duty laptop that could either be plugged in to

4    a port back in an office or could be used as a

5    stand-alone.

6          Q.    So, could be used as a stand-alone,

7    that would just be sort of a laptop that the officer

8    could or the trooper could take to their vehicle; is

9    that correct?

10         A.    Yes.  The vehicles had a computer

11   stand in them that, I'm not an IT professional, but

12   hooked in to components that made them work.

13         Q.    All right.  So, would, in your memory

14   when those units were first installed in the

15   vehicles, did those computers communicate directly to

16   the KHP system?  Or did there have to be, like, a

17   download when the trooper brought the car back to the

18   office?

19         A.    They communicated directly with our

20   systems.

21         Q.    So they were sort of using cellular

22   systems?

23         A.    Originally, we used like a

24   radiofrequency that wasn't as robust as cellular,

25   and, at some point, we switched over to cellular.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 34

Page 34

1    Q.    Probably about the time they got

2    cellular towers all the way across Kansas; is that

3    right?

4    A.    Yes.

5    Q.    Yeah, all right.

6          Did you, during the time that you were

7    a first line supervisor for field units, do any

8    traffic work yourself?

9    A.    I did some.  My job was about

10   80 percent administrative and about 20 percent

11   enforcement as a first line supervisor.

12   Q.    So, when you were doing the 20 percent

13   of enforcement, what kinds of activities were you

14   doing during those years that you were in Hutchinson?

15   A.    The same kind of work that I did as a

16   road trooper, as a field trooper.  Traffic

17   enforcement, accident investigation, safety programs,

18   enforcement of criminal laws.

19   Q.    All right.  And then in 2006, you said

20   you were promoted to captain; is that correct?

21   A.    Yes.

22   Q.    And you had a change in duty station

23   at that time; is that correct?

24   A.    I did.

25   Q.    And what did you begin to do then in



BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 35

1   2006?

2           A.       I had two, two sections in the patrol

3   that I oversaw as a captain.  The first was in

4   Salina, Kansas, I oversaw our Communications Center

5   and the 70-some employees that worked there.

6                   And then I oversaw a unit in Topeka

7   that we called our Criminal Justice Information

8   Services Unit, and there were, oh, a dozen or so

9   employees there.  So, I worked really between Salina

10  and Topeka those two units.

11          Q.       All right.  Before we go into those

12  two units, at some point were you doing work with the

13  US Marshals Office?

14          A.       I did a little bit of off-duty time

15  for just a short period back late '80s, maybe early

16  '90s, somewhere in that time frame.  I did some

17  off-duty work to assist the US Marshals Office out of

18  Wichita mostly with transportation of prisoners.

19          Q.       I saw a couple of different articles

20  that mention some -- well, there was one that talked

21  about a narcotics search and warrant execution in the

22  2005 time frame.  Does that sound familiar to you?

23          A.       I don't recall the particular

24  circumstance you're referring to.

25          Q.       So, is it fair to say that narcotics



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 36

Page 36

1   search and, searches, and warrant executions was not

2   a regular part of your job at any point in your

3   career with the Kansas Highway Patrol?

4           A.      We typically did not execute warrants

5   on behalf of another agency, unless we were

6   specifically requested, which did not happen very

7   much.  And execution of search warrants didn't happen

8   a whole lot in my individual career, but it certainly

9   does happen in some troopers' careers somewhat more

10  frequently.

11          Q.      You mentioned doing some off-duty work

12  you said in the late '80s and the early '90s; is that

13  right?

14          A.      Yeah, that time frame.  It wasn't very

15  long.  It wasn't 6 months maybe at the most.

16          Q.      Okay.  And which agency were you doing

17  the off-duty work with?

18          A.      The US Marshals Service.

19          Q.      I also saw another article mentioning

20  you with the US Marshal Service on a child

21  pornographer who had ended up over in the Branson,

22  Missouri, area.  Do you have a recollection of that?

23          A.      No.  I think you must be talking about

24  somebody all together with different with the same

25  name because I did not do anything like that.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                July 28, 2021

Page 37

1        Q.      Okay.  Are you aware of another Randy

2   Moon in law enforcement in the, sort of, Kansas, the

3   eastern Kansas, western Missouri area?

4        A.      No, I'm not.

5        Q.      Okay.  Okay, so when you were

6   transferred to I think you said it was -- well, I

7   don't actually think you said.

8              So when you received that next

9   promotion or the new assignment over Communications

10  and the CJIS, where were you located?

11       A.      I started out officing in Salina and

12  so for about -- from about 2006 to 2010, my office

13  was primarily in Salina, but I maintained an office

14  in Topeka, as well, and traveled to the office in

15  Topeka as I needed.

16              In 2010, because over those years I

17  was spending much more time with the CJIS unit in

18  Topeka in my duties as the CJIS systems officer for

19  the State of Kansas, necessitated that I really

20  needed to be in Topeka because of the amount of

21  meetings and responsibilities that I had associated

22  with that unit.  So I moved to Topeka in 2010 and

23  stayed as the captain of the Communications Center in

24  Salina, but I just switched locations.

25       Q.      And how long were you in this job



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                               July 28, 2021

Page 38

1    covering the Communications Center and CJIS?

2         A.     Until my promotion in early 2015 to

3    the assistant superintendents position.

4         Q.     All right.  Now, the troop that you

5    were supervising from 2006 to 2015 is Troop M; is

6    that right?

7         A.     Yes.

8         Q.     All right.  And, as the captain in

9    Troop M, were you sort of the senior officer in that

10   particular troop?

11        A.     Yes.

12        Q.     All right.  And that is true for all

13   of the years, from '06 to '15; is that correct?

14        A.     Yes.  I had, at that -- during those

15   years, I had a lieutenant, a uniformed lieutenant,

16   that reported to me that worked in the Communications

17   Unit.  And I had a uniformed lieutenant who worked

18   for me in the CJIS unit.

19               Both the Communications Unit and the

20   CJIS unit are primarily civilian employees.  So about

21   65 or so of the dispatch personnel that we had were

22   all civilian employees and they were managed by first

23   line civilian employees in the Dispatch Center who

24   were then also managed or overseen by the lieutenant

25   who reported to me.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 39

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 39

1      MS. GREATHOUSE:  All right.  I think

2  we're -- let's go ahead -- we're just under about an

3  hour, I've got some exhibits that I'm going to start

4  to mark now, so this would be a good time to take a

5  break so we can get those marked and then we'll

6  resume.

7      VIDEOGRAPHER:  The time is 11:01 AM.

8  We're taking a short break.  Going off the record.

9      (Recess.)

10      (Moon Exhibit 71 was marked for

11  identification.)

12      VIDEOGRAPHER:  The time is 11:16 AM.

13  We are back on the record.

14  BY MS. GREATHOUSE:

15      Q.    Mr. Moon, I have given you what we

16  have marked as Deposition Exhibit 71.  For the

17  record, it is Bates No. OAG017625.  Have you seen a

18  document like this before?

19      A.    Yes.

20      Q.    Okay.  So this is an organizational

21  chart for the way Troop M is set up inside the KHP;

22  is that accurate?

23      A.    Yes.  It looks like it's a fairly

24  present organizational chart.

25      Q.    Right.  This is not the organizational



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 40

Page 40

1     chart that existed when you were in charge, when you

2     were the sergeant of Troop M; is that correct?

3          A.     Yes.

4          Q.     Right.  Okay.  But does it generally

5     show the same thing that you just described about how

6     Troop M was organized when you were there?

7          A.     Yes.

8          Q.     All right.  So, it shows that the

9     troop commander, which would have been you at the

10    time you were there; is that correct?

11         A.     Yes.

12         Q.     And then it shows the two lieutenants,

13    one over Communications and one over CJIS, correct?

14         A.     Yes.

15         Q.     And those were what you referred to as

16    the uniformed lieutenants, right?

17         A.     Yes.

18         Q.     So, if you look at this, sort of,

19    chart, at what point do the people in Troop M become

20    civilians?

21                Or which ones are civilians versus

22    which ones are uniformed?

23                Is there a level in the organizational

24    chart where that happens?

25         A.     There are only three sworn positions,



BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                July 28, 2021

Page 41

1    that of the captain and those two lieutenants.

2          Q.      Okay.

3          A.      There was a time in the Patrol's

4    history when the communications specialists wore

5    uniforms and may well have been sworn, but those days

6    are long passed.

7          Q.      All right.  So, can you give us

8    generally a description of what your duties were when

9    you were the captain of Troop M?

10         A.      Sure.  Since they're two units, I'll

11   talk about each respectively.

12                 The Communications Unit, I oversaw the

13   operation of that unit.  So it was my job as the

14   commander to ensure that our employees were providing

15   a good service to our troopers, as well as to the

16   public.

17                 There's a bit of a technical piece

18   associated with that position dealing with the radio

19   communications and telecommunications equipment.  So

20   I, one of the responsibilities I had, was working

21   very closely with K-DOT, who actually owned the radio

22   communications system in the state of Kansas.

23                 And I worked very closely with K-DOT

24   officials in ensuring that that system was robust and

25   operational at all times and that it met the needs of



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 42

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 42

1   the Kansas Highway Patrol.  And that would include

2   anything from the type of radios, the number of

3   radios that our troopers had, all the way to having

4   meetings and discussions with them concerning

5   upgrades to that entire system and how that might

6   impact the Highway Patrol.

7              I did not supervise the employees

8   daily.  That would have been the lieutenant's

9   position.  But I was certainly in direct

10  communication, direct contact with the lieutenant on

11  what was occurring within the Communications Center

12  and the daily operational status, so to speak.

13             And so, generally speaking, I just

14  oversaw that entire operation, everything from the

15  welfare of the people to the equipment.

16             As it relates to the CJIS unit --

17      Q.    Can we -- let's just stop with

18  Communications, I'll ask a few questions and then

19  we'll go onto CJIS.

20      A.    Sure.

21      Q.    All right?

22             So with regard Communications, I just

23  want to clarify that when you're talking about

24  radios, you're talking about the system, the radio

25  system, that is in the troopers' vehicles or attached



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

1    to their uniforms; is that correct?

2         A.    Yes.  And the system that makes our

3    central communications system operate, it's an 800

4    megahertz trunked radio system that has a series of

5    76 to 80, I'm not sure how many towers there are

6    anymore, that are generally all linked together that

7    allow the troopers to be able to talk across the

8    state to each other.

9         Q.    And then they also not only talk to

10   each other, but they talk to people who are working

11   in the Communications portion of Troop M; is that

12   correct?

13        A.    That's correct.

14        Q.    And so would it be fair to say that,

15   like, dispatch is part of Troop M?

16        A.    Yes.  That Communications Center that

17   I'm talking about is our dispatch.  It is the 911 of

18   the Highway Patrol, minus the 911 part.

19        Q.    Right.  Okay.

20              And so the Communications group is

21   primarily sitting in an office building in Salina; is

22   that correct?

23        A.    Yes.  The Troop C, and I don't know

24   that the Troop M headquarters anymore, but at one

25   time it was.  But the Troop C building that houses



BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                July 28, 2021

Page 44

1   the field headquarters for the troopers located in

2   the north central part of the state, in that

3   particular building in the basement portion

4   underground is where the Communications Center is

5   located.

6          Q.     All right.  And is it located

7   underground for purposes of making sure that it's

8   safe during, let's say, weather events?

9          A.     That's an interesting story.  I guess

10  the short answer is yes.  But they're underground

11  because there was an afterthought, because during the

12  renovation of that building back in the days when it

13  was Marymount, the area which was above ground that

14  they were going to put the Communications Unit was

15  not large enough.  So, it's my understanding that as

16  an afterthought, they ended up going down to the

17  basement that had more room.

18         Q.     Got it.  Okay.

19                So the people that are working in that

20  Communications Center, describe for me the equipment

21  that would have been sitting in front of a dispatcher

22  in the time that you were there from 2006 to 2015, if

23  you know.

24         A.     Sure.  They have a couple of computer

25  screens and a computer and they have a radio system.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850

1  In fact, these days that is all linked together.  And

2  then they would have telephone numbers and then they

3  would have other types of telephonic hotlines, I

4  guess, is maybe the easiest way to call them.

5             Highway Patrol Communications Center

6  takes care of the State of Kansas, the school safety

7  hotline.  It takes care of the I think it's a drunk

8  driving hotline.  Seems like there might be another,

9  but I've forgotten.

10      Q.    All right.  Now you said these days

11  those systems are all linked together.

12      A.    Uh-huh.

13      Q.    When you say "these days," when are

14  you talking about?

15      A.    Meaning from the time that I was the

16  commander to present.

17      Q.    All right.  So from 2006 until you

18  left the Patrol which was in -- well, strike that.

19  Let's just get that date set.

20             You resigned from the Patrol in April

21  of '19; is that correct?  Or is it '20 --

22      A.    I retired from the --

23      Q.    -- you retired?

24      A.    -- the Patrol in June of 2019.

25      Q.    All right.  So when you're saying



1  "these days those systems are all linked together,"

2  the phrase "these days" is a reference to 2006 to

3  2019; is that fair?

4          A.     Yes.

5          Q.     All right.  Now, I have heard the

6  phrase "computer-assisted dispatch."  Are you

7  familiar that phrase?

8          A.     Yes.

9          Q.     Tell me what your understanding of a

10  computer-assisted dispatch system is.

11          A.     The computer-assisted dispatch, or CAD

12  in short, is a logging system that enables

13  dispatchers to more effectively do their job, in so

14  much as when calls come in, they are logged in to

15  this system.  Oftentimes, the dispatchers are

16  required to categorize the calls in the system.  And

17  it also enables the dispatchers to correctly assign

18  the calls based on what troopers are available and

19  where they are located in proximity to a situation.

20          Q.     All right.  And the CAD is actually an

21  incident-based reporting system, correct?

22          A.     It is an incident-based system, yes.

23          Q.     And by -- is your understanding of

24  "incident based" means it's sort of per contact with

25  the public or a particular incident that requires a



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING ♦ LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs      DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                         July 28, 2021

Page 47

1    law enforcement officer?

2          A.      Generally speaking, yes.

3          Q.      Okay.  Is there another way you would

4    define "incident-based reporting"?

5          A.      Well, when I hear the term

6    "incident-based reporting," I think of the

7    responsibility by the Kansas Bureau of Investigation

8    who collects incident-based information from law

9    enforcement agencies across the country.  But,

10   generally speaking, in the way that you've defined

11   "incident-based reporting," I think that would fairly

12   summarize the computer-aided dispatch system.

13         Q.      And is the computer aided -- or is the

14   CAD system the primary data system that the

15   communication group of Troop M are using?

16         A.      Yes.

17         Q.      Okay.  Are there other data systems

18   that that communications system uses that you're

19   aware of?

20         A.      I don't believe so.

21         Q.      Okay.  And do you have an

22   understanding of where the CAD data is stored at the

23   KHP?

24         A.      During my time as the commander, it

25   was stored in Salina at that complex.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 48

Page 48

1          Q.      Okay.  So there were servers at that

2     complex in Salina where the CAD data was stored; is

3     that correct?

4          A.      Yes.

5          Q.      And do you know whether that CAD data

6     was -- well, strike that.

7                  Are you familiar with the phrase

8     "Record Management System"?

9          A.      Yes.

10         Q.      And are you aware that the KHP had a

11    Records Management System, or RMS, in the time

12    between 2006 and 2019?

13         A.      Yes.

14         Q.      Do you know whether the CAD data was

15    cross-recorded or saved in the KHP's record

16    management system between 2006 and 2019?

17         A.      I don't know that I can speak

18    precisely to your question.  The systems are tied

19    together.  I don't know the intricacies today because

20    I've been away from the Patrol.

21                 During the time that I was the

22    commander out there, there was a lot of work going

23    into tying those systems together, because at one

24    time they weren't tied together.  So that was going

25    on when I was the captain.  But I really can't speak,


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                             July 28, 2021

Page 49

1    you know, to after that time.

2                    I know eventually there was some

3    linkage of them, I just don't know what data

4    specifically that the RMS pulls or is fed from the

5    CAD.

6           Q.     So, is it fair to say that by the time

7    you left Troop M in 2000 -- was it '14 or '15?

8           A.     '15.

9           Q.     Okay.  So between the time that you

10   were at Troop M from 2006 to 2015, is it correct to

11   say that implementation of communication between CAD

12   and RMS was not yet complete when you left?

13          A.     I'm sorry, I just don't recall exactly

14   when that was completed.

15          Q.     Is it fair to say that you know that

16   that communication link was completed at some time

17   while you were still with the KHP?

18          A.     Yes.

19          Q.     What troop inside of the KHP manages

20   the RMS?

21          A.     The IT section, Internet Technology

22   section.

23          Q.     Does that have a -- is that section

24   given a troop number that you know of?

25          A.     No, they're just called IT.  They work



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

1  out of our headquarters in Topeka.

2        Q.    What is your understanding of,

3  generally, what the KHP's RMS holds?  What data does

4  it hold?

5        A.    Well, again, I'm limited on my

6  knowledge because I'm not in IT.  I have no IT

7  background.

8             It is a Records Management System.

9  So, it's my understanding that it holds, among other

10  things which I may not know exactly what those other

11  things are, it holds the Kansas incident-based

12  record -- incident-based arrest records.  It holds

13  accident investigation records.  It holds drunk

14  driving investigation records.  Offense, that may not

15  be an arrest, records.

16             Yes, I think I'll stop at that because

17  I don't know exactly for certain what other records

18  it holds.

19        Q.    And, to be clear, when I asked that

20  question, I asked your knowledge of it.  And so I

21  know that what I'm getting from you is your knowledge

22  of these systems --

23        A.    Sure.

24        Q.    -- not official --

25        A.    Well, it certainly holds other records



Page 51

1   for certain, I know that.  I think it holds pursuits

2   and other aspects of the Patrol, I just don't know

3   all of them.

4           Q.      Did any aspect of the communications

5   group of Troop M have responsibility for data input

6   into the RMS between 2016 and 2019 to your knowledge?

7           A.      No.  They did their entries into CAD,

8   and I don't remember specifically whether it was

9   pushed or pulled into the RMS, but it is fed to the

10  RMS.

11          Q.      As part of your role as the captain of

12  Troop M, were you also chair of a regional group that

13  oversaw the, sort of, the radio thing that you

14  mentioned, the 800 megahertz system?

15          A.      I wasn't the chair of the 800

16  megahertz.  I was a chair for a frequency band that

17  was in the 700 megahertz.  I was the chair of that

18  because the Patrol at that time managed the public

19  safety 700 megahertz bands which really were not

20  utilized during that time.

21          Q.      Okay.  So when you say the 700 public

22  safety band, what do you mean by that?

23          A.      Well, there are other uses of the 700

24  frequency, or really any frequency, whether it's 800,

25  high band, low band, there are commercial uses, there



BLAINE FRANKLIN SHAW, et al. vs                DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                      July 28, 2021

                                                          Page 52

1    are personal uses.  And so what the Highway Patrol

2    managed was just the public safety use of the 700

3    megahertz.

4          Q.      All right.  And when you say "public

5    safety," what does that term include, to your

6    knowledge?

7          A.      Police, fire, EMS, first responders.

8          Q.      Okay.  Let's switch over now and talk

9    about the CJIS unit.  What were -- well, first of

10   all, why don't you describe what the CJIS unit does?

11         A.      Sure.  CJIS stands for Criminal

12   Justice Information Services.  So when we're talking

13   about Criminal Justice Information Services, we're

14   talking about the type of services that law

15   enforcement, whether it's the Highway Patrol or

16   whether it's police or sheriff's departments across

17   the state and across the country, utilize.

18              For example, the National Crime

19   Information Center, NCIC, that is a system that the

20   CJIS unit managed.  They trained on it, they trained

21   other agencies on it, they trained our dispatchers

22   and our personnel on the use of that system.

23              The various Kansas systems that are

24   primarily housed at the Kansas Bureau of

25   Investigation, for example, I think it's changed now,



BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                      July 28, 2021

Page 53

1   I think NCIC holds misdemeanor warrants.  But at one

2   time, the KBI managed a system where all warrants

3   that didn't constitute a felony went into their

4   system.  And, again, this CJIS unit trained on the

5   use of that system.

6              There are other systems and files that

7   are associated with NCIC that this unit would train

8   agencies on the use of.  And then more, maybe a

9   little bit more relevant, or equally as relevant I

10  should say, to the training aspect, this unit did

11  auditing of those systems.  Meaning auditing of the

12  use or misuse of those systems, not just within the

13  KHP, but throughout all of law enforcement in the

14  state of Kansas.

15             So they were broken into two separate

16  sections.  There was a section that trained and

17  instructed and audited on the data side, meaning the

18  use or misuse of the data that comes from these

19  systems.

20             And then there was a technical

21  security audit team that would go to agencies and

22  audit the connections between their systems and these

23  systems to ensure that those connections were meeting

24  all the appropriate safeguards and protocols,

25  firewalls and virus protection and a whole host of



1   other technical things that were often -- would often

2   make my head swim, but.

3               So those units did training in all

4   those various things and did auditing of police

5   agencies in the use of those.

6               And, as the commander over that unit,

7   similarly to the Communications unit, I, of course,

8   was responsible for ensuring that they were doing

9   what they were supposed to go doing, in terms of

10  their services.

11              I had a rather unique role, because

12  there was only one of them in the entire state and

13  that I served as the FBI's what they called the State

14  CJIS systems officer.  And that is the person in each

15  state that the FBI designates as the individual who

16  helps enforce the use of the federal systems, like

17  NCIC, there are others, AFIS and a whole host of

18  files, I don't know how many they're up to now, 17,

19  19.

20              That individual also participated in

21  meetings at the national level with both the peer

22  CSOs from across the country, as well as the FBI CJIS

23  unit, in helping form a policy for the use of these

24  systems on behalf of the director of the FBI.

25         Q.    All right.  You just used the used the



BLAINE FRANKLIN SHAW, et al. vs        DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                    July 28, 2021

Page 55

1  acronym "CSO," can you tell me what you meant by

2  that?

3          A.      That is the CJIS systems officer.  I'm

4  sorry, it's been a couple years and it's actually

5  been longer than that since I've been away from that

6  unit.  CJIS systems officer.

7          Q.      Okay.  So, were you saying that you

8  were the CJIS systems officer for the State of

9  Kansas?

10         A.      Yes.

11         Q.      Okay.  I'm just trying to make sure

12  that that was the same thing --

13         A.      Yes.

14         Q.      -- that you were describing.  All

15  right.

16         A.      The captain who oversees Troop M

17  automatically inherits that role.  It's typically a

18  role that's assigned to the superintendent, but,

19  through delegation, because he would have absolutely

20  no time to manage that, he assigns that to the Troop

21  M commander.

22         Q.      Another question here, if you would

23  look back at Exhibit 71.  When I look at the CJIS

24  portion of that organizational chart, do you see that

25  there are people who are referred to as an



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

Page 56

1   "auditor/trainer," and then people who are referred

2   to as a "tech," which I assume means technical

3   auditor/trainer; is that correct?

4          A.      That's correct.

5          Q.      And so was that that distinction that

6   you were talking about in job roles?

7          A.      Yes.  If you look up above, you'll see

8   that there is a title "data quality supervisor" and

9   "technical audit supervisor," and that sort of was

10  the distinction between those two rows of people.

11                 One side of them dealt with what we

12  termed as the "data quality," the use of the data.

13  The other side dealt with the technical issues

14  surrounding the connections into these systems.

15                 Does that make sense?

16         Q.      Yes.  So the technical side was how

17  the systems communicate with each other through

18  technology; is that correct?

19         A.      That's correct.

20         Q.      And the data quality side was making

21  sure that the information that Kansas law enforcement

22  was putting into the system was accurately recorded?

23         A.      Correct.

24         Q.      Is that correct?

25         A.      And accurately used -- or I'm sorry --



Page 57

1   appropriately used.

2          Q.      When you say "appropriately used,"

3   what do you mean?

4          A.      These auditors had the ability to look

5   into the systems to see how transactions were ran.

6   "Transaction" meaning if somebody were going to check

7   to see if I was a wanted person, well, there's a

8   trail that follows that.  Because in order to find

9   that out, they're going to utilize the National Crime

10  Information Center, which is a piece of hardware that

11  the FBI maintains for the benefit of all law

12  enforcement across the country and the world in fact.

13                So this unit was sort of the -- they

14  sort of policed the police in the state of Kansas on

15  the use of NCIC and all the various files that are

16  attached to NCIC, and there's, I don't know, 17 or 19

17  of them.

18                So they have the ability to go in and

19  see who was making the queries and why.  And meaning

20  why in so much as what information they provided as

21  to why they were seeking that information.

22          Q.      So to take it to sort of a basic

23  level, would it be fair to say that an inappropriate

24  use might be an officer making a query for a personal

25  reason as opposed to a law enforcement reason?



BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 58

1          A.      Yes.

2          Q.      Okay.  Are there other misuses besides

3    the one that I could see as a lay person?

4          A.      That's probably the most prevalent one

5    is personal use.  I have to put my thinking cap on

6    here and kind of think back to those days, because

7    the personal use was on of the most prevalent ones.

8                  Sometimes that information might --

9    again, it's still sort of a personal use if it's

10   being provided to somebody outside of law

11   enforcement.  But obviously there are rules

12   associated, policies, even laws associated with the

13   use of criminal justice incident data.

14                 And so they go to agencies, look into

15   their files, so to speak, to see whether or not the

16   use of that data or how they were putting information

17   in to the system met the requirements of those rules.

18         Q.      All right.  As part of Troop M, were

19   you also working with something called "N-DEx"?

20         A.      Yes.

21         Q.      Can you describe what N-DEx is?

22         A.      N-DEx is a system, it stands for the

23   National Data Exchange.  It's basically a ginormous

24   warehousing of criminal justice data.  It came about

25   after the attacks on America in 9/11, and Congress



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 59

Page 59

 1   mandated that the FBI build this system.  Because
 2   following 9/11 and some of the congressional
 3   inquiries, there were findings that agencies,
 4   including many federal agencies, didn't talk well to
 5   each other.  They didn't share information to each
 6   other.  They operated in individual silos as it came
 7   to sharing data or sharing information.
 8                    So one of the takeaways was that the
 9   FBI was tasked with building this system that would
10   eventually allow all of law enforcement across the
11   country to be able to share information, meaning
12   criminal arrest information, offense information.
13   Not really intelligence information.  It wasn't
14   really intended to be an intelligence device,
15   although I can see some ways in which it could be
16   utilized for that, but.
17                    So, as my role of the CJIS systems
18   officer, I ended up, through my association with the
19   FBI CJIS unit, having a bit of a hand in the
20   implementation of N-DEx through input on things that
21   were important to law enforcement, as well as being
22   the first police agency in the nation that was
23   willing to actually teach other police agencies on
24   how to use that, along with our agency utilizing it
25   also.


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 60

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 60

1        Q.      When you say "it," are you referring

2   to N-DEx --

3        A.      N-DEx.

4        Q.      -- or CJIS?

5        A.      N-DEx, I'm sorry.  We're speaking of

6   index.

7                MS. GREATHOUSE:  Shoot, I thought I

8   had that silenced.  I apologize.

9   BY MS. GREATHOUSE:

10       Q.      Now you said that N-DEx came about as

11  a result of 9/11, correct?

12       A.      Yes.

13       Q.      You were, I think in 2012, appointed

14  to an FBI, like, advisory board; is that correct?

15       A.      Yes.

16       Q.      Was that related to this project?  Or

17  was it something different?

18       A.      It was all connected.  The FBI CJIS

19  Advisory Board is a group, there is a representative

20  from every state that serves on this advisory board

21  and it's advisory to the FBI directory on CJIS

22  systems and use of CJIS systems and the needs of law

23  enforcement.

24                And the CJIS systems officers all, by

25  nature of being a CSO, belong to working groups that



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850

Page 61

1    met a couple of times a year to discuss these policy

2    issues.  Well, they, the working groups, reported to

3    the Advisory Policy Board.  So I went at some point

4    from being not just a working board member, but also

5    serving on the higher oversight board, the Advisory

6    Policy Board.

7            Q.     Okay.  And so what was the role that

8    you had at that upper level with the information

9    services Advisory Policy Board?

10           A.     So the Advisory Policy Board would

11   essentially approve or disapprove policy regarding

12   NCIC and the use of the NCIC systems that was

13   formulated by the respective working groups.

14                  And there was a working group from

15   every region of the company that represented both a

16   CSO from every state and a local, what they called a

17   local authority, meaning a police official, generally

18   a chief or a sheriff, who represented all of the

19   local agencies in that state.

20                  Those two individuals would go and

21   join with peer colleagues from all over the country

22   and would meet with the FBI semi annually to discuss

23   policy issues governing the use of NCIC or other

24   systems, like N-DEx, that the FBI was either

25   developing or had developed.


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 62

Page 62

1            Those working groups would revise or

2    develop new policy, then that would go to the

3    advisory working -- or the Advisory Board for

4    consideration by the board.  And if the board

5    approved any number of usually more than 100

6    different changes, then it would go to the FBI

7    director for either approval and implementation, or

8    it would get kicked back all the way down and would

9    be worked on in the future.

10           Q.    Okay.  So, these policies that were

11   being sort of created through this board, did they

12   cover the categories of data that should be input

13   into the system?

14           A.    Yes.

15           Q.    Okay.  So, like, what kinds of

16   categories of data were added in making these

17   policies?

18           A.    Everything -- and I'm going to just

19   broadly summarize -- but everything from wanted

20   persons and warrants and stolen articles, stolen

21   vehicles.  It's a very, very, very broad list, but

22   items such as that.

23           Q.    So, the information that was input

24   into this system was not incident based?

25           A.    Yes.



1        Q.     It was incident based?

2        A.     Yes.  There was also -- it's rather

3 complex because it's not just NCIC, that's one piece

4 of it.  There's the incident-based reporting piece.

5 There's the fingerprint, what they now call AFIS,

6 automatic fingerprint, something, something.  Then

7 there was N-DEx and there were numerous systems.

8               And so the working groups and the

9 Advisory Policy Board created or revised policy for

10 all of those, not just NCIC.

11       Q.     For purposes of the record, you and I

12 have both used the phrase "N-DEx" today, correct?

13       A.     Uh-huh.  Yes.

14       Q.     And that is actually capital N hyphen

15 capital D-E-X; is that correct?

16       A.     Yes.

17       Q.     It's not the word "index"?

18       A.     No.

19       Q.     It sounds like the word "index," but

20 it's actually N-DEx.

21       A.     Yes.

22       Q.     Correct?  Okay.

23               I wanted to make sure the reporter got

24 that because that's going to make a difference in how

25 she records what you and I are saying, and I just



BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 64

1   realized that as we were going along.

2              Okay.  So you said there is an

3   incident-based reporting piece of the NCIC; is that

4   correct?  Or --

5        A.    It's actually stand-alone.  The

6   Kansas -- in our state, the Kansas Bureau of

7   Investigation manages what they call "KIBRS," which

8   is the Kansas Incident Based Reporting System.

9              The FBI houses a system called "NIBRS"

10  which is the National Based Incident Reporting

11  System.  And I guess for terms for making it

12  simplified, the goal was for the State's

13  incident-based reporting systems to feed to the

14  federal system, so, again, information sharing.

15             That was easier said than done

16  because, as you can imagine, the different platforms

17  across the country and then some states didn't

18  collect the same kinds of data, so that was yet

19  another one of the things that were worked on is

20  trying to create universal platforms and a way in

21  which criminal justice users could access other

22  criminal justice agencies' data provided they had the

23  right to do so.

24        Q.    Now, you mentioned KIBRS and I'm

25  guessing that that is K-B-R-S?



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 65

1           A.      K-I-B-R-S.  Kansas Incident Based

2   Reporting System.  That is managed in Kansas by the

3   KBI.  However, since only -- there can only be one

4   CJIS systems officer in Kansas, even though KBI

5   managed it, the CSO is responsible for it.  So in a

6   bifurcated system like that, I would work hand in

7   hand with the Bureau's, KBI's, KIBRS folks, the

8   people in that unit, specifically their head.  So

9   that when I'd go to these meetings, I would be able

10  to appropriately represent the things that they felt

11  were needed.

12           A lot of states, the state police

13  manages the entire system.  But Kansas is one of a

14  very small handful of states that still has,

15  primarily because of political reasons, a bifurcated

16  system.

17           We have in our state of course the

18  governor who has an executive branch and an attorney

19  general who has that branch.  And because of that,

20  there is not a state police in Kansas, therefore, we

21  don't have -- we don't have those systems housed, I

22  say "we," meaning the Patrol.  So, the Patrol managed

23  NCIC primarily, the KBI managed the incident based

24  reporting systems and the fingerprint systems.

25           Q.      So, did the KHP's incident based



Page 66

1    reporting system communicate with the KBI's incident

2    based reporting system?

3          A.    Yes.

4          Q.    Okay.  And what kind of data was

5    communicated from the KHP to the KBI that was

6    incident based?

7          A.    Pretty much what the KBI told us that

8    they wanted, which is really primarily standard

9    offense and arrest data.  That's primarily what the

10   Kansas Incident Based Reporting System collects.

11         Q.    Okay.  I want to make sure I

12   understand this.  So let's just imagine we have an

13   incident, we'll call it an arrest, so we have an

14   arrest.

15         A.    Uh-huh.

16         Q.    On that arrest, what pieces of data

17   are collected and then sent over to the KBI?

18         A.    I will do my best to summarize.  I

19   will not hit every data element because there are so

20   many and certainly the KBI or one of our CJIS folks

21   would be better suited to tell you.

22               But, in summary, certainly a victim's

23   information would be counted in those reports.  A

24   suspect's information, if there was one and that was

25   known, would be reported.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

Page 67

1      Q.     Well, I had asked you about an arrest.

2  So if we had an arrest, we would have a suspect,

3  right?

4      A.     Yes, I'm sorry.  I fell asleep on you

5  for a minute.

6      Q.     That's all right.

7      A.     Yes.  In the case of an arrest, then

8  if there is a victim, then a victim's information.  A

9  defendant or a suspect's information.  An officer's

10  information.  The location of where the incident or

11  the arrest allegedly occurred.  What the arrest was,

12  what the violation is alleged to have occurred.

13  Personal data on the suspect or the defendant.  I'm

14  certainly missing some data, but.

15      Q.     But that's to the best of your

16  recollection --

17      A.     Yes.

18      Q.     -- you've given -- to the best of your

19  recollection, you have given me the categories that

20  you can recall as you sit here today?

21      A.     Yes, a summary of the categories.

22      Q.     All right.  Okay, we're probably going

23  to come back and talk a little bit more about that.

24  But let's keep moving because I want to get -- make

25  sure I understand all the systems that Troop M was



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850

Page 68

1    responsible for.

2                    So did Troop M -- or was Troop M

3    responsible for the license plate reader, or LPR

4    system, in Kansas?

5          A.      No.   That database is housed with the

6    Kansas Bureau of Investigation.

7          Q.      To your knowledge, could the KHP

8    access that LPR information from the KBI?

9                    MS. GREATHOUSE:   This is alphabet

10   soup.

11         A.      Maybe.

12   BY MS. GREATHOUSE:

13         Q.      Did Troop M have any responsibility

14   for a Uniformed Criminal Reporting Program?

15         A.      No.   That is another program that the

16   Kansas Bureau of Investigation manages.

17         Q.      Now we've talked about a couple of

18   different programs here that the KBI is in charge of,

19   but that would have to be communicated to the

20   national system through the national criminal -- the

21   NCIC; is that correct?

22         A.      Not technically speaking.

23         Q.      Okay.

24         A.      NCIC is a stand-alone system.   NIBRS

25   the, National Incident Based System, is stand-alone.



Page 69

1    AFIS, the fingerprint system and whatever else it

2    collects these days, is a stand-alone system.  UCR

3    and NIBRS are very similar.

4           Q.     All right.  But as the CJIS systems

5    officer for Kansas, did you have responsibility for

6    the communication of that data that's held by KBI to

7    the national systems?

8           A.     The short answer is yes.  Meaning that

9    if there was problems in the reporting of that, then

10   the FBI would alert me.

11          From a more realistic standpoint, the

12   KBI was really responsible, in so much as if there

13   was a problem, I'd be notified and I would simply

14   contact the KBI, my contact there, and say, hey,

15   what's going on, and, you know, they would take care

16   of it.

17          Q.     So the KBI had its own way to directly

18   communicate to national systems; is that correct?

19          A.     Yes.

20          Q.     The KBI's data did not have to flow

21   through the KHP systems; is that correct?

22          A.     Not anything was non-NCIC, correct.

23          Q.     So KBI data that related to the NCIC

24   did come through the Kansas Highway Patrol's systems;

25   is that correct?



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                               July 28, 2021

Page 70

1          A.     Again, technically, no, because the

2    item that they call -- they call it "the switch,"

3    which is really nothing more than a connection to,

4    from and to, was actually housed at KBI.  It's very

5    complicated in Kansas because of the bifurcated

6    system.  KBI holds most of the repositories in Kansas

7    for data, not NCIC though.

8                    So even though the KHP's responsible

9    for NCIC because a long time ago decisions were made

10   that KBI was going to maintain these repositories and

11   these connections, that even that NCIC connection is

12   there.

13                   So, yes, technically, the KBI is able

14   to communicate directly with the FBI outside of the

15   CSO.  But from a policy standpoint, because the FBI

16   doesn't want to go to every local or state entity

17   across the country to deal with these matters, they

18   appoint one individual, and that one would have been

19   the CSO.

20          Q.     So when you say -- you used the word

21   "switch," and the switch is literally a piece of

22   hardware that connects the KBI's systems to national

23   systems; is that correct?

24          A.     That is correct.

25          Q.     And so there was this physical switch



BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                July 28, 2021

                                                          Page 71

1    at the KBI and then there's also a physical switch so

2    the Kansas Highway Patrol can communicate to national

3    systems; is that correct?

4              A.      Yes.  We go through, the KHP and any

5    police agencies connection to NCIC, is through the

6    one connection through KBI.

7              Q.      Okay.

8              A.      There's not separate connections.

9              Q.      So there's only --

10             A.      There is a back-up.  There is a

11   back-up connection that actually is housed at the KHP

12   in Salina.  So if NCIC fails at the connection, the

13   KBI fails, the redundancy switches over to this other

14   switch in Salina.

15             Q.      Okay.  So, other than a back-up,

16   there's only one switch to national reporting systems

17   for the state of Kansas?

18             A.      Yes.

19             Q.      All right.  Was Troop M responsible at

20   all for the Interstate Identification Index, which I

21   think has another acronym that you use; is that

22   correct?

23             A.      Well, yes.  You know, the FBI loves

24   their acronyms.  The Interstate Identification Index

25   stands for III.  What III is is the criminal,



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

Page 72

1   criminal history records of individuals who have been

2   arrested.  And, again, Kansas makes everything

3   complicated when it comes to these criminal justice

4   systems because, you know, we're different from state

5   police agencies who house -- one entity houses it

6   all.

7              So the KHP, because III is a part of

8   NCIC, trains on it, audits on it.  But, again the KBI

9   has a integral piece of III as well because of that

10  connection to the FBI.

11      Q.    All right.

12      A.     I'm trying to make it as hard as I

13  possibly can for you, counsel.

14      Q.     I appreciate it.  I'm hoping I'm

15  tracking you.

16             Okay.  Other than what we have already

17  talked about, were there any other information

18  sharing tools that the Kansas -- well, that you were

19  overseeing when you were the captain of Troop M?

20      A.     No.

21      Q.     That you can think of.

22      A.     No.

23             MS. GREATHOUSE:  Okay, let's go off

24  the record for a minute please.

25             VIDEOGRAPHER:  The time is 12:16 PM,



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

Page 73

1   taking a short break.  Going off the record.

2              (Recess.)

3              VIDEOGRAPHER:  The time is 12:23 PM.

4   We are back on the record.

5   BY MS. GREATHOUSE:

6         Q.     When we were talking about your, sort

7   of, formal education, you mentioned an FBI program

8   that you went to; is that correct?

9         A.     Yes.

10        Q.     And did that program have anything to

11  do with the kinds of information systems we've been

12  discussing?  Or did it cover different categories?

13        A.     It covered other things.

14        Q.     Okay.  So what were the kinds of

15  things that were addressed in your FBI training

16  program?

17        A.     Sure.  The program we're talking about

18  is referred to as the FBI National Leadership Or

19  National Executive Training.  And it's a 3-month long

20  training course that attendees who are selected to go

21  spend their 3 months at Quantico, Virginia, and,

22  essentially, are in a college-like atmosphere.  And

23  they have a very large cafeteria-style curriculum of

24  courses that are tailored as you so deem that

25  you -- or better spoken I guess -- as you desire.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850

Page 74

1              So they have a catalog of different

2    kinds of courses, and an individual who's going to

3    attend then selects the courses that they attend.

4    Now there are a few mandatory courses that the FBI

5    requires that are leadership based.

6              But, essentially, the academy is all

7    about learning to be a police administrator, how to

8    eventually become a chief of police or sheriff or a

9    superintendent of a highway patrol and/or just a

10   leader in a police agency.

11            So it encompasses a large number of

12   courses, everything from leadership to communications

13   to media to criminal investigation techniques.  Oh,

14   goodness, physical fitness, wow, there are a lot.

15   And the school is attended by not only students from

16   US police agencies, but national police agencies.  So

17   it's really an international, international training

18   opportunity.

19        Q.    Is this a program that you had to

20   apply to be accepted to?

21        A.    Yes.

22        Q.    Okay.  And do you know whether there

23   have been other -- in the time that you were with the

24   Kansas Highway Patrol, were you aware of other

25   individuals with the Patrol that went to this



BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                      July 28, 2021

Page 75

1    academy?

2           A.    Yes.  Over the course of my career,

3    I'm not exactly sure just how many of our personnel

4    have attended the FBI's academy.  But from the time

5    that I attended, I was aware of a group of eight

6    individuals within the patrol who had attended that

7    academy.

8                 It's very difficult to get into

9    because when you think of 40,000 police agencies

10   across the country and, you know, literally millions

11   of officers and a lot who apply every year, it's

12   difficult to get into.

13          Q.    Well, it sounds like maybe the Patrol

14   was sending about one person a year, if you went in

15   2010 and were with the Patrol until '19, that about

16   one a year.  Does that sound accurate?

17          A.    Our goal was to send one a year.  The

18   eight or so that I speak of encompassed employees

19   that attended some number of years before me and

20   years after me.

21                So, in that time, which is a fairly

22   significant, maybe 15-year period, we're only talking

23   about maybe six or eight employees.  But our goal was

24   to send one a year, just we didn't always succeed in

25   reaching that goal because of the volume, the shear


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 76

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 76

1    volume of candidates that applied from across the

2    world.

3           Q.      You listed the kinds of courses that

4    were available at the academy, do you recall what

5    courses you took at the academy?

6           A.      No, not specifically.  I mean, I can

7    name a few.  I took some leadership courses.  I took

8    an internet security course.  I took a speech writing

9    course.  And there were others, I just simply don't

10   remember.  That's been over 10 years ago.

11          Q.      Do you remember taking any courses

12   that had to do with the media?

13          A.      No.

14          Q.      Did you take any courses that had to

15   do with criminal investigation or field work?

16          A.      Yes.

17          Q.      Was there a particular area in

18   investigation or field work that you took at the KBI

19   that you recall?

20          A.      At the FBI?

21          Q.      FBI.

22          A.      I remember specifically taking a

23   course on interrogation.

24          Q.      Did you take any courses that had to

25   do with reporting?  By which I mean internal reports,



BLAINE FRANKLIN SHAW, et al. vs            DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                  July 28, 2021

Page 77

1  police reports.

2          A.      I don't remember.

3          Q.      Okay.  So on the timeline I think

4  we've now come up to 2015 when you were appointed

5  lieutenant colonel of the KHP; is that correct?

6          A.      Yes.

7          Q.      And when you received that job, it was

8  because you were selected to take that job by the new

9  superintendent of the Highway Patrol; is that

10  correct?

11          A.      Yes.

12          Q.      Was that a job that you applied for?

13          A.      No.

14          Q.      So you just -- it's like one of those

15  things where you just get a phone call one day and

16  they say, hey, will you be the assistant

17  superintendent?

18          A.      That's kind of how it happened.

19          Q.      Okay.  Can you tell me what your

20  duties were as the assistant superintendent?

21          A.      Sure, I'll generalize them.  The

22  assistant superintendent of the Kansas Highway Patrol

23  is very much one might think of a vice-president of a

24  company or a COO of a company, in so much as the

25  assistant superintendent is the No. 2 person.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 78

1            So, the assistant superintendent
2    oversees all operations of the agency, whether those
3    are operations by uniformed personnel or by civilian
4    personnel.
5            There were shy of 1,000 employees, I
6    want to say 900-ish, so the lieutenant colonel, the
7    assistant superintendent, oversees, not directly, but
8    oversees everything that goes on in the Patrol.  The
9    assistant superintendent ensure that the directives
10   that are set out by the superintendent are carried
11   out throughout the agency.
12            The assistant superintendent is
13   involved in all matters regarding policy.  The
14   assistant superintendent is involved in all matters
15   concerning hiring and disciplinary.  The assistant
16   superintendent reviews internal affairs cases.
17            The assistant superintendent spends a
18   great deal of time overseeing all expenditures of an
19   approximately $90 million budget.
20            The assistant superintendent is really
21   also there to ensure that the personnel of the
22   highway practical, all the men and women, that their
23   welfare is taken care of.  And there are many, many,
24   many other duties, but I hope that gives some
25   understanding.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850
COURT REPORTING ◆ LEGAL VIDEO

App. Vol. XXIII, 79

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                               July 28, 2021

Page 79

1      Q.      It does.

2              So, since you came to the assistant

3    superintendent role from Troop M, did the, sort of,

4    communications and reporting and all of that stay

5    something that you were paying a lot of attention to

6    as the assistant superintendent?

7      A.      Not directly.  I mean, quite frankly,

8    through delegation, we had majors and captains and

9    others who took care of those things directly.  So if

10   it needed to reach my level, obviously I was made

11   aware of things, but, you know, any particular

12   changes that might have occurred that really weren't

13   worthy of reaching that level, I might not have known

14   about.

15     Q.      Okay.  So, when you went from the

16   captain of Troop M to the lieutenant colonel of the

17   Patrol, you sort of jumped over, sort of, several

18   ranks; is that correct?

19     A.      I jumped over the rank of major.

20   There were four majors that were employed.  And when

21   Colonel Bruce was selected to become the

22   superintendent, and I'm sort of speaking for him, but

23   I think he felt that I was a better fit as it related

24   to him and the Patrol in whole than the personnel

25   that one might think would ordinarily ascend to that



Page 80

1   position.

2                 So, yes, I ended up going from a

3   captain to a lieutenant colonel and skipping the rank

4   of major.

5        Q.     You said that there were four majors

6   in the KHP, at least at the time in 2015 when you

7   became lieutenant colonel; is that right?

8        A.     Yes.

9        Q.     Were those majors assigned to

10  particular, let's say, topics or job duties in the

11  KHP?

12       A.     Region, yes.  The majors were

13  typically, as it related to our personnel, our field

14  personnel were assigned regionally.  So we had a

15  major who covered the entire western region of the

16  state which would have encompassed two troop

17  commands.  So everything in the entire western part

18  of the state, that major took care of those

19  operations.

20                Then we had a major that was assigned

21  to the central portion of the state.  So basically

22  from the Oklahoma line to Nebraska within certain

23  boundaries.

24                And then, likewise, an eastern major.

25                And then we had a major who took care



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850

Page 81

1  of some of the specialized or some of the support

2  type of operations.  Because, as you can imagine with

3  an organization like the Patrol, there are many

4  moving parts.  And so it's not, I think what some

5  people might think of, just all troopers.  There are

6  as many civilian employees as there are troopers, and

7  a lot of different sections within the Patrol that

8  are just civilians.

9          Q.     When you were the captain of Troop M,

10  did you report to one of the majors?

11          A.     Yes.

12          Q.     Okay.  Which major did you report to?

13  And I'm talking about position, not name.

14          A.     Well, I reported to a couple because

15  they changed, retired, promoted and so forth.  So, at

16  one point, I reported to a gentleman by the name of

17  John Gant who is retired now.  And then I reported to

18  Major Bruce, at the time, before he became the

19  superintendent.

20          Q.     And so, I'm sorry, I don't think my

21  question was clear.  I wasn't wondering about their

22  names.  I was wondering, you told me there was a

23  western, a central --

24          A.     Oh, I'm sorry.

25          Q.     -- an eastern and a specialized,



1   right?

2          A.      Yes.

3          Q.      Okay.  Which one of those sort of

4   categories did you report to?

5          A.      It was the support.

6          Q.      Okay.

7          A.      Support.

8          Q.      And so, at some point, you were

9   reporting to Major, at that point, Major Bruce when

10  he was the major of the Patrol over support, the

11  specialized and support part of the KHP; is that

12  correct?

13         A.      Yes.

14         Q.      Okay.  So, when Major Bruce was named

15  the superintendent, there had to have also been

16  somebody who was named to the position of the support

17  major position; is that correct?

18         A.      Well, Colonel Bruce and I actually

19  promoted a captain into that major's position after

20  we assumed our positions.

21         Q.      Okay.  But I guess what I was asking,

22  inartfully, is that when Major Bruce was promoted,

23  that spot that had been your supervisor was empty; is

24  that correct?

25         A.      Yes.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

1       Q.     Okay.  So in your role as -- well, let

2   me ask, would you have referred to your role as

3   lieutenant colonel?  Or would you normally call it

4   assistant superintendent?

5       A.     Both.

6       Q.     Okay.

7       A.     I think from day to day, I was

8   referred to as a lieutenant colonel.  But I suppose

9   the more formal title was that of the assistant

10  superintendent, so.

11      Q.     Okay, so those terms are

12  interchangeable as we use them?

13      A.     They're interchangeable, for sure.

14      Q.     So when you were the lieutenant

15  colonel of the Patrol, did you act as its

16  spokesperson?

17      A.     No, only when the superintendent

18  designated me to or he was not available.  So, for

19  the most part, obviously the superintendent is the

20  spokespersons for all things Highway Patrol.

21  However, from a realistic standpoint, an agency our

22  size, he simply cannot address all the matters, so we

23  have, or the Patrol has, public relations officers or

24  personnel and they are geographically who speak to

25  issues geographically.



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850

BLAINE FRANKLIN SHAW, et al. vs      DEPOSITION OF RANDY MOON
HERMAN JONES, et al.      July 28, 2021

Page 84

```
 1              If it is an issue of politics or

 2    policy, that is likely going to be a discussion that

 3    comes to the level of my -- the role I had or the

 4    current superintendent's role.  And then it could be

 5    delivered by one of those positions or it could be

 6    delivered by a public relations officer.

 7         Q.    So, if you were giving an interview to

 8    the press when you were the lieutenant colonel, you

 9    would have communicated in advance with the

10    superintendent about that issue?

11         A.    Of course.

12         Q.    And would you also have worked with

13    one of the, you know, the information specialists or

14    the --

15         A.    The public relations specialist.

16         Q.    All right.  So yes?

17         A.    Yes.

18         Q.    Is that a, yes, you would have?

19         A.    Yes.

20         Q.    All right, sorry my question was bad

21    there.

22              So, earlier we talked about the

23    article that you had looked at that was cited in some

24    of our court filings.  Do you recall that?

25         A.    Yes.
```



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 85

Page 85

```
 1          Q.      So, when you gave that interview, you
 2   were giving that in your capacity as the lieutenant
 3   colonel of the KHP, correct?
 4          A.      Yes.
 5          Q.      And did you communicate with the
 6   colonel about that issue before you gave the
 7   interview?
 8          A.      I communicated with the superintendent
 9   regarding the request by the woman who came from the
10   "Topeka Capital Journal" to visit with us.  So he was
11   aware that myself, one of our legal counsel, our
12   criminal interdiction commander, that we were going
13   to have that interview.  He was aware of that.
14                  He was aware of what it centered
15   around.  He probably did not know until after the
16   interview what each of us individually said.  In
17   other words, we didn't meet, my recollection is, we
18   did not meet beforehand to powwow and discuss what we
19   were going to say.
20          Q.      Before that interview, did the
21   reporter give you the topic that she was going to ask
22   questions about?
23          A.      No.
24          Q.      Okay.  So, you said that there was an
25   interdiction supervisor who was also interviewed at
```



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

                                                       Page 86

1   this same time; is that correct?

2        A.    Yes.

3        Q.    Do you recall who that was?

4        A.    Yes, his name was Captain, I assume

5   it's still captain, Brent Hogelin, H-O-G-E-L-I-N I

6   believe.

7        Q.    Okay.  And was he the captain that

8   oversaw the Interdiction Unit of the Kansas Highway

9   Patrol?

10       A.    Yes.

11       Q.    Just for purposes of making sure that

12  you and I have the same understanding of what

13  interdiction is, will you tell me what you mean, what

14  you understand "interdiction" to mean?

15       A.    Sure.  As far as the Kansas Highway

16  Patrol is concerned, and probably generally accepted,

17  criminal interdiction, and in our case we have a team

18  of troopers who are specially trained, meaning that

19  they've gone above and beyond just normal training

20  and they look for criminal activity, specific

21  criminal activity.  And really, I mean, realistically

22  all criminal activity.  But they certainly focus on

23  things like human trafficking, narcotics trafficking,

24  weapons trafficking or anything illegal connected

25  with weapons.  Yeah.



Page 87

1       Q.     And is it fair to say that the

2  majority of the interdiction that happens with the

3  Kansas Highway Patrol involves travelers on the

4  highways of Kansas?

5       A.     Yes.

6       Q.     Do you -- I mean, would you say --

7  well, strike that.

8             Do you have any knowledge about what

9  percentage of interdiction efforts occur in traffic

10  as opposed to other kinds of interdiction efforts?

11      A.     I don't know statistically speaking

12  and when you're -- are you speaking -- I guess I

13  should clarify.  So you're asking me do I have

14  knowledge as to any interdiction efforts other than

15  motorized traffic?

16      Q.     I'll re-ask my question.

17            Do you have a general understanding

18  of, you know, what percentage of interdiction efforts

19  in the Kansas Highway Patrol are happening via

20  traffic stops on the highways or freeways in Kansas?

21      A.     I think the majority of the

22  interdiction effort is traffic related, just by

23  nature of the Patrol's duties.

24      Q.     All right.  So when the reporter came

25  to the KHP, did she indicate that she wanted to talk



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

Page 88

1   to somebody in Interdiction?  Do you know?

2         A.    I don't think so.  I think we assumed.

3   I think she had made a number of requests in the

4   preceding weeks.  And I think given those requests,

5   we had some idea that she might want to be talking

6   about the Vasquez case, about license plates, about

7   Interdiction efforts.

8         Q.    Now, when you say she'd made a number

9   of requests in the preceding weeks or months, you're

10  referring to Kansas Open Record Act requests that she

11  made to the Patrol?

12        A.    Yes.

13        Q.    You said you also worked with legal

14  counsel related to that interview, correct?

15        A.    Yes.

16        Q.    Can you tell me the name of the person

17  you worked with?

18        A.    Yes.  Her name is Sarah Washburn and

19  she served in a couple of different capacities for

20  the Patrol.  One was she was counsel in our asset

21  forfeiture and she also taught criminal law.

22        Q.    When you say she taught criminal law,

23  where did she teach criminal law?

24        A.    At the Kansas Highway Patrol training

25  center in Salina.


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN   800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING ♦ LEGAL VIDEO

App. Vol. XXIII, 89

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                            July 28, 2021

                                                        Page 89

1           MS. GREATHOUSE:  Just going to pause

2    for a second, I need to grab a water.  Finished my

3    coffee and now my voice is going.

4           A.      She taught other things also.

5    BY MS. GREATHOUSE:

6           Q.      So, this particular interview you gave

7    was in 2017; is that right?

8           A.      Yes.

9           Q.      And, at that time, was it the Kansas

10   Highway Patrol's position that it was not

11   unreasonable when a trooper was conducting a stop for

12   that trooper to consider that people coming from

13   Colorado, or I suppose any other state where

14   marijuana was legal, that the trooper could consider

15   that in determining whether or not they needed to

16   conduct a search or wanted to conduct a search of a

17   vehicle that had been stopped?

18          A.      I think our troopers considered many

19   facets as it related to searches.  Residency may or

20   may not have been one of those facets.

21          Q.      But if in the interview, and we can

22   look at it here in a minute, you indicated that it

23   was something for the troopers to appropriately

24   consider, that would have been the position of the

25   KHP; is that correct?



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

1          MR. CHALMERS:  Let me pose an

2     objection before you answer.

3               That's not an accurate

4     characterization of the interview, and so I object to

5     the form.

6     BY MS. GREATHOUSE:

7          Q.    I will restate.  I will restate my

8     question.

9               Any statement you gave in that

10    interview would have been the position of the KHP as

11    regards stops or searches by the KHP; is that

12    correct?

13         A.    I believe so.

14         Q.    In 2017, would you say that asset

15    seizures in Kansas had become a political issue for

16    the Patrol?

17         A.    I think so.

18         Q.    Can you describe what you mean when

19    you say it was a political issue for the Patrol?

20         A.    Asset seizures?

21         Q.    Yes.

22         A.    There had been, over the years, the

23    Patrol was requested by the legislature to explain

24    what the Patrol did specifically with asset

25    forfeiture moneys.  There had been some attempts by



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 • 913.317.8800 • FAX 913.317.8850

Page 91

1   the legislature and consideration given to taking

2   asset forfeiture on the state level, the proceeds

3   from the Patrol and routing them into other areas of

4   government.  That, of course, becomes political.

5              The -- and it's not just in Kansas, it

6   was not just in Kansas at that time that state

7   legislatures across the country were looking at asset

8   forfeiture.  So that's what I meant by that

9   statement.

10             Q.    So, before the issue became one that

11  the Kansas legislature was looking at, if there were

12  seizures by the Patrol, those moneys actually came to

13  the Patrol for operations; is that correct?

14             A.    They generally are used for things

15  like equipment and training, not operations.

16             Q.    Okay.  So you might buy a new airplane

17  or something like that; is that correct?

18             A.    Yes.

19             Q.    All right.  And then after the

20  legislatures became interested in those sums of

21  money, the issue was whether or not those funds would

22  be pulled into general state operations instead of

23  just for use by the KHP; is that correct?

24             A.    Yes.

25             Q.    Okay.  And so was it -- as I just



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                            July 28, 2021

Page 92

 1    described it, is that sort of the political issue

 2    that the KHP was dealing with in 2017 about seizures?

 3            A.      Yes, I think so.

 4            Q.      Okay.  Now, do you recall the actual

 5    interview with the reporter in 2017 that resulted in

 6    the article?

 7            A.      Well, I printed the article to refresh

 8    my memory, and so I have read the article.  And, I

 9    mean, obviously at the time I received the subpoena,

10    I didn't remember everything about that interview.

11    And I've read the article and refreshed my memory,

12    so, you know, I'm more familiar with it today than I

13    was a few weeks ago.

14            Q.      So when you read that article, did it

15    sort of take you back and help you remember the

16    actual conversation you had with the reporter?

17            A.      Yes.  To some extent.

18            Q.      Okay.  Well, first of all, did you

19    bring documents with you today?

20            A.      Yes.  I brought the article itself.

21            Q.      Okay.  So, is that what's in the

22    folder in front of you?

23            A.      Yes.

24            Q.      Do you mind if I take a look at which

25    version of it?  Because there's different versions



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING + LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

                                                          Page 93

1    available on the internet.

2         A.    No.

3         Q.    Okay.  Got it.

4               Let's go ahead and mark that copy as

5    Exhibit 72.

6               (Moon Exhibit 72 was marked for

7    identification.)

8    BY MS. GREATHOUSE:

9         Q.    Okay.  You now have Exhibit 72 in

10   front of you.

11              MS. GREATHOUSE:  Art, I do have a copy

12   of that version.  You have it in front of you too,

13   never mind.

14              MR. CHALMERS:  Probably, yeah.

15   BY MS. GREATHOUSE:

16        Q.    This article is entitled, "KHP says

17   out-of-state license plates not a factor in stops;

18   agency can't provide records substantiating claim."

19   Is that correct?

20        A.    Yes.

21        Q.    And the article was published in March

22   of 2017; is that correct?

23        A.    Yes.

24        Q.    Now I am also going to show you, and

25   I'm not going to mark it, but for the record it is



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING ♦ LEGAL VIDEO

App. Vol. XXIII, 94

Page 94

1   marked as P000128 to 136 in the documents produced in

2   this case.

3               Can you look at that and tell me

4   whether you believe those are different printouts of

5   the same article?

6        A.     Without reading every single word and

7   just looking at it summarily, it appears to be the

8   same.

9        Q.     Thank you.  On the Exhibit 72 in front

10  of you, would you please turn to I think what will be

11  the fifth page?

12       A.     Yes.

13       Q.     On that page, do you see where your

14  name starts, at least on my copy it's about

15  two-thirds of the way down?

16       A.     Yes.

17       Q.     And there appear to be two paragraphs

18  there that refer to you, correct?

19       A.     Yes.

20       Q.     Could you please read the second

21  paragraph that contains the quote from you?

22       A.     Yes.  "'We're right next to a state

23  where it's legal.  We cannot ask our troopers to

24  ignore that fact,' Moon said.  'It's not an

25  unreasonable explanation -- expectation to think that



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING ♦ LEGAL VIDEO

App. Vol. XXIII, 95

BLAINE FRANKLIN SHAW, et al. vs     DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                 July 28, 2021

Page 95

1   people are going to come across the country to go to

2   that state to purchase marijuana, and then leave that

3   state and go back to where they came from, and once

4   they do that, they are committing violations of the

5   law."

6         Q.      Thank you. In the first sentence of

7   that, you used the word or the phrase "where it's

8   legal," do you see that?

9         A.      Yes.

10        Q.      And by "it," you're actually referring

11   to marijuana; is that correct?

12        A.      Yes. We are talking about marijuana

13   and, more specifically, THC since marijuana is not

14   the only thing that contains THC and it's not the

15   only thing that is sold in the states that have

16   legalized marijuana.

17        Q.      Right. So, "it" refers to marijuana

18   or one of its components, THC, correct?

19        A.      Yes. Yes.

20        Q.      And talking about states where it's

21   legal, at that point in 2017, this was really a

22   discussion about Colorado; is that correct?

23        A.      Well, I think this was a discussion

24   about Colorado specifically, but there were more than

25   just Colorado that had legalized marijuana at that



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 96

Page 96

 1   time.

 2          Q.     The major issue for Kansas at this

 3   point in time with movement of marijuana or other THC

 4   products across Kansas was largely coming from

 5   Colorado; is that fair?

 6                 MR. CHALMERS:  Object to form.

 7                 THE WITNESS:  I'm sorry, I didn't

 8   hear.  What, Counsel?

 9                 MS. GREATHOUSE:  Did you get his

10   objection on the record?  Okay, go ahead.

11          A.     So could you restate your question?

12                 MS. GREATHOUSE:  Will you read it back

13   for me please?

14                 (Whereupon, the requested portion of

15   the record was read by the reporter as follows:

16          Q.     The major issue for Kansas at this

17   point in time with movement of marijuana or other THC

18   products across Kansas was largely coming from

19   Colorado; is that fair?)

20                 MR. CHALMERS:  Same objection.

21          A.     It is my understanding at that

22   particular time most of our marijuana and edible

23   seizures were coming out of Colorado.

24   BY MS. GREATHOUSE:

25          Q.     And in the paragraph before in this


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850
COURT REPORTING ◆ LEGAL VIDEO

App. Vol. XXIII, 97

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                July 28, 2021

Page 97

1  article, you had specifically indicated that the

2  political issue that was created in Kansas was, in

3  part, created by the fact that Colorado had legalized

4  recreational marijuana; is that correct?

5          A.      Well, the actual -- the language in

6  the -- that I've been attributed to here said "in

7  such states as Colorado," so that would have been

8  inclusive of Colorado and Washington and California

9  and Oregon and the however many number of states

10  where marijuana was legal in 2017.

11          Q.      Right.  But we're talking about

12  western states in the United States where people

13  might be driving it, marijuana or THC-containing

14  products, across Kansas; is that fair?

15          A.      Sure.

16          Q.      Okay.  So is it accurate to say that

17  in that article the KHP's position was that because

18  drivers might have purchased marijuana or other

19  THC-containing products in Colorado or another

20  western state and then be bringing it illegally

21  through Kansas, it was okay to focus on out-of-state

22  vehicles?

23                  MR. CHALMERS:  Object to the form of

24  the question.  Misstates what the article says.

25          A.      I don't think that's a proper



BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                            July 28, 2021

Page 98

1  characterization.

2  BY MS. GREATHOUSE:

3        Q.       Okay.  How would you give it a proper

4  characterization?

5        A.       I think the Patrol's position, first

6  of all, this is, I guess, a bit my opinion, our

7  troopers have no interest in personal use marijuana.

8                 Our troopers, the Patrol's troopers

9  were primarily interested in the trafficking of

10 significant amounts of marijuana or edibles or

11 anything containing THC.

12                When I say "significant" I'm not

13 talking about an ounce of marijuana, which is legal

14 in some states to purchase and possess.  I'm talking

15 about 100 pounds of marijuana, so.

16                But regardless of where it came from,

17 the Patrol had great interest in stopping the

18 trafficking of that level of narcotics.

19       Q.       Is it accurate to say that 1 pound of

20 marijuana is at a felony level in Kansas?

21       A.       Well, and it, at least at that time,

22 it also fit into the characteristics of a significant

23 amount of marijuana.

24       Q.       But in the article, you were

25 specifically referencing states where there had been



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850
METROPOLITAN COURT REPORTING ◆ LEGAL VIDEO

Page 99

1   marijuana legalization; is that correct?

2           A.      I'm not sure I understand your

3   question.

4           Q.      In the first paragraph where you are

5   quoted on Page 5 of Exhibit 72, you are referencing

6   marijuana legalization in such states as Colorado; is

7   that correct?

8           A.      Yes.

9           Q.      So is or did, in your understanding,

10  marijuana legalization in states such as Colorado

11  result in hundreds of pounds of marijuana being moved

12  across Kansas?

13          A.      Yes.

14          Q.      Okay.  So, describe for me how

15  legalization in one state was causing that to move

16  across Kansas?

17          A.      Because we knew from previous stops,

18  from interview with -- interviews with defendants

19  sometimes who would cooperate and sometimes who would

20  just voluntarily provide the information or provide

21  the information in an interview, we knew that people

22  were coming from one state across the nation or other

23  states or any number of states to Colorado to

24  purchase marijuana or any of the associated edibles

25  and so forth, and then taking them back to wherever



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 100

```
 1   it is they came from.  We knew that.
 2              So, as I stated in the article, it
 3   wasn't unreasonable for our troopers to understand
 4   that because we knew that was going on.
 5        Q.     So what the concern was is that
 6   somebody from, let's say the eastern part of the
 7   United States, was going to drive to, let's use
 8   Colorado as an example where there is recreational
 9   use of marijuana and THC products, and buy 100 pounds
10   of recreational-use marijuana and bring it back
11   across Kansas to the eastern part of the United
12   States?
13        A.     Happens every day.  Maybe not 100
14   pounds, but multiple pounds every single day.
15        Q.     Do you know how many ounces of
16   marijuana you can buy a day for recreational use in
17   Colorado?
18        A.     I believe it's one ounce.
19        Q.     Okay.  Was it the KHP's position that
20   a traveler was more likely to be violating the law if
21   they were traveling from a drug source state like
22   Colorado?
23        A.     No.  I wouldn't say that.
24        Q.     I have one more question back when we
25   were talking about Troop M that I realized I did not
```



BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                July 28, 2021

Page 101

 1    ask, and the time that you were over or supervising

 2    Troop M.

 3              Did the CJIS side of Troop M have

 4    anything to do with collecting data from the mobile

 5    data computers that were in troopers' vehicles and

 6    storing it?

 7         A.   No.

 8         Q.   Did CJIS have anything to do with

 9    training regarding the mobile data computers?

10         A.   Yes.

11         Q.   And so would that be training that

12    they would give inside the KHP?

13         A.   Yes.

14         Q.   And was it training that the Patrol

15    also offered to other law enforcement agencies across

16    Kansas?

17         A.   Yes.

18         Q.   So, when the CJIS trainers were

19    training KHP troopers on use of the mobile data

20    computers in troopers' cars, are you aware of what

21    that training entailed?

22         A.   Yes.

23         Q.   Okay.  Can you describe it to me

24    please?

25         A.   Well, as we talked about earlier, one



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

                                                    Page 102

1   of the forms of and probably the most prevalent was

2   the use of NCIC.  One of the other important aspects

3   that they trained on for the troopers was how to run

4   queries for such things like a driver's license

5   check, a registration check, a wanted persons check,

6   a stolen vehicle check.

7              So, that really is probably the large

8   amount or the largest amount of training that the

9   CJIS people gave our troopers was how to run these

10  queries to hit these databases and get the

11  information that they wanted.

12             Before the mobile units, they

13  typically would call a dispatcher and asked that,

14  asked for that information.  So, in those days, our

15  auditors were actually teaching these troopers on how

16  to get the information themselves from the same

17  sources.  And also on the rules of the use of them,

18  use of those databases.

19       Q.    So the CJIS training was focused on

20  running queries as opposed to inputting data by the

21  troopers; is that correct?

22       A.    Yes.

23       Q.    Would CJIS have been involved in

24  training troopers on input into the systems?

25       A.    I don't believe so.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                      July 28, 2021

                                                              Page 103

1        Q.      Okay.

2        A.      Well, which system?

3        Q.      Okay, well, which systems would CJIS

4    trainers have been teaching about?

5        A.      Primarily NCIC and then the Kansas,

6    the Kansas files, like driver's license and

7    registration.  So troopers would not have the ability

8    to input in those systems.

9                And, typically, the only kinds of

10   information that's input, for example, in NCIC would

11   be, and the Patrol does not do, is somebody steals

12   your car, so you go to the police department, say,

13   hey, somebody stole my car.

14                So the dispatcher or the police

15   official is going to get all the information

16   pertinent to that vehicle, what the make and model

17   and what the vehicle identification number is, maybe

18   what the license plate number is.

19                And then a dispatcher will then in

20   turn enter all that information into the system,

21   NCIC, so that anyone across the nation who queried

22   that tag or that ID number would received the

23   information that it was stolen.

24                Our troopers did not have the ability

25   to do that.  In fact, nor did our dispatchers.  We



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 104

1   were not an inputting agency in that way because we

2   didn't, you know, we weren't a police department, so

3   to speak.

4          Q.     So, the kind of data that would be

5   input through the CJIS supervised, sort of, systems,

6   did not have anything to do with specific incidents

7   and -- strike that.

8                 We'll use an example.  Let's say we

9   have a drunk driver on the highway who's pulled over

10  and they are arrested.

11                During the course of that stop, a

12  trooper might make inquiries through the NCIC; is

13  that correct?

14         A.     Yes.

15         Q.     And the trooper also would be

16  preparing arrest or providing or inputting arrest

17  documentation data into the KHP's systems; is that

18  correct?

19         A.     He would be preparing the data that

20  would later be uploaded to the system.  It wasn't

21  uploaded instantaneously.

22                So he would, yes, he would query

23  certain records, driver's license, wanted,

24  registration, use that to prepare the paperwork that

25  might be required in a DUI arrest.  And then fill out

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

                                                        Page 105

1      what paperwork he could on scene, complete that

2      paperwork later, then it would be uploaded into the

3      Records Management System.

4              Q.      Okay.  You've just used the word

5      "paperwork" a lot, correct?

6              A.      Uh-huh.  Yes.

7              Q.      Is that actually something they're

8      writing on paper?  Or is it like something that

9      they're typing into their computer?

10             A.      Well, it could be both.  But as it

11     relates to computerized forms, the Highway Patrol had

12     a certain number of required forms, whether it be

13     required by the KBI or K-DOT or maybe even the

14     courts, that they could have in a computer in digital

15     format so that the trooper could complete that

16     information in a digital manner.  Whereas, some

17     information might still need to be handwritten.  And

18     I don't know today.

19                     At one time, for example, you may be

20     familiar with the implied consent paperwork, the

21     advisories and the forms provided to defendants, that

22     was not something generated in digital format from

23     Patrol's computers.

24             Q.      So that was, the implied consent, was

25     actually paper?


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 106

Page 106

1          A.     Yes.

2          Q.     Is that what you're saying?

3          A.     Yes.

4          Q.     Are you aware of any other paper

5     reports that they would have been filling out in the

6     field related to an arrest?

7          A.     Probably not anymore.  I think most of

8     it is digitized.

9          Q.     All right.  And if paper had been

10    used, was it then taken back to the KHP office and

11    digitized or scanned and uploaded?

12         A.     There was a, yes, there was a means

13    for a trooper to be able to scan additional paperwork

14    that perhaps was handwritten so that it could become

15    part of the Records Management System record for that

16    incident.

17         Q.     All right.  So, what kinds of data

18    would a trooper input through their computer during

19    an arrest out in the field?

20         A.     Well, they would -- and, again, I'm

21    speculating here a little bit.

22         Q.     Well, I don't actually want to you

23    speculate, but I do want you to give me your

24    understanding of -- strike that.

25               Let me ask it, let's start a different



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 107

1    question here.

2                    If there was, let's say, an arrest

3    record or an arrest report that was created in the

4    field by a trooper, would that be uploaded through a

5    system that you supervised through Troop M?

6            A.      No.

7            Q.      Okay.  What system would that be

8    uploaded through?

9            A.      The arrest reports would have been

10   uploaded into the Highway Patrol's Record Management

11   System and then it interfaced to the KBI's Incident

12   Based Reporting System.

13           Q.      Okay.  The KHP does from time to time

14   send out communications to the people in the KHP when

15   there are changes in the law that impact the KHP; is

16   that correct?

17           A.      No, not really.  Not so much -- there

18   was a day and time that that -- that they could have.

19   But it didn't happen very often even back then.

20   Today, most of the changes in the law come

21   electronically to the troopers.

22           Q.      Okay.

23           A.      Or, if I may finish, or they learn

24   about in like in-service training.

25           Q.      So, let's say in 2016 when you were



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                      July 28, 2021

Page 108

1    the lieutenant colonel, would, to your knowledge, if

2    there was a change in the law, would that be

3    disseminated to troopers electronically?

4            A.    A change in the law, Kansas law or any

5    law?

6            Q.    I'll rephrase the question.

7                  In 2016 when you were the lieutenant

8    colonel, if there was a change in the law that

9    impacted the activities of the Kansas Highway Patrol,

10   would that be communicated to the troopers

11   electronically?

12           A.    The troops would have received

13   electronic information as it pertained to Kansas

14   statutes.  Anything really besides that would be

15   something that they would learn about at in-service

16   training, which occurs once a year.

17           Q.    So, earlier you mentioned the Vasquez

18   case.

19           A.    Yes.

20           Q.    So, when the Vasquez case was decided

21   by the 10th Circuit, that would have only been

22   communicated to the troopers at the next in-service

23   training; is that what you're saying?

24           A.    Primarily.

25           Q.    Okay.  Was there a secondary or a



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850
COURT REPORTING ◆ LEGAL VIDEO

1  tertiary way?

2        A.        Well, I mean, sure, I mean, the

3  troopers could learn about it themselves independent

4  of KHP training.  And certainly some who had the

5  initiative, who had that interest in that type of law

6  or in that type of -- those type of activities might

7  themselves know about that because that particular

8  case was, you know, fairly publicized.  So, they

9  could gain some knowledge that way.

10                 But in terms of perhaps teaching the

11  more legalistic pieces of that or the more technical

12  pieces, they would learn that at in-service.

13        Q.        So other than something that they

14  might have done personally, was the only way that the

15  KHP was communicating a change of law, like the

16  Vasquez case, to the troopers, that would happen at

17  the in-service training?

18                 MR. CHALMERS:  Lack of foundation.

19  I'm sorry.

20  BY MS. GREATHOUSE:

21        Q.        Correct?

22                 MR. CHALMERS:  Lack of foundation.

23        A.        I just could simply answer that by

24  telling you that the primary means in which they

25  would learn about that would be in-service.  That's



BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

                                                        Page 110

```
 1    not to say that they might not learn about it in

 2    other ways.

 3    BY MS. GREATHOUSE:

 4          Q.      All right.  When did you learn about

 5    the Vasquez case?

 6          A.      I'm sure it was shortly after the 10th

 7    Circuit gave the opinion.

 8          Q.      So you don't recall having known about

 9    the lawsuit that Peter Vasquez had brought against

10    the KHP before the 10th Circuit's decision; is that

11    correct?

12          A.      I was familiar with the lawsuit being

13    in the position that I was in.

14          Q.      So the Vasquez lawsuit was something

15    that you were involved in as the lieutenant colonel;

16    is that what you're saying?

17          A.      I was briefed on it by our legal

18    counsel.

19          Q.      And then you were told about the

20    decision when it came down; is that correct?

21          A.      Yes.

22          Q.      Do you recall whether there was any

23    internal policies of the KHP that were changed when

24    that decision came down?

25          A.      I'm not aware of any.
```



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

Q. Okay. Do you recall ever meeting with the superintendent to talk about Vasquez?

A. I don't remember a specific day or meeting. I know that the superintendent and I and legal counsel and the command staff would have been -- would have had conversation at one of our weekly or monthly command staff meetings because legal staff would have informed all of the command staff, the majors, the colonels, concerning that situation and how it might or might not impact any legal proceedings and/or perhaps the necessity to change, make any policy or training changes.

Q. Now you have said that there were no policy changes as a result of Vasquez; is that correct?

A. Correct.

Q. Are you aware of training changes that were made as a result of Vasquez?

A. I am not personally aware, so I can neither say that there were or there were not.

Q. But it's fair to say that you were not involved in any decision to change the troopers' training because of Vasquez; is that correct?

A. That would not have been my purview. That would have been the purview of our training

Page 112

1    commander and our legal staff.

2         Q.      Do you recall any discussion with the

3    colonel where a decision was made about what to do

4    after Vasquez came down?

5         A.      Relating to what?

6         Q.      You indicated that there were command

7    staff meetings weekly, correct?

8         A.      Yes.

9         Q.      And that you believe Vasquez, after

10   the Vasquez decision came down in 2016, that it was

11   discussed at at least one command staff meeting; is

12   that accurate?

13        A.      Yes.

14        Q.      When that discussion was happening,

15   was it just a debrief on what the decision was?

16        A.      Yes.  And I believe that legal counsel

17   advised us that KHP Legal would be discussing with

18   the Attorney General's Office our desire for that to

19   be appealed.

20        Q.      All right.  And do you understand that

21   the case -- that there was a writ filed with the

22   United States Supreme Court that was eventually not

23   accepted?

24        A.      Yes.

25        Q.      All right.  So, and you understand



BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                    July 28, 2021

Page 113

1    that at the point that the United States Supreme

2    Court did not accept an appeal of the case, that

3    Vasquez became the law that applied in the state of

4    Kansas; is that correct?

5              A.     I don't -- I guess I'm not familiar

6    with what law that the 10th Circuit imposed.  Perhaps

7    you could enlighten me, Counsel.

8              Q.     Okay.  So are you aware that when the

9    10th Circuit made a decision that the Vasquez stop

10   and search violated the United States Constitution,

11   that decision applied to all future stops that

12   happened in the state of Kansas?

13             A.     Yes, I understand that.  It's also my

14   understanding that the Vasquez case centered around,

15   heavily upon, a license plate issue.

16             Q.     Do you know whether it was license

17   plate or state of residency?

18             A.     Well, both.

19             Q.     And so you then do understand that

20   when the Vasquez opinion was finalized, that troopers

21   in the Patrol had to follow the dictates of the

22   Vasquez decision; is that correct?

23             A.     You're working under the preface that

24   the troopers in the Patrol did something wrong,

25   correct?



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

Page 114

```
 1        Q.      Well, the Vasquez decision determined
 2   that the troopers did something wrong; is that
 3   correct?
 4        A.      Yes.
 5        Q.      Right.  So, the Vasquez decision had
 6   to be followed by the Patrol's troopers to make sure
 7   that they didn't do the same thing that the troopers
 8   did in the Vasquez stop and search; is that correct?
 9        A.      I think generally speaking that's
10   correct.
11        Q.      And so when the command staff was
12   looking at the Vasquez decision, is it fair to say
13   that it was determined that no changes needed to be
14   made to the way the Patrol was handling stops and
15   searches?
16        A.      Counsel, I don't know if there were
17   changes made in the training protocol or not.
18        Q.      I think I asked a slightly different
19   question.
20             MS. GREATHOUSE:  Would you read back
21   my question?
22             (Whereupon, the requested portion of
23   the record was read by the reporter as follows:
24        Q.      And so when the command staff was
25   looking at the Vasquez decision, is it fair to say
```



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING ♦ LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                      July 28, 2021

Page 115

1  that it was determined that no changes needed to be

2  made to the way the Patrol was handling stops and

3  searches?)

4              MR. CHALMERS:  It's been asked and

5  answered.

6         A.     We made no policy changes.  There may

7  have been training protocol that was changed.

8  BY MS. GREATHOUSE:

9         Q.     But, as you sit here today, you don't

10  know if training protocol changed after Vasquez was

11  decided; is that correct?

12             MR. CHALMERS:  Asked and answered.

13        A.     I don't know.

14  BY MS. GREATHOUSE:

15        Q.     Who was the commander or the

16  supervisor over training in 2016 and '17?

17        A.     It was either Captain Jimmie Atkinson

18  or Captain Allan -- I can't think of Allan's last

19  name right now.

20        Q.     Let me ask it this way --

21        A.     We made a change some time during that

22  period of time.

23        Q.     Let me ask it this way.  It would have

24  been the captain over which troop that was --

25        A.     J.  J.  It would have been the



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850
COURT REPORTING ◆ LEGAL VIDEO

1   training --

2          Q.      I'm going to re-ask the question

3   because you and I got on top of each other and I just

4   want to make sure that we got the record right.

5          A.      Okay.

6          Q.      So, sorry to stop you, but.

7                  Is it fair to say that the captain of

8   Troop J would have been in charge -- strike that.

9                  Is it fair to say that whoever was the

10  captain of Troop J in 2016 or 2017 when Vasquez was

11  decided would have been the person in charge of

12  training of the troopers?

13         A.      Yes.

14         Q.      When you became the lieutenant colonel

15  in 2015, did you have to take any additional

16  training?

17         A.      No.

18         Q.      And after the point in time that you

19  went into the more administrative side of the KHP

20  when you were the captain of Troop M in 2016, did you

21  continue to do your annual in-service training?

22         A.      Yes.

23         Q.      Okay.  So what kinds of classes, as an

24  example, would you take when you went to in-service?

25         A.      Classes on legal issues.  Classes on



BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 117

```
 1   things such as racial sensitivity.  First aid

 2   classes.  Defensive tactics classes.  Use of

 3   equipment classes.  Firearms training.  I think I

 4   already said equipment training, so I mean.

 5        Q.      Do you ever recall being trained on

 6   the Vasquez case?

 7        A.      No.

 8              MS. GREATHOUSE:  Let's go ahead and

 9   take a little break at this point.  We're getting

10   close.

11              VIDEOGRAPHER:  The time is -- excuse

12   me -- the time is 1:42 PM.  We're taking a break.

13   Going off the record.

14              (Recess.)

15              VIDEOGRAPHER:  The time is 2:04 PM.

16   We are back on the record.

17   BY MS. GREATHOUSE:

18        Q.      I had another question that I wanted

19   to follow up on Exhibit 72, which is in front of you,

20   which is the article.

21              We talked about the fact that you had

22   been interviewed for it, correct?

23        A.      Yes.

24        Q.      And we talked through two paragraphs

25   in that article that had to do -- or that attributed
```



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 ⬦ 913.317.8800 ⬦ FAX 913.317.8850
COURT REPORTING ⬦ LEGAL VIDEO

Page 118

 1     statements to you; is that correct?

 2          A.      Yes.

 3          Q.      Did you say the things that are in

 4     that article and that are attributed to you?

 5          A.      Yes.

 6          Q.      Okay.  Just some sort of general

 7     information with regard to your understanding of how

 8     things operated at the KHP between 2006 and 2019.

 9                  Where, in your knowledge, did the KHP

10     keep incident reports, store incident reports?

11          A.      The Records Management System.

12          Q.      And would you understand the phrase

13     "incident report" to be different from the phrase

14     "case report"?

15          A.      No.  I think they're synonymous.

16          Q.      Did KHP store any form of, like,

17     booking data?

18          A.      Not that I'm aware of.

19          Q.      Do you know whether the KHP stored any

20     kind of incarceration data?

21          A.      No.

22          Q.      Did the KHP store any parole or

23     probation information?

24          A.      No.

25          Q.      Where did the KHP store information



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 • 913.317.8800 • FAX 913.317.8850

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                July 28, 2021

Page 119

1   about arrests?

2           A.      In the Records Management System.

3           Q.      Where did the KHP store data related

4   to tickets?

5           A.      In the e-Citation database.

6           Q.      Where is -- well, strike that.

7                   Which troop oversees the e-Citation

8   system?

9           A.      The IT Department.

10          Q.      And how would a trooper input

11  something into the e-Citation system?

12          A.      It's all done electronically.  All he

13  has to do is submit, fill out the citation and hit

14  Submit and then it travels electronically to the

15  various destinations, the database, you know, the

16  courts.

17          Q.      And so when you say he fills out the

18  information, you're talking about electronically

19  filling it out; is that correct?

20          A.      Yes.

21          Q.      Something that's done on the trooper's

22  computer in the car?

23          A.      Yes.

24          Q.      Are they actually carrying a full

25  computer at the point that you left in 2019?



BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                      July 28, 2021

Page 120

1          A.      Yes, a full, full laptop.

2          Q.      So they were using like a portable

3   voice, like a phone or a tablet, to do any of their

4   reporting; is that correct?  And I'm asking as of

5   2019 when you left.

6          A.      No on the phones.  The tablets I think

7   were being experimented at, with, looked at.  So some

8   troopers could have had tablets.

9          Q.      Where did the KHP store information

10  about searches resulting in seizures?

11         A.      I believe that our Troop N, which is

12  our Criminal Interdiction Unit, kept track of

13  seizures.  That's not to say they might not have been

14  kept track elsewhere, but I'm confident that Troop N

15  kept track of seizures.

16         Q.      Are you aware of any other place that

17  the KHP stored data on searches resulting in

18  seizures?

19         A.      No.

20         Q.      Where does the KHP store data on

21  searches that do not result in seizures?

22         A.      I don't know if that data is kept,

23  Counsel.

24         Q.      Do you know that it's not kept?

25         A.      No.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                            July 28, 2021

Page 121

1          Q.          So, you don't know one way or the

2    other whether the KHP keeps track of data on searches

3    that don't result in seizures?

4          A.          That's correct.

5          Q.          Would you agree that a good

6    recordkeeping system is an essential part of a law

7    enforcement organization?

8          A.          Yes.

9          Q.          And so with the KHP, those systems

10   would be the RMS and the CAD that feeds into the RMS;

11   is that right?

12         A.          Yes.

13         Q.          Are you aware of any other

14   recordkeeping systems that store law enforcement

15   data?

16         A.          Well, we talked about the e-Citation

17   database.  But as far as the Patrol, the Records

18   Management System is the official repository.

19   However, some troopers may keep files or notes

20   locally.  But as far as official copies of things,

21   that would be the Records Management System.

22         Q.          Are you --

23         A.          I guess I should back up.  Our

24   Internal Affairs unit has a database also that is a

25   database of investigations relating to complaints of



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

1    misconduct.

2         Q.    Okay.  So I'm going to rephrase my

3    question to try to incorporate those things that you

4    just said.

5              Is it fair to say that the

6    recordkeeping system, systems, of the KHP, as regards

7    its interactions with the public, are comprised of

8    the CAD, the RMS and the e-Citation system?

9         A.    As far as I know.

10        Q.    When you were the lieutenant colonel

11   of the KHP, were you involved in any conversations

12   regarding updates to the RMS?

13        A.    Yes.  In so much as the IT head, who

14   was part of our command staff, would make us aware of

15   when changes were going to occur, and sometimes he

16   would inform us of what those changes were, not

17   always.

18        Q.    Did the command staff, while you were

19   part of it, ever discuss the types of data that

20   should be kept in the RMS?

21        A.    I think we had some discussions over

22   those years of, not only the types of data, but that

23   there ought to be other types of data that we should

24   capture and other systems that we should look at.

25              But, as you may know with government,



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                            July 28, 2021

Page 123

1    you are limited budgetarily to your priorities, so

2    sometimes those things didn't become a priority.

3         Q.    Okay.

4         A.    There's a lot of different things we

5    would have liked to have had, you know, technology

6    wise, but the budget just wouldn't allow it.

7         Q.    In the time that you were in the

8    command, were there things -- strike that.

9              In the time that you were part of the

10   command at the KHP, were there updates to the system,

11   the RMS, that specifically recall discussing that

12   you could not do because of budget?

13        A.    Not specifically.

14        Q.    Do you recall generally the kinds of

15   updates that the command discussed while you were

16   part of it regarding RMS updates?

17        A.    I think that we had discussions about

18   wanting to be able to capture more kinds of data, but

19   we were not able to do so with the particular RMS we

20   had.

21        Q.    What kinds of data do you remember

22   discussing that you couldn't capture in your

23   current -- in the then current RMS?

24        A.    I really don't recall exactly what all

25   those data or data fields were that we wanted.

11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 124

Page 124

1      Q.    Do you know what RMS you were using

2  when you were in the command structure of the KHP?

3      A.    I did know, but I don't remember now.

4      Q.    Does the name "Global" mean anything

5  to you with regard to the RMS?

6      A.    Yes.  That is the vendor that we

7  utilized.

8      Q.    Okay.

9      A.    Thank you for refreshing my memory.

10     Q.    I don't remember the whole name, I

11  just remember it has "Global."

12            When you were in the command

13  structure, was the KHP pleased with the services that

14  you were getting from Global?

15     A.    I think so generally.  But I'll

16  preface that, that that would be a better question

17  asked of our IT head.

18     Q.    Do you recall what other kinds of

19  systems that the command structure was discussing as

20  a need of the KHP when you were part of it?

21     A.    No.  I don't.

22     Q.    When you were part of the command

23  structure, did you discuss why the KHP keeps their

24  data in the way they do?

25     A.    I don't remember.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

Page 125

1  Q.  While you were part of the KHP

2 command, do you recall discussions about needing to

3 keep new or additional types of data?

4  A.  I think we had those kinds of

5 conversations.  I just don't remember the kinds of

6 data that we felt like that we wanted that the RMS

7 couldn't capture.

8  Q.  Do you recall any discussions about

9 whether or not you should be tracking data on stops

10 that didn't result in a ticket or an arrest?

11  A.  Perhaps.  I do remember conversations

12 about tracking traffic stops.

13  Q.  Is it accurate to say in the time that

14 you were in the command structure at the KHP that

15 there was no way or no source of data to track stops

16 by troopers that didn't result in a ticket or arrest?

17  A.  I think that's a fair statement.

18  Q.  Tell me about the conversations you

19 recall having about the issue of needing to store

20 additional data.

21  A.  Well, you might recall some number of

22 years back there was a lot of publicity surrounding

23 racial profiling, and there was in fact even some

24 legislative interest in trying to garner data

25 surrounding stops concerning people of color or



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs                DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                        July 28, 2021

                                                             Page 126

 1    minorities.  And we certainly didn't have that

 2    capability.

 3              Would that be helpful, sure it would.

 4    It would certainly be helpful to be able to account

 5    for every time an officer drew his weapon.  It would

 6    be helpful to know every time a search or seizure was

 7    done, well, a search, whether anything that was

 8    seized or not.  I mean, there's lots of things I

 9    think we would have liked to have had.

10         Q.      Did the KHP have any position on when

11    troopers could make a decision in the field about

12    whether to make an arrest when drugs were found or

13    just get rid of the drugs so that the person who was

14    stopped didn't have them anymore?

15         A.      Yes.  I think they were forwarded a

16    pretty wide area of latitude concerning that very

17    issue because the Criminal Interdiction Unit, for

18    example, were tasked with, you know, primarily trying

19    to, as it related to narcotics, focus on significant

20    seizures.  So, they really had no interest in a high

21    school or college age or even adult with a joint or a

22    very small amount of personal use, unless, unless

23    there were other issues, criminal or other narcotics

24    factors.

25              But just on a general traffic stop



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 127

1    where a joint or small, you know, something small

2    like that is found, that really is not where we

3    wanted them focusing their time and energy.

4                    So, I think it's probably fair to say

5    that there have been some number of occasions over

6    the years where troopers aided the individuals in

7    dumping those contents in the ditch.

8         Q.    Okay.  So, you mentioned that it would

9    be okay if they were dumping a joint in the ditch; is

10   that right?

11        A.    Yes.  And I can --

12        Q.    How about --

13        A.    I can attest to back in the days when

14   I was a road trooper having done that myself.

15        Q.    How about a pound of marijuana?

16        A.    I think when you're starting to get to

17   those kinds of qualities, the dynamics change.

18        Q.    Okay.  And --

19        A.    So I don't know that the same amount

20   of latitude for personal use would be given for the

21   kinds of weights that would lend itself to

22   distribution.

23        Q.    And you said earlier that a pound was

24   a significant seizure; is that correct?

25        A.    I believe under, and again I'm working



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 128

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                      July 28, 2021

Page 128

1  under data from a couple years back, I believe a

2  pound was considered significant.

3          Q.      I'll rephrase the question.

4                  At the time that you were part of the

5  KHP, was it your understanding that a pound of

6  marijuana was a significant seizure?

7          A.      I think our reporter might have

8  actually reported that.

9                  Yes.  One pound of marijuana.

10         Q.      Are you aware of any official position

11  in the KHP about getting rid of or dumping a

12  significant seizure amount in the ditch?

13         A.      No, I am not.

14         Q.      Okay.  You said you thought that the

15  dynamics changed at the point that it became a

16  significant seizure; is that correct?

17         A.      Yes.

18                  MR. CHALMERS:  Asked and answered.

19  BY MS. GREATHOUSE:

20         Q.      What did you mean by that?

21         A.      Well, first of all, we're talking

22  about going from a misdemeanor to a felony.

23  Secondly, the higher the number, the more probability

24  that we were talking about a distribution case.

25         Q.      Any other factors that you think are



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850

Page 129

 1    involved there?

 2         A.    Yes.  Our agency policy, we -- I'll

 3    stop with that.  Because I'm not entirely sure about

 4    the agency policy from...

 5         Q.    Where would agency policies like that

 6    be located?

 7         A.    Within the KHP policy manual.

 8         Q.    Okay.  Is the KHP policy manual

 9    something that's publicly available?

10         A.    It wasn't at the time I retired.  The

11    other place it could be is if Troop N has a policy

12    manual pertaining to those troopers and their work.

13         Q.    So, as you're sitting here today, do

14    you recall when you were part of the KHP whether or

15    not the KHP policy manual contained any information

16    or any policy on when a trooper could get rid of a

17    certain amount of drugs in a stop rather than make an

18    arrest?

19         A.    Not specifically in that language.

20    However, as I mentioned earlier, troopers are given

21    some amount of latitude.

22         Q.    So what kind of language do you think

23    that the agency policy manual would use in that

24    regard?

25         A.    Counsel, I can't remember.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

1    Q.    Okay.

2    A.    I mean.  The Patrol's policy manual is

3    that thick (indicating).

4    Q.    In any of your work with the KHP, were

5    you ever involved in data retrieval from KHP's

6    various systems?

7    A.    No.

8    Q.    In your role in the command structure,

9    did you ever have to work with the IT Department to

10   gather statistics on various law enforcement

11   activities?

12   A.    The answer to that is yes.  And I'd

13   like to go back to the previous question, as I think

14   about that as my role as a commander over Troop N,

15   there were times when the -- we might have had a

16   request from the command staff to retrieve some CAD

17   data.

18         Now while I myself did not do that, we

19   had employees that knew where to go into the CAD to

20   get that data to supply it to the command staff.

21         So, to be more accurate to your

22   previous question, I suppose that would be, yes,

23   there were times.

24   Q.    Okay.  So, specifically with regard to

25   those kinds of requests for CAD data, do you recall



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 • 913.317.8800 • FAX 913.317.8850
METROPOLITAN
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 131

1   what those requests would have been?

2          A.      No.   Could have been any number of

3   reasons.

4          Q.      Do you recall the kinds of data that

5   they were asking for?

6          A.      No.   I mean, it could have been -- it

7   could have been the location of a trooper at a

8   certain time, where a vehicle was towed.   It's hard

9   to say.

10         Q.      But you are not aware of how such

11  queries would be made in the CAD system; is that

12  right?

13         A.      No.   I wouldn't know how first -- I

14  wouldn't even begin to know how they do that.

15         Q.      And did you know whether or not the

16  people that could make those kinds of queries would

17  only do it for specific stops?   Or a broad section of

18  data about covering multiple?

19              MR. CHALMERS:   Lack of foundation.

20         A.      It would depend on what was requested

21  as to what the individual whose job was to do that

22  would go look for.

23  BY MS. GREATHOUSE:

24         Q.      I think I probably asked a bad

25  question, so I will try again.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

Page 132

1    Do you know whether or not the folks

2    inside of Troop N -- M could retrieve are broad

3    swathes of data through a query or whether they could

4    only do it on an incident-by-incident basis?

5        A.    Incident by incident.

6        Q.    Do you know why they couldn't query

7    for a broad swathe of data?

8            MR. CHALMERS:  Lack of foundation.

9            MS. GREATHOUSE:  I asked him if he

10   knew why.

11       A.    Well, let me back up, Counsel.  I'm

12   not -- I'm not sure I'm speaking accurately here.  It

13   is responsible, I just simply don't remember.  It is

14   possible that they could have, if there was a request

15   for traffic stops involving a white vehicle or a

16   let's say a black male, I think it might have been

17   possible for those to have been queried, but I just

18   don't remember.  I really don't.

19            I just don't remember whether it was

20   incident by incident or whether they could on certain

21   fields go in and pull everything in the last

22   6 months.

23   BY MS. GREATHOUSE:

24       Q.    Did the CAD system record anything

25   with regard to K-9 sniffs in your recollection?



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

Page 133

1          A.     I don't know if there was a specific

2    data field for that.  There could have been and if

3    there wasn't and the trooper was telling the

4    dispatcher that was what they were doing, they could

5    have went into like a miscellaneous section and

6    indicated that.  I just don't remember if that was a

7    field or not.

8          Q.     So in the CAD system, it sounds like

9    there was a free form space where the dispatcher

10   could type in information; is that correct?

11         A.     Yes.

12         Q.     So, the CAD system wasn't just

13   checking boxes?

14         A.     Correct.

15         Q.     How about when the troopers are

16   sending in information, let's say, via an arrest

17   record?  Did that system have a free form section

18   where the trooper could fill in information?

19              MR. CHALMERS:  Lack of foundation.

20   The question is too broad to solicit an accurate

21   answer.

22              MS. GREATHOUSE:  You can just state

23   your objection.

24              MR. CHALMERS:  I did.  I objected to

25   the form.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

Page 134

1          MS. GREATHOUSE:  Well, you don't need

2    to do a speaking objection.

3          MR. CHALMERS:  I stated what it was

4    and I explained what the form problem was, which I'm

5    obligated to do by rule, Counsel.

6          A.    Not to my knowledge.

7    BY MS. GREATHOUSE:

8          Q.    How, in your knowledge, would a KHP

9    trooper record their probable cause that they might

10   be formulating in an interaction with the public?

11         A.    On an arrest report.

12         Q.    And --

13         A.    In the Narrative section.  There was a

14   form, I believe it was numbered HP 133 and it

15   was -- it allowed a trooper to write in some detail

16   details of the incident that might go along with the

17   arrest or offense report.  So that would be one

18   place.

19         Q.    Okay.  So that was a free form section

20   where the trooper could just fill in information as

21   opposed to check boxes or give little discrete bits

22   of information, like a name?

23         MR. CHALMERS:  Lack of foundation.

24   BY MS. GREATHOUSE:

25         Q.    Is that correct?



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
METROPOLITAN
COURT REPORTING ♦ LEGAL VIDEO

Page 135

1          A.        The HP 133, I believe they called it

2    an investigative or something like that, had some

3    data fields at the top that generally was populated

4    by other forms.

5                    So if we captured it here, then it

6    shared it in the same fields.  And then there was an

7    area for the trooper to be able to type and list out

8    the details or his notes or anything that he felt

9    might have been important or pertinent.

10         Q.        Okay.  So that's a document that a

11   trooper would fill out after they've determined

12   they're going to make an arrest, right?

13         A.        Yes.

14         Q.        And would it in fact have been filled

15   out after the arrest was made?

16         A.        Generally speaking.

17         Q.        If the trooper was not yet certain

18   that they were going to make an arrest, was there any

19   way that you knew of that a KHP trooper could record

20   information as they are building a potential case?

21         A.        Yes.

22         Q.        And what would that be?

23         A.        Most of the troopers have a video

24   recorder in their car with a mic.  They could speak

25   into the microphone that they're seeing or observing



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING ♦ LEGAL VIDEO

Page 136

1    certain things that would help them in their

2    reasonable suspicion, and that camera system could

3    then record that information.

4             Q.      Did the KHP train troopers to do what

5    you have just described in your knowledge?

6             A.      I'm not certain that that particular

7    training was made available.  I think it was

8    something the troopers just learned.  For example,

9    when I worked traffic enforcement and I was following

10   a vehicle that I suspected might have contained an

11   impaired driver, I myself spoke in to the microphone

12   to indicate what the driver was doing because it

13   aided me later in remembering and taking that

14   information down into the official reports that were

15   necessary.

16             So I don't know that there's any

17   training, per se, but I think troopers just figure

18   that out.

19             Q.      Okay.  So other than use the voice

20   recording systems that the troopers have, are you

21   aware of any other system that KHP had for a trooper

22   to record reasonable suspicion as they were gathering

23   it?

24             A.      I am not.

25             Q.      Part of the reason that the KHP would



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING ♦ LEGAL VIDEO

Page 137

1  want to take those steps to record probable cause is

2  to make sure that the troopers are doing what they're

3  supposed to do; is that right?

4                  MR. CHALMERS:  Object to the form.  I

5  think you also maybe misspoke.  Did you mean probable

6  cause or reasonable suspicion?

7                  MS. GREATHOUSE:  I'll rephrase the

8  question.

9  BY MS. GREATHOUSE:

10        Q.      Part of the reason that the KHP wants

11  troopers to be able to store or record reasonable

12  suspicion as they are building it is to make sure

13  that the troopers are doing what they're supposed to

14  do; is that correct?

15                  MR. CHALMERS:  Object to the form.

16        A.      I'm not sure your question, Counsel,

17  that the KHP wanted them to record their probable

18  cause or reasonable suspicion.  I don't know that

19  that's an accurate question.

20  BY MS. GREATHOUSE:

21        Q.      Did the KHP not want their troopers to

22  record reasonable suspicion?

23        A.      I don't know that the KHP either

24  wanted or didn't want.

25        Q.      Is there an advantage to not recording



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

Page 138

1   reasonable suspicion as it is being built by a

2   trooper?

3          A.     I don't think there's advantage.  I

4   just think that, you know, I go back to a time where

5   there were no video recorders, so what the trooper

6   said mattered.

7                 So, I mean, and not all of the

8   troopers even today have video cameras.  So, I mean,

9   it's certainly an advantage because later on it could

10  be utilized, as we know, in a court of law to verify

11  the voracity of what the trooper is saying happened.

12                But the lack of that doesn't

13  necessarily invalidate the trooper's voracity either.

14         Q.     It doesn't invalidate the trooper's

15  voracity when it comes to an arrest, correct?

16         A.     Yes.  I think that's a fair statement,

17  although I'm not exactly sure I understand the

18  statement or the question.

19         Q.     Is it fair to say that the KHP has an

20  interest in making sure that its troopers'

21  interactions with the public are legal?

22         A.     Yes.

23         Q.     How does the KHP check on that when it

24  comes to troopers building a reasonable suspicion

25  during a stop?


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING ♦ LEGAL VIDEO

App. Vol. XXIII, 139

Page 139

1        A.     Well, I think one way that the KHP is

2  able to determine whether the troopers are doing what

3  they're supposed to do is the use of the video

4  camera.  As it pertains to reasonable suspicion,

5  building that, the video camera may capture that, it

6  may not.

7        Q.     Well, the video camera certainly would

8  not capture anything that's going on in the trooper's

9  head; is that correct?

10       A.     That's correct.

11       Q.     And so and a video camera on its own

12  wouldn't record what a trooper is saying unless the

13  voice module is activated; is that correct?

14       A.     That's correct.  But it still records

15  what they're doing.

16       Q.     Well, you can't see what a trooper's

17  doing if they're still in their car, right?

18       A.     Actually, these days, today, I believe

19  the KHP cars have an internal camera.

20       Q.     Did the KHP's cars have an internal

21  camera while you were still at the KHP?

22       A.     I think so.

23       Q.     Do you think that was in all vehicles

24  or just part of them?

25       A.     It was certainly in part of them.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs     DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                          July 28, 2021
Page 140

1   Whether it was in all of them, I can't say.

2       Q.    So, was it the KHP's position when you

3   were part of it that between video and audio

4   recording of interactions with the public by a

5   trooper, those forms of recording would be enough to

6   review reasonable suspicion?

7       A.    Not necessarily.

8       Q.    Okay.  So how else was the KHP when

9   you were part of it going to review whether troopers

10  were appropriately building reasonable suspicion

11  during a stop?

12      A.    Well, part of it would be to confirm

13  from the trooper himself.  I suppose one could

14  confirm from a defendant their version of the events

15  as well, if we're looking to try to independently

16  determine whether or not a trooper had a reasonable

17  suspicion.

18      Q.    And all of those kinds of reviews

19  would have to be done on an incident-by-incident

20  basis; is that correct?

21      A.    Yes.

22      Q.    There's no tool that the KHP uses to

23  make sure that on a broader base the troopers are

24  appropriately building reasonable suspicion?

25              MR. CHALMERS:  Object to the form.



Page 141

1    A.    Just training.  The troopers are

2 trained.  And outside of training, I guess not.  I

3 mean.

4 BY MS. GREATHOUSE:

5    Q.    Outside of training from what you've

6 said here today during the time that you were at the

7 KHP, the only way the KHP could check to see whether

8 troopers were appropriately building a reasonable

9 suspicion case during a stop would be to sit through

10 what could be hours of video or weeks of video to

11 determine whether a particular trooper was

12 appropriately doing it; is that correct?

13    MR. CHALMERS:  Object to form.

14    A.    Well, I also -- I mean, that's one

15 way.  Another way, as I mentioned earlier, is that

16 there are times that supervisors may accompany a

17 trooper who's doing their day-to-day work, and that

18 would be another way to determine whether or not a

19 trooper's doing what they're trained to do properly.

20 BY MS. GREATHOUSE:

21    Q.    That's just one day, though, right?

22    A.    Yes.

23    Q.    You got no -- the KHP had absolutely

24 no way to look at a particular trooper over the

25 course of a period of time, whether it be a month or



BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

                                                           Page 142

1    a 12-month review period, and determine if that

2    trooper was appropriately building reasonable

3    suspicion cases against individuals who they had

4    stopped?

5                   MR. CHALMERS:  Object to form.  It's

6    not only leading, it's also argumentative.

7         A.      I think the answer to that is no.

8    BY MS. GREATHOUSE:

9         Q.      No, the KHP didn't have a way to do

10   that kind of review, correct?

11        A.      Well --

12                  MR. CHALMERS:  Same objection.

13        A.      Well, the KHP through its Internal

14   Affairs division, if we -- if we had reason to

15   believe that a trooper, whether it's reasonable

16   suspicion or something else, was not doing what they

17   were supposed to be doing, that would be a function

18   of Internal Affairs to look into that and try to

19   determine whether that is the case or not.

20                  And I don't know all the methods that

21   Internal Affairs could use, but certainly looking

22   very thoroughly at arrest reports and talking with

23   the trooper and anybody else involved in the case to

24   try to gather, or cases, to gather an understanding

25   of whether this trooper has a problem with



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 143

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                July 28, 2021

Page 143

1  understanding the elements of reasonable suspicion.

2                        But we have no mechanical system, so

3  to speak.

4  BY MS. GREATHOUSE:

5        Q.     When you've mentioned Internal

6  Affairs, when Internal Affairs is actually reviewing

7  a situation, is that incident based?  Or can it be

8  more broadly about a trooper not building a

9  reasonable suspicion case on a stop, on stops?

10       A.     Yes, it could be.

11       Q.     Okay.  Are you, in the time that you

12 were in the KHP, were you ever aware of a trooper

13 being investigated by Internal Affairs -- and I'm not

14 asking for a name -- because they weren't building a

15 reasonable suspicion case on their stops?  By which I

16 mean plural, not singular, incidents where complaints

17 came in.

18       A.     I don't remember, Counsel.

19       Q.     It's fair to say that through the

20 training that the KHP gives to its troopers during

21 the time that you were part of the command structure

22 was to make sure that troopers were appropriately

23 building reasonable suspicion when they were

24 conducting stops; is that fair?

25       A.     Yes.  In fact, I believe those types



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850
COURT REPORTING + LEGAL VIDEO

App. Vol. XXIII, 144

Page 144

1    of courses were taught by Ms. Washburn.

2         Q.    And one of the goals that the KHP

3    would have in having its troopers build a proper

4    reasonable suspicion case is because they want the

5    arrests to stand up in court; is that fair?

6         A.    Of course.

7         Q.    And is another part of that because

8    the KHP doesn't want its troopers to violate the

9    rights of the public?

10        A.    Yes.  That's correct.  We have no

11   vested interest in doing things wrong or violating

12   Constitutional rights.

13        Q.    In a situation, like let's say this

14   lawsuit, is there a way that the KHP could, that

15   you're aware of, show that its troopers were

16   statistically building their reasonable suspicion

17   case for stops that didn't result in arrests?

18             MR. CHALMERS:  Object to form.  And

19   also lack of foundation.

20        A.    I'm not aware of any way.

21   BY MS. GREATHOUSE:

22        Q.    Back to we were talking a little bit

23   about seizures and the political aspects of seizures,

24   do you recall that?

25        A.    Yes.



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 • 913.317.8800 • FAX 913.317.8850

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                July 28, 2021

Page 145

1          Q.      Is my understanding correct that a

2    certain size of a seizure stays at the state level,

3    the proceeds of that seizure, and then when it gets

4    larger, those proceeds go to federal law enforcement?

5          A.      Generally speaking.

6          Q.      Is there a dollar figure at which that

7    happens?  Or is it at a sort of charge level that

8    that happens, in your knowledge?

9          A.      I don't know that I can say exactly

10   what that threshold is.

11         Q.      Okay.  So if you don't know what the

12   threshold is, is it a dollar amount?

13         A.      I don't know that.

14         Q.      Okay.  So you don't even -- you don't

15   know --

16         A.      I mean you're talking about cash

17   seizures, correct, at this point?

18         Q.      I'll rephrase the question.

19                 Do you know whether a seizure becomes

20   state or federal because of the value of what is

21   seized?

22         A.      I think that can be a factor.  I don't

23   know that that's the only factor.

24         Q.      What other factors would come into

25   play in whether that's a state seizure or a federal



BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                July 28, 2021

Page 146

1    seizure?

2         A.    Well, again, I'm not sure I'm the best

3    qualified to answer this question, but.  I think

4    other factors could be ongoing investigations by

5    other agencies, for example, the federal government.

6    I mean, that's one that immediately comes to mind.

7         Q.    At some point in time, the Kansas

8    legislature actually asked the KBI to keep a database

9    of KHP's seizures; is that correct?

10        A.    Of all law enforcement seizures.

11        Q.    Were you part of the KHP when that law

12   was passed?

13        A.    Yes.

14        Q.    Do you recall approximately when that

15   happened?

16        A.    Some time between 2017 and 2019.

17        Q.    So that was passed while you were part

18   of the command structure, right?

19        A.    Yes.

20        Q.    And so what steps did the KHP take in

21   order to comply with that new requirement?

22        A.    We assigned members of the agency,

23   meaning our IT Department, our Legal, our perhaps

24   Captain Hogelin from our Troop N to work with the KBI

25   in developing both the data fields and any technical



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

Page 147

1   assistance regarding the actual building of that

2   database.  And I'm sure there was discussions about

3   interface, how's the data going to get from us to you

4   and so forth.

5          Q.     So, where inside of the KHP's systems

6   was that data extracted from?

7          A.     Well, I believe that there were -- I

8   believe that there were electronic forms built in

9   order for that information to be provided to the new

10  database.  I'm not sure that I remembered that that

11  was complete by the time I left the Patrol.  I think

12  that was still being worked on.

13         Q.     Were you part of the supervision of

14  that project?

15         A.     I don't know that I would say I was

16  part of the direct supervision.  I was aware.  I

17  would say our IT head was primarily the individual

18  overseeing the KHP's assistance in developing the

19  appropriate forms and interfaces, and while I think

20  our legal counsel also was involved in ensuring all

21  the legalities were met with the required information

22  and so forth.

23         Q.     You said you thought there was a form

24  that had to be filled out.  Do you recall that?

25         A.     Well, I think, in order for -- I mean,



Page 148

1  yes, I do remember it.  In order for the data to go

2  to the KBI, it had to have been captured somehow, and

3  it would not have been, in 2018, it wouldn't have

4  been captured pen and pencil.  So, I'm fairly

5  confident that it would have been some kind of

6  electronic means of providing the data to the KBI.

7        Q.    Is it fair to say that you don't know

8  whether that was done by a data extraction from the

9  RMS versus a separate form that had to be filled out

10 by the trooper involved in the seizure?

11       A.    Yeah, I don't know.

12       Q.    Would you agree with the statement

13 that, generally, troopers collect little data when

14 they're just performing a stop?

15       A.    Not really.

16       Q.    Okay.  So what kind of data are they

17 collecting on a stop?

18       A.    Well, as we talked about earlier,

19 let's just use a citation for example, they're

20 collecting all the personal identifiable information

21 on an individual in that stop, name --

22       Q.    I want to clarify here.  We're talking

23 about a stop.  I haven't said anything about a

24 citation or a ticket yet.  So let's back up.

25       A.    Okay.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 149

1          Q.      We're going to first just start with a

2    stop and nothing else.

3          A.      Okay.

4          Q.      So would you agree with me that the

5    troopers collect little data if there's only a stop?

6          A.      It depends on what the stop is for.

7          Q.      Okay.  So explain to me what you mean

8    by that.

9          A.      If our troopers come across a motorist

10   that has a flat tire, they fill out a form that

11   captures the motorist's name, the vehicle

12   information, the license plate.  So there's data

13   collected in something just as simple as changing a

14   tire.  I mean, that's one example.

15         Q.      Okay.  If a trooper stops a driver --

16   and this again is based on your experience with the

17   KHP -- because they have drifted a little bit over a

18   line.

19         A.      Uh-huh.

20         Q.      And they just give the person that's

21   stopped a verbal warning.  Do they collect any data?

22         A.      Well, they may.  They may collect the

23   information concerning the motorist, who they are,

24   where they live, their physical characteristics.  The

25   Dispatch Center would certainly capture the



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

Page 150

1    information concerning the stop and the information

2    conveyed to them from the trooper, which might

3    include license plate information, so there's some

4    data collected.

5            Q.    Okay.  But would you agree that if

6    it's only a verbal warning, there's not a lot of data

7    that is collected?

8                  MR. CHALMERS:  It's an incomplete

9    hypothetical.  It's been asked and answered.

10           A.    I'm just not sure I agree with that

11   based on a couple of the examples that we talked

12   about.

13                 The troopers will normally, even with

14   a verbal warning, collect driver's license

15   information and registration information.  They'll

16   check for warrants.  And, again, that information

17   then goes into the CAD system even on a warning.

18   BY MS. GREATHOUSE:

19           Q.    You mentioned that when they're

20   collecting data on a change of a tire, they fill out

21   a report on that; is that correct?

22           A.    They complete electronically a form,

23   and I can't remember the number of it, it's called a

24   "Service Rendered."  And it is again for the purposes

25   of the patrol.  It's a form used to help the Patrol



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 • 913.317.8800 • FAX 913.317.8850
METROPOLITAN
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs        DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                    July 28, 2021

                                                        Page 151

1    know what our troopers are doing.  And, you know,

2    interestingly enough, sometimes complaints are made

3    about things, and those, you know, those types of

4    forms help us to determine where our trooper was and

5    what he was doing at any given time.

6            Q.      Where are those Service Rendered forms

7    or data stored?

8            A.      Should be stored in the RMS.

9            Q.      Is anything stored in the RMS if, to

10   your knowledge when you were part of the KHP, if

11   there is only a verbal warning on a stop?

12           A.      Let me make sure I'm understanding

13   you, Counsel.  So do you mean that a trooper stops a

14   vehicle, doesn't call it in, doesn't get any

15   identifying information on the individual or any

16   vehicle information and just tells the person to slow

17   down and on their way?

18           Q.      Let me rephrase my question.

19                   If a trooper makes a stop and they

20   call in the information through CAD, as they normally

21   do when they make a stop, if they only give a verbal

22   warning, is it correct that the trooper would not

23   fill out any additional information directly into the

24   RMS?

25           A.      They fill out, rather than a citation



BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                      July 28, 2021

Page 152

1    form, they fill out a warning form.  They do actually

2    fill out a what looks like a citation, except it is a

3    warning.

4              Q.      Are the troopers required to give a

5    written warning?

6              A.      There's supposed to.

7              Q.      Is there actually a policy in the KHP

8    that when you give a warning, it should be in

9    writing?

10             A.      I think so.  But I will tell you that

11   I am guilty of not filling out warning forms in my

12   past.  So does it happen, sure.

13             Q.      What would be the reasons that a

14   trooper would decide not to fill out a warning form?

15             MR. CHALMERS:  Lack of foundation.

16   BY MS. GREATHOUSE:

17             Q.      In your understanding.

18             A.      Well, in my case it was --

19             MR. CHALMERS:  Still he's speculating.

20   I object to the form.

21             A.      In my case it was probably laziness, I

22   just didn't want to fill it out.  Didn't want to take

23   the time to do it.

24   BY MS. GREATHOUSE:

25             Q.      We were talking about, sort of, volume



BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 153

1   of data that a trooper would take on a stop where

2   there is a warning.  Would you agree or disagree that

3   a trooper would record more data if they issued a

4   citation?

5          A.     No.  The data is the same on a

6   citation as it is a warning.

7          Q.     Okay.  Would they collect more

8   information if they're actually going to conduct a

9   search?

10         A.     I don't know about that.

11         Q.     In your understanding of the KHP,

12  would they collect more data if they were making an

13  arrest?

14         A.     Yes.

15         Q.     And would they collect more data than

16  a stop or a citation if they were making a seizure?

17         A.     No.  I don't think necessarily more.

18         Q.     In your time at the KHP, did the KHP

19  use its records to track disproportionate impacts of

20  stops across the public?

21         A.     Did we track that?  Did the Patrol

22  track that?

23         Q.     I'll re-ask the question.

24                In your time at the KHP, did the

25  Patrol use records to track disproportionate impacts?



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs                DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                    July 28, 2021

Page 154

 1                MR. CHALMERS:  Object to form.  It's

 2     vague.

 3           A.      Not that I'm aware of.

 4     BY MS. GREATHOUSE:

 5           Q.      In your time at the KHP, did the

 6     Patrol use records to track disproportionate impacts

 7     of searches?

 8                MR. CHALMERS:  Same objection.  It's

 9     vague.

10           A.      Not that I'm aware of.

11     BY MS. GREATHOUSE:

12           Q.      Do you understand the phrase

13     "disproportionate impact" as it relates to law

14     enforcement activities?

15           A.      Yes.

16           Q.      Can you tell me what your

17     understanding of that is?

18           A.      For example, in this case, the idea

19     that in a certain period of time the Patrol has

20     stopped more out-of-state motorists than in-state

21     motorists can be construed as being disproportionate

22     in the statement, in and of itself, not necessarily

23     factoring in other things.

24           Q.      In your time at the KHP, did the

25     Patrol use records to track disproportionate impacts



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

Page 155

```
 1   of arrests?
 2        A.     Not that I'm aware of.
 3        Q.     In your time at the KHP, did the KHP
 4   use records to assess the effectiveness of stops?
 5        A.     I've got to think about that just a
 6   minute.
 7               MS. GREATHOUSE:  While you think, I'm
 8   going to grab another water.
 9        A.     I think it's fair to say, while maybe
10   not collecting the data, I think it's fair to say
11   that a supervisor could use an officer's arrest
12   report and review that to determine whether or not he
13   was understanding laws, applying the laws
14   appropriately.
15   BY MS. GREATHOUSE:
16        Q.     So the KHP would use records to assess
17   the effectiveness of individual stops I think is what
18   you were saying.  Do I have that right?
19        A.     They could possibly, yes.
20        Q.     Okay.  So, other than on an
21   incident-by-incident kind of basis, are you aware of
22   any way in which the KHP used records while you were
23   there to assess the effectiveness of stops across the
24   Patrol?
25        A.     I think over my time and other times,
```


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850
COURT REPORTING + LEGAL VIDEO

App. Vol. XXIII, 156

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 156

1   the Patrol has used records on, for example, holiday

2   weekends, record of DUI arrests to show

3   effectiveness, in terms of like DUI enforcement or

4   accident reports to show that accidents were up or

5   down.  So, yes, I think there were times when the

6   Patrol has done that in certain cases.

7           Q.      During your time at the KHP, were you

8   aware of the KHP using records to assess the

9   effectiveness of searches?

10          A.      Not to my knowledge.

11          Q.      In your time at the KHP, was it your

12   experience that troopers were resistant to having to

13   fill out more forms and more data?

14          A.      Troopers hate all change.

15          Q.      Well, then I guess I'm asking -- so is

16   the answer to my question yes?

17          A.      Generally, yes.  Troopers are human

18   beings and they don't like more work piled on them

19   than any of us.

20          Q.      Would you agree that in your time at

21   the KHP, that the Patrol accepted the bureaucracy or

22   an increase in bureaucracy was necessary to ensure

23   that the KHP was accountable for its activities?

24          MR. CHALMERS:  Object to form.  It's

25   assuming facts that aren't in evidence.



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850

Page 157

1     A.     I don't know about the bureaucracy

2  part.  I do know that under Colonel Bruce

3  accountability was very important.  In fact, one of

4  the things that our administration did was we began

5  seeking accreditation as an agency through an entity

6  called "CALEA," another acronym.

7  BY MS. GREATHOUSE:

8     Q.     C-A-L-E-A?

9     A.     Yes.  And I don't remember exactly

10  what all the letters are, but it's something,

11  something law enforcement accreditation.  The

12  commission on -- commission for accreditation for law

13  enforcement or something like that.  So, I would say

14  that, you know, that was very important to us.

15     Q.     And what were the kinds of things, in

16  your understanding, that CALEA was looking at in

17  order to get that accreditation for the KHP?

18     A.     They looked at about every aspect of

19  the patrol.  I mean, it was an interesting

20  experience.  It was almost like being audited.  They

21  would take, you know, pretty much everything and

22  measure it against what were deemed to be best

23  practices.

24         And, I mean, there's just a myriad of

25  things that they looked at.  I'd have to refer back


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 158

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 158

1    to some material because I simply don't remember all

2    the different things that they looked at.

3          Q.    Do you recall whether they looked at

4    recordkeeping policies?

5          A.    Oh, yes.

6          Q.    Do you know what aspects -- do you

7    remember what aspects of recordkeeping policies they

8    looked at?

9          A.    No.

10          Q.    Now, in order to comply -- well, in

11    order to get the CALEA accreditation, were their

12    additional bureaucratic steps that had to be taken or

13    built inside the KHP in order to meet and get that

14    accreditation?

15          A.    Yes.  And again I'm not sure I'd use

16    the term "bureaucratic," but there were definitely

17    additional steps that the Patrol had to take to meet

18    the standards.  Oftentimes, and many times, it really

19    related to changes in policy.  Sometimes it related

20    to change in practice.  For example, the way that we

21    moved evidence had to change.  The way we stored

22    evidence had to change.

23          Q.    Do you remember any other changes that

24    the KHP had to make as a result of CALEA

25    accreditation?



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

Page 159

1          A.      There were certainly some, I just
2     don't remember all of them.
3          Q.      Other than CALEA, are there other
4     steps that you are aware of that the KHP took to be
5     accountable to the public?
6          A.      Yes.  I'd like to think that we, you
7     know, the Patrol polices itself to some extent.  And,
8     you know, the Patrol has high standards and not
9     everybody can be a trooper.  And so there's not only
10    supervisory accountability, there's peer
11    accountability.  So, yeah, I think so.
12               MS. GREATHOUSE:  I lost my train of
13    thought.  Would you read back my last question?
14               (Whereupon, the requested portion of
15    the record was read by the reporter as follows:
16         Q.      Other than CALEA, are there other
17    steps that you are aware of that the KHP took to be
18    accountable to the public?)
19         A.      I mean, quite frankly, that's one
20    aspect of why agencies have Internal Affairs.
21    BY MS. GREATHOUSE:
22         Q.      And in order to internally police
23    yourself, the KHP, or itself, the KHP had to have
24    accurate information on its activities; is that
25    correct?



Page 160

1          A.     Yes.  I think that's a fair statement.

2    Although, although, I'll caveat that and say that

3    sometimes information is just not accurate.  We

4    strive to accurate information, but, as often

5    outlined in the media today, not all information is

6    accurate.

7          Q.     Is it fair to say that a measure of

8    how the KHP can police itself is entirely dependent

9    on the accuracy and existence of information?

10               MR. CHALMERS:  Asking for an opinion.

11   Object.

12         A.     Yes.  I think, you know, as we have

13   learned today in 2021, that information is very

14   powerful.  And particularly in public agencies,

15   information is important.

16   BY MS. GREATHOUSE:

17         Q.     And information was equally important

18   in 2015 through 2019?

19         A.     Sure.

20         Q.     Is that fair?

21         A.     Sure.  Absolutely.

22         Q.     Okay.  Do you also agree that

23   gathering data and recordkeeping are necessary to

24   ensure that the KHP is effective in its role?

25               MR. CHALMERS:  Incomplete



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING ♦ LEGAL VIDEO

App. Vol. XXIII, 161

Page 161

1   hypothetical.  And it, additionally, is calling for

2   an opinion.  I object.

3        A.      Yes.  In my opinion, it's important.

4   BY MS. GREATHOUSE:

5        Q.      In the time that you were at the KHP

6   and in the command structure, was there a discussion

7   about accountability to the public?

8        A.      Well, I think we had those types of

9   discussions on a regular basis at the command staff

10  level.  One of the members of the command staff is

11  the Internal Affairs commander, and so, yes, there

12  were always discussions about accountability.  As I

13  said earlier, the Patrol has no vested interest in

14  doing anything wrong.

15       Q.      At the time you were at the KHP, in

16  your understanding, was the KHP interested in having

17  its records be transparent and available to the

18  public?

19       A.      That's a topic that Colonel Bruce and

20  I discussed, in fact, with the command staff.  I

21  don't know today, but at that time our policies were

22  not available to the public, for example, on the

23  internet.

24               And we discussed the merits of that

25  and, you know, I, for one, personally believe that



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

Page 162

1    the Patrol had absolutely nothing to hide concerning

2    its policies or its practices.  And that information

3    that can be made available to the public should.

4                    But, on the other hand, there are some

5    investigative techniques and things that need not be

6    revealed so as not to endanger officers.

7                    But, yes, we talked about those

8    things.  In fact, that again was -- kind of went hand

9    in hand with our decision to seek CALEA

10   accreditation.

11        Q.    When you were on the command staff at

12   the KHP, was there a conclusion, an official

13   conclusion, of the KHP about whether or not it wanted

14   to be transparent?

15        A.    Well, I'll answer that as yes, because

16   when the colonel says we're going to be transparent,

17   that's official.

18        Q.    Okay.  Previously, you told me it was

19   your opinion that the KHP should be transparent.  Do

20   you recall that?

21        A.    Yes.

22        Q.    And now you're saying that it was

23   actually also Colonel Bruce's opinion that the KHP

24   should be transparent?

25        A.    That's correct.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

Page 163
1     Q.      I've got some questions about the kind

2  of data that is stored in the RMS of the KHP because

3  I want to determine what is and isn't stored.  I'm

4  asking for your knowledge when I ask these questions

5  during the time that you were there.  All right?

6     A.      Yes.

7     Q.      Okay.  So, did the KHP collect

8  information and store it in the RMS about a person

9  who was stopped, such as, like, name, age, gender,

10 that basic data?

11    A.      Yes.  That would be information that

12 would have been originating with the CAD and then

13 moved in to the RMS.

14    Q.      Is that also true for vehicle

15 registration?  That it would have been gathered in

16 the CAD and moved on to the RMS?

17    A.      Yes.

18    Q.      Did, during that time, the KHP collect

19 information on ethnicity of people who were stopped?

20    A.      I am not certain on that one.

21    Q.      Do you know whether the KHP was

22 collecting information on the nationality of people

23 who were stopped?

24    A.      I do not believe so.  Because that

25 would require a trooper to make a guess.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850

1        Q.     Or to ask a question, right?

2        A.     Yes.  But that question leads to

3  complaints from the public, so.  Trust me, it does.

4  You make an assumption about that and ask somebody,

5  or not even make the assumption, just ask somebody,

6  not everybody is very happy to divulge that kind of

7  information.  So, I don't think we stored that.

8        Q.     Did the KHP collect information on the

9  name or badge number of the trooper involved?

10       A.     Yes.  On traffic citation or arrest

11  reports, yes, those all would have been captured.

12       Q.     And also in the CAD; is that correct?

13       A.     Yes.

14       Q.     Did the KHP collect and store

15  information on the time, date and place of the stop?

16       A.     Yes.

17       Q.     Did the KHP collect information on the

18  law or violation that caused the stop?

19       A.     Yes.

20       Q.     If a trooper stopped someone for

21  speeding, would that have been reported via the CAD

22  in the initial interactions between the trooper and

23  the dispatcher?

24       A.     Not necessarily.

25       Q.     So there wasn't a policy that required



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs            DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                July 28, 2021

Page 165

1    that --

2            A.      No.

3            Q.      -- in the CAD; is that correct?

4            A.      That's correct.

5            Q.      Did the KHP collect information on

6    individualized grounds for suspicion?

7            A.      No.

8            Q.      Did the KHP collect information on the

9    reason for a stop?

10           A.      Yes.

11           Q.      And how would that have been

12   collected?

13           A.      It could have been collected in the

14   CAD.  If not, then if an arrest were made or a

15   traffic summons, then it would have been captured

16   that way.

17           Q.      Did the KHP collect information when a

18   search was occurring on what the troopers were

19   looking for?

20           A.      Not on what they were looking for.

21           Q.      When the KHP stopped people -- strike

22   that.

23                   In your experience at the KHP, was the

24   Patrol collecting information and storing it on the

25   outcome of a stop?



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                          July 28, 2021

Page 166

 1          A.       I don't know if that's every case.

 2          Q.       Are you aware of whether or not the

 3    KHP had a policy about collecting and storing

 4    information on the outcome of stops?

 5          A.       I don't remember.

 6          Q.       Are you aware during the time that you

 7    were a part of the KHP on whether the Patrol

 8    collected information and stored it on the length of

 9    a stop?

10          A.       Yes.  That would have been recorded in

11    the CAD and then pushed into the RMS.

12          Q.       And is that true if it was only a stop

13    that didn't result in a citation or arrest?

14          A.       Yes.  Because the trooper initiating

15    the traffic stop with the Communications Center would

16    trigger a CAD call.

17          Q.       And then is that CAD call ended when

18    the interaction is over?

19          A.       Yes.

20          Q.       So the trooper calls in an end to that

21    interaction?

22          A.       Yes.

23          Q.       Is that correct?

24          A.       Yes.

25          Q.       And that time is stored in the CAD?



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 167

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                  July 28, 2021

Page 167

1    A.    Yes.

2         Q.    Did the KHP collect and store

3    information on the type of search that might be being

4    conducted?

5         A.    I am not certain about that.

6         Q.    Did the KHP collect and store

7    information on the use of force during an encounter?

8         A.    Yes.

9         Q.    And how was that recorded?

10        A.    Electronically through a Use of Force

11   form.

12        Q.    So a Use of Force form would be filled

13   out by the trooper involved; is that correct?

14        A.    And his supervisor.  Filled out by the

15   trooper and then reviewed by the supervisor.  And in

16   some cases reviewed even higher, depending on the

17   outcome.

18        Q.    And also dependent on the type of

19   force; is that fair?

20        A.    Yes.

21        Q.    Would handcuffing somebody trigger a

22   Use of Force report?

23        A.    No.

24        Q.    Do you recall what level of force

25   required that kind of reporting?



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 168

Page 168

1        A.      I don't remember all the categories

2    that triggered that, but.  Certainly resistance,

3    injury, death.

4        Q.      Do you recall whether the KHP actually

5    had a policy on what had to be filled out in that Use

6    of Force form?

7        A.      Yes.

8        Q.      Were CAD stop data ever sent to

9    trooper supervisors for review?

10       A.      Yes.

11       Q.      Was that done in a regular way?  Or on

12   an incident basis?

13       A.      I think primarily on an incident

14   basis.

15       Q.      So, is it fair to say that the KHP was

16   not using CAD data in performance reviews of

17   troopers?

18       A.      I don't know that entirely.  I think

19   some supervisors may have.  I don't know that it was

20   a widespread, adopted widespread.  But I think in,

21   you know, my time that it has been used for that

22   purpose.

23       Q.      But is it fair to say that that wasn't

24   a regular occurrence?

25       A.      Yes.



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 • 913.317.8800 • FAX 913.317.8850
METROPOLITAN
COURT REPORTING • LEGAL VIDEO

Page 169

```
 1        Q.      When it comes to stops performed by

 2   the KHP, was there a way that the KHP could create

 3   statistics to analyze stop trends?

 4                MR. CHALMERS:  Lack of foundation.

 5   It's also vague.

 6        A.      I do not know about that.  I'm not

 7   certain.

 8   BY MS. GREATHOUSE:

 9        Q.      We were talking earlier about the fact

10   that audio and video is captured regarding stops; is

11   that correct?

12        A.      Yes.

13        Q.      Is it fair to say that neither of

14   those provide any quantitative data?

15                MR. CHALMERS:  Object to form.  I

16   don't think -- well, it's so vague, I don't know what

17   that means.

18                But go ahead and answer if you can.

19        A.      Yes.

20   BY MS. GREATHOUSE:

21        Q.      Did the video and audio information

22   that the KHP was capturing on stops allow the KHP to

23   analyze patterns of stop practices?

24                MR. CHALMERS:  Lack of foundation.

25        A.      It could.
```



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 • 913.317.8800 • FAX 913.317.8850

BLAINE FRANKLIN SHAW, et al. vs     DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                      July 28, 2021

Page 170

1  BY MS. GREATHOUSE:

2        Q.    Okay.  And how would that work in your

3  experience at the KHP?

4        A.    As I mentioned earlier, as a first

5  line supervisor, I had the ability to review video of

6  traffic stops.  So, in the course of those reviews, I

7  would certainly consider whether or not, based on the

8  information that was available, whether or not it

9  appeared that the trooper was doing what he was

10  trained to do and was properly enforcing the laws.

11       Q.    And when you were a first line

12  supervisor, were you reviewing lots of the video and

13  audio so as to be able to identify a pattern with a

14  specific trooper?

15       A.    In one case, yes, I did that in one

16  case.  It didn't necessarily deal with the reasons

17  for the stop.  It had to do with the trooper's

18  conduct during the stop.

19       Q.    And so you looked at multiple sets of

20  video and audio in order to determine if that

21  particular trooper was conducting him or herself

22  properly; is that right?

23       A.    That's correct.

24       Q.    Okay.  So, but is it fair to say that

25  the video and audio data that is gathered by the KHP



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 171

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 171

1    cannot be used to analyze patterns of stop practices

2    across the Patrol?

3         A.    I don't think it would be very easy to

4    do that.  It would be, I think, possible to do that.

5    But I think it would be difficult to do that.  The

6    amount of time required and personnel to do that

7    would make it extremely difficult.

8              But could it be done, theoretically,

9    yes, it could be, but, whew, be tough.

10        Q.    Is it fair to say that it would be

11   easier to do that if additional items of data were

12   gathered and stored regarding stop practices --

13             MR. CHALMERS:  Vague.

14   BY MS. GREATHOUSE:

15        Q.    -- not just video and audio?

16             MR. CHALMERS:  The question is vague

17   and assumes an unstated hypothetical I guess.

18        A.    Possibly.

19   BY MS. GREATHOUSE:

20        Q.    What kinds of data do you think would

21   have helped the KHP be able to analyze patterns of

22   stop practices across the Patrol?

23        A.    Well, I think one could argue things

24   like ethnicity, certainly.  Race, certainly.  Those

25   are a couple of examples.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs        DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                           July 28, 2021

Page 172

1       Q.      Is it fair to say -- well, strike

2   that.

3               Did the video and audio data that was

4   captured and stored by the KHP allow it to analyze

5   patterns of search practices across the Patrol?

6       A.      I don't think as a practice.  But it

7   was -- it could have been available for that use.

8   But I don't think, generally speaking, except for

9   perhaps Troop N where that occurred on a regular

10  basis.  I can't speak for what Captain Hogelin may or

11  may not have used the troopers' video data for, but

12  it's certainly possible.

13      Q.      Are you aware of the KHP actually

14  using that video or audio in the Interdiction troop

15  while you were there?

16      A.      I'm not personally aware of that.

17      Q.      But, again, doing a review of video

18  and audio could take many hours, even just inside the

19  Interdiction troop; is that correct?

20      A.      Yes, it does.

21      Q.      And could you identify any additional

22  kinds of data that could have been stored and

23  recorded by the KHP other than video and audio in

24  order to analyze those patterns of search practices

25  across the Patrol?



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

Page 173

1      A.      I can't think of any offhand, but I'm

2  sure there are many, many types of data that could be

3  useful.

4      Q.      Would one of those be recording

5  reasonable suspicion factors for each stop?

6      A.      I suppose so.

7      Q.      Did the video and audio data that was

8  recorded and stored by the KHP allow it to review

9  bias in stops across the KHP?

10     A.      Yes, it could.  In fact, I believe we

11 were required annually to do some type of reporting

12 concerning bias.  So it could be, I don't know if

13 that was a methodology that was used, though.

14     Q.      And by "methodology that was used,"

15 you mean whether or not the video and audio was

16 reviewed to determine ethnicity of people stopped?

17     A.      Well, that would have been used to

18 determine that.  I just don't know specifically.

19     Q.      So are you saying that the KHP would

20 review all video of stops to determine the ethnicity

21 of the person who was stopped?

22     A.      No.  I'm not saying that.

23     Q.      Are you indicating that there would

24 have been a form of data that the KHP was identifying

25 and storing that allowed you to collect ethnicity



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850

Page 174

1   data on persons who were stopped?

2          A.     No.

3          Q.     Okay.  How would the KHP do any

4   reporting on ethnicity in your experience?

5          A.     If we received complaints of

6   bias-based policing, then the ethnicity and race

7   would become known to us.

8          Q.     Okay.  So, the review for bias in

9   stops would be happening on an incident basis, not

10  across the troop; is that correct?

11         A.     That's correct.

12         Q.     Did the KHP have a way to review bias

13  in stops across the Patrol?

14         A.     Not that I'm aware of.

15         Q.     Okay.  In determining reasonable

16  suspicion during a stop, did the video or audio have

17  a way of capturing something that the troopers'

18  senses were detecting, such as a smell?

19         A.     No.  A video could not capture that.

20         Q.     Okay.  And the audio would only

21  capture it if the trooper said it; is that correct?

22         A.     That's correct.  Well, let me back up.

23  No, no, I'll stay with what I'm...

24         Q.     And is it correct that the video and

25  audio could not record what the trooper could see in



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs                DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                      July 28, 2021

                                                         Page 175

 1    a vehicle that could not be seen from the camera

 2    angle; is that correct?

 3         A.     That's correct.

 4         Q.     Generally, when you were in the

 5    command at the KHP, did the command find value in the

 6    information systems was dependent on what you were

 7    actually storing?

 8         A.     You might ask me that a different way.

 9         Q.     As soon as it came out of my mouth, I

10    thought he's going to ask me to clarify that one.

11                Is it correct that the value in the

12    KHP's information systems while you were there

13    depends on the data that the KHP was actually

14    storing?

15         A.     Yes.

16         Q.     Did the KHP do any anonymized

17    statistical reporting on bias?

18         A.     Say that one more time, I'm sorry.

19         Q.     Did the KHP do any statistical

20    reporting on bias in its policing efforts?

21         A.     Yes.  I think we were required to

22    complete an annual form.  I don't know, I don't

23    remember the form itself or the data elements.  But I

24    think that's a requirement of all Kansas law

25    enforcement.


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 176

1          Q.      Where would the KHP get that

2    information in order to do the statistical analysis?

3          A.      I don't -- I'm not certain it was

4    based on statistics as it was based on maybe other

5    factors, complaints and so forth.

6          Q.      So, correct me if I'm wrong, I want to

7    make sure that I understand what you're saying.  That

8    reporting that was done on bias in policing was based

9    only on when there were complaints?

10         A.      I've got to stop here and try to think

11   back of whether or not I'm even being accurate on the

12   reporting.  And I'm not certain that I remember.

13         Q.      Okay.

14         A.      I think I'll just say move on because

15   I don't remember exactly.

16         Q.      That's fair.

17         A.      And I don't want to misspeak.

18         Q.      Is it fair to say that unless the KHP

19   was recording the ethnicity of the persons that its

20   troopers interacted with in each case, there wouldn't

21   be a way to do a statistical analysis of

22   ethnicity-biased policing?

23         A.      I think that's fair.

24         Q.      And my understanding from today is

25   that the KHP was not collecting ethnicity data on all



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                July 28, 2021

Page 177

1   of the people who were stopped; is that correct?

2              MR. CHALMERS:  Well, it's been asked

3   and answered and I'm not sure it's an accurate

4   statement.

5              But go ahead and answer again.

6              MS. GREATHOUSE:  I want him to correct

7   me if I'm wrong.

8              MR. CHALMERS:  Well, maybe you ought

9   to just move on with the questions.

10       A.    Well, let me back up here a minute.

11  As we've been talking through this, I do believe the

12  KHP collected ethnicity.  It did not collect race.  I

13  think, if I'm not mistaken, they collected ethnicity,

14  but not race.

15  BY MS. GREATHOUSE:

16       Q.    What is your understanding of the

17  difference between ethnicity and race?

18       A.    Origin.

19       Q.    Tell me what you mean by that.

20       A.    Somebody can be of -- well, I guess

21  there is no difference now that I think about it.

22       Q.    So what information do you think was

23  being stored on individuals that would have to do

24  with either ethnicity or race?

25       A.    Yeah, I'm not sure that the Patrol



BLAINE FRANKLIN SHAW, et al. vs       DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                          July 28, 2021

Page 178

1    did.  I think decades ago the Patrol's citation

2    contained that information, but I don't believe it

3    does currently.  That's why I was having a little bit

4    of, a little bit of confusion because at one time

5    that information was collected, but it hasn't been

6    collected for a while.

7                    MS. GREATHOUSE:  I just want to do a

8    review of my questions to see if I've got anything

9    else.  Do you want to take a break while I do that

10   and then we can come back?  Or do you want to ask

11   your questions and I can review?

12                   MR. CHALMERS:  I want you to be done,

13   so do whatever you have to do to get your questions

14   done.

15                   MS. GREATHOUSE:  Okay, well, then

16   let's go ahead and take a break and let me review my

17   questions to see if I've got anything else and we'll

18   get moving.

19                   VIDEOGRAPHER:  The time is 3:53, we're

20   taking a short break and going off the record.

21                   (Recess.)

22                   VIDEOGRAPHER:  The time is 3:59 PM, we

23   are back on the record.

24   BY MS. GREATHOUSE:

25            Q.    When you were at the KHP, was it your



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

                                                          Page 179

1  experience that its data systems were designed for

2  law enforcement purposes, not directly for public

3  accountability?

4        A.    I'd say they were designed primarily

5  for law enforcement.

6        Q.    What aspects of the KHP systems in

7  your experience were designed for public

8  accountability?

9        A.    Well, I think elements of those

10 systems are utilized, for example, through our

11 Internal Affairs for public accountability in so much

12 as if there's there is a complaint, the trooper -- or

13 the investigator is able to look at some of the data

14 that may be available to help determine whether or

15 not that complaint can be substantiated or not.

16             So, I mean, I think in that example,

17 there is public accountability.

18             VIDEOGRAPHER:  Can I interrupt just

19 for one moment?

20             MS. GREATHOUSE:  Yep.

21             VIDEOGRAPHER:  We can still stay -- I

22 just need to check something real quick.  Just bear

23 with me.

24 BY MS. GREATHOUSE:

25        Q.    All right.  Earlier, we were talking



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 180

1   about when you were in the command that there were

2   discussions of adding new systems or parts of

3   systems, but that budgetary constraints didn't always

4   let that happen; is that correct?

5           A.      Yes.

6           Q.      What kinds of additional data were you

7   wanting to capture?

8           A.      You probably don't remember,

9   Counselor, you asked a very similar question earlier

10  about that, and I really don't recall.

11          Q.      If I did, I'm not trying to trick you,

12  I don't remember --

13          A.      Yes.

14          Q.      -- that I asked that, so.

15          A.      And I really don't recall.  We had

16  discussions over those years about various things

17  that we had hoped that we would be able to obtain

18  over the course of our administration.  But, you

19  know, some things were, you know, more successful

20  than others.

21                  But in the data area, that stuff was

22  just very, very expensive.  When you're talking about

23  a Records Management System, you know, you're talking

24  about hundreds of thousands of dollars.

25          Q.      Was there any discussion of the fact



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

1    that collection of additional data may impact the law

2    enforcement officers themselves and how they behave

3    in the field?

4                    MR. CHALMERS:  It's been asked and

5    answered.

6                    MS. GREATHOUSE:  No, it hasn't.

7                    MR. CHALMERS:  He just told you he

8    didn't remember.

9                    MS. GREATHOUSE:  This was a different

10   question.

11            A.      I think we had a discussion one

12   occasion concerning, for example, when an officer

13   drew his firearm.  That information would be helpful

14   to the administration in so much as knowing, you

15   know, well, a lot of things, but, you know, we had a

16   discussion about that.

17                    There was, in fact, there was some

18   amount of conversation about that because there were

19   those who were in favor of that and there were those

20   who were not.  But, I mean, I could see where that

21   type of information would be beneficial.

22   BY MS. GREATHOUSE:

23            Q.      And an example of where data

24   collection has impacted law enforcement officers in

25   the field would be when video was introduced in the



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850
METROPOLITAN
COURT REPORTING ◆ LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                July 28, 2021

Page 182

1    cars; is that correct?

2            A.        Yes.

3            Q.        And would that also have been true of

4    when audio recording was automated in the cars?

5            A.        Yes.

6            Q.        Are there any other times that you

7    recall in your experience in law enforcement that

8    there was a change in the way data was recorded that

9    really impacted how law enforcement officials were

10   acting in the field?

11           A.        Over 3-1/2 decades, I know that there

12   were.  I know that there were.  I'm not sure that I

13   can remember all the instances, but there was, you

14   know, one thing, one constant, about law enforcement

15   is that there's going to be change.  Sometimes that

16   change is because of technology, and sometime it's

17   because of things like case law, so.  Yes, I'm sure

18   there were.

19           Q.        Okay.  I forgot to ask if you are

20   currently employed.

21           A.        Nope.

22           Q.        So, since you retired from the Patrol,

23   you have not had outside employment; is that correct?

24           A.        I worked for just a short period.  My

25   fiancée is the director of Special Education



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 183

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 183

1   Services, and they didn't have anybody to take care

2   of their building and it needed a lot of attention,

3   so after she made a few attempts at trying to hire

4   somebody and not having any luck, said I'd pay you if

5   you did the job.  So I came in and did that for a

6   while, but I'm not even really sure I consider that

7   employment.

8                    I mean, I was getting paid, but it was

9   more for me to have something to do when I got tired

10  of working on the Jeep rock crawler and things like

11  that that I do when I'm just enjoying retirement.

12       Q.     In your retirement from the KHP, do

13  you have any agreement with it when you're giving

14  testimony like in this case?

15       A.     No.

16       Q.     Okay.

17              MS. GREATHOUSE:  I have no further

18  questions.

19              VIDEOGRAPHER:  The time is still

20  4:06 --

21              MR. CHALMERS:  I would like kind of

22  like to ask some questions.

23              VIDEOGRAPHER:  Oh, oh, I'm sorry,

24  strike that.  The time is 4:06 and we are still on

25  the record.

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                    July 28, 2021

Page 184

1              (Moon Exhibit 73 was marked for

2    identification.)

3                           EXAMINATION

4    BY MR. CHALMERS:

5              Q.      I represent the Highway Patrol Colonel

6    Jones in this litigation.  I don't think we've ever

7    met before, have we?

8              A.      No, I don't believe so.

9              Q.      I don't have a whole lot to ask you.

10   Hopefully, I will only confine my questions to things

11   that are maybe relevant.  But what I'd like to do is

12   clarify one little thing quickly.

13                      When you talk about the e-Citation, is

14   that the same thing as digiTICKET?

15             A.      Yes.

16             Q.      Okay.  So, I think that now the

17   Highway Patrol uses the digiTICKET system, and where

18   you talked about e-Citation, yours was a generic

19   description of what the software is; is that right?

20             A.      Yes, the term e-Citation is electronic

21   citation.  The software that captures that is

22   digiTICKET.

23             Q.      I tossed over to you, and I apologize

24   for doing it in that fashion, but I didn't want to

25   reach into your face, a copy of what's been



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 185

1    previously marked as Exhibit 20.  I've got it folded

2    to a page, it's the Vasquez versus Lewis decision

3    that have issued in 2016.

4                    Do you have that in front of you?

5          A.       This one?

6          Q.       You got it.

7                    If you look at the page that I turned

8    to, which is Page 5, at the top on the right there's

9    a paragraph that starts out, "Vasquez's status as a

10   resident of Colorado."

11                   Do you see what I'm referring to?

12         A.       Yes.

13         Q.       And the Court says, "The officers rely

14   heavily on the Vasquez's residency because Colorado

15   is 'known to be home to medical marijuana

16   dispensaries.'"

17                   It's what's reported by the Court.  Do

18   you see that?

19         A.       Yes.

20         Q.       And I want to skip down here and get

21   down to the nut of what the Court then concluded.

22                   At the bottom of that paragraph, there

23   is a looks like couple sentences from the bottom it

24   starts, "It is wholly improper to assume."

25                   Do you see what I'm talking about?



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850
COURT REPORTING ◆ LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 186

1    Are you there?

2              A.      Not yet.  Down at the bottom of

3    the --

4              Q.      Yes.  It says, "Thus the officers."

5    Actually you see in 1138 there's the little asterisk

6    and they say, "Thus, the Officer's reasoning would

7    justify the search and seizure of the citizens of,"

8    but I want to talk about the next sentence.

9              A.      Yes, I see that.

10             Q.      The Court said, "It is wholly improper

11   to assume that an individual is more likely to be

12   engaged in criminal conduct because of his state of

13   residence, and thus any fact that would inculpate

14   every resident of a state cannot support reasonable

15   suspicion."

16                     Do you see I've read that correctly?

17             A.      Yes.

18             Q.      Wasn't it the position that the Kansas

19   Highway Patrol by training policy that the mere state

20   of residence was not a basis for reasonable suspicion

21   to detain a suspect to detain a motorist?

22             A.      Yes.

23             Q.      That's always been the policy, hasn't

24   it, so long as you've been around?

25             A.      Yes.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850
COURT REPORTING ◆ LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                            July 28, 2021

Page 187

1          Q.      Now it then went on to say,

2    Accordingly, it is to abandon the pretext -- or --

3    Accordingly, it is time to abandon the pretext -- I

4    apologize, let me start over again see if I can't

5    read this afternoon.

6                   "Accordingly, it is time to abandon

7    the pretense that state citizenship is a permissible

8    basis upon which to justify detention in search of

9    out-of-state motorists, and time to stop the practice

10   of the detention of motorists for nothing more than

11   an out-of-state license plate."

12                  Do you see what I've read?

13         A.      Yes.  You read that correctly.

14         Q.      Has it ever been the policy, either by

15   training or practice that you're aware of at the

16   Highway Patrol, that the state of citizenship or, for

17   that matter, the out-of-state license plate is a

18   basis for reasonable suspicion to detain a motorist?

19         A.      No.  It is not.

20         Q.      Now after the Vasquez decision which

21   came out, according to this document, August 2016,

22   would there have been a need to change Kansas Highway

23   Patrol policies to comply with the instructions that

24   we just read from the decision?

25         A.      No.  And, in fact, that's why we



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 • 913.317.8800 • FAX 913.317.8850
METROPOLITAN
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                July 28, 2021

                                                   Page 188

 1    didn't -- we felt like we were complying.

 2          Q.      You mentioned that during the course

 3    of the interview with I think it was the Topeka

 4    Journal writer that there were other people there

 5    with you other than just the journalist.  You had

 6    Captain Hogelin, was he there?

 7          A.      Yes.

 8          Q.      And Sarah Washburn, she was also

 9    present?

10          A.      Yes.

11          Q.      And during the course of that

12    interview, both Hogelin and Washburn made statements

13    for purposes of the article to the reporter; is that

14    correct?

15          A.      Yes.

16          Q.      Did you hear those statements?

17          A.      Yes.

18          Q.      And were they, at the time that they

19    were giving the statements, expressing what you

20    understood to be Kansas Highway Patrol's position?

21          A.      Yes.

22          Q.      Now, if we look at Exhibit 72, that's

23    the article, let's talk about it for a second.

24                  In that article on the second page,

25    there's a little description a heading that says



BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                      July 28, 2021

Page 189

1    "Record request."  I want you to move up just a few

2    paragraphs.

3              A.    Yes.

4              Q.    It says, "In a deposition, Lewis

5    explained the troopers were referring to vehicles

6    with Colorado plates, but he said that wasn't a

7    factor in the Vasquez stop."

8                    And then there's a quote that I want

9    to talk to you about from Ms. Washburn.  Says, "I am

10   very confident that the patrol has never trained that

11   you look at the license plate."  End quote.  And it

12   refers that to Ms. Washburn.

13                   Do you have a recollection of her

14   saying that?

15             A.    Yes.

16             Q.    And is that accurate in your opinion,

17   her statement?

18             A.    Well, her statement of you never look

19   at a license plate, well, of course, we look at

20   license plates.  But in this context, the

21   conversation dealt with the license plate itself for

22   the reason of the stop.

23             Q.    And I want to have you turn to Page 4

24   then if you can.  And the third full paragraph up

25   where it says, "Washburn said," see if you can find



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

Page 190

1   that.

2           A.      Yes, I have it.

3           Q.      Said, "Washburn said license plates

4   become a factor in a stop only when they are expired,

5   incorrectly displayed or associated with specific

6   suspect or criminal information."

7                   Do you remember her saying something

8   to that effect?

9           A.      Yes.

10          Q.      And do you agree with that?

11          A.      Yes, I do.

12          Q.      But when you're talking about

13  reasonable suspicion, Washburn said, moving up a

14  couple of paragraphs and it's quoted, "That's not a

15  factor in why you stop a car, ever."

16                  Do you remember her saying that?

17          A.      Yes.

18          Q.      And has that been what your

19  understanding is of policy and practice at the

20  Highway Patrol since you were there?

21          A.      Yes.

22          Q.      Well, now in this lawsuit, Captain

23  Hogelin has provided a declaration and at

24  Paragraph 22 of that declaration he makes the

25  following statement, and I want to see if this is


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 191

BLAINE FRANKLIN SHAW, et al. vs       DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                            July 28, 2021

Page 191

1    consistent with your belief and understanding.

2                    But before I do that, Captain Hogelin,

3    what was his position when you were there?

4         A.      He held the rank of captain and he was

5    the commander over a troop, Troop N.  And, as I

6    testified earlier, that troop's purpose is criminal

7    interdiction.  And I cited several, several areas

8    that that troop focuses on.

9         Q.      And as part of his responsibilities,

10   were you aware that he was involved in giving

11   training on how to conduct a traffic stop, when it's

12   appropriate to detain, when it's appropriate to

13   search?

14        A.      That would not surprise me.

15        Q.      Okay.  Those would be issues that

16   would be pretty routine to Troop N?

17        A.      Yes.  Of course.

18        Q.      In his declaration, at Paragraph 22,

19   he said, "Even before the Vasquez decision was

20   rendered, KHP troopers' training had established that

21   the reasonable suspicion required to extend a traffic

22   stop is not supported by (a) a driver's travel,

23   origin or destination alone; (b) a driver's state

24   citizenship; or (c) nothing more than out-of-state

25   license plate."


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850
COURT REPORTING ◆ LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                        July 28, 2021

Page 192

1                   Is that consistent with your

2  understanding of the training before the Vasquez

3  decision?

4          A.       Where are you finding that at?

5          Q.       It's not in there.  I'm sorry.

6          A.       Oh, okay.  I'm sorry.  Could you read

7  it one more time?

8          Q.       I'd be happy to do that again.  In his

9  declaration at Page 22, he said, or Paragraph 22, he

10  said, "Before the Vasquez decision was rendered, KHP

11  troopers' training had established that a reasonable

12  suspicion required to extend a traffic stop is not

13  supported by," and we'll take it in chunks, "(a) a

14  driver's travel origin or destination alone."

15                  Do you agree with that statement?

16          A.       Yes.

17          Q.       And is that what you understood to be

18  the training when you were with the Highway Patrol?

19          A.       Yes.

20          Q.       And was it consistent with what the

21  practice was from what you knew of your officers?

22          A.       It was my understanding, yes.

23          Q.       B, again it's not established by a

24  driver's state citizenship.  That wasn't a factor

25  according to training when you were there; is that



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850
COURT REPORTING ◆ LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                      July 28, 2021

Page 193

1    right?

2              A.      That's correct.

3              Q.      And it was not established by nothing

4    more than an out-of-state license plate, we discussed

5    that.   That also was not a factor based on the

6    training that you were aware of at the time you

7    were --

8              A.      That's correct.

9              Q.      Now, was there some sort of, to your

10   knowledge, widespread practice of conducting traffic

11   stops and extending the traffic stops on the basis

12   of -- for reasonable suspicion based on those, any of

13   those three categories, even though it would have

14   been inconsistent with the training?

15             A.      No.   Not that I'm aware of.

16             Q.      You were, turning then to page -- or

17   back to Exhibit 72, you were asked about a couple of

18   quotes that you gave, and that's at Page 5, if you

19   could turn to that.

20                     You were asked about this last -- the

21   second to last paragraph.   And I think the quote that

22   was attributed to you -- and this was a quote that

23   you remember giving, is that correct, is that, "It's

24   not an unreasonable expectation to think that people

25   are going to come across the country to go to the



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING ♦ LEGAL VIDEO

1   state to purchase marijuana, and then leave the state

2   and go back to where they come from, and once they do

3   that, they are committing violations of law."

4               You were asked about that quote?  And

5   that's a quote that you gave; is that correct?

6        A.    Yes.

7        Q.    Keep that in mind, but let's turn to

8   the next page.  And talks under license plate on

9   Page 6 of the exhibit.  And if you go down one, two,

10   three, four, the fourth paragraph, where it starts

11   out, "Reasonable suspicion."

12               Do you see that?

13        A.    Yes.

14        Q.    Says, "Reasonable suspicion, Washburn

15   says, takes into account the totality of

16   circumstances, which could be positive or negative.

17   Factors include the presence of air fresheners, the

18   number of air fresheners, where the person is coming

19   from or going, and if they're being honest and if

20   they're exhibiting extreme nervousness."

21               Do you remember Washburn saying words

22   to that effect?

23        A.    Yes.

24        Q.    And do you agree with that statement?

25        A.    Yes.  In fact, there are many other



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                    July 28, 2021

                                                      Page 195

1    factors that can be included --

2          Q.      Sure.

3          A.      -- in those.

4          Q.      And where the person is --

5                  MS. GREATHOUSE:  Were you done with

6    your answer?

7                  THE WITNESS:  Yes.

8                  MS. GREATHOUSE:  Okay, thank you.

9    BY MR. CHALMERS:

10         Q.      And where the person is coming from or

11   going, is that what you're referring to back on

12   Page 5 where you talk about it's not an unreasonable

13   expectation to think people who are going to come

14   from the country to go to that state to purchase

15   marijuana and then leave the state?

16                 MS. GREATHOUSE:  Are you looking at

17   the article?  I'm sorry, Art, I lost it.  I missed it

18   if you said if there was a reference.

19                 MR. CHALMERS:  Exhibit 72.

20                 MS. GREATHOUSE:  Yes.  Where?

21   BY MR. CHALMERS:

22         Q.      Okay, and at Page 6 we've talked about

23   what Washburn said.  And one of the things that

24   Washburn said was, that you agreed could be part of

25   the totality of the circumstances along with a lot of



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING ♦ LEGAL VIDEO

App. Vol. XXIII, 196

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                            July 28, 2021

Page 196

1    other things --

2         A.    Yes.

3         Q.         -- is where the person -- excuse

4    me -- where the person is coming from or going.

5                   And what I'm asking you is where the

6    person are coming from and going, is that what you

7    were trying to describe or what you were actually

8    describing at Paragraph 5 -- or excuse me -- Page 5

9    when you talk about coming across the country to go

10   to a state to purchase marijuana?

11        A.    Yes.

12        Q.    Okay.  Then going to Page 6, again

13   back to Page 6, Washburn is given to quote or

14   attributed a statement the third paragraph up,

15   "Coming from a drug source state is a very small

16   piece, if it is considered at all, Washburn said.

17   She reiterated that an out-of-state license plate

18   won't be a factor."

19                   And is that something that you

20   remember her saying?

21        A.    Yes.

22        Q.    And do you agree with that statement?

23        A.    Yes.

24        Q.    In fact, the very article itself, the

25   title, Exhibit 72, says, "KHP says out-of-state



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850
COURT REPORTING ◆ LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 197

1  license plates not a factor in stops," and then it

2  says, "Agency can't provide records substantiating

3  claim."

4              But the point was, in your

5  conversation with this reporter, was to communicate

6  that out-of-state license plates were not a factor,

7  wasn't it?

8       A.    That's correct.  In fact, I'll expand

9  just a minute on that.

10      Q.    Please.

11      A.    This particular reporter, and it's my

12 recollection, that the statement that the agency

13 could not provide the records substantiating the

14 claim, we visited with her in the middle of the

15 afternoon on I want to say March 3rd, and then this

16 article was written and published on March 4th.  So,

17 whether or not we had any information to provide her,

18 we couldn't possibly have given her that information

19 that quickly.

20      Q.    Okay.  I want you to look at another

21 exhibit real quickly.  It's a single page, typed at

22 the top it says "34."  Do you find that?

23      A.    Yes.

24      Q.    I'll let you know that this is an

25 excerpt from the First Amended Complaint that was



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850
COURT REPORTING ◆ LEGAL VIDEO

1    filed in this lawsuit by the plaintiffs.

2                    As I recall, you read some of the

3    documents that were filed by the plaintiffs in this

4    lawsuit; is that correct?

5         A.    Yes.

6         Q.    This particular document, what's

7    called a "First Amended Complaint" and I want to talk

8    to you about Paragraph 36.  Just take a second and

9    look at Paragraph 36 and let me know if that's one of

10   the things that you remember reading.

11        A.    Yes.

12        Q.    Now, that paragraph of the allegations

13   made in this lawsuit by the plaintiffs and their

14   attorneys quotes you as saying, "It's not an

15   unreasonable expectation" in quotation marks.  Do you

16   see that?

17        A.    Yes.

18        Q.    And if you compare that to Exhibit 72

19   which their footnote references, that's the paragraph

20   that we just talked about where you said it's not an

21   unreasonable expectation to think that people where

22   they're going to come across the country to go

23   through the state to purchase marijuana and so forth.

24        A.    Yes.

25        Q.    Do you see that?


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING ♦ LEGAL VIDEO

App. Vol. XXIII, 199

Page 199

```
1         A.     Yes.

2         Q.     Now, did you communicate in this

3    article or otherwise that it was your opinion that

4    it's not unreasonable expectations for troopers to

5    assume that drivers and out-of-state plates heading

6    to or returning from Colorado are trafficking

7    marijuana?

8         A.     No.

9         Q.     Did you make that assumption?

10        A.     No.

11        Q.     In your view, is that even a fair

12   interpretation of what you were reported to have said

13   to the newspaper reporter?

14        A.     No.  This is not a proper

15   characterization.

16               MR. CHALMERS:  I don't have any other

17   questions.  Thank you.

18               MS. GREATHOUSE:  I have a few

19   follow-ups.

20                    EXAMINATION

21   BY MS. GREATHOUSE:

22        Q.     Do you know whether the KHP trains in

23   advanced interdiction that two of the most important

24   factors in questioning a person who has been stopped

25   is where they are going to and where they are coming
```



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 200

1   from?

2          A.      The first part of the question, yes,

3   I'm aware that the Patrol offers advanced

4   interdiction.

5                 The second part of the question, I

6   don't know necessarily that there's any more or less

7   weight added to that particular question as to its

8   importance.  It is a factor.

9          Q.      So, in interdiction, one of the

10  factors to be considered in determining whether or

11  not a search might be conducted of a vehicle is where

12  the driver says they are coming from and where they

13  are going to; is that correct?

14         A.      No.  We are talking about reasonable

15  suspicious, so the totality of the circumstances

16  really are what's important in determining whether or

17  not the trooper believes something is going on that

18  might lead him to search.  The state of residency

19  alone would not be constituting enough reasonable

20  suspicion to make that search.  There should be other

21  factors.

22                MS. GREATHOUSE:  Move to strike the

23  answer as non-responsive.

24                Will you please read the question

25  back?



BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

                                                          Page 201

1          (Whereupon, the requested portion of

2     the record was read by the reporter as follows:

3          Q.     So, in interdiction, one of the

4     factors to be considered in determining whether or

5     not a search might be conducted of a vehicle is where

6     the driver says they are coming from and where they

7     are going to; is that correct?)

8               MR. CHALMERS:  Wait a second.  He's

9     given you an answer, you've moved to strike it,

10    that's fine.  But he's not obligated to give you

11    another answer.

12               MS. GREATHOUSE:  I don't want you to

13    coach the witness.  And so if you and I want to have

14    this conversation, I am going to ask the witness to

15    leave the room.  It's not appropriate to you to coach

16    the witness, Art.

17               MR. CHALMERS:  He's not obligated to

18    answer a question that he's answered, whether you

19    think it's irresponsive or not, on the basis that

20    you've raised that motion.

21               MS. GREATHOUSE:  Okay.

22               MR. CHALMERS:  You don't get to ask

23    the question twice.

24               MS. GREATHOUSE:  That's not true.

25               MR. CHALMERS:  Ask a new question.



BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 202

1          MS. GREATHOUSE:  No.  He can answer

2    the question and you can stop interfering with my

3    examination.

4    BY MS. GREATHOUSE:

5          Q.     I asked if -- do you understand the

6    difference between one factor and a totality of

7    factors?

8          A.     Yes.

9          MS. GREATHOUSE:  Okay.  Will you

10   please read the question again?

11          (Whereupon, the requested portion of

12   the record was read by the reporter as follows:

13          Q.     So, in interdiction, one of the

14   factors to be considered in determining whether or

15   not a search might be conducted of a vehicle is where

16   the driver says they are coming from and where they

17   are going to; is that correct?)

18          A.     That's the question.  That was the

19   question that was asked, and I stand by the answer I

20   provided.

21   BY MS. GREATHOUSE:

22          Q.     So your answer is that one factor is a

23   totality of the circumstances?

24          A.     No.  I did not say that, Counsel.

25          Q.     But the question was, is travel --


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 203

1              MR. CHALMERS: You're arguing with

2   him.

3              MS. GREATHOUSE: It's a different

4   question.

5   BY MS. GREATHOUSE:

6        Q.      Is travel a factor in the totality of

7   factors?

8        A.      It can be.

9        Q.      Yes. So the question is, in

10   interdiction training, does the KHP teach that

11   questions to be asked during a stop are where the

12   driver is coming from and where they are going to?

13        A.      Counsel, I attended advanced

14   interdiction -- or criminal interdiction back in the

15   '80s, and I simply cannot recall if that particular

16   question was asked.

17        Q.      So it's fair to say --

18        A.      Nor do I know today if that is what is

19   taught.

20        Q.      Okay. So it's fair to say you have no

21   idea one way or the other whether it is appropriate

22   to include where a person is traveling from and where

23   they are traveling to as part of building reasonable

24   suspicion; is that correct?

25        A.      No.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

Page 204

 1              MR. CHALMERS:  Object to the form.

 2   But he's answered.  Go ahead.

 3          A.     No, I don't think that's correct,

 4   Counsel.

 5   BY MS. GREATHOUSE:

 6          Q.     Okay.  Are you agreeing that it is

 7   appropriate to use where someone is going to and

 8   where they are coming from in building reasonable

 9   suspicion?

10          A.     I think it depends on the

11   circumstances.  I simply cannot answer that

12   singularly.  It depends on the circumstances.

13          Q.     Right.  And in the circumstances of

14   someone who is traveling through Kansas out of state,

15   it is appropriate for troopers to consider that that

16   person may have been in a state where marijuana is

17   legal; is that correct?

18              MR. CHALMERS:  Argumentative.  And

19   it's also leading.  Not my witness.

20          A.     You're asking whether it's appropriate

21   that the troopers consider that they may have been in

22   a state where marijuana is legal?

23              MS. GREATHOUSE:  Will you please read

24   back the question?

25              (Whereupon, the requested portion of



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 205

1   the record was read by the reporter as follows:

2          Q.     Right.  And in the circumstances of

3   someone who is traveling through Kansas out of state,

4   it is appropriate for troopers to consider that that

5   person may have been in a state where marijuana is

6   legal; is that correct?)

7          A.     I suppose it depends on the traffic

8   stop and any additional circumstances.  I can't say

9   that in every single instance.

10  BY MS. GREATHOUSE:

11         Q.     Well, nothing applies in every single

12  interaction in policing; is that fair?

13         A.     Yes.

14         Q.     But it's also fair to say that at the

15  time you spoke on behalf of the KHP in 2017 when you

16  gave this interview, that the KHP was not asking its

17  troopers -- strike that.

18                It's fair to say that at the time you

19  gave the interview in 2017, the KHP thought it was

20  appropriate for troopers to consider if out-of-state

21  travelers coming through Kansas had been in a state

22  where marijuana is legal; is that correct?

23                MR. CHALMERS:  Asked and answered.

24         A.     I don't think that's accurate,

25  Counsel.



BLAINE FRANKLIN SHAW, et al. vs        DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                           July 28, 2021

                                                          Page 206

1    BY MS. GREATHOUSE:

2          Q.      So how is what I just said different

3    than what you said in the article?  I'm talking about

4    Exhibit 72 that's there in front of you.

5          A.      Primarily because I believe you're

6    trying to paint a picture that our troopers are

7    stopping motorists simply because they have traveled

8    through Colorado, and that is not the case.

9          Q.      I have never said that today.  So that

10   is --

11         A.      That is the picture that I feel that's

12   being painted here.  Or, or, searching them because

13   of the fact that they've been in Colorado.

14         Q.      And, in fact, you said in this

15   interview that that is an appropriate factor for your

16   troopers to consider in a stop; is that correct?

17         A.      No.

18               MR. CHALMERS:  Object to the form.

19   BY MS. GREATHOUSE:

20         Q.      That's not what you said?

21         A.      No.  That is not what I said.

22         Q.      Did you say, "We cannot ask our

23   troopers to ignore the fact it's not an unreasonable

24   expectation to think that people are going to come

25   across the country to go to the state to purchase



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 • 913.317.8800 • FAX 913.317.8850

BLAINE FRANKLIN SHAW, et al. vs                     DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                       July 28, 2021

Page 207

1    marijuana and then leave that state and go back to

2    where they came from, and, once they do that, they

3    are committing violations of the law"?

4            A.      Yes.   That's what I said.

5            Q.      And how is that different than

6    including the factor that somebody has traveled

7    through a marijuana state, a marijuana-legal state,

8    and then they come to Kansas as a factor in the

9    totality of circumstances?

10           A.      Because not every motorist is coming

11   from Colorado.   Not every motorist is trafficking

12   drugs.

13                   I'm talking, in this article, I'm

14   talking specifically about motorists or citizens who

15   intend to traffic in narcotics.   Who intend to leave

16   wherever they are and to come to a state where --

17   and, by the way, they cannot legally buy pounds and

18   pounds of marijuana.   So whether it's being provided

19   through the cartels that are in those states or

20   whether it's being sold out of back door of the

21   dispensaries, that's what I'm talking about.   I'm not

22   saying anything other than that.

23                   The troopers of the Highway Patrol

24   cannot ignore the fact that that occurs.   That does

25   happen.



BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                        July 28, 2021

Page 208

```
 1                  That's not giving rise to any

 2      reasonable suspicion, it's just simply a fact that

 3      they can't ignore that because it does happen.

 4           Q.      But you were also talking, not only

 5      about what the intent was of the driver, you were

 6      talking about what the troopers should consider.

 7                  MR. CHALMERS:  It's argumentative.

 8      BY MS. GREATHOUSE:

 9           Q.      Correct?

10                  MR. CHALMERS:  It's argumentative.

11           A.      I don't know that I am saying that the

12      troopers should consider that.  I'm saying that they

13      cannot ignore the fact that Kansas is right next to

14      Colorado.  We can't ignore that.  We know that

15      legalized marijuana is in Colorado and we're right

16      next to that.  We can't ignore that.

17                  So, if somebody is traveling through

18      Kansas to Colorado for purposes of trafficking

19      marijuana or any other kind of narcotics, we can't

20      ignore that just because marijuana is legal in

21      Colorado.

22      BY MS. GREATHOUSE:

23           Q.      Would you agree with me that legalized

24      marijuana in Colorado is something entirely different

25      than marijuana that came from a cartel?
```



Page 209

 1          A.      Yes.

 2          Q.      You were asked some questions about

 3  the Vasquez opinion that is in front of you.  You

 4  recall that, correct?

 5          A.      Okay.

 6          Q.      If you look at the -- you see the

 7  paragraph where you were asked questions about -- on

 8  Page 5 at the upper right, and I'm talking about the

 9  decision that's in front of you, Exhibit 20.

10          A.      Okay.

11          Q.      Okay.  So beneath that, the first full

12  paragraph in the right column on Page 5 it starts

13  with the words "and we cannot."  Do you see that

14  paragraph?

15                  I'm sorry move down.  Next paragraph.

16  The next paragraph down.  That one.

17          A.      Okay.

18          Q.      So, is it correct that a totality of

19  the circumstances -- and this isn't from

20  this -- we're going to talk about this paragraph.

21  But, first, is it true that a totality of the

22  circumstances takes a variety of different factors

23  and puts them together to create reasonable

24  suspicion?

25          A.      Yes.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 210

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 210

 1          Q.        And here in the Vasquez decision, the
 2    Court said that they "could not think of a scenario
 3    in which a combination of otherwise innocent factors
 4    becomes suspicious because the individual is from one
 5    of the aforementioned 25 states or the District of
 6    Columbia," which are the legalized marijuana states
 7    at that point in time; is that correct?
 8          A.        Okay.  Yes.
 9          Q.        And so here the Court is saying that
10    if travel from out of state, even a state where
11    marijuana is legal, that can't be added with other
12    innocent factors to come up with reasonable
13    suspicion.  Is that your understanding of that
14    paragraph?
15                    MR. CHALMERS:  Well, wait a second.
16    Wait a second.  It's a misstatement of what it says.
17    And you're asking him to give a legal opinion, I
18    suppose, as to a document.
19    BY MS. GREATHOUSE:
20          Q.        Go ahead.  You can answer.
21          A.        Well, I'm not sure that I'm in a
22    position to debate what the thought of the Court was
23    in their findings here.  However, I can say that it
24    is the Patrol's experience, whether the Court agrees
25    with it or not, it is the Patrol's experience over



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN  800.748.7511 ♦ 913.317.8800 ♦ FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 211

Page 211

1   decades that individuals who traffic in narcotics

2   don't necessarily live in a state where the narcotic

3   is legal.

4              So, that means they have to come from

5   somewhere else.  If they are coming to a state, like

6   let's assume Colorado or Washington where it's

7   legally grown and accessible -- I don't remember

8   where I was going with that point.  But they --

9        Q.    Okay.  Would you like her to read back

10  your answer?

11       A.    No, that's all right.

12             It's not -- it's not unreasonable for

13  our troopers to understand that fact, which is again

14  part of what I was trying to say in my quote.

15             And I'm not sure -- I'm not sure that

16  the Court's analysis of this where they are

17  indicating in here this notion of the state of

18  residency is the justification.

19             Of course, anybody, I mean, you can

20  take a set of circumstances and throw them together

21  and call it reasonable suspicion.  But they could

22  also be innocent factors also.  We understand that.

23             But given these officers' experience

24  with what their training has told them, that, to me,

25  that changes the dynamic.



BLAINE FRANKLIN SHAW, et al. vs     DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 212

1     Q.     If you'd look back at that paragraph

2   we were discussing in Vasquez, if you look at the

3   last sentence.  The Court has said, "Absent a

4   demonstrated extraordinary circumstance, the

5   continued use of state residency as a justification

6   for the fact of or continuation of a stop is

7   especially permissible."

8     A.     Yes.

9     Q.     Is that what that says?

10    A.     That's what that says.

11    Q.     Can you tell me how you think that

12  statement by the Court that says you can't use the

13  state of residency, absent some exceptions, they do

14  say there might be exceptions, is different than what

15  you said in the article where you said we can't ask

16  our troopers to ignore travel?

17    A.     I think they're exactly the same,

18  Counsel.

19    Q.     Right.  The Court said you can't do

20  it, and you said we can't ask our troopers to ignore

21  it.

22    A.     No, I'm saying I think they're exactly

23  the same.

24           When the Court's talking about absent

25  demonstrated extraordinary circumstances, well, what



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 ◆ 913.317.8800 ◆ FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                      July 28, 2021

Page 213

1    I'm talking about is traveling from one state to a

2    state like Colorado to purchase more than the legal

3    amount of marijuana to traffic is an extraordinary

4    circumstance.

5         Q.    Got it.

6               Do you recall that Mr. Chalmers was

7    asking you a series of questions about three

8    categories of information that weren't being used by

9    the KHP in stops?

10        A.    Yes.

11        Q.    How do you know those categories of

12   information aren't being used by the troopers --

13   or strike that.

14              How did KHP command when you were part

15   of KHP command know the troopers weren't using those

16   three categories in conducting stops?

17        A.    Well, I think we rely on our policy

18   and our training.  Now, to say that officers don't go

19   outside that, I'm not going to take that step.  But

20   based on our policies and our training, I think I

21   answered that appropriately.

22        Q.    So, you're saying the official policy

23   of the KHP is to not use those three categories, or

24   was when you were part of the KHP; is that correct?

25        A.    Yes.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 214

Page 214

1          Q.     And it's also correct that the KHP

2     command has absolutely no way to confirm that across

3     the Patrol troopers aren't using those three

4     categories, because there's nowhere that reasonable

5     suspicion is stored in your data systems for searches

6     that don't result in arrests?

7                    MR. CHALMERS:  Okay, let me pose an

8     objection.  First, it's calling for opinion.  Second,

9     it's compound because you've got multiple elements

10    floating around.

11                    You can go ahead and answer if you

12    can.

13         A.     I think it is impossible for one human

14    being to know what is in the mind of another human

15    being.

16    BY MS. GREATHOUSE:

17         Q.     Right.  They would have to write down

18    -- strike that.

19                    A trooper would have to write down

20    their reasonable suspicion and store it in the KHP

21    systems before KHP command could know what the

22    trooper believed was reasonable suspicion in any

23    particular stop; is that correct?

24                    MR. CHALMERS:  Object to the form.

25    Calls for opinion.  And it's also compound.

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

                                                      Page 215

1          A.     I think the KHP's command could merely

2     review or report or ask the officer what his

3     reasonable suspicion was.  I doesn't have to be

4     recorded in a Records Management System.

5     BY MS. GREATHOUSE:

6          Q.     And is it your experience that the

7     troopers are always honest?

8          A.     No, that is not my experience.

9          Q.     Right.  So, troopers may add factors

10    to reasonable suspicion after the fact if they

11    haven't been recorded at the time of the stop; is

12    that accurate?

13         A.     I don't think that's accurate.  I

14    couldn't really answer that.  That's being a bit

15    speculative --

16         Q.     Okay.

17         A.     -- on what they could or couldn't do.

18         Q.     So, you think that all of the KHP

19    troopers in the time that you were in the command, if

20    they had to write down their reasonable suspicion

21    after the fact would be able to remember every single

22    item they were using as reasonable suspicion at the

23    time of the stop?

24         A.     I don't know that.

25                MR. CHALMERS:  Speculation.



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs                    DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                                        July 28, 2021
Page 216

 1   BY MS. GREATHOUSE:

 2        Q.      So let's just say there's an internal

 3   investigation related to a stop that did not result

 4   in an arrest.  So there is no contemporaneous record

 5   of reasonable suspicion during the stop.  Okay?

 6        A.      Yes.

 7        Q.      Do you except that as a hypothetical?

 8        A.      Yes.

 9        Q.      The only way the KHP could review

10   reasonable suspicion is to believe what the trooper

11   said after the fact; is that accurate?

12               MR. CHALMERS:  Object to the form.

13   Lack of foundation.  Incomplete hypothetical.

14        A.      I think the answer to that question is

15   that the investigating officer, whether he would

16   believe it or not, would use the basis of what the

17   officer said in the investigation.

18               Whether he believes it or not is

19   another story.  But there are other factors that

20   would be considered before that investigating officer

21   would make recommendations to myself or to the

22   colonel.

23   BY MS. GREATHOUSE:

24        Q.      What would the other factors be that

25   you would consider in identifying reasonable



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

BLAINE FRANKLIN SHAW, et al. vs          DEPOSITION OF RANDY MOON
HERMAN JONES, et al.                              July 28, 2021

Page 217

1    suspicion in that scenario?

2          A.      If there were other witness there that

3    corroborate what the trooper is saying.

4          Q.      Okay.  So if there's a second trooper

5    there, right?

6          A.      If the defendant himself corroborates

7    what the trooper says.

8          Q.      Okay.

9          A.      If independent witnesses corroborate

10   what the trooper's saying.  I mean, there are a

11   number of things.  If the video camera captures audio

12   that corroborates what the trooper says or was

13   thinking or.

14         Q.      Anything else?

15         A.      No.

16              MS. GREATHOUSE:  I think I'm done.

17              MR. CHALMERS:  I don't have any

18   further questions.  Thank you, Mr. Moon.

19              THE WITNESS:  Thank you, all.

20              MS. GREATHOUSE:  Thank you.  Sorry

21   this went longer than I expected.

22              VIDEOGRAPHER:  The time is 4:51.  That

23   concludes this deposition.  We are now off the

24   record.

25              MS. GREATHOUSE:  Did you want to


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

App. Vol. XXIII, 218

Page 218

1  review it and sign the deposition when it's complete?

2  Or waive that right?  You have the opportunity to

3  review and correct if you'd like to.

4          THE WITNESS:  Actually, yes, I would.

5          MS. GREATHOUSE:  Okay.

6          REPORTER:  Mr. Chalmers, can I send

7  you an Etran?

8          MR. CHALMERS:  I'd like an Etran and a

9  scanned copy of the exhibits.

10         MS. GREATHOUSE:  I never remember what

11  our standing order is, but just sent me that.

12      (The deposition concluded at 4:53 PM.)

13

14

15

16

17

18

19

20

21

22

23

24

25



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

219

1
2
3
4
5
6                          _Randy D Moon_
                          _____
7                          RANDY MOON
8
9
10
11                         Subscribed and Sworn to
12  before me this ___1st___ day of _September_, 2021.
13
14
15       _Brenda L Maddox_
       BRENDA L. MADDOX          _____
       Notary Public - State of Kansas
16     My Appt. Expires 8-9-2025    Notary Public
17
18                         County of _Marion_
19
20                         State of _Kansas_
21
22
23  BLAINE FRANKLIN SHAW, et al. Vs. HERMAN JONES, in his
    official capacity as the Superintendent of the Kansas
24  Highway Patrol, et al.
25

1                          ERRATA SHEET

2    RE:  BLAINE FRANKLIN SHAW, et al. vs. HERMAN JONES,
     in his official capacity as the Superintendent of the
3    Kansas Highway Patrol, et al.

4    DEPOSITION OF:  RANDY MOON

5    PG/LN NO.    CORRECTION      REASON FOR CHANGE

6    :_____:_____:_____

7    :_____:_____:_____

8    :_____:_____:_____

9    :_____:_____:_____

10   :_____:_____:_____

11   :_____:_____:_____

12   :_____:_____:_____

13   :_____:_____:_____

14   :_____:_____:_____

15   :_____:_____:_____

16   :_____:_____:_____

17   :_____:_____:_____

18   :_____:_____:_____

19   :_____:_____:_____

20   _____ I certify that I have read my deposition in
21   the above case and I request that no changes be made.
     _____ I certify that I have read my deposition in
22   the above case and I request that the above changes
     be made.
23
                          SIGNATURE OF DEPONENT:
24
     _____
25   DATED: _1- Sept. 2021_


METROPOLITAN
COURT REPORTING ◆ LEGAL VIDEO

11880 COLLEGE BOULEVARD, SUITE 405
OVERLAND PARK, KANSAS 66210
1.800.748.7511 · 913.317.8800 · FAX 913.317.8850

Page 221

```
 1              C E R T I F I C A T E

 2          I, Nissa M. Sharp, a Certified Court

 3   Reporter, do hereby certify:

 4          That prior to being examined the witness was

 5   by me duly sworn;

 6          That said deposition was taken down by me in

 7   shorthand at the time and place hereinbefore stated

 8   and was thereafter reduced to writing under my

 9   direction;

10          That I am not a relative or employee or

11   attorney or counsel of any of the parties, or a

12   relative or employee of such attorney or counsel, or

13   financially interested in the action.

14          The original transcript is in the custody of:

15          Ms. Leslie A. Greathouse
                Spencer Fane, LLP
16          1000 Walnut Street
                Suite 1400
17          Kansas City, Missouri  64106

18
            WITNESS my hand and seal this 28th day of
19
     July, 2021.
20

21          _____
                Nissa M. Sharp
22              CSR No. 1365, CCR No. 528

23
     BLAINE FRANKLIN SHAW, et al. Vs. HERMAN JONES, in his
24   official capacity as the Superintendent of the Kansas
        Highway Patrol, et al.
25
```



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

**Exhibits**

Moon_072821_
**Ex 71** 3:17 39:10,16
55:23

Moon_072821_
**Ex 72** 93:5,6,9 94:9
99:5 117:19 188:22
193:17 195:19
196:25 198:18 206:4

Moon_072821_
**Ex 73** 184:1

---

**$**

**$90** 78:19

---

**(**

**(a)** 191:22 192:13

**(b)** 191:23

**(c)** 191:24

---

**0**

**06** 38:13

---

**1**

**1** 21:12 98:19

**1,000** 78:5

**10** 25:10 76:10

**100** 62:5 98:15 100:9,
13

**10:06** 4:1,5

**10th** 108:21 110:6,10
113:6,9

**1138** 186:5

**11:01** 39:7

**11:16** 39:12

**11th** 8:17

**12** 20:22,23

**12-month** 142:1

**12:16** 72:25

**12:23** 73:3

**133** 134:14 135:1

**136** 94:1

**14** 14:7 49:7

**15** 29:21 38:13 49:7,8

**15-year** 75:22

**17** 54:18 57:16
115:16

**19** 45:21 54:19 57:16
75:15

**1963** 8:17

**1981** 8:25 10:21,24

**1982** 12:7

**1984** 10:24 12:25

**1986** 11:7 13:19 15:4

**1987** 10:23

**1989-ish** 11:8

**1990** 14:21

**1995** 14:25 15:4

**1995-ish** 18:11

**1996** 30:11

**1:42** 117:12

---

**2**

**2** 13:10 14:24 77:25

**2-year** 9:16

**20** 20:25 34:10,12
45:21 185:1 209:9

**2000** 16:20,21,23,25
19:14 21:25 29:4,22
30:1,15,18,24 49:7

**2000s** 30:6

**2001** 19:14

**2005** 20:13 35:22

**2006** 20:15 21:25
29:4,22 32:24 34:19
35:1 37:12 38:5
44:22 45:17 46:2
48:12,16 49:10 118:8

**2008** 32:24

**2010** 10:3 37:12,16,
22 75:15

**2012** 60:13

**2015** 38:2,5 44:22
49:10 77:4 80:6
116:15 160:18

**2016** 51:6 107:25
108:7 112:10 115:16
116:10,20 185:3
187:21

**2017** 89:7 90:14 92:2,
5 93:22 95:21 97:10
116:10 146:16
205:15,19

**2018** 148:3

**2019** 45:24 46:3
48:12,16 51:6 118:8
119:25 120:5 146:16
160:18

**2021** 160:13

**22** 190:24 191:18
192:9

**25** 210:5

**28th** 4:4

**2:04** 117:15

---

**3**

**3** 10:25 73:21

**3-1/2** 182:11

**3-month** 9:21 73:19

**34** 197:22

**34A** 5:3

**36** 198:8,9

**3:53** 178:19

**3:59** 178:22

**3rd** 197:15

---

**4**

**4** 11:6 189:23

**4-1/2** 16:18

**40,000** 75:9

**4:06** 183:20,24

**4:51** 217:22

**4:53** 218:12

**4th** 197:16

---

**5**

**5** 99:5 185:8 193:18
195:12 196:8 209:8,
12

---

**6**

**6** 20:17 36:15 132:22
194:9 195:22 196:12,
13

**6-year** 20:20

**619-CV-01343** 4:7

**65** 38:21

---

**7**

**70-some** 35:5

**700** 51:17,19,21,23
52:2

**71** 39:10,16 55:23

**72** 93:5,6,9 94:9 99:5
117:19 188:22
193:17 195:19
196:25 198:18 206:4

**73** 184:1

**76** 43:5

---

**8**

**8-hour** 26:25

**80** 34:10 43:5

**800** 43:3 51:14,15,24

**80s** 18:10 35:15
36:12 203:15

**84** 12:7,17 13:5

**85** 12:17

11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

i1

App. Vol. XXIII, 223

**86** 14:2

**9**

**9/11** 58:25 59:2 60:11

**900-ish** 78:6

**90s** 30:5 35:16 36:12

**911** 43:17,18

**96** 15:10,15

**96-98** 18:13

**98** 16:23

**99** 16:20,23

**A**

**abandon** 187:2,3,6

**ability** 57:4,18 103:7, 24 170:5

**absent** 212:3,13,24

**absolutely** 55:19 141:23 160:21 162:1 214:2

**academy** 13:23 14:4, 9 74:6 75:1,4,7 76:4, 5

**accept** 113:2

**accepted** 74:20 86:16 112:23 156:21

**access** 64:21 68:8

**accessible** 211:7

**accident** 17:5 23:24 28:18 34:17 50:13 156:4

**accidents** 156:4

**accompany** 141:16

**account** 126:4 194:15

**accountability** 157:3 159:10,11 161:7,12 179:3,8,11, 17

**accountable** 156:23 159:5,18

**accreditation** 157:5, 11,12,17 158:11,14, 25 162:10

**accuracy** 160:9

**accurate** 16:10,11 24:14 39:22 75:16 90:3 97:16 98:19 112:12 125:13 130:21 133:20 137:19 159:24 160:3, 4,6 176:11 177:3 189:16 205:24 215:12,13 216:11

**accurately** 56:22,25 132:12

**achieve** 23:5

**acronym** 55:1 71:21 157:6

**acronyms** 71:24

**act** 83:15 88:10

**acting** 182:10

**activated** 139:13

**active** 10:24 11:17

**activities** 5:12 34:13 108:9 109:6 130:11 154:14 156:23 159:24

**activity** 86:20,21,22

**actual** 24:2 92:4,16 97:5 147:1

**add** 215:9

**added** 62:16 200:7 210:11

**adding** 180:2

**additional** 106:13 116:15 125:3,20 151:23 158:12,17 171:11 172:21 180:6 181:1 205:8

**additionally** 161:1

**address** 5:2 83:22

**addressed** 73:15

**administration** 9:11 12:5 157:4 180:18 181:14

**administrative** 34:10 116:19

**administrator** 74:7

**adopted** 168:20

**adult** 126:21

**advance** 84:9

**advanced** 199:23 200:3 203:13

**advantage** 137:25 138:3,9

**advised** 112:17

**advisories** 105:21

**advisory** 60:14,19, 20,21 61:3,5,9,10 62:3 63:9

**affairs** 78:16 121:24 142:14,18,21 143:6, 13 159:20 161:11 179:11

**affiliation** 4:9

**afforded** 16:1

**AFIS** 54:17 63:5 69:1

**aforementioned** 210:5

**afternoon** 187:5 197:15

**afterthought** 44:11, 16

**age** 126:1 163:9

**agencies** 47:9 52:21 53:8,21 54:5 58:14 59:3,4,23 61:19 71:5 72:5 74:16 75:9 101:15 146:5 159:20 160:14

**agencies'** 64:22

**agency** 36:5,16 59:22,24 74:10 78:2, 11 83:21 93:18 104:1 129:2,4,5,23 146:22 157:5 197:2,12

**agree** 121:5 148:12 149:4 150:5,10 153:2 156:20 160:22 190:10 192:15

194:24 196:22 208:23

**agreed** 195:24

**agreeing** 204:6

**agreement** 23:15 183:13

**agrees** 210:24

**ahead** 39:2 93:4 96:10 117:8 169:18 177:5 178:16 204:2 210:20 214:11

**aid** 28:11 117:1

**aided** 47:13 127:6 136:13

**air** 16:4 194:17,18

**airplane** 91:16

**alert** 69:10

**Allan** 115:18

**Allan's** 115:18

**allegations** 198:12

**alleged** 67:12

**allegedly** 67:11

**allowed** 134:15 173:25

**alphabet** 68:9

**Amended** 197:25 198:7

**America** 58:25

**amount** 18:20 28:22 37:20 98:23 102:8 126:22 127:19 128:12 129:17,21 145:12 171:6 181:18 213:3

**amounts** 98:10

**analysis** 176:2,21 211:16

**analyze** 169:3,23 171:1,21 172:4,24

**and/or** 74:9 111:11

**angle** 175:2

**annual** 116:21


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

175:22

**annually** 61:22
173:11

**anonymized** 175:16

**answers** 6:7

**anymore** 43:6,24
106:7 126:14

**apologize** 60:8
184:23 187:4

**appeal** 113:2

**appealed** 112:19

**appeared** 26:21
170:9

**appears** 94:7

**applied** 76:1 77:12
113:3,11

**applies** 205:11

**apply** 74:20 75:11

**applying** 155:13

**appoint** 70:18

**appointed** 60:13
77:4

**approach** 24:25

**appropriately** 57:1,
2 65:10 89:23
140:10,24 141:8,12
142:2 143:22 155:14
213:21

**approval** 62:7

**approve** 61:11

**approved** 62:5

**approximately** 5:8
20:9,18 78:19 146:14

**April** 45:20

**area** 14:11 24:3 27:2,
10 31:2 36:22 37:3
44:13 76:17 126:16
135:7 180:21

**areas** 21:3 23:13
27:6 91:3 191:7

**argue** 171:23

**arguing** 203:1

**argumentative**
142:6 204:18 208:7,
10

**arrest** 28:21 29:1
32:7 50:12,15 59:12
66:9,13,14,16 67:1,2,
7,11 104:16,25
106:6,19 107:2,3,9
125:10,16 126:12
129:18 133:16
134:11,17 135:12,15,
18 138:15 142:22
153:13 155:11
164:10 165:14
166:13 216:4

**arrested** 72:2 104:10

**arrests** 119:1 144:5,
17 155:1 156:2 214:6

**arrived** 30:23

**Art** 93:11 195:17
201:16

**Arthur** 4:13

**article** 7:17,19,23
36:19 84:23 92:6,7,8,
11,14,20 93:16,21
94:5 97:1,17,24
98:24 100:2 117:20,
25 118:4 188:13,23,
24 195:17 196:24
197:16 199:3 206:3
207:13 212:15

**articles** 35:19 62:20

**ascend** 79:25

**asleep** 67:4

**aspect** 21:25 51:4
53:10 157:18 159:20

**aspects** 51:2 102:2
144:23 158:6,7 179:6

**assess** 155:4,16,23
156:8

**asset** 88:20 90:14,20,
24 91:2,7

**assign** 46:17

**assigned** 11:20
14:10 15:1,9 55:18
80:9,14,20 146:22

**assignment** 14:18
16:8 20:14 37:9

**assignments** 11:16

**assigns** 55:20

**assist** 35:17

**assistance** 147:1,18

**assistant** 38:3
77:16,20,22,25 78:1,
7,9,12,14,15,17,20
79:2,6 83:4,9

**association** 23:16
59:18

**assume** 56:2 86:4
185:24 186:11 199:5
211:6

**assumed** 82:20 88:2

**assumes** 171:17

**assuming** 156:25

**assumption** 11:12
164:4,5 199:9

**asterisk** 186:5

**Atkinson** 115:17

**atmosphere** 73:22

**attached** 42:25
57:16

**attacks** 58:25

**attempts** 90:25
183:3

**attend** 12:23 24:13
74:3

**attended** 9:18 11:3
74:15 75:4,5,6,19
203:13

**attendees** 73:20

**attention** 79:5 183:2

**attest** 127:13

**attorney** 4:14 65:18
112:18

**attorneys** 29:9
198:14

**attributed** 97:6
117:25 118:4 193:22
196:14

**audio** 140:3 169:10,
21 170:13,20,25
171:15 172:3,14,18,
23 173:7,15 174:16.
20,25 182:4 217:11

**audit** 53:21,22 56:9

**audited** 53:17 157:20

**auditing** 53:11 54:4

**auditor/trainer** 56:1,
3

**auditors** 57:4 102:15

**audits** 72:8

**August** 187:21

**authority** 61:17

**automated** 182:4

**automatic** 63:6

**automatically** 55:17

**awaited** 12:2

**aware** 37:1 47:19
48:10 74:24 75:5
79:11 85:11,13,14
101:20 106:4 110:25
111:17,19 113:8
118:18 120:16
121:13 122:14
128:10 131:10
136:21 143:12
144:15,20 147:16
154:3,10 155:2,21
156:8 159:4,17
166:2,6 172:13,16
174:14 187:15
191:10 193:6,15
200:3

## B

**Bachelor's** 9:21

**back** 10:17 12:25
13:5 14:24 18:10
20:10,21 22:15 25:16
26:7 28:6 29:7 30:12
31:21 32:5,16 33:4,
17 35:15 39:13 44:12
55:23 58:6 62:8
67:23 73:4 92:15
95:3 96:12 99:25
100:10,24 106:10


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

*i3*

App. Vol. XXIII, 225

107:19 114:20
117:16 121:23
125:22 127:13 128:1
130:13 132:11 138:4
144:22 148:24
157:25 159:13
174:22 176:11
177:10 178:10,23
193:17 194:2 195:11
196:13 200:25
203:14 204:24 207:1,
20 211:9 212:1

**back-up** 71:10,11,15

**background** 8:14
50:7

**bad** 84:20 131:24

**badge** 164:9

**balance** 27:8

**band** 51:16,22,25

**bands** 51:19

**Barber** 20:6

**barracks** 12:1

**Barton** 9:5 11:2,3,5
20:5

**base** 140:23

**based** 24:23 25:1
46:18,24 62:24 63:1
64:8,10 65:1,23,25
66:2,6,10 68:25 74:5
107:12 143:7 149:16
150:11 170:7 176:4,8
193:5,12 213:20

**basement** 44:3,17

**basic** 17:3 57:22
163:10

**basically** 58:23
80:21

**basis** 132:4 140:20
155:21 161:9 168:12,
14 172:10 174:9
186:20 187:8,18
193:11 201:19
216:16

**Bates** 39:17

**bear** 179:22

**began** 13:20 29:23
157:4

**begin** 34:25 131:14

**beginning** 22:4 23:4

**behalf** 36:5 54:24
205:15

**behave** 181:2

**beings** 156:18

**belief** 191:1

**believed** 214:22

**believes** 200:17
216:18

**belong** 60:25

**Bend** 9:8

**beneath** 209:11

**beneficial** 181:21

**benefit** 57:11

**bias** 173:9,12 174:8,
12 175:17,20 176:8

**bias-based** 174:6

**bifurcated** 65:6,15
70:5

**birth** 8:16

**birthday** 8:16

**bit** 8:1 9:23 19:8 20:5
35:14 41:17 53:9
59:19 67:23 98:6
106:21 144:22
149:17 178:3,4
215:14

**bits** 134:21

**black** 132:16

**blended** 19:9

**board** 60:14,19,20
61:3,4,5,6,9,10 62:3,
4,11 63:9

**bogged** 32:3

**booking** 118:17

**born** 8:17

**bottom** 185:22,23
186:2

**boundaries** 80:23

**boxes** 133:13 134:21

**branch** 65:18,19

**Branson** 36:21

**break** 6:23 7:1 39:5,8
73:1 117:9,12 178:9,
16,20

**Brent** 86:5

**briefed** 110:17

**briefly** 12:11

**briefs** 7:18

**bring** 92:19 100:10

**bringing** 97:20

**broad** 62:21 131:17
132:2,7 133:20

**broader** 140:23

**broadly** 62:19 143:8

**broken** 53:15

**brought** 33:17 92:20
110:9

**Bruce** 79:21 81:18
82:9,14,18,22 157:2
161:19

**Bruce's** 162:23

**budget** 15:22 78:19
123:6,12

**budgetarily** 123:1

**budgetary** 180:3

**build** 59:1 144:3

**building** 43:21,25
44:3,12 59:9 135:20
137:12 138:24 139:5
140:10,24 141:8
142:2 143:8,14,23
144:16 147:1 183:2
203:23 204:8

**built** 138:1 147:8
158:13

**Bureau** 9:19 47:7
52:24 64:6 68:6,16

**Bureau's** 65:7

**bureaucracy**

156:21,22 157:1

**bureaucratic**
158:12,16

**Butler** 14:12

**buy** 91:16 100:9,16
207:17

---

### C

**C-A-L-E-A** 157:8

**CAD** 46:11,20 47:14,
22 48:2,5,14 49:5,11
51:7 121:10 122:8
130:16,19,25 131:11
132:24 133:8,12
150:17 151:20
163:12,16 164:12,21
165:3,14 166:11,16,
17,25 168:8,16

**cafeteria-style**
73:23

**CALEA** 157:6,16
158:11,24 159:3,16
162:9

**California** 97:8

**call** 45:4 63:5 64:7
66:13 70:2 77:15
83:3 102:13 151:14,
20 166:16,17 211:21

**called** 28:12 35:7
49:25 54:13 58:19
61:16 64:9 135:1
150:23 157:6 198:7

**calling** 161:1 214:8

**calls** 46:14,16,18
166:20 214:25

**camera** 136:2 139:4,
5,7,11,19,21 175:1
217:11

**cameras** 138:8

**Camp** 12:3,4,6

**candidates** 76:1

**cap** 58:5

**capability** 126:2

**capacities** 88:19



capacity 14:22 85:2

capital 7:17 63:14,15 85:10

captain 17:25 20:14, 15 22:20 34:20 35:3 37:23 38:8 41:1,9 48:25 51:11 55:16 72:19 79:16 80:3 81:9 82:19 86:4,5,7 115:17,18,24 116:7, 10,20 146:24 172:10 188:6 190:22 191:2,4

captains 79:8

capture 122:24 123:18,22 125:7 139:5,8 149:25 174:19,21 180:7

captured 135:5 148:2,4 164:11 165:15 169:10 172:4

captures 149:11 184:21 217:11

capturing 169:22 174:17

car 33:17 103:12,13 119:22 135:24 139:17 190:15

carbon 29:19

care 45:6,7 69:15 78:23 79:9 80:18,25 183:1

career 11:20 13:20 17:15,23 24:16 36:3, 8 75:2

careers 36:9

carried 78:10

carrying 119:24

cars 101:20 139:19, 20 182:1,4

cartel 208:25

cartels 207:19

case 4:7 8:2 15:9 25:25 29:10 67:7 86:17 88:6 94:2 108:18,20 109:8,16 110:5 112:21 113:2,

14 117:6 118:14 128:24 135:20 141:9 142:19,23 143:9,15 144:4,17 152:18,21 154:18 166:1 170:15, 16 176:20 182:17 183:14 206:8

cases 78:16 142:3,24 156:6 167:16

cash 145:16

catalog 74:1

categories 27:19 28:13 62:12,16 67:19,21 73:12 82:4 168:1 193:13 213:8, 11,16,23 214:4

categorize 46:16

caused 164:18

causing 99:15

caveat 160:2

cellular 33:21,24,25 34:2

center 35:4 37:23 38:1,23 42:11 43:16 44:4,20 45:5 52:19 57:10 88:25 149:25 166:15

centered 85:14 113:14

central 32:1 43:3 44:2 80:21 81:23

chair 51:12,15,16,17

Chalmers 4:13 90:1 93:14 96:6,20 97:23 109:18,22 115:4,12 128:18 131:19 132:8 133:19,24 134:3,23 137:4,15 140:25 141:13 142:5,12 144:18 150:8 152:15, 19 154:1,8 156:24 160:10,25 169:4,15, 24 171:13,16 177:2,8 178:12 181:4,7 183:21 184:4 195:9, 19,21 199:16 201:8, 17,22,25 203:1 204:1,18 205:23

206:18 208:7,10 210:15 213:6 214:7, 24 215:25 216:12 217:17 218:6,8

chance 6:18

change 17:10 24:24 29:10 30:19 34:22 108:2,4,8 109:15 111:12,22 115:21 127:17 150:20 156:14 158:20,21,22 182:8,15,16 187:22

changed 25:17 28:5 29:8 52:25 81:15 110:23 115:7,10 128:15

changing 29:17 149:13

characteristics 98:22 149:24

characterization 90:4 98:1,4 199:15

characterize 14:16

charge 40:1 68:18 116:8,11 145:7

chart 39:21,24 40:1, 19,24 55:24

check 57:6 102:5,6 134:21 138:23 141:7 150:16 179:22

checking 133:13

chief 61:18 74:8

child 36:20

chunks 192:13

Circuit 108:21 110:7 113:6,9

Circuit's 110:10

circumstance 35:24 212:4 213:4

circumstances 194:16 195:25 200:15 202:23 204:11,12,13 205:2,8 207:9 209:19,22 211:20 212:25

citation 119:13 148:19,24 151:25 152:2 153:4,6,16 164:10 166:13 178:1 184:21

citations 28:8

cited 84:23 191:7

citizen 24:23,25

citizens 25:2 186:7 207:14

citizenship 187:7,16 191:24 192:24

civic 23:20

civilian 38:20,22,23 78:3 81:6

civilians 40:20,21 81:8

CJIS 37:10,17,18 38:1,18,20 40:13 42:16,19 52:9,10,11, 20 53:4 54:14,22 55:3,6,8,23 59:17,19 60:4,18,21,22,24 65:4 66:20 69:4 101:3,8,18 102:9,19, 23 103:3 104:5

claim 93:18 197:3,14

clarify 30:13 42:23 87:13 148:22 175:10 184:12

classes 116:23,25 117:2,3

clear 6:14 50:19 81:21

clearance 12:2

close 117:10

closely 41:21,23

coach 201:13,15

coffee 89:3

colleagues 61:21

collect 64:18 148:13 149:5,21,22 150:14 153:7,12,15 163:7,18 164:8,14,17 165:5,8, 17 167:2,6 173:25



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

i5

App. Vol. XXIII, 227

177:12

collected 66:17
149:13 150:4,7
165:12,13 166:8
177:12,13 178:5,6

collecting 101:4
148:17,20 150:20
155:10 163:22
165:24 166:3 176:25

collection 181:1,24

collects 47:8 66:10
69:2

college 9:1,3,5,16
10:9 11:2,10,15
126:21

college-like 73:22

colonel 77:5 78:6
79:16,21 80:3,7
82:18 83:3,8,15 84:8
85:3,6 108:1,8
110:15 112:3 116:14
122:10 157:2 161:19
162:16,23 184:5
216:22

colonels 111:9

color 125:25

Colorado 89:13
95:22,24,25 96:5,19,
23 97:3,7,8,19 99:6,
10,23 100:8,17,22
185:10,14 189:6
199:6 206:8,13
207:11 208:14,15,18,
21,24 211:6 213:2

Columbia 210:6

column 209:12

combination 210:3

combined 25:7

command 111:5,7,8
112:6,11 114:11,24
122:14,18 123:8,10,
15 124:2,12,19,22
125:2,14 130:8,16,20
143:21 146:18 161:6,
9,10,20 162:11 175:5
180:1 213:14,15
214:2,21 215:1,19

commander 40:9
41:14 45:16 47:24
48:22 54:6 55:21
85:12 112:1 115:15
130:14 161:11 191:5

commands 80:17

commenced 4:1

commercial 51:25

commission 157:12

committing 95:4
194:3 207:3

communicate 33:15
56:17 66:1 69:18
70:14 71:2 85:5
197:5 199:2

communicated
33:19 66:5 68:19
84:9 85:8 108:10,22

communicating
109:15

communication
42:10 47:15 49:11,16
69:6

communications
35:4 37:9,23 38:1,16,
19 40:13 41:4,12,19,
22 42:11,18,22 43:3,
11,16,20 44:4,14,20
45:5 47:18 51:4 54:7
74:12 79:4 107:14
166:15

community 9:5 10:9
11:2,10 27:23

company 61:15
77:24

comparatively
15:20

compare 198:18

complaint 179:12,15
197:25 198:7

complaints 24:23
25:1,15 26:2,5
121:25 143:16 151:2
164:3 174:5 176:5,9

complete 6:3,24
28:23,25 49:12
105:1,15 147:11

150:22 175:22 218:1

completed 49:14,16

completing 28:19

complex 47:25 48:2
63:3

complicated 70:5
72:3

comply 146:21
158:10 187:23

complying 188:1

components 33:12
95:18

compound 214:9,25

comprised 122:7

computer 31:12,16,
23,25 32:12,17 33:10
44:24,25 47:13
105:9,14 106:18
119:22,25

computer-aided
47:12

computer-assisted
46:6,10,11

computerized 29:20
31:6,9 32:8 105:11

computers 29:20
30:5,7,19,21 31:4,20,
23 33:15 101:5,9,20
105:23

computing 32:15

concern 100:5

concerned 86:16

concluded 185:21
218:12

concludes 217:23

conclusion 162:12,
13

conduct 24:23 89:16
153:8 170:18 186:12
191:11

conducted 167:4
200:11 201:5 202:15

conducting 89:11
143:24 170:21

193:10 213:16

confident 120:14
148:5 189:10

confine 184:10

confirm 140:12,14
214:2

confusion 178:4

Congress 58:25

congressional 59:2

connected 60:18
86:24

connection 70:3,11
71:5,6,11,12 72:10

connections 53:22,
23 56:14 70:11 71:8

connects 70:22

consent 105:20,24

consideration 62:4
91:1

considered 89:18
128:2 196:16 200:10
201:4 202:14 216:20

consistent 191:1
192:1,20

constant 182:14

constitute 53:3

constituting 200:19

Constitution 113:10

Constitutional
144:12

constrained 23:14

constraints 180:3

construed 154:21

contact 27:14 42:10
46:24 69:14

contained 129:15
136:10 178:2

contemporaneous
216:4

contents 127:7

context 189:20



**continuation** 212:6

**continue** 116:21

**continued** 212:5

**continuum** 30:25

**conversation** 92:16
111:6 181:18 189:21
197:5 201:14

**conversations**
122:11 125:5,11,18

**conveyed** 150:2

**COO** 77:24

**cooperate** 99:19

**copies** 121:20

**copy** 93:4,11 94:14
184:25 218:9

**Corps** 10:11,15,20
11:9,20,23

**correct** 5:16,17 7:20
8:5,22,23 9:7 13:1,
21,24 15:12 18:4
19:1 21:5 23:6 24:11
26:10 27:17,20,25
28:3 32:18,19 33:9
34:20,23 38:13 40:2,
10,13 43:1,12,13,22
45:21 46:21 48:3
49:10 56:3,4,18,19,
23,24 60:11,14
63:12,15,22 64:4
68:21 69:18,21,22,25
70:23,24 71:3,22
73:8 77:5,10 79:18
82:12,17,24 85:3
86:1 88:14 89:25
90:12 91:13,17,23
93:19,22 94:18
95:11,18,22 97:4
99:1,7 102:21
104:13,18 105:5
107:16 109:21
110:11,20 111:15,16,
23 112:7 113:4,22,25
114:3,8,10 115:11
117:22 118:1 119:19
120:4 121:4 127:24
128:16 133:10,14
134:25 137:14
138:15 139:9,10,13,
14 140:20 141:12

142:10 144:10 145:1,
17 146:9 150:21
151:22 159:25
162:25 164:12 165:3,
4 166:23 167:13
169:11 170:23
172:19 174:10,11,21,
22,24 175:2,3,11
176:6 177:1,6 180:4
182:1,23 188:14
193:2,8,23 194:5
197:8 198:4 200:13
201:7 202:17 203:24
204:3,17 205:6,22
206:16 208:9 209:4,
18 210:7 213:24
214:1,23 218:3

**correctly** 46:17
186:16 187:13

**corroborate** 217:3,9

**corroborates** 217:6,
12

**counsel** 4:8 7:3
72:13 85:11 88:14,20
96:8 110:18 111:5
112:16 113:7 114:16
120:23 129:25
132:11 134:5 137:16
143:18 147:20
151:13 202:24
212:18

**Counselor** 180:9

**counted** 66:23

**counties** 20:1,5,8

**country** 47:9 52:17
54:22 57:12 59:11
61:21 64:17 70:17
75:10 91:7 95:1
193:25 195:14 196:9
198:22 206:25

**County** 9:5 11:2,4,5
14:10,12,23,25
19:24,25 20:1,5,6

**couple** 12:4 25:17
35:19 44:24 55:4
61:1 68:17 81:14
88:19 128:1 150:11
171:25 185:23
190:14 193:17

**courses** 73:24 74:2,
3,4,12 76:3,5,7,11,
14,24 144:1

**court** 4:3,16 6:9 7:24
84:24 112:22 113:2
138:10 144:5 185:13,
17,21 186:10 210:2,
9,22,24 212:3,12,19

**Court's** 211:16
212:24

**courts** 29:9 105:14
119:16

**cover** 62:12 73:12

**covered** 9:24 73:13
80:15

**covering** 38:1
131:18

**Cowley** 11:4 14:12

**crawler** 183:10

**create** 64:20 169:2
209:23

**created** 18:15,17
62:11 63:9 97:2,3
107:3

**Crime** 52:18 57:9

**criminal** 17:4 21:2
34:18 35:7 52:11,13
58:13,24 59:12
64:21,22 68:14,20
71:25 72:1,3 74:13
76:15 85:12 86:17,
20,21,22 88:21,22,23
120:12 126:17,23
186:12 190:6 191:6
203:14

**criteria** 23:3,8,11
24:18 25:7

**cross-recorded**
48:15

**CSO** 55:1 60:25
61:16 65:5 70:15,19

**CSOS** 54:22

**current** 5:2 84:4
123:23

**curriculum** 73:23

**D-E-X** 63:15

**D.C.** 12:1

**daily** 27:14 42:8,12

**data** 32:19,21,25
47:14,17,22 48:2,5,
14 49:3 50:3 51:5
53:17,18 56:8,12,20
58:13,16,23,24 59:7
62:12,16 64:18,22
66:4,9,16,19 67:13,
14 69:6,20,23 70:7
101:4,5,9,19 102:20
104:4,17,19 106:17
118:17,20 119:3
120:17,20,22 121:2,
15 122:19,22,23
123:18,21,25 124:24
125:3,6,9,15,20,24
128:1 130:5,17,20,25
131:4,18 132:3,7
133:2 135:3 146:25
147:3,6 148:1,6,8,13,
16 149:5,12,21
150:4,6,20 151:7
153:1,3,5,12,15
155:10 156:13
160:23 163:2,10
168:8,16 169:14
170:25 171:11,20
172:3,11,22 173:2,7,
24 174:1 175:13,23
176:25 179:1,13
180:6,21 181:1,23
182:8 214:5

**database** 68:5
119:5,15 121:17,24,
25 146:8 147:2,10

**databases** 102:10,
18

**date** 8:16 45:19
164:15

**David** 12:3,4,6

**day** 11:22 26:25
27:16 77:15 83:7
100:13,14,16 107:18
111:3 141:21

**day-to-day** 141:17



**days** 20:21 22:16 25:16 28:6 29:7 30:12 31:22 32:5,20 41:5 44:12 45:1,10, 13 46:1,2 58:6 69:2 102:14 127:13 139:18

**deal** 70:17 78:18 170:16

**dealing** 41:18 92:2

**dealt** 56:11,13 189:21

**death** 168:3

**debate** 210:22

**debrief** 112:15

**decades** 28:6 178:1 182:11 211:1

**decide** 152:14

**decided** 18:14 108:20 115:11 116:11

**deciding** 26:18

**decision** 110:10,20, 24 111:22 112:3,10, 15 113:9,11,22 114:1,5,12,25 126:11 162:9 185:2 187:20, 24 191:19 192:3,10 209:9 210:1

**decisions** 70:9

**declaration** 190:23, 24 191:18 192:9

**deem** 73:24

**deemed** 157:22

**defendant** 67:9,13 140:14 217:6

**defendants** 4:14 8:2 99:18 105:21

**Defensive** 117:2

**define** 47:4

**defined** 47:10

**degree** 9:12,16 11:4

**delegation** 55:19 79:8

**delivered** 84:5,6

**demonstrated** 212:4,25

**department** 10:13, 18 13:6,9 103:12 104:2 119:9 130:9 146:23

**departments** 52:16

**depend** 131:20

**depended** 27:12 31:2

**dependent** 160:8 167:18 175:6

**depending** 167:16

**depends** 149:6 175:13 204:10,12 205:7

**deposition** 4:1,7 5:5, 9 7:15 8:8,11 9:25 39:16 189:4 217:23 218:1,12

**depositions** 5:11,15

**describe** 33:1 44:20 52:10 58:21 90:18 99:14 101:23 196:7

**describing** 55:14 196:8

**description** 13:15 41:8 184:19 188:25

**designated** 83:18

**designates** 54:15

**designed** 179:1,4,7

**desire** 73:25 112:18

**desk** 32:17

**destination** 191:23 192:14

**destinations** 119:15

**detail** 12:12,25 15:10,17 16:17 17:18 19:6 134:15

**details** 134:16 135:8

**detain** 186:21 187:18 191:12

**detecting** 174:18

**detention** 187:8,10

**determine** 7:22 139:2 140:16 141:11, 18 142:1,19 151:4 155:12 163:3 170:20 173:16,18,20 179:14

**determined** 114:1, 13 115:1 135:11

**determines** 15:25

**determining** 89:15 174:15 200:10,16 201:4 202:14

**develop** 62:2

**developed** 61:25

**developing** 31:22 61:25 146:25 147:18

**device** 59:14

**dictates** 113:21

**difference** 63:24 177:17,21 202:6

**difficult** 75:8,12 171:5,7

**digital** 105:14,16,22

**digiticket** 184:14,17, 22

**digitized** 106:8,11

**direct** 42:9,10 147:16

**directives** 78:9

**directly** 33:15,19 69:17 70:14 78:7 79:7,9 151:23 179:2

**director** 54:24 62:7 182:25

**directory** 60:21

**disagree** 153:2

**disapprove** 61:11

**discharged** 10:16

**disciplinary** 21:19 78:15

**discrete** 134:21

**discuss** 22:17 61:1,

22 85:18 122:19 124:23

**discussed** 112:11 123:15 161:20,24 193:4

**discussing** 73:12 112:17 123:11,22 124:19 212:2

**discussion** 84:2 95:22,23 112:2,14 161:6 180:25 181:11, 16

**discussions** 42:4 122:21 123:17 125:2, 8 147:2 161:9,12 180:2,16

**dispatch** 38:21,23 43:15,17 46:6,10,11 47:12 149:25

**dispatcher** 44:21 102:13 103:14,19 133:4,9 164:23

**dispatchers** 46:13, 15,17 52:21 103:25

**dispensaries** 207:21

**dispensaries.'** 185:16

**displayed** 190:5

**disproportionate** 153:19,25 154:6,13, 21,25

**disseminated** 108:3

**distinction** 56:5,10

**distribution** 127:22 128:24

**district** 29:9 210:5

**ditch** 127:7,9 128:12

**division** 22:21 142:14

**divulge** 164:6

**document** 39:18 135:10 187:21 198:6 210:18

**documentation**



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

i8

App. Vol. XXIII, 230

104:17

**documents** 92:19 94:1 198:3

**dollar** 145:6,12

**dollars** 180:24

**door** 207:20

**download** 33:17

**dozen** 35:8

**drew** 126:5 181:13

**drifted** 149:17

**drills** 12:21,23

**drive** 5:3 100:7

**driver** 104:9 136:11, 12 149:15 200:12 201:6 202:16 203:12 208:5

**driver's** 102:4 103:6 104:23 150:14 191:22,23 192:14,24

**drivers** 97:18 199:5

**driving** 45:8 50:14 97:13

**drug** 100:21 196:15

**drugs** 126:12,13 129:17 207:12

**drunk** 45:7 50:13 104:9

**DUI** 32:7 104:25 156:2,3

**duly** 4:19

**dumping** 127:7,9 128:11

**duties** 12:11 14:17 17:10 26:22 28:20 37:18 41:8 77:20 78:24 80:10 87:23

**duty** 10:24 11:17,21 14:8,20 33:3 34:22

**dynamic** 211:25

**dynamics** 127:17 128:15

### E

**e-citation** 119:5,7,11 121:16 122:8 184:13, 18,20

**earlier** 84:22 101:25 108:17 127:23 129:20 141:15 148:18 161:13 169:9 170:4 179:25 180:9 191:6

**early** 11:20,22 30:6 32:20 35:15 36:12 38:2

**easier** 64:15 171:11

**easiest** 45:4

**easily** 31:21

**east** 31:4,5

**eastern** 37:3 80:24 81:25 100:6,11

**easy** 171:3

**edible** 96:22

**edibles** 98:10 99:24

**education** 8:19 9:15 10:5 27:23 73:7 182:25

**educational** 24:8 27:5

**effect** 190:8 194:22

**effective** 160:24

**effectively** 46:13

**effectiveness** 155:4,17,23 156:3,9

**effort** 87:22

**efforts** 87:9,10,14,18 88:7 175:20

**electronic** 108:13 147:8 148:6 184:20

**electronically** 107:21 108:3,11 119:12,14,18 150:22 167:10

**element** 66:19

**elements** 28:15 143:1 175:23 179:9 214:9

**elevate** 17:22

**eligible** 18:3

**eliminate** 18:14

**employed** 79:20 182:20

**employee** 22:3,8,17

**employees** 35:5,9 38:20,22,23 44:14 42:7 75:18,23 78:5 81:6 130:19

**employment** 9:18 11:7 182:23 183:7

**empty** 82:23

**EMS** 52:7

**enables** 46:12,17

**encompassed** 75:18 80:16

**encompasses** 74:11

**encounter** 167:7

**end** 20:13 166:20 189:11

**endanger** 162:6

**ended** 12:22 20:4 36:21 44:16 59:18 80:2 166:17

**energy** 127:3

**enforce** 54:16

**enforcement** 5:12, 16 13:17 14:16 15:5 17:4 21:2 23:14 28:16,20 34:11,13, 17,18 37:2 47:1,9 52:15 53:13 56:21 57:12,25 58:11 59:10,21 60:23 101:15 121:7,14 130:10 136:9 145:4 146:10 154:14 156:3 157:11,13 175:25 179:2,5 181:2,24 182:7,9,14

**enforcing** 170:10

**engaged** 186:12

**enjoying** 183:11

**enlighten** 113:7

**ensure** 15:23 16:1 41:14 53:23 78:9,21 156:22 160:24

**ensuring** 12:13 41:24 54:8 147:20

**entailed** 13:16 14:11 15:17 21:11,16 101:21

**enter** 103:20

**entire** 42:5,14 54:12 65:13 80:15,17

**entitled** 93:16

**entity** 70:16 72:5 157:5

**entries** 51:7

**equally** 53:9 160:17

**equipment** 21:14 41:19 42:15 44:20 91:15 117:3,4

**essential** 121:6

**essentially** 61:11 73:22 74:6

**established** 191:20 192:11,23 193:3

**ethnicity** 163:19 171:24 173:16,20,25 174:4,6 176:19,25 177:12,13,17,24

**ethnicity-biased** 176:22

**Etran** 218:7,8

**evaluate** 25:13

**events** 44:8 140:14

**eventually** 22:19 49:2 59:10 74:8 112:22

**evidence** 156:25 158:21,22

**examination** 4:21



184:3 199:20 202:3

**examples** 150:11 171:25

**exceptions** 212:13, 14

**excerpt** 197:25

**Exchange** 58:23

**excuse** 14:6 30:20 33:2 117:11 196:3,8

**execute** 36:4

**execution** 35:21 36:7

**executions** 36:1

**executive** 9:18 10:1 65:18 73:19

**exhibit** 39:10,16 55:23 93:5,6,9 94:9 99:5 117:19 184:1 185:1 188:22 193:17 194:9 195:19 196:25 197:21 198:18 206:4 209:9

**exhibiting** 194:20

**exhibits** 39:3 218:9

**existed** 40:1

**existence** 160:9

**expand** 197:8

**expect** 24:10

**expectation** 25:11 94:25 193:24 195:13 198:15,21 206:24

**expectations** 22:5 199:4

**expected** 23:19 26:23 217:21

**expenditures** 78:18

**expensive** 180:22

**experience** 149:16 156:12 157:20 165:23 170:3 174:4 179:1,7 182:7 210:24,25 211:23 215:6,8

**experimented** 120:7

**expired** 190:4

**explain** 90:23 149:7

**explained** 134:4 189:5

**explanation** 94:25

**explanations** 27:1

**expressing** 188:19

**extend** 191:21 192:12

**extending** 193:11

**extent** 92:17 159:7

**extracted** 147:6

**extraction** 148:8

**extraordinary** 212:4,25 213:3

**extreme** 194:20

**extremely** 171:7

**F**

**face** 184:25

**facets** 89:19,20

**facility** 12:14

**fact** 45:1 57:12 97:3 103:25 117:21 125:23 135:14 143:25 157:3 161:20 162:8 169:9 173:10 180:25 181:17 186:13 187:25 194:25 196:24 197:8 206:13,14,23 207:24 208:2,13 211:13 212:6 215:10,21 216:11

**fact,'** 94:24

**factor** 93:17 145:22, 23 189:7 190:4,15 192:24 193:5 196:18 197:1,6 200:8 202:6, 22 203:6 206:15 207:6,8

**factoring** 154:23

**factors** 26:17 126:24 128:25 145:24 146:4 173:5 176:5 194:17 195:1 199:24 200:10, 21 201:4 202:7,14 203:7 209:22 210:3, 12 211:22 215:9 216:19,24

**facts** 156:25

**fails** 71:12,13

**fair** 15:3,7 25:7,8 30:10,21 35:25 43:14 46:3 49:6,15 57:23 87:1 96:5,19 97:14 111:21 114:12,25 116:7,9 122:5 125:17 127:4 138:16,19 143:19,24 144:5 148:7 155:9,10 160:1,7,20 167:19 168:15,23 169:13 170:24 171:10 172:1 176:16,18,23 199:11 203:17,20 205:12,14, 18

**fairly** 5:18 16:5 39:23 47:11 75:21 109:8 148:4

**fall** 10:3

**familiar** 5:18 35:22 46:7 48:7 92:12 105:20 110:12 113:5

**family** 15:24

**fashion** 31:4 184:24

**favor** 181:19

**FBI** 54:15,22,24 57:11 59:1,9,19 60:14,18,21 61:22,24 62:6 64:9 69:10 70:14,15 71:23 72:10 73:7,15,18 74:4 76:20,21

**FBI's** 54:13 75:4

**February** 15:10

**fed** 49:4 51:9

**federal** 9:19 54:16 59:4 64:14 145:4,20, 25 146:5

**feed** 64:13

**feeds** 121:10

**feel** 206:11

**fell** 67:4

**felony** 53:3 98:20 128:22

**felt** 25:24 65:10 79:23 125:6 135:8 188:1

**fiancée** 182:25

**field** 11:23 17:2 30:18 31:8 32:15 34:7,16 44:1 76:15,18 80:13 106:6,19 107:4 126:11 133:2,7 181:3,25 182:10

**fields** 123:25 132:21 135:3,6 146:25

**figure** 136:17 145:6

**figured** 32:3

**filed** 7:23 112:21 198:1,3

**files** 53:6 54:18 57:15 58:15 103:6 121:19

**filings** 84:24

**fill** 31:24 32:16 104:25 119:13 133:18 134:20 135:11 149:10 150:20 151:23,25 152:1,2,14,22 156:13

**filled** 135:14 147:24 148:9 167:12,14 168:5

**filling** 32:9 106:5 119:19 152:11

**fills** 119:17

**finalized** 113:20

**find** 57:8 175:5 189:25 197:22

**finding** 192:4

**findings** 59:3 210:23

**fine** 201:10

**fingerprint** 63:5,6 65:24 69:1



finish 107:23

Finished 89:2

fire 52:7

firearm 181:13

Firearms 117:3

firewalls 53:25

fit 79:23 98:22

fitness 74:14

flat 149:10

floating 214:10

flow 69:20

focus 16:12 86:22 97:21 126:19

focused 102:19

focuses 191:8

focusing 127:3

folded 185:1

folder 92:22

folks 65:7 66:20 132:1

follow 113:21 117:19

follow-ups 199:19

footnote 198:19

force 167:7,10,12,19, 22,24 168:6

forfeiture 88:21 90:25 91:2,8

forgot 11:1 182:19

forgotten 45:9

form 22:15 54:23 90:5 96:6 97:23 118:16 133:9,17,25 134:4,14,19 137:4,15 140:25 141:13 142:5 144:18 147:23 148:9 149:10 150:22,25 152:1,14,20 154:1 156:24 167:11,12 168:6 169:15 173:24 175:22,23 204:1 206:18 214:24 216:12

formal 8:18 9:15 10:5 73:7 83:9

format 105:15,22

forms 29:19,20 31:25 32:7,8 102:1 105:11, 12,21 135:4 140:5 147:8,19 151:4,6 152:11 156:13

formulated 61:13

formulating 134:10

forwarded 126:15

found 126:12 127:2

foundation 109:18, 22 131:19 132:8 133:19 134:23 144:19 152:15 169:4, 24 216:13

fourth 194:10

frame 19:18 22:1 32:24 35:16,22 36:14

frankly 79:7 159:19

free 133:9,17 134:19

freeways 87:20

frequency 51:16,24

frequently 36:10

fresheners 194:17, 18

front 44:21 92:22 93:10,12 94:9 117:19 185:4 206:4 209:3,9

full 19:12 119:24 120:1 189:24 209:11

fully 31:6,9

function 142:17

funds 91:21

future 62:9 113:11

---

### G

gain 109:9

Gant 81:17

garner 125:24

gather 130:10 142:24

gathered 163:15 170:25 171:12

gathering 136:22 160:23

gave 85:1,6 89:6 90:9 102:9 110:7 193:18 194:5 205:16,19

gender 163:9

general 13:17 14:17 16:5 21:23 65:19 87:17 91:22 118:6 126:25

General's 4:14 112:18

generalize 77:21

generally 21:2,12 23:8 24:2,15 25:20 29:16 40:4 41:8 42:13 43:6 47:2,10 50:3 61:17 86:16 91:14 114:9 123:14 124:15 135:3,16 145:5 148:13 156:17 172:8 175:4

generated 105:22

generating 26:5

generic 184:18

gentleman 81:16

geographically 83:24,25

get all 103:15

ginormous 58:23

give 13:15 21:23 23:19 27:15 41:7 85:21 98:3 101:12 106:23 134:21 149:20 151:21 152:4, 8 201:10 210:17

giving 5:19 24:7 28:11 84:7 85:2 183:13 188:19 191:10 193:23 208:1

Global 124:4,11,14

goal 25:4,7 64:12 75:17,23,25

goals 23:17 24:18,24 144:2

good 4:2 6:18 27:4,5 39:4 41:15 121:5

goodness 74:14

gosh 19:13

governing 61:23

government 91:4 122:25 146:5

governor 15:24,25 16:13 65:18

governor's 15:1,10, 17 16:17

governors 15:19 17:12,18 19:6

grab 89:2 155:8

graduate 8:24

graduated 8:19 10:8 14:9

great 5:24 9:8 26:21 78:18 98:17

Greathouse 4:10,11, 22 39:1,14 60:7,9 68:9,12 72:23 73:5 89:1,5 90:6 93:8,11, 15 96:9,12,24 98:2 109:20 110:3 114:20 115:8,14 117:8,17 128:19 131:23 132:9, 23 133:22 134:1,7,24 137:7,9,20 141:4,20 142:8 143:4 144:21 150:18 152:16,24 154:4,11 155:7,15 157:7 159:12,21 160:16 161:4 169:8, 20 170:1 171:14,19 177:6,15 178:7,15,24 179:20,24 181:6,9,22 183:17 195:5,8,16,20 199:18,21 200:22 201:12,21,24 202:1, 4,9,21 203:3,5 204:5, 23 205:10 206:1,19 208:8,22 210:19 214:16 215:5 216:1, 23 217:16,20,25 218:5,10

11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850

**ground** 16:4 44:13

**grounds** 165:6

**group** 43:20 47:15
51:5,12 60:19 61:14
75:5

**groups** 23:20 60:25
61:2,13 62:1 63:8

**grown** 211:7

**guess** 44:9 45:4
64:11 73:25 82:21
87:12 98:6 113:5
121:341 141:2 156:15
163:25 171:17
177:20

**guesses** 12:9

**guessing** 64:25

**guilty** 152:11

**H**

**H-O-G-E-L-I-N** 86:5

**half** 20:4

**hand** 59:19 65:6,7
162:4,8,9

**handcuffing** 167:21

**handful** 65:14

**handling** 114:14
115:2

**handwritten** 105:17
106:14

**happen** 36:6,7,9
107:19 109:16
152:12 180:4 207:25
208:3

**happened** 19:13
77:18 113:12 138:11
146:15

**happening** 87:19
112:14 174:9

**happy** 164:6 192:8

**hard** 6:9 72:12 131:8

**hardware** 57:10
70:22

**Harper** 19:25

**hate** 156:14

**head** 54:2 65:8
122:13 124:17 139:9
147:17

**heading** 188:25
199:5

**headquarters** 22:20
43:24 44:1 50:1

**hear** 47:5 96:8
188:16

**heard** 46:5

**heavily** 113:15
185:14

**heavy** 33:3

**held** 69:6 191:4

**helped** 171:21

**helpful** 126:3,4,6
181:13

**helping** 54:23

**helps** 54:16

**hey** 69:14 77:16
103:13

**hide** 162:1

**high** 8:19,21 9:15
11:14 26:2 51:25
126:20 159:8

**higher** 9:22 27:9 61:5
128:23 167:16

**highway** 7:4 11:7
13:20 18:10 25:18
36:3 42:1,6 43:18
45:5 52:1,15 69:24
71:2 74:9,24 77:9,22
78:22 83:20 86:8,15
87:3,19 88:24 89:10
104:9 105:11 107:10
108:9 184:5,17
186:19 187:16,22
188:20 190:20
192:18 207:23

**highways** 87:4,20

**hire** 183:3

**hired** 13:6

**hiring** 78:15

**history** 41:4 72:1

**hit** 66:19 102:10
119:13

**Hogelin** 86:5 146:24
172:10 188:6,12
190:23 191:2

**hold** 50:4

**holds** 50:3,9,11,12,
13,18,25 51:1 53:1
70:6

**holiday** 156:1

**home** 10:17 185:15

**hometown** 10:18

**honest** 194:19 215:7

**honorably** 10:16

**hooked** 33:12

**hope** 78:24

**hoped** 180:17

**hoping** 72:14

**host** 53:25 54:17

**hosted** 9:19

**hotline** 45:7,8

**hotlines** 45:3

**hour** 39:3

**hours** 141:10 172:18

**house** 72:5

**housed** 52:24 65:21
68:5 70:4 71:11

**houses** 43:25 64:9
72:5

**how's** 147:3

**HP** 134:14 135:1

**huh-uh** 6:8

**human** 22:21 86:23
156:17 214:13,14

**hundreds** 99:11
180:24

**Hutch** 19:15

**Hutchinson** 17:1,7
19:17,19 30:24
31:13,19 34:14

**hyphen** 63:14

**hypothetical** 150:9
161:1 171:17 216:7,
13

**I**

**ID** 103:22

**idea** 88:5 154:18
203:21

**identifiable** 148:20

**identification** 39:11
71:20,24 93:7 103:17
184:2

**identify** 170:13
172:21

**identifying** 151:15
173:24 216:25

**ignore** 94:24 206:23
207:24 208:3,13,14,
16,20 212:16,20

**III** 71:25 72:7,9

**illegal** 86:24

**illegally** 97:20

**imagine** 64:16 66:12
81:2

**immediately** 146:6

**impact** 17:15,18 42:6
107:15 111:10
154:13 181:1

**impacted** 108:9
181:24 182:9

**impacts** 153:19,25
154:6,25

**impaired** 136:11

**implementation**
49:11 59:20 62:7

**implied** 105:20,24

**importance** 200:8

**important** 59:21
102:2 135:9 157:3,14



160:15,17 161:3
199:23 200:16

imposed 113:6

impossible 214:13

improper 185:24
186:10

improve 24:3

improvement 24:4,
6,10 25:12

in-car 25:18

in-service 107:24
108:15,22 109:12,17,
25 116:21,24

in-state 154:20

inactive 12:22

inappropriate 57:23

inartfully 82:22

incarceration
118:20

incident 46:24,25
58:13 62:24 63:1
64:8,10 65:1,23,25
66:1,6,10,13 67:10
68:25 106:16 107:11
118:10,13 132:5,20
134:16 143:7 168:12,
13 174:9

incident-based
46:21,22 47:4,6,8,11
50:11,12 63:4 64:3,
13

incident-by-
incident 132:4
140:19 155:21

incidents 104:6
143:16

include 24:19 42:1
52:5 150:3 194:17
203:22

included 195:1

including 59:4 207:6

inclusive 97:8

incomplete 150:8
160:25 216:13

inconsistent 193:14

incorporate 122:3

incorrectly 190:5

increase 156:22

inculpate 186:13

independent 109:3
217:9

independently
22:10 140:15

index 60:6 63:17,19
71:20,24

indicating 130:3
173:23 211:17

indicator 26:21

individual 36:8
54:15,20 59:6 70:18
74:2 131:21 147:17
148:21 151:15
155:17 186:11 210:4

individualized
165:6

individually 85:16

individuals 61:20
72:1 74:25 75:6
127:6 142:3 177:23
211:1

infantry 11:21,22

inform 122:16

information 8:14
15:13 29:8,12 31:24
35:7 47:8 52:12,13,
19 56:21 57:10,20,21
58:8,16 59:5,7,11,12,
13 61:8 62:23 64:14
66:23,24 67:8,9,10
68:8 72:17 73:11
84:13 99:20,21
102:11,14,16 103:10,
15,20,23 105:16,17
108:13 118:7,23,25
119:18 120:9 129:15
133:10,16,18 134:20,
22 135:20 136:3,14
147:9,21 148:20
149:12,23 150:1,3,
15,16 151:15,16,20,
23 153:8 159:24

160:3,4,5,9,13,15,17
162:2 163:8,11,19,22
164:7,8,15,17 165:5,
8,17,24 166:4,8
167:3,7 169:21 170:8
175:6,12 176:2
177:22 178:2,5
181:13,21 190:6
197:17,18 213:8,12

informed 111:8

inherits 55:17

initial 164:22

initially 18:9 32:14

initiating 166:14

initiative 109:5

injury 168:3

innocent 210:3,12
211:22

input 51:5 59:20
62:12,23 102:24
103:8,10 104:5
106:18 119:10

inputting 102:20
104:1,16

inquiries 59:3
104:12

inside 17:21 32:17
39:21 49:19 101:12
132:2 147:5 158:13
172:18

inspections 28:9,10

installed 33:14

instance 205:9

instances 182:13

instantaneously
104:21

instructed 53:17

instructions 187:23

integral 72:9

intelligence 59:13,
14

intend 207:15

intended 59:14

intent 208:5

interacted 176:20

interacting 26:3

interaction 25:14
134:10 166:18,21
205:12

interactions 122:7
138:21 140:4 164:22

interchangeable
83:12,13

interdiction 21:7
85:12,25 86:8,13,14,
17 87:2,9,10,14,18,
22 88:1,7 120:12
126:17 172:14,19
191:7 199:23 200:4,9
201:3 202:13 203:10,
14

interest 98:7,17
109:5 125:24 126:20
138:20 144:11
161:13

interested 91:20
98:9 161:16

interesting 44:9
157:19

interestingly 11:19
18:8 151:2

interface 147:3

interfaced 107:11

interfaces 147:19

interfering 202:2

internal 76:25 78:16
110:23 121:24
139:19,20 142:13,18,
21 143:5,6,13 159:20
161:11 179:11 216:2

internally 159:22

international 74:17

internet 49:21 76:8
93:1 161:23

interpretation
199:12

interrogation 76:23



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

i13

App. Vol. XXIII, 235

**interrupt** 179:18

**Interstate** 71:20,24

**interview** 84:7 85:1,
7,13,16,20 88:14
89:6,21 90:4,10 92:5,
10 99:18,21 188:3,12
205:16,19 206:15

**interviewed** 85:25
117:22

**interviews** 99:18

**intricacies** 48:19

**introduced** 181:25

**invalidate** 138:13,14

**investigated** 143:13

**investigating**
216:15,20

**investigation** 9:20
21:3 23:25 28:18
34:17 47:7 50:13,14
52:25 64:7 68:6,16
74:13 76:15,18
216:3,17

**investigations** 17:5
121:25 146:4

**investigative** 135:2
162:5

**investigator** 179:13

**involved** 78:13,14
102:23 110:15
111:22 122:11 129:1
130:5 142:23 147:20
148:10 164:9 167:13
191:10

**involves** 87:3

**involving** 132:15

**irresponsive** 201:19

**issue** 84:1,10 85:6
90:15,19 91:10,21
92:1 96:2,16 97:2
113:15 125:19
126:17

**issued** 153:3 185:3

**issues** 56:13 61:2,23
83:25 116:25 126:23
191:15

**issuing** 28:8

**item** 70:2 215:22

**items** 62:22 171:11

---

### J

**January** 8:17

**Jeep** 183:10

**Jimmie** 115:17

**job** 5:24 10:9,10
12:10,11 15:16 16:2,
3 17:6 21:11,15,25
31:8 34:9 36:2 37:25
41:13 46:13 56:6
77:7,8,12 80:10
131:21 183:5

**jobs** 18:3,7

**John** 81:17

**join** 10:20 61:21

**joined** 29:22

**joint** 126:21 127:1,9

**Jones** 8:4 184:6

**Josh** 4:11

**Journal** 85:10 188:4

**journalist** 188:5

**judge** 7:6

**July** 4:4

**jumped** 79:17,19

**June** 45:24

**justice** 9:11 35:7
52:12,13 58:13,24
64:21,22 72:3

**justification** 211:18
212:5

**justify** 186:7 187:8

---

### K

**K-9** 132:25

**K-B-R-S** 64:25

**K-DOT** 41:21,23
105:13

**K-I-B-R-S** 65:1

**Kansas** 4:14 5:4 7:4
9:6 11:7 12:25 13:20
17:1 22:15 23:16
32:6 34:2 35:4 36:3
37:2,3,19 41:22 42:1
45:6 47:7 50:11
52:23,24 53:14 55:9
56:21 57:14 64:6,8
65:1,2,4,13,20 66:10
68:4,6,16 69:5,24
70:5,6 71:2,17 72:2,
18 74:24 77:22 86:8,
15 87:3,4,19,20
88:10,24 89:9 90:15
91:5,6,11 96:2,4,16,
18 97:2,14,21 98:20
99:12,16 100:11
101:16 103:5,6
108:4,9,13 113:4,12
146:7 175:24 186:18
187:22 188:20
204:14 205:3,21
207:8 208:13,18

**KBI** 53:2 65:3,4,23
66:5,7,17,20 68:8,18
69:6,12,14,17,23
70:4,6,10,13 71:1,6,
13 72:8 76:18 105:13
146:8,24 148:2,6

**KBI's** 65:7 66:1 69:20
70:22 107:11

**KHP** 15:6 17:15,21
29:15 32:17 33:16
39:21 47:23 48:10
49:17,19 53:13 66:5
68:7 69:21 71:4,11
72:7 77:5 80:6,11
82:11 85:3 87:25
89:25 90:10,11 91:23
92:2 93:16 101:12,19
106:10 107:13,14,15
109:4,15 110:10,23
112:17 116:19 118:8,
9,16,19,22,25 119:3
120:9,17,20 121:2,9
122:6,11 123:10
124:2,13,20,23
125:1,14 126:10
128:5,11 129:7,8,14,
15 130:4 134:8
135:19 136:4,21,25
137:10,17,21,23
138:19,23 139:1,19,

21 140:8,22 141:7,23
142:9,13 143:12,20
144:2,8,14 146:11,20
149:17 151:10 152:7
153:11,18,24 154:5,
24 155:3,16,22
156:7,8,11,21,23
157:17 158:13,24
159:4,17,23 160:8,24
161:5,15,16 162:12,
13,19,23 163:2,7,18,
21 164:8,14,17
165:5,8,17,21,23
166:3,7 167:2,6
168:4,15 169:2,22
170:3,25 171:21
172:4,13,23 173:8,9,
19,24 174:3,12
175:5,13,16,19
176:1,18,25 177:12
178:25 179:6 183:12
191:20 192:10
196:25 199:22
203:10 205:15,16,19
213:9,14,15,23,24
214:1,20,21 215:18
216:9

**KHP's** 48:15 50:3
65:25 70:8 97:17
100:19 104:17 130:5
139:20 140:2 146:9
147:5,18 175:12
215:1

**KIBRS** 64:7,24 65:7

**kicked** 62:8

**kind** 23:8 34:15 58:6
66:4 77:18 104:4
118:20 129:22
142:10 148:5,16
155:21 162:8 163:1
164:6 167:25 183:21
208:19

**kinds** 18:7 21:3
34:13 62:15 64:18
73:11,14 74:2 76:3
87:10 103:9 106:17
116:23 123:14,18,21
124:18 125:4,5
127:17,21 130:25
131:4,16 140:18
157:15 171:20
172:22 180:6



Kingman 14:23 20:1

knew 99:17,21 100:1, 4 110:19 132:10 135:19 192:21

knowing 181:14

knowledge 50:6,20, 21 51:6 52:6 68:7 87:8,14 108:1 109:9 118:9 134:6,8 136:5 145:8 151:10 156:10 163:4 193:10

## L

lack 109:18,22 131:19 132:8 133:19 134:23 138:12 144:19 152:15 169:4, 24 216:13

lady 15:24

Lakeshore 5:3

language 97:5 129:19,22

laptop 33:2,3,7 120:1

large 16:6 24:22 44:15 73:23 74:11 102:7

largely 16:8 96:4,18

larger 145:4

largest 102:8

late 30:5 35:15 36:12

latitude 126:16 127:20 129:21

law 5:12,16 29:10 37:2 47:1,8 52:14 53:13 56:21 57:11,25 58:10 59:10,21 60:22 88:21,22,23 95:5 100:20 101:15 107:15,20 108:2,4,5, 8 109:5,15 113:3,6 121:6,14 130:10 138:10 145:4 146:10, 11 154:13 157:11,12 164:18 175:24 179:2, 5 181:1,24 182:7,9, 14,17 194:3 207:3

laws 13:18 29:10 34:18 58:12 155:13 170:10

lawsuit 8:4 110:9,12, 14 144:14 190:22 198:1,4,13

lay 58:3

laziness 152:21

lead 200:18

leader 74:10

leadership 9:18 10:2 73:18 74:5,12 76:7

leading 142:6 204:19

leads 164:2

learn 107:23 108:15 109:3,12,25 110:1,4

learned 136:8 160:13

learning 74:7

leave 95:2 194:1 195:15 201:15 207:1, 15

left 12:24 29:15 31:8 45:18 49:7,12 119:25 120:5 147:11

legal 85:11 88:13 89:14 94:23 95:8,21 97:10 98:13 110:17 111:5,8,11 112:1,16, 17 116:25 138:21 146:23 147:20 204:17,22 205:6,22 208:20 210:11,17 211:3 213:2

legalistic 109:11

legalities 147:21

legalization 99:1,6, 10,15

legalized 95:16,25 97:3 208:15,23 210:6

legally 207:17 211:7

legislative 125:24

legislature 90:23 91:1,11 146:8

legislatures 91:7,20

lend 127:21

length 166:8

Leslie 4:10

letters 157:10

level 9:22 40:23 54:21 57:23 61:8 79:10,13 84:3 91:2 98:18,20 145:2,7 161:10 167:24

Lewis 185:2 189:4

license 68:3 88:6 93:17 102:4 103:6,18 104:23 113:15,16 149:12 150:3,14 187:11,17 189:11,19, 20,21 190:3 191:25 193:4 194:8 196:17 197:1,6

lieutenant 16:24 17:8,11,15,25 18:2,7, 23,24 19:1,6,10,12 22:19,23 38:15,17,24 42:10 77:5 78:6 79:16 80:3,7 83:3,8, 14 84:8 85:2 108:1,7 110:15 116:14 122:10

lieutenant's 42:8

lieutenants 18:15, 16,17,19 40:12,16 41:1

likewise 80:24

limited 50:5 123:1

link 49:16

linkage 49:3

linked 43:6 45:1,11 46:1

list 28:14 62:21 135:7

listed 10:6 76:3

literally 70:21 75:10

litigation 184:6

live 5:3 149:24 211:2

local 13:17 61:16,17, 19 70:16

locally 121:20

located 32:12 37:10 44:1,5,6 46:19 129:6

location 67:10 131:7

locations 37:24

logged 46:14

logging 46:12

long 13:8 14:4,19 16:16 18:18 20:11 36:15 37:25 41:6 70:9 73:19 186:24

longer 55:5 217:21

looked 12:10 28:4,7, 10 84:23 120:7 157:18,25 158:2,3,8 170:19

lost 159:12 195:17

lot 21:19 22:11 29:6, 7,8 30:3 36:8 48:22 65:12 74:14 75:11 79:5 81:7 105:5 123:4 125:22 150:6 181:15 183:2 184:9 195:25

lots 126:8 170:12

loves 71:23

low 51:25

lower 27:10

LPR 68:3,8

luck 183:4

## M

made 11:12 18:23 33:12 70:9 79:10 88:3,8,11 111:18 112:3 113:9 114:14, 17 115:2,6,21 131:11 135:15 136:7 151:2 162:3 165:14 183:3 188:12 198:13

maintain 70:10

maintained 37:13

maintains 57:11



**major** 79:19 80:4,15, 18,20,24,25 81:12,18 82:9,10,14,17,22 96:2,16

**major's** 82:19

**majority** 87:2,21

**majors** 79:8,20 80:5, 9,12 81:10 111:9

**make** 5:20,25 6:6,14 12:9 19:12 22:20 31:15 54:2 55:11 56:15 63:23,24 66:11 67:24 72:12 103:16 104:12 111:12 114:6 116:4 122:14 126:11, 12 129:17 131:16 135:12,18 137:2,12 140:23 143:22 151:12,21 158:24 163:25 164:4,5 171:7 176:7 199:9 200:20 216:21

**makes** 43:2 72:2 151:19 190:24

**making** 21:13 44:7 56:20 57:19,24 62:16 64:11 86:11 138:20 153:12,16

**male** 132:16

**manage** 55:20

**managed** 38:22,24 51:18 52:2,20 53:2 65:2,5,22,23

**management** 48:8, 11,16 50:8 105:3 106:15 107:10 118:11 119:2 121:18, 21 180:23 215:4

**manages** 49:19 64:7 65:13 68:16

**mandated** 59:1

**mandatory** 74:4

**manner** 25:1 105:16

**manpower** 15:22

**manual** 29:18 32:9 129:7,8,12,15,23 130:2

**March** 93:21 197:15, 16

**marijuana** 89:14 95:2,11,12,13,16,17, 25 96:3,17,22 97:4, 10,13,18 98:7,10,13, 15,20,23 99:1,6,10, 11,24 100:9,10,16 127:15 128:6,9 185:15 194:1 195:15 196:10 198:23 199:7 204:16,22 205:5,22 207:1,7,18 208:15, 19,20,24,25 210:6,11 213:3

**marijuana-legal** 207:7

**Marine** 10:10,15,20 11:9,20,23 12:1

**Marines** 10:14 11:18

**Marion** 5:4

**mark** 39:4 93:4,25

**marked** 39:5,10,16 93:6 94:1 184:1 185:1

**marks** 198:15

**Marshal** 36:20

**Marshals** 35:13,17 36:18

**Maryland** 12:3

**Marymount** 44:13

**Master's** 9:22

**material** 158:1

**matter** 187:17

**mattered** 138:6

**matters** 70:17 78:13, 14 83:22

**meaning** 17:2 45:15 53:11,17 57:6,19 59:11 61:17 65:22 69:8 86:18 146:23

**means** 46:24 56:2 106:12 109:24 148:6 169:17 211:4

**meant** 18:2 55:1 91:8

**measure** 157:22 160:7

**mechanical** 143:2

**media** 74:13 76:12 160:5

**medical** 185:15

**meet** 22:2,3,7,16 61:22 85:17,18 158:13,17

**meeting** 53:23 111:1,4 112:11

**meetings** 22:12 37:21 42:4 54:21 65:9 111:7 112:7

**megahertz** 43:4 51:14,16,17,19 52:3

**member** 61:4

**members** 146:22 161:10

**memory** 32:22 33:13 92:8,11 124:9

**men** 27:15 78:22

**mention** 35:20

**mentioned** 17:7 36:11 51:14 64:24 73:7 108:17 127:8 129:20 141:15 143:5 150:19 170:4 188:2

**mentioning** 36:19

**mere** 186:19

**merits** 161:24

**met** 41:25 58:17 61:1 147:21 184:7

**methodology** 173:13,14

**methods** 142:20

**Metropolitan** 4:3

**mic** 135:24

**microphone** 135:25 136:11

**mid** 13:19

**middle** 30:9,19 197:14

**mild** 21:18

**million** 78:19

**millions** 75:10

**mind** 92:24 93:13 146:6 194:7 214:14

**minorities** 126:1

**minus** 43:18

**minute** 67:5 72:24 89:22 155:6 177:10 197:9

**miscellaneous** 133:5

**misconduct** 122:1

**misdemeanor** 53:1 128:22

**missed** 195:17

**missing** 67:14

**Missouri** 36:22 37:3

**misspeak** 176:17

**misspoke** 137:5

**misstatement** 210:16

**Misstates** 97:24

**mistaken** 177:13

**misuse** 53:12,18

**misuses** 58:2

**mobile** 32:19,21,25 101:4,9,19 102:12

**model** 103:16

**module** 139:13

**moment** 179:19

**money** 91:21

**moneys** 90:25 91:12

**month** 141:25

**monthly** 111:7

**months** 11:25 26:10 36:15 73:21 88:9 132:22

**moon** 4:7,18,25 5:1 37:2 39:10,15 93:6

11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 • 913.317.8800 • FAX 913.317.8850

METROPOLITAN
COURT REPORTING • LEGAL VIDEO

*i16*

App. Vol. XXIII, 238

94:24 184:1 217:18

**morning** 4:2

**morphed** 18:18

**motion** 201:20

**motorist** 149:9,23
186:21 187:18
207:10,11

**motorist's** 149:11

**motorists** 28:11
154:20,21 187:9,10
206:7 207:14

**motorized** 87:15

**mouth** 175:9

**move** 7:12 17:24
99:15 176:14 177:9
189:1 200:22 209:15

**moved** 15:13 37:22
99:11 158:21 163:13,
16 201:9

**movement** 31:22
96:3,17

**moving** 67:24 81:4
178:18 190:13

**multiple** 26:16,19
100:14 131:18
170:19 214:9

**myriad** 28:13 157:24

---

**N**

**N-DEX** 58:19,21,22
59:20 60:2,3,5,10
61:24 63:7,12,20

**named** 82:14,16

**names** 81:22

**narcotic** 211:2

**narcotics** 35:21,25
86:23 98:18 126:19,
23 207:15 208:19
211:1

**Narrative** 134:13

**nation** 15:19 59:22
99:22 103:21

**national** 52:18 54:21
57:9 58:23 64:10
68:20,25 69:7,18
70:22 71:2,16 73:18,
19 74:16

**nationality** 163:22

**nature** 60:25 87:23

**NCIC** 52:19 53:1,7
54:17 57:15,16
61:12,23 63:3,10
64:3 65:23 68:21,24
69:23 70:7,9,11 71:5,
12 72:8 102:2 103:5,
10,21 104:12

**Nebraska** 80:22

**necessarily** 27:9
138:13 140:7 153:17
154:22 164:24
170:16 200:6 211:2

**necessitated** 37:19

**necessity** 111:11

**needed** 21:14 24:24
37:15,20 65:11 79:10
89:15 114:13 115:1
183:2

**needing** 125:2,19

**negative** 194:16

**nervousness**
194:20

**News** 7:17

**newspaper** 199:13

**NIBRS** 64:9 68:24
69:3

**Nissa** 4:15

**non-ncic** 69:22

**non-responsive**
200:23

**normal** 86:19

**north** 19:25 44:2

**notes** 121:19 135:8

**notified** 69:13

**notion** 211:17

**number** 22:4 23:25
24:20,22,25 26:2

28:2 32:3 42:2 49:24
62:5 74:11 75:19
88:3,8 97:9 99:23
103:17,18,22 105:12
125:21 127:5 128:23
131:2 150:23 164:9
194:18 217:11

**numbered** 134:14

**numbers** 24:2 45:2

**numerical** 25:6

**numerical-based**
25:4

**numerically** 24:11

**numerous** 63:7

**nut** 185:21

**nutshell** 21:20,22

---

**O**

**OAG017625** 39:17

**oath** 4:19

**object** 7:4 90:4 96:6
97:23 137:4,15
140:25 141:13 142:5
144:18 152:20 154:1
156:24 160:11 161:2
169:15 204:1 206:18
214:24 216:12

**objected** 133:24

**objection** 7:8 90:2
96:10,20 133:23
134:2 142:12 154:8
214:8

**objects** 7:7

**obligated** 134:5
201:10,17

**observing** 135:25

**obtain** 180:17

**occasion** 181:12

**occasions** 5:9 127:5

**occur** 22:11 87:9
122:15

**occurred** 67:11,12
79:12 172:9

**occurrence** 168:24

**occurring** 42:11
165:18

**occurs** 29:10 108:16
207:24

**off-duty** 35:14,17
36:11,17

**offense** 32:7 50:14
59:12 66:9 134:17

**offered** 101:15

**offers** 200:3

**offhand** 173:1

**office** 4:14 32:13,16,
17 33:4,18 35:13,17
37:12,13,14 43:21
106:10 112:18

**officer** 13:7,12 28:22
33:7 37:18 38:9 47:1
54:14 55:3,6,8 57:24
59:18 65:4 69:5 84:6
126:5 181:12 215:2
216:15,17,20

**officer's** 67:9 155:11
186:6

**officers** 60:24 75:11
83:23 162:6 181:2,24
185:13 186:4 192:21
213:18

**officers'** 211:23

**official** 50:24 61:17
103:15 121:18,20
128:10 136:14
162:12,17 213:22

**officials** 41:24 182:9

**officing** 37:11

**oftentimes** 26:20
46:15 158:18

**Oklahoma** 80:22

**one's** 17:23

**ongoing** 146:4

**online** 7:25

**Open** 88:10

**operate** 43:3



11880 College Blvd., Suite 405
Overland Park, KS 66210
800.748.7511 • 913.317.8800 • FAX 913.317.8850

METROPOLITAN
COURT REPORTING • LEGAL VIDEO

i17

App. Vol. XXIII, 239

operated 59:6 118:8

operation 41:13
42:14

operational 41:25
42:12

operations 78:2,3
80:19 81:2 91:13,15,
22

opinion 29:6 98:6
110:7 113:20 160:10
161:2,3 162:19,23
189:16 199:3 209:3
210:17 214:8,25

opportunity 74:18
218:2

opposed 16:9 57:25
87:10 102:20 134:21

order 17:22,24 57:8
146:21 147:9,25
148:1 157:17 158:10,
11,13 159:22 170:20
172:24 176:2 218:11

ordinarily 79:25

Oregon 97:9

organization 81:3
121:7

organizational
39:20,24,25 40:23
55:24

organized 40:6

origin 177:18 191:23
192:14

originally 19:5,24
20:2 33:23

originating 163:12

ounce 98:13 100:18

ounces 100:15

out-of-state 93:17
97:21 154:20 187:9,
11,17 191:24 193:4
196:17,25 197:6
199:5 205:20

outcome 165:25
166:4 167:17

outlined 160:5

oversaw 35:3,4,6
41:12 42:14 51:13
86:8

overseeing 72:19
78:18 147:18

overseen 38:24

oversees 55:16
78:2,7,8 119:7

oversight 22:11 61:5

overview 16:7

owned 41:21

---

P

P000128 94:1

paid 183:8

paint 206:6

painted 206:12

paper 105:8,25
106:4,9

paperwork 104:24
105:1,2,5,20 106:13

paragraph 94:21
96:25 99:4 185:9,22
189:24 190:24
191:18 192:9 193:21
194:10 196:8,14
198:8,9,12,19 209:7,
12,14,15,16,20
210:14 212:1

paragraphs 94:17
117:24 189:2 190:14

parole 118:22

part 20:23 36:2
43:15,18 44:2 51:11
58:18 72:7 80:17
82:11 83:19 97:3
100:6,11 106:15
121:6 122:14,19
123:9,16 124:20,22
125:1 128:4 129:14
136:25 137:10
139:24,25 140:3,9,12
143:21 144:7 146:11,
17 147:13,16 151:10
157:2 166:7 191:9
195:24 200:2,5

203:23 211:14
213:14,24

participated 54:20

parts 81:4 180:2

passed 41:6 146:12,
17

past 152:12

Patrick 4:3

patrol 7:4 11:7 13:20
18:10 25:18 31:3
35:2 36:3 42:1,6
43:18 45:5,18,20,24
48:20 51:2,18 52:1,
15 65:22 71:2 74:9,
24,25 75:6,13,15
77:9,22 78:8 79:17,
24 81:3,7 82:10
83:15,20,23 86:9,16
87:3,19 88:11,20,24
90:16,19,23,24 91:3,
12,13 98:17 101:14
103:11 105:11 108:9
113:21,24 114:14
115:2 121:17 147:11
150:25 153:21,25
154:6,19,25 155:24
156:1,6,21 157:19
158:17 159:7,8
161:13 162:1 165:24
166:7 171:2,22
172:5,25 174:13
177:25 182:22 184:5,
17 186:19 187:16,23
189:10 190:20
192:18 200:3 207:23
214:3

Patrol's 41:3 69:24
87:23 89:10 98:5,8
105:23 107:10 114:6
130:2 178:1 188:20
210:24,25

patrolman 10:13

pattern 170:13

patterns 169:23
171:1,21 172:5,24

pause 89:1

pay 183:4

paying 79:5

peer 54:21 61:21
159:10

pen 22:14 148:4

pencil 148:4

pending 6:25

people 40:19 42:15
43:10 44:19 55:25
56:1,10 65:8 81:5
89:12 95:1 97:12
99:21 102:9 107:14
125:25 131:16
163:19,22 165:21
173:16 177:1 188:4
193:24 195:13
198:21 206:24

percent 34:10,12

percentage 87:9,18

perform 23:23

performance 21:18,
24 23:3 26:20 27:19
168:16

performed 22:9
169:1

performing 23:13
148:14

period 20:3,20,24
23:4,5 26:8 35:15
75:22 115:22 141:25
142:1 154:19 182:24

permissible 187:7
212:7

person 54:14 57:7
58:3 75:14 77:25
88:16 116:11 126:13
149:20 151:16 163:8
173:21 194:18 195:4,
10 196:3,4,6 199:24
203:22 204:16 205:5

personal 5:14 52:1
57:24 58:5,7,9 67:13
98:7 126:22 127:20
148:20

personally 109:14
111:19 161:25
172:16

personnel 21:18
38:21 52:22 75:3



BLAINE FRANKLIN SHAW, et al. vs
HERMAN JONES, et al.
DEPOSITION OF RANDY MOON
July 28, 2021

78:3,4,21 79:24
80:13,14 83:24 171:6

**persons** 62:20 102:5
174:1 176:19

**pertained** 108:13

**pertaining** 129:12

**pertains** 139:4

**pertinent** 103:16
135:9

**Peter** 110:9

**phone** 77:15 120:3

**phones** 120:6

**phrase** 46:2,6,7 48:7
63:12 95:7 118:12,13
154:12

**physical** 70:25 71:1
74:14 149:24

**physically** 32:12

**picture** 206:6,11

**piece** 41:17 57:10
63:3,4 64:3 70:21
72:9 196:16

**pieces** 66:16 109:11,
12

**Pierson** 4:11

**piled** 156:18

**place** 120:16 129:11
134:18 164:15

**plaintiffs** 4:12 198:1,
3,13

**plate** 68:3 103:18
113:15,17 149:12
150:3 187:11,17
189:11,19,21 191:25
193:4 194:8 196:17

**plates** 88:6 93:17
189:6,20 190:3
197:1,6 199:5

**platforms** 64:16,20

**play** 145:25

**pleased** 124:13

**plugged** 33:3

**plural** 143:16

**PM** 72:25 73:3
117:12,15 178:22
218:12

**point** 6:19,23 7:4
14:5,13 20:3 22:18,
22 30:3 31:6 33:25
35:12 36:2 40:19
61:3 81:16 82:8,9
95:21 96:3,17 113:1
116:18 117:9 119:25
128:15 145:17 146:7
197:4 210:7 211:8

**police** 10:13,18 13:6,
7,9,11 28:22 52:7,16
54:4 57:14 59:22,23
61:17 65:12,20 71:5
72:5 74:7,8,10,16
75:9 77:1 103:12,14
104:2 159:22 160:8

**policed** 57:14

**polices** 159:7

**policies** 58:12 62:10,
17 110:23 129:5
158:4,7 161:21 162:2
187:23 213:20

**policing** 16:9,12
174:6 175:20 176:8,
22 205:12

**policy** 54:23 61:1,3,
6,9,10,11,23 62:2
63:9 70:15 78:13
84:2 111:12,14 115:6
129:2,4,7,8,11,15,16,
23 130:2 152:7
158:19 164:25 166:3
168:5 186:19,23
187:14 190:19
213:17,22

**political** 65:15 90:15,
19 91:4 92:1 97:2
144:23

**politics** 84:1

**populated** 135:3

**pornographer** 36:21

**port** 33:4

**portable** 120:2

**portion** 43:11 44:3
55:24 80:21 96:14
114:22 159:14 201:1
202:11 204:25

**pose** 90:1 214:7

**position** 18:14,16,
17,19 38:3 41:18
42:9 80:1 81:13
82:16,17,19 89:10,24
90:10 97:17 98:5
100:19 110:13
126:10 128:10 140:2
186:18 188:20 191:3
210:22

**positions** 40:25
82:20 84:5

**positive** 194:16

**possess** 98:14

**possibly** 72:13
155:19 171:18
197:18

**potential** 135:20

**pound** 98:19 127:15,
23 128:2,5,9

**pounds** 98:15 99:11
100:9,14 207:17,18

**powerful** 160:14

**powwow** 85:18

**practical** 78:22

**practice** 158:20
172:6 187:9,15
190:19 192:21
193:10

**practices** 157:23
162:2 169:23 171:1,
12,22 172:5,24

**Pratt** 8:21 10:13,17
13:1,5,7,9 20:6

**preceding** 88:4,9

**precisely** 48:18

**preface** 113:23
124:16

**preparation** 7:15 8:8

**prepare** 104:24

**preparing** 104:16,19

**presence** 194:17

**present** 39:24 45:16
188:9

**president** 12:14
15:21 16:15

**presidential** 12:3,25

**press** 84:8

**pretense** 187:7

**pretext** 187:2,3

**pretty** 30:9 66:7
126:16 157:21
191:16

**prevalent** 58:4,7
102:1

**previous** 99:17
130:13,22

**previously** 162:18
185:1

**primarily** 12:13
14:11 15:23 16:12
37:13 38:20 43:21
52:24 65:15,23 66:8,
9 98:9 103:5 108:24
126:18 147:17
168:13 179:4 206:5

**primary** 47:14
109:24

**printed** 7:16 92:7

**printouts** 94:4

**priorities** 123:1

**priority** 123:2

**prisoners** 35:18

**probability** 128:23

**probable** 134:9
137:1,5,17

**probation** 118:23

**problem** 69:13 134:4
142:25

**problems** 69:9

**proceedings** 111:11

**proceeds** 91:2
145:3,4


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

*i19*

App. Vol. XXIII, 241

**processors** 30:4,5, 21

**produced** 94:1

**products** 96:4,18 97:14,19 100:9

**professional** 33:11

**proficient** 27:3

**profiling** 125:23

**program** 9:24 10:2 68:14,15 73:7,10,16, 17 74:19

**programs** 23:20 28:12 34:17 68:18

**project** 60:16 147:14

**promoted** 15:1 16:24 17:7,11,14 20:14 34:20 81:15 82:19,22

**promotion** 37:9 38:2

**promotions** 17:23

**proper** 97:25 98:3 144:3 199:14

**properly** 141:19 170:10,22

**protection** 53:25

**protective** 15:2,18 16:1,9,13

**protocol** 114:17 115:7,10

**protocols** 53:24

**provide** 93:18 99:20 169:14 197:2,13,17

**provided** 16:3 22:15 57:20 58:10 64:22 105:21 147:9 190:23 202:20 207:18

**providing** 41:14 104:16 148:6

**proximity** 46:19

**public** 23:19 25:14 26:4 41:16 46:25 51:18,21 52:2,4 83:23 84:6,15 122:7 134:10 138:21 140:4 144:9 153:20 159:5, 18 160:14 161:7,18, 22 162:3 164:3 179:2,7,11,17

**publication** 15:9

**publicity** 125:22

**publicized** 109:8

**publicly** 129:9

**published** 93:21 197:16

**pull** 132:21

**pulled** 51:9 91:22 104:9

**pulls** 49:4

**purchase** 95:2 98:14 99:24 194:1 195:14 196:10 198:23 206:25 213:2

**purchased** 97:18

**purpose** 168:22 191:6

**purposes** 44:7 63:11 86:11 150:24 179:2 188:13 208:18

**pursuits** 51:1

**purview** 111:24,25

**pushed** 51:9 166:11

**put** 44:14 58:5

**puts** 209:23

**putting** 56:22 58:16

---

**Q**

**qualified** 146:3

**qualities** 127:17

**quality** 56:8,12,20

**Quantico** 73:21

**quantitative** 169:14

**queried** 103:21 132:17

**queries** 57:19 102:4, 10,20 131:11,16

**query** 57:24 104:22 132:3,6

**question** 6:1,19,20, 25 17:17 30:16 48:18 50:20 55:22 81:21 84:20 87:16 90:8 96:11 97:24 99:3 100:24 107:1 108:6 114:19,21 116:2 117:18 122:3 124:16 128:3 130:13,22 131:25 133:20 137:8, 16,19 138:18 145:18 146:3 151:18 153:23 156:16 159:13 164:1, 2 171:16 180:9 181:10 200:2,5,7,24 201:18,23,25 202:2, 10,18,19,25 203:4,9, 16 204:24 216:14

**questioning** 199:24

**questions** 6:18 7:5, 11 42:18 85:22 163:1,4 177:9 178:8, 11,13,17 183:18,22 184:10 199:17 203:11 209:2,7 213:7 217:18

**quick** 179:22

**quickly** 19:10 184:12 197:19,21

**quota** 25:9

**quotas** 23:15

**quotation** 198:15

**quote** 94:21 189:8,11 193:21,22 194:4,5 196:13 211:14

**quoted** 7:17,23 8:5 99:5 190:14

**quotes** 193:18 198:14

---

**R**

**race** 171:24 174:6 177:12,14,17,24

**racial** 117:1 125:23

**radio** 41:18,21 42:24

43:4 44:25 51:13

**radiofrequency** 33:24

**radios** 42:2,3,24

**raised** 201:20

**ran** 57:5

**Randy** 4:7,18,25 37:1

**rank** 14:14 16:24 19:10 79:19 80:3 191:4

**ranks** 79:18

**ratio** 20:22

**re-ask** 87:16 116:2 153:23

**reach** 79:10 184:25

**reaching** 75:25 79:13

**read** 7:19 92:8,11,14 94:20 96:12,15 114:20,23 159:13,15 186:16 187:5,12,13, 24 192:6 198:2 200:24 201:2 202:10, 12 204:23 205:1 211:9

**reader** 68:3

**reading** 94:6 198:10

**ready** 11:14

**Reagan** 12:5

**real** 179:22 197:21

**realistic** 69:11 83:21

**realistically** 86:21

**realized** 64:1 100:25

**reallocated** 18:22

**reallocation** 18:21

**reason** 57:25 136:25 137:10 142:14 165:9 189:22

**reasonable** 136:2,22 137:6,11,18,22 138:1,24 139:4 140:6,10,16,24 141:8 142:2,15 143:1,9,15,


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

i20

App. Vol. XXIII, 242

23 144:4,16 173:5
174:15 186:14,20
187:18 190:13
191:21 192:11
193:12 194:11,14
200:14,19 203:23
204:8 208:2 209:23
210:12 211:21 214:4,
20,22 215:3,10,20,22
216:5,10,25

**reasoning** 186:6

**reasons** 65:15 131:3
152:13 170:16

**recall** 30:24 35:23
49:13 67:20 76:4,19
84:24 86:3 92:4
110:8,22 111:1 112:2
117:5 123:11,14,24
124:18 125:2,8,19,21
129:14 130:25 131:4
144:24 146:14
147:24 158:3 162:20
167:24 168:4 180:10,
15 182:7 198:2
203:15 209:4 213:6

**received** 15:13 24:22
37:8 77:7 92:9
103:22 108:12 174:5

**receiving** 25:15

**Recess** 39:9 73:2
117:14 178:21

**recollection** 36:22
67:16,19 85:17
132:25 189:13
197:12

**recommendations**
216:21

**record** 4:5,9,24 6:1,
3,14 7:6,8 39:8,13,17
48:8,15 50:12 63:11
72:24 73:1,4 88:10
93:25 96:10,15
106:15 107:3,10
114:23 116:4 117:13,
16 132:24 133:17
134:9 135:19 136:3,
22 137:1,11,17,22
139:12 153:3 156:2
159:15 174:25
178:20,23 183:25
189:1 201:2 202:12

205:1 216:4 217:24

**recorded** 4:6 56:22
166:10 167:9 172:23
173:8 182:8 215:4,11

**recorder** 135:24

**recorders** 138:5

**recording** 136:20
137:25 140:4,5 173:4
176:19 182:4

**recordkeeping**
121:6,14 122:6
158:4,7 160:23

**records** 48:11 50:8,
12,13,14,15,17,25
63:25 72:1 93:18
104:23 105:3 106:15
118:11 119:2 121:17,
21 139:14 153:19,25
154:6,25 155:4,16,22
156:1,8 161:17
180:23 197:2,13
215:4

**recreational** 97:4
100:8,16

**recreational-use**
100:10

**reduce** 24:25

**redundancy** 71:13

**refer** 94:18 157:25

**reference** 46:2
195:18

**references** 198:19

**referencing** 98:25
99:5

**referred** 40:15 55:25
56:1 73:18 83:2,8

**referring** 35:24 60:1
88:10 95:10 185:11
189:5 195:11

**refers** 95:17 189:12

**refresh** 92:7

**refreshed** 92:11

**refreshing** 124:9

**regard** 42:22 118:7
124:5 129:24 130:24

132:25

**region** 61:15 80:12,
15

**regional** 51:12

**regionally** 80:14

**registration** 102:5
103:7 104:24 150:15
163:15

**regular** 12:20 36:2
161:9 168:11,24
172:9

**reiterated** 196:17

**related** 60:16 69:23
79:23 80:13 87:22
88:14 89:19 106:6
119:3 126:19 158:19
216:3

**relates** 42:16 105:11
154:13

**relating** 112:5
121:25

**relation** 5:12

**relations** 83:23 84:6,
15

**relevant** 53:9 184:11

**rely** 185:13 213:17

**remember** 18:12
31:5,12 51:8 76:10,
11,22 77:2 92:10,15
111:3 123:21 124:3,
10,11,25 125:5,11
129:25 132:13,18,19
133:6 143:18 148:1
150:23 157:9 158:1,
7,23 159:2 166:5
168:1 175:23 176:12,
15 180:8,12 181:8
182:13 190:7,16
193:23 194:21
196:20 198:10 211:7
215:21 218:10

**remembered** 147:10

**remembering**
136:13

**rendered** 28:12
150:24 151:6 191:20
192:10

**Reno** 19:25

**renovation** 44:12

**rephrase** 30:16
108:6 122:2 128:3
137:7 145:18 151:18

**report** 21:19 29:16
31:1,20 81:10,12
82:4 107:3 118:13,14
134:11,17 150:21
155:12 167:22 215:2

**reported** 38:16,25
61:2 66:25 81:14,16,
17 128:8 164:21
185:17 199:12

**reporter** 4:16 6:9
63:23 85:21 87:24
92:5,16 96:15 114:23
128:7 159:15 188:13
197:5,11 199:13
201:2 202:12 205:1
218:6

**Reporters** 4:4

**reporting** 46:21
47:4,6,11 63:4 64:3,
8,10,13 65:2,24 66:1,
2,10 68:14 69:9
71:16 76:25 79:4
82:9 107:12 120:4
167:25 173:11 174:4
175:17,20 176:8,12

**reports** 28:19,23,25
29:4,11,12 32:7,16
66:23 76:25 77:1
106:5 107:9 118:10
136:14 142:22 156:4
164:11

**repositories** 70:6,10

**repository** 121:18

**represent** 65:10
184:5

**representative**
60:19

**represented** 61:15,
18

**request** 85:9 130:16
132:14 189:1

**requested** 36:6
90:23 96:14 114:22


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

i21

App. Vol. XXIII, 243

131:20 159:14 201:1
202:11 204:25

**requests** 88:3,4,9,10
130:25 131:1

**require** 163:25

**required** 28:23,25
29:9 46:16 104:25
105:12,13 147:21
152:4 164:25 167:25
171:6 173:11 175:21
191:21 192:12

**requirement** 146:21
175:24

**requirements** 29:17
58:17

**requires** 29:11 46:25
74:5

**research** 8:1

**researched** 8:3

**reserve** 10:25 12:23

**Reserves** 12:17

**residence** 186:13,20

**residency** 89:19
113:17 185:14
200:18 211:18 212:5,
13

**resident** 185:10
186:14

**resigned** 45:20

**resistance** 168:2

**resistant** 156:12

**Resources** 22:21

**respective** 32:13
61:13

**responders** 52:7

**responsibilities**
37:21 41:20 191:9

**responsibility** 17:3
47:7 51:5 68:13 69:5

**responsible** 54:8
65:5 68:1,3 69:12
70:8 71:19 132:13

**restate** 90:7 96:11

**result** 60:11 99:11
111:14,18 120:21
121:3 125:10,16
144:17 158:24
166:13 214:6 216:3

**resulted** 92:5

**resulting** 120:10,17

**resume** 39:6

**retired** 45:22,23
81:15,17 129:10
182:22

**retirement** 183:11,
12

**retreat** 12:3

**retrieval** 130:5

**retrieve** 130:16
132:2

**returning** 199:6

**revealed** 162:6

**review** 21:24 22:4,
13,15,18 23:4,5
25:19 26:8,12,18
140:6,9 142:1,10
155:12 168:9 170:5
172:17 173:8,20
174:8,12 178:8,11,16
215:2 216:9 218:1,3

**reviewed** 167:15,16
173:16

**reviewing** 21:19
22:23 25:22 27:13
143:6 170:12

**reviews** 21:18 24:19
78:16 140:18 168:16
170:6

**revise** 62:1

**revised** 63:9

**Rice** 19:24

**rid** 126:13 128:11
129:16

**ride** 22:8

**rights** 144:9,12

**rise** 208:1

**RMS** 48:11 49:4,12,

20 50:3 51:6,9,10
121:10 122:8,12,20
123:11,16,19,23
124:1,5 125:6 148:9
151:8,9,24 163:2,8,
13,16 166:11

**road** 11:25 14:16
15:4 34:16 127:14

**Robinson** 4:3

**robust** 33:24 41:24

**rock** 183:10

**role** 13:12 51:11
54:11 55:17,18 59:17
61:7 79:3 83:1,2
84:3,4 130:8,14
160:24

**roles** 56:6

**rolled** 20:15

**rolling** 31:3

**room** 44:17 201:15

**roughly** 11:8

**routine** 191:16

**routing** 91:3

**rows** 56:10

**rule** 7:6 134:5

**rules** 5:20 7:12
58:11,17 102:17

**run** 102:3,9

**running** 102:20

## S

**safe** 16:2 44:8

**safeguards** 53:24

**safety** 23:19 28:10,
12 34:17 45:6 51:19,
22 52:2,5

**Salina** 32:1 35:4,9
37:11,13,24 43:21
47:25 48:2 71:12,14
88:25

**Sarah** 88:18 188:8

**saved** 48:15

**scale** 15:21

**scan** 106:13

**scanned** 106:11
218:9

**scenario** 210:2
217:1

**scene** 105:1

**school** 8:19,22 9:15
11:14 45:6 74:15
126:21

**schools** 23:20 27:4

**screens** 44:25

**search** 35:21 36:1,7
89:16 113:10 114:8
126:6,7 153:9 165:18
167:3 172:5,24 186:7
187:8 191:13 200:11,
18,20 201:5 202:15

**searches** 36:1 89:19
90:11 114:15 115:3
120:10,17,21 121:2
154:7 156:9 214:5

**searching** 206:12

**secondary** 108:25

**Secret** 15:20 16:14

**section** 19:23 49:21,
22,23 53:16 131:17
133:5,17 134:13,19

**sections** 35:2 53:16
81:7

**secure** 12:14

**security** 12:2 15:10,
17 53:21 76:8

**seek** 162:9

**seeking** 57:21 157:5

**seized** 126:8 145:21

**seizure** 126:6 127:24
128:6,12,16 145:2,3,
19,25 146:1 148:10
153:16 186:7

**seizures** 90:15,20
91:12 92:2 96:23
120:10,13,15,18,21
121:3 126:20 144:23
145:17 146:9,10



**selected** 11:22 73:20 77:8 79:21

**selects** 74:3

**semi** 61:22

**send** 75:17,24 107:14 218:6

**sending** 75:14 133:16

**senior** 38:9

**sense** 27:15 56:15

**senses** 174:18

**sensitivity** 117:1

**sentence** 95:6 186:8 212:3

**sentences** 185:23

**separate** 53:15 71:8 148:9

**sergeant** 15:1 17:24 18:9,15,22 30:11 40:2

**series** 43:4 213:7

**serve** 15:19

**served** 10:23 12:4 54:13 88:19

**server** 32:1

**servers** 48:1

**serves** 60:20

**service** 15:20 16:14 28:12 36:18,20 41:15 150:24 151:6

**services** 15:2,18 16:1,4 35:8 52:12,13, 14 54:10 61:9 124:13 183:1

**serving** 61:5

**set** 22:4 23:3,15,17 39:21 45:19 78:10 211:20

**sets** 170:19

**setting** 24:19 25:9

**share** 59:5,11

**shared** 135:6

**sharing** 59:7 64:14 72:18

**Sharp** 4:15

**Shaw** 8:4

**she'd** 88:8

**shear** 75:25

**sheriff** 61:18 74:8

**sheriff's** 52:16

**shifts** 22:8

**Shoot** 60:7

**short** 35:15 39:8 44:10 46:12 69:8 73:1 178:20 182:24

**shortly** 18:23 20:15 110:6

**show** 40:5 93:24 144:15 156:2,4

**shows** 40:8,12

**shy** 78:5

**side** 53:17 56:11,13, 16,20 101:3 116:19

**sign** 218:1

**significance** 17:20

**significant** 75:22 98:10,12,22 126:19 127:24 128:2,6,12,16

**silenced** 60:8

**silos** 59:6

**similar** 69:3 180:9

**similarly** 54:7

**simple** 149:13

**simplified** 64:12

**simply** 69:13 76:9 83:22 109:23 132:13 158:1 203:15 204:11 206:7 208:2

**single** 94:6 100:14 197:21 205:9,11 215:21

**singular** 143:16

**singularly** 204:12

**sit** 22:14,16 67:20 115:9 141:9

**sitting** 43:21 44:21 129:13

**situation** 46:19 111:10 143:7 144:13

**size** 83:22 145:2

**skip** 185:20

**skipping** 80:3

**slightly** 114:18

**slow** 151:16

**small** 65:14 126:22 127:1 196:15

**smaller** 15:21

**smell** 174:18

**sniffs** 132:25

**software** 31:16 184:19,21

**sold** 95:15 207:20

**solicit** 133:20

**sort** 8:14 23:3 27:18 30:25 33:7,21 37:2 38:9 40:18 46:24 51:13 56:9 57:13,14, 22 58:9 62:11 73:6 79:3,17,22 82:3 92:1, 15 104:5 118:6 145:7 152:25 193:9

**sound** 15:11 35:22 75:16

**sounded** 17:17

**sounds** 27:18 63:19 75:13 133:8

**soup** 68:10

**source** 100:21 125:15 196:15

**sources** 102:17

**south** 19:25

**space** 133:9

**speak** 42:12 48:17, 25 58:15 75:18 83:24 104:3 135:24 143:3 172:10

**speaking** 5:25 21:12 25:20 42:13 47:2,10 60:5 68:22 79:22 87:11,12 114:9 132:12 134:2 135:16 145:5 172:8

**Special** 182:25

**specialist** 84:15

**specialists** 41:4 84:13

**specialized** 11:23 14:18 21:6 81:1,25 82:11

**specially** 86:18

**specific** 19:8 31:14 86:20 104:6 111:3 131:17 133:1 170:14 190:5

**specifically** 36:6 49:4 51:8 65:8 76:6, 22 90:24 95:13,24 97:1 98:25 123:11,13 129:19 130:24 173:18 207:14

**speculate** 106:23

**speculating** 106:21 152:19

**Speculation** 215:25

**speculative** 215:15

**speech** 76:8

**speed** 28:8

**speeding** 164:21

**spend** 10:12 25:21 73:21

**spending** 28:15 37:17

**spends** 78:17

**spent** 11:21,25

**spoke** 25:1 136:11 205:15

**spoken** 73:25

**spokesperson** 83:16

**spokespersons**

83:20

**spot** 82:23

**staff** 111:5,7,8,9
112:1,7,11 114:11,24
122:14,18 130:16,20
161:9,10,20 162:11

**Stafford** 20:6

**stand** 33:11 144:5
202:19

**stand-alone** 33:5,6
64:5 68:24,25 69:2

**standard** 32:7 66:8

**standards** 158:18
159:8

**standing** 218:11

**standpoint** 69:11
70:15 83:21

**stands** 52:11 58:22
71:25

**start** 6:2 8:15 11:17
13:4 39:3 106:25
149:1 187:4

**started** 13:4 37:11

**starting** 12:17 32:23
127:16

**starts** 94:14 185:9,24
194:10 209:12

**state** 4:8,23 13:17
22:15 23:16 31:3
37:19 41:22 43:8
44:2 45:6 52:17
53:14 54:12,13,15
55:8 57:14 60:20
61:16,19 64:6 65:12,
17,20 70:16 71:17
72:4 80:16,18,21
89:13 91:2,6,22
94:22 95:2,3 97:20
99:15,22 100:21
113:3,12,17 133:22
145:2,20,25 186:12,
14,19 187:7,16
191:23 192:24 194:1
195:14,15 196:10,15
198:23 200:18
204:14,16,22 205:3,
5,21 206:25 207:1,7,
16 210:10 211:2,5,17

212:5,13 213:1,2

**State's** 64:12

**stated** 100:2 134:3

**statement** 25:9 90:9
91:9 125:17 138:16,
18 148:12 154:22
160:1 177:4 189:17,
18 190:25 192:15
194:24 196:14,22
197:12 212:12

**statements** 118:1
188:12,16,19

**states** 10:10 64:17
65:12,14 95:15,20
97:7,9,12 98:14,25
99:6,10,23 100:7,12
112:22 113:1,10
207:19 210:5,6

**station** 14:9,20 34:22

**statistical** 175:17,19
176:2,21

**statistically** 87:11
144:16

**statistics** 23:12 28:7
130:10 169:3 176:4

**status** 42:12 185:9

**statutes** 108:14

**stay** 20:11 79:4
174:23 179:21

**stayed** 20:13 37:23

**stays** 145:2

**steals** 103:11

**step** 18:1 19:1 213:19

**steps** 137:1 146:20
158:12,17 159:4,17

**stole** 103:13

**stolen** 62:20 102:6
103:23

**stop** 26:12 42:17
50:16 89:11 104:11
113:9 114:8 116:6
126:25 129:3,17
138:25 140:11 141:9
143:9 148:14,17,21,
23 149:2,5,6 150:1

151:11,19,21 153:1,
16 164:15,18 165:9,
25 166:9,12,15 168:8
169:3,23 170:17,18
171:1,12,22 173:5
174:16 176:10 187:9
189:7,22 190:4,15
191:11,22 192:12
202:2 203:11 205:8
206:16 212:6 214:23
215:11,23 216:3,5

**stopped** 89:17
126:14 142:4 149:21
154:20 163:9,19,23
164:20 165:21
173:16,21 174:1
177:1 199:24

**stopping** 98:17
206:7

**stops** 24:20 28:3
87:20 90:11 93:17
99:17 113:11 114:14
115:2 125:9,12,15,25
131:17 132:15 143:9,
15,24 144:17 149:15
151:13 153:20 155:4,
17,23 166:4 169:1,
10,22 170:6 173:9,20
174:9,13 193:11
197:1 213:9,16

**store** 118:10,16,22,
25 119:3 120:9,20
121:14 125:19
137:11 163:8 164:14
167:2,6 214:20

**stored** 47:22,25 48:2
118:19 120:17 151:7,
8,9 158:21 163:2,3
164:7 166:8,25
171:12 172:4,22
173:8 177:23 214:5

**storing** 101:6 165:24
166:3 173:25 175:7,
14

**story** 44:9 216:19

**strike** 45:18 48:6
87:7 104:7 106:24
116:8 119:6 123:8
165:21 172:1 183:24
200:22 201:9 205:17
213:13 214:18

**strive** 160:4

**structure** 124:2,13,
19,23 125:14 130:8
143:21 146:18 161:6

**students** 74:15

**study** 9:9

**stuff** 180:21

**submit** 119:13,14

**subpoena** 92:9

**substantiated**
179:15

**substantiating**
93:18 197:2,13

**substantively** 24:14

**succeed** 75:24

**successful** 180:19

**suited** 66:21

**summarily** 94:7

**summarize** 47:12
62:19 66:18

**summary** 66:22
67:21

**summer** 14:1

**summons** 165:15

**Sumner** 14:10,11,25

**sums** 91:20

**superintendent**
18:13 55:18 74:9
77:9,17,20,22,25
78:1,7,9,10,12,14,16,
17,20 79:3,6,22
81:19 82:15 83:4,10,
17,19 84:10 85:8
111:2,4

**superintendent's**
84:4

**superintendents**
38:3

**supervise** 42:7

**supervised** 20:7
31:18 104:5 107:5

**supervising** 19:22
20:19 21:8 38:5


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

i24

App. Vol. XXIII, 246

101:1

supervision 21:17
147:13,16

supervisor 17:1
18:4,10 20:12,22
21:11 22:3,7 24:17
25:19 27:7 29:14,24
30:9,12,15,17,18
31:8 34:7,11 56:8,9
82:23 85:25 115:16
155:11 167:14,15
170:5,12

supervisors 141:16
168:9,19

supervisory 159:10

supply 130:20

support 81:1 82:5,7,
10,11,16 186:14

supported 191:22
192:13

suppose 16:7 83:8
89:13 130:22 140:13
173:6 205:7 210:18

supposed 54:9
137:3,13 139:3
142:17 152:6

Supreme 112:22
113:1

surface 32:23

surprise 191:14

surrounding 56:14
125:22,25

suspect 67:2,13
186:21 190:6

suspect's 66:24
67:9

suspected 136:10

suspicion 136:2,22
137:6,12,18,22
138:1,24 139:4
140:6,10,17,24 141:9
142:3,16 143:1,9,15,
23 144:4,16 165:6
173:5 174:16 186:15,
20 187:18 190:13
191:21 192:12
193:12 194:11,14

200:20 203:24 204:9
208:2 209:24 210:13
211:21 214:5,20,22
215:3,10,20,22
216:5,10 217:1

suspicious 200:15
210:4

swathe 132:7

swathes 132:3

swear 4:17

swim 54:2

switch 52:8 70:2,21,
25 71:1,14,16

switched 33:25
37:24

switches 71:13

sworn 4:19 40:25
41:5

synonymous
118:15

system 32:4 33:16
41:22,24 42:5,24,25
43:2,3,4 44:25 46:10,
12,15,16,21,22
47:12,14,18 48:8,11,
16 50:8 51:14 52:19,
22 53:2,4,5 56:22
58:17,22 59:1,9
62:13,24 64:8,9,11,
14 65:2,6,13,16 66:1,
2,10 68:4,20,24,25
69:1,2 70:6 103:2,20
104:20 105:3 106:15
107:5,7,11,12 118:11
119:2,8,11 121:6,18,
21 122:6,8 123:10
131:11 132:24 133:8,
12,17 136:2,21 143:2
150:17 180:23
184:17 215:4

systems 31:9,12
33:20,22 37:18 45:11
46:1 47:17 48:18,23
50:22 52:23 53:6,11,
12,19,22,23 54:14,
16,24 55:3,6,8 56:14,
17 57:5 59:17 60:22,
24 61:12,24 63:7
64:13 65:4,21,24

67:25 69:4,7,18,21,
24 70:22,23 71:3,16
72:4 73:11 102:24
103:3,8 104:5,17
121:9,14 122:6,24
124:19 130:6 136:20
147:5 175:6,12
179:1,6,10 180:2,3
214:5,21

T

tablet 120:3

tablets 120:6,8

tactics 117:2

tag 103:22

tailored 73:24

takeaways 59:8

takes 28:21,24 29:6
45:6,7 194:15 209:22

taking 20:4 39:8 73:1
76:11,22 91:1 99:25
117:12 136:13
178:20

talk 8:18 9:23 41:11
43:7,9,10 52:8 59:4
67:23 87:25 111:2
184:13 186:8 188:23
189:9 195:12 196:9
198:7 209:20

talked 8:10 27:22
35:20 68:17 72:17
84:22 101:25 117:21,
24 121:16 148:18
150:11 162:7 184:18
195:22 198:20

talking 24:1 26:1
30:14 36:23 42:23,24
43:17 45:14 52:12,14
56:6 73:6,17 75:22
81:13 88:5 95:12,20
97:11 98:13,14
100:25 119:18
128:21,24 142:22
144:22 145:16
148:22 152:25 169:9
177:11 179:25
180:22,23 185:25
190:12 200:14 206:3
207:13,14,21 208:4,6

209:8 212:24 213:1

talks 194:8

tasked 59:9 126:18

taught 88:21,22 89:4
144:1 203:19

teach 59:23 88:23
203:10

teaching 102:15
103:4 109:10

team 53:21 86:17

tech 56:2

technical 41:17
53:20 54:1 56:2,9,13,
16 109:11 146:25

technically 68:22
70:1,13

techniques 74:13
162:5

technology 30:25
49:21 56:18 123:5
182:16

telecommunication
s 41:19

telephone 45:2

telephonic 45:3

telling 109:24 133:3

tells 151:16

term 47:5 52:5
158:16 184:20

termed 56:12

terms 21:17 54:9
64:11 83:11 109:10
156:3

terribly 32:4

tertiary 109:1

testified 4:19 191:6

testimony 5:19
183:14

THC 95:13,14,18
96:3,17 98:11 100:9

THC-CONTAINING
97:13,19


11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

i25

App. Vol. XXIII, 247

**theoretically** 171:8

**thick** 130:3

**thing** 6:24 23:24 40:5
51:13 55:12 95:14,15
114:7 182:14 184:12,
14

**things** 21:14,16
23:25 24:20 25:17
28:5 29:7 50:10,11
54:1,4 59:20 64:19
65:10 73:13,15 77:15
79:9,11 83:20 86:23
89:4 91:14 102:4
117:1 118:3,8 121:20
122:3 123:2,4,8
126:8 136:1 144:11
151:3 154:23 157:4,
15,25 158:2 162:5,8
171:23 180:16,19
181:15 182:17
183:10 184:10
195:23 196:1 198:10
217:11

**thinking** 58:5 217:13

**thought** 31:23 60:7
128:14 147:23
159:13 175:10
205:19 210:22

**thoughts** 22:14

**thousands** 180:24

**threshold** 145:10,12

**throw** 211:20

**ticket** 125:10,16
148:24

**tickets** 119:4

**tied** 48:18,24

**time** 5:25 10:12 13:12
14:5 15:12 18:9,14
19:11,15,18 20:20,24
21:25 22:13 24:22
25:21,23 26:19,24
28:15,17,22,24 29:3,
6,14,15,17 31:7,13,
18 32:24 34:1,6,23
35:14,16,22 36:14
37:17 39:4,7,12
40:10 41:3 43:25
44:22 45:15 47:24
48:11,21,24 49:1,6,9,

16 51:18,20 53:2
55:20 70:9 72:25
73:3 74:23 75:4,21
78:18 80:6 81:18
86:1 89:9 91:6 92:9
96:1,3,17,22 98:21
101:1 105:19 107:13,
18 115:21,22 116:18
117:11,12,15 123:7,9
125:13 126:5,6 127:3
128:4 129:10 131:8
138:4 141:6,25
143:11,21 146:7,16
147:11 151:5 152:23
153:18,24 154:5,19,
24 155:3,25 156:7,
11,20 161:5,15,21
163:5,18 164:15
166:6,25 168:21
171:6 175:18 178:4,
19,22 183:19,24
187:3,6,9 188:18
192:7 193:6 205:15,
18 210:7 215:11,19,
23 217:22

**timeline** 77:3

**times** 6:7,12 22:12
26:11,16,19 28:11
29:19 41:25 61:1
130:15,23 141:16
155:25 156:5 158:18
182:6

**tire** 149:10,14 150:20

**tired** 183:9

**title** 56:8 83:9 196:25

**today** 4:4,16 5:22
6:19 7:15 8:8,11
25:17 28:21,24 48:19
63:12 67:20 92:12,19
105:18 107:20 115:9
129:13 138:8 139:18
141:6 160:5,13
161:21 176:24
203:18 206:9

**told** 66:7 81:22
110:19 162:18 181:7
211:24

**tool** 140:22

**tools** 72:18

**top** 116:3 135:3 185:8

197:22

**Topeka** 7:16 15:2
35:6,10 37:14,15,18,
20,22 50:1 85:10
188:3

**topic** 85:21 161:19

**topics** 80:10

**tossed** 184:23

**totality** 194:15
195:25 200:15 202:6,
23 203:6 207:9
209:18,21

**tough** 171:9

**towed** 131:8

**towers** 34:2 43:5

**track** 29:16 120:12,
14,15 121:2 125:15
153:19,21,22,25
154:6,25

**tracking** 72:15
125:9,12

**traffic** 14:16 15:5
17:3,4 21:2 24:20
28:2,16,20 34:8,16
87:9,15,20,22 125:12
126:25 132:15 136:9
164:10 165:15
166:15 170:6 191:11,
21 192:12 193:10,11
205:7 207:15 211:1
213:3

**trafficking** 86:23,24
98:9,18 199:6 207:11
208:18

**trail** 57:8

**train** 53:7 136:4
159:12

**trained** 52:20,21
53:4,16 86:18 102:3
117:5 141:2,19
170:10 189:10

**trainers** 101:18
103:4

**training** 9:19,21 27:5
53:10 54:3 73:15,19,
20 74:17 86:19 88:24
91:15 101:9,11,14,

19,21 102:8,19,24
107:24 108:16,23
109:4,17 111:12,17,
23,25 114:17 115:7,
10,16 116:1,12,16,21
117:3,4 136:7,17
141:1,2,5 143:20
186:19 187:15
191:11,20 192:2,11,
18,25 193:6,14
203:10 211:24
213:18,20

**trains** 72:8 199:22

**Transaction** 57:6

**transactions** 57:5

**transferred** 14:21,
23,24 16:25 37:6

**transitioning** 30:6

**transparent** 161:17
162:14,16,19,24

**transportation** 16:4
35:18

**travel** 191:22 192:14
202:25 203:6 210:10
212:16

**traveled** 37:14 206:7
207:6

**traveler** 100:20

**travelers** 87:3
205:21

**traveling** 100:21
203:22,23 204:14
205:3 208:17 213:1

**travels** 119:14

**trends** 169:3

**trick** 180:11

**trigger** 166:16
167:21

**triggered** 168:2

**troop** 19:20,23 20:12
38:4,5,9,10 39:21
40:2,6,9,19 41:9
43:11,15,23,24,25
47:15 49:7,10,19,24
51:5,12 55:16,20
58:18 67:25 68:2,13



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

i26

71:19 72:19 79:3,16
80:16 81:9 100:25
101:2,3 107:5 115:24
116:8,10,20 119:7
120:11,14 129:11
130:14 132:2 146:24
172:9,14,19 174:10
191:5,8,16

**troop's** 191:6

**trooper** 14:14,15,17
15:5 17:3 23:5,12,19,
21 24:22 25:11,24
26:1,12,13,21,24
27:3,9 28:7,8,22,25
31:18 33:8,17 34:16
89:11,12,14 104:12,
15 105:15 106:13,18
107:4 119:10 127:14
129:16 131:7 133:3,
18 134:9,15,20
135:7,11,17,19
136:21 138:2,5,11
139:12 140:5,13,16
141:11,17,24 142:2,
15,23,25 143:8,12
148:10 149:15 150:2
151:4,13,19,22
152:14 153:1,3 159:9
163:25 164:9,20,22
166:14,20 167:13,15
168:9 170:9,14,21
174:21,25 179:12
200:17 214:19,22
216:10 217:3,4,7,12

**trooper's** 25:14
26:22 119:21 138:13,
14 139:8,16 141:19
170:17 217:10

**troopers** 17:2 20:8,
10,18,23 21:1,8,13
22:10 23:16 26:8
27:14 29:3,24 30:15,
24 31:24 41:15 42:3
43:7 44:1 46:18 81:5,
6 86:18 89:18,23
94:23 98:7,8 100:3
101:19 102:3,9,15,
21,24 103:7,24
107:21 108:3,10,22
109:3,16 113:20,24
114:2,6,7 116:12
120:8 121:19 125:16
126:11 127:6 129:12,
20 133:15 135:23

136:4,8,17,20 137:2,
11,13,21 138:8,24
139:2 140:9,23
141:1,8 143:20,22
144:3,8,15 148:13
149:5,9 150:13 151:1
152:4 156:12,14,17
165:18 168:17
176:20 189:5 199:4
204:15,21 205:4,17,
20 206:6,16,23
207:23 208:6,12
211:13 212:16,20
213:12,15 214:3
215:7,9,19

**troopers'** 36:9 42:25
101:5,20 111:22
138:20 172:11
174:17 191:20
192:11

**troops** 108:12

**true** 38:12 163:14
166:12 182:3 201:24
209:21

**trunked** 43:4

**Trust** 164:3

**turn** 94:10 103:20
189:23 193:19 194:7

**turned** 185:7

**turning** 193:16

**Twelve** 26:10

**two-thirds** 94:15

**tying** 48:23

**type** 25:9 27:5 42:2
52:14 81:2 109:5,6
133:10 135:7 167:3,
18 173:11 181:21

**typed** 197:21

**types** 29:11 45:3
122:19,22,23 125:3
143:25 151:3 161:8
173:2

**typewriter** 29:19

**typewriters** 29:25
30:4,20

**typical** 32:6

**typically** 20:21 22:2
36:4 55:17 80:13
102:13 103:9

**typing** 105:9

---

### U

**UCR** 69:2

**uh-huh** 6:8 17:19
23:7 24:9 27:24 28:1
29:2 45:12 63:13
66:15 105:6 149:19

**unclear** 6:19

**underground** 44:4,
7,10

**underperformance**
27:19

**underperforming**
25:25 26:22 27:11

**understand** 6:4,10,
17,20 7:1 26:4 29:16
31:15 66:12 67:25
86:14 99:2 100:3
112:20,25 113:13,19
118:12 138:17
154:12 176:7 202:5
211:13,22

**understanding** 5:21
21:23 44:15 46:9,23
47:22 50:2,9 78:25
86:12 87:17 96:21
99:9 106:24 113:14
118:7 128:5 142:24
143:1 145:1 151:12
152:17 153:11
154:17 155:13
157:16 161:16
176:24 177:16
190:19 191:1 192:2,
22 210:13

**understood** 188:20
192:17

**uniformed** 38:15,17
40:16,22 68:14 78:3

**uniforms** 41:5 43:1

**unique** 54:11

**unit** 15:2,18 16:25
17:12 33:1 35:6,8

37:17,22 38:17,18,
19,20 41:12,13 42:16
44:14 52:9,10,20
53:4,7,10 54:6,7,23
55:6 57:13 59:19
65:8 86:8 120:12
121:24 126:17

**United** 10:10 97:12
100:7,11 112:22
113:1,10

**units** 30:18 31:9
32:19,21 33:14 34:7
35:10,12 41:10 54:3
102:12

**universal** 64:20

**unreasonable** 89:11
94:25 100:3 193:24
195:12 198:15,21
199:4 206:23 211:12

**unstated** 171:17

**unusually** 26:2

**updates** 122:12
123:10,15,16

**upgrades** 42:5

**uploaded** 32:1
104:20,21 105:2
106:11 107:4,8,10

**upper** 61:8 209:8

**users** 64:21

**utilize** 52:17 57:9

**utilized** 51:20 59:16
124:7 138:10 179:10

**utilizing** 59:24

---

### V

**vague** 154:2,9 169:5,
16 171:13,16

**varied** 26:15

**variety** 209:22

**Vasquez** 88:6
108:17,20 109:16
110:5,9,14 111:2,14,
18,23 112:4,9,10
113:3,9,14,20,22
114:1,5,8,12,25



115:10 116:10 117:6
185:2 187:20 189:7
191:19 192:2,10
209:3 210:1 212:2

**Vasquez's** 185:9,14

**vehicle** 33:8 89:17
102:6 103:16,17
131:8 132:15 136:10
149:11 151:14,16
163:14 175:1 200:11
201:5 202:15

**vehicles** 28:9 33:10,
15 42:25 62:21 97:22
101:5 139:23 189:5

**vendor** 124:6

**verbal** 6:7 149:21
150:6,14 151:11,21

**verify** 138:10

**version** 92:25 93:12
140:14

**versions** 92:25

**versus** 8:4 40:21
148:9 185:2

**vested** 144:11
161:13

**vice-president**
77:23

**victim** 67:8

**victim's** 66:22 67:8

**video** 4:6 25:22
26:12,23 135:23
138:5,8 139:3,5,7,11
140:3 141:10 169:10,
21 170:5,12,20,25
171:15 172:3,11,14,
17,23 173:7,15,20
174:16,19,24 181:25
217:11

**videos** 25:18,19
26:3,19 27:13

**view** 15:9 199:11

**violate** 144:8

**violated** 113:10

**violating** 100:20
144:11

**violation** 67:12
164:18

**violations** 95:4
194:3 207:3

**Virginia** 73:21

**virus** 53:25

**visit** 85:10

**visited** 197:14

**voice** 89:3 120:3
136:19 139:13

**volume** 75:25 76:1
152:25

**voluntarily** 99:20

**voracity** 138:11,13,
15

---

### W

**wait** 201:8 210:15,16

**waive** 218:2

**wanted** 23:4 57:7
62:19 63:23 66:8
87:25 89:16 102:5,11
104:23 117:18
123:25 125:6 127:3
137:17,24 162:13

**wanting** 123:18
180:7

**warehousing** 58:24

**warning** 149:21
150:6,14,17 151:11,
22 152:1,3,5,8,11,14
153:2,6

**warnings** 28:9

**warrant** 35:21 36:1

**warrants** 36:4,7
53:1,2 62:20 150:16

**Washburn** 88:18
144:1 188:8,12
189:9,12,25 190:3,13
194:14,21 195:23,24
196:13,16

**Washington** 12:1
97:8 211:6

**water** 89:2 155:8

**ways** 59:15 110:2

**weapon** 126:5

**weapons** 86:24,25

**weather** 44:8

**weekends** 12:21
156:2

**weekly** 111:7 112:7

**weeks** 14:7 88:4,9
92:13 141:10

**weight** 200:7

**weights** 127:21

**welfare** 21:13 42:15
78:23

**west** 20:5 31:4,5

**western** 37:3 80:15,
17 81:23 97:12,20

**whew** 171:9

**white** 132:15

**wholly** 185:24
186:10

**Wichita** 14:22 35:18

**wide** 126:16

**widespread** 168:20
193:10

**wise** 123:6

**witnesses** 217:9

**woman** 85:9

**women** 27:16 78:22

**wondering** 81:21,22

**word** 30:4,5,20
63:17,19 70:20 94:6
95:7 105:4

**words** 6:7 85:17
194:21 209:13

**wore** 41:4

**work** 5:16 9:20 10:17
15:5 22:10 32:2
33:12 34:8,15 35:12,
17 36:11,17 48:22
49:25 65:6 76:15,18

129:12 130:4,9
141:17 146:24
156:18 170:2

**worked** 14:11,17
22:9 27:2 35:5,9
38:16,17 41:23 62:9
64:19 84:12 88:13,17
136:9 147:12 182:24

**working** 11:4 41:20
43:10 44:19 58:19
60:25 61:2,4,13,14
62:1,3 63:8 113:23
127:25 183:10

**world** 57:12 76:2

**worthy** 79:13

**wow** 74:14

**writ** 112:21

**write** 29:4 31:20
134:15 214:17,19
215:20

**writer** 188:4

**writing** 29:17 31:1
76:8 105:8 152:9

**written** 152:5 197:16

**wrong** 27:17 113:24
114:2 144:11 161:14
176:6 177:7

---

### Y

**year** 8:24 11:25 14:22
15:15 20:4 22:5,7,12
23:22 24:5 25:12
26:9,12 61:1 75:11,
14,16,17,24 108:16

**years** 9:3 10:19,24,
25 11:6 12:4 13:10
14:24 16:18 18:21
20:8,17 25:18 29:8,
13,21 31:6 32:3
34:14 37:16 38:13,15
55:4 75:19,20 76:10
90:22 122:22 125:22
127:6 128:1 180:16



11880 College Blvd., Suite 405
Overland Park, KS 66210
METROPOLITAN 800.748.7511 • 913.317.8800 • FAX 913.317.8850
COURT REPORTING • LEGAL VIDEO

*i28*

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that a copy of the foregoing APPELLANT'S APPENDIX, as submitted in digital form is an exact copy of the document filed with the Clerk.

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2024, the foregoing APPELLANT'S APPENDIX was electronically filed with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I also certify that within five business days of the issuance of notice that the electronic filing is compliant, one paper copy will be delivered by Federal Express to the Clerk's Office.


DATED: April 24, 2024                    /s/ Kurtis K. Wiard