# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

BLAINE FRANKLIN SHAW et al.,

*Plaintiffs-Appellees*,

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,

*Defendant-Appellant*.

―――――――――――――――

MARK ERICH et al.,

*Plaintiffs-Appellees*,

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,

*Defendant-Appellant*.

## APPELLEES' RESPONSE BRIEF

Appeal from the United States District Court for the District of Kansas
Honorable Kathryn H. Vratil, Senior District Court Judge
District Court Case Nos. 19-CV-1343-KHV & 20-CV-1067-KHV-GEB

Brian Hauss
Elizabeth Gyori
AMERICAN CIVIL LIBERTIES
 UNION FOUNDATION
125 Broad Street, Floor 18
New York, NY 10004
Phone: (212) 549-2500
Fax: (212) 549-2654
bhauss@aclu.org
egyori@aclu.org

Kunyu Ching
AMERICAN CIVIL LIBERTIES
 UNION FOUNDATION OF KANSAS
10561 Barkley Street, Suite 500
Overland Park, KS 66212
Phone: (913) 490-4110
Fax: (913) 490-4119
kching@aclukansas.org

*Attorneys for Plaintiffs-Appellees*

ORAL ARGUMENT REQUESTED

Leslie A. Greathouse
Patrick McInerney
SPENCER FANE LLP
1000 Walnut Street, Suite 1400
Kansas City, MO 64106
Phone: (816) 474-8100
Fax: (816) 474-3216
lgreathouse@spencerfane.com
pmcinerney@spencerfane.com

*Attorneys for Plaintiffs-Appellees*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ iii

PRIOR AND RELATED APPEALS ......................................................... 1

STATEMENT OF THE ISSUES ............................................................... 1

STATEMENT OF THE CASE.................................................................... 2

I.    The District Court Found That Smith Is Responsible for the Challenged KHP Practices. ............................................................................................ 4

    A.    KHP troopers stop and detain out-of-state drivers at highly disproportionate rates compared to Kansas drivers. ............................ 5

    B.    The KHP trains and permits troopers to rely on out-of-state residency and travel plans in forming reasonable suspicion, and to use the Two-Step in an unconstitutionally coercive manner.................................... 6

    C.    The district court found that the challenged policies or practices resulted in unconstitutional detentions in five adjudicated cases between 2017 and 2022.................................................................... 11

        The Shaw Stop ......................................................................... 12

        The Erich/Maloney Stop ........................................................ 13

        The Bosire Stop........................................................................ 15

        The Kelly Stop ......................................................................... 16

        The Dunn Stop ......................................................................... 17

II.    The District Court Awarded Limited Injunctive Relief to Address the KHP's Unconstitutional Policies or Practices. ..................................................... 18

SUMMARY OF ARGUMENT................................................................... 19

ARGUMENT ............................................................................................... 21

I.    The District Court Correctly Ruled That Plaintiffs Have Standing to Obtain Prospective Relief Against the KHP. ............................................................ 21

II.    The District Court Did Not Abuse Its Discretion in Awarding Limited Injunctive Relief to Address the KHP's Persistent Flouting of *Vasquez*.......28

    A.    The award of limited injunctive relief to address a pervasive and unconstitutional law enforcement practice does not violate principles of comity, federalism, and equitable restraint. .................................... 30

i

| | 1. | The district court did not clearly err in finding that the KHP maintains a pervasive practice of giving out-of-state residency or travel plans undue weight in determining reasonable suspicion, in violation of *Vasquez*. | 34 |
|---|---|---|---|
| | 2. | Smith does not contest the district court's finding that he trains and permits troopers to violate *Vasquez* | 37 |
| B. | | Individual Damages Actions Are Not Adequate to Address the KHP's Unconstitutional Practices. | 41 |

III. The District Court Did Not Err in Enjoining the KHP's Unconstitutional Application of the Kansas Two-Step. .......................................46

| A. | Prior rulings upholding individual uses of the Two-Step do not preclude the district court's finding that the KHP has a policy or practice of carrying out the Two-Step in an unconstitutional manner. | 46 |
|---|---|---|
| B. | Record evidence supports the district court's conclusion that KHP troopers use the Two-Step in an unconstitutionally coercive manner. | 48 |
| C. | The district court did not abuse its discretion in requiring affirmative consent and approval for voluntary questioning and consent searches. | 50 |

CONCLUSION .................................................................................53

STATEMENT IN SUPPORT OF ORAL ARGUMENT.........................54

CERTIFICATE OF COMPLIANCE ....................................................56

CERTIFICATE OF SERVICE ............................................................57

CERTIFICATE OF DIGITAL SUBMISSION .......................................58

# TABLE OF AUTHORITIES

## Cases

*Allee v. Medrano*,
 416 U.S. 802 (1974) ................................................................. 32, 43

*Alsaada v. City of Columbus*,
 536 F. Supp. 3d 216 (S.D. Ohio 2021) ..................................... 32

*Awad v. Ziriax*,
 670 F.3d 1111 (10th Cir. 2012) ............................................... 41

*Bannister v. Bd. of Cnty. Comm'rs*,
 829 F. Supp. 1249 (D. Kan. 1993) ........................................... 43

*Brown v. Plata*,
 563 U.S. 493 (2011) ................................................................ 31

*City of Los Angeles v. Lyons*,
 461 U.S. 95 (1983) ........................................................ 19, 25, 45

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013) ................................................................ 24

*Courthouse News Serv. v. N.M. Admin. Off. of Cts.*,
 53 F.4th 1245 (10th Cir. 2022) ............................................... 45

*Covino v. Patrissi*,
 967 F.2d 73 (2d Cir. 1992) ...................................................... 42

*Daniels v. Southfort*,
 6 F.3d 482 (7th Cir. 1993) ....................................................... 45

*Deshawn E. v. Safir*,
 156 F.3d 340 (2d Cir. 1998) .................................................... 26

*Dodds v. Richardson*,
 614 F.3d 1185 (10th Cir. 2010) ............................................... 39

*Duran v. Carruthers*,
 678 F. Supp. 839 (D.N.M. 1988) ....................................... 51, 52

*Duran v. Carruthers*,
 885 F.2d 1492 (10th Cir. 1989) ............................................... 51

*Easyriders Freedom F.I.G.H.T. v. Hannigan*,
   92 F.3d 1486 (9th Cir. 1996) .......................................................... 32, 42

*Fish v. Schwab*,
   957 F.3d 1105 (10th Cir. 2020)........................................................22

*Floyd v. City of New York*,
   283 F.R.D. 153 (S.D.N.Y. 2012)................................................. 23, 42

*Franklin v. City of Chicago*,
   102 F.R.D. 944 (N.D. Ill. 1984).......................................................26

*Free the Nipple-Ft. Collins v. City of Fort Collins*,
   916 F.3d 792 (10th Cir. 2019) .............................................. 30, 41, 42

*Gilmore v. City of Montgomery*,
   417 U.S. 556 (1974) .........................................................................51

*Green v. Cnty. Sch. Bd.*,
   391 U.S. 430 (1968) .........................................................................51

*Hague v. Comm. for Indus. Org.*,
   307 U.S. 496 (1939) .........................................................................32

*LaDuke v. Nelson*,
   762 F.2d 1318 (9th Cir. 1985) .........................................................34

*Lankford v. Gelston*,
   364 F.2d 197 (4th Cir. 1966) ..................................................... 43, 44

*Laufer v. Looper*,
   22 F.4th 871 (10th Cir. 2022) .........................................................22

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
   2 F.4th 330 (4th Cir. 2021) .............................................................42

*Ligon v. City of New York*,
   925 F. Supp. 2d 478 (S.D.N.Y. 2013)..............................................32

*Mack v. Suffolk County*,
   191 F.R.D. 16 (D. Mass. 2000).........................................................26

*Md. State Conf. of NAACP Branches v. Md. Dep't of State Police*,
   72 F. Supp. 2d 560 (D. Md. 1999)....................................................27

iv

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) .......................................... 23, 28

*Melendres v. Maricopa County*,
  897 F.3d 1217 (9th Cir. 2018) ................................................34

*Milliken v. Bradley*,
  433 U.S. 267 (1977) ................................................................51

*Mills v. District of Columbia*,
  571 F.3d 1304 (D.C. Cir. 2009) ........................... 32, 42, 52

*Mitchum v. Foster*,
  407 U.S. 225 (1972) ................................................................32

*Nat'l Fed'n of Fed. Emps. v. Weinberger*,
  818 F.2d 935 (D.C. Cir. 1987) ...............................................44

*O'Shea v. Littleton*,
  414 U.S. 488 (1974) ...................................................... 24, 45

*Ohio v. Robinette*,
  519 U.S. 33 (1996) ..................................................................52

*Ortega-Melendres v. Arpaio*,
  836 F. Supp. 2d 959 (D. Ariz. 2011)................................ 23, 42

*Pennsylvania v. Porter*,
  659 F.2d 306 (3d Cir. 1981)....................................................39

*Rahmann v. Chertoff*,
  530 F.3d 622 (7th Cir. 2008) ..................................................45

*Ramos v. Banner Health*,
  1 F.4th 769 (10th Cir. 2021) ...................................................50

*Rizzo v. Goode*,
  423 U.S. 362 (1976) ...................................... 20, 33, 34, 38, 39, 51

*Rodriguez v. United States*,
  575 U.S. 348 (2015) ................................................................52

*Safe Streets All. v. Hickenlooper*,
  859 F.3d 865 (10th Cir. 2017) ....................................... 51, 52

*Shaw v. Schulte*,
   36 F.4th 1006 (10th Cir. 2022) ........................................................1, 37

*Simic v. City of Chicago*,
   851 F.3d 734 (7th Cir. 2017) ......................................................... 27, 28

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ..................................................................... 21, 22

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*,
   402 U.S. 1 (1971) ......................................................................... 50, 52

*Tandy v. City of Wichita*,
   380 F.3d 1277 (10th Cir. 2004) ..............................................................22

*United States v. Wood*,
   106 F.3d 942 (10th Cir. 1997) ..............................................................44

*Uroza v. Salt Lake County*, No. 2:11CV713DAK,
   2014 WL 4457300 (D. Utah Sept. 10, 2014) ....................................26

*Vasquez v. Lewis*,
   834 F.3d 1132 (10th Cir. 2016).................................................. 3, 37, 46

*Weitzel v. Div. of Occupational & Pro. Licensing*,
   240 F.3d 871 (10th Cir. 2001) ..............................................................45

*Wyoming v. U.S. Dep't of Agric.*,
   661 F.3d 1209 (10th Cir. 2011)..............................................................29

**Statutes**

K.S.A. § 60-4101 *et seq.*...............................................................44

K.S.A. § 74-2107 .........................................................................39

**Other Authorities**

1 Wayne R. LaFave, Search & Seizure § 1.12(a)
   (6th ed. & Mar. 2024 update) ...................................................... 42, 44

11A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2948.1
   (3d ed. & Nov. 2018 update) ..............................................................41

Joanna C. Schwartz, *Civil Rights Without Representation*,
   64 Wm. & Mary L. Rev. 641 (2023) ....................................................43

## PRIOR AND RELATED APPEALS

In this case's one prior appeal, *Shaw v. Schulte*, 36 F.4th 1006 (10th Cir. 2022), this Court heard an interlocutory appeal from the district court's denial of summary judgment to two Kansas Highway Patrol troopers on the basis of qualified immunity. Those troopers are not parties to this appeal.

## STATEMENT OF THE ISSUES

The district court found that Defendant-Appellant Col. Erik Smith, in his official capacity as Superintendent of the Kansas Highway Patrol ("KHP"), is responsible for the KHP's unconstitutional policies or practices of: (1) routinely giving out-of-state residency and travel plans significant weight in the reasonable suspicion calculus; and (2) using the Kansas Two-Step to extend traffic stops without reasonable suspicion and without the motorists' knowing, intelligent, and voluntary consent.

The issues presented on appeal are:

I.     Do Plaintiffs-Appellees have standing to obtain declaratory and injunctive relief against these unconstitutional practices, where they continue to drive on Kansas highways to and from so-called "drug source states," such as Colorado?

II.    Did the district court abuse its discretion in awarding narrowly tailored injunctive relief to abate these unconstitutional practices, given the irreparable harm imposed by the KHP's violation of Fourth Amendment rights?

III.    Did the district court abuse its discretion in requiring the KHP to use written consent forms in order to remedy the agency's unconstitutional practice of using the Kansas Two-Step to extend traffic stops under circumstances where a reasonable driver would not feel free to leave?

## STATEMENT OF THE CASE

The district court aptly summarized the stakes of this case: "In the name of drug interdiction, the [KHP] has waged war on motorists—especially out-of-state residents traveling between Colorado and Missouri on federal highway I-70 in Kansas. . . . The war is basically a question of numbers: stop enough cars and you're bound to discover drugs. And what's the harm if a few constitutional rights get trampled along the way?" App. II, 1–2 (footnote omitted).

The KHP's strategy is straightforward. Troopers use "the hundreds or thousands of traffic laws on the books" to pull over motorists, mostly out-of-state residents, for routine traffic stops. App. II, 2. "[T]roopers are trained to conclude the traffic stop, somehow signal that the driver is free to go, then immediately re-engage the driver in friendly, casual conversation to keep the driver at the scene and enable the trooper to develop reasonable suspicion or take another stab at getting consent—

a maneuver colloquially known as the 'Kansas Two-Step.'" App. II, 4–5. If the driver refuses to consent to a search, the trooper can still detain the vehicle for a canine sniff and insist reasonable suspicion existed the whole time. App. II, 5.

In *Vasquez v. Lewis*, this Court denied qualified immunity to a KHP trooper who relied on a motorist's Colorado residency to justify one such roadside detention. 834 F.3d 1132 (10th Cir. 2016). *Vasquez* admonished that "it is time to abandon the pretense that state citizenship is a permissible basis upon which to justify the detention and search of out-of-state motorists, and time to stop the practice of detention of motorists for nothing more than an out-of-state license plate." *Id.* at 1138. "Absent a demonstrated extraordinary circumstance," the Court wrote, "the continued use of state residency as a justification for the fact of or continuation of a stop is impermissible." *Id. Vasquez* added that travel to or from a drug source state "is so broad as to be indicative of almost nothing," given the number of states that have legalized marijuana. *Id.* (citation omitted).

But the KHP continues to use the same playbook. KHP troopers subjected Plaintiffs-Appellees Blaine Shaw, Samuel Shaw, Joshua Bosire, Mark Erich and Shawna Maloney ("Plaintiffs") to three prolonged roadside detentions in 2017, 2018, and 2019. App. II, 9. In all three stops: "(1) plaintiff's vehicle had an out-of-state license plate; (2) plaintiff was traveling to or from Colorado; (3) the driver committed a traffic violation; (4) a KHP trooper witnessed the traffic violation,

pulled the vehicle over and gave the driver a citation or warning; (5) the trooper further detained plaintiff for a canine sniff of the vehicle; and (6) the trooper did not discover drugs or other contraband." *Id.* The Shaw and Erich/Maloney stops involved the use of the Two-Step. *Id.* Plaintiffs continue to drive on Kansas highways to and from "drug source states," including Colorado. App. II, 16, 20, 30.

Plaintiffs brought this 42 U.S.C. § 1983 lawsuit against Col. Smith in his official capacity as KHP Superintendent, alleging violation of their Fourth and Fourteenth Amendment rights and seeking declaratory and injunctive relief.[1]

## I.    The District Court Found That Smith Is Responsible for the Challenged KHP Practices.

After a two-week bench trial, the district court found that Smith is responsible for two policies or practices that violate the Fourth Amendment: (1) a policy or practice "of impermissibly giving residency and travel plans significant weight when calculating reasonable suspicion," App. II, 63; and (2) a policy or practice "of prolonging traffic stops by using the Kansas Two-Step to coerce drivers into answering questions when the troopers do not have reasonable suspicion and the drivers do not feel free to leave," App. II, 66; *see also* App. II, 75.

---

[1] The district court substituted Col. Smith for the prior Superintendent, Herman Jones. Dist. Ct. ECF No. 545. All references to Smith throughout this brief mean the Superintendent of the KHP in his official capacity.

The district court's findings were based on: (1) unrebutted testimony from Plaintiff's expert statistical witness, Dr. Jonathan Mummolo; (2) testimony and documentary evidence showing that the KHP trains and permits troopers to engage in the challenged policies or practices; and (3) five adjudicated Fourth Amendment violations taking place between 2017 and 2022.

### A. KHP troopers stop and detain out-of-state drivers at highly disproportionate rates compared to Kansas drivers.

The district court accepted as credible expert witness Jonathan Mummolo's statistical and quantitative analysis of KHP traffic enforcement policies. App. II, 10–12. An assistant professor of politics and public affairs at Princeton University and co-owner of statistical consulting firm Knox & Mummolo LLC, Dr. Mummolo demonstrated that between January 2018 and November 2020, "KHP troopers stopped 70 per cent more out-of-state drivers than would be expected if KHP troopers stopped in-state and out-of-state drivers at the same rate," accounting for approximately 50,000 excess traffic stops of out-of-state drivers. App. II, 11; App. XIV, 24:23–25:9. Dr. Mummolo found that 77 percent of all traffic stops and more than *90 percent* of canine deployments were "conducted on out-of-state motorists, despite out-of-state drivers representing only about 35 per cent of the drivers on the road at the measured times and locations." App. II, 11–12; App. XIV, 40:11-16. Smith "presented no evidence which explains this disparity on grounds that are unrelated to out-of-state residency or travel plans." App. II, 12.

**B.** **The KHP trains and permits troopers to rely on out-of-state residency and travel plans in forming reasonable suspicion, and to use the Two-Step in an unconstitutionally coercive manner.**

The district court also considered testimony and documentary evidence showing that the KHP's training, documentation, and supervision policies promote the challenged policies or practices.

The district court found that the "KHP trains and permits [troopers] to evaluate a driver's out-of-state residency and travel plans when developing reasonable suspicion," in flagrant disregard of *Vasquez*. App. II, 43. Assistant Superintendent Randy Moon responded to *Vasquez* by "stat[ing] publicly that it would be unreasonable to expect troopers to ignore the fact that drivers are coming from a drug source state such as Colorado that has legalized marijuana." App. II, 44; *see* App. XXIII, 94:9–96:1, 207:22–209:21, 213:11–214:4. And the KHP's former legal counsel, Sarah Washburn, interpreted the decision minimally, "testif[ying] that . . . [*Vasquez*] merely reiterated the principle that a driver's out-of-state residency, origin or destination cannot be the 'sole' factor forming the basis of reasonable suspicion." App. II, 44; *see* App. XVI, 37:13–38:7, 47:2–52:12. Notably, *Vasquez* did not elicit *any* change in KHP policy; the agency did not implement policy changes until 2020, in response to this lawsuit. App. II, 44.

Despite these policy changes, the "KHP apparently *continues* to train its troopers that they may consider a driver's out-of-state origin or destination as 'a'

reasonable suspicion factor in conjunction with other factors." App. II, 44–45 (emphasis added). Indeed, "[m]ultiple KHP troopers testified that they continue to rely on a driver's state of origin or destination in developing reasonable suspicion." App. II, 45. Trooper Ryan Wolting "testified that the state on a license plate can be a factor in deciding who to pull over, and that the fact that a driver is traveling from Denver can contribute to reasonable suspicion because marijuana is legal in Denver." *Id.*; *see* App. XXII, 114:3–117:9, 153:13–156:18; Trial Ex. 133 07:47–09:53, 30:45–34:06.[2] And Trooper Chandler Rule "testified that he uses a driver's state of origin or destination as a factor in forming reasonable suspicion, and that the KHP has trained him to use travel on I-70," which runs from Missouri to Colorado, "as a factor in forming reasonable suspicion because it is a primary drug corridor." App. II, 45; *see* App. XXI, 54:18–56:7, 93:7-16; Trial Ex. 131 2:16–5:44, 24:55–25:15.

Supervisory officials shared these misapprehensions about *Vasquez*'s import. Lieutenant Greg Jirak "testified that a driver's state of origin is appropriate to consider in forming reasonable suspicion because drug production and distribution occur in states such as California, Colorado, Oklahoma and Missouri." App. II, 45;

---

[2] Pursuant to this Court's May 17, 2024 Order, Plaintiffs are conventionally filing the following trial exhibits with this Court: (1) Trial Exhibit 3B (B. Shaw Cell Phone Video); (2) Trial Exhibit 130 (Lieutenant Rohr's deposition designations); (3) Trial Exhibit 131 (Trooper C. Rule's deposition designations); (4) Trial Exhibit 132 (Lieutenant Jirak's deposition designation); (5) Trial Exhibit 133 (Trooper Wolting's deposition designations).

*see* App. XXII, 38:20–42:22; Trial Ex. 132 21:16–26:09. Likewise, Lieutenant Justin Rohr "testified that a driver's state of origin indicates criminal activity because large amounts of drugs originate in states such as California and Colorado." App. II, 45; *see* App. XX, 33:24–38:25, Trial Ex. 130 09:30–10:46. Even Captain Brent Hogelin was unclear on KHP policy, testifying "both that (1) KHP policy does not permit troopers to use a driver's out-of-state residency as *the sole* factor contributing to reasonable suspicion (suggesting that troopers may use that factor in conjunction with other factors), and (2) KHP policy does not permit troopers to use a driver's out-of-state residency as *a* factor contributing to reasonable suspicion (suggesting that troopers may not use that factor at all)." App. II, 45 n.52; *see* App. XVII, 76:20–77:20, 97:23–98:2. "No trooper testified that he does not use a driver's state of origin or destination as a factor in forming reasonable suspicion." App. II, 45.

The district court also found that the KHP trains and permits its troopers to perform the Kansas Two-Step in an unconstitutionally coercive manner, as the stops adjudicated below demonstrated. App. II, 58. The KHP trains troopers to perform the Two-Step before and after they have entered service. App. II, 51. It teaches troopers specifically that they need not take even two steps to end the non-consensual encounter that usually occurs for a traffic violation. *Id*. The KHP instructs troopers that it is "[n]ot mandatory to disengage, as long as a reasonable person in the suspect's position would feel free to leave. Even if they are not." *Id*. (alteration in

original). Further, the KHP directs troopers not to inform the motorist that they are free to go at the end of the non-consensual encounter, but rather to say phrases like, "Have a safe trip." App. II, 52. Armed with this training, troopers "are very successful in pressuring motorists to remain after traffic stops without knowing, intelligent and voluntary consent." App. II, 58. The court noted that Smith did "not pretend [below] that only a handful of rogue troopers abuse their power by engaging in the Two-Step." *Id.*

Moreover, the KHP's documentation policies facilitate rampant suspicionless roadside detentions, especially of out-of-state drivers. Until September 2022, the "KHP did not train or require its troopers to list the bases for reasonable suspicion in post-detention reports unless the traffic stop involved an accident, arrest, seizure or canine deployment." App. II, 46. Thus, "[i]f a motorist filed a complaint or a lawsuit, and the trooper had not listed the bases for reasonable suspicion in a report, that trooper would document the traffic stop after the fact—sometimes long after the fact—and try to reconstruct the basis for reasonable suspicion." *Id.* Before 2022, the KHP required troopers to fill out reports when they conducted canine sniffs, but the "reports frequently provided no detail about grounds for the canine sniff." *Id.* Consequently, "supervising troopers and command staff at the KHP have rarely learned about traffic stops that do not result in recovery of narcotics." *Id.*

The KHP finally changed its policies in 2022, after this lawsuit was filed, to require troopers to document all detentions—including those that do not result in an arrest or seizure. App. II, 47. The KHP now documents some traffic stop data, including (1) the trooper who made or participated in the detention, (2) the date, time, and location, (3) vehicle information, and (4) reasonable suspicion factors. App. II, 49. But the KHP still does not collect data on the following:

> [T]he proportion of in-state versus out-of-state drivers that KHP troopers pull over for traffic stops; how many traffic stops lead to post-traffic stop detentions for vehicle searches; how many of these detentions do or do not result in contraband seizures; how frequently troopers perform the Kansas Two-Step; how often civilians lodge complaints against particular troopers arising out of traffic stops; or how often particular troopers violate the constitutional rights of drivers.

*Id*. The KHP's documentation policies prevent it from taking steps to address the improper detentions perpetrated by its troopers. *See id.*

Finally, the KHP's supervisory practices incentivize troopers to play fast and loose with Fourth Amendment requirements in pursuit of big drug busts. The KHP encourages troopers to search as many cars as possible, and uses the number of seizures performed as one metric to assess trooper performance. App. II, 54. KHP training slides "state that a successful KHP trooper 'must make high volume traffic stops,' and troopers must 'STOP A LOT OF CARS!'" App. II, 54–55. But "the KHP does not require supervising troopers to consider how many roadside detentions a trooper has performed that did not yield any contraband, or the number of times that

courts have sustained motions to suppress involving that trooper," during annual performance reviews. App. II, 54. And only one KHP unit, constituting roughly five percent of all troopers, conducts a random quarterly view of traffic stops and detentions. *Id.* In instances when the KHP finds that a trooper has acted impermissibly, it imposes minimal consequences. *See* App. II, 30. For example, even after an internal investigation concluded that Trooper Brandon McMillan detained Bosire longer than necessary in violation of his constitutional rights, the KHP merely ordered corrective action appropriate for a minor rule violation, as opposed to discipline. App. XIV, 119–23. McMillan was ordered to undergo only one hour of additional training and a ride-along with another trooper, during which there was no discussion of "proper procedures for stops or searches," meaning "McMillan did not learn anything." App. II, 30.

**C.    The district court found that the challenged policies or practices resulted in unconstitutional detentions in five adjudicated cases between 2017 and 2022.**

The district court also considered the individual circumstances of the three prolonged detentions in which Plaintiffs were involved, as well as the prolonged detentions of three non-parties: Daniel Kelly, Suzanne Dunn, and Curtis Martinez. App. II, 12–42. The court found that in five of the six adjudicated stops, the troopers'

implementation of the challenged policies or practices resulted in Fourth Amendment violations.[3]

### The Shaw Stop

On December 20, 2017, Trooper Douglas Schulte stopped Plaintiffs Blaine and Samuel Shaw for speeding on I-70 while they were traveling in a car with Osage Nation license plates from their home in Oklahoma City, Oklahoma to Colorado to visit friends and family. App. II, 12–13. After Schulte cited Blaine for speeding, Schulte "took three steps away from the vehicle, [] pivoted within three and a half seconds and returned to the driver's window to ask, 'Hey Blaine, can I ask you a question real quick?'" App. II, 13. Still reading the citation, Blaine responded, "yeah." *Id*.; *see also* Trial Ex. 3B 11:25–11:35. Blaine felt he could not leave because Schulte was so close to the vehicle that he could not safely pull out. App. II, 13. After questioning Blaine about his destination and contraband in the vehicle, which Blaine denied possessing, Schulte sought permission to search the vehicle. *Id*. The Shaws refused, and Schulte detained them for a canine sniff that did not recover any narcotics. *Id*.

---

[3] The district court found that Trooper Scott Proffitt's detention of non-party Curtis Martinez was supported by reasonable suspicion and therefore did not violate the Fourth Amendment, but Proffitt nonetheless used the Two-Step in a coercive manner. App. II, 42.

Consistent with the jury verdict in Blaine's favor, the district court found that Schulte violated the Fourth Amendment by (1) giving "undue weight to the Shaws' out-of-state residence and travel plans" and (2) "impermissibly extend[ing] the Shaws' detention by performing the Kansas Two-Step under circumstances where a reasonable driver would not have felt free to leave." App. II, 15. "The KHP never disciplined Schulte for violating the Shaws' Fourth Amendment rights or instructed him to undergo corrective action such as re-training with legal counsel." App. II, 16. Blaine is now "anxious about the prospect of being detained by the KHP" when he drives through Kansas. *Id.*

<u>The Erich/Maloney Stop</u>

On March 9, 2018, Technical Trooper Justin Rohr decided to follow an RV with temporary Colorado tags driven by Plaintiff Mark Erich on I-70. App. II, 16. Erich was accompanied by his wife, Plaintiff Shawna Maloney, and their two children, aged 10 and 13. *Id.* As Erich was driving in the right lane, Rohr approached the RV from behind in the left lane, "virtually on its bumper, for about 15 seconds." *Id.* Blinded by Rohr's headlights and concerned that Rohr was an aggressive or drunk driver, Erich guided the RV toward the shoulder of the road to avoid Rohr's vehicle, causing the RV's right-side wheels to cross the fog line. *Id.* Rohr then stopped the RV for crossing the fog line, gave Erich a warning, and told the family to "have a safe trip" and "drive careful." App. II, 16–17. After taking four steps away

13

from the RV, Rohr returned four and a half seconds later to the driver's side window and asked, "Hey sir, can I ask you some questions?" *Id*. Feeling unable to leave because of Rohr's proximity to the RV, Erich agreed but then changed his mind and, after Rohr confirmed that Erich was not obligated to answer any questions, expressed his desire to leave. App. II, 17–18. Rohr then detained the family, conducted a canine sniff, and fruitlessly searched the RV for approximately 20 minutes. App. II, 18–20. Rohr informed the family that they were free to leave, but then detained them to search the RV roof, again finding nothing. App. II, 20.

Since Rohr had "provoked the traffic violation," the district court found that the stop lacked a reasonable basis and was therefore invalid under the Fourth Amendment, rendering the troopers' subsequent actions likewise unlawful. App. II 21–23, 25. The court further found that "even if Rohr had reasonable suspicion for the original traffic stop *and* reasonable suspicion to extend the detention for a canine sniff, Rohr clearly did not have reasonable suspicion to *further* extend the detention—a second time—to climb the ladder on the back and search the roof of the RV." App. II, 26. During the search, the troopers damaged the vehicle, derailing the family's camping plans. App. II, 20. This Fourth Amendment violation caused the Erich/Maloney family lasting severe anxiety and anger, which negatively impacted their day-to-day lives, interstate travel, and trust in law enforcement. App.

II, 20–21. "The family did not take another vacation for three years because their children were too scared," and they eventually sold the RV. *Id.*

<u>The Bosire Stop</u>

On February 10, 2019, Plaintiff Joshua Bosire was driving home to Wichita, Kansas after visiting his daughter in Colorado when Trooper Brandon McMillan pulled him over, suspecting Bosire of traveling in a drug caravan. App. II, 27. McMillan's suspicions stemmed in part from observing Bosire at a gas station with a rental vehicle with Missouri license plates; watching Bosire interact with the gas station attendant; and noticing another rental vehicle nearby. *Id.* McMillan eventually stopped Bosire for driving seven miles over the speed limit. *Id.* During the stop, Bosire declined to answer McMillan's questions about his travel plans beyond saying "he was coming from the west and heading east." *Id.* Bosire also refused to allow McMillan to search his vehicle. *Id.* Despite acknowledging aloud that he lacked reasonable suspicion to hold Bosire for a drug dog, McMillan detained Bosire for a canine sniff. App. II, 28. The canine did not alert, so McMillan let Bosire go. *Id.*

The district court found that McMillan violated the Fourth Amendment by (1) detaining Bosire for a canine sniff when he lacked reasonable suspicion and (2) relying "heavily on Bosire's out-of-state travel origin in developing reasonable

suspicion." App. II, 29. The incident "damaged Bosire's trust in law enforcement and causes him significant fear and anxiety around police." App. II, 30.

<u>The Kelly Stop</u>

On May 27, 2020, Trooper James McCord stopped Daniel Kelly while driving eastbound on I-70 in a vehicle with California license plates. App. II, 30. McCord claimed that he pulled Kelly over for following another vehicle too closely. *Id*. *But see* App. II, 30 n.35 (finding "[t]he dashcam footage does not credibly substantiate" McCord's claim about Kelly's traffic violation). After giving Kelly a warning, McCord "waved goodbye and performed a Kansas Two-Step by taking two steps away from the vehicle, returning less than two seconds later, and saying 'Oh, by the way sir, can I ask you just a few more questions?'" App. II, 31. McCord then asked Kelly if he had any contraband, which Kelly denied, and for consent to a vehicle search, which Kelly refused. *Id*. McCord detained Kelly, deployed a canine, and searched Kelly's vehicle, finding nothing. App. II, 31–32.[4]

The district court found that McCord violated the Fourth Amendment when he performed the Two-Step to prolong Kelly's detention and detained Kelly for a canine sniff without reasonable suspicion. App. II, 33.

---

[4] Although McCord recovered a pen with "THC" on the cartridge, he did not test the pen. App. II, 32.

<u>The Dunn Stop</u>

On February 5, 2021, Trooper Chandler Rule stopped Suzanne Dunn while driving a rental car on I-70, en route from her home in Arlington, Virginia to Denver, Colorado. App. II, 33–34. Rule pulled Dunn over because she continued driving in the left lane for approximately 50 seconds after passing two trucks, which he believed violated Kansas law authorizing driving in the left lane only to pass other vehicles. *See id*. & n.39 (finding Dunn's stop "exceedingly pretextual"). After giving Dunn a warning and wishing her a safe trip, Rule "took one step away from the vehicle, re-approached it less than one second later, and asked, 'Hey ma'am, do you mind if I ask you a couple questions?'" to which Dunn responded, "yeah." App. II, 34. At this point, "Dunn did not feel free to leave, in part because Rule had put his head and arms inside her vehicle through the passenger-side window as he questioned her." App. II, 35. Although Dunn denied having any drugs and refused a search of her trunk, she agreed to a canine sniff because she believed she would be allowed to remain inside the car while the canine ran around the vehicle. *Id*. Instead, Rule ordered Dunn to exit the car. The canine purportedly alerted, and Rule searched the vehicle. *Id*. at 35–36. Finding no contraband, Rule allowed Dunn to leave. *Id*.

The district court found that "(1) Rule performed the Kansas Two-Step under circumstances where a reasonable driver would not feel free to leave, and (2) Rule

did not have reasonable suspicion to extend Dunn's detention when he performed the Two-Step." App. II, 38.

## II. The District Court Awarded Limited Injunctive Relief to Address the KHP's Unconstitutional Policies or Practices.

After several rounds of supplemental briefing on the appropriate form of injunctive relief, *see* App. II, 201–02, the district court enjoined the KHP from: (1) giving any weight in the reasonable suspicion calculus to the fact that a motorist is traveling to or from a "drug source" or "drug destination" state or on a drug corridor; and (2) using the Two-Step "to extend traffic stops of motorists without reasonable suspicion or without the motorists' knowing, intelligent, and voluntary consent." App. II, 213.

The district court also ordered the KHP to undertake appropriate remedial measures requiring the KHP to: adequately document motorist stops and detentions; analyze and report on its collected data; update its policies to ensure motorists affirmatively consent to voluntary searches; update its trainings to reflect Fourth Amendment requirements; ensure proper supervision over troopers' compliance with the Fourth Amendment, in a manner the KHP shall determine; implement safeguards through audio-visual equipment to monitor troopers' compliance with the law; and submit performance compliance reviews to the court. App. II, at 213–24. The injunction will remain in effect for between two and four years, provided the

KHP can bring itself into compliance with the injunction's objectives during that time. App. II, 212–13.

Smith appealed. A motions panel of this Court granted a stay of the injunction pending appeal.

## SUMMARY OF ARGUMENT

The district court found that Smith is responsible for a policy or practice that, in defiance of *Vasquez*, "unlawfully detains motorists in Kansas (especially out-of-state motorists) without reasonable suspicion or consent, based on out-of-state residency and—to more than a minimal extent—based on travel plans that are not implausible or inherently contradictory." App. II, 75. The district court further found, based on the KHP's training materials and the detentions adjudicated below, that Smith "is responsible for a policy or practice of using the Kansas Two-Step to extend traffic stops of motorists in Kansas without reasonable suspicion and without the motorists' knowing, intelligent and voluntary consent." *Id.*

Smith does not directly challenge the district court's finding that the KHP trains and permits its troopers to engage in these unconstitutional practices. Instead, he seeks reversal on three grounds, none persuasive. First, citing the Supreme Court's decision in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), Smith argues that Plaintiffs lack standing because it is speculative whether they will again be subjected to a traffic stop and subsequent roadside detention while driving on Kansas

highways. But Plaintiffs face a realistic threat of future detentions because they continue to drive on Kansas highways to and from "drug source states," such as Colorado. *Lyons* acknowledged that individuals have standing to enjoin a law enforcement agency's unconstitutional policies or practices, even if those policies or practices occur post-stop or post-arrest. Courts nationwide have applied that ruling to find standing in cases challenging law enforcement agencies' unlawful detention practices.

Second, Smith contends that the district court violated principles of federalism, comity, and equitable restraint in awarding injunctive relief. Relying principally on the Supreme Court's decision in *Rizzo v. Goode*, 423 U.S. 362 (1976), he argues that the five independent Fourth Amendment violations the district court identified are insufficient to sustain injunctive relief against a state law enforcement agency. In *Rizzo*, however, the Supreme Court held that § 1983 liability could not be imposed on supervisory officials in the absence of evidence that they were responsible for the unrelated individual instances of police misconduct the district court recognized. Here, by contrast, the district court found that the KHP itself trains and permits its troopers to flout *Vasquez* and employ the Two-Step in an unconstitutional manner. While monetary relief is the traditional remedy for torts committed by individual officers, injunctive relief is warranted to abate a law enforcement agency's unconstitutional policies or practices.

Finally, Smith argues that the district court abused its discretion in requiring the KHP to obtain written consent prior to re-engaging a motorist for "voluntary" questioning shortly after a traffic stop has concluded, as well as for consent searches. Smith does not dispute that the Two-Step, whether used to initiate further questioning or a consent search, can be carried out in an unconstitutional manner, though he quibbles with the district court's findings that the uses of the Two-Step adjudicated below were coercive. Mainly, he argues that the district court's remedy is broader than necessary to cure any constitutional violation. But when a court identifies an unconstitutional policy or practice, as the district court did here, it has broad powers to remedy the violation. Those powers extend to the temporary curbing of techniques that have a demonstrated susceptibility to abuse, such as the Two-Step.

Accordingly, this Court should affirm the well-reasoned judgment of the district court.

## ARGUMENT

### I. The District Court Correctly Ruled That Plaintiffs Have Standing to Obtain Prospective Relief Against the KHP.

Article III standing is established when a plaintiff demonstrates "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (cleaned up). The injury must be "concrete and particularized and actual or imminent, not

conjectural or hypothetical." *Id.* at 158 (cleaned up). Plaintiffs may establish standing for injunctive relief by demonstrating a "realistic threat" that they will be wronged in a similar way in the future. *Tandy v. City of Wichita*, 380 F.3d 1277, 1284 (10th Cir. 2004); *accord, e.g.*, *Laufer v. Looper*, 22 F.4th 871, 876 (10th Cir. 2022). This Court reviews the district court's standing determination de novo, and the factual findings underlying that determination for clear error. *Fish v. Schwab*, 957 F.3d 1105, 1118 (10th Cir. 2020).

Here, the KHP's own lack of documentation made it impossible for the district court to estimate the true likelihood that a specific driver would be stopped or detained, the prevalence of the Two-Step, or how frequently troopers perform it under circumstances where a driver would not feel free to leave. App. II, 57. But the court found it "clear" from the extensive evidence presented at trial "that KHP troopers stop out-of-state drivers at a highly disproportionate rate, and that once a trooper stops an out-of-state driver, a canine sniff (and its attendant delay) is disproportionately likely to ensue." App. II, 57–58. The district court also found the trial record "clear" that KHP troopers "regularly" use "the Two-Step to create highly coercive circumstances and that they are very successful in pressuring motorists to remain after traffic stops without knowing, intelligent, and voluntary consent." App. II, 58. The court further found that Smith trains and permits troopers to rely on out-

of-state residency and travel plans in forming reasonable suspicion, and to perform the Two-Step in a coercive manner. *Id.*; *see also* App. II, 43–46, 50–53.

In light of these factual findings, the district court held that "[P]laintiffs have demonstrated a sufficiently realistic threat that the KHP will violate their Fourth Amendment rights in the future." App. II, 59. As the court pointed out, a single prior injury pursuant to an unconstitutional policy or practice will often establish a realistic threat of future harm sufficient to support standing for injunctive relief. *See, e.g.*, *Floyd v. City of New York*, 283 F.R.D. 153, 170 (S.D.N.Y. 2012) ("Even [a] single stop, in light of the tens of thousands of facially unlawful stops, would likely confer standing."); *Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 979 (D. Ariz. 2011) (finding plaintiffs had standing to challenge stop policy even though "likelihood that any particular named Plaintiff will again be stopped in the same way may not be high"), *aff'd sub nom. Melendres v. Arpaio*, 695 F.3d 990, 998–99 (9th Cir. 2012).[5]

Smith argues that Plaintiffs lack standing because it is "speculative" whether KHP troopers will again subject them to a traffic stop, the Two-Step, and/or a suspicionless prolonged detention. Opening Br. 16–18. Citing *Lyons* and *O'Shea v.*

---

[5] Smith attempts to distinguish *Ortega-Melendres* on the ground that it "did not turn on conjecture about whether plaintiffs would first be stopped for a traffic offense." Opening Br. 20. *But see Melendres*, 695 F.3d at 998–99 (rejecting precisely this argument on the ground that plaintiffs could reasonably expect to be subjected to a future traffic stop).

*Littleton*, 414 U.S. 488 (1974), he attempts to erect a bright-line rule that any claim for prospective relief based on post-stop or post-arrest interactions with law enforcement is too speculative to support standing, because it assumes that the plaintiff will engage in some unlawful conduct provoking another law-enforcement encounter. Opening Br. 15–18. But both *O'Shea* and *Lyons* found that standing was lacking due to a chain of hypotheticals much more attenuated and conjectural than the risk that KHP troopers will again detain Plaintiffs pursuant to the challenged policies.

In *O'Shea*, plaintiffs brought claims against two county judges for discriminatory bond-setting and sentencing practices. The Supreme Court did not find a realistic threat of future injury, because the plaintiffs asserted only a vague, non-specific fear that they might be accused of a crime in the future. 414 U.S. at 497. Furthermore, their likelihood of injury necessarily depended on both a discretionary police decision to arrest them and a prosecutor's decision to charge them before they might appear before the judges whose conduct they sought to challenge. *Id.* These layered contingencies, based in part on the independent actions of third parties not before the court, defeated standing. *Id*. ("[A]ttempting to anticipate whether and when these respondents will be charged with crime and will be made to appear before either petitioner takes us into the area of speculation and conjecture."); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411–14 & n.5 (2013) (holding that the

plaintiffs lacked standing to challenge § 702 of the Foreign Intelligence Surveillance Act, where the plaintiffs could only speculate about whom the government would target for surveillance, what legal authorities it would invoke if it targeted them, and whether the third-party Foreign Intelligence Surveillance Court would authorize the interception of their messages).

In *Lyons*, the plaintiff sought to enjoin Los Angeles Police Department officers from using chokeholds on civilians without provocation or resistance; however, the use of chokeholds absent provocation was wholly unauthorized and violated city policy. 461 U.S. at 110. In the absence of a specific agency-condoned pattern or practice of administering illegal chokeholds, the Supreme Court found it speculative that the plaintiff would again be stopped by a police officer who would execute a chokehold directly contrary to city policy. *Id.* at 108. The Court also found the plaintiff's risk of future injury speculative because he did not allege an intention to engage in conduct, such as resisting arrest, that would provoke the use of a chokehold. *Id.* Thus, in both *Lyons* and *O'Shea*, it was the tenuous nature of the prospective harms—rather than a concrete rule requiring courts to assume plaintiffs' future perfect adherence to the law—that defeated standing.

In fact, *Lyons* recognized that prospective relief is appropriate to combat a clearly defined pattern and practice of law enforcement misconduct, even if the plaintiff's claim necessarily anticipates a future law enforcement encounter. *Id.* at

105–06 ("In order to establish an actual controversy in this case, Lyons would have had not only to allege that he would have another encounter with the police but also . . . that the City ordered or authorized police officers to act in such manner."). "After *Lyons*, several federal courts have held that the victim of an established government policy can sue to enjoin that policy even [i]f he would not again be subject to it unless arrested once more." *Uroza v. Salt Lake County*, No. 2:11CV713DAK, 2014 WL 4457300, at *5 (D. Utah Sept. 10, 2014) (finding standing to challenge use of immigration detainers to extend incarceration of jailed individuals). *See, e.g.*, *Deshawn E. v. Safir*, 156 F.3d 340, 345 (2d Cir. 1998) (finding standing to enjoin policies and practices of detective squad that interrogated juveniles facing possible delinquency charges); *Mack v. Suffolk County*, 191 F.R.D. 16, 21 (D. Mass. 2000) (finding standing to challenge county's policy of routinely subjecting female pre-arraignment detainees to strip searches and visual body cavity searches without individualized suspicion); *Franklin v. City of Chicago*, 102 F.R.D. 944, 948 (N.D. Ill. 1984) (finding standing to challenge police use of squadrols to transport arrestees).

Unlike *O'Shea* and *Lyons*, the risk of future injury here does not depend on an attenuated chain of hypotheticals. Kansas has "hundreds or thousands of traffic laws on the books," providing "KHP troopers innumerable reasons to stop motorists for violations," many of which are entirely accidental. App. II, 2. Even a careful driver

reasonably expects to be pulled over for a traffic violation sooner or later. *See* App. II, 34 n.39 (finding Dunn's stop "exceedingly pretextual"); App. XX, 43:4-7 (Rohr testifying that he follows cars hoping to observe a traffic violation). And the district court found that the KHP has a practice of: (1) routinely assigning significant weight to out-of-state residency and travel plans in the reasonable suspicion calculus; and (2) employing the Kansas Two-Step to extend traffic stops under circumstances where a reasonable driver would not feel free to leave. App. II, 75. Plaintiffs face a realistic threat of future traffic stops and unlawful detentions pursuant to these unconstitutional practices, because they continue to drive on Kansas highways to and from "drug source states" like Colorado. App. II, 16, 20, 30. Plaintiffs' "likelihood of injury depends only on their status" as out-of-state motorists "and their need to travel on [I-70]. Any 'illegal' action on their part associated with the future stop need be no more than a minor, perhaps unintentional, traffic infraction." *Md. State Conf. of NAACP Branches v. Md. Dep't of State Police*, 72 F. Supp. 2d 560, 564 (D. Md. 1999).

The ubiquity of unintentional traffic violations distinguishes this case from *Simic v. City of Chicago*, 851 F.3d 734 (7th Cir. 2017), which Smith invokes. There, the Seventh Circuit held that the plaintiff lacked standing to enjoin a municipal ordinance prohibiting driving while using a cell phone, where she did not also challenge a state law prohibiting the same conduct. *Id.* at 738–39. The court reasoned

that it "must assume[] that Simic does not have concrete plans to violate Illinois law by using her cell phone while driving in Chicago," and therefore could not indulge her challenge to the municipal ordinance. *Id.*

Here, even if it were reasonable to assume that Plaintiff drivers could guarantee perfect compliance with all traffic laws, "[s]ome Plaintiffs were only passengers in vehicles that [KHP troopers] stopped; there is no claim that those passengers disobeyed traffic law." *Melendres*, 695 F.3d at 998. Moreover, troopers can induce a violation, as Trooper Rohr did to Erich and Maloney, and then unlawfully detain them pursuant to the challenged policies or practices. App. II, 21. Or troopers may pull drivers over for a traffic violation that did not in fact occur, as Trooper McCord apparently did to Kelly. App. II, 30 & n.35; *see also Melendres*, 695 F.3d at 998 (finding standing where deputies could initiate a traffic stop even in the absence of a violation and then detain plaintiffs pursuant to the challenged policy). "Thus, even as to the Plaintiff-drivers, adherence to traffic laws fails to assure that they would not face future injury." *Melendres*, 695 F.3d at 999.

## II. The District Court Did Not Abuse Its Discretion in Awarding Limited Injunctive Relief to Address the KHP's Persistent Flouting of *Vasquez*.

"[T]o obtain a permanent objection, a party must prove: (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Wyoming v.*

*U.S. Dep't of Agric.*, 661 F.3d 1209, 1272 (10th Cir. 2011) (cleaned up). This Court "review[s] a district court's grant of a permanent injunction for an abuse of discretion, examining its factual findings for clear error and its legal determinations de novo." *Id.* (citations omitted). "A district court abuses its discretion where it commits a legal error or relies on clearly erroneous factual findings, or where there is no rational basis in the evidence for its ruling." *Id.* (citation omitted).

All four factors are met here. Based on the extensive evidence presented at trial, the district court found that Smith is responsible for the challenged practices of giving out-of-state residency and travel plans significant weight in the reasonable suspicion calculus, and deploying the Kansas Two-Step under circumstances where a reasonable driver would not feel free to leave. The court further found that "[i]ndividual lawsuits against KHP troopers have not persuaded and evidently will not persuade the KHP to adopt permanent and comprehensive changes that are necessary to protect plaintiffs and similarly situated motorists from constitutional violations in the future," and held that Plaintiffs' exposure to future unconstitutional detentions pursuant to KHP policies or practices constitutes irreparable harm. App. II, 67–68. The court carefully balanced the need to address these unconstitutional practices against the asserted burdens to KHP operations and the principles of comity and equitable restraint. App. II, 68–71. Finally, the court concluded that "[i]t is 'always in the public interest to prevent the violation of a party's constitutional

rights.'" App. II, 72 (quoting *Free the Nipple-Ft. Collins v. City of Fort Collins*, 916 F.3d 792, 807 (10th Cir. 2019)).

**A.** **The award of limited injunctive relief to address a pervasive and unconstitutional law enforcement practice does not violate principles of comity, federalism, and equitable restraint.**

Smith does not meaningfully contest the district court's findings that: (1) "KHP troopers routinely consider out-of-state license plates, in combination with other factors, in developing reasonable suspicion," App. II, 12, in direct contravention of *Vasquez*; (2) "KHP troopers detain a disproportionate number of out-of-state motorists in part because the *KHP trains and permits them* to evaluate a driver's out-of-state residency and travel plans when developing reasonable suspicion," App. II, 43 (emphasis added); and (3) the KHP's practice has, predictably, resulted in "multiple instances where troopers detained motorists based in part on travel plans which were not inherently implausible, and the additional factors cited in support of reasonable suspicion would not lead a reasonable officer to suspect" criminal activity, App. II, 63. In fact, aside from arguing that Plaintiffs lack standing, Smith does not even challenge the district court's declaratory judgment that he is responsible for a policy or practice that unconstitutionally subjects out-of-state motorists to suspicionless roadside detentions.

Smith also does not challenge the remedies directed at this unconstitutional policy or practice.[6] The district court went to great lengths to craft an injunction sufficient to remedy the KHP's unconstitutional practices without unduly interfering with the KHP's legitimate operations. The injunction requires: more detailed documentation of stops and detentions, using forms and audiovisual equipment the KHP already employs; use of consent forms for voluntary questioning after the conclusion of a traffic stop and for consent searches; timely review of this documentation by supervisors and quarterly reporting by the agency; close and effective supervision to ensure troopers comply with the Constitution; relevant training for troopers and supervisors; and biannual compliance audits to assess the KHP's compliance with the injunction.

Instead, Smith asserts that injunctive relief is simply not available here. In his view, the principles of comity, federalism, and equitable restraint preclude the use of injunctive relief to address the unconstitutional policies or practices the district court found. Opening Br. 22–24. Not so. Although courts "must be sensitive to the State's interest[s]," they "nevertheless must not shrink from their obligation to enforce the constitutional rights of all persons." *Brown v. Plata*, 563 U.S. 493, 511 (2011) (cleaned up). "The very purpose of § 1983 was to interpose the federal courts

---

[6] Smith does challenge the consent forms ordered in response to the KHP's policy or practice of using the Two-Step to unlawfully extend traffic stops. Opening Br. 35–47. Plaintiffs address those arguments in Section III, *infra*.

between the States and the people, as guardians of the people's federal rights . . . .
In carrying out that purpose, Congress plainly authorized the federal courts to issue
injunctions in § 1983 actions, by expressly authorizing a 'suit in equity' as one of
the means of redress." *Mitchum v. Foster*, 407 U.S. 225, 242 (1972).

In particular, the Supreme Court has long recognized that "injunctive relief is
appropriate" to remedy "a persistent pattern of police misconduct." *Allee v.
Medrano*, 416 U.S. 802, 815 (1974) (citing *Hague v. Comm. for Indus. Org.*, 307
U.S. 496, 517 (1939)). Thus, courts have not hesitated to enjoin law enforcement
policies or practices that violate the Fourth Amendment. *See, e.g.*, *Easyriders
Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996) ("Specific
findings of a persistent pattern of misconduct supported by a fully defined record
can support broad injunctive relief." (collecting cases)); *Mills v. District of
Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (preliminarily enjoining municipal
police checkpoint program) ("[T]he District is not currently imposing [a
neighborhood safety zone] checkpoint, but it has done so more than once, and the
police chief has expressed her intent to continue to use the program until a judge
stops her."); *Alsaada v. City of Columbus*, 536 F. Supp. 3d 216, 256 (S.D. Ohio 2021)
(preliminarily enjoining Columbus Police Department's use of non-lethal force
against nonviolent protestors); *Ligon v. City of New York*, 925 F. Supp. 2d 478, 541–
45 (S.D.N.Y. 2013) (preliminarily enjoining NYPD from performing trespass stops

outside certain buildings without reasonable suspicion and from using "furtive movement," without more, as the basis for reasonable suspicion).

Against this long-established authority, Smith cites the Supreme Court's decision in *Rizzo*, which reversed a district court's prophylactic injunction designed to address 19 assorted instances of unconstitutional conduct by Philadelphia's police officers in a single year. 423 U.S. at 367–68. Given *Rizzo*, Smith argues, five adjudicated Fourth Amendment violations over a five-year period cannot possibly support an award of injunctive relief. Opening Br. 11.[7] But *Rizzo* did not establish a numerical threshold for identified constitutional violations before a federal court may enjoin wayward state law enforcement agencies. Instead, *Rizzo* held that injunctive relief was improper because there was no "affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any

---

[7] Although he does not assert clear error, Smith tries to discount two of the five Fourth Amendment violations identified below. First, he argues that the district court faulted the scope of the search of the Erich/Maloney RV after a canine alert, rather than the initial decision to detain. Opening Br. 24–25. In fact, the court found that the trooper "followed an RV with Colorado tags in hopes of provoking a traffic violation, and his conduct caused the very traffic violation that he was hoping for," rendering the subsequent detention unlawful. App. II, 22, 25. The court also found that the trooper terminated the detention after searching the vehicle's interior and then *re-detained* Erich and Maloney, without reasonable suspicion, in order to search the vehicle's roof. App. II, 26–27. Second, Smith argues that Dunn consented to the canine sniff of her vehicle, so no unconstitutional detention took place. Opening Br. 25. But the district court found that the trooper detained Dunn when he conducted the Two-Step in a manner that prevented her from leaving. *That* detention, which occurred before Dunn consented to the canine sniff, was not supported by reasonable suspicion. App. II, 38.

plan or policy by [the defendant supervisory officials] express or otherwise showing their authorization or approval of such misconduct." *Id.* at 371.

Two features distinguish this case from *Rizzo*. First, *Rizzo* addressed a score of unrelated constitutional violations by individual police officers, whereas the district court here identified two specific practices relevant to the unconstitutional detentions adjudicated below. Second, *Rizzo* did not concern a finding that an agency head trains and permits officers to implement unconstitutional practices, as the district court found Smith did here.

      **1.**      **The district court did not clearly err in finding that the KHP maintains a pervasive practice of giving out-of-state residency or travel plans undue weight in determining reasonable suspicion, in violation of *Vasquez*.**

In *Rizzo*, the Supreme Court emphasized that the propriety of injunctive relief against a supervisory official turns not on "the number of [constitutional] violations, but the common thread running through them," showing that the defendant official is "causally linked" to the individual instances of misconduct. 423 U.S. at 375. The "*undifferentiated allegations* of police abuse" in that case did not give rise to a "'pattern' of police misconduct sufficient to justify the detailed affirmative injunction ordered by the lower courts." *LaDuke v. Nelson*, 762 F.2d 1318, 1325 n.10 (9th Cir. 1985) (emphasis added); *accord Melendres v. Maricopa County*, 897 F.3d 1217, 1222 (9th Cir. 2018).

In contrast, the district court here identified a specific unconstitutional practice—that "disregard of *Vasquez* is pervasive within the ranks of the KHP." App. II, 64.[8] Dr. Mummolo testified that 77 percent of KHP's traffic stops and *90 percent* of its canine deployments were conducted on out-of-state drivers, even though these drivers "represented only about 35 per cent of the drivers on the road at the measured times and locations." App. II, 11–12. "Based on the significant statistical disparity between stops and searches of in-state versus out-of-state motorists," the court found it clear that KHP troopers routinely give out-of-state residency and travel plans significant weight in the reasonable suspicion calculus, despite *Vasquez*'s admonition that these factors are almost never appropriate grounds for reasonable suspicion. App. II, 12. This pervasive pattern is the common thread linking Smith to the individual Fourth Amendment violations proven at trial.

Smith argues that Dr. Mummolo's statistical analysis is unreliable because Dr. Mummolo used Safegraph mobile phone data to estimate the proportion of out-of-state drivers on the road at a given time and place. Smith objects to the use of Safegraph data because it potentially includes people within a quarter mile of the interstate, but not necessarily on the interstate; he hypothesizes that this potential overinclusion could skew results by overestimating the relative proportion of Kansas

---

[8] The district court's findings regarding the KHP's use of the Two-Step are addressed in Section III, *infra.*

drivers on highways. Opening Br. 27–28. This conjecture, which is not supported by any expert rebuttal testimony, is unpersuasive. As Dr. Mummolo explained at trial, Kansas Department of Transportation traffic records show that "the volume of traffic along the interstate . . . tends to be about ten times as large as any businesses that are near the interstate that are accessible within this quarter mile bandwidth," meaning "there just simply isn't enough traffic volume" from local roads to explain the observed disparities in the stop and detention rates of out-of-state drivers. App. XIV, 72:11-19; *see also* App. XIV, 30:1–31:20. Although Dr. Mummolo acknowledged that he was not aware of other studies using Safegraph data to study traffic flows in particular, App. XIV, 82:18-21, he identified several studies recently published in peer-reviewed journals that either used Safegraph data or validated its accuracy, App. XIV, 16:23–18:1.

Smith also argues that the overrepresentation of out-of-state drivers in traffic stops is irrelevant because the stops would be valid under the Fourth Amendment if the drivers were in fact speeding. Opening Br. 29. But "[f]or this disparity to be explained by out-of-state drivers being more likely to speed, roughly 88 per cent of out-of-state drivers would have to speed at places and times where only 29 per cent of in-state drivers speed. No evidence supports the existence of such a disparity in driving habits." App. II, 11. And although Smith asserts that there is only a "slight [13 percent] disparity" between out-of-state drivers' share of traffic stops and their

share of canine sniffs, Opening Br. 29, the fact remains that *almost all* of KHP's canine sniffs are performed on out-of-state drivers, while only about a third of drivers on Kansas highways hail from other states. As the district court found, these statistical disparities can be explained only by an agency-wide policy or practice of routinely "giving residency and travel plans significant weight when calculating reasonable suspicion," in violation of *Vasquez*. App. II, 63.

2. **Smith does not contest the district court's finding that he trains and permits troopers to violate *Vasquez*.**

The district court also found—and Smith does not dispute—that the "KHP trains and permits [troopers] to evaluate a driver's out-of-state residency and travel plans when developing reasonable suspicion." App. II, 43. It is hard to imagine a more flagrant repudiation of *Vasquez*, which itself concerned a KHP trooper. There, this Court held that (absent extraordinary circumstances) out-of-state residency is an "impermissible" factor in the reasonable suspicion calculus, and that out-of-state travel plans are "so broad as to be indicative of almost nothing." *Vasquez*, 834 F.3d at 1137–38 (citation omitted); *accord Shaw*, 36 F.4th at 1015.

Yet, the KHP's Assistant Superintendent and its former legal counsel both refused to recognize *Vasquez*'s clear instruction that out-of-state drivers are not inherently more suspicious than Kansas drivers. App. II, 44. Indeed, *Vasquez* did not elicit *any* change in KHP's policies until 2020, when the agency implemented policy changes in response to this lawsuit. *Id.* And despite revising its training materials,

KHP's training continues to teach, and troopers continue to believe, that a driver's out-of-state origin or destination is a valid basis for reasonable suspicion. App. II, 44–45; *see supra* 6–8.

The KHP's documentation and supervisory policies also facilitate the agency's pervasive disregard of *Vasquez*. Until September 2022, the KHP routinely allowed troopers to conduct detentions without documenting their grounds for reasonable suspicion. App. II, 46. Even now, the KHP does not collect critical data about detained drivers' state residency, traffic stops, vehicle searches, contraband seizures, or rights violations. App. II, 47. Consequently, the KHP *still* "does not analyze its traffic enforcement practices to identify disparities and practices that need correction." *Id.* Tellingly, the agency evaluates troopers in part based on how many seizures they perform, but it does not require supervisors to consider the number of times a trooper's unconstitutional actions have resulted in successful suppression motions. App. II, 54.

Smith waves away these findings, arguing that *Rizzo* bars the imposition of injunctive relief to address "inadequate [law enforcement] data collection, supervision, and discipline." Opening Br. 31 (quoting *Rizzo*, 423 U.S. at 379). But as discussed above, *Rizzo* rejected the imposition of "prophylactic procedures" on a state law enforcement agency for the purpose of reducing the overall rate of *undifferentiated* constitutional violations by "a handful of its employees." 423 U.S.

at 378. The Supreme Court did not purport to immunize supervisory officials from responsibility for specific unconstitutional *policies or practices* enforced by their subordinates. *See Pennsylvania v. Porter*, 659 F.2d 306, 324 (3d Cir. 1981) ("*Rizzo v. Goode* does not require the adoption of an ordinance saying in so many words 'we direct that the constitution be violated' before an inference can be drawn of the existence of an official policy of encouragement of such violations. Inaction by those with a statutory duty to take action can convey a potent message."); *cf. Dodds v. Richardson*, 614 F.3d 1185, 1203 (10th Cir. 2010) ("Oklahoma law made Defendant responsible for the policies that operated and were enforced by his subordinates at the jail. And under his watch, as he admits, the policies which caused Plaintiff's constitutional injury continued to operate.").[9]

Regardless, the district court's ruling was not predicated solely on Smith's failure to take corrective action in response to the KHP's persistent and pervasive violation of *Vasquez*. As noted above, the KHP continues to train its troopers to consider a driver's out-of-state travel plans as "a" factor in the reasonable suspicion calculus, App. II, 44–45, causing "KHP troopers [to] place far more than minimal weight" on drivers' out-of-state origin or destination, App. II, 63. And the district

---

[9] Like the *Porter* and *Dodds* defendants, Smith is statutorily responsible for regulating the conduct of his troopers. *See* K.S.A. § 74-2107; App. II, 55 (stating that Smith "is ultimately responsible for all KHP policies, disciplinary actions and patterns of misconduct").

39

court found that "KHP policy or training is inconsistent regarding whether troopers may use out-of-state *residency* as a factor contributing to reasonable suspicion," even though *Vasquez* held that this factor is impermissible absent extraordinary circumstances. App. II, 45 n.52 (emphasis added). The net result of the KHP's training, supervision, and data collection policies—as borne out by both Dr. Mummolo's "unrefuted" statistical analysis and "the individual traffic stops in this case"—is "that KHP troopers engage in a pattern or practice of impermissibly giving residency and travel plans significant weight when calculating reasonable suspicion." App. II, 63.

Last, Smith audaciously argues (without citing authority) that it is irrelevant whether the KHP has a policy or practice that flouts *Vasquez*. He maintains that statistical analysis cannot determine whether individual detentions based on "an innocuous factor" ultimately lacked reasonable suspicion. Opening Br. 30. This self-serving defense is unconvincing. As the district court pointed out, the KHP's own lack of documentation prevents systematic examination of the justifications for roadside detentions. App. II, 49–50. But the individual detentions the district court analyzed demonstrate that the KHP's practice of treating out-of-state residency and travel plans as inherently suspicious, in defiance of clearly established law, frequently results in unconstitutional detentions. That is enough to establish, by a preponderance of the evidence, that the KHP's policy or practice itself violates the

Fourth Amendment. After all, when this Court says that "it is time to stop the practice of detention of motorists for nothing more than an out-of-state license plate," *Vasquez*, 834 F.3d at 1138, it ought to have the equitable power to back up that command.

## B. Individual Damages Actions Are Not Adequate to Address the KHP's Unconstitutional Practices.

Smith alternatively argues that the district court erred in holding that injunctive relief is necessary to prevent irreparable harm. According to him, Plaintiffs have an adequate remedy at law because any constitutional violations caused by KHP policies or practices can be remedied after the fact through actions for money damages. Opening Br. 31–32. The district court rejected this argument, holding that although "[d]rivers who experience illegal roadside detentions have some remedies at law," these remedies "are not sufficient to abate the significant risk that plaintiffs will again experience irreparable harm" in the form of future Fourth Amendment violations. App. II, 67.

"Most courts consider the infringement of a constitutional right enough and require no further showing of irreparable injury." *Free the Nipple*, 916 F.3d at 805 (citing *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012); 11A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2948.1 (3d ed. & Nov. 2018 update)). "What makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial. *Any* deprivation of *any*

constitutional right fits that bill." *Id.* (citation omitted; emphases added). Fourth Amendment violations are no exception to this rule. *See, e.g.*, *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc); *Mills*, 571 F.3d at 1312; *Easyriders*, 92 F.3d at 1501; *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992); *Floyd*, 959 F. Supp. 2d at 672; *Ortega-Melendres*, 836 F. Supp. 2d at 979.

Although a motorist who has been unconstitutionally detained may file a § 1983 or state tort lawsuit for damages, this *post hoc* remedy does not obviate the need for injunctive relief to address an *ongoing* policy or practice that violates the Fourth Amendment. *See Mills*, 571 F.3d at 1312 (finding irreparable harm where "the police chief has expressed her intent to continue to use the [unconstitutional checkpoint] program until a judge stops her"). As Professor LaFave explained, "[t]he longstanding principle that equity will not grant relief to a petitioner who has an adequate remedy at law has sometimes been invoked, but without success, against plaintiffs seeking to enjoin repeated or continuing Fourth Amendment violations." 1 Wayne R. LaFave, Search & Seizure § 1.12(a) (6th ed. & Mar. 2024 update) (footnote omitted). That is because, in the Fourth Amendment context, damages have "not been deemed an adequate remedy in the sense of foreclosing injunctive relief." *Id.*

Several considerations support this consensus. First, as with other constitutional violations, "the wrongs inflicted [by Fourth Amendment violations] are not readily measurable in terms of dollars and cents." *Lankford v. Gelston*, 364 F.2d 197, 202 (4th Cir. 1966) (en banc) (cited approvingly in *Allee*, 416 U.S. at 816 n.9); *see also Bannister v. Bd. of Cnty. Comm'rs*, 829 F. Supp. 1249, 1252 (D. Kan. 1993) ("[I]t is well-established that a violation of the constitutional right to be free from unreasonable search and seizure protected by the Fourth Amendment causes irreparable harm where monetary recovery could not remedy the constitutional violation.").

Moreover, not everyone who is subjected to an unconstitutional search or seizure is willing to bring a damages lawsuit. Many individuals who suffer an unconstitutional detention may not know that their rights have been violated, and many attorneys decline to take on such cases because of the financial cost of the litigation and the limited potential to recover significant fee awards in individual damages cases. *See* Suppl. App. 72–73 (describing how attorney fees recovery in *Vasquez* could not even cover counsel's litigation costs, so he now declines to bring § 1983 cases because they are not financially feasible); *see* Joanna C. Schwartz, *Civil Rights Without Representation*, 64 Wm. & Mary L. Rev. 641, 658–60 (2023). And as the district court observed, the doctrine of qualified immunity makes damages suits "especially unavailing in most cases." App. II, 68 n.60.

A damages remedy also "does not compel the government to alter its policies or practices" to comply with the Constitution, while "that is the precise function of prospective injunctive relief." *Nat'l Fed'n of Fed. Emps. v. Weinberger*, 818 F.2d 935, 941 (D.C. Cir. 1987) (holding that possibility of a damages remedy did not preclude injunctive relief against an unconstitutional drug testing program). Nor do damages appreciably deter law enforcement misconduct in many cases. *See Lankford*, 364 F.2d at 202 ("[T]he lesson of experience is that the remote possibility of money damages serves as no deterrent to future police invasions."). That has certainly proved true here, where the district court found that numerous "[i]ndividual lawsuits against KHP troopers have not persuaded and evidently will not persuade the KHP to adopt permanent and comprehensive changes that are necessary to protect plaintiffs and similarly situated motorists from constitutional violations in the future." App. II, 67–68.[10]

---

[10] Smith suggests that "the exclusionary rule provides troopers with a strong motivation to ensure their actions comply with the Fourth Amendment, lest any drug offenders they apprehend escape scot-free." Opening Br. 34. But officers may believe they can deter criminal activity through detentions, searches, and arrests, even if the prospects for conviction are dim. LaFave, *supra*, § 1.12(a). And "[w]hen troopers intercept currency tied to drugs, the KHP keeps some of it to cover operational costs, even if the driver is not charged with or convicted of a crime." App. II, 2 n.3 (citing K.S.A. § 60-4101 *et seq*.). Thus, although this Court has long applied the exclusionary rule to evidence obtained through a detention predicated on out-of-state travel plans, *see United States v. Wood*, 106 F.3d 942, 946–47 (10th Cir. 1997), the threat of suppression has evidently not induced the KHP to change its practice.

None of the cases Smith cites to support his contrary position are on point. *O'Shea* applied *Younger* abstention principles "because the plaintiffs sought 'an injunction aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials.'" *Courthouse News Serv. v. N.M. Admin. Off. of Cts.*, 53 F.4th 1245, 1257 (10th Cir. 2022) (quoting *O'Shea*, 414 U.S. at 499–500); *see also Weitzel v. Div. of Occupational & Pro. Licensing*, 240 F.3d 871, 875 (10th Cir. 2001) (courts should abstain under *Younger* "when a state forum provides an adequate avenue for relief" (cleaned up)). Here, there is no reason to abstain, because the injunction does not purport to reach state criminal proceedings under any circumstances.

*Lyons* observed that money damages are available to remedy *past* constitutional violations. 461 U.S. at 111. It did not purport to bar injunctive relief for nonspeculative future injuries arising from unconstitutional law enforcement policies or practices. *See* Section I, *supra*. Likewise, *Daniels v. Southfort* held that injunctive relief was unavailable because the plaintiff had not established "a reasonable probability that the [alleged police misconduct] was part of an official policy to the end that there is a substantial likelihood that future violations will occur." 6 F.3d 482, 486 (7th Cir. 1993). That is precisely what the district court found here. Finally, *Rahmann v. Chertoff* addressed class certification, not irreparable harm. 530 F.3d 622, 625 (7th Cir. 2008) ("Our concern today is . . . the court's

decision to certify two nationwide classes."). Class certification is not at issue here, because Smith stipulated that any injunctive relief awarded to Plaintiffs would run to all persons similarly situated. App. II, 128.

No remedy at law is sufficient to cure the KHP's unconstitutional practices.

## III. The District Court Did Not Err in Enjoining the KHP's Unconstitutional Application of the Kansas Two-Step.

Smith's Kansas Two-Step argument likewise misses the mark. To start, he mischaracterizes the injunction's terms. The district court did not "categorically enjoin[] use of the Two-Step." Opening Br. 37. Rather, it held that the KHP engages in a policy or practice of using the Two-Step in a manner that violates the Fourth Amendment, and issued time-limited injunctive relief to address that violation. App. II, 76.

### A. Prior rulings upholding individual uses of the Two-Step do not preclude the district court's finding that the KHP has a policy or practice of carrying out the Two-Step in an unconstitutional manner.

Smith's attempt to hide behind prior Two-Step rulings, Opening Br. 37–39, is unpersuasive for multiple reasons. First, Smith ignores essential context—namely, the KHP's routine deployment of the Two-Step to detain drivers with out-of-state residency or travel plans after a traffic stop's conclusion, despite *Vasquez*'s instruction that these factors almost never support reasonable suspicion. *Vasquez*, 834 F.3d at 1137–38. As the district court recognized, the KHP uses the Two-Step

to further its dragnet detention of out-of-state drivers, App. II, 4–5, and the Two-Step is itself a significant source of Fourth Amendment violations, App. II, 52–53. Any remedy that does not address the KHP's coercive use of the Two-Step would be a half-measure.

Second, the district court found that KHP training on the Two-Step fosters a procedure ripe for constitutional violations. KHP training materials instruct that when performing the Two-Step, it is "[n]ot mandatory to disengage, as long as a reasonable person in the suspect's position would feel free to leave. Even if they are not." App. II, 51; App. XVII, 10:5-20; *see also* App. XXI, 82:20-25, Trial Ex. 131 16:13–16:25 ("Q. Why do you say something like 'Have a good trip' or whatever at the end of traffic stop? A. To make the driver feel as they are free to leave. Q. Are they free to leave? A. It's dependent on the situation."); App. XX, 93:5-11 ("Q. Like you say, so Mr. Erich was never free to go in this encounter once you pulled him over, right? A. I guess so, yes. Q. . . . So why did you tell him you['re] free to go? A. I don't know."), Trial Ex. 130 1:06:30–1:06:39.

In fact, KHP tactics are designed to provide a forensic veneer of voluntariness, while ensuring that drivers do not actually feel free to leave. The KHP directs troopers engaging in the Two-Step to avoid telling motorists that they are "free to go," because that phrase could "confuse the driver or occupants" into actually leaving—thereby thwarting the goal to "stop as many cars as possible." App. XVII,

10:24–11:25, 14:10-25, 73:20–74:3, 95:17–96:6; Suppl. App. 90 (training troopers that "[i]f you tell someone they are free to go, they ARE free to go" and recommending other phrases instead). This training and direction led the district court to conclude that "KHP troopers conduct the Kansas Two-Step under circumstances where reasonable drivers do not feel free to leave and do not knowingly, voluntarily and intelligently consent to re-engage with the trooper." App. II, 52–53.

Finally, the Two-Step cases Smith cites concerned motions to suppress in individual criminal cases. *See* Opening Br. 37–39. Those cases are not inconsistent with the district court's finding that the KHP currently maintains a policy or practice of deploying the Two-Step, especially against out-of-state drivers, in such a way that a reasonable driver would not feel free to leave—allowing troopers to coerce information and detain drivers without reasonable suspicion. App. II, 15, 17–18, 26 n.32, 33, 34–35, 42.

## B. Record evidence supports the district court's conclusion that KHP troopers use the Two-Step in an unconstitutionally coercive manner.

Smith suggests that the Two-Step is unconstitutional only if there is "a coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice . . . ." Opening Br. 39–40. But this Court has never held that this list is

exhaustive, leaving open the possibility that other factors can create a coercive environment. *See, e.g.*, *United States v. Chavira*, 467 F.3d 1286, 1290–91 (10th Cir. 2006). Regardless, some of those factors were—as Smith acknowledges, Opening Br. 40—present in the stops the district court examined.

The district court found that a reasonable driver would not have felt free to leave in the Shaw, Erich/Maloney, Kelly, Dunn, and Martinez stops. This decision was based on numerous factors: (1) the brief period of disengagement (ranging from less than one second to four and a half) and troopers' proximity to the vehicle, App. II, 15, 26 n.32, 33, 38, 42; (2) additional officers present at the Shaw, Dunn, and Erich/Maloney stops, App. V, 26:17–27:17; App. VI, 85:19–86:3, 92:11-16; App. XX, 60:12-17, 79:21–81:13; App. XXI, 104:10-20; and (3) Blaine Shaw, Erich, and Maloney's feelings that they could not disregard the troopers' post-Two-Step questions, with Maloney citing the trooper's firearm and "position of authority" as reasons she was "scared to leave," App. V, 26:22–27:1; App. XII, 29:12–30:4, 37:20–38:4.

Moreover, Smith's assertion that Trooper Rule made physical contact with Dunn's vehicle only after she agreed to answer additional questions is incorrect. Opening Br. 42. As Dunn testified, and a review of the dashcam videos shows, each time Trooper Rule engaged with Dunn—before and after the Two-Step—at least his head, if not also his arms and shoulders, were within the car window frame. App.

XIII, 91:10-21, 99:1-16; Trial Ex. 121 02:45–04:12; Trial Ex. 122 2:47–6:00.[11] Dunn further testified that she wanted to leave but did not feel free to do so because she was concerned for his safety. *See* App. XIII, 93:5-13. The record evidence amply supports the district court's factual findings. *Ramos v. Banner Health*, 1 F.4th 769, 777 (10th Cir. 2021) ("A factual finding is clearly erroneous if there is no support for it in the record or we are left with a definite and firm conviction that a mistake has been made." (cleaned up)).

C.     **The district court did not abuse its discretion in requiring affirmative consent and approval for voluntary questioning and consent searches.**

Smith complains that the injunction goes beyond constitutional requirements in obliging troopers to inform drivers that they are free to leave, obtain written consent for searches, and obtain supervisory approval for consensual vehicle searches. Opening Br. 46–47. But he glosses over the KHP's training encouraging coercive Two-Step tactics and the measures the district court determined are necessary to bring the KHP back in line. In fashioning equitable remedies, a court may go beyond the Constitution's minimum requirements if it determines such measures are necessary to cure the underlying constitutional violation. *See, e.g.*, *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971); *Duran v.*

---

[11] Smith conventionally filed copies of these trial exhibit videos pursuant to the Court's April 18, 2024 Order.

*Carruthers*, 678 F. Supp. 839, 846–47 (D.N.M. 1988) ("[T]he Tenth Circuit has directly applied to institutional reform litigation the vital principle that a federal court's equitable powers are inherently sufficiently broad to allow federal courts to fashion effective injunctive relief to cure federal constitutional violations."), *aff'd*, 885 F.2d 1492 (10th Cir. 1989).

"'[I]n federal equity cases[,] the nature of the violation' of a federal right 'determines the scope of the remedy' available." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 902 (10th Cir. 2017) (alteration original) (quoting *Rizzo*, 423 U.S. at 378). "Once a constitutional violation is established, remedial decrees may require actions not independently required by the Constitution if those actions are, in the judgment of the court, necessary to correct the constitutional deficiencies." *Duran*, 678 F. Supp. at 847 (citing *Green v. Cnty. Sch. Bd.*, 391 U.S. 430, 438 (1968); *Milliken v. Bradley*, 433 U.S. 267 (1977); *Gilmore v. City of Montgomery*, 417 U.S. 556 (1974)).[12] Further, a stricter remedy is justified where a state actor not only engages in an unconstitutional practice, but also has a demonstrated penchant for

---

[12] Smith attempts to distinguish *Milliken* and *Duran* by claiming that those cases required remedies "to end continuing, unconstitutional conditions," whereas the harms Plaintiffs assert here are merely hypothetical. Opening Br. 44. This argument is unavailing not only for the reasons discussed in Section I, *supra*, but also in view of the evidence adduced at trial of an ongoing practice. The injunction is designed to address the KHP's brazen disregard for Tenth Circuit precedent concerning reasonable suspicion—as proven at trial—and it is thus a "remedy . . . necessary to return the state of affairs to a constitutional status." Opening Br. 44.

disregarding this Court's instructions regarding its constitutional obligations. *See, e.g.*, *Swann*, 402 U.S. at 15; *Mills*, 571 F.3d at 1312; *Safe Streets All.*, 859 F.3d at 902; *Duran*, 678 F. Supp. at 846–47.

That is precisely the situation here. The injunction terms requiring written consent before a trooper reengages a driver after a traffic stop concludes and concerning consent searches rectify the KHP's coercive use of the Two-Step, which results in detentions and searches based on consent that is not knowingly, intelligently, or voluntarily given. The injunction terms are thus narrowly tailored to cure the KHP's persistent unconstitutional practices, and the evidence the district court heard at trial soundly supports the remedies imposed.

Smith's reliance on *Ohio v. Robinette*, 519 U.S. 33 (1996), is misplaced. Opening Br. 46. *Robinette* simply states that an advisal of rights or that one is free to go is not required for an encounter to be consensual, *id.* at 39; it does not address the legality of extended roadside detentions, much less under the circumstances presented in this case.[13] The injunction here is not inconsistent with *Robinette*, because the district court did not hold that the Fourth Amendment unconditionally

---

[13] In its most recent word on the subject, the Supreme Court reiterated the necessity of reasonable suspicion in order to extend a stop for a canine sniff. *Rodriguez v. United States*, 575 U.S. 348 (2015). *Rodriguez* did not expressly state that an officer may extend a stop based solely on consent—suggesting that the Two-Step's fiction of a consensual encounter does not inoculate the KHP from unconstitutional coercion. *See* App. II, 6–7 & n.15 (citing *Rodriguez*, 575 U.S. at 354).

requires such an advisal. Rather, the district court tailored the temporary relief here to remedy the KHP's specific policy or practice of performing the Two-Step in an unconstitutionally coercive manner.

Furthermore, Smith is responsible for the injunction provisions of which he now complains, as he repeatedly failed to provide the district court with alternatives. *See* App. II, 115 (overruling Smith's objections that the proposed injunction is "unduly burdensome" and not "narrowly tailored" because he failed to propose any less burdensome or more narrowly tailored alternatives). The injunction is also time-limited, remaining in effect for four years—or even as few as two years—depending on the KHP's diligence. App. II, 212–13. If the KHP successfully remedies the identified constitutional violations, the injunction will be dissolved.

Ultimately, Plaintiffs are not required to prove that *every* encounter with a KHP trooper is nonconsensual to justify injunctive relief. What Plaintiffs did prove, and the district court properly concluded, is that KHP training and practices encourage and promote conducting traffic stops in a manner likely to lead to unconstitutional detentions. The injunction's terms are entirely appropriate to redress this ongoing, unlawful use of the Two-Step.

## CONCLUSION

For the foregoing reasons, this Court should affirm.

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiffs-Appellees support Defendant-Appellant Smith's request for oral argument because this case involves important questions about federal courts' power to abate unconstitutional law enforcement policies or practices, and because they believe that oral argument will materially assist the Court in resolving the important legal issues presented in this case.

Dated: May 28, 2024

Respectfully submitted,

/s/ Brian Hauss

Brian Hauss
Elizabeth Gyori
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
125 Broad Street, Floor 18
New York, NY 10004
Phone: (212) 549-2500
Fax: (212) 549-2654
bhauss@aclu.org
egyori@aclu.org

Kunyu Ching
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION OF KANSAS
10561 Barkley Street, Suite 500
Overland Park, KS 66212
Phone: (913) 490-4110
Fax: (913) 490-4119
kching@aclukansas.org

*Attorneys for Plaintiffs-Appellees*

*/s/ Leslie A. Greathouse*

Leslie A. Greathouse
Patrick McInerney
SPENCER FANE LLP
1000 Walnut Street, Suite 1400
Kansas City, MO 64106
Phone: (816) 474-8100
Fax: (816) 474-3216
lgreathouse@spencerfane.com
pmcinerney@spencerfane.com

*Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 12,938 words.

This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

Dated: May 28, 2024                              */s/ Brian Hauss*
                                                                 Brian Hauss

                                                                 *Attorney for Plaintiffs-Appellees*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2024, I filed a true and correct copy of the foregoing with the Clerk of the United States Court of Appeals for the Tenth Circuit by using the appellate case filing CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Dated: May 28, 2024 /s/ Brian Hauss
Brian Hauss

*Attorney for Plaintiffs-Appellees*

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that (1) all required privacy redactions have been made; (2) any paper copies of this document submitted to the Court are exact copies of the version electronically filed; and (3) the electronic submission was scanned for viruses using Microsoft Defender and, according to that program, this document is virus free.

Dated: May 28, 2024

/s/ Brian Hauss
Brian Hauss

*Attorney for Plaintiffs-Appellees*