# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

BLAINE FRANKLIN SHAW, et al.,
*Plaintiffs-Appellees,*

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

———

MARK ERICH, et al.,
*Plaintiffs-Appellees,*

v.

ERIK SMITH, in his official capacity as
Superintendent of the Kansas Highway Patrol,
*Defendant-Appellant.*

## APPELLANT'S REPLY BRIEF

Appeal from the United States District Court for the District of Kansas
Honorable Kathryn H. Vratil, Senior District Court Judge
District Court Case Nos. 19-CV-1343-KHV and 20-CV-1067-KHV-GEB

**OFFICE OF ATTORNEY GENERAL
KRIS W. KOBACH**

120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
(785) 296-2215
anthony.powell@ag.ks.gov
dwight.carswell@ag.ks.gov
kurtis.wiard@ag.ks.gov

Anthony J. Powell
 *Solicitor General*
Dwight R. Carswell
 *Deputy Solicitor General*
Kurtis K. Wiard
 *Assistant Solicitor General*

*Attorneys for Defendant-Appellant*

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

Page

**ARGUMENT** ..................................................................................... 1

**I.** **Plaintiffs fail to show standing.** ................................................ 1

**II.** **Plaintiffs fail to reconcile the district court's injunction with *Rizzo,* particularly given that they have an adequate remedy at law.** ........................................................ 5

    **A.** **The district court's finding of a constitutional violation was based on questionable statistical analysis and the traffic stops in this case, neither of which justify injunctive relief.** .......................................... 5

    **B.** **A damages remedy is adequate and more appropriate than injunctive relief.** ...................................... 12

**III.** **The Two-Step provisions of the district court's decision cannot be squared with this Court's precedents.** ................. 16

**IV.** **Plaintiffs offer no defense of the consent search provisions of the district court's injunction.** ............................................. 19

**CONCLUSION** ................................................................................. 20

**CERTIFICATE OF COMPLIANCE** .................................................... 21

**CERTIFICATE OF DIGITAL SUBMISSION** ..................................... 21

**CERTIFICATE OF SERVICE** ............................................................ 21

# TABLE OF AUTHORITIES

**Cases**

*Clapper v. Amnesty International,*
  568 U.S. 398 (2013)..............................................................2

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983).......................................... 1, 2, 10, 12, 13

*Contra Ortega-Melendres v. Arpaio,*
  836 F. Supp. 2d 959 (D. Ariz. 2011) ......................................3

*Daniels v. Southfort,*
  6 F.3d 483 (7th Cir. 1993)....................................................13

*Floyd v. City of New York,*
  283 F.R.D. 153 (S.D.N.Y. 2012) ............................................4

*Franklin v. City of Chicago,*
  102 F.R.D. 944 (N.D. Ill. 1984) .............................................3

*Hughes v. Rizzo,*
  282 F. Supp 881 (E.D. Pa. 1968)........................................14

*Irwin v. Dixion,*
  50 U.S. (9 How.) 10 (1850) ..................................................11

*Mack v. Suffolk County,*
  191 F.R.D. 16 (D. Mass. 2000) .............................................3

*Oliver v. Woods,*
  209 F.3d 1179 (10th Cir. 2000)...........................................17

Orin S. Kerr, *The Limits of Fourth Amendment Injunctions*,
  7 J. on Telecomm. & High Tech. L. 127 (2009) ..................14

*Pennsylvania v. Porter,*
   659 F.2d 306 (3d Cir. 1981) ................................................................ 9

*Rahman v. Chertoff,*
   530 F.3d 622 (7th Cir. 2008) ............................................................ 13

*Rizzo v. Goode,*
   423 U.S. 362 (1976) .................................................. 1, 5, 9, 10, 11, 12

*United States v. Ackerman,*
   831 F.3d 1292 (10th Cir. 2016) ......................................................... 10

*United States v. Jones,*
   701 F.3d 1300 (10th Cir. 2012) ......................................................... 17

*United States v. Ledesma,*
   447 F.3d 1307 (10th Cir. 2006) ......................................................... 17

*United States v. McHugh,*
   639 F.3d 1250 (10th Cir. 2011) ........................................................... 8

*United States v. Patten,*
   183 F.3d 1190 (10th Cir. 1999) ......................................................... 16

*United States v. Whitley,*
   680 F.3d 1227 (10th Cir. 2012) ........................................................... 8

*Uroza v. Salt Lake County,*
   No. 2:11CV713DAK, 2014 WL 4457300 (D. Utah Sept. 10, 2014) ...... 2

*Vasquez v. Lewis,*
   834 F.3d 1132 (10th Cir. 2016) ........................................................ 5, 6

## ARGUMENT

Plaintiffs try in vain to distinguish Supreme Court and Tenth Circuit precedent that mandates reversal of the district court's decision. Plaintiffs' alleged future injuries are just as speculative as in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), so they lack standing to obtain prospective injunctive and declaratory relief. On the merits, the same federalism and separation of powers concerns that animated *Rizzo v. Goode*, 423 U.S. 362 (1976), render the district court's injunction here improper, particularly when Plaintiffs have an adequate remedy at law for any future Fourth Amendment violation. And the Two-Step provisions of the district court's injunction cannot be squared with this Court's precedents upholding the constitutionality of prior Two-Step encounters, while the consent search provisions are unjustified in the absence of any demonstrated constitutional violation.

## I.     **Plaintiffs fail to show standing.**

Plaintiffs argue that they have standing to seek prospective injunctive and declaratory relief because traffic violations are ubiquitous. Appellees' Br. at 26-28. But this ignores the fact that the plaintiff in *Lyons* was stopped for a traffic violation, and the prospect of him being

stopped by the police again was part of what rendered his alleged future injuries too speculative to support standing. *See Lyons*, 461 U.S. at 97, 105. So too here. Yet just as in *Lyons*, speculation about a future traffic stop is only the first link in the chain of conjecture. Any future injury is also contingent on officers violating the Constitution after a traffic stop—in this case by either deciding to further detain a driver and being wrong about the existence of reasonable suspicion or by conducting a Two-Step under circumstances where a reasonable person would not feel free to leave. The conjectural nature of those hypothetical future injuries does not give rise to a case or controversy.

Plaintiffs argue that *Lyons* does not control because they are challenging an unconstitutional policy or practice, which they claim gives them standing. Appellees' Br. at 25-26. It is true that a policy can confer standing *if* that policy renders an injury "certainly impending," or at the very least creates a "*substantial* risk of harm." *Clapper v. Amnesty International*, 568 U.S. 398, 409-10, 414 n.5, 422 (2013) (emphasis added). Thus, in the cases Plaintiffs cite, courts found standing because the challenged policies made it a "near certainty" that the injury would occur. *Uroza v. Salt Lake County*, No. 2:11CV713DAK,

2014 WL 4457300, at *5 (D. Utah Sept. 10, 2014); *see also Mack v. Suffolk County*, 191 F.R.D. 16, 21 (D. Mass. 2000) (finding standing to challenge a "routine procedure" that "applied to every woman detained"); *Franklin v. City of Chicago*, 102 F.R.D. 944, 948 (N.D. Ill. 1984) (finding standing to challenge arrestee transport policy that left officers with "no discretion" and thus "always" applied to "all arrestees").

Those cases are a far cry from this one. To begin with, KHP does not have a policy of detaining drivers without reasonable suspicion. *Contra Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 979-80 (D. Ariz. 2011). Nor do KHP troopers consider travel to or from drug source states or along drug corridors alone as sufficient to support reasonable suspicion. App. II, 45, 62. Instead, at most, those factors are considered as contributing to reasonable suspicion along with other factors. Thus, the prospect of a trooper detaining a driver following the conclusion of a traffic stop will depend on the existence of other suspicious factors, and an injury will occur only if the trooper is wrong about the existence of reasonable suspicion based on the totality of the circumstances. Whether that will occur to one of the Plaintiffs in the future is purely

speculative. Plaintiffs' reliance on *Floyd v. City of New York*, 283 F.R.D. 153 (S.D.N.Y. 2012), is also misplaced, as they have not shown "tens of thousands of facially unlawful stops" in the past, *id.* at 170; they have demonstrated—at most—a total of five unconstitutional stops over the course of five years.

Likewise, while KHP policies allow troopers to perform the Two-Step after the conclusion of a traffic stop, whether to do so is left to the trooper's discretion. And even then, a constitutional injury will occur only if the trooper happens to carry out the Two-Step in such a manner that a reasonable person would not realize he or she is free to leave—which is entirely speculative. Plaintiffs offer no response to the point that they are particularly unlikely to be injured since, having brought this lawsuit, they will surely know that they are free to leave in the event a KHP trooper were to not only stop one of them but then also seek their consent for additional questioning following the conclusion of that traffic stop. Opening Br. at 17.

## II. Plaintiffs fail to reconcile the district court's injunction with *Rizzo*, particularly given that they have an adequate remedy at law.

Plaintiffs' brief falls well short of demonstrating any "extraordinary circumstances" that would justify placing a state law enforcement agency under federal court supervision. *See Rizzo*, 423 U.S. at 379. In the unlikely event one of the Plaintiffs were to ever suffer a Fourth Amendment violation by a KHP trooper in the future, that Plaintiff would have an adequate remedy at law in the form of a damages lawsuit—a far more appropriate remedy than a prophylactic injunction.

### A. The district court's finding of a constitutional violation was based on questionable statistical analysis and the traffic stops in this case, neither of which justify injunctive relief.

Plaintiffs' attempts to distinguish *Rizzo* are unavailing. Plaintiffs claim that the district court found KHP trains it troopers to violate the Fourth Amendment and that Colonel Smith does not contest this finding. Appellees' Br. at 30-34. But this claim mischaracterizes the district court's decision. The district court found that "[o]n paper, KHP training appears to be consistent with *Vasquez*" *v. Lewis*, 834 F.3d 1132

(10th Cir. 2016). App. II, 63. Specifically, the district court noted that KHP policies do not allow troopers to use a driver's state citizenship as a factor contributing to reasonable suspicion. App. II, 45-46; *see also* App. XXII, 68-69; XXIII, 187-94. And the district court recognized that under *Vasquez*, "KHP troopers may consider a driver's travel plans (out-of-state origins or destinations) as factors contributing to reasonable suspicion, but are required to give those factors very minimal weight." App. II, 62. The district court also noted that since 2020, KHP has included *Vasquez* in its trooper training materials. App. II, 44; *see also* App. XVI, 23-26.

The district court's problem was not with KHP's "formal training and written policies," but rather with its belief that, in practice, KHP troopers give too much weight to the fact that a driver is traveling to or from a drug source state in evaluating reasonable suspicion. App. II, 63-64. The district court identified two grounds for this belief: (1) "Mummolo's statistical evidence" and (2) "the evidence regarding the individual traffic stops in this case." App. II, 63. Colonel Smith's opening brief did, in fact, dispute both of these grounds as insufficient to justify injunctive relief. Opening Br. at 24-30

Plaintiffs' response as to Mummolo's statistical testimony misses the point. Colonel Smith is not arguing that "out-of-state drivers [are] more likely to speed." Appellees' Br. at 36. Colonel Smith's point is that even if Mummolo's statistics did show that out-of-state drivers are disproportionately likely to be stopped for speeding (which Colonel Smith also contests[1]), that would not violate the Fourth Amendment because stopping a driver who is speeding or committing some other traffic violation is a valid Fourth Amendment seizure. And given that 77 percent of the initial traffic stops in Mummolo's study involved out-of-state drivers, the fact that 90 percent of post-traffic stop detentions for canine sniffs involved out-of-state drivers, *see* App. XIV, 40-41, is

---

[1] Plaintiffs' only response to the point that Mummolo's baseline was flawed because he used cell phone location data from people *not* on the interstate is that Mummolo's testified "the volume of traffic along the interstate . . . tends to be about ten times as large as any businesses that are near the interstate that are accessible within this quarter mile bandwidth." Appellees' Br. at 36. But that tells us nothing about how many local residents visit businesses near the interstate without getting on the interstate, much less demonstrates that the proportion of Kansas to out-of-state visitors at those businesses mirrors the proportion of Kansas to out-of-state drivers on the interstate, which is the whole premise of Mummolo's analysis. *See* Opening Br. at 28.

only a slight disparity that could easily be based on the facts of the particular stops.

Nor does considering a factor that contributes little or nothing to reasonable suspicion violate the Fourth Amendment if the remaining factors provide reasonable suspicion.[2] After all, reasonable suspicion is an objective standard; the fact that an officer subjectively considers an innocuous factor does not somehow taint the entire stop. *See United States v. Whitley*, 680 F.3d 1227, 1234 (10th Cir. 2012) ("The detaining officer's subjective beliefs and intentions are, quite simply, irrelevant." (quoting *United States v. McHugh*, 639 F.3d 1250, 1256 (10th Cir. 2011))). Whether reasonable suspicion exists depends on the facts of each particular case and cannot be demonstrated by statistics. In the end, Mummulo's statistical analysis fails to show even a single Fourth Amendment violation, much less the sort of policy or practice of Fourth Amendment violations that the district court erroneously relied on in ordering injunctive relief.

---

[2] For example, the district court found reasonable suspicion in the Erich/Maloney stop based on other factors, while giving at most only minimal weight to travel from a drug source state, despite the trooper's reliance on that factor. App. II, 24-25.

But even if Plaintiffs had demonstrated a statistical pattern of Fourth Amendment violations, that would not be enough. Plaintiffs cite *Pennsylvania v. Porter*, 659 F.2d 306 (3d Cir. 1981), for the proposition that inaction in the face of a pattern of constitutional violations is sufficient to justify injunctive relief. Appellees' Br. at 39. But their citation and parenthetical quotation come from Part IV(D) of Judge Gibbons's opinion, which was only joined by a minority of the court. 659 F.2d at 309. A majority of the judges instead joined Judge Garth's opinion on this issue, *id.*, which recognized that for injunctive relief to be warranted under *Rizzo*, "misconduct cannot be merely a failure to act." *Id.* at 336 (Garth, J., concurring in part and dissenting in part).

Plaintiffs have failed to identify any "deliberate plan" by Colonel Smith to violate the Fourth Amendment that might constitute the kind of "extraordinary circumstances" under which an injunction would be warranted. *Rizzo*, 423 U.S. at 375, 379. As noted above, the district court's injunction was based on (1) Mummolo's statistical analysis and (2) evidence of the traffic stops presented at trial—not on any formal KHP training or policies. App. II, 63-64. To the extent the district court found fault with KHP's training and policies, the district court's concern

was that they were not sufficient to prevent individual troopers from committing Fourth Amendment violations, not that KHP's training and policies affirmatively authorized constitutional violations. But that is no different than the "failure to act in the face of a statistical pattern" that the Supreme Court found insufficient to justify injunctive relief in *Rizzo*. 423 U.S. at 376; *see also Lyons*, 461 U.S. at 100, 112-13 (reversing an injunction ordering an improved training program). In fact, the case for injunctive relief is even weaker here given the district court's finding that insufficient data makes it impossible to determine how pervasive the alleged constitutional violations are and has likely enabled those alleged violations to escape the KHP's attention for many years. App. II, 64. In other words, the district court failed to find that any KHP superintendent even had knowledge of the alleged pattern of constitutional violations.

Raising an argument not made by Appellees—which this Court should therefore not consider, *see United States v. Ackerman*, 831 F.3d 1292, 1299 (10th Cir. 2016)—*Amici* are wrong that *Rizzo* is a form of *Younger* abstention. *Rizzo* is not about courts abstaining from exercising jurisdiction; it is about the appropriate use of equitable

remedies. As the Supreme Court noted, "[e]ven in an action between private individuals, it has long been held that an injunction is 'to be used sparingly, and only in a clear and plain case.'" 423 U.S. at 378 (quoting *Irwin v. Dixion*, 50 U.S. (9 How.) 10, 33 (1850)). The Supreme Court simply recognized that when it comes to "a federal court's legal power to 'supervise the functioning of [a] police department,'" considerations of comity, federalism, and the separation of powers should make courts even more reluctant to issue injunctive relief. *Id.* at 380.

*Amici*'s claim that *Rizzo* has no application outside interference with a state court proceeding is contradicted by *Rizzo* itself. The injunction there involved revised police department policies for handling citizen complaints against police officers, *id.* at 365—nothing to do with an ongoing state court proceeding. Rather than limiting its decision to state court proceedings, the Supreme Court held that "the principles of federalism which play such an important part in governing the relationship between federal courts and state governments" "likewise have applicability where injunctive relief is sought, not against the judicial branch of the state government, but against those

in charge of an executive branch of an agency of state or local governments." *Id.* at 380.

The Supreme Court later reaffirmed this holding in *Lyons*, explaining that "principles of equity, comity and federalism . . . should inform the judgment of federal courts when asked to oversee state law enforcement authorities." 461 U.S. at 112. The Supreme Court held that the district court there departed from these principles in issuing an injunction against police chokehold practices along with imposing "[a]n improved training program and regular reporting and record keeping." *Id.* at 100, 112. Again, that injunction did not implicate any state court proceeding, yet the Court found it inappropriate. The same is true here.

## B. A damages remedy is adequate and more appropriate than injunctive relief.

Plaintiffs' argument that fear of a future constitutional violation necessarily constitutes an irreparable injury that cannot adequately be remedied by a damages action in the event the fear materializes is directly contradicted by *Lyons*. There, the Supreme Court held that even if Lyons had standing to seek an injunction, "[t]he equitable remedy is unavailable absent a showing of irreparable injury, a

requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again." 461 U.S. at 111. The Court also declined to issue injunctive relief because Lyons had "an adequate remedy at law" in his suit for damages. *Id.* While the Court was referring to a remedy for Lyons's past injury, the point is that a damages remedy *can* be an adequate remedy for a constitutional violation.

To be sure, the existence of a damages remedy alone does not necessarily prevent courts from enjoining the enforcement of a unconstitutional law or program. But the calculus is different when plaintiffs ask federal courts to "oversee state law enforcement authorities" in an effort to prevent future Fourth Amendment violations. *Id.* at 112. The speculative nature of any future injury— which is equally present here—does play into this. *See* Appellees' Br. at 45 (attempting to distinguish *Daniels v. Southfort*, 6 F.3d 483 (7th Cir. 1993)). But the concern goes beyond Article III standing. Rather, the point is that in this context, a traditional damages remedy is more appropriate than injunctive relief. *See Rahman v. Chertoff*, 530 F.3d 622, 626-27 (7th Cir. 2008).

This is at least partly due to the extremely fact-specific nature of Fourth Amendment cases. "[A]s a matter of history and practice, injunctive relief has been quite rare in Fourth Amendment cases." Orin S. Kerr, *The Limits of Fourth Amendment Injunctions*, 7 J. on Telecomm. & High Tech. L. 127, 128 (2009). In the Fourth Amendment context, "[c]ourts have generally limited injunctive relief to ongoing programs such as . . . drug testing policies or road blocks" based on "the specific established . . . facts of the ongoing program." *Id.* at 130. When, as here, the concern is with hypothetical future police encounters based on fact-specific standards like reasonable suspicion, any Fourth Amendment violations that might occur are best addressed by suits for damages or the exclusionary rule—which can account for the specific factual scenarios—rather than broad injunctive relief. *See id.* at 128-30, 133-36 (quoting *Hughes v. Rizzo*, 282 F. Supp 881, 885 (E.D. Pa. 1968) ("[T]he myriad factual situations in which [Fourth Amendment] issues can arise are so varied . . . that any attempt at broad-spectrum relief should be avoided. Courts are simply not equipped to supervise the day-to-day operations of police officers by injunction.")).

Contrary to Plaintiffs' claim, a damages remedy is not inadequate just because it does not guarantee that the Constitution will never again be violated. Appellees' Br. at 44. As Plaintiffs recognized below, even under the district court's injunction, it is possible that a KHP trooper at some point in the future will make a mistake about the existence of reasonable suspicion and violate the Fourth Amendment. A showing of three to five constitutional violations over the course of five years comes nowhere close to demonstrating that a damages remedy is ineffectual. Together with the exclusionary rule, a damages remedy exercises a strong deterrent effect. That is particularly true given that plaintiffs in § 1983 actions can receive not only compensatory damages, but also possibly punitive damages (which Bosire obtained, App. II, 227), as well as attorney's fees and costs (which in this case exceeded $1.6 million just for the damages claims against the two KHP troopers in their individual capacities that are not being appealed, D. Ct. Doc. #630 at 13).

## III. The Two-Step provisions of the district court's decision cannot be squared with this Court's precedents.

Plaintiffs also fail to reconcile the district court's decision with numerous cases from this Circuit upholding the constitutionality of Two-Step encounters. Opening Br. at 37-41. The fact that those cases "concerned motions to suppress in individual criminal cases," Appellees' Br. at 48, is neither here nor there—the same Fourth Amendment principles apply in both contexts. Nor is there anything wrong with the fact that KHP troopers do not specifically tell drivers they are "free to go." Appellees' Br. at 47-48.[3] This Court has repeatedly held that such an advisory is not required for an encounter to be consensual. *See, e.g.*, *United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir. 1999). Instead—consistent with this Court's precedents—troopers use phrases like "Have a safe trip," "Take care," or "Have a good day," App. II, 52, which

---

[3] Appellees cite KHP training materials that state "a reasonable person in the suspect's position [must] feel free to leave. Even if they are not," and suggest that this is somehow nefarious. Appellees' Br. 47. But this statement just refers to the fact that even if a trooper has decided (if necessary) to ultimately detain a driver based on reasonable suspicion, the trooper may pursue a consensual encounter to further develop (or dispel) reasonable suspicion or to seek consent for a canine sniff or vehicle search. There is nothing wrong with that.

"signal the end of an encounter, and afford [the driver] an opportunity to depart." *United States v. Ledesma*, 447 F.3d 1307, 1315 (10th Cir. 2006). Plaintiffs' complaint that KHP troopers use the Two-Step in the absence of reasonable suspicion, Appellees' Br. at 46 and 52 n.13, represents a fundamental misunderstanding of Fourth Amendment doctrine. "[C]onsensual encounters are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing." *United States v. Jones*, 701 F.3d 1300, 1312 (10th Cir. 2012) (quoting *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000)).

Contrary to Plaintiffs' suggestion, Colonel Smith is not arguing that the factors this Court has previously identified as relevant to determining whether consent was coerced are exclusive. Rather, the problem is that the facts the district court relied on in finding coercion here (with the possible exception of the Dunn stop, as discussed below) are commonplace and were equally present in cases where this Court

found post-traffic stop encounters constitutional. *See* Opening Br. at 34-35.[4]

Plaintiffs defend the district court's findings as to the Dunn stop by arguing that the trooper made physical contact with Dunn's vehicle before she agreed to answer additional questions. Appellees' Br. at 49. But they seem to be referring to the initial traffic stop. After giving Dunn a warning, telling her to have a safe trip, and taking a step away from the car, the trooper asked Dunn, "Hey ma'am, do you mind if I ask you a couple questions," to which Dunn responded, "yeah," *before* the trooper put his head and arm back in the passenger window. App. II, 34; Ex. 122 at 3:00-3:10. In any event, this Court can view the dash cam video and determine whether the trooper's actions were coercive, if necessary. But it really does not matter. Even if the trooper made physical contact with the vehicle *and* this rendered the encounter coercive *and* this single incident somehow justified prospective

_____

[4] Plaintiffs also note that a second trooper was present at some of the stops, Appellees' Br. at 49, but the district court never relied on this in finding the Two-Steps to be coercive. App. II, 52-53, 65-66. Nor in any of the stops was the second trooper near the driver, so as to suggest coercion, when the first trooper performed the Two-Step. *See* Ex. 1 (Shaw) at 15:00; Ex. 29 (Erich) at 10:50; Ex. 122 (Dunn) at 3:00.

injunctive relief, any injunction would at most properly be addressed to the allegedly coercive conduct—the trooper's touching of the vehicle. There would be no reason to categorically prohibit the Two-Step unless troopers obtain consent in writing, which is not required under Tenth Circuit and Supreme Court precedent.

## IV. Plaintiffs offer no defense of the consent search provisions of the district court's injunction.

Plaintiffs entirely fail to respond to the argument that the consent search provisions of the district court's injunction are unwarranted because not a single stop involved a consent search. *See* Opening Br. at 47. That alone warrants reversal. Instead, Plaintiffs focus exclusively on the Two-Step. But the Two-Step and consent searches are different matters, as demonstrated by the fact that several Plaintiffs agreed to additional questioning as part of a Two-Step encounter, while all declined consent to search. The district court also imposed written consent requirements (as well as a supervisor approval requirement) for consent searches separate from and in addition to the written consent requirements for Two-Step encounters. Those requirements are legally unjustified.

## CONCLUSION

The district court's judgment against Colonel Smith should be reversed.

Respectfully submitted,

KRIS W. KOBACH
Kansas Attorney General

/s/ Dwight R. Carswell
Anthony J. Powell
  *Solicitor General*
Dwight R. Carswell
  *Deputy Solicitor General*
Kurtis K. Wiard
  *Assistant Solicitor General*

120 SW 10th Ave., 2nd Floor
Topeka, KS 66612-1597
(785) 296-2215
anthony.powell@ag.ks.gov
dwight.carswell@ag.ks.gov
kurtis.wiard@ag.ks.gov

*Attorneys for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(ii) because it contains 3,831 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(b), as calculated by the word-counting function of Microsoft Word.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface—14-point Century Schoolbook—using Microsoft Word.

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that a copy of the foregoing APPELLANT'S REPLY BRIEF, as submitted in digital form is an exact copy of the written document filed with the Clerk.

## CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2024, the foregoing APPELLANT'S REPLY BRIEF was electronically filed with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I also certify that within five business days of issuance of notice that the electronic filing is compliant, seven paper copies will be delivered by Federal Express to the Clerk's Office.


DATED: June 18, 2024          /s/ Dwight R. Carswell