**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 29, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

BLAINE FRANKLIN SHAW; SAMUEL JAMES SHAW; JOSHUA BOSIRE; MARK ERICH; SHAWNA MALONEY,

Plaintiffs - Appellees,

v.

ERIK SMITH, in his official capacity as the Superintendent of the Kansas Highway Patrol,

Defendant - Appellant.

------------------------------

ERWIN CHEMERINSKY; FRED O. SMITH, JR.; DAVID C. VLADECK,

Amici Curiae.

No. 23-3264 & 23-3267

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 6:19-CV-01343-KHV)**

---

Dwight R. Carswell, Deputy Solicitor General (Anthony J. Powell, Solicitor General, Kurtis K. Wiard, Assistant Solicitor General with him on briefs) Office of Attorney General Kris. W. Kobach, Topeka, Kansas for Defendant-Appellant.

Kunyu Ching, American Civil Liberties Union Foundation of Kansas, Overland Park, Kansas (Brian Hauss, Elizabeth Gyori, American Civil Liberties Union Foundation, New York, New York, Leslie A. Greathouse, Patrick McInerney, Spencer Fane LLP, Kansas City, Missouri, with her on the briefs) for Plaintiffs-Appellees.

Halle H. Edwards and Melissa Arbus Sherry, Latham & Watkins LLP, Washington, DC, filed an amicus brief for legal scholars Erwin Chemerinsky, Fred O. Smith, Jr., and David C. Vladeck.

---

Before **HARTZ**, **KELLY**, and **FEDERICO**, Circuit Judges.

---

**FEDERICO**, Circuit Judge.

---

Driving between Kansas and Colorado is not a crime. But for years, interstate drivers traveling in Kansas have apparently endured a pattern of unconstitutional searches and seizures, primarily because one state has legalized marijuana and the other has not. On appeal, we consider the validity of an injunction the district court imposed against the Kansas Highway Patrol (KHP) to halt unlawful practices. KHP challenges the district court's injunction, arguing lack of jurisdiction and abuse of discretion.

We must determine whether out-of-state drivers who were detained by KHP without either reasonable suspicion or voluntary consent now have standing to enjoin unconstitutional practices of KHP. We must also determine whether the district court abused its discretion in its imposition of the injunction. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part,

reverse in part, and remand for further proceedings consistent with this opinion.

# I. BACKGROUND

## A. Facts and Evidence

This case began with a series of traffic stops in Kansas. The facts described are based upon the record developed before and found by the district court.

### *1. Shaw Stop*

On December 20, 2017, KHP Trooper Douglas Schulte stopped Blaine Shaw (driver) and his brother Samuel Shaw (passenger) for speeding on I-70.[1] The Shaws were driving from Oklahoma to Colorado in a car with Osage Nation license plates. Trooper Schulte took Blaine Shaw's license and registration, issued him a speeding ticket, and told him to have a safe trip. Trooper Schulte then took three steps away from the Shaws' car, turned around, and then said, "Hey Blaine, can I ask you a question real quick?" *Shaw v. Jones*, 683 F. Supp. 3d 1205, 1222 (D. Kan. 2023). Blaine replied, "yeah." *Id.* Trooper Schulte was performing the "Kansas Two-Step," a tactic where troopers complete a traffic stop and then re-engage the driver in conversation

---

[1] Interstate 70 is a major east-west highway that runs through the entire State of Kansas, from the Missouri border in Kansas City to the Colorado border near Goodland.

in an effort to secure the driver's consent for further questioning. The trooper's objective is to continue questioning to develop reasonable suspicion, so that the trooper can either extend the detention period, search the car, or have a dog arrive on scene to sniff the car for contraband.

After Blaine Shaw answered more of Trooper Schulte's questions, he was asked to consent to the search of his car. When he refused, Trooper Schulte detained the Shaws for a canine sniff and a search, neither of which yielded any contraband.

Trooper Schulte testified that he had reasonable suspicion to conduct a search based on a series of factors, including that the Shaws (1) were traveling on I-70 (a "known drug corridor"), (2) were traveling to Colorado (a "drug source state"), and (3) were from Oklahoma (a drug "destination state").[2] *Id.* at 1223–24. Under the Fourth Amendment, the "use of state residency as a justification for the fact of or continuation of a [traffic] stop is impermissible." *Vasquez v. Lewis*, 834 F.3d 1132, 1138 (10th Cir. 2016). As a jury later found, Trooper Schulte violated the Shaws' constitutional rights under the Fourth Amendment.

[2] The other factors cited for reasonable suspicion by Trooper Schulte were that Blaine Shaw took too long to pull over, that he had an eight year old charge for possession of marijuana with intent to distribute, that his car was registered to his father, that the car was crowded and appeared lived in, that Samuel Shaw did not speak, and that Blaine Shaw was a criminal justice major and refused to consent to a search.

### *2. Bosire Stop*

The other plaintiffs in this case had similar interactions with KHP. On February 10, 2019, KHP Trooper Brandon McMillan stopped Joshua Bosire after seeing him parked at a gas station located just off I-70. Bosire was driving a rental car with Missouri plates and returning to Kansas from Colorado. Trooper McMillan thought he smelled marijuana, and then saw Bosire at a gas pump next to another person who also had a rental car. Trooper McMillan suspected the two drivers of drug trafficking and hoped to stop one of them. He drove his patrol car onto the median of I-70 and waited for one of them to drive by. When Bosire passed him going seven miles per hour over the speed limit, Trooper McMillan stopped him for speeding.

Trooper McMillan asked Bosire several questions, including if he was coming from Colorado, but Bosire refused to answer. After giving him a warning for speeding, Trooper McMillan asked Bosire for consent to search his car. Bosire refused, and Trooper McMillan detained him and called for a dog to come and sniff the car. No contraband was discovered. Trooper McMillan relied in part on a belief that Bosire was traveling from Colorado when deciding to stop his car.

### *3. Erich/Maloney Stop*

On the morning of March 9, 2018, KHP Trooper Justin Rohr stopped Mark Erich (driver) and Shawna Maloney (passenger) while they were driving

their RV on I-70. Trooper Rohr thought it was suspicious for an RV to be driving early in the morning outside of the typical season for camping. Trooper Rohr drove his patrol car close to the RV's rear bumper to look at its Colorado tags. Erich saw how close Trooper Rohr's car was and crossed over the fog line to get some distance. Trooper Rohr then stopped Erich for crossing the fog line. After taking his license and registration and asking a few basic questions, Trooper Rohr told Erich to have a safe trip. He then performed the Two-Step, taking four steps away from the RV before returning to ask more questions.

Trooper Rohr proceeded to ask Erich about his destination. Erich told Trooper Rohr that he was heading to Alabama, and then said that he preferred not to answer any further questions. After that, Trooper Rohr detained them. Trooper Rohr relied in part on the fact that the RV was traveling from Colorado to generate reasonable suspicion to detain Erich, Maloney, and their children.[3] They were detained for half an hour while Trooper Rohr searched the RV for contraband and conducted a canine sniff, but ultimately no contraband was found.

[3] Trooper Rohr also testified that he had reasonable suspicion to detain them because the RV appeared to have been painted recently, Erich had paint on his hand, and it looked like the RV might contain a secret compartment. The district court acknowledged that these factors might generate reasonable suspicion. However, it ruled that the initial traffic stop was invalid because Erich had not broken any traffic laws, and thus the entire detention was unlawful.

### B. Procedural History

Plaintiffs are the individuals described above, who KHP stopped and detained. They each brought claims for injunctive relief under 42 U.S.C. § 1983 against Herman Jones,[4] then-Superintendent of KHP, claiming a violation of their Fourth Amendment right to be free of unreasonable searches and seizures and a violation of their constitutional right to travel under Article IV, the Fourth Amendment, and the Fourteenth Amendment.

Blaine Shaw, Samuel Shaw, and Joshua Bosire each also brought claims for damages under 42 U.S.C. § 1983 against the troopers who stopped them. Samuel Shaw settled his damages claim, while Blaine Shaw and Bosire each had separate jury trials on the issue of damages. As to Blaine Shaw, a jury found that Trooper Schulte lacked reasonable suspicion to extend the Shaws' detention and that he could not have consented to further detention because a reasonable person in his position would not have felt free to leave. As to Bosire, a jury found that Trooper McMillan lacked reasonable suspicion to detain him and violated his Fourth Amendment rights. Both juries ultimately awarded damages to Blaine Shaw and Bosire.

---

[4] Herman Jones was later replaced by Erik Smith as KHP Superintendent and substituted as a party.

These plaintiffs' claims for injunctive relief were consolidated with claims made by Mark Erich and Shawna Maloney, and a two-week bench trial ensued.

### C. Bench Trial

The evidence Plaintiffs introduced at trial confirmed that their stops were not exceptional. The district court heard similar testimony from three other individuals who had been stopped while driving but were not plaintiffs in the suit.[5] Data suggests that numerous other drivers have been stopped in

[5] Danielle Kelly, Suzanne Dunn, and Curtis Martinez were all detained and searched on I-70. For Kelly and Dunn, the district court found that KHP troopers lacked reasonable suspicion and impermissibly relied on the drivers' state of origin. For all three, the court found that KHP troopers performed the Two-Step in a way that coerced the driver's agreement to extend the stop.

a similar manner because KHP disproportionately detains out-of-state drivers coming into Kansas.[6]

At trial, Plaintiffs introduced evidence from Princeton University Professor Jonathan Mummolo, an expert in statistical analysis, who testified about his analysis of KHP stops. Professor Mummolo conducted a study of KHP's practices based on its own records of roadside stops, measures of traffic volume from the Kansas Department of Transportation (KDOT), and commercial cell phone data showing whether travelers near I-70 and I-35 were from out of state. He found that out-of-state drivers were much more likely than in-state drivers to be stopped by KHP, and when stopped were much more likely to be subject to canine searches.

[6] Initially, Plaintiffs sought to certify this case as a class action on behalf of "all persons in the United States who travelled on I-70 as a motorist or passenger, were actually or appeared to be driving to or from Colorado, in a vehicle with license plates from a state other than Kansas, who were stopped, detained by the KHP and subjected to searches of their vehicles or persons by a canine but were not subsequently convicted of a crime as a result of the stop, detainment, arrest, or search by the KHP." Aplt. App. I at 95. However, defense counsel stipulated that "the equitable relief that the named plaintiffs demand against [KHP], if granted, would benefit the putative class members without the certification of a class." *Id.* at 144. Relying on this stipulation, the district court did not reach the merits of the motion for class certification, summarily denying it. Likewise, Plaintiffs did not pursue discovery to ascertain the class size or its members, and KHP's insistence that it lacks adequate records likely would have made any such discovery futile. Thus, Plaintiffs were not the only individuals KHP stopped and detained unlawfully, and it would be inequitable to allow KHP to reverse course on the effect of its stipulation.

He said that this statistical difference was so significant that it could not be explained by coincidence. Despite representing roughly 35 percent of drivers on the road, out-of-state drivers made up 77 percent of total traffic stops and 90 percent of canine sniffs in the data sets Mummolo analyzed. The data further showed that significantly more out-of-state drivers were stopped by KHP than should have been stopped excluding this factor, amounting to 50,000 additional stops in under two years. These disparities persisted even though there was "no clear evidence of differential rates of the discovery of illegal drugs or contraband" between in-state and out-of-state drivers. Aplt. App. XIV at 12. In sum, Professor Mummolo's testimony indicated KHP's consistent pattern and practice of targeting out-of-state drivers for stops and searches.

Testimony from KHP troopers further revealed that, as a matter of practice and training, they stop out-of-state drivers specifically because they are coming from out of state. Under *Vasquez*, a driver's state of residency is a completely innocuous factor in determining whether a driver is suspicious. 834 F.3d at 1137–39. It is "so broad as to be indicative of almost nothing" either on its own or in combination with "otherwise innocent factors[.]" *Id.* at 1137–38.

Likewise, travel along I-70 cannot be used as a basis for reasonable suspicion. *Id.* at 1138 ("And that Vasquez was driving on I-70 does not make his otherwise innocent conduct suspicious. I-70 is a major corridor between Colorado and the East Coast. It could equally be said that it is suspicious

to not drive from Colorado to Maryland along I-70."). As we have admonished, "it is time to abandon the pretense that state citizenship is a permissible basis upon which to justify the detention and search of out-of-state motorists[.]" *Id.*

Despite the holding of *Vasquez*, KHP troopers testified that, in their view, they could establish reasonable suspicion based on a driver's state of origin. Trooper Ryan Wolting and Lieutenant Greg Jirak both testified that they consider a driver's state of origin as a factor when determining whether reasonable suspicion to stop them exists. According to them, this flawed view among troopers results from KHP training. When directly asked if KHP had trained him to use a driver's state of origin as a factor in determining reasonable suspicion, Trooper Rohr testified, "yes." Aplt. App. XX at 35–37. Trooper Rule testified that he was trained on what constitutes reasonable suspicion, and that he considered a driver's state of origin as part of the totality of the circumstances for finding reasonable suspicion. In conflict with *Vasquez*'s holding, not one KHP trooper testified that they did not use state of origin as a factor.

Although we published *Vasquez* in 2016, KHP did not incorporate *Vasquez* into its training materials until after Plaintiffs filed this case in 2020. The only KHP training material on *Vasquez* prior to 2020 was an email bulletin sent out to troopers after the decision was published in 2016. KHP's legal counsel testified that she made no changes to her training materials based on

*Vasquez* and believed that the decision did not make substantive changes to the law or that troopers needed to be aware of it.

Immediately after *Vasquez* was published, the Assistant Superintendent of KHP stated publicly that "we cannot ask our troopers to ignore" the fact that Colorado had legalized marijuana and that drivers from that state might be bringing it into Kansas. Aplt. App. XXIII at 97–98. At trial, Captain Brent Hogelin, responsible for leading and training a unit of troopers, testified that KHP acted consistently with *Vasquez*. However, he also testified that "[o]ur practices didn't change" after *Vasquez*, even though KHP troopers were defendants in that case too. Aplt. App. XVI at 88.

At the same time, KHP adopted a policy that pushed troopers to make more traffic stops. KHP training slides stated that troopers must "make high volume traffic stops" and "STOP A LOT OF CARS!" *Shaw*, 683 F. Supp. 3d at 1248. Conversely, when troopers made stops that were found to have violated a driver's constitutional rights, only minor corrections were imposed, such as one hour of additional training and a ride-along with another trooper. Additionally, KHP's record keeping policies did not require KHP troopers to document their reasons for concluding that there was reasonable suspicion of a motorist.

Based on this evidence, the district court found that "KHP trains and permits [troopers] to evaluate a driver's out-of-state residency and travel plans

when developing reasonable suspicion" in violation of *Vasquez*. *Id.* at 1240. The district court also found that KHP has a pattern and practice of using the Two-Step in a way that violates the Fourth Amendment rights of interstate drivers. When a driver is pulled over for a traffic stop, a law enforcement officer must let them go after checking their license and registration unless (1) there is a reasonable, articulable suspicion to detain them or (2) the officer obtains their voluntary consent. *See United States v. Wallace*, 429 F.3d 969, 974 (10th Cir. 2005) ("[A]n officer can extend the stop if he either has a reasonable, [articulable] suspicion of other crimes or the driver voluntarily consents to further questioning.") (citation and internal quotation marks omitted).

KHP troopers are trained to perform the Two-Step, which is an extension of a traffic stop for a round of seemingly innocuous questions between the trooper and the driver. According to KHP, all additional questions and answers are consensual, casual conversations, so these additional questions do not constitute a seizure under the Fourth Amendment. But to be consensual, such questioning must be voluntary and not "the product of duress or coercion" based on the "totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). Such questioning is consensual only if "a reasonable person would believe he was free to leave or disregard the officer's request for information." *United States v. Manjarrez,* 348 F.3d 881, 885–86 (10th Cir. 2003).

KHP trains its troopers on this area of the law. But the district court found that after signaling that they were done talking to drivers, troopers deliberately delayed anywhere from one to five seconds before re-engaging with drivers to ask more questions. The court ruled that "in videotapes of the . . . Two-Steps that the [c]ourt reviewed during trial, viewed in light of the overall circumstances, the periods of disengagement were not sufficient for reasonable drivers to feel free to leave." *Shaw*, 683 F. Supp. 3d at 1255.

Troopers were also trained that it was not necessary to physically step away from a driver's car following the completion of a routine traffic stop. Troopers sometimes remained so close to a car that it would be unsafe for drivers to drive away. KHP also trained its troopers to avoid saying drivers are "free to go" and to instead use less clear phrasing, such as, "[h]ave a safe trip," "[h]ave a good day," and "[t]ake care." Aple. Supp. App. at 93. The district court ruled that KHP troopers were consistently using the Two-Step to detain drivers in violation of the Fourth Amendment.

At the conclusion of the bench trial, the district court also found that Trooper Rohr lacked reasonable suspicion to detain Erich, and that he lacked reasonable suspicion for portions of the search of the RV. The district court entered declaratory and permanent injunctive relief in favor of Plaintiffs.

Superintendent Smith now appeals the district court's ruling and the permanent injunction. This court previously granted a stay of the district court's injunction, pending the outcome of this appeal.

**D. Permanent Injunction**

On appeal, Superintendent Smith argues that Plaintiffs lack standing to seek injunctive and declaratory relief, and that the district court abused its discretion in granting the permanent injunction. We now review the injunction in more detail.

The district court granted a permanent injunction to prohibit KHP from engaging in unconstitutional searches and seizures. Under Section II of the injunction, when determining if reasonable suspicion exists, KHP is enjoined from giving weight to a driver's travel to or from certain "drug source" states or on a suspected "drug corridor." Aplt. App. II at 215. KHP is also enjoined from using the Two-Step to extend traffic stops without reasonable suspicion or voluntary consent from the driver. The injunction applies only to drivers and their passengers traveling in Kansas on I-70, I-35, U.S. Route 54, or U.S. Route 36 who have out-of-state plates and appear to be driving to or from Colorado. The injunction is set to be in effect for four years, though it may be dissolved after two years if KHP demonstrates it has achieved the injunction's objectives.

In Section III, the injunction also imposes upon KHP several remedial measures, summarized as follows.

### *1. Documentation*

The district court crafted a series of requirements to manage KHP's data collection and to monitor whether it is complying with the injunction and detaining drivers on a proper basis. Under the terms of the injunction, troopers are required to document and describe all traffic stops and any consent searches conducted after a stop. To facilitate this, KHP must develop an electronic reporting format that requires troopers to list any factor used in developing reasonable suspicion and to describe the details of any attempts to obtain consent and any search that occurred.

### *2. Consent Notification*

Troopers are required to inform drivers of their right to refuse consent whenever asking for consent to search. A driver's consent must also be documented on a written form explaining the driver's rights and requiring a signature from both the trooper and the driver. Similarly, troopers must inform drivers of their right to refuse to give consent before they try to reengage in questioning after a traffic stop and must get that consent in writing and log the interaction.

### *3. Recording Policy*

The injunction also imposes new policy requirements for recording traffic stops. KHP is required to maintain working video and audio recording in all patrol cars. Recording devices must be activated during all traffic stops and

must be used to record consent requests, car searches, and the use of canine sniffs.

### *4. Supervisory Review*

Supervisors must review traffic stop reports within 72 hours of a stop, and then take corrective actions if any trooper's conduct appears to be unlawful or against KHP policy. Troopers must notify a supervisor of their plan to conduct a consent search and must get approval from that supervisor before doing so. That supervisor must then document their reasons for granting or denying permission to conduct a consent search and must submit logs of these documents to the district court.

### *5. Training Materials*

KHP is required to revise its training curriculum. In consultation with Plaintiffs, it must create new training and testing material on reasonable suspicion and voluntary consent. KHP is required to provide all troopers with at least ten hours of training on this program on an annual basis. New training materials for supervisors and eight hours of annual training on how they should monitor troopers' compliance are also required.

### *6. Performance Review*

KHP must also develop a comprehensive system for analyzing the data it collects and must produce quarterly reports and make them available to the district court, Plaintiffs, and the public. Every six months, KHP is required to

submit performance compliance reviews to the district court to assess whether it is adhering to the injunction's requirements.

## II. STANDARD OF REVIEW

We review questions of justiciability, including standing, de novo. *See Awad v. Ziriax*, 670 F.3d 1111, 1119–20 (10th Cir. 2012). Otherwise, we review the decision to grant a permanent injunction for abuse of discretion. *See United States v. Supreme Ct. of New Mexico*, 839 F.3d 888, 928 (10th Cir. 2016). "The district court's discretion in this context is necessarily broad and a strong showing of abuse must be made to reverse it." *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1201 (10th Cir. 2009) (citation and internal quotation marks omitted). We will reverse only if "the district court's injunction embodies an 'arbitrary, capricious, whimsical, or manifestly unreasonable judgment.'" *Supreme Ct. of New Mexico*, 839 F.3d at 928 (quoting *ClearOne Commc'ns, Inc. v. Bowers*, 643 F.3d 735, 752 (10th Cir. 2011)).

When reviewing for abuse of discretion, "we examine the district court's legal determinations de novo, and its underlying factual findings for clear error." *Att'y Gen. of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009). "[C]lear error occurs only when the record does not support the district court's factual findings or when, after reviewing the record, we have the definite and firm conviction that a mistake has been made." *MVT Servs.,*

*LLC v. Great W. Cas. Co.*, 118 F.4th 1274, 1281 (10th Cir. 2024) (citation and internal quotation marks omitted).

## III. DISCUSSION

### A. Standing

To comply with the Constitution, federal courts may only hear "[c]ases" and "[c]ontroversies[.]" U.S. Const. art. III, § 2. To be a justiciable case or controversy under Article III, "the plaintiff must have a personal stake in the case," giving them standing to sue. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation and internal quotation marks omitted). Plaintiffs bear the burden of demonstrating standing to sue. *Id.* at 430–31. And "[e]ach plaintiff must have standing to seek each form of relief in each claim." *Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007). Moreover, standing must be demonstrated "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Because this case went to trial, we "look to the evidence presented there to determine whether the plaintiffs carried their burden of proving standing." *Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 973 (10th Cir. 2020).

To establish standing, a plaintiff must demonstrate that they (1) "ha[ve] suffered or likely will suffer an injury in fact," (2) "the injury likely was caused or will be caused by the defendant," and (3) "the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. All. for*

*Hippocratic Med.*, 602 U.S. 367, 380 (2024). To demonstrate an injury-in-fact, a plaintiff must show that they have suffered or will suffer “an invasion of a legally protected interest” that is both (a) “concrete and particularized” and (b) “actual or imminent, not conjectural or hypothetical.” *Lujan*, 504 U.S. at 560.

For an injury to be “concrete,” “it must actually exist,” meaning that it must be “real” rather than “abstract,” though it need not be physically “tangible.” *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (citations omitted). To be “particularized,” it “must affect the plaintiff in a personal and individual way.” *Id.* at 339. Finally, to be actual or imminent, an injury must have either happened or “[a]n allegation of future injury may suffice if the threatened injury is ‘certainly impending,’ or there is a ‘substantial risk’ that the harm will occur.” *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int’l USA*, 568 U.S. 398, 409–10, 414 n.5 (2013)). “[A] plaintiff cannot sustain a claim for prospective injunctive relief that is based on ‘speculative future harm.’” *Collins v. Daniels*, 916 F.3d 1302, 1314 (10th Cir. 2019) (quoting *Lippoldt v. Cole*, 468 F.3d 1204, 1217 (10th Cir. 2006)).

Superintendent Smith alleges that Plaintiffs have failed to show standing to obtain prospective injunctive relief. On appeal, he only contests

whether Plaintiffs' injury is actual or imminent such that there has been an injury in fact.[7]

Superintendent Smith argues that Plaintiffs' claims must fail because the injunction is designed to prevent future injury that is not imminent. In particular, he points to *City of Los Angeles v. Lyons* to show that Plaintiffs' basis for seeking an injunction is too speculative to grant them standing. 461 U.S. 95, 102–03 (1983).

In *Lyons*, the Supreme Court held that a plaintiff who was placed in a chokehold by law enforcement officers lacked standing to obtain injunctive relief barring the future use of chokeholds. *Id.* at 105. Although Lyons demonstrated that he had been unlawfully placed in a chokehold in the past, he could not adequately show that he was likely to be stopped and placed into an unlawful chokehold again in the future. *Id.* ("Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of the chokeholds by police officers."). The Court also outlined what Lyons would have needed to show to have standing. First, he would need to "allege that he would have another encounter with the police." *Id.* at 105–

[7] Plaintiffs established that Superintendent Smith is a state official who serves as the final authority of KHP, and that he is ultimately responsible for authorizing KHP policies and practices. As such, if they suffered injury, there is both causation and redressability with respect to Superintendent Smith.

06. Then he would need to show either that all police officers use unlawful chokeholds or "that the City ordered or authorized police officers to act in such manner." *Id.* at 106.

We now consider whether the Plaintiffs meet the *Lyons* requirements for standing. To begin, Plaintiffs have demonstrated "a substantial risk" that they will have another traffic stop encounter with KHP. *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 109 (10th Cir. 2024) (quoting *Susan B. Anthony List*, 573 U.S. at 158). We assume, as we must, that Plaintiffs will endeavor to follow the law and not purposefully drive in a manner that would lead to them being pulled over. *See O'Shea v. Littleton*, 414 U.S. 488, 497 (1974) ("We assume that respondents will conduct their activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct said to be followed by petitioners."). But even a diligent, good faith attempt to follow the law cannot guarantee that a driver will not be stopped by law enforcement. Traffic infractions are incredibly common and may be caused by any number of mere mistakes. *See Navarette v. California,* 572 U.S. 393, 409–411 (2014) (Scalia, J., dissenting). For one of the plaintiffs, they had no safe choice but to commit a traffic violation, as a KHP patrol car's close driving forced them to drift over the fog line on the edge of the highway. And significantly, any of the plaintiffs could also be riding as a passenger in a car

in the future, meaning they would have no control over whether traffic laws are violated.

Rather than being mere speculation, there is a substantial risk that Plaintiffs – no matter how carefully they try to follow traffic laws – will be pulled over by KHP at some point again. This is particularly true when KHP policy requires its troopers to "STOP A LOT OF CARS!" *Shaw*, 683 F. Supp. 3d at 1248.

Traffic stops, in fact, are routine and beyond the control of drivers.[8] The likelihood of Plaintiffs being stopped again in Kansas is inordinately high because they are out-of-state drivers. The district court found that out-of-state drivers are stopped at "disproportionately high rates compared to drivers who

[8] At trial, Superintendent Jones (prior to being substituted for Superintendent Smith) argued that the probability of a given driver being stopped by KHP is 0.41 percent. However, as the district court noted, this estimate was derived by dividing the number of traffic stops by the number of cars registered by KDOT traffic sensors. This result is flawed because cars activate multiple sensors during one trip, and because it ignores the disparity in stops for out-of-state drivers. We defer to the district court's finding of fact on this matter.

are Kansas residents."[9] *Shaw*, 683 F. Supp. 3d at 1221. Despite being a minority of the drivers on Kansas highways, out-of-state drivers made up a large majority of all traffic stops and 90 percent of all cars that underwent canine searches. Plaintiffs offered evidence to show they plan to continue traveling through Kansas and must drive on Kansas highways to do so. Given the frequency of traffic stops and the data showing the disproportionate targeting of out-of-state drivers, there is a substantial risk that Plaintiffs will be stopped by KHP again in the future.

---

[9] This finding was based on the testimony of Professor Mummolo, and Superintendent Smith continues to dispute its accuracy on appeal. He contests the practice of using cell phone data to calculate the number of out-of-state drivers on the road at a given time and alleges that these data are inaccurate. The district court heard such arguments at length during Professor Mummolo's examination, and the arguments against his testimony raised on appeal are the same as those heard at trial. Cell site data may be imperfect, but Professor Mummolo testified that "the bottom line is that the disparities" seen "in the report are of such a magnitude" that they would not be affected by minor errors. Aplt. App. XIV at 20. The district court accepted this reasoning and relied on the veracity of Professor Mummolo's findings. On appeal, we see no reason to believe that the district court made a clear error in this regard. *Fish v. Schwab*, 957 F.3d 1105, 1118 (10th Cir. 2020) ("[W]e review the factual findings underlying the district court's standing determination for clear error."). The district court grappled with the facts of this case over the course of a two-week trial and was in the best position to weigh Professor Mummolo's testimony. *Holdeman v. Devine*, 572 F.3d 1190, 1192 (10th Cir. 2009) ("It is not the role of an appellate court to retry the facts, because the court below has the exclusive function of appraising credibility, determining the weight to be given testimony, drawing inferences from facts established, and resolving conflicts in the evidence." (citation and internal quotation marks omitted)). As such, we defer to its finding of fact that KHP disproportionately stopped and searched out-of-state drivers.

Second, under *Lyons* we next look to whether Plaintiffs established a pattern and practice of unlawful conduct by KHP during traffic stops. The district court found that KHP authorizes troopers to use a driver's state of origin to determine reasonable suspicion and to conduct the Two-Step in a coercive manner. Every trooper who testified at trial admitted to facts that violated drivers' Fourth Amendment rights under *Vasquez*. One explicitly stated that he had been trained to do so. As for the Two-Step, the district court ruled that troopers had a pattern and practice of acting in a way that would make a reasonable driver unsure if they were free to leave. Contrast that with *Lyons*, where the district court found that "police officers were instructed to use chokeholds only when lesser degrees of force do not suffice" and there was not "any evidence showing a pattern of police behavior" that might indicate a policy of using chokeholds more frequently. 461 U.S. at 110, 110 n.9.

The district court here found not merely that some troopers violate the Fourth Amendment, but that KHP "train[s] its troopers" to consistently violate the Constitution. *Shaw*, 683 F. Supp. 3d at 1241. Our fellow circuit courts have held that discrete groups targeted by law enforcement have standing to challenge an unconstitutional "pattern of officially sanctioned . . . behavior, violative of the plaintiffs' rights." *Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012) (citations and internal quotation marks omitted) (holding that Hispanic plaintiffs had standing to challenge a practice of making traffic stops

based on racial profiling); *see also Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344–45 (2d Cir. 1998) (holding that juvenile plaintiffs had standing to seek an injunction against a policy of stopping and interrogating juveniles at family court). Although KHP does not have a formal, written policy that officers should violate *Vasquez* and use the Two-Step to coerce consent, the district court nonetheless found that it inadequately trains its troopers and that the troopers violate *Vasquez* in the field consistent with their training. These findings meet the conditions described in *Lyons* where officers were "ordered or authorized . . . to act in such manner." 461 U.S. at 106.

*Lyons* did not disrupt the Supreme Court's consistent understanding that "[w]here as here, there is a persistent pattern of police misconduct, injunctive relief is appropriate." *Allee v. Medrano*, 416 U.S. 802, 815 (1974). The Court's problem in *Lyons* was that it did not believe that "the odds, that Lyons would not only again be stopped for a traffic violation but would also be subjected to a chokehold without any provocation whatsoever [were] sufficient to make out a federal case for equitable relief." 461 U.S. at 108. (citation and internal quotation marks omitted). The odds in this case are far greater. The occurrence of a future event is never certain, but Plaintiffs have met their burden to establish imminence. *See Clapper*, 568 U.S. at 414 n.5 ("Our cases

do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about.").[10]

Finally, it would make little sense to deny standing to these plaintiffs. The purpose of standing doctrine is to ensure that our court is judging "the legal rights of litigants in actual controversies" instead of giving advisory opinions beyond our constitutional power. *Baker v. Carr*, 369 U.S. 186, 204 (1962) (citation and internal quotation marks omitted). By the extensive record established throughout this litigation, Plaintiffs have proven that they have a genuine and particularized interest and fear in how they will be treated by KHP in the future on Kansas highways. We hold that Plaintiffs have established standing to pursue injunctive relief. Having determined that they have standing, we must separately ask whether plaintiffs were actually entitled to the injunction issued by the district court. *Davis v. United States*, 564 U.S. 229, 249 n.10 (2011) (noting that standing does not depend on the merits of a claim).

[10] The risk of future harm here can be compared to the facts in *Am. Humanist Ass'n, Inc. v. Douglas Cnty. Sch. Dist. RE-1*, where the challenged school conduct was a "one-time event" and the principal of the school "was unaware of the religious aspect of the trip" being challenged "and testified that he would not have allowed such a fundraiser had he been aware." 859 F.3d 1243, 1254 (10th Cir. 2017). Here, in contrast, the district court found systematic repetition of the Two-Step that was known to KHP officials and woven into KHP's culture and training materials. This establishes a substantial risk of future harm to Plaintiffs, along with countless other drivers.

### B. Injunction Standards

With standing established, we now turn our review to the nature of the injunctive relief granted by the district court. Plaintiffs sued Superintendent Smith in his official capacity under 42 U.S.C. § 1983, alleging that under the color of state law he subjected Plaintiffs to the deprivation of their constitutional rights. Under the *Ex parte Young* exception to Eleventh Amendment immunity, a plaintiff may sue state officials in their official capacities to obtain equitable relief against the state. 209 U.S. 123, 159–60, 189 (1908). To do so, a plaintiff must "(1) allege an ongoing violation of federal law and (2) seek relief properly characterized as prospective." *Chilcoat v. San Juan Cnty.*, 41 F.4th 1196, 1214 (10th Cir. 2022) (brackets, citation, and internal quotation marks omitted).

Plaintiffs must also demonstrate that they have met the traditional requirements for a permanent injunction, "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1180 (10th Cir. 2003). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

### *1. Federalism Concerns*

Superintendent Smith does not contest the general principle that Plaintiffs may seek injunctive relief against a state officer acting in his official capacity. Rather, he argues that the district court's injunction nonetheless violates a general principle of equitable relief: respect for federalism.

"[W]hen a party seeks injunctive relief in federal court against a state or local government or governmental entity, concerns of federalism counsel respect for the integrity and function of those bodies[.]" *Signature Properties Int'l Ltd. P'ship v. City of Edmond*, 310 F.3d 1258, 1269 (10th Cir. 2002) (citation and internal quotation marks omitted). Since we are reviewing the district court's decision to grant a permanent injunction despite such concerns, we review for abuse of discretion. *See id.* at 1268.

Superintendent Smith relies primarily on two cases, *O'Shea*, 414 U.S. 488, and *Rizzo v. Goode*, 423 U.S. 362 (1976), to make this argument. *O'Shea* concerned a set of civil rights claims against law enforcement officers and city officials in Cairo, Illinois for bringing criminal cases in a racially discriminatory manner. 414 U.S. at 491. The plaintiffs there sought to enjoin the city's discriminatory practices in setting criminal defendant's bonds, sentencing criminal defendants, and requiring criminal jury fees. *Id.* at 491–92. The Court found both that the plaintiffs lacked standing and that their requested equitable relief could not be granted. *Id.* at 499.

In *Rizzo*, the Court heard a class action suit to enjoin the Philadelphia Police Department from engaging in discriminatory practices. 423 U.S. at 366–67. The class sought injunctive relief that would alter the department's disciplinary procedures based upon evidence that a small number of law enforcement officers consistently engaged in unlawful racial discrimination without being punished. *Id.* at 372–73. The Court found that the class lacked standing and noted that "on the facts of this case . . . important considerations of federalism are additional factors weighing against it." *Id.* at 378.

Neither *O'Shea* nor *Rizzo* is fatal to the injunction here. In *O'Shea*, the Supreme Court was concerned that the injunctive relief sought would cause federal courts to intrude into ongoing state criminal proceedings. 414 U.S. at 500 ("What [the plaintiffs] seek is an injunction aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials."). Generally, federal courts must abstain from intruding into such matters. *See, e.g.*, *Younger v. Harris*, 401 U.S. 37, 43 (1971). But nothing about the district court's injunction here would affect any state criminal proceeding. The injunction would simply impose certain requirements on how KHP conducts itself when training its troopers and making investigatory stops.

*Rizzo*, though closer to the facts of this case, still fails to control our decision. The class in *Rizzo* sued the Philadelphia Police Department for a

failure to effectively supervise several rogue officers. 423 U.S. at 375–76. The officers in *Rizzo* were acting contrary to both the law *and* department policy. *Id.* Here, the district court found both that there was a pervasive practice of unconstitutional searches and seizures *and* that troopers were trained by KHP to engage in unconstitutional practices. As such, we are not convinced that precedent makes the district court's injunction inherently an abuse of discretion on federalism grounds.

#### ***2. Exercise of Equitable Authority***

Superintendent Smith also argues the district court exceeded its equitable authority.[11] First, he argues that the injunction is unwarranted

[11] After this case was submitted for decision, the Supreme Court ruled that federal courts do not have the equitable power to issue "universal injunctions" to enjoin the enforcement of an executive or legislative policy. *Trump v. CASA, Inc.*, 606 U.S. 831, 839-840 (2025). That important Supreme Court opinion does not preclude the district court's exercise of equitable authority here for three reasons. First, the injunction here is not a "universal injunction" that applies throughout the nation; rather, it applies only to one state agency that conducts law enforcement duties within the State of Kansas and protects only out-of-state drivers traveling in Kansas. Second, the Supreme Court left open for lower courts to determine the scope of "complete relief" when granting injunctions. *Id.* at 2558. The relief here provides an "indivisible remedy" which incidentally benefits some third parties. *Id.* at 2564-65 (Thomas, J., concurring). Third, the plaintiffs here originally sought to certify a class of drivers beyond the individual plaintiffs. In response, KHP stipulated that any relief provided to the individual plaintiffs would benefit the putative class. *Supra* note 6. By entering into this stipulation, KHP waived the right to appeal the scope of the parties that may benefit from any relief granted. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1127 (10th Cir. 2011).

because there were only a few examples of trooper misconduct that were presented at trial. The district court found that Superintendent Smith is responsible for troopers unlawfully violating the Fourth Amendment during traffic stops. Testimony and evidence about multiple KHP traffic stops was presented at trial. But the district court also relied on other evidence, including Professor Mummolo's report and testimony about KHP training, to establish that KHP troopers had a consistent pattern and practice of violating the Constitution and were trained to do so. At this stage of the proceedings, we defer to the district court's findings of fact and do not find that the court abused its discretion in granting an injunction because only a limited number of drivers testified.[12]

We also reject Superintendent Smith's argument that money damages provide an adequate alternative remedy. Plaintiffs have alleged a substantial risk of ongoing constitutional injury, which cannot be fully redressed by money damages alone. *See Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019) ("What makes an injury irreparable is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full

[12] Again, KHP stipulated that class certification was unnecessary because any injunctive relief ordered for the plaintiffs would bind it with respect to all drivers. This stipulation does not make the district court's injunction immune from later review, but it severely undercuts any argument from Superintendent Smith that there were a limited number of plaintiffs.

trial. Any deprivation of any constitutional right fits that bill." (citations and internal quotation marks omitted)). The root of Plaintiffs' injury is a substantial risk of being unjustly stopped and searched on a Kansas highway again, and the fear and humiliation that accompanies such an encounter.

That harm is redressed by injunctive relief which prevents it from happening to Plaintiffs again.[13] Individual lawsuits for damages would not accomplish this goal, nor does the uncertain prospect of monetary damages in a future case prohibit the imposition of injunctive relief. *See id. Vasquez* itself was an individual suit against KHP troopers, but KHP did not adjust its behavior in response to its holding until this case. As such, we do not find the prospect of money damages in individual lawsuits to preclude injunctive relief.

**C. The District Court's Injunction**

We now turn to the specific injunction granted by the district court. First, we consider the relief granted to stop KHP troopers from improperly considering a driver's state of origin as a factor in determining reasonable suspicion. Then we address the injunction limiting use of the Two-Step.

[13] While money damages are often used to compensate plaintiffs for emotional injuries, that does not always guarantee their practical effect as a deterrent or even as a means of redress for traffic stop cases. Juries can vary sharply in their damage determinations. Joshua Bosire was awarded over $40,000 in compensatory and punitive damages, while Blaine Shaw was awarded a mere $1 in nominal damages.

**HARTZ**, J., joined by **KELLY**, J.[14]

---

### 1. Driver's State of Origin

On the record before us, we hold that the district court abused its discretion by granting injunctive relief beyond ordering further training regarding the irrelevance of a driver's state of origin. Injunctions against state officials should be no more intrusive than necessary, and Plaintiffs have not made a showing that anything more than mandatory training is necessary.

### I. Drug-Source and Destination States

As fully set forth above, this court has repeatedly stated that the fact that the State from which a vehicle has traveled is a drug-source State or that the destination of the vehicle is a drug-destination State should not be considered in determining whether to stop or detain a vehicle. Yet multiple witnesses from KHP testified that officers regularly do consider those facts and are trained to do so. (We have already noted that after our decision in *Vasquez*, 834 F.3d 1132, was issued in 2016, the legal counsel for KHP made no changes to the training materials, believing that the decision did not

[14] Up to this point, this has been an opinion by Judge Federico for a unanimous panel. The remainder of this opinion is by Judge Hartz, joined by Judge Kelly except for footnote 15.

change the substantive law and that troopers did not need to be aware of it.) Plaintiffs have made no showing that officers will persist in this practice even after being trained not to do so. The record indicates that such corrective training began after this suit was filed, but there was no evidence presented to the district court regarding the impact of training.

Perhaps, though we have our doubts, the broad injunctive relief ordered here would have been acceptable in similar circumstances with respect to a possible private party. But the demands of federalism prohibit federal courts from ordering such broad relief against a state agency without a strong showing of necessity. As we have said, "In fashioning injunctive relief against a state agency or official, a district court must ensure that the relief ordered is no broader than necessary to remedy the federal violation." *Eaglemed LLC v. Cox*, 868 F.3d 893, 905 (10th Cir. 2017) (brackets and internal quotation marks omitted). "Fundamental precepts of comity and federalism admit of no other rule." *Id.* (brackets and internal quotation marks omitted).

This court's view is hardly an innovation. Invoking "principles of federalism," the Supreme Court 50 years ago wrote, "Where . . . the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law." *Rizzo*, 423

U.S. at 378 (internet quotation marks omitted). "Congress plainly intended declaratory relief to act as an alternative to the strong medicine of the injunction." *Steffel v. Thompson*, 415 U.S. 452, 466 (1974).

This is not to say that broader injunctive relief may not ultimately be imposed. It is just that there needs to be a showing that such relief is necessary. For example, in *Knox v. Salinas*, 193 F.3d 123 (2d Cir. 1999) (per curiam), the question was the appropriate remedy for violations of due process by the Commissioner of Motor Vehicles in selling towed vehicles. The district-court injunction prescribed detailed remedial notification procedures relating to towing. *See id.* at 125. The appellate court reversed for lack of a showing that new agency regulations, adopted after the suit was brought, were inadequate. *See id.* at 130; *see also Ruiz v. Estelle*, 679 F.2d 1115, 1145 (5th Cir.), *amended in part, vacated in part on other grounds*, 688 F.2d 266 (5th Cir. 1992) (stating in prison-reform case that, federal courts should "fashion the least intrusive remedy that will still be effective" and that "the remedy should begin with what is absolutely necessary" (internal quotation marks omitted)); *Toussaint v. McCarthy*, 801 F.2d 1080, 1107–1108 (9th Cir. 1986) ("An injunction must be narrowly tailored to cure the constitutional violation and must not intrude on the functions of state officials unnecessarily."); *Marie v. Mosier*, 196 F. Supp. 3d 1202, 1213 (D. Kan. 2016) (court originally entered declaratory judgment

with respect to permitting same-sex marriages but, in light of evidence of noncompliance, later issued injunction).

In limiting the scope of the injunction, we are not, as suggested by the partial dissent, "'refus[ing] to decide a case in deference'" to the State of Kansas. Partial Dissent at 2 (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013)). Nor are we "turn[ing] a blind eye" to constitutional violations. *Id.* at 3. On the contrary, we are emphatically reminding KHP that it has been violating the Constitution. That misconduct must end. The issue is solely one of the appropriate initial remedy. A more vigorous remedy would be required if the misconduct continues.

**2. The Two-Step**

In light of circuit precedent, we do not think that the record supports injunctive relief regarding the Two-Step practice of the KHP. This circuit has never held that this practice has violated a driver's constitutional rights and has repeatedly upheld that practice in specific cases.

The district court issued a comprehensive injunction to control the use of the Kansas Two-Step by state police officers. The heart of its concern was that the officers' tactics rendered the drivers' consents involuntary. The court complained of such matters as the officers not informing drivers of a right to refuse to talk to them (telling the drivers "have a good day" rather than "you are free to go") and not moving far enough away from the vehicle

for a long enough time. The problem is that the precedent in this circuit is contrary to that view of the law.

The issue posed when deciding the propriety of the Two-Step is whether, as a result of the procedure, the encounter between the officer and the driver has become a Fourth Amendment seizure rather than a consensual encounter. In the following discussion, we assume that the initial detention of the vehicle was supported by reasonable suspicion, probable cause, or consent. Otherwise, whatever occurs during the Two-Step procedure may already be constitutionally tainted. If, for example, the stop was unlawfully based on the state of origin of the car, any encounter after the Two-Step may be the fruit of that constitutional violation.

To determine whether or not an encounter with an officer is a seizure, we ask whether "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 436 (1991). In other words, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Id.* at 437 (internal quotation marks omitted). This test is an objective one; it does not depend on the subjective state of mind of the person encountering an

officer, and it "presupposes an *innocent* person." *Id.* at 438. This court considers the following nonexclusive factors:

> (1) the location of the encounter, particularly whether it occurred in an open place within the view of people other than officers or a small, enclosed space without other members of the public nearby; (2) the number of officers involved; (3) whether an officer touched the defendant or physically restrained the defendant's movements; (4) the officer's attire; (5) whether the officer displayed or brandished a weapon; (6) whether the officer used aggressive language or tone of voice that indicated compliance with a request might be compelled; (7) whether and for how long the officer retained the defendant's personal effects, such as identification; and (8) whether the officer advised the defendant that he had the right to terminate the encounter.

*United States v. Tafuna*, 5 F.4th 1197, 1201 (10th Cir. 2021); *see United States v. Mercado-Gracia*, 989 F.3d 829, 836 (10th Cir. 2021).

In the present context, however, we need not—we should not—reinvent the wheel. We have a robust body of case law applying those factors in the very context of this case—police requests to talk further with the driver after a traffic stop on a highway has been completed.

In *United States v. West*, 219 F.3d 1171, 1177 (10th Cir. 2000), the officer returned the driver's documents and then addressed the driver "'without any additional detention or restriction.'" The officer did not "'hold, detain or block the vehicle,'" and the officer did not "use[] a commanding or threatening manner or tone of voice, display[] a weapon or touch[] [the driver]." *Id.* The officer "likely stood relatively close to the vehicle to avoid

being hit by traffic on the busy interstate." *Id.* We held that "the post-stop conversation was consensual." *Id.* This result is inconsistent with the view that the officer must move away from the vehicle and wait to continue the conversation for several seconds after returning the documents.

In *United States v. Bradford*, 423 F.3d 1149, 1158 (10th Cir. 2005), we said that "[a]n officer is not required to inform a suspect that she does not have to respond to his questioning or that she is free to leave." In that case the driver was in the officer's patrol car when the officer returned her documents and began asking further questions; then, after he "told [her] to have a safe trip" and she left the patrol car, he followed her and asked further questions. *Id.* at 1159. We held that the encounters were consensual, noting that there was no indication of a "coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled." *Id.* (internal quotation marks omitted). This holding cannot be reconciled with the requirements of the injunction.

Also inconsistent with the injunction is our holding in *United States v. Ledesma*, 447 F.3d 1307, 1314–15 (10th Cir. 2006). The officer handed the driver a written warning for a temporary-tag violation and returned her license and registration. *See id.* at 1314. "After explaining the warning, he

added in an ordinary, non-threatening voice, 'Thank you girls. You have a safe one.'" *Id.* at 1314–15. Following that exchange, the trooper asked the driver and a passenger several questions. *See id.* at 1315. We held that the continuation of the encounter was consensual: "At that point, a reasonable person would have felt free to leave. Phrases like 'thank you' and 'have a safe one' signal the end of an encounter, and afford a defendant an opportunity to depart. Although he did not explicitly inform [the driver] and her passenger that they were free to leave, [the officer's] words of farewell suggested that any subsequent discussion was consensual." *Id.* at 1315; *accord United States v. Hunter,* 663 F.3d 1136, 1144–45 (10th Cir 2011) (after returning papers, officer told driver to have a safe journey and walked away from the car but then "turned around and immediately began asking questions"); *see also Mercado-Gracia*, 989 F.3d at 837 (officer told driver that he was free to go, although that is not required for encounter to be consensual); *United States v. Guerrero*, 472 F.3d 784, 786 (10th Cir. 2007) ("The officer returned the paperwork and thanked the men for their time. He walked away, then stopped after a few seconds, turned back around, and asked Mr. Guerrero several new questions, including, eventually, for consent to search the car.").

As we understand the partial dissent on this issue, it would hold that these decisions did not bind the district court here because the

determination of voluntariness is a factual issue, leaving the district court with broad discretion to disagree with the circuit opinions that have ruled otherwise. But Tenth Circuit precedent does not grant that discretion.

We are bound by this court's en banc decision in *United States v. Little*, 18 F.3d 1499 (10th Cir. 1994). The principal issue in that case was whether an encounter on a train "was a seizure implicating the Fourth Amendment, rather than a consensual encounter." *Id.* at 1503. We said that we review factual findings by the district court for clear error but "review de novo the ultimate determination of Fourth Amendment reasonableness." *Id.* (internal quotation marks omitted). We reversed the district court's order suppressing evidence on the ground that an officer's encounter with a woman in a train roomette was not consensual; we said that the lower court erred because it "apparently gave definitive weight to both the roomette setting and the failure to specifically advise [the defendant] that she need not answer questions." *Id.* at 1506.

Following *Little*, in *United States v. Abdenbi*, 361 F.3d 1282, 1291 (10th Cir. 2004), we affirmed the district court's decision that a police encounter was consensual. We held that the court's findings regarding the historical facts were "not clearly erroneous," and "conduct[ed] a *de novo* review of all the relevant circumstances to determine whether an

interaction between an individual and a law enforcement officer is a consensual encounter that does not implicate the Fourth Amendment." *Id.*

Thus, in determining whether an encounter was a Fourth Amendment seizure or consensual, what we review for clear error is the district court's findings regarding the historical facts. Whether those facts establish a consensual encounter is an issue that we review de novo. As we have summed up the standard of review:

> In reviewing the denial of a motion to suppress, this court views the evidence in the light most favorable to the government and accepts the district court's factual findings unless clearly erroneous. This court conducts a *de novo* review of all the relevant circumstances to determine whether an interaction between an individual and a law enforcement officer is a consensual encounter that does not implicate the Fourth Amendment.

*United States v. Spence*, 397 F.3d 1280, 1282 (10th Cir. 2005) (brackets, citation and internal quotation marks omitted).

As the Seventh Circuit has recognized, this standard of review is strongly supported by the reasoning of the Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 697–699 (1996), which adopted the same standard of review for questions of probable cause and reasonable suspicion. *See United States v. Wade*, 400 F.3d 1019, 1021 (7th Cir. 2005). *Ornelas* said, "We think independent appellate review of these ultimate determinations of reasonable suspicion and probable cause is consistent

with the position we have taken in past cases." *Ornelas*, 517 U.S. at 697. In language that seems particularly apt to the situation before us, the Supreme Court explained, "A policy of sweeping deference would permit, in the absence of any significant difference in the facts, the Fourth Amendment's incidence to turn on whether different trial judges draw general conclusions that the facts are sufficient or insufficient to constitute probable cause." *Id.* (brackets and internal quotation marks omitted). The very type of result we have here was on the mind of the Court: "Such varied results would be inconsistent with the idea of a unitary system of law. This, if a matter-of-course, would be unacceptable." *Id.*

And that was not the only reason for de novo review. "In addition, the legal rules for probable cause and reasonable suspicion acquire content only through application. Independent review is therefore necessary if appellate courts are to maintain control of, and to clarify, the legal principles." *Id.* The same goes for the legal meaning of *consensual* in determining whether a police encounter was a seizure. As does the third reason given by the Court: "Finally, *de novo* review tends to unify precedent and will come closer to providing law enforcement officers with a defined set of rules which, in most instances, makes it possible to reach a correct determination beforehand as to whether an invasion of privacy is justified in the interest of law enforcement." *Id.* at 697–98 (internal quotation marks omitted).

The *Ornelas* opinion recognized that so many facts can enter into the analysis of probable cause that a determination in one case will rarely bind the determination in another. *See id.* at 698. But it pointed out that there are exceptions to this general rule, and it identified several. *See id.* Here we have another exceptional context. Certainly, the issue of whether there has been a consensual encounter after a highway traffic stop and return of the driver's documents is one circumstance when an appellate ruling in one case can provide substantial guidance in many circumstances. "And even when one case may not squarely control another one, the two decisions when viewed together may usefully add to the body of law on the subject." *Id.*

The above reasoning is somewhat abstract. But this case provides several concrete illustrations. It would be inconsistent with the rule of law to have this court say that a reasonable person would not be seized just because the officer says "have a safe trip" rather than "you are free to leave," while a district court in this circuit holds to the contrary. Or to have this court say that an encounter is consensual even if an officer takes just one step away from the vehicle before asking permission to continue questioning the driver, while a district court suppresses evidence on virtually identical facts. The fact-finding by the district court to which we give deference is only the finding of the historical facts, such as what the officer said and did. Whether, on given historical facts, the actions of an officer would render an

encounter a seizure is a matter for de novo review by appellate courts, not a "factual" issue subject to the discretion of the trial judge.[15]

[15] The standard of review described in the text is for district-court rulings on whether an encounter with a law-enforcement officer was a Fourth Amendment seizure or a consensual encounter. In reviewing a decision that a consent *to search* was voluntary, we have used a different standard, at least on occasion. *See, e.g., United States v. Zubia Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001) (reviewing a ruling on voluntariness for clear error). But, particularly in light of the Supreme Court decision in *Ornelas*, I have some confidence that, if presented with the issue, the Court would apply the above standard of review in the context of a purportedly consensual search.

Indeed, it may have already done so. In *Schneckloth v. Bustamonte*, 412 U.S. 218 (1972), the Court rejected, on habeas review (long before enactment of The Antiterrorism and Effective Death Penalty Act of 1996), the decision by the Ninth Circuit that a consent to search a vehicle could not be considered voluntary unless the consenter knew "that his consent could have been withheld and that he could have refused to have his vehicle searched," *id.* at 222. Guided by its precedents regarding whether a confession was voluntary, *see id.* at 223–24, the Court held that resolving the question of voluntariness requires "analyzing all the circumstances of an individual consent," and that "proof of knowledge of the right to refuse consent is [not] a necessary prerequisite to demonstrating a 'voluntary' consent," *id.* at 232–33.

Summarizing its ruling at the end of the opinion, the Court emphasized the need to conduct a holistic inquiry, stating, "*Voluntariness is a question of fact* to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." *Id.* at 248–249 (emphasis added). Because our general rule is that we review fact findings for clear error, the emphasized language in that sentence has been cited as authority for the proposition that the entire question of voluntariness is subject only to review for clear error. But that sentence in *Schneckloth* did not mention the standard of review. Rather, the point of the statement—indeed, the whole point of the opinion—was that *all the facts* (not just one feature, such as the subject's knowledge of the right to refuse) have to be

considered by the court to resolve whether consent was voluntary. The Court was not focused on which court has the final word.

Indeed, other language in the opinion strongly implies that the proper standard of review is the same as what we have applied in this opinion. To begin with, the Court emphasized that the notion of voluntariness is a complex one. "It cannot be taken literally to mean a 'knowing' choice. . . . Rather, 'voluntariness' has reflected an accommodation of the complex of values implicated in police questioning of a suspect." *Id.* at 224–25. "Accommodating a complex of values" is the essence of appellate review, not the bailiwick of the trial court.

Further, *Schneckloth* relied on an area of the law in which de novo review on appeal had been, and continues to be, the rule. I have already mentioned that *Schneckloth* first turned to its precedent regarding voluntary confessions. It stated: "In some 30 different cases decided during the [prior 40 years] . . . the Court was faced with the necessity of determining whether in fact the confessions in issue had been 'voluntarily' given. It is to that body of case law to which we turn for initial guidance on the meaning of 'voluntariness' in the present context." *Id.* at 223–24 (citations and footnote omitted). What the Court drew from that body of law was that a determination of "voluntariness" requires consideration of profound policy (that is, legal) issues and that each case will depend on the particular circumstances. And, although this was not the focus of the opinion, the Court repeatedly said that it was the Supreme Court that had to make the decision based on the historical facts. *See, e.g., id.* at 226 ("In determining whether a defendant's will was overborne in a particular case, the Court [referring to the Supreme Court] has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation"); *id.* ("In all of these cases, the Court determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted. *Culombe v. Connecticut*, [367 U.S. 566], 603 [1961]"). The citation to *Culombe* is of particular significance because the referenced passage specifically addresses the standard of review, albeit in dense professorial language. And that standard of review amounted to review of findings of historical fact for clear error and de novo review for the remainder of the analysis. *See Culombe*, 367 U.S. at 603–05.

In any event, it is settled Supreme Court law that on the question of the voluntariness of a confession, the application of the law to the facts is reviewed de novo by appellate courts. *See U.S. Bank N.A. Nat'l Ass'n v.*

The partial dissent attempts to provide comfort by describing the district court's injunction as amounting to no more than "a narrow command to use [the Two-Step] lawfully." Partial Dissent at 6. It says that "[t]he only actions enjoined are uses of the Two-Step to extend traffic stops of motorists without reasonable suspicion without the motorists' knowing, intelligent, and voluntary consent." *Id.* at 5 (internal quotation marks omitted). But if that were really all the guidance given by the district court's injunction—that is, the injunction merely told KHP to obey the law—then the injunction would be fatally flawed on that account alone. To be fair to the enjoined party and to enable proper appellate review, every injunction order must "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(B), (C); *see*

---

*Village at Lakeridge, LLC*, 583 U.S. 387, 396 n.4 (stating that "[i]n the constitutional realm, . . . we have often held that the role of appellate courts in marking out the limits of a standard through the process of case-by-case adjudication favors *de novo* review even when answering a mixed question primarily involves plunging into a factual record," and citing in support "*Miller v. Fenton*, 474 U.S. 104, 115–116 (1985) (voluntariness of confession under the Fourteenth Amendment's Due Process Clause)" (original brackets and internal quotation marks omitted). It would be remarkable if the Supreme Court adopted a different standard of review for consent to search, when *Schneckloth* predicated its analysis on confession cases and nothing in that opinion suggests a difference in the two lines of cases that would justify a different standard of review. Given the number of appellate opinions applying the clearly-erroneous standard of review for consent to search, I hope that the Supreme Court has the opportunity to clarify the matter in the near future.

*Schmidt v. Lessard*, 414 U.S. 473, 476–77 (1974) (explaining the reasons for requiring specificity). "Obey the law" orders do not pass muster. *See Keyes v. Sch. Dist. No. 1, Denver, Colo.*, 895 F.2d 659, 668 (10th Cir. 1990) ("[G]enerally, injunctions simply requiring the defendant to obey the law are too vague. Paragraph 4 of the interim decree does no more than require the district to obey the law, and therefore must be stricken." (citation omitted)); 11A *Wright and Miller's Federal Practice and Procedure* § 2955 (3d ed. 1998) ("[O]rders simply requiring defendants to 'obey the law' uniformly are found to violate the specificity requirement [of Rule 65(d)(1)(B)].").

We set aside as an abuse of discretion the portion of the district court's injunction that concerns the Kansas Two-Step.

## IV. CONCLUSION

For the above reasons, we **AFFIRM** the district court's injunction in part, **REVERSE** it in part, and **REMAND** for further proceedings consistent with this opinion.

While I agree with the majority's decision to preserve the portions of the district court's injunction mandating revised training, I would not stop there. In my view, given the violations of our precedent by KHP, we should afford the district court greater discretion and the opportunity to revise its injunction.

**I**

I acknowledge that a district court may abuse its discretion if it violates the "well-settled principle that an injunction must be narrowly tailored to remedy the harm shown." *Citizen Band Potawatomi Indian Tribe of Oklahoma v. Oklahoma Tax Comm'n*, 969 F.2d 943, 948 (10th Cir. 1992). The remedial measures prescribed by the district court, acknowledged by Plaintiffs during oral argument to be "strong medicine," Oral Arg. at 25:32, are so extensive that they cannot all be considered narrowly tailored to remedy the constitutional violations found. For example, some remedial measures raise concerns that the cost of compliance will become too great a burden and outweigh the benefit to motorists. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." (citation omitted))

Still, I cannot agree with the majority that KHP's actions were a result of a simple error by KHP legal counsel who did not believe *Vasquez* changed substantive law, so troopers did not need to be aware of it. Op. at 35. That understates, by a mile, the record of what happened here. The rule set by *Vasquez* was clear: do not detain and search drivers because they are traveling from out of state and do not consider their state of residency in determining reasonable suspicion. The trial evidence, record of the case, and the district court's findings make it clear that KHP *intentionally* ignored this rule. *See Shaw v. Jones*, 683 F. Supp. 3d 1205, 1241 (D. Kan. 2023). Indeed, KHP's Assistant Superintendent publicly stated that the highway patrol "cannot ask" troopers to follow *Vasquez*, even though that is what the Fourth Amendment requires. Aplt. App. XXIII at 97–98. When state agencies purposely flout the Constitution, it necessitates meaningful injunctive relief.

The majority concludes that "the demands of federalism" limit the scope of relief that we can grant. Op. at 35. But the Supreme Court has established that federal courts should only limit their review on federalism grounds in narrow instances where there are ongoing state court proceedings. *See Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013) ("[O]nly exceptional circumstances . . . justify a federal court's refusal to decide a case in deference to the States.") (first alteration in original) (citation and internal quotation marks omitted)). In all other circumstances, we must adhere to the "virtually

unflagging obligation of the federal courts to exercise the jurisdiction given them." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). There may be reasons for "caution" when a federal court grants an injunction against a state governmental body that is "mandatory rather than prohibitory." *Signature Properties Int'l Ltd. P'ship v. City of Edmond*, 310 F.3d 1258, 1269 (10th Cir. 2002). But the exercise of caution does not mean that federal courts should turn a blind eye to evidence that proves a state policy and practice of violating individuals' constitutional rights. *See* Chemerinsky, Smith, and Vladeck Am. Br. at 21–22.

There is also a converse federalism concern to acknowledge. The focus of this case is not simply KHP and Kansas. In a case involving interstate travel, we must consider national implications. "Long ago, the Supreme Court explained the right of interstate travel is inherent in the fact that '[t]he people of these United States constitute one nation.'" *Maehr v. U.S. Dep't of State*, 5 F.4th 1100, 1118 (10th Cir. 2021) (alteration in original) (quoting *Crandall v. Nevada*, 73 U.S. 6 Wall. 35, 43 (1867)). Likewise, this court has recognized that the right to interstate travel is "expressly protected" under Article IV, § 2 of the Constitution, the Privileges and Immunities Clause. *Peterson v. Martinez*, 707 F.3d 1197, 1213 (10th Cir. 2013) (citation and internal quotation marks omitted). And the Privileges and Immunities Clause "implicates not only the individual's right to nondiscriminatory treatment but also, perhaps more so,

the structural balance essential to the concept of federalism." *Austin v. New Hampshire*, 420 U.S. 656, 662 (1975). The other forty-nine states and tribal nations have an interest in ensuring that their drivers are not unconstitutionally detained by Kansas troopers deliberately targeting out-of-state drivers on interstate highways.

On remand, I would ask the district court to closely scrutinize its required remedial actions and order only those that can be easily administered by KHP with the resources already at its disposal. The district court is in a better position than we are to revise its own language considering the facts of this case and the legal requirements of our opinion. *See M.G. through Garcia v. Armijo*, 117 F.4th 1230, 1249 (10th Cir. 2024) ("[T]he district court has broad power to deal with unique intricacies of each case, 'for breadth and flexibility are inherent in equitable remedies.'" (quoting *United States v. Paradise*, 480 U.S. 149, 183–84 (1987))).

**II**

The majority's analysis as to the Kansas Two-Step is also flawed. The Two-Step most commonly comes before this court in the context of a criminal case where we are tasked to review the legality of a search that led to the discovery of criminal contraband later charged as part of the criminal offense. In that context, this court has indeed found that the Two-Step does not categorically make an encounter unlawfully coercive. *See United States v.*

*Ledesma*, 447 F.3d 1307, 1314–15 (10th Cir. 2006). That is unsurprising because the Supreme Court has instructed us to avoid categorical approaches to the Fourth Amendment. *See Ohio v. Robinette*, 519 U.S. 33, 39 (1996) ("[W]e have consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry."). "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *see also Robinette*, 519 U.S. at 40. Given the particularized nature of this factual inquiry, we cannot categorically say that the Two-Step is always lawful any more than we can say that it is always unlawful.

Whether a given use of the Two-Step is coercive depends on the totality of the circumstances of the stop and how the tactic is implemented against the driver. The district court's injunction was specifically aimed at curtailing KHP's particular use of the Two-Step in a patently unlawful manner. *Shaw*, 683 F. Supp. 3d at 1247 ("*[I]n the circumstances present in this case*, troopers unlawfully detained drivers[.]" (emphasis added)). The only actions enjoined are uses of the Two-Step "to extend traffic stops of motorists without reasonable suspicion or without the motorists' knowing, intelligent, and voluntary consent." Aplt. App. II at 215. In other words, the only prohibited uses of the Two-Step are those that are already unlawful under our precedents.

*See Ledesma*, 447 F.3d at 1314. The district court's injunction is not a blanket prohibition on using the Two-Step, but rather a narrow command to use it lawfully coupled with associated remedial measures to ensure compliance.

The majority discusses several criminal cases where we affirmed evidentiary rulings that the Two-Step was consensual and concludes that these precedents make the district court's findings defective as a matter of law. However, the utility of these cases may be limited when the voluntariness of a driver's consent "is a question of fact, determined by the totality of the circumstances and reviewed for clear error."[1] *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001); *see also United States v. Davis*, 636 F.3d 1281, 1292 (10th Cir. 2011). To be sure, it is our responsibility to review and consider the district court's findings of fact and then, applying de novo review, make an "ultimate determination of reasonableness under the Fourth

[1] The majority claims, incorrectly, that my position is that the district court should ignore precedent from this court. Op. Br. at 42-43. Rather, my point is that each police-motorist encounter must stand on its own because the question whether a consent to search is voluntary is a question of fact, wherein a court must consider the totality of the circumstances. Indeed, *Schneckloth*, an opinion handed down fifty-three years ago and one that has been cited thousands of times by lower courts, makes this exact point twice in the opinion. 412 U.S. at 227, 248-49. Our precedent as to voluntariness and reasonableness informs this analysis and must be applied by district courts in this circuit. However, the variation in facts and circumstances may lead to different outcomes, as it did here, because none of our precedent "turned on the presence or absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances." *Id*. at 226.

Amendment[.]" *United States v. West*, 219 F.3d 1171, 1177 (10th Cir. 2000). But de novo review is not a back door allowing plenary review of the district court's factual findings. Our ultimate legal determination must be based on "subsidiary factual questions" answered by the district court and reviewed for clear error. *United States v. McNeal*, 862 F.3d 1057, 1061 (10th Cir. 2017) ("On the specific issue of coercion, we review 'subsidiary factual questions, such as whether the police intimidated or threatened a suspect … under the clearly erroneous standard,' but we review de novo the ultimate issue of voluntariness, which is a question of law." (quoting *United States v. Short*, 947 F.2d 1445, 1449 (10th Cir. 1991))).

The district court properly received evidence and considered the totality of the circumstances of several stops where KHP used the Two-Step and then found that the drivers involved did not give voluntary consent. Troopers used phrases like "Have a safe trip[,]" "Take care[,]" and "Have a good day." *Shaw*, 683 F. Supp. 3d at 1246. While these phrases typically "signal the end of an encounter, and afford a defendant an opportunity to depart[,]" *Ledesma*, 447 F.3d at 1315, troopers would then immediately re-engage. In two of the traffic stops, troopers "waited less than one second between disengaging and re-engaging with the driver[.]" *Shaw*, 683 F. Supp. 3d at 1247. These troopers remained near the driver's car, taking only "between one and four steps from the vehicle before turning to re-engage with the drivers." *Id.* In one case, a

trooper leaned his arms and head through the passenger window. *Id.* Under such circumstances, the district court found that a driver would "not feel free to leave because" a KHP trooper "was too close to his car to do so safely." *Id.* at 1222.

These same circumstances and corresponding findings of fact were not present in the prior Two-Step cases examined by the majority. *See West*, 219 F.3d at 1177 (10th Cir. 2000); *United States v. Bradford*, 423 F.3d 1149, 1158 (10th Cir. 2005); *Ledesma*, 447 F.3d at 1314–15. Given the district court's findings that KHP troopers remained too close to drivers for them to safely leave, we cannot analogize this case to other cases where there was no "additional detention or restriction" and where law enforcement did not "hold, detain or block the vehicle." *West*, 219 F.3d at 1177 (quoting the district court). While the majority identifies other common factors between this case and our precedents, no one factor "is dispositive, however, as a court must consider all the circumstances surrounding the encounter." *Ledesma*, 447 F.3d at 1314 (citation and internal quotation marks omitted). The district court is in a far better position than we are to consider those circumstances. In fact, every single case cited by the majority affirmed the district court's factual findings that the encounters involved were consensual. *See West*, 219 F.3d at 1177; *Bradford*, 423 F.3d at 1158–59; *Ledesma*, 447 F.3d at 1314; *United States v. Hunter,* 663 F.3d 1136, 1145 (10th Cir 2011); *United States v. Mercado-Gracia*,

989 F.3d 829, 837 (10th Cir. 2021); *United States v. Guerrero*, 472 F.3d 784, 786, 790 (10th Cir. 2007). Now, when the district court has found a lack of consent, our deferential standard of review does not suddenly evaporate.

We can only overturn the district court's underlying factual findings if we believe them to be clear error. *Zubia-Melendez*, 263 F.3d at 1162. "A finding of fact is clearly erroneous if it is without factual support in the record or if the appellate court, after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been made." *Nieto v. Kapoor*, 268 F.3d 1208, 1217 (10th Cir. 2001) (quoting *Tosco Corp. v. Koch Indus., Inc.,* 216 F.3d 886, 892 (10th Cir. 2000)). The district court provided ample support in the record for its findings, and I have no reason to think that it has made a mistake.

No "reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter" under the facts found by the district court. *Florida v. Bostick*, 501 U.S. 429, 436 (1991). Given the evidence and this record, could any motorist – even one well versed in Fourth Amendment law and aware of the Two-Step – honestly believe that they are free to drive off from a traffic stop when a state trooper continues to stand next to their vehicle window asking questions? That presents safety concerns, which do not change just because a trooper tells a driver to "take care." As the district court found, following a trial and extensive findings of fact, the entire purpose of KHP's training on the Two-Step was to coerce drivers into feigned consent. I cannot

join the majority's approach to brush aside the fact-and-circumstance-based inquiry required by our precedents.

**III**

In the introduction to its order that meticulously and laboriously made findings to merit the granting of the permanent injunction, the district court exclaimed that KHP "has waged war on motorists – especially out-of-state residents traveling between Colorado and Missouri on federal highway I-70 in Kansas." *Shaw*, 683 F. Supp. 3d at 1215. Hyperbole aside, the district court's point, and ultimately its findings, were largely correct.

Rather than scrapping all but the training requirement (which is insufficient to cure the constitutional violations that occurred here), I would reverse and vacate all remedial measures in Section III of the injunction because its requirements and prohibitions are "broader than necessary to remedy the [constitutional] violation." *EagleMed LLC v. Cox*, 868 F.3d 893, 905 (10th Cir. 2017) (citation omitted). I would then remand to require the district court to impose only those remedial measures that are narrowly tailored to address KHP's constitutional violations. I respectfully dissent from only the part of the majority opinion (beginning on III.C.1) that stops short of this result.